

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2008 MAR -7  PM 3: 34

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KURIAN DAVID, SONY VASUDEVAN SULEKHA, PALANYANDI THANGAMANI, MARUGANANTHAM KANDHASAMY, HEMANT KHUTTAN, ANDREWS ISSAC PADAVEETTIYL, and DHANANJAYA KECHURU, on behalf of other similarly situated individuals, and SABULAL VIJAYAN, KRISHAN KUMAR, JACOB JOSEPH KADDAKKARAPPALLY, KULDEEP SINGH, AND THANASEKAR CHELLAPPAN, individually, Plaintiffs, v. SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS). Defendants. | **08-1220** **SECT. A MAG 3** Civ. No. Complaint -- Class Action and Collective Action |

## COMPLAINT

1. In the aftermath of Hurricane Katrina, Plaintiff class members, over 500 Indian men,

were trafficked into the United States through the federal government's H-2B guestworker

Fee $350.
Process
x Dktd
CtRmDep
Doc. No.

program to provide labor and services to Defendant Signal International LLC ("Signal").

Plaintiffs were subjected to forced labor as welders, pipefitters, shipfitters, and other marine

fabrication workers at Signal operations in Pascagoula, Mississippi and Orange, Texas.

2.   Plaintiffs, individually and on behalf of similarly situated workers, bring this action

to recover for damages inflicted by Signal and Signal's recruiters and agents operating in India,

the United Arab Emirates, and the United States. Defendants have exploited and defrauded

Plaintiffs and other class members by fraudulently recruiting them to work in the United States

and effectuating a broad scheme of psychological coercion, threats of serious harm and physical

restraint, and threatened abuse of the legal process to maintain control over Plaintiffs and other

class members.

3.   Lured by Defendants' fraudulent promises of legal and permanent work-based

immigration to the United States for themselves and their families, Plaintiffs and other class

members plunged their families into debt. Plaintiffs and other class members incurred

substantial debt, liquidated their life savings, and sold their family homes to pay mandatory

recruitment, immigration processing, and travel fees charged by Defendants totaling as much as

$20,000 per worker. Trusting in the immigration and work benefits promised by Defendants,

Plaintiffs and other class members further surrendered stable employment opportunities in India

and as guestworkers in the Persian Gulf.

4.   Defendants' main recruiting agents in India and the United Arab Emirates held

Plaintiffs' and other class members' passports and visas and threatened, coerced, and defrauded

Plaintiffs and other class members into paying extraordinary fees for recruitment, immigration

processing and travel.  Defendants further caused Plaintiffs and other class members to believe

that if they did not work for Signal under the auspices of temporary and Signal-restricted H-2B

guestworker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, and/or other serious harms.

5.  Upon Plaintiffs' and other class members' arrival in the United States, Signal required them to live in guarded, overcrowded, and isolated labor camps. Signal further deceived Plaintiffs and other class members regarding their visa status, threatened Plaintiffs and other class members with loss of immigration status and deportation, and generally perpetrated a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs and other class members afraid, intimidated, and unable to leave Signal's employ.

6.  On March 9, 2007, Signal, in coordination with Defendant Sachin Dewan ("Dewan") and private security guards, attempted to forcibly and unlawfully deport Plaintiffs Sabulal Vijayan and Jacob Joseph Kadakkarappally in retaliation for speaking out against discriminatory conditions in Signal's labor camp in Pascagoula, Mississippi. Signal similarly attempted to forcibly and unlawfully deport Plaintiffs Kuldeep Singh, Thanasekar Chellappan, and Krishan Kumar.

7.  Terrified by the threat of imminent deportation and the security guards pursuing him, Plaintiff Vijayan attempted suicide and had to be taken to a local hospital. Amidst the chaos, Plaintiff Singh hid and escaped the Signal labor camp. Signal personnel and security guards successfully forced Plaintiffs Kadakkarappally, Chellappan, and Kumar into a locked and guarded room. There, Signal detained Plaintiffs Kadakkarappally, Chellappan, and Kumar for several hours, refusing their pleas for water and access to the bathroom.

8.  Witnessing and/or hearing of the events of March 9, 2007, the remaining Plaintiffs and other class members at Signal's operations in Mississippi and Texas reasonably feared that they would suffer harm or physical restraint if they left employment with Signal. Deeply

fearful, isolated, disoriented, and unfamiliar with their rights under United States law, these workers felt compelled to continue working for Signal.

9.   Plaintiffs assert class action claims against Defendants arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA"); the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985); collective action claims under the Fair Labor Standards Act (FLSA); and claims for damages arising from fraud/negligent misrepresentation and breach of contract. Plaintiffs Sabulal Vijayan, Jacob Joseph Kadakkarappally, Kuldeep Singh, Krishan Kumar, and Thanasekar Chellappan also bring individual claims arising from the retaliation in violations of the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985), false imprisonment, assault, battery, intentional infliction of emotional distress and/or negligent infliction of emotional distress.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. § 1964(c) (RICO), 28 U.S.C. § 1343 (civil rights), and 29 U.S.C. § 216(b) (FLSA).

11. This Court has supplemental jurisdiction over causes of action based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts which support the federal claims.

12. Venue in the Eastern District of Louisiana is proper under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 in that various Defendants and/or agents of Defendants, including Malvern C. Burnett, the Law Offices of Malvern C. Burnett, A.P.C., Gulf Coast Immigration Law Center

L.L.C., Kurella Rao, and Indo-Amerisoft, L.L.C., reside and/or may be found in New Orleans and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in and around the New Orleans area.

13. Declaratory and injunctive relief are sought under 28 U.S.C. § 2201 *et seq.*

## PARTIES

### Plaintiffs

14. Plaintiffs are Indian nationals and former or current H-2B guestworkers who were recruited from India and/or the United Arab Emirates by Defendants at various points between 2003 and 2007.

15. Plaintiffs are of South Asian Indian descent.

16. At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by RICO, 18 U.S.C. § 1961(3).

17. At all relevant times, Plaintiffs were employed by Signal as defined by the FLSA, 29 U.S.C. § 203(g).

18. At all relevant times, Plaintiffs were engaged in commerce and/or in the production of goods for sale in interstate commerce.

