Exhibit 22

Relevant pages from Deposition of Malvern Burnett, taken on September 10, 2008, Kurian David, et al, v. Signal International, LLC, et al., and relevant exhibits thereto

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

KURIAN DAVID, et al              CIVIL ACTION
                                 NO. 08-cv-01220
          Plaintiffs,
VERSUS                           JUDGE ZAINEY

SIGNAL INTERNATIONAL, LLC     MAGISTRATE KNOWLES
et al,

          Defendants.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

          Deposition of MALVERN C. BURNETT, ESQUIRE,
1523 Polymnia Street, New Orleans, Louisiana,
70130, taken in the Law Offices of Barrasso,
Usdin, Kupperman, Freeman & Sarver, 909 Poydras
Street, Suite 2400, New Orleans, Louisiana,
70112, on September 10th, 2008, at or about
10:10 a.m.

APPEARANCES:

          SOUTHERN POVERTY LAW CENTER
          By:  Daniel Werner, Esquire
               Naomi Tsu, Esquire
          233 Peachtree Street, suite 2150
          Atlanta, Georgia  30303
          (Counsel for Plaintiffs)

          ASIAN AMERICAN LEGAL DEFENSE AND
          EDUCATION FUND
          By:  Tushar Sheth, Esquire
          99 Hudson Street, 12th Floor
          New York, New York  10013-2815
          (Co-Counsel for Plaintiffs)

          BARRASSO, USDIN, KUPPERMAN, FREEMAN
          & SARVER
          By:  Stephen H. Kupperman, Esquire
          909 Poydras Street, Suite 2400
          New Orleans, Louisiana  70112
          (Counsel for Michael Pol and Global

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

```
                                                              Page 2
  1    APPEARANCES CONTINUED:

  2         PORTEOUS, HAINKEL AND JOHNSON
            By:  Ralph R. Alexis, III, Esquire
  3         705 Carondelet Street
            New Orleans, Louisiana  70139-3774
  4         (Counsel for Burnett Defendants)

  5         MIDDLEBERG, RIDDLE & GIANNA
            By:  Donald C. Douglas, Jr., Esquire
  6         201 St. Charles Avenue, 31st Floor
            New Orleans, Louisiana  70170-3100
  7         (Counsel for Signal International, LLC)

  8         PAGE, MANNINO, PERESICH & MCDERMOTT
            By:  Michael E. Whitehead, Esquire
  9         759 Vieux Marche Mall
            Biloxi, Mississippi  39533
 10         (Counsel for J & M Associates Inc., of
             Mississippi)
 11
            STEPHEN H. SHAPIRO, ESQUIRE
 12         200 Maine Street
            Jefferson, Louisiana  70121
 13         (Counsel for Dewan & Consultants

 14
       REPORTED BY:
 15
            Gail F. Mason, RPR
 16         Certified Court Reporter
            Certificate No. 96004
 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 3

1
                              I N D E X
2

3    Title Page  . . . . . . . . . . . . . .    1

4    Appearances . . . . . . . . . . . . .    1,2

5    Index   . . . . . . . . . . . . . . .    3

6    Stipulations of Counsel . . . . . . . .    4

7    EXAMINATION:

8         By Mr. Sheth . . . . . . . . . . .    4

9         By Mr. Kupperman . . . . . . . .  169

10        By Mr. Alexis. . . . . . . . . .  170

11        By Mr. Sheth . . . . . . . . . .  171

12   EXHIBITS:

13        Burnett No. 1 (Notice of Action) . 135
          Burnett No. 2 (Annexure) . . . . . 137
14        Burnett No. 3 (11/22/04 ltr) . . . 146
          Burnett No. 4 (H2B & Green Card) . 148
15        Burnett No. 5 (Labor approval) . . 149
          Burnett No. 6 (4/1/04 ltr) . . . . 150
16        Burnett No. 7 (6/23/06 ltr). . . . 153

17

     WITNESS INSTRUCTED NOT TO ANSWER:
18
          Pages:  9, 10, 39, 54, 68, 95, 97,
19               105, 114, 119, 122, 148 and
                 155
20

21   Witness' Certificate . . . . . . . . . 173

22   Reporter's Certificate  . . . . . . . . 174

23

24

25

PROFESSIONAL SHORTHAND REPORTERS, INC   1(800)-536-5255   BATONROUGE*NEW ORLEANS* SHREVEPORT
                                    504-529-5255

Page 4

1                   S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4     counsel for the parties hereto that the

5     deposition of the aforementioned witness is

6     hereby being taken pursuant to the Federal

7     Rules of Civil Procedure for all purposes;

8          That all formalities of signing, sealing,

9     certification, and filing are hereby waived;

10         That all objections are to be considered

11    under the Federal Rules of Civil Procedure.

12                    *   *   *   *   *

13         (MALVERN C. BURNETT, ESQUIRE, AFTER HAVING

14    BEEN FIRST DULY SWORN BY THE ABOVE-NAMED

15    CERTIFIED COURT REPORTER, WAS EXAMINED AND

16    TESTIFIED AS FOLLOWS:)

17    EXAMINATION BY MR. SHETH:

18         Q.  Good morning, Mr. Burnett.

19         A.  Good morning.

20         Q.  My name is Tushar Sheth.  I'm a staff

21    attorney at the Asian American Legal Defense

22    and Education Fund.  I represent the Plaintiffs

23    in this action.  With me here today is Dan

24    Werner and Naomi Tsu from the Southern Poverty

25    Law Center.

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al          Malvern C. Burnett, Esquire

Page 42

1          A.   Particular individuals?   Yes.

2          Q.   Strike that.   I understand what the

3     confusion is there because you would get the

4     designation and then the -- understood.   Okay.

5     Well, how did Signal become your client?   Did

6     they contact you?

7          A.   Actually, I think the first

8     conversation I had with Signal was -- was with

9     a conference call with Signal.

10          Q.   Well, how did you get involved with

11     H2B visas and Signal?

12          A.   I was asked to meet with Signal to

13     discuss providing H2B visas and potentially

14     immigrant visas -- and immigrant visa petitions

15     for the workers for Signal.

16          Q.   Who asked you to meet with Signal?

17          A.   It was Michael Pol, P-O-L.

18          Q.   Who is Michael Pol?

19          A.   He is a client and personal friend.

20          Q.   And how long have you known Michael

21     Pol?

22          A.   Since approximately 1996.

23          Q.   And in what capacity did you meet --

24     first meet Michael Pol?   In your professional

25     capacity or in your --

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 49

```
1    I've given him legal advice individually and
2    not in connection with any company, so -- does
3    that answer your question?
4         Q.  So you've given him legal advice
5    individually but not to any company that he
6    owned or was a part of?
7         A.  I didn't say that.
8         Q.  Okay.  Why don't you --
9         A.  I said I may have given him -- I said
10   I've given him -- I'm certain I've given him
11   legal advice individually as well as a
12   representative of another entity.
13        Q.  Okay.  So for the purposes of the
14   following questions, why don't we assume that
15   when I refer to "Mr. Pol," we're referring to
16   him individually or as a representative of a
17   company or an owner of a company.
18        A.  Okay.
19        Q.  And definitely you should ask me if
20   you're confused.
21        A.  Sure.
22        Q.  When you say you might have given
23   legal advice to Mr. Pol as a part of an entity,
24   what entities are you referring to?
25        A.  I'm not sure if I can -- if I can
```

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

                                                                        Page 53

1         Q.   Okay.  Did Michael Pol -- and I think

2    I already asked this, but did Michael Pol --

3    did there come a time when Michael Pol became

4    your client individually?

5         A.   In my mind, I would have to say yes.

6         Q.   Okay.  When did Mr. Pol become your

7    client individually?

8         A.   I would have to say sometime between

9    my representation of him in IMI International

10   and Med-Tech.  And when I -- let me clarify

11   because, you know, we became friends, and we

12   would talk on the phone frequently.  And I was

13   always keeping him abreast, you know, of

14   current developments in the law.  And he --

15   he's a very inquisitive person, and he would

16   ask me questions about the law.  And I can

17   assure you that numerous times I have imposed a

18   lunch on him in remuneration for legal advice I

19   provided to him over the phone or in person,

20   for that matter.

21              And I consider that -- I

22   considered him to be a client in that.  I mean,

23   I really -- honestly, I do because I certainly

24   could not -- I would not discuss with my family

25   or friends or associates the contents of the

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 54

1   discussions that we had over the phone or over

2   lunch because I would deem those to be

3   client/privilege information.

4       Q.   The representation that you're

5   referring of Mr. Pol individually, was that

6   related to immigration matters?

7       A.   Yes.

8       Q.   Okay.  Was there ever a retainer

9   between you and Mr. Pol as an individual?

10          BY MR. KUPPERMAN:

11              Again, I don't know whether

12   that's invasive of the attorney/client

13   privilege or not.  But to the extent it is,

14   then I want to protect that privilege to the

15   fullest extent.

16          BY MR. ALEXIS:

17              I'm going to instruct him not to

18   answer because I don't want to violate any

19   privilege.  Also, that really has nothing to do

20   with jurisdiction and venue.

21          BY MR. SHETH:

22              How can it not?  That's absurd.

23          BY MR. ALEXIS:

24              He's already said -- if he's the

25   client, what else do you need?  Why do you need

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 59

 1      A.  The provision of labor to an entity in

 2  South Louisiana.

 3      Q.  What is that entity?

 4      A.  I think that's protected by

 5  attorney/client privilege.

 6      Q.  Well, you've described it as doing

 7  business.  Can you explain what you mean by

 8  that?

 9      A.  Yeah, the provision, you know, trying

10  to secure labor.

11      Q.  So what does that have to do with

12  legal advice?  Did you provide legal advice?

13      A.  Because I'm an immigration lawyer.

14  And if you -- if foreign labor is going to be

15  utilized, whether or not it was contemplated.

16      Q.  So was this a discussion in your

17  capacity as his lawyer?

18      A.  As his lawyer?

19      Q.  Yes.

20      A.  Maybe.

21      Q.  So by "maybe" you mean you're not sure

22  whether it was his company?

23      A.  Correct.  And to be honest, I don't

24  know -- I don't recall if there was -- if he

25  was representing a particular entity at the

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 60

1    time.  I just don't recall.

2          Q.  Do you know where in South Louisiana

3    this business is located?

4          A.  Somewhere around Houma, Morgan City.

5          Q.  You referred earlier to lunch meetings

6    with Mr. Pol in relation to your representation

7    of him; is that correct?

8          A.  Did I refer to lunch meetings?

9          Q.  Yeah.

10         A.  I'm not -- yes, I've had -- yes.  Yes,

11   I have.  Numerous.

12         Q.  Okay.  Well, in your representation of

13   Mr. Pol, how often -- individually, how often

14   would you meet with him in person?

15         A.  Sporadically.  I saw more of him in

16   Ocean Springs post-Katrina just because he used

17   to live in Ocean Springs --

18         Q.  Okay.

19         A.  -- and it would be a convenient place,

20   you know, for us to have lunch.

21         Q.  Okay.  Did you have meetings with him

22   in Louisiana in your representation -- strike

23   that.  I'm referring to your representation of

24   him individually right now.  Did you meet with

25   him in Louisiana?

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

```
                                                  Page 61

  1         A.  As I stated earlier, sometime before

  2    Mardi Gras we met in -- in South Louisiana or

  3    Southeast Louisiana.  And it wasn't business,

  4    socially I met him in Louisiana, in New

  5    Orleans.  I mean, I invited him -- he stayed at

  6    my apartment for Mardi Gras.

  7         Q.  And for this question now, I'm

  8    referring to Mr. Pol individually or as a

  9    representative of IMIS or as a representative

 10    of Med-Tech or as a representative of Global

 11    Resources.  Did you meet with Mr. Pol in

 12    Louisiana in your --

 13         A.  Yes.

 14         Q.  Okay.  How often would you meet with

 15    him in Louisiana in relation to any of those

 16    entities or him individually?

 17         A.  Very infrequently.  He did you come to

 18    New Orleans often.  It was -- you know, it was

 19    convenient for him to meet me in my Bay Saint

 20    Louis office, for instance, my Gulfport office

 21    and my Ocean Springs office just because that's

 22    where he lived.  And I was -- and I was there

 23    on a weekly basis, so --

 24         Q.  Well, generally beginning in -- you

 25    first met him in 1996.
```

Kurian David, et al v. Signal International, LLC, et al          Malvern C. Burnett, Esquire

Page 62

```
 1       A.  Here in New Orleans.  And in, like,
 2  1996, 1997, I would see him quite frequently in
 3  New Orleans because he did have offices at that
 4  time, an office in New Orleans or on the
 5  Westbank, I think.
 6       Q.  Right.
 7       A.  And he had staff here, so he was in
 8  town, you know, frequently then.  But, say,
 9  after '98, '99, it was very infrequent that I
10  would see him in New Orleans.
11       Q.  So by "infrequently," can you be more
12  specific?  What does that mean?  More than once
13  a month or less than once a month?
14       A.  Fewer.  Fewer than once a month.  And
15  I don't know.  In New Orleans, you know, maybe
16  a couple, three times a year at the most, at
17  the very most.  And that may be, you know,
18  generous.
19       Q.  Okay.
20       A.  Again, because I'm in -- I had offices
21  -- I mean, I had offices in Mississippi, and it
22  was just -- after he pulled out of New Orleans
23  and sold his business, I just didn't -- you
24  know, he didn't come to New Orleans.  We would
25  see each other in Mississippi.
```

Page 63

1          Q.  But you did meet with him in New

2     Orleans maybe two or three times a year you're

3     saying?

4          A.  Yes.  And whether it was -- I mean,

5     maybe.  That's not -- you know, I hate to guess

6     because you can't remember guesses.  And if I

7     get asked this in the future, I'm not going to

8     be able to remember what I guessed.  So I'm

9     just going to say that I really can't be sure.

10    I mean, that's really the only accurate way I

11    can respond.  But I will tell you it was

12    infrequent.

13         Q.  After 2000, did you ever meet -- other

14    than the meeting in 2008 in Southeast

15    Louisiana, did you ever meet with Mr. Pol in

16    New Orleans between 2000 and 2008?

17         A.  I'm sure I did, but I can't recall.

18         Q.  After Katrina, did you ever meet with

19    Mr. Pol in New Orleans?

20         A.  Well, he came for Mardi Gras.  Prior

21    to Mardi Gras, I can't recall.

22         Q.  I want to go back to the question and

23    answer that sort of took place a little earlier

24    before we got into locations, which is you

25    stated earlier that Mr. Pol asked you to meet

Page 64

1    with representatives of Signal.

2         A.  Yes.

3         Q.  When was that?

4         A.  That would have been in the spring of

5    2006.

6         Q.  And when he first approached you, did

7    he tell you why he wanted you to meet with

8    Signal?

9         A.  Yes, to --

10            BY MR. KUPPERMAN:

11               Well, let me interject.  It's

12   okay if you want to tell him yes or no, but

13   please keep confidential whatever was said

14   between you and the client.

15            BY MR. SHETH:

16               Go ahead.

17            BY THE WITNESS:

18               Yes.

19            BY MR. ALEXIS:

20               Well --

21   EXAMINATION BY MR. SHETH:

22        Q.  Did you ultimately meet with a

23   representative of Signal?

24        A.  Yes.

25        Q.  And I'm asking that --

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 80

1    strike that.  Was Michael Pol involved in any

2    way with these visa petitions for Signal?

3        A.  Yes, insofar as Michael was the one

4    that brought Signal to -- that told Signal that

5    I was available for immigration work and

6    brought me into the project.  And his company

7    Global, I believe, was the entity responsible

8    for assisting with the project in -- both in

9    Mississippi and abroad.

10        Q.  Okay.  And by Global, you mean --

11        A.  And Texas, by the way.

12        Q.  And by "Global" you mean Global

13    Resources?

14        A.  Yes.

15            BY MR. SHETH:

16                Could you read back Mr. Burnett's

17    answer?

18                (WHEREUPON, THE REQUESTED PORTION

19    OF THE TRANSCRIPT WAS READ BACK BY THE COURT

20    REPORTER.)

21    EXAMINATION BY MR. SHETH:

22        Q.  When you say that Global Resources was

23    involved with assisting with the project, can

24    you explain?

25        A.  Global was the entity -- Michael Pol

Kurian David, et al v. Signal International, LLC, et al                Malvern C. Burnett, Esquire

Page 81

1   and Global was the entity that was -- that was

2   responsible for proposing to Signal that there

3   was -- there were available workers whether

4   they be domestic or foreign -- and I don't

5   recall the provision of domestic workers, but

6   I'm sure it -- it must have been discussed at

7   some point in time -- and that he was aware of

8   the availability of foreign workers abroad whom

9   he could marshal, you know, to fill Signal's

10  needs.

11       Q.  Okay.  Did you represent Mr. Pol in

12  his work related to the H2B visa petitions?

13           BY MR. ALEXIS:

14               I'm sorry.  I beg your pardon.

15  Could you read that question back, please?

16               (WHEREUPON, THE REQUESTED PORTION

17  OF THE TRANSCRIPT WAS READ BACK BY THE COURT

18  REPORTER.)

19           BY MR. KUPPERMAN:

20               Object to the form of the

21  question.

22           BY MR. ALEXIS:

23               Did you represent --

24           BY MR. SHETH:

25               Petitions for -- if we can come

**[PAGE BREAK]**

Page 85

1        A.  Correct.

2        Q.  Okay.  Where did those meetings take

3    place?

4        A.  Ocean Springs.  I'm pretty sure Ocean

5    Springs.  Now, did I meet him -- did I -- no, I

6    didn't.  I was just thinking.  Not in relation

7    to this.  It would be Ocean Springs.

8        Q.  Did you meet with him in New Orleans?

9        A.  I don't think so, but I might -- I

10   might have.  Again, this -- again, this is in

11   like 2000 -- this is the fall of 2005, right,

12   and the spring of 2006?  Is that the time

13   period?

14       Q.  Well, the dates you gave me earlier

15   were April of 2006 to December 2007.

16       A.  Oh, okay.  I misunderstood.  That's

17   the first time that -- that I met with Signal

18   was April of 2006.

19       Q.  Okay.  Why did you --

20       A.  But we talked -- you know, we talked

21   on the phone, you know, prior to that.

22       Q.  When did you first start having

23   discussions with Mr. Pol regarding the work for

24   Signal?

25       A.  It was in the spring of 2006.

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 86

1      Q.  Okay.  Did you have phone

2    conversations during this time period with

3    Mr. Pol regarding the work for Signal?

4      A.  Yes.

5      Q.  I'm assuming you had many phone

6    conversations with him.

7      A.  Many phone conversations with him

8    because, I mean, you know, during this time

9    period, particularly right after the storm.

10   His house got whacked.  My house got whacked.

11   We were both in the same boat for lack of a

12   better word.  And we commiserated a lot.  So we

13   discussed -- not only did we discuss business,

14   but we discussed a lot of personal matters as

15   we continue to.

16     Q.  Understood.  Did he ever call you in

17   your New Orleans office during this time

18   period?

19     A.  I'm sure.  I'm sure he did.  Now,

20   whether or not I was -- whether I was -- well,

21   let me clarify.  Whether I was in my New

22   Orleans.  I've got a cell phone, a New Orleans

23   cell phone.  It's my only cell phone I have.

24   And that's the only number he calls.

25     Q.  So he never calls you at your office

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 87

1    line?

2         A.  He always knows.  He's got -- you

3    know, we all have clients where they've got

4    your cell number and they refuse to call you at

5    your office.  You know?  This is one of those

6    guys.  He just never friggin does it.

7         Q.  Okay.

8         A.  Can I take a comfort break, please?

9            BY MR. SHETH:

10               Yes, sure.

11               (WHEREUPON, A BREAK WAS TAKEN.)

12   EXAMINATION BY MR. SHETH:

13        Q.  Read back the last couple questions,

14   please.

15               (WHEREUPON, THE REQUESTED PORTION

16   OF THE TRANSCRIPT WAS READ BACK BY THE COURT

17   REPORTER.)

18   EXAMINATION BY MR. SHETH:

19        Q.  Okay.  You stated earlier that the

20   retainer included a fee structure of $5,000 for

21   your work in representing Signal -- a retainer

22   with Signal for your work in representing

23   Signal regarding the H2B visa petitions; is

24   that correct?

25        A.  H2B extension -- or H2B visa petitions

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 106

1    EXAMINATION BY MR. SHETH:

2        Q.  What was Michael Pol's role in getting

3    H2B work -- foreign workers to work at Signal?

4            BY MR. KUPPERMAN:

5                Let me just interpose an

6    objection.  To the extent that he can answer

7    that without invading any attorney/client

8    privilege, I have no problem.

9            BY MR. SHETH:

10               Sure.

11           BY MR. KUPPERMAN:

12               Other than the fact that, I

13   think, it doesn't relate to jurisdiction and

14   venue, but --

15           BY THE WITNESS:

16               Yeah, you know, he was going to

17   assist in the management at -- of the workers

18   at Signal, at least that was my understanding.

19   And he would assist with Sachin Dewan, Dewan

20   Consultants in the vetting of the workers.

21   There was testing that was performed of the

22   prospective workers, and -- and he worked with

23   Sachin in that regard.

24       Q.  Who recruited these workers?

25       A.  Principally, I would say Sachin

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                              Malvern C. Burnett, Esquire

Page 123

1   jurisdiction and venue.

2        BY MR. SHETH:

3            Absolutely not.  Absolutely not.

4   We're definitely going to have to come back to

5   this.  Absolutely not.

6   EXAMINATION BY MR. SHETH:

7        Q.  All right.  Could Signal have brought

8   over workers from India without someone --

9   without the filing of a petition gaining

10  approval for that?

11       BY MR. ALEXIS:

12           Object to the form of the

13  question.

14       BY THE WITNESS:

15           Not in -- not that I'm aware of.

16  EXAMINATION BY MR. SHETH:

17       Q.  And could Signal have brought over

18  workers from India without the filing of

19  petitions for individual workers to come over?

20       BY MR. ALEXIS:

21           Same objection.

22       BY THE WITNESS:

23           Do you mean -- is your question

24  is there another mechanism to employ -- to

25  employ foreign workers other than H2B?

Kurian David, et al v. Signal International, LLC, et al                Malvern C. Burnett, Esquire

Page 124

1    Absolutely not --

2    EXAMINATION BY MR. SHETH:

3        Q.  No, no, no, no.  Signal was interested

4    in bringing over H2B workers; is that correct?

5        A.  Yes.

6        Q.  Okay.  So to bring over H2B workers,

7    first a petition had to be filed on behalf of

8    Signal to get approval for that, right?

9        A.  (Witness nodded head up and down),

10   yes.

11       Q.  And, second, once individual workers

12   were identified, they had to file petitions to

13   actually come over?

14       A.  No.

15       Q.  Well, what did they have to do to come

16   over?

17       A.  They have to file applications.

18       Q.  Applications.  They had to file

19   applications to come over?

20       A.  Correct.

21       Q.  Without either of those things,

22   workers could not have come?

23       A.  Correct.

24       Q.  In this capacity as H2B workers?

25       A.  Yes.

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

```
                                                    Page 125

 1       Q.  You stated earlier that Sachin Dewan

 2   identified and recruited clients among his

 3   other duties in India -- excuse me -- not

 4   clients, workers for Signal?

 5            BY MR. DOUGLAS:

 6                 I object to the form of that

 7   question.

 8            BY MR. SHAPIRO:

 9                 I'll join.

10   EXAMINATION BY MR. SHETH:

11       Q.  Okay.  Strike that.  You stated

12   earlier that Sachin Dewan among his other --

13   among many duties was to identify and recruit

14   workers to come over on H2B visas as a part of

15   this project?

16            BY MR. SHAPIRO:

17                 And that was asked and answered;

18   wasn't it?

19            BY MR. ALEXIS:

20                 Same objection.  Same objection

21   to the form.

22            BY MR. SHETH:

23                 Go ahead.

24            BY THE WITNESS:

25                 I believe that Sachin Dewan
```

Kurian David, et al v. Signal International, LLC, et al                     Malvern C. Burnett, Esquire

                                                                            Page 126

1    recruited H2B workers to come to work for

2    Signal, yes.

3    EXAMINATION BY MR. SHETH:

4        Q.  Explain to me what Michael Pol's

5    involvement in all of this was.

6        A.  I thought I did that earlier.

7    Basically --

8            BY MR. ALEXIS:

9                You did, and I'm going to object

10   to the form of the question.  But go ahead and

11   answer it.

12           BY THE WITNESS:

13               He liaised with Signal and --

14   with Sachin Dewan and assisted in the testing

15   and the vetting of the workers to come to the

16   United States.  But, really, he's a better

17   person to ask that question than me -- or than

18   I.  Excuse me.

19   EXAMINATION BY MR. SHETH:

20       Q.  Did Michael Pol receive any

21   compensation in relation to workers from India

22   coming over to Signal on H2B visas?

23       A.  I can't say definitely yes, but I

24   certainly expect so.

25       Q.  Do you know how much he was

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 127

1    compensated?

2          A.   I do not.

3          Q.   Was Sachin Dewan compensated in

4    relation to H2B workers coming from India to

5    Signal.

6          A.   I -- (witness nodded head up and

7    down.)

8              BY MR. DOUGLAS:

9                  Say that question again.

10             BY MR. SHETH:

11                 Was Sachin Dewan compensated for

12   H2B workers coming from India to Signal.

13             BY MR. DOUGLAS:

14                 Okay.

15             BY MR. SHAPIRO:

16                 I'm going to object to the form.

17             BY THE WITNESS:

18                 I would -- I would expect so.

19   EXAMINATION BY MR. SHETH:

20         Q.   Was there any contract between you and

21   Michael Pol in relation to the Signal H2B

22   workers?

23         A.   No.

24             BY MR. DOUGLAS:

25                 Form.

Page 128

```
 1   EXAMINATION BY MR. SHETH:

 2       Q.  Was there any contract between you and

 3   Sachin Dewan in relation to the signal H2B

 4   workers?

 5           BY MR. SHAPIRO:

 6               Object to form.

 7           BY MR. KUPPERMAN:

 8               Object to the form of the

 9   question.

10           BY MR. DOUGLAS:

11               Form.

12           BY MR. ALEXIS:

13               Same objection.

14           BY THE WITNESS:

15               No.

16   EXAMINATION BY MR. SHETH:

17       Q.  How did Sachin Dewan get involved with

18   this effort to recruit H2B workers from India

19   to Signal?

20           BY MR. SHAPIRO:

21               Object to form.

22           BY MR. DOUGLAS:

23               Form.

24           BY MR. ALEXIS:

25               Same objection.
```

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

```
                                                         Page 129
     1          BY THE WITNESS:
     2                It's my belief that through
     3   Michael Pol.
     4   EXAMINATION BY MR. SHETH:
     5       Q.  Can you explain?
     6          BY MR. SHAPIRO:
     7                Object to form again.
     8          BY MR. ALEXIS:
     9                Same objection.
    10          BY MR. KUPPERMAN:
    11                I'll join in that objection.
    12          BY THE WITNESS:
    13                They have been business
    14   acquaintances for some time.  And I think that
    15   because they had this -- because they knew each
    16   other and had done business previously, they
    17   chose to do business with each other again.
    18   EXAMINATION BY MR. SHETH:
    19       Q.  Okay.  When's the first time that you
    20   met Sachin Dewan?
    21       A.  Probably in '96 or '97.
    22       Q.  In what context did you meet Sachin
    23   Dewan in '96 or '97?
    24       A.  In representing Michael Pol and IMI in
    25   obtaining H2B visas for IMI.
```

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 135

1    -- I thought I described Med-Tech --

2         BY MR. SHETH:

3              Earlier --

4         BY THE WITNESS:

5              -- Med-Tech, Global -- what --

6         BY MR. SHETH:

7              You called it the nurses.  I

8    think you called it the nurses.  You didn't

9    call it Med-Tech this time around.

10        BY MR. SHAPIRO:

11             Let's just go off the record.

12             (WHEREUPON, AN OFF-THE-RECORD

13   DISCUSSION, AT WHICH TIME, BURNETT NO. 1 WAS

14   MARKED FOR IDENTIFICATION PURPOSES.)

15   EXAMINATION BY MR. SHETH:

16        Q.  Mr. Burnett, can you take a look at

17   this document?

18        A.  Yes.

19        Q.  Have you seen this document before?

20        A.  Yes.

21        Q.  What is this document?

22        A.  It's an H2B approval notice, Form

23   I-797.

24        Q.  Okay.  Who produced this document?

25        A.  USCIS.

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 136

    1        Q.  And it was mailed to you?

    2        A.  I would assume so.  I may have

    3    received it by fax from USCIS.

    4        Q.  All right.  Where did you receive it?

    5        A.  It would have been received in my New

    6    Orleans office.

    7        Q.  At 1523 Polymnia Street?

    8        A.  Yes.

    9        Q.  And is this -- what is the title of

   10    this document?

   11        A.  Notice of Action.

   12        Q.  Was this Notice of Action sent to you

   13    in response to a filing that you made?

   14        A.  Yes.

   15        Q.  And what filing is that?

   16        A.  An I-129H.

   17        Q.  Okay.  And where was that filing made

   18    -- did you file that document?

   19        A.  Yes.

   20        Q.  Where was that filing made from?

   21        A.  It would have been mailed from my New

   22    Orleans office.

   23        Q.  Okay.  Did you prepare the I-129?

   24        A.  Yes.  My office prepared the I-129.

   25        Q.  And that was prepared in your New

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 137

1    Orleans office?

2         A.  Yes.

3         Q.  All right.

4              (WHEREUPON, BURNETT NO. 2 WAS

5    MARKED FOR IDENTIFICATION PURPOSES.)

6              BY THE WITNESS:

7              (Witness reviewed document.)

8    EXAMINATION BY MR. SHETH:

9         Q.  Mr. Burnett, you have what's in front

10   of you what's marked as Exhibit Burnett 2?

11        A.  Yes.

12        Q.  Have you seen this document before?

13        A.  Yes -- well, not -- yeah, I'm sure I

14   must have.  My signature is on it, yeah.  So,

15   yeah, I've seen it before.

16        Q.  Okay.  What is this document?

17        A.  It is an addendum to a prior agreement

18   between myself and other -- and Sachin Dewan

19   and Michael Pol and foreign workers who sought

20   to immigrate to work for J&M Associates.

21        Q.  Okay.  And is that your signature at

22   the bottom?

23        A.  Yes.

24        Q.  Who else has signed this document?

25        A.  It looks like Michael Pol and Sachin

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 138

1    Dewan.

2        Q.  What is the title of the agreement

3    that it's annexed to -- or that's it's an

4    addendum to, or what is that document?

5        A.  It would have been the --

6            BY MR. ALEXIS:

7                I'm just going to object to the

8    form of the question because it's a compound

9    question.  But if you can -- subject to that.

10           BY THE WITNESS:

11               I'm trying to think of what the

12   name -- the actual name of the agreement was.

13   It was -- you know, it was an agreement to

14   provide legal services to a worker.

15   EXAMINATION BY MR. SHETH:

16       Q.  Did you draft this document?

17       A.  No.

18       Q.  Did you have any involvement in its

19   preparation?

20       A.  I'm sure that I made some -- some

21   suggestions as to content.  But I'm looking at

22   the term of annexure to agreement.  That looks

23   like an Indian legalism to me.

24       Q.  Man, probably.  I'm sorry.  Could you

25   repeat his last answer?

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

Page 146

1              When you say "consult," I don't

2      know, you know, how to really define that.  But

3      I will say that -- that he -- that he solicited

4      from the workers information which I used to

5      compile information to submit on those forms.

6      EXAMINATION BY MR. SHETH:

7          Q.  Did you consult with Michael Pol or

8      did Michael Pol have any involvement with the

9      preparation of filing of any of those

10     immigration-relate documents?

11             BY MR. KUPPERMAN:

12                 Object to the form of the

13     question.

14             BY THE WITNESS:

15                 Honestly, I don't think so.

16     EXAMINATION BY MR. SHETH:

17         Q.  Okay.

18         A.  I mean, if he did, it would be

19     tangential, you know.  I --

20                 (WHEREUPON, BURNETT NO. 3 WAS

21     MARKED FOR IDENTIFICATION PURPOSES.)

22     EXAMINATION BY MR. SHETH:

23         Q.  Mr. Burnett, you have in front of you

24     what's been marked as Burnett Exhibit 3.  Let

25     me know when you're done reviewing it.

```
                                                      Page 147

  1         A.  (Witness reviewed document.)  Okay.

  2         Q.  Mr. Burnett, have you seen this

  3    document before?

  4         A.  Yes.

  5         Q.  What is this document?

  6         A.  It's a letter that appears to be

  7    lacking a page 2.

  8         Q.  It's a letter from who?

  9         A.  That's -- that's what I'm not clear.

 10    It's from Global Resources, but it's not

 11    signed.

 12         Q.  Okay.

 13         A.  I mean, is there a second page to

 14    this?  I believe that there is.

 15         Q.  I don't know.

 16         A.  There should be two pages to this.

 17         Q.  Okay.  Well, let's work with what we

 18    have.  Why do you think it's from Global

 19    Resources?

 20         A.  Because it appears on the letterhead.

 21         Q.  The letterhead is Global Resources; is

 22    that correct?

 23         A.  Yes.

 24         Q.  Okay.  Did you have any role in

 25    preparing this letter?
```

Kurian David, et al v. Signal International, LLC, et al                    Malvern C. Burnett, Esquire

```
                                                    Page 148
 1        A.   I'm sure that my brain was picked by

 2   Michael Pol.  This is a Michael Pol letter.

 3        Q.   Did you give any final approval to

 4   this letter before it was sent out?

 5             BY MR. KUPPERMAN:

 6                  Let me lodge an objection just to

 7   the extent that there's an invasion of the

 8   attorney/client privilege.

 9             BY MR. ALEXIS:

10                  And in that case, let me instruct

11   him not to answer just to be cautious.

12             BY MR. SHETH:

13                  That's fine.

14                  (WHEREUPON, BURNETT NO. 4 WAS

15   MARKED FOR IDENTIFICATION PURPOSES.)

16   EXAMINATION BY MR. SHETH:

17        Q.   All right.

18        A.   (Witness reviewed document.)  I've

19   reviewed the document.

20        Q.   Okay.  Have you seen this document

21   before?

22        A.   I'm not 100 percent sure.

23        Q.   Do you know what this document is?

24        A.   It purports --

25             BY MR. ALEXIS:
```

[PAGE BREAK]



WORKFORCE FOR THE WORLD

22 November 2004



PLAINTIFF'S
EXHIBIT
Burnett 3

Dear "Green Card" Candidate:

I thought it would be a good time to write you and let you know the current status of your "green card" application in the U.S. The good news is that President Bush has been re-elected. As you know, our president has been very pro-immigration but has put the newly devised immigration programs on hold because of election year politics. More importantly, the congress and senate of the US has picked up members of the presidents party, which now have a majority of the seats. This will be very important for not only the "PERM" (Program Electronic Review Management) which is the Fast Track Labor Certification process but also the proposed "Guest Worker Program". The new "PERM" process is scheduled to be fully implemented in early 2005. Enclosed you will find a circular that was issued by the US authority in charge of implementing the "PERM" program. This circular was intended for the regional offices explaining to them how to make the necessary changes.

Your immigration attorney, Mr. Malvern Burnett, has already initiated your alien labor certification on behalf of your permanent employer J&M Associates. This has been initiated under the Reduction in Recruitment program (RIR). This is also a Fast Track Program introduced in October 04. Under this process the Labor Certification may be completed by April of 2005.

The United States Department of Labor (DOL), has already established two national PERM processing centers one in Chicago and one in Atlanta, the Directors and the certifying officers have also been appointed. DOL assumes that the new PERM regulation shall be published by the end of December, 04 and the two national centers will be operational in 60 days from date of publication. Thereafter the Labor Certification it will take only 15-30 days. The currently filed RIR process and the PERM process are similar and allow transferring the cases from RIR to PERM. The advertisements process is under way which shall be completed by February, 05 just on time when the PERM center will be functional, so we shall be the one of the first in queue for the Labor certification under PERM process. Immigrant visa petitions will be filed as soon as the labor department certifications are issued. Immigrant visa petitions will take approximately 6-9 months from the date of filing.

WORLDWIDE HEADQUARTERS

U.S.A.
P.O. Box 1850
Ocean Springs, MS 39566
Phone: 228-875-123
Fax: 228-818-2740

INDIA
708 Sagar Tech Plaza
Sakti Naka Junction, Andheri Kurla Rd.
Mumbai 400 076
Phone: 91-225-694-1617 • Fax: 91-225-690-2077

DUBAI
Building 17
Room 158
Dubai Internet City
Dubai U.A.E.