Exhibit 23

Relevant pages from Deposition of Michael Pol, taken on
August 27, 2008, in Kurian David, et al, v. Signal
International, LLC, et al., and relevant exhibits thereto

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

KURIAN DAVID, et al              CIVIL ACTION
                                 NO. 08-cv-01220
          Plaintiffs,
VERSUS                           JUDGE ZAINEY

SIGNAL INTERNATIONAL, LLC    MAGISTRATE KNOWLES
et al,

          Defendants.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

          Deposition of MICHAEL POL, 13 Herring
Road, Beaumont, Mississippi, 39423, taken in
the Law Offices of Barrasso, Usdin, Kupperman,
Freeman & Sarver, 909 Poydras Street, Suite
2400, New Orleans, Louisiana, 70112, on August
27th, 2008, at or about 11:05 a.m.


APPEARANCES:

        SOUTHERN POVERTY LAW CENTER
        By:  Daniel Werner, Esquire
             Naomi Tsu, Esquire
        233 Peachtree Street, suite 2150
        Atlanta, Georgia  30303
        (Counsel for Plaintiffs)

        ASIAN AMERICAN LEGAL DEFENSE AND
        EDUCATION FUND
        By:  Tushar Sheth, Esquire
        99 Hudson Street, 12th Floor
        New York, New York  10013-2815
        (Co-Counsel for Plaintiffs)

        NEW ORLEANS WORKERS' CENTER FOR RACIAL
        JUSTICE
        By:  Jennifer J. Rosenbaum, Esquire
        803 Baronne Street
        New Orleans, Louisiana  70113
        (Co-Counsel for Plaintiffs)

Page 2

```
 1    APPEARANCES CONTINUED:

 2         BARRASSO, USDIN, KUPPERMAN, FREEMAN
           & SARVER
 3         By:  Stephen H. Kupperman, Esquire
           909 Poydras Street, Suite 2400
 4         New Orleans, Louisiana  70112
           (Counsel for Michael Pol and Global
 5          Resources, Inc.)

 6         HEIDELBERG, STEINBERGER, COLMER & BURROW
           By:  Kelly LarAnn Cash, Esquire
 7         711 Delmas Avenue
           Pascagoula, Mississippi  39568-1407
 8         (Co-Counsel for Michael Pol)

 9         PORTEOUS, HAINKEL AND JOHNSON
           By:  Ralph R. Alexis, III, Esquire
10         705 Carondelet Street
           New Orleans, Louisiana  70139-3774
11         (Counsel for Burnett Defendants)

12         MIDDLEBERG, RIDDLE & GIANNA
           By:  Donald C. Douglas, Jr., Esquire
13         201 St. Charles Avenue, 31st Floor
           New Orleans, Louisiana  70170-3100
14         (Counsel for Signal International, LLC)

15         PAGE, MANNINO, PERESICH & MCDERMOTT
           By:  Michael E. Whitehead, Esquire
16         759 Vieux Marche Mall
           Biloxi, Mississippi  39533
17         (Counsel for J & M Associates Inc., of
            Mississippi)
18
      ALSO PRESENT:
19
           Anjali Nair, Paralegal, Southern
20           Poverty Law Center

21         Malvern Burnett, Esquire

22    REPORTED BY:

23         Gail F. Mason, RPR
           Certified Court Reporter
24         Certificate No. 96004

25
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 3

```
 1
                       I N D E X
 2

 3   Title Page  . . . . . . . . . . . . .    1

 4   Appearances . . . . . . . . . . . . .   1,2

 5   Index    . . . . . . . . . . . . . .    3

 6   Stipulations of Counsel . . . . . . .    4

 7   EXAMINATION:

 8       By Mr. Werner. . . . . . . . . .    4

 9   EXHIBITS:

10       Pol No. 1 (Motion to Dismiss). . .   9
         Pol No.2 (Sale & Assumption) . . .  15
11       Pol No. 3 (tax lien) . . . . . . .  16
         Pol No. 4 (Corporate Filing) . . .  37
12       Pol No. 5 (Green Card Program) . .  52
         Pol No. 6 (2/25 & 26 e-mails). . .  95
13       Pol No. 7 (Annexure to Agree). . .  99
         Pol No. 8 (11/24/04 ltr) . . . . . 103
14       Pol No. 9 (4/1/04 ltr) . . . . . . 111
         Pol No. 10 (Recruit Agree) . . . . 126
15       Pol No. 11 (Corp Filing) . . . . . 139

16

     REQUESTS FOR INFORMATION BY MR. WERNER:
17
         No. 1. . . . . . . . . . . . . .  59
18       No. 2. . . . . . . . . . . . . .  66
         No. 3. . . . . . . . . . . . . . 101
19       No. 4. . . . . . . . . . . . . . 122
         No. 5. . . . . . . . . . . . . . 126
20

21   Reporter's Certificate  . . . . . . . 164

22

23

24

25
```

Page 4

1                 S T I P U L A T I O N

2

3         It is stipulated and agreed by and between

4     counsel for the parties hereto that the

5     deposition of the aforementioned witness is

6     hereby being taken pursuant to the Federal

7     Rules of Civil Procedure for all purposes;

8         That all formalities of signing, sealing,

9     certification, and filing are hereby waived;

10        That all objections are to be considered

11    under the Federal Rules of Civil Procedure.

12                    *   *   *   *   *

13        (MICHAEL POL, AFTER HAVING BEEN FIRST DULY

14    SWORN BY THE ABOVE-NAMED CERTIFIED COURT

15    REPORTER, WAS EXAMINED AND TESTIFIED AS

16    FOLLOWS:)

17            BY MR. KUPPERMAN:

18                Before we start and on the

19    record, to just confirm that this deposition is

20    for jurisdictional and venue purposes only.

21            BY MR. WERNER:

22                Right, our questions have been

23    limited to matters related to jurisdiction and

24    venue, that's correct.

25    EXAMINATION BY MR. WERNER:

Kurian David, et al v. Signal International, LLC, et al                                      Michael Pol

Page 5

```
 1        Q.  Mr. Pol, if you could just, please,

 2    for the record state your full name and

 3    address.

 4        A.  Michael Pol, P-O-L, 13 Herring Road,

 5    Beaumont, Mississippi, 39423.

 6        Q.  Okay.  Mr. Pol, thank you.  This

 7    deposition, as you know, is being taken as part

 8    of a lawsuit that's been filed by a number of

 9    former employees of Signal International, LLC,

10    against yourself and a number of other

11    individuals and entities.  My name is Daniel

12    Werner.

13        A.  Nice to meet you.

14        Q.  I'm one of the attorneys for the

15    plaintiffs in this case.

16        A.  Okay.

17        Q.  With me is Tushar Sheth, the Asian

18    American Legal Defense and Education Fund, and

19    Jennifer Rosenbaum of the New Orleans Workers'

20    Center.

21        A.  Off the record just a second.

22                (WHEREUPON, OFF-THE-RECORD

23    DISCUSSION.)

24    EXAMINATION BY MR. WERNER:

25        Q.  Then Naomi Tsu with the Southern
```

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                          Michael Pol

```
                                                      Page 12
 1    any other location other than Mississippi or

 2    India?

 3         A.  No.

 4         Q.  Have you ever operated any business

 5    that's located in Louisiana?

 6            BY MR. KUPPERMAN:

 7                And by "you" you're now referring

 8    to Mr. Pol?

 9    EXAMINATION BY MR. WERNER:

10         Q.  Mr. Pol, again, with my previous

11    instruction.

12         A.  Could you --

13            BY MR. KUPPERMAN:

14                Well, there's a difference.

15            BY MR. WERNER:

16                Well, Mr. Pol or -- obviously,

17    I'm not referring to Global here because he

18    already suggested that it didn't.

19    EXAMINATION BY MR. WERNER:

20         Q.  But have you, Mr. Pol, ever conducted

21    business or operated any business or have a

22    role in any business in the state of Louisiana?

23         A.  Yes.

24         Q.  What business was that?

25         A.  International Marine and Industrial
```

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

Page 13

1    Services, Incorporated.

2         Q.  Was that business incorporated in

3    Louisiana?

4         A.  No, sir.  Mississippi.

5         Q.  It was not incorporated in Louisiana?

6         A.  No, sir.

7         Q.  Has it ever been incorporated in

8    Louisiana?

9         A.  Not by me.

10            BY MR. KUPPERMAN:

11                And while you all are doing this,

12    could you all talk louder?  They're having

13    trouble hearing.

14            BY MR. WERNER:

15                I'm sorry.  I'll do my best.

16            BY MR. ALEXIS:

17                Thank you.

18    EXAMINATION BY MR. WERNER:

19         Q.  Has International Marine and

20    Industrial Services ever been registered as a

21    foreign corporation in the state of Louisiana?

22         A.  Yes.

23         Q.  Where was the place of business of

24    International Marine and Industrial Services?

25         A.  609 Highway 90, Gautier, Mississippi.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 14

1        Q.  Did it have any other places of

2    business?

3        A.  Yes.

4        Q.  Where?

5        A.  Tampa, Florida.  We had an office in

6    Tampa.  I don't recall the address, but it was

7    on 22nd Street, Tampa.

8        Q.  Where else?

9        A.  We had a building over here on the

10   Westbank next to Avondale Shipyard.  I don't

11   recall the address of that either.  It was just

12   past the Huey P. Long Bridge.

13       Q.  Who owned the property where the

14   business was located in Louisiana?

15       A.  I don't recall.

16       Q.  Might it have been you?

17       A.  I think it was the company, but I --

18       Q.  Might it have been you?

19           BY MR. KUPPERMAN:

20               Let me object.  He's not here to

21   guess at answers.  I think he's given already

22   give you the best answer he can.

23           BY MR. WERNER:

24               You can answer the question as

25   I've phrase it.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                      Page 15

   1            BY MR. KUPPERMAN:

   2                   Well, might it?  Anything is

   3    possible, I guess.  If you want the answer, I'm

   4    sure the court records can tell you.

   5                   (WHEREUPON, POL NO. 2 WAS MARKED

   6    FOR IDENTIFICATION PURPOSES.)

   7    EXAMINATION BY MR. WERNER:

   8            Q.  Mr. Pol, I'm showing you what's been

   9    marked as Plaintiff's Exhibit 2.  Please take a

  10    look at this document.

  11            A.  (Witness reviewed document.)

  12            Q.  Do you recognize this document?

  13            A.  Yes, sir.

  14            Q.  And will you tell me what it is?

  15            A.  I'm not sure exactly what you call it.

  16    Sale and Assumption.

  17            Q.  Will you tell me what the purpose of

  18    this document is?

  19            A.  This is where we purchased that piece

  20    of property on -- there's an address there

  21    somewhere.  I saw it.  It's in -- I missed it.

  22    It was on --

  23            Q.  Yeah, it was on approximately 1714

  24    Bridge City Avenue -- Bridge City Avenue.

  25            A.  Bridge City Avenue.  That was it.
```

Kurian David, et al v. Signal International, LLC, et al                     Michael Pol

```
                                                      Page 16
  1        Q.   In Bridge City?

  2        A.   Right.  Back in 1998.  Ten years ago,

  3   yeah.

  4        Q.   Now, you said this is where "we"

  5   purchased the property, who are you referring

  6   to when you say "we"?

  7        A.   Well, I mean it was purchased for the

  8   company.

  9        Q.   Okay.  But who purchased it?

 10        A.   I did.

 11        Q.   How long did you own this property?

 12        A.   I sold it in 2003.

 13        Q.   You sold it in 2003.  Who did you sell

 14   it to?

 15        A.   Let's see.  I can't remember the guy's

 16   name.  Anderson?  I can't remember his name.

 17   He's from Duncan, South Carolina.  So I

 18   apologize.  My brain is little fried this

 19   morning.

 20                  (WHEREUPON, POL NO. 3 WAS MARKED

 21   FOR IDENTIFICATION PURPOSES.)

 22   EXAMINATION BY MR. WERNER:

 23        Q.   Mr. Pol, I'm showing you what's been

 24   marked as Exhibit 3.  Will you take a look at

 25   this document?
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 17

1        A.   (Witness reviewed document.)

2             BY MR. WERNER:

3                  Off the record.

4                  (WHEREUPON, OFF THE RECORD.)

5             BY MR. KUPPERMAN:

6                  You don't have a question pending

7    right now, correct?

8             BY MR. WERNER:

9                  I do not have a question pending.

10   Oh, wait, wait, wait, Mr. Kupperman.  You can't

11   whisper instructions to your client.

12            BY MR. KUPPERMAN:

13                 I'm not giving him any

14   instructions nor is there a question pending

15   right now.

16            BY MR. WERNER:

17                 I asked him to look at -- it's

18   absolutely improper to speak to your client --

19            BY MR. KUPPERMAN:

20                 I don't believe so.

21            BY MR. WERNER:

22                 Well, then I can ask him what

23   exactly you've told him.

24            BY MR. KUPPERMAN:

25                 You may ask him and I will

Kurian David, et al v. Signal International, LLC, et al                               Michael Pol

```
                                                          Page 18
 1   object --
 2           BY MR. WERNER:
 3               You are not to speak to your
 4   clients during the course of this deposition.
 5   That is improper.  You're not permitted to --
 6           BY MR. KUPPERMAN:
 7               You really think it's improper
 8   without a question pending for me to talk to my
 9   client?
10           BY MR. WERNER:
11               I asked your client to please
12   take a look at this document.  I'm going to ask
13   him to identify this document.
14           BY MR. KUPPERMAN:
15               Well, he can identify it, but I
16   want to ask him a question before -- I want to
17   talk to him before you go on to anything
18   substantive.
19           BY MR. WERNER:
20               I am not -- if you would like to
21   talk to him during the break, that is fine.
22           BY MR. KUPPERMAN:
23               Well, then let's take a break.
24           BY MR. WERNER:
25               Well, I'm not agreeing to take a
```

Kurian David, et al v. Signal International, LLC, et al                     Michael Pol

```
                                                   Page 19
 1   break right now.

 2            BY MR. KUPPERMAN:

 3                 You don't have to agree.  I'm

 4   taking a break.

 5            BY THE WITNESS:

 6                 I've got to use the toilet.

 7                 (WHEREUPON, OFF THE RECORD.)

 8   EXAMINATION BY MR. WERNER:

 9       Q.  Back on.  Mr. Pol, we've just taken a

10   break that was probably about three or four

11   minutes.  During this break, did you confer

12   with your attorney in the hall?

13       A.  Yes.

14       Q.  Did you confer about this document

15   with your attorney in the hall?

16            BY MR. KUPPERMAN:

17                 I'm going to object to the

18   question because I think that it invades the

19   attorney/client privilege, and I'm going to

20   instruct him not to answer.

21            BY MR. WERNER:

22                 I can ask what -- well, certainly

23   I'm entitled to ask what he conferred about.  I

24   haven't yet asked anything about the substance

25   of the conversation.
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                        Page 20
   1            BY MR. KUPPERMAN:

   2                But I think that tells you about

   3    the substance.  I'll tell you what, I'm more

   4    than happy to let him answer if I have a

   5    stipulation that there's no waiver of

   6    attorney/client privilege if he answers.

   7            BY MR. WERNER:

   8                That's fine.

   9            BY MR. KUPPERMAN:

  10                Is that okay with everybody else

  11    here?

  12            BY MR. WHITEHEAD:

  13                That's fine.

  14            BY MR. DOUGLAS:

  15                (Nodded head up and down.)

  16            BY MR. ALEXIS:

  17                Yeah.

  18            BY MR. KUPPERMAN:

  19                I've got a yes.  Okay.

  20            BY MR. WERNER:

  21                And your place to raise

  22    attorney/client privilege would be if we used

  23    this testimony for whatever purpose, in a

  24    motion or whatever it may be.

  25            BY MR. KUPPERMAN:
```

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

```
 1                I didn't understand what you just

 2    said, but he can go ahead and answer the

 3    question because there's no waiver of the

 4    privilege.

 5    EXAMINATION BY MR. WERNER:

 6        Q.  Will you please tell me what you

 7    discussed with your attorney in the hall.

 8              BY MR. KUPPERMAN:

 9                No, wait.  That wasn't the

10    question.  The question was whether or not we

11    discussed the document.

12              BY MR. WERNER:

13                Oh, I thought you were saying

14    that you were going to waive --

15              BY THE WITNESS:

16                And I already said yes to that.

17              BY MR. WERNER:

18                Okay.  So you discussed the

19    document.  What did you discuss about the

20    document?

21              BY MR. KUPPERMAN:

22                Now, I'm going to object on the

23    basis of attorney/client privilege.

24              BY MR. WERNER:

25                Okay.  For the record, it is
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 22

```
 1    certainly Plaintiff's position that any

 2    discussion that Mr. Pol had with his counsel

 3    while a document was in front of him about the

 4    subject matter of that document is not

 5    privileged and, in fact, is fully discoverable

 6    during the course of this deposition.  We

 7    certainly reserve the right to bring this

 8    before the Court and to reconvene this

 9    deposition to ask any related questions and to

10    seek any remedies that may be available.

11    EXAMINATION BY MR. WERNER:

12         Q.  Mr. Pol, will you please take a look

13    at -- well, will you please describe this

14    document to me?

15         A.  Well, I've never seen it before.  It

16    looks like -- because I'm from Mississippi, but

17    it appears to be a document that has something

18    to do with back taxes that's trying to be

19    collected.

20         Q.  What is the date on this document on

21    the second page?

22         A.  The date?  13th day of June 2007.

23              BY MR. WERNER:

24                   Will Counsel stipulate that it's

25    a tax sale document?
```

Page 23

1          BY MR. KUPPERMAN:

2               Yes, that's what it looks like to

3     me.  I've never seen it before either, but that

4     certainly looks to be.

5          BY THE WITNESS:

6               It looks like it.

7     EXAMINATION BY MR. WERNER:

8          Q.  So I'm wondering why a tax sale of

9     property that is indicated to be owned by you

10    in June of 2007 would occur if you're saying

11    you sold the property in 2003.

12         A.  This property was sold along with

13    International Marine and Industrial Services in

14    2003 to a man in Duncan, South Carolina whose

15    last name is Anderson.  I cannot remember his

16    first name or his company name.  But all of the

17    documents that were related to this, including

18    the deed that I signed over to him, this

19    property, I am no longer in possession of.  The

20    Gulf of Mexico is.

21         Q.  You're saying you sold the

22    International Marine and Industrial Services to

23    Mr. Anderson --

24         A.  Yes.

25         Q.  -- in 2003 as well?

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 24

1        A.  Yes.

2        Q.  Was International Marine and

3   Industrial Services administratively dissolved

4   for failure to pay -- to file an annual report?

5        A.  It may have been.  International

6   Marine actually -- the assets of it were sold

7   to this guy, this Anderson guy.  And the -- I

8   guess the original name, International Marine

9   and Industrial Services, I kept.  We had a

10  dispute with AIG Insurance Company on insurance

11  premiums that we could not resolve, and

12  International Marine, therefore, went bankrupt.

13       Q.  Did it file a bankruptcy petition?

14       A.  Yes, it did.

15       Q.  In which court?

16       A.  Federal Court in Mississippi.

17       Q.  Do you know when that petition was

18  filed?

19       A.  Sometime right before I lost my house.

20       Q.  So that would have been in 2005?

21       A.  Yeah, it was shortly before the

22  hurricane.

23       Q.  Do you remember which chapter of the

24  bankruptcy it was filed in?

25       A.  You got me there, Counselor.

Page 25

1      Q.  Did you have any business partners in

2   International Marine and Industrial Services?

3      A.  No, sir.

4      Q.  What was your title at International

5   Marine?

6      A.  President.

7      Q.  What was the purpose of International

8   Marine and Industrial Services?

9      A.  It was a labor support company.

10     Q.  I'm going to use shorthand

11   International Marine to refer to International

12   Marine and Industrial Services, Inc.

13     A.  We can just call it IMI.  If you want

14   to do that, that's just as easy.

15     Q.  We'll call it IMI then.

16     A.  There you go.

17     Q.  Even easier.  When I call it IMI, you

18   understand that I'm referring to International

19   Marine and --

20     A.  Yes, sir.

21     Q.  -- Industrial Services?

22     A.  Yes, sir.

23     Q.  Did IMI provide labor to any

24   businesses in the state of Louisiana?

25     A.  Yes, it did.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

1        Q.  Which businesses?

2        A.  Primarily, Avondale Shipyard.  It's

3    been a long time.  You'll have to give me just

4    a second here to think.  We did do some

5    business with -- what's the name of that place

6    -- American Shipyard or American -- down in

7    Galliano.  North American Shipyard maybe?  Can

8    anybody give me an amen?  I just -- I think

9    that's the name of it.

10       Q.  Your guess is as good as mine right

11   now.  Anybody else other than Avondale and the

12   company you think is North American Shipyard?

13       A.  It was insignificant.  If there were

14   others, it was minor.

15       Q.  And minor, like what would that mean?

16       A.  I mean, you and I may have a different

17   determination of minor.  Money.

18       Q.  That's what I'm asking.

19       A.  Money.  You know, it would be a small

20   customer that, you know, didn't really make a

21   lot of money.

22       Q.  Okay.  But I guess I'm trying to

23   figure out, even if it was a customer who you

24   characterized as minor who those customers

25   were?

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 27

1        A.  I don't recall.

2        Q.  You don't recall any of your other

3    customers in the state of Louisiana?

4        A.  I remember my big customers.  That's

5    it.

6        Q.  When was the last year you provided --

7    or IMI provided laborers to Avondale Shipyard?

8        A.  You know, you've got me on that one.

9    I don't know for sure.  I'd have to check with,

10   actually, my accountant.  I'm not positive that

11   I provided them in 2003.  It probably was more

12   like 2001 or '2, but I can't even be positive

13   on that without -- without checking to see.

14              I have lost all my documents from

15   those years.  I had them in my home.  And, of

16   course, I was -- my home was destroyed during

17   Hurricane Katrina.  So I would have to go back

18   and recreate that somehow or another from other

19   sources.  I'm not sure where I could find that.

20       Q.  You said you -- one option would be to

21   check with your accountant.  Who was your

22   accountant for IMI?

23       A.  Rip Prichard.

24       Q.  Could you spell the last name?

25       A.  I'm terrible on spelling last names.

Page 28

1    Rip is how I know him.

2         Q.   As best you can.

3         A.   Prichard, like P-R-I-C-H-A-R-D, I

4    think.

5         Q.   And Rip Prichard was the accountant

6    for IMI?

7         A.   Yes, he was.

8         Q.   Has Mr. Prichard been the accountant

9    for any other business that you've own or

10   operated?

11        A.   Yes.

12        Q.   Which other businesses?

13        A.   Global Resources.

14        Q.   Anything else?

15        A.   He's been my personal accountant as

16   well, but that's it.

17        Q.   Where is Mr. Prichard's office?

18        A.   It's on Hillcrest in Mobile.

19        Q.   In Mobile, Alabama?

20        A.   Yes, sir.

21        Q.   Does he also have an office in New

22   Orleans --

23        A.   No, sir.

24        Q.   -- that you know of?  I'd just ask --

25   I have the same habit -- if you could just wait

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                        Page 29
 1      until I'm done with my question to answer.  It

 2      makes things easier for her as well.

 3           A.  Yes.

 4           Q.  When did IMI first provide workers to

 5      Avondale Shipyard?

 6           A.  1996.

 7           Q.  And your testimony is that they

 8      provided workers from 1996 until --

 9           A.  Somewhere in the 2002, maybe 2003, but

10      I'm not positive on that.  But it certainly

11      wasn't after 2003.

12           Q.  The workers that IMI supplied to

13      Avondale Shipyard, were they workers from the

14      United States?

15           A.  Yes.

16           Q.  Exclusively?

17           A.  Not exclusively.

18           Q.  Did IMI have any role in obtaining

19      visas for workers who came --

20           A.  Yes.

21           Q.  -- to work for Avondale?

22           A.  Yes.

23           Q.  Okay.  What kind of visas did IMI help

24      to secure?

25           A.  I'd have to ask my lawyer.  He's
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                          Page 30

 1    sitting on the end of the table down there.  I

 2    don't recall --

 3          Q.  So for the record --

 4          A.  -- exactly.  I don't know the -- I

 5    don't want to get it wrong.

 6          Q.  For the record, Mr. Pol pointed to --

 7          A.  Mr. Malvern Burnett.

 8          Q.  -- Malvern Burnett.  And Malvern

 9    Burnett was your lawyer --

10          A.  Yes.

11          Q.  -- for the purpose of --

12          A.  Yes.

13          Q.  -- obtaining workers on visas --

14          A.  Yes.

15          Q.  -- to work at Avondale?  Could you

16    just repeat your answer one more --

17          A.  Yes.

18          Q.  Thank you.  And Mr. Burnett was the

19    lawyer for IMI?

20          A.  Yes.  I'm sorry about getting ahead of

21    you.

22          Q.  No, no, that happens.  Where were the

23    workers from who were not from the United

24    States?

25          A.  Mexico, Indochina, India, workers from
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                    Page 31
 1    all over.
 2         Q.  What was your -- what was your role
 3    personally in recruiting or finding these
 4    workers for IMI?
 5         A.  I guess very much like a general in
 6    the Army.  I led the charge.
 7         Q.  You led the charge.  What does that
 8    mean?
 9         A.  You know, I was operating the company
10    that was doing this, so --
11         Q.  Did you travel?
12         A.  Absolutely.
13         Q.  Where did you travel to?
14         A.  I traveled to many different locations
15    in the United States.  I traveled to the Middle
16    East.  I traveled to India.  I traveled to Guam
17    even.  I tried to recruit U.S. citizens as
18    well.
19         Q.  And when you were doing this for IMI
20    when you were recruiting these workers for
21    Avondale Shipyard, were you working out of the
22    Louisiana property?
23         A.  Actually, that didn't come until
24    after, after that was all said and done with.
25    So I didn't even own it at that time.  At the
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

1    time that I recruited the Indians to come to

2    the United States to work, I did not own that

3    building.

4         Q.  Did you rent that building?

5         A.  No.

6         Q.  So you didn't recruit any workers to

7    come -- any Indian workers to come to Avondale

8    after 1998?

9         A.  No, sure didn't.

10        Q.  Did you recruit any workers period to

11   come to Avondale after 1998?

12        A.  Yes -- not from India.

13        Q.  Not from India, but from other

14   locations?

15        A.  U.S. citizens, yes.

16        Q.  From other foreign countries?

17        A.  No.

18        Q.  So after 1998, you did not recruit a

19   single foreign worker to come to work for

20   Avondale, you or IMI?

21        A.  No.

22        Q.  How long were the Indian workers who

23   you recruited for Avondale working there?  What

24   was their term of employment?

25             BY MR. ALEXIS:

Page 33

```
 1                    Excuse me.  Could you read back

 2      the question.

 3                    (WHEREUPON, THE REQUESTED PORTION

 4      OF THE TRANSCRIPT WAS READ BACK BY THE COURT

 5      REPORTER.)

 6            BY MR. ALEXIS:

 7                    I'd like to object to the

 8      question.  I don't know that it applies to

 9      jurisdiction and venue as we agreed.

10            BY MR. WERNER:

11                    Well --

12            BY MR. ALEXIS:

13                    I'm just making that objection.

14            BY MR. WERNER:

15                    -- you can make your objection on

16      the record.  And, obviously, Mr. Pol needs to

17      answer that question.

18            BY THE WITNESS:

19                    Excuse me.  Could you ask that

20      again?

21            BY MR. KUPPERMAN:

22                    And I'll join in the objection

23      while you're with it, but I'm not --

24            BY MR. WERNER:

25                    But you'll let him answer?
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                     Page 34
   1            BY MR. KUPPERMAN:
   2                 -- I'm not instructing him not to
   3      answer.
   4                 (WHEREUPON, THE REQUESTED PORTION
   5      OF THE TRANSCRIPT WAS READ BACK BY THE COURT
   6      REPORTER.)
   7            BY THE WITNESS:
   8                 Is your question related to
   9      contractually or is it related to the actual
  10      time that they worked?
  11      EXAMINATION BY MR. WERNER:
  12         Q.  Well, let's start with contractually
  13      and then we'll go into the actual time worked.
  14      Contractually, how long was it?
  15         A.  Contractually, it was for -- we
  16      promised them that they would have a job for --
  17      I think it was nine months, nine to ten months.
  18      In theory, being that, you know, in case
  19      something happened with the visas and they
  20      didn't get renewed that that would be it.  And
  21      then, of course, they ended up working like 18,
  22      19, 20 months.  Some worked a little longer,
  23      some a little shorter depending on when they
  24      came and how long their visas -- what the
  25      duration of their visa was.
```

Page 35

```
 1        Q.  What was the -- were these workers who

 2   you placed at Avondale Shipyard on Avondale's

 3   payroll?

 4        A.  No, sir.

 5        Q.  Whose payroll were they on?

 6        A.  They were on my payroll.

 7        Q.  On IMI's payroll?

 8        A.  Yes, sir.

 9        Q.  And that includes the U.S. workers and

10   the foreign workers?

11        A.  Yes.

12        Q.  When was the last time there were

13   workers employed at Avondale Shipyard who were

14   on IMI's payroll?

15        A.  I think we've been over this once.  I

16   don't know how I can answer it any better.

17        Q.  Well, it's a different question from

18   what I asked before.

19        A.  Ask that again.

20           BY MR. WERNER:

21                If you don't mind reading that

22   back.

23                (WHEREUPON, THE REQUESTED PORTION

24   OF THE TRANSCRIPT WAS READ BACK BY THE COURT

25   REPORTER.)
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                        Page 36
   1          BY THE WITNESS:
   2               That's exactly the same question
   3   that you asked earlier.  I told you that I
   4   couldn't remember.  It was sometime in 2002
   5   maybe or '3.  Not past 2003.
   6   EXAMINATION BY MR. WERNER:
   7      Q.  So these workers ended up no longer
   8   being on IMI's payroll after you -- after you
   9   said that you sold the company?
  10      A.  Any worker?
  11      Q.  I'm talking about any worker, not just
  12   foreign workers.  Any worker.
  13      A.  2002 to 2003 would be the maximum they
  14   could have been on the payroll.  Maybe I don't
  15   understand what you're saying.
  16      Q.  I think you answered my question.
  17          BY MR. KUPPERMAN:
  18               Dan, let me just stop you.  Can
  19   you go back and read the question before that
  20   one.
  21               (WHEREUPON, THE REQUESTED PORTION
  22   OF THE TRANSCRIPT WAS READ BACK BY THE COURT
  23   REPORTER.)
  24          BY MR. KUPPERMAN:
  25               I was just -- I didn't know if I
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 37

1    heard you referring to Indian workers and his

2    answer was 2003 or all.  And I think your

3    question was directed to all.

4            BY MR. WERNER:

5               That's correct.

6    EXAMINATION BY MR. WERNER:

7        Q.  Was IMI registered as a corporation or

8    as a foreign corporation in any state other

9    than Louisiana and Mississippi?

10       A.  Yes, I'm pretty sure it was.

11       Q.  What other states?

12       A.  That I can't remember, but I believe

13   -- I believe that it was Florida and possibly

14   Maryland, but I can't say for sure.  Alabama

15   maybe too.

16       Q.  Do you remember what name it used in

17   Alabama if it was registered there?

18       A.  It could have been IMI.  It could have

19   been International Marine and Industrial

20   Services.

21       Q.  I'll make it easier for you.

22               (WHEREUPON, POL NO. 4 WAS MARKED

23   FOR IDENTIFICATION PURPOSES.)

24   EXAMINATION BY MR. WERNER:

25       Q.  I'm showing you what's been marked as

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                     Page 38
 1    Plaintiff's 4.  I'm just showing this to you to
 2    jog your memory.  Was --
 3         A.  Yes.
 4         Q.  -- the name it was registered -- was
 5    the name IMI it was registered under in Alabama
 6    IMI Services of Alabama, Inc.?
 7         A.  Yes, sir, this is it.
 8         Q.  Thank you.
 9         A.  And there's your accountant right
10    there, R.I. Prichard, if you need to talk to
11    him.
12         Q.  Thank you.  I'm sure we will.  Did
13    Sachin Dewan have any role in IMI?
14         A.  What did you say?
15         Q.  Did Sachin Dewan have any role in IMI?
16         A.  Are you saying Sachin Dewan?
17         Q.  Forgive my pronunciation.  You know
18    who I'm referring to.
19         A.  He had no role in IMI.  He had no role
20    in my company.
21         Q.  He had no role in IMI?
22         A.  Absolutely not.
23         Q.  Did he have any role in the
24    recruitment of workers for IMI?
25         A.  Yes.
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 39

1        Q.   What was his role?

2        A.   Recruiting workers for IMI.

3        Q.   And what did that involve?

4        A.   That involved recruiting in India.

5        Q.   Did Mr. Dewan continue to recruit

6   workers -- Mr. Dewan continue to recruit

7   workers for IMI after you maybe sold its

8   assets?

9            BY MR. ALEXIS:

10               Let me object to the question

11   again.  I think you maybe go beyond the scope

12   of jurisdiction and venue.

13           BY MR. WERNER:

14               This is a --

15           BY THE WITNESS:

16               I don't exactly understand what

17   you just asked.

18           BY MR. WERNER:

19               Well, I'll respond to the

20   objection first which is that IMI is a business

21   that was operating in Louisiana.  I think I'm

22   entitled to ask the questions about -- and

23   Mr. Dewan has contested personal jurisdiction

24   as well.

25           BY MR. ALEXIS:

[PAGE BREAK]

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 43

1        Q.   Was it more than 250?

2        A.   No, I don't think so.

3        Q.   Was it more than 100?

4        A.   I'm not sure.  I think I'd have to say

5   less than 100.

6        Q.   Was it -- so the total number of

7   workers placed at North American Shipyard

8   during the entire period from 1996 to 2003, you

9   think it was less than 100?

10       A.   I'm pretty sure it was less than 100.

11       Q.   How many workers total did IMI place

12   at Avondale Shipyard during the life of IMI?

13       A.   I cannot answer that question.  I do

14   not know.

15       Q.   Was it more than a thousand?

16       A.   I can't answer that.

17       Q.   Was it more than one?

18       A.   I can't answer -- I can't answer it.

19   I mean, it was certainly more than one.

20       Q.   Well, that's what I'm working towards.

21   Was it more than five?

22       A.   I know where you're headed with this.

23   I can't give you an exact number.

24       Q.   I'm not asking for an exact number.

25   I'm asking for a range that you're comfortable

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                        Page 48
  1    Wachovia, but it used to be South Trust.  It's
  2    owned now -- those banks have changed so much I
  3    can't remember.  In those years, it would have
  4    been South Trust Bank in Pascagoula.
  5         Q.  During the existence of IMI, how
  6    frequently did you go to the Louisiana
  7    building?
  8         A.  Maybe once every two or three months.
  9         Q.  And otherwise the building was vacant?
 10         A.  Oh, I had employees there.
 11         Q.  How many employees were there?
 12         A.  Generally, two.
 13         Q.  And what were those employees doing?
 14         A.  Those employees would be coordinators
 15    and a receptionist.
 16         Q.  What were the coordinators' names?
 17         A.  I don't recall.
 18         Q.  You don't recall any of them?
 19         A.  No.
 20         Q.  What were the receptionists' names?
 21         A.  Don't recall.
 22         Q.  Any of them?
 23         A.  None.
 24         Q.  Was there a written contract between
 25    IMI and Avondale?
```

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

Page 49

1       A.  No.

2       Q.  Was there any kind of a written

3   agreement whatsoever between IMI and Avondale?

4       A.  No.

5       Q.  How was --

6       A.  Well, when you say --

7       Q.  I don't want to split hairs here.  I

8   think you know what I'm asking.

9       A.  I don't know what you're asking.

10      Q.  Well, I'm asking was there any kind of

11  a document that memorialized the arrangement

12  between IMI and Avondale?

13      A.  Certainly there was, and it was a rate

14  sheet and what they would pay you when you

15  brought them an employee.  So the human

16  resources department would take care of that at

17  Avondale Shipyard.  And that was a document

18  that got you into the shipyard.  In other

19  words, your company qualified to do business

20  there.  And then once you were qualified to do

21  business there, you could bring people in to

22  them as a labor provider.  That was the only

23  document that I had with Avondale Shipyard.

24      Q.  How did you -- how did IMI get

25  qualified to provide workers to Avondale?

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                           Michael Pol

Page 60

1    called Med Staff International, Inc.?

2        A.  Yes.

3        Q.  When was that created?

4        A.  You've probably got the --

5        Q.  I don't, but what -- when was it

6    created?

7        A.  I can't remember the date exactly.

8        Q.  What was the purpose of that business?

9        A.  To recruit nurses.

10       Q.  Did it ever recruit nurses?

11       A.  Yes.

12       Q.  Is it still in existence?

13       A.  No.

14       Q.  When did it cease to do business?

15       A.  2004, '5.  In 2005 maybe, 2004.

16       Q.  And where did Med Staff International

17   place nurses?

18       A.  In Jackson, Mississippi.

19       Q.  Any other locations?

20       A.  Nope.

21       Q.  Where did these -- where were these

22   nurses from?

23       A.  India.

24       Q.  Was Sachin Dewan involved with that

25   business?

Page 61

1      A.  Yes.

2      Q.  What was his involvement?

3      A.  Recruiting nurses.

4      Q.  Was Mr. -- was Malvern Burnett

5  involved in that business?

6          BY MR. ALEXIS:

7              Let me object to the form of the

8  question.  I think it's ambiguous.  But subject

9  to that.

10         BY THE WITNESS:

11             Malvern wasn't involved in my

12  business at Med Staff, if that's the --

13  EXAMINATION BY MR. WERNER:

14     Q.  We're going to split hairs again.  Did

15  Malvern Burnett have any role in the

16  recruitment of nurses or the acquisition of

17  visas for placements made by Med Staff?

18         BY MR. KUPPERMAN:

19             Let me just object to the

20  characterization that he had, I think, prior to

21  your question.  It was probably recorded, but

22  you can go ahead and answer.

23         BY THE WITNESS:

24             What was the question again?

25         BY MR. WERNER:

**[PAGE BREAK]**

Page 67

1       A.   I don't know that I would say -- you

2   know, I mean, what do you count as "several"?

3   I think there were two.

4       Q.   How many?  Two?

5       A.   Yeah, I think there were two e-mails,

6   one to and one fro.  And, you know, I never had

7   any interest with doing any business with

8   Dr. Rao.

9       Q.   Why not?

10      A.   He's doing the same thing I'm doing.

11  Why would I want to be doing business with him?

12  I can do what he's -- I don't need him.

13      Q.   Did you ever send a fax or receive a

14  fax from Dr. Rao?

15      A.   I don't think so.

16      Q.   Did you ever talk to Dr. Rao on the

17  phone?

18      A.   Yes.

19      Q.   When?

20      A.   When we got our visas approved,

21  Dr. Rao called me on the phone to congratulate

22  me.  And he was in India.  He called me from

23  India and congratulated me.  And then he wanted

24  me to talk to Sachin Dewan about bringing some

25  of his people to the U.S., the people that he

Page 68

1    had recruited for apparently somebody he has

2    over here, some company he recruited for.  And,

3    you know, I didn't have anything to do with any

4    of that.

5                  But, you know, he couldn't get

6    them over here.  And we had visas available,

7    and so he wanted to try to put them with me.  I

8    said -- I told him I'd talk to Sachin.  So

9    Sachin and I discussed it, and I think we let a

10   number of people that were qualified that

11   belonged to him come over here.  And I agreed

12   to do it for, you know, a lesser amount of

13   money because Dr. Rao had already collected

14   money from these guys.

15        Q.  And when did this phone conversation

16   take place?

17        A.  Gosh.  Summer of '06, summer -- late

18   summer '06 maybe.

19        Q.  And what visas had been approved?

20        A.  It's some visas that had been for --

21   for Signal International.  Visas had been

22   approved.

23        Q.  So these workers who Dr. Rao had

24   recruited in India ended up being placed by you

25   at Signal International?

Kurian David, et al v. Signal International, LLC, et al                              Michael Pol

Page 69

```
 1       A.  Yes.

 2       Q.  When you say Dr. Rao was doing the

 3  same -- in the same business as you, what are

 4  you referring to?

 5       A.  He was recruiting people, trying to

 6  put them to work in the United States from

 7  India.

 8       Q.  Did you consider him a competitor?

 9       A.  Absolutely.

10       Q.  What type of visas did the gentlemen

11  who were placed -- who were recruited by Rao

12  and placed by you have?

13       A.  What type --

14       Q.  What type of visas?

15       A.  They got H2Bs.

16       Q.  Was the only time you communicated to

17  Dr. Rao about these placements that one

18  telephone call?

19       A.  Yes, one telephone call.  But it

20  wasn't he that I was interested in talking to.

21  Actually, it was Sachin Dewan who was calling

22  me and asking me to do this, and I told Dr. Rao

23  that I'd just deal with Sachin because I didn't

24  want to get involved with his deal over there.

25  I mean, I would just deal with Sachin.  So
```

Page 70

1    that's what I did.

2         Q.  Well, you talked to Dr. Rao and

3    then --

4         A.  One time on the phone.

5         Q.  Where was Dr. Rao placing people at

6    that time?

7         A.  I have no idea.

8             BY MR. ALEXIS:

9                 I'm sorry.  I didn't hear the

10   answer.

11            BY THE WITNESS:

12                I have no idea.

13   EXAMINATION BY MR. WERNER:

14        Q.  Do you know where Dr. Rao was when you

15   exchanged e-mails?

16        A.  I was assuming he was in India.

17        Q.  When did you first meet -- when did

18   you first meet Malvern Burnett?

19        A.  That would have been sometime in the

20   early part of 1996.

21        Q.  Where did you meet him?

22        A.  Where did I meet him?

23        Q.  Yes.

24        A.  I met him at his office in Polymnia

25   Street in New Orleans.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                      Page  71
  1         Q.   And what was the purpose of that

  2    meeting?

  3         A.   To see if he would be interested in or

  4    if he could help me -- assist me with getting

  5    some H2B visas.

  6         Q.   And what did he tell you?

  7         A.   Absolutely for $10,000.

  8         Q.   Did you pay him $10,000?

  9         A.   I did.

 10         Q.   How many visas did Mr. Burnett get for

 11    you at that time?

 12         A.   450.

 13         Q.   And where were those workers placed?

 14         A.   Avondale.

 15         Q.   So at that time he was placing workers

 16    for IMI?

 17         A.   For IMI.

 18         Q.   What was your -- or IMI's agreement

 19    with Mr. Burnett with respect to payment of

 20    monies to them and the type of work he would do

 21    for you?

 22         A.   Well, at that time it was -- it was a

 23    $10,000 fee to do the 400-some-odd H2B visas,

 24    to do the work for me.

 25         Q.   Was there anything that was created in
```

Page 72

```
 1   writing that memorialized your agreement with

 2   Mr. Burnett at that time?

 3        A.  I don't think so and I don't recall

 4   it, but it could have.  My problem is is

 5   everything I've ever owned is gone because of

 6   the hurricane, everything prior to 2005.  And

 7   so it would be difficult for me to dig stuff

 8   like that up.

 9        Q.  How many times did you meet with

10   Mr. Burnett during the process of acquiring

11   these H2B visas?

12        A.  You ask some tough questions.  I mean,

13   I don't know.  I know I did meet with him.

14        Q.  You met with him multiple times?

15        A.  I certainly must have met with him

16   multiple times.  But now he had an office in

17   the Markham Building over in Gulfport that we

18   would meet in Mississippi.  He didn't make me

19   come all the way over here.

20        Q.  Well, you came here periodically to

21   meet with him?

22        A.  I came here periodically just to check

23   on my men that worked for the company.

24        Q.  And you would meet with him while you

25   were here?
```

Page 73

1        A.   Not necessarily.

2        Q.   Sometimes?

3        A.   Not -- well, maybe a few times.

4        Q.   Would you communicate with him by

5   phone?

6        A.   Phone, e-mail certainly.

7        Q.   So you would call him in his office in

8   New Orleans?

9        A.   I never called him at his office.  I

10   always called him on his cell phone.

11        Q.   His cell phone in New Orleans?

12        A.   Well, I don't know.  My brother has

13   got a cell phone that's got a California

14   number, and he can sit across the table from me

15   and talk to me.

16        Q.   When was the next time that you did

17   business with Mr. Burnett?

18        A.   Be more specific.

19        Q.   When was the next time that you had

20   any kind of business dealings with Mr. Burnett?

21        A.   You mean from the recruitment of the

22   Indians here at Avondale Shipyard?

23        Q.   After that initial recruitment of 450

24   workers, what was the next work that he did for

25   you or any of your corporate entities?

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                      Page 74

  1        A.  Well, okay.  He did -- he did for

  2   International Marine.  He did do a recruitment

  3   for North American Shipyard.

  4        Q.  When was that?

  5        A.  '99, '98.

  6        Q.  And how many workers were recruited

  7   for North American Shipyard?

  8        A.  I don't remember the exact number.

  9        Q.  Was it more than 100?

 10        A.  I don't think so.  I think it was less

 11   than 100.

 12        Q.  When Mr. Burnett did this work for

 13   you, both for the Avondale placement and the

 14   North American Shipyard place, did Mr. Burnett

 15   -- did Mr. Burnett have an arrangement with you

 16   that he would also receive fees from the

 17   workers?

 18        A.  No.

 19            BY MR. ALEXIS:

 20                I'm sorry.  From --

 21            BY MR. WERNER:

 22                From the workers.  From the

 23   people who were being recruited.

 24            BY THE WITNESS:

 25                No.
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 75

1    EXAMINATION BY MR. WERNER:

2        Q.  How much did you pay Mr. Burnett for

3    the services that were performed around the

4    placement at North American Shipyard?

5        A.  I didn't hear you.

6            BY MR. KUPPERMAN:

7                Would you try to keep your voices

8    up?

9            BY MR. ALEXIS:

10               Yeah, I can't hear.

11           BY MR. WERNER:

12               Could you read that back, please?

13               (WHEREUPON, THE REQUESTED PORTION

14   OF THE TRANSCRIPT WAS READ BACK BY THE COURT

15   REPORTER.)

16           BY THE WITNESS:

17               I don't remember.  I think -- I

18   don't remember, honestly.  I'm sure Mr. Burnett

19   would have a record of it.

20   EXAMINATION BY MR. WERNER:

21       Q.  Were you involved in any way either as

22   a party or a witness in any litigation

23   involving the workers who you placed at

24   Avondale?

25       A.  No, sir.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 76

1       Q.  Same question for North American

2   Shipyard.

3       A.  No, sir.

4       Q.  How did you pay Mr. Burnett?  Did you

5   hand him a check?

6       A.  Which?

7       Q.  Let's talk about the first one.

8       A.  Check.

9       Q.  Did you mail it to him?

10       A.  No.

11       Q.  You handed it to him?

12       A.  Yes.

13       Q.  How about the second, the North

14   American Shipyard placement?

15       A.  I handed it to him.

16       Q.  A check?

17       A.  Yes, I think.  I think it was -- yeah,

18   a check.

19       Q.  Have you ever paid any money to

20   Mr. Burnett in any form other than a check?

21       A.  I loaned him some money one time in

22   Dubai.

23       Q.  What was the purpose of that?

24       A.  It was cash.  I didn't ask him what it

25   was.  He said he needed it.

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                                          Michael Pol

Page 80

1         Q.   Do you come every year?

2         A.   Nope.  I've only been to Mardi Gras

3    twice in my life in New Orleans.

4         Q.   Did you ever come for Jazz Fest?

5         A.   No, never been to a Jazz Fest.

6         Q.   What was the purpose of your

7    communication with Mr. Burnett in 2005 -- your

8    business dealings with Mr. Burnett in 2005?

9         A.   Mr. Burnett actually called me.

10        Q.   And what did you talk about?

11        A.   We talked about recruiting and

12   bringing people here.

13        Q.   Did he tell you why he initiated the

14   call?

15        A.   He initiated the call to stimulate me

16   to go look for some place to put people to

17   work.

18        Q.   Did he already have people lined up?

19        A.   No.

20        Q.   So --

21        A.   Not that I know of.

22        Q.   So what did he -- what did he tell you

23   he wanted you to do?

24        A.   Well, frankly, I mean, I don't

25   remember the exact conversation, but there was

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                          Page 81

  1    an idea that was -- that laws were about to

  2    change with regard to the difficulty of

  3    bringing in foreign workers to the United

  4    States.  And I think that was mostly the

  5    conversation, about the changing of the laws

  6    and the possibilities that if we got started,

  7    we might be able to do a project somewhere.

  8              And that's why we haven't

  9    actually -- to back up a second.  That's why

 10    from, you know, 2000-whatever to 2005, we

 11    didn't ever do any business because it was

 12    impossible to recruit and bring people in here

 13    on H2B visas.  It was just impossible.  So I

 14    think that was -- most of the conversation

 15    really dealt with, you know, I think the law is

 16    going to change and I believe that we're going

 17    to be able to do something different.

 18              And he watches this stuff and the

 19    legislative things that are going on.  And he

 20    just brought it up -- you know, brought me up

 21    to speed and said, hey, you know, why don't we

 22    try to get back together and do something.

 23        Q.  Get back together as -- you know, as

 24    what?  As a business?

 25        A.  Well, you know, each entity, I guess,
```

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

Page 82

1    would do their -- do their part.  Each entity

2    would do their part.

3              Q.  And what was Mr. Burnett's part?

4              A.  Well, he's an immigration attorney.

5              Q.  So what was his part?

6              A.  Immigration.

7              Q.  Immigration.  Give me some more

8    details.

9              BY MR. ALEXIS:

10                   Let me object because I don't

11   think this line of questioning deals with

12   jurisdiction and venue and contacts that

13   Mr. Pol may have had in Louisiana.

14             BY MR. WERNER:

15                   It absolute -- Mr. Burnett is

16   based in Louisiana.  It directly involves

17   communications, business dealings with

18   Mr. Burnett.  Your objection is noted for the

19   record.  And, obviously, Mr. Pol needs to

20   answer these lines of questions.

21   EXAMINATION BY MR. WERNER:

22             Q.  Between 2000 to 2005, did you work

23   with any lawyer other than Mr. Burnett?

24             A.  No, sir.

25             Q.  I'm sorry.  Between '98 and 2005, did

Page 83

1    you work with any lawyer other than

2    Mr. Burnett?

3         A.   The answer is still no.

4         Q.   In 2005, what was your fee arrangement

5    with Mr. Burnett?

6              BY MR. KUPPERMAN:

7                   I'm going to interpose the same

8    objection Ralph just make.  I don't think this

9    has a thing to do with jurisdiction.

10             BY MR. WERNER:

11                  Your objection is noted.  Please

12   answer.

13             BY MR. ALEXIS:

14                  Same objection.

15             BY THE WITNESS:

16                  I don't recall that there was a

17   fee agreement.

18   EXAMINATION BY MR. WERNER:

19        Q.   So Mr. Burnett calls you in 2005, says

20   there's this opportunity possibly to get on the

21   -- get in front of this possible new visa

22   program.  How did you respond?

23        A.   Positively.

24        Q.   Did you say -- what did you tell him?

25        A.   I was interested.

Page 84

1        Q.  What else did you talk about during

2    that conversation?

3        A.  We talked about looking for -- looking

4    for sponsors to sponsor people.

5        Q.  Did you talk about anything else

6    during that conversation?

7        A.  Not that I recall.

8        Q.  Did you talk about next steps?

9        A.  Not that I recall.

10       Q.  Did you -- when was the next time you

11   had any kind of communication with Mr. Burnett?

12       A.  I don't recall.

13          BY MR. WERNER:

14             Could you read back my last

15   question?

16             (WHEREUPON, THE REQUESTED PORTION

17   OF THE TRANSCRIPT WAS READ BACK BY THE COURT

18   REPORTER.)

19          BY THE WITNESS:

20             I need another break.

21             (WHEREUPON, A BREAK WAS TAKEN.)

22   EXAMINATION BY MR. WERNER:

23       Q.  Do you remember what month in 2005

24   Mr. Burnett called you about possibly going

25   into this arrangement?

Kurian David, et al v. Signal International, LLC, et al                        Michael Pol

```
                                                   Page 85
 1      A.   January.

 2      Q.   How soon after that call did you have

 3  a follow-up conversation with Mr. Burnett?

 4      A.   I don't recall how soon, but it was at

 5  the Markham Building in Gulfport.  I do

 6  remember that.

 7      Q.   Did you talk to him to arrange that

 8  meeting?

 9      A.   No, we -- of course I did.

10      Q.   Did you talk to him on the phone?

11      A.   Yes.  I think he was at his Bay Saint

12  Louis home at that time.

13      Q.   When did you have that meeting?

14      A.   I couldn't tell you the exact date.

15      Q.   Was it in the first three months of

16  2005?

17      A.   Yes.

18      Q.   And what was discussed at that

19  meeting?

20           BY MR. ALEXIS:

21            I want to object to this line of

22  questioning because what does that have to do

23  with jurisdiction and venue?  With all due

24  respect, you're trying to do discovery perhaps

25  on -- not perhaps but on issues far beyond
```

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

                                                              Page 96

     1                    (Witness reviewed document.)

     2     EXAMINATION BY MR. WERNER:

     3          Q.   We're looking at Plaintiff's Exhibit

     4     No. 6.   Next to the "from" line at the top, do

     5     you see an e-mail address?

     6          A.   Yeah.

     7          Q.   Is that your e-mail address?

     8          A.   Yeah, it is.

     9          Q.   Do you recognize this document?

    10          A.   Yes, I do.

    11          Q.   Will you describe what it is?

    12          A.   It's a letter to Joseph Jacob

    13     explaining to him that -- that I had forwarded

    14     his information to Mr. Malvern Burnett.

    15          Q.   And why did you forward it to

    16     Mr. Burnett?

    17          A.   Because Mr. Burnett would be the one

    18     who would be handling all of this.

    19          Q.   Would be handling all of what?

    20          A.   The Permanent Employment

    21     Certification.

    22          Q.   You talk about a second payment.   What

    23     was that second payment?

    24               BY MR. ALEXIS:

    25                    I just want to again, without

Kurian David, et al v. Signal International, LLC, et al                           Michael Pol

Page 97

1  trying to interrupt things, I object to the

2  question.  I think it goes beyond the scope of

3  jurisdiction and venue.

4          BY MR. KUPPERMAN:

5              Same objection.

6          BY MR. ALEXIS:

7              I tell you what I'm -- for the

8  record, I'll just say, object, jurisdiction and

9  venue, and that's the way I'm going to shorten

10 it.

11         BY MR. WERNER:

12             I appreciate that.  And I'll

13 understand what you mean.

14         BY MR. ALEXIS:

15             Thank you.

16         BY MR. WERNER:

17             Would you mind reading the

18 question back, please.

19             (WHEREUPON, THE REQUESTED PORTION

20 OF THE TRANSCRIPT WAS READ BACK BY THE COURT

21 REPORTER.)

22         BY THE WITNESS:

23             The second payment, that would be

24 his payment that was due because of a time

25 line.

```
                                               Page 98
 1   EXAMINATION BY MR. WERNER:

 2        Q.  When you say "his," are you talking

 3   about Mr. Jacob's payment?

 4        A.  Mr. Jacobs's, yes.

 5        Q.  And a payment to whom?

 6        A.  It looks like here to --

 7             BY MR. KUPPERMAN:

 8                  If you know, let him know.  If

 9   you don't know, just tell him you don't know.

10             BY THE WITNESS:

11                  Well, I'm just trying to read it

12   to make sure I understand what this --

13             BY MR. WERNER:

14                  And please don't -- I've

15   instructed him that if he doesn't know, you

16   know, he knows how this works.  Please don't

17   interpose any comments while there's a question

18   pending.

19             BY MR. KUPPERMAN:

20                  I haven't interposed any

21   instructions or comments or anything else.  I'm

22   just --

23             BY MR. WERNER:

24                  If that wasn't an instruction, I

25   don't know what is one.
```

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 104

1            BY THE WITNESS:

2                  (Witness reviewed document.)

3      EXAMINATION BY MR. WERNER:

4            Q.  I'm showing you what's been marked as

5      Plaintiff's Exhibit 8.  Do you recognize this

6      document?

7            A.  Yes, sir.

8            Q.  Will you describe what it is for me?

9            A.  It's an update letter.

10           Q.  Is that -- is it written on -- whose

11     letterhead is it written on?

12           A.  It's written on Global Resources'

13     letterhead.

14           Q.  At the bottom of the letter it lists

15     three separate addresses.  Do you see what I'm

16     referring to?

17           A.  Yes.

18           Q.  It shows a U.S. P.O. Box address and

19     phone number and an India address and phone and

20     fax number and a Dubai address.

21           A.  Right.

22           Q.  I'd like to ask just a question about

23     the India address.  Was this an office of

24     Global Resources located in India?

25           A.  Actually, it was just a shared address

PROFESSIONAL SHORTHAND REPORTERS, INC   1(800)-536-5255   BATONROUGE*NEW ORLEANS* SHREVEPORT
504-529-5255

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

```
                                                              Page 123

   1   did?

   2           BY MR. ALEXIS:

   3               Same objection.

   4           BY MR. KUPPERMAN:

   5               Same objection.  Continuing

   6   objection.  Is that okay?

   7           BY MR. WERNER:

   8               Your objection is noted.

   9           BY THE WITNESS:

  10               I'm going to have to check on

  11   that.  I'm not sure how much.

  12   EXAMINATION BY MR. WERNER:

  13       Q.  Did you pay money to Mr. Burnett for

  14   the services he provided to Global Resources

  15   and to yourself between --

  16       A.  I did in --

  17       Q.  -- 2005 and 2008?

  18       A.  I did at some point in time, but I'll

  19   have to check and make sure.  I don't recall

  20   the specific date.

  21       Q.  Do you recall how much it was?

  22       A.  No, sir, I don't.

  23       Q.  Was there just one payment?

  24       A.  I think there was.

  25       Q.  And what was the purpose of that
```

Kurian David, et al v. Signal International, LLC, et al                          Michael Pol

Page 124

1    payment?

2         A.  Sorry, but you've got me confused.

3    And I'm just -- I can't -- I don't recall

4    paying him -- I mean, I know I paid Mal

5    something for some work that he did for me, but

6    I can't remember when.  And I don't know if it

7    was in 2005 or 2006 or 2001.  But I know I paid

8    for some work for Mal to do for me.  And I

9    don't have any record of that with me, and I

10   don't recall it off the top of my head.

11        Q.  Was the work that you paid Mr. Burnett

12   work that was related to the recruitment of

13   Indian workers in 2005 and 2006?

14        A.  Yes, it could have been because we

15   were also recruiting nurses at the time.

16        Q.  For Indian pipe-fitters and welders in

17   2005 and 2006.

18            BY MR. KUPPERMAN:

19                I'm sorry.  For Indian --

20            BY MR. WERNER:

21                Pipe-fitters or welders.

22            BY THE WITNESS:

23                I can't remember.

24   EXAMINATION BY MR. WERNER:

25        Q.  Did you have any kind of a written

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 125

1    agreement whatsoever be it a contract, a

2    retainer or a letter of representation, any

3    kind of written agreement reflecting the

4    representation -- or the services that

5    Mr. Burnett would provide to you or to Global

6    Resources?

7         A.  I don't recall.  I don't think so, but

8    I don't recall for sure.

9         Q.  So you had some kind of a relationship

10   -- business relationship with Mr. Burnett that

11   was involving many thousands of dollars that

12   you think likely was not memorialized in any

13   kind of a written agreement?

14            BY MR. KUPPERMAN:

15                Object to the form of the

16   question.  Also asked and answered.

17            BY THE WITNESS:

18                We at one point in time had an

19   agreement for him to represent me, and I don't

20   remember when that was, when it was signed, but

21   it was certainly something that Mr. Burnett

22   wanted to have to represent me.

23   EXAMINATION BY MR. WERNER:

24        Q.  It was to represent you personally?

25        A.  To represent my company.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 126

1         Q.  Which company?

2         A.  I think it was Global Resources.

3             BY MR. WERNER:

4                 I'd like to request a copy of

5     that agreement.

6     EXAMINATION BY MR. WERNER:

7         Q.  Do you remember what was contained in

8     that agreement?

9         A.  No, sir.

10        Q.  Do you remember anything about what

11    was in that agreement?

12        A.  No, sir.

13        Q.  Did you sign that agreement?

14        A.  I -- you know, I'm kind of having

15    second thoughts that it was even there.  It's

16    -- I don't remember if it was with

17    International Marine or if it was with Global.

18    But I know I signed something with Mal, but I

19    don't remember when.

20                (WHEREUPON, POL NO. 10 WAS MARKED

21    FOR IDENTIFICATION PURPOSES.)

22            BY MR. WERNER:

23                And just so you all know, this is

24    the agreement that was attached to the Signal

25    Answer and Counter claims.  So you should be

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 127

1    familiar with it, so you don't have to peruse

2    it with that much detail.

3                    (WHEREUPON, A BREAK WAS TAKEN FOR

4    ALL COUNSEL TO PARTICIPATE IN A CONFERENCE

5    CALL, AT WHICH TIME MS. CASH LEFT THE

6    PROCEEDINGS.)

7    EXAMINATION BY MR. WERNER:

8        Q.  So we're back on.  Mr. Pol, we've

9    taken about an hour recess in this deposition.

10   You understand that you're still under oath?

11       A.  Yes, sir.

12       Q.  I'm showing you what's been marked as

13   Plaintiff's Exhibit 10.  Would you please take

14   a look at this document.

15       A.  I know it frontwards and backwards.

16       Q.  Will you identify it for me?

17       A.  This is the contract with Signal

18   International and Global Resources.

19       Q.  Will you look at what's listed as page

20   4 of 5 which is the last page in this packet.

21   Above your name, is that your signature?

22       A.  Yes, it is.

23       Q.  Who drafted this agreement?

24       A.  Signal.

25       Q.  Did Signal consult with you when they

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

Page 128

1    drafted this agreement?

2         A.  They did.

3         Q.  Was Mr. Burnett involved in the

4    drafting of this agreement?

5         A.  No, sir.

6         Q.  Not in any way?

7         A.  Well, actually, he was -- I would say,

8    yes, possibly if you consider that he was --

9              BY MR. ALEXIS:

10             Let me object to the form of the

11   question and also object to the question as

12   being outside the scope.  Go ahead.

13             BY THE WITNESS:

14             -- because he was going to be

15   doing legal work for Signal, he needed to know

16   what the scope of this was so that he could

17   have a -- what do we call that?  Hold on a

18   second -- a duty to -- immigration attorney

19   assigned to provide such services to Signal

20   shall owe a duty of loyalty to Signal.  And so,

21   yes, from that perspective he wanted to know

22   what was in the contract.

23   EXAMINATION BY MR. WERNER:

24        Q.  Do you know who at Signal drafted this

25   agreement?

[PAGE BREAK]

Page 133

 1   U.S. paid him in -- in India.

 2        Q.   How do you know that?

 3        A.   Well, I guess --

 4             BY MR. ALEXIS:

 5                  Same objection.

 6             BY THE WITNESS:

 7                  I just -- I heard that.

 8             BY MR. WERNER:

 9                  Who did you hear it from?

10             BY MR. ALEXIS:

11                  Same objection.

12             BY THE WITNESS:

13                  I mean, I just understood that he

14   was getting paid by the foreign workers.

15   EXAMINATION BY MR. WERNER:

16        Q.   Could this agreement have been

17   implemented without an immigration attorney?

18        A.   Sure.

19             BY MR. ALEXIS:

20                  Same objection.

21   EXAMINATION BY MR. WERNER:

22        Q.   Would you describe Mr. Burnett's role

23   in the recruitment of the Indian workers by

24   Global as a critical role?

25             BY MR. ALEXIS:

Kurian David, et al v. Signal International, LLC, et al                           Michael Pol

1              Same objection.

2         BY MR. KUPPERMAN:

3              Object to the form of the

4    question.

5         BY THE WITNESS:

6              Yes.

7    EXAMINATION BY MR. WERNER:

8      Q.   Why is that?

9         BY MR. ALEXIS:

10              Same objection.

11         BY MR. KUPPERMAN:

12              And I'm -- if it's okay, I'd like

13   to join in all of his objections without

14   reiterating that.

15         BY MR. WERNER:

16              That's fine.

17         BY THE WITNESS:

18              Am I supposed to answer?

19         BY MR. WERNER:

20              Yes, you can answer.

21         BY THE WITNESS:

22              I don't have the expertise that

23   Mr. Burnett has in immigration law.  There are

24   others who are not attorneys who do have

25   expertise, so I guess the answer to your

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 135

1    question is somebody else could have done this.

2    But I had a lot of faith in Mr. Burnett that he

3    understood the process.  And so, yes, he played

4    a very critical role in this.

5    EXAMINATION BY MR. WERNER:

6         Q.  Did Mr. Burnett represent you or any

7    of your businesses in any matters other than

8    the recruitment of foreign workers?

9         A.  Yes.

10        Q.  What matters?

11           BY MR. ALEXIS:

12               What was -- I'm sorry.  What was

13    the end of that?

14           BY MR. WERNER:

15               Other than the recruitment of

16    foreign workers.

17           BY THE WITNESS:

18               Yes, he represented me on a case

19    that I had here in Louisiana where a truck hit

20    my -- a big truck hit my little car -- hit my

21    little truck.  And so, yes, he did.  He had

22    represented me on other issues.

23    EXAMINATION BY MR. WERNER:

24        Q.  When was that case filed?

25        A.  It never was actually what I would

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 136

1     call a case file.  He wrote letters to the

2     company, and then they paid for my damages.

3     And that was it.  I mean --

4          Q.  When did that occur?

5          A.  2006 -- no, no.  I'm so sorry.  I'm so

6     sorry.  1996.

7          Q.  1996?

8          A.  1996.

9          Q.  Other than that accident -- well, let

10    me ask you this:  Did that accident happen

11    while you were doing work for IMI?

12         A.  Yes.

13         Q.  And it occurred where?  In Louisiana?

14         A.  In Slidell.

15         Q.  In Slidell.  And you were personally

16    involved with that accident?

17         A.  Yes.  I was -- I was driving the

18    vehicle.

19         Q.  What else other than the recruitment

20    of foreign workers has Mr. Burnett represented

21    you on, if anything?

22              BY MR. KUPPERMAN:

23              Let me just interpose an

24    objection.  I think he talked about some stuff

25    this morning, so I'm assuming you're excluding

```
                                                Page 137

 1   whatever he's already talked about in the

 2   deposition?

 3             BY MR. WERNER:

 4                 Well, that involved the

 5   recruitment of foreign workers.

 6             BY MR. KUPPERMAN:

 7                 I'm sorry?

 8             BY MR. WERNER:

 9                 That involved the recruiting of

10   foreign workers.  I'm saying except for that.

11             BY MR. KUPPERMAN:

12                 I'm sorry.  It's so late, and

13   we've gone through so many things, I don't know

14   what it was.

15             BY THE WITNESS:

16                 Can I just say that Mr. Burnett

17   has advised me on different legal issues for

18   the entire time that I've known him as best as

19   he can, you know.  If I have some legal

20   question or something, I call him on occasions

21   to ask him what he thinks about.  So, I mean, I

22   can't give you specific time --

23   EXAMINATION BY MR. WERNER:

24       Q.  And you call him at his office in New

25   Orleans?
```

Page 138

1       A.  I call him at his office in

2   Mississippi.  I usually --

3       Q.  And if he's not there, do you call him

4   at his office in New Orleans?

5           BY MR. KUPPERMAN:

6               Hang on.  Let him finish.

7           BY THE WITNESS:

8               I usually have lunch with him

9   over there in Mississippi.

10  EXAMINATION BY MR. WERNER:

11      Q.  Do you sometimes call him at his

12  office in New Orleans?

13      A.  I never call his office.  I want to

14  get that straight.  I never call his office.  I

15  have his cell phone.  I call him on his cell

16  phone and, you know, tell him, hey, when are

17  you going to be around so that we can have

18  lunch or talk or whatever.

19      Q.  So you don't know where he is when you

20  talk to him?

21      A.  I have no idea where he is.

22      Q.  Is Global Resources, Inc., registered

23  as a corporation in any state other than

24  Mississippi?

25      A.  No.

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

                                                          Page 139

1       Q.  Has it ever been registered in another

2    state other than Mississippi?

3       A.  No.

4              (WHEREUPON, POL NO. 11 WAS MARKED

5    FOR IDENTIFICATION PURPOSES.)

6    EXAMINATION BY MR. WERNER:

7       Q.  I've just handed you what's been

8    marked as Plaintiff's Exhibit 11.  Do you

9    recognize this document?

10      A.  I sure do -- no.  No, wait a minute.

11   I don't recognize this document because I've

12   never seen it.  But I'll tell you this, I do

13   recognize this name, Perry Garner, who is a guy

14   who I had to fire from -- from my company for

15   stealing from me.  And this is a corporation

16   that he opened and put my name on it in

17   Alabama.  And that's a fact.

18      Q.  Is this the first time that you've

19   seen -- that you heard that he opened this

20   corporation?

21      A.  No, I knew he did it.

22      Q.  You knew he did it?

23      A.  I knew he did it.  That's why he got

24   fired.

25      Q.  When was he fired?

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                    Page 140
  1        A.  1999, 2000, somewhere in that time

  2   frame.

  3        Q.  Why didn't you want him to incorporate

  4   in Alabama?

  5        A.  This was actually a scam that was

  6   being run on me by a guy named Ollie McVeigh

  7   and Perry Garner and Ollie's wife -- excuse me

  8   -- his daughter.  And they actually went and

  9   took my name and company and started a --

 10   started a company in Alabama and was doing

 11   business without my knowledge.

 12        Q.  What kind of business?

 13        A.  I guess the same business that -- they

 14   were leasing labor.

 15        Q.  Has Global ever had any employees --

 16   direct employees who are on Global's payroll?

 17        A.  No, sir.

 18        Q.  Has Global ever paid you a salary?

 19        A.  Yes.

 20        Q.  So you were on Global's payroll?

 21        A.  Not as an employee.

 22        Q.  Okay.  As what?

 23        A.  As -- I mean, as an owner.

 24        Q.  So Global paid you a salary as owner

 25   of Global?
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 141

1        A.   Yeah.

2        Q.   How would you describe -- and I'll ask

3    this as a kind of pretty broad question.  But

4    what is the business of Global?  What does

5    Global do?

6        A.   Global is a company that provides U.S.

7    companies with an opportunity to be matched up

8    with labor from overseas.  That's what it does.

9        Q.   But does Global exclusively place

10   foreign workers at U.S. companies as opposed to

11   U.S. workers?

12       A.   Yes.

13       Q.   When did Global first place foreign

14   workers at a U.S. company?

15       A.   Signal.

16       Q.   Signal was the first customer?

17       A.   Yeah, Signal was the first one.

18       Q.   And that was in 2000 -- when did they

19   start working in --

20       A.   '6.

21       Q.   2006.  Why did you shift from IMI to

22   Global?  In other words, why did you sell IMI

23   and then open up Global?

24       A.   I sold IMI.

25       Q.   Why?

**[PAGE BREAK]**

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                      Page 146
  1    business of providing labor to all of these

  2    shipyards, I just know where the work is.

  3         Q.   And where -- where have you gone to

  4    offer the services of Global?

  5              BY MR. WHITEHEAD:

  6                    Object to the form.

  7              BY MR. WERNER:

  8                    Noted.  Please answer.

  9              BY THE WITNESS:

 10                    I've gone to Signal, obviously.

 11    I've gone to J & M, obviously.  I went to a

 12    company down in Jacksonville, Florida.  I

 13    talked to a company in Newport News -- Newport

 14    News, Virginia.  Just some old contacts --

 15    California.  I talked to some -- someone -- no,

 16    I'm sorry -- in Seattle or -- yeah, Seattle.

 17    I've talked to several different -- different

 18    companies.

 19    EXAMINATION BY MR. WERNER:

 20         Q.   Any companies in Louisiana?

 21         A.   I had a brief conversation with --

 22    recently with guy in Houma who actually

 23    contacted me and said that there was a company

 24    down there that might be interested in my

 25    services.  And he took me -- I met him down
```

Kurian David, et al v. Signal International, LLC, et al                              Michael Pol

Page 147

1      there and went and visited with these folks,

2      but they weren't interested.

3            Q.  What company was it?

4            A.  Gulf Island I think is the name of it.

5            Q.  Gulf Island.  And when did that

6      meeting take place?

7            A.  Oh, that was back in February.

8            Q.  February of 2008?

9            A.  Yeah.

10           Q.  And which guy did you meet with?  What

11     was his name?

12           A.  I don't remember the people in the --

13     I don't recall the names of the people that

14     were at the meeting at Gulf Island.  But the

15     guy that -- he's an insurance agent down in

16     Houma.  He's actually a friend of Mal's.

17           Q.  Of Mile's?

18           A.  Of Mal Burnett.

19           Q.  Oh, Mal.  Sorry.

20           A.  And I am so sorry I can't recall his

21     name.  I'm losing my mind.  You've got me

22     tired.  If it's important to you, I can get it

23     for you or you can ask Mr. Burnett.

24           Q.  Was Mr. Burnett involved with those

25     discussions?

Page 148

```
 1        A.   Let's see.  He met me down there.

 2        Q.   Has Mr. Burnett been involved in any

 3   of the other discussions you had with any of

 4   these other prospective customers?

 5        A.   No.  No.

 6        Q.   Did Mr. Burnett -- how did these

 7   people know to get in touch with you?

 8            BY MR. KUPPERMAN:

 9                Object to the form.

10            BY THE WITNESS:

11                I'm not sure.

12   EXAMINATION BY MR. WERNER:

13        Q.   Did Mr. Burnett set up the contact?

14            BY MR. ALEXIS:

15                Same objection on jurisdiction

16   and venue.

17            BY THE WITNESS:

18                Actually, he didn't.  This was a

19   guy that I met -- somehow I met him.  I was

20   over in Lafayette at Dynamic Industries.  And

21   he did something -- he was an insurance agent

22   that did some work over there, and that's how I

23   met this guy originally.

24   EXAMINATION BY MR. WERNER:

25        Q.   And what were you doing in Lafayette
```

Page 149

1    at Dynamic Industries?

2         A.   Trying to do some business with

3    Dynamic Industries.

4         Q.   So Dynamic Industries is another place

5    where you tried to do some business in

6    Louisiana?

7         A.   Yes.

8         Q.   Okay.  So you initially said the only

9    place was this one place.  Now we have this

10   Dynamic Industries in Lafayette.  When did you

11   first talk to Dynamic Industries in Lafayette

12   about doing business?

13        A.   Well, actually, I was trying to get on

14   as an employee.

15        Q.   So you applied for a job at Dynamic

16   Industries?

17        A.   Yes, sir.

18        Q.   A job doing what?

19        A.   For their recruiting, like to be over

20   all of their recruiting.

21        Q.   When did you apply for that job?

22        A.   In 2005, right after the hurricane.

23        Q.   What was the result of that?

24        A.   They didn't -- they didn't use my

25   services.

Kurian David, et al v. Signal International, LLC, et al                                    Michael Pol

Page 150

```
 1        Q.  Did you submit anything in writing,
 2   any kind of a --
 3        A.  Actually, I had a friend named Bobby
 4   Adams who was up in Mississippi that he -- he's
 5   like -- he's up in Jackson.  And he's -- he
 6   knew Mike Marino very well at this company.
 7   And he thought I would -- he wanted me to meet
 8   him.  And he thought that I would be a good
 9   person to do that kind of stuff for him.  After
10   the hurricane, I was just looking for something
11   to do, you know.
12        Q.  But my question was whether you
13   submitted any kind of a written application or
14   resume or anything to --
15        A.  No, it was all verbal.
16        Q.  Did you talk about -- only about being
17   employed or --
18        A.  Yeah.
19        Q.  -- did you also talk about possibly
20   contracting out to provide employment?
21        A.  No, I talked to him about being an
22   employee because they don't -- they -- Bobby
23   told me that they didn't do that kind of stuff.
24   They didn't contract stuff like that out.
25        Q.  Dynamic is a business that does what?
```

```
                                                    Page 151

 1        A.  It's a -- it's a -- they -- I think

 2   they retrofit oil rigs and stuff like that.

 3        Q.  And have you approached any other

 4   business or entity in Louisiana offering your

 5   services?

 6        A.  That's it.

 7        Q.  Has any business in Louisiana

 8   approached you asking about your services other

 9   than the ones we've already mentioned?

10        A.  Not since you guys got started with

11   this.

12        Q.  Well, before we got started with this,

13   did they?

14        A.  No, sir.

15        Q.  Have you or Global Resources ever been

16   investigated by any government agency for any

17   purpose?

18        A.  Nope.

19        Q.  Are you related by blood or marriage

20   to any of the defendants in this case?

21        A.  Like Mr. Burnett?

22        Q.  Or Mr. --

23        A.  Who else?

24        Q.  -- Dewan or --

25        A.  No.
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

```
                                                        Page 152
   1        Q.  So nobody in your family is married to

   2   anybody in any of --

   3        A.  No, no.

   4        Q.  -- the other families that you know

   5   of?

   6        A.  Not that I know of.  There's no blood

   7   relation there.  You're pretty thorough, I'll

   8   tell you that.

   9        Q.  I try.  When did you first meet Sachin

  10   Dewan?

  11        A.  Sachin Dewan.

  12        Q.  Sachin Dewan.

  13        A.  1996.

  14        Q.  And who introduced you to Mr. Dewan?

  15        A.  Subod Napalcar (phonetic.)

  16        Q.  And who is that?

  17        A.  He's an Indian, from India.

  18        Q.  How did you know this gentleman?

  19        A.  I met him through Dr. Bengal.

  20        Q.  How do you know Dr. Bengal?

  21        A.  He was a neighbor of mine in

  22   Pascagoula.

  23        Q.  And have you done business continually

  24   with Dr. Dewan since you initially met him in

  25   1996?
```

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 153

1        A.  Off and on.

2        Q.  Off and on.  When were the off

3   periods?

4        A.  2000 -- '99, 2000, all the way up to

5   2005.

6        Q.  So from 2000 to 2005, you didn't do

7   any business with him?

8        A.  We just did strictly labor service in

9   that period of time.

10        Q.  Strictly labor service, what does that

11   mean?

12        A.  You know, as I described earlier, IMI

13   and the leased labor.

14        Q.  But Mr. Dewan was helping you --

15        A.  No.

16        Q.  -- find that labor?

17        A.  No, sir.

18        Q.  Was that the time period that you only

19   leased U.S. workers?

20        A.  That's correct.

21        Q.  What is the nature of the business

22   relationship you had with Mr. Dewan?

23        A.  It's just, you know, an assisting

24   relationship, where he assisted me to get

25   people.

Kurian David, et al v. Signal International, LLC, et al                        Michael Pol

Page 154

1        Q.  Would you consider him a business

2   partner?

3        A.  Not really.  An associate, yes.  But

4   partner, no.

5        Q.  A business associate.  Have you ever

6   entered into any kind of written agreement with

7   Mr. Dewan?

8        A.  Yes, we did.  When we got into the

9   nurse recruiting, we did enter into an

10  agreement back in 2003 or '4 or whatever.  I

11  can't remember the exact time that we got

12  started on that.  But that's all gone.

13       Q.  But you never entered into a written

14  agreement with him regarding the placement of

15  welders or pipe-fitters?

16       A.  No, sir.

17            BY MR. WERNER:

18                Let us just take a couple

19  minutes.  We're probably done or very very

20  close.

21                (WHEREUPON, A BREAK WAS TAKEN.)

22            BY MR. WERNER:

23                Back on the record.  I have no

24  more questions for you, Mr. Pol.  Thank you for

25  bearing with us here.  I want to just for the

Kurian David, et al v. Signal International, LLC, et al                    Michael Pol

Page 155

```
 1    record reiterate that we propounded discovery

 2    demands on Mr. Pol and Global Resources some 35

 3    days ago, 34 days ago.  And on Monday we

 4    received Mr. Pol's and Global's responses.

 5    These were two interrogatories and request for

 6    production.

 7                And other than, I think,

 8    responding to one interrogatory indicating that

 9    Mr. Pol attended Mardi Gras in New Orleans in

10    2008, there were no other responses.

11    Everything was objected to.  And not a single

12    document has been provided in response to our

13    discovery demands even though in responses --

14    some of those requests for production,

15    Mr. Pol's counsel indicated that he would

16    provide documents.

17                It's our position that those

18    documents were likely to provide a key source

19    of information, the documents that we requested

20    in the interrogatory responses, a key source of

21    information that would have aided in this

22    deposition.  It's for that reason that we will

23    continue this deposition.  We do not consider

24    it closed until such time as we receive

25    adequate responses from Mr. Pol and from Global
```

**[PAGE BREAK]**

9840994   CB 2988 417

MB  3857  684

98-40994

**SALE AND ASSUMPTION**

**BY:   LIGHTHOUSE RESOURCES, INC.**

**TO:   MICHAEL L. POL**

**UNITED STATES OF AMERICA**

**STATE OF LOUISIANA**

**PARISH OF JEFFERSON**

✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱✱

BE IT KNOWN, that on this 17th day of the month of July, In the year of our Lord, one

thousand nine hundred and ninety-eight (1998), and of the Independence of the United States of

America, the two hundred and twenty-second (222nd);

BEFORE ME, **CONRAD A. BUCHLER**, a Notary Public, duly commissioned and qualified

In and for the Parish of Jefferson, State of Louisiana, therein residing, and In the presence of the

witnesses hereinafter named and undersigned:

PERSONALLY CAME AND APPEARED:

**LIGHTHOUSE RESOURCES, INC.**, Tax Identification No. 64-0877352, a Mississippi
Corporation domiciled In the County of Hancock, represented herein by Charles H. Avery,
its President, by virtue of a resolution of the Board of Directors, dated July 14, 1998, a
copy of which is annexed hereto, and its mailing address is 711 Canal Road, Picayune,
Mississippi 39466;

who declare that they do, by these presents grant, bargain, sell, convey, transfer, assign, set

over, abandon and deliver without any warranty whatsoever, even for the return of the purchase

price, but with full substitution and subrogation in and to all the rights of actions of warranty which

they have or may have against all preceding owners and vendors unto:

**MICHAEL L. POL**, Social Security No. 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, a person of the full age of majority
and a resident of and domiciled In the County of Jackson, State of Mississippi, who
declared unto me, Notary, under oath, that he has been married but once and then to
Shari Grantham, with whom he is presently living and residing, and his mailing address
Is P.O. Box 2191, Pascagoula, Mississippi 39569. The said Michael L. Pol declares that
he is purchasing the hereinbelow described property as his separate property, being
purchased with his separate funds, and to be administered separate and apart, and in no
way is said property to from a part of the community of acquets and gains existing
between them.

here present accepting, and purchasing for himself, his heirs and assigns, and acknowledging due

delivery and possession thereof, all and singular the following described property, to-wit:

TWO (2) CERTAIN LOTS OF GROUND, together with all the buildings and improvements
thereon, and all of the rights, ways, privileges, servitudes and advantages thereunto
belonging or In anywise appertaining, situated in what is known as **BELT BRIDGE
SUBDIVISION**, situated in the Fifth Ward of the Parish of Jefferson, State of Louisiana,
above the town of Westwego, and according to a blue print of a survey made by Victor
E. Hawkins, Surveyor, dated February 18, 1943, said lots are described by the **NUMBERS
ONE (1) and TWO (2) of SQUARE NUMBER TWENTY-THREE (23)**, which square is
bounded by Bridge City Avenue (formerly the Highway), Tenth Street, Eleventh Street and
Industry Street.  Said Lots Numbers One (1) and Two (2) adjoin and measure each
twenty-five (25') feet front on Bridge City Avenue (formerly the Highway), the same width
in the rear, by a depth of one hundred (100') feet between equal and parallel lines.  Lot
One (1) forms the corner of Bridge City Avenue (formerly the Highway) and Eleventh
Street.

The Improvements thereon bear the Municipal No. 1714 Bridge City Avenue, Bridge City,
Louisiana 70094.



PLAINTIFF'S
EXHIBIT
Vol a

98-40994

Being the same property acquired by Lighthouse Resources, Inc. from Bessie Hebert, wife of/and Walton E. Amondin, by act before Conrad A. Buchler, Notary Public, dated July 3, 1997, recorded under Entry No. 9734097 and in COB 2964, folio 97.

TO HAVE AND TO HOLD the said described property herein conveyed unto the said purchaser, his heirs and assigns forever.

THIS SALE IS MADE AND ACCEPTED, for and in consideration of the price and sum of **SEVENTY THOUSAND SIX HUNDRED EIGHTY AND 74/100 ($70,680.74) DOLLARS**, in part payment whereof the said purchasers have presently paid in ready current money unto said vendors the sum of SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($7,500.00) DOLLARS, the receipt whereof is hereby acknowledged and due acquittance granted therefor; and for the balance of said purchase price, to-wit the sum of SIXTY THREE THOUSAND ONE HUNDRED EIGHTY AND 74/100 ($63,180.74) DOLLARS, said purchaser assumes and bind himself personally to pay in full to its complete and final discharge that certain mortgage note originally executed by **LIGHTHOUSE RESOURCES, INC.**, in the principal sum of **SIXTY SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($67,500.00) DOLLARS**, payable to the order of **BESSIE HEBERT ARNONDIN and WALTON E. ARNONDIN**, and payable at 808 Avenue C, Westwego, Louisiana 70094, or at a different place if required by the Note Holder, bearing interest on the unpaid balance at the rate of seven and one-half (7.50%) percent per annum from date until paid, payable in one hundred twenty (120) consecutive monthly installments in the amount of EIGHT HUNDRED ONE AND 24/100 ($801.24) DOLLARS per month each, including principal and interest, which said mortgage note was paraphed "Ne Varietur" for identification with an act of Credit Sale, by act before Conrad A. Buchler, Notary Public, dated July 3, 1997, recorded under Entry No. 9734097 and in MOB 3803, folio 835, Parish of Jefferson, on which there is presently a total outstanding balance due of SIXTY THREE THOUSAND ONE HUNDRED EIGHTY AND 74/100 ($63,180.74) DOLLARS.

The purchaser herein further bind and obligate himself personally to fully comply with and discharge all of the terms and conditions of the mortgage aforesaid and in the note that it secures to the same extent as if he had personally executed said instruments.

The purchaser herein further do hereby binds himself individually and in solido with the maker of said promissory note to the full and final payment and discharge of said promissory note and all of the liabilities and obligations expressed in said act of mortgage and also to keep the improvements on the property fully insured as required by the described act of mortgage.

Which Note after having been paraphed "Ne Varietur" by me, Notary, for identification herewith, has been delivered unto the mortgagee, here present, who acknowledge due receipt

98-40994

thereof.

And now to these presents comes **MICHAEL L. POL**, who does hereby waive, renounce and relinquish in favor of the holder or holders of the hereinabove described note, all homestead rights, claims or exemptions which are now or may be guaranteed by the Constitution and laws of the State of Louisiana.

By reference to the Mortgage and Conveyance certificates issued by Jefferson Certificate Corporation, annexed hereto and made part hereof, it does not appear that said property has been heretofore alienated by the vendor or that it is subject to any encumbrance whatever, except:

Tax Sale by Lighthouse Resources, Inc. unto Laprop, Inc. for $1,429.12, dated May 27, 1998, recorded under Entry No. 9834907 and in COB 2986, folio 435.

This Tax sale will be redeemed subsequent to this act.

The parties to this act are aware of the fact that the mortgage and conveyance certificates, as well as tax research certificate herein referred to are open, being not yet dated or signed, and relieve and release me, Notary, from all responsibility and liability in connection therewith.

All State, Parish and City taxes up to and including the taxes due and exigible in 1998 are paid as per tax researches annexed hereto and made part hereof.

The parties hereto take cognizance that no title examination was performed by the undersigned Notary, nor new survey made on the hereinabove described property in connection with this act of sale, and do hereby relieve and release me, Notary, from any liability and responsibility in connection with any title defect which might have been disclosed by such title examination or survey.

By their signature to this act, all parties herein further declare that they desire to amend the original promissory note, and the credit sale dated July 3, 1997, recorded under Entry No. 9734097 and in MOB 3803, folio 835, to delete the reference to the fact that the purchaser/maker herein may payoff the entire loan balance before maturity without incurring a prepayment penalty, and to herein impose a prepayment penalty of three (3.00%) percent of the unpaid principal balance in the event the mortgage is paid in full within five years from date of this act of sale and assumption.

VENDORS and PURCHASERS hereby acknowledge and recognize that the property sold and purchased is hereby transferred in "AS-IS" condition, and the PURCHASERS do hereby relieve and release VENDORS and all previous owners thereof from any and all claims for any vices or defects in said property, whether obvious or latent, known or unknown, and particularly for any claim or cause of action for redhibition pursuant to Louisiana Civil Code Articles 2520, et seq., or for the diminution of the purchase price pursuant to Louisiana Civil Code Articles 2541, et seq.

98-40994

PURCHASER expressly waives all warranties as to the property herein sold, whether implied by this or any other writing or representation, as well as all warranties provided by law. This waiver applies to all warranties of any nature, express or implied, including without limitation warranties of fitness for a particular purpose, or of merchantability, or otherwise. PURCHASER understands that under Articles 2520 through 2548 of the Louisiana Civil Code and other provisions of law this sale would ordinarily include a warranty, implied by law, against certain defects in the property sold. PURCHASER expressly waives any and all such warranties with respect to all defects, whether apparent or latent, visible or not, and regardless of whether PURCHASER is presently aware of such defects. This waiver of warranty extends to all defects, even if the defect or defects render the property absolutely useless, or so inconvenient and imperfect that PURCHASER would not have purchased it had PURCHASER known of the defect. PURCHASER has examined the property thoroughly and is fully satisfied with its condition. PURCHASER has read and understands the foregoing waiver of warranty, the waiver has been pointed out and explained, and questions or doubts PURCHASER has concerning the same have been answered satisfactorily. VENDOR and PURCHASER acknowledge and stipulate that the sale price was negotiated and agreed upon after consideration of the waiver of warranty herein set forth. PURCHASER and VENDOR acknowledge reading and understanding of the warranty waiver provisions contained in this instrument by their initials:

PURCHASER: _____   VENDOR: _____

And now to these presents personally came and intervened **BESSIE HEBERT ARNONDIN** and **WALTON E. ARNONDIN**, holders of the mortgage note assumed herein, who hereby consents to the sale of the hereinabove described property and the assumption of the mortgage note which it presently holds, and to the amendment as provided herein.

THUS DONE AND PASSED, on the day, month and year first aforesaid, in the presence of the undersigned competent witnesses of lawful age, who have signed their names with the said parties, and me, Notary, after due reading of the whole.

WITNESSES:                 LIGHTHOUSE RESOURCES, INC.


_____   BY: _____
                          CHARLES H. AVERY, President

_____        _____
                          MICHAEL L. POL

                          _____
                          BESSIE HEBERT ARNONDIN

                          _____
                          WALTON E. ARNONDIN

_____
CONRAD A. BUCHLER
NOTARY PUBLIC

Prepared for: Conrad Buchler                    Cert. #:6239-M

# JEFFERSON CERTIFICATE CORPORATION

300 Huey P. Long Avenue, Suite 280
Gretna, Louisiana 70053
Phone: (504) 361-0218
Fax: (504) 361-8857

98-40994

**Parish of Jefferson**
**State of Louisiana**

## MORTGAGE CERTIFICATE

Jefferson Certificate Corporation certifies that this certificate has been run exactly in the name or names hereunder
set forth in the Clerk of Court's Office for the Parish of Jefferson. When names are provided with no middle initial,
then names with middle initials are not run. When names are provided with a middle initial, identical names with
no middle initials or other middle initials are not run.
While we do not certify as to variations of said name(s), some variations of name(s) are provided whenever
possible.

I hereby certify that a search of the mortgage records of the Clerk of Court's Office for the Parish of Jefferson in the
following exact name or names and property finds the following open mortgage inscriptions of record:

**Lighthouse Resources, Inc., (Acq. 7/3/97, COB 2964/97, Run to Date)**

**This research covers that certain legal description as set out in COB 2964 , folio 97 ,
and briefly described as follows:**

**Subdivision:  Belt Bridge**
**Square/Block: 23**
**Lot: 1 & 2**
**Municipal Address/Fronting Street: 1740 Bridge City Avenue**

MOB 3803/835, Vendor's Lien by Present Owners in favor of Walton E. Arnondin et al, in the
amount of $67,500.00, before Conrad Buchler, N.P., dated 7/3/97, filed 7/7/97, Entry No.
9734097.

jap
Certified through:     7/2/98                    Signed: _Jo Ann Pfranschmidt_
                                                 Jefferson Certificate Corporation

Closed out date:                                 Signed: _____
                                                 Jefferson Certificate Corporation

Prepared for: Conrad Buchler                    Cert. #: 6239-C

# JEFFERSON CERTIFICATE CORPORATION
### 300 Huey P. Long Avenue, Suite 280
### Gretna, Louisiana 70053
### Phone: (504) 361-0218
### Fax: (504) 361-8857

### Parish of Jefferson
### State of Louisiana

98-40994

# CONVEYANCE CERTIFICATE

Jefferson Certificate Corporation certifies that this certificate has been run exactly in the name or names hereunder set forth in the Clerk of Court's Office for the Parish of Jefferson.  When names are provided with no middle initial, then names with middle initials are not run.  When names are provided with a middle initial, identical names with no middle initials or other middle initials are not run.

While we do not certify as to variations of said name(s), some variations of name(s) are provided whenever possible.

I hereby certify that a search of the conveyance records of the Clerk of Court's Office for the Parish of Jefferson in the following exact name or names and property finds the following open conveyance inscriptions of record:

**Lighthouse Resources, Inc., (Acq. 7/3/97, COB 2964/97, Run to Date)**

**This research covers that certain legal description as set out in COB 2964 , folio 97 , and briefly described as follows:**

**Subdivision:  Belt Bridge**
**Square/Block: 23**
**Lot: 1 & 2**
**Municipal Address/Fronting Street: 1740 Bridge City Avenue**

COB 2986/435, Tax Sale against Present Owners in favor of Laprop, Inc., dated 5/27/98, filed 6/18/98, Entry No. 9834907.

jap
Certified through:      7/2/98                    Signed: _Jo Ann Pfannschmidt_
                                                  Jefferson Certificate Corporation

Closed out date:                                  Signed: _____
                                                  Jefferson Certificate Corporation

# SOUTHERN ABSTRACTS, INC.

### 300 HUEY P. LONG – SUITE 200 – GRETNA, LOUISIANA 70053
### (504)361-0206

98-40994

| BUCHLER | 102274 |
|---|---|
| FILE NUMBER | CERTIFICATE NUMBER |

PROPERTY TAX RESEARCH
STATE OF LOUISIANA, PARISH OF JEFFERSON
July 13, 1998

BY RESEARCH MADE THIS DAY ON REAL ESTATE SITUATED IN THE PARISH
AND DESIGNATED AS:

LOTS 1 2 SQ 23 BELT BRIDGE

PARISH TAXES APPEAR AS FOLLOWS, VIZ:

CURRENT TAX STATUS

AMOUNT:   EXEMPT $0.00          PAID $1,275.37          DUE $0.00

| YEAR | BILL NUMBER | WARD/ SECTION | NAME | STATUS |
|---|---|---|---|---|
| 1997 | 0054486 | 50 | ARNONDIN,WALTON E & WF | See Above Tax Status |
| 1996 | 0054200 | 50 | Same | Ex:___Due:___Pd: X |
| 1995 | 0054038 | 50 | Same | Ex:___Due:___Pd: X |
| 1994 | 0054030 | 50 | Same | Ex:___Due:___Pd: X |

This property tax research is limited as to the above described property and
as to the years and parties listed above and no further.

I hereby certify that the above forgoing to be a true and correct statement
the tax rolls and files of the Office of the Tax Collector of the Parish
of Jefferson.

BY _Maria E. Dantin_____
    James B. Barkate, President
    Southern Abstract, Inc.

STATE OF MISSISSIPPI

COUNTY OF PEARL RIVER

98-40994

### RESOLUTION

At a Special Meeting of the Officers and Board of Directors of Lighthouse Resources, Inc., held in Picayune, Mississippi, on the 14th day of July, 1998, the following resolution was introduced and adopted:

"BE IT RESOLVED by the Officers and Board of Directors of Lighthouse Resources, Inc., that Lighthouse Resources, Inc. shall enter into a contract of sale with Michael L. Pol to sell the building located at 1714 Bridge City Avenue, Bridge City, LA, which now houses the recruiting office of Lighthouse Resources, Inc."

WITNESS the signatures on this the 14th day of July, A. D., 1998.

CHARLES AVERY
President and CEO

DEBORAH W. AVERY
Vice President and CFO

DEBORAH W. AVERY
Acting Secretary/Treasurer

I, DEBORAH W. AVERY, Acting Secretary/Treasurer of Lighthouse Resources, Inc., a Mississippi Corporation, certify that the above and foregoing resolution is a true and correct copy of a resolution unanimously adopted at a Special Meeting of the Officers and Board of Directors of said Corporation at which a quorum was present and that said Resolution now appears on the minutes of said Corporation.

SO CERTIFIED, this the 14th day of July, A. D., 1998.

DEBORAH W. AVERY
Acting Secretary/Treasurer

ATTACH 9840994
7/17/98

**RESOLUTION OF THE BOARD OF DIRECTORS OF**

**OF**

**LIGHTHOUSE RESOURCES, INC.**

BE IT RESOLVED that Charles H. Avery, President of this corporation, is hereby authorized and

empowered for and on behalf of, and in the name of this corporation, to sell to **MICHAEL L. POL** for the

sum of **SEVENTY THOUSAND SIX HUNDRED EIGHTY AND 74/100 ($70,680.74) DOLLARS**, according

to the hereinbelow described terms, the following described property:

> TWO (2) CERTAIN LOTS OF GROUND, together with all the buildings and improvements thereon,
> and all of the rights, ways, privileges, servitudes and advantages thereunto belonging or in anywise
> appertaining, situated in what is known as **BELT BRIDGE SUBDIVISION**, situated in the Fifth Ward
> of the Parish of Jefferson, State of Louisiana, above the town of Westwego, and according to a
> blue print of a survey made by Victor E. Hawkins, Surveyor, dated February 18, 1943, said lots are
> described by the **NUMBERS ONE (1) and TWO (2) of SQUARE NUMBER TWENTY-THREE (23)**,
> which square is bounded by Bridge City Avenue (formerly the Highway), Tenth Street, Eleventh
> Street and Industry Street.  Said Lots Numbers One (1) and Two (2) adjoin and measure each
> twenty-five (25') feet front on Bridge City Avenue (formerly the Highway), the same width in the
> rear, by a depth of one hundred (100') feet between equal and parallel lines.  Lot One (1) forms
> the corner of Bridge City Avenue (formerly the Highway) and Eleventh Street.

> The improvements thereon bear the Municipal No. 1714 Bridge City Avenue, Bridge City, Louisiana
> 70094.

> Being the same property acquired by Lighthouse Resources, Inc. from Bessie Hebert, wife of/and
> Walton E. Amondin, by act before Conrad A. Buchler, Notary Public, dated July 3, 1997, recorded
> under Entry No. 9734097 and in COB 2964, folio 97.

BE IT FURTHER RESOLVED that Charles H. Avery, President of this corporation, is hereby further

authorized and empowered for and on behalf of, and in the name of this corporation, to execute an act of

Sale and Assumption with Michael L. Pol, for the price and sum of **SEVENTY THOUSAND SIX HUNDRED**

**EIGHTY AND 74/100 ($70,680.74) DOLLARS**, in part payment whereof the said purchasers to pay in ready

current money unto said vendor the sum of **SEVEN THOUSAND FIVE HUNDRED AND NO/100**

**($7,500.00) DOLLARS**, and for the balance of said purchase price, to-wit the sum of **SIXTY THREE**

**THOUSAND ONE HUNDRED EIGHTY AND 74/100 ($63,180.74) DOLLARS**, said purchaser assuming and

binding himself personally to pay in full to its complete and final discharge that certain mortgage note

originally executed by **LIGHTHOUSE RESOURCES, INC.**, in the principal sum of **SIXTY SEVEN**

**THOUSAND FIVE HUNDRED AND NO/100 ($67,500.00) DOLLARS**, payable to the order of **BESSIE**

**HEBERT ARNONDIN and WALTON E. ARNONDIN**, and payable at 808 Avenue C, Westwego, Louisiana

70094, or at a different place if required by the Note Holder, bearing interest on the unpaid balance at the

rate of seven and one-half (7.50%) percent per annum from date until paid, payable in one hundred twenty

(120) consecutive monthly installments in the amount of **EIGHT HUNDRED ONE AND 24/100 ($801.24)**

DOLLARS per month each, including principal and interest, which said mortgage note was paraphed "Ne

Varietur" for identification with an act of Credit Sale, by act before Conrad A. Buchler, Notary Public, dated

July 3, 1997, recorded under Entry No. 9734097 and in MOB 3803, folio 835, Parish of Jefferson, on which

there is presently a total outstanding balance due of SIXTY THREE THOUSAND ONE HUNDRED EIGHTY

AND 74/100 ($63,180.74) DOLLARS.

BE IT FURTHER RESOLVED that Charles H. Avery, President of this corporation, is hereby further authorized and empowered for and on behalf of, and in the name of this corporation, to execute any and all or other instruments or notarial acts in order to carry out, complete and fully effectuate the foregoing, to receive and receipt the partial purchase price thereof, to grant full acquittance and discharge therefor, and to do any and all things the said officer, in officer's sole and uncontrolled discretion, deems necessary or proper in connection therewith.

-----------------------------------------------

I certify that I am the duly acting and qualified Secretary of **LIGHTHOUSE RESOURCES, INC.** and that the above and foregoing constitutes a true and correct copy of a resolution duly adopted at a meeting of the Board of Directors of said corporation held on July 14, 1998, at which meeting a quorum was present and voted in favor of said resolutions, and said resolutions have never been modified or rescinded and are still in full force and effect.

Date: July 14, 1998

*Deborah W. Avery*

DEBORAH W. AVERY
Acting Secretary/Treasurer

**[PAGE BREAK]**

08/13/2007 10:19:02 AM JEFF PAR 1817964 jmw $38.00
10750020 CONVEYANCE BOOK 3198 PAGE 816

STATE OF LOUISIANA
PARISH OF JEFFERSON

OR

POL,MICHAEL L

TO

RUDOLPH A. EDWARDS

# STATE OF LOUISIANA

### PARISH OF JEFFERSON

### Office of Sheriff and Ex-Officio Tax Collector

BE IT KNOWN, That I, Harry Lee, Sheriff and Ex-Officio Tax Collector of the Parish of Jefferson, by virtue of the authority vested in me by the Constitution and Laws of the State of Louisiana, appearing herein through my duly authorized deputy, Andrew J. Leblanc, Jr., Director of the Bureau of Revenue and Taxation for the Sheriff and Ex-Officio Tax Collector, and especially having been assessed with the property hereinafter described for the year ____2003____, and the taxes thereon, having become delinquent on the 31st day of December of said year, I made out and mailed to the said ____POL,MICHAEL L____ _____ by certified letter, a notice in conformity with said Laws of the State · and the said ____POL,MICHAEL L____ _____, failing to pay the amount of taxes, interest, costs, etc., due by him as shown by the said assessment rolls of ___2003___; I have caused to be seized and advertised for sale in The Times-Picayune, in the manner prescribed as required by law, daily newspaper published in the Parish of Orleans, it being the Official Journal of the Parish of Jefferson. Said advertisement appearing in its issues on the ___10th___ day of ___May,  2007___, and the ___7th___ day of ___June, 2007___, advertising the sale to take place on the ___13th___ day of ___June, 2007___, of the following described property, viz:

LOTS 1 2 SQ 23 BELT BRIDGE
PROPERTY ADDRESS:   1712 BRIDGE CITY AVE

# 10750020

All of the said property being situated in Ward No. ___50   60317___ in the Parish of Jefferson. The amount of taxes, interest and cost due on said property by said Tax debtor is the following amounts, viz:

| | | |
|---|---|---|
| Parish Tax | $ | 1,323.46 |
| Notice | | 7.00 |
| Interest | | 555.66 |
| Advertisement | | 40.50 |
| Recording of Deed | | 38.00 |
| Deed from Tax Collector | | 75.00 |
| Liens and Other Costs | | 325.00 |
| Total | $ | 2,364.62 |

document: jpsorps\txeldeed.doc

2



PLAINTIFF'S
EXHIBIT
Pol 3

# 10750020

And I, the said Harry Lee, Sheriff and Ex-OfficioTax Collector as aforesaid, in accordance with law and the terms of said advertisement, at the principal front door of the Court House of the Parish of Jefferson on the 13th day of June, 2007 , it being the day for said sale named in advertisement, and after complying with all other legal formalities, did offer for sale the least quantity of the above described property that any bidder would buy for the taxes, interest, and costs. **There being no bidder for less than the whole**

(If no bidder for less than the whole so state.)

and RUDOLPH A. EDWARDS , whose address is 824 HOOTER RD BRIDGE CITY, LA 70094 ,

bidding the amount of the taxes, interest, and costs, it being the sum $2,364.62 , TWO THOUSAND THREE HUNDRED SIXTY-FOUR DOLLARS AND 62 CENTS

which amount the said RUDOLPH A. EDWARDS

paid to me in cash, the receipt whereof is hereby acknowledged, the said property was adjudicated to the said RUDOLPH A. EDWARDS .

NOW THEREFORE, I, Harry Lee, Sheriff and Ex-Officio Tax Collector of the Parish of Jefferson, through my undersigned Deputy, under and by virtue of the authority vested in me as aforesaid and under and by virtue of the law of the State of Louisiana, and for the consideration of the taxes, interests and costs, as above set forth, do hereby grant, bargain, sell, transfer, assign, set over and deliver in the name of the Parish of Jefferson, unto the said RUDOLPH A. EDWARDS his heirs and assigns, all and singular the above described property, without any warranty of title whatsoever,and all the right, title and interest which the said POL,MICHAEL L has or had in same, with the right of the purchaser RUDOLPH A. EDWARDS to be put in actual possession of said property by order of any Court of competent jurisdiction. It, however, being understood and stipulated that in conformity with the said act and under the terms and conditions therein expressed the owner of said property may **redeem the same at any time within three years from the date of filing this deed for record in the Conveyance Office of the Parish of Jefferson by complying with the provisions of the said Law of the State of Louisiana.**

In witness whereof, I have hereunto subscribed my name officially, through my undersigned Deputy, at my office, City of Gretna, Parish of Jefferson and in the presence of GREER TOMPSON and BONNIE BRYANT two competent witnesses, who signs these presents with me, said Sheriff and Ex-Officio Tax Collector, on this the 13th day of June, 2007 .

WITNESSES:

Andrew J. LeBlanc, Jr., Director
Bureau of Revenue and Taxation
For: Sheriff and Ex-Officio Tax Collector

document: jpsorps\txsldeed.doc

**[PAGE BREAK]**

**Jennifer Rosenbaum**

| | |
|---|---|
| **From:** | mpol@cableone.net |
| **Sent:** | Sunday, February 26, 2006 4:59 PM |
| **To:** | kadakkarappally jacob |
| **Subject:** | Re: official |

Dear Joseph Jacob,

I am in recipt of your e-mail and have also forwarded it to the immigration attorney Malvern Burnett.

The labor certicifcation has been approved. Therefore, your second payment is due as agreed to in the contract you signed.

What you filled out and signed is the application for Permanent residence and visa to be issued.

If you fail to make the second payment by the end of this week, you will be substituted with someone on the waiting list.

If you have any questions, please feel free to respond.

Thank you,
Michael Pol
Global Resources

On Sat, 25 Feb 2006 18:54 , kadakkarappally jacob <chikoochinnu@yahoo.co.uk> sent:

Dear Sir,
    I am KADAKKARAPPALLY JOSEPH JACOB have received the Application for permanent employment certification and I signed and sent it to India. During the same time I want to ask you that this is only a application for permanent employment certification, that means till now he labour certification is not completed. As per our agreement the second instalment have to be paid after the labour certification card received. now I am confused why you are asking the second instalment now so please give me the Right reply

With regards,
    K J JACOB_

To help you stay safe and secure online  we've developed the all new Yahoo! Security Centre



**[PAGE BREAK]**

FROM :                                   FAX NO. :5045250011              Apr. 05 2007 11:11AM  P2



WORKFORCE FOR THE WORLD

22 November 2004

Dear "Green Card" Candidate:

I thought it would be a good time to write you and let you know the current status of your "green card" application in the U.S. The good news is that President Bush has been re-elected. As you know, our president has been very pro-immigration but has put the newly devised immigration programs on hold because of election year politics. More importantly, the congress and senate of the US has picked up members of the presidents party, which now have a majority of the seats. This will be very important for not only the "PERM" (Program Electronic Review Management) which is the Fast Track Labor Certification process but also the proposed "Guest Worker Program". The new "PERM" process is scheduled to be fully implemented in early 2005. Enclosed you will find a circular that was issued by the US authority in charge of implementing the "PERM" program. This circular was intended for the regional offices explaining to them how to make the necessary changes.

Your immigration attorney, Mr. Malvern Burnett, has already initiated your alien labor certification on behalf of your permanent employer J&M Associates. This has been initiated under the Reduction in Recruitment program (RIR). This is also a Fast Track Program introduced in October 04. Under this process the Labor Certification may be completed by April of 2005.

The United States Department of Labor (DOL), has already established two national PERM processing centers one in Chicago and one in Atlanta, the Directors and the certifying officers have also been appointed. DOL assumes that the new PERM regulation shall be published by the end of December, 04 and the two national centers will be operational in 60 days from the date of publication. Thereafter the Labor Certification it will take only 15-30 days. The currently filed RIR process and the PERM process are similar and allow transferring the cases from RIR to PERM. The advertisements process is under way which shall be completed by February, 05 just on time when the PERM center will be functional, so we shall be the one of the first in queue for the Labor certification under PERM process. Immigrant visa petitions will be filed as soon as the labor department certifications are issued. Immigrant visa petitions will take approximately 6-9 months from the date of filing.

---

**WORLDWIDE HEADQUARTERS**

U.S.A.
P.O. Box 1859
Ocean Springs, MS 39566
Phone: 228-875-1351
Fax: 228-818-2750

INDIA
708 Sagar Tech Plaza
Saki Naka Junction, Andheri Kurla Rd.
Mumbai 400 076
Phone: 91-225-694-1617 • Fax: 91-225-690-2077

DUBAI
Building 17
Room 158
Dubai Internet City
Dubai U.A.E.



PLAINTIFF'S EXHIBIT

**[PAGE BREAK]**

# Global Resources, Inc. and Signal International, Inc Skilled Worker Recruitment Agreement

This recruitment agreement ("Agreement") is entered into by **Global Resources, Inc.** a Mississippi Corporation referred to as "Global" and **Signal International, Inc.**, A Mississippi Corporation having its office address at 601 Bayou Casotte Parkway, Pascagoula, MS, referred to as "Signal".

This Agreement establishes the framework for a business relationship between the two parties to select, acquire, and transport to and from the United States, foreign skilled workers (hereinafter "Foreign Workers") under the "H2B" temporary program and/or the "permanent residence" process to be employed by Signal or its subsidiaries and acquired on behalf of Signal by Global for that purpose.

**Whereas**, in the United States, there is a shortage of skilled workers. Global is in the business of assisting skilled Foreign Workers abroad, for a fee to be paid by the Foreign Workers, to find employment in the United States under the H2B or I-140 "Permanent Resident" process. Global also has an interest in assisting employers in the United States to have access to competent skilled Foreign Workers from abroad. The purpose of this Agreement being, to join together competent Foreign Workers and a US employer for the mutual benefit of both and for the consideration of the fee to be paid to Global by the skilled Foreign Workers. The time frame for completing these two processes are as follows:

1. H2B visas are temporary in nature (10 months or less) and are for emergency needs. H2B's are designed to be completed within 120 days (more or less) from the date of application.
2. I-140 Permanent Resident visas are for long-term needs and are generally available from 18-24 months after labor certification approval.

**Whereas, Global and Signal agree to the following:**

1. Global will advertise, pre-test, and select and qualify Foreign Workers that are suitable for employment with Signal under the terms agreed upon.
2. Global will provide all immigration documents for the selected Foreign Workers and an immigration attorney to file all proper documents for the" H2B" and/or "permanent resident" process. Signal shall be responsible for all fees imposed by any U.S. or state governmental agency in connection with the filing of the "H2B" and/or "permanent residence" applications and required documentation for Foreign Workers procured hereunder.
3. Global will provide to Signal, at no charge, an Immigration Attorney to assist, advise and process the Signal requirements for migrating the skilled Foreign Workers, including but not limited to the filing and processing of any certification applications with the appropriate State Workforce Agency and USCIS. The



Immigration Attorney assigned to provide such services to Signal shall owe a duty of loyalty to Signal.

4. **Global** will provide Signal with copies of any and all immigration or employment documentation filed by or on behalf of Signal or any Foreign Worker employed by Signal pursuant to this Agreement, including any contract executed between Global and any Foreign Worker.

5. Signal shall have no responsibility or obligation pursuant to any contract executed by Global on its own behalf and any Foreign Worker or for any oral, written or implied promises or offers made by Global to any Foreign Worker, unless expressly agreed to in writing by Signal.

6. **Global** will insure that each Foreign Worker will be able to speak, read and write in the English language.

7. **Global** will provide each Foreign Worker with an employment contract drafted and approved by Signal, in the form attached hereto as Exhibit "A," and require that each Foreign Worker execute same before Global will allow the Foreign Worker into the program or take any action.

8. **Global** shall have no authority to amend, supplement, modify or alter the terms of the employment contract between Signal and any Foreign Worker without the express written consent of Signal.

9. **Global** will be responsible for all costs related to the recruitment, transportation and entry of the "H2B" and/or "permanent resident" skilled Foreign Workers to the US.

10. Upon visa issuance, **Global** will deliver, at no cost to Signal, the "H2B" and/or "permanent resident" skilled Foreign Worker to the airport nearest the city that Signal chooses.

11. **Global** shall provide housing, transportation and meals ("Accommodations") for any Foreign Worker during the period of employment in the U.S. for Signal. The costs for any such Accommodations to be provided to the Foreign Workers shall be agreed upon between the Foreign Worker and Global and shall be paid for by the Foreign Worker. Upon written notice from Global and the Foreign Worker specifying the agreed costs for such Accommodations, Signal agrees to administer payments for the Accommodations through the deduction of the agreed amounts from the Foreign Worker's earned wages at regular payroll intervals and to transfer all such deducted amounts for Accommodations to Global. Signal shall have no further obligation or responsibility for the provision or costs of housing, transportation and food for any Foreign Worker. Global shall protect, defend, indemnify and hold Signal its parent and affiliated entities, and their directors, officers, employees, agents, insurers and underwriters from and against any and all claims, costs, damages, fines, or penalties arising out of or in connection with the provision of the Accommodations by Global, regardless of fault, unless caused by the willful conduct or gross negligence of Signal.

12. Upon the expiration of the authorized period of employment pursuant to any work visa of any Foreign Worker employed by Signal, Signal shall deliver the Foreign Worker to the airport nearest the city where the Foreign Worker was employed. Signal shall have no further obligation or responsibility for the Foreign Worker or the costs of his/her transportation. However, in the event that any Foreign



Worker is terminated by Signal prior to the end of the employment period authorized by his/her work visa, Signal shall be responsible for the reasonable costs of such Foreign Worker's return transportation, to the extent required by applicable law or regulation.

13. **Signal** agrees to pay the "offered" wage in the contract executed between Signal and the newly acquired Foreign Worker.

14. **Signal** will sign and complete all immigration documentation pertaining to the Foreign Workers hired by Signal on a timely basis as needed by Global.

15. **Signal** will provide to Global a letter with a listing of the number, type and specification of skill that is required of the Foreign Workers to fulfill their needs.

16. **Signal** will provide a contract to Global, along with a limited power of attorney to sign on behalf of Signal, for each candidate specifying the terms and conditions of employment, including, as applicable, the offered wage, working hours, overtime, period of employment, insurance, lodging, transportation, place of employment, termination, etc. in the form attached hereto as Exhibit "A."

17. **Signal** will properly insure all Foreign Workers according to the laws of the various states where such Foreign Workers are employed and the United States for injuries sustained while at work.

18. **Signal** agrees that the Foreign Workers that are brought to the United States under this program are going to be employees of Signal and not Global and furthermore, hold Global harmless for any lawsuits or actions that are brought against Global by any Foreign Worker pertaining to this employment.

    A. The hold harmless shall pertain to actions only after the Foreign Worker becomes an employee of Signal, which is defined as when they are delivered to Signal at the nearest US airport.

19. In entering this Agreement **Signal** relies upon **Global's** experience and expertise in procuring Foreign Workers and processing all documentation associated with the visa and/or permanent residence applications in compliance with U.S. immigration law and regulation to ensure that the Foreign Workers can be legally employed by Signal to work in the U.S. **Global** shall protect, defend (including payment of attorney's fees and costs) and indemnify Signal, its parent and affiliated entities, and their directors, officers, employees, agents, insurers and underwriters from and against any and all claims, costs, damages, fines, or penalties arising out of or in connection with the processing of any visa or permanent resident applications, including any required documentation, or any violation of immigration law or regulation resulting from improper processing of any such applications.

20. **Signal** is responsible for all expenses related to travel by its US employees or principles to and from foreign countries during this process for testing or observation.

21. **Signal** will have the duty to advertise at their expense for requirements of the state workforce agency during the "recruiting period".

22. **Signal** understands and agrees that it is possible that temporary H2B visas may not be issued in a timely manner due to caps set by the US government. In any case, the permanent resident (I-140) process will continue as agreed upon.



This Agreement shall be subject to the Laws of The State of Mississippi.

In witness thereof, the parties have agreed and their authorized representatives have executed this document below.

**For Global Resources, Inc.**

Michael L. Pol, President                    4/18/06
                                             Date

**For Signal International, Inc.**

Chris Cunningham, CFO                        4/18/06
                                             Date