**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**KURIAN DAVID, ET AL**                                           **CIVIL ACTION**

**VERSUS**                                                       **NO. 08-1220**

**SIGNAL INTERNATIONAL, LLC, ET AL**                              **SECTION  "A" (3)**

**ORDER AND REASONS**

The undersigned Magistrate Judge conducted a telephone hearing regarding Plaintiffs'

Motion for Protective Order Precluding Inquiries with an *In Terrorem* Effect (Doc. # 315) and

Plaintiffs' Motion to Compel (Doc. # 319).  Participating on behalf of plaintiffs were Alan Bruce

Howard, Daniel Werner and Robert P. Wynne.  Participating on behalf of defendants were

Donald C. Douglas, Jr., Erin Casey Hangartner and Patricia F. Bollman for Signal International,

LLC, Stephen H. Shapiro for Sachin Dewan and Dewan Consultants Pvt. Ltd., Ralph R. Alexis,

III, Glenn B. Adams and Michael Madiere for the Burnett defendants and Michael E. Whitehead

for J&M Associates, Inc. of Mississippi.  Insofar as Plaintiffs' Motion to Compel seeks a

representation order/determination of counsel or default judgment as to Indo-Ameri Soft LLC

and Rao Defendants formerly represented by Kevin Kennedy Gipson (who has withdrawn),

those issues are more appropriately addressed to the district judge.  An order compelling

1

discovery responses against the unrepresented corporate defendants is premature at this point because the aforesaid corporate defendants are currently not represented by counsel and cannot represent themselves.

Turning to Plaintiffs' Motion for Protective Order Precluding Inquiries with an *In Terrorem* Effect (Doc. # 315), it is GRANTED for the following reasons.

## BACKGROUND

Plaintiffs are a putative class of over 500 Indian men who were allegedly trafficked into the United States through the federal government's H-2B guestworker program to work for Signal International, LLC, in the aftermath of Hurricane Katrina.  Plaintiffs claim that the defendants knowingly recruited, transported and harbored the Plaintiffs and other putative class members in violation of laws prohibiting peonage, slavery, involuntary servitude and force labor within the meaning the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590 (TVPA). Plaintiffs assert class action claims against the defendants arising from violations of their rights under a number of different statutes, to wit: (1) Trafficking Victims Protection Reauthorization Act of 2003 (TVPA), 18 U.S.C. § 1595; (2) 18 U.S.C. § 1589 (Forced Labor); (3) 42 U.S.C. § 1981;[1] (4) Abuse of Process under 18 U.S.C. § 1589(3);[2] (5) Violations of the Ku Klux Klan Act of 1871, 42 U.S.C. §1985 and the Thirteenth Amendment; (6) Fraud and Negligent

---

[1]Plaintiffs allege that defendants' scheme to isolate plaintiffs and other class members, to force them to live in conditions causing psychological harm, and to limit outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to coerce Plaintiffs and other class members into believing that they would suffer serious harm if they were to leave the employ of defendants.

[2]Plaintiffs claim that defendants threatened putative class members with deportation and deceived plaintiffs and other class members about the terms of their visas. Complaint at ¶ 283 at p. 58.

Misrepresentation; (7) Breach of Contract; (8) Violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 206, et seq.;[3]  and  (9) False Imprisonment, Assault and Battery and Intentional or Negligent Infliction of Emotional Harm.  Plaintiffs allege multiple predicate acts of forced labor under 18 U.S.C. § 1589 in furtherance of the defendants' unlawful scheme of RICO Enterprises to profit from recruiting, obtaining and provisioning plaintiffs for work in the United States through fraudulent promises, charging exorbitant payments for recruitment and immigration services and engaging in exploitative and coercive recruitment and labor practices, all of the foregoing in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962( c), (d) ("RICO").[4]  On October 1, 2008, putative class plaintiffs filed their motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).[5]

Defendant Signal International, LLC ("Signal"), is in the business of providing construction services to the Gulf Coast oil and gas industry.  Factual allegations include that beginning in late 2003 the "recruiter defendants" Dewan Consultants, Sachin Dewan, Global Resources, Inc. and Michael Pol placed advertisements in various newspapers across India and the United Arab Emirates seeking welders, fitters and other marine fabrication workers on behalf of various U.S.-based companies.  According to plaintiffs, the advertisements promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States with their families.  The plaintiffs contend that

---

[3]Plaintiffs' collective action under the FLSA includes claims of willful failure to pay minimum and overtime wages and unlawful deductions from wages, including expenses for point-of-hire travel, visa, recruitment, tools and housing expenses.

[4]Rec. Doc. No. 1.

[5]Rec. Doc. No. 165.

they paid exorbitant fees to the defendants for recruitment, immigration processing and travel.

Plaintiffs submit that, unbeknownst to them, they were never eligible to obtain the promised

green cards and that, once arriving in the United States, they were subject to serious abuses and

forced labor at Signal's labor camps in Pascagoula, Mississippi, and in Orange, Texas.

In its Order and Reasons issued December 8, 2008, the district judge found the factual

assertions made by plaintiff, David Kurian, representative of the factual assertions made by

others.  They are reiterated below *in extenso*.

> According to David, a citizen of India, he saw a newspaper ad by Dewan
> Consultants while he was employed in Abu Dhabi.  In May 2006, David attended
> a seminar led by defendant Sachin Dewan with the assistance of the defendant
> Malvern Burnett.  David claims that at the seminar Dewan told the attendees that
> for 600,000 rupees plus costs, he could get workers an employment-based green
> card in the United States.   The attendees were told that the money would be paid
> in three installments and that the money would cover Dewan's fee as well as fees
> for Burnett and Michael Pol.  Burnett is an attorney at law specializing in
> immigration matters, and Pol owns Global Resources, Inc., a company in the
> business of assisting U.S. companies in finding skilled labor to work at their
> facilities.  David claims that Burnett spoke at the seminar and explained to the
> potential recruitees how the green card process would work.
>
> David took and passed the pipe fitter skills test.  Thereafter, David
> attended two additional group meetings, the second of which was led by Dewan
> and Burnett.  Burnett explained the green card process once again and he and
> Dewan handed out contracts from Global Resources, Malvern Burnett and Dewan
> Consultants, and an employment contract for Signal International.  A
> representative from Dewan's office helped the group to successfully fill out the
> forms.
>
> In June and August of 2006, David made installment payments at Dewan's
> office including checks made payable to Burnett and Pol.  In late August 2006
> David attended a meeting in Dubai where Dewan and Burnett told the workers
> that before their visas would expire the green cards would be approved.  At a
> subsequent meeting Dewan and Burnett gave workers instructions on how to
> answer questions from the U.S. consular officers during their visa interviews.
> Dewan and Burnett allegedly instructed the workers not to reveal how much
> money they had paid for the recruitment fees and not to mention the green cards.
>
> The consulate officials took David's passport and at the behest of Dewan
> Consultants the passport was returned directly to Dewan's office.  According to
> David, Dewan refused to return his passport until he made the final installment

payment to Dewan and paid for medical testing to be performed by a physician chosen by Dewan.

      In February 2007, David made the final payment with checks made payable to Dewan, Burnett and Pol. David claims that he was then rushed to sign forms written in English that he could not understand and it was only upon signing these forms and making the final installment payment that Dewan finally returned his passport. During this process David saw other workers attempt to back out and have their money returned but that someone from Dewan Consultants had threatened to destroy their passports in retaliation. David contends that the and his wife sold many of their personal belongings to raise the money necessary to pay Dewan, Burnett and Pol.

      On February 16, 2007, David arrived at Signal's labor camp in Orange, Texas where he signed a number of additional employment forms. David claims that he later learned that the forms permitted Signal to take deductions from his salary for food and accommodations and that Signal required the workers to open an account with a specific bank where their paychecks would be deposited. David charges that the living conditions and food at Signal were horrible and that the Indian workers were told that even if they left that they would be charged the daily rate of room and board.

      David claims that the Indian workers were searched by guards when they would come and go from camp and that guards would sometimes come into the living quarters at night to search workers' belongings. According to David, the workers began to get sick because of the overcrowded conditions and Signal required the workers to purchase all of their own tools. David claims that the workers were relegated to performing all of the dangerous and dirty work inside of the ships and that the American workers were not required to do such work.

      According to David, when the workers complained, Signal made more promises about the green cards and threatened that if the workers continued to complain then they would be deported and not receive the promised visas. David continued to work under conditions that he characterized as horrible because he was afraid of the consequences of leaving given that he had incurred so much debt to raise the money to come to the United States.[6]

The district judge took up the matter of several defendants' motions to dismiss, including the Dewan Defendants, denying same.[7]

### CONTENTIONS OF THE PARTIES

Plaintiff seeks an order protecting Putative Class Representatives and putative class

---

[6]Order and Reasons filed December 8, 2008 [Rec. Doc. No. 288].

[7]*Id.*

members from inquiries which have an inherently *in terrorem* effect.  More particularly, plaintiffs seek to prohibit inquiry into:

(1) *current* immigration status of any Plaintiff -- *i.e*., post-termination of his employment with defendant Signal;

(2) *current* address or place of residence of any Plaintiff;

(3) employers or potential employers of any Plaintiff *post-termination of employment with defendant Signal.*

Plaintiffs' counsel explains that there are three issues central to plaintiffs' motion, which are:  (1) whether the subject inquiries have an *in terrorem* effect or are threatening in nature; (2) whether the claims at issue in this case allow for the protection sought; and (3) whether the defendants have articulated any basis indicating that such inquiries are relevant and, if so, does this overcome the *in terrorem* effect.

As to the first aspect of the analysis, plaintiffs submit that they have cited an abundance of authorities that support their position that inquiries as to the *current* immigration status of the putative class representatives, *inter alia*, will have an *in terrorem* effect on putative class representatives and *prima facie* chilling effect on any inclination they have to prosecute the putative class members claims in this case.  Plaintiffs further argue that the current immigration status of putative class representatives have nothing to do with their claims, which concern the time period during which they were employed by Signal.   Given the *prima facie* nature of the *in terrorem* effect at issue, plaintiffs contend that sworn declarations of the plaintiffs are not necessary to meet their burden and that the suggestion that plaintiffs are required to submit sworn declarations attesting to facts as to which they are seeking protection is a *non sequitur*.

As to the second issue, plaintiffs contend that their claims are the type of claims that warrant the imposition of such protection.  Plaintiffs contend that the cases cited by defendants -- including of *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002) and *Egbuna v. Time-Life Libraries*, 153 F.3d 184, 187-188 (4th Cir. 1998) -- are inapplicable.  Plaintiffs submit that they cited a plethora of cases[8] which challenge the defendants'  suggestion that immigration reform effected such a monumental change policy that it curtails the reach of Title VII and other statutes such that they no longer afford protection to unauthorized aliens.  For purposes of all of the plaintiffs claims in addition to FLSA and Title VII -- including  RICO, trafficking, *inter alia* -- the ability to assert such claims does not hinge upon whether the plaintiffs are in status or out of status.  Plaintiffs submit that the NLRA case, *Hoffman Plastics, supra*, is inapposite because it involved a claim for work which was not actually performed.[9]  Plaintiffs in the case at bar seek damages for work actually performed.

Plaintiffs highlight that all of their claims are available to workers regardless of their

---

[8]*See Olivera-Morales v. International Labor Management Corp., Inc*. 2008 WL 53293 (M. D. N. C. 2008) (distinguishing  *Egbuna*, *supra*, noting that Olivera-Morales sought assistance from Defendants not only to obtain employment in the United States but also to obtain the necessary documentation and authorization so that she could begin working in the United States and highlighting that both parties anticipated that, as a result of their efforts, Ms. Olivera-Morales would be qualified to work in the United States); *Rivera v. NIBCO, Inc*. 364 F.3d 1057 (9th Cir. 2004) (noting that *Hoffman*,*supra,* does not resolve the question whether federal courts may award backpay to undocumented workers who have been discharged in violation of Title VII); *Escobar v. Spartan Sec. Serv., 281 F.Supp.2d 895, 897* (S. D. Tex. 2003) (holding that *Hoffman* "did not specifically foreclose all remedies for undocumented workers under either the National Labor Relations Act or other comparable federal labor statutes").

[9]*Reyes v. Van Elk, Ltd.*,  148 Cal. App. 4th 604 (Cal. App. 2 Dist. 2007) (finding that *Hoffman* does not prohibit plaintiffs from having standing to raise claims for prevailing wages as those claims are also for work already performed and that "prevailing wage law uses the general term 'worker' and does not restrict workers to citizens"); *Zavala v. Wal-Mart Stores, Inc*., 393 F. Supp.2d 295, 325  (D. N. J. 2005) (holding that the FLSA did not preclude undocumented workers from obtaining relief for work already performed).

immigration status; thus, current immigration status could not possibly have any relevance. Finally, plaintiffs submit that any conceivable relevance is overshadowed by the *in terrorem* effect.

Defendants contend that, in order to grant plaintiff's motion, the Court must find that the inquiries are not relevant as a matter of law as to every one of the claims that the plaintiffs have raised in this lawsuit and the defenses raised by the defendants.  Defendants argue that plaintiffs have not cited one case that extends the discovery limitations of the FLSA wage and hour cases to each of the claims that plaintiffs have made in this case.

As aforestated, the defendants contend that the Supreme Court's authority in  *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002)[10] suggests that the question in this case is better analyzed through a wider lens than the plaintiffs suggest is appropriate.[11]  Defendants also cite *Egbuna v. Time-Life Libraries*, 153 F3d 184, 187-188 (4th Cir. 1998) for the proposition that the IRCA effected a monumental change in our country's immigration policy and prior cases which indicated that Title VII protects unauthorized aliens from employment discrimination are inapplicable.[12]

---

[10]In *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), an NLRA case, the Supreme Court found that "awarding backpay to illegal aliens runs counter to policies underlying the [Immigration Reform and Control Act of 1986] IRCA" and that awarding backpay in the case before it "trivializes immigration laws" and "condones and encourages future violations." *Id.* at 149-151.  *See* Defendant Signal's Memorandum in Opposition at pp.2-3 [Rec. Doc. No. 324].

[11]*See* Defendant Signal's Sur-Reply at p. 2 [Rec. Doc. No. 337].

[12]In *Egbuna v. Time-Life Libraries,* 153 F.3d 184 (4th Cir. 1998), a Title VII failure to rehire case involving an undocumented worker, the Fourth Circuit determined that Egbuna's former employer had not violated Title VII as matter of law when it failed to rehire him because Egbuna, at the time he applied to be rehired, was not a documented worker, and therefore was not qualified for the position he sought. *Id.* at 186 ("Egbuna was unqualified for the position he sought by virtue of his failure to possess legal documentation authorizing him (an alien) to work

Defendants submit that the record is devoid of any factual basis for the allegations regarding the *in terrorem* effect.[13]  Defendants argue that, in all of the cases in which protection was granted, there was a clear factual basis supporting an order.   Defendant's contend that there is a dearth of authority warranting the extension of discovery limitations applicable to FLSA wage and hour cases to each and every claim that plaintiffs have made, including civil RICO based on fraud, civil RICO based on violations of the TVPA, discrete TVPA claims, §1981 claims, §1985 claims, discrete fraud claims and breach of contract claims.  It is defendants' position that, for the Court to grant plaintiff's motion and prevent inquiry into current immigration status, current residence and post-termination employment history, the Court must also find that such information is irrelevant as a matter of law to every one of the claims and defenses in this proceeding.[14]

Defendants submit that the applicable law suggests numerous relations between this civil proceeding and the current immigration status of a class representative including the following, to wit:

> ›        "In pari delicto is a cognizable defense to civil RICO"[15] and the basis of that
>           defense in this case is that some or all of the purported class representatives lied

---

in the United States").

[13]*See* Burnett Defendants' Memorandum in Opposition at p. 9 at nn. 9-10 (citing *Recinos-Recinos v. Express Forestry, Inc*., 2006 WL 197030 *7 (E. D. La. 2006) for the proposition that plaintiffs must make a specific and particularized showing that the inquiry would generate an *in terrorem* effect and arguing that plaintiff's counsel's sworn declaration "rife with stereotyped and conclusory statement" falls far short of the mark necessary warrant the protection sought).

[14]Defendant Signal's Sur-Reply at p. 2 [Rec. Doc. 337].

[15]*Rogers v. McDorman,* 521 F.3d 381, 386 (5th Cir. 2008).

to government officials in order to obtain their visas.[16]

› Standing of an illegal alien to bring non-wage and hour claims cannot be decided in the abstract in the wake of *Hoffman Plastic, supra,* since it mandates that courts be wary, as a matter of public policy, of actions that undermine the IRCA.[17]

› A class representative may be inclined to present the importance of his presence in the United States as a class representative as an equity supporting a T-visa application suggesting both bias on the part of the witness and a conflict of interests with putative class members.

› Whether the plaintiff obtained resettlement benefits under the TVPA as part of obtaining a T-visa or U-visa (or some other arrangement) is relevant to the witnesses credibility as receipt of such benefits could be probative of whether a witness fabricated his story to obtain benefits.[18]

Defendants contend that the purported "fear" is the subject of argument only and there is no affidavit or other competent evidence supporting plaintiff's counsel's suggestion of any *in terrorem* effect.  In this regard, Signal submits that, long ago,  USCIS was apprised of the terminated workers immigration status and that there is nothing that Signal can learn about the putative class representatives' current immigration status that the ICE and USCIS does not already know.

In terms of relevance -- in addition to the issues of commonality, typicality and adequacy -- defendants submit that inherent in every claim is the issue of damages.  Defendants contend that the non-disclosure of plaintiffs' current employment goes to the heart of any damages the

---

[16]For example, Signal cites the deposition of class representative, Hemant Khuttan, who raised the 5th Amendment privilege against self-incrimination and refused to answer a question as to whether he lied during his consular interview to obtain a visa. *See* Defendant Signal's Memorandum in Opposition at pp. 6-7 (citing the Hemant Khuttan Deposition at pp. 222-224 (Signal's Exhibit "A")) [Rec. Doc. No. 324].

[17]*Id.*

[18]*See* Defendant Signal's Memorandum in Opposition at pp. 5-6 [Rec. Doc. No. 324].

putative class members may have incurred.  Defendant argues that damages is a critical issue on

class certification -- *i.e*., how and why the plaintiffs have been damaged and variances in the

damage claims from one class member to another.

## ANALYSIS

### A. Standard for Granting Protective Order

According to Rule 26(b) of the Federal Rules of Civil Procedure, a party "may obtain

discovery regarding any matter, not privileged, which is relevant to the subject matter involved

in the pending action."[19]   Rule 26(c) authorizes courts, for good cause, to "make any order

which justice requires to protect a party or person from annoyance, embarrassment, oppression,

or undue burden or expense, including ... that certain matters not be inquired into, or that the

scope of the disclosure or discovery be limited to certain matters ...."[20]   The burden is upon the

party seeking non-disclosure or a protective order to show good cause.[21]

### B. Good Cause Showing

Plaintiffs argue that discovery related to current immigration status, post-termination

employment status and current address are not relevant to his right to recover unpaid wages,

typicality, commonality or adequacy, *inter alia*. Further, plaintiffs contend that the intimidating

effect of requiring disclosure of immigration status is sufficient to establish "good cause" when

the question of immigration status only goes to a collateral issue.  Defendants argue that such

information is relevant to those determinations, as well as standing and their *in pari delicto*

---

[19]Fed. R. Civ. P. 26(b)(1).

[20]Fed. R. Civ. P. 26(c).

[21]*See United States v. Garnett,* 571 F.2d 1323, 1326 & n. 3 (5th Cir. 1978); *Blanchard and Co., Inc. v. Barrick Gold Corp*., 2004 WL 737485 (E. D. La. 2004).

defense, which is a central issue in this case particularly considering plaintiffs' RICO claims. Additionally, defendants argue that the inquiry is relevant to the putative class representatives' credibility and class certification issues.

***Relevance of Immigration Status and***
***Authorization to Work in the United States***
***to an Action to Recover Unpaid Wages and Overtime Pay***
***for Work Actually Performed***

Defendants have addressed the relevance of the information sought and contend that plaintiffs must demonstrate that the issues are not relevant to any claim or issue in the case, including plaintiffs' civil rights or tort claims.  Plaintiffs contend that the damage and prejudice which would result if discovery into their current immigration status were permitted far outweighs its probative value with respect to their discrimination and tort claims.

This Court finds plaintiffs' argument persuasive.  Even if current immigration status were relevant to plaintiffs race/national origin discrimination, contract and tort claims, discovery of such information would have an intimidating effect on an employee's willingness to assert his workplace rights.[22]  Plaintiffs' claims and allegations of fact supporting same in the case at bar find no parallel in reported federal decisions reviewed by the undersigned.

As stated above, this is also an action for unpaid wages and overtime for work actually performed for Signal. Courts have recognized the *in terrorem* effect of inquiring into a party's immigration status and authorization to work in this country when irrelevant to any material claim because it presents a "danger of intimidation [that] would inhibit plaintiffs in pursuing

---

[22]*See, e.g .*, *Rivera v. NIBCO, Inc*., 364 F.3d 1057, 1065 (9th Cir.2004) ( "[W]ere we to direct district courts to grant discovery requests for information related to immigration status in every case involving national origin discrimination under Title VII, countless acts of illegal and reprehensible conduct would go unreported.").

12

their rights."[23]   Here, plaintiffs' current immigration status is a collateral issue. The protective

order becomes necessary as "[i]t is entirely likely that any undocumented [litigant] forced to

produce documents related to his or her immigration status will withdraw from the suit rather

than produce such documents and face ... potential deportation."[24]

### Relevance, if any, of Hoffman Plastic Compounds, Inc. v. NLRB

In *Hoffman*, the Supreme Court held that allowing the National Labor Relations Board

("NLRB") "to award backpay to illegal aliens would unduly trench upon explicit statutory

prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the

successful evasion of apprehension by immigration authorities, condone prior violations of the

immigration laws and encourage future violations. However broad the Board's discretion to

fashion remedies when dealing only with the NLRA [National Labor Relations Act], it is not so

unbounded as to authorize this sort of an award."[25]   The court noted that *awarding back pay*[26]

ran counter to the policies underlying the IRCA because it was for "years of work not performed,

for wages that could not lawfully have been earned, and for a job obtained in the first instance by

---

[23]*Liu v. Donna Karan International, Inc.*, 207 F.Supp.2d 191, 193 (S.D.N.Y.2002) (citations omitted).

[24]*Topo v. Dhir*, 210 F.R.D. 76, 78 (S.D.N.Y.2002) (*quoting Flores v. Albertsons Inc.*, 2002 WL 1163623, *6 (C. D. Cal. Apr. 9, 2002)); *see also EEOC v. First Wireless Group, Inc*., 225 F.R.D. 404 (E.D.N.Y.2004) (good cause shown for protective order where disclosure of immigration status would cause embarrassment, potential criminal charges, or deportation if status was discovered to be illegal).

[25]*Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. at pp. 151-152.

[26] "Back pay" is an equitable remedy and commonly refers to the wages and other benefits that an employee would have been earned but for an unlawful firing; such awards are diminished by earnings in the interim.  *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941)

a criminal fraud."[27]   Nevertheless, the *Hoffman* court stated that the NLRB could impose other

"significant sanctions" against an employer for its violation of the NLRA.[28]

The *Hoffman* case is inapposite.  It concerned remedies available to undocumented

workers under the NLRA and not their standing to file a claim before the NLRB.  Indeed, the

Supreme Court reaffirmed the portion of its earlier holding in *Sure-Tan, Inc. v. NLRB,* 467 U.S.

883 (1984) that undocumented workers had standing to file claims under the NLRA.[29]

In *Patel v. Quality Inn South,* 846 F.2d 700, 704 (11th Cir.1988), the court held that the

IRCA did not purport to limit remedies for unpaid wages available to undocumented aliens under

the FLSA.  The Eleventh Circuit explained that, if the FLSA did not cover undocumented aliens,

employers would have an incentive to hire them. The court noted that minimum wage laws

supported the IRCA policy of reducing illegal immigration because such laws offset the most

"attractive feature" of such workers -- their willingness to work for less than the minimum

wage.[30]   The court concluded that claims for wages for work already performed did not conflict

with federal immigration policy.[31]   Other courts agree that the IRCA did not foreclose all

remedies for undocumented workers under FLSA, NLRA, other federal labor statutes and state

---

[27]*Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. at p. 149.

[28]*Id.*, at p. 152.

[29]*Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. at pp. 149-150, n. 4; *see also I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1047 n. 4 (1984) (stating that *Sure-Tan* 's remedial holding permits retrospective sanctions against an employer even where the employee is an illegal alien).

[30]*Patel v. Quality Inn South,* 846 F.2d 700, 704 (11th Cir.1988), *cert. denied,* 489 U.S. 1011 (1989).

[31]*Id.*, at pp. 705-706.

law remedies.[32]

In summary, *Hoffman Plastics* does not control plaintiffs' claims for unpaid minimum

and overtime wages for work already performed, *inter alia*.  Plaintiffs highlight that they are not

claiming "back pay;" instead, their wage claim is for work already performed.

### Credibility

Defendants assert that information as to current immigration status would allow them to

test plaintiff's credibility and thus their adequacy as putative class representatives, *inter alia*.

Credibility is always at issue.   That, in and of itself, does not warrant an inquiry into the subject

---

[32]*See Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 243 (2nd Cir.
2006) ; *Rivera v. NIBCO, Inc.,* 364 F.3d 1057, 1067 (9th Cir. 2004) (finding *Hoffman* not as
broadly applicable and specifically noting the differences between the NLRA and Title VII);
*Rios v. Enterprise Ass'n Steamfitters Local 638*, 860 F.2d 1168, 1173 (2d Cir. 1988) ( holding
that undocumented aliens were eligible to receive backpay under Title VII); *Chellen v. John
Pickle Co.,*  446 F.Supp.2d 1247 (D. C. Ok. 2006); *Zavala v. Wal-Mart Stores, Inc*., 393
F.Supp.2d 295, 321-25 (D. N. J. 2005) (concluding that the FLSA did not preclude
undocumented workers from obtaining relief for work already performed); *Galaviz-Zamora v.
Brady Farms, Inc*., 230 F.R.D. 499, 501-03 (W. D. Mich.2005); *Escobar v. Spartan Sec. Serv.*,
281 F.Supp.2d 895, 897 (S. D. Tex.2003) (holding that *Hoffman* "did not specifically foreclose
all remedies for undocumented workers under either the National Labor Relations Act or other
comparable federal labor statutes"); *Cano v. Mallory Management*, 760 N.Y.S.2d 816
(N.Y.Sup.,2003) (noting that every case citing *Hoffman* since it was rendered has either
distinguished it or limited its application greatly); *Tyson Foods, Inc. v. Guzman*, 116 S.W.3d
233, 244 (2003) (rejecting *Hoffman Plastic*-based challenge to tort award to undocumented alien
and noting that *Hoffman Plastic* "only applies to an undocumented alien worker's remedy for an
employer's violation of the NLRA and does not apply to common-law personal injury
damages"); *Flores v. Amigon*, 233 F. Supp.2d 462, 463-64 (E. D. N. Y.2002) (holding that
*Hoffman* does not bar backpay under the FLSA and granting a protective order barring discovery
into the plaintiff's immigration status);  *Liu v. Donna Karan Int'l, Inc*., 207 F.Supp.2d 191, 192-
192-193  (S.D.N.Y.2002) (questioning the applicability of *Hoffman* to the FLSA and denying the
defendant's request to discover the plaintiff's immigration status due to the danger of
"intimidation, the danger of destroying the cause of action, [and the risk that the discovery
would] inhibit plaintiffs in pursuing their rights" (internal quotation marks omitted)); *Singh v.
Jutla*, 214 F.Supp.2d 1056, 1061 (N. D. Cal. 2002) (noting that *Hoffman Plastic* did not
foreclose all NLRA remedies to undocumented workers).

of *current* immigration status when such examination would impose an undue burden on private

enforcement of employment discrimination laws, *inter alia*.[33]  "While documented workers face

the possibility of retaliatory discharge for an assertion of their labor and civil rights,

undocumented workers confront the harsher reality that, in addition to possible discharge, their

employer will likely report them to the INS and they will be subjected to deportation

proceedings or criminal prosecution."[34]   In *Rivera*, the court observed that granting employers

the right to inquire into immigration status in employment cases would allow them to implicitly

raise threats of such negative consequences when a worker reports illegal practices.[35]

    This Court finds that defendants' opportunity to test the credibility of plaintiffs does not

outweigh the public interest in allowing employees to enforce their rights.

### *Damages-Mitigation*

    Plaintiffs assert that the issue of damages and mitigation are not relevant at this pre-

certification discovery phase of the proceedings.  Defendants espouse the opposite view and

submit that the issue of damages is material to the issues of typicality, commonality and

adequacy inquiries. The Court is not persuaded by the defendants' arguments.

    A number of courts have determined that requests that seek to discover the immigration

status of plaintiffs are both irrelevant and prejudicial. These courts have denied defendants'

---

[33] *See Avila-Blum v. Casa de Cambio Delgado, Inc*., 236 F.R.D. 190, 192 (S. D. N. Y. 2006); *Rengifro v. Erevos Enterprises, Inc.* 2007 WL 894376 (S. D. N. Y. 2007) (concluding that the opportunity to test the credibility of a party based on representations made when seeking employment does not outweigh the chilling effect that disclosure of immigration status has on employees seeking to enforce their rights).

[34] *Rivera v. NIBCO, Inc*., 364 F.3d 1057, 1064 (9th Cir.2004).

[35] *Id*., at 1065.

requests to discover the addresses, social security numbers, and driver's license numbers of named plaintiffs and putative class members.

In *Galaviz-Zamora*, the court denied discovery requests similar to those in this case in an action in which plaintiffs sought both class certification under Rule 23 and collective action certification under FLSA.[36]  The court held that the plaintiffs' immigration status was irrelevant to their ability to represent other class members, class certification, and credibility, and thus denied discovery of the plaintiffs' tax returns, W-2 or 1099 forms, all identification documents and information regarding worker status, alien status, social security cards, visas, national origin, and alien identifications, each date and time that the plaintiffs have crossed the US/Mexico border, and any other document or information likely to lead to discovery of the plaintiffs' immigration status.[37]

This Court agrees with these other courts that the current immigration status of a class representative is irrelevant in wage and hour cases, in light of FLSA's coverage of all workers-undocumented or not. Courts have noted that such a position not only benefits the individual workers, but advances the goals of the FLSA. "Permitting an employer to circumvent the labor laws as to undocumented aliens 'permits abusive exploitation of workers' and 'creates an unacceptable economic incentive to hire undocumented workers by permitting employers to underpay them.'"[38]  To allow the immigration status of a class representative to be investigated - indeed to require a representative to enjoy legal immigration status - would seriously undermine

---

[36]*Galaviz-Zamora*, 230 F.R.D.  at 502-03 .

[37]*Id.*

[38]*Flores*, 233 F.Supp.2d at 464 (*citing Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984)).

the effectiveness of the FLSA.

The Court must balance the legitimate discovery needs of defendants to defend against certification as a class action and collective action and the real *in terrorem* effect that identification and investigation of plaintiffs, putative class members, and witnesses of unclear immigration status has on the enforcement of FLSA and other federal statutes.  The undersigned has concluded that the defendant can explore and challenge the class certification requirements of numerosity, typicality, commonality, and adequacy of representation, Rule 23(a), and predominance of common issues of law and fact, Rule 23(b)(2), without identifying information of named plaintiffs, putative class members, or potential witnesses.

Defendants can sufficiently evaluate numerosity with only the names of the putative class members by comparing them to the names of its workers. As to commonality and typicality, the Court has also concluded that defendants do not need identifying information if it receives from counsel information on the work periods, claimed pay due, work or employment agreement of both plaintiffs and putative class members.  Defendants can also evaluate how the situations of the named plaintiffs compare to the situations of the putative class.

As to the adequacy of representation, this is a question primarily dependent on the lack of conflict between the named plaintiff and putative class members and the resources and skills of counsel, not the characteristics of the representative plaintiff.  The Court acknowledges that, in infrequent circumstances, the history or characteristics of a representative may be so noxious as to be disqualifying.  Indeed, the defendants are free to (and apparently have) investigated this issue on their own *outside* of the bounds of discovery.

 The FLSA, other federal labor statutes and state court causes of action afford relief

regardless of immigration status.  Numerous cases cited herein above stand for the proposition that lack of INS documentation is not a bar to recovery or class representative status.

### *In Pari Delicto*

In light of the facts pled in the plaintiffs' complaint, defendant's argument regarding current status and its relevance to their in *pari delicto* defense is not convincing.  This case is distinguishable from cases cited by the defendant.  Specifically, Kurian David, et al, sought assistance from the Defendants not only to obtain employment in the United States but also to obtain the necessary documentation and authorization so that they could begin working in the United States.  Thus, according to the allegations, both plaintiffs and defendants anticipated that as a result of their efforts, plaintiffs would be documented and qualified to work in the United States.  Allowing inquiry into plaintiff's post-termination status under these circumstances is tantamount to a categorical ruling precluding foreign nationals from any protection against the type of abuses alleged.  The allegations of the complaint are that plaintiffs were trafficked against their will (in some respects) into the United States by the defendants, who allegedly first robbed plaintiffs of any documentation they had, put them in insurmountable debt and shipped them to the United States for work, all the while promising that plaintiffs' INS documentation would follow and it never did.  Allowing defendants' inquiry into current status under these circumstances has a potential to invite abuse by employers and to undermine the goals of the federal labor statutes, *inter alia*.

### *In Terrorem Effect*

Defendants contend that the record is devoid of *competent* evidence of a "chilling" or "*in terrorem*" effect that will follow defendants' inquiry into the plaintiffs' current status, current

addresses and post-termination employment history.  The record is replete with competent

evidence (sworn testimony) bearing on the issue, including declarations of the named plaintiffs.[39]

> For instance, Kechuru Dhananjaya attests as follows:

> > Like many workers, I cannot return to India with the massive debts that I
> > face as I could not find work in India that would allow me to escape this debt.  I
> > would not be able to pay even interest on these loans.  I would be indebted for
> > life.  In the camp, I talked to many other workers who faced the same situation.  I
> > worried that my reputation would be greatly damaged and that I would be
> > financially devastated with so many outstanding loans.  Many workers said to me
> > that if the company sent them back to India, there would be no way to survive and
> > to bear the shame, it would be better to commit suicide.[40]

> Another plaintiff, Muruganantham Kandhasamy, similarly declares:

> > Even though the visa that was promised to us never came and the
> > conditions I faced at Signal were horrendous I did not feel free to leave my job
> > because I had gone into massive debt to work for Signal and would be considered
> > "illegal" if I left the job.  I felt trapped and scared.  Because I had paid such a
> > large amount of money, I couldn't go back to India....
> > > A friend at the Signal Pascagoula camp told me by phone that on March 9,
> > 2007, the company locked up a group of workers into a trailer and threatened
> > them with deportation because they had spoken up regarding the terrible
> > conditions at the facility.  I was told there were armed guards who imprisoned the
> > workers and that Sabulal, one of the workers, attempted suicide.[41]

> Taking the aforesaid declarants at their word, it is difficult to imagine a predicament

more dire than that described in each of the above-referenced sworn declarations.[42]  Considering

the foregoing, this Court can only conclude that any inquiry into plaintiffs' current immigration

---

[39]*See* Declarations of Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasami, Hemant Khuttan, Padaveettiyi Isaac Andrews and Kechuru Dhananjaya. Exhibits 1-7 to Plaintiffs' Motion for Class Certification [Rec. Doc. No. 165].

[40]Declaration of Kechuru Dhananjaya [Rec. Doc. No. 165-12].

[41]Declaration of Muruganantham Kandhasamy [Rec. Doc. No. 165-9].

[42]*See* Note 41, *supra*.

status, current residence and/or post-termination employment history will most assuredly strike paralyzing fear in the plaintiffs sufficient to chill any inclination they may have had to prosecute their pending claims.

### *Feasibility of a Protective Order*

The Court has not ignored the defendants suggested compromise whereby discovery would be limited to the present litigation and not disclosed to any third party for any purpose beyond this litigation.  Defendants, however, do not just seek information as to current status, they also seek plaintiffs' current addresses.  This not only poses a threat to plaintiffs but to others with whom the putative class representatives may reside or friends or relatives who reside in close proximity to the plaintiffs.  In addition, there are several unrepresented parties in this case, which is problematic at best.

The undersigned is not convinced that, in this particular case, such a "protective" order would abate the chilling effect of inquiries into current status, current address and current employment.  Even under the umbrella of a protective order, the danger of intimidation would inhibit plaintiffs in pursuing their rights in this case.

### CONCLUSION

For all of the above and foregoing reasons, this Court is of the opinion that plaintiffs are entitled to protection from inquiry into their current immigration status, current addresses and employment history post-termination from Signal.  Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Protective Order # 315 is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Compel #319 is DISMISSED AS PREMATURE without prejudice as to plaintiffs right to reurge same after there is a

determination of counsel as to Indo-Ameri Soft LLC and Rao Defendants.

New Orleans, Louisiana, this 2nd day of April, 2009.


DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

22