UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**************************************************

| | | |
|---|---|---|
| KURIAN DAVID, et al, | * | CIVIL ACTION NO: |
| Plaintiffs | * | 08-cv-01220 |
| | * | |
| v. | * | SECTION "A" |
| | * | JUDGE ZAINEY |
| SIGNAL INTERNATIONAL, LLC, et al, | * | |
| | * | MAGISTRATE 3 |
| Defendants | * | MAG. JUDGE KNOWLES |

**************************************************

## MEMORANDUM OF DEFENDANT, SIGNAL INTERNATIONAL LLC IN SUPPORT OF MOTION TO COMPEL

**MAY IT PLEASE THE COURT:**

## FACTS AND PROCEDURAL BACKGROUND

On June 29, 2010, an editorial appeared in the New York Times stating that an agency of the federal government had determined that the trafficking claims against Signal International were valid. The full text of the op-ed was as follows:

A decision by the federal government to grant special visas to about 150 Indian metalworkers is the most encouraging news yet in a case that has cast a harsh light on the dark side of legal immigration. ***The United States Citizenship and Immigration Services***, an arm of the Department of Homeland Security, ***has concluded that the workers***, part of a group of 500 men recruited to work in Gulf Coast shipyards after Hurricane Katrina, ***had been subject to involuntary servitude and were entitled to visas set aside for victims of human trafficking***. The decision is remarkable because the case — a federal lawsuit and investigations by the Departments of Justice and Homeland Security — involves accusations that officials with another agency at homeland security, Immigration and Customs Enforcement, or ICE, helped the company silence workers' complaints. To be hired in Mississippi and Texas as H-2B guest workers ***for Signal International***, an oil-rig company, the men went heavily into debt, paying recruiters for the company from $12,000 to $20,000 each.

1

They figured the sacrifice was worth it for good jobs and green cards. They got neither. They were forced to live in isolated labor camps and told they would be fired and deported if they tried to leave or made trouble. According to sworn testimony by the company's officers, Signal had a powerful ally in its bullying. When workers complained about broken promises and abusive conditions, Signal consulted officials at ICE on how to fire "chronic whiners" who were threatening to organize protests. The agency replied, according to the testimony of one company official: 'Take them all out of the line on the way to work; get their personal belongings. Get them in a van and get their tickets and get them to the airport and send them back to India.' In an internal e-mail message, a Signal official disclosed that ICE had promised to go after workers who had walked off the job, 'to send a message to the remaining workers that it is not in their best interests to try and 'push' the system.' ***The workers, with the help of the New Orleans Workers' Center for Racial Justice, pushed anyway. They took Signal to court with a host of charges. Now the citizenship agency has accepted the validity of the workers' claims***. The criminal investigation is not yet complete. The workers' advocates argue that the Department of Justice needs to remove ICE as its designated lead agency in the Signal investigation. They're right. ICE is too entangled in this debacle to investigate Signal or itself." (Emphasis added).

***See***          "*They          Pushed          Back*,"          reprinted          at
http://www.nytimes.com/2010/06/29/opinion/29tue3.html?_r=1&scp=1&sq=Signal%20International&st=cse.

Three weeks earlier, on June 9, 2010, Signal served a request for production on the named plaintiffs seeking both the named plaintiffs' applications for the "special visas," the T and/or U visas,[1] mentioned in the op-ed, and any supplements the named plaintiffs filed to obtain

---

[1] In ***European Connections and Tours, Inc. v. Gonzales***, 480 F. Supp.2d 1355, 1365-66 (N.D.Ga. 2007), United States District Judge Clarence Cooper explained, "In 2000, Congress passed the Victims of Violence and Trafficking Protection Act of 2000, the purpose of which [was] 'to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims.' 22 U.S.C. § 7101. The statute created two new forms of relief for battered immigrants - the T and U visas. The 'T visa' is designed specifically for those who have been subjected to sex trafficking or other severe forms of trafficking in persons (e.g., involuntary servitude, peonage, debt bondage, or slavery). The 'U visa' or 'U nonimmigrant status' permits certain noncitizen crime victims who have suffered substantial mental or physical abuse as a result of the crime to be in the United States. Included in the enumerated crimes is domestic violence, regardless of marital status. In passing this legislation, Congress specifically found that '[v]ictims of trafficking] are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked [and] are often subjected to coercion and intimidation including physical detention and debt bondage, and … often fear retribution and forcible removal to countries in which they will face retribution or other hardship.' 22 U.S.C. § 7102. Consequently, 'these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such

"special visas" for "qualifying family member[s]." *See* Exhibit 1, attached hereto. *See also* OMB Form No. 1615-0099 (expiring 3/31/11) ("Instructions for Form I-914, Application for T Nonimmigrant Status"), at p. 3 (setting forth instructions "[i]f you are filing for a qualifying family member, . . . Supplement A, must be submitted for each family member for whom you are filing.").

On July 9, 2010, plaintiffs served their response to this request on Signal. *See* Exhibit 2, attached hereto. Plaintiffs refused to produce any documents in response to the request on several, written grounds.

First, plaintiffs asserted that the applications fell within the current protective order with regard to issues such as current address and immigration status. Obviously, Signal readily agrees to the redaction or similar protection of information this Court previously ordered withheld from Signal.

Plaintiffs additionally objected to the production of any documents concerning family members on the ground that it would expose them to "harassment and intimidation." *See* Exhibit 2, p. 4. This is essentially a recapitulation of the prior, *in terrorem* argument. However, this time, there are no cases on point and this time, plaintiffs have opened the door. The fact is that the issues raised by this controversy have a constitutional dimension, as Signal discusses further below. *See*, *e.g.*, *Lindsey v. Normet*, 405 U.S. 56, 66, 92 S. Ct. 862, 870-71, 31 L. Ed.2d 36 (1972) ("'Due process requires that there be an opportunity to present every available defense.' *American Surety Co.* v. *Baldwin*, 287 U.S. 156, 168 (1932). See also *Nickey* v. *Mississippi*, 292 U.S. 393, 396 (1934).").

---

crimes.' *Id.*" Such visas can be granted by the USCIS in aid of "current or impending prosecution of any defendants who may be charged with severe forms of trafficking in persons . . . to ensure that the Department of Justice component has access to all witness statements provided by the applicant . . ." *See* 8 C.F.R. § 214.11(e). Law enforcement certificates in aid of such applications are essentially considered the primary evidence of their validity. *See id.*, at (f)(1).

At the end of the day, it may not be necessary to know who the family members are or where they are. What is critical, for the reasons discussed below, is that Signal discover whether supplements were filed for family members. If they were, the supplements need to be provided, subject to the Court's reasonable safeguards.

Thirdly, plaintiffs claim that the information is not relevant to the class certification question. The law is otherwise, as Signal shows below. Credibility illuminates adequacy of representation when credibility touches the claims in the litigation. *See*, *e.g.*, *Byes*, *infra*.

Plaintiffs further objected that this was an effort to harvest document discovery from the absent class. The text of Exhibit 1 contradicts this objection. The text confined the request to the named plaintiffs.

Finally, plaintiffs objected to production of documents on the grounds of work product and attorney client privilege. Signal believes this to be a boiler-plate objection with no discernible merit but Signal also demonstrates below that such privileges were waived by the plaintiffs either directly or relationally. *Cf*. *Southern Scrap*, *infra*.

A Rule 37 conference was subsequently held pursuant to LR 37.1E on July 12, 2010 with the named plaintiffs with a view towards "amicably resolving the issues." *Id*. At that time, however, plaintiffs adhered to their original position and raised an additional ground for non-production. Plaintiffs invoked a further privilege against disclosure based on 8 U.S.C. § 1367. Plaintiffs stated that *Hawke v. United States Department of Homeland Security, Citizenship and Immigration Services*, 2008 U.S. Dist. LEXIS 87603, *3 (N.D.Cal. Sept. 29, 2008) validated their position. *Hawke* involved a husband facing a misdemeanor battery prosecution for battering his ex-wife. *Id*.  Husband sought the wife's special visa application to harvest impeachment evidence of prior, untrue complaints. *Id*.

**8 U.S.C. § 1367**

In relevant part, § 1367(a)(2) provides:

> Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official [of these Departments or their bureaus] . . . (2) permit . . . disclosure to anyone . . . of any information which relates to an alien who is the beneficiary of an application for relief under paragraph (15)(T), [or] (15)(U) . . . (8 U.S.C.A. § 1367(a) (West Supp. 2009)).

Subparagraph (c), titled, "Penalties for violations," reads, in part:

> Anyone who willfully . . . permits information to be disclosed ***in violation of this section*** . . . shall be subject to appropriate disciplinary action and . . . civil money penalty . . . (***See id.***, at (c) (emphasis added)).

Subparagraph (b)(3) relevantly states, "Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information." ***See id.***, at (b)(3).

Inasmuch as the purpose of the present motion is to obtain the applications in order to facilitate judicial review of the determination alleged by the Times, i.e., that the "citizenship agency" found the workers' claims of trafficking as to Signal to be valid, this is a perfect case for the Court to independently determine whether the privilege even applies. ***See Reynolds***, ***infra***. ***See also*** 8 C.F.R. 214.11(b) (setting forth T visa eligibility requirements suggesting that agency reviews application to determine whether applicant was victim of severe form of trafficking, is in United States on account thereof, and has complied with reasonable request for assistance in investigation or prosecution of acts of trafficking).

***Hawke*** is inapposite. ***Hawke***, for example, directly involved the DHS, which explicitly invoked the privilege with regard to a battered woman. No agency is involved in the present proceeding. Second, in ***Hawke***, the agency "contend[ed] that the Violence Against Women Act

prohibit[ed] disclosure . . ." *See Hawke*, *supra*, at *15. In the present case, in contrast, no agency of the federal government has made an assertion to this Court concerning a privilege or the application thereof. In *Hawke*, after reviewing the Violence Against Women Act, i.e., § 1367, the Court agreed that § 1367 prohibited disclosure. *Id*. The Court in *Hawke* was especially sensitive to the law's goal of protecting battered women. The District Court accordingly denied production of the ex-wife's application on the basis of the DHS's explicit objection. *See id*., at *19-*20. However, the present case does not involve a battered woman. For all of these reasons, *Hawke* has no bearing on this case.

<u>**SIGNAL IS ENGAGED IN A TWO-FRONT WAR**</u>

Although Signal, a shipyard with an international clientele, is obviously defending itself aggressively in this Court, the Court can see that Signal is engaged in a two front war: one being waged in this forum and the other one being waged on the daunting battlefield of national and international opinion.

It is important for the Court to reflect on the irrefutable fact that the New York Times op-ed was not an isolated example. To the contrary, stories in the press and on the world-wide web concerning Signal's alleged victimization of its temporary workers have characterized this litigation since its inception. For example, an online media outlet known as the High Plains Reader published an account *explicitly based on T visa applications* about former Signal H2B workers who were arrested in North Dakota. This outlet wrote:

> [An attachment to the T visa application, i.e.] The Cass 23 factsheet described the appalling conditions workers said they found upon arrival at Signal's labor camps in the Gulf. "This was the worst place we had lived. Places that are known for treating workers poorly … had all treated us better than we were being treated in the United States," they wrote. The extremely crowded metal trailers offered no privacy; there were inadequate toilet and shower facilities; food often made people sick; the camp was surrounded a fence and security guards. And more than $1,000 a

month was deducted from their paychecks for this substandard room and board. "Signal understood that because we had a large debt, they could treat us poorly, and we would have to stay there," the workers wrote.

**The T visa application** from Dec. 2008 goes on to finger Signal in a litany of threats and literal coercion, including an instance when five coworkers who spoke out in March 2007 were detained by armed guards, creating a culture of fear of legal or financial retribution and subsequently a condition of involuntary servitude. "All of these factors combined to cause Applicants to reasonably believe that they had no choice but to continue working despite abysmal conditions at Signal or they would face the serious harms of: being deported to India with severe debts they could not pay; physical restraint; and abuse of the legal process …," the application says. As for the [attachment], they expressed hope that after years of toil, they will simply be allowed to once again provide for their families – to pursue happiness at last. Wrote the workers [in the applications]: "We ask the American people to understand that people should not be punished for being victims of trafficking and speaking out against abuse like we were. The company and recruiters that brought us, continue to work, make a profit, remain free and see their families, while they call us criminals. Please do not let this happen to anyone else and let the world know that America is a land of freedom and justice for all. . . . The four men who remain in Fargo declined to comment for this story, heeding the advice of Saket Soni, director of the New Orleans organization, which is representing the approximately 250 immigrants scattered nationwide who have applied for T visas. Soni cited unspecified "dynamics" that might jeopardize the visa application process, but refused to elaborate. (*See* Exhibit 3).

It is impossible to read such pieces without being struck by the naturalness of the inference that these stories are being orchestrated, more likely than not, by the plaintiffs, their allies and their lawyers. Crucially, these pieces conclusively establish that the other side has selectively shared T visa applications with members of the "media."

Signal accordingly moves this Court to bring more fairness to this proceeding by granting Signal access to the plaintiffs' T and U visa applications. *Cf*. **Southern Scrap**, **infra**, at *29 (plaintiffs waive privilege in protected communications when they "open door" to discovery of communications by injecting issue into the controversy); **Copper**, **infra**.

7

**THIS MOTION TESTS WHETHER SIGNAL WILL BE
GRANTED REASONABLE AND NECESSARY ACCESS TO EVIDENCE**

Signal has earned access to the named plaintiffs' T and U visa applications on the ground of fairness. In addition, no law stands between it and the applications. Furthermore, Signal's due process rights require that the applications be produced. ***See Gonzales v. United States***, 348 U.S. 407, 414 n. 5, 75 S. Ct. 409, 413 n. 5, 99 L. Ed. 467 (1955);[2] ***Eisenberg***, ***infra***, at 1111 ("a full and fair hearing includes the right of each party to be apprised of all of the evidence upon which the adjudication will rest, plus the right of each party to examine, explain or rebut all such evidence.")

As Signal discusses below, plaintiffs may seek to use the application process pursuant to Fed.R.Evid. 803(8) to burnish their claims. There simply is no other ***appropriate*** forum available to Signal for vanquishing the litigation against it and repairing Signal's wrongfully sullied reputation. What Signal is certain of, for the reasons discussed below, is that it is not on a fishing expedition. Furthermore, as Signal discusses below in significant detail, the issues of bias and corruption surrounding the applications are so massive that the prejudice Signal suffers from a denial of production is incalculable. In ***United States v. Partin***, 493 F.2d 750, 757-760 (5th Cir. 1974), the Fifth Circuit criticized the trial court for not allowing the defendant to show that a witness and his family received $26,000 under suspicious circumstances. Money is not a more powerful incentive for fabricating evidence than is the opportunity for a T or U visa applicant to effectively save his life and that of his wife and children, if any. In light of these factors, Signal can think of no rationale that is consistent with the Fifth Amendment that could rationally explain to Signal a decision to deprive it of the capacity to pierce the applications apart from the

---

[2] "'The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and meet them. The right to submit argument implies that opportunity; otherwise, the right may be but a barren one. Those who are brought into conflict with the Government . . . are entitled . . . to be heard . . . before it issues its final command.'" (Citation omitted).

issue of privilege discussed in this brief that Signal feels it has resolved for the reasons more fully set forth below.

This much is clear, however. The discovery Signal seeks now is directly relevant to the issue of class certification. Federal law acknowledges that inquiries into credibility illuminate adequacy. *See generally Savino et al v. Computer Credit, Inc*., 164 F.3d 81, 87 (2nd Cir. 1998) (denying Motion to Certify Class based on credibility concerns raised by plaintiff's differing accounts about letters central to lawsuit); *Kline v. Wolf*, 702 F.2d 400 (2[d] Cir. 1983) (affirming order of United States District Judge Weinstein denying Motion for Certification based on credibility concerns as to class representative); *Byes et al. v. Telecheck Recovery Services, Inc.*, 173 F.R.D. 421 (E.D.La. 1997) (Mentz, J.) (same).[3] Given the prominence, in this case, of the trafficking claims, the nexus between the credibility issues raised by this motion and the issues of class certification are undeniable. *Cf*. Order and Reasons (Doc. # 754), at pp. 4-5 (noting that plaintiffs seek to certify class of persons making trafficking claims). Therefore, this motion pertains to subject-matter within the limitations imposed by this Court at the beginning of the litigation.

As indicated earlier, this motion also evokes both the Fifth Circuit's decision in *Copper v. Department of Navy*, 594 F.2d 484, 488 (5th Cir. 1979), and this Court's opinion in *Southern Scrap Material Co. v. Fleming*, 2003 U.S. Dist. LEXIS 10815 (E.D.La. June 18, 2003) (Knowles, M.J.).

---

[3] Plaintiff Byes brought suit on behalf of all those similarly situated against defendants for violation of the Fair Debt Collection Practices Act. *Id*. Defendants challenged Byes' adequacy as a class representative. They did so based on her "unfamiliarity with the proceedings in this case, *her lack of credibility*, and her criminal conviction for theft." *Id*. at 426 (emphasis added). Judge Mentz concluded that Byes was not an adequate class representative. He specifically considered the charge that Byes had submitted a false affidavit to the Court. *Id*. at 429. Judge Mentz concluded that he had character or credibility concerns that justified a finding of inadequacy. *Id.,* at 427, *citing* Newberg on Class Actions, Third Edition § 3.33 at 3-158. Judge Mentz remarked that other courts have refused to certify classes where the proposed representatives were "guilty of prior fraudulent conduct or would be likely to present incredible testimony." *Id*. As *Byes* therefore convincingly illustrates, in class action litigation, it is an accepted principle that issues of credibility can directly bear on the Rule 23(a) "adequacy" determination.

In resisting production, plaintiffs seem to rely principally on a privilege addressed to federal officials – the Attorney General, the Secretary of Homeland Security, the Secretary of State, and other officials or employees of those Departments. *See* 8 U.S.C.A. § 1367 (West Supp. 2009).

On the basis, presumably, of this same statute, official instructions for the DHS I-914 form comprising the T visa application refer to "Confidentiality." *See* OMB Form No. 1615-0099 (expiring 3/31/11). The instructions state, on page 8, *inter alia*, "[i]nformation provided in the application is confidential and protected from disclosure." *See id.*, at p. 8. Obviously, however, the form must track federal law. Signal's contention is that § 1367 and the principles of statutory construction that are applicable to it underscore the truism that the disclosure that is prohibited is disclosure by the universe of persons to whom the statute refers. Critically, neither § 1367 nor the form state that *the applicant* is forbidden from sharing the information with others when a federal court deems such disclosure to be appropriate, and Signal can find no authority holding that the privilege set forth in § 1367 is absolute under these circumstances. Plainly, as the United States Supreme Court stressed in *Reynolds*, it is "the court itself [that] must determine whether the circumstances are appropriate for the claim of privilege . . ." *See Reynolds*, *infra*, at 7, 73 S. Ct. at 532.

In suggesting that they have invoked a federal statute that provides a privilege against discovery of the applications, plaintiffs have clearly overlooked a principle enshrined in American law since 1953. In that year, in *United States against Reynolds*, the Supreme Court emphasized that a privilege like the one set forth in § 1367 "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim . . ., lodged by the head of the department which has control of the matter, after actual personal consideration by that officer. The court itself must

determine whether the circumstances are appropriate for the claim of privilege . . ." *See United States v. Reynolds*, 345 U.S. 1, 7-8, 73 S. Ct. 528, 532, 97 L. Ed. 727 (1953) (footnotes omitted). *See also Overby v. United States Fidelity and Guaranty Company*, 224 F.2d 158, 163 (5th Cir. 1955) (same); *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 387 (5th Cir. 1970) ("Governmental privilege is assertible only by the government affected.") (citing *Reynolds*).

To return to *Copper*, which was a product liability case mounted by the survivors of a person killed in the crash of a Marine Corps helicopter, there, a panel consisting of Judges Wisdom, Gee and Fay was so disturbed by the biased distribution of a portion of an allegedly privileged aircraft accident report that the panel remarked, "[i]t is intolerable that such confidential documents should be furnished to one side of a lawsuit and not to the other." *Copper*, *supra*, at 488. Given the circumstances surrounding the plaintiffs use of the media, Signal feels that this is an analogous situation.

As discussed before, in refusing to produce to Signal their T and U visa applications, the named plaintiffs also explicitly alluded to attorney-client and work-product privilege. *See* Exhibit 2, attached hereto, at p. 4.

In *Southern Scrap*, a civil RICO suit, this Court approached the subject of attorney-client and work product privileges from the perspective of actions that result in a waiver. *See Southern Scrap*, *supra*, at *3. There, this Court made a number of observations about privileges that are salient to the plaintiffs' reliance on work product and attorney client privileges and to the problem of privileges against discovery in general. In *Southern Scrap*, this Court observed, for example, that federal law concerning waiver provides that disclosure of a significant portion of the protected document waives the privilege in the whole record, and even concerning "all other communications relating to the same subject matter." *See id.*, at *28. This Court also alluded, in *Southern Scrap*, on the basis of *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989), to the

recognized risk of opening the door to waiver by voluntarily injecting the subject into the litigation. *See id.*, at *29. "'When,'" this Court quoted the Fifth Circuit as stating in ***Turner***, "'confidential communications are made a material issue in a judicial proceeding, *fairness demands treating the defense as waiver of privilege. The great weight of authority holds that the attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit*, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" ***Id***. (Emphasis added).

This Court also alluded, in ***Southern Scrap***, to yet another authority noting that work-product privilege may be lost "when the fact relevant to a narrow issue are in dispute and have been disclosed in such a way that it would be unfair to deny the other party access to facts relevant to the same subject matter. 'Courts have recognized subject-matter waiver of work-product in instances where a party deliberately disclosed work-product in order to gain a tactical advantage and in instances where a party made testimonial use of work-product and then attempted to invoke the work-product doctrine to avoid cross-examination.'" ***See id.***, at *31 (citations omitted).

Signal is not suggesting that these principles relate to whether the plaintiffs waived a privilege belonging to a federal official. Signal has already acknowledged that federal law stipulates that the plaintiffs have no such power. However, plaintiffs have asserted attorney client and work product privilege to avoid the production of these materials. In addition, as Signal has already noted, plaintiffs may claim that they possess a privilege against disclosure derivative of § 1367 but apart from it. Should they make such a claim, the waiver principles discussed by this Court in ***Southern Scrap*** provide a powerful, equitable rationale for concluding that the

plaintiffs' privilege was waived by the door opening evidenced by the op-ed discussed at the beginning of this brief.

Plainly, it is probable that Signal finds itself in this position as a result of actions in which the plaintiffs and their allies and privies have engaged. It is therefore right for Signal to argue that the plaintiffs opened the door to the discovery of the materials sought by this motion.

As stated earlier, no other forum is available to Signal that is more appropriate than this one for the kind of investigation Signal would launch pursuant to the Federal Rules were it to obtain possession of the T and U visa applications of the plaintiffs.[4] Signal discusses the procedural and evidentiary implications of this statement below in great detail. However, if Signal can obtain the applications and prove, to the satisfaction of this Court, that the applications are rife with inaccuracies and misstatements, misstatements the plaintiffs have already contradicted or will contradict soon, not only will Signal hopefully persuade this Court that Rule 23(a) has not been satisfied, news of a Signal victory in the certification phase of this litigation could help Signal repair the unfairness of the media assault instigated by the plaintiffs.

In this regard, it is notable that the op-ed asserted that an agency of the federal government had determined that the trafficking claims of Signal's temporary workers were valid as to Signal. Surely, fairness demands that Signal be granted access to the applications, under whatever protective measures the Court deems appropriate, so that Signal can endeavor, through entirely lawful means, to reverse the false impression occasioned by the assertion. *Cf*. *Southern Scrap*, *supra*.

## ARGUMENT

---

[4] In part, the Form I-914 Instructions, the instructions for T visa applications, state: "If you knowingly and willfully falsify or conceal a material fact or submit a false document with your form I-914, we will deny Form I-914 and may deny any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution." *See* OMB Form, *supra*, at p. 9. The I-914 form explicitly provides, moreover, that the representations in the application are "certified" by the applicant under penalty of perjury.

### 1. *In Law, Plaintiffs Have No Right to Assert a Privilege That Belongs Solely to the Government*

Signal maintains that the plaintiffs' objections to the production of their T and U visa applications and those of their families are boilerplate and featherweight. Signal further maintains that it has established powerful reasons for seeking the plaintiffs' T and U visa applications as well as documents pertaining to whether visas were likewise sought for family members. Signal further maintains that the compelling basis for seeking the applications is directly attributable to the likely actions of the plaintiffs and their allies. (Whatever risk there is of offending earlier Court orders touching *in terrorem* discovery is easily eliminated).

By citing ***Reynolds*** and the Fifth Circuit's seminal opinion in ***Overby***, ***supra***, however, Signal has established that the plaintiffs have no right to invoke § 1367 as a basis for non-production. In addition, ***Hawke*** is obviously inapposite. As stated earlier, this is, at bottom, a motion testing whether the courts will curtail Signal's legitimate discovery of the facts culminating in an important newspaper's announcement that an arm of the United States Government determined that the trafficking claims of those who are suing Signal are valid. ***Cf***. Fed.R.Civ.Proc. 26(b)(1) (West Pamph. 2009) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's . . . defense . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."); Fed.R.Evid. 607 (impeachment evidence so potentially significant that party is granted right to impeach own witness). Hovering over the questions raised by this motion are questions on a constitutional plane under the due process clause of the Fifth Amendment, as discussed before and below. ***See Gonzales v. United States***, ***supra*** (right to fair hearing embraces not only right to present evidence but also right to reasonable opportunity to

know claims of opposing party and meet them; right to submit argument implies that opportunity; otherwise, right may be barren one); *Eisenberg*, *infra*, at 1111 (full and fair hearing includes right of each party to be apprised of all evidence upon which adjudication will rest, plus right of each party to examine, explain or rebut all such evidence).

### 2. This is Not an Agency Administrative Proceeding

Signal acknowledges that the USCIS has issued regulations setting forth a variety of procedures for evaluating the truthfulness of the representations made to the agency by applicants. *See* 8 C.F.R. 214.11(a). In no way do those procedures, however, rise to the level of examination associated with proceedings in this Court.

In addition, plaintiffs may seek to affirmatively use the applications and the approval of them in the trafficking portion of this case pursuant to Rule 803(8) of the Federal Rules of Evidence as so called evaluative reports to prove that the trafficking claims are meritorious. Signal is therefore within its rights to contend that it is entitled to discover the applications and to do so now to prove that the named plaintiffs are not adequate representatives with regard to those claims.

Supporting Signal's contention that the applications are discoverable is *In re: Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. 1981). *Eisenberg*, which likewise involved an issue of privilege, made these observations:

> As Eisenberg points out, the right granted a party by the *due process* clause to a full and fair hearing *encompasses the individual's right to be aware of and refute the evidence against the merits of his case*. An exception to this principle is made when countervailing government interests dictate that information sought to be discovered should remain secret. Privilege questions are determined on the basis of an *in camera*, *ex parte* examinations of the evidence. . . . Clearly, the merits of discovery requests can be addressed on the basis of an *in camera*, *ex parte* examination of the information likely to be discovered without offending the due process clause. (Emphasis added).

*Eisenberg* indicates that Signal is entitled to the applications to prepare a defense to their potential use as evaluative reports and to counteract the assertion, to the nation as a whole, that an agency of the federal government has determined that the plaintiffs' trafficking claims are valid as to Signal. Examining whether the applications were largely fabricated may reveal that they were granted for reasons having little or nothing to do with Signal. Such subtleties have obviously escaped the Times. Signal, however, does not have the luxury of being similarly neglectful.

Fundamentally, Signal seeks the applications for impeachment purposes. It hopes to use them, and a mountain of other evidence, to show that the named plaintiffs are not adequate class representatives. Signal has, it believes, a constitutional right to discover the applications for these and other reasons. *See Eisenberg*, *supra*. *Cf*. Fed.R.Evid. 402 (relevant evidence is admissible); Fed.R.Evid. 607 (indicating that Signal has right to attack credibility of plaintiffs who filed T and U visa applications for their families and themselves); 4 Weinstein's Federal Evidence, § 607.03[2][b][1] (Matthew Bender 3/97) (recommending that court evaluate admission of impeachment evidence, subject to rule 403, under "overriding mandate [to] enhance[] the possibility of ascertaining the truth and [therefore] doing justice.")

### *3. This is Not a Fishing Expedition*

Signal is emphatically not engaged in a fishing expedition. From its prior, deposition interaction with the named plaintiffs with regard to their declarations to this Court, Signal knows that declarations by the named plaintiffs are fertile ground for impeachment. Signal is not criticizing or attacking the USCIS. Signal has worked on these issues with a level of diligence that is costly. Signal has likely had more access to evidence than the agency did.

Every Declaration which was attached to the Motion to Certify Class signed by a class representative, and filed with this Court, concluded with the following statement:

> I swear under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my memory.

*See* Declaration of Andrews Isaac Padaveettiyl, attached herein as Exhibit 4.

In fact, however, the sworn statements of the named plaintiffs were so riddled with inaccuracies and misstatements that one must infer that the T visa applications are characterized by a similar volume of misstatements, especially given the nature of the pot appearing at the end of T visa rainbow: the right, possibly for an entire family, to stay in the United States almost indefinitely.

An example of the non-conclusory factors militating in favor of full discovery is paragraph 33 of the Declaration of class representative Andrews I. Padaveettiyl. There, Padaveettiyl stated, under oath:

> For accommodations, we were given a bed in a 24 man trailer.  There was only one or two bathrooms in our trailer.  We complained about these cramped and uncomfortable living conditions and asked if we could live outside of the camp in our own apartments.  The company told us that we could not.

*See* Exhibit 4.

It is uncontested, however, as Padaveettiyl stated in his deposition, that he could have indeed lived outside the "man camp" if he had wanted to. He said:

> Q:  Did you, Andrews, ever once asked anybody at Signal if you could stop paying the housing accommodation fees and go live someplace else?
>
> A:  December, 2007, I bought a car.  At that time, I told them I have a car.  If I can go and live outside the facility.  **They said you can go**.  But I still have to pay them the 245 every week, whether I stay outside the facility or not - - whether I stay inside the facility or not.

*See* Deposition of Andrews Isaac Padaveettiyl, Volume II, Page 122, line 18 – Page 123, line 3, attached herein as Exhibit 5 (emphasis added).

17

Further examination illuminated other misstatements in paragraph 33, specifically concerning the number of men living with him in a bunkhouse.  In reality, 24 men was a gross misrepresentation:

> Q: How many people were in Bunkhouse 1 with you the first night you got there?
>
> A: In my memory, there were about 16.  Sixteen, one six.
>
> Q: Sixteen, One six.  Yes I understand.  Did that number go down from 16 before you left?
>
> A: Certainly.  It went down.
>
> Q: All right.  How low - -  I'm sorry.
>
> A: Certainly.  It went down.
>
> Q:  Okay.  How low did that number get of people staying in Bunkhouse 1 before you left?
>
> A:  Six people left, so it must be ten.  It went down to ten.

*See* Deposition of Andrews Isaac Padaveettiyl, Volume II, Page 111, lines 1 – 14, attached herein as Exhibit 6.

Saying 24 men in the declaration when in truth the total never eclipsed 16 and at times dropped to as low 10 cannot be considered an insignificant mistake. Signal would argue that this was an intentional misstatement meant to exaggerate the alleged hardship associated with living in Signal's housing facilities, at a time when Signal's employees were often likewise also living in manufactured or alternative housing.

Further review of Plaintiff Padaveettiyl's sworn statement brings other misstatements into stark relief.  Paragraph 35 of Padaveettiyl's Declaration reads:

> There was security at the front entrance watching us each time we came in and out of the facility.  On occasions when I wanted to leave the facility, the security guards asked me all sorts of questions about where I wanted to go and the reasons for my trip.  Signal only provided transportation to us to go to Walmart.  They would not take us anywhere else, even to go out to eat.  I felt confined by the guards at the security gate.

*See* Exhibit 4.

Questioned about this paragraph in deposition, however, Padaveettiyl's testified:

Q:  Whenever you want – you could leave whenever you want day or night without any problems, period, correct?

A:  That's correct.

Q:  That's correct?

A:  That is correct.

Q:  You say on occasions when you wanted to leave, the security guards asked you questions.  How many times do you claim that happened?

A:  Every time when I came back with things in my hand, they'll check.  Only then they let me in.

Q:  I didn't ask when you came back, I asked when you left.

A:  No.

Q:  You also mention that, in Paragraph 35, "Signal only provided transportation to us to go to Walmart."  Let me finish.  "They would not take us anywhere else, even to go out to eat."  Now, that's not true is it?

A:  That is not true.

*See* Deposition of Andrews Isaac Padaveettiyl, Volume II, Page 113, line 22 – Page 114, line 21,

attached herein as Exhibit 7.

These are merely a few of the misstatements contained in Padaveettiyl's sworn

declaration. There are others.

Turning to the sworn declaration of another class representative, Sony Vasudevan

Sulekha, paragraph 24 of his Declaration stated:

The working conditions were also very bad.  Indians were given the worst job assignments that were the most dangerous and we were treated worse than all of the American workers.  I began to experience health problems as a result of industrial dust, and when myself and the other Indian workers got sick, we were denied adequate medical care…

*See* Declaration of Sony Vasudevan Sulekha, attached herein as Exhibit 8.

In reality, this is a gross misrepresentation, as the witness acknowledged. Firstly, Signal brought Sulekha to a doctor every time he requested:

> Q: Whatever number of doctors you claim to have seen in Pascagoula while you were working at Signal, how did you get from Signal to the doctor's offices?
>
> A: Company manager's car.
>
> Q: Okay.
>
> A: Pickup.
>
> Q: So the company manager would bring you to the doctor when you wanted to go to the doctor right?
>
> A: Yes.

*See* Deposition of Sony Vasudevan Sulekha, page 299, line 16 – page 300, line 4, attached herein as Exhibit 9.

Second, Sulekha testified:

> Q: Sony, do you know how the foreman made decisions about what worker was responsible for what task on a given day on either of the crews you worked on?
>
> A: Foreman shows us the spot, and we work according to that.
>
> Q: Sure. But do you know, Sony, how the foreman decided which man worked in which spot and did which job on a given day?
>
> A: Don't know.

*See* Deposition of Sony Vasudevan Sulekha, page 401, lines 7 – 18, attached herein as Exhibit 10.

Additionally, Sulekha had a respirator, provided by Signal, which he could have, and indeed should have used, to prevent injury. Sulekha testified:

> Q: Did you have your own respirator?

A:  Yes.

Q:   Could you use the respirator whenever you felt you needed to use the respirator?

A:  During work, I could.

Q:   Yeah. And during work, did any Signal foreman or supervisor try to prevent you from using your respirator?

A:  No.

See Deposition of Sony Vasudevan Sulekha, page 301, lines 13 – 25, attached herein as Exhibit 11.

In summary, Sulekha swore under oath that Signal denied him adequate medical attention and caused him breathing problems when in reality Signal never refused Sulekha medical care and provided Sulekha with safety equipment to prevent dust inhalation.

Furthermore, Paragraph 22 of Sulekha's Declaration reads:

I felt like I was in jail, there was nothing else around the camp, it was very isolated.  There were barb wire fences, we didn't have our freedom, you could only leave for a short time on the weekend.

See Exhibit 8.

In reality, Sulekha's acknowledged that he was free to leave the housing area whenever he wanted to and was in no way restricted to weekend travel:

Q:  And once you bought your car, you could walk out the camp, get into your car, drive off whenever you wanted to when you weren't working?

A:  Yes.

Q:  And you did that right?

A:  Yes.

See Deposition of Sony Vasudevan Sulekha, page 262, lines 3 – 13, attached herein as Exhibit 12.

He added:

Q:  Did anybody ever try to stop you or prevent you from leaving and going to Gulfport or Pascagoula or going whenever you wanted to go?  When you weren't working, of course.

A:  No.

See Deposition of Sony Vasudevan Sulekha, page 264, lines 16 – 21, attached herein as Exhibit 13.

Signal could go on like this indefinitely, but there are limits to the length of written arguments to this Court. It suffices to note that the record shows that Signal has ample reason for seeking access to the plaintiffs,' sworn T visa applications and any supplements thereto, subject to any limitations the Court may see fit to impose. (The Court must, of course, however, also address whether any privilege applies. ***See Reynolds***, ***supra***).

### *4. No One Should Deny Signal Access to Powerful Impeachment Evidence*

"'[E]vidence having substantial probative value upon the credibility of a witness should be admissible subject to the provisions of . . . [Rules 401 and 403 . . . ] unless some strong consideration of policy calls for unconditional exclusion.'" ***Cf***. 4 Weinstein's Federal Evidence, ***supra***, at § 607.03[2][b][i] n. 4 (concerning note to Model Code of Evidence Rule 106).

Courts should therefore evaluate the admission of impeachment evidence, subject to rule 403, under the mandate of enhancing the possibility of ascertaining the truth and therefore doing justice. ***See id.***, at § 607.03[2][b][i].

Judge Weinstein notes that this is an ancient rule, observing that even "[t]he common law recognized [the value], apart from observed reaction on the witness stand, [of] impeachment by proof of . . . contradiction, [and] prior inconsistent statements . . ." ***See id.***, at § 607.03[2][a].

 Throughout this memorandum, Signal has discussed the self-evident and compelling problem of bias and related corruption surrounding T visas. The risk of bias and corruption is

rooted in the self-evident, overwhelming temptation to fabricate or exaggerate evidence to gain

entry to this country for oneself and one's wife and children. In light of this self-evident risk, the

wiser course, the one for which there is ample basis in law, as Judge Weinstein has suggested, is

to grant the defendant access to the source of impeachment:

> Although the Federal Rules of Evidence do not mention impeachment for **bias**, the Supreme Court held in *United States v. Abel* that bias is **clearly** a permissible **and established basis for impeachment** under the Rules. . . . Since bias of a witness is **always significant** in assessing credibility, the trier of fact **must be** sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction.
>
> ***Courts are therefore liberal in accepting testimony relevant to a showing of bias. Bias is never classified as a collateral matter lying beyond the scope of inquiry, or as a matter on which an examiner is required to take a witness' answer***.

***See*** 4 Weinstein's Federal Evidence, ***supra***, at § 607.04[1] (footnotes omitted, italics in original

emphasis added).

A related construct arose in ***Reeves v. Sanderson Plumbing Products, Inc.***, 530 U.S.

133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed.2d 105 (2000), a civil rights case. There, the Supreme

Court, citing its earlier habeas case, ***Wright v. West***, 505 U.S. 277, 296, 112 S. Ct. 2482, 2492,

120 L. Ed.2d 225 (1992),[5] said: "the factfinder is entitled to consider a party's ***dishonesty*** about a

material fact as 'affirmative evidence of guilt.'"        (Emphasis added).

In the context of this motion, the guilt the jury should consider is the guilt associated with

fabricating an application under penalty of perjury.

## <u>CONCLUSION</u>

For all of these reasons, this Court should grant this motion to compel. The named

plaintiffs should be ordered to produce the T visa applications sought in exhibit 1, with all and

---

[5] "And if the jury did disbelieve West, it was further entitled to consider whatever it concluded to be perjured testimony to be affirmative evidence of guilt, . . .".

sundry supplements. Needless to say, Signal will gladly comply with any protection the Court may devise to eliminate risks about which the Court is concerned. Signal has no interest whatever in opposing the Court on such matters. It seeks only the right to be heard.

Fundamentally, Signal wants its impeachment evidence to prove the plaintiffs and their allies in the media wrong. Due process means next to nothing if Signal has no such right. Signal prays for Order accordingly.

Respectfully submitted,

*/s/ Erin Casey Hangartner*_____
Erin Casey Hangartner, La. Bar No. 24768
Dominic J. Gianna, La. Bar No. 6063
Alan Dean Weinberger, La. Bar No. 13331
E. Ross Buckley, Jr., La. Bar No. 3627
Hal D. Ungar, La. Bar No. 31344
Middleberg, Riddle & Gianna
201 St. Charles Avenue, 31st Floor
New Orleans, LA 70170
Telephone (504) 525-7200
Fax (504) 581-5983

and

Patricia A. Bollman, La. Bar 17563
A Professional Law Corporation
Post Office Box 13707
New Orleans, LA 70185
Telephone: (504) 218-5887
Facsimile: (504) 304-0890
patricia@bollmanfirm.com
Counsel for Signal International, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2010, I electronically filed the foregoing Memorandum with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to non-CM/ECF participants.

*/s/ Erin Casey Hangartner*
Erin Casey Hangartner

ND: 4825-3304-8583, v.  1