UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KURIAN DAVID, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 08-1220** |
| **SIGNAL INTERNATIONAL, L.L.C., ET AL.** | **SECTION "A" (3)** |

**ORDER**

After oral hearing, this Court took under advisement Signal's Motion to Compel Production of T-Visa Applications [Doc. #778]. For the following reasons, the Court GRANTS the motion in part and DENIES the motion in part.

**I.      Background**

Plaintiffs filed their complaint on behalf of a putative class that consists of over 500 Indian men whom defendants allegedly trafficked into the United States through the federal government's H-2B guestworker program in violation of putative class plaintiffs' rights to be free from forced labor, involuntary servitude and peonage under the Thirteenth Amendment and 18 U.S.C. § 1854. Additionally, plaintiffs claim violations of the Trafficking Victims Protection Act of 2003, 18 U.S.C. §§ 1589-90 ("TVPA") and violations of their rights under 42 U.S.C. § 1981 to be free from a hostile work environment and discrimination based on race, national origin, and/or alienage status, all of the foregoing in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962( c)-(d) ("RICO"). [Doc. #1].  On October 1, 2008, putative class plaintiffs filed their motion

for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3). [Doc. # 165].

The putative class of over 500 Indian men secured visas to work in the United States for defendant Signal International, L.L.C. ("Signal") in the aftermath of Hurricane Katrina.  Signal provides construction services to the Gulf Coast oil and gas industry. Plaintiffs allege that beginning in late 2003, defendants Dewan Consultants and Sachin Dewan ("the Dewan defendants"), Global Resources, Inc. and Michael Pol ("the Global defendants") and Dr. Kurella Rao and Indo-Amerisoft, L.L.C. ("IAS") placed advertisements in various newspapers across India and the United Arab Emirates, which advertisements sought welders, fitters and other marine fabrication workers on behalf of various U.S.-based companies.  The advertisements promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States with their families.  Plaintiffs contend that they paid exorbitant fees to defendants for recruitment, immigration processing and travel.  Plaintiffs maintain that unbeknownst to them, they were never eligible to obtain the promised green cards and that, upon arrival in the United States, defendants subjected them to serious abuses and forced labor at Signal's labor camps in Pascagoula, Mississippi and in Orange, Texas.

Putative class representative David Kurian's factual assertions are representative of those of the other plaintiffs. [Doc. #174-3].  The allegations are as follows.  According to David, a citizen of India, he saw a newspaper advertisement by Dewan Consultants while employed in Abu Dhabi. In May 2006, David attended a seminar led by defendant Sachin Dewan with the assistance of defendant Malvern Burnett of the Law Offices of Malvern C. Burnett, A.P.L.C. ("the Burnett defendants").  David claims that, at the seminar, Dewan told the attendees that for 600,000 rupees

(over $12,000.00) plus costs, he could obtain an employment-based green card in the United States. The attendees were told that the money would be paid in three installments and that the money would cover Dewan's fee as well as the fees for Burnett and Michael Pol. Burnett is an attorney at law who specializes in immigration matters, and Pol owns Global Resources, Inc., a company that helps American companies find skilled labor to work at their facilities. David claims that Burnett spoke at the seminar and explained to the potential recruitees how the green card process would work.

David took and passed the pipe-fitter skills test. David then attended two additional group meetings, the second of which was led by Dewan and Burnett. Burnett explained the green card process once again, and he and Dewan handed out contracts from Global Resources, Burnett, and Dewan Consultants and an employment form for Signal. A representative from Dewan's office helped the group to fill out the forms.

In June and August 2006, David made installment payments at Dewan's office, which included checks made payable to Burnett and Pol. In late August 2006, David attended a meeting in Dubai, where Dewan and Burnett told the workers that before their visas would expire, the green cards would be approved. At a subsequent meeting, Dewan and Burnett gave the workers instructions on how to answer questions from the American consular officers during their visa interviews. Dewan and Burnett allegedly instructed the workers not to reveal how much money they had paid for the recruitment fees and not to mention the green cards.

The consulate officials took David's passport and, at the behest of Dewan Consultants, the passport was returned directly to Dewan's office. According to David, Dewan refused to return his

passport until he made the final installment payment to Dewan and paid for medical testing to be performed by a physician chosen by Dewan.

In February 2007, David made the final payment with checks made payable to Dewan, Burnett and Pol. David claims that he was then rushed to sign forms written in English that he could not understand, and it was only upon signing these forms and making the final installment payment that Dewan finally returned his passport. During this process, David saw other workers try to back out and have their money returned, but someone from Dewan Consultants would then threaten to destroy their passports in retaliation. David contends that he and his wife sold many of their personal belongings to raise the money necessary to pay Dewan, Burnett and Pol.

On February 16, 2007, David arrived at Signal's labor camp in Orange, Texas where he signed a number of additional employment forms. David claims that he later learned that the forms allowed Signal to take deductions from his salary for food and accommodations and that Signal required the workers to open an account with a specific bank where their paychecks would be deposited. David charges that the living conditions and food at Signal were horrible and that the Indian workers were told that even if they left, they would be charged the daily rate of room and board.

David claims that the Indian workers were searched by guards when they would come and go from the camp and that guards would sometimes come into the living quarters at night to search workers' belongings. According to David, the workers began to get sick because of the overcrowded conditions. Signal also required the workers to purchase all of their own tools. David claims that the workers were relegated to performing all of the dangerous and dirty work inside of

the ships and that the American workers were not required to do such work.

According to David, when the workers complained, Signal made more promises about the green cards and threatened that if the workers continued to complain, they would be deported and not receive the promised visas. David continued to work under conditions that he characterizes as horrible because he was afraid of the consequences of leaving, given that he had incurred so much debt to raise the money to come to the United States.

## II.     The Parties' Contentions

### 1.     Signal's Motion to Compel Production of T-Visa Applications

Signal notes that a recent *New York Times* article dated June 29, 2010 reported that an agency of the federal government has determined that the trafficking claims against Signal are valid.[1] Three weeks before the article, Signal had served discovery requests on plaintiffs that sought plaintiffs' applications for T- and/or U-visas (visas granted to victims of human trafficking and other crimes that allow the victims and their families to remain in the United States).

Signal notes plaintiffs' objections to production of the visa applications as follows:

Plaintiffs first objected on the ground that the documents fall under the protection of the current protective order. [Doc. #367]. Signal agrees that some of the information in the applications may be protected by the protective order but argues that the applications may be redacted pursuant to such order.

Plaintiffs also objected to production of any documents concerning family members on the

---

[1]  Editorial, *They Pushed Back*, N.Y. Times, June 29, 2010, at A30 (reprinted at http://www.nytimes.com/2010/06/29/opinion/29tue3.html?_r=2&scp=1&sq=Signal%20International&st=cse).

ground that it would expose them to harassment and intimidation. This is a repeat of the *in terrorem* argument that this Court has accepted before.

Plaintiffs also objected on the ground that the information is not relevant to class certification. Signal argues that the documents are relevant to prove credibility. Signal contends that federal law acknowledges that inquiries into credibility illuminate adequacy of the class representatives.

Lastly, plaintiffs objected on the ground of attorney-client/work-product privileges.

At the Rule 37.1 conference, plaintiffs raised another objection: The production of the documents would violate 8 U.S.C. § 1367, which provides that the Attorney General, any official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any employees or officials of these departments may not disclose any information relating to an alien who is the beneficiary of a T- or a U-visa. Subsection (b)(3) provides that Section 1367 shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of the information. 8 U.S.C. § 1367(b)(3).

Signal argues that this is the perfect case for judicial review of the allegations reported in the *New York Times*. Noting that plaintiffs cited *Hawke v. United States Department of Homeland Security*, No. C-07-03456 RMW, 2008 WL 4460241 (N.D. Cal. Sept. 29, 2008), as support for their Section 1367 argument, Signal distinguishes the case, arguing that no agency is involved here and no agency has asserted the Section 1367 privilege. Signal also argues that *Hawke* concerned only the protection of battered women. Signal further contends that no law forbids the applicant from

sharing the information with others when a federal court deems disclosure appropriate. Citing *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953), Signal argues that the Supreme Court has emphasized that a privilege like that in Section 1367 belongs to the government alone and not to a private litigant.

Signal contends that it is engaged in a two-front war, one in this forum and one in the press. Citing another article in the *High Plains Reader* , Signal asserts that the article was explicitly based on T-visa applications.[2]  [Ex. 3, attached to Signal's Mem. Supp. Mot. Compel].  Signal argues that the cite to the T-visa application in the *High Plains Reader* article proves that plaintiffs have shared such applications with the media.  Signal argues that plaintiffs have thus waived any privilege by opening the door. Citing case law from this Court and the Fifth Circuit, Signal contends that the law underlying the waiver of the attorney-client and/or work-product privileges applies equally to Section 1367, and, given that plaintiffs produced the applications to the press, all privileges have been waived.

Signal argues that it is entitled to the documents on the ground of fairness and that Signal's due process rights to a fair hearing require that the documents be produced.  Signal contends that plaintiffs will use the documents to burnish their claims.  Signal argues that bias and prejudice taint the applications in that plaintiffs will exaggerate their claims to allow their wives and children to remain in the country.

Signal asserts that the applications are rife with misstatements and inaccuracies. Signal then

---

[2] Bruce Vaughn, *When Freedom Turns Its Back*, High Plains Reader (reprinted at http://hpr1.com/feature/article/when_freedom_turns_its_back/).

quotes statements from the initial sworn statements of several putative class representatives and notes that the deposition testimony of the same putative class representatives later conflicted with the earlier statements.

Lastly, Signal contends that the Court can not deny it access to impeachment evidence. Signal argues that it has demonstrated the bias and corruption rooted in the self-evident, overwhelming temptation to fabricate or to exaggerate evidence to gain entry to this country for oneself and one's wife and children.

### 2. Plaintiffs' Memorandum in Opposition

Plaintiffs note that on April 2, 2009, this Court granted plaintiffs' motion for protective order and denied Signal discovery into plaintiff's current immigration status. [Doc. #367]. Citing case law, plaintiffs argue that courts have not hesitated to block discovery into immigration applications and other immigration-related documents because the chilling or *in terrorem* effect of the inquiries outweighs the probative value of discovery. Pointing to the T-visa application filed under seal, plaintiffs note that the application itself seeks the grounds for inadmissibility, information about cooperation with law enforcement, information about crimes the applicant may have committed and specific information about family members.

Plaintiffs note that Congress amended the law pertaining to T- and U-visa holders in 2006 to protect the confidentiality of the applications. Plaintiffs argue that the primary purpose of the amendment was to prevent disclosure of the applications to the alleged human traffickers and criminals. Disclosure would allow defendants, like Signal, to interfere with or to undermine plaintiffs' immigrations cases and encourage immigration enforcement to pursue removal actions

against them.  Because Signal has steadfastly refused to enter a protective order except by order of this Court, plaintiffs assert that Signal could contact United States Citizenship and Immigration Services ("USCIS") to seek revocation of visas.

Plaintiffs also contend that disclosure would undermine law enforcement efforts to investigate human trafficking and other crimes.  Plaintiffs argue that disclosure would have the perverse result of turning a program designed to allow immigrants to assist a law enforcement investigation into a program that necessarily discloses the existence of the investigation itself. Plaintiffs assert that disclosure would have a chilling effect on plaintiffs' First Amendment right to organize and to participate in workers' rights campaigns and government reform work.

Plaintiffs further argue that Section 1367 prevents disclosure of the applications.  Plaintiffs first contend that the judicial review section does not apply because "judicial review of a determination" refers to judicial review of the underlying T- or U-visa application and not a separate civil or criminal proceeding.  *Hawke*, 2008 WL 4460241, at *6.  Second, plaintiffs note that subsection (b)(4) states that "[s]ubsection (a)(2) shall not apply if all the . . . individuals in the case are adults and they have all waived the restrictions of such subsection."   8 U.S.C. § 1367(b)(4). Thus, plaintiffs contend, an individual must be able to assert the privilege because he can waive it; if not, the language in subsection (b)(4) is superfluous.

Any disclosure of the applications, plaintiffs next argue, would violate the protective order in this lawsuit, which order bars any "inquiry into plaintiffs' current immigration status."  Plaintiffs note that the Court's order did not just order the protection of plaintiffs' current immigration status but also any *inquiry* into such status.  Plaintiffs note that Signal and other defendants in this suit

9

opposed plaintiffs' earlier motion for a protective order because they wanted to obtain more information regarding plaintiffs' T- and U-visa applications. This Court rejected defendants' request and held that any inquiry into plaintiffs' current immigration status, including the existence of T- or U-visa applications, is barred. Plaintiffs note that production of the applications would necessarily reveal their current immigration status.

Plaintiffs further note that this Court earlier concluded that Signal's opportunity to test the credibility of plaintiffs does not outweigh the public interest in allowing employees to enforce their rights. *David v. Signal Int'l, L.L.C.*, 257 F.R.D. 114, 121 (E.D. La. 2009) ("Credibility is always at issue. That, in and of itself, does not warrant an inquiry into the subject of current immigration status when such examination would impose an undue burden on private enforcement of employment discrimination laws, inter alia.") Plaintiffs argue that the examples of alleged misstatements in Signal's memorandum amply demonstrate that Signal already has more than enough evidence to challenge plaintiffs' credibility.

Plaintiffs contend that Signal's due process rights are not at issue because plaintiffs have never intimated that they will use the applications to burnish their claims. Plaintiffs contend that the applications are irrelevant here and relate only to an administrative process separate and independent from this proceeding.

In response to Signal's argument that it is waging a war on two fronts, plaintiffs respond that any party that calls plaintiffs and their counsel "liars" in the media is hardly in a position to complain about negative media attention that it receives. Plaintiffs note that counsel for Signal called plaintiffs' allegations "lies" in the *High Plains Reader*. Indeed, plaintiffs note, Signal's desire

to use the information in the applications to counter its negative image in the media is an additional reason to deny Signal's motion.

Plaintiffs further contend that they were not at all involved in the article in the *High Plains Reader*, so any argument that they waived any privilege as to that article is specious. With regard to the *New York Times* article, plaintiff note that over their objection, the New Orleans Workers' Center for Racial Justice ("Workers' Center") disclosed that a number of T-visas had been granted. Plaintiffs see this as a blunder but also note that the article does not report that its author had ever actually seen an application. Plaintiffs argue that a statement that approximately 150 putative class members had received T-visas does not mean that 500 class members have waived their privileges.

Lastly, plaintiffs argue that Signal rejected their offer to disclose the applications with many redactions. Plaintiffs redacted all personal and family information, the legal arguments in support of the application, the evidence of cooperation with law enforcement and the grounds for inadmissibility and prior crimes.

Should the Court grant Signal's motion, plaintiffs ask the Court to include these documents under the protective order recently approved in this suit. [Doc. #797].

### 3. Signal's Reply

Signal argues that plaintiffs can not complain about the timing of the motion to compel. Signal contends that it asked plaintiffs to immediately object to production of the applications if plaintiffs thought that the protective order prevented the disclosure of such applications. Signal asserts that plaintiffs waited until the end of the discovery period to do so and now can not complain that Signal has filed the motion to compel.

Signal also argues that plaintiffs were involved in the "Cass 23," the group of putative plaintiffs referenced in the *High Plains Reader*. Citing to a *Bismarck Tribune* article dated November 13, 2008, Signal notes that the article referenced Jennifer Rosenbaum, counsel here as well. [Ex. C, attached to Signal's Reply]. Evidently, the article notes that Rosenbaum nodded to several men as they left the courtroom and referred reporters to Jacob Horowitz, who stated that Signal was a "criminal."

### 4. Plaintiffs' Sur-Reply

Plaintiffs argue that Signal's discovery requests were late, simply too late. Plaintiffs note that Signal propounded the requests 20 days before the *New York Times* article so it can not rely on the publication of the article to excuse its delay.

Plaintiffs also contend that while Rosenbaum is an attorney in this suit, she has not participated in the suit since January and is not a part of the present opposition. Plaintiffs note that none of the class representatives here were part of the "Cass 23" and therefore could not have waived any privilege.

## III. Analysis

On April 2, 2009, this Court granted plaintiff's motion for a protective order. [Doc. #367]. In that order, the Court found that any inquiry into the plaintiffs' current immigration status was irrelevant to the claims asserted in this suit and that "discovery of such information would have an intimidating effect on an employee's willingness to assert his workplace rights." [Doc. #367 at p. 12 (citing *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1065 (9th Cir. 2004)]. Citing the declarations of several of the named plaintiffs, the Court recognized the *in terrorem* effect on plaintiffs that would

result were the Court to allow discovery on plaintiffs' current immigration status. [Doc. #367 at p. 20]. The Court concluded: "Considering the foregoing, this Court can only conclude that any inquiry into plaintiffs' current immigrations status . . . will most assuredly strike paralyzing fear in the plaintiffs sufficient to chill any inclination they may have had to prosecute their pending claims." [*Id.* at pp. 20-21].

Also in that order, and as noted by plaintiffs, the Court held that the credibility of the named class representatives as it relates to their adequacy of representation did not, in and of itself, "warrant inquiry into the subject current immigration status when such examination would impose an undue burden on private enforcement of employment discrimination laws, *inter alia*." [*Id.* at pp. 15-16]. The Court ultimately concluded that "defendants' opportunity to test the credibility of plaintiffs does not outweigh the public interest in allowing employees to enforce their rights." [*Id.* at p. 16].

The Court's order was upheld on appeal. [Doc. #476]. The Court finds that nothing has occurred in this suit or in the relevant case law that would change the Court's earlier findings of fact and conclusions of law. Production of the T- and U-visa applications themselves would necessarily result in an inquiry into plaintiffs' current immigration status, an inquiry that this Court has already barred.

The publication of the articles in the *New York Times*, the *High Plains Reader* and the *Bismarck Tribune* would potentially affect only one new argument advanced by Signal: That the individually-named putative class representatives here have waived any privilege with regard to the T- and U-visa applications when an unrelated putative absent class member -- or his counsel -- allegedly turned over his T-visa application to the *High Plains Reader*. In short, Signal argues that

because one putative absent class member has allegedly waived any claim to privilege -- be it attorney-client, work-product or the privilege under 8 U.S.C. § 1367 -- all putative class representatives have waived any claim to privilege.

The Court rejects this argument.  Despite its superficial allure, Signal has cited this Court to no case law -- and this Court has found none -- on point.  In any event, the argument proceeds from a faulty premise.  The argument fails simply because no class yet exists here.  The District Court has continued the class certification hearing to January 11, 2001.  At the present time, then, only individual litigants sue defendants herein.  Even were the Court to find that an alleged putative absent class member -- who may or may not be part of the class here -- waived any claim to privilege by revealing his T-visa application to a third party, such actions would not affect the individually-named putative class representatives here.[3]  Accordingly, the Court denies production of the T- and/or U-visa applications.

At the oral hearing on the motion, however, plaintiffs suggested a compromise.  Plaintiffs

---

[3] In similar circumstances that relate to conflicts of interest and the existence of an attorney-client relationship, courts have unanimously held that pre-certification, absent class members do not even possess the traditional attorney-client relationship with putative class counsel.  *See, e.g., In re Cmty. Bank of N. Va.*, 418 F.3d 277, 313 (3d Cir. 2005) ("courts have recognized that class counsel do not possess a traditional attorney-client relationship with absent class members."); *Morisky v. Public Service Elec. and Gas Co.,* 191 F.R.D. 419, 424 (D.N.J. 2000) ("at this juncture, this is only a putative class action and not a certified class action. The employees who have filed notices seeking to join this lawsuit as class members, therefore, cannot be considered clients of the Tomar firm. . . . [O]nly the named plaintiffs are clients of the Tomar firm at this stage. . . . Therefore, Tomar cannot assert the attorney-client privilege with respect to the employees who submitted the questionnaires but are not named plaintiffs because only clients can claim this privilege.").  This line of case law supports the finding that absent class members are not part of the class until certification and do not -- pre-certification -- possess the traditional attorney-client privilege nor, by extension, can they waive it.

have offered to produce the sworn statements of the putative class representatives that are attached to the T- and/or U-visa applications. The Court finds that this compromise is the most productive way to resolve the instant dispute.

**IV.    Conclusion**

For the foregoing reasons, the Court grants in part and denies in part Signal's Motion to Compel Production of T-Visa Applications [Doc. #778]. Plaintiffs need not produce the T- and/or U-vias applications themselves to Signal, but plaintiffs shall produce the sworn statements attached to such applications. The Court denies any requests for fees associated with the filing of the instant motion.

New Orleans, Louisiana, this 26th day of August, 2010.

_____
**DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE**