IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KURIAN DAVID, SONY VASUDEVAN SULEKHA,PALANYANDI THANGAMANI, MURUGANANTHAM KANDHASAMY, HEMANT KHUTTAN, PADAVEETTIYIL ISSAC ANDREWS, and KECHURU DHANANJAYA, on behalf of other similarly situated individuals, and SABULAL VIJAYAN, KRISHAN KUMAR, JACOB JOSEPH KADDAKKARAPPALLY, KULDEEP SINGH, and THANASEKAR CHELLAPPAN, individually, <br>                Plaintiffs, <br><br>     v. <br><br> SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, BILLY R. WILKS, J & M MARINE & INDUSTRIAL, LLC, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS). <br>                Defendants. | ) ) ) ) ) Civ. No. 08-1220 ) JCZ/DEK ) ) ) ) Complaint -- Class ) Action and Collective ) Action ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**SECOND AMENDED COMPLAINT**

1.    In the aftermath of Hurricane Katrina, Plaintiff class members, over 500 Indian men, were trafficked into the United States through the federal government's H-2B guestworker program to provide labor and services to Defendant Signal International LLC ("Signal").  Recruited to perform welding, pipefitting, and other marine fabrication work, Plaintiffs were subjected to forced labor and other serious abuses at Signal operations in Pascagoula, Mississippi and Orange, Texas.

2.    Plaintiffs, individually and on behalf of similarly situated workers, bring this action to recover for damages inflicted by Signal and Signal's recruiters and agents

operating in India, the United Arab Emirates, and the United States.  Defendants have exploited and defrauded Plaintiffs and other class members by fraudulently recruiting them to work in the United States and effectuating a broad scheme of psychological coercion, threats of serious harm and physical restraint, and threatened abuse of the legal process to maintain control over Plaintiffs and other class members.

3.      Lured by Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, Plaintiffs and other class members plunged themselves and their families into debt to take advantage of these seemingly promising opportunities.  Plaintiffs and other class members took out substantial loans, liquidated their life savings, and sold their family homes and valued possessions to pay mandatory recruitment, immigration processing, and travel fees charged by Defendants totaling as much as $20,000 per worker.  Trusting in the veracity of the immigration and work benefits promised by Defendants, Plaintiffs and other class members further relinquished stable employment opportunities in India and as guestworkers in the Persian Gulf.

4.      Defendants' main recruiting agents in India and the United Arab Emirates held Plaintiffs' and other class members' passports and visas and threatened, coerced, and defrauded Plaintiffs and other class members into paying extraordinary fees for recruitment, immigration processing and travel.  Several Defendants further caused Plaintiffs and other class members to believe that if they did not work for Signal under the auspices of temporary Signal-restricted H-2B guestworker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, and/or other serious harm.

5.      Upon Plaintiffs' and other class members' arrival in the United States, Signal required them to live in guarded, overcrowded, and isolated labor camps.  Signal further deceived Plaintiffs and other class members regarding their visa status, threatened Plaintiffs and other class members with loss of immigration status and deportation, and generally perpetrated a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs and other class members afraid, intimidated, and unable to leave Signal's employ.

6.      On March 9, 2007, Signal, in coordination with Defendant Sachin Dewan ("Dewan") and private security guards, attempted to forcibly and unlawfully deport Plaintiffs Sabulal Vijayan and Jacob Joseph Kadakkarappally in retaliation for speaking out against discriminatory conditions in Signal's labor camp in Pascagoula, Mississippi. Signal similarly attempted to forcibly and unlawfully deport Plaintiffs Kuldeep Singh, Thanasekar Chellappan, and Krishan Kumar.

7.      Terrified by the threat of imminent deportation and the security guards pursuing him, Plaintiff Vijayan attempted suicide and had to be taken to a local hospital. During the same morning, Signal personnel and security guards successfully forced Plaintiffs Kadakkarappally, Chellappan, and Kumar into a locked and guarded room. There, Signal detained Plaintiffs Kadakkarappally, Chellappan, and Kumar for several hours, refusing their pleas for drinking water and permission to use the bathroom. Amidst the chaos of the pre-dawn raid, Plaintiff Singh hid and escaped from the Signal labor camp.

8.      Having witnessed and/or heard of the events of March 9, 2007, the remaining Plaintiffs and other class members at Signal's operations in Mississippi and

Texas reasonably feared that they would suffer serious harm or physical restraint if they were to leave Signal's employ.  Deeply indebted, fearful, isolated, disoriented, and unfamiliar with their rights under United States law, these workers felt compelled to continue working for Signal.

9.      Plaintiffs assert class action claims against Defendants arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA"); the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. §1985); collective action claims under the Fair Labor Standards Act (FLSA); and claims for damages arising from fraud, negligent misrepresentation and breach of contract. Plaintiffs Sabulal Vijayan, Jacob Joseph Kadakkarappally, Kuldeep Singh, Krishan Kumar, and Thanasekar Chellappan also bring individual claims arising from the retaliation in violations of the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985), false imprisonment, assault, battery, intentional infliction of emotional distress and/or negligent infliction of emotional distress.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. §1964(c) (RICO), 28 U.S.C. § 1343 (civil rights), and 29 U.S.C. § 216(b) (FLSA).

11.      This Court has supplemental jurisdiction over causes of action based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts which support the federal claims.

12.      Venue in the Eastern District of Louisiana is proper under 18 U.S.C. §1965 and 28 U.S.C. § 1391 in that various Defendants and/or agents of Defendants,

including Malvern C. Burnett, the Law Offices of Malvern C. Burnett, A.P.C., Gulf Coast Immigration Law Center L.L.C., Kurella Rao, and Indo-Amerisoft, L.L.C., reside and/or may be found in New Orleans and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in and around the New Orleans area.

13.     Declaratory and injunctive relief are sought under 28 U.S.C. § 2201 et seq.

## PARTIES

### Plaintiffs

14.     Plaintiffs are Indian nationals and former or current H-2B guestworkers who were recruited from India and/or the United Arab Emirates by Defendants at various times between 2003 and the present.

15.     Plaintiffs are of South Asian Indian descent and are Indian nationals.

16.     At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by RICO, 18 U.S.C. § 1961(3).

17.     At all relevant times, Plaintiffs were employed by Signal as defined by the FLSA, 29 U.S.C. § 203(g).

18.     At all relevant times, Plaintiffs were engaged in interstate commerce and/or in the production of goods for sale in interstate commerce.

### *The Group I Plaintiffs*

19.     Class representative Plaintiff Kechuru Dhananjaya was recruited in 2003 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2007, Dhananjaya worked at Signal's Orange, Texas facility.

20.     Class representative Plaintiff Padaveettiyil Issac Andrews was recruited in 2004 from the United Arab Emirates and India for work in the United States.   After

arriving in the United States in 2006, Andrews worked at Signal's Pascagoula, Mississippi facility.

21.     Throughout this Complaint, Plaintiffs refer to Plaintiffs Andrews and Dhananjaya as the "Group I Plaintiffs."

*The Group II Plaintiffs*

22.     Class representative Plaintiff Kurian David was recruited in 2006 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2007, David worked at Signal's Orange, Texas facility.

23.     Class representative Plaintiff Sony Vasudevan Sulekha was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2006, Sulekha worked at Signal's Pascagoula, Mississippi facility.

24.     Class representative Plaintiff Muruganantham Kandhasamy was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2007, Kandhasamy worked at Signal's Orange, Texas facility.

25.     Class representative Plaintiff Palanyandi Thangamani was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2006, Thangamani worked at Signal's Pascagoula, Mississippi facility.

26.     Class representative Plaintiff Hemant Khuttan was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2007, Khuttan worked at Signal's Pascagoula, Mississippi facility.

27.     Throughout this Complaint, Plaintiffs refer to Plaintiffs David, Sulekha, Kandhasamy, Thangamani, and Khuttan as the "Group II Plaintiffs."

*Individual Plaintiffs*

28.     Individual Plaintiff Sabulal Vijayan was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States.  Vijayan worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated his employment on March 9, 2007.

29.     Individual Plaintiff Jacob Joseph Kaddakkarappally was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States.  Kaddakkarappally worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated his employment on March 9, 2007.

30.     Individual Plaintiff Thanasekar Chellappan was recruited beginning in 2006 from India for work in the United States.  Chellappan worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

31.     Individual Plaintiff Kuldeep Singh was recruited beginning in 2006 from India for work in the United States.  Singh worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

32.     Individual Plaintiff Krishan Kumar was recruited beginning in 2006 from India for work in the United States.  Kumar worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

Defendants

*The Employer Defendant*

33.     Defendant Signal International, LLC is a corporation organized under the laws of Delaware and a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas, and Pascagoula, Mississippi.

*Recruiter Defendants*

34.     Defendant Global Resources, Inc. ("Global") is a corporation organized under the laws of Mississippi and is engaged in the business of recruiting workers from India for employment in the United States.  Global has substantial business contacts with New Orleans, Louisiana.

35.     Defendant Michael Pol ("Pol") is the President of Global Resources, Inc., and resides in Mississippi.  Pol has substantial business contacts with New Orleans, Louisiana.

36.     Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India, which maintains offices in Mumbai (Bombay), India, and Dubai, United Arab Emirates.  Defendant Dewan Consultants has substantial business contacts with New Orleans, Louisiana.

37.     Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants.  Dewan resides in India and has substantial business contacts with New Orleans, Louisiana.

38.     Upon information and belief, Defendants Dewan and Dewan Consultants authorize and utilize Defendants Pol and Global to act as their United States-based operations and/or agents.

39.     Upon information and belief, Defendants Pol and Global authorize and utilize Defendants Dewan and Dewan Consultants to act as their India and United Arab Emiratesbased operations and/or agents.

40.     Upon information and belief, Defendants Dewan, Dewan Consultants, Pol, and Global acted as a joint venture with respect to the recruitment, contracting, and provision of Plaintiffs for labor or services.

41.     Defendants Pol and Global Resources utilize Defendants Dewan and Dewan Consultants to conduct and carry out their shared business interests and activities in India and the United Arab Emirates.  Among other things, Defendants Pol and Global Resources share offices with Defendants Dewan and Dewan Consultants in India and the United Arab Emirates.

42.     Upon information and belief, Defendants Dewan and Dewan Consultants utilize Defendants Pol and Global Resources to conduct and effectuate their shared business interests and activities in the United States.

43.     Throughout this Complaint, Plaintiffs refer to Defendants Dewan, Dewan Consultants, Pol, and Global collectively as "Recruiter Defendants."

*Legal Facilitator Defendants*

44.     Defendant Malvern C. Burnett ("Burnett") is an attorney who resides in and maintains offices in New Orleans, Louisiana.

45.     Defendant Gulf Coast Immigration Law Center L.L.C. ("GCILC") is a limited liability corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Defendant Burnett serves as its sole registered agent, member, and/or corporate officer.

46.     Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Defendant Burnett serves as its sole registered agent, member, and/or corporate officer.

47.     Upon information and belief, Defendants Burnett, GCILC, and Burnett Law Offices are engaged in a joint venture and/or are alter egos in that all entities have the same corporate mailing address, intermingle business assets, fail to operate at arms' length, and Defendant Burnett serves as the registered agent and sole member and/or corporate officers for GCLIC and Burnett Law Offices.

48.     Upon information and belief, Defendant Burnett, GCILC, and the Burnett Law Offices have the same business objectives and Defendant Burnett uses GCILC and the Burnett Law Offices to conduct and effectuate shared business objectives.

49.     Throughout this Complaint, Plaintiffs refer to Defendants Burnett, GCILC, and Burnett Law Offices collectively as "Legal Facilitator Defendants."

*Labor Broker Defendants*

50.     Defendant Indo-Amerisoft, L.L.C, a corporation organized under the laws of Louisiana and headquartered in New Orleans, Louisiana, is engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

51.     Defendant Kurella Rao is the Chairman and Director of Indo-Amerisoft, LLC, and maintains offices in the New Orleans, Louisiana metropolitan area. Rao has substantial business contacts in the New Orleans, Louisiana area.

52.     Defendant J & M Associates of Mississippi, Inc. ("J & M"), a corporation organized under the laws of Mississippi with substantial business contacts in the New Orleans area, was at all relevant times engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

53.     Defendant Mr. Billy R. Wilks ("Mr. Wilks") was the founder and general manager of J & M and currently acts as a consultant for the company. Mr. Wilks has substantial business contacts in the New Orleans, Louisiana area. Mr. Wilks is personally liable for the conduct of J & M as discovery subsequent to the filing of the First Amended Complaint, and outlined in paragraphs 54-58 here below, has established that Mr. Wilks had full control and decision-making authority over J & M such that J & M and Mr. Wilks were alter egos of one another.

54.     Mr. Wilks is the founder of J & M.  He incorporated it in 1996.  The main corporate office of J & M is Mr. Wilks's home.  J & M, during the time relevant to this litigation, was entirely beholden to Mr. Wilks for its business activity.  Further, during the time relevant to this litigation Mr. Wilks has testified that all of J & M's decisions and policy changes would have to be approved by him.  He was in effect the sole decision-maker of all of the company's relevant business activity.  Both Mr. Wilks and his former lawyer describe Mr. Wilks as the only person who knows anything about the company and that it is indeed his company.

55.     At some point prior to 2007, J & M Associates was sued in unrelated litigation.  In response to that lawsuit, Mr. Wilks set up a new corporation – J & M Marine & Industrial LLC ("J & M Marine") – primarily to avoid the litigation then pending against J & M, but also to continue the work that was underway with J & M.

56.     Mr. Wilks used the contractual arrangements and relationships he had set up between J & M and the Recruiter Defendants to create profitable opportunities for his new J & M Marine entity.  In other words, Mr. Wilks harvested the value that remained in J & M and transferred it to J & M Marine with no regard to the independent corporate identity of J & M.  Such a transition is not reflective of the action of a corporate entity; rather, it indicates an action done for the convenience and singular strategy of the principal, Mr. Wilks.

57.     In 2007, Mr. Wilks put J & M into dormancy.  This purported change of corporate status was, upon information and belief, done without any formal shareholder vote or board member meeting.  Further, J & M is undercapitalized; it has, according to Mr. Wilks, approximately $300,000 in debt.  Further, Mr. Wilks, in yet another indication of the absence of corporate formalities between him and J & M, has represented to this Court that he intends to borrow money so that he is able to personally fund J & M's legal defense.

58.     J & M filed a "Notice to Dissolve/Revoke" with the Mississippi Secretary of State on September 12, 2010.  Its status as of the date of this filing, according to the Mississippi Secretary of State's Business Services website, is "Intent to Dissolve AR."

59.     In short, there is no independence between Defendant Wilks and J & M.  J & M was simply used as the corporate entity to facilitate Mr. Wilks's personal business.

As he testified during his deposition, he did everything for the company.  Indeed prior to incorporating J & M in 1996, Mr. Wilks was doing the exact same work, as the 100% owner, under a "doing/business/as" rubric.  Once Mr. Wilks incorporated in 1996 there was no change to the company activity or purpose, and J & M certainly did not obtain an identity independent from its founder.

60.     Defendant J & M Marine, a limited liability company organized under the laws of Mississippi with substantial business contacts in the New Orleans, Louisiana area, is engaged in the business of recruiting and providing labor to United States companies.  As discovery subsequent to the filing of the First Amended Complaint demonstrates, and as outlined in paragraphs 60-66 here below, J & M Marine is a mere continuation of J & M with no substantial difference in management, personnel and corporate purpose.  As the successor corporation to J & M, it is therefore liable for any judgment entered against J & M.

61.     The primary reason that J & M Marine came into existence is because Defendant Wilks's other entity, J & M, was being sued.  To evade that litigation Defendant Wilks created J & M Marine in 2006.

62.     Once Mr. Wilks created J & M Marine he simply shifted his employee, Nicole Homel-Tellier, from J & M over to J & M Marine.  As he had done with J & M, he listed himself as the registered agent and his home address as the company's principal address with the Mississippi Secretary of State.

63.     Both J & M and J & M Marine clearly share the same initials, which reference the same individuals: John and Michael Wilks.

64.     Both corporations perform the same work: recruit laborers to then sub-contract them out to other companies for a profit.  Given both entities were in the same business and both operated out of the same address, it is likely that whatever assets were held by J & M (e.g. computers, printers) were at the disposal of J & M Marine both during the time that both  companies existed and also once J & M was put into dormancy.

65.     More importantly, with respect to the "asset" crossover between the two companies, Defendant Wilks moved the laborers – members of the putative class – from J & M, who they contracted with, over to J & M Marine.  In other words, the very revenue source of J & M became the revenue for J & M Marine.

66.     In bringing the candidates over to J & M Marine, after they had signed contracts with J & M, Defendant Wilks was unequivocally holding J & M Marine out, at the very least to the putative class, as the successor company of J & M.  Further, this transition of recruits, in conjunction with avoiding the litigation then pending against J & M, exemplifies the taking of the benefits of the predecessor company while leaving its liabilities behind.  Mr. Wilks acknowledges that J & M Associates has a $100,000 judgment against it, an obvious liability that has not tracked across to J & M Marine.

67.     Throughout this Complaint, Plaintiffs refer to Defendants Indo-Amerisoft, Rao, J & M, Mr. Wilks and J & M Marine collectively as "Labor Broker Defendants."

*All Defendants*

68.     At all relevant times, Defendants Dewan, Dewan Consultants, Pol, Global, Burnett, Burnett Law Offices and GCILC acted as agents of Defendants Signal, J & M, Indo-Amerisoft  and  Rao  for  the  purposes  of  recruiting,  obtaining,  contracting, transportation and/or providing Plaintiffs for labor or services.

69.     Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts with New Orleans, Louisiana.

70.     At all relevant times, Defendants were "persons" within that term as defined by RICO, 18 U.S.C. § 1961(3).

71.     Upon information and belief, Defendants have been engaged in and continue to engage in ongoing contacts with Plaintiffs and/or class members, including recruiting, obtaining, labor contracting, providing immigration-related services to, transporting, harboring, providing and/or employing Plaintiffs and/or other class members.

72.     At all relevant times, Defendants operated enterprises engaged in interstate commerce or in the production of goods for interstate commerce.

73.     At all relevant times, Defendant Signal employed Plaintiffs for the purposes of the FLSA, 29 U.S.C. § 203.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

74.     Claims for damages, injunctive and declaratory relief under the TVPA, 42 U.S.C. §§ 1981 and 1985 and state law fraud and breach of contract, and for damages and declaratory relief under RICO (the First through Sixth Claims for Relief) are brought by the Class Representative Plaintiffs on behalf of themselves and all similarly situated persons pursuant to Rule 23.

75.     All claims for damages under the FLSA are brought by the Class Representative Plaintiffs as a collective action pursuant to 29 U.S.C. § 216(b).

### Rule 23 Class Allegations

76.     Class claims for injunctive relief are brought pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).  For the purposes of injunctive relief, the class consists of all Indian

H-2B guestworkers who were recruited by Defendants and who traveled and/or were transported to the United States from 2003 through the present and who traveled and/or were transported to the United States at any time under the auspices of H-2B visas assigned to Defendant Signal International.

77.    Class claims for actual, punitive and treble damages are brought pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).  For the purposes of actual, punitive and treble damages, the class consists of all Indian H-2B guestworkers who were recruited by Defendants and who traveled and/or were transported to the United States at any time from 2003 through the present under the auspices of H-2B visas assigned to Defendant Signal International.

*Rule 23(a)*

78.    The precise number of individuals in the class is known only to Defendants, but the class is believed to include over 500 individuals.  Because of the number of class members and because class members are foreign nationals and migrant workers, joinder of all class members is impracticable.

79.    This action involves questions of law common to the class, including:

a.    Whether Defendant Signal and Recruiter Defendants' conduct as set forth in the First Claim for Relief violated the forced labor and trafficking provisions of the TVPA (18 U.S.C. §§ 1589 and 1590);

b.    Whether all Defendants' conduct as set forth in the Second Claim for Relief violated RICO Sections 1962(c) and 1962(d);

c.    Whether Defendant Signal's conduct as set forth in the Third Claim for Relief violated 42 U.S.C. § 1981;

16

d. Whether Defendant Signal's conduct as set forth in the Fourth Claim for Relief violated 42 U.S.C. § 1985(3);

e. Whether Defendants' conduct as set forth in the Fifth Claim for Relief constituted fraud and/or negligent misrepresentation for which they are legally liable;

f. How terms of Plaintiffs' and other class members' contracts with Defendants should be interpreted and whether Defendants breached contracts with Plaintiffs and other class members as set forth in the Sixth Claim for Relief below;

g. The nature of damages available to Plaintiffs and other class members, including the applicability of compensatory, treble, and/or punitive damages; and

h. Whether and what kinds of injunctive relief are appropriate.

80. This action involves questions of fact common to the class, including:

a. Whether Defendant Signal and Recruiter Defendants threatened Plaintiffs and other class members with and/or used physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other class members' labor or services;

b. Whether Defendant Signal and the Recruiter Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

c.      Whether Defendants conducted one or more enterprises through a pattern of racketeering activity;

d.      Whether Defendants conspired to conduct one or more enterprises through a pattern of racketeering activity;

e.      Whether Defendants committed or agreed to commit the predicate racketeering acts identified in the Second Claim for Relief, inter alia, mail fraud, wire fraud, visa fraud, forced labor, trafficking, and unlawful document-related activities in furtherance of trafficking;

f.      Whether Defendant Signal subjected Plaintiffs and other class members to differential and adverse discriminatory terms and conditions of employment and created a hostile work environment;

g.      Whether Defendant Signal conspired with other actors for the purpose of depriving Plaintiffs and other class members of their right to be free from involuntary servitude and/or forced labor;

h.      Whether Defendants' unfulfilled promises to Plaintiffs were made willfully or negligently;

i.      Whether Plaintiffs and other class members reasonably relied on Defendants' fraudulent or negligent promises;

j.      Whether Defendant Signal subjected Plaintiffs and other class members to differential and/or adverse terms and conditions of employment on the basis of their race, national origin, and/or alienage;

      k.     Whether Defendants failed to comply with the terms of their contracts with Plaintiffs and other class members and, if so, which terms were breached; and

      l.     The source and amount of Plaintiffs' and other class members' damages.

81.     The claims of the Class Representative Plaintiffs asserted in the First through Sixth Claims for Relief are typical of the claims of the class.

82.     The Class Representative Plaintiffs will fairly and adequately protect the interests of the class.

83.     Plaintiffs' counsel are experienced in handling class action litigation on behalf of guestworkers and migrant workers like Plaintiffs and are prepared to advance costs necessary to vigorously litigate this action.

*Rule 23(b)(2)*

84.     Defendants have acted and/or have refused to act on grounds generally applicable to the class with respect to the claims set forth in the Third and Fourth Claims for Relief thereby making final injunctive relief applicable to the class appropriate under Fed. R. Civ. P. 23(b)(2), by, inter alia:

      a.     Engaging in and refusing to desist from engaging in unlawful discriminatory practices, such as requiring Plaintiffs and other class members to live in substandard segregated housing in Signal-owned labor camps;

      b.     Engaging in and refusing to desist from engaging in a common illegal scheme, plan, and/or pattern of fraudulent recruitment and

immigration processing activities which attempted to force and forces Plaintiffs and other class members to provide labor or services to Defendant Signal and which injured Plaintiffs and other class members in their business and/or property;

c.      Engaging in and refusing to desist from engaging in a common scheme, plan and/or pattern designed to cause Plaintiffs and other class members to believe that they would suffer serious harm, abuse of the legal process and/or physical restraint if they did not provide labor or services to Defendant Signal;

d.      Engaging in and refusing to desist from engaging in actions that constitute illegal labor trafficking; and

e.      Threatening to engage in similar recruitment and labor practices in the future.

85.      Upon information and belief, Defendants continue to conduct and engage in unlawful recruitment and labor practices, threatening current and future violations of Plaintiffs' and other class members' rights.

*Rule 23(b)(3)*

86.      Common questions of law and fact relevant to the First through Sixth Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.

87.      A class action is superior to other available methods of adjudicating the claims set forth in the First through Sixth Claims for Relief because, inter alia:

a.      Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.      The class members are foreign nationals and migrant workers who are deeply in debt, lack the means and/or resources to secure individual legal assistance, and are particularly likely to be unaware of their rights to prosecute these claims;

c.      No member of the class has already commenced litigation to determine the questions presented; and

d.      A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized recruitment, record-keeping, and employment practices thoughout the time period at issue.

<u>FLSA Collective Action Allegations</u>

88.     All claims set forth in the Seventh Claim for Relief are brought against Defendant Signal by the Class Representative Plaintiffs on behalf of themselves and all other similarly situated persons pursuant to the collective action provisions of 29 U.S.C. §216(b) of the FLSA.

89.     The Class Representative Plaintiffs seek to represent a FLSA class consisting of all Indian H-2B workers employed by Defendant Signal at its Orange, Texas and Pascagoula, Mississippi facilities at any time from October 1, 2006 to the present.

21

90.     The proposed FLSA class members are similarly situated in that they have

been subject to uniform practices by Defendant Signal which violated the FLSA,

including:

        a.      Signal's systematic unlawful payroll deductions for room and

        board and work-related tools; and

        b.      Signal's workforce-wide failure to reimburse class members for

        travel, immigration processing, visa, recruitment, and other immigration-

        related expenses to the extent necessary to ensure that class members

        earned the required minimum and overtime wages during their first

        workweek.

## STATEMENT OF FACTS

### The Recruitment Process

#### Recruitment of the Group I Plaintiffs

91.     Beginning in late 2003 and continuing through at least 2004, Recruiter

Defendants (Defendants Dewan, Dewan Consultants, Pol, and Global) placed ads in

various newspapers across India and the United Arab Emirates, seeking welders, fitters,

and other marine fabrication workers on behalf of various U.S.-based companies and

individuals, including Labor Broker Defendants (Defendants Indo-Amerisoft, Rao, and

J & M).

92.     Upon information and belief, Recruiter Defendants placed such ads in

coordination and agreement with Legal Facilitator Defendants (Defendants Burnett,

GCILC, and Burnett Law Offices), and Labor Broker Defendants.

93.     Upon information and belief, since at least December 2003 through at

least mid-2004, Legal Facilitator Defendants and Labor Broker Defendants frequently

communicated and consulted frequently via mail, fax, e-mail and/or telephone communications to coordinate and direct Recruiter Defendants' activities, including advertising efforts on behalf of Labor Broker Defendants.

94.     The advertisements placed by Recruiter Defendants promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States with their families.

95.     In response to these advertisements, Class Representative Plaintiffs Kechuru Dhananjaya and Padaveettiyil Issac Andrews and all others similarly situated (hereinafter "Group I Plaintiffs") contacted Recruiter Defendants by telephone, and/or attended meetings and testing sessions organized by Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants and their agents, employees and/or representatives at several locations throughout India and the United Arab Emirates.

96.     Specific facts relevant to the experiences of Group I Class Representatives Kechuru Dhananjaya and Padaveettiyil Issac Andrews are set forth in the chart attached to this Complaint as Exhibit 1, which is incorporated herein by reference, and which is incorporated into Plaintiffs' concurrently-filed RICO Case Statement.

97.     Upon information and belief, prior to attending these meetings and testing sessions, Labor Broker Defendants, Recruiter Defendants, and Legal Facilitator Defendants conferred in and around the months of February, March, and April 2004 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings and testing sessions.

98.     In telephone communications, in-person meetings, faxes, contracts, and other written documents transmitted by mail and/or wire in the first half of 2004,

Recruiter Defendants personally and through employees, agents and/or associates, told Group I Plaintiffs that if Group I Plaintiffs successfully passed skills tests administered in the United Arab Emirates or India and paid fees totaling approximately 5 to 8 lakh rupees (approximately $12,000 to $20,000), then Group I Plaintiffs would be able to apply for permanent resident (green card) status in the United States with Labor Broker Defendants.

99.     In these communications occurring during the first half of 2004, Recruiter Defendants and Legal Facilitator Defendants further explained that the installment payments would be divided among Recruiter Defendants, Legal Facilitator Defendants, and one of the two Labor Broker Defendants.

100.     In telephone communications, in-person meetings, faxes, written contracts, and/or other written communications, transmitted, upon information and belief, by mail and/or wire in the first half of 2004, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants instructed Group I Plaintiffs that the total fees would be paid in a series of approximately three installments.

101.     In these conversations in the first half of 2004, Group I Plaintiffs were informed on several occasions by Recruiter Defendants and/or Legal Facilitator Defendants that in exchange for an additional fee of approximately $1,500 per family member, Group I Plaintiffs would be able to obtain legal permanent residence for their spouses and children.

102.     At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through approximately mid-2004, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker

Defendants, personally and/or through their agents, representatives, and/or employees, represented to Group I Plaintiffs that Labor Broker Defendants were stable and reputable U.S. companies offering lawful and ample employment opportunities, and that Labor Broker Defendants would obtain for Group I Plaintiffs green cards enabling Group I Plaintiffs to permanently and legally immigrate to United States with their family members.

103.    At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through approximately mid-2004, the Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants, personally and/or through their agents, employees and/or representatives, told Group I Plaintiffs that the green card process, once commenced, would be completed within 18 to 24 months.

104.    In such communications with Plaintiffs, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants further promised to act diligently and do everything necessary to obtain green cards for Group I Plaintiffs in the timelines stipulated.

105.    Based on these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, Group I Plaintiffs signed contracts (hereinafter "the green card contracts") at various times in early to mid-2004 with Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants.

106.    Contracts signed by Plaintiffs and other documents provided to the Group I Plaintiffs by Legal Facilitator Defendants, Recruiter Defendants, and Labor Broker

Defendants through the use of mail and/or wire transmissions in and around early to mid-2004, further promised that Group I Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for Group I Plaintiffs as promised.

107.    Legal Facilitator Defendants, Recruiter Defendants, and Labor Broker Defendants knew or should have known that they would not refund Group I Plaintiffs' money as promised in the contracts and other documents.

108.    Legal Facilitator Defendants, Recruiter Defendants and Labor Broker Defendants induced the Group I Plaintiffs to enter into the green card contracts without intent to diligently pursue Group I Plaintiffs' green card applications; knowingly without any basis whatsoever for representing, inter alia, that the companies and/or entities purportedly sponsoring Group I Plaintiffs' applications were financially solvent and had reliable and stable employment opportunities to provide Group I Plaintiffs; that green card applications sponsored by such companies would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

109.    In reasonable reliance on Legal Facilitator Defendants, Recruiter Defendants and Labor Broker Defendants' explicit and repeated promises regarding green cards, family members' ability to immigrate to the United States, and lawful and legitimate employment opportunities in the United States, Group I Plaintiffs undertook considerable economic, social, familial and personal sacrifices, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees.

110.   In attempting to amass the funds necessary to initiate the green card process, Group I Plaintiffs gathered their life savings and borrowed staggering sums of money from family members, friends, banks, and loan sharks, often at high interest rates, in order to make the payments required by Defendants and their agents.  Many Group I Plaintiffs mortgaged or sold their homes and/or land belonging to them or their families. Some Group I Plaintiffs cashed in life insurance policies and/or sold prized family possessions such as their wives' wedding jewelry.

111.   Group I Plaintiffs signed contracts with Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants and made the first round of installment payments required by these contracts.

112.   After Group I Plaintiffs signed contracts with Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants and paid the first installment payments required by the contracts, these Defendants failed to provide Group I Plaintiffs with updates regarding the progress of their green card applications for extended periods of time.

113.   When Group I Plaintiffs contacted Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants by phone, mail, and/or e-mail at various times between the last half of 2004 and mid-2006 to check on the progress of their green card applications, these Defendants assured them that the green card process was going forward.

114.   While awaiting the processing of their green cards, Group I Plaintiffs continued to accrue substantial interest on the money they had borrowed for the purpose of making the first installment payment to these Defendants.

115.    In or around January 2006, Recruiter Defendants, Legal Facilitator Defendants and Labor Broker Defendants, personally and/or through their agents, employees and/or representatives notified Group I Plaintiffs via telephone, e-mail, and/or mail communications that the labor certification required for their green card applications had been approved by the U.S. government.

116.    After this notification, Recruiter Defendants, Legal Facilitator Defendants and Labor Broker Defendants used wire and/or mail communications to collect the second and/or third installment payments from the Group I Plaintiffs.

117.    By spring 2006, after the 18 to 24 month processing period promised by Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants had elapsed, the Group I Plaintiffs had still not received their green cards.

118.    By spring of 2006, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants had yet to refund Group I Plaintiffs' payments as promised by Plaintiffs' green card contracts.

119.    While awaiting the processing of their green cards, Group I Plaintiffs continued to accrue substantial interest on moneys they had borrowed in order to make the required payments to Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants.

120.    In late May and early June of 2006, Defendant Signal filed with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor by mail, electronic transmission, and/or fax the completed forms ETA 750 and attachments seeking permission to import and hire 590 foreign guestworkers under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant

regulations 8 C.F.R. § 214.2(h)(6) and 20 C.F.R. § 655.3, and associated administrative letters and/or guidance (commonly known as "the H-2B guestworker program").

121.    Defendant Signal sought these workers to perform various jobs essential to its marine fabrication services business, including welding and fitting.

122.    The H-2B guestworker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs when employers attest that they cannot find U.S. workers to perform the available jobs.

123.    H-2B visas are non-immigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.

124.    Defendant Signal stated in the ETA 750 forms that its need for H-2B guestworkers was "peak load and a one-time occurrence" and that "the temporary workers will work for the length of the prescribed dates of need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

125.    In the ETA 750 forms, Defendant Signal named Legal Facilitator Defendants as its agents for the purposes of preparing and submitting these applications to import H-2B guestworkers.

126.    Upon information and belief, Defendant Signal, at or around the time it filed the ETA 750 forms in May and June 2006, repeatedly contacted Legal Facilitator Defendants and Labor Broker Defendants by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.

127.   Upon information and belief, in the course of telephone, fax, e-mail and/or mail communications occurring in or around May or June 2006, Defendant Signal authorized Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill the anticipated H-2B guestworker jobs at Signal operations.

128.   Upon information and belief, in the course of these communications, Defendant Signal further authorized Recruiter Defendants to represent that Signal would assume sponsorship of the pending and as-yet-unsuccessful green card applications on behalf of Group I Plaintiffs.

129.   Upon information and belief, in the course of these communications, Defendant Signal further authorized Recruiter Defendants to represent that Signal would apply for at least two to three H-2B visa extensions on behalf of all Plaintiffs to allow them to remain in the United States working for Signal while Plaintiffs' green card applications were being processed.

130.   Defendant Signal authorized its agents to make these representations even though it knew or had reason to know that such visa extensions and green card applications would not be bona fide and valid under United States immigration law. Moreover, Defendant Signal authorized its agents to make these misrepresentations even though it did not intend to apply for and in fact knew it could not legally apply for such visa extensions and/or green cards on behalf of Plaintiffs.

131.   In spring and summer of 2006, Group I Plaintiffs who had already initiated the green card process spoke with Recruiter Defendants over the phone and in person regarding their long-pending green card applications.

132.    In these communications, Recruiter Defendants offered Group I Plaintiffs the opportunity to pursue their green cards under the sponsorship of Defendant Signal. Plaintiffs were told that for an additional sum of approximately 35,000 to 45,000 rupees ($800 to $1,100), they could quickly obtain H-2B visas to go to the United States for work at Defendant Signal's operations.

133.    In these communications, Recruiter Defendants falsely assured Group I Plaintiffs that Defendant Signal would seek at least two extensions of the temporary H-2B visas with which Plaintiffs would gain admittance to the United States, and that Plaintiffs' H-2B visas would thereafter lead to immediate and permanent green cards.

134.    The Recruiter Defendants personally and through their agents, representatives and employees, made representations to Class Representative Plaintiff Kechuru that Defendant Signal would obtain a work-authorized green card and H-2B visa extensions for him on multiple occasions, including in or about November or December of 2006 during a phone conversation with employees in Recruiter Defendants' offices in Dubai, United Arab Emirates.

135.    Upon information and belief, in the weeks leading up to this February 2006 meeting, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed and representations to be made at the meeting.

136.    In these communications with Group I Plaintiffs, Recruiter Defendants further failed to disclose material facts regarding the H-2B visa, including the fact that H-2B visas confer only a temporary non-immigrant status which does not allow the bearer

to adjust to permanent residency status and the fact that applying for H-2B visa status is fundamentally incompatible with simultaneously applying for a green card.

137.    Group I Plaintiffs, unaware of U.S. immigration law and the temporary, nonimmigrant character of H-2B visas and desperate not to forfeit the substantial fees that they had already paid, agreed, in reliance on the representations of Recruiter Defendants, to transfer their green card applications to Defendant Signal's sponsorship and further agreed to work for Defendant Signal under H-2B visas pursuant to the terms explained by Recruiter Defendants.

138.    In reliance on the representations of Recruiter Defendants, Legal Facilitator Defendants and Defendant Signal, Group I Plaintiffs entered the United States on H-2B guestworker visas in late 2006 and early 2007 for the purposes of working for Defendant Signal at its Pascagoula, Mississippi and Orange, Texas facilities.

139.    Group I Plaintiffs would not have paid the extraordinary fees charged by Recruiter Defendants and Legal Facilitator Defendants for travel, green cards, visas, and work opportunities had they known that these Defendants' promises and representations were false.

140.    Group I Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for travel, green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

Recruitment of the Group II Plaintiffs

141.    Acting as Defendant Signal's recruiting agent for the purposes of
facilitating the recruitment of Indian workers for employment at Signal, the Recruiter
Defendants placed advertisements in newspapers throughout India and the United Arab
Emirates in spring, summer, and fall 2006 offering opportunities for welders and fitters to
immigrate permanently to the United States under the auspices of Defendant Signal, "a
leading marine and fabrication company in Mississippi and Texas."

142.    Recruiter Defendants' advertisements and other recruiting efforts were
undertaken on behalf of, at the direction of, and/or in coordination and consultation with
Defendant Signal.

143.    In response to the advertisements posted by Recruiter Defendants,
Plaintiffs Kurian David, Sony Vasudevan Sulekha, Muruganantham Kandhasamy,
Palanyandi Thangamani, Hemant Khuttan, and all those similarly situated (hereinafter
"Group II Plaintiffs") contacted Recruiter Defendants in spring, summer and fall 2006 via
telephone and in-person meetings.

144.    Specific facts relevant to the experiences of Group II Class
Representatives Kurian David, Sony Vasudevan Sulekha, Muruganantham Kandhasamy,
Palanyandi Thangamani, and Hemant Khuttan are set forth in the chart attached to this
Complaint as Exhibit 1, which is incorporated herein by reference, and which is
incorporated into Plaintiffs' concurrently-filed RICO Case Statement.

145.    Upon information and belief, Defendant Signal's direction of and
coordination of Recruiter Defendants' recruitment efforts was effectuated by the use of

numerous telephone, fax, e-mail, and/or mail communications occurring from spring of 2006 through at least January 2007.

146.    Upon information and belief, in these communications Defendant Signal authorized Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill anticipated H-2B guestworker jobs at Signal operations.

147.    Upon information and belief, in these communications, Defendant Signal further authorized Recruiter Defendants to represent that Signal would agree to sponsor bona fide green card applications for the Group II Plaintiffs and obtain at least two H-2B visa extensions on behalf of Group II Plaintiffs to allow them to remain in the United States working for Signal while their green card applications were being processed.

148.    Defendant Signal authorized these representations even through it knew or had reason to know that such visa extensions and green card applications would not be bona fide, valid, or lawful under United States immigration law and even though Signal did not intend to apply for and in fact knew that it could not legally apply for such visa extensions and/or green cards on behalf of Group II Plaintiffs.

149.    In spring, summer, and fall of 2006, Group II Plaintiffs attended meetings at which Recruiter Defendants and Legal Facilitator Defendants, acting on Signal's behalf, informed Group II Plaintiffs of the opportunity to work for Defendant Signal on H-2B visas which would lead to permanent resident (green card) status.

150.    Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants

conferred in and spring, summer, and fall 2006 by phone, mail, fax and/or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings.

151.    The United States-based Recruiter Defendants (Pol and Global) and Legal Facilitator Defendants traveled across state and international lines to attend meetings with Group II Plaintiffs in India and the United Arab Emirates in spring, summer, and fall of 2006.

152.    According the statements made at these meetings and in communications effected by wire and mail during this time period, Defendant Signal would sponsor Group II Plaintiffs' green card applications and extend their H-2B visas multiple times to enable Group II Plaintiffs to work in the United States while their green card applications were pending.  In exchange, Group II Plaintiffs would have to pay fees totaling approximately 8 lakhs ($20,000) each in a series of approximately three installments.

153.    Group II Plaintiffs were further informed by Recruiter Defendants and/or Legal Facilitator Defendants that in exchange for an additional fee of approximately $1,500 per family member, Plaintiffs would be able to obtain legal permanent residence for their spouses and children.

154.    At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted through the use of mail and wire communications occurring during the spring and summer of 2006, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants, personally and/or through their agents, representatives, and/or employees, represented to Group II Plaintiffs that Signal would provide lawful, stable, and ample employment opportunities, that working under an H-2B visa for Signal was not inconsistent with applying for permanent

immigration status sponsored by Signal, and that Signal would obtain for Group II Plaintiffs work-authorized green cards enabling the Group II Plaintiffs to permanently and legally immigrate to United States with their families.

155.    In such communications with Plaintiffs, Recruiter Defendants and Legal Facilitator Defendants further promised to act diligently and do everything necessary to ensure that Plaintiffs obtain green cards within 24 months of initiating the green card process.

156.    Reasonably relying on these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, Group II Plaintiffs signed green card contracts at various points from mid-2006 and late 2007 with Recruiter Defendants and Legal Facilitator Defendants in which they promised to pay the fees charged by these Defendants.

157.    Contracts signed by Plaintiffs and other documents provided to Group II Plaintiffs by Legal Facilitator Defendants and Recruiter Defendants through the use of mail and/or wire transmissions in and around mid 2006 through at least early 2007, further promised that Group II Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for Group II Plaintiffs as promised.

158.    Legal Facilitator Defendants and Recruiter Defendants knew or should have known, however, that they would not refund Group II Plaintiffs' money as promised in the contracts and other documents.

159.    Legal Facilitator Defendants and Recruiter Defendants induced Group II Plaintiffs to enter the green card contracts without intent to diligently pursue Group II

Plaintiffs' applications and without any basis whatsoever for representing, inter alia, that Defendant Signal had lawful long-term employment opportunities to provide Group II Plaintiffs; that Defendant Signal could legally apply for numerous H-2B visa extensions to maintain Group II Plaintiffs' presence in the United States; that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; that green card applications sponsored by Defendant Signal would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

160.    In reasonable reliance on Recruiter Defendants and Legal Facilitators' explicit and repeated promises regarding green cards and employment opportunities in the United States, Group II Plaintiffs undertook considerable personal and familial sacrifices to amass the funds necessary to initiate the green card process with Defendant Signal.

161.    Group II Plaintiffs gathered their life savings and borrowed staggering sums of money from family members, friends, banks, and loan sharks, often at high interest rates, in order to make the payments required by Defendants and their agents. Many Group II Plaintiffs mortgaged or sold their homes and/or land belonging to them or their families.   Some Group II Plaintiffs cashed in life insurance policies and/or sold prized family possessions such as their wives' wedding jewelry.

162.    In reasonable reliance on the promises of Recruiter Defendants and Legal Facilitator Defendants, Group II Plaintiffs signed contracts with these Defendants and made payments required by these contracts.

163.    Group II Plaintiffs would not have paid the extraordinary fees charged by Recruiter Defendants and Legal Facilitator Defendants for green cards, visas, and employment opportunities had they known that these Defendants' promises and representations were false.

164.    Group II Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants and Legal Facilitator Defendants for green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

Preparations and Departure for Signal Operations in the United States (All Plaintiffs)

165.    At various times during the spring, summer, and fall 2006, employees of Defendant Signal traveled to various locations in India and the United Arab Emirates and tested Plaintiffs' and other class members' welding and pipefitting skills in anticipation of employing them in the United States.

166.    Plaintiffs and other class members paid costs necessary to travel to the cities where these tests were held.

167.    Plaintiffs and other class members paid admission fees charged to take these tests.

168.    Plaintiffs and other class members attended and passed these tests, which were overseen and graded by Defendant Signal's agents, employees, and/or representatives.

169.    Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants

conferred in spring, summer, and fall 2006 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

170.    On or about July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

171.    Around the time of this approval, Plaintiffs and other class members made necessary preparations in order to travel to the United States on H-2B visas to work for Signal, including: paying to obtain necessary travel and legal documents; making payments to the United States consulate, Recruiter Defendants and Legal Facilitator Defendants for mandatory H-2B visa and consular processing fees; attending H-2B visa interviews; and paying Recruiter Defendants for travel arrangements.

172.    In order to secure H-2B visas to work for Signal, Plaintiffs and other class members were required to be interviewed by United States Consular offices in Indian cities.

173.    These consular interviews necessitated that Plaintiffs and other class members pay the costs of travel from their homes and/or current places of employment to various large Indian cities including Chennai (Madras) and Mumbai (Bombay).

174.    Recruiter Defendants and/or Legal Facilitator Defendants, acting as Defendant Signal's agents, required that Plaintiffs and other class members meet with Recruiter Defendants and/or the Legal Facilitator Defendants in these Indian cities prior to attending their consular interviews.

175.    Upon information and belief, prior to these meetings Recruiter Defendants and Legal Facilitator Defendants discussed by e-mail, telephone, or in-person

communications the topics to be discussed and instructions to be given to Plaintiffs at these meetings.

176.    At these pre-interview meetings, Recruiter Defendants and Legal Facilitator Defendants ensured that Plaintiffs and other class members were up-to-date on paying the fee installments required by their green card contracts.

177.    Defendants further required that Plaintiffs and other class members pay an additional 35,000 to 45,000 rupees ($800 to $1,100) fee for H-2B visa processing.

178.    Recruiter Defendants required Plaintiffs and other class members to sign documents permitting Defendant Sachin Dewan to receive their visa-stamped passports from the Consulate on Plaintiffs' and other class members' behalves.

179.    Recruiter Defendants also coached the Plaintiffs and other class members on what to say during consular interviews.

180.    Recruiter Defendants told Plaintiffs and other class members that if they did not follow Recruiter Defendants' instructions regarding the interviews, Plaintiffs and other class members would not receive their visas and would forfeit the all moneys they had previously paid to Defendants, in addition to losing their opportunity to permanently immigrate to the United States.

181.    During Plaintiffs' and other class members' consular interviews, the consular officials took Plaintiffs' and other class members' passports from them.

182.    Once Plaintiffs' and other class members' visas were approved, consular officials sent their passports, with H-2B visas affixed, directly to Defendant Dewan.

183.    After receiving word that Plaintiffs' visas were approved, Recruiter Defendants made travel arrangements for Plaintiffs' and other class members' departures to the United States.

184.    Before Plaintiffs and other class members could leave for the United States, however, Plaintiffs and other class members were required to attend final meetings in Recruiter Defendants' Mumbai (Bombay) office.

185.    Such meetings typically took place mere hours before Plaintiffs' and other class members' scheduled departures to the United States, when Recruiter Defendants' office was teeming with anxious fellow Signal workers awaiting departure to the United States.

186.    At these meetings, Recruiter Defendants collected final installment payments required by Plaintiffs' and other class members' green card contracts.

187.    Recruiter Defendants also required that Plaintiffs and other class members, most of whom do not proficiently read or speak English, sign English language documents with little or no time for review.

188.    Recruiter Defendants refused to return Plaintiffs' and other class members' passports -- which had been in Defendant Sachin Dewan's possession since after Plaintiffs' H-2B visas were approved by Consular Officials -- until after Plaintiffs and other class members had paid the final installments and signed the mandatory paperwork.

189.    In forceful tones, Recruiter Defendants' staff demanded that Plaintiffs and other class members quickly sign the mandatory documents, lest they miss the flights to the United States which Recruiter Defendants had scheduled for them.

190.    Without possession of their passports and within this rushed and hostile atmosphere, Plaintiffs and other class members had no reasonable opportunity to review, negotiate, and/or make any changes to the documents presented them.

191.    On occasions when workers who appeared at the Mumbai office failed to present sufficient funds to pay the final installment required by the green card contracts, Defendant Dewan and his associates threatened to destroy and/or deface these workers' passports.

192.    Such threats were uttered in the presence of other workers, causing these workers to reasonably believe that they had no choice but to pay the final installments in full.

193.    Based on the Recruiter Defendants' threatening and coercive behavior during these pre-departure meetings in Mumbai and the extraordinary and increasing levels of debt they had incurred to pay the Recruiter Defendants and Legal Facilitator Defendants for green card and H-2B visa arrangements, Plaintiffs and other class members reasonably believed that they had no choice but to make the payments required by the Recruiter Defendants and to travel to the United States to work for Defendant Signal.

194.    Plaintiffs and approximately 500 class members traveled from Mumbai to Defendant Signal's operations in the U.S. at various times from November 2006 to January 2007 on tickets arranged by the Recruiter Defendants.

195.    Pursuant to Defendant Signal's instructions and arrangements, approximately 300 workers were sent to Signal's Pascagoula, Mississippi facility and

approximately 200 workers were sent to Signal's Orange, Texas facility upon arrival in the United States.

### Conditions at the Signal Facilities in Pascagoula and Orange

196.    Upon arrival at Defendant Signal's facilities in Pascagoula and Orange, Plaintiffs and other class members were shocked to discover that they were expected to live in isolated, overcrowded labor camps comprised of trailer-like bunkhouses.

197.    Defendant Signal's labor camps were located in isolated, industrial areas miles removed from shopping areas, places of worship, and residential communities.  The camps were enclosed by fences and accessible only by a single guarded entrance.

198.    The labor camp gates were constantly monitored by security guards retained by Defendant Signal.  Upon information and belief, some or all of these guards may have been obtained by Signal through the Swetman Security company.

199.    Signal's security guards monitored Plaintiffs' and other class members' comings and goings by requiring them to show their employee identification badges and recording when Plaintiffs and other class members entered and exited the camps. Signal's security guards also searched Plaintiffs' and other class members' packages and bags when they entered the camps.

200.    Except on rare occasions, Plaintiffs and other class members were not permitted to receive visitors in the labor camps.

201.    Up to twenty-four men were housed in each bunkhouse and made to sleep in two-tiered bunk beds.  The bunk beds were so tightly packed in the bunkhouses that it was difficult for workers to move about in the narrow passageways between bunks.

202.    The Signal labor camp bunkhouses had insufficient toileting and bathing facilities for twenty-four men, resulting in long lines around the bathrooms before and after work shifts.

203.    Privacy was non-existent, and Plaintiffs and other class members often experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.

204.    Defendant Signal's personnel and/or security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings.

205.    Plaintiffs and other class members took their meals in Defendant Signal's mess halls, which were only open during limited hours.  Due to unhygienic kitchen conditions, Plaintiffs and other class members frequently became ill, sometimes requiring hospitalization.

206.    Defendant Signal deducted approximately $35 per day ($245 per week, or approximately $1,050 per month) from Plaintiffs' and other class members' paychecks for these substandard accommodations and meals.

207.    When Plaintiffs and other class members complained and asked to live outside the labor camps, Defendant Signal initially refused and subsequently told workers that if they tried to live outside the camps it would still deduct the approximately $35 per day charge from Plaintiffs' and other class members' wages.  As a result, Plaintiffs and other class members reasonably felt that they had no choice but to continue living in the Signal camps.

208.    Defendant Signal only housed Indian H-2B workers such as Plaintiffs in its labor camps.   Upon information and belief, workers of non-Indian descent and workers who were U.S. citizens were not required to live in and/or pay for accommodations in Defendant Signal's labor camps.

209.    Defendant Signal subjected Plaintiffs and other class members to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and U.S. citizen workers were not similarly subjected.

210.    In addition, Signal camp personnel and supervisors frequently used offensive language in speaking with and/or referring to Plaintiffs and other Indian H-2B workers and regularly insulted Plaintiffs and other Indian H-2B workers on the basis of their race, national origin, and/or alienage.

211.    During the first week of employing Plaintiffs and other class members in the United States, Defendant Signal did not reimburse Plaintiffs and other class members for any of the expenses that Plaintiffs were required to incur as a pre-condition of seeking employment with Signal.

212.    During the first two weeks of employing Plaintiffs and other class members in the United States, Defendant Signal deducted approximately $100 to $200 each week from Plaintiffs' and other class members' checks for job-related tool kits which they were required to purchase from Defendant Signal.

213.    Signal personnel and management regularly threatened Plaintiffs and other class members that if they did not continue working for Signal, or did not work according

45

to Signal's specifications, Plaintiffs and other class members would be deported back to India.

214.    In the isolated and guarded atmosphere of the labor camps and grappling with the crushing debts they had incurred to come to the United States, Plaintiffs and other class members reasonably felt that Signal's statements were threatening and felt forced to continue working for Signal despite terrible working and living conditions.

215.    At regular meetings and in one-on-one or small group conversations with Signal camp personnel and management, some workers, including Plaintiffs Vijayan and Kadakkarappally, voiced complaints regarding the discriminatory treatment to which Indian H-2B workers were subject.

216.    Plaintiffs Vijayan and Kadakkarappally took leading roles in gathering and voicing others' complaints to Defendant Signal's personnel in camp meetings.

217.    When Indian workers, including Vijayan and Kadakkarappally, voiced grievances regarding housing, food, and wages, Defendant Signal's personnel warned them to stop complaining.

218.    When Signal took no action in response to workers' complaints, numerous Indian H-2B workers living at the Pascagoula labor camp, including Plaintiffs Vijayan and Kadakkarappally, began meeting collectively to discuss how to persuade Signal to improve conditions in its labor camps.

219.    Defendant Signal became aware of these meetings and the leadership and organizing roles taken by Plaintiffs Vijayan and Kadakkarappally.

220. Defendant Signal, through its employees and/or agents, contacted the Recruiter Defendants to express its concerns about worker organizing efforts and the specific involvement of Plaintiffs Vijayan and Kadakkarappally.

221. Upon information and belief, during these conversations Recruiter Defendants and Signal reached an agreement regarding steps that they would take to discourage further worker organizing and to ensure that the majority of the H-2B workforce continued to work at Signal.

222. Upon information and belief, Signal management and camp personnel conferred and planned internally and with the private Swetman security firm to respond to workers' organizing activities and to take actions to ensure that the majority of the H-2B workforce continued to work at Signal.

223. On or about March 7, 2007, Defendant Sachin Dewan called Plaintiff Vijayan's wife at her home in India and warned her that Plaintiff Vijayan must stop making trouble at Signal.

224. Plaintiff Vijayan's wife informed Vijayan of this call, and Vijayan called Defendant Dewan on or about March 8, 2007. During that conversation, Defendant Dewan told Plaintiff Vijayan that Defendant Dewan had learned from Signal that Vijayan was organizing the workers and making trouble. Defendant Dewan told Plaintiff Vijayan that if the organizing continued, all the workers would be sent back to India.

225. Vijayan informed other Indian workers about the calls he and his wife had received from Defendant Dewan, and word spread quickly through the Pascagoula and Orange camps regarding the threats against Vijayan.

226.    News about the calls between Dewan, Vijayan and Vijayan's wife substantially heightened the reasonable fears of Plaintiffs and other class members in the Pascagoula and Orange camps that if they complained about or tried to leave the discriminatory and substandard working and living conditions at Signal, the Recruiter Defendants and Signal would retaliate against Plaintiffs or their families with acts of violence or by arranging for Plaintiffs' and other class members' deportation to India.

227.    Defendant Signal called a workforce-wide meeting on March 8, 2007 in the Pascagoula camp, attended by Signal management and Defendant Burnett.

228.    At this meeting, Signal management told Plaintiffs and other class members that Signal would fight back against organizing efforts by the workers.

229.    Signal management further threatened that Signal would not extend Plaintiffs' and other class members' H-2B visas if the workers took legal action against Signal.    At that same meeting Defendant Burnett told the workers that they were ineligible for other kinds of immigration relief and could depend only on Signal to maintain their H-2B immigration status and pursue their green card applications.

230.    Early the next morning, March 9, 2007, Signal locked the gate to its Pascagoula labor camp, thereby obstructing the sole means of direct entry to and exit from the camp.

231.    Around this same time, Signal camp coordinator Darrell Snyder, and approximately five security guards, some or all of whom were obtained through the private Swetman Security firm, swept through the bunkhouses carrying pictures of Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan.

232.   Security guards began accosting workers to determine whether they were the individuals shown in the pictures.

233.   Plaintiffs and other class members became increasingly frightened and confused by these activities, particularly when word spread that Signal had locked the gate that served as the sole exit from the labor camp.

234.   Around 5:15 AM that morning, Plaintiff Vijayan was walking towards the dining area.  A security guard and Snyder aggressively confronted Vijayan and instructed him that he was in their custody.

235.   Based on the threats made at the meeting on March 8, 2007 and Plaintiff Vijayan's recent phone call with Sachin Dewan, Vijayan feared what Defendant Signal might do to him.

236.   When Plaintiff Vijayan attempted to go towards the bathroom to wash his hands, Snyder and several security guards chased after him, shouting.

237.   Plaintiff Vijayan began to panic, thinking of the enormous quantity of money he had spent to come to the United States and the massive debts he owed in India.  Vijayan knew that he would not be able to repay such debts if he were deported and no longer employed by Signal.

238.   These feelings, combined with Plaintiff Vijayan's reasonable fear that Snyder and the security guards might physically hurt him, drove Vijayan to attempt suicide.  Vijayan had to be transported from the labor camp to a local hospital for immediate medical attention.

239.   While attempting to assist Plaintiff Vijayan in obtaining medical attention, Plaintiff Jacob Joseph Kadakkarappally ("Kadakkarappally") was grabbed by Snyder.

240.   Snyder took Plaintiff Kadakkarappally forcefully by the arm and marched him into a communal room in the labor camp referred to by workers as "the TV room."

241.   In the TV room, Snyder informed Plaintiff Kadakkarappally that he was fired and demanded that Plaintiff Kadakkarappally stay inside the TV room. Kadakkarappally was prevented from leaving the TV room by several security guards. Upon arriving in the TV room, Kadakkarrappally found two workers already locked inside.

242.   Earlier that morning, Snyder and the security guards had grabbed Plaintiff Thanasekar Chellappan ("Chellappan") in the communal eating area and Plaintiff Krishnan Kumar ("Kumar") in his bunkhouse and forced both of them into the locked TV room.

243.   Plaintiff Kuldeep Singh, upon realizing Snyder and the security guards were looking for him and intended to apprehend and detain him, hid himself and later fled the camp via an adjacent work area.

244.   After passing surreptitiously through the work area, Plaintiff Singh was able to locate an exit accessible from the work area and thereby secretly escape from Signal property.

245.   At around 6 AM, Snyder locked Plaintiffs Kadakkarappally, Kumar and Chellappan in the TV room and detained them there for several hours.

246.   At least three security guards watched over Plaintiffs Kadakkarappally, Kumar and Chellappan while they were detained.  Over the course of several hours, security guards denied Kadakkarappally, Kumar, and Chellappan's repeated requests to be let out of the TV room, to get something to drink, and to use the bathroom.

247.     When Plaintiff Kadakkarappally, Kumar, and Chellappan's co-workers attempted to come into the TV room to talk to the three workers locked inside, the security guards pushed them back.

248.     Confused and frightened, workers assembled outside the TV room to protest the treatment of Plaintiffs Kadakkarappally, Kumar, and Chellappan.

249.     At around 10 AM, Signal camp personnel finally permitted Plaintiffs Kadakkarappally, Kumar, and Chellappan to use the bathroom accompanied by security guards, one at a time.

250.     Around noon, Snyder and a Pascagoula police officer entered the TV room and the officer questioned why Plaintiffs Kadakkarappally, Kumar, and Chellappan were there.   Snyder said that these workers had been fired and would be sent back to India.

251.     Around 2 p.m., Snyder and the Pascagoula police officer returned to the TV room where Plaintiffs Kadakkarappally, Kumar and Chellappan were still being held. Around this time, Signal management appeared on the scene and informed Plaintiffs Kadakkarappally that he had been terminated and was being sent back to India.

252.     By this time, local media, religious advocates, and other individuals had gathered outside the camp gate to express their concern over the continued detention of Kadakkarappally, Kumar, and Chellappan.   In addition, the Indian H-2B workers remained assembled around the TV room, demanding that their co-workers be released.

253.     Faced with growing protests by community members and Signal employees, Defendant Signal finally released Kadakkarappally, Kumar, and Chellappan from the TV room and allowed them to leave the Pascagoula labor camp.

254.    Plaintiffs and other class members working at Signal's Orange facilities rapidly learned of the events at the Pascagoula labor camp on March 9, 2007.  In response and out of fear for their continued well-being, some workers surreptitiously fled the camps.

255.    Within a few days of Plaintiffs' and other class members' arrival at its labor camps in late 2006 and early 2007, Signal personnel had conducted meetings at the labor camps between Plaintiffs and representatives from specific banks.  In Pascagoula, these meetings were with representatives from M & M Bank.

256.    At the instruction of Defendant Signal, Plaintiffs and other class members at these respective locations had opened accounts with the designated banks and agreed to directly deposit their wages in these accounts.  Defendant Signal's establishment of Plaintiffs' and other class members' accounts with these banks gave it unique access to and control over Plaintiffs' and other class members' funds.

257.    At some point before April 10, 2007, after some class members had fled Signal's Pascagoula camp, M & M Bank denied these departed workers access to their bank accounts and invalidated their ATM cards.

258.    Upon information and belief, M & M Bank refused the departed workers access to their own bank accounts at Defendant Signal's behest.

259.    Workers still working at Signal labor camps heard about the difficulty departed Signal workers had in accessing their funds through Signal-established bank accounts and reasonably believed that similar action might be taken against them should they try to leave Defendant Signal's employ.

260.    The information about workers' inability to access their money, combined with other factors described herein, contributed to the remaining Plaintiffs' and other class members' reasonable beliefs that if they tried to leave the employ of Defendant Signal they would face serious harm and/or threatened or actual abuse of the legal process.

261.    Defendant Signal's actions on and after March 9, 2007 significantly intensified the reasonable fears of the remaining Plaintiffs and other class members in the Pascagoula and Orange camps that if they tried to leave Signal's employ or oppose unlawful and coercive employment conditions at Signal, they faced physical restraint, detention, forced deportation, or other serious harms and/or abuses of the legal process.

262.    Throughout the spring and summer of 2007, Signal personnel in the Mississippi and Texas camps held various meetings with the remaining Plaintiffs and other class members to discuss the status of Plaintiffs' and other class members' H-2B visas and green card applications.

263.    Upon information and belief, during spring and summer 2007 Signal personnel conferred amongst themselves and with the Recruiter Defendants and the Legal Facilitator Defendants via phone and/or e-mail to reach agreement on what should be said to workers attending the meetings.

264.    Soon after March 9, 2007, Defendant Signal held a camp-wide meeting in Pascagoula.  Signal personnel told the workers that Signal would sponsor their green cards if they stayed at Signal and obeyed Signal's rules, and warned that if workers held any meetings against Signal's interests, they would be terminated.

265.    In that same time period, Defendants Sachin Dewan and Burnett came to the Signal camp and again promised, in the presence of Signal personnel, that Signal, through its attorney Defendant Burnett, would make bona fide applications for green cards and obtain several H-2B visa extensions for Plaintiffs and other class members. Plaintiffs and other class members reasonably believed these promises.

266.    In meetings and conversations in spring and summer 2007, Defendant Signal, through its agents and employees at the Pascagoula and Orange facilities, continued to promise that Signal would arrange for the H-2B visa extensions and green cards originally promised Plaintiffs and other class members when they were recruited in India and the United Arab Emirates.

267.    Plaintiffs' and other class members' continuing dependence on Defendant Signal for their present and future immigration status, their continuing high levels of indebtedness, as well as other factors reasonably led Plaintiffs and other class members to fear serious harm and/or abuse of the legal process if they left Signal's employ.

268.    Under such circumstances, Plaintiffs and other class members reasonably felt like they had no choice but to continue working for Signal.

269.    On July 31, 2007, despite Signal's prior assurances that it would apply for H-2B visa extensions for Plaintiffs and other class members, Plaintiffs' and other class members' H-2B visas expired.

270.    At various times relevant to Plaintiffs' claims, Defendant Signal has refused to confirm whether valid H-2B visa extensions have in fact been obtained for Plaintiffs and other class members, coercing Plaintiffs and other class members to

continue working for Signal in the hope that Signal will finally resolve their uncertain immigration status.

271.    Since first contracting with Defendants in India and the United Arab Emirates, Plaintiffs and other class members have yet to receive the green cards Defendants promised them. Despite clear contractual provisions requiring them to do so, the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants have refused to refund any of the moneys Plaintiffs and other class members paid to them for unsuccessful green card and visa processing.

272.    Since first contracting with Defendants in India and the United Arab Emirates, Plaintiffs and other class members have had to seek other legal counsel to assist them in pursuing green card applications and other immigration relief, thereby incurring thousands of dollars in additional legal fees and costs which have not been reimbursed by Defendants.

## FIRST CLAIM FOR RELIEF

### THE TRAFFICKING VICTIMS PROTECTION ACT OF 2003

Forced Labor (18 U.S.C. § 1589) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor)
*Defendants Signal International LLC and the Recruiter Defendants (Michael Pol, Global Resources, Sachin Dewan, and Dewan Consultants)*

273.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

274.    The Class Representative Plaintiffs bring this claim on behalf of themselves and all other similarly situated workers against Defendant Signal and Recruiter Defendants.

275.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPA), 18 U.S.C. § 1595.

276.    Defendant Signal and Recruiter Defendants attempted to and did subject Plaintiffs and other class members to forced labor in violation of 18 U.S.C. § 1589.

277.    Defendant Signal and Recruiter Defendants knowingly attempted to and did physically restrain and/or threaten Plaintiffs and other class members with serious harm in order to obtain the labor and services of Plaintiffs and other class members in violation of 18 U.S.C. §1589(1).

278.    Defendant Signal and Recruiter Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs and other class members using a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce and did coerce Plaintiffs and other class members to believe that they would suffer serious harm if they were to leave the employ of Defendants in violation of 18 U.S.C.§ 1589(2).

279.    Defendant Signal and Recruiter Defendants' scheme to isolate Plaintiffs and other class members, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs and other class members that they would suffer serious harm if they were to leave the employ of Defendant Signal.

280.    Defendant Signal and Recruiter Defendants threatened Plaintiffs and other class members with deportation and deceived Plaintiffs and other class members about the terms of their visas in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3).

281.    Defendant Signal and Recruiter Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs and other class members so as to obtain their labor and services in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590 (TVPA).

282.    In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendant Signal and Recruiter Defendants knowingly recruited, transported, harbored and/or obtained the Plaintiffs and other class members for labor or services in furtherance of these Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a.    enticing, persuading, or inducing the Plaintiffs and other class members to go on board an airliner and to go to various locations throughout the United Arab Emerates, India, and the United States, with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

b.    knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by the TVPA, 22 U.S.C. §7102(5)(a) and (b), violating 18 U.S.C. § 1584;

c.    removing, confiscating, or possessing Plaintiffs' and other class members' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

d.    attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1594(a).

283.    As a proximate result of the conduct of Defendant Signal and Recruiter Defendants, Plaintiffs and other class members have suffered injuries to their persons, businesses, and property, and other damages.

284.    Plaintiffs and other class members are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C.§ 1962(c) and 18 U.S.C.§ 1962(d)

*All Defendants*

285.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

286.    Plaintiffs' RICO Case Statement, filed concurrently with this Complaint, is incorporated herein by reference.

287.    Plaintiffs' and other class members' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against all Defendants.

288.    Plaintiffs and other class members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

289.    Each of the Defendants is a "RICO person" within the meaning of 18 U.S.C. § 1963(1).

290.    All Defendants and the United States Consular officers in India constitute an association-in-fact, and therefore an enterprise (the "RICO Enterprise I"), within the meaning of 18 U.S.C. § 1964(4).

291.    Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal are an association-in-fact, and therefore an enterprise (the "RICO Enterprise II"), within the meaning of 18 U.S.C. § 1964(4).

292.    Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank are an association-in-fact, and therefore an enterprise (the "RICO Enterprise III") within the meaning of 18 U.S.C. § 1964(4).

## The RICO Enterprises

### RICO Enterprise I

293.    RICO Enterprise I is an ongoing business relationship between all Defendants, and the United States Consular officers in India, with the common purpose of recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including on Signal's operations in Texas and Mississippi.

294.    RICO Enterprise I is engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

295.    The members of RICO Enterprise I function as a continuing unit.

296.    Defendants conducted or participated in, and/or conspired to conduct or participate in the affairs of RICO Enterprise I through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to recruit, obtain, transport, process, and provide workers through the use of fraudulent promises, exorbitant fees, forced labor, and/or trafficking.

297.    Specifically, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

        a.    Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

        b.    Involuntary servitude in violation of 18 U.S.C. § 1584.

        c.    Forced labor in violation of 18 U.S.C. § 1589;

        d.    Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590; and

        e.    Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

298.    Specifically, all Defendants conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

        a.    Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

        b.    Wire fraud to further their unlawful scheme in violation of 18 U.S.C. §1343; and

        c.    Immigration document fraud in violation of 18 U.S.C. § 1546.

RICO Enterprise II

299.    RICO Enterprise II is an ongoing business relationship between Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal with the common purpose of selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and to travel to the United States to work for companies including Signal.

300.    The members of RICO Enterprise II operate as a continuing unit.

301.    RICO Enterprise II is engaged in interstate commerce in that its activities and transactions relating to the sale of United States green card, visa, and job opportunities affect interstate commerce.

302.    Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted or participated in and/or conspired to conduct or participate in, the affairs of RICO Enterprise II through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to sell United States green cards and work opportunities to Indian workers for the purposes of furnishing such workers for employment at Signal's operations.

303.    Specifically, the Recruiter Defendants, the Legal Facilitator Defendants, and Defendant Signal conducted or participated in the affairs of RICO Enterprise II by engaging in the following predicate acts of racketeering activity under 18 U.S.C. §1961(1):

        a.    Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

        b.    Involuntary servitude in violation of 18 U.S.C. § 1584.

    c.       Forced labor in violation of 18 U.S.C. § 1589;

    d.       Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

    e.       Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

    f.       Mail fraud in violation of 18 U.S.C. § 1341;

    g.       Wire fraud in violation of 18 U.S.C. § 1343; and

    h.       Immigration document fraud in violation of 18 U.S.C. § 1546.

<u>RICO Enterprise III</u>

304.    RICO Enterprise III is an ongoing business relationship between the Recruiter Defendants, the Legal Facilitator Defendants, Defendant Signal, Swetman Security, and M&M Bank with the common purpose of providing and maintaining a consistent and acquiescent labor force at Signal operations.

305.    RICO Enterprise III is engaged in interstate commerce in that its activities and transactions relating to maintaining and providing a consistent labor force at Signal occurred across state and international lines, and involve wages and working conditions at an employer engaged in interstate commerce (Signal).

306.    The members of RICO Enterprise III function as a continuing unit.

307.    Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted, or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal

to maintain a consistent and acquiescent H-2B Indian labor force at Signal through the use of fraudulent promises, forced labor, and trafficking.

308.     Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted, or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.      Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

b.      Involuntary servitude in violation of 18 U.S.C. § 1584.

c.      Forced labor in violation of 18 U.S.C. § 1589;

d.      Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

e.      Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

f.      Mail fraud to further their unlawful scheme in violation of 18 U.S.C. §1341;

g.      Wire fraud to further their unlawful scheme in violation of 18 U.S.C. §1343; and

h.      Immigration document fraud in violation of 18 U.S.C. § 1546.

**Predicate Acts**

Enticement into Slavery: 18 U.S.C. § 1583

309.     Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of enticement into modern-day slavery in

violation of 18 U.S.C. § 1583, and as set forth in Plaintiffs' First Claim for Relief, ¶ 268(a), supra.

### Involuntary Servitude: 18 U.S.C. § 1584

310.   Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of involuntary servitude in violation of 18 U.S.C. §1584, and as set forth in Plaintiffs' First Claim for Relief, ¶ 268(b), *supra*.

### Forced Labor: 18 U.S.C. § 1589

311.   Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal through RICO Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in Plaintiffs' First Claim for Relief, ¶¶ 262-266, *supra*.

### Trafficking for the Purposes of Forced Labor and/or
### Involuntary Servitude: 18 U.S.C. § 1590

312.   As set forth in the preceding paragraphs, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal through RICO Enterprises I, III, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and/or involuntary servitude in violation of 18 U.S.C. § 1590, and as set forth in Plaintiffs' First Claim for Relief, ¶¶ 267-268, *supra*.

### Document Servitude: 18 U.S.C. § 1592

313.   Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or

conspired to commit multiple predicate acts of document servitude in violation of 18 U.S.C. §1592, and as set forth in Plaintiffs' First Claim for Relief, ¶ 268(c), *supra*.

<u>Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343</u>

314.   As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, made and/or conspired to make false promises regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

315.   As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, made and/or conspired to make false promises regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

316.   As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail, on numerous occasions to further this fraudulent scheme.

317.   As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail on numerous occasions to further this fraudulent scheme.

318.   These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

Immigration Document Fraud: 18 U.S.C. § 1546(a)

319.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite these Defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

320.    As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite these Defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

321.    These willful, knowing, and intentional acts constitute immigration document fraud in violation of 18 U.S.C. § 1546(a).

**Pattern of Related Racketeering Acts**

322.    Defendants have engaged in the racketeering activity described in this Claim repeatedly starting in 2003 and continuing through the present with respect to approximately 500 Indian workers.

323.    Upon information and belief, the RICO enterprises discussed above are currently seeking new Indian H-2B workers for employment at Signal who may be subject to similar racketeering activities.

324.    Upon information and belief, the racketeering activity committed by Defendants, through the RICO enterprises, continues presently.  Defendants, through the

enterprises, remain engaged in activities to fraudulently recruit workers in India and exploit them in the United States.

325.    Defendants, though the RICO enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

326.    Defendants' racketeering acts have similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other class members, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant Indian H-2B guestworker labor force at Signal's operations.

327.    Defendants' acts have yielded similar results and caused similar injuries to Plaintiffs and other class members, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees.

328.    As set forth in the preceding paragraphs and in Exhibit 1, the racketeering acts have similar participants: the Recruiter Defendants, the Legal Facilitator Defendants, the Labor Broker Defendants, and Signal.

329.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, though the RICO enterprises, directed their racketeering activities at similar victims: Indian workers who contacted the Recruiter Defendants in search of green cards, economic opportunity, and stable employment in the United States.

330.    Defendants' acts have similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs and other class members, and use of similar employment practices and policies with respect to Plaintiffs and other class members.

## Injury

331.    As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries to their property and/or business, including but not limited to: exorbitant fees paid by Plaintiffs for green cards, visas and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; losses of personal and real property incurred in reliance on Defendants' fraudulent acts; lost and unpaid wages, lost employment opportunities, and other pecuniary and/or losses to real or personal property.

332.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981

*Defendant Signal International LLC*

333.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

334.    The Class Representative Plaintiffs, on behalf of themselves and all others similarly situated, assert this claim pursuant to 42 U.S.C. § 1981 for injunctive relief, declaratory relief, and damages against Defendant Signal.

335.    The actions of Defendant Signal, as set forth herein, violated Plaintiffs' and class members' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' and class members' rights to enjoy and benefit from non-discriminatory employment relationships with Defendant Signal.

336.    Specifically, Defendant Signal subjected Plaintiffs and class members to discriminatory and offensive mandatory room and board arrangements at Signal labor camps.

337.    Defendant Signal did not subject its non-Indian and/or U.S. citizen employees to the same or similar room and board arrangements.

338.    As set forth in the preceding paragraphs, Defendant Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian and/or U.S. citizen employees were not similarly subject.

339.    As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Plaintiffs and other class members, Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' and other class members' race, national origin, and/or alienage.

340.    As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs and other class members was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. §1981.

341.    Plaintiffs and other class members reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, national origin, and/or alienage.

342.    Defendant Signal's hostile, abusive, and discriminatory treatment of Plaintiffs and other class members was unwelcome.

343.     Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs and other class members of their rights.

344.     As a result of Defendant Signal's unlawful acts, Plaintiffs and other class members have suffered injury to their property and/or persons.

345.     Plaintiffs seek all appropriate relief, including declaratory and injunctive relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
42 U.S.C. § 1985 and the Thirteenth Amendment

*Defendants Signal International LLC and the Recruiter Defendants (Michael Pol, Global Resources, Inc., Sachin Dewan and Dewan Consultants)*

346.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347.     The Class Representative Plaintiffs, on behalf of themselves and all others similarly situated, assert this claim pursuant to 42 U.S.C. § 1985(3) for injunctive relief, declaratory relief, and damages against Defendant Signal and Recruiter Defendants.

348.     As set forth in the preceding paragraphs and Plaintiffs' First Claim for Relief, Defendant Signal and Recruiter Defendants, along with non-defendants, including the Swetman Security firm and M & M Bank, conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs and other class members of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

70

349.    Defendant Signal and Recruiter Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs and other class members of their rights and/or acted in furtherance of a conspiracy to deprive Plaintiffs and other class members of their rights.

350.    Defendant Signal and Recruiter Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Plaintiffs and other class members of their rights.

351.    As a result of the unlawful acts of Defendant Signal and Recruiter Defendants, Plaintiffs and other class members have suffered damages.

352.    Plaintiffs seek all appropriate relief, including declaratory and injunctive relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### FRAUD AND NEGLIGENT MISREPRESENTATION

*All Defendants*

353.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

354.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and untrue statements and representations to Plaintiffs and other class members regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

355.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants knowingly or negligently failed to disclose material facts to Plaintiffs and other class members regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

356.    Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs and other class members to pay the large fees requested by the Labor Brokers, Recruiter Defendants, and/or Legal Facilitator Defendants.

357.    Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs and other class members to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for the Labor Brokers and/or Defendant Signal.

358.    Plaintiffs and other class members were entitled to rely on Defendants' representations.

359.    In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs and other class members paid large sums of money to Defendants.

360.    In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs and other class members incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees and/or representatives.

361.    In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs and other class members sold personal and real property and surrendered employment opportunities in India and the United Arab Emirates.

362.    In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs and other class members left their homes and jobs and India and the United Arab Emirates and traveled to the Untied States to work for Defendant Signal.

363.    As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, Plaintiffs and other class members have been injured.

364.    Plaintiffs and other class members are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

BREACH OF CONTRACT

*All Defendants*

365.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

366.    As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs and other class members in the United States within 18 to 24 months as well as steady work opportunities in the United States with Defendant Signal and/or Labor Broker Defendants in exchange for Plaintiffs' and other class members' payment of fees to Defendants and their employees, agents and/or representatives and agreement to work for Defendant Signal and/or Labor Broker Defendants.

367.    Plaintiffs and other class members accepted Defendants' offers, paid the agreedupon fees, and performed the agreed-upon work.

368.    Defendants breached their contracts with Plaintiffs and other class members by failing to comply with their binding promises regarding green cards and H-2B visa status.

369.    In reliance on these agreements, Plaintiffs and other class members paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

370.    As a direct result of Defendants' breach, Plaintiffs and other class members have suffered damages.

74

371.    Plaintiffs and other class members are entitled to recover compensatory damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

FAIR LABOR STANDARDS ACT ("FLSA")
COLLECTIVE ACTION

*Defendant Signal International L.L.C.*

372.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

373.    The named Plaintiffs assert this claim for damages and declaratory relief pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.

374.    Pursuant to 29 U.S.C. § 216(b), the named Plaintiffs have consented in writing to be Plaintiffs in this FLSA action.  Their written consents are attached to this Complaint as composite Exhibit 2.

375.    Defendant Signal violated 29 U.S.C. § 206 by failing to pay Plaintiffs and others similarly situated the applicable minimum wage for every compensable hour of labor they performed.

376.    Defendant Signal violated 29 U.S.C. § 207 by failing to pay Plaintiffs and others similarly situated the applicable overtime wage for every compensable hour of labor they performed.

377.    The violations of the FLSA set out above resulted from Defendant Signal's unlawful deductions from the wages of Plaintiffs and others similarly situated including, inter alia, expenses for point-of-hire travel, visa, recruitment, tools, and housing expenses.

378.     Defendant Signal's failure to pay Plaintiffs and others similarly situated the federally mandated minimum and overtime wages were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

379.     As a consequence of Defendant Signal's violations of the FLSA, Plaintiffs and others similarly situated are entitled to recover their unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## EIGHTH CLAIM FOR RELIEF

### VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981 (Retaliation)

*Individual Plaintiffs Vijayan and Kadakkarappally Against Defendant Signal International, L.L.C.*

380.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

381.     Individual Plaintiffs Vijayan and Kadakkarappally assert this claim pursuant to 42 U.S.C. § 1981 for injunctive relief, declaratory relief, and damages.

382.     The actions of Defendant Signal violated Plaintiffs Vijayan's and Kadakkarappally's rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, by, inter alia, threatening, assaulting, battering, falsely imprisoning, causing emotional distress to, and terminating the employment of Plaintiffs Vijayan and Kadakkarappally as a direct response to and in retaliation for their legally protected opposition to Defendant Signal's discriminatory practices.

383.     Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs Vijayan and Kadakkarappally of their rights.

384.    As a result of Defendant Signal's unlawful acts, Plaintiffs Vijayan and Kadakkarappally have suffered injury.

385.    Plaintiffs Vijayan and Kadakkarappally seek all appropriate relief, including declaratory and injunctive relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

VIOLATIONS OF THE KLU KLUX KLAN ACT OF 1871
(42 U.S.C. § 1985) (Thirteenth Amendment and Constitutional Right to Travel)

*Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar and Chellappan Against Defendant Signal International, L.L.C. and Recruiter Defendants (Michael Pol, Global Resources, Inc., Sachin Dewan, and Dewan Consultants)*

386.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

387.    Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar and Chellappan assert this claim pursuant to 42 U.S.C. § 1985(3) for injunctive relief, declaratory relief, and damages by the Individual Plaintiffs against Defendant Signal and Recruiter Defendants.

388.    As set forth in the preceding paragraphs and the First Claim for Relief, Defendant Signal, Recruiter Defendants, and the Swetman Security firm conspired, agreed, planned, and coordinated for the purpose of depriving the Individual Plaintiffs equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia 18 U.S.C. §§ 1589, 1590) to be free from forced labor and trafficking in persons and to exercise their Constitutional right to travel.

389.    As set forth above the preceding paragraphs and the First Claim for Relief, Defendant Signal and Recruiter Defendants, along with the Swetman Security firm, acted in furtherance of their conspiracy for the purpose of depriving the Individual Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (<u>inter</u> <u>alia</u> 18 U.S.C. §§ 1589, 1590) to be free from trafficking in persons and to exercise their Constitutional right to travel.

390.    Defendant Signal and Recruiter Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive the Individual Plaintiffs of their rights and/or acted in furtherance of a conspiracy to deprive the Individual Plaintiffs of their rights.

391.    Defendant Signal and Recruiter Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive the Individual Plaintiffs of their rights.

392.    As a result of Defendant Signal's unlawful acts, the Individual Plaintiffs have suffered injury.

393.    The Individual Plaintiffs seek all appropriate relief, including declaratory and injunctive relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT

*Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan Against Defendant Signal International L.L.C.*

394.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

395.    Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan bring this claim for damages resulting from their false imprisonment by Defendant Signal.

396.    Defendant Signal acted to unlawfully and unreasonably detain the Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan against their will and consent.

397.    Defendant Signal acted with malice, gross negligence, and/or reckless disregard.

398.    Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan suffered injury as a result of Defendant Signal's actions.

399.    Defendant Signal is liable to the Individual Plaintiffs for damages, including compensatory and punitive damages.

## ELEVENTH CLAIM FOR RELIEF

### ASSAULT AND BATTERY

*Plaintiffs Vijayan, Kadakkarappally, Kumar, Singh and Chellappan against Defendant Signal International L.L.C.*

400.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

401.   Individual Plaintiffs Vijayan, Kadakkarappally, Kumar, Singh and Chellappan assert this claim for damages resulting from their assault and battery by Defendant Signal.

402.   Defendant Signal intentionally acted with intent to cause harmful or offensive contact with Individual Plaintiffs Vijayan, Kadakkarappally, Kumar, Singh, and Chellappan.

403.   Defendant Signal intentionally placed Individual Plaintiffs Vijayan, Kadakkarappally, Kumar, Singh, and Chellappan in apprehension of imminent harmful or offensive contact.

404.   Defendant Signal's actions resulted in harmful or offensive contact with Individual Plaintiffs Vijayan, Kadakkarappally, Kumar, Singh, and Chellappan.

405.   Defendant Signal acted with malice, gross negligence, and/or reckless disregard.

406.   Individual Plaintiffs Vijayan, Kadakkarappally, Kumar, and Chellappan suffered injury as a result of Defendant Signal's actions.

407.   Defendant Signal is liable to the Individual Plaintiffs for damages, including compensatory and punitive damages.

## TWELFTH CLAIM FOR RELIEF

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan against Defendant Signal International L.L.C.*

408.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

409.     Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan bring this claim for damages resulting from Defendant Signal's intentional infliction of emotional distress.

410.     Defendant Signal's actions to assault, batter, and falsely imprison Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan were extreme and outrageous.

411.     Defendant Signal undertook this conduct with the intent to cause, or with disregard of, the reasonable forseeability of causing severe emotional distress.

412.     Defendant Signal's conduct was intentional, willful, and/or wanton.

413.     Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan suffered severe emotional distress as a result of Defendant Signal's actions.

414.     Defendant Signal is liable to the Individual Plaintiffs for damages, including compensatory and punitive damages.

## THIRTEENTH CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan Against Defendant Signal International, L.L.C.*

415.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

416.     Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan bring this claim for damages resulting from Defendant Signal's negligent infliction of emotional distress.

417.    Defendant Signal's actions to assault, batter, and falsely imprison Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan were negligent.

418.    The emotional distress suffered by Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan was a reasonably foreseeable result of Defendant Signal's conduct.

419.    Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan suffered severe emotional injury as a result of Defendant Signal's actions.

420.    Defendant Signal is liable to Individual Plaintiffs Vijayan, Kadakkarappally, Singh, Kumar, and Chellappan for damages, including compensatory and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.    Certifying Plaintiffs' First through Sixth Claims for Relief in this action as class claims pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b.    Designating the Class Representative Plaintiffs as class representatives pursuant to Federal Rule of Civil Procedure 23, and designating Plaintiffs' counsel as counsel for the Class;

c.    Preliminarily certifying the claims set forth in Plaintiffs' Seventh Claim for Relief as a collective action pursuant to 29 U.S.C. § 216(b).

d.    Declaratory and injunctive relief;

e.    Compensatory damages;

f.    Punitive damages;

g.    Treble damages as authorized by RICO, 18 U.S.C. § 1964(c)

h.    Liquidated damages as authorized by the FLSA, 29 U.S.C. § 216;

i.    An award of prevailing party costs, including attorney fees;

j.    A finding of alter ego between Mr. Billy R. Wilks and J & M thus

piercing J & M's corporate veil;

k.    A finding that J & M Marine is the successor of J & M; and

l.    Such other relief as the Court deems just and appropriate.

Respectfully submitted,

s/_*Alan B. Howard*_____
Alan B. Howard, T.A. (*pro hac vice*)
New York Bar No. 2136661
Hugh Sandler (*pro hac vice*)
New York Bar No. 4712584
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8000
ahoward@dl.com
hsandler@dl.com

Chandra S. Bhatnagar (*pro hac vice*)
New York Bar No. 4136966
Human Rights Program
American Civil Liberties Union
125 Broad Street – 18th Floor
New York, New York 10004
Telephone: (212) 519-7840
cbhatnagar@aclu.org

Daniel Werner (*pro hac vice*)
New York Bar No. 3969839
Naomi Tsu (*pro hac vice*)
California Bar No. 248599
Immigrant Justice Project
Southern Poverty Law Center
233 Peachtree Street, Suite 2150
Atlanta, Georgia 30303
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
daniel.werner@splcenter.org
naomi.tsu@splcenter.org

s/ *Tracie L. Washington*_____
Tracie L. Washington, Esq.
Louisiana Bar No. 25925
Louisiana Justice Institute
1631 Elysian Fields
New Orleans, Louisiana 70117
Telephone: (504) 872-9134

Ivy O. Suriyopas (*pro hac vice*)
New York Bar No. 4406385
Asian American Legal Defense
and Education Fund
99 Hudson Street, 12th Floor
New York, NY  10013
Telephone: (212)966-5932
isuriyopas@aaldef.org