# DEPOSITION EXCERPTS

## WILLIAM DANIEL BINGLE

1      IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF LOUISIANA

3

4  KURIAN DAVID, SONY VASUDEVAN
    SULEKHA, PALANYANDI THANGAMANI,

5  MARUGANANTHAM KANDHASAMY,
    HERMANT KHUTTAN, ANDREWS ISSAC

6  PADA VEETTIYL, AND
    DHANANJAYA KECHURA, ON BEHALF

7  OF OTHER SIMILARLY SITUATED
    INDIVIDUALS, AND SABULAL

8  VIJAYAN, KRISHAN KUMAR, JACOB
    JOSEPH KADDAKKARAPPALLY,

9  KULDEEP SINGH, AND THANASEKAR
    CHELLAPPAN, INDIVIDUALLY,

10            PLAINTIFFS

11  VERSUS              CIVIL ACTION NO.
                      08-1220 SECTION A

12                  MAGISTRATE 3
    SIGNAL INTERNATIONAL, LLC,

13  MALVERN C. BURNETT, GULF
    COAST IMMIGRATION LAW CENTER,

14  L.L.C., LAW OFFICES OF MALVERN
    C. BURNETT, A P.C., INDO-AMERI

15  SOFT, L.L.C., KURELLA RAO, J&M
    ASSOCIATES, INC. OF MISSISSIPPI,

16  GLOBAL RESOURCES, INC., MICHAEL
    POL, SACHIN DEWAN, AND DEWAN

17  CONSULTANTS PVT. LTD (a/k/a
    MEDTECH CONSULTANTS,

18            DEFENDANTS

19

20   VIDEOTAPED DEPOSITION ORAL AND TELEPHONIC
                 OF

21         WILLIAM DANIEL BINGLE

22       CORPORATE REPRESENTATIVE OF
       SIGNAL INTERNATIONAL, L.L.C.

23         OCTOBER 28, 2009

24

25

1      Q.  Do you know whether it was in
2   that first personal meeting that he
3   explained this H-2B process?
4      A.  I don't remember which meeting
5   it was.
6      Q.  Before you personally went to
7   India in 2005, in connection with the
8   recruiting of Indian workers, was it your
9   understanding from Mr. Pol that the
10   process was as you just described it,
11   file petitions to get the workers over
12   here on H-2B Visas, extend them and then
13   file for the green cards?
14      MS. HANGARTNER:  Object to form.
15      MS. MCARTHUR:  Object to form.
16      A.  It would have been two
17   extensions and then the green card.
18   BY MR. HOWARD:
19      Q.  Would that process --
20      A.  Yes.
21      Q.  -- was that your understanding
22   when you went to India?
23      A.  Yes.
24      Q.  Did you get that understanding
25   from anyone else besides Mr. Pol?

1      A.  From Malvern Burnett.
2      Q.  Let's just stick with the
3   discussions with Mr. Pol in early 2006.
4   Other than discussing the H-2B Visa
5   process and saying you would get skilled
6   workers, what did he tell you?
7      A.  As to what?  I don't understand
8   what you are asking.
9      Q.  Anything.  Just the recruiting
10   process?
11      A.  We asked him how much it would
12   cost for the guys to come over and he
13   told -- we asked who would pay for it.
14   He told us the money would be funded by
15   the Indians; that Signal would not have
16   to pay any money to get the guys here.
17   We asked him how much it was and he said
18   it was about two to $3,000 is what the
19   Indians paid to come over and for
20   everything.  We asked them what was
21   involved with us and he said basically
22   you fill out the forms and we deliver the
23   Indians to you.
24      Q.  At no cost to you?
25      A.  That's correct.

Bingle
23:9 - 24:2

1      Q.  Sound like a pretty good deal?
2      A.  Yes.
3      Q.  Did he tell you that it was the
4   Indians would pay two to $3,000 total for
5   the right to come over to work for Signal
6   or was that just the money that Pol would
7   receive?
8      A.  That was total.
9      Q.  He specified that?
10      A.  Yes.
11      Q.  And did have you an
12   understanding who would be collecting
13   that two to $3,000?
14      A.  Yes.
15      Q.  And who was that?
16      A.  They would have been --
17      MR. ALEXIS, III:  Object to form.
18      MR. HOWARD:  You can answer.
19      A.  That would have been Michael
20   Pol, Malvern Burnett and Sachin Dewan.
21      Q.  BY MR. HOWARD:  And did Mr. Pol
22   tell you this about the money before you
23   even went over to India yourself?
24      A.  Yes.
25      MS. MCARTHUR:  Object to form.

1   BY MR. HOWARD:
2      Q.  Just so we have the time table
3   down, do you recall when it was you took
4   your first trip to India?
5      A.  It would have been October.
6   That was the only trip I took.
7      Q.  Thank you for clarifying.
8        Now, prior to that trip to
9   India, about how many conversations did
10   you have with Mr. Pol about the process?
11      A.  About the process, I don't
12   recall.  I don't recall how many.
13      Q.  How many about anything relating
14   to the recruitment of Indian workers?
15      A.  There were several calls.  I
16   mean, when we went on the trip I had
17   to, you know, verify the trip
18   arrangements and everything.  There were
19   several conversations at that point in
20   time, but the process itself probably six
21   or seven maybe.
22      Q.  Prior to speaking with Mr. Pol
23   about the Indian recruitment, your
24   previous experience with him was knowing
25   he had been a marketing consultant for

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1     Q. When did you find that out?
2     A. That would have been after we --
3 well, during -- I am not really sure
4 exactly what the time it was, but it
5 would have been in the timing when we
6 found out that -- when we talked to
7 Patricia about the process and she
8 informed us how the process really worked
9 with the green cards.
10    Q. And what was that?
11    A. That --
12    MR. SHAPIRO: Object to form.
13    A. -- to file for a green card you
14 could not stay here.
15    MS. HANGARTNER: Let me object as to
16 any conversations that Mr. Bingle may
17 have had directly with Patricia Bollman.
18    MR. HOWARD: I am looking for his
19 understanding about the change in the
20 process.
21    MS. HANGARTNER: Just wanted to be
22 clear.
23    MR. HOWARD: Okay.
24    A. We found out later that the
25 process, the H-2B process with the

**Bingle 46:24-47:11**

1 extension and the extensions would not
2 support the green card filing without a
3 lot of time delays and hassles on the
4 part of the guys that came over.
5 BY MR. HOWARD:
6    Q. In fact, they would actually
7 have to go back to India --
8    A. Right.
9    Q. -- in order to qualify to come
10 back on the green card?
11    A. Right. That is correct.
12    MR. ALEXIS, III: Object to form.
13 BY MR. HOWARD:
14    Q. And when you learned that, would
15 that have been December of 2008; is that
16 about right?
17    A. I don't recall the exact time.
18    Q. Prior to learning that, was
19 Signal telling all the workers you are
20 going to get your green cards, we are
21 going to file for green cards for you?
22    A. That is two different things.
23 We told them that we would do whatever we
24 could to support the filing of the green
25 cards.

1    Q. And your testimony is Signal was
2 telling that to the workers right up to
3 the point until you learned that your
4 understanding of the process was
5 incorrect?
6    MS. HANGARTNER: Object to form.
7    A. Yes.
8 BY MR. HOWARD:
9    Q. And who personally on behalf of
10 Signal was communicating that to the
11 workers?
12    MS. HANGARTNER: Object to form.
13    A. That would have been Ron
14 Schnoor.
15 BY MR. HOWARD:
16    Q. Were you ever present when Ron
17 Schnoor did that?
18    A. Yes.
19    Q. When was that?
20    A. That would have been -- I am not
21 sure of the dates. Some time around
22 March or April of '06.
23    Q. March '07?
24    A. '07.
25    Q. Is that the one occasion you

1 recall Mr. Schnoor giving that assurance
2 to the workers?
3    MS. HANGARTNER: Can I interrupt.
4 You are limiting this to Pascagoula;
5 correct?
6    MR. HOWARD: Yes, if that is what you
7 know.
8    MS. HANGARTNER: Yes.
9    A. Yes, I don't deal with Texas.
10 BY MR. HOWARD:
11    Q. So you don't know what was told
12 to the Texas workers at all?
13    A. No.
14    Q. So the Mississippi workers your
15 testimony is those workers were told by
16 Mr. Schnoor in March of April of '07,
17 that we will do what we have to do for
18 filings for green cards for you?
19    A. That's correct.
20    Q. Other than that occasion, were
21 you present at any other time when Mr.
22 Schnoor made that presentation to
23 workers?
24    A. I believe there was one other
25 time.

1    Q.  When was that?
2    A.  That would have been later on
3  that year.
4    Q.  Fall or late in that year?
5    A.  I don't recall.
6    Q.  And what did he say on that
7  occasion?
8    A.  The same thing basically, that
9  we would do whatever, you know, we could
10  to support their filing for their
11  extensions and green card.
12    Q.  Do you know what other Signal
13  representatives were telling the workers
14  in Mississippi during the course of 2007
15  about whether they would get green cards
16  or not?
17    A.  No.
18    Q.  Have you -- I guess you did not
19  read Mr. Snyder's testimony about his
20  understanding what he was communicating
21  to the workers?
22    A.  I did not read his testimony.
23    Q.  Mr. Snyder was at one point the
24  camp boss in the Mississippi camp; is
25  that right?

1    A.  Yes.
2    Q.  He reported to you?
3    A.  Yes.
4    Q.  And did you assign him to be the
5  camp boss?
6    A.  Yes.
7    Q.  Did you give him the assignment
8  of sticking around in the evenings to
9  handle complaints from Indian workers?
10    A.  He did that on his own.  I did
11  not instruct him to do it, but he did
12  that.
13    Q.  Was he acting in his capacity as
14  a Signal manager when he did that?
15    A.  Yes.
16    Q.  When you learned he was doing
17  that did you tell him not to?
18    A.  No.
19    Q.  Did he ever report back to you
20  what he was hearing from the workers?
21    A.  Yes.
22    Q.  And what did he report back to
23  you?  What did he report back?
24    A.  All the different things he
25  reported or?

1    Q.  General matters.
2    A.  Most of the discussion was over
3  the food.  The biggest thing was the food
4  and the number of people in the bunks.
5    Q.  Did he ever report to you that
6  the Indian workers were asking when they
7  were going to get their green cards?
8    A.  I don't recall if he did.
9    Q.  Do you recall ever giving Mr.
10  Snyder instructions what to tell workers
11  or not to tell workers concerning green
12  cards?
13    A.  No.
14    Q.  Did you ever instruct him not to
15  discuss green cards with workers?
16    A.  No.
17    MR. HOWARD:  Mark this as the next
18  exhibit, please.  Mr. Bingle, I'm showing
19  you what has been marked Exhibit 515.  It
20  is application for alien employment
21  certification on behalf of 180 unnamed
22  fitters, dated June 2006, baring your
23  signature.  It is Bates Burnett-CY-00024
24  through 00025.
25

1    (Plaintiff's Exhibit 515 was
2  marked for identification by the court
3  reporter and said exhibit is attached
4  hereto.)
5    Q.  BY MR. HOWARD:  Have you seen
6  this document before?
7    A.  Yes.
8    Q.  Is that your signature on page
9  2?
10    A.  Yes.
11    Q.  Did you sign this document on
12  June 2nd, 2006?
13    A.  Yes.
14    Q.  Did you sign this under the
15  penalty of perjury?
16    A.  Yes.
17    Q.  See that the top of the second
18  page says the exact dates you expect to
19  employ the alien and it is given 10-01-06
20  to 7-31-07; correct?
21    A.  Yes.
22    Q.  That an accurate representation
23  to the U.S. Government?
24    A.  Yes.
25    Q.  How do you reconcile the fact

Bingle
53:11 - 55:10

1  that you were telling the government that
2  you were only going to employ
3  aliens until July 31st, 2007, and you
4  testified here that it was Signal's
5  intent to apply for extensions and green
6  cards and give them permanent employment.
7       A.  Under the advice of our
8  immigration attorney at the time, Malvern
9  Burnett, this is the process used to file
10  for the H-2B process.  You can only file
11  for an H-2B Visa for 10 months, and that
12  was the 10-month period on this
13  application for filing the extensions.
14  He told us that would be taken care of at
15  a later date.
16       Q.  Did you ask Mr. Burnett though,
17  I am a little uncomfortable signing
18  something under oath that tells me we are
19  only going to employ the aliens for 10
20  months when we have the intent to keep
21  them longer?
22       MS. HANGARTNER:  Object to form.
23       A.  He said that is the way the
24  process works.
25  BY MR. HOWARD:

1       Q.  I am asking you though, did you
2  express some discomfort to Mr. Burnett
3  before signing this document?
4       A.  Yes.
5       Q.  And he told you that was the way
6  the process worked?
7       A.  Yes.
8       Q.  And so you just followed his
9  advice?
10       A.  Yes.
11       Q.  Did you discuss that document
12  with anybody else at Signal before
13  signing it?
14       A.  I probably would have discussed
15  it with Lisa Spears.
16       Q.  Who is she?
17       A.  She is our contracts
18  administrator or contracts manager.
19       Q.  Does she have a legal
20  background?
21       A.  I don't know.
22       Q.  Did you express to her your
23  concern about signing that document?
24       A.  I don't recall if I did.
25       Q.  Mark this please.  Just for the

1  record, before you look at this document.
2  When you sign Exhibit 515 on June 2nd,
3  2006, your understanding was it was
4  Signal's intent to employ the H-2B
5  workers for longer than July 31st, 2007;
6  correct?
7       A.  That's correct.
8       MR. HOWARD:  The next document
9  Exhibit 516, is a two-page letter over
10  your signature dated July 26th, 2006.
11  The Bates range here is Burnett-CY-00358
12  through 359.  I ask you to review this
13  document, please.
14       (Plaintiff's Exhibit 516 was
15  marked for identification by the court
16  reporter and said exhibit is attached
17  hereto.)
18       Q.  BY MR. HOWARD:  Have you had an
19  opportunity to review that?
20       A.  Yes.
21       Q.  And this is a letter that you
22  sent July 26, 2006, to the United States
23  Department of Homeland Security in St.
24  Albans, Vermont?
25       A.  Yes.

1       Q.  And that is your signature?
2       A.  Yes.
3       Q.  And how was this sent?  Was this
4  sent by U.S. Mail or by fax over the
5  wire?
6       A.  I don't recall how it was sent.
7       Q.  It was sent to the US Department
8  of Homeland Security?
9       A.  I believe this was sent.  We
10  signed the letter and gave them to
11  Malvern Burnett and he sent them off.
12       Q.  Did Malvern Burnett prepare the
13  letter?
14       A.  Yes.
15       Q.  Did you read it before you
16  signed it?
17       A.  Yes.
18       Q.  The last two sentences, "these
19  peak load temporary workers will not
20  become part of the permanent work force.
21  They will work for the length of the
22  prescribed dates of need, will be paid in
23  accordance with the prevailing wage, and
24  will return to their home country at the
25  end of employment."  Those are the

Bingle
57:12 - 61:21

```
1    references to the Indian workers being
2    recruited; correct?
3         A.  That is correct.
4         Q.  Were those accurate statements?
5         A.  They were --
6         MS. HANGARTNER:  Object to form.
7         A.  They were statements that were
8    again directed by Malvern Burnett as part
9    of the process to get the guys over here
10   under an H-2B Visa.
11   BY MR. HOWARD:
12        Q.  I understand that.  Were they
13   accurate and truthful statements?
14        MR. ALEXIS, III:  Object to form.
15        A.  At the time of signing this
16   letter with the H-2B process yes that was
17   a correct statement.
18   BY MR. HOWARD:
19        Q.  When you signed this letter in
20   July, 2006, did you intend for the Indian
21   recruits that you were bringing over to
22   this country to work on a temporary basis
23   and go back to Indian at the end of their
24   employment or were you intending to bring
25   them permanently and file for green cards
```

```
1    for them?
2         A.  We were intending to file for
3    green cards for them.
4         Q.  So if you intending to file for
5    green cards and had that intent in your
6    mind when you signed this letter, how is
7    it that you can say that it was an
8    accurate statement to tell the US
9    Government that they will work only
10   temporarily and go back to India when the
11   work is done?
12        MS. HANGARTNER:  Object to form.
13   Asked and answered.
14        MR. ALEXIS, III:  Object to form.
15        A.  That is what we were told by
16   Malvern Burnett the way the process
17   works.
```

Bingle 59:19--60:20

```
18   BY MR. HOWARD:
19        Q.  I understand you are saying that
20   Malvern Burnett told you to say this.  I
21   understand that he drafted the letter.
22   I'm asking you if those two sentences, as
23   drafted by Malvern Burnett, were
24   consistent with Signal's intent or not?
25        A.  No.
```

```
1         Q.  They were inconsistent with
2    Signal's intent?
3         A.  Yes.
4         Q.  So they were inaccurate
5    statements to tell the government this in
6    July 2006?
7         MS. HANGARTNER:  Object to form.
8         MR. ALEXIS, III:  Object to form.
9         A.  Yes.
10   BY MR. HOWARD:
11        Q.  Did you have any problem signing
12   a letter with inaccurate statements even
13   though your attorney was telling you to
14   do it?
15        MR. ALEXIS, III:  Object to form.
16        A.  Yes, we had problems -- I mean,
17   I had a problem with it, but it's what
18   the immigration attorney who was versed
19   in the H-2B process told us this is how
20   the process works.
21   BY MR. HOWARD:
22        Q.  When you say "told us" did he
23   tell someone else besides yourself?
24        A.  I don't recall who all he told.
25        Q.  Did you go to Mr. Schnoor and
```

```
1    say, look, I have a problem.  Our
2    immigration lawyer is asking me to lie to
3    the US Government?
4         MS. HANGARTNER:  Object to form.
5         MR. ALEXIS, III:  Object to form.
6         A.  We discussed it and were told by
7    who we thought was a reputable
8    immigration attorney at the time that
9    that's the way the process worked.
10   That's just the US Government.
11   BY MR. HOWARD:
12        Q.  So you just said Mr. Burnett
13   says, you know, it is okay to lie to the
14   US Government, that's the way it works,
15   and you accepted it?
16        MS. HANGARTNER:  Object to form.
17        MR. ALEXIS, III:  Object to form.
18        A.  Yes.
19   BY MR. HOWARD:
20        Q.  And you signed this letter?
21        A.  Yes.
22        Q.  Did you ask him to change
23   anything in the letter?
24        A.  I don't recall if we asked him
25   to change anything or not.
```

1  contract person?
2      A.  Yes.
3      Q.  And Signal considered this
4  potential?
5      A.  We talked about it briefly.
6      Q.  And you rejected it?
7      A.  Yes.
8      Q.  As too expensive?
9      A.  Yes.
10     Q.  The Indians were going to be
11  cheaper for Signal?
12     A.  Yes.
13     MS. HANGARTNER:  Object to form.
14  BY MR. HOWARD:
15     Q.  In the e-mail that you sent to
16  Ronald Schnoor and Lisa Spears on
17  February 27, 2006, on the next to last
18  page, you start that, "Speaking with
19  Michael Pol this morning he assured me
20  that any Indian workers we would get
21  would be more willing to work on repairs
22  and conversions.  That is the background
23  they come from."  What are the repairs
24  and conversions that were referenced?
25     A.  The repair and conversion work

1  is the work we do at Signal as opposed to
2  working in a fabrication shop where it is
3  cleaner and well lit.  It is less
4  stressful and less -- working on a repair
5  conversion is a lot harder work then
6  working in a fabrication shop.
7      Q.  And who were the Indian workers
8  more willing to do this work then -- that
9  is a bad question.
10         This suggests that the Indian
11  workers as opposed to some other group
12  would be more willing to do this work.
13  Who is the other group you had in mind?
14     A.  I don't know what Michael was
15  referencing at that point.  I mean, he
16  just -- they were more willing to
17  work on repair and conversions then
18  anyone else.  I guess he was making a
19  general statement at that point.
20     Q.  In the next e-mail from you on
21  the preceding page, but later in time on
22  February 28, 2006, you wrote an e-mail to
23  Ronald Schnoor and Lisa Spears; do you
24  see that?
25     A.  Yes.

Bingle
72:6 - 73:22

1      Q.  It says, "If the employee will
2  not work or just does not work out, the
3  return ticket to India needs to be for
4  Global's account also."  Do you see that?
5      A.  Yes.
6      Q.  So is it your intent that any
7  Indian workers who came over that did not
8  work out would be sent back to India?
9      A.  Yes.
10     Q.  And they would not get green
11  cards?
12     A.  That is correct.
13     Q.  What do you mean by working out?
14     A.  Could be a variety of things.
15  They could come over and just not like
16  the area.  They could get home sick.
17  Just anything in general that would make
18  it where they would not be a valued
19  employee for Signal.
20     Q.  Did Signal also have the power
21  to determine that a worker was not
22  working out and needs to go home?
23     A.  Yes.
24     Q.  And that was your intent from
25  the start?  That was your understanding

1  from the start of this recruitment
2  process?
3      A.  That if a worker --
4      Q.  If Signal decided that a worker
5  was not working out for some reason
6  according to Signal they could be sent
7  home?
8      A.  That is the way we do all our
9  employees, yes.
10     Q.  But you've never done employees
11  from India before; correct?
12     A.  That's correct.
13     Q.  And do most of your employees
14  pay recruiting fees to join Signal?
15     A.  No.
16     Q.  So you would agree with me there
17  was more of a cost to an Indian worker
18  that was paying recruiting fees and
19  moving half way around the world to come
20  to work for Signal then your normal
21  employees?
22     A.  Yes.
23     Q.  You say we need to -- "that the
24  return ticket needs to be for Global's
25  account also."  So you did not want to

1    A.  Yes.
2    Q.  And when you talked with the
3  Consulate, did they raise the issue of
4  green cards?
5    A.  No.
6    Q.  Did they ask you how long the
7  Signal's need for the workers existed?
8    A.  I don't believe so.
9    Q.  Did you tell them that the need
10  was only for 10 months?
11    A.  We -- I told them -- I never
12  gave them a specific date range, no.
13    Q.  What about Mr. Burnett?
14    A.  Not that I recall.
15    Q.  Do you recall anything about
16  what you told the US Consulate?
17    A.  We discussed various things,
18  most of it was just a brief introduction
19  of Signal, what we did, why, how the
20  Coast was devastated by the hurricane and
21  asked if they heard about Hurricane
22  Katrina, and just general information on
23  that.  And we told them we needed the
24  workers because our work force had moved
25  away.  There were really no specific

1  questions from any of them.
2    Q.  Did any of the conversations
3  with Mr. Burnett in advance of the visit
4  to the Consulate give you any concerns
5  over what he was advising?
6    A.  No.
7    MR. ALEXIS, III:  Object to form.
8  BY MR. HOWARD:
9    Q.  Other than meeting with the
10  Consulate, was there any other purpose
11  for your visit to India?
12    A.  No.
13    Q.  Did you do anything else while
14  you were in India related to the
15  recruitment of Indian workers?
16    A.  I sat in on one meeting that
17  Sachin and Malvern had with a group of
18  the Indians.
19    Q.  Where was that?
20    A.  That was at the hotel in New
21  Deli.
22    Q.  Do you recall the hotel?
23    A.  No.
24    Q.  How long did that meeting last?
25    A.  I was there for probably about

1  an hour.  I don't know how long the
2  meeting lasted.
3    Q.  How many workers were there?
4    A.  There were probably about 20.
5    Q.  Was that meeting conducted in
6  English or some other language?
7    A.  A little of both.
8    Q.  What was the other language?
9    A.  That would have been Hindi, as
10  far as I know.
11    Q.  And was the Hindi portion
12  translated into English so you could --
13    A.  No.
14    Q.  And I take it you don't
15  understand Hindi?
16    A.  No.
17    Q.  The portion that was conducted
18  in English, what was said and by whom?
19    A.  I just greeted the guys and told
20  them who I was in English, told them a
21  little bit about Signal, and that we were
22  looking forward to working with them.
23  And then I left, and Malvern and Sachin
24  stayed behind and talked to the guys.
25    Q.  During the time you were there,

1  was anything discussed about green cards?
2    A.  No.
3    Q.  Was anything discussed about
4  H-2B Visas?
5    A.  No.
6    Q.  Was anything discussed about
7  where they would be living when they came
8  to Signal?
9    A.  No.
10    Q.  Was anything discussed about the
11  work when they came to Signal?
12    A.  Just what I told them about rig
13  repair and not a whole lot.
14    Q.  At the time that you went to
15  India had you prepared on behalf of
16  Signal an offer of employment for Indian
17  recruits?
18    A.  I did not prepare it, but there
19  was one prepared.
20    Q.  Who prepared it?
21    A.  I don't recall who prepared it.
22    Q.  Was it prepared for your
23  signature?
24    A.  Yes.
25    Q.  Let me show you what has already

Bingle
85:25 - 86:25

1  been previously marked as Exhibit 381 in
2  this matter.  Is this the offer of
3  employment that had been prepared for
4  your signature?
5       A.  Yes.
6       Q.  Did you actually sign this
7  document?  Not this particular copy of
8  it, but a version of this?
9       A.  I don't recall if I signed it
10  while I was -- I think I did sign some of
11  them while I was there.  The rest of them
12  would have been signed by whoever had the
13  power of attorney, I believe.
14       Q.  Would that have been Sachin
15  Dewan?
16       A.  I believe so.
17       Q.  And he had the authority to sign
18  your name to these offers of employment?
19       A.  Yes.
20       Q.  And is it your understanding
21  that this same offer of employment was
22  given to every Indian recruit who was --
23  who had passed the test and was going to
24  be coming to work for Signal?
25       A.  Yes.

Bingle 87:1-13

1       Q.  Was this offer of employment
2  also -- what was the purpose of giving
3  them this offer of employment; do you
4  know?
5       A.  No, I don't know.
6       Q.  Did you understand it to be
7  Signal's offer of employment?
8       A.  Yes.
9       Q.  So you understood that the
10  Indian workers when they got this would
11  rely on it as what Signal was offering
12  for them?
13       A.  Yes.
14       Q.  Just for the record, again,
15  every worker who Signal was recruiting to
16  come work for Signal got the same offer
17  of employment?
18       A.  I don't know --
19       MS. HANGARTNER:  Object to form.
20       A.  I don't know that because I did
21  not hand them out.
22  BY MR. HOWARD:
23       Q.  Was it the intent of Signal to
24  have everyone get them?
25       A.  Yes.

1       Q.  Did Signal prepare for you to
2  provide or for Sachin Dewan to provide to
3  the recruits any other offer of
4  employment in India?
5       MS. HANGARTNER:  Object to form.
6       MR. HOWARD:  Bad question.  I'm
7  sorry.
8       Q.  BY MR. HOWARD:  Was it your
9  intent that Exhibit 381, a signed version
10  of this agreement, be given to every
11  recruit who was being given an offer of
12  employment to come to Signal; correct?
13       A.  Yes.
14       Q.  Before they arrived in
15  Mississippi or Texas, whichever was their
16  final destination at Signal, was any
17  other offer of employment given to these
18  workers on behalf of Signal, to your
19  knowledge?
20       A.  I don't know.
21       Q.  You don't know of any?
22       A.  I don't know if -- we gave them
23  some information on housing and tools and
24  some other things.  I don't know if it
25  was another offer of employment or what

1  it was, but we gave them some information
2  on what would be required of them when
3  they got here.
4       Q.  And what would be required in
5  terms of salary deductions?
6       A.  Yes.
7       Q.  Anything else?
8       A.  I don't recall the specifics.
9       Q.  For example, the workers who
10  were being given an offer of employment
11  had been tested for their skills;
12  correct?
13       A.  Yes.
14       Q.  Welders were given an actual
15  skills test welding?
16       A.  Yes.
17       Q.  And that test was conducted by
18  Signal employees; correct?
19       A.  It was witnessed by Signal
20  employees, yes.
21       Q.  In fact, Signal insisted its
22  employees go over there to witness the
23  testing; right?
24       A.  That is correct.
25       Q.  Signal did not want to rely on

23 (Pages 86 to 89)

1 anyone else to determine if these workers
2 were qualified to come work at Signal?
3     A. Yes.
4     Q. And everyone who was given an
5 offer of employment, such as Exhibit 381,
6 had passed this test to the satisfaction
7 of Signal's employees; correct?
8     A. Yes.
9     Q. Did you, on behalf of Signal,
10 tell any recruit whom you gave this offer
11 of employment, a version of Exhibit 381,
12 that when they came to Signal they would
13 receive further testing, and if they did
14 not pass that testing their salary, which
15 is listed in Exhibit 381 as $18 per hour
16 could be reduced?
17     A. Did I tell anyone that?
18     Q. Correct.
19     A. No.
20     Q. Do you know if any of the Signal
21 employees who you sent or Signal sent to
22 conduct or witness the testing were
23 instructed to the tell the workers that?
24     A. No.
25     Q. Do you know whether any of Mr.

1 Dewan, Mr. Pol, or Mr. Burnett were
2 instructed to tell the recruits that
3 fact?
4     A. No, I don't know.
5     Q. Is there anyone at Signal who
6 would know that?
7     A. Not that I am aware of.
8     Q. Did anyone from Signal go to
9 India in connection with the recruiting
10 process other than yourself and employees
11 who conduct or witness the tests?
12     A. At which time?
13     Q. Before any Indian worker arrived
14 at Signal?  The first Indian workers
15 arrived at Signal in late October 2007?
16     A. Yes.
17     Q. So prior to a late October 2007,
18 other than yourself?
19     MS. HANGARTNER:  October 2006.
20     MR. HOWARD:  I'm sorry.  Now you've
21 got me doing it.
22     MS. HANGARTNER:  It's okay.
23 BY MR. HOWARD:
24     Q. So prior to late October 2006,
25 when the first Indian workers arrived at

1 Signal, had anyone from Signal itself,
2 that is an employee of Signal, gone to
3 India other than yourself and the
4 gentlemen who were witnessing the skills
5 test?
6     A. No.
7     Q. Do you know whether the
8 gentlemen who went to administer and
9 witness the skills tests were authorized
10 to say anything to the workers on behalf
11 of Signal?
12     A. I don't know that we
13 specifically told them they could not say
14 anything.  They were there to witness the
15 test, administer the test and witness the
16 test.
17     Q. And I asked before about the
18 welding tests.  Tests were given to
19 fitters as well; correct?
20     A. Yes.
21     Q. That's a written test?
22     A. It is a written test, yes.
23     Q. Did you on behalf of Signal or
24 anyone else on behalf of Signal, to your
25 knowledge, tell the Indian recruits who

1 received a signed version of Exhibit 381
2 that if they came to Signal and their
3 work was not to Signal's satisfaction
4 that they would be terminated and sent
5 back to India?
6     A. Could you repeat that again, the
7 first part of it.
8     MR. HOWARD:  Could you read that
9 back.
10     (The reporter read the record.)
11     A. No.
12     Q. BY MR. HOWARD:  When -- prior to
13 going to India, had you had any
14 conversations or communications with
15 Sachin Dewan?
16     A. I don't believe so.
17     Q. And you met him for the first
18 time when you got there?
19     A. Yes.
20     Q. So that was also the first time
21 you spoke with him?
22     A. As far as I remember.  I might
23 have talked to him on the phone briefly
24 but we never had any in depth
25 conversations.

1     Q. When you got there did you have
2 in depth conversations with him?
3     A. No.
4     Q. What did you discuss with him?
5     A. Just not really anything. He
6 was more of a guide taking me around to
7 the different consulates.
8     Q. Did you discuss with him the
9 H-2B Visa program?
10    A. No.
11    Q. Did you discuss with him green
12 cards?
13    A. No.
14    Q. Did he ask you any questions
15 about what Signal was going to be doing
16 with respect to green cards?
17    A. No.
18    Q. Did you have any discussion with
19 him at all about what representations
20 were being made to the workers as to what
21 would happen when they got to the US
22 vis-a-vis green cards?
23    A. No.
24    Q. Now, in late October, early
25 November 2006, workers began arriving --

*Bingle 94:11 - 23*

*Bingle 94:24-96:7, 95:2-96:7*

1     A. Yes.
2     Q. -- correct? How soon after
3 workers arrived did you come to learn
4 that they were expecting to get green
5 cards?
6     A. The day the first ones arrived.
7     Q. How did that happen?
8     A. I met -- I went to the airport
9 and met the guys at the airport and we
10 had buses arranged to bring them from the
11 airport to Signal. And I went back to
12 Signal just to give them -- you know,
13 just to talk to them and give them a face
14 to -- you know, being far from home just
15 somebody to talk to, somebody that they
16 could, you know, just if they had any
17 questions about anything that was going
18 on. And once they got to the housing
19 facility a group of them come up and said
20 when do we get our green cards.
21    Q. And what did you tell them?
22    A. At that point, I mean it kind of
23 took me by surprise that they were
24 thinking they were getting green cards
25 right away. I said, "Well, first thing

1 we've got to do is get you situated.
2 There is processes we have to go through.
3 We have to file for extensions. We have
4 to do everything in due course." And
5 that would all come, but the first thing
6 was to get everybody settled and get them
7 ready to go to work.
8     Q. And did they tell you anything
9 else in those first couple days about
10 what they had been promised when they
11 were in India?
12    A. No.
13    Q. Going back to your conversation
14 with Mr. Dewan, is it your testimony that
15 you never told them Signal would apply
16 for green cards for the workers?
17    A. Told?
18    Q. Sachin Dewan.
19    A. I don't recall if I told him
20 that or not. I don't recall having an in
21 depth conversations with Sachin about the
22 green card process.
23     Our understanding was that the
24 process was all Michael Pol and Malvern
25 and Sachin were all aware of the process.

*Bingle 96:13-25*

1     Q. How did you have that
2 understanding?
3     A. Just based on the conversations
4 with Michael and Malvern that they had
5 worked together before. They had worked
6 together as a team.
7     Q. So they told you that Sachin
8 Dewan knows the process?
9     A. Yes.
10    Q. Did the workers that you picked
11 up at the airport and brought to get
12 settled in in Mississippi tell you how
13 much money they paid in order to have the
14 opportunity to come to work for Signal?
15    A. No.
16    Q. When did you first learn how
17 much money they had paid?
18    A. I don't recall when we first
19 learned about it. John Sanders is the
20 one that brought it to our attention.
21    Q. Do you know if it was a matter
22 of days? Weeks? Months after workers
23 begin?
24    A. I don't remember.
25    Q. Do you recall the conversations

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1 or were you party to conversations at
2 Signal about terminating Mr. Pol?
3     A. Yes.
4     Q. Do you recall when those were?
5     A. Later after we found out that he
6 had lied to us about how much the guys
7 were going to pay to come over.
8     Q. And if I represent that was in
9 November of 2006, would that be
10 consistent with your general
11 recollection?
12     A. I don't recall.
13     MR. HOWARD: For the record, I am
14 showing you what has been marked as
15 Exhibit 520. It is a two-page document
16 with Bates range SIGE 0002092 to 2093 on
17 Signal International letterhead, dated
18 November 22, 2006, a letter from Ron
19 Schnoor to Michael Pol.
20         (Plaintiff's Exhibit 520 was
21 marked for identification by the court
22 reporter and said exhibit is attached
23 hereto.)
24     Q. BY MR. HOWARD: Have you seen
25 this letter before?

1     A. Yes.
2     Q. Did you see it before it went
3 out November 22, 2006?
4     A. Yes.
5     Q. Was it discussed with you by Mr.
6 Schnoor or others?
7     A. Yes.
8     Q. And who else besides Mr.
9 Schnoor?
10     A. I don't recall who else was all
11 in the conversations.
12     Q. And what were those
13 conversations leading up to this letter?
14     MS. MCARTHUR: Object to form.
15     A. That we felt we had been lied
16 to, and the Indian workers had been lied
17 to. And that it was causing dissension
18 amongst the workers keeping them from
19 doing their work. It was taking away
20 their focus and in that case it was a
21 problem for them and a problem for us
22 because they were Signal employees.
23 BY MR. HOWARD:
24     Q. In what way had Signal been lied
25 to and by whom?

1     A. We were lied to by Michael Pol
2 about the amount of money the Indians
3 paid to come over.
4     Q. At that point, that is before
5 November 22, 2006, did Signal have an
6 understanding that Mr. Pol had lied to
7 them about anything else other than the
8 money?
9     MS. MCARTHUR: Object to form.
10     A. At that point in time, I don't
11 know if we knew the process, the green
12 card process would take longer. I don't
13 recall at that point in time. I don't
14 believe this was at this point.
15 BY MR. HOWARD:
16     Q. But the lie about the money was
17 sufficient for Signal in November of 2006
18 to terminate Mr. Pol?
19     A. Yes.
20     Q. In what way did you understand
21 Mr. Pol had lied to the workers?
22     MS. MCARTHUR: Object to form.
23     A. Well, maybe he had not lied to
24 the workers. Maybe it was just that he
25 had charged them more money then he told

Bingle 101:3-5

1 us.
2 BY MR. HOWARD:
3     Q. And he charged them an amount of
4 money that Signal thought was exorbitant?
5     A. Yes.
6     Q. How did you learn about the
7 amounts of money that Mr. Pol and the
8 others had in fact charged the workers?
9     MR. ALEXIS, III: Object to form.
10     A. Some of the guys out in the camp
11 were complaining about it to John
12 Sanders.
13 BY MR. HOWARD:
14     Q. And you said it was causing a
15 problem, some dissension in the camp;
16 correct?
17     A. Yes.
18     Q. In what way was the amount of
19 fees that the workers had paid causing
20 problems?
21     A. At that point, I don't believe
22 that the guys realized that Signal was
23 not involved in how much money they paid.
24 They thought that we were more involved
25 in bringing them over then we really

26 (Pages 98 to 101)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1    3,000?
2       MS. MCARTHUR:  Object to form.
3       A.  No, he did not.
4  BY MR. HOWARD:
5      Q.  Going back to Mr. Sanders notes
6  preceding the meeting, Signal understood
7  that the assurance of the green card is
8  what they relied on to come to Signal?
9       MR. ALEXIS, III:  Object to form.
10     MS. HANGARTNER:  Are you asking him
11  for the best of his knowledge or to refer
12  to this?
13     MR. HOWARD:  I'm asking him whether
14  his knowledge going into the meeting with
15  Mr. Pol was consistent with the notes
16  from Mr. Sanders.
17     Q.  BY MR. HOWARD:  Whether going
18  into that meeting you understood that the
19  reason the Indian workers had come to
20  Signal was the assurance of a green card?
21     MR. ALEXIS, III:  Object to form.
22     A.  My understanding was that they
23  came over here because we paid higher
24  wages, and they come over under the
25  process.  Once I saw this, then yeah, I

1  mean we found out that some of the guys
2  said that they only came because they
3  were getting a green card.
4  BY MR. HOWARD:
5      Q.  Did that cause you concern?
6      A.  I don't recall if it caused me
7  concern since we were planning on going
8  for the green cards.
9      Q.  Even as of November 20th, were
10  you planning on going for the green cards
11  for every worker that was coming from
12  India?
13     A.  Again, under the same basis as
14  before as long as they met Signal's
15  expectations, yes.
16     Q.  So if they did not meet Signal's
17  expectations Signal would not go for
18  their green card?
19     A.  That's correct.
20     Q.  Did you ever think as of
21  November 2006, when there are still
22  Indian workers over in India that have
23  not yet come, that if they are only
24  coming here to get the green card and
25  there is a chance they are going to pay

*[handwritten note, boxed in red:]* Bingle 115:9-19; 115:9 - 118:5

1  all these fees, $15,000 a person to come
2  here, and if they don't work out Signal
3  is going to send them home and not file
4  for a green card for them maybe it is
5  better to not bring them at all?
6     MS. HANGARTNER:  Object to form.
7     MR. ALEXIS, III:  Object to form.
8     Q.  Did I think that at the time?
9  BY MR. HOWARD:
10     Q.  Correct.
11     A.  Based on what we knew at the
12  time if they paid that much money to come
13  here based on the amount of time the
14  extensions and everything they could have
15  worked, then you know it would -- still
16  would have been profitable for them to be
17  here.  They were -- they could pay off
18  what they owed and made a little bit of
19  money.
20     Q.  So you were making an economic
21  decision on their behalf?
22     A.  I'm making an economic
23  decision -- well, yes, at that point
24  that's all we could go on.  They were
25  already here and had already paid the

1  money.
2     Q.  I am talking about the ones that
3  were not here yet.
4     A.  The ones that weren't there had
5  still paid some of the money.  We did not
6  know at that point how much.  So, yes, we
7  were making an economic decision.
8     Q.  Okay.  Just so I understand.
9  You were deciding on behalf of the people
10  who had not yet come that they had
11  already paid money which you assumed
12  would not be refunded; correct?
13     A.  That is correct.
14     Q.  And that was an assumption on
15  your part?
16     A.  Yes.
17     Q.  And you thought to yourself,
18  well, even if they don't ultimately work
19  out and we don't get them the green card,
20  and even though we know that that is what
21  they are coming for for the green card we
22  will pay them enough that they will be
23  able to pay back the recruiting fees and
24  maybe make a little bit of money so it is
25  worth it to them, so we will keep

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    bringing them in.
2         MS. HANGARTNER:  Object to form.
3    BY MR. HOWARD:
4         Q.  Is that what you telling me?
5         A.  Yes.
6         Q.  Do you see in Mr. Sanders' notes
7    that he said that workers took out loans
8    from family members, or else pledged
9    houses, land, farms, et cetera as
10   collateral to money lenders.
11        MS. HANGARTNER:  Alan, which page?
12        MR. HOWARD:  The first page.  It is
13   2084.  They are out of order.
14        MS. HANGARTNER:  Thank you.
15   BY MR. HOWARD:
16        Q.  Did Mr. Sanders indicate that
17   fact to you as well going in to the
18   November 20th meeting?
19        A.  I was probably given a copy of
20   this.  I don't recall all the details.
21        Q.  Now, it says in the second page,
22   front on which M. Pol is wrong.  And
23   under the heading Signal, the first
24   bullet point is not providing us with the
25   best workers, only those that paid the

1    money.  Was that your feeling in November
2    2006?
3         A.  Some of the guys that come over
4    that -- that yes.
5         Q.  Okay.  So already by November
6    2006, you had an indication that the
7    workers who were being recruited from
8    India were not the best workers and were
9    not what you had expected; correct?
10        A.  That's correct.
11        Q.  So did you already have an
12   indication by November 2006, that some of
13   these workers were not going to work out
14   and you would not be filing for green
15   cards for them?
16        MS. HANGARTNER:  Object to form.
17        A.  No.
18   BY MR. HOWARD:
19        Q.  What was your thinking what
20   would be done with these people that were
21   not the best workers?
22        A.  That we would work with them and
23   try to get their skills -- get their
24   skill levels up.
25        Q.  And if they could not get their

1    skill levels up?
2         A.  Then if they could not get their
3    skill levels up then they would be
4    terminated.
5         Q.  Did these workers include
6    welders and fitters who had taken the
7    tests administered and overseen by Signal
8    employees?
9         A.  Yes.
10        Q.  Did you have an understanding
11   why they were able to pass the tests in
12   India and yet were not turning out to be
13   the best workers when they got to Signal?
14        A.  We had various -- we thought
15   different things.  We did not know
16   exactly why.
17        Q.  Did you ever come to an
18   understanding as to why?
19        A.  Some of them just were not the
20   guys that tested.  Some of them did not
21   test at all.
22        Q.  How do you know that?
23        A.  Well, we don't know that they
24   did not test, but some of the guys just
25   -- I mean, if they passed the test over

1    there their skill level when they got
2    here there was no way that they could
3    have passed the test over there and then
4    come over here and perform at such a low
5    level.
6         Q.  And you knew this in November
7    2006?
8         A.  I don't recall exactly.  I mean,
9    we had a lot of people coming in and we
10   had a lot of works.  I don't know that --
11   I mean, we worked with everybody so they
12   had some skills.
13        Q.  But in November 2006, is it fair
14   to say there was some dissatisfaction
15   with the workers that were coming?
16        A.  Yes.
17        Q.  And there was even speculation
18   on your part that there may have been
19   some shenanigans in India as far as who
20   is taking the test and who is coming
21   here?
22        A.  Yes.
23        Q.  And who else was involved in
24   that testing besides Signal
25   representatives, was that Sachin Dewan?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    A.  Yes.
2    Q.  Did you have a concern that
3  maybe Dewan was not being totally upfront
4  with this process?
5    A.  Yes.
6    Q.  And you had that concern as of
7  November 2006?
8    A.  As far as I remember.
9    MR. SHAPIRO:  Object to form.
10  BY MR. HOWARD:
11    Q.  Why did you continue to work
12  with him?
13    A.  Because we were -- at this point
14  in time all the guys we were still
15  working with them and there was, you
16  know, I mean, the guys had already paid
17  the money, a lot of the money, and they
18  already were just, you know, close to
19  getting their visas and paying their
20  final money to come over.
21    Q.  You understood that Sachin Dewan
22  was your agent over there, didn't you?
23  I'm not just talking about a legal term.
24  I'm just talking -- he is working on your
25  behalf.

1    MS. HANGARTNER:  Object to form.
2  BY MR. HOWARD:
3    Q.  Correct?
4    A.  Yes.
5    Q.  Signal gave him a power of
6  attorney?
7    A.  Yes.
8    Q.  And you had suspicions that
9  Signal -- that he is not doing things
10  that are right; correct?
11    A.  That's correct.  If it was at
12  that -- at some point in time.  I don't
13  recall if it was exactly this point in
14  time.
15    Q.  Why didn't Signal revoke the
16  power of attorney and tell him or say you
17  are working on our behalf, you refund
18  that money.  We don't want to work with
19  you anymore.  We don't want to be
20  party to this.
21    A.  After the Michael Pol incident
22  we did talk to Sachin and Malvern both
23  and had came up with another agreement to
24  work with both of them.
25    Q.  I will show you those in a

1  minute.  But you were not prepared to
2  take the step and terminate them in
3  November 2006; correct?
4    A.  That's correct.
5    Q.  Whose decision was that?
6    A.  I don't recall.
7    Q.  Were you party to that decision?
8    A.  I am sure I was in discussions.
9    Q.  Ultimately who made the
10  decision, was that Mr. Schnoor or Mr.
11  Marler?
12    A.  Mr. Schnoor.
13    Q.  Um... the third bullet point
14  under Signal on page two says, "unhappy
15  workers, dissension not fair after we
16  spent several million and have by our
17  estimate the best camp in the world."
18  And I can't read the rest.  I see WOR.
19  You are talking about the millions Signal
20  spent on the camp; correct?
21    A.  That's correct.
22    MS. HANGARTNER:  Object to form.
23    MR. ALEXIS, III:  Object to the form.
24    MS. HANGARTNER:  Again, he is not the
25  author of the document.

1    MR. HOWARD:  Fair.  Fair enough.
2    Q.  BY MR. HOWARD:  But to your
3  understanding Signal spend millions of
4  dollars building the camps?
5    A.  Yes.
6    Q.  And those camps were built
7  specifically for the Indian workers;
8  correct?
9    A.  That's correct.
10    Q.  And the Indian workers were
11  charged a deduction from their wage?
12    A.  Yes.
13    Q.  A daily fee of $35?
14    A.  Yes.
15    Q.  And that was to pay for the
16  operation of the camp and the food?
17    A.  Yes.
18    Q.  And to help Signal recoup the
19  investment of the several million
20  dollars; correct?
21    A.  Yes.
22    MR. HOWARD:  Why don't we take a
23  break at this point.
24    VIDEOGRAPHER:
25    We are going off the record.

1    each Indian worker in Pascagoula and
2    Orange Texas?
3        A.  Yes.
4        Q.  Did you know that Signal was
5    making that request?
6        A.  Once I saw the letter I did,
7    yes.
8        Q.  When did you see the letter?
9        A.  I don't recall when I saw the
10   letter.  I was not involved in the
11   discussions, in these discussions.
12       Q.  But you saw the letter in the
13   ordinary course, you know, sometime after
14   it was sent?  That is not in preparation
15   for deposition, but some time near the
16   time it was sent?
17       A.  Yes.
18       Q.  Do you know whether Sachin Dewan
19   and Malvern Burnett agreed to return
20   $1,000 each to each worker?
21       A.  No.
22       Q.  You don't know?
23       A.  I don't know if they did.
24       MR. ALEXIS, III:  Object.
25   BY MR. HOWARD:

1        Q.  You don't?
2        A.  No.
3        MR. SHAPIRO:  What was the answer to
4    the question?
5        A.  The answer was no.
6    BY MR. HOWARD:
7        Q.  In the third paragraph is says,
8    "Signal recognizes Mr. Pol's dishonesty
9    is not the fault of Dewan Consulting or
10   Burnett Law Offices."  Did you have
11   discussions with Mr. Schnoor about that
12   issue?
13       A.  No.
14       Q.  Do you know why he said that?
15       A.  No.
16       Q.  Do you agree with that?
17       MR. ALEXIS, III:  Object to form.
18       MS. HANGARTNER:  Are you talking now
19   or when he -- the first time he read the
20   letter?
21   BY MR. HOWARD:
22       Q.  Well, what about now?
23       MR. ALEXIS, III:  Same.
24       A.  Now?  Can you restate the
25   question.

1    BY MR. HOWARD:
2        Q.  Sure.  Do you agree with the
3    suggestion or the statement made in this
4    letter by Mr. Schnoor that Mr. Pol's
5    dishonesty is not the fault of Dewan
6    Consulting or Burnett Law Offices?
7        MR. ALEXIS, III:  Same objection.
8        A.  I don't know what drove Mr. Pol
9    to dishonesty.  I mean it's --
10   BY MR. HOWARD:
11       Q.  Do you believe that Mr. Dewan or
12   Mr. Burnett were dishonest with Signal in
13   any way?
14       A.  Yes.
15       Q.  How?
16       MR. ALEXIS, III:  Object to form.
17       A.  As of this time, yeah.  I mean,
18   as of now.  Yes.
19   BY MR. HOWARD:
20       Q.  How?  In what way?
21       MR. SHAPIRO:  Object to form.
22       A.  In later documents we have not
23   talked about yet where they agreed they
24   would represent Signal, it would show
25   Malvern Burnett was working with some of

1    the guys on the side to take them away
2    from Signal and put them with other
3    companies where they could get a green
4    card faster.  There had been some kind of
5    deal where they filed previously or
6    something and that was working out at
7    that point in time.
8    BY MR. HOWARD:
9        Q.  In the recruiting process in
10   India prior to the workers coming to work
11   for Signal, do you believe that Malvern
12   Burnett or Sachin Dewan were dishonest
13   with Signal in any way?
14       MS. HANGARTNER:  And, again, you are
15   speaking now?
16       MR. SHAPIRO:  Object to form.
17   BY MR. HOWARD:
18       Q.  Now, what you know now?
19       A.  Now, yes.
20       Q.  In what way?
21       A.  They promised the workers they
22   would get green cards.  I mean, you can't
23   promise a guy is going to get a green
24   card and you can't promise it's going to
25   be approved.  You don't know.

Bingle
133:9 -
134:22

34 (Pages 130 to 133)

1    Q.  Well, to the extent they
2  promised every worker that Signal would
3  apply for green cards for every worker
4  was that dishonest?
5    MR. ALEXIS, III:  Object to form.
6  BY MR. HOWARD:
7    Q.  Based on what you know now?
8    A.  Based on what I know now, yes.
9    Q.  In what way?
10    A.  We would only apply for their
11  green card if they were good workers, if
12  they were skilled, highly skilled
13  workers.
14    Q.  So to the extent the promise
15  that Signal was going to apply for green
16  cards for every worker from whom Sachin
17  Dewan, Michael Pol, and Malvern Burnett
18  collected recruiting fees that was a
19  false promise?
20    MR. SHAPIRO:  Object to form.
21    MR. ALEXIS, III:  Object to form.
22    A.  Now, yes.
23  BY MR. HOWARD:
24    Q.  Well, was it a -- when did it
25  become a false promise?

1    A.  When the guys that --
2    MR. SHAPIRO:  Object to form.
3    A.  When the guys that were brought
4  over here did not meet the requirements
5  that Signal stated and required.
6  BY MR. HOWARD:
7    Q.  And that happened as early as
8  November 2006?
9    A.  We had some communications, yes.
10    Q.  And is it correct that by March
11  of 2007, Signal had made the
12  determination that there were going to be
13  some workers for whom Signal would not
14  even offer Visa extensions?
15    A.  Yes.
16    Q.  When was that determination
17  made?
18    A.  I don't recall the exact date.
19  I mean, once we found out that some of
20  the guys just could not do work that was
21  commensurate with the minimum amount
22  required for us to pay by the prevailing
23  wage we realized we could not keep those
24  guys.
25    Q.  When you say "the prevailing

Bingle
135:10-15

1  wage" are you talking $18 an hour?
2    A.  No, there was a prevailing wage
3  that we are requiring to pay by the Visa
4  process and it was 12 dollars and
5  something.
6    Q.  And there were some workers that
7  Signal was not prepared to pay that wage?
8    A.  That is correct.
9    Q.  Was every worker that came over
10  to Signal in this recruiting process
11  subject to the qualification that if you
12  don't work out we are not going to apply
13  for a green card for you?
14    MS. HANGARTNER:  Object to the form.
15    A.  When you say "subject to" what
16  do you mean by that?  I mean --
17  BY MR. HOWARD:
18    Q.  Every worker who was -- there
19  was -- would you agree with me there was
20  not a single worker brought over where if
21  it turned out that they were not up to
22  Signal's standards as far as their work
23  goes, Signal would not apply for a green
24  card on their behalf?
25    A.  Yes.

1    Q.  Is it also correct that as of
2  March 2007, Signal made the determination
3  that workers who were competent
4  skill-wise, but were somehow disruptive
5  in the man camp would not -- Signal would
6  not apply for a green card for them?
7    A.  No.
8    MS. HANGARTNER:  Object to form.
9  BY MR. HOWARD:
10    Q.  At any time was Darrell Snyder
11  asked by you for names of workers who
12  were disruptive in the man camp for
13  purposes of not having their Visas
14  extended?
15    A.  I don't recall.
16    Q.  If he testified that he was
17  asked to provide such names, would you
18  have a basis to disagree with that
19  testimony?
20    MS. HANGARTNER:  Form.
21    A.  No.
22  BY MR. HOWARD:
23    Q.  Do you recall -- but you don't
24  recall giving him that direction
25  yourself?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    The time is 12:17 p.m.
2        (Lunch recess.)
3        VIDEOGRAPHER:
4            We are back on the record.  The
5    time is 1:41 p.m.
6    BY MR. HOWARD:
7        Q.  Good afternoon, Mr. Bingle.
8    Before the lunch break I provided you
9    with a copy of what has been marked
10   Exhibit 524, which again for the record
11   is a rough transcript done by of an
12   audio file that had been previously
13   produced of a meeting for the Indian
14   workers, at which Ronny Schnoor and
15   Malvern Burnett gave addresses.  Have you
16   had an opportunity to review the
17   document?
18       A.  Yes.
19       Q.  Based on the transcript --
20       MR. ALEXIS, III:  Alan, I apologize.
21   Just to make it easier, I am going to
22   object to this whole line of questioning
23   and make it continuing so you can ask
24   your questions without interruption; is
25   that okay?

1        MR. HOWARD:  That's fine.  Thank you,
2    Ralph.
3        MS. HANGARTNER:  And I will reiterate
4    my objection as well.
5        MR. HOWARD:  That is fine.
6        Q.  BY MR. HOWARD:  Based on your
7    reading of the transcript, do you know
8    whether you were in attendance at this
9    meeting?
10       A.  Yes, I was.
11       Q.  Who else from Signal was there,
12   to your recollection?
13       A.  Just Ron and I were there, and
14   according to this transcript Chris was
15   there.  So I do recall Chris being there.
16       Q.  That is Chris Cunningham, the
17   Signal CFO?
18       A.  Yes.
19       Q.  And was Mr. Burnett there?
20       A.  Yes.
21       Q.  Was anyone else there other than
22   the Indian workers?
23       A.  I don't recall.
24       Q.  Where did this meeting take
25   place?

1        A.  At the housing facility.
2        Q.  In Mississippi?
3        A.  Yes.
4        Q.  Were all the workers from
5    Mississippi there?
6        A.  I don't know if all of them were
7    there because we work two shifts.  Some
8    of them might have been working.  I don't
9    know.  At some point in time we might
10   have given them some time off so
11   everybody could be here.  This might have
12   been one of those times.  We did that
13   every so often.
14       Q.  Was a similar -- so was the
15   address given only one time or did you do
16   one for the day shift and one for the
17   night shift?
18       A.  I think this one probably would
19   have been done for both shifts.  We
20   probably would have held the night shift
21   from going in.
22       Q.  Were any workers excluded from
23   the meeting?
24       A.  No.
25       Q.  Were any workers for whom --

1    well, as of this point in time March
2    2007, had there already been
3    consideration at Signal not to extend the
4    Visas of certain workers?
5        A.  Is the date on the top of this
6    the date this actually took place?
7        Q.  I believe so.  March 12th.
8        A.  Then at this point in time we
9    would have already terminated some
10   employees.
11       Q.  You would have terminated some
12   and you would have also been considering
13   not extending the Visas of others;
14   correct?
15       A.  We would have been discussing
16   it.
17       Q.  Would the people whom you were
18   discussing not extending their Visas
19   nonetheless invited to this meeting?
20       A.  Yes.
21       Q.  Was a similar meeting held with
22   the Texas workers?
23       A.  I don't know.
24       Q.  Do you know whether any
25   instructions were given by Ron Schnoor

38 (Pages 146 to 149)

1　the guys were scared into thinking they
2　would get fired they would run.
3　　Q.　Was there efforts made to
4　conceal from the workers the fact that
5　they were being evaluated for
6　consideration whether extensions would be
7　given?
8　　A.　I don't know that we concealed
9　it from them.　I don't know that we went
10　out and told them specifically why we
11　were doing what we were doing.
12　　Q.　As a matter of fact just a few
13　days before this Mr. Schnoor had assured
14　all of the workers in the Mississippi
15　camp that they were the long-term
16　solution; correct?
17　　MS. HANGARTNER:　Object to form.
18　　A.　I don't know if that is exactly
19　what he said.　But he said the ones that
20　were the long-term solution were the guys
21　that would be, you know, work with us.　I
22　mean, you would have to ask him what his
23　intent was in that statement.　I did not
24　make the statement.　I don't know what
25　his intent was.

1　BY MR. HOWARD:
2　　Q.　Well, you would agree thought
3　that Signal did not take the initiative
4　or take the steps in mid March 2007 to
5　actually tell the Indian workers, look,
6　for those of you who just don't get up to
7　snuff with your work or for whatever
8　reason we are not going to choose to
9　exercise your extensions.　You did not
10　tell them that?
11　　A.　Not in mid March until we did
12　this evaluation.
13　　Q.　As a matter of fact, they were
14　not told until the very end of June;
15　correct?
16　　A.　I don't know when they were
17　told.
18　　Q.　Um... Mr. Schnoor wrote back to
19　you, Bing agreed and the extension is
20　leverage we could use to incentive to
21　improvement in skill and attitude.　Do
22　you know what he meant by that?
23　　A.　No.
24　　Q.　Did you ask him what he meant by
25　that?

1　　A.　No.
2　　Q.　Did you have an understanding
3　reading that one sentence what he meant
4　by that?
5　　MS. HANGARTNER:　Understanding now or
6　understanding at the time?
7　BY MR. HOWARD:
8　　Q.　Understanding at the time?
9　　A.　At the time, I mean, I had a
10　basic idea what he was talking about,
11　which was to, you know, tell the guys if
12　you want to get your skill level up.　I
13　mean a lot of guys in the workforce when
14　you talk about attitude I think you are
15　confusing a lot of the attitude.　The
16　attitude on the work force, some of the
17　guys just did not want to learn what they
18　were out there to do.
19　　Q.　So you read the attitude there
20　to be workplace attitude as opposed to
21　man camp attitude?
22　　A.　That's correct.
23　　Q.　The question was:　In what way
24　was the extension to be used by Signal as
25　leverage to give an incentive in

1　improvement in skill and attitude?
2　　A.　If we wanted to use it as
3　leverage we could go to the guys and say,
4　look, your skills out there are not
5　improving and you need to -- you are not
6　as productive as you need to be.　You
7　need to take the initiative to go ahead
8　and get your skill level up.
9　　Q.　But did you tell them in that
10　context as the leverage you need to do
11　this in order to get a Visa extension?
12　　A.　Did I tell them that?
13　　Q.　Correct.
14　　A.　No.
15　　Q.　Did you instruct anybody else to
16　tell them that?
17　　A.　No.
18　　Q.　If you were not going to tell
19　them about the extension because you were
20　afraid that they were scared they weren't
21　going to get it they would abscond, why
22　did Mr. Schnoor telling you to use the
23　extension as leverage?
24　　MS. HANGARTNER:　Object to form.
25　Speculation.

Bingle
165:18 - 166:21

Elisa Dreier Reporting Corp.　(212) 557-5558
950 Third Avenue, New York, NY 10022

1      A.  That's -- sometimes Ron says
2  things that -- they are suggestions that
3  may or may not be followed.
4  BY MR. HOWARD:
5      Q.  In this case your testimony is
6  you did not follow your boss's
7  suggestion?
8      A.  No.
9      Q.  Now, would you agree with me
10  that part of Signal's incentive in having
11  workers improve their skill level to the
12  point where they could be extended, have
13  their Visa extended, was an economic
14  decision for Signal because if Signal
15  lost those workers replacing them would
16  be more expensive for Signal?
17      A.  Yes.
18      Q.  These Indian workers were
19  cheaper than the contract workers with
20  whom you would have to replace them?
21      A.  Yes.
22      Q.  And that was part of the
23  thinking in the process of trying to
24  improve their skill level?
25      A.  Part of the process, yes.

1      MR. HOWARD:  Mr. Bingle, I'm showing
2  you another document, which has been
3  marked 525.  It is a multipage document
4  Bates range SIGE 00057052 through 058.
5  It is an e-mail that goes for two pages
6  from March 2007, with an attachment of
7  Indian worker names and indications under
8  column extend.
9      (Plaintiff's Exhibit 525 was
10  marked for identification by the court
11  reporter and said exhibit is attached
12  hereto.)
13      Q.  BY MR. HOWARD:  Do you recognize
14  this document?
15      A.  Yes.  Excuse me.
16      Q.  And did you write the e-mail
17  March 21st, 2007?
18      A.  Yes.
19      Q.  Subject:  Indians.  And in that
20  e-mail you say, "the intent of this is to
21  take marginal candidates and make them
22  stronger by way of offering guidance and
23  opportunities to practice their
24  deficiencies so we can make first-class
25  workers out of as many as possible,

1  thereby minimizing the need for expensive
2  contract workers."  And that was your
3  thinking at the time?
4      A.  Yes.
5      Q.  Was there any consideration
6  given in your thinking to getting workers
7  up to speed in their skill level so that
8  their Visas could be extended?  The
9  promises that had been made to the
10  workers to bring them over to this
11  country?
12      MR. ALEXIS, III:  Object to form.
13      A.  Could you read that question
14  back to me, please.
15  BY MR. HOWARD:
16      Q.  Sure.  Let me rephrase it.  In
17  making the decision to give the bubble
18  guys an opportunity to improve their
19  skills so they would have their Visas
20  extended by Signal, did you give any
21  consideration to the promises that had
22  been made to these workers to bring them
23  over to this country or was it strictly
24  an economic decision for Signal?
25      A.  It was probably a little of

1  both.  And when you talk about the bubble
2  guys, it was the bubble guys and the guys
3  that were nos at the time that we
4  intended to bring along, it was not just
5  the bubble guys.
6      Q.  For all of those guys then, it
7  was then part of your consideration that
8  promises had been made to them, we got to
9  do what we can to be in a position to
10  extend their Visas; right?
11      A.  To do what we can, yes.
12      Q.  But for some of them you decided
13  no at the end of the day; is that right?
14      A.  I don't recall what we -- you
15  know, whether we terminated any more and
16  sent them home after this I don't recall.
17      Q.  Were there any for whom -- I'm
18  sorry.  Were there any that you told in
19  July we are not exercising your Visa
20  extension?
21      A.  I don't recall.
22      Q.  Who would know that?
23      A.  Probably Malvern or whoever
24  whenever we did the Visa extensions.  I
25  would have to look at a list to know for

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1   sure.
2      Q. Well, he was authorized by you
3   to do the Visa extensions for everybody;
4   right?
5      A. Right.
6      Q. And you were going to take the
7   decision at Signal as to whether to tell
8   the workers that got the Visa extension
9   whether they could keep working for you;
10   right?
11      A. Right. But we had a lot of guys
12   that quit between -- that absconded
13   between, you know, starting at this point
14   in time started leaving.
15      Q. And isn't it a fact that some of
16   those guys were absconding because they
17   found out that they were being evaluated
18   and their Visas might not get extended at
19   all by Signal?
20      A. I don't know why they left.
21      Q. That was a concern you had up
22   front and why you did not want to tell
23   them about this; right?
24      A. It was a concern.
25      MS. HANGARTNER: Object to form.

1   BY MR. HOWARD:
2      Q. What was the percentage
3   breakdown, if you know, offhand? And I
4   don't need you to do a calculation how
5   many yes's and how many no's?
6      A. I don't know. I would have to
7   look at it and give you a breakdown.
8      Q. But whatever is reflected on the
9   chart under the column "extend" and the
10   yes's are the yes's and the no's are the
11   no's?
12      A. At that point in time, yes.
13      Q. Would you agree that the
14   evaluation process by which the Indian
15   workers were judged was a subjective one?
16      A. Subjective meaning what?
17      Q. Well, that they were not given a
18   test pass/fail, they were evaluated on a
19   host of criteria according to Signal and
20   given a subjective score?
21      A. Yes.
22      Q. And who participated in that
23   scoring process?
24      A. The individual guys foremen and
25   their superintendents.

1      Q. Did you have input into that
2   process?
3      A. No.
4      Q. You just accepted their
5   recommendations?
6      A. We talked about some of them. I
7   mean, I went through and looked at them
8   and asked them for certain guys if they
9   had comments and I would go back and talk
10   to them about the comments to see what we
11   could do to, you know, just to make sure
12   everything was right.
13      Q. What additional training was
14   provided for the nos and bubble guys?
15      A. It just depends on what the guy
16   was. We had a training center that they
17   could go and do after-hours training on
18   fitting or welding or whatever their
19   craft was or whatever their skill level
20   was.
21      Q. I mean, were there official
22   classes set up or was this on-the-job
23   training?
24      A. No. It was not on-the-job
25   training. It was after-hours training

1   where they could and work with our --
2   work with some guys and get their skill
3   level up. And some of it was on-the-job
4   training. A lot of what we do is
5   on-the-job training.
6      Q. Were they paid for the hours
7   they were given this training after the
8   job?
9      A. No.
10      Q. And was that after-hours
11   training for which they are not paid kind
12   of a prerequisite for them to become a
13   yes?
14      A. No.
15      Q. So if they said they would not
16   do the training would they become a yes
17   from a no?
18      A. If they -- if their skill level
19   improved by being on the job every day.
20      Q. How long a process was
21   envisioned? Like were you just going to
22   train them from March until the Visa
23   extension deadline ended or was there a
24   set time that you had in mind we have to
25   make a decision yes or no?

44 (Pages 170 to 173)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1  MS. HANGARTNER:  Object to form.
2  MR. ALEXIS, III:  Object to form.
3  A.  I don't know that I thought
4  about it in that context at that point in
5  time.
6  BY MR. HOWARD:
7  Q.  Did your thinking about green
8  cards for the H-2B workers change over
9  time?
10  MR. ALEXIS, III:  Object to form.
11  A.  Not particularly.  I mean, I
12  don't think so.
13  BY MR. HOWARD:
14  Q.  You testified this morning that
15  in the first bus ride over to Mississippi
16  with the workers from the airport in late
17  October '06 or early 2007 you told all of
18  those workers we were going to take care
19  of the filings for you; correct?
20  A.  Yes.
21  Q.  Subsequent to that did you ever
22  have any conversations with any of the
23  workers where you indicated to them a
24  change in position by Signal that it was
25  not going to file paperwork for all of

Bingle
182:14 -20;
182:14-183:6;
182:21-183:6

1  the workers?
2  A.  No.
3  Q.  Why not?
4  A.  Never had the opportunity, I
5  guess, or did not see the need to tell
6  them.
7  MR. HOWARD:  Let's go off the record.
8  VIDEOGRAPHER:
9  Going off the record.  The time
10  is 2:20 p.m.
11  (Brief recess.)
12  VIDEOGRAPHER:  We are back on the
13  record.  The time is 2:21 p.m.
14  BY MR. HOWARD:
15  Q.  Mr. Bingle, do you recall ever
16  hearing from John Sanders either by
17  e-mail or in person.  And I just want to
18  preface that telling you the document is
19  an e-mail on which you are not copied.  I
20  am not going to quiz you on something and
21  then show you an e-mail.  I only have a
22  one copy.  It was previously marked
23  Exhibit 390.  So rather then go through
24  the whole process of reviewing ot I will
25  just ask you if you heard this from Mr.

1  Sanders.  And that is Mr. Sanders view as
2  of July 26, 2007, only a few days before
3  the Visas were to expire, that to date
4  Signal had not done the best job it could
5  about communication with the workers, and
6  by failing to do that it was a
7  possibility that some of the yes workers
8  will run away after July 31st, due to
9  lack of information.  Is that a concern
10  he expressed to you?
11  A.  No.
12  Q.  Mr. Sanders -- what was Mr.
13  Sanders role vis-a-vis the Mississippi
14  workers and the Texas workers; do you
15  know?
16  A.  Not in detail.  He kind of -- I
17  don't know if he took over for Darrell in
18  the camp or Darrell was after him in the
19  camp.  I think Darrell -- I don't
20  remember  how it went.
21  Q.  Do you know if he had some
22  responsibilities for Texas?
23  A.  Yes.
24  Q.  What were those?
25  A.  I mean, I know he had some.  I

1  don't know they were.  I just knew he was
2  just back and forth between the two
3  facilities.
4  Q.  Did he report to you?
5  A.  No.
6  Q.  Mr. Bingle, I want to go back to
7  an issue we touched upon this morning,
8  which were the applications for the H-2B
9  Visas to the US Government.  And I showed
10  you what was marked as, I believe,
11  Exhibit 515, which is an application that
12  you signed?
13  A.  Yes.
14  Q.  How many applications do you
15  recall signing to the US Government?
16  A.  I don't recall.
17  Q.  Would it be more than one?
18  A.  Yes.
19  Q.  Do you recall signing one on
20  behalf of unnamed fitters?
21  A.  Yes.
22  Q.  And the one we looked at was on
23  behalf of 180 unnamed fitters.  Do you
24  recall signing on behalf of 140 unnamed
25  fitters, the second one?

47 (Pages 182 to 185)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1  production aspects of all the people not
2  just Indians but all the workers.
3      Q.  As of July 2007, was it Signal's
4  intent at least on behalf of some of the
5  workers to file for permanent residency
6  for them?
7      A.  Yes.
8      Q.  Did you have an understanding
9  that Signal in July of 2007, that the
10  workers from -- the H-2B workers from
11  India wanted to stay in the United
12  States?
13      A.  Yes.
14      Q.  Would it have been an inaccurate
15  statement to tell the Government in July
16  2007, that the H-2B workers on behalf of
17  whom you were seeking an extension of
18  their H-2B Visa were going to work for
19  the prescribed dates of need and then
20  return to their home country at the end
21  of the employment?
22      MS. HANGARTNER:  Object to form.
23      MR. ALEXIS, III:  Object to form.
24      A.  Dependant on what time we
25  realized what the actual H-2B process

1  green card process, at that time we would
2  file for their Visa or their green cards,
3  but if they had to go home before that
4  then that was the intent.  I don't know
5  what the intent was at the point in time
6  when they signed the letter.  Like I
7  said, I was working with the guys in the
8  yard and not dealing with the extensions
9  and the green cards and all that.
10  BY MR. HOWARD:
11      Q.  If I were to represent to you it
12  was not until later in the year that Mr.
13  Burnett was terminated and Ms. Bollman
14  was hired by Signal, that it was after
15  July 2007, would that representation,
16  would it have been inconsistent with what
17  you knew about the workers and their
18  intent and expectation of getting a green
19  card to tell the US Government that they
20  would work for 10 more months and then go
21  back to India at the end of the
22  employment?
23      MS. HANGARTNER:  Object to form.
24      MR. ALEXIS, III:  Object.
25      A.  Again, it is just like the

1  original application.  If Malvern was --
2  at that point in time Malvern was still
3  advising us on how to proceed and that is
4  the way he said the process worked and we
5  took that at face value.
6  BY MR. HOWARD:
7      Q.  I understand your testimony that
8  you took Mr. Burnett your attorney's
9  advice at face value.  My question is as
10  a factual matter what Signal knew that
11  these workers expected about green cards
12  and permanent residency, was it an
13  inaccurate statement in July 2007, to
14  tell the Government they are only going
15  to work 10 months and then they are going
16  to go back to India?
17      MS. HANGARTNER:  Form.
18      MR. ALEXIS, III: Object to form.
19      A.  Yes.  I am going to ask for a
20  break here shortly, my back is starting
21  to tighten up.
22      MR. HOWARD:  Why don't we take one
23  now, because I might be moving on to
24  another subject.
25      VIDEOGRAPHER:

Bingle
192:7-19

1      We are going off the record.
2  The time is 2:33 p.m.
3      (Brief recess.)
4      VIDEOGRAPHER:
5      We are back on the record.  The
6  time is 2:47 p.m.
7  BY MR. HOWARD:
8      Q.  Mr. Bingle, I put before you
9  Exhibit 527, a one-page document Bates
10  SIGE 0356221.  It's a Nov 17, 2006,
11  e-mail from Lisa Spears to Michael Pol,
12  Malvern Burnett, Sachin Dewan.  Copying
13  John Sanders.
14      (Plaintiff's Exhibit 527 was
15  marked for identification by the court
16  reporter and said exhibit is attached
17  hereto.)
18      It says, "Michael, Malvern, and
19  Sachin, in the attached you will note
20  that Bill had requested a copy of all
21  signed documents.  To date I have
22  received none."  Do you recall making a
23  request to get signed documents signed on
24  Signal's behalf by any other party?
25      A.  I don't recall making the

49 (Pages 190 to 193)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1  request, but obviously I did.
2      Q.  Do you recall there being an
3  issue in this November 2006 time period,
4  the same time you are about to have the
5  meeting with Michael Pol that Signal had
6  not received documents that had been
7  signed on Signal's behalf by Global
8  Resources or any of the other entities
9  with whom you were doing business?
10     A.  Do I recall discussion -- what?
11     Q.  Discussions or the issue you
12  were having problems getting documents
13  that these other parties had signed on
14  Signal's behalf?
15     A.  I don't recall discussions to
16  that effect, no.
17     Q.  Do you recall that issue coming
18  up at all?
19     A.  Not really, no.
20     Q.  Do you recall why you wanted to
21  see documents that had been signed on
22  behalf of Signal?
23     A.  No.
24     Q.  Mr. Bingle, did you have any
25  involvement in the decision to build man

1  camps to house the Indian H-2B workers?
2      A.  Yes.
3      Q.  What was your involvement in
4  that decision?
5      A.  It was just a discussion on
6  whether we should do it, why we would do
7  it, and things like that.
8      Q.  Who did you have that discussion
9  with?
10     A.  That would have been with Ron
11  and probably Chris Cunningham, the CFO.
12     Q.  Whose decision was it to build
13  the man camps?
14     A.  I don't know if I know exactly
15  whose decision it was.  It was probably
16  Ron's decision with approval from Chris
17  and Dick.
18     Q.  That is Dick Marler?
19     A.  Yes.
20     Q.  The -- did you have approval
21  authority over that decision?
22     A.  No.
23     Q.  What input did you give to that
24  decision?
25     A.  I don't recall specifically.

**Bingle**
**195:12-19**

1      Q.  I mean, were you in favor of
2  building man camps?
3      A.  Yes.
4      Q.  For what reason?
5      A.  To give the guys a place to live
6  when they got here.  We knew after
7  Katrina that the housing market in the
8  area was very depressed, and rather than
9  have the guys try to go out and find a
10  place to stay we could provide it for
11  them.  Plus it would help the local
12  community be more accepting of the guys
13  coming in if they were not taking up
14  housing that the local people needed to
15  use while they were rebuilding their
16  homes.
17     Q.  Did you have involvement in the
18  practical processes, hiring GE, and the
19  actual building of the camp?
20     A.  No.
21     Q.  Did you have any knowledge of
22  what went on in that regard?
23     A.  I had basic knowledge of the
24  fact that it was being done; that we were
25  getting prices from different people and

1  things like that.
2      Q.  Did you have any involvement in,
3  for example, assurances that the camp
4  would comply with OSHA?
5      A.  Did I have --
6      Q.  Involvement with that?
7      A.  Yeah, I mena that was always a
8  discussion that we would be in full
9  compliance with all regulations.
10     Q.  Do you know how Signal complied,
11  if it did, with the regulations with
12  respect to the man camp?
13     A.  We got the -- we had the City
14  come out and inspect it.
15     Q.  Did OSHA ever inspect it?
16     A.  No.
17     Q.  Do you know what OSHA
18  requirements are for living space for
19  workers?
20     A.  No.
21     Q.  Do you know what issues, if any,
22  Signal faced in making these trailers
23  OSHA compliant?
24     A.  No.
25     Q.  Who would have been involved in

1    Q.  Complaining about the number of
2  workers in the trailers?
3    A.  Yes.
4    Q.  Were some of the trailers up to
5  -- they had a capacity of 24 workers per
6  trailer; correct?
7    A.  I don't recall the exact
8  numbers.
9    Q.  Do you know the number of
10  workers maximum that were in each
11  trailer?
12    A.  No.
13    Q.  Would you agree that it was a
14  general complaint among the workers of
15  the conditions and the food?
16    A.  It was a -- I would not say a
17  constant complaint.  I don't know if it
18  was general complaint amongst all of
19  them.
20    Q.  You had an understanding that
21  there were workers who would prefer to
22  live away from the camp; correct?
23    A.  Yes.
24    Q.  Did you also have an
25  understanding that these workers could

1  not afford to live away from the camp if
2  they also had to pay $1,000 a month to
3  Signal for the camp?  You understood
4  that; right?
5    A.  It depends on how many of them
6  went and got a place to live and what it
7  cost them.  I wasn't -- I don't know
8  exactly.  You know?
9    Q.  Did you have a general
10  understanding that these workers were
11  financially strapped including based on
12  the recruiting fees and debt they
13  incurred to come to work at Signal?
14    MS. HANGARTNER:  Object to form.
15    MR. ALEXIS, III: Object to form.
16    A.  I don't know that they were -- I
17  mean, that's a -- some of them might have
18  been.
19  BY MR. HOWARD:

Bingle 203:20-204:3

20    Q.  Did Signal understand that by
21  having a policy that required each of the
22  workers to pay Signal a thousand dollars
23  toward the man camp, even if they those
24  to live elsewhere, the effect of that
25  policy would be that the workers would be

1  financially compelled to live in the
2  camps?
3    A.  Yes.
4    COURT REPORTER:  I'm sorry, did you
5  --
6    THE WITNESS:  Yes.
7    COURT REPORTER:  Thank you.
8    MR. HOWARD:  Mr. Bingle, I am showing
9  you now what has been marked as Exhibit
10  528.  It's another series of e-mails,
11  with the Bates range SIGE 0009628 through
12  9630.
13    (Plaintiff's Exhibit 528 was
14  marked for identification by the court
15  reporter and said exhibit is attached
16  hereto.)
17    Q.  BY MR. HOWARD:  Please just let
18  me know when you've had the opportunity
19  to read theses.
20    A.  Okay.
21    Q.  These are e-mails from August
22  2007; correct?
23    A.  Yes.
24    Q.  Now, in August of 2007, this was
25  a time period when Signal was considering

1  bringing more H-2B workers in from India;
2  correct?
3    A.  Yes.

Bingle
205:4-206:12

4    Q.  And there was discussion at
5  Signal about whether these Indian workers
6  would also be required to live in the man
7  camps; correct?
8    A.  Correct.
9    Q.  And the decision was made that
10  yes they would be required to live in the
11  man camps; right?
12    A.  Yes.
13    Q.  And the reasoning for that was
14  you still had to pay off the costs of the
15  man camp; right?
16    A.  Yes.  And because of the
17  housing.  The housing situation had not
18  got much better by then.
19    Q.  But there was some housing
20  available for the Indian workers in the
21  area, wasn't there?
22    A.  There was some, yes.
23    Q.  And, in fact, what is indicated
24  in these e-mails, including specifically
25  the e-mail from John Sanders to yourself

52 (Pages 202 to 205)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    and others on August 7th, was that once
2    you filled the camp to capacity with the
3    new H-2B workers some of the existing
4    workers could live offsite on a lottery
5    basis; correct?
6        A. Yes.
7        Q. So, in other words, he was
8    contemplating having a lottery, where if
9    you won the lottery you got to live
10   outside the man camp; correct?
11       A. That is what John was saying,
12   yes.
13       Q. Did you have an understanding of
14   his proposal?
15       A. Yes.
16       Q. Did you agree with it?
17       A. I agreed that if the camp was
18   full and we had extra guys then some of
19   them might be able to live offsite. I
20   did not necessarily agree with the
21   lottery for doing it.
22       Q. But how were you going to
23   determine which ones could live offsite
24   and which ones had to stay in the camp?
25       A. I didn't have a -- we didn't

1    have an idea at that time. This was just
2    an idea of John's.
3        Q. And would you agree the idea of
4    John's was these ones who -- or whether
5    on a lottery basis or not got to live
6    offsite would not have to pay the $35 a
7    day or $1,000 a month; correct?
8        A. Correct.
9        Q. So you did not necessarily agree
10   that would be like winning the lottery
11   for these workers?
12       A. I did not think of it at that
13   point.
14       COURT REPORTER: I'm sorry.
15       THE WITNESS: I did not think of --
16   the guys winning a lottery.
17   BY MR. HOWARD:
18       Q. Those additional H-2B workers
19   never came to Signal; correct?
20       A. That's correct.
21       Q. And Signal never changed its
22   policy about charging $35 a day even if
23   you chose to live off the -- outside the
24   camp; correct?
25       A. We -- that's correct.

1        MR. HOWARD: Showing you now what has
2    been marked as Exhibit 529. Another set
3    of e-mails. Bates range SIGE 0010999
4    through 11002. These are e-mails from
5    the March 2008 time period, including
6    ones from yourself.
7        (Plaintiff's Exhibit 529 was
8    marked for identification by the court
9    reporter and said exhibit is attached
10   hereto.)
11       Q. BY MR. HOWARD: Have you had an
12   opportunity to review this?
13       A. Yes.
14       Q. Going back -- first of all, this
15   is the March 2008 time period. At this
16   point, were there indications of
17   substantial unrest in the remaining
18   Indian H-2B worker population in
19   Mississippi?
20       A. Yes.
21       Q. And you referred in your e-mail
22   of March 5th to Rhonda George, Tracy
23   Binion, Darrell Snyder, wit a re line,
24   "All quiet on the home front. No
25   rumblings. No shifting of the eyes. No

1    quiet whisperings. Question mark. What
2    are the moles saying?" What is that a
3    reference to?
4        A. Just some of the -- some of the
5    guys in the camp who were happy with
6    everything that was going on would
7    sometimes go to Darrell or Rhonda and
8    give them some information about what the
9    other guys were talking about.
10       Q. And those are who you are
11   referring to as the moles?
12       A. Yes.
13       Q. Those are other Indian workers
14   who are kind of talking about their
15   colleagues?
16       A. Yes.
17       Q. To you?
18       A. No.
19       Q. To you Signal?
20       A. To Signal, yes.
21       Q. And that information made its
22   way up to you?
23       A. Sometimes, yes.
24       Q. And in this case you were asking
25   about what they were saying?

53 (Pages 206 to 209)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1    A. Right.
2    Q. Was there anything in particular
3 happening at the time that gave you
4 suspicion that something was in the
5 works?
6    A. Yeah, sometimes we got
7 information that we were told that some
8 of the guys were going to abscond.
9    Q. Did you ever get information
10 about guys, that is Indian workers,
11 talking to lawyers or immigration
12 specialists?
13    A. Sure.
14    Q. And that had been going on for
15 quite a long time; correct?
16    A. Yes.
17    Q. And that included all the way
18 back to the previous March, just before
19 the March 9th incident with Sabulal
20 slitting his wrists; right?
21    A. Yes.
22    Q. And I promised we would get to
23 that and we will get to it shortly.
24       There is discussion if in one of
25 the e-mails from Mr. Snyder about

1 suggesting that Signal needs to be
2 prepared to terminate these guys for
3 breach of the employment agreement if
4 they balk at the $35 per day. Do you
5 know what he was talking about there?
6    A. In which part, the employment
7 agreement?
8    Q. Well, his discussion that it
9 would be a breach of the employment
10 agreement if they balked at the $35 a
11 day?
12    A. Yeah, if they said they did not
13 want to pay it.
14    Q. Well, in fact, what this is
15 about; right, isn't that if workers leave
16 the worksite, abscond, Mr. Snyder
17 suggesting they could be terminated for
18 breach of the employment agreement
19 because they are not going to be paying
20 the $35 a day; correct?
21    A. Well, if they abscond they're in
22 accordance with H-2B law, they are
23 illegals and we have to turn them in and
24 terminated their employment.
25    Q. But he is actually tying it to

1 the $35 a day payment; correct?
2    A. Yes.
3    Q. And your response on March 5th
4 to Darrel Snyder is, "Good thing about
5 the contract is that it's a payroll
6 deduct. They can complain, but they
7 can't stop it from being deducted." That
8 is a reference to the $35 a day?
9    A. Yes.
10    Q. And that was your view?
11    A. Yes.
12    Q. Mr. Bingle, I want to talk for a
13 bit about wages. The wages that were in
14 the original offer of employment that you
15 gave to workers in India, and also had
16 Mr. Dewan giving to workers on Signal's
17 behalf, said that they would be paid $18
18 an hour; correct?
19    A. Yes.
20    Q. And that was the prevailing wage
21 for first-class workers?
22    A. That was a little less. It was
23 in the range of the first-class workers.
24 It was not top money, but it was in the
25 range, yes.

1    Q. What was top money?
2    A. I believe -- I don't recall. It
3 was 18.50 or 18.75, somewhere around
4 there.
5    Q. Why was the decision made to not
6 pay them the top money, but a little
7 less?
8    A. That is normal practice we have
9 for people that we don't know. Even guys
10 from the United States, if we don't know
11 them we won't pay them top money to start
12 with. We will wait to see how they work
13 out and then give them raises as they
14 progress or show progress.
15    Q. And in the case of these workers
16 some of them did get raises; correct?
17    A. Yes.
18    Q. And others actually had their
19 salary wages reduced?
20    A. Yes.
21    Q. Correct?
22    A. Yes.
23    Q. To what level?
24    A. To the level commensurate with
25 their skills.

Bingle
213:18 -
214:16

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1    Q.  And would that be in the range
2  of 13 or 14 dollars an hour?
3    A.  Some of them probably.
4    Q.  And some of them even less?
5    A.  We could not go below the
6  prevailing wage.
7    Q.  When did you find out you could
8  not go below the prevailing wage?
9    A.  I don't recall.  But it was some
10 time before we terminated the guys in
11 March.
12    Q.  Leading up to that did you --
13 there was an issue that some of the guys
14 that were being terminated were actually
15 below the $13 an hour range; correct?
16    A.  Yes.
17    Q.  They were at about $9.00 an
18 hour?
19    A.  Yes.
20    Q.  And did you have an
21 understanding going into that process
22 that if we pay the prevailing wage there
23 is no problem.  If we pay a guy less than
24 the prevailing wage and he agrees to it
25 and does not complain no problem.  If we

1  pay a guy less and he complains it could
2  be an issue.  Do you recall that mindset
3  of yours?
4    MS. HANGARTNER:  Object to form.
5    A.  From just a purely Indian
6  standpoint, yes.
7  BY MR. HOWARD:
8    Q.  What do you mean from just a
9  purely Indian standpoint?
10    A.  From the workforce, from a whole
11 workforce as a whole, if I was paying a
12 guy that did not have 13 dollar skills 13
13 dollars because he was an H-2B guy and I
14 needed to pay him that legally to keep
15 him here, but I had other guys that were
16 working on the rig that were from the
17 United States or for contract labor from
18 another -- well, contract labor wouldn't
19 matter.  But if they were Signal direct
20 hires that I was paying only $9.00 an
21 hour to do the same job I was paying a
22 $13 an hour guy it would cause problems
23 within the workforce as a whole.
24    Q.  So you wanted to pay the Indian
25 guys less, and if the Indian guys did not

1  complain there would be no problem;
2  correct?
3    A.  If they understood they were
4  being paid that because that was their
5  skill level if they agreed to it.
6    Q.  But if they complained, why
7  would it be an issue?  Would it be a
8  legal issue because of the H-2B rules?
9    A.  Yes.
10    Q.  And how did you learn that?
11    A.  I don't recall whether I asked
12 Tracey or whether we talked to Malvern.
13 I mean, I would have asked Tracey and she
14 would have asked -- you know, she would
15 have gone into H-2B into the rules and
16 regulations at that point to try to find
17 it.
18    Q.  And so at this point you kind of
19 made a decision for these guys who you
20 thought had skill levels at a 9 dollar
21 level, which was below prevailing wage to
22 terminated them; correct?
23    A.  Yes.
24    Q.  And how many of those were
25 there?

1    A.  Six.
2    Q.  Now, are you aware that the
3  decision was made by Signal to terminate
4  more than just those six workers at this
5  point in time?
6    A.  Yes.
7    Q.  Were you part of the decision to
8  terminate the other workers?
9    A.  Yes.
10    Q.  Who were the other workers?
11    A.  One was Sabular and one was
12 Josey Joseph, I believe.
13    Q.  Jacob Joseph?
14    A.  Jacob Joseph.
15    Q.  Were you in agreement with the
16 decision to terminate Sabular and Jacob
17 Joseph?
18    A.  Yes.
19    Q.  Whose recommendation was it to
20 terminate those two individuals?
21    A.  Darrell's recommendation
22 initially.
23    Q.  And to whom did he make that
24 recommendation?
25    A.  Ron and I.

55 (Pages 214 to 217)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    A.  Yes.
2    Q.  Did Ron Schnoor discuss with you
3  what he had discussed with Darrell Snyder
4  about how to handle the termination?
5    A.  He gave me a general idea.
6    Q.  What did he tell you?
7    A.  That we should do it in the
8  morning before the guys went to work.
9    Q.  And why was that?
10    A.  To keep the disruptions out on
11  the workplace as little as possible.
12    Q.  Did you have a discussion with
13  him about maybe it would be better to
14  invite the workers individually off the
15  worksite rather than to do it in front of
16  the whole camp?
17    A.  No.
18    Q.  Did he indicate it was going to
19  be done early in the morning at the time
20  when both shifts would be in the camp?
21    A.  Both shifts would -- he did not
22  indicate that, but both shifts will be in
23  the camp.  The second shift would have --
24  they got off at -- they could have been
25  asleep at that point in time.

**Bingle 222:18 - 223:6**

1    Q.  They got off at 3:00 or 4:00 in
2  the morning?
3    A.  Yes.
4    Q.  And the shift was going in at
5  6:00?
6    A.  Yes.
7    Q.  So this was to be done at 5:00
8  a.m.?
9    A.  I don't know the exact time.
10  The day shift goes in at 6:30.
11    Q.  Did you have any discussions
12  with Mr. Schnoor or Mr. Snyder that by
13  doing this in the camp at a time when it
14  camp was full that it might actually
15  cause more disruption in the camp?
16    A.  No.
17    Q.  Did that ever occur to you that
18  that might happen?
19    A.  No.
20    Q.  Did you have an understanding
21  from your discussions with Mr. Schnoor
22  that Swetman guards were going to be used
23  in this process?
24    A.  No.
25    Q.  You did not know that was going

1  to happen?
2    A.  No.
3    Q.  I take it you were not involved
4  in the planning meetings with -- that Mr.
5  Snyder had with the security guards or
6  with Signal security personnel in the
7  afternoon of March 8th or the morning of
8  March 9th about how this was going to be
9  handled?
10    A.  No.
11    Q.  Would it be fair to say things
12  did not go as smoothly as you would have
13  hoped?
14    A.  Yes.
15    Q.  When did you first find out that
16  things on March 9th had not gone as
17  smoothly as you would have hoped?
18    A.  Darrell called me and let me
19  know that there was some problems.
20    Q.  What were the problems that he
21  told you about?
22    A.  That Sabual had tried to go --
23  had gone in the bathroom and tried to cut
24  his wrists and there was general mayhem
25  at that point in time.

1    Q.  And what was your reaction?
2    A.  Kind of concerned and
3  immediately went over to the camp.
4    Q.  What did you see when you got to
5  the camp?
6    A.  Just a bunch of guys standing
7  around.  A lot of the guys were just
8  standing around outside in the common
9  area just in little groups talking.
10    Q.  Do you have a recollection at
11  what time you arrived at the camp?
12    A.  I don't recall, no.
13    Q.  Would it be late morning?  Early
14  morning?
15    A.  It would have been sometime
16  probably around 7:00 or a little after
17  7:00 maybe.
18    Q.  I can tell from many of your
19  e-mails you're a guy who gets in pretty
20  early; right?
21    A.  Yes.
22    Q.  I see some of them as early as
23  like 6:00 a.m.?
24    A.  Yes.
25    Q.  So you would have already been

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1   at the camp when you got the call?
2        A.  I don't -- at that point in
3   time, and this is kind of a strange
4   thing, but there is a restaurant in town
5   that opens at 6:00 that I used to go to
6   for breakfast, so I would have eaten
7   breakfast and then gone after that, so it
8   probably would have been about 6:30 that
9   I would have been at work that day.
10       Nowadays, I go at 6:00.  I don't
11  go to that restaurant anymore for
12  breakfast, so that's just -- I found
13  someplace that serves breakfast before
14  6:00.
15       Q.  So it would have been sometime
16  in the 7:00, 8:00 a.m. range, you figure?
17       A.  Probably about 7:00, 7:30,
18  somewhere around there.
19       Q.  And you went directly over to
20  the camp?
21       A.  Yes.
22       Q.  When you got to the camp, did
23  Mr. Snyder or anybody else tell you that
24  there were certain workers who were in
25  trailer 15?

1        A.  Yeah, he told me that some of
2   the guys that were terminated were in one
3   of the trailers, one of the lounge areas.
4        Q.  Did you go into the trailer to
5   see them?
6        A.  I did at some point, yes.
7        Q.  Well, did you do it at that
8   point when you were told or sometime
9   later?
10       A.  I don't know if it was
11  specifically when he told me they were
12  there.  I mean, I was walking around
13  talking to all the guys that were
14  outside.  I don't know if Darrell come up
15  to me right when I got there.  I got
16  there and just started talking to the
17  guys that were there.
18       Q.  And what were you talking to the
19  guys who were there about?
20       A.  Just trying to get them to go in
21  to work because they were already late,
22  and just trying to reassure them of the
23  fact that we are not out trying to
24  terminate everybody.  We are -- you know,
25  that unfortunately some guys skill levels

1   did not meet what they -- what we needed
2   and we had to send them home based on the
3   process, but everybody else was fine and
4   we needed them to go back to work.
5        Q.  Did you also tell them that two
6   of the guys were being terminated because
7   they were talking on the rigs?
8        A.  No, I did not tell them that.
9        Q.  Did you have an understanding as
10  of March 5th, 2007, when you got Exhibit
11  443 about the skill level of Sabulal and
12  Jacob Joseph?
13       A.  I don't recall.  I mean, I am
14  sure they were pretty well, pretty
15  skilled guys.
16       Q.  Do you know whether they in fact
17  got merit raises in the days before that?
18       A.  I know Sabulal did.
19       Q.  That would be an indication that
20  he was a skilled worker?
21       A.  Yes.
22       Q.  Did -- what were the concerns
23  that were being expressed to you by the
24  Indian workers when you were talking to
25  them in the camp the morning of March 9,

Bingle
228:9-21

1   2007?
2        A.  They -- just that they were all
3   going to get shipped home.  They were
4   just all concerned that they were going
5   to be sent home like everybody else and
6   they weren't going to get their
7   extensions or anything else.  There was
8   just a general panic with the guys at
9   that time.
10       Q.  Would it be fair to say that the
11  proceedings of that morning had led to
12  that panic?
13       A.  Probably.
14       Q.  Do you agree with me that
15  Signal's decision to use security guards
16  to round up workers the morning of March
17  9th --
18       MS. HANGARTNER:  Object to form.
19  BY MR. HOWARD:
20       Q.  -- contributed to a panic among
21  these workers?
22       A.  I don't know that they used
23  security guards to round anybody up.  I
24  don't know how it was done, but I don't
25  think we had security guards going in and

1      MR. HOWARD:  We have to change the
2  tape.
3      VIDEOGRAPHER:  We are going off the
4  record.  The time is 3:27 p.m.
5      (Brief recess.)
6      VIDEOGRAPHER:  We are back on the
7  record.  The time is 3:29 p.m.
8      MR. HOWARD:  Mr. Bingle, let me show
9  you what has been marked as Exhibit 530.
10  An e-mail chain with the Bates range SIGE
11  0322906 through 2909.  And these are
12  e-mails from April 2007 time period,
13  April 9th to be exact.
14      (Plaintiff's Exhibit 530 was
15  marked for identification by the court
16  reporter and said exhibit is attached
17  hereto?)
18      Q.  BY MR. HOWARD:  Before you
19  review that, let me ask you were you
20  generally involved with the rules that
21  Signal implemented for the man camps?
22      A.  Yes.
23      Q.  And one of the rules was that no
24  alcohol was to be allowed in the camps;
25  correct?

1      A.  That's correct.
2      Q.  What was the rational for that
3  rule?
4      A.  Just because we had a lot of
5  guys living in a small area.  Just
6  thought it would be better then, you
7  know, to have somebody getting inebriated
8  and causing trouble.
9      Q.  Who came up with that rule?
10      A.  I don't recall who come up with
11  that rule.
12      Q.  Were you in agreement with it?
13      A.  Yes.
14      Q.  Do you see any concern that,
15  you know, depriving guys who were living
16  there the opportunity to have a beer
17  after work or something in their own
18  home, so to speak, would be a cause for
19  complaint?
20      A.  No.
21      Q.  Did the guys complain about it?
22      A.  Some of them did.
23      Q.  Were any considerations given
24  for alternatives where alcohol could be
25  allowed in a designated area?

1      A.  I don't recall.
2      Q.  Was it from the start that there
3  was just going to be a zero alcohol
4  policy for the camp?
5      A.  Yes.
6      Q.  Who came up with the idea of a
7  no visitors rule for the camp?
8      A.  I don't recall who come up with
9  that.
10      Q.  Was that one you were in
11  agreement with?
12      A.  Yes.
13      Q.  Why?
14      A.  Just because some people could
15  bring somebody in to came that the other
16  guys did not like.  It was just a -- it
17  was more of a community camp then it was
18  an individual's home, so it was more of a
19  basis on what was, you know, what was the
20  best way to, you know, keep everybody
21  happy.
22      Q.  So you would agree that because
23  these Indian H-2B workers were living in
24  a community camp rather than a private
25  home they had to give up some of the

1  rights they would enjoy if they did live
2  in a private home?
3      MS. HANGARTNER:  Object to form.
4      A.  Yes.
5  BY MR. HOWARD:
6      Q.  And the camp was built for the
7  Indian H-2B workers; correct?
8      A.  That's correct.
9      Q.  And only Indian H-2B workers
10  lived there; correct?
11      A.  Yes.
12      Q.  And only Indian H-2B workers
13  were allowed to live there by Signal;
14  correct?
15      A.  Yes.
16      Q.  And if an American worker said,
17  you know, my house was destroyed in
18  Katrina, I got no place to live, I would
19  like to live in the man camp.  Would you
20  have let them?
21      A.  No.
22      Q.  And what was the consequence for
23  Indian workers who did not abide by the
24  rules of the man camp?
25      A.  I think there were some

Bingle 237:6-21

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    test that was given to the welder
2    applicants and the written fitter test
3    that was given to the fitter applicants
4    those who passed those test were extended
5    an offer of employment with Signal;
6    correct?
7       A.  Yes.
8       Q.  And was that the Exhibit 381
9    Offer of Employment that you signed as
10   was dated October 5, 2006, that is
11   Exhibit 381?
12      A.  Yes.
13      MR. HOWARD:  I have nothing further.
14   Thank you.  Thank you on the phone
15   everyone.
16      VIDEOGRAPHER:
17         This deposition has ended.  The
18   time is 4:49 p.m.
19   (Deposition session concluded at 4:29 p.m.)
20
21
22
23
24
25

1          SIGNATURE OF WITNESS
2       I,_____, do
3    Solemnly swear that I have read the foregoing
4    _____ pages and that the same is a true and
5    correct transcript of the testimony given by me
6    at the time and place hereinbefore set forth,
7    with the following corrections:
8
9    PAGE:  LINE:  SHOULD READ:   REASON FOR CHANGE
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17          NOTARIZATION
18      I, _____, notary public
19   For the State of Mississippi, _____
20   county, do hereby certify that _____
21   personally appeared before me this _____ day of
22   _____, 2009, at _____, Mississippi.
23   My commission expires:
24   _____      _____
25          (NOTARY PUBLIC)

1          CERTIFICATE OF COURT REPORTER
2       I, CRYSTAL LYNN MORRIS, CSR 1704, Court
3    reporter and Notary Public, in and for the
4    county of Harrison, State of Mississippi,
5    hereby certify that the foregoing pages contain
6    a true and correct transcript of the testimony
7    of the witness, as taken be me at the time and
8    place heretofore stated, and later reduced to
9    typewritten form by computer-aided
10   transcription under my supervision, to the best
11   of my skill and ability.
12      I further certify that the witness was
13   placed under oath to truthfully answer all
14   questions I this matter under the authority
15   vested in me by the State of Mississippi.
16      I further certify that I am not in the
17   employ of, or related to, any counsel or party
18   in this matter, and have no interest, monetary
19   or otherwise, in the final outcome of the
20   proceedings.
21      Witness my signature and seal, this the
22   10th day of November, 2009.
23
24   _____
     Crystal L. Morris, CSR #1704
25   My Commission Expires February 4, 2012

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# DEPOSITION EXCERPTS

## TRACEY A. BINION

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3   KURIAN DAVID, SONY          CIVIL ACTION
     VASUDEVAN SULEKHA,
 4   PALANYANDI THANGAMANI,      NO. 08-1220
     MARUGANANTHAM KANDHASAMY,
 5   HEMANT KHUTTAN, ANDREWS     SECTION "A"
     ISSAC PADA VEETTIYL, AND
 6   DHANANJAYA KECHURA, ON      MAGISTRATE 3
     BEHALF OF OTHER SIMILARLY
 7   SITUATED INDIVIDUALS, AND
     SABULAL VIJAYAN, KRISHAN
 8   KUMAR, JACOB JOSEPH
     KADDAKKARAPPALLY, KULDEEP
 9   SINGH, AND THANASEKAR
     CHELLAPPAN, INDIVIDUALLY,
10
                PLAINTIFFS
11
     VERSUS
12
     SIGNAL INTERNATIONAL,
13   LLC, MALVERN C. BURNETT,
     GULF COAST IMMIGRATION
14   LAW CENTER, L.L.C., LAW
     OFFICES OF MALVERN C.
15   BURNETT, A.P.C.,
     INDO-AMERI SOFT L.L.C.,
16   KURELLA RAO, J & M
     ASSOCIATES, INC. OF         VOLUME 1
17   MISSISSIPPI, GLOBAL
     RESOURCES, INC., MICHAEL
18   POL, SACHIN DEWAN, AND
     DEWAN CONSULTANTS PVT.
19   LTD. (a/k/a MEDTECH
     CONSULTANTS).
20
                DEFENDANTS.
21
     Videotaped Rule 30(b)(6) deposition of SIGNAL
22   INTERNATIONAL, L.L.C., given through its
     designated representative, TRACEY A. BINION, 601
23   Bayou Cassotte Parkway, Pascagoula, Mississippi
     39581, taken in the offices of Middleberg, Riddle
24   & Gianna, 31st Floor, 201 St. Charles Avenue, New
     Orleans, Louisiana  70170, on Monday, the 28th
25   day of September, 2009, beginning at 9:23 a.m.
```

1  it could have been the same person, you know, for
2  a while.
3      Q.  Okay.  Okay.  And were there forms
4  that the Indian H2B workers signed that other
5  people didn't sign?
6      MS. BOLLMAN:
7        Object to form.
8      A.  Yes.
9  EXAMINATION BY MS. TSU:
10     Q.  Okay.  And by that, you mean that
11  there were forms that Indian H2B workers signed
12  that non-Indian workers didn't sign?
13     A.  You talking, like, the Employment
14  Agreement?
15     Q.  I think that would be one of them.
16  There would be an Employment Agreement.  There
17  would also be housing rules, I would assume.  Is
18  that something that only H2B workers signed?
19     A.  Yes.
20     Q.  Man camp rules and regulations --
21     A.  Yes.
22     Q.  -- is that something that only H2B
23  workers would sign?
24     A.  Yes.
25     Q.  Payroll deduction form for the $35 a

1  day deduction, is that something only H2B workers
2  would sign?
3     A.  Yes.
4     Q.  All right.  Is there anything else
5  that you can think of that only they would sign?
6     A.  Tool deduct.
7     Q.  Okay.  They're the only ones who had
8  tools deducted, the cost of tools deducted from
9  their wages?
10     A.  No, that's not true.
11     Q.  Okay.
12     A.  If you bought tools, every employee
13  paid it through their paycheck, but they signed
14  it at the time they bought the tools.
15     Q.  I see.  Okay.  Anything else?
16     A.  No.
17     Q.  Okay.  Let's see.
18     MS. TSU:
19       I'd like to introduce --
20       it's SIGE3689.  Oh, you know what,
21       I'm sorry, everyone.  Before we do
22       this, can I just have the very
23       top?  Can we mark this as Exhibit
24       413, please?  It's the Notice of
25       Deposition.

1     (Whereupon, Exhibit Number
2     413 was marked for identification.)
3  EXAMINATION BY MS. TSU:
4     Q.  Tracey, will you confirm that you
5  appeared here today pursuant to that?
6     A.  Yes, I'm here.
7     Q.  Pursuant to the Notice of
8  Deposition?
9     MS. TSU:
10       Off the record.
11     THE VIDEOGRAPHER:
12       We're now off the record at
13       9:47.
14       (Whereupon, a discussion was
15       held off the record.)
16     THE VIDEOGRAPHER:
17       We're now back on the
18       record.  The time is 9:48.
19  EXAMINATION BY MS. TSU:
20     Q.  So, Tracey, I'm going to give you
21  something that's been marked as Exhibit 414, and
22  pass that around.
23     MS. TSU:
24       People on the phone, it's
25       SIGE0006389.

1     (Whereupon, Exhibit Number
2     414 was marked for identification.)
3  EXAMINATION BY MS. TSU:
4     Q.  Tracey, let me know when you've had
5  a trance to look at that.
6     A.  Okay.  I've seen it.
7     Q.  Do you recognize this?
8     A.  I do.
9     Q.  What is it?
10     A.  It's a copy of a combination to the
11  locks.
12     Q.  What would the locks be used for?
13     A.  We gave it to them for their
14  lockers.
15     Q.  Okay.  So, you gave it to the H2B
16  workers for the lockers in their -- in their
17  trailers?
18     A.  Yes.
19     Q.  Is that how you refer to them?
20  Okay.  And, so, Signal had the combination to the
21  workers -- to open the temporary workers'
22  lockers?
23     A.  We kept them in the personnel file
24  because they were losing their combinations.
25     Q.  Okay.  Did Signal ever search the

1  States?
2      A.  I'm not aware of that.
3      Q.  To your knowledge, did anyone tell
4  the workers they would be subject to demotion
5  based on retesting?
6      A.  No.
7      Q.  To your knowledge, did anyone from
8  Signal tell them that they would be subject to
9  termination?
10     A.  Yes.
11     Q.  Okay.  Who told them that?
12     A.  Well, they got it in their
13 Employment Agreement.  It said employment at
14 will.
15     Q.  Okay.  When did they get that
16 Employment Agreement?
17     A.  I know they got it during
18 orientation.  I do not know if they also looked
19 at it in India.
20     Q.  Okay.  Was there anybody who --
21 strike that question.
22         Okay.  Could -- the -- to be clear,
23 the H2B workers, once they arrived in the United
24 States, all of them were retested; is that right?
25     A.  I don't know if everyone was

1  retested.
2      Q.  Were some of them retested?
3      A.  Yes.
4      Q.  Okay.  And were some of them
5  demoted?
6      A.  Yes.
7      Q.  Okay.  And were some of their wages
8  cut?
9      A.  They were reduced based on the
10 skill, yes.
11     Q.  Okay.  And were some of them
12 terminated?
13     A.  Yes.
14     Q.  Okay.  And were all of them subject
15 to demotion if Signal thought that was the
16 appropriate -- if Signal thought that was
17 appropriate?
18     A.  All employees are.
19     Q.  Okay.  Including the H2B workers?
20     A.  Yes.
21     Q.  Okay.  Thank you.
22         And just to try to get more of a
23 sense of things, would you say that more than
24 half are retested?
25     A.  I don't know.

1      Q.  Okay.
2      A.  I really don't.
3      Q.  Do you have any sense of numbers?
4      A.  I don't do the testing.
5      Q.  Okay.  Would you say -- would you
6  say that more than half of their wages reduced?
7      A.  No, I would not say that.
8      Q.  Okay.  Would you say 10 percent?
9      A.  Possibly.
10     Q.  Okay.  Is there a number that you
11 would feel comfortable saying percentage or hard
12 number that got their wages reduced?
13     A.  No.  No.
14     Q.  Okay.  Who decided if a worker
15 needed to be retested?
16     A.  Came from Production.
17     Q.  What is Production?  What
18 does that mean?
19     A.  Basically, the workers, when they're
20 producing out in the field, that's referred to as
21 production.  So, their supervision.
22     Q.  Okay.  How does that line of
23 authority go?  From the workers in the field, who
24 supervises them?
25     A.  First thing, they have a foreman.

1      Q.  Okay.
2      A.  Then, they have a general foreman.
3      Q.  Okay.
4      A.  Then, they have a superintendent.
5  Then, they have a department head.  Then, it's
6  the VP of Production, and the VP reports to the
7  senior VP and general manager.
8      Q.  Okay.  So, at what level of
9  authority can somebody say that a worker needs to
10 be retested?
11     A.  I would say the foreman can suggest
12 it to the general foreman, but there is no black-
13 and-white policy on that.
14     Q.  Okay.  And do you know who was
15 suggesting it in these cases?
16     A.  No.
17     MS. BOLLMAN:
18         Object to form.
19 EXAMINATION BY MS. TSU:
20     Q.  Okay.  Who is -- is now or was --
21 well, who is now the vice president of
22 Production?
23     A.  Bill Bingle.
24     Q.  Okay.  And was he the vice president
25 of Production from 2006 till the present day?

1   work hours you work, you know, technically, the
2   more recordables you could have and still keep
3   the goal.  If the entire work force met the goal,
4   then, you were eligible to get it.  Then, it went
5   to the next level and looked at, were you
6   specifically eligible, have you been
7   disqualified.
8       Q.   Okay.
9       A.   That better?
10      Q.   That makes sense.  Thank you.
11      A.   Okay.
12      Q.   Okay.  And, so, if a worker got the
13  bonus, how much extra would he get in his check
14  per hour?
15      A.   There was a scale based on what your
16  position was, and it's changed throughout the
17  program.
18      Q.   Okay.
19      A.   Started at around 25 or 35¢ per
20  hour, plus overtime.
21      Q.   Okay.
22      A.   And it was based on whether you were
23  first-class and below or a foreman or a general
24  foreman.  There were three ratings.
25      Q.   Okay.  And, then -- so, then when

1   did the program, the safety bonus program start?
2       A.   I think '03 or '04.  I don't really
3   remember on that.
4       Q.   Okay.  And did it go up at some
5   point from the 25 to 35¢ an hour?
6       A.   Yes.  I believe it went to 55¢.
7       Q.   And was that for everybody, or were
8   there still three rates?
9       A.   There were still three rates.  That
10  was the lowest.
11      Q.   Okay.  And when was that?
12      A.   I don't remember when it went to
13  55¢.
14      Q.   Okay.  And you said that they -- and
15  that was per hour?
16      A.   Yes.
17      Q.   Okay.  For the entire month?
18      A.   Per worked hour for the entire
19  month.
20      Q.   Okay.  And then was that -- was
21  that, say, 25¢ an hour calculated as part of the
22  regular rate of pay when Signal was determining
23  overtime?
24      A.   I don't know.  I don't remember.
25      Q.   Okay.  Is it still calculated now?

1       A.   We don't have the bonus now.
2       Q.   When was the bonus phased out?
3       A.   Sometime this year.
4       Q.   Okay.  Why was it phased out?
5       A.   Needed to cut back on costs.
6       Q.   Okay.  Who made that decision?
7       A.   CEO.
8       Q.   That would be Richard Marler?
9       A.   Yes.
10      Q.   Okay.  Okay.  And -- let's see.  So,
11  do you remember whether overtime was ever paid on
12  the safety bonus itself?
13      A.   Yes, it was.
14      Q.   Okay.
15      A.   Yes.
16      Q.   Okay.  So, does that mean that it
17  would be -- would that be for hours that the
18  employee worked over 40 -- hold on.  Let me try
19  to think how to explain this.  Would that just be
20  for -- I don't know how to explain this right.
21  Okay.  I'll probably have to come back to that.
22          Okay.  So, was overtime paid on the
23  safety bonus, at the safety bonus rate, for the
24  entire time that the safety bonus existed?
25      A.   Yes.

1       Q.   And is that reflected on the payroll
2   records that Signal gives to its workers?
3       A.   Yes.
4       Q.   Okay.  Did all arriving Indian H2B
5   workers live in the man camps, whether in Texas
6   or Mississippi?
7       A.   Yes.
8       Q.   Did any non-Indians live in the man
9   camps?
10      A.   Some of the cooks.
11      Q.   Okay.  Did any of Signal's other
12  workers live on-site?
13      A.   No.
14      Q.   And did you ever receive complaints
15  about the food?
16      A.   Personally?
17      Q.   Did anybody -- either you personally
18  or somebody in your department that reported to
19  you.
20      A.   No.
21      Q.   Okay.  Who would those complaints
22  have gone to, if any?
23      A.   Probably the camp manager.
24      Q.   Were you aware of people complaining
25  about the food?

1    A. Yes.
2    Q. Were you aware if Signal -- Signal's
3 responses?
4    A. Yes.
5    Q. Who would be the best person to ask
6 about Signal's responses?
7    A. Darrell Snyder.
8    Q. To the best of your knowledge, did
9 Signal ever change caterers --
10    A. No.
11    Q. -- while the Indian H2B workers were
12 present?
13    A. Sorry. No.
14    Q. To the best of your knowledge, did
15 Signal ever give the workers a choice of not
16 paying Signal for food?
17    A. No.
18    Q. Okay. To the best of your
19 knowledge, did Signal ever allow workers to cook
20 their own food?
21    A. Yes.
22    Q. Under what circumstances?
23    A. I just know the workers would tell
24 me they had cooked themselves.
25    Q. Okay. Okay. Were they allowed to

1 use the kitchen --
2    A. Yes.
3    Q. -- to cook?
4    A. Yes.
5    Q. At any hour? Were there any
6 restrictions placed on when they could use the
7 kitchen?
8    A. I don't know.
9    Q. Workers who cooked their own food,
10 did they still have the general deduction, the
11 $35 a day, taken from their paycheck?
12    A. Yes.
13    Q. What about complaints about housing,
14 did those go to you or your staff?
15    A. Specifically what about housing?
16    Q. If people didn't want to pay the
17 rates or if people wanted to shift where they
18 were or if people had a problem with the -- say
19 there was a leak, any of that.
20    A. Typically, no, that would not come
21 through HR.
22    Q. Where would that go?
23    A. To the man camp manager.
24    Q. Okay. So, Darrell Snyder or Rhonda
25 George?

**Binion 59:9-12**

1    A. Yes.
2    Q. Okay.
3    A. That would have been just for
4 Mississippi.
5    Q. Okay. Who was the man camp manager
6 for Texas?
7    A. Ravinder Reddy.
8    Q. Okay. Do you know if Mr. Snyder is
9 capable of talking about the situation in Texas?
10    A. No, he's not.
11    Q. Does Mr. Reddy still work for
12 Signal?
13    A. No, he does not.
14    Q. When did he stop working for Signal?
15    A. I believe when the camp closed.
16    Q. When did the camp close?
17    A. March of '08.
18    Q. Okay. Are you still in contact with
19 Mr. Reddy?
20    A. No.
21    Q. Did Signal offer him a job in a
22 different department?
23    A. I don't know.
24    Q. Is that the sort of thing that you
25 would know if it happens?

1    A. I mean, I would think I would know,
2 but I don't know. It could have -- it could have
3 happened and me not know about it, absolutely.
4    Q. Okay. Did Signal, to the best of
5 your knowledge, ever get rid of the guards at the
6 man camps while there were workers there?
7    MS. BOLLMAN:
8        Object to form.
9 EXAMINATION BY MS. TSU:
10    Q. Let me reask that question. I'm not
11 talking about after Texas closed, for example.
12 I'm just talking about when the man camps
13 actually had people in them. But did Signal ever
14 get rid of the guards at the man camps?
15    A. You talking at both man camps or
16 which one?
17    Q. At both.
18    A. Did they ever get rid of the guards
19 while people were living there?
20    Q. Uh-huh.
21    A. No, I'm not aware of that.
22    Q. Okay. Did you have anything to do
23 with the setting of the $35 a day deduction for
24 room and board?
25    A. No.

1    A.    You would have to ask Darrell.  He
2  was the one that was threatened.
3    Q.    And then Jacob Joseph
4  Kaddakkarappally?
5    A.    The same.
6    Q.    So, he was also seeking the green
7  card and you understood him to be threatening and
8  harassing workers?
9    A.    I wouldn't characterize it as
10  seeking the green card.  I would say that he was
11  threatening that if Signal did not get him a
12  green card, that he would continue to create
13  unrest in the facility.
14    Q.    What kind of unrest was Signal
15  experiencing in the facility?
16    A.    Just constant commotion.
17    Q.    What kind of commotion?
18    A.    They were constantly, you know,
19  questioning about what are you going to do for
20  us, what are you going to do for us, what are you
21  going to do for us, that type of thing.
22    Q.    Under what circumstances would
23  workers ask Signal what it was going to do for
24  them?
25    A.    Well, it was shortly after, you

1  know, when they were asking -- telling us about
2  all the money they had paid.  It was around that
3  time we had found out, you know, just how much
4  the recruiters had, you know, charged them.
5  Obviously, we didn't know about that and we were
6  pretty upset.  The workers were upset, thinking
7  that Signal had something to do with it, and we
8  obviously didn't.
9    Q.    And did that commotion die down
10  after Sabulal and Jacob Joseph left?
11    A.    Pretty much.
12    Q.    So, that was part of the goal of
13  firing them then?
14    A.    I don't know --
15    MS. BOLLMAN:
16        Object to form.
17    A.    I don't know if that was the goal.
18  You would have to ask the people that wanted them
19  fired.
20  EXAMINATION BY MS. TSU:
21    Q.    Do you know who wanted them fired?
22    MS. BOLLMAN:
23        Object to form.
24    A.    No.
25  EXAMINATION BY MS. TSU:

1    Q.    Let's keep going through the people.
2  Kuldeep Singh, what's your understanding as to
3  why he was terminated?
4    A.    Poor skill level.
5    Q.    Do you know who it was who decided
6  he had a poor skill level?
7    A.    No.
8    Q.    Krishan Kumar?
9    A.    Poor skill level.
10    Q.    Do you know who decided he had a
11  poor skill level?
12    A.    No.
13    Q.    Thanasekar?
14    A.    Poor skill level.
15    Q.    Again, do you know who made that
16  determination?
17    A.    No.
18    Q.    Okay.  What did you think about the
19  process of how they were terminated?
20    MS. BOLLMAN:
21        Object to form.
22    A.    I wasn't there when they were
23  terminated.
24  EXAMINATION BY MS. TSU:
25    Q.    I'm sorry.  I couldn't hear you.

1    A.    I wasn't there that morning when
2  they were terminated.
3    Q.    What time were they terminated?
4    A.    Before I got there.  I don't know
5  specifically what time.
6    Q.    Were you -- what time did you arrive
7  that day?
8    A.    Shortly after 6:00.
9    Q.    And were you aware of anything that
10  was different?
11    MS. BOLLMAN:
12        Object to form.
13    A.    Different?
14  EXAMINATION BY MS. TSU:
15    Q.    In the sense that -- in the sense
16  that when you drove up to work that day, did
17  anything look different?
18    A.    I didn't drive up to work that day.
19    Q.    How did you get to work?
20    A.    I drove, but I wasn't starting the
21  day there.
22    Q.    Where were you at 6:00 a.m.?
23    A.    I was at home first.  I was called
24  to come there.
25    Q.    Okay.  Who called you?

25 (Pages 94 to 97)

1     Q.   What would be normal?
2     A.   Depends on when it is and what
3  contracts I have in the yard, and what the manning
4  needs are.  It could be as high as 30 percent.
5  Could be as low as 3 to 4.
6     Q.   Okay.  Did the H2B workers generally
7  replace subcontracted workers?
8     A.   Did they generally replace?
9     Q.   When they came in, the people that
10  they were -- did they -- did Signal stop seeking
11  out subcontracted workers when the H2Bs came in?
12    A.   No.
13    MS. BOLLMAN:
14        Object to form.
15    MR. ALEXIS:
16        Object to form.
17    A.   We couldn't because the workers kept
18  absconding.  So, I kept needing to keep my
19  subcontractors -- if they had not all absconded,
20  I would have been able to displace all the subs,
21  probably.
22  EXAMINATION BY MS. TSU:
23    Q.   The subcontracted workers, are they
24  mostly American citizens?
25    A.   I don't know.

1  workers, it was costing us around another hundred
2  to $200,000 a day.  A day.
3     Q.   Okay.  Right after the storm, what
4  percentage of your work -- of Signal's work
5  was -- what percentage of your work force was
6  constituted by subcontracted workers?
7     A.   When was that?  I'm sorry.
8     Q.   Right after the storm.
9     A.   I really don't remember.  See,
10  here -- you know, I don't -- I don't -- I don't
11  really remember our numbers.  We didn't have good
12  numbers then because we still had people in the
13  system hoping they would come back.  We didn't
14  terminate people waiting to see if they evacuated
15  and were wanting to come back.  So, I don't
16  really have good numbers for directly after the
17  storm.  But I would say probably around January,
18  it was probably 30 to 35 percent.
19    Q.   Okay.  And the $100,000 a day, can
20  you break that down to a percentage?  For
21  example, how much would you approximate a first-
22  class welder would make if they were a direct
23  employee versus a subcontracted employee?
24    A.   Assuming they were top pay?
25    Q.   Sure.

**Binion 127:8-128:2**

1     Q.   Okay.  Do they mostly speak English?
2     A.   I mean, I didn't work with them and
3  I didn't process them in myself.  I've seen a lot
4  of their limited paperwork, but we don't track --
5  we don't track -- I don't believe I track the
6  subcontractors' race.  I don't remember if I do
7  or not.
8     Q.   Okay.  If there was an e-mail
9  somewhere about Bill Bingle talking about
10  replacing Hispanics with Indians, would you think
11  he might be talking about replacing subcontracted
12  workers with H2B workers?
13    A.   I would say yeah.  Yeah.
14    Q.   Okay.  And why would you want to
15  displace subcontracted workers?
16    A.   Because it was so expensive.
17    MS. BOLLMAN:
18        Object to form.
19  EXAMINATION BY MS. TSU:
20    Q.   How much more were subcontracted
21  workers versus direct workers?
22    A.   I don't remember specifically.  I
23  mean, that's not really my kind of area,
24  department, the costs of subcontract labor, but I
25  believe at the time they were bringing in the H2B

1     A.   At that -- what time frame?  Sorry.
2     Q.   Say 2006.
3     A.   Well, I don't specifically remember.
4  I don't remember what top pay was then, so, let's
5  just kind of assume something.
6     Q.   That's fine.
7     A.   If it were maybe $19 an hour
8  compared to $40 an hour, plus benefits.  There's
9  not a burden rate added on to that 19.  So, then,
10  you've got to add on a couple extra dollars per
11  hour for the burden rate.
12    Q.   Is the burden rate then what the
13  benefits costs the employer?
14    A.   Yes.
15    Q.   And it's just a couple dollars?
16    A.   Yeah, it's just, like, two or three
17  dollars.
18    Q.   An hour.  Okay.
19    A.   (Nods head affirmatively.)
20    Q.   What benefits do direct hires have?
21    A.   You want me to list them all?
22    Q.   Sure.
23    A.   Medical, dental, vision, cancer,
24  long-term disability, 401(k), vacation, sick.  I
25  think that's it.  There may be others I'm

33 (Pages 126 to 129)

1      A.    Ask whatever you want to ask.
2      Q.    Okay.  No one specifically?
3      A.    (Shakes head negatively.)
4      Q.    Okay.  That's fine.  I'm not going
5  to answer that right now.
6      A.    Okay.
7      Q.    I was just curious.  I think you
8  were put up for specific ones.  Okay.
9            Back at the beginning of the
10  deposition, you said that Signal stopped
11  accepting H2B workers because of issues with job
12  skills at Texas; is that right?
13      A.    Yes.
14      Q.    Okay.  Were all of the H2B workers
15  in Texas -- did they all have poor job skills?
16      A.    I don't know that.
17      Q.    Okay.  Did -- well, did some of
18  them, in fact, come to Mississippi at some point?
19      A.    Yes.
20      Q.    They were transferred to
21  Mississippi?
22      A.    Yes.
23      Q.    And then were they retested once
24  they were in Mississippi and kept on?
25      A.    I'm not aware of any retesting when

1  they got to Mississippi.
2      Q.    It would be your understanding that
3  those people who were kept on and brought over to
4  Mississippi had good job skills?
5      A.    Could have been.  I assume so.  I
6  don't know.
7      Q.    Okay.  Do you -- if you told me this
8  before, I apologize.  Do you know who made the
9  decision to not bring over any more workers to
10  the Texas site?
11      MS. BOLLMAN:
12          Object to form.
13      A.    No.
14  EXAMINATION BY MS. TSU:
15      Q.    Why were workers brought from Texas
16  to Mississippi?
17      A.    When are you talking about?
18      Q.    In, I guess it would be, in the
19  month leading up to March, '08, when the H2B camp
20  in Texas was closed.
21      A.    So, you're saying immediately
22  preceding the closing.
23      Q.    In the months before that, uh-huh.
24      A.    How many months?
25      Q.    Well, let's start with immediately

1  preceding.
2      A.    Okay.  About 30 transferred in March
3  of '08.
4      Q.    Okay.  And why were they transferred
5  from Texas to Mississippi?
6      A.    Because the work was ending in Texas
7  and they had mostly government work and, so, we
8  moved them to Mississippi, where we could work
9  them on rigs.
10      Q.    Okay.  And the -- and prior to that,
11  how many people?  Was there another transfer
12  before that?
13      A.    Well, we actually tried to transfer
14  the whole group, but more than 30 absconded, so,
15  we only ended up with 30.
16      Q.    How many -- you said you had 200 or
17  so workers that went to Texas; is that right?
18      A.    Around.  (Nods head affirmatively.)
19      Q.    And, so, 30 ended up being
20  transferred to Mississippi in March of '08.
21      A.    Yes.
22      Q.    What happened to the other 170?
23      A.    There were two other transfers.
24  Three individuals came at one time in the middle
25  of '07.  I don't remember the exact date.  And

1  then there was another small transfer, I'd say,
2  maybe 20 people, sometime between the summer of
3  '07 and March of '08.  The rest absconded.
4      Q.    The transfer in mid-'07, how many
5  people came on that?
6      A.    Three.
7      Q.    Three.  So, three, 20 and 30 came
8  over --
9      A.    Approximately.
10      Q.    -- approximately, from Texas.  Okay.
11  So, you're saying that approximately 150
12  absconded?
13      A.    Approximately, if that's the math.
14      Q.    The three that transferred in the
15  middle of '07, was that related in any way to
16  visa extensions?
17      A.    No.                    Binion 137:18-141:23
18      Q.    You did apply to extend visas in the
19  middle of '07; is that right?
20      A.    Yes.
21      Q.    And how many people did you apply to
22  extend visas for from Texas?
23      MS. BOLLMAN:
24          Object to form.
25      A.    In July?

EXAMINATION BY MS. TSU:

1  Q.  In July of '07.

2  A.  Everyone that was there.

3  Q.  Okay.  And how many people was that in Texas?

4  A.  I don't remember.  I don't remember the active count then.

5  Q.  Okay.  I've seen things in the evidence of about a yes/no program.  Are you familiar with that program or with that term?

6  A.  It wasn't a program --

7  MS. BOLLMAN:

8      Object to form.

9  A.  -- but I'm familiar with what you're talking about.

EXAMINATION BY MS. TSU:

10  Q.  Okay.  Is there another -- is there a better way for me to refer to it?

11  A.  Evaluation.

12  Q.  Okay.  So, there was an evaluation program that went on.

13  A.  (Nods head affirmatively.)

14  Q.  And when did that start in 2007?

15  A.  In 2007, prior to the extension -- I mean, until the visa ending.

1  Q.  Okay.  And, so, the visa ended on July 31st, right?

2  A.  The first one, yes.

3  Q.  Okay.  And do you know when the program started?

4  MR. ALEXIS:

5      I'm going to object to the form of the question.

6  A.  What program?

EXAMINATION BY MS. TSU:

7  Q.  The evaluation program.

8  A.  Okay.  It wasn't a program.  It was an evaluation, just like we evaluate all employees.  It was an evaluation.

9  Q.  Okay.  So, when did the evaluation start?

10  A.  Sometime preceding the end of the visa -- sometime before July.  I don't remember exactly when it started.

11  Q.  How long did the evaluation go on?

12  A.  (Shakes head negatively.)

13  Q.  Who conducted the evaluation?

14  A.  I don't know.  Wasn't me.  I don't know.  Could have been different people.

15  Q.  And, so, it's your testimony that

1  you applied for extensions of visas for all Texas workers?  Is that what you said?

2  A.  From the first visa.  Yes, that's my recollection, is that it was for everyone.

3  Q.  Does that mean everybody had a passing grade on their evaluation?

4  A.  No.

5  Q.  And why did you keep the people who did not have passing grades on the evaluation?

6  A.  I didn't say we kept them.  I said that we applied for their extension.

7  Q.  Okay.  And when did you find out -- when did you -- and why were you going -- why did you apply for their extensions?

8  MS. BOLLMAN:

9      Object to form.

10  A.  My attorney told me it was easier just to keep everybody on there.

EXAMINATION BY MS. TSU:

11  Q.  Okay.  And who was the attorney?

12  A.  Malvern Burnett.

13  Q.  Okay.  And what did you understand to mean by it was easier to keep everyone on there.  What does "on there" mean?

14  A.  Because the evaluations weren't

1  completed at the time we needed to finalize the extension paperwork.

2  Q.  Okay.  So, you didn't have a final answer.  So, you applied for everybody?

3  A.  Correct.

4  Q.  And when did you file those extension paperworks -- paperwork?

5  A.  I didn't.  My attorney did.

6  Q.  When did you sign it?

7  A.  July.  I don't remember the exact date, but it would have been July.

8  Q.  Okay.  When did you get -- well, let me go to Mississippi first.  You said that there were about 288 workers into Mississippi; is that right?

9  A.  Correct.

10  Q.  Okay.  And did you apply for extensions of H2B visas for all of the ones who were there in July of 2007?

11  A.  To my knowledge, yes.

12  Q.  And those applications also went in in July of 2007?

13  A.  Correct.

14  Q.  And was -- did you apply for everyone for the same reason, because Mr. Burnett

1          REPORTER'S CERTIFICATE
2
3
4          I, CAROL VALLETTE SLATER, Certified
5   Court Reporter, Registered Professional Reporter,
6   in and for the State of Louisiana, as the officer
7   before whom this testimony was taken, do hereby
8   certify that TRACEY A. BINION, after having been
9   duly sworn by me upon authority of R.S. 37:2554,
10  did testify as hereinbefore set forth in the
11  foregoing pages; that this testimony was reported
12  by me in the stenotype reporting method, was
13  prepared and transcribed by me or under my
14  personal direction and supervision, and is a true
15  and correct transcript to the best of my ability
16  and understanding; that I am not related to
17  counsel or the parties herein, nor am I otherwise
18  interested in the outcome of this matter.
19
20
21          CAROL VALLETTE SLATER (CCR 78020)
            CERTIFIED COURT REPORTER
22          REGISTERED PROFESSIONAL REPORTER
23
24
25

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

# DEPOSITION EXCERPTS

## MALVERN BURNETT

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
      KURIAN DAVID, SONY           CIVIL ACTION
 4    VASUDEVAN SULEKHA,
      PALANYANDI THANGAMANI,       NO. 08-1220
 5    MARUGANANTHAM KANDHASAMY,
      HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6    ISSAC PADA VEETTIYL, AND
      DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7    BEHALF OF OTHER SIMILARLY
      SITUATED INDIVIDUALS, AND
 8    SABULAL VIJAYAN, KRISHAN
      KUMAR, JACOB JOSEPH
 9    KADDAKKARAPPALLY, KULDEEP
      SINGH, AND THANASEKAR
10    CHELLAPPAN, INDIVIDUALLY,
11              PLAINTIFFS
12    VERSUS
13    SIGNAL INTERNATIONAL,
      LLC, MALVERN C. BURNETT,
14    GULF COAST IMMIGRATION
      LAW CENTER, L.L.C., LAW
15    OFFICES OF MALVERN C.
      BURNETT, A.P.C.,
16    INDO-AMERI SOFT L.L.C.,
      KURELLA RAO, J & M
17    ASSOCIATES, INC. OF
      MISSISSIPPI, GLOBAL
18    RESOURCES, INC., MICHAEL
      POL, SACHIN DEWAN, AND       VOLUME 1
19    DEWAN CONSULTANTS PVT.
      LTD. (a/k/a MEDTECH
20    CONSULTANTS).
21              DEFENDANTS.
22
      Videotaped deposition of MALVERN C. BURNETT, 1523
23    Polymnia Street, New Orleans, Louisiana  70130,
      taken in the offices of Middleberg, Riddle &
24    Gianna, 31st Floor, 201 St. Charles Avenue, New
      Orleans, Louisiana  70170, on Tuesday, the 17th
25    day of November, 2009, beginning at 9:20 a.m.
```

1   when you met with Signal and discussed your
2   approximately $3,750 fee, you don't remember
3   whether the fees that Mr. Dewan charged also came
4   up?
5       MR. SHAPIRO:
6           Object to form.
7       A.   Let me explain something to you.
8   EXAMINATION BY MR. WERNER:
9       Q.   Sure.
10      A.   All right?  I went through the most
11  horrific experience in my life on August 29th of
12  2005.  I had a house that I built -- my dream
13  house that I built in 2000 on the beach in
14  Waveland, Mississippi, destroyed with everything
15  that I collected and possessed.  I had my wife --
16  my wife's mother killed -- she lived four blocks
17  away.  She did not evacuate.  She just moved down
18  15 months before.  She was killed in the storm.
19  I got dislocated from my family for almost a
20  four-year period -- I mean, I was dislocated from
21  my family, evacuated my family to Lafayette.  I'm
22  having to stay here.  I lost both of my offices
23  in Mississippi entirely.  My office in Bay St.
24  Louis, not even the front steps were left.  My
25  office in Gulfport, the whole bottom floor of the

1   13-story Markham Building was blown out and I was
2   on the frigging first floor.  Okay.  So, you
3   know, my memory ain't as sharp as it used to be.
4   And I've gone to a couple of psychologists at the
5   request of family members, and they say, you
6   know, you're doing a good job, you're handling it
7   all right because you're able to keep things
8   together.  Well, you know, my memory ain't what
9   it was and it probably will never be.  And, so,
10  when you're asking these questions, I'm doing the
11  very level best that I can at responding, and
12  you're just going to have to be patient with me.
13  Al right?  I'm not asking for sympathy.  I'm just
14  laying it on the line.  I continue to live with
15  what I think is a disability of having gone
16  through this, like the rest of this freaking
17  city, you know, and the rest of this region, you
18  know, and that's the long and short of it.  All
19  right?
20      Q.   You know, I understand that --
21      A.   So, when you press me for details
22  and I tell you that I don't recall, hey, bud, I
23  don't recall.
24      Q.   I understand that you and the rest
25  of the people in this region really went through

1   a lot during that storm.  I'm asking -- when I
2   ask you these questions, I'm asking you based on,
3   you know, the best of your recollection what you
4   think the answer is.  If you don't remember, you
5   don't remember, and that's the truthful answer.
6   And I think, you know, that's how you've answered
7   the questions.
8           When you met with Signal in the fall
9   of 2006 to discuss your fees, did anybody at
10  Signal -- you've testified earlier that you told
11  the folk at Signal that --
12      A.   I told the boat?
13      Q.   The folk.
14      A.   The folk.
15      Q.   -- the people at Signal that you
16  thought these fees were reasonable; is that
17  correct?
18      A.   Correct.
19      Q.   Okay.  Did anybody at Signal agree
20  with you that it was a reasonable fee, indicate
21  their agreement to you that it was a reasonable
22  fee?
23      A.   If I recall, I suggested that they
24  contact other counsel, immigration counsel, in
25  the region to compare, to see, and I think this

1   letter speaks for itself.
2       Q.   At that time, was -- do you believe
3   it was clear to Signal that your $3,750 fee --
4       A.   I said approximately.  I got less in
5   some cases, I got more in some cases.
6       Q.   Was it clear at that time that your
7   approximately $3,750 fee was on top of the fee
8   that Michael Pol charged?
9       A.   Most assuredly.

Burnett 97:2-9

10      Q.   So, Signal understood that at that
11  time?
12      A.   Most assuredly.
13      Q.   Do you remember if at that meeting
14  Signal confronted you and said we've found out
15  about these fees.  What's up with this?  Or was
16  it just a general meeting to talk about fee
17  arrangements?
18      A.   I don't think that you could
19  characterize it as a confrontation.  I mean,
20  we -- I'm trying to think if it occurred in the
21  context of, you know, Michael's gone, this is
22  what, you know, he charged.  We understand that
23  you charged, you know, this amount because
24  workers were -- told them basically what they
25  were paying.  You know, at one point, I think

25 (Pages 94 to 97)

1  being with -- my mind is starting to drift on me.
2  Give me a second -- John Sanders when the visas
3  first got issued, and I don't know when he was
4  there. I was -- I don't know.
5      Q.  I'm just trying to get to the bottom
6  of this apparent dispute that you had with Mr.
7  Dewan and then we're going to break for lunch.
8  The --
9      A.  I think I can explain it to you this
10 way.
11     Q.  Okay. Go for it.
12     A.  Let me try to explain it to you this
13 way. You know, there were people who -- who --
14 who claimed that they were -- they claimed that
15 they were instructed by Sachin Dewan to state
16 that they had been refunded all of their monies,
17 when, in fact, they state that they had not.
18     Q.  Okay. And how many installments
19 would they have made -- had they made their first
20 two installments that you know of?
21     MR. SHAPIRO:
22         Object to form.
23     A.  I -- I had it alluded to me that --
24 that they had paid a substantial sum of money.
25 EXAMINATION BY MR. WERNER:

1      Q.  Was it the full amount, all three
2  installments, or you think it was maybe two of
3  three?
4      A.  I can't say for a fact how many
5  installments, but it was -- it was a substantial
6  sum of money.
7      Q.  And what was that substantial sum of
8  money?
9      A.  You know, varying amounts.
10     Q.  Between what and what?
11     A.  Between 15 and $30,000.
12     Q.  Is -- was part of your concern that
13 Mr. Dewan had collected the full amount, was
14 sending the workers to the U.S. and then was
15 pocketing the money without you getting your
16 share of it?
17     MR. SHAPIRO:
18         Object to form.
19     A.  My concern -- my concern was that --
20 well, there was some concern associated with
21 whether or not I was getting paid. You know, you
22 never knew. But my main concern was that the
23 workers were coming to the United States on visas
24 that were not valid.
25 EXAMINATION BY MR. WERNER:

1      Q.  There was some concern about not
2  being paid, too.
3      MR. SHAPIRO:
4          Object to form.
5      A.  My concern was that these people
6  were coming on visas that were not valid. In
7  fact, I told Signal of this. I said, it's my
8  belief that people are coming on these visas.
9  They did revoke -- they did send notices out
10 revoking the visas.
11 EXAMINATION BY MR. WERNER:
12     Q.  You said just a couple minutes ago
13 that part of your concern was also that you
14 weren't getting paid for these guys.
15     A.  Not necessarily these guys, but
16 people who -- who had paid -- I mean, the fact is
17 if -- if people were -- if people were claiming
18 that they were refunded -- if they were being
19 instructed they were refunded and they weren't
20 being refunded, you know, how would I know that
21 people who -- who had claimed to have been
22 refunded in the past were, in fact, refunded?
23     Q.  I mean --
24     A.  You see my point?
25     Q.  I see where you're going. Isn't --

1  part of your concern -- I mean, you had this
2  agreement with Mr. Dewan and Mr. Pol that this
3  money was essentially going to be split three
4  ways; is that right?
5      MR. ALEXIS:
6          Object to form.
7  EXAMINATION BY MR. WERNER:
8      Q.  With some variation.
9      A.  I was expecting my reasonable
10 attorney's fees.
11     Q.  And your reasonable attorney's fees,
12 you believed to be generally --
13     A.  Three thousand, seven hundred
14 fifty -- just depended.
15     Q.  It was somewhere between -- what was
16 the maximum reasonable attorney's fees that
17 workers were expected to pay?
18     A.  It may have been -- the maximum,
19 there may have been a few between five and six.
20     Q.  Five and $6,000?
21     A.  Between, yeah.
22     Q.  So -- and these H2B workers are
23 workers who you had already done work -- you had
24 already done the immigration work for the ones
25 who you were concerned about Dewan was sending to

Burnett
169:11-21

1     A.   Says the attorney will represent
2   worker as a licensed attorney in the United
3   States and file all necessary documents with the
4   government to assist the worker make application,
5   make application, for the permanent residency
6   program.
7   EXAMINATION BY MR. WERNER:
8     Q.   Right.  So, again, going back to
9   what happened at the consular interview, if this
10  had been presented to a candidate before the
11  consular interview, the candidate would have gone
12  into that consular interview with the
13  understanding that a permanent resident
14  application was going to be applied for on his
15  behalf by you.
16    MR. ALEXIS:
17        Object to the form of the
18    question, but subject to that, go
19    ahead.
20    A.   Perhaps at some point -- I mean, at
21  some point in the future, but there was no -- no
22  timeline set forth, you know, when they would
23  assist in making that application.
24  EXAMINATION BY MR. WERNER:
25    Q.   Let me have you look at Exhibit 575,

**Burnett 266:25 - 269:17**

1   which is the -- it's dated March 6th, 2007.
2     A.   No.  No.  I've got it September 6th,
3   2007.
4     Q.   September 6th.  You're correct.  I'm
5   reading my numbers wrong.  September 6th, 2007.
6   Fee Agreement between yourself and Signal
7   International.  It's SIGE0008010.  It's not
8   signed by any -- the one that we have is not
9   signed by anybody.  Do you know if this Fee
10  Agreement was eventually signed by somebody at
11  Signal?
12    A.   Excellent question.  I would assume
13  it was.  I mean, it was in -- they had it.  I
14  mean, I can just assume it was.
15    Q.   Let me just ask a few questions
16  about this.  Have you ever seen this Fee
17  Agreement?
18    A.   Yes.
19    Q.   Okay.  Does this memorialize the Fee
20  Agreement that you actually had with Signal at
21  some point?
22    A.   It was my understanding that we had
23  a Fee Agreement that -- that purported to
24  authorize me to represent the filing of H2Bs -- a
25  separate filing of H2Bs, I should say.

1     Q.   And it was for that that Signal was
2   to pay you a retainer fee of $5,000, an advance
3   of $5,000?
4     A.   This was an accommodation.  When we
5   discussed -- when I discussed this with Signal,
6   for one thing, it was getting late -- it started
7   late in the process to be filing this petition,
8   but they decided that they -- that they had a
9   need for workers and wanted to supplement their
10  workforce.  I forget the exact circumstances, but
11  I don't know if it was in -- I don't know if it
12  was -- if it was a -- a naval contract that had
13  pulled some of their normal -- their U.S. worker
14  workforce away that mandated this, but for
15  whatever the reason, it was supposed to be and it
16  was my understanding that I would do the H2B and
17  also be permitted to visa process the workers.
18  In other words, to bring over the H2B workers.
19  And it was discussed with -- with Sanjay Keswani
20  that he and I -- in fact, he represented to me
21  that -- that it was his understanding with
22  consultations with Darrell Snyder that Sachin and
23  I would be doing the visa processing, bringing
24  the workers over, and we discussed even, you
25  know, using of -- use of recruiters and which

1   fees to charge.  We discussed fees ranging from
2   1,500 to, you know, five, $6,000 per worker.  So,
3   they were going to supplement basically the fees
4   that I was receiving from Signal.
5     Q.   Who was going to -- the workers were
6   going --
7     A.   The workers were going to pay.  The
8   workers were going to pay us.  He was going to be
9   the recruiter and I was going to be doing the
10  immigration work.
11    Q.   And this is long after Signal
12  already knew that you had charged somewhere --
13    A.   This is just for the H2B.
14    Q.   This is --
15    A.   This is going to be just H2B.
16  Straight H2B.  Not permanent residency.  H2B
17  alone.
18    Q.   And what did you ultimately settle
19  on, if anything, with Signal in terms of the
20  amount?
21    A.   Nothing.  The very day -- the very
22  day the visa was approved, I was fired.
23    Q.   And why were you fired?
24    A.   Conflict of interest.
25    Q.   And what was the conflict?

1    the question.
2        A.    Yeah.  The form's already loaded.
3    You know, the forms are -- you could load the
4    draft forms, you know, basically.  We're just
5    waiting for advertising, for recruitment and --
6    EXAMINATION BY MR. WERNER:
7        Q.    Yeah.  Here's my question.  You
8    could have done the advertisement and the
9    recruitment starting in 2004 and had
10   everything --
11       A.    But not to use with the PERM.
12       Q.    But you could have used -- you could
13   have used that with the PERM.
14       A.    No, you could not have used.  No,
15   absolutely not.  You're wrong.  You're wrong.
16       Q.    So --
17       A.    You didn't know what to do until the
18   regulations came out.
19       Q.    The regulations came out in
20   December, 2004.
21       A.    No.  But they were amended, revised
22   and took effect in March.  You had to wait.  You
23   had to -- there was absolutely no way that you
24   could start a job order under PERM until after
25   the effective date.  And anyone that had PERMs,

1    anyone that did RIRs by then -- you know, if they
2    did an RIR in 2004, 2003, those babies were
3    sitting in the backlog elimination center, and
4    they were in limbo, absolutely limbo.
5        Q.    The final regs were published in
6    December of 2004, is that correct, for PERM?
7        A.    I don't know the exact date.  I
8    remember they took effect in March.
9        Q.    Right.  Right.
10       A.    Now, and you could only start the
11   process in March.
12       Q.    That's March of 2005.
13       A.    Correct.
14   MR. WERNER:
15       Let's go ahead and quit for
16   the day.
17   THE VIDEOGRAPHER:
18       It is now 5:54 p.m.  This
19   concludes the video deposition of
20   Malvern C. Burnett at 5:54 p.m.
21       (Whereupon, the testimony of
22   the witness was adjourned at 5:54
23   p.m.)
24
25

1            WITNESS' CERTIFICATE
2
3
4
5        I, MALVERN C. BURNETT, the
6    undersigned, do hereby certify that I have read
7    the foregoing deposition and it contains a true
8    and correct transcript of the testimony given by
9    me:
10
11
12   ( ) Without corrections.
13   ( ) With corrections as reflected on
14       the errata sheet(s) prepared by me
15       and made a part hereof.
16
17
18
19
20
21
22       MALVERN C. BURNETT
23
24       DATE
25

1            REPORTER'S CERTIFICATE
2
3
4        I, CAROL VALLETTE SLATER, Certified
5    Court Reporter, Registered Professional Reporter,
6    in and for the State of Louisiana, as the officer
7    before whom this testimony was taken, do hereby
8    certify that MALVERN C. BURNETT, after having
9    been duly sworn by me upon authority of R.S.
10   37:2554, did testify as hereinbefore set forth in
11   the foregoing pages; that this testimony was
12   reported by me in the stenotype reporting method,
13   was prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21       CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22       REGISTERED PROFESSIONAL REPORTER
23
24
25

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
      KURIAN DAVID, SONY           CIVIL ACTION
 4    VASUDEVAN SULEKHA,
      PALANYANDI THANGAMANI,       NO. 08-1220
 5    MARUGANANTHAM KANDHASAMY,
      HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6    ISSAC PADA VEETTIYL, AND
      DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7    BEHALF OF OTHER SIMILARLY
      SITUATED INDIVIDUALS, AND
 8    SABULAL VIJAYAN, KRISHAN
      KUMAR, JACOB JOSEPH
 9    KADDAKKARAPPALLY, KULDEEP
      SINGH, AND THANASEKAR
10    CHELLAPPAN, INDIVIDUALLY,
11              PLAINTIFFS
12    VERSUS
13    SIGNAL INTERNATIONAL,
      LLC, MALVERN C. BURNETT,
14    GULF COAST IMMIGRATION
      LAW CENTER, L.L.C., LAW
15    OFFICES OF MALVERN C.
      BURNETT, A.P.C.,
16    INDO-AMERI SOFT L.L.C.,
      KURELLA RAO, J & M
17    ASSOCIATES, INC. OF
      MISSISSIPPI, GLOBAL
18    RESOURCES, INC., MICHAEL
      POL, SACHIN DEWAN, AND       VOLUME 2
19    DEWAN CONSULTANTS PVT.
      LTD. (a/k/a MEDTECH
20    CONSULTANTS).
21              DEFENDANTS.
22
      Videotaped deposition of MALVERN C. BURNETT, 1523
23    Polymnia Street, New Orleans, Louisiana  70130,
      taken in the offices of Middleberg, Riddle &
24    Gianna, 31st Floor, 201 St. Charles Avenue, New
      Orleans, Louisiana  70170, on Wednesday, the 18th
25    day of November, 2009, beginning at 9:20 a.m.
```

1 vastly improved since the first months
2 immediately following the disasters, not even
3 half of the entire pre-Katrina population has
4 returned, rendering it still difficult to find
5 qualified skilled workers throughout the area.
6      Q.   Reading at the bottom of Page 8043,
7 second sentence of the last paragraph, starting
8 with:  "Although Signal International" -- do you
9 see what I'm referring to?
10      A.   Uh-huh.
11      Q.   "Although Signal
12 International employs
13 permanent workers, we must, at
14 this time, supplement the
15 permanent workforce with
16 temporary workers because of
17 the described peak load need.
18 these peak load, temporary
19 workers will not become a part
20 of the permanent workforce."
21      A.   Correct.
22      Q.   Okay.  You're suggesting that this
23 particular letter was for a new group of H2B
24 workers that Signal hopes to bring in; is that
25 correct?

**Burnett 456:22-458:21**

1      MR. ALEXIS:
2           Object to form.
3      A.   Either bring in or transfer.
4 EXAMINATION BY MR. WERNER:
5      Q.   Transfer from --
6      A.   Another location.
7      Q.   Maybe from Texas to Mississippi?
8      A.   Correct.
9      Q.   Okay.
10      A.   I might add that further in that
11 paragraph that I was referring to, it says:
12           "Every day more houses and
13      apartments are being completed and
14      ready for habitations.  With the
15      citizens of the area making their
16      way back to their homes, we
17      estimate that there will be much
18      improvement in the local workforce
19      within the coming year, further
20      contending our current need is a
21      peak load need."
22      Q.   Do you remember -- let's see if we
23 can find the document.  Do you remember whether
24 the sentence:  "These peak load temporary workers
25 will not become a part of the permanent

1 workforce" was included in the letter that
2 supported Signal's application for extension of
3 the H2B workers in Mississippi?
4      A.   Do I know if it was considered?
5      Q.   Do you know if that was included in
6 that letter?
7      A.   It's -- I don't know -- I can't say
8 for a fact, but it is -- it is typical that you
9 would include such a statement.
10      Q.   Okay.  And you would include such a
11 statement even though on or about March 10th --
12 March 12th, you attended a meeting where you
13 confirmed that during an earlier meeting with
14 John Sanders, you had told the workers that you
15 intended to apply for permanent residence.
16      MR. KUPPERMAN:
17           Object to the form.
18      MR. ALEXIS:
19           Object to form.
20      A.   Yeah.  But, you know, you got to
21 understand that permanence is a very relative
22 concept, and permanent workforce on one day is
23 not permanent workforce on another day.  In other
24 words, it may be a year or two before these guys
25 returned to come to work for Signal.  See what

1 I'm saying?  In other words, there's -- does not
2 necessarily mean that these people converting
3 from temporary directly to permanent, does not
4 necessarily require or state that as a fact.
5 EXAMINATION BY MR. WERNER:
6      Q.   Yeah, but -- but what it states
7 unequivocally is that the temporary workers will
8 not become a part of the permanent workforce, and
9 if that was part of the H2B extension
10 application --
11      A.   At that time.  At that time.
12      Q.   But the workers themselves had been
13 told earlier that they would have -- some of the
14 workers intended to become a part of the
15 permanent work force?
16      MR. KUPPERMAN:
17           Let me object.  Repetitive.
18      MR. ALEXIS:
19           Object to form, but go
20 ahead.
21      A.   I stand by my answer.
22 EXAMINATION BY MR. WERNER:
23      Q.   Later in the recording that I
24 played, there's a discussion about the T visa
25 process; is that correct?

**Burnett 458:23-461:9**

1      A.   Yes.
2      Q.   How long -- do you know when the T
3 visa was created, when people could start
4 applying for T visas, what year?
5      A.   I know that they started -- they
6 started applying for them, I think, sometime
7 around 2003-2004, if I'm not mistaken.
8      Q.   Okay.
9      A.   I know that some, as indicated in
10 the letter, that some Falcon's Field people
11 applied for them.
12      Q.   So, in the recording, there's a part
13 where, apparently -- and, again, reserving Mr.
14 Alexis' right to object to authenticity --
15      "In my 20 years of
16      practicing immigration law, I have
17      never known anyone to get this
18      visa granted."
19    MR. ALEXIS:
20      I'll just object to the
21 form, but you can --
22      A.   This is true.
23 EXAMINATION BY MR. WERNER:
24      Q.   Right.  Even though the visa program
25 itself was only maybe four or five years old.

1      A.   I can't tell you exactly how old the
2 visa process is.  I can tell you that in my
3 experience, it had never been granted.  I'd not
4 known anyone to have it granted.
5      Q.   Had you done any research to see how
6 many visas had been granted before you made that
7 statement?
8    MR. ALEXIS:
9      Object to form.
10      A.   No.  I just know from my practice.
11 EXAMINATION BY MR. WERNER:
12      Q.   Would it surprise you that by the
13 end of 2006, there had been 899 T visas granted?
14    MR. ALEXIS:
15      Object to form.
16      A.   No, it wouldn't surprise me.
17 EXAMINATION BY MR. WERNER:
18      Q.   Okay.  So, if that wouldn't surprise
19 you, then, why did you say to the workers that,
20 to your knowledge, none had ever been granted?
21    MR. ALEXIS:
22      Object to form.
23      A.   Because, to my knowledge, none had
24 been granted.  That's why.
25 EXAMINATION BY MR. WERNER:

1      Q.   Even though the data was readily
2 available that -- the number T visas that had, in
3 fact, been granted?
4    MR. KUPPERMAN:
5      Object; argumentative.
6      A.   How readily available is it?
7    MR. ALEXIS:
8      Object to form.
9      A.   I don't know.  You tell me.
10    MR. ALEXIS:
11      Objection.
12 EXAMINATION BY MR. WERNER:
13      Q.   Later in the recording, again,
14 without you waiving any right to object to its
15 authenticity, you indicate that -- and I'll
16 quote, and this is 44:36 through 44:56.
17      "If you don't want to talk
18      to me, ask around the Indian
19      community, ask to speak to an
20      employee, whoever works for
21      Falcon's Field.  Falcon's Field
22      employees, many of them filed for
23      the T visa, not one of has been
24      approved.  The majority that were
25      in the United States illegally, or

1      they've already been sent home."
2    MR. ALEXIS:
3      I'll object to the form of
4      the question because of the way it
5      was worded, but subject to that --
6      A.   Yeah, that was my understanding.
7 EXAMINATION BY MR. WERNER:
8      Q.   Okay.  So, you did offer, to the
9 best of your recollection, during this meeting to
10 have a former Falcon's Field employee go and talk
11 to Signal's workers about his experience applying
12 for a T visa?
13      A.   No.  I offered to provide the name
14 and number of the individual so if anyone wanted
15 to talk to him about the process, what he went
16 through.  And I also answered questions at that
17 discussion.  Moreover, for the benefit of the
18 applicants, I left a copy of the T visa
19 applications with the instruction sheets with the
20 Signal camp manager so that anyone who wanted to
21 could review it.
22      Q.   I'm showing you what's been marked
23 as Exhibit 598.  Please take a look at this
24 document.  Again, this is Exhibit 598, and it's
25 Bates-stamped Number DEWAN 000645.

39 (Pages 459 to 462)

(504)525-1753          HUFFMAN & ROBINSON, INC.          (800)749-1753
ONE SHELL SQUARE,#250      CERTIFIED COURT REPORTERS      NEW ORLEANS, LA 70139

1  Restaurant meeting, but, basically, I went
2  through the process, that you apply through the
3  Department of Labor for alien labor
4  certification, you go through recruitment of U.S.
5  workers, establishing that there are no U.S.
6  workers available at the prevailing wage, and
7  once the labor certification recruitment is
8  finalized, you submit the completed recruitment
9  results to the Department of Labor, and they
10 decide whether or not to approve on deny it, and
11 thereafter, you apply to the USCIS via H2B visa
12 petitions, and once those get approved, they are
13 forwarded abroad to the U.S. consulate, noted on
14 the applications.
15 EXAMINATION BY MS. BOLLMAN:
16     Q.   Did you discuss with Signal at this
17 meeting the time frame --
18     MR. ALEXIS:
19         Object to form.
20 EXAMINATION BY MS. BOLLMAN:
21     Q.   -- that -- the length of time that
22 an H2B worker can remain in the United States?
23     A.   Typically -- we say time frame.
24 It's a two -- it's a -- time frame of the process
25 is 120 days, and the Department of Labor

1  typically approved applications in increments of
2  ten months.
3      Q.   My question is:  Did you explain to
4  Signal at that meeting how -- the time period
5  that the H2B worker can remain in the United
6  States on an H2B visa?
7      A.   Ten months initially with extensions
8  thereafter.  A full period -- there's a -- the
9  law stipulates that you can remain in the United
10 States for a full period of three years.  I did
11 not indicate it to them, but I'd never known that
12 to happen.
13     Q.   What did you tell Signal the
14 realistic expectation for the time frame that an
15 H2B worker could stay in the United States, based
16 on your experience?
17     MR. ALEXIS:
18         Object to form.
19     A.   It really depended on how the
20 Department of Labor would react to the H2B
21 petitions filed post-Katrina.  You know, I said
22 it could be -- it could just be one ten -- one
23 ten-month period, and that would be it, or, you
24 know, we could obtain extensions thereafter.  I
25 do clearly remember stating to them that, in all

1  likelihood, you'd file -- you know, file one
2  application, and if you saw an extension, you
3  could file an extension, and while the
4  application is pending, the regulations allow for
5  an automatic extension of work authorization for
6  a period of 240 days or until a decision is
7  rendered by the district director.
8  EXAMINATION BY MS. BOLLMAN:
9      Q.   And what did you tell Signal at that
10 meeting about the immigrant process, the
11 employment-based green card process?
12     A.   I basically described the PERM
13 process and the time periods that it takes, and
14 that the filing of a PERM application in and of
15 itself is -- is -- well, the timing -- basically,
16 I told them what it takes -- how long it takes to
17 file the PERM.
18     Q.   And how long did you say that was?
19     A.   Particularly three to six months to
20 get the -- to get the PERM done, and then the
21 I-140, anywhere from six to nine months, and visa
22 process thereafter.  You're looking at about a
23 two-year period with current priority dates.
24 Now, at that time, the priority dates weren't
25 current, but we had no idea when they might be

Burnett
518:11-519:7

1  current again.
2      Q.   And did you discuss that with
3  Signal, the fact that the priority dates weren't
4  current at that time?
5      A.   Uh-huh.  Uh-huh.  Yeah.
6      MR. ALEXIS:
7          Oh, I was going to say, you
8      have to verbalize your answer.
9      A.   Yeah.  Yeah.  I'm sorry.  Yeah.
10 Yeah.
11 EXAMINATION BY MS. BOLLMAN:
12     Q.   And how far were they backlogged at
13 that point in time, do you recall?
14     A.   Well, it went from being current in
15 200- -- in June of 2005 to backlogged to, if I'm
16 not mistaken, 2001 or 2002.  2001 or 2002.  I
17 forget.  I forget what it was.
18     Q.   It was several years, though?
19     A.   Yeah, it was several years.  It was
20 several years.  But the visa numbers were
21 bouncing -- bouncing all around, and there was
22 various discussion on how long it might -- it
23 might take.  But, initially, the whole idea was
24 that Signal understood that they would be filing
25 for permanent residency if the H2B visas were

1  even denied, because the H2B process was
2  speculation at that point because it had been --
3  up to that point, the H2Bs -- all H2Bs had been
4  denied for shipyard workers.
5      Q.    And did you discuss that with Signal
6  at the time --
7      A.    Uh-huh.
8      Q.    -- that --
9      A.    You keep saying at the time.  It's
10  over a series of meetings and, you know, at this
11  Opus -- this Opus luncheon, you know, it was
12  basically an overview.  I'm not sure if we had a
13  teleconference at a later time that we called in
14  or if I went in and met with management -- I
15  mean, I went to Signal several times to discuss
16  this process, and met with Signal, met with
17  Bingle, met with Rigolo in Pascagoula.
18      Q.    All right.  Well, let's say for
19  purposes of the discussion we're having right now
20  about what you told Signal about the various
21  immigration processes, that we're talking about
22  this luncheon meeting and any other meetings you
23  had with management or telephone conversations
24  between the time that you first came in contact
25  with Signal, were introduced to Signal, until the

1  time when you actually began the work on the H2B
2  visa petitions.  So, any conversations that you
3  had with them where you were explaining or
4  discussing both the H2B visa process and the
5  employment-based green card process.  Okay?  I'm
6  just trying to --
7      A.    Is that a question?
8      Q.    No.  I'm trying to get an
9  understanding that we can just talk -- when we're
10  talking about this now -- because you're saying I
11  didn't say it just at that April, 2006 meeting.
12  So, I'm saying we can just agree that we're
13  talking about any meetings or conversations you
14  had during that time frame.  When did you meet
15  them, February of -- or get introduced to them,
16  February of '06 until you started the actual
17  filing.
18      A.    Yeah.  It was --
19      MR. ALEXIS:
20          Wait.  There's no question.
21      There's no question.
22  EXAMINATION BY MS. BOLLMAN:
23      Q.    So, with that context, that we're
24  talking about all of those together, you -- did
25  you discuss with Signal -- well, no.  You just

1  said something -- I'm sorry.  Let me start over.
2          You said that when you had this
3  discussion about the H2B process and the
4  employment-based green card process, that it
5  was -- the green card process was going to be in
6  lieu of the H2B visas, if they didn't -- if the
7  H2Bs were denied?
8      MR. ALEXIS:
9          I'm going to object to form.
10      A.    I remember stating to them that the
11  regulation, it says that the filing of a
12  permanent residency application on behalf of the
13  beneficiary in the same or similar skill will be
14  reason in and of itself to deny a temporary alien
15  labor certification.
16  EXAMINATION BY MS. BOLLMAN:
17      Q.    So, you discussed that with Signal?
18      A.    Uh-huh.  Yeah.
19      Q.    And do you remember who you
20  specifically discussed that with?
21      A.    Signal management.  I mean, again, I
22  met with so many people.  Signal's got probably
23  six -- six or eight various managers.  Different
24  people who we dealt with at different times.  You
25  know, I met -- I met and discussed immigration

1  with Darrell Snyder, with Ron Schnoor, with Tom
2  Rigolo, with Tracey Binion, with John Sanders,
3  with -- there was a young lady that was working
4  in the man camp that I talked about these things
5  with.  Bill Bingle.  I mean -- and, so, it's
6  difficult for me to, you know, discern with whom
7  I said specific things.
8      Q.    Well, in -- in -- with respect to
9  that, did you have one person at Signal that you
10  were using as your contact to explain the whole
11  process so that they understood the totality of
12  what you were saying?
13      MR. ALEXIS:
14          Object to form.
15      A.    No.  They had -- they had no one
16  person.  They had no one person designated.
17  EXAMINATION BY MS. BOLLMAN:
18      Q.    Well, did you ever discuss that with
19  someone at Signal management, that you needed one
20  person who could understand the entire process so
21  that they could make educated decisions about
22  what you were telling them?
23      MR. ALEXIS:
24          Object to form.
25      A.    I would hope that a corporation of

1 and you were filing I-140s for the
2 same workers for another employer?
3 MR. ALEXIS:
4     I'm going to instruct him
5 not to answer it, because I
6 really -- I just think that's
7 totally out of bounds.  I mean,
8 it's probably the last question
9 anyway.
10 MS. HANGARTNER:
11     Change the tape.
12 MS. BOLLMAN:
13     Change the tape.
14 THE VIDEOGRAPHER:
15     We're going off the record.
16 It's 5:22.  This is the end of
17 Tape 6.
18     (Whereupon, a discussion was
19 held off the record.)
20     (Whereupon, the testimony of
21 the witness was adjourned at 5:22
22 p.m.)
23
24
25

1         REPORTER'S CERTIFICATE
2
3
4     I, CAROL VALLETTE SLATER, Certified
5 Court Reporter, Registered Professional Reporter,
6 in and for the State of Louisiana, as the officer
7 before whom this testimony was taken, do hereby
8 certify that MALVERN C. BURNETT, after having
9 been duly sworn by me upon authority of R.S.
10 37:2554, did testify as hereinbefore set forth in
11 the foregoing pages; that this testimony was
12 reported by me in the stenotype reporting method,
13 was prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21     CAROL VALLETTE SLATER (CCR 78020)
    CERTIFIED COURT REPORTER
22     REGISTERED PROFESSIONAL REPORTER
23
24
25

1         WITNESS' CERTIFICATE
2
3
4
5     I, MALVERN C. BURNETT, the
6 undersigned, do hereby certify that I have read
7 the foregoing deposition and it contains a true
8 and correct transcript of the testimony given by
9 me:
10
11
12 ( ) Without corrections.
13 ( ) With corrections as reflected on
14     the errata sheet(s) prepared by me
15     and made a part hereof.
16
17
18
19
20
21
22     MALVERN C. BURNETT
23
24     DATE
25

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
      KURIAN DAVID, SONY         CIVIL ACTION
 4    VASUDEVAN SULEKHA,
      PALANYANDI THANGAMANI,     NO. 08-1220
 5    MARUGANANTHAM KANDHASAMY,
      HEMANT KHUTTAN, ANDREWS    SECTION "A"
 6    ISSAC PADA VEETTIYL, AND
      DHANANJAYA KECHURA, ON     MAGISTRATE 3
 7    BEHALF OF OTHER SIMILARLY
      SITUATED INDIVIDUALS, AND
 8    SABULAL VIJAYAN, KRISHAN
      KUMAR, JACOB JOSEPH
 9    KADDAKKARAPPALLY, KULDEEP
      SINGH, AND THANASEKAR
10    CHELLAPPAN, INDIVIDUALLY,
11               PLAINTIFFS
12    VERSUS
13    SIGNAL INTERNATIONAL,
      LLC, MALVERN C. BURNETT,
14    GULF COAST IMMIGRATION
      LAW CENTER, L.L.C., LAW
15    OFFICES OF MALVERN C.
      BURNETT, A.P.C.,
16    INDO-AMERI SOFT L.L.C.,
      KURELLA RAO, J & M
17    ASSOCIATES, INC. OF
      MISSISSIPPI, GLOBAL
18    RESOURCES, INC., MICHAEL
      POL, SACHIN DEWAN, AND     VOLUME 4
19    DEWAN CONSULTANTS PVT.
      LTD. (a/k/a MEDTECH
20    CONSULTANTS).
21               DEFENDANTS.
22
      Deposition of MALVERN C. BURNETT, 1523 Polymnia
23    Street, New Orleans, Louisiana  70130, taken in
      the offices of Middleberg, Riddle & Gianna, 31st
24    Floor, 201 St. Charles Avenue, New Orleans,
      Louisiana  70170, on Wednesday, the 13th day of
25    January, 2010, beginning at 1:17 p.m.
```

1 extension?
2    A.   An H2B extension.
3    Q.   Oh, there'd be a third extension to
4 the original?
5    A.   You can extend, as I indicated, by
6 law, you're permitted to extend an H2B worker or
7 continue with H2B status for a continuous
8 duration of three years.
9    Q.   Okay. Because I thought you said
10 two extensions, each one being ten months?
11    A.   And three times ten is 30.
12    Q.   Right.
13    A.   And, conceivably, there's a third
14 one beyond that. You can file it. Typically,
15 you know, even if it were denied, you can still
16 take an extension while the application is
17 pending. The workers can continue to work for a
18 period of up to 240 days.
19    Q.   Oh, I see. So, you can draw it out
20 like that; is that right?
21    A.   I don't know if that's a correct
22 characterization, but the law permits workers for
23 whom timely applications for extensions have been
24 filed to work for a period of up to 240 days or
25 until a decision from the district director is

1 rendered, whichever shall come first.
2    Q.   Okay. How much would it cost --
3 well, let's just look at Exhibit 577. You have
4 the exhibits in front of you?
5    A.   No, I do not.
6    Q.   You don't have all the exhibits from
7 your deposition at your --
8    A.   I just told you I do not.
9 MR. SANDLER:
10      Does other counsel have it
11    available to make it available to
12    Mr. Burnett?
13 MS. HANGARTNER:
14      I'm getting it. What was
15    the exhibit? 577?
16 THE WITNESS:
17      Okay. I've got the document
18    in front of me.
19 EXAMINATION BY MR. SANDLER:
20    Q.   Great. I'm not going to ask you to
21 look at too much, but you can look at the whole
22 thing if you don't recall it, and then I'll
23 ask -- well, it's really just Paragraph V that I
24 want to ask you about, Roman Numeral V.
25    A.   Okay. I'm looking at it.

1    Q.   Okay. So, this is an agreement -- I
2 think you stated yesterday you did not draft the
3 agreement; is that right?
4    A.   I did not.
5    Q.   Do you recall who did?
6    A.   No, I do not. I am not sure if
7 Michael Pol's attorney, Jimmy Heidelberg --
8    Q.   That's just Michael Pol's
9 attorney --
10    A.   I'm not sure if he -- typically, he
11 would have his lawyers look at the documents and
12 draft in particular if they're in effect here. I
13 think this is probably something Jimmy Heidelberg
14 had a hand in, but I can't be sure.
15    Q.   Okay. But you don't have any
16 recollection of that?
17    A.   No.
18    Q.   Okay. And, so, from Paragraph V,
19 and it starts: All parties agree to charge five
20 lakh or 500,000 rupees, would you agree?
21    A.   Yeah. We had that issue previously,
22 and I think that's the way we resolved it.
23    Q.   Okay. That's the price of a
24 permanent residency green card?
25 MR. ALEXIS:

> Burnett
> 782:18-783:13

1      Object to form.
2 MR. SHAPIRO:
3      Object to form.
4    A.   That's what it -- that's what it --
5 that's what it appears to state, yes.
6 EXAMINATION BY MR. SANDLER:
7    Q.   Okay. Thanks. And on the back
8 page -- you will forgive me if this was asked
9 yesterday, but that's -- these are the three
10 parties to the agreement, Michael Pol, Sachin
11 Dewan and yourself, Malvern Burnett. I'm looking
12 at DEWAN 00945 right now.
13    A.   Correct.
14    Q.   Okay. How much does -- suppose that
15 a worker simply wanted -- scratch that.
16      I want to look at Exhibit 583. It's
17 an e-mail from you and Michael Pol to Sachin
18 Dewan, and the Bates number is DEWAN 000508 to
19 509.
20    A.   I see it.
21    Q.   Now, in the third paragraph -- do
22 you want a moment to read it over or --
23    A.   You can ask me a question.
24    Q.   Okay. Sure. In the third
25 paragraph, which begins:

Object to form.

EXAMINATION BY MR. SANDLER:

Q. If I were an Indian worker in this time period, say, the '06 time period, and I just wanted an H2B, what would a normal charge for that be?

A. It just depended.

Burnett 865:16-857:16

MR. ALEXIS:

Object to form, but go ahead.

EXAMINATION BY MR. SANDLER:

Q. No, I understand it depends.

A. It would depend, you know, who the petitioner was, what the duration of employment was, what the type of employment was.

Q. Say that the duration would be ten months and I wanted to go work for Signal and all I wanted was an H2B. How much would you charge?

MR. ALEXIS:

I'm going to object to the form of that question.

A. It would depend on the -- on the success rate, on --

EXAMINATION BY MR. SANDLER:

Q. Right.



A. -- the type of employment, the earnings ability of the employment, a variety of factors.

Q. Okay. So, what would be the ballpark, if you could give me a range?

MR. ALEXIS:

I'm going to object to the form and also that it's -- I think y'all already talked about that in your direct, but I'm going to go ahead --

A. Yeah. As we discussed earlier, we were going to be doing, for instance, we had discussed doing H2Bs subsequently in 2007, and we talked about a range anywhere from 1,000 to $6,000.

EXAMINATION BY MR. SANDLER:

Q. A thousand to $6,000. Okay.

So, if the earning ability for the employer is higher than for another employer, would you charge more?

MR. ALEXIS:

Object. I'm going to object to the form again. You're outside of the scope of redirect.



MR. SANDLER:

No. I respectfully disagree with that, Ralph.

MR. ALEXIS:

Hold on one second, if you please. Let's stop a second.

I'm going to instruct him not to answer because if you go to, just for example, Page 361 and 362, this whole line of questioning was gone into by Dan --

MR. SANDLER:

What was the line?

MR. ALEXIS:

-- about, you know, how much -- how much do you charge for various things. If you look at Page 361, 362.

Would you please read back the question?

MR. SANDLER:

Before Carol does that, plaintiffs' position is you can always get a clarification for the



record. We're just trying to get some straight answers.

MR. ALEXIS:

If you're asking for a clarification of what Dan asked him --

MR. SANDLER:

It's not the same question, Ralph.

MR. ALEXIS:

Hold on one second.

MR. SANDLER:

If you want to point me to the line that you're seeing on Page 361 or 362 that is my question, then, you know, that's something that we can kind of debate about.

THE COURT REPORTER:

Question: So, if the earning ability for the employer is higher than for another employer, would you charge more?

MR. ALEXIS:

But my question is: What

Page 884

WITNESS' CERTIFICATE

I, MALVERN C. BURNETT, the undersigned, do hereby certify that I have read the foregoing deposition and it contains a true and correct transcript of the testimony given by me:

( ) Without corrections.
( ) With corrections as reflected on
the errata sheet(s) prepared by me
and made a part hereof.

MALVERN C. BURNETT

DATE

Page 885

REPORTER'S CERTIFICATE

I, CAROL VALLETTE SLATER, Certified Court Reporter, Registered Professional Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MALVERN C. BURNETT, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

CAROL VALLETTE SLATER (CCR 78020)
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250    CERTIFIED COURT REPORTERS    NEW ORLEANS, LA 70139

# DEPOSITION EXCERPTS

## CHRIS CUNNINGHAM

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
     KURIAN DAVID, SONY           CIVIL ACTION
 4   VASUDEVAN SULEKHA,
     PALANYANDI THANGAMANI,       NO. 08-1220
 5   MARUGANANTHAM KANDHASAMY,
     HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6   ISSAC PADA VEETTIYL, AND
     DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7   BEHALF OF OTHER SIMILARLY
     SITUATED INDIVIDUALS, AND
 8   SABULAL VIJAYAN, KRISHAN
     KUMAR, JACOB JOSEPH
 9   KADDAKKARAPPALLY, KULDEEP
     SINGH, AND THANASEKAR
10   CHELLAPPAN, INDIVIDUALLY,
11              PLAINTIFFS
12   VERSUS
13   SIGNAL INTERNATIONAL,
     LLC, MALVERN C. BURNETT,
14   GULF COAST IMMIGRATION
     LAW CENTER, L.L.C., LAW
15   OFFICES OF MALVERN C.
     BURNETT, A.P.C.,
16   INDO-AMERI SOFT L.L.C.,
     KURELLA RAO, J & M
17   ASSOCIATES, INC. OF
     MISSISSIPPI, GLOBAL
18   RESOURCES, INC., MICHAEL
     POL, SACHIN DEWAN, AND
19   DEWAN CONSULTANTS PVT.
     LTD. (a/k/a MEDTECH
20   CONSULTANTS).
21              DEFENDANTS.
22   Videotaped deposition of CHRIS CUNNINGHAM, CPA,
     Suite 16250, 11 North Water Street, Mobile,
23   Alabama  36602, taken in the offices of
     Middleberg, Riddle & Gianna, 31st Floor, 201 St.
24   Charles Avenue, New Orleans, Louisiana  70170, on
     Friday, the 26th day of February, 2010, beginning
25   at 9:10 a.m.
```

1  buyer and a willing seller to know that.
2      Q.   Quite right.  But why do you think
3  it's depreciated?
4      MS. HANGARTNER:
5          I am going to object to
6      form.  Hugh, with all due respect,
7      this has nothing to do with class.
8      Nothing.  Signal's current
9      financial status is merits only,
10     not class.  I mean, I understand
11     where you're trying to go, but I
12     don't think you can get there in
13     class.
14     MR. SANDLER:
15         I'm just responding to an
16     answer that Mr. Cunningham gave.
17     MS. HANGARTNER:
18         You're pushing the envelope
19     a little far.
20     MR. SANDLER:
21         Can we take a break now?
22     THE VIDEOGRAPHER:
23         Sure.  Off the record.  The
24     time is 10:03.  This is the end of
25     Tape 1.

1          (Whereupon, a discussion was
2      held off the record.)
3      THE VIDEOGRAPHER:
4          This is the continued
5      videotaped deposition of Chris
6      Cunningham.  This is the beginning
7      of Tape 2.  The time is now 10:13.
8  EXAMINATION BY MR. SANDLER:
9      Q.   Mr. Cunningham, I just wanted to ask
10 you a quick question about those entities again.
11 Sorry.  This is a new question about it.
12     A.   Sure.
13     Q.   Does -- Signal International Texas,
14 G.P. entity, who was the director of that entity?
15 Who was the head of that entity?
16     A.   At what time?
17     Q.   Sorry.  2006, 2007, 2008.
18     A.   I believe there was an overlap.
19 There was a chain.  I believe in 2006, and I'm
20 not sure of the timeline, Tom Rigolo was the
21 senior VP and general manager of the Texas
22 operation, and then somewhere in that time frame,
23 Rodney Meisetschlaeger -- anyway, he became the
24 senior VP and general manager.
25     Q.   When was that, do you know, around?

1  Just roughly.  I don't need the specific month.
2      A.   It was March/April -- no, I think
3  John Haley came in and temporarily took over the
4  operation, and John Haley had been the original
5  head of the Texas operation when Signal started.
6  When Tom Rigolo left, John Haley came out of
7  retirement and came back until we found Rodney
8  Meisetschlaeger.
9      Q.   So, there was no overlap between Tom
10 Rigolo and Rodney Meisetschlaeger?
11     A.   There was a short gap.
12     Q.   A short gap.  Okay.  Now, Signal
13 Texas, G.P., the entity, they took their
14 instruction and counsel from Signal International
15 in terms of policies and --
16     A.   Yes.
17     Q.   Signal International, L.L.C. at the
18 time --
19     A.   Correct.
20     Q.   -- governed it even though the
21 entity was on paper paying the payroll of the
22 workers, right?
23     A.   The paychecks came from the G.P.
24     Q.   Right.
25     A.   I mean, that's what it says on

**Cunningham 56:12-57:21**

1  there.  Where the money came from came from a
2  Texas bank account, a Texas payroll account.
3      Q.   Right, but not just the money, but,
4  like, the policies, how the organization was run,
5  that entity was governed out of, like, the Signal
6  International, L.L.C. entity based in Pascagoula;
7  is that right?
8      A.   At that time, correct.
9      Q.   Okay.  So, it was a separate entity
10 on paper and the payroll records will indicate
11 that that entity paid the Texas employees --
12     A.   Correct.
13     Q.   -- but for all intents and purposes,
14 it's Signal International, L.L.C.?
15     A.   Policy was governed by the corporate
16 people, myself being one of them, which reside in
17 the L.L.C.
18     Q.   Right.  Okay.  So, there were no
19 significant differences other than, like, maybe,
20 like, legal distinctions about entities?
21     A.   Correct.
22     Q.   In 2006, 2007, 2008, did Mr. Marler
23 ever share with you an idea of taking Signal
24 public?
25     A.   It was -- it was a discussion that

1  we both had.
2     Q.   Okay.
3     A.   Since I am the financial person,
4  anything that would have to do with something
5  like taking the company public would more come
6  under my realm rather than his in terms of the --
7  what needs to be done to do it.
8     Q.   Right.  Right.  Right.  So, where
9  did the idea emerge from?
10    A.   The one -- well, the idea was the
11  original investors, and that's what they were,
12  investors, would have at some point in time an
13  exit strategy, and one of the methods in which to
14  cause that exit to happen would be the
15  possibility of a number of different
16  transactions, one of which could be a public
17  offering.
18    Q.   How many private investors were
19  there?
20    A.   There was one entity that owned
21  Signal, L.L.C., and that was ACON Offshore
22  Partners.
23    Q.   Okay.  And that's the only private
24  investor that Signal had?
25    A.   That was -- at that time, that was

1  the only investor.
2     Q.   And when you say "at that time,"
3  what time are you referencing?
4     A.   I'm talking from inception in 2003
5  up through January 3rd of 2008.
6     Q.   So, there's no Brener Group as a
7  private investor of Signal?
8     A.   Not directly in Signal.
9     Q.   Okay.  Indirectly in Signal?
10    A.   Well, the entity that owns Signal
11  was ACON Offshore Partners, G.P.
12    Q.   Okay.  And did they also own Brener
13  Group?
14    A.   No, not to my knowledge.
15    Q.   Okay.  So, how was Brener Group
16  indirectly an investor of Signal?
17    A.   I would believe that they were an
18  investor within the ACON Offshore partnership.
19    Q.   Okay.  So, Brener was an investor of
20  ACON Offshore --
21    A.   Partners.
22    Q.   Partners, G.P.
23    A.   Right.  He was a limited partner.
24    Q.   Gabriel Brener.
25    A.   Okay.

1     Q.   Have you ever met Mr. Brener?
2  MS. HANGARTNER:
3        Object to form.
4     A.   By phone only.
5  EXAMINATION BY MR. SANDLER:
6     Q.   So, you said that the public
7  offering was an option for Signal as a method for
8  the investor to divest their interests in the
9  corporation; is that right?
10    A.   It was a consideration.
11    Q.   It was a consideration.  So, how
12  serious was the consideration?
13    A.   As serious as any other one, any
14  other option, which would have either been a
15  144(a) transaction, which we ultimately did, or a
16  merger, or being acquired by another company.
17    Q.   Right.  Sorry.  That's a good
18  answer.  What I mean is not like how was it going
19  to be -- how was it going to materialize.  My
20  question was:  In the thinking of Signal at the
21  time amongst the senior people, such as yourself
22  and, I guess, Mr. Marler, what was -- did you
23  want to do a public offering, or what was the,
24  like, the impetus there?
25    A.   I think it was -- a public offering

1  was a consideration, but after considering all
2  the facts, it became clear that that was not the
3  way to proceed.
4     Q.   When did that become clear?
5     A.   I don't know the exact date.
6     Q.   I don't mean the exact date.
7     A.   Oh, after meeting with various
8  investment bankers and having discussions, we
9  just didn't have the size or the mass to do it.
10    Q.   What year was that?
11    A.   Gosh.  It started in 2000- -- I
12  think late 2006.  Yeah.  It was in 2006.
13    Q.   That you were thinking about doing
14  it?
15    A.   Right.
16    Q.   And when did you meet with the
17  bankers?
18    A.   Huh?
19    Q.   When did you meet with the bankers?
20    A.   Oh, during the third and fourth
21  quarter of 2006.
22  MS. HANGARTNER:
23        Hugh, did you intend to mark
24  this as an exhibit?
25  MR. SANDLER:

Cunningham
60:17 - 61:12

1    I did.  Sorry.  My bad.
2    Let's mark that Exhibit 763.  I'm
3    entering an Exhibit 763.  We've
4    actually already discussed it, but
5    I'm now numbering it.  It's an
6    article, and the headline of the
7    article is Signal Buys Bender
8    Shipyard, and it's from the Mobile
9    Register, and it's an article
10   dated January 16th, 2010.
11        (Whereupon, Exhibit Number
12   763 was marked for identification.)
13   MR. ALEXIS:
14        Okay.
15   MR. SANDLER:
16        So, just as an FYI, and it's
17   an Exhibit 763.
18   MR. ALEXIS:
19        Thank you.
20   MR. SANDLER:
21        No problem.
22   EXAMINATION BY MR. SANDLER:
23   Q.   I want to -- you've met Mr. Sanders,
24   right, John Sanders?
25   A.   Yes.  Yes.

1    Q.   Did you know that he kept a personal
2    diary at Signal?
3    A.   I've heard that.
4    Q.   Okay.  He kept it on the Signal
5    server.  You've heard that?
6    A.   I heard that.
7    Q.   Okay.  This is just to establish the
8    timing.  I just want to get everything straight
9    on the record.
10   A.   Okay.
11   Q.   I'm going to show you an entry of
12   Mr. Sanders', and it actually -- it's heavily
13   redacted, so, it looks a bit strange, and you
14   have to read it from the third page to the first
15   page, but bear with me, but just have a look at
16   it and I want to ask you about some timing.  It's
17   originally been entered as Exhibit Number 649.
18   For the record, it's SIGE0556941.  I'm concerned
19   with the Tuesday, April 17th entry.  It goes all
20   over the place because of the redactions.
21   A.   Okay.  Okay.
22   Q.   Okay.  So, this is an entry that
23   John recorded in and around April 17th, 2007.  He
24   generally made entries the evening of, but it's
25   in and around that date.  You see how they're

1    still talking about going public here on the
2    first page?
3    A.   I see that.

Cunningham 64:4-67:23

4    Q.   So, is it possible that Signal was
5    still contemplating going public in April of
6    2007?
7    A.   Yes.
8    Q.   Okay.  Do you know a fixed date when
9    they definitely weren't thinking about going
10   public anymore?  I don't mean to put you -- if
11   you don't know, you don't need to guess.  I'm
12   just asking.
13   A.   I would have to look at it.  I would

Cunningham 64:18-68:2

14   have to look at my records.
15   Q.   Sure.
16   A.   It was sometime in 2007, you know,
17   second, third quarter.  I don't know.
18   Q.   What's important when you're taking
19   a company public that's -- on the financial side?
20   A.   A good story.
21   Q.   All right.
22   A.   A good history.  Growth potential.
23   Q.   Okay.  Let's stop and just go down
24   there.  What's a good story?
25   A.   Good story is something that gets an

1    investor's attention, rapid growth, the ability
2    to continue growth and profitability, good
3    multiples.
4    Q.   What are multiples?
5    A.   EBITDA and -- you can equate it to
6    earnings per share.
7    Q.   EBITDA is earnings before income
8    taxes, depreciation and amortization.  And do you
9    agree?
10   A.   That's correct.
11   Q.   So, those -- so, how do you get good
12   multiples?
13   A.   Well, the other thing, good
14   management, too.
15   Q.   Good management.  Okay.  I mean,
16   what is good management, for instance?
17   A.   A management team that appears to be
18   competent and, I guess, competency is judged by
19   the results of that organization.
20   Q.   Okay.  So, it's kind of a self-
21   fulfilling prophecy, if you're successful, you're
22   going to be presumed to be good management?
23   A.   Correct.  And, normally, conversely,
24   when a company's not doing well, management
25   generally gets the blame that they're

1  incompetent, so --
2      Q.   Sure.  So, what -- how do you get a
3  good EBITDA?
4      A.   Profitability.
5      Q.   Okay.  Is that just it?
6      A.   Cost management, profitability, the
7  ability to perform on your jobs, on your
8  construction jobs.  You know, performance.
9      Q.   You mean, like, financial
10 performance?
11     A.   No.
12     Q.   Oh.
13     A.   Bidding jobs correctly, Number 1,
14 and then performing, making your budgets.  Our
15 business is primarily the sale of man-hours and
16 each job we budget how many man-hours it will
17 take to perform a certain job, and a budget is
18 saying you can do this in a thousand hours, and
19 if you do it in a thousand hours or less, then,
20 you're performing very well.
21     Q.   Right.
22     A.   And if you go over that --
23     Q.   So, just -- just so we're clear for
24 the record.  EBITDA -- the E is earnings?
25     A.   Right.

1      Q.   And that is what your earnings are
2  before you deduct everything else that EBITDA
3  stands for, right?
4      A.   That's correct.
5      Q.   So, earnings is your profit, right?
6      A.   Before those items, correct.
7      Q.   Before those items.  What we might
8  call your gross profit or -- not your gross
9  profit, but --
10     A.   It would be your net.  It would be
11 your net before your items.
12     Q.   Net before your items.  Okay.
13     A.   Net income, it's generally referred
14 to.
15     Q.   Net income.  Thank you.  So, in
16 order to have a good EBITDA, you need a good net
17 income.
18     A.   Correct.
19     Q.   And net income is a function of
20 profit?
21     A.   Correct.
22     Q.   And profit is revenue minus costs?
23     A.   That is absolutely correct.
24     Q.   Aside from taking the company
25 public, you need a good EBITDA just to keep your

1  private investors happy and --
2      A.   That's a fair statement.
3      Q.   All right, Mr. Cunningham.  I want
4  to show you another document.  I want to show you
5  another document, and it is Bates SIGE0005430,
6  and I'm going to mark it Exhibit Number 764.
7  It's a quick read.
8           (Whereupon, Exhibit Number
9           764 was marked for identification.)
10     A.   Okay.  Okay.
11 EXAMINATION BY MR. SANDLER:
12     Q.   So, this is the letter you sent to
13 Mr. Pol terminating him as your agent, correct?
14     A.   Correct.
15     Q.   And I see that you've signed it
16 here.
17     A.   That's my signature.
18     Q.   Did you draft this letter?
19     A.   No.
20     Q.   Okay.  Who drafted it?
21     A.   I'm not sure.  My -- I can only
22 assume that Lisa Spears did.
23     Q.   Okay.  Were you involved in the
24 decision to terminate Mr. Pol?
25     A.   No.

1      Q.   When did you learn that Signal was
2  terminating Mr. Pol?
3      A.   Probably shortly on or before this
4  letter being written.
5      Q.   Did you know the reasons they were
6  terminating Mr. Pol?
7      A.   I was told what the reasons were.
8      Q.   What were you told?
9      A.   I was told that there had been a
10 meeting between Ron Schnoor and Mr. Pol regarding
11 fees that had been paid by the H2B workers and
12 the amount of the fees were not the fees that
13 were originally told to us that these workers
14 were paid -- or had paid, and when we learned of
15 it, we brought him in and demanded of him to make
16 a refund, and I forget what that refund would be,
17 which he had --
18     Q.   Were you --
19     A.   I was not at the meeting.
20     Q.   You were --
21     A.   I was not at the meeting.
22     Q.   You were not at the meeting.  Okay.
23 So, this is all what Mr. Schnoor told you or
24 maybe John Sanders or --
25     A.   Most likely Ron.

18 (Pages 66 to 69)

1      into the draft Housing Agreement
2      and send to Michael Pol?"
3         So, Signal drafted the housing
4  agreement? Would you know that?
5     A.   Yeah, in conjunction with our law
6  firm.
7     Q.   Okay. So, they didn't draft -- your
8  testimony is that they didn't draft the Global
9  Resources agreement, the April 18th, 2006, one,
10  but they did draft the housing agreement in the
11  fall of '06?
12     A.   Yes.
13     Q.   And by "they," I mean Signal.
14     A.   Yes.
15     Q.   Do you know why they would have
16  chosen to draft the housing agreement and not
17  chosen to draft the --
18     A.   Because I don't think a housing
19  agreement existed, to my knowledge.
20     Q.   Okay. So, the --
21     A.   There wasn't one to take from
22  anywhere else.
23     Q.   Okay. So, you drafted from scratch.
24  Is that right?
25     A.   Correct.

1     Q.   So, now, you, at the top of the
2  second page --
3     A.   Okay.
4     Q.   You've basically signed off on this
5  housing agreement. Right? They're asking are
6  there any more comments, and you're saying:
7  "None that I'm aware."
8     A.   Correct.
9     Q.   So, you reviewed that contract and
10  you were okay with it?
11     A.   Correct.
12     Q.   Can you describe for me the process
13  of coming up with the $35 a day fee, the factors
14  that you discussed?
15     A.   Well, Number 1, the cost of the
16  food, which is the largest part, and I believe
17  that to be have been $14 a day for three meals.
18     Q.   Okay. Yes.
19     A.   And the remaining $21 was discussed
20  in general with regard to the overall operating
21  costs, projected operating costs of the camp,
22  along with the cost to establish the camp and to
23  recoup some of that investment. Now, you know,
24  as it stands, we didn't do a very good job,
25  apparently, because at the end of the day, we

1  spent $6½ million more than we collected. So, we
2  didn't really recover anything.
3     Q.   You arrived at this $35 a day fee on
4  this day? This e-mail is October 19th, 2006.
5  Let me put it into context for you.
6     A.   On or about.
7     Q.   On or about. On October 18th, 2006,
8  John circulated the Pascagoula man camp cost
9  analysis. Okay?
10     A.   Okay.
11     Q.   And this is October 19th, 2006.
12     A.   Okay.
13     Q.   So, is that cost analysis a factor
14  in determining the $35 a day fee?
15     A.   I'm sure it was.
16     Q.   So, what other factors were there in
17  that -- let's say the 21? I understand the 14
18  was some kind of, like, arrangement you had. So,
19  in the $21 of the $35, what was the --
20     A.   Rationale?
21     Q.   Yeah. Or the factors? What are the
22  things that were important?
23     A.   I believe, to the best of my memory,
24  that discussion was to recover the cost of the
25  camps over approximately a five-year period,

1  knowing that these workers would be here for a
2  max of, you know, roughly two years, give or
3  take, but that we would continue in the H2B
4  program and we would get more --
5     Q.   More temporary workers?
6     A.   -- more temporary workers.
7     Q.   Oh, okay.
8     A.   And that would be a risk that we
9  would take and we took that risk and it didn't
10  pay off because we didn't have them for a five-
11  year period. So, in any business decision,
12  there's a risk.
13     Q.   Sure. Yeah. You know, I'm not
14  trying to say you made a bad decision. I just
15  want to know what the factors were.
16     A.   Right.

Cunningham
137:17-139:9

17     Q.   So, it was just the factor, if there
18  weren't any others, is recouping the cost of this
19  man camp?
20     A.   Correct.
21     Q.   So, $35 a day fee is 1,050 per month
22  per person?
23     A.   Correct.
24     Q.   So, cancelling the program, bringing
25  in the workers, is what I mean by program, would

1 be detrimental to the finances, given the costs
2 that you had already sunk?
3     A.   It depends on your definition of
4 "detrimental."
5     Q.   Well, we spoke about millions of
6 dollars that had already been --
7     A.   Well, it would depend on whether or
8 not we could actually remarket these man camps if
9 no one came and entered into them and they were
10 brand -- I say brand-new --
11     Q.   Yeah.
12     A.   Okay -- they were new to us, but
13 anyway.
14     Q.   Okay.
15     A.   I'm glad I'm amusing.  But anyway,
16 that we would be able to sell them back.
17 Hopefully, GE would help us to market them to one
18 of their other customers.
19     Q.   Did you have any of those plans in
20 place?
21     A.   No, because at the time, it wasn't
22 necessary.
23     Q.   Okay.  But in any case, you needed
24 some kind of financing -- the provision of the
25 man camp was tied to some kind of other monies

1 coming in to afford it, the Indian workers or a
2 plan -- like a Plan B, so to speak, to afford it?
3     A.   Correct.
4     Q.   And because you had no other plan in
5 place, if no Indian workers had come, that would
6 have been pretty detrimental at that point, and
7 then you would have had to, like, scramble for a
8 Plan B; is that right?
9     A.   That's more than likely.
10     Q.   I'm now going to show you another
11 document, and it's a letter that you sent to GE.
12     A.   Okay.
13     Q.   And the Bates for it is SIGE0055589,
14 and it's Exhibit Number 774.  I'll give you as
15 much time as you need for it.
16         (Whereupon, Exhibit Number
17         774 was marked for identification.)
18     A.   Okay.
19 EXAMINATION BY MR. SANDLER:
20     Q.   Okay.  Who put this table together,
21 do you know?
22     A.   I can only -- I don't know for
23 certain, but I assume it's John Sanders.
24     Q.   Okay.  And these numbers here, these
25 totals at the bottom, Pascagoula and Orange, do

1 you see that there?
2     A.   I do.
3     Q.   They're very close in value.
4     A.   Okay.
5     Q.   And the Pascagoula being 2.629
6 million, roughly, and the Orange being 2.641
7 million, roughly, right?
8     A.   That's what it says.
9     Q.   Okay.  Are these the other
10 expenditures that you were mentioning earlier
11 today when you said there were other costs to
12 setting up the man camp?
13     A.   I'm sure they -- they are some of
14 them, yes.
15     Q.   But you don't think they're all of
16 them?
17     A.   No.  I don't believe this is the
18 total cost of the man camps.
19     Q.   Okay.  What is the purpose of this
20 letter to GE?
21     A.   To increase the amount that we're
22 going to be borrowing, that we were initially put
23 forwards to them that we were going to borrow or
24 lease.
25     Q.   So, why -- and this is October 24.

1 This is a week before the first workers arrive.
2 I know you don't know that, but they did arrive
3 on October 31st.
4     A.   Okay.
5     Q.   So, why wouldn't you include all the
6 costs?
7     A.   I don't know if we had all of the
8 costs yet.  We continued to incur costs all
9 during the course of them being here.  We
10 continually upgraded and made improvements to the
11 facilities.
12     Q.   But from Day 1, okay, from when the
13 first Indian workers arrived, are these all the
14 costs?
15     A.   Oh, I don't know that to be fact.  I
16 mean, as of this particular date, maybe as of the
17 prior accounting period, which would have been
18 September 30th.  I don't know if this -- since
19 the letter is written in the middle of the month,
20 whether it included expenditures in the month of
21 October, or whether there was some type of cutoff
22 period.
23     Q.   Fair enough.  But what would you --
24 suppose you were writing this letter today in a
25 similar situation, what would you want to see on

36 (Pages 138 to 141)

(504)831-1753                          HUFFMAN & ROBINSON, INC.                          (800)749-1753
433 METAIRIE ROAD, #220               CERTIFIED COURT REPORTERS                  METAIRIE, LA  70005

1    Q.    -- was capitalized.  So, that
2  wouldn't include, like, the welder training?
3    A.    Items such as that, that's correct.
4    Q.    So, 6.4 million -- so, that's the
5  money that you would be looking to recuperate
6  through the per diem and things of that nature?
7    A.    Yes.
8    Q.    Okay.  Anything else that the per
9  diem would seek to recuperate?  Would it be
10  trying to recuperate a number that includes,
11  like, the welding training and stuff like that?
12    A.    Anticipated operational costs to run
13  the facility.
14    Q.    Okay.  So, when you came up with
15  that $35 a day fee, what numbers were kind of
16  relevant to your calculation?
17    A.    Operational costs and recovering
18  expended capital.
19    Q.    Right.  Okay.  So, you would be
20  looking -- so, you would have been considering a
21  number greater than the 6.4 million number that
22  you testified to earlier today, right?
23    A.    At the time that we -- at the time
24  that we developed that rate, we had that work
25  sheet that John Sanders performed.

1    Q.    Right.
2    A.    That was the basis by which we used.
3  As it turned out, the capitalized costs were much
4  greater than that.  So, you're asking me a
5  question of what -- an after-the-fact question.
6  I can't go back and look at numbers today and
7  those numbers were not used to develop the $35 a
8  day rate.  The numbers that were prepared by John
9  Sanders were what was used to prepare it.
10    Q.    Okay.  That makes sense to me.  I
11  follow you.  So, in terms of calculating that
12  cost, the document that I showed you a little bit
13  earlier, that one there -- what's the exhibit
14  number of it, 774, the yellow --
15    A.    Yeah, 774.
16    Q.    So, 774, those -- that's the same
17  date -- well, it's about five days after you had
18  established the $35 a day fee.  So, would these
19  be the kinds of things that would have been on
20  your mind in terms of --
21    A.    I don't know if these would have
22  been.  I think that the former document that we
23  used which had the spreadsheet --
24    Q.    Yeah.
25    A.    -- would have been the basis by

1  which we used.  I mean, obviously, the timeline
2  is right in line with --
3    Q.    Yeah.  That's right.  And you didn't
4  have a hand in putting that spreadsheet together,
5  is that what you're saying?
6    A.    I did not.
7    Q.    So, you just took on face what John
8  produced to you?
9    A.    He has got an M.B.A. from Columbia.
10  I hope he knows what he is doing.
11    Q.    All right.  When we were talking
12  about the contract earlier today, I think it was,
13  like, kind of the first topic that we began to
14  cover, you said that you weren't familiar with
15  H2B and permanent resident.  You didn't have a
16  knowledge of that.
17    A.    I don't believe I said that.
18    Q.    Okay.  Well, is it the case that at
19  the time of contracting with Michael Pol, Global
20  Resources, Signal had a need for workers?
21    A.    Yes.
22    Q.    Okay.  How would you characterize
23  that need?
24    A.    If you've ever been through a major
25  hurricane like that, you would understand, and

1  it's hard to explain when there's complete
2  devastation and it looks like a hurricane has
3  gone off and you're dealing with both business
4  and personal issues, which everyone was dealing
5  with.  I myself lost everything to Hurricane
6  Katrina.  You try to put the business back
7  together the best you can and salvage and
8  mitigate the damage that was done, and then you
9  have our federal government come in and start
10  paying exorbitant wages to people to help clean
11  up and steal your workforce and you are left with
12  trying to satisfy customers who have had
13  equipment that is valued, you know, in the
14  billions of dollars that is vital to every one of
15  us sitting at this table who puts gasoline in
16  their car and you try to get them back and
17  working so as to avert what could be an even more
18  catastrophic event, and you do whatever you have
19  to to go get workers, and this opportunity came
20  up, was presented to us, and we said, we need to
21  pursue this.  We need workers here.
22    Q.    Okay.  Thank you.  When you -- when
23  you said the government came in and paid
24  exorbitant wages, are you saying this is FEMA
25  that came in and --

1  time period?
2      Q.   Yeah.
3      MS. HANGARTNER:
4          Produced in the 15th
5  production.
6      MR. SANDLER:
7          Okay.  Thank you.  Forgive
8  me for asking for something you've
9  already produced.
10     MS. HANGARTNER:
11         That's okay.
12     A.   These don't match up with the
13  figures that I have, so, I don't -- I'm not --
14  EXAMINATION BY MR. SANDLER:
15     Q.   Okay.
16     A.   They were prepared by two different
17  individuals, so, I don't know -- but they're
18  within reason.
19     Q.   They're within reason.  Okay.  Is it
20  possible that we can get those documents that you
21  have in your folder with you today?
22     MR. SANDLER:
23         I'll ask Erin.
24     MS. HANGARTNER:
25         Uh-huh.

1      MR. SANDLER:
2          That's possible?
3      MS. HANGARTNER:
4          Sure.
5      MR. SANDLER:
6          We could have photocopies at
7  the end of the day or something?
8  And that would be, like, a little,
9  tiny production.
10     MS. HANGARTNER:
11         Yes.
12  EXAMINATION BY MR. SANDLER:
13     Q.   So, I just want to ask you, so, some
14  months, at least -- I'm looking at this sheet,
15  and I realize you've made some kind of
16  qualifications to it.

Cunningham 171:18-23

17     A.   Yeah.
18     Q.   But it's fair to say that some
19  months Signal made more money off the deducts
20  than their costs were; is that right?
21     A.   Correct.  And that was the intent,
22  to help pay back the capital expenditures.  So,
23  that was a good thing when that happened.
24     Q.   Right.  Now, I'm asking you about --
25  you see the year-to-date on SIGE0558493?

1      A.   The year-to-date?
2      Q.   Yeah, after the December column,
3  it's YTD.
4      A.   Yeah.  Yeah.
5      Q.   So, Signal took in $1.36 million
6  from the Texas workers in 2007?
7      A.   Correct.
8      Q.   And then you've got payroll accrual.
9  Can you explain that to me?
10     A.   That's what will be coming out, even
11  though the check would fall into the next year,
12  it was for the period --
13     Q.   Okay.  Thank you.  So, it's actually
14  1,383,762.44.
15     A.   That's correct.  Even though the
16  employees may not have received their $22,000
17  yet, that was in between paycheck.
18     Q.   Right.  Right.  Well, they never got
19  the money -- well, they never saw the money on
20  their check.  It was a direct payroll deduct.
21  Right?
22     A.   Right.  It was -- it was in their
23  gross.
24     Q.   It was in their gross.
25     A.   Correct.

1      Q.   Well, wait.  Was it a deduct?
2      A.   It was a deduct.
3      Q.   Off their net or their gross?
4      A.   Their gross.  I don't know if it
5  mattered.  On their net.
6      Q.   On their net?
7      A.   On their net.
8      Q.   So, after they -- they get a gross?
9      A.   They get a gross.
10     Q.   They pay taxes and whatever they
11  pay --
12     A.   Whatever is left.
13     Q.   Then, there's a $35 deduct?
14     A.   Yes.
15     Q.   So, the $35 is an after-tax charge.
16  They're actually paying tax on earning the $35,
17  but they never see any of the $35?
18     A.   No.  It's deducted.
19     Q.   Right.  Why wouldn't you just make
20  it gross then?  Why wouldn't you deduct it at the
21  source?
22     A.   I don't think we were able to.  I
23  don't think it qualified for the Cafeteria 125
24  Plan.
25     Q.   Was that the reason?

(504)831-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
433 METAIRIE ROAD, #220          CERTIFIED COURT REPORTERS          METAIRIE, LA  70005

1 man camp as -- in whatever capacity, then, his
2 salary would have been allocated to the man camp.
3     Q.    So, then, that would have been
4 burden added?
5     A.    That would have been part of the
6 overhead, that's correct.
7     Q.    So, I just want to ask you some
8 questions about the man camp itself.
9     A.    Okay.
10     Q.    First, how many times did you visit
11 the camps?
12     A.    I don't know for certain how many
13 times.  Three, four, five.
14     Q.    In the total tenure of the existence
15 of the camp?
16     A.    Correct.
17     Q.    Okay.  And did you ever see the
18 Orange camp?
19     A.    I never toured the Orange camp.
20     Q.    I'm just trying to work out the
21 timeline of the man camp management.  So, John
22 Sanders was the manager from the inception of the
23 camp until when?
24     A.    I don't know.  John Sanders did not
25 report to me.

1     Q.    Right.  Do you know if Darrell
2 Snyder assisted John in running the man camp?
3     A.    At some point, Darrell Snyder -- I
4 know Darrell Snyder was involved in the man camp.
5     Q.    Okay.  Do you know what his
6 involvement was?
7     A.    At one point, I believe, overseeing
8 it, managing it.
9     Q.    Okay.  Do you know when that was?
10     A.    No, have no idea of the timeline.
11     Q.    I'm going to represent to you that
12 John's tenure at the man camp ended around April
13 or May of 2007.  Does that sound right to you?
14     A.    You probably have it in front of
15 you, so -- yeah, that's fine.
16     Q.    Okay.  And then, do you know who
17 Frank Tipton is?
18     A.    I believe he was someone that was
19 hired to be the manager of the facility.
20     Q.    And do you know how long his tenure
21 was?
22     A.    Do not.
23     Q.    Do you know who Rhonda George is?
24     A.    Yes.
25     Q.    Okay.  Do you know when she started

1 at Signal?
2     A.    I don't know the exact dates.
3     Q.    Okay.  So, when would Darrell have
4 been the manager of the man camp then?  That's
5 the arc of managers, as I understand it.
6     A.    As I understand it, too, that's the
7 names, for the Mississippi facility.
8     Q.    Quite right.  Quite right.  Who were
9 for the Texas facility?
10     A.    I'm not sure of the people's names.
11     Q.    Okay.  So, when would Darrell have
12 taken over?
13     A.    I don't know those dates.
14     Q.    Would it have been after John and
15 before Frank?  Is that possible?
16     A.    That sounds right.
17     Q.    Okay.  John went to Ghana on
18 vacation in February, 2007.  You may or may not
19 know that.
20     A.    I recall hearing something to that
21 effect.
22     Q.    Do you know who was the manager
23 while John was away?
24     A.    No.
25     Q.    Would it make sense for it to be

Cunningham 181:11-22;
182:19-183:11,184:5-185:1, 188:3-7

1 Darrell, given the timing?
2     A.    It could have been.
3     Q.    Okay.  Were you aware of any
4 criticisms regarding Mr. Tipton's running of the
5 camp?
6     A.    I was not.
7     Q.    But as a matter of course, he didn't
8 report to you, so, you wouldn't know if there
9 were or weren't any?
10     A.    Correct.
11     Q.    I'm going to show you a document,
12 and it's SIGE0006263 to SIGE0006264, and I'm
13 going to also include SIGE0006259, and I'll
14 explain and let you have a look at it.
15     A.    Okay.
16     Q.    It is the H2B Resident Housing
17 Agreement, and it's signed in January of 2007.  I
18 think it's a second version that was recirculated
19 in January of '07.  I'll let you have a look.
20     A.    Okay.
21         (Whereupon, Exhibit Number
22 779 was marked for identification.)
23     A.    Okay.
24 EXAMINATION BY MR. SANDLER:
25     Q.    Just so we're all clear, the third

1  page, which is 6259, the last page you were
2  looking at, that's a housing rules agreement that
3  this employee signed, like all other employees --
4      A.  Right.
5      Q.  -- on December 6th, 2006.
6      A.  That's the date there.
7      Q.  Right.  And then in January of '07,
8  when we're now into the two front pages, that's
9  another housing agreement that they had the
10  employees sign.  Are you familiar with this?
11      A.  I've seen these.
12      Q.  Okay.  Why did all the Indian
13  workers have to sign a new housing agreement in
14  2007, January of 2007?
15      A.  I don't know the exact facts and
16  circumstances.
17      Q.  Can you tell me generally?
18      A.  No.
19      Q.  All right.  Were you involved in the
20  drafting of this contract?
21      A.  No.
22      Q.  Mr. Schnoor testified that you were
23  involved in the first version of the housing
24  agreement.  Is that right?  If you want, I can
25  get the testimony.

1      A.  That's fine.  I don't -- you don't
2  have to --
3      Q.  I don't want to mischaracterize.
4  So, all the same --
5      A.  He said what he said.
6      Q.  I want to make sure I'm remembering
7  it correctly.
8      A.  Once again, I probably was involved
9  to the extent that Lisa Spears was drafting an
10  agreement, a housing agreement for the workers
11  through our outside counsel.
12      Q.  Right.
13      A.  Which is probably the reference
14  about which Ron Schnoor made the comment it was
15  under me.
16      Q.  Right.  Right.  Right.  He described
17  you as our contracts people, likely Dick and
18  Chris, is what he said.
19      A.  Right.
20      Q.  Does that sound right?
21      A.  Which would flow down to Lisa.
22      Q.  Okay.  So, you've read this
23  agreement before today or you've not read this
24  agreement before today?
25      A.  I don't know if I read it word for

1  word.
2      Q.  But you knew the content of it
3  vaguely or --
4      A.  Yeah, vaguely.
5      Q.  I want to ask you a question, but I
6  feel like -- well, let me just try.  I'm going to
7  ask you about the wording in the second paragraph
8  of the left-hand column.  I will just read it and
9  then I've got a question for you.
10      "This Agreement constitutes
11  a non-possessory permission for
12  the use of Landlord provided
13  housing by a Resident during the
14  full term of their employment with
15  Signal International, L.L.C."
16      Did I read that correctly?
17      A.  You did.
18      Q.  Do you know who drafted that?
19      A.  Somebody in David Bland's office.
20      Q.  Okay.  So, that's a legal --
21      A.  That's a tenant-landlord legal --
22      Q.  Okay.  So, a lawyer drafted that?
23      A.  Correct.
24      Q.  And it was incorporated into this
25  document.

1      A.  (Nods head affirmatively.)
2      Q.  I want to ask you about Clause 8,
3  which is on the second page.
4      A.  Okay.
5      Q.  I'll give you a chance to -- or I'll
6  read it -- read it and we can talk about it.
7      "Discipline Response
8  Procedures:
9      "First offense:  If the
10  Resident is found in violation of
11  any of the above rules and
12  regulations, the Landlord's
13  housing manager will complete a
14  documentation of the violation.
15  This documentation will be kept in
16  the Resident's file and a copy
17  delivered to the Employer.  A fine
18  of $250 will be assessed and
19  payment thereof will be made by
20  direct deduction from Employer.
21      "Repeat offense.  If the
22  Resident repeats any violations of
23  the above rules and regulations, a
24  meeting with the Resident,
25  Landlord's Housing Manager and a

Cunningham
185:5-186:17

1 representative of the Employer
2 will be required. A fine of $500
3 will be assessed and payment
4 thereof will be made by direct
5 deduction from Employer."
6      Third paragraph: "The
7 Landlord reserves the right to
8 terminate the Resident's housing
9 agreement in response to a repeat
10 offense."
11      Were you aware of these fine -- this
12 fine structure?
13      A. I was aware -- I was -- yes. To
14 answer the question, yes.
15      Q. And the $250 fine for the first
16 offense, that's approximately a week's rent?
17      A. Roughly.
18      Q. Can you tell me the rationale as to
19 why Signal concluded that it needed to penalize a
20 worker a week's worth of rent if he moved
21 furniture from one room to the next or if a
22 friend of his came to visit him?
23      A. The rationale behind it?
24      Q. Uh-huh.
25      A. I can only assume, because I didn't

1 come up with those numbers. I don't know where
2 they came up from. I think it was more
3 operational. I think it was with the intent that
4 to keep the people in the camp cognizant of the
5 rules of the facility and aware that disregard
6 for those rules would be a monetary -- a possible
7 monetary deduction or --
8      Q. At Signal's discretion?
9      A. At Signal's -- at -- not necessarily
10 Signal. It's the housing management. The
11 landlord's housing manager.
12      Q. Which was a Signal employee?
13      A. Correct. Now, to my knowledge, I
14 never heard of a single deduction being made from
15 any employee.
16      Q. Okay. I'm going to show you a
17 couple documents very quickly just to
18 establish -- I'm going to enter SIGE0009495 that
19 runs to 9496. It's an e-mail which you're on,
20 and it's Exhibit 780.
21      (Whereupon, Exhibit Number
22 780 was marked for identification.)
23      MR. SANDLER:
24      It's a flip, just so you
25 know.

1      A. Okay.
2 EXAMINATION BY MR. SANDLER:
3      Q. Okay. So, you were cognizant of the
4 terms, or you concurred that the agreement
5 wasn't -- at least on January 5th, you were
6 satisfied with the terms of the agreement, right?
7      A. Correct.
8      Q. Okay. I'm just going to enter
9 SIGE0011575, and it's Exhibit 781.
10      (Whereupon, Exhibit Number
11 781 was marked for identification.)
12      A. Okay.
13 EXAMINATION BY MR. SANDLER:
14      Q. Okay. So now, Lisa Spears, in the
15 second e-mail from the top, is specifically
16 asking you, Ron Schnoor and Tracey Binion to
17 review Tom Rigolo's e-mail below.
18      A. Okay.
19      Q. Do you agree that that's what that
20 e-mail is asking?
21      A. That's what it's asking.
22      Q. Did you do that? Did you look at
23 Tom's e-mail?
24      A. Probably.
25      Q. Okay. But you disagreed with him?

1      A. I neither agreed nor disagreed.
2      Q. Okay. You said before that the fee
3 structure, the fine structure was set up so that
4 people would remain cognizant of the rules; is
5 that right?
6      A. I did say that.
7      Q. Okay. So, you're saying that if it
8 was a lesser fine, you would think that the
9 workers would not observe the rules; is that your
10 testimony?
11      MS. HANGARTNER:      Cunningham
12      Object to form.      189:17-191:18
13      A. I don't know what --
14 EXAMINATION BY MR. SANDLER:
15      Q. Let me strike that. Let me strike
16 that.
17      Can you explain to me why you
18 thought a $250 fine was necessary to keep the
19 Indian workers cognizant of the rules?
20      A. I don't know what number would have
21 been a good number. That was a number that came
22 up that we decided upon, sounded good to me. I
23 didn't object to it.
24      Q. Right.
25      A. So, okay. Fine. Why should anybody

(504)831-1753                HUFFMAN & ROBINSON, INC.                (800)749-1753
433 METAIRIE ROAD, #220        CERTIFIED COURT REPORTERS        METAIRIE, LA 70005

```
 1   worry about it?  If you're -- if you're coming to
 2   live in an orderly -- to the -- to the rules, it
 3   wouldn't be a problem.
 4       Q.   Right.  But my question --
 5       A.   I live by rules.  I mean, if I break
 6   a rule, I expect to pay the price.
 7       Q.   Right, but the rules in this housing
 8   agreement are you aren't allowed to have
 9   visitors, you can't move furniture between rooms.
10   I'm asking if you think --
11       A.   It's discretionary.  I mean, it's
12   discretionary.  It doesn't mean it's an automatic
13   assessment.  You could be.
14       Q.   Do you think that's proportional?
15   Do you think that these fines are proportional to
16   the rules for which they govern?
17       A.   It's subjective.
18       Q.   Yeah, but you're the contracts guy
19   at Signal and this is a contract and it's with
20   Signal employees and I'm asking you if you --
21       A.   And I think it's subjective.
22       Q.   Okay.  What is your subjective
23   opinion?
24       A.   That this was okay.
25       Q.   That $250 --
```

```
 1       A.   I didn't object to it, so,
 2   therefore, I must have agreed to it.
 3       Q.   Okay.  So, if a guest came to visit
 4   the camp, that would be -- that would be breaking
 5   one of these rules and that would mean that it
 6   would be okay for the -- the employee to pay a
 7   $250 fine?
 8       MS. HANGARTNER:
 9           Object to form.
10       MR. SANDLER:
11           Okay.
12       MS. HANGARTNER:
13           Came to visit the camp
14       doesn't mean he's in the camp.
15   EXAMINATION BY MR. SANDLER:
16       Q.   Came to visit the worker in his
17   home, that would be okay?
18       A.   The rules were the rules.
19       Q.   I have another document.  This is
20   another journal entry from Mr. Sanders.
21       A.   Okay.
22       Q.   Describes an encounter with you,
23   so --
24       A.   Oh, lovely.
25       Q.   It is SIGE0556496 and it runs to
```

```
 1   6497, and the entry I'm interested in is
 2   Wednesday, October 25th, 2006.  Exhibit 782.
 3           (Whereupon, Exhibit Number
 4       782 was marked for identification.)
 5       A.   Okay.
 6   EXAMINATION BY MR. SANDLER:
 7       Q.   Was this the first tour of the man
 8   camp that you took?  Does the date seem about
 9   right?
10       A.   I suppose it was.
11       Q.   Okay.  And you've never seen the Taj
12   Mahal, so -- was that --
13       A.   I've seen pictures of it.
14       Q.   You've seen pictures of it.  And you
15   thought the housing -- the man camp resembled the
16   Taj Mahal?
17       A.   I was being facetious, of course.
18   It was an analogy.
19       Q.   Okay.
20       A.   Okay.  I thought it was obviously,
21   from his writing, he thought I was impressed with
22   it, and I was.
23       Q.   Okay.  So, that was what that was.
24       A.   Yeah.
25       Q.   Did you go inside the trailers?
```

```
 1       A.   Yes.
 2       Q.   Okay.  And, so, the beds were
 3   already set up, the bunk beds were all set up
 4   when you saw it?
 5       A.   I believe so.
 6       Q.   So, when you worked out the $35 a
 7   day fee, you had never seen the man camp then?
 8       A.   Timelinewise, I guess not.
 9       Q.   I want to show you two documents
10   together.  The first one is SIGE0015520, and it's
11   going to be Exhibit 783, and the next one is
12   SIGE0556991.  It's already an exhibit.  It's
13   Exhibit 621.
14           (Whereupon, Exhibit Number
15       783 was marked for identification.)
16   EXAMINATION BY MR. SANDLER:
17       Q.   I'm just going to hand this to you.
18   Read them together.  You can look at the dates.
19   It's about five days apart.  One is John Sanders'
20   diary entry, another is an e-mail to GE that
21   you're cc'd on.
22       A.   Okay.  Okay.
23       Q.   You've read both documents?
24       A.   I have.
25       Q.   I'm just going to read a bit of them
```

1    Okay.  That's all I have.
2  THE WITNESS:
3    Okay.
4  MR. SANDLER:
5    I think that's a wrap.
6  THE VIDEOGRAPHER:
7    This is the conclusion of
8  the videotaped deposition of Chris
9  Cunningham.  We're going off the
10  record.  The time is now 4:40.
11    (Whereupon, the testimony of
12  the witness was concluded at 4:40
13  p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

1    WITNESS' CERTIFICATE
2
3
4
5    I, CHRIS CUNNINGHAM, CPA, the
6  undersigned, do hereby certify that I have read
7  the foregoing deposition and it contains a true
8  and correct transcript of the testimony given by
9  me:
10
11
12    (  ) Without corrections.
13    (  ) With corrections as reflected on
14      the errata sheet(s) prepared by me
15      and made a part hereof.
16
17
18
19
20
21
22    CHRIS CUNNINGHAM, CPA
23
24    DATE
25

1    REPORTER'S CERTIFICATE
2
3
4    I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that CHRIS CUNNINGHAM, CPA, after having
9  been duly sworn by me upon authority of R.S.
10  37:2554, did testify as hereinbefore set forth in
11  the foregoing pages; that this testimony was
12  reported by me in the stenotype reporting method,
13  was prepared and transcribed by me or under my
14  personal direction and supervision, and is a true
15  and correct transcript to the best of my ability
16  and understanding; that I am not related to
17  counsel or the parties herein, nor am I otherwise
18  interested in the outcome of this matter.
19
20
21    CAROL VALLETTE SLATER (CCR 78020)
      CERTIFIED COURT REPORTER
22    REGISTERED PROFESSIONAL REPORTER
23
24
25

# DEPOSITION EXCERPTS

## KURIAN DAVID

## Page 116

```
1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
    KURIAN DAVID, SONY        CIVIL ACTION
4   VASUDEVAN SULEKHA,
    PALANYANDI THANGAMANI,    NO. 08-1220
5   MARUGANANTHAM KANDHASAMY,
    HEMANT KHUTTAN, ANDREWS   SECTION "A"
6   ISSAC PADA VEETTIYL, AND
    DHANANJAYA KECHURA, ON     MAGISTRATE 3
7   BEHALF OF OTHER SIMILARLY
    SITUATED INDIVIDUALS, AND
8   SABULAL VIJAYAN, KRISHAN
    KUMAR, JACOB JOSEPH
9   KADDAKKARAPPALLY, KULDEEP
    SINGH, AND THANASEKAR
10  CHELLAPPAN, INDIVIDUALLY,
11          PLAINTIFFS
12  VERSUS
13  SIGNAL INTERNATIONAL,
    LLC, MALVERN C. BURNETT,
14  GULF COAST IMMIGRATION
    LAW CENTER, L.L.C., LAW
15  OFFICES OF MALVERN C.
    BURNETT, A.P.C.,
16  INDO-AMERI SOFT L.L.C.,
    KURELLA RAO, J & M
17  ASSOCIATES, INC. OF
    MISSISSIPPI, GLOBAL
18  RESOURCES, INC., MICHAEL
    POL, SACHIN DEWAN, AND
19  DEWAN CONSULTANTS PVT.    VOLUME 2
    LTD. (a/k/a MEDTECH
20  CONSULTANTS).
21          DEFENDANTS.
22
    Videotaped deposition of KURIAN DAVID, c/o Alan
23  Howard, Dewey & LeBoeuf, 1301 Avenue of the
    Americas, New York, New York 10019, taken at the
24  Prince Conti Hotel, 830 Conti Street, New
    Orleans, Louisiana 70112, on Thursday, the 12th
25  day of February, 2009, beginning at 9:11 a.m.
```

## Page 117

```
1   APPEARANCES:
2       DEWEY & LeBOEUF
        (BY: ROBERT P. WYNNE)
3       Suite 2550
        1000 Main Street
4       Houston, Texas 77002-5009
5              and
6       JENNIFER ROSENBAUM
        217 North Prieur Street
7       New Orleans, Louisiana 70112
8       ATTORNEYS FOR THE PLAINTIFFS
9
        MIDDLEBERG, RIDDLE & GIANNA
10      (BY: ERIN CASEY HANGARTNER
            DONALD C. DOUGLAS, JR.)
11      31st Floor
        201 St. Charles Avenue
12      New Orleans, Louisiana 70170-3100
13             and
14      PATRICIA A. BOLLMAN
        A Professional Law Corporation
15      Post Office Box 13707
        New Orleans, Louisiana 70185
16
        ATTORNEYS FOR SIGNAL INTERNATIONAL,
17      L.L.C.
18      PORTEOUS, HAINKEL & JOHNSON
        (BY: RALPH R. ALEXIS, III
19          GLENN B. ADAMS)
        704 Carondelet Street
20      New Orleans, Louisiana 70130-3774
21      ATTORNEYS FOR GULF COAST IMMIGRATION
        LAW CENTER, L.L.C.
22
23
24
25
```

## Page 118

```
1   APPEARANCES CONTINUED:
2       BARRASSO, USDIN, KUPPERMAN,
        FREEMAN & SARVER
3       (BY: JUDITH A. WENGER)
        Suite 2400
4       909 Poydras Street
        New Orleans, Louisiana 70112
5
        ATTORNEYS FOR GLOBAL RESOURCES,
6       INC. AND MICHAEL POL
7       STEPHEN H. SHAPIRO
        200 Maine Street
8       Jefferson, Louisiana 70121
9       ATTORNEYS FOR SACHIN DEWAN AND
        DEWAN CONSULTANTS PVT. LTD. ALSO
10      KNOWN AS MEDTECH CONSULTANTS
11  ALSO PRESENT:
12      TRACEY BINION
        SIGNAL INTERNATIONAL, L.L.C.
13
        BRYAN C. BAGNETTO
14      MIDDLEBERG, RIDDLE & GIANNA
15      ANJALI NAIR
        Immigrant Justice Project
16      Southern Poverty Law Center
        Suite 2150
17      233 Peachtree Street
        Atlanta, Georgia 30303
18
19  TRANSLATOR:
20      RADHAMANI KUMAR, M.D.
        LEGAL INTERPRETERS, INC.
21      Suite 200
        3350 Ridgelake Drive
22      Metairie, Louisiana 70002
23
24
25
```

## Page 119

```
1   APPEARANCES CONTINUED:
2   VIDEOGRAPHER:
3       KEN HART
        Legal Video Specialist
4       HART VIDEO OF LOUISIANA, L.L.C.
        Bay 5
5       1185 Robert Boulevard
        Slidell, Louisiana 70458
6
7
8
9
10
11
12
13
14
15
16  REPORTED BY:
17      CAROL VALLETTE SLATER
        Certified Court Reporter
18      Registered Professional Reporter
19
20
21
22
23
24
25
```

Page 180

1    Q.   Thank you.
2         Bet your answer is different now.
3    What about Sachin Dewan? Does Kurian David claim
4    that Sachin Dewan did something wrong to Kurian
5    David?
6        THE INTERPRETER:
7             What is that? Chin?
8        MR. DOUGLAS:
9             Sachin Dewan.
10       THE INTERPRETER:

David
180:12-182:13

11            Very much he has done.
12       Q.   Tell me what your claim is against
13   Sachin -- let me back up.  Tell me what Kurian
14   David claims Sachin Dewan did wrong to Kurian
15   David.
16       THE INTERPRETER:
17            I have to tell that in
18       detail so many things.
19       Q.   Have at it.
20       THE INTERPRETER:
21            Tell me.  Break it up.
22       Small sentences.
23            I was working in Abu Dhabi
24       as a foreman in NPCC company as
25       the foreman -- high-level senior

Page 181

1        foreman.  Then, I saw an
2        advertisement in a paper.
3        According to that advertisement, I
4        have applied to Sachin Dewan's
5        office.  This is what was said in
6        the advertisement.  You can apply
7        for permanent resident visa for
8        the U.S. So, you can apply for
9        that and communicate with us in
10       the address -- what was shown in
11       the advertisement, Sachin Dewan's.
12       MR. DOUGLAS:
13            Yes, ma'am.
14       THE INTERPRETER:
15            It was an office in Dubai.
16       I communicated with them.  They
17       had a meeting in a hotel at Abu
18       Dhabi.  They had a seminar at Abu
19       Dhabi.  So, they talked about this
20       company.  They said the name of
21       the company is Signal
22       International.  Your lawyer's name
23       is Malvern C. Burnett.  This is
24       affiliated with Global Resource
25       and Michael Pol.  So, they have

Page 182

1        authorized Sachin Dewan for the
2        visa.  Didn't get the visa, but
3        the communication is through this
4        channel.  You can apply for green
5        card.  This company will give you
6        green card in 24 months.  You have
7        to give some money for this.  You
8        give this money in three
9        installments.  If in two years,
10       you get the green card, once you
11       get the green card, you can go to
12       America with your family.  That is
13       what they said in that meeting.
14   EXAMINATION BY MR. DOUGLAS:
15       Q.   Okay.
16       THE INTERPRETER:
17            They assured about this
18       company's facilities, where are
19       this company has grounds and
20       factories and food and
21       accommodation for the workers and
22       everything, they discussed.  They
23       treat the workers real nice.
24       Those things they said.  They said
25       they need the workers ahead of

Page 183

1        time because of the hurricane on
2        H2B visa.  So, they are going to
3        apply for the H2B visa.  They said
4        these things.
5        Q.   Okay.
6        THE INTERPRETER:
7             They told another time --
8        they called us and said there is
9        practical and theory testing.
10       Only if you pass then only you can
11       go.  We went to Dubai, Alkhoose,
12       place called Alkhoose, and I
13       worked short-call Almulla
14       Engineering, A-L-M-U-L-L-A,
15       Engineering.
16       Q.   Hang on.  Keep in mind, I just --
17   I'm trying to understand just what your claim
18   is against Sachin Dewan is.
19       THE INTERPRETER:
20            That's what I'm explaining.
21       I told you I have to tell you in
22       detail.
23       Q.   Okay.  Okay.
24       THE INTERPRETER:
25            We went for a test in the

Page 204

1    Many things I need -- I need
2  to get.
3    Q.   Tell me what the list of the many
4  things you need to get from Signal International
5  as a result of this lawsuit is.
6    THE INTERPRETER:
7      First, I wanted to tell they
8    promised me green card and they
9    cheated me on that.  They brought
10   me here.  Very difficult
11   situations I had to work.  Very
12   bad accommodations to stay.
13   Human -- they stole the human
14   rights from us.  They
15   considered -- they treated us like
16   slaves.  They promised green card.
17   They promised extension of visa,
18   all those things.  If you don't
19   work in this conditions, we will
20   export you back to your homeland,
21   they said.
22   Q.   All right.  Stop.  My question is:
23  What do you want to get from Signal International
24  as a result of this lawsuit?  It sounds like
25  you're telling me what your complaints are

Page 205

1  against Signal, but I want to know what you want
2  to get from Signal as a result of this lawsuit.
3    THE INTERPRETER:
4      I'm not telling about the
5    complaint.  If I had to tell the
6    complaints, there is many
7    complaints.  What I want is that
8    visa -- I for all this.  I don't
9    want anybody else to suffer these
10   kind of things.  The government
11   has to caution about this and make
12   arrangements for this.  And I have
13   lost money out of this and my
14   family and I suffered mental
15   agony.  I have to get the money
16   back what I have spent for this.
17   I need to have reward for my
18   suffering.  Because this company
19   has done these wrongs, the legal
20   proceeding has to punish this
21   company for these things.  These
22   are all the things I want.
23   Q.   All right.  What I got from that was
24  a visa, you don't want anybody to suffer, you
25  want the government to make some arrangements and

Page 206

1  you want some reward for mental agony.
2    MR. DOUGLAS:
3      I'm sorry, Doctor.
4  EXAMINATION BY MR. DOUGLAS:
5    Q.   What I got from that was you want
6  some kind of visa, you want nobody to suffer, you
7  want the government to make some kind of
8  arrangements for you, you want a reward for your
9  mental agony, you want a reward for your
10  suffering, you want the money back that you paid,
11  and you want to punish the company?
12   MR. WYNNE:
13     Objection.  Some of those
14   are a rather complete
15   mischaracterization.
16   THE INTERPRETER:
17     Have to punish the company.
18   MR. WYNNE:
19     Translate the objection.
20   Objection.
21   THE INTERPRETER:
22     What you said, some of the
23   things is not clear to me.  For
24   example, about the visa, I am not
25   asking for visa.

Page 207

1  EXAMINATION BY MR. DOUGLAS:
2    Q.   Okay.
3    THE INTERPRETER:
4      Besides, not issued by the
5    company.  I'm not believing I'll
6    get green card.
7    Q.   What else do you want to clear up on
8  that list I just read you?
9    THE INTERPRETER:
10     You need to ask again.  Once
11   more, please ask.
12   Q.   You told me about the visa part.  My
13  next thing on my list is you don't want anybody
14  else to suffer.
15   THE INTERPRETER:
16     For sure, I don't want
17   anybody who is coming for this
18   kind of visas to suffer.
19   Q.   Okay.  The next on my list is you
20  want the government to make some kind of
21  arrangement for you.
22   THE INTERPRETER:
23     For me or in general?
24   Q.   For you.
25   THE INTERPRETER:

David
207:19-208:17

Page 208

1      Not for myself, but
2  something about this H2B visa.
3  When we come for H2B visa, we need
4  to have the -- that person need to
5  have the freedom to stay, the
6  freedom to eat and the freedom to
7  move around, walk around, to meet
8  with your brothers and friends --
9  freedom to meet with your brothers
10  and friends. For example, Signal
11  make us stay like we stay in a
12  jail, inside a fenced compound.
13  They did not allow friends or
14  relatives inside. We couldn't --
15  they did not allow us to attend
16  any mass in our language -- masses
17  in a church or a temple.
18      Q.  I understand that. We're talking
19  about what you want the government to make
20  arrangements for. Is it that you want the
21  government to fix that?
22      THE INTERPRETER:
23         When -- the government
24  should tell the companies when
25  they issue the H2B visa, the

Page 209

David 209:4-22

1  government should tell that they
2  shouldn't do anything to prevent
3  the human rights.
4      Q.  Okay. Next on my list is you want
5  money back. What money do you want back?
6      THE INTERPRETER:
7         I came here just because
8  they offered green card. If only
9  I get H2B visa, I wouldn't have
10  been coming here because I was
11  working in a high position with a
12  good salary abroad. I have left
13  that and I have spent money to
14  come here and many other things I
15  spend money. My brother-in-law's
16  house is sold for me to take a
17  loan from him to come over here.
18  Because I need money again here,
19  they have to sell the house and on
20  a cheap price. If he will sell
21  the house now, we probably might
22  have gotten six times more money.
23      Q.  I don't care about that.
24      THE INTERPRETER:
25         But I have to get all that

Page 210

1  back because they promised me
2  green -- promised me this, so
3  that's the only reason I came.
4      Q.  Yes, ma'am.
5         Did you give any money to Signal
6  ever?
7      THE INTERPRETER:
8         Yes.
9      Q.  What money?
10      THE INTERPRETER:
11         Malvern C. Burnett was the
12  lawyer for Signal.
13      Q.  Okay.
14      THE INTERPRETER:
15         He is the one who recruited
16  us and offered green card for us.
17  Signal's person couldn't come
18  there to recruit us. So, he
19  represented Signal, Malvern C.
20  Burnett. I have taken demand
21  draft on his name. So, that is
22  equal that I paid money to Signal.
23      Q.  Did you ever -- other than the money
24  you paid for housing, did you ever hand any
25  money, either a check or cash, to any Signal

Page 211

1  employee?
2      THE INTERPRETER:
3         Can you ask the question
4  again?
5      Q.  Sure. Other than the money that was
6  deducted from your pay for housing --
7      THE INTERPRETER:
8         Over here or back home?
9      Q.  Over here. And other than the money
10  you claim you gave Malvern Burnett --
11      MR. ALEXIS:
12         Object to form, by the way.
13  EXAMINATION BY MR. DOUGLAS:
14      Q.  -- did you give any money to Signal?
15      THE INTERPRETER:
16         Not as money cash.
17      Q.  Not as money cash.
18      THE INTERPRETER:
19         Not as cash.
20      Q.  Did you give any funds --
21      MR. WYNNE:
22         Objection to the
23  translation.
24  EXAMINATION BY MR. DOUGLAS:
25      Q.  Did you give any funds in any form

Page 240

1    He can answer.
2    THE INTERPRETER:
3        We thought Malvern C.
4    Burnett is equal to Signal. He is
5    the staff of Signal. So, the
6    money we are giving Malvern C.
7    Burnett is equal to giving money
8    to Signal.
9    MR. ADAMS:
10       Again, object to the
11   responsiveness of the nonresponse.
12 EXAMINATION BY MR. DOUGLAS:
13   Q.   I'm not asking you what you thought.
14 I'm not asking you what you believe. I'm not
15 asking you what you felt. I'm asking you what
16 you heard. I am asking you what sounds went into
17 your ears, whether they went into your ears or
18 not. The question again is, and I can ask this
19 question 40 more times until I get a "yes" or a
20 "no," did Malvern C. Burnett ever tell you before
21 you came to the States that he was going to give
22 any of the money to Signal?
23   MR. WYNNE:
24       I object to the way the
25   question was asked. It was a

Page 241

1    little argumentative. The tone
2    was a little harsh and I realize
3    it's a frustrating process, but I
4    don't think it has to get to that.
5    If he doesn't answer, I think you
6    can object, nonresponsive, and
7    move at a later date to compel the
8    answer.
9    THE INTERPRETER:
10       Can I translate?
11   MR. DOUGLAS:
12       Yeah. Go ahead.
13   THE INTERPRETER:
14       He did not say that.
15 EXAMINATION BY MR. DOUGLAS:
16   Q.   Thank you.
17       Did you ever sign an agreement with
18 Sachin Dewan before you came over to the United
19 States?
20   THE INTERPRETER:
21       Pardon me.
22   Q.   Did you ever sign a written
23 agreement with Sachin Dewan before you came over
24 to the United States?
25   THE INTERPRETER:

[handwritten note: David 241:22-243:11]

Page 242

1        Yes.
2    Q.   What was your understanding of your
3 agreement with Sachin Dewan?
4    THE INTERPRETER:
5        We given money to Sachin
6    Dewan with the understanding that
7    he's using that money to get us
8    green card.
9    Q.   All right. Did you, before you came
10 to the United States, sign a written agreement
11 with Malvern C. Burnett?
12   THE INTERPRETER:
13       Yes.
14   Q.   What did you understand your
15 agreement with Malvern C. Burnett was before you
16 came to the United States?
17   MR. ALEXIS:
18       Object to form.
19   THE INTERPRETER:
20       We understood that the
21   monies given to him is for that
22   processing of green card.
23 EXAMINATION BY MR. DOUGLAS:
24   Q.   Before you came to the United
25 States, did you ever sign a written agreement

Page 243

1 with either Michael Pol or Global Resources?
2    THE INTERPRETER:
3        Yes.
4    Q.   What did you understand your
5 agreement with Michael Pol or Global Resources to
6 be?
7    THE INTERPRETER:
8        Global Resources was
9    supposed to give us green card
10   while we are working for the
11   company.
12   Q.   So, would you agree with me that you
13 paid Sachin Dewan to work for you?
14   MR. SHAPIRO:
15       Object to form.
16   THE INTERPRETER:
17       Pardon me.
18 EXAMINATION BY MR. DOUGLAS:
19   Q.   Would you agree that you entered
20 into an agreement with Sachin Dewan for him to do
21 something for you?
22   MR. WYNNE:
23       Object to translation.
24   THE INTERPRETER:
25       Is that a -- the question?

Page 252

1    Okay.
2       MR. WYNNE:
3          Same objection.
4       THE INTERPRETER:
5          I cannot say if they read it
6    or not without understanding the
7    meaning of the paragraph.
8  EXAMINATION BY MR. DOUGLAS:
9    Q.   Okay.  That's not what I'm asking.
10 Okay.  What I'm asking is, this whole document,
11 the one with your name at the very top of it that
12 says Kurian David, where you sued a bunch of
13 people, did anybody sit down with this document,
14 that happens to be labeled Exhibit 196 and is
15 entitled First Amended Complaint, and read it to
16 you in Malayalum?
17      MR. WYNNE:
18         Same objection.  And asked
19      and answered.
20      THE INTERPRETER:
21         They didn't read the whole
22      thing, but the lawyer said
23      whatever changes were made.
24 EXAMINATION BY MR. DOUGLAS:
25    Q.   All right.  Well, now that you

Page 253

1  remember that you apparently were read parts of
2  it but not the whole thing, do you remember if
3  this paragraph was part of the things that were
4  read to you in Malayalum?
5       MR. WYNNE:
6          Same objections.
7       THE INTERPRETER:
8          Should I --
9       MR. WYNNE:
10         You can tell him I said same
11      objections, and then ask the
12      question.  He can answer it.  Just
13      ask him and he'll answer it, if he
14      can.
15      THE INTERPRETER:
16         Don't remember.
17 EXAMINATION BY MR. DOUGLAS:
18    Q.   Don't remember.  All right.
19      Do you know what a Group II
20 plaintiff is?
21      THE INTERPRETER:
22         Does that mean that in the
23      petition there are two kinds of
24      plaintiffs?
25    Q.   That's what I'm asking him.  Does he

Page 254

1  know what it means?
2       THE INTERPRETER:
3          I don't understand what is
4    Group II.  In the front, there are
5    many people.  Are you meaning
6    them?
7    Q.   Okay.  Do you know if you're a Group
8  II plaintiff or not?
9       THE INTERPRETER:
10         I know I am a plaintiff in
11      this case, but I don't know if I
12      am a Group II plaintiff.
13    Q.   All right.  Isn't it true, Kurian,
14 that when you made your decision to pay money to
15 Sachin Dewan, you relied on the representations
16 and promises made to you by Sachin Dewan?
17      THE INTERPRETER:
18         He trusted -- I trusted.
19      That's why gave money.  Otherwise,
20      we won't give.
21    Q.   So, you agree with me then that you
22 relied on the representations made to you when
23 you made your decision to pay money to Sachin
24 Dewan?
25      THE INTERPRETER:

David 254:21-255:1

Page 255

1       Yes.
2    Q.   Would you also agree with me that
3  you relied on your -- I'm sorry -- you relied on
4  the representations of Sachin Dewan when you
5  signed your agreement with Sachin Dewan?
6       THE INTERPRETER:
7          I have signed two agreements
8       with Sachin Dewan.  Which one you
9       are asking?
10    Q.   The first one.
11      THE INTERPRETER:
12         I depend on him.  I trusted.
13    Q.   All right.  Now, what about the
14 second one?
15      THE INTERPRETER:
16         They didn't give me time to
17      read the second agreement.  They
18      just asked to sign here, sign
19      here.  They didn't show the
20      agreement to me.
21    Q.   But when you made your decision to
22 become involved with Sachin Dewan, you made that
23 decision based on the representations that were
24 made to you, right?
25      THE INTERPRETER:

## Page 312

1    Q.   I don't understand the answer.
2         THE INTERPRETER:
3              Yes, basically.  I cannot
4    give a word.  He says yes.
5         Q.   Let me ask it this way, Kurian.  On
6    Tuesday, you looked at this with your attorney,
7    correct, 302?
8         THE INTERPRETER:
9              Read it.
10        Q.   Read it.  Okay.  Was the entire
11   document translated into Malayalum for you on
12   Tuesday, or were only pieces of the document
13   translated into Malayalum for you on Tuesday?
14        THE INTERPRETER:
15             From the beginning,
16   everything.
17        Q.   Everything.
18        THE INTERPRETER:
19             Yes.
20        Q.   When you went through this
21   declaration on Tuesday and everything was read to
22   you, did you find any mistakes in this
23   declaration?
24        THE INTERPRETER:
25             There was some mistakes in

## Page 313

1    my address, I thought.
2         Q.   All right.  And other than that?
3         THE INTERPRETER:
4              There was one other point.
5         Q.   Which point was that, Kurian?
6         THE INTERPRETER:
7              Forgot which point it was.
8         Q.   Why don't you kind of take a second
9    and think about it and see if you can remember
10   what point it was that you had -- you thought was
11   a mistake.
12        THE INTERPRETER:
13             I remember my address was
14   wrong.  There was one more point
15   which -- one more word which was
16   wrong which I don't remember now.
17        Q.   All right.  Well, if as we go
18   through this we come to that item or any other
19   item that you think is wrong, will you please
20   tell me what that is?
21        THE INTERPRETER:
22             If you read each and every
23   one, I can say which point it was
24   that needed to be corrected.
25        Q.   Sure.  And, unfortunately, I think

## Page 314

1    you told me a minute ago that we need to read
2    everything for you to understand the paragraphs,
3    correct?
4         THE INTERPRETER:
5              Yes.
6         Q.   All right.
7    MR. DOUGLAS:
8              Doctor, could you please
9    read Paragraph 4 to Mr. Kurian
10   David?
11        THE INTERPRETER:
12             In Malayalum?
13   MR. DOUGLAS:
14             Well, yeah.  They say you
15   got to read it to him in
16   Malayalum.
17   MR. WYNNE:
18             Don't know if it would be
19   helpful any other way.
20             Object to translation.
21        THE INTERPRETER:
22             That is true.  I saw that
23   advertisement.
24   MR. DOUGLAS:
25             You read the whole thing to

## Page 315

1    him, Doctor?
2         THE INTERPRETER:
3              Yes.
4    EXAMINATION BY MR. DOUGLAS:
5         Q.   All right.  In the middle of that
6    paragraph, you -- right smack in the middle, it
7    says you were making -- you were "making good
8    money" back in early 2006.  How much were you
9    making in early 2006?
10        THE INTERPRETER:
11             The salary?
12        Q.   Yeah.
13   THE INTERPRETER:
14             Do I have to tell that?
15        Q.   Yeah.  You put it in there.  Yeah.
16   THE INTERPRETER:
17             I have gotten -- I have
18   gotten good money, but I want to
19   ask my lawyer if I need to
20   answer --
21   MR. WYNNE:
22             Yes.
23   MR. DOUGLAS:
24             Sure.  Ask your lawyer.
25   THE INTERPRETER:

David
315:5-317:11

Page 316

1          -- how much money I got.
2     MR. WYNNE:
3          Yes.
4     THE INTERPRETER:
5          It was different amount in
6     different months.  Food and
7     accommodation were given by the
8     company.
9     EXAMINATION BY MR. DOUGLAS:
10    Q.   Okay.
11    THE INTERPRETER:
12         Two peoples together
13    accommodation.
14    Q.   I don't care about accommodations,
15 Kurian, right now.  What I care about is how much
16 "good money" was in early 2006.  That's what I
17 want to know.
18    THE INTERPRETER:
19         When you compare money what
20    I got here, I have to compare
21    money what I got for the
22    accommodation and food.
23    Q.   And maybe we'll do that later.  I
24 want a number right now or more than one number
25 right now.  How much were you making, which you

Page 317

1  referred to was "good money," in early 2006 in
2  Abu Dhabi?
3     THE INTERPRETER:
4          Between 4,000 and 6,000.
5     Q.   Four thousand and 6,000 what?
6     THE INTERPRETER:
7          Dirhams.
8     Q.   Was that between 4,000 and 6,000
9  dirhams a month?
10    THE INTERPRETER:
11         Yes.
12    Q.   Okay.  So, obviously, sometimes it
13 would be closer to 4,000 and some months, it
14 would be closer to 6,000 dirhams?
15    THE INTERPRETER:
16         In between that, up or down.
17    Q.   Okay.  How long before early 2006
18 did you start earning between 4,000 and 6,000
19 dirhams a month?
20    THE INTERPRETER:
21         Approximately eight years.
22    Q.   Okay.  So, you were earning in that
23 range for the previous eight years?
24    THE INTERPRETER:
25         Yes.

Page 318

1     Q.   Had you been working in Abu Dhabi
2  for the previous eight years?
3     THE INTERPRETER:
4          Not only in Abu Dhabi.  I
5     had work many places in the world.
6     Q.   Were you always paid in dirhams over
7  the prior eight years?
8     THE INTERPRETER:
9          No.  I have been paid in
10    dollar, rial, Qatar rial.
11    Q.   Let me ask it this way:  When did
12 you start working in Abu Dhabi before early 2006?
13    THE INTERPRETER:
14         Four and a half years in Abu
15    Dhabi and one and a half years in
16    Dubai.
17    Q.   Okay.  Thank you.  How does 4,000 --
18 do you know how 4,000 dirhams translates into
19 rupees?
20    THE INTERPRETER:
21         It varies different times.
22    Approximately 60,000 rupees.
23    Q.   What about in early 2006, do you
24 remember how 4,000 dirhams would convert into
25 rupees?

Page 319

1     THE INTERPRETER:
2          About 12 -- I don't remember
3     correctly, but about 12 rupees per
4     dirham.
5     Q.   Okay.  You also mention that you saw
6  an advertisement in the Gulf News talking about
7  working in the United States.
8     THE INTERPRETER:
9          I saw the advertisement
10    offering permanent visa and job.
11    Q.   What month in 2006 did you first see
12 this advertisement?
13    THE INTERPRETER:
14         I can't remember correctly.
15    Q.   Do you still have a copy of this
16 advertisement?
17    THE INTERPRETER:
18         I don't have it now, but I
19    can bring it.
20    Q.   Why did you save a copy of this
21 particular advertisement?
22    THE INTERPRETER:
23         Many companies cheat like
24    this.  So, I kept it to save.
25    Q.   Okay.  Did the advertisement --

Page 328

1    understand spoken Hindi, but I
2    have little problem reading the
3    script Hindi.
4    Q.   What other languages were -- besides
5  Hindi, did they translate this into any other
6  languages?
7        THE INTERPRETER:
8         In English.
9    Q.   So, just Hindi and English?
10       THE INTERPRETER:
11        Yes, only that.
12   Q.   All right.  Let's read the next two
13 sentences.  Malvern Burnett explained the
14 specifics of the process.  And then the next
15 sentence is a long sentence.  I'm sorry.
16       You finished?
17       THE INTERPRETER:
18        Yes.
19   Q.   Was this the first time you had
20 heard the name Signal International?
21       THE INTERPRETER:
22        I heard Signal International
23    in America.
24   Q.   Had you been to America before
25 May --

Page 329

1        MR. WYNNE:
2         Object to that translation.
3        THE INTERPRETER:
4         That's what he said.
5  EXAMINATION BY MR. DOUGLAS:
6    Q.   Had you been to America before May,
7  2006?
8        THE INTERPRETER:
9         Yes.  That time, I heard.
10   Q.   That was the first time you heard of
11 Signal, right?
12       THE INTERPRETER:
13        Yes.
14   Q.   All right.  Let's go to the next
15 sentence.  It starts with:  He said that.
16       THE INTERPRETER:
17        Okay.
18        Yes.
19   Q.   Did Mr. Burnett tell you at this
20 meeting when you would begin the green card
21 process?
22       THE INTERPRETER:
23        We have signed in papers for
24    the green card and we were told
25    the process would start even

Page 330

1    before we go there.
2    Q.   Did you sign any papers at this
3  seminar you talk about in Paragraph 5?
4        THE INTERPRETER:
5         No.
6    Q.   Were you given any papers at this
7  seminar you talk about in Paragraph 5?
8        THE INTERPRETER:
9         They showed us brochure
10    about the facilities, the company.
11   Q.   Anything else?
12       THE INTERPRETER:
13        They said good things about
14    the company.  It's a very good
15    company.  They treat employees
16    good.  We get good food and
17    accommodation.  You can work free.
18    You will be free there to work and
19    you have freedom there.  You can
20    stay there 30 months and enjoy the
21    life.
22   Q.   I understand that.  My question was:
23 Were you given any papers at this seminar you
24 talk about in Paragraph 5, and you told me you
25 were shown a brochure.  Were you -- did you see

David 330:6-21

Page 331

1  any other papers at this seminar besides the
2  brochure?
3        THE INTERPRETER:
4         Not on the same day.
5    Q.   Not on the same day?
6        MR. DOUGLAS:
7         Is that what you said,
8    Doctor.
9        THE INTERPRETER:
10        Not on the same day.
11 EXAMINATION BY MR. DOUGLAS:
12   Q.   Can you describe this brochure to
13 me?
14       THE INTERPRETER:
15        My lawyer has the brochure.
16    Six or eight Signal companies,
17    different places, pictures of the
18    Signal company workplaces.  The
19    capacity and things like that.
20   Q.   Were there any pictures of the
21 housing accommodations in this brochure?
22       THE INTERPRETER:
23        They showed us video some.
24   Q.   They showed you a video of the
25 accommodations?  Is that what you said?

Page 340

1    Q.    Stop for a minute.  When you
2  finished the test and before this meeting you're
3  about to talk about, did you have any more
4  discussions -- did you have any discussions with
5  the two Americans from Signal?
6       THE INTERPRETER:
7           When --
8       Q.    When you finished his test but
9  before this meeting?
10      THE INTERPRETER:
11          Talked.  He talked.
12      Q.    You talked to them?
13      THE INTERPRETER:
14          Yes.
15      Q.    What did you talk to them about?
16      THE INTERPRETER:
17          I told them that I am
18      working as a foreman in the
19      company and the people who were
20      with me also confirmed that I am
21      the foreman.  I have written a
22      book about this pipe verification.
23      MR. DOUGLAS:
24          I have to interrupt you.
25      A.    Fabrication.

Page 341

1       MR. DOUGLAS:
2           Fabrication.  We have to
3       stop.  We're out of videotape.
4       THE VIDEOGRAPHER:
5           Off the record.
6       MR. DOUGLAS:
7           We will pick up here
8       tomorrow.
9           (Whereupon, a discussion was
10      held off the record.)
11          (Whereupon, the testimony of
12      the witness was concluded at 5:12
13      p.m.)

Page 342

1           WITNESS' CERTIFICATE
2
3
4
5       I, KURIAN DAVID, the undersigned, do
6  hereby certify that I have read the foregoing
7  deposition and it contains a true and correct
8  transcript of the testimony given by me:
9
10
11      ( ) Without corrections.
12      ( ) With corrections as reflected on
13          the errata sheet(s) prepared by me
14          and made a part hereof.
15
16
17
18
19
20
21      KURIAN DAVID
22
23      DATE
24
25

Page 343

1       REPORTER'S CERTIFICATE
2
3
4       I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that KURIAN DAVID, after having been duly
9  sworn by me upon authority of R.S. 37:2554, did
10 testify as hereinbefore set forth in the
11 foregoing pages; that this testimony was reported
12 by me in the stenotype reporting method, was
13 prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21      CAROL VALLETTE SLATER (CCR 78020)
        CERTIFIED COURT REPORTER
22      REGISTERED PROFESSIONAL REPORTER
23
24
25

## Page 344

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA
 3
   KURIAN DAVID, SONY        CIVIL ACTION
 4 VASUDEVAN SULEKHA,
   PALANYANDI THANGAMANI,      NO. 08-1220
 5 MARUGANANTHAM KANDHASAMY,
   HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6 ISSAC PADA VEETTIYL, AND
   DHANANJAYA KECHURA, ON      MAGISTRATE 3
 7 BEHALF OF OTHER SIMILARLY
   SITUATED INDIVIDUALS, AND
 8 SABULAL VIJAYAN, KRISHAN
   KUMAR, JACOB JOSEPH
 9 KADDAKKARAPPALLY, KULDEEP
   SINGH, AND THANASEKAR
10 CHELLAPPAN, INDIVIDUALLY.
11     PLAINTIFFS
12 VERSUS
13 SIGNAL INTERNATIONAL,
   LLC, MALVERN C. BURNETT,
14 GULF COAST IMMIGRATION
   LAW CENTER, L.L.C., LAW
15 OFFICES OF MALVERN C.
   BURNETT, A.P.C.,
16 INDO-AMERI SOFT L.L.C.,
   KURELLA RAO, J & M
17 ASSOCIATES, INC. OF
   MISSISSIPPI, GLOBAL
18 RESOURCES, INC., MICHAEL
   POL, SACHIN DEWAN, AND
19 DEWAN CONSULTANTS PVT.      VOLUME 3
   LTD. (a/k/a MEDTECH
20 CONSULTANTS).
21     DEFENDANTS.
22
   Videotaped deposition of KURIAN DAVID, c/o Alan
23 Howard, Dewey & LeBoeuf, 1301 Avenue of the
   Americas, New York, New York 10019, taken at the
24 Prince Conti Hotel, 830 Conti Street, New
   Orleans, Louisiana 70112, on Friday, the 13th
25 day of February, 2009, beginning at 8:42 a.m.
```

## Page 345

```
 1 APPEARANCES:
 2    DEWEY & LeBOEUF
      (BY: ROBERT P. WYNNE)
 3    Suite 2550
      1000 Main Street
 4    Houston, Texas 77002-5009
 5        and
 6    JENNIFER ROSENBAUM
      217 North Prieur Street
 7    New Orleans, Louisiana 70112
 8     ATTORNEYS FOR THE PLAINTIFFS
 9
   MIDDLEBERG, RIDDLE & GIANNA
10   (BY: ERIN CASEY HANGARTNER
     DONALD C. DOUGLAS, JR.)
11   31st Floor
     201 St. Charles Avenue
12   New Orleans, Louisiana 70170-3100
13       and
14 PATRICIA A. BOLLMAN
     A Professional Law Corporation
15   Post Office Box 13707
     New Orleans, Louisiana 70185
16
     ATTORNEYS FOR SIGNAL INTERNATIONAL.
17   L.L.C.
18 PORTEOUS, HAINKEL & JOHNSON
     (BY: RALPH R. ALEXIS, III
19   GLENN B. ADAMS)
     704 Carondelet Street
20   New Orleans, Louisiana 70130-3774
21   ATTORNEYS FOR GULF COAST IMMIGRATION
     LAW CENTER, L.L.C.
22
23
24
25
```

## Page 346

```
 1 APPEARANCES CONTINUED:
 2    BARRASSO, USDIN, KUPPERMAN,
      FREEMAN & SARVER
 3    (BY: JUDITH A. WENGER)
      Suite 2400
 4    909 Poydras Street
      New Orleans, Louisiana 70112
 5
       ATTORNEYS FOR GLOBAL RESOURCES,
 6     INC. AND MICHAEL POL
 7 STEPHEN H. SHAPIRO
      200 Maine Street
 8 Jefferson, Louisiana 70121
 9     ATTORNEYS FOR SACHIN DEWAN AND
       DEWAN CONSULTANTS PVT. LTD. ALSO
10     KNOWN AS MEDTECH CONSULTANTS
11 ALSO PRESENT:
12    TRACEY BINION
      SIGNAL INTERNATIONAL, L.L.C.
13
      BRYAN C. BAGNETTO
14    MIDDLEBERG, RIDDLE & GIANNA
15    ANJALI NAIR
      Immigrant Justice Project
16    Southern Poverty Law Center
      Suite 2150
17    233 Peachtree Street
      Atlanta, Georgia 30303
18
19 TRANSLATOR:
20    RADHAMANI KUMAR, M.D.
      LEGAL INTERPRETERS, INC.
21    Suite 200
      3350 Ridgelake Drive
22    Metairie, Louisiana 70002
23
24
25
```

## Page 347

```
 1 APPEARANCES CONTINUED:
 2 VIDEOGRAPHER:
 3    KEN HART
      Legal Video Specialist
 4 HART VIDEO OF LOUISIANA, L.L.C.
      Bay 5
 5    1185 Robert Boulevard
      Slidell, Louisiana 70458
 6
 7
 8
 9
10
11
12
13
14
15
16 REPORTED BY:
17    CAROL VALLETTE SLATER
      Certified Court Reporter
18    Registered Professional Reporter
19
20
21
22
23
24
25
```

Page 356

1    Q.   How did you take an English written
2 test and successfully pass it?
3    THE INTERPRETER:
4        It is about my job, relating
5    to my job, the test is.  The
6    questions I understood easily.  I
7    knew the answers because I have 24
8    years of experience in this field.
9    Q.   And nobody translated this written
10 test into Malayalum for you, correct?
11   THE INTERPRETER:
12       Nobody has to translate to
13   me the matters relating to my job.
14   Q.   Let's look at Number 7 now.
15   THE INTERPRETER:
16       Okay.
17   Q.   Trying to figure out the fastest way
18 to do this.
19   MR. DOUGLAS:
20       Doctor, I think you're going
21   to have to read him this whole
22   paragraph.  I'm sorry.  All at one
23   time.
24   THE INTERPRETER:
25       Number 7?

Page 357

1    MR. DOUGLAS:
2        Yes, ma'am.
3    THE INTERPRETER:
4        Understood.
5 EXAMINATION BY MR. DOUGLAS:
6    Q.   When was this meeting?
7    THE INTERPRETER:
8        Immediately after the skill
9    test, the same day.
10   Q.   Okay.  At the same location or a
11 different location?
12   THE INTERPRETER:
13       Same place.
14   Q.   At this meeting you talk about in
15 Paragraph 7, were the two Signal employees who
16 gave you the skills test present?
17   THE INTERPRETER:
18       They were there to take the
19   test, and after that, they were
20   there for this meeting, also.
21   Q.   You mentioned some things that
22 Sachin Dewan -- that you claim Sachin Dewan said
23 at the meeting.  What language did Sachin Dewan
24 use to communicate with the workers?
25   THE INTERPRETER:

Page 358

1        Sachin Dewan first said
2    things in English, then in Hindi,
3    he translated.
4    Q.   Do you know why Sachin Dewan would
5 have said anything in English at this meeting?
6    MR. ALEXIS:
7        Object to form.
8    THE INTERPRETER:
9        I think they have the staff
10   of the Signal there, for them also
11   to make them understand his spoken
12   English.
13 EXAMINATION BY MR. DOUGLAS:
14   Q.   Sure.  Did any of the applicants at
15 this meeting speak English as their native
16 tongue?
17   THE INTERPRETER:
18       Nobody there with that.
19   Q.   You make a reference to 40,500
20 dirhams.  Can you convert that into rupees?
21   THE INTERPRETER:
22       If you have a calculator, I
23   will tell you.
24   MR. SHAPIRO:
25       I'm sorry.  I didn't hear

Page 359

1    the answer to that.
2    THE INTERPRETER:
3        If you have a calculator, he
4    can tell.
5 EXAMINATION BY MR. DOUGLAS:
6    Q.   Don't worry about that.  It's not
7 that important today.
8    THE INTERPRETER:
9        I can calculate and tell you
10   if you want.
11   Q.   Don't worry about it.  Not worth the
12 time today.
13       Do you know why at this meeting you
14 were told there was one fee for a green card and
15 one -- and a separate fee for the H2B visa?
16   THE INTERPRETER:
17       I know.
18   Q.   You know?
19   THE INTERPRETER:
20       I know.
21   Q.   All right.  Tell me why there was
22 two different charges then.
23   MR. ALEXIS:
24       I'm going to object to the
25   form, by the way.

David
359:13-360:9

Page 360

1　THE INTERPRETER:
2　　Some people apply just for
3　the green card. They only come if
4　they get the green card. Some
5　people are ready because the
6　company said if you go on H2B
7　visa, you get the green card
8　eventually. So, some people were
9　ready for that.
10　EXAMINATION BY MR. DOUGLAS:
11　Q. Great. Thank you.
12　　Let's go down to Paragraph 8, and
13　I'm not going to have you read the whole thing --
14　THE INTERPRETER:
15　　Thank you.
16　MR. DOUGLAS:
17　　Unless somebody makes me
18　make you read the whole thing, but
19　I want you to read the first
20　sentence to him, please, Doctor.
21　EXAMINATION BY MR. DOUGLAS:
22　Q. At another group meeting. Who --
23　was any representative of Signal at this meeting
24　described in Paragraph 8?
25　THE INTERPRETER:

Page 361

1　　Yes, it was there.
2　Q. Who?
3　THE INTERPRETER:
4　　Malvern C. Burnett.
5　Q. Were the two Signal employees that
6　were at the written pipefitter skills test also
7　present at this meeting on May 27th?
8　THE INTERPRETER:
9　　No.
10　Q. Was Michael Pol at this meeting?
11　THE INTERPRETER:
12　　No.
13　Q. Did anybody besides Sachin Dewan and
14　Malvern Burnett address the applicants at this
15　meeting?
16　THE INTERPRETER:
17　　Sachin Dewan's brother,
18　younger brother, Manish Dewan,
19　talked in this meeting.
20　Q. Did Sachin Dewan speak at this
21　meeting?
22　THE INTERPRETER:
23　　Yes.
24　Q. And, obviously, Malvern Burnett
25　spoke at the meeting.

Page 362

1　THE INTERPRETER:
2　　Malvern Burnett talked in
3　English. Sachin Dewan translated
4　that into Hindi.
5　Q. Okay. Let's skip down a couple
6　lines.
7　MR. DOUGLAS:
8　　Doctor, you'll see right in
9　the middle, that's paragraph that
10　starts, They handed out contracts.
11　THE INTERPRETER:
12　　Uh-huh.
13　MR. DOUGLAS:
14　　Could you read that sentence
15　to him briefly?
16　THE INTERPRETER:
17　　Yes.
18　EXAMINATION BY MR. DOUGLAS:
19　Q. Did you sign all three -- I'm
20　sorry -- all four of the agreements that you
21　described in that sentence?
22　THE INTERPRETER:
23　　Yes.
24　Q. Do you still have copies of all four
25　of the agreements that you described in that

Page 363

1　sentence?
2　THE INTERPRETER:
3　　I don't have it with me now,
4　but I have it at home.
5　Q. Of all four?
6　THE INTERPRETER:
7　　I believe so.
8　Q. Have you looked at any or all of
9　those four agreements since the day you signed
10　them?
11　THE INTERPRETER:
12　　Yes, I read.
13　Q. Okay. What do you understand the
14　Global Resources agreement that you signed as
15　described in Paragraph 8 accomplished?
16　THE INTERPRETER:
17　　I don't remember now to
18　explain. If you can read it, I
19　can explain.
20　Q. What about the agreement with
21　Malvern Burnett that you signed in Paragraph 8,
22　what do you understand that agreement was for?
23　MR. ALEXIS:
24　　Object to form.
25　THE INTERPRETER:

## Page 388

1  that you understood three-fourths of what he
2  spoke in English?
3      THE INTERPRETER:
4          Almost.  I didn't say in the
5      meeting, like, three-fourths.
6      Most of the things, we understood,
7      and with the translation, we
8      completely understood.
9      Q.   Before entering into this whole
10  process to go to work at Signal, had you ever
11  been involved in any sort of immigration
12  proceedings to come to the United States?
13      THE INTERPRETER:
14          No.
15      Q.   Do you understand three-fourths of
16  what I'm saying in English?
17      THE INTERPRETER:
18          What I said three-fourth is
19      not exactly three-fourth, but I
20      generally understand most of the
21      things.
22      Q.   Do you understand most of what I'm
23  saying in English?
24      THE INTERPRETER:
25          Few words I don't

## Page 389

1  understand.
2      Q.   So, that means you understand most
3  of the words I'm saying in English?
4      THE INTERPRETER:
5          Almost I understand.
6      Q.   If you are called to testify at a
7  hearing in this matter or at the trial in this
8  matter, will you testify in English or in
9  Malayalum?
10      THE INTERPRETER:
11          No.
12      Q.   No.  It's not a "yes" or "no"
13  question.  If you are called to testify at a
14  hearing in this matter or at the trial in this
15  matter --
16      THE INTERPRETER:
17          Wait.
18      MR. DOUGLAS:
19          I'm sorry.
20  EXAMINATION BY MR. DOUGLAS:
21      Q.   -- will you testify in English or in
22  Malayalum?
23      THE INTERPRETER:
24          I can only speak in
25      Malayalum.  I don't understand

## Page 390

1      most of the court languages.
2      Q.   So, will you demand that you testify
3  through an interpreter if you are called to
4  testify at a hearing or the trial in this matter?
5      THE INTERPRETER:
6          For sure, I need.
7      Q.   Will you also demand that every
8  attorney who questions you, including your own
9  attorneys, question you through an interpreter?
10      THE INTERPRETER:
11          Yes, I will.  If I need to
12      understand, I need to hear in
13      Malayalum.
14      Q.   Let's go back to Paragraph 12,
15  Kurian.  I'm very interested in the part of your
16  document that starts with:  We were not to tell
17  the officials the truth about certain things.
18      THE INTERPRETER:
19          Yes.
20      Q.   Did you think it odd that someone
21  was telling you to not tell the truth to a
22  government official?
23      THE INTERPRETER:
24          Yes, but they told us the
25      reason.  If I tell the truth, this

David
390:20-392:5

## Page 391

1      visa will be cancelled, and you
2      will never get the green card
3      afterwards.  If one person tell
4      the truth, none of you get the
5      visa and, also, we don't get --
6      return you the money.  We don't
7      give you the money back.
8      MR. WYNNE:
9          Object to translation.
10  EXAMINATION BY MR. DOUGLAS:
11      Q.   Did you question whoever told you to
12  not tell the truth to the official about this
13  instruction?
14      MR. SHAPIRO:
15          Object to form.
16      THE INTERPRETER:
17          We asked him why we
18      shouldn't tell the truth.  Then,
19      they explained to us this H2 visa
20      will be cancelled.  You tell them
21      if you gave money.  If you tell
22      them that you gave money and
23      going, you will never get the
24      green card, also.  If anything
25      like that happens, we would not

## Page 392

1 give any money back -- whatever
2 you paid us. So, we were forced
3 to obey because we paid the money.
4 So, we were forced to obey that --
5 to do that.
6 EXAMINATION BY MR. DOUGLAS:
7    Q.   Who do you contend told you to not
8 tell the truth to the consular officials?
9    MR. SHAPIRO:
10       Object to form.
11    MR. ALEXIS:
12       Object to form.
13 EXAMINATION BY MR. DOUGLAS:
14    Q.   You can answer.
15    THE INTERPRETER:
16       Malvern C. told.
17    Q.   Did he tell you why you needed to
18 lie to the officials about how much money you had
19 paid for a recruitment fee?
20    MR. ALEXIS:
21       Object to form.
22    THE INTERPRETER:
23       He didn't tell particularly
24    why you should -- he didn't
25    explain particularly why he said

## Page 393

1    that.
2 EXAMINATION BY MR. DOUGLAS:
3    Q.   Did he tell you -- would you agree
4 with me, Kurian, that intentionally not telling
5 someone the truth is the same thing as lying to
6 that person?
7    THE INTERPRETER:
8       Yes, that is true. But I
9    had a reason. I was forced to
10    tell.
11    Q.   Okay. Did anybody explain to you
12 why you were to lie to the consular officials and
13 only say that you had paid a very small amount?
14    MR. ALEXIS:
15       Object to form.
16    THE INTERPRETER:
17       They said only if you need a
18    very small amount for the H2 visa.
19    If they happen to know we gave
20    more money than required for that,
21    they will create problem. That is
22    why they said not to tell how much
23    money you gave or how much money
24    you owe in the future.
25 EXAMINATION BY MR. DOUGLAS:

## Page 394

1    Q.   And when you just told me that if
2 they happen to know we gave more money than
3 required, they will create a problem, are you
4 referring to the consular officials that you were
5 about to lie to?
6    THE INTERPRETER:
7       Yes.
8    MR. WYNNE:
9       Objection;
10    mischaracterization.
11 EXAMINATION BY MR. DOUGLAS:
12    Q.   Did anybody explain to you why you
13 were supposed to lie to the consular officials
14 about the possibility of green cards?
15    THE INTERPRETER:
16       Malvern C. explained and
17    told.
18    Q.   What did Malvern C. explain and tell
19 you about why you needed to lie to the consular
20 officials about the green cards?
21    MR. ALEXIS:
22       Object to form.
23    MR. WYNNE:
24       Objection; asked and
25    answered.

David
394:18-395:21

## Page 395

1    THE INTERPRETER:
2       Malvern C. explained these
3    things in detail. You are going
4    now for -- on H2 visa. H2 visa
5    will be extended twice when you
6    reach here. Within that 24-month
7    period with the renewal of the H2
8    visa, you will get the green card.
9    We have started all the
10    paperwork -- already started for
11    that. So, you tell now that you
12    are just going on the H2 visa
13    only. Then, we ask them, so you
14    will only get H2 visa? Then, they
15    explained again, not only H2 visa,
16    after you go there within this two
17    renewal period time, within 24
18    months, you will get the green
19    card. The company is doing -- has
20    done all the -- started doing all
21    the paperwork for that.
22 EXAMINATION BY MR. DOUGLAS:
23    Q.   I understand that. What I don't
24 understand is why you -- why it was told to you
25 that it would be necessary to tell a lie to the

Page 444

1 EXAMINATION BY MR. DOUGLAS:
2    Q.   Well, yes, that is what I'm asking
3 you about because I keep using the word
4 declaration and pointing to Exhibit 302.  And
5 yesterday, when I went a lot of time going
6 through how this declaration, Exhibit 302, was
7 put together, I asked you several times, and you
8 responded several times that it was one long
9 conversation over several hours with an attorney
10 and a translator, and that was the only time you
11 worked on this declaration.  They faxed it to you
12 three days later, you signed it and faxed it
13 back.
14    MR. WYNNE:
15       Object; mischaracterization.
16    The questions yesterday were about
17    September 25th and September 28th
18    specifically.  There were never
19    any questions about what led up to
20    those dates, and that's what this
21    line of questioning is.
22    THE INTERPRETER:
23       Shall I translate it?
24    MR. DOUGLAS:
25       Oh, absolutely.  Go right

Page 445

1    ahead.
2    THE INTERPRETER:
3       That is what I have to say,
4    too.  Yesterday, you asked me when
5    did you learn about -- read about
6    this, when were you explained
7    about this.  That is the only
8    thing you asked, and I answered.
9    MR. DOUGLAS:
10       Okay.  We'll revisit this at
11    another time.  It's 11:48.  I
12    promised you 11:45.  So, five more
13    minutes isn't going to make a
14    difference for us, but it'll make
15    a difference for you.  So, I'm
16    going to go ahead and suspend the
17    deposition at this time, subject
18    to Mr. Wynne's objections, I'm
19    sure.
20    MR. WYNNE:
21       Of course.
22    MR. DOUGLAS:
23       To be continued and
24    renoticed and finished up later.
25    THE INTERPRETER:

Page 446

1       Thank you.
2    MR. ALEXIS:
3       I just want to say one thing
4    on the record.  This is Ralph
5    Alexis, on behalf of Malvern
6    Burnett defendants.  I wasn't here
7    at the very beginning, but I just
8    want to confirm with everybody,
9    all these depositions we've been
10    taking are subject to the so-
11    called usual stipulation, and we
12    also had agreed from the outset
13    that we just said object to form
14    and that shortens the objections,
15    and one objection is good for all.
16    I just wanted to make sure
17    everybody -- we're on the same
18    page.
19    MR. DOUGLAS:
20       Yeah.
21    MR. WYNNE:
22       No problem retroactive with
23    respect to application of that.
24    MR. ALEXIS:
25       Just wanted to make sure.
    (Whereupon, the testimony of
    the witness was concluded at 11:53 a.m.)

Page 447

1       WITNESS' CERTIFICATE
2
3
4
5       I, KURIAN DAVID, the undersigned, do
6 hereby certify that I have read the foregoing
7 deposition and it contains a true and correct
8 transcript of the testimony given by me:
9
10
11    ( ) Without corrections.
12    ( ) With corrections as reflected on
13       the errata sheet(s) prepared by me
14       and made a part hereof.
15
16
17
18
19
20
21    KURIAN DAVID
22
23    DATE
24
25

Page 448

```
 1        REPORTER'S CERTIFICATE
 2
 3
 4        I, CAROL VALLETTE SLATER, Certified
 5 Court Reporter, Registered Professional Reporter,
 6 in and for the State of Louisiana, as the officer
 7 before whom this testimony was taken, do hereby
 8 certify that KURIAN DAVID, after having been duly
 9 sworn by me upon authority of R.S. 37:2554, did
10 testify as hereinbefore set forth in the
11 foregoing pages; that this testimony was reported
12 by me in the stenotype reporting method, was
13 prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21        CAROL VALLETTE SLATER (CCR 78020)
          CERTIFIED COURT REPORTER
22        REGISTERED PROFESSIONAL REPORTER
23
24
25
```

## Page 449

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA
 3
   KURIAN DAVID, SONY          CIVIL ACTION
 4 VASUDEVAN SULEKHA,
   PALANYANDI THANGAMANI,       NO. 08-1220
 5 MARUGANANTHAM KANDHASAMY,
   HEMANT KHUTTAN, ANDREWS     SECTION "A"
 6 ISSAC PADA VEETTIYL, AND
   DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7 BEHALF OF OTHER SIMILARLY
   SITUATED INDIVIDUALS, AND
 8 SABULAL VIJAYAN, KRISHAN
   KUMAR, JACOB JOSEPH
 9 KADDAKKARAPPALLY, KULDEEP
   SINGH, AND THANASEKAR
10 CHELLAPPAN, INDIVIDUALLY,
11        PLAINTIFFS
12 VERSUS
13 SIGNAL INTERNATIONAL,
   LLC, MALVERN C. BURNETT,
14 GULF COAST IMMIGRATION
   LAW CENTER, L.L.C., LAW
15 OFFICES OF MALVERN C.
   BURNETT, A.P.C.,
16 INDO-AMERI SOFT L.L.C.,
   KURELLA RAO, J & M
17 ASSOCIATES, INC. OF
   MISSISSIPPI, GLOBAL
18 RESOURCES, INC., MICHAEL
   POL, SACHIN DEWAN, AND
19 DEWAN CONSULTANTS PVT.
   LTD. (a/k/a MEDTECH
20 CONSULTANTS).
21        DEFENDANTS.
22
23
24        KURIAN DAVID
25        VOLUME 4
```

## Page 450

```
 1 Deposition of KURIAN DAVID, c/o Daniel Werner,
   Immigrant Justice Project, Southern Poverty Law
 2 Center, Suite 2150, 233 Peachtree Street,
   Atlanta, Georgia 30303, taken in the offices of
 3 Huffman & Robinson, Inc., Suite 250 Annex, 701
   Poydras Street, New Orleans, Louisiana 70139, on
 4 Thursday, the 9th day of April, 2009, beginning
   at 9:14 a.m.
 5
   APPEARANCES:
 6
   DEWEY & LeBOEUF
 7 (BY: ALAN B. HOWARD)
   1301 Avenue of the Americas
 8 New York, New York 10019
 9    ATTORNEYS FOR THE PLAINTIFFS
10
   MIDDLEBERG, RIDDLE & GIANNA
11 (BY: ERIN CASEY HANGARTNER
        DONALD C. DOUGLAS, JR.)
12 31st Floor
   201 St. Charles Avenue
13 New Orleans, Louisiana 70170-3100
14      and
15 PATRICIA A. BOLLMAN
   A Professional Law Corporation
16 Post Office Box 13707
   New Orleans, Louisiana 70185
17
        ATTORNEYS FOR SIGNAL INTERNATIONAL,
18 L.L.C.
19
   PORTEOUS, HAINKEL & JOHNSON
20 (BY: RALPH R. ALEXIS, III)
   704 Carondelet Street
21 New Orleans, Louisiana 70130-3774
22      ATTORNEYS FOR GULF COAST IMMIGRATION
        LAW CENTER, L.L.C.
23
24
25
```

## Page 451

```
 1 APPEARANCES CONTINUED:
 2   BARRASSO, USDIN, KUPPERMAN,
     FREEMAN & SARVER
 3   (BY: CHRISTY C. HAROWSKI)
     Suite 2400
 4   909 Poydras Street
     New Orleans, Louisiana 70112
 5
        ATTORNEYS FOR GLOBAL RESOURCES,
 6      INC. AND MICHAEL POL
 7
     STEPHEN H. SHAPIRO
 8   200 Maine Street
     Jefferson, Louisiana 70121
 9
        ATTORNEYS FOR SACHIN DEWAN AND
10      DEWAN CONSULTANTS PVT. LTD. ALSO
        KNOWN AS MEDTECH CONSULTANTS
11
   ALSO PRESENT:
12
     TRACEY BINION
13   SIGNAL INTERNATIONAL, L.L.C.
14   BRYAN C. BAGNETTO
     MIDDLEBERG, RIDDLE & GIANNA
15
     ANJALI NAIR
16   Immigrant Justice Project
     Southern Poverty Law Center
17   Suite 2150
     233 Peachtree Street
18   Atlanta, Georgia 30303
19 TRANSLATOR:
20   USHA E. DEVIDOSS
     LEGAL INTERPRETERS, INC.
21   Suite 200
     3350 Ridgelake Drive
22   Metairie, Louisiana 70002
23 REPORTED BY:
24   CAROL VALLETTE SLATER
     Certified Court Reporter
25   Registered Professional Reporter
```

## Page 452

```
 1        I N D E X
 2
 3 EXAMINATION BY:              PAGE
 4 MR. DOUGLAS              455
 5 MR. ALEXIS               515
 6 MR. SHAPIRO              573
 7 MS. HAROWSKI             626
 8 MR. HOWARD               629
 9 MR. DOUGLAS              651
10 MR. DOUGLAS              663
11 MR. DOUGLAS              664
12
13 EXHIBITS:
14 Exhibit Number 347           478
     Notice of Continuation Deposition
15   of Kurian David
     KURIAN00035 - 00037
16
     Exhibit Number 348           479
17   Employment Agreement
     DAVID00001869 - 00001870
18
     Exhibit Number 349           485
19   Dewan Consultants Receipt Vouchers
     DAVID00005510
20
     Exhibit Number 350           531
21   Attorney Services Agreement
22 Exhibit Number 351           531
     Memorandum of Understanding
23   DAVID00001867 - 00001868
24 Exhibit Number 352           562
     2007 Form W-2
25   KURIAN00038
```

Page 493

1 card processing is not going.
2 After they removed -- they removed
3 Malvern C. Burnett.
4 EXAMINATION BY MR. DOUGLAS:
5 Q. After they removed -- I understand.
6 You told me Malon told you that, right?
7 THE INTERPRETER:
8 Company manager, Malon.
9 Q. After that meeting with Malon and
10 before you quit, did the company have a meeting
11 where they told you we're starting the green card
12 process for you guys?
13 MR. HOWARD:
14 Objection to translation.
15 THE INTERPRETER:
16 Can you repeat that again?
17 EXAMINATION BY MR. DOUGLAS:
18 Q. I understand that in October of '07,
19 you claim that Malon told you the company's not
20 going to start the green card process. After
21 that --
22 THE INTERPRETER:
23 Can you repeat that, green
24 card processing?
25 Q. Malon told you the company is not

Page 494

1 going to start the green card processing. After
2 he said that, did the company ever tell you,
3 yeah, we're going to start the green card
4 process? Anybody with the company.
5 THE INTERPRETER:
6 Nobody said that.
7 Q. Were you moved -- transferred from
8 Orange over to Pascagoula before you left?
9 THE INTERPRETER:
10 I didn't hear that.
11 Q. Were you transferred from Orange to
12 Pascagoula before you left Signal?
13 THE INTERPRETER:
14 I didn't go.
15 Q. You didn't go to Pascagoula?
16 THE INTERPRETER:
17 No, I didn't go.
18 MR. DOUGLAS:
19 Can you read him Paragraph
20 32, please?
21 Finished?
22 THE INTERPRETER:
23 Yes.
24 EXAMINATION BY MR. DOUGLAS:
25 Q. Kurian, you say in Paragraph 32 that

Page 495

1 you felt like you lived in a jail. Tell me why
2 you felt that way.
3 THE INTERPRETER:
4 There are several reasons
5 for that. First thing is I know
6 I'm staying in a place I really
7 didn't want to stay; second, they
8 are giving me the food which I
9 don't like; and the third thing
10 is, you know, they control what we
11 eat. If my friends or relatives
12 come, they are not allowed to come
13 in. Not even -- they don't even
14 allow us to drink a beer -- drink
15 beer.
16 Q. In the camp?
17 THE INTERPRETER:
18 Inside the camp.

David
495:19-496:7

19 Q. Anything else?
20 THE INTERPRETER:
21 Even where we sleep, you
22 know, they come in and check the
23 cabinet and the bed. When we go
24 for duty and when we end, also,
25 when we come back, if you go to

Page 496

1 Wal-Mart or we go to church, when
2 we come back, they check the bag
3 and -- check the bags. You think
4 about all that, there is no
5 freedom -- there was no freedom.
6 That is why I thought it is a
7 jail.
8 Q. Kurian, could you have walked out of
9 the gate whenever you wanted to walk out of the
10 gate and leave Signal?
11 THE INTERPRETER:
12 Yes. Yeah, I could. But I
13 didn't have the -- they didn't
14 allow us to go outside -- to walk
15 outside.
16 Q. Could you get in a car and drive off
17 whenever you wanted to get in a car and drive
18 off?
19 THE INTERPRETER:
20 Company arranged a van. If
21 there is not -- there is not
22 enough people, that is about 12,
23 then, they won't go. And the work
24 site and all the tools, you know,
25 we pay and buy. Safety things

1    Q.   And you told us that you paid
2  $4,000, correct?
3       THE INTERPRETER:
4          Yes.
5    Q.   Now, $4,000, would you agree, is
6  approximately 200,000 rupees?
7       THE INTERPRETER:
8          Yes, around.
9    Q.   And you could have used that money
10 to pay down your debts?
11      THE INTERPRETER:
12         Yes.
13   Q.   But you chose to buy the car?
14      THE INTERPRETER:
15         I decided to buy the car
16 because if you don't have a car,
17 it's like you -- it's like you
18 don't have legs.
19 MR. ALEXIS:
20         I'm going to show to counsel
21 exhibits marked 352 and 353. I
22 will state that Exhibit 352 is a
23 2007 W-2 form issued by Signal to
24 Kurian David, and Exhibit 353 is a
25 2008 W-2 form issued by Signal to

1  Kurian David.
2          (Whereupon, Exhibit Number
3       352 and Exhibit Number 353 were
4       marked for identification.)
5  EXAMINATION BY MR. ALEXIS:
6    Q.   Kurian, I'd like to direct your
7  attention to Exhibit 352, please. If you look at
8  Box Number 1, it shows that you made $50,176.16
9  working for Signal in 2007; is that correct?
10      THE INTERPRETER:
11         The amount shows is a gross
12 amount.  They cut more than half
13 of that.  They took it back.
14   Q.   Would you agree with me that $50,000
15 is approximately two and a half million rupees?
16      THE INTERPRETER:
17         Not that much.  It's about
18 two million.  No, not two million.
19 I have to calculate.
20   Q.   Let me ask you this:  Would you
21 agree that there are 50 rupees to a dollar,
22 approximately?
23      THE INTERPRETER:
24         Fifty rupees is right now.
25 When I was working, it's only 40

1  rupees per dollar.
2    Q.   So, you believe that $50,000 is
3  approximately two million rupees.
4       THE INTERPRETER:
5          Calculate.
6    Q.   You want a pen and paper?
7       THE INTERPRETER:
8          This is 20 lakhs.  It is not
9  two million.  If I'm allowed to
10 say, it's -- 100 lakhs is one
11 million.  In India, it's kody.
12 One hundred lakhs is one kody.
13   Q.   You believe that $50,000 is 20
14 lakhs?
15      THE INTERPRETER:
16         Yes.
17   Q.   And that is a great deal more than
18 you made in the UAE?
19      MR. HOWARD:                    David
20         Objection to form.           563:24-566:1
21      THE INTERPRETER:
22         This amount, I didn't get.
23 EXAMINATION BY MR. ALEXIS:
24   Q.   The amount you received was a great
25 deal more than you received in the UAE.

1       MR. HOWARD:
2          Objection to form.
3       THE INTERPRETER:
4          Yes.
5  EXAMINATION BY MR. ALEXIS:
6    Q.   And that's why you came to this
7  country.
8       MR. HOWARD:
9          Objection to form.
10      THE INTERPRETER:
11         No.
12 EXAMINATION BY MR. ALEXIS:
13   Q.   That's not why you came?
14      THE INTERPRETER:
15         No.
16   Q.   That's not one of the reasons you
17 came?
18      THE INTERPRETER:
19         One reason, yes.  One of the
20 reasons.
21   Q.   It was a big reason, no?
22      MR. HOWARD:
23         Objection to form.
24      THE INTERPRETER:
25         I don't think it's a big

Page 565

1  reason. I came here only because
2  I would be able to get the green
3  card. The family life with my
4  kids would be better. If it's
5  only H2B visa, I wouldn't have
6  come.
7  EXAMINATION BY MR. ALEXIS:
8     Q.   You're still here, though?
9     MR. HOWARD:
10       Objection; form.
11    THE INTERPRETER:
12       Yes.
13 EXAMINATION BY MR. ALEXIS:
14    Q.   And if you hadn't come over here on
15 an H2B visa, you wouldn't be here, would you?
16    MR. HOWARD:
17       Objection to form.
18    THE INTERPRETER:
19       I would not have come. Oh,
20 I said I would have come. I would
21 have gotten green card. I paid
22 for the green card. They said
23 within 24 months, I will be able
24 to get the green card. With green
25 card, I would have stayed here --

Page 566

1     I could have stayed here.
2     MR. ALEXIS:
3        I'm going to object to the
4     responsiveness of the answer and
5     ask that it be stricken at the
6     appropriate time.
7     MR. DOUGLAS:
8        I join.
9  EXAMINATION BY MR. ALEXIS:
10    Q.   Kurian, in Paragraph 5 of your
11 declaration, you talk about Malvern Burnett
12 giving an explanation to a group seminar. You
13 testified that someone interpreted -- strike
14 that.
15       You testified that Malvern Burnett
16 spoke in English, correct?
17    THE INTERPRETER:
18       Yes.
19    Q.   And he was interpreted by a Hindi
20 interpreter.
21    THE INTERPRETER:
22       Yes.
23    Q.   And you don't understand English 100
24 percent; is that correct?
25    THE INTERPRETER:

Page 567

1        Yes, that's correct.
2     Q.   So, your understanding of what
3  Malvern Burnett said comes greatly from the Hindi
4  translation that you heard?
5     THE INTERPRETER:
6        Yes. Hindi interpreter was
7     Sachin Dewan.
8     Q.   I understand. Let me also direct
9  your attention to Paragraph 8 of your
10 declaration. In that paragraph, you state that
11 Malvern Burnett spoke to a group meeting,
12 correct?
13    THE INTERPRETER:
14       Yes.
15    Q.   And, once again, he spoke in
16 English, correct?
17    THE INTERPRETER:
18       Yes.
19    Q.   And, once again, his words were
20 interpreted in Hindi?
21    THE INTERPRETER:
22       Sachin Dewan translated back
23    in Hindi.
24    Q.   And, once again, your understanding
25 of what Malvern Burnett said comes largely from

Page 568

1  the Hindi translation?
2     THE INTERPRETER:
3        In English, a little bit I
4     could understand. With the
5     translation and combined, I could
6     understand.
7     Q.   I understand. But since you only
8  understand English a little, your understanding
9  of what Malvern Burnett was saying came from the
10 Hindi translation?
11    THE INTERPRETER:
12       Yes.
13    Q.   Again, I'd like to direct your
14 attention to Paragraph 12. Are you testifying
15 today that Malvern Burnett addressed a group of
16 men and talked to them about how to answer
17 consular interviews?
18    THE INTERPRETER:
19       Yes.
20    Q.   Again, he spoke in English?
21    THE INTERPRETER:
22       Yes.
23    Q.   And, again, he was translated into
24 Hindi?
25    THE INTERPRETER:

## Page 637

1    Yeah.  If you sit in the
2  top, your head will hit the
3  ceiling.  But if you sit in the
4  bottom, your head will hit the top
5  bed.
6  Q.    Were there times you were living
7  there when every bunk, every bed in your trailer
8  was occupied?
9  THE INTERPRETER:
10    You're talking about that,
11  the trailer I was in?
12  Q.    Correct.
13  THE INTERPRETER:
14    That day when I went and
15  lived, there was only 15 people,
16  and after a week -- within a week,
17  it became full.
18  Q.    And for how long did it stay full?
19  THE INTERPRETER:
20    After that, some people
21  left.  Some people have
22  transferred to Mississippi.  Like
23  that, I know, the number went
24  down.
25  Q.    Can you estimate the length of

## Page 638

1  time -- was it days, weeks or months -- that your
2  trailer was full, up to 24 people?
3  THE INTERPRETER:
4    Cannot say exactly.  About
5  four, five months.
6  Q.    How many toilets were in your
7  trailer?
8  THE INTERPRETER:
9    Two.
10  Q.    How many showers were in your
11  trailer?
12  THE INTERPRETER:
13    Two.
14  Q.    Did you -- how often would you have
15  to wait for a shower when you wanted to shower?
16  THE INTERPRETER:
17    About sometimes several
18  hours had to wait.
19  Q.    Why so long?
20  THE INTERPRETER:
21    The people who go there
22  first, they take a bath, and then
23  after that, you know, it's
24  according to that.
25  Q.    Was everybody coming back from work

*[David 638:6-640:4]*

## Page 639

1  at the same time?
2  MR. DOUGLAS:
3    Form.
4  THE INTERPRETER:
5    There were night shifts and
6  day shifts.  When day shift --
7  when they come back, then, the
8  night shift goes.  When we are
9  sleeping, the night shift, they
10  will come back around 2:00 at
11  night.  They come and open the
12  cabinets and then they walk around
13  and then we lose our sleep, and if
14  you go to bed at 10:00 and you can
15  sleep till 2:00, then, you lose
16  your sleep.  My job is, like, you
17  have to do a lot of calculation.
18  And if you couldn't sleep, people
19  are like -- you know, you have a
20  lot of mental trouble.  So, we
21  requested for this night shift
22  people to live separate.  They
23  have the day shift and the night
24  shift people stayed in separate
25  quarters, all these problems could

## Page 640

1  have solved, and even for that and
2  the company didn't do anything and
3  they said you have to stay as the
4  accommodations are given.
5  MR. DOUGLAS:
6    Object to responsiveness of
7  the continuing narrative that has
8  nothing to do with the question.
9  THE INTERPRETER:
10    Can you repeat that?
11  MR. DOUGLAS:
12    I want to object to the
13  responsiveness.
14  EXAMINATION BY MR. HOWARD:
15  Q.    You mentioned before, Mr. David, as
16  one of the reasons you felt that this was a jail
17  is that you were not allowed to have visitors in
18  the camp; is that right?
19  THE INTERPRETER:
20    Yes.
21  Q.    You mentioned that one person who
22  had come to try and visit you at the camp was
23  someone you referred to as your brother.  Who is
24  that?
25  THE INTERPRETER:

Page 665

1      WITNESS' CERTIFICATE
2
3
4
5      I, KURIAN DAVID, the undersigned, do
6  hereby certify that I have read the foregoing
7  deposition and it contains a true and correct
8  transcript of the testimony given by me:
9
10
11     ( ) Without corrections.
12     ( ) With corrections as reflected on
13         the errata sheet(s) prepared by me
14         and made a part hereof.
15
16
17
18
19
20
21     KURIAN DAVID
22
23     DATE
24
25

Page 666

1      REPORTER'S CERTIFICATE
2
3
4      I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that KURIAN DAVID, after having been duly
9  sworn by me upon authority of R.S. 37:2554, did
10 testify as hereinbefore set forth in the
11 foregoing pages; that this testimony was reported
12 by me in the stenotype reporting method, was
13 prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21     CAROL VALLETTE SLATER (CCR 78020)
       CERTIFIED COURT REPORTER
22     REGISTERED PROFESSIONAL REPORTER
23
24
25