### *The Group I Plaintiffs*

19. Class representative Plaintiff Dhananjaya Kechuru was recruited in 2003 from the United Arab Emirates and India for work in the United States. After arriving in the United States in 2007, Kechuru worked at Signal's Orange, Texas facility.

20. Class representative Plaintiff Andrews Issac Padaveettiyl was recruited in 2004 from the United Arab Emirates and India for work in the United States. After arriving in the United States in 2006, Andrews worked at Signal's Pascagoula, Mississippi facility.

21. Throughout this Complaint, Plaintiffs refer to Plaintiffs Padaveettiyl and Kechuru as the "Group I Plaintiffs."

*The Group II Plaintiffs*

22. Class representative Plaintiff Kurian David was recruited in 2006 from the United Arab Emirates and India for work in the United States. After arriving in the United States in 2007, David worked at Signal's Orange, Texas facility.

23. Class representative Plaintiff Sony Vasudevan Sulekha was recruited in 2006 from India for work in the United States. After arriving in the United States in 2006, Sulekha worked at Signal's Pascagoula, Mississippi facility.

24. Class representative Plaintiff Maruganantham Kandhasamy was recruited in 2006 from India for work in the United States. After arriving in the United States in 2007, Kandhasamy worked at Signal's Orange, Texas facility.

25. Class representative Plaintiff Palanyandi Thangamani was recruited in 2006 from India for work in the United States. After arriving in the United States in 2006, Thangamani worked at Signal's Pascagoula, Mississippi facility.

26. Class representative Plaintiff Hemant Khuttan was recruited in 2006 from India for work in the United States. After arriving in the United States in 2007, Khuttan worked at Signal's Pascagoula, Mississippi facility.

27. Throughout this Complaint, Plaintiffs refer to Plaintiffs David, Sulekha, Kandhasamy, Thangamani, and Khuttan as the "Group II Plaintiffs."

*Individual Plaintiffs*

28. Individual Plaintiff Sabulal Vijayan was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States. Vijayan worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated him on March 9, 2007.

29. Individual Plaintiff Jacob Joseph Kaddakkarappally was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States. Kaddakkarappally worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated him on March 9, 2007.

30. Individual Plaintiff Thanasekar Chellappan was recruited beginning in 2006 from India for work in the United States. Chellappan worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated him on March 9, 2007.

31. Individual Plaintiff Kuldeep Singh was recruited beginning in 2006 from India for work in the United States. Singh worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated him on March 9, 2007.

32. Individual Plaintiff Krishan Kumar was recruited beginning in 2006 from India for work in the United States.  Kumar worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated him on March 9, 2007.

<u>Defendants</u>

*The Employer Defendant*

33. Defendant Signal International, LLC is a corporation organized under the laws of Delaware, is a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas, and Pascagoula, Mississippi.

*The Recruiter Defendants*

34. Defendant Global Resources, Inc. ("Global") is a corporation organized under the laws of Mississippi and is engaged in the business of recruiting workers from India for employment in the United States. Global has substantial business contacts with New Orleans, Louisiana.

35. Defendant Michael Pol ("Pol"), the President of Global Resources, Inc., resides in Mississippi, and has substantial business contacts with New Orleans, Louisiana.

36. Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India, which maintains offices in Mumbai (Bombay), India, and Dubai, United Arab Emirates. Defendant Dewan Consultants has substantial business contacts with New Orleans, Louisiana.

37. Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants, resides in India, and has substantial business contacts with New Orleans, Louisiana.

38. Upon information and belief, Defendants Dewan and Dewan Consultants authorize and use Defendants Pol and Global as their United States-based branch of operations and/or agents.

39. Upon information and belief, Defendants Pol and Global authorize and use Defendants Dewan and Dewan Consultants to act as their India and United Arab Emirates-based branch of operations and/or agents.

40. Upon information and belief, Defendants Dewan, Dewan Consultants, Pol, and Global acted as a joint venture with respect to the recruitment, contracting, and provision of Plaintiffs for labor or services.

41. Defendants Pol and Global Resources utilize Defendants Dewan and Dewan Consultants to conduct and carry out their shared business interests and activities in India and

the United Arab Emirates. Among other things, Defendants Pol and Global Resources share

offices with Defendants Dewan and Dewan Consultants in India and the United Arab Emirates.

42. Upon information and belief, Defendants Dewan and Dewan Consultants utilize

Defendants Pol and Global Resources to conduct and effectuate their shared business interests

and activities in the United States.

43. Throughout this Complaint, Plaintiffs refer to Defendants Dewan, Dewan

Consultants, Pol, and Global collectively as "the Recruiter Defendants."

*The Legal Facilitator Defendants*

44. Defendant Malvern C. Burnett ("Burnett") is an attorney who resides in and

maintains offices in New Orleans, Louisiana.

45. Defendant Gulf Coast Immigration Law Center L.L.C. ("GCILC") is a limited

liability corporation organized under the laws of Louisiana and located in New Orleans,

Louisiana. Upon information and belief, Defendant Burnett serves as its sole registered agent,

member, and/or corporate officer.

46. Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a

professional law corporation organized under the laws of and located in New Orleans,

Louisiana. Upon information and belief, Defendant Burnett serves as its sole registered agent,

member, and/or corporate officer.

47. Upon information and belief, Defendants Burnett, GCILC, and Burnett Law Offices

are engaged in a joint venture and/or are alter egos in that all entities have the same corporate

mailing address, intermingle business assets, fail to operate at arms' length, and Defendant

Burnett serves as the registered agent and sole member and/or corporate officers for GCLIC and

Burnett Law Offices.

48. Upon information and belief, Defendant Burnett, GCILC, and the Burnett Law Offices have the same business objectives and Defendant Burnett uses GCILC and the Burnett Law Offices to conduct and effectuate shared business objectives.

49. Throughout this Complaint, Plaintiffs refer to Defendants Burnett, GCILC, and Burnett Law Offices collectively as "The Legal Facilitator Defendants."

### The Labor Broker Defendants

50. Defendant Indo-Amerisoft, L.L.C, a corporation organized under the laws of Louisiana and headquartered in New Orleans, Louisiana, is engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

51. Defendant Kurella Rao, the Chairman and Director of Indo-Amerisoft, LLC, maintains offices in the New Orleans, Louisiana metropolitan area and has substantial business contacts there.

52. Defendant J & M Associates of Mississippi, Inc. ("J & M"), a corporation organized under the laws of Mississippi with substantial business contacts in New Orleans, is engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

53. Throughout this Complaint, Plaintiffs refer to Defendants Indo-Amerisoft, Rao, and J & M collectively as "the Labor Broker Defendants."

### All Defendants

54. At all relevant times, Defendants Dewan, Dewan Consultants, Pol, Global, Burnett, Burnett Law Offices and GCILC acted as agents of Defendants Signal, J & M, Indo-Amerisoft

and Rao for the purposes of recruiting, obtaining, contracting, transportation and/or providing Plaintiffs for labor or services.

55. Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts with New Orleans, Louisiana.

56. At all relevant times, Defendants were "persons" within that term as defined by RICO, 18 U.S.C. § 1961(3).

57. Upon information and belief, Defendants have been engaged in and will continue to engage in ongoing contacts with Plaintiffs and/or class members, including recruiting, obtaining, labor contracting, providing immigration-related services to, transporting, harboring, providing and/or employing of Plaintiffs and/or other class members.

58. At all relevant times, Defendants operated enterprises engaged in commerce or in the production of goods for commerce.

59. At all relevant times, Defendant Signal employed Plaintiffs for the purposes of the FLSA, 29 U.S.C. § 203.

### CLASS AND COLLECTIVE ACTION ALLEGATIONS

60. Claims for damages, injunctive and declaratory relief under the TVPA, 42 U.S.C. §§ 1981 and 1985, for damages and declaratory relief under RICO, and for damages based on state law fraud and breach of contract (the First through Seventh Claims for Relief) are brought by the Class Representative Plaintiffs on behalf of themselves and all similarly situated persons pursuant to Rule 23.

61. All claims for damages under the FLSA are brought by the Class Representative Plaintiffs as a collective action pursuant to 29 U.S.C. § 216(b).

### Rule 23 Class Allegations

11

62. Class claims for injunctive relief are brought pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2). For the purposes of injunctive relief, the class consists of all Indian H-2B guestworkers who were recruited by Defendants from 2003 on and who traveled and/or were transported to the United States at any under the auspices of H-2B visas assigned to Defendant Signal International.

63. Class claims for actual, punitive and treble damages are brought pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3). For the purposes of actual, punitive and treble damages, the class consists of all Indian H-2B guestworkers who were recruited by Defendants and who traveled and/or were transported to the United States at any time from 2006 to the present under the auspices of H-2B visas assigned to Defendant Signal International.

*Rule 23(a)*

64. The precise number of individuals in the class is known only to Defendants, but the class is believed to include over 500 individuals.  Because of the number of class members and because class members are foreign nationals and migrant workers, joinder of all class members is impracticable.

65. This action involves questions of law common to the class, including:

a.  Whether Defendant Signal and the Recruiter Defendants' conduct as set out in the First and Second Claims for Relief violated the forced labor and trafficking provisions of the TVPA (18 U.S.C. §§ 1589 and 1590);

b.  Whether all Defendants' conduct as set out below in the Third Claim for Relief violated RICO Sections 1962(c) and 1962(d);

c.  Whether Defendant Signal's conduct as set out below in the Fourth Claim for Relief violated 42 U.S.C. § 1981;

    d.   Whether Defendant Signal's conduct as set out below in the Fifth Claim for Relief violated 42 U.S.C. § 1985(3);

    e.   Whether Defendants' conduct as set out below in the Sixth Claim for Relief constituted fraud and/or negligent misrepresentation for which they are legally liable;

    f.   How terms of Plaintiffs' and other class members' contracts with Defendants should be interpreted and whether Defendants breached contracts with Plaintiffs and other class members as set out in the Seventh Claim for Relief below;

    g.   The nature of damages available to Plaintiffs and other class members, including the applicability of treble, compensatory and/or punitive damages; and

    h.   Whether and what kinds of injunctive relief are appropriate.

66.   This action involves questions of fact common to the class, including:

    a.   Whether Defendant Signal and the Labor Recruiter Defendants used and/or threatened Plaintiffs and other class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other class members' labor or services;

    b.   Whether Defendant Signal and the Labor Recruiter Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

    c.   Whether Defendants conducted one or more enterprises through a pattern of racketeering activity;

d.   Whether Defendants conspired to conduct one or more enterprises through a
pattern of racketeering activity;

e.   Whether Defendants committed or agreed to commit the predicate
racketeering acts identified in the Third Claim for Relief, inter alia, mail
fraud, wire fraud, visa fraud, Travel Act violations, forced labor, trafficking,
and unlawful document-related activities in furtherance of trafficking;

f.   Whether Defendant Signal subjected Plaintiffs and other class members to
differential and discriminatory terms and conditions of employment and
created a hostile work environment;

g.   Whether Defendant Signal conspired with other actors for the purpose of
depriving Plaintiffs and other class members of their right to be free from
involuntary servitude and/or forced labor;

h.   Whether Defendants made promises and/or representations to Plaintiffs and
other class members through the mail and wires that were fraudulent;

i.   Whether such promises were made willfully or negligently;

j.   Whether Plaintiffs and other class members reasonably relied on Defendants'
fraudulent promises;

k.   Whether Defendant Signal subjected Plaintiffs and other class members to
differential and/or adverse terms and conditions of employment on the basis
of their race and/or alien status;

l.   Whether Defendant Signal conspired with other parties for the purposes of
depriving Plaintiffs and other class members of their rights to be free of
forced labor and involuntary servitude;

    m.  Whether Defendants in fact failed to comply with the terms of their contracts with Plaintiffs and other class members and, if so, which terms were breached; and

    n.  The source and amount of Plaintiffs' and other class members' damages.

67. The claims of the Class Representative Plaintiffs asserted in the First through Seventh Claims for Relief are typical of the claims of the class.

68. The Class Representative Plaintiffs will fairly and adequately protect the interests of the class.

69. Plaintiffs' counsel are experienced in handling class action litigation on behalf of guestworkers and migrant workers like Plaintiffs and are prepared to advance costs necessary to vigorously litigate this action.

*Rule 23(b)(2)*

70. Defendants have acted and/or have refused to act on grounds generally applicable to the class with respect to the claims set forth in the Fourth and Fifth Claims for Relief thereby making final injunctive relief applicable to the class appropriate under Fed. R. Civ. P. 23(b)(2), by, inter alia:

    a.    Engaging in and refusing to desist from engaging in unlawful discriminatory practices, such as requiring Plaintiffs and other class members to live in substandard segregated housing in Signal-owned labor camps;

    b.    Engaging in and refusing to desist from engaging in a common illegal scheme, plan, and/or pattern of fraudulent recruitment and immigration processing activities which attempted to force and forces Plaintiffs and other class members

to provide labor or services to Defendant Signal and which injured Plaintiffs and other class members in their business and/or property;

c.      Engaging in and refusing to desist from engaging in a common scheme, plan and/or pattern designed to cause Plaintiffs and other class members believe that they would suffer serious harm, abuse of the legal process and/or physical restraint if they did not provide labor or services to Defendant Signal; and

d.      Engaging in and refusing to desist from engaging in actions that constitute illegal labor trafficking; and

e.      Upon information and belief, Defendants' continuing involvement in similar recruitment and labor practices

71.  Upon information and belief, Defendants continue to conduct and engage in unlawful recruitment and labor practices, threatening current and future violations of Plaintiffs' and other class members' rights.

*Rule 23(b)(3)*

72. Common questions of law and fact relevant to the First through Seventh Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.

73. A class action is superior to other available methods of adjudicating the claims set forth in the First through Seventh Claims for Relief because, inter alia:

a.      Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.    The class members are foreign nationals and migrant workers who are heavily in

debt and lack the means and/or resources to secure individual legal assistance and

who are particularly likely to be unaware of their rights to prosecute these claims;

c.    No member of the class has already commenced litigation to determine the

questions presented; and

d.    A class action can be managed with efficiency and without undue difficulty

because Defendants have systematically and regularly committed the violations

complained of herein and have used standardized recruitment, record-keeping,

and employment practices.

FLSA Collective Action Allegations

74. All claims set forth in the Eighth Claim for Relief are brought against Defendant

Signal by the Class Representative Plaintiffs on behalf of themselves and all other similarly

situated persons pursuant to the collective action provisions of 29 U.S.C. § 216(b) of the FLSA.

75. The Class Representative Plaintiffs seek to represent a FLSA class consisting of all

Indian H-2B workers employed by Defendant Signal at its Orange, Texas and Pascagoula,

Mississippi facilities at any time from October 1, 2006 through the present.

76. The proposed FLSA class members are similarly situated in that they have been

subject to uniform practices by Defendant Signal which violated the FLSA, including:

a.    Signal's systematic unlawful payroll deductions for room and board and work-related

tools; and

b.    Signal's workforce-wide failure to reimburse class members for travel, immigration

processing, visa, recruitment, and other immigration-related expenses to the extent

necessary to ensure that class members earned the required minimum and overtime wages during their first workweek.

## STATEMENT OF FACTS

### The Recruitment Process

#### Recruitment of the Group I Plaintiffs

77. Beginning in late 2003 and continuing through at least 2004, the Recruiter Defendants (Defendants Dewan, Dewan Consultants, Pol, and Global) placed ads in various newspapers across India and the United Arab Emirates, seeking welders, fitters, and other marine fabricators on behalf of various U.S.-based companies and individuals, including the Labor Broker Defendants (Defendants Indo-Amerisoft, Rao, and J & M).

78. Upon information and belief, the Recruiter Defendants placed such ads in coordination and agreement with the Legal Facilitator Defendants (Defendants Burnett, GCILC, and Burnett Law Offices), and the Labor Broker Defendants.

79. Upon information and belief, since at least December 2003 through at least mid-2004, the Legal Facilitator Defendants and the Labor Broker Defendants communicated and consulted frequently via mail, fax, e-mail and/or telephone communications to coordinate and direct the Recruiter Defendants' activities, including advertising efforts on behalf of the Labor Broker Defendants.

80. The advertisements placed by the Recruiter Defendants promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States with their families.

81. At various points throughout late 2003 through approximately mid-2004, Class Representative Plaintiffs Dhananjaya Kechuru and Plaintiff Andrews Issac Padaveettiyl  and

18

others similarly situated (hereinafter "the Group I Plaintiffs") responded to the advertisements placed by the Recruiter Defendants.

82. Specifically, the Group I Plaintiffs contacted the Recruiter Defendants by telephone, and/or attended meetings and testing sessions organized by the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants and their agents, employees and/or representatives at several locations throughout India and the United Arab Emirates.

83. Upon information and belief, prior to attending these meetings and testing sessions, the Labor Broker Defendants, Recruiter Defendants, and Legal Facilitator Defendants conferred in and around the months of February, March, and April 2004 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings and testing sessions.

84. The U.S.-based Recruiter Defendants (Pol and Global), the Labor Broker Defendants, and the Legal Facilitator Defendants traveled across state and international lines to attend meetings with Group I Plaintiffs in India and the United Arab Emirates.

85. In telephone communications, in-person meetings, faxes, contracts, and other written documents transmitted by mail and/or wire in the first half of 2004, the Recruiter Defendants personally and through employees, agents and/or associates, told the Group I Plaintiffs that if the Group I Plaintiffs passed skills tests administered in the United Arab Emirates or India and paid fees totaling approximately 5 to 8 lakh rupees (approximately $12,000 to $20,000), they would be able to apply for permanent resident (green card) status in the United States with the Labor Broker Defendants.

86. In these communications occurring during the first half of 2004, the Recruiter Defendants and Legal Facilitator Defendants further explained that the installment payments

would be divided among the Recruiter Defendants, the Legal Facilitator Defendants, and one of
the two Labor Broker Defendants.

87. In telephone communications, in-person meetings, faxes, written contracts, and/or
other written communications, transmitted, upon information and belief, by mail and/or wire in
the first half of 2004, the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor
Broker Defendants instructed the Group I Plaintiffs that the total fees would be paid in a series
of approximately three to four installments.

88. In these conversations in the first half of 2004, the Group I Plaintiffs were informed
on multiple occasions by the Recruiter Defendants and/or the Legal Facilitator Defendants that
in exchange for an additional fee of approximately $1,500 per family member, Plaintiffs would
be able to obtain legal permanent residence for their spouses and children.

89. The Recruiter Defendants, the Legal Facilitator Defendants, and Defendants Indo-
Amerisoft and Rao, personally and/or through their agents, representatives, and/or employees,
made representations to Class Representative Kechuru that the Labor Broker Defendants would
obtain a work-authorized green card for him on numerous occasions, including:

      a.    In or around December 2003 in an advertisement in the Gulf News, a

newspaper based in Dubai, United Arab Emirates. Upon information and belief,

in the weeks leading up to the appearance of the advertisement, the Legal

Facilitator Defendants, the Recruiter Defendants, and the Labor Broker

Defendants communicated and consulted frequently via mail, fax, e-mail and/or

telephone communications regarding its content and placement;

      b.    In or around December 2003 at the Recruiter Defendants' Dubai offices

by an employee of the Recruiter Defendants believed to be named Disha; and

c.    In or around January 2004 in a meeting at the Recruiter Defendants' Dubai

offices attended by the Legal Facilitators and Defendants Rao and Indo-

Amerisoft. Upon information and belief, in the weeks leading up to the January

2004, the Legal Facilitator Defendants, the Recruiter Defendants, and the Labor

Broker Defendants communicated and consulted frequently via mail, fax, e-mail

and/or telephone communications regarding the issues to be discussed at the

meeting.

90. The Recruiter Defendants, the Legal Facilitator Defendants, and Defendant J & M,

personally and/or through their agents, representatives, and/or employees, made representations

to Class Representative Plaintiff Padaveettiyl that the Labor Broker Defendants would obtain a

work-authorized green card for him on numerous occasions, including a meeting at the

Recruiter Defendants' Dubai offices in or around April 2004. This meeting was attended by the

Legal Facilitator Defendants and the Recruiter Defendants.

91. Upon information and belief, in the weeks leading up to these 2004 meetings

attended by Plaintiff Padaveettiyl, the Legal Facilitator Defendants, the Recruiter Defendants,

and the Labor Broker Defendants communicated and consulted frequently via mail, fax, e-mail

and/or telephone communications regarding the issues to be discussed at the meetings.

92. At informational meetings and in telephone conversations, faxes, contracts, and

other written documents transmitted in late 2003 through approximately mid-2004, the

Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants,

personally and/or through their agents, representatives, and/or employees, represented to the

Group I Plaintiffs that the Labor Broker Defendants were stable and reputable U.S. companies

offering lawful and ample employment opportunities, and that Labor Broker Defendants would

obtain for the Group I Plaintiffs work-authorized green cards enabling the Group I Plaintiffs to permanently and legally immigrate to United States with their families.

93. At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through approximately mid-2004, the Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants, personally and/or through their agents, employees and/or representatives, told the Group I Plaintiffs that the green card process, once commenced, would be completed within 18 to 24 months.

94. In such communications with Plaintiffs, the Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants further promised to act diligently and do everything necessary to obtain green cards for the Group I Plaintiffs in the timelines stipulated.

95. Based on these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, the Group I Plaintiffs signed contracts (hereinafter "the green card contracts") at various points in early to mid-2004 with the Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants.

96. Contracts signed by Plaintiffs and other documents provided to the Group I Plaintiffs by the Legal Facilitator Defendants, the Recruiter Defendants, and Labor Broker Defendants through the use of mail and/or wire transmissions in and around early to mid-2004, further promised that the Group I Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for the Group I Plaintiffs as promised.

97. The Legal Facilitator Defendants, the Recruiter Defendants, and the Labor Broker Defendants knew or should have known, however, that they would not refund the Group I Plaintiffs' money as promised in the contracts and other documents.

98. The Legal Facilitator Defendants, the Recruiter Defendants and the Labor Broker Defendants induced the Group I Plaintiffs to enter the green card contracts without intent to diligently pursue the Group I Plaintiffs' applications and knowingly without any basis whatsoever for representing, inter alia, that the companies and/or entities purportedly sponsoring the Group I Plaintiffs' applications were financially solvent and had reliable and stable employment opportunities to provide the Group I Plaintiffs; that green card applications sponsored by such companies would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

99. In reasonable reliance on the Legal Facilitator Defendants, the Recruiter Defendants and the Labor Broker Defendants' explicit and repeated promises regarding green cards and employment opportunities in the United States, the Group I Plaintiffs undertook considerable personal and familial sacrifices to amass the funds necessary to initiate the green card process.

100.   The Group I Plaintiffs gathered their life savings and borrowed staggering sums of money from family members, friends, banks, and loan sharks, often at high interest rates, in order to make the payments required by Defendants and their agents. Many of the Group I Plaintiffs mortgaged or sold their homes and/or land belonging to them or their families. Some of the Group I Plaintiffs cashed in life insurance policies and/or sold prized family possessions such as their wives' wedding jewelry.

101.   In reasonable reliance on Defendants' explicit and repeated promises regarding green cards and employment opportunities in the United States, Class Representative Plaintiff Kechuru paid 6 lakh rupees (approximately $15,000) total to the Recruiter Defendants, Legal

Facilitator Defendants, and Defendants Indo-Amerisoft and Kurella Rao. Plaintiff Kechuru had to rely on loans to obtain this money, including an interest-bearing bank loan.

102.   In reasonable reliance on Defendants' explicit and repeated promises regarding green cards and employment opportunities in the United States, Class Representative Plaintiff Padaveettiyil paid the Recruiter Defendants, Legal Facilitator Defendants and Defendant J & M over 5.5 lakh rupees (approximately $12,500). To pay these fees, Plaintiff Padaveettiyil had to liquidate his life savings and sell property.

103.   The Group I Plaintiffs signed contracts with the Recruiter Defendants, Legal Facilitator Defendants, and the Labor Broker Defendants and made the first round of installment payments required by these contracts.

104.   Despite having signed contracts with the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants, and having paid the first installment payments required by the contracts, these Defendants failed to provide the Group I Plaintiffs with updates regarding the progress of their green card applications for extended periods of time.

105.   When the Group I Plaintiffs contacted the Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants by phone, mail, and/or email at various points from approximately the last half of 2004 through approximately mid-2006 to check on the progress of their applications, these Defendants assured them that the process was going forward.

106.   While awaiting the processing of their green cards, the Group I Plaintiffs continued to accrue substantial interest on moneys they had borrowed in order to make the first installment payment to these Defendants.

107.   In or around January 2006, the Recruiter Defendants, the Legal Facilitator Defendants and the Labor Broker Defendants, personally and/or through their agents, employees and/or representatives notified the Group I Plaintiffs via wire and/or mail communications that the labor certification required for their green card applications had been approved by the U.S. government.

108.   After this notification, the Recruiter Defendants, the Legal Facilitator Defendants and the Labor Broker Defendants used wire and/or mail communications to effectuate collection of the second and/or third installment payments from the Group I Plaintiffs.

109.   By spring of 2006, after the 18 to 24 month period promised by the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants had elapsed, the Group I Plaintiffs had still not received their green cards as promised.

110.   By spring of 2006, the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants had yet to refund the Group I Plaintiffs' payments as promised by Plaintiffs' green card contracts.

111.   While awaiting the processing of their green cards, the Group I Plaintiffs continued to accrue substantial interest on moneys they had borrowed in order to make the required payments to the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants.

112.   In late May and early June of 2006, Defendant Signal filed with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor by mail and/or fax completed forms ETA 750 and attachments seeking permission to import and hire 590 foreign guestworkers under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant regulations 8 C.F.R. § 214.2(h)(6) and 20 C.F.R. § 655.3, and

associated administrative letters and/or guidance (commonly known as "the H-2B guestworker program").

113.   Defendant Signal sought these workers to perform various jobs essential to its marine fabrication services business, including welding and fitting.

114.   The H-2B guestworker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs when employers attest that they cannot find U.S. workers to perform the available jobs.

115.   H-2B visas are non-immigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.

116.   Defendant Signal further stated in the ETA 750 forms that its need for H-2B guestworkers was "peak load and a one-time occurrence" and that "the temporary workers will work for the length of the prescribed dates of need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

117.   In the ETA 750 forms, Defendant Signal named the Legal Facilitator Defendants as its agents for the purposes of preparing and submitting these applications to import H-2B guestworkers.

118.   Upon information and belief, Defendant Signal, at or around the time it filed the ETA 750 forms seeking permission to import H-2B guestworkers in May and June 2006, repeatedly contacted the Legal Facilitator Defendants and the Labor Broker Defendants by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.

119.   Upon information and belief, in the course of telephone, fax, email and/or mail communications occurring in or around May or June 2006, Defendant Signal authorized the Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill the anticipated H-2B guestworker jobs at Signal operations.

120.   Upon information and belief, in the course of these communications, Defendant Signal further authorized the Recruiter Defendants to represent that Signal would assume sponsorship of the pending and as-yet-unsuccessful green card applications on behalf of the Group I Plaintiffs and apply for at least two to three H-2B visa extensions on behalf of all Plaintiffs to allow them to remain in the United States working for Signal while the Group I Plaintiffs' green card applications were being processed.

121.   Defendant Signal authorized these representations even through it knew or had reason to know that such visa extensions and green card applications would not be bona fide and valid under United States immigration law and even though it did not intend to apply for and in fact knew it could not legally apply for such visa extensions and/or green cards on behalf of the Group I Plaintiffs.

122.   In spring and summer of 2006, the Group I Plaintiffs who had initiated the green card process spoke with the Recruiter Defendants over the phone and in person regarding their long-pending green card applications.

123.   In these communications, the Recruiter Defendants offered the Group I Plaintiffs the opportunity to pursue their green cards under the sponsorship of Defendant Signal. For an additional sum of approximately 35,000 to 45,000 rupees ($800 to $1,100), Plaintiffs were told

they could quickly obtain H-2B visas to go to the United States for work at Defendant Signal's operations.

124.   In these communications, the Recruiter Defendants falsely assured the Group I Plaintiffs that Defendant Signal would seek at least two extensions for the temporary H-2B visa with which Plaintiffs would gain admittance to the United States, and that Plaintiffs' H-2B visas would thereafter lead to immediate and permanent green cards.

125.   The Recruiter Defendants personally and through their agents, representatives and employees, made representations to Class Representative Plaintiff Kechuru that Defendant Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including in or about November or December of 2006 during a phone conversation with employees in the Recruiter Defendants' offices in Dubai, United Arab Emirates.

126.   Upon information and belief, in the weeks leading up to the phone conversation with Plaintiff Kechuru, the Legal Facilitator Defendants, the Recruiter Defendants, and the Labor Broker Defendants communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the contents of the green card and H-2B visa offers being made to Plaintiffs.

127.   The Recruiter Defendants, personally and/or through their agents, representatives and/or employees, made representations to the Class Representative Padaveettiyl that Defendant Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including a meeting at the Recruiter Defendants' offices in Dubai in or around February 2006.

128.   Upon information and belief, in the weeks leading up to this February 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting.

129.   In these communications, the Recruiter Defendants further failed to disclose material facts regarding the H-2B visa, including the fact that H-2B visas confer only a temporary non-immigrant status which does not allow the bearer to adjust to permanent residency status and the fact that applying for H-2B visas is fundamentally incompatible with applying for green cards.

130.   The Group I Plaintiffs, unaware of U.S. immigration law and the temporary, non-immigrant character of H-2B visas, agreed, in reliance on the representations of the Recruiter Defendants, to transfer their green card applications to Defendant Signal's sponsorship and further agreed to work for Defendant Signal under H-2B visas pursuant to the terms explained by the Recruiter Defendants.

131.   In reliance on the representations of the Recruiter Defendants, the Legal Facilitator Defendants and Defendant Signal, Class Representative Plaintiff Kechuru entered the United States on an H-2B guestworker visa in December 2003 and worked for Signal at its facility in Orange, Texas.

132.   In reliance on the representations of the Recruiter Defendants, the Legal Facilitator Defendants and Defendant Signal, Class Representative Plaintiff Padaveettiyl entered the United States on an H-2B guestworker visa in October 2006 and worked for Signal at its Pascagoula, Mississippi facility.

133.    The Group I Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for travel, green cards, visas, and work opportunities had they known that these Defendants' promises and representations were false.

134.    The Group I Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for travel, green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

<u>Recruitment of the Group II Plaintiffs</u>

135.    Acting as Defendant Signal's recruiting agent for the purposes of facilitating the recruitment of Indian workers for employment at Signal, the Recruiter Defendants placed advertisements in newspapers throughout India and the United Arab Emirates in spring, summer, and fall of 2006 offering opportunities for welders and fitters to immigrate permanently to the United States under the auspices of Defendant Signal, "a leading marine and fabrication company in Mississippi and Texas."

136.    In response to the advertisements posted by the Recruiter Defendants, Plaintiffs Plaintiffs Kurian David, Sony Vasudevan Sulekha, Maruganantham Kandhasamy, Palanyandi Thangamani, Hemant Khuttan, and all those similarly situated (hereinafter "the Group II Plaintiffs") contacted the Recruiter Defendants in spring, summer and fall of 2006 via telephone and in-person meetings.

137.    The Recruiter Defendants' advertisements and other recruiting efforts were undertaken on behalf of, at the direction of, and/or in coordination and consultation with Defendant Signal.

138.   Upon information and belief, Defendant Signal's direction of and coordination of the Recruiter Defendants' recruitment efforts was effectuated by the use of numerous telephone, fax, email, and/or mail communications occurring from spring of 2006 through at least January 2007.

139.   Upon information and belief, in these communications Defendant Signal authorized the Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill anticipated H-2B guestworker jobs at Signal operations.

140.   Upon information and belief, in these communications, Defendant Signal further authorized the Recruiter Defendants to represent that Signal would agree to sponsor bona fide green card applications for the Group II Plaintiffs and obtain at least two H-2B visa extensions on behalf the Group II Plaintiffs to allow them to remain in the United States working for Signal while all their green card applications were being processed.

141.   Defendant Signal authorized these representations even through it knew or had reason to know that such visa extensions and green card applications would not be bona fide and valid under United States immigration law and even though Signal did not intend to apply for and in fact knew that it could not legally apply for such visa extensions and/or green cards on behalf of the Group II Plaintiffs.

142.   In spring, summer, and fall of 2006, the Group II Plaintiffs attended meetings at which the Recruiter Defendants and the Legal Facilitator Defendants, acting on Signal's behalf, informed the Group II Plaintiffs of the opportunity to work for Defendant Signal on H-2B visas which would lead to permanent resident (green card) status.

143.   Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants conferred in and spring, summer, and fall 2006 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings.

144.   The United States-based Recruiter Defendants (Pol and Global) and the Legal Facilitator Defendants traveled across state and international lines to attend meetings with Group II Plaintiffs in India and the United Arab Emirates in spring, summer, and fall of 2006.

145.   According the statements made at these meetings and in communications effected by wire and mail during this time period, Defendant Signal would sponsor the Group II Plaintiffs' green card applications and extend their H-2B visas multiple times to enable the Group II Plaintiffs to work in the United States while their green card applications were pending. In exchange, the Group II Plaintiffs would have to pay fees totaling approximately 8 lakhs ($20,000) each in a series of approximately three installments.

146.   The Group II Plaintiffs were further informed by the Recruiter Defendants and/or the Legal Facilitator Defendants that in exchange for an additional fee of approximately $1,500 per family member, Plaintiffs would be able to obtain legal permanent residence for their spouses and children.

147.   At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted through the use of mail and wire communications occurring during the spring and summer of 2006, the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants, personally and/or through their agents, representatives, and/or employees, represented to the Group II Plaintiffs that Signal would provide lawful, stable, and ample employment opportunities, that working under an H-

2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal, and that Signal would obtain for the Group II Plaintiffs work-authorized green cards enabling the Group II Plaintiffs to permanently and legally immigrate to United States with their families.

148.  In such communications with Plaintiffs, the Recruiter Defendants and Legal Facilitator Defendants further promised to act diligently and do everything necessary to obtain green cards for the Group II Plaintiffs within 24 months.

149.  The Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal personally and/or through their agents, representatives, and/or employees, made representations to Class Representative Plaintiff Kandhasamy that Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including:

a.    In or about May 2006 in an advertisement in the Daily Thanthi, an Indian newspaper. Upon information and belief, in the weeks to the appearance of the May 2006 advertisement, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding its content and placement;

b.    In or about May 2006 at a meeting in Chennai (Madras) attended by the Recruiter Defendants and Defendant Signal. Upon information and belief, in the weeks leading up to May 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting; and

c.    In or about August or September 2006 at a meeting in Chennai attended by the Recruiter Defendants, Defendant Signal, and the Legal Facilitator Defendants. Upon

information and belief, in the weeks leading up to September 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting;

150.    The Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal personally and/or through their agents, representatives, and/or employees, made representations to Class Representative Plaintiff Thangamani that Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including:

a.    In or about March or April 2006 in advertisements published in Malayalam and Tamil newspapers in India. Upon information and belief, in the weeks to the appearance of the April 2006 advertisement, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding its content and placement;

b.    In or about May 2006 at a meeting in Chennai attended by the Recruiter Defendants and Defendant Signal. Upon information and belief, in the weeks leading up to May 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting; and

c.    In August or September 2006 in a meeting in Chennai attended by the Recruiter Defendants, the Legal Facilitator Defendants, and Defendant Signal. Upon information and belief, in the weeks leading up to September 2006 meeting,

the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting.

151.   The Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal personally and/or through their agents, representatives, and/or employees, made representations to Class Representative Plaintiff Khuttan that Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including:

a.   In or about September 2006 in an advertisement in the Times of India. Upon information and belief, in the weeks to the appearance of the September 2006 advertisement, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding its content and placement;;

b.   In or about September 2006 during a phone call with staff at the Recruiter Defendants' office; and

c.   In October 2006 by employees in the Recruiter Defendants' Mumbai office. Upon information and belief, in the weeks leading up to October 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting.

152.   The Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal personally and/or through their agents, representatives, and/or employees, made representations to Class Representative Plaintiff David that Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including:

a.    In or around March 2006 in an advertisement in the Gulf News, a newspaper based in Dubai, United Arab Emirates. Upon information and belief, in the weeks to the appearance of the March 2006 advertisement, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding its content and placement;

b.    In or around March 2006 in at a meeting in a hotel at Abu Dhabi, United Arab Emirates attended by the Recruiter Defendants. Upon information and belief, in the weeks leading up to March 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting; and

c.    In or about April 2006 at a meeting in Dubai, United Arab Emirates attended by the Recruiter Defendants and Legal Facilitator Defendants. Upon information and belief, in the weeks leading up to April 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting.

153.    The Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal personally and/or through their agents, representatives, and/or employees, made representations to Class Representative Plaintiff Vasudevan that Signal would obtain a work-authorized green card and H-2B visa extensions for him on numerous occasions, including:

a.    In or about April 2006 in an advertisement in an Indian newspaper. Upon information and belief, in the weeks to the appearance of the April 2006 advertisement, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding its content and placement; and

b.    On or about May 1, 2 or 3, 2006, at a meeting at the Hilton Hotel in Cochin attended by the Recruiter Defendants and Legal Facilitator Defendants at which a video discussing opportunities at Defendant Signal was shown to workers in attendance. Upon information and belief, in the weeks leading up to May 2006 meeting, the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed at the meeting.

154.    Reasonably relying on these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, the Group II Plaintiffs signed green card contracts at various points from mid-2006 and late 2007 with the Recruiter Defendants and Legal Facilitator Defendants in which they promised to pay the fees charged by these Defendants.

155.    Contracts signed by Plaintiffs and other documents provided to the Group II Plaintiffs by the Legal Facilitator Defendants and Recruiter Defendants through the use of mail and/or wire transmissions in and around mid 2006 through at least early 2007, further promised that the Group II Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for the Group II Plaintiffs as promised.

156.  The Legal Facilitator Defendants and the Recruiter Defendants knew or should have known, however, that they would not refund the Group II Plaintiffs' money as promised in the contracts and other documents.

157.  The Legal Facilitator Defendants and Recruiter Defendants induced the Group II Plaintiffs to enter the green card contracts without intent to diligently pursue the Group II Plaintiffs' applications and without any basis whatsoever for representing, inter alia, that Defendant Signal had lawful long-term employment opportunities to provide the Group II Plaintiffs; that Defendant Signal could legally apply for numerous H-2B visa extensions to maintain the Group II Plaintiffs' presence in the United States; that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; that green card applications sponsored by Defendant Signal would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

158.  In reasonable reliance on the Recruiter Defendants and Legal Facilitators' explicit and repeated promises regarding green cards and employment opportunities in the United States, the Group II Plaintiffs undertook considerable personal and familial sacrifices to amass the funds necessary to initiate the green card process with Defendant Signal.

159.  The Group II Plaintiffs gathered their life savings and borrowed staggering sums of money from family members, friends, banks, and loan sharks, often at high interest rates, in order to make the payments required by Defendants and their agents. Many Group II Plaintiffs mortgaged or sold their homes and/or land belonging to them or their families. Some Group II Plaintiffs cashed in life insurance policies and/or sold prized family possessions such as their wives' wedding jewelry.

160.  In reasonable reliance on the explicit and repeated promises of the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal regarding green cards, H-2B visas, and employment opportunities in the United States, Class Representative Kandhasamy paid the Recruiter Defendants and Legal Facilitator Defendants over 6 lakh rupees (approximately $15,000), which he collected by selling his wife's jewelry and taking out an interest-bearing bank loan.

161.  In reasonable reliance on the explicit and repeated promises of the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal regarding green cards, H-2B visas, and employment opportunities in the United States, Class Representative Thangamani paid the Recruiter Defendants and Legal Facilitator Defendants over 6 lakh rupees (approximately $15,000), which he collected by selling his relatives' and his wife's jewelry, taking out an interest-bearing bank loan from a finance company, and selling land that he owned.

162.  In reasonable reliance on the explicit and repeated promises of the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal regarding green cards, H-2B visas, and employment opportunities in the United States, Class Representative Khuttan paid the Recruiter Defendants and Legal Facilitator Defendants approximately 8.5 lakh rupees (approximately $21,000), which he collected by taking out an interest-bearing bank loan, and borrowing from his father's retirement account.

163.  In reasonable reliance on the explicit and repeated promises of the Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal regarding green cards, H-2B visas, and employment opportunities in the United States, Class Representative David paid the

Recruiter Defendants and Legal Facilitator Defendants approximately $18,000, which he collected by taking out an interest-bearing bank loan and selling his house.

164.  In reasonable reliance the explicit and repeated promises of the Recruiter Defendants, the Legal Facilitator Defendants, and Defendant Signal regarding green cards and employment opportunities in the United States, Class Representative Plaintiff Vasudevan paid 6 lakh rupees (approximately $15,000) to the Recruiter Defendants and Legal Facilitator Defendants, which he collected by taking out an interest-bearing bank loan and selling land owned in his wife's name.

165.  In reasonable reliance on the promises of the Recruiter Defendants and Legal Facilitator Defendants, the Group II Plaintiffs signed contracts with these Defendants and made payments required by these contracts.

166.  The Group II Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for green cards, visas, and employment opportunities had they known that these Defendants' promises and representations were false.

167.  The Group II Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

Preparations and Departure for Signal Operations in the United States (All Plaintiffs)

168.  At various points during the spring, summer, and fall of 2006, Defendant Signal's personnel traveled to various locations in India and the United Arab Emirates and tested

Plaintiffs' and other class members' welding and fitting skills in anticipation of employing them in the United States.

169.    Plaintiffs and other class members paid costs necessary to travel to the cities where these tests were held.

170.    Plaintiffs and other class members paid admission fees charged to take these tests.

171.    Plaintiffs and other class members attended and passed these tests, which were overseen and graded by Defendant Signal's agents, employees, and/or representatives.

172.    Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants conferred in and spring, summer, and fall 2006 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

173.    The Defendant Signal's personnel, the United States-based Recruiter Defendants (Pol and Global) and the Legal Facilitator Defendants traveled across state and international lines to these testing sessions in spring, summer, and fall of 2006.

174.    On or around July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

175.    Around the time of this approval, Plaintiffs and other class members made necessary preparations in order to travel to the United States on H-2B visas to work for Signal, including: paying to obtain necessary travel and legal documents; making payments for mandatory H-2B visa and consular processing fees to the United States consulate, the Recruiter Defendants and the Legal Facilitator Defendants; attending H-2B visa interviews; and paying for travel arrangements through the Recruiter Defendants.