# DEPOSITION EXCERPTS

# SANTHOSH KUMAR GOPINATHAN PILLAI

**Page 1**

```
 1      UNITED STATES DISTRICT COURT
 2      EASTERN DISTRICT OF LOUISIANA
 3
        KURIAN DAVID, SONY        CIVIL ACTION
 4      VASUDEVAN SULEKHA,
        PALANYANDI THANGAMANI,    NO. 08-1220
 5      MARUGANANTHAM KANDHASAMY,
        HEMANT KHUTTAN, ANDREWS   SECTION "A"
 6      ISSAC PADA VEETTIYL, AND
        DHANANJAYA KECHURA, ON    MAGISTRATE 3
 7      BEHALF OF OTHER SIMILARLY
        SITUATED INDIVIDUALS, AND
 8      SABULAL VIJAYAN, KRISHAN
        KUMAR, JACOB JOSEPH
 9      KADDAKKARAPPALLY, KULDEEP
        SINGH, AND THANASEKAR
10      CHELLAPPAN, INDIVIDUALLY,
11           PLAINTIFFS
12      VERSUS
13      SIGNAL INTERNATIONAL,
        LLC, MALVERN C. BURNETT,
14      GULF COAST IMMIGRATION
        LAW CENTER, L.L.C., LAW    VOLUME 1
15      OFFICES OF MALVERN C.
        BURNETT, A.P.C.,
16      INDO-AMERI SOFT L.L.C.,
        KURELLA RAO, J & M
17      ASSOCIATES, INC. OF
        MISSISSIPPI, GLOBAL
18      RESOURCES, INC., MICHAEL
        POL, SACHIN DEWAN, AND
19      DEWAN CONSULTANTS PVT.
        LTD. (a/k/a MEDTECH
20      CONSULTANTS).
21           DEFENDANTS.
22
        Videotaped deposition of SANTHOSH KUMAR
23      GOPINATHAN PILLAI, 601 Bayou Cassotte Parkway,
        Pascagoula, Mississippi 39581, taken in the
24      offices of Middleberg, Riddle & Gianna, 31st
        Floor, 201 St. Charles Avenue, New Orleans,
25      Louisiana 70170, on Wednesday, the 3rd day of
        December, 2008, beginning at 9:13 a.m.
```

**Page 3**

```
 1  APPEARANCES CONTINUED:
 2      BARRASSO, USDIN, KUPPERMAN,
        FREEMAN & SARVER
 3      (BY: JUDITH A. WENGER)
        Suite 2400
 4      909 Poydras Street
        New Orleans, Louisiana 70112
 5
        ATTORNEYS FOR GLOBAL RESOURCES,
 6      INC. AND MICHAEL POL
 7
        SCOTT D. SMITH
 8      240 Eisenhower Drive (39531)
        Post Office Box 4603
 9      Biloxi, Mississippi 39535-4603
10          ATTORNEY FOR SANTHOSH KUMAR
        GOPINATHAN PILLAI
11
12
13  ALSO PRESENT:
14      TRACEY BINION
        SIGNAL INTERNATIONAL, L.L.C.
15
16      BRYAN C. BAGNETTO
        MIDDLEBURG, RIDDLE & GIANNA
17
18
        TRANSLATOR:
19
        ISMAIL CHARANIA
20      TRANSLATIONS R US
        780 Dekalb Ind. Way
21      Decatur, Georgia 30033
22
23
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2      NAOMI TSU
        Immigrant Justice Project
 3      Southern Poverty Law Center
        Suite 2150
 4      233 Peachtree Street
        Atlanta, Georgia 30303
 5
        and
 6
        DEWEY & LeBOEUF
 7      (BY: ROBERT P. WYNNE)
        Suite 2550
 8      1000 Main Street
        Houston, Texas 77002-5009
 9
        ATTORNEYS FOR THE PLAINTIFFS
10
11  MIDDLEBERG, RIDDLE & GIANNA
        (BY: ERIN CASEY HANGARTNER
12      DONALD C. DOUGLAS, JR.)
        31st Floor
13      201 St. Charles Avenue
        New Orleans, Louisiana 70170-3100
14
        and
15
        PATRICIA A. BOLLMAN
16      A Professional Law Corporation
        Post Office Box 13707
17      New Orleans, Louisiana 70185
18      ATTORNEYS FOR SIGNAL INTERNATIONAL,
        L.L.C.
19
20  PORTEOUS, HAINKEL & JOHNSON
        (BY: RALPH R. ALEXIS, III)
21      704 Carondelet Street
        New Orleans, Louisiana 70130-3774
22
        ATTORNEYS FOR GULF COAST IMMIGRATION
23      LAW CENTER, L.L.C.
24
25
```

**Page 4**

```
 1  APPEARANCES CONTINUED:
 2  VIDEOGRAPHER:
 3      RUSSELL MORAN
        VENUE DOCKET
 4      Suite 385
        701 Poydras Street
 5      New Orleans, Louisiana 70139
 6
 7  REPORTED BY:
 8      CAROL VALLETTE SLATER
        Certified Court Reporter
 9      Registered Professional Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 21

1    THE INTERPRETER:
2        After 40 hours, we get the
3    overtime.
4    Q.  And what is the overtime rate?
5    THE INTERPRETER:
6        I don't know about the
7    overtime rate.
8    Q.  Okay. Do you get safety bonuses at
9 Signal?
10    THE INTERPRETER:
11        Yes, I get it.
12    Q.  Okay. Do you know how the safety
13 bonus is figured out?
14    MS. TSU:
15        Objection; form.
16    THE INTERPRETER:
17        If I don't get any safety
18    injury, then, I get the safety
19    bonus.
20 EXAMINATION BY MS. HANGARTNER:
21    Q.  Okay. Can you tell us, is there
22 a -- is there a difference in pay between what
23 you made in Abu Dhabi and at Signal
24 International?
25    THE INTERPRETER:

Page 22

1        In Abu Dhabi, I get paid
2    every month. Over here, I get
3    paid in a week, and the money is
4    more over here.
5    Q.  How much more?
6    THE INTERPRETER:
7        What can I say, but
8    according to the bank rate, the
9    money that I'm getting now in the
10    Indian currency is 150,000 Indian
11    rupees.
12    Q.  150,000 Indian rupees, is that per
13 week?
14    THE INTERPRETER:
15        It's per month.
16    Q.  I now want to talk about back in
17 India, when you first heard about Signal
18 International. How did you first hear about
19 Signal International?
20    THE INTERPRETER:
21        I saw it in a Kerala
22    newspaper.
23    Q.  Do you remember what the wording
24 was? What did that say?
25    THE INTERPRETER:

Page 23

1        I don't know.
2    Q.  When did you see that article?
3    MS. TSU:
4        Mischaracterization;
5    objection.
6 EXAMINATION BY MS. HANGARTNER:
7    Q.  When did you see that ad?
8    THE INTERPRETER:
9        I saw in the paper and I
10    read it.
11    Q.  And based on what you read, what did
12 you do?
13    THE INTERPRETER:
14        The main agent was Sachin
15    Dewan.  He had a branch in Kerala,
16    Arvind Associates, A-R-V-I-N-D,
17    Associates.  The director of
18    Arvind Associates was Salimon.  I
19    have called him.  He said that you
20    come directly in the office.  I
21    went to the office.  I met with
22    him in the office.  He said that I    Pillai 23:11-24:10
23    should pay him eight lakhs Indian
24    rupees.  Eight lakhs.
25    Q.  And what did he say that that money

Page 24

1 was for?
2    THE INTERPRETER:
3        He said first H2B visa.  I
4    will get H2B visa first.  The
5    company will give you two
6    extension.  The first extension
7    and the second extension, and then
8    you will get the green card.
9    That's why you have to pay this
10    money.
11    Q.  And when did you go see Salimon in
12 Kerala?
13    THE INTERPRETER:
14        I don't know.
15    Q.  Okay. Were you alone or was anyone
16 else with you?
17    THE INTERPRETER:
18        I started from my home and I
19    was alone.
20    Q.  Okay. Was it your understanding
21 that Salimon worked for Sachin Dewan?
22    THE INTERPRETER:
23        Yes.
24    Q.  Based on what Salimon told you about
25 the H2B and the green card, what did you do next?

Page 285

1      (Whereupon, a discussion was
2  held off the record.)
3      (Whereupon, the testimony of
4  the witness was adjourned at 6:14
5  p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 287

1              REPORTER'S CERTIFICATE
2
3
4          I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that SANTHOSH KUMAR GOPINATHAN PILLAI,
9  after having been duly sworn by me upon authority
10 of R.S. 37:2554, did testify as hereinbefore set
11 forth in the foregoing pages; that this testimony
12 was reported by me in the stenotype reporting
13 method, was prepared and transcribed by me or
14 under my personal direction and supervision, and
15 is a true and correct transcript to the best of
16 my ability and understanding; that I am not
17 related to counsel or the parties herein, nor am
18 I otherwise interested in the outcome of this
19 matter.
20
21
22          CAROL VALLETTE SLATER (CCR 78020)
            CERTIFIED COURT REPORTER
23          REGISTERED PROFESSIONAL REPORTER
24
25

Page 286

1      WITNESS' CERTIFICATE
2
3
4
5      I, SANTHOSH KUMAR GOPINATHAN PILLAI,
6  the undersigned, do hereby certify that I have
7  read the foregoing deposition and it contains a
8  true and correct transcript of the testimony
9  given by me:
10
11
12  ( ) Without corrections.
13  ( ) With corrections as reflected on
14      the errata sheet(s) prepared by me
15      and made a part hereof.
16
17
18
19
20
21
22      SANTHOSH KUMAR GOPINATHAN PILLAI
23
24      DATE
25

Page 288

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA
 3
     KURIAN DAVID, SONY        CIVIL ACTION
 4   VASUDEVAN SULEKHA,
     PALANYANDI THANGAMANI,    NO. 08-1220
 5   MARUGANANTHAM KANDHASAMY,
     HEMANT KHUTTAN, ANDREWS   SECTION "A"
 6   ISSAC PADA VEETTIYL, AND
     DHANANJAYA KECHURA, ON    MAGISTRATE 3
 7   BEHALF OF OTHER SIMILARLY
     SITUATED INDIVIDUALS, AND
 8   SABULAL VIJAYAN, KRISHAN
     KUMAR, JACOB JOSEPH
 9   KADDAKKARAPPALLY, KULDEEP
     SINGH, AND THANASEKAR
10   CHELLAPPAN, INDIVIDUALLY,
11        PLAINTIFFS
12   VERSUS
13   SIGNAL INTERNATIONAL,
     LLC, MALVERN C. BURNETT,
14   GULF COAST IMMIGRATION
     LAW CENTER, L.L.C., LAW   VOLUME 2
15   OFFICES OF MALVERN C.
     BURNETT, A.P.C.,
16   INDO-AMERI SOFT L.L.C.,
     KURELLA RAO, J & M
17   ASSOCIATES, INC. OF
     MISSISSIPPI, GLOBAL
18   RESOURCES, INC., MICHAEL
     POL, SACHIN DEWAN, AND
19   DEWAN CONSULTANTS PVT.
     LTD. (a/k/a MEDTECH
20   CONSULTANTS).
21        DEFENDANTS.
22
     Videotaped deposition of SANTHOSH KUMAR
23   GOPINATHAN PILLAI, 601 Bayou Cassotte Parkway,
     Pascagoula, Mississippi, 39581, taken in the
24   offices of Middleberg, Riddle & Gianna, 31st
     Floor, 201 St. Charles Avenue, New Orleans,
25   Louisiana 70170, on Wednesday, the 4th day of
     December, 2008, beginning at 9:29 a.m.
```

Page 289

```
 1   APPEARANCES:
 2        NAOMI TSU
          Immigrant Justice Project
 3        Southern Poverty Law Center
          Suite 2150
 4        233 Peachtree Street
          Atlanta, Georgia 30303
 5
              and
 6
          DEWEY & LeBOEUF
 7        (BY: ROBERT P. WYNNE)
          Suite 2550
 8        1000 Main Street
          Houston, Texas 77002-5009
 9
          ATTORNEYS FOR THE PLAINTIFFS
10
11   MIDDLEBERG, RIDDLE & GIANNA
          (BY: ERIN CASEY HANGARTNER)
12        DONALD C. DOUGLAS, JR.)
          31st Floor
13        201 St. Charles Avenue
          New Orleans, Louisiana 70170-3100
14
              and
15
          PATRICIA A. BOLLMAN
16        A Professional Law Corporation
          Post Office Box 13707
17        New Orleans, Louisiana 70185
18        ATTORNEYS FOR SIGNAL INTERNATIONAL,
          L.L.C.
19
20   PORTEOUS, HAINKEL & JOHNSON
          (BY: RALPH R. ALEXIS, III)
21        704 Carondelet Street
          New Orleans, Louisiana 70130-3774
22
          ATTORNEYS FOR GULF COAST IMMIGRATION
23        LAW CENTER, L.L.C.
24
25
```

Page 290

```
 1   APPEARANCES CONTINUED:
 2        BARRASSO, USDIN, KUPPERMAN,
          FREEMAN & SARVER
 3        (BY: JUDITH A. WENGER)
          Suite 2400
 4        909 Poydras Street
          New Orleans, Louisiana 70112
 5
          ATTORNEYS FOR GLOBAL RESOURCES,
 6        INC. AND MICHAEL POL
 7
          STEPHEN H. SHAPIRO
 8        200 Maine Street
          Jefferson, Louisiana 70121
 9
          ATTORNEYS FOR SACHIN DEWAN AND
10        DEWAN CONSULTANTS PVT. LTD. ALSO
          KNOWN AS MEDTECH CONSULTANTS
11
12        SCOTT D. SMITH
          240 Eisenhower Drive (39531)
13        Post Office Box 4603
          Biloxi, Mississippi 39535-4603
14
          ATTORNEY FOR SANTHOSH KUMAR
15        GOPINATHAN PILLAI
16
     ALSO PRESENT:
17
          BRYAN C. BAGNETTO
18        MIDDLEBURG, RIDDLE & GIANNA
19
20   TRANSLATOR:
21        ISMAIL CHARANIA
          TRANSLATIONS R US
22        780 Dekalb Ind. Way
          Decatur, Georgia 30033
23
24
25
```

Page 291

```
 1   APPEARANCES CONTINUED:
 2   VIDEOGRAPHER:
 3        RUSSELL MORAN
          VENUE DOCKET
 4        Suite 385
          701 Poydras Street
 5        New Orleans, Louisiana 70139
 6
 7   REPORTED BY:
 8        CAROL VALLETTE SLATER
          Certified Court Reporter
 9        Registered Professional Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 392

1    Q.   Did anyone from Signal ever explain
2  to you that an H2B visa -- while you were in the
3  process of getting H2B visas, that you could not
4  apply for a green card?
5      MR. ALEXIS:
6          Object to form.
7      MS. HANGARTNER:
8          Object to form.
9  EXAMINATION BY MR. SHAPIRO:
10     Q.   Has anybody from Signal explained
11 the H2B visa process to you?
12     THE INTERPRETER:
13         When?
14     Q.   At any time when you were there.
15     THE INTERPRETER:
16         Patricia told me. I was
17     told that the first H2B visa will
18     be extended. Then, the second
19     will be applied and approved, and
20     then the green card application
21     will be done. They've already
22     applied for the labor
23     certification.
24     Q.   Okay. Isn't it so that Sachin Dewan
25 or anyone from Dewan Consultants never guaranteed

Page 393

1  that you would get a green card?
2      THE INTERPRETER:
3          I give the money for the
4      green card, and if they are taking
5      the green card money, so, they
6      have to guarantee me a green card.
7      Q.   But, Santhosh, you understand that
8  many things are out of the control of people
9  applying for the green card?
10     THE INTERPRETER:
11         Since they have taken the
12     money, they have to do something.
13     What do I know? Nobody is coming
14     or nobody is talking to us. So,
15     how do I know that they are doing
16     or not?
17     Q.   Okay. Did anyone ever promise you
18 that people would come -- come to see you, help
19 you at Signal?
20     THE INTERPRETER:
21         Where?
22     MR. SHAPIRO:
23         Where?
24     MR. SMITH:
25         Orange or Pascagoula?

Page 394

1      MR. SHAPIRO:
2          Oh, at either location.
3      MS. HANGARTNER:
4          Object to the form. Or in
5      India.
6      THE INTERPRETER:
7          Who promised?
8  EXAMINATION BY MR. SHAPIRO:
9      Q.   I'm asking the question: Did anyone
10 ever promise you that they would come and see you
11 to help you?
12     THE INTERPRETER:
13         Salimon in Kerala told me
14     that we will get one extension,
15     you will get second extension and
16     then you will get the green card.
17     Q.   Okay. And did Salimon explain that
18 it was Signal that was to apply for that H2B
19 renewal and green card?
20     MR. ALEXIS:
21         Object to form.
22     THE INTERPRETER:
23         Yes.
24 EXAMINATION BY MR. SHAPIRO:
25     Q.   And, specifically, how do you feel

Pillai 394:9-395:13

Page 395

1  that Sachin Dewan or Dewan Consultants cheated
2  you?
3      THE INTERPRETER:
4          They have taken the money to
5      do the work for me. And let's
6      say, for example, I give you the
7      money to buy land, I give you the
8      money to buy the land on -- as a
9      trustworthy person. Then, you
10     don't give me the land and you
11     pocket the money and you don't
12     come and see me, what should I
13     understand?
14     Q.   Okay. How long have you worked for
15 Signal now?
16     THE INTERPRETER:
17         On February 8th, it will be
18     two years.
19     Q.   Okay. And would it be fair to say
20 that you've made quite a bit of money working for
21 Signal?
22     MS. TSU:
23         Objection to form.
24     THE INTERPRETER:
25         Yeah, I did good money.

Page 400

1      money for the green card
2      processing and nothing is being
3      done by them. I'm very happy.
4      They brought me to this company
5      and I'm very happy working in the
6      company, but my only question is
7      they took the money for the green
8      card and they are not helping me.
9          Q.   But yet the green card process has
10   been explained to you, hasn't it?
11     MS. HANGARTNER:
12         Object to the form.  When
13     was the green card process fully
14     explained to him?
15   EXAMINATION BY MR. SHAPIRO:
16         Q.   The green card process was explained
17   to you in India and in the United States, wasn't
18   it?
19     MS. HANGARTNER:
20         Objection.
21     MS. TSU:
22         Objection; form.
23     MS. HANGARTNER:
24         Misstatement of prior
25     testimony.

Page 401

1      MR. SHAPIRO:
2          He testified that he has had
3      help from Signal in understanding
4      the green card process.
5      MS. HANGARTNER:
6          That happened in the United
7      States, not in India.
8      MR. SHAPIRO:
9          All right. I'll just break
10     down the questions.
11   EXAMINATION BY MR. SHAPIRO:
12         Q.   The H2B process and the green card
13   process was explained to you fully in India,
14   wasn't it?
15     MS. TSU:
16         A mischaracterization of
17     testimony; objection.
18     MS. HANGARTNER:
19         Objection.
20     MR. SHAPIRO:
21         You mean, it wasn't
22     explained to him?
23     MS. HANGARTNER:
24         No.
25     MS. TSU:

Page 402

1          He hasn't stated that.   Pillai 402:5-406:19
2      MR. SHAPIRO:
3          All right. I'll go back.
4      EXAMINATION BY MR. SHAPIRO:
5          Q.   At any time in India, when you were
6      in India, Mumbai or Kerala, was the H2B process
7      and green card process explained to you by
8      anyone?
9      THE INTERPRETER:
10         I was only explained that I
11     will get first visa and then that
12     first visa will be extended, and
13     then the green card processing
14     will be done.
15         Q.   Okay.  And where was that done?
16     THE INTERPRETER:
17         I went with the agent and he
18     told me about this.
19         Q.   Okay.  Was that also explained in
20     any -- at any other place in India?
21     THE INTERPRETER:
22         Salimon explained me in
23     Kerala.
24         Q.   Okay.  And what about in Mumbai?
25     THE INTERPRETER:

Page 403

1          No, not in Bombay.  Not in
2      Mumbai.
3          Q.   And what about in the United States?
4      MS. TSU:
5          Object to form.  Can you
6      explain what your specific
7      question is?
8      MR. SHAPIRO:
9          Okay.
10   EXAMINATION BY MR. SHAPIRO:
11         Q.   Has anyone explained to you the H2B
12   process and green card process here, while you
13   were at Signal in the United States?
14     THE INTERPRETER:
15         Patricia explained me.
16     MR. SHAPIRO:
17         Okay.  All right.  That's
18     all the questions I had.  Thank
19     you.
20     MS. WENGER:
21         At this point, just briefly,
22     rather than take a break, could
23     you just make a note on the
24     record, please, that Barrasso,
25     Usdin has appeared without

Page 404

1 prejudice to its pending motion to
2 dismiss and has no questions for
3 this gentleman. Thank you.
4 MS. TSU:
5 Oh, and I think I haven't
6 offered into evidence my exhibits.
7 MR. ALEXIS:
8 Anybody have any other
9 questions?
10 MS. TSU:
11 I'll offer them after. I
12 need to figure out which ones they
13 are.
14 MS. HANGARTNER:
15 Are you going to ask more
16 questions?
17 MR. SHAPIRO:
18 Are we still running?
19 MS. TSU:
20 Let's talk, but I think we
21 may have a couple.
22 MR. SHAPIRO:
23 I'd like to offer and
24 introduce Number 92.
25 THE VIDEOGRAPHER:

Page 405

1 Going of the record. It's
2 1:16 p.m. This is the end of Tape
3 10.
4 (Whereupon, a discussion was
5 held off the record.)
6 THE VIDEOGRAPHER:
7 Back on the record. It's
8 2:01 p.m. This is the beginning
9 of Tape 11.
10 EXAMINATION BY MS. HANGARTNER:
11 Q. Hi, Santhosh. I just have a few
12 questions for you.
13 THE INTERPRETER:
14 Okay.
15 Q. When were in India, did you believe
16 that Salimon worked for Sachin Dewan?
17 THE INTERPRETER:
18 Yes, I understood that.
19 Q. In India, did Salimon ever explain
20 to you that there was no guarantee that you would
21 get a green card?
22 MR. ALEXIS:
23 Object to the form.
24 THE INTERPRETER:
25 He didn't say that.

Page 406

1 MS. WENGER:
2 I'm sorry. I didn't hear
3 the answer.
4 THE INTERPRETER:
5 He explained to me that
6 after H2B extension, I will get
7 the green card.
8 EXAMINATION BY MS. HANGARTNER:
9 Q. So, you believed when you left India
10 that you were coming to America and would get a
11 green card; is that correct?
12 MR. ALEXIS:
13 Object to form.
14 MR. SHAPIRO:
15 Object to form.
16 THE INTERPRETER:
17 Yeah, I understood that, and
18 I believed that person. I trust
19 on him that, yes, it may be done.
20 EXAMINATION BY MS. HANGARTNER:
21 Q. Did you fully understand the H2B
22 process before Patricia explained it to you?
23 MR. ALEXIS:
24 Object to form.
25 MR. SHAPIRO:

Page 407

1 Objection.
2 THE INTERPRETER:
3 No.
4 EXAMINATION BY MS. HANGARTNER:
5 Q. Do you remember when Patricia told
6 you about the H2B process? Was that in Orange or
7 in Pascagoula?
8 THE INTERPRETER:
9 In Pascagoula.
10 Q. Did you fully understand the green
11 card process before Patricia explained it to you?
12 MR. SHAPIRO:
13 Objection to form.
14 MR. ALEXIS:
15 Object to form.
16 THE INTERPRETER:
17 No.
18 EXAMINATION BY MS. HANGARTNER:
19 Q. And do you remember if she explained
20 that green card process to you in Pascagoula or
21 in Orange?
22 THE INTERPRETER:
23 Repeat that. I didn't catch
24 the last.
25 EXAMINATION BY MS. HANGARTNER:

Page 428

```
 1          I'm offering Exhibit Number
 2    92 on behalf of Sachin Dewan and
 3    Dewan Consultants.
 4    MR. SMITH:
 5          It was 59 already entered
 6    in.
 7    MS. HANGARTNER:
 8          I entered mine as soon as I
 9    finished.
10    THE VIDEOGRAPHER:
11          This concludes the video
12    deposition of Santhosh Pillai.
13    We're going off the record.  It is
14    2:31 p.m.
15          (Whereupon, the testimony of
16    the witness was concluded at 2:31
17    p.m.)
18
19
20
21
22
23
24
25
```

Page 429

```
 1    WITNESS' CERTIFICATE
 2
 3
 4
 5          I, SANTHOSH KUMAR GOPINATHAN PILLAI,
 6    the undersigned, do hereby certify that I have
 7    read the foregoing deposition and it contains a
 8    true and correct transcript of the testimony
 9    given by me:
10
11
12    ( ) Without corrections.
13    ( ) With corrections as reflected on
14        the errata sheet(s) prepared by me
15        and made a part hereof.
16
17
18
19
20
21
22          SANTHOSH KUMAR GOPINATHAN PILLAI
23
24    DATE
25
```

Page 430

```
 1          REPORTER'S CERTIFICATE
 2
 3
 4          I, CAROL VALLETTE SLATER, Certified
 5    Court Reporter, Registered Professional Reporter,
 6    in and for the State of Louisiana, as the officer
 7    before whom this testimony was taken, do hereby
 8    certify that SANTHOSH KUMAR GOPINATHAN PILLAI,
 9    after having been duly sworn by me upon authority
10    of R.S. 37:2554, did testify as hereinbefore set
11    forth in the foregoing pages; that this testimony
12    was reported by me in the stenotype reporting
13    method, was prepared and transcribed by me or
14    under my personal direction and supervision, and
15    is a true and correct transcript to the best of
16    my ability and understanding; that I am not
17    related to counsel or the parties herein, nor am
18    I otherwise interested in the outcome of this
19    matter.
20
21
22          CAROL VALLETTE SLATER (CCR 78020)
            CERTIFIED COURT REPORTER
23          REGISTERED PROFESSIONAL REPORTER
24
25
```

# DEPOSITION EXCERPTS

# MICHAEL L. POL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
     KURIAN DAVID, SONY            CIVIL ACTION
 4   VASUDEVAN SULEKHA,
     PALANYANDI THANGAMANI,        NO. 08-1220
 5   MARUGANANTHAM KANDHASAMY,
     HEMANT KHUTTAN, ANDREWS       SECTION "A"
 6   ISSAC PADA VEETTIYL, AND
     DHANANJAYA KECHURA, ON        MAGISTRATE 3
 7   BEHALF OF OTHER SIMILARLY
     SITUATED INDIVIDUALS, AND
 8   SABULAL VIJAYAN, KRISHAN
     KUMAR, JACOB JOSEPH
 9   KADDAKKARAPPALLY, KULDEEP
     SINGH, AND THANASEKAR
10   CHELLAPPAN, INDIVIDUALLY,
11               PLAINTIFFS
12   VERSUS
13   SIGNAL INTERNATIONAL,
     LLC, MALVERN C. BURNETT,
14   GULF COAST IMMIGRATION
     LAW CENTER, L.L.C., LAW
15   OFFICES OF MALVERN C.
     BURNETT, A.P.C.,
16   INDO-AMERI SOFT L.L.C.,
     KURELLA RAO, J & M
17   ASSOCIATES, INC. OF
     MISSISSIPPI, GLOBAL
18   RESOURCES, INC., MICHAEL
     POL, SACHIN DEWAN, AND
19   DEWAN CONSULTANTS PVT.
     LTD. (a/k/a MEDTECH
20   CONSULTANTS).
21               DEFENDANTS.
22
23
24
25
```

Pol 62:2-65:9

Page 62

```
 1        A.   Not at that time.
 2        Q.   Okay.  In his deposition, Sachin
 3   Dewan testified that in early 2004, you
 4   approached him about potentially recruiting
 5   Indians for a -- for permanent residency to work
 6   in a company called J & M.  Do you recall that?
 7        A.   I don't recall it happening that
 8   way.
 9        Q.   Okay.  Can you -- let me ask you how
10   the J & M project originated.
11        A.   As I recall, Mr. Dewan was involved
12   with a project with Mr. -- excuse me -- Dr. Rao,
13   and he made mention to me that, you know, he was
14   doing this project and was there anything that
15   I -- you know, any customers that I may have that
16   would be interested in doing something similar.
17   And I talked to Mr. Burnett about it as well.
18   And they were explaining to me how this new
19   concept -- that this new program was coming out,
20   PERM.  I'm not sure exactly what that stands for,
21   but I think that was the -- not positive, but I
22   think that was the program that they were going
23   to use for Dr. Rao.  And that's how -- that's how
24   it began.
25        Q.   Your recollection is Sachin Dewan
```

Page 63

```
 1   was working with Dr. Rao, and was the project
 2   that you're referring to Indo-Ameri Soft?
 3        A.   I think that -- it could be.  I
 4   recognize that name, but --
 5        Q.   Okay.  So, you understood that
 6   Sachin Dewan and Dr. Rao were working on some
 7   other separate project.
 8        A.   Yes.
 9        Q.   And it's your recollection that
10   Sachin Dewan came to you and suggested why don't
11   you and I work on a project similar to what
12   myself and Dr. Rao were working on?
13        A.   That's the way I recall it.
14        Q.   And the project that you and Sachin
15   Dewan contemplated involved permanent residency
16   visas for Indian workers.
17        A.   Yes.
18        Q.   So, this conversation takes place
19   before you had discussed J & M as the potential
20   vehicle?
21        A.   Yes.
22        Q.   Do you recall when you all had that
23   conversation?
24        A.   2004, maybe.  Early 2004.
25        Q.   Early 2004.  So, after you had this
```

Page 64

```
 1   conversation with Sachin Dewan -- was it a
 2   telephone conversation?
 3        A.   Oh, sure.  Obviously.
 4        MR. SHAPIRO:
 5             I'm sorry.  What was the
 6        answer?
 7        MR. BHATNAGAR:
 8             He said: "Sure."
 9   EXAMINATION BY MR. BHATNAGAR:
10        Q.   What happened next in terms of your
11   interest regarding what he had suggested?
12        A.   Well, I spoke with Mr. Burnett.  I
13   wanted him to explain to me the process, and he
14   did.
15        Q.   What did he tell you?
16        A.   If I could give you just a quick
17   background, you know, H2Bs were difficult to get
18   from India.  So, the process of permanent
19   residence seemed to be a viable alternative to me
20   to put workers with companies in the United
21   States.  And the way that Mr. Burnett explained
22   it to me was that the program was about to
23   change, and that instead of, you know, the five
24   years, whatever, that the current program was
25   taking up to get through the process and get to
```

Page 65

```
 1   the United States, that this was more of a fast
 2   track-type program that could get people here in
 3   24 months.  So, I thought that idea was
 4   reasonable.  I thought that a customer may be
 5   interested in -- because of the shortage in the
 6   labor pool in the United States in certain
 7   trades, that, you know, some people may be
 8   interested in this.  And then I contacted my
 9   friend Billy Wilks, J & M.
10        Q.   And Mr. Burnett -- when you say
11   that -- could get here in 24 months, you mean
12   that workers could physically be in the United
13   States in 24 months.  That was your understanding
14   with Mr. Burnett?
15        A.   Well, you know, any time that you're
16   dealing with the government and this process, you
17   know, there's a lot of ifs.
18        Q.   Right.
19        A.   If everything works correctly, then,
20   it's possible to do that.
21        Q.   Now, at the time that you and Sachin
22   Dewan had this conversation in early 2004, you
23   had already sold IMI, right?
24        A.   Yes.
25        Q.   And can I ask you why you sold IMI?
```

17 (Pages 62 to 65)

Pol 80:5-14

Page 78

1  paying $12,000 to be a part of this program,
2  doesn't that seem like a very, very high fee?
3      MR. ALEXIS:
4          Object to form.
5      MR. SHAPIRO:
6          Object to form.
7      MS. HAROWSKI:
8          Object to form.
9      A.  Let's get our ifs right.  Say that
10 again.
11 EXAMINATION BY MR. BHATNAGAR:
12     Q.   If a worker is paying two years of
13 their salary -- Sachin testified that for the
14 Indian workers, they were paying over two years'
15 worth of salary to be part of this project.
16     A.   That's if they worked in India.
17     Q.   I'm saying Indian workers.  I'll
18 talk about Dubai workers in a second, or the UAE
19 workers.  The Indian workers, according to Sachin
20 Dewan, were paying over two years' worth of
21 salary in order to be part of this program.
22     MR. ALEXIS:
23         Object to form.
24 EXAMINATION BY MR. BHATNAGAR:
25     Q.   Does that strike you as excessive in

Page 79

1  terms of fees?
2      MR. SHAPIRO:
3          Object to form.
4      A.   It doesn't, because I don't know if
5  the ifs are correct.  I mean, it's difficult to
6  speculate, really, about what that guy has, what
7  he makes, what he -- they're all different.
8  EXAMINATION BY MR. BHATNAGAR:
9      Q.   There's no speculation in this
10 question.  Sachin Dewan said it would cost at
11 least two years of salary for these workers to
12 participate in the program.  So, my question to
13 you is:  Does that strike you as an excessive
14 amount for a worker to pay to be part of this?
15     MR. ALEXIS:
16         Object to form.
17     MS. HAROWSKI:
18         Object to form.
19     MR. SHAPIRO:
20         Object to form.
21     A.   No.  Because you don't base it on
22 what he's paid.  You base it on what he can make,
23 what he can make when he goes to the project that
24 he's going to.
25 EXAMINATION BY MR. BHATNAGAR:

Page 80

1      Q.   Do you also base it on what he's
2  going to get in terms of, in addition to salary,
3  immigration status?
4      A.   I would think that you could.
5      Q.   So, was part of the rationale for
6  charging these fees the fact that the workers
7  were going to be getting permanent residency in
8  the United States?
9      MS. HAROWSKI:
10         Object to form.
11     A.   Well, as you can see in this
12 Multilateral Business Agreement that you handed
13 me, we were trying for the green card, and that's
14 what this whole thing was based upon.
15 EXAMINATION BY MR. BHATNAGAR:
16     Q.   So, the reason that you could expect
17 that workers might be willing to pay that amount
18 of money was because the workers would be
19 expecting that at the end of the process, they
20 would get a green card; is that right?
21     MR. ALEXIS:
22         Object to form.
23     A.   Yes, I think they would expect that.
24 EXAMINATION BY MR. BHATNAGAR:
25     Q.   And because they would be making

Page 81

1  more money in the United States, it seemed
2  reasonable that you could charge them these fees,
3  right?
4      A.   Which fee?
5      Q.   Okay.  Strike that.
6          When you and Malvern Burnett and
7  Sachin Dewan sat down and you had the
8  conversation about this whole agreement, the
9  hammering it out, you came to a resolution
10 regarding what the fees were going to be -- what
11 were going to be, right?
12     A.   Yes, we did.
13     Q.   And that resolution was informed by
14 Sachin Dewan's experience regarding what typical
15 fees were, what the market could bear, right?
16     A.   Yes.
17     Q.   And the other aspect of that is what
18 you were going to be giving to the workers in
19 exchange for the fees that they were going to be
20 paying you, right?
21     A.   Yes.
22     Q.   And the one thing that you'd be
23 offering the workers is the salary that a United
24 States job would offer, which is higher than
25 Indian salary, right?

21 (Pages 78 to 81)

Page 82

1    A.  Yes.
2    Q.  And the second thing you would be
3  offering the workers is a green card; is that
4  right?
5    MR. ALEXIS:
6      Object to form.
7    MS. HAROWSKI:
8      Object to form.
9    A.  It depends on what that worker
10  understood at the time that he came to the United
11  States. I mean, what worker are we talking
12  about? Ones that have never come or ones that
13  have been here?
14  EXAMINATION BY MR. BHATNAGAR:
15    Q.  This is a very simple question. My
16  question is: Your discussion and your rationale
17  for charging 500,000 rupees had to do with the
18  fact that, A, workers were going to get paid more
19  in the United States and, B, as your agreement
20  indicates, workers were going to be getting green
21  cards, right?
22    MR. ALEXIS:
23      Object. Object to form
24  again.
25    A.  We're talking about theory workers,

Pol 83:7-16

Page 83

1  right? In theory. A worker under this plan.
2  EXAMINATION BY MR. BHATNAGAR:
3    Q.  Under this plan.
4    A.  In theory, under this plan, yes, the
5  worker would or should expect, because he would
6  never have left India before he had a green card.
7    Q.  Okay. Let's follow that. So, a
8  worker would not pay this amount of money,
9  500,000 rupees, unless they were going to get a
10  higher paying job in the U.S. and get a green
11  card, right?
12    MR. ALEXIS:
13      Object to form.
14    MS. HAROWSKI:
15      Object to form.
16    A.  Right.
17  EXAMINATION BY MR. BHATNAGAR:
18    Q.  Okay. Now, of these -- let's talk a
19  little bit about -- about the fees that you all
20  charged. What were -- how was it determined -- I
21  mean, let me ask you more specifically: How were
22  the fees determined for Sachin Dewan?
23    MR. SHAPIRO:
24      Object to form.
25    A.  In our agreement, we agreed for that

Page 84

1  figure for permanent resident workers. Is that
2  what we're referring to?
3  EXAMINATION BY MR. BHATNAGAR:
4    Q.  Uh-huh. This is all about your
5  agreement.
6    A.  It was one-third.
7    Q.  Okay. So, one-third for you,
8  one-third for Malvern Burnett, one-third for
9  Sachin Dewan, right?
10    A.  Yes.
11    Q.  And what was Sachin Dewan doing to
12  earn his one-third of 500,000 rupees? What was
13  his role in this?
14    A.  His role was getting the workers.
15    Q.  So, recruiting the workers?
16    A.  Correct.
17    Q.  And what was Malvern Burnett doing
18  to get his one-third of this?
19    MR. ALEXIS:
20      Object to form.
21    MR. BHATNAGAR:
22      Let me strike that.
23  EXAMINATION BY MR. BHATNAGAR:
24    Q.  What was Malvern Burnett doing in
25  the contract that you came up with, what was

Page 85

1  Malvern Burnett doing to earn one-third of
2  500,000 rupees?
3    MR. ALEXIS:
4      Object to form.
5    A.  He was in charge of the immigration
6  work.
7  EXAMINATION BY MR. BHATNAGAR:
8    Q.  And the immigration work that he was
9  doing on their behalf, in exchange for that, he
10  would be getting one-third of 500,000 rupees?
11    A.  Correct.
12    Q.  Does that seem to you an excessive
13  fee for immigration work?
14    MR. ALEXIS:
15      Object to form.
16    MS. HAROWSKI:
17      Object to form.
18    A.  No, because I've seen the
19  advertisements in India where they charge upwards
20  of ten or $15,000 for doing the same thing.
21  EXAMINATION BY MR. BHATNAGAR:
22    Q.  Okay. Are you aware that in the
23  summer of 2007, Malvern Burnett charged Signal
24  $5,000 for H2B applications on behalf of 47
25  welders and 130 fitters?

22 (Pages 82 to 85)

Page 90

1      A.   I don't have an opinion.  It's
2  between Mr. Burnett and Signal and the
3  participants.
4  EXAMINATION BY MR. BHATNAGAR:
5      Q.   I'm not asking about Signal.  I'm
6  saying do you think it was excessive for an
7  Indian worker to pay one-third of 500,000 rupees
8  to get immigration services from Mr. Burnett in
9  light of what he was charging Signal?
10     MR. ALEXIS:
11         Object to form.
12     A.   I really don't have an opinion on
13 that.  First time I have ever seen it.  I haven't
14 thought about it.
15 EXAMINATION BY MR. BHATNAGAR:       **Pol**
16     Q.   So, after you and Mr. Burnett and   **90:16-25**
17 Sachin Dewan signed a contract, you began the
18 process for J & M recruiting.  So, what was the
19 plan that you had come up with for J & M?
20     A.   Very simple.  Recruit them workers.
21     Q.   Okay.  And Sachin Dewan was to be
22 the Indian recruiter, you were to be the American
23 labor broker and Malvern Burnett was to be the
24 immigration lawyer; is that right?
25     A.   Yes.

Page 91

1      Q.   In the agreement, I think, in
2  Paragraph VII, it says here:
3          "If 'Facilitator,' 'Global'
4      and 'Attorney' decides to increase
5      or reduce the charges for the
6      process of the program of
7      Permanent Residency/Green Card,
8      'Facilitator,' 'Global' and
9      'Attorney' will get paid in the
10     same ratio as described in Section
11     V."
12         So, that's one-third, one-third,
13 one-third; is that right?
14     A.   Yes.
15     Q.   So, let me ask you about Paragraph
16 VII.  Why did you -- did you all contemplate
17 raising the fees that you were -- or lowering the
18 fees that you were charging workers?
19     A.   Well, obviously, there's some
20 contemplation because there's a paragraph about
21 that very subject.
22     Q.   Okay.  Well, let me ask you about
23 that contemplation.  Why did you include that
24 paragraph in there?
25     A.   Well, first of all, I want to make

Page 92

1  it clear that I didn't write this contract.  This
2  was written by Sachin Dewan, but this gives you,
3  you know, latitude to move.  This is just -- I
4  mean, it's a moving target over time.  For
5  instance, today, who would have thought that, you
6  know, our economy would be down 30 percent.  So,
7  you know, you contemplate lowering as well as
8  raising.  You just don't know.
9      Q.   So, it's your recollection that
10 Sachin Dewan drafted this contract?
11     A.   That's my recollection.
12     Q.   Not Malvern Burnett.
13     MR. SHAPIRO:
14         Object to form.
15     A.   I think this came from Sachin.
16 EXAMINATION BY MR. BHATNAGAR:
17     Q.   Okay.  But you signed the contract,
18 so, obviously, you approved everything that was
19 in there?
20     A.   Yes.
21     Q.   Were you familiar with the other
22 recruitment that Dewan Consultants had been
23 involved with bringing Indian workers to the Gulf
24 Coast?
25     MS. HAROWSKI:

Page 93

1          Object to form.
2      A.   Could you please ask that again?
3  EXAMINATION BY MR. BHATNAGAR:
4      Q.   Let me ask that another way.  Were
5  you aware that Dewan Consultants was recruiting
6  Indian workers or had been recruiting Indian
7  workers to go to the Gulf?
8      A.   With me?
9      Q.   No, not with you.  Just in general.
10     A.   No.
11     MR. ALEXIS:
12         The Gulf?
13     MR. SHAPIRO:
14         I think he's already
15     answered that question.
16     A.   I'm not aware of that.
17     MR. SHAPIRO:
18         Objection.
19 EXAMINATION BY MR. BHATNAGAR:
20     Q.   Okay.  Let me ask you this another way.
21 You were aware that Sachin -- that Dewan
22 Consultants had been -- had recruited Indian
23 workers to go to Dubai and the Gulf Middle East,
24 right?
25     A.   Yes.

24 (Pages 90 to 93)

Page 98

1    Q.   Do you recognize that document?
2    A.   Yes.
3    Q.   And is that a fax to you or a copy
4  of a fax to you from J & M Associates?
5    A.   Yes.
6    Q.   And is that the demand letter
7  setting out their requirements for the job?
8    A.   Yes.
9    Q.   Okay.  I'm now going to show you
10 GR-1733, which is a Limited Power of Attorney.
11 Do you recognize this document?
12        (Whereupon, Exhibit Number
13        521 was marked for identification.)
14    A.   Yes.
15 EXAMINATION BY MR. BHATNAGAR:
16    Q.   Is that the Power of Attorney that J
17 & M Associates gave you?
18    A.   Yes.
19    Q.   And is that your signature at the
20 bottom?
21    A.   Yes.
22    Q.   Dated 3/5/04.  And then I'm next
23 going to show you GR-1734 and 1735.  Do you
24 recognize that document?
25    A.   Yes.

Page 99

1    Q.   And is that your signature at the
2  bottom?
3    A.   Yes.
4    Q.   And the heading says:  Global
5  Resources, Incorporated and J & M Associates,
6  Incorporated, Skilled Worker Migration Agreement.
7  I'm marking this as 521.
8    MR. BHATNAGAR:
9        I should just note for the
10       record the Limited Power of
11       Attorney was 520 and the -- I
12       didn't actually mark --
13       Can we go off the record for
14       a second?
15       (Whereupon, a discussion was
16       held off the record.)
17    MR. BHATNAGAR:
18       Just a little bit of
19 housekeeping.  We have marked for
20 exhibits -- firstly, the --
21 starting with Exhibit Number 518.
22 It's the Global Resources Power of
23 Attorney, which is Bates Number
24 000961.  Exhibit Number 519 is the
25 Global Resources demand letter.

Page 100

1        It's Bates Number 000962.  That's
2  Dewan production, both of them.
3  And that's Exhibit Number 519.
4  Exhibit Number 520 is from the
5  Global Resources production, 1732
6  is the Bates number, and it is the
7  J & M Power -- demand letter to
8  Michael Pol.  That's Exhibit
9  Number 520.  Then, Exhibit Number
10 521 is the J & M Limited Power of
11 Attorney to Michael Pol, and
12 that's Bates Number GR-1733.  And
13 then, lastly, Exhibit Number 522
14 is Global Resources, Incorporated
15 and J & M Associates, Incorporated
16 Skilled Worker Migration
17 Agreement.
18        (Whereupon, Exhibit Number
19        522 was marked for identification.)
20 EXAMINATION BY MR. BHATNAGAR:
21    Q.   So, let me start with Exhibit Number
22 522, which is Bates Number 1734 and 1735.  Do you
23 recognize this document, Mr. Pol?
24    A.   Yes.
25    Q.   And is that the agreement that

Pol
100:21-103:8

Page 101

1  Global Resources and J & M created together
2  regarding the project you were going to be
3  working on for them?
4    A.   Yes.
5    Q.   And is that your signature at the
6  end?
7    A.   Yes.
8    Q.   And it's dated 2/2/04?
9    A.   Yes.
10    Q.   And to the best of your
11 recollection, is that the signature of Billy
12 Wilks?
13    A.   As far as I can tell.
14    Q.   And that's also dated 2/2/04?
15    A.   Yes.
16    Q.   In this agreement, in the second
17 paragraph, I will read it.
18        "This agreement establishes
19 the framework for a business
20 relationship between the two
21 parties to select, acquire and
22 transport to the United States,
23 foreign skilled workers under the
24 'permanent residence' process for
25 migration, and to be employed by J

26 (Pages 98 to 101)

1      & M or its subsidiaries and
2    acquired on behalf of J & M by
3    Global for that purpose."
4         Did I read that right?
5    A.   Yes.
6    Q.   Is it fair to say that that was what
7  the purpose of your agreement was?
8    A.   Yes.
9    Q.   So, the purpose of the agreement was
10  to bring foreign skilled workers under the
11  permanent residence process to be employed by J &
12  M?
13    A.   Yes.
14    Q.   I also would like to call your
15  attention to the third paragraph, and I will read
16  this, also.
17        "Whereas, in the United
18        States, there is a shortage of
19        skilled workers, Global is in the
20        business of assisting skilled
21        workers abroad, for a fee, to
22        migrate to the United States under
23        the I-140 'Permanent Residence'
24        process, and assist them in
25        obtaining employment."

1         Did I read that right?
2    A.   Yes.
3    Q.   So, is it fair to say that Global
4  Resources was in the business of assisting
5  skilled workers abroad to assist them in
6  migrating to the United States under the I-140
7  process?
8    A.   Yes.
9    Q.   Okay.  Great.  I'm now going to show
10  you a copy of an advertisement that Sachin Dewan
11  identified as a J & M and/or Zito -- and Zito
12  advertisement.  And it's from the plaintiffs'
13  motion for a protective order.  It was Exhibit
14  Number 69.
15    MR. BHATNAGAR:
16        These are the same exhibits,
17        just for Counsels' sake, these are
18        the same exhibits that we referred
19        to during the Dewan deposition,
20        for the advertisements.
21    MS. BOLLMAN:
22        Uh-huh.
23  EXAMINATION BY MR. BHATNAGAR:
24    Q.   This is Exhibit Number 69 from the
25  plaintiffs' motion for protective order filed

1  10/01/08, and Sachin Dewan testified that this
2  was an advertisement for the opportunity at J &
3  M.  Do you recall seeing this advertisement
4  before?
5    A.   No, I didn't.
6    Q.   Did you see any of the
7  advertisements before they were printed?
8    A.   No, I did not.
9    Q.   Did you see any of the
10  advertisements in the newspapers after they were
11  printed?
12    A.   I may have seen one later, but,
13  obviously, I didn't see this one.
14    Q.   This particular one, you don't
15  recognize?
16    A.   No.
17    Q.   Okay.  I'm not marking this, by the
18  way.
19    MR. SHAPIRO:
20        Oh, you're not?
21    MR. BHATNAGAR:
22        No.  I'm just showing it to
23        him.  Let me go ahead and mark it.
24        So, this will be Exhibit Number
25        523.

1         (Whereupon, Exhibit Number
2         523 was marked for identification.)
3    MR. BHATNAGAR:
4        And Exhibit Number 524 will
5        be another advertisement that
6        Sachin Dewan testified was related
7        to the J & M project as well,
8        which is Exhibit Number 67 from
9        plaintiffs' motion for a
10        protective order, and I'm marking
11        this as Exhibit Number 524.
12        (Whereupon, Exhibit Number
13        524 was marked for identification.)
14  EXAMINATION BY MR. BHATNAGAR:
15    Q.   Do you recognize this advertisement,
16  sir?
17    A.   No.
18    MS. BOLLMAN:
19        Is that an exhibit to the
20        protective order or for class
21        certification?
22    MR. BHATNAGAR:
23        I'm sorry.  Class
24        certification.
25    MR. ALEXIS:

Page 106

```
1          Thank you.
2      MR. BHATNAGAR:
3          Apologies for that.
4      MS. BOLLMAN:
5          That's okay.
6  EXAMINATION BY MR. BHATNAGAR:
7      Q.   So, you haven't seen either of these
8  advertisements before, right, Mr. Pol?
9      A.   Nope.
10     Q.   Can I ask you -- I'm going to read
11 the first line of the advertisement and tell me
12 if I'm reading it right.
13         "Migrate to U.S.A. on green
14     card/permanent residence visa in
15     California/New Orleans."
16         Did I read that right?
17     A.   Yes.
18     Q.   And would this advertisement, in
19 your mind -- I know you haven't seen it before,
20 but would it, in your mind, reflect the process
21 for Global Resources?
22     MR. ALEXIS:
23         Object to form.
24     MR. KUPPERMAN:
25         Objection.  I don't think it
```

Page 108

```
1          Read them out loud?
2      MR. BHATNAGAR:
3          Yeah, read them out loud,
4      please.
5      A.   "Job guarantee provided for two
6  to three years; earn from 4,000 to
7  5,000 U.S. dollars per month;
8  permanent lifetime settlement in
9  U.S.A. for self and family; minimum
10 two years experience required."
11 EXAMINATION BY MR. BHATNAGAR:
12     Q.   Were those the representations that
13 were made at the seminar that you attended?
14     MR. SHAPIRO:
15         Object to form.
16     A.   I never made those representations,
17 and I don't recall hearing anybody else make that
18 representation, not -- not identical to this.
19 EXAMINATION BY MR. BHATNAGAR:
20     Q.   Okay.  Let me ask you:  You were at
21 a seminar -- you were at seminars on the 16th and
22 17th, right?
23     A.   I think I was.
24     Q.   And at the seminars that you were
25 at, did you or did someone else make any of these
```

Page 107

```
1  matters what's in his mind.
2      MR. BHATNAGAR:
3          Right.  The question is
4      struck.
5  EXAMINATION BY MR. BHATNAGAR:
6      Q.   So, I read that properly, right?
7      A.   Yes.
8      Q.   And the second advertisement:
9          "Migrate to U.S.A. on green
10     card/permanent residence visa in
11     California/New Orleans."
12         Did I read that right?
13     A.   Yes.
14     Q.   Now, this exhibit, it says at the
15 bottom of the advertisement:
16         "Seminar conducted:  Dubai
17     at Sea View Hotel on 16th and 17th
18     December 2004."
19         Do you remember attending a seminar
20 in Dubai at the Sea View Hotel on December 16th
21 and 17th, 2004?
22     A.   I think I was there.
23     Q.   Can you read the four checks that
24 are in this advertisement?
25     MR. KUPPERMAN:
```

Pol
107:14-111:16

Page 109

```
1  representations?
2      MR. SHAPIRO:
3          Object to form.
4      A.   As I said, I never made that
5  representation to anyone and did not hear that
6  representation made by anyone.
7  EXAMINATION BY MR. BHATNAGAR:
8      Q.   Okay.  But this is an advertisement
9  that mentions a seminar that you did attend?
10     MR. KUPPERMAN:
11         Object to the form of the
12     question.  Asked and answered.  He
13     said he thought he was there.
14     He's not sure.
15 EXAMINATION BY MR. BHATNAGAR:
16     Q.   You can still answer.
17     A.   I think I was there.
18     Q.   Okay.  So, following the
19 advertisements, Sachin Dewan testified that after
20 these advertisements were printed, he and you
21 would organize seminars to give workers
22 information -- potential workers information as
23 to the way that the process would work.  Was that
24 your recollection as well?
25     A.   Say that one more time.
```

28 (Pages 106 to 109)

1    Q.   Was it your recollection that
2  following the publishing of these advertisements,
3  seminars were organized for workers to attend?
4    A.   Yes.
5    Q.   And the -- Sachin Dewan testified
6  that they were J & M seminars in Chennai, Abu
7  Dhabi, Dubai, Bombay and Kerala.  Is that your
8  recollection?
9    A.   I think so.
10    Q.   And these seminars took place in
11  2004, right?
12    A.   I believe you're correct.
13    Q.   And were you at all of these
14  seminars?
15    A.   I don't recall.
16    Q.   Do you recall if there were any J &
17  M seminars that you didn't attend?
18    A.   I just don't remember the ones that
19  I attended or didn't attend.
20    Q.   Okay.  Do you know of any seminars
21  that took place that you weren't able to attend
22  for J & M?
23    A.   It's been five years ago.  I just
24  can't answer.  I don't know.
25    Q.   I mean, that's a sufficient -- the

1  question is:  Do you know of any seminars for J &
2  M that you did not attend?
3    MR. KUPPERMAN:
4        Asked and answered.
5  EXAMINATION BY MR. BHATNAGAR:
6    Q.   So, if you don't know of any
7  seminars, that's a legitimate answer, but I just
8  want to get some clarification.
9    MR. KUPPERMAN:
10        Same objection.
11    A.   I don't know.  I don't recall.

Pol
111:13-18

12  EXAMINATION BY MR. BHATNAGAR:
13    Q.   Okay.  Just -- I want to be clear as
14  to what it is that you don't recall.  Do you know
15  of any seminars for J & M that you didn't attend?
16    A.   No.
17    MR. KUPPERMAN:
18        Asked --
19  EXAMINATION BY MR. BHATNAGAR:
20    Q.   Okay.  That's fine.  Thank you.
21        The seminars -- let's talk about a
22  seminar.  Take me through a typical meeting.  How
23  would the seminar unfold?
24    MR. KUPPERMAN:
25        Objection to the form.

1    A.   Well, of course, every seminar, as
2  we have described it, is different in the sense
3  that you're in a different state, city, country,
4  in the sense that people are speaking maybe a
5  different language.  So, there were many
6  different ways that these seminars went on.  I
7  never saw one that was the same.  So, it would be
8  difficult to characterize one in general.
9  EXAMINATION BY MR. BHATNAGAR:
10    Q.   Well, Sachin Dewan testified that it
11  was his recollection that though, you know, the
12  locations varied and the languages might have
13  varied, that there was a certain order of
14  presentation, for example.  Was that your
15  recollection as well?
16    MR. KUPPERMAN:
17        Let me just interpose an
18        objection to the constant
19        reference of Mr. Dewan and what he
20        testified about.  I just think
21        that's improper.  It's okay to ask
22        him what he recalls, but not --
23    MS. WASHINGTON:
24        Is that an objection or is
25        it just a moral thing?

1    MR. KUPPERMAN:
2        No.  It's an objection,
3        which is why I phrased it that
4        way.
5    MR. ALEXIS:
6        Object to form, also.
7  EXAMINATION BY MR. BHATNAGAR:
8    Q.   You're permitted to answer.
9    A.   I'm sorry to ask you this.  Would
10  you please ask me again?
11    Q.   Mr. Dewan's testimony is now part of
12  the discovery record.  So, certainly, referring
13  to it to give some context is certainly
14  appropriate.  Mr. Dewan testified that it was his
15  recollection that the J & M seminars generally
16  had a certain order of how they would proceed.
17  So, my question is:  Was that your recollection
18  as well?
19    MR. KUPPERMAN:
20        Same objection.
21    A.   No, that's not my recollection.
22  EXAMINATION BY MR. BHATNAGAR:
23    Q.   So, is it -- okay.  At a particular
24  seminar, Sachin Dewan testified that he would
25  recall that, for example, one person would speak

Page 114

1   first, then another person would speak second,
2   and then, you know, there would be questions or
3   other things.  Was that your recollection or not?
4        MR. KUPPERMAN:
5             Can I just have a continuing
6   objection?
7        MR. BHATNAGAR:
8             Sure.
9        MR. SHAPIRO:
10            I'm going to join in that,
11  too.
12       MR. ALEXIS:
13            Me, too.
14       MR. SHAPIRO:
15            Chandra, I'm relying on
16  you -- I don't have the deposition
17  transcript in front of me, and I
18  see you don't either, but I'm
19  relying on the fact that your
20  characterization of Mr. Dewan's
21  testimony is accurate.  I have no
22  way of challenging that at this
23  particular moment in time.
24       MR. BHATNAGAR:
25            You know what, for ease of

Page 115

1   reference, since it's not really
2   important, I'm about to move on,
3   but if there is something that is
4   an important aspect of Dewan
5   testimony, for ease of reference,
6   I will let folks know what page of
7   the record it is on --
8        MR. SHAPIRO:
9             Okay.
10       MR. BHATNAGAR:
11            -- so that it can be
12  verified later on if it's
13  something that's particularly
14  contentious.
15       MR. SHAPIRO:
16            I'll maintain the objection
17  about testifying, about bringing
18  up Mr. Dewan's testimony.
19  EXAMINATION BY MR. BHATNAGAR:
20       Q.   So, what were the topics of the
21  seminar?
22       A.   I think perhaps you have to put
23  yourself in the mind set of the worker, you know,
24  where -- where are we going, what are we going to
25  be doing, what type of facility are we working

Page 116

1   in, how much do we get paid, those type
2   questions.  That's typically what I heard.
3        Q.   Okay.  The workers would have those
4   questions, but you would have to figure out a way
5   to present that information to them before they
6   began asking questions, right?
7        A.   I didn't have to figure that out.
8   That was Mr. Dewan's job to do that.
9        Q.   But you had a role in this.  You
10  were attending the seminar.
11       A.   Yes.  I tried to come to as many as
12  I could, but I'm not saying that I was at all of
13  them.  I don't recall.
14       Q.   So, at the ones that you were at,
15  what did you do?
16       A.   Mostly sit there.
17       Q.   Did you speak?
18       A.   Depending on where I was and how
19  well the people in that location understood what
20  I was saying, I tried to speak just to introduce
21  myself and where I was from and what my purpose
22  was.
23       Q.   And what was your purpose?
24       A.   Purpose was to be there to assist
25  Mr. Dewan to recruit workers from India to come

**Pol**
**116:9-117:1**

Page 117

1   to the United States.
2        Q.   So, you didn't lay out the plan for
3   the workers at any of the meetings?
4        A.   No, I never did that.
5        Q.   And other than introducing yourself,
6   you didn't describe any of the -- of the major
7   questions -- strike that.
8             Other than introducing yourself, you
9   didn't describe the terms and conditions of the
10  job?
11       A.   I may have -- I may have done that
12  on an individual basis, maybe, occasionally.  I
13  don't recall -- that was not my role.  I didn't
14  do that.
15       Q.   So, what was your role at the
16  seminars?
17       A.   To be there.  To make sure that --
18  you know, that I was representing the company in
19  India.  So that they would see me there.
20       Q.   Was there any particular topic that
21  you insisted had to be included in the seminar?
22       A.   I can't -- I can't say that there
23  was any one particular thing that was insisted.
24  There was a number of things that, you know, I
25  guess you could say components that need to be

30 (Pages 114 to 117)

Pol 142:1-9

Page 142

1    Q.   Okay.  The seminar in Cochin,
2  Malvern Burnett was not in attendance at that
3  seminar, right?
4    A.   Which one?
5    Q.   The one you were just describing in
6  Cochin.
7    A.   I was thinking of a big one, and we
8  had several big ones in Cochin, and Malvern was
9  at one of them, but he wasn't at another one.
10    Q.   J & M seminar in Cochin, Malvern
11  Burnett was not there, right?
12    A.   I apologize to you, but this all
13  runs together after a period of time, and I don't
14  recall -- you know, I can't say Malvern Burnett
15  was here, wasn't here.  I know he was there at
16  one and I know I was there at one, and we may
17  have been there together at least once.
18    Q.   Okay.  So, the seminar that you
19  remember in Cochin where there was 150 to 200
20  guys, do you remember how the contracts were
21  signed?  What was the process?
22    A.   Sometimes the contracts weren't
23  signed.  Sometimes people took them with them.
24  They brought them back later, I guess, to Salimon
25  or to Sachin or whoever.  They didn't necessarily

Page 143

1  sign it the first time they saw it.
2    Q.   Were there people that signed it
3  then?
4    A.   There were.
5    Q.   And how was that organized?
6    A.   I don't understand what you mean.
7    Q.   I mean, you've got 150 to 200 people
8  in a room.  You've got a number of different
9  contracts.  Are the contracts distributed?  Take
10  me through the narrative of how this took place.
11    A.   Yes.  Of course, the contracts were
12  distributed to the people that were interested in
13  having one.
14    Q.   And were the contracts explained?
15    A.   I guess they were.  They -- in
16  Kerala, you know, most people there read and
17  write English very well.  So, I don't -- I mean,
18  they can read it, certainly, and, of course,
19  Salimon was there to explain in their tongue what
20  some of these things meant, and I'm assuming that
21  he did.  I have no way to know for sure because I
22  don't speak that language.
23    Q.   So, who described the terms of the
24  contract?
25    A.   It's self-evident.  You can read it.

Page 144

1    Q.   Well, I mean, respectfully, it's
2  self-evident to you, but it may not be self-
3  evident to people that don't have the same
4  background, educational background or experience.
5  I would assume there was someone that was going
6  to explain the terms of the contract; is that
7  right?
8    MR. ALEXIS:
9      Object to form.
10    A.   I don't know that necessarily that
11  particular contract was explained in detail.  I
12  think it was handed out for people -- and people
13  that didn't understand it, they asked questions.
14  People that didn't understand it and didn't
15  understand the answer to the questions took it
16  with them.
17  EXAMINATION BY MR. BHATNAGAR:
18    Q.   So, those questions were put to you
19  or those questions were put to Sachin Dewan?
20    A.   They were put to --
21    MR. SHAPIRO:
22      Object to form.
23    A.   First of all, I don't even know if I
24  was there at some of these.
25  EXAMINATION BY MR. BHATNAGAR:

Page 145

1    Q.   I'm asking about the one -- I just
2  want to ask you about ones that you remember.
3  So, at the Cochin meeting, you were there.  There
4  were workers who had questions.
5    A.   The main question that I got was:
6  How long will it take for me to get to the United
7  States?  That's the main question that I got.  It
8  wasn't about any of this.
9    Q.   Okay.  And what was the answer to
10  that question?
11    A.   As I described earlier, it depends.
12  Depends on how long this process takes.  It's,
13  generally, my understanding of it was Mr. Burnett
14  has explained to me.
15    Q.   Okay.  Let me show you -- so, your
16  understanding -- I'm looking at the document that
17  I showed before, the Terms & Conditions document
18  that had the payment schedule, and I'll refer
19  back to it.
20    MR. BHATNAGAR:
21      Off the record for a quick
22  second.
23      (Whereupon, a discussion was
24  held off the record.)
25  EXAMINATION BY MR. BHATNAGAR:

37 (Pages 142 to 145)

Page 170

1  Indians -- that typically they complain a lot
2  about everything all the time anyway.  So, the
3  answer to your question would be yes, there's a
4  lot of complaining going on.
5      Q.  Okay.  Well, let me ask more
6  specifically:  Did either Mr. Burnett or Mr.
7  Dewan communicate to you that workers who were
8  part of the J & M process had -- were complaining
9  about delays?
10     MR. ALEXIS:
11         Object to form.
12     A.  Specifically, I don't remember, you
13  know, complaining about this delay.  I do
14  remember --
15  EXAMINATION BY MR. BHATNAGAR:
16     Q.  No, not this delay.  Delays in
17  general on the J & M process.
18     A.  I can remember Sachin telling me
19  that people were complaining.
20     Q.  Okay.
21     A.  But I can't remember anybody
22  complaining to me.
23     Q.  But you can remember Mr. Dewan
24  telling you that there were people complaining to
25  him about delays?

Page 172

1      A.  No.
2      Q.  Do you recall why you refunded him?
3      A.  I just -- I just don't remember.  I
4  think -- I think maybe his -- at least one of
5  them, maybe their father died or something or --
6  I can't remember.
7      Q.  Okay.  Other than that applicant,
8  you don't remember refunding any other applicants
9  for J & M?
10     A.  I don't recall.
11     Q.  Do you recall refunding any
12  applicants other than that one applicant?
13     MR. KUPPERMAN:
14         Asked and answered.
15     A.  I recall the one.
16  EXAMINATION BY MR. BHATNAGAR:
17     Q.  Other than that applicant, do you
18  recall any others that --
19     A.  I feel like there were more, but I
20  can't remember for sure.
21     Q.  Okay.  Do you remember Sachin Dewan
22  asking you -- well, do you remember Sachin Dewan
23  telling you that he was going to refund other
24  applicants?
25     A.  I've heard him say that.

Pol 171:7-13

Page 171

1      A.  Yeah.
2      Q.  And do you remember him telling you
3  that there were people who asked for refunds for
4  J & M?
5      A.  Yeah, I think there were some people
6  that asked for refunds.
7      Q.  And how did you handle the refunds,
8  people who asked for refunds?
9      A.  Well, we didn't refund anybody
10 because, I mean, the process was not done yet and
11 it's only -- it was only, you know -- it was a
12 couple things hanging it up and we didn't -- we
13 didn't refund anything.
14     Q.  So, it's your testimony that you
15 didn't refund any of the J & M applicants?
16     A.  Well, I may have refunded a few.  I
17 don't -- I don't recall.  I know I refunded at
18 least one, but, in general, no.  I didn't -- I
19 didn't -- I took the position that, you know,
20 you -- the process was working.  It was -- you
21 know, it was my understanding from Mr. Burnett
22 that the process was working.
23     Q.  So, there's one applicant you
24 remember refunding.  Let me ask you about that
25 applicant.  Do you recall who it was?

Page 173

1      Q.  And do you recall Sachin Dewan
2  asking you to contribute to -- monies to refund
3  applicants for J & M?
4      A.  I don't specifically -- well, yeah,
5  I do.  I remember him -- him saying that he
6  wanted me to -- I think he wanted me and Mal both
7  to give some money for some, but I've never had a
8  true accounting of any of that.  I still to this
9  day don't know who all he wanted to refund.  He
10 claims he refunded somebody, but I don't know.
11     Q.  Well, Mr. Shapiro will recall that
12 Mr. Dewan testified that he had refunded several
13 hundred thousand dollars to J & M applicants.  Do
14 you have that understanding?
15     A.  I don't.  I don't know that he did,
16 I don't know that he didn't.  I've never seen any
17 proof that he did.
18     Q.  He also testified that he requested
19 you and Mr. Burnett to contribute.  Do you
20 remember that?
21     A.  I do remember that at some point in
22 time -- it may have been right after Katrina --
23 that he -- that he asked us to participate in
24 refunding, but I didn't know who was being
25 refunded and for what.  I had no idea.

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250         CERTIFIED COURT REPORTERS         NEW ORLEANS, LA 70139



Page 174

1      Q.   So, did you -- you testified that
2  you did not agree to give any money for refunds.
3      A.   Well, I needed -- I needed some
4  proof that there was going to some refunds.  I
5  mean, this was all done in cash.
6      Q.   So, is that correct, that he asked
7  you to provide refunds and you didn't agree?
8      MR. KUPPERMAN:
9          Object to form.
10     A.   Yes.
11 EXAMINATION BY MR. BHATNAGAR:
12     Q.   And was it your recollection that he
13 also asked Mr. Burnett to contribute to refunds
14 and that he also didn't agree?
15     A.   I don't know that he asked him.  I
16 know that maybe he said something to me.
17     Q.   But was it your recollection that
18 Mr. Burnett also did not contribute to refunds?
19     A.   I don't recall what he -- what Mr.
20 Burnett did.
21     Q.   Okay.  After the J & M process
22 had -- was underway, at some point in time, you
23 came into contact with a company called Knights
24 Marine; is that right?
25     A.   Yes.

Page 175

1      Q.   And can you describe how you first
2  came into contact with Knights Marine?
3      A.   I just know them.
4      Q.   Do you have anything to add to that?
5      A.   I know them.  I've known them all my
6  life.
7      Q.   Who is "them"?
8      A.   Knights Marine.  The family.
9      Q.   So, you know the family that owns
10 Knights Marine?
11     A.   Sure.
12     Q.   Okay.  And how did you first come
13 into a business relationship with Knights Marine?
14     A.   Well, we were going to do something
15 for Knights Marine similar to what we were going
16 to do for J & M.  I mean, they were a labor
17 provider as well and, you know, I was going to
18 try to help them to get some -- get some people
19 to work for them.
20     Q.   And what time period was that?
21     A.   That was in early, I want to say,
22 January of '06.
23     Q.   So, the conversations you were
24 having with Knights Marine were overlapping with
25 the J & M process, is that right, timewise?

Page 176

1      A.   Well, they weren't overlapping in
2  the sense that the process was the same.  It
3  was -- it was -- they were a lot further -- you
4  know, J & M were a lot further along than they
5  were.
6      Q.   Meaning there was an existing J & M
7  project that still hadn't been completed and then
8  you began having conversations with Knights
9  Marine?
10     A.   We did have a conversation with
11 Knights Marine.
12     Q.   The time period was overlapping; is
13 that right?
14     A.   Yes, it would have overlapped
15 somewhat.
16     Q.   Would -- just on the issue of the
17 refunds, you mentioned that it was all in cash
18 and that you didn't have an accounting from
19 Sachin Dewan.  Was that what you were concerned
20 about giving refunds, is that you didn't have an
21 accounting?
22     A.   Would you want to give back money
23 that you didn't know where it came from or who
24 collected it?
25     Q.   Perhaps that's -- from the contract

Pol
176:16-24

Page 177

1  that you had signed with Mr. Dewan and Mr.
2  Burnett, it was clear that the money was fixed,
3  it was 500,000, and if you all three agreed, it
4  could be raised or lowered, right?
5      MR. KUPPERMAN:
6          Object to form.
7      A.   I think you're correct.
8  EXAMINATION BY MR. BHATNAGAR:
9      Q.   So, the money that J & M applicants
10 should have been paying should have been a fixed
11 amount, right?
12     A.   Yes.
13     Q.   And a fixed amount divided in
14 one-third would be going to you, a fixed amount
15 divided in one-third would be going to Mr.
16 Burnett, and a fixed amount divided by one-third
17 would be going to Mr. Dewan, right?
18     A.   In theory, yes.
19     Q.   So, why were there questions about
20 accounting in your mind?
21     A.   I don't like doing cash business.  I
22 don't -- it's difficult to trace.  There's no way
23 to know what happened to the cash.  I mean, did
24 he take it?  Did he give it back?  Did he never
25 give it?  Did he say he got it back and didn't in

45 (Pages 174 to 177)



Page 190

1     A.   I think that's 1/5.
2     Q.   I'm sorry.
3     A.   Excuse me.  5/1.  First day of May.
4     Q.   First day of May, 2006, by the
5   applicant?
6     A.   Uh-huh.
7     Q.   And by the signature by Knights
8   Marine, by the 1st of May, 2006, as well?
9     A.   That doesn't mean that there was any
10  money collected.
11    Q.   I'm just asking if that's what it
12  appears it was signed to you.  Now, I guess my
13  next question is if a worker signs a contract,
14  aren't they supposed to make the first payment
15  when they sign the contract?
16    A.   Well, they were supposed to, but
17  they didn't necessarily do that.
18    Q.   Do you recall if this particular
19  applicant paid money?
20    A.   No.  No.
21    Q.   Do you recall if any applicants paid
22  money with regard to Knights?
23    MR. ALEXIS:
24        Object to form.  Asked and
25    answered.

Page 191

1     A.   Say again.
2     MR. BHATNAGAR:
3        Could you read that back?
4     THE COURT REPORTER:
5        Question: Do you recall if
6     any applicants paid money with
7     regard to Knights?
8     A.   I don't.
9   EXAMINATION BY MR. BHATNAGAR:
10    Q.   Would they have been refunded if
11  Knights fell apart if an applicant had paid
12  money?
13    A.   They would have been, but, more than
14  likely, they would have swapped to another
15  company.
16    Q.   Okay.
17    MR. BHATNAGAR:
18        You know what, maybe we
19    could take a break now for lunch.
20    Is that okay with everyone?  Let's
21    go off the record.
22        (Whereupon, a discussion was
23    held off the record.)
24    MR. BHATNAGAR:
25        Back on the record.

Page 192

1        Just for the record, we're
2     going to request all parties to
3     keep the breaks as short as
4     possible.  We're trying to be very
5     mindful of the time today.
6   EXAMINATION BY MR. BHATNAGAR:
7     Q.   Mr. Pol, prior to our break, we had
8   been discussing Knights Marine and the
9   recruitment that you were involved with for
10  Knights Marine.  And around that time, you also
11  began to have contacts with Signal International
12  regarding recruiting; is that right?
13    A.   Uh-huh.
14    Q.   Can you describe how the
15  conversations with Signal International began?
16    A.   I called -- I called Ron Schnoor and
17  gave him a quick rundown of what -- you know,
18  what I thought I could do for them, and within
19  two or three days, Bill Bingle had called me --
20  Bill Bingle gave me a call and wanted to set up a
21  meeting.
22    Q.   And what was it that you told Ron
23  Schnoor that you could do for them?
24    A.   Well, it was almost identical to the
25  rest of everything.  It was permanent resident

Pol
192:7-193:10

Page 193

1   process for workers.
2     Q.   So, you told him you could provide
3   him workers on the permanent resident process and
4   that they would be employed by Signal
5   International?
6     A.   Yes.
7     Q.   And was -- what was his response to
8   that?
9     A.   That's exactly the way that they
10  wanted to do it in the beginning.
11    Q.   Okay.  So, following your initial
12  conversation with Ron Schnoor -- do you remember
13  when that was?
14    A.   I can't recall what day it was.
15  Sometime -- you know, the first quarter.
16    Q.   First quarter of 2006?
17    A.   Yes.
18    Q.   And that -- following that
19  conversation, did you speak to Malvern Burnett
20  and Sachin Dewan about your conversation with Ron
21  Schnoor?
22    A.   Some point in time, I did.
23    Q.   Before your meeting with Bill
24  Bingle, or after?
25    A.   After.

49 (Pages 190 to 193)

Page 194

1    Q.   After?
2    A.   Yeah.
3    Q.   Okay.  So, maybe --
4    A.   No need to call, you know, when you
5  don't know what the deal is.
6    Q.   Right.
7    A.   I needed to put it together first.
8    Q.   So, do you remember when the initial
9  meeting with Signal was?  Around that same first
10  quarter of 2006?
11    A.   Yes.
12    Q.   And it was at the Signal facility?
13    A.   It was.
14    Q.   And was it you and Mr. Bingle and
15  who else?
16    A.   On the initial meeting, I don't
17  recall.  I think it was -- I think it was just
18  Bill and I.
19    Q.   Can you describe a little bit about
20  what you spoke about?
21    A.   Very much what we've been talking
22  about today.  Very similar.  You know, how we
23  would do this in theory, the concept of it, and
24  Bill liked the idea, and then, of course, you
25  know, he didn't make any comments one way or the

Page 195

1  other, but we did have a follow-up meeting, and I
2  don't recall when the follow-up was either, but
3  we can probably backtrack on some documents and
4  see when the contract was signed, as it was in
5  April.  I think it was prior to that.
6    Q.   When you say "the process," could
7  you set out what the process was that you
8  described for Signal?
9    A.   We -- we were going to get permanent
10  resident visas for Signal International for, you
11  know, welders and fabricators for their facility
12  in Pascagoula and in Texas.
13    Q.   And that was the understanding with
14  Mr. Schnoor?
15    A.   Yes, it was.
16    Q.   And that was the understanding with
17  Mr. Bingle?
18    A.   Yes, it was.
19    Q.   And the immigration process to bring
20  the workers over, when did you -- in relation
21  to -- strike that.
22         When did you first contemplate H2B
23  visas as a vehicle to bring workers over with
24  regard to Signal International?
25    MS. HAROWSKI:

Page 196

1    Object to form.
2    A.   The H2Bs were actually an
3  afterthought.  It was always permanent residence
4  that we were talking about, discussing.  One of
5  the things that, you know, Signal wanted to do
6  was try to see if there was any way to try to do
7  it any quicker and, so, we had consultation with
8  Mr. Burnett and, you know, he said H2B was an
9  option to bring people quicker, but at all times,
10  my understanding from Ron Schnoor, Bill Bingle
11  and everybody involved at Signal, that the
12  permanent resident process was always there.
13  EXAMINATION BY MR. BHATNAGAR:
14    Q.   Okay.  I'm going to show you a
15  document marked -- it's from the GR -- Global
16  Resources production, and it's GR-001 to 006,
17  marking it as Exhibit Number 537.  It's a Global
18  Resources and Signal International Skilled Worker
19  Recruitment Agreement.  Here you go.  Can you
20  take a look at that and tell me if you recognize
21  it?
22         (Whereupon, Exhibit Number
23         537 was marked for identification.)
24    A.   I do.
25  EXAMINATION BY MR. BHATNAGAR:

**Pol 196:14-198:4**

Page 197

1    Q.   And is that your signature at the
2  bottom of the agreement?
3    A.   It is, yes.
4    Q.   And is it your understanding that
5  that's Ronald Schnoor's signature above his name
6  at the bottom of the agreement?
7    A.   I think it is, yeah.
8    Q.   Okay.  Now, I'm going to ask you to
9  read the second paragraph of the agreement out
10  loud, please.
11    A.   "This agreement establishes
12  the framework for a business
13  relationship between the two
14  parties to select, acquire, and
15  transport to and from the United
16  States, foreign skilled workers
17  (hereinafter 'Foreign Workers')
18  under the 'H2B' temporary
19  program and/or the 'permanent
20  residence' process to be employed
21  by Signal or its subsidiaries and
22  acquired on behalf of Signal by
23  Global for that purpose."
24    Q.   Would you say the purpose of the
25  agreement was to bring over Indian workers on the

**Pol 197:24-198:4**

Page 198

1  permanent residency process for Signal?
2      MS. BOLLMAN:
3          Object to form.
4      A.   Yes.
5  EXAMINATION BY MR. BHATNAGAR:
6      Q.   And one of the options to hasten
7  that process was H2B visas?
8      A.   I think it was.
9      Q.   But the process itself was always
10  about permanent residency for the workers, right?
11      A.   It was.
12      Q.   Now, this document was signed, I
13  believe, in April of 2006.  At the time that it
14  had been signed, had -- I know you had had
15  conversations earlier to the time that the
16  document was signed.  Had you begun any work on
17  the recruiting for Signal International prior to
18  signing this document?
19      A.   I don't recall, you know, actually
20  recruiting anybody, but because there were --
21  see, at this time, there was an overlap between
22  Knights Marine and Signal, so, there was a
23  recruiting going on, and some of those people may
24  have, you know, thought they were going to go to
25  Knights but instead they went to Signal.  So,

Page 199

1  there may have been some recruiting for Signal,
2  not on purpose for Signal, but just because of
3  the fact that there was a recruiting going on.
4      Q.   And the recruiting for Knights was
5  also for permanent residency for the workers as
6  well, right?
7      A.   Yes.
8      Q.   So, if a worker were to have been
9  recruited for Knights and then end up going with
10  the opportunity for Signal instead, materially,
11  it wouldn't change in terms of them receiving
12  permanent residency?
13      A.   Only the name of the company
14  changed.
15      Q.   Okay.  I'm now going to show you
16  SIGE5481 to 5488.
17      MS. HAROWSKI:
18          Can you say that number
19  again?
20      MR. BHATNAGAR:
21          SIGE5481 to 5488.
22  EXAMINATION BY MR. BHATNAGAR:
23      Q.   And these are demand letters and
24  Power of Attorneys granted by Signal.  I'm going
25  to put these all in one exhibit.

Page 200

1          (Whereupon, Exhibit Number
2  538 was marked for identification.)
3  EXAMINATION BY MR. BHATNAGAR:
4      Q.   Mr. Pol, I'm going to ask you to
5  look through these documents and tell me if you
6  recognize them.
7      THE WITNESS:
8          Would you like to look at
9  this?
10      MR. ALEXIS:
11          Thank you.
12      A.   I recognize it.
13  EXAMINATION BY MR. BHATNAGAR:
14      Q.   So, the first document, which is
15  5481 and 5482, is this a demand letter from
16  Signal International regarding the positions that
17  are available?
18      A.   Yes.
19      Q.   And did you discuss with Signal
20  drafting this and sending it to Sachin Dewan?
21      A.   Yes.
22      Q.   Now, in this document, and this is
23  5481 and 5482, it says in the subject line:
24  "Acquisition of skilled workers for H2B/permanent
25  residence to the U.S.A."

Page 201

1      A.   Yes, it does.
2      Q.   And that was your understanding and
3  Signal's understanding --
4      A.   Yes.
5      MS. BOLLMAN:
6          Object to form.
7  EXAMINATION BY MR. BHATNAGAR:
8      Q.   -- to the best of your knowledge?
9  Okay.  The second document, 5483, this is a
10  letter on Signal International letterhead to
11  Sachin Dewan.  Did you also have discussions with
12  Signal about drafting this letter?
13      A.   Yes.
14      Q.   And what is the purpose of this
15  letter?
16      A.   As I understand it, and I stand to
17  be corrected, but I believe that this is required
18  by the recruiting agent in India to make sure
19  that he has this document for legal purposes.
20      Q.   Okay.
21      A.   And, you know, there's a lot of
22  scams and things of that nature that go on, so,
23  they want to make sure they have signed
24  documents.  You will notice there's separate
25  documents, one signed by Ron Schnoor and one

51 (Pages 198 to 201)

(504)525-1753                           HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Page 206

A. Okay. It's very difficult to read.
Q. Did I read it right?
A. As far as I can tell. You may want to get a second opinion.
Q. Then, Exhibit 71:
"Large shipyard in the U.S.A. requires on H2B and employment-based green card visas."
Have I read that right?
A. Yes.
Q. So, would it be fair to say that all three of these advertisements offered a green card along with an H2B visa?
A. Yes.
Q. And these advertisements were, to the best of your knowledge, advertising the opportunity at Signal International, right?
A. Yes.
MR. SHAPIRO:
Is that an in globo exhibit, Chandra?
MR. BHATNAGAR:
It is.
MR. SHAPIRO:

Page 207

539.
MR. BHATNAGAR:
Yeah.
MR. SHAPIRO:
Thanks.
EXAMINATION BY MR. BHATNAGAR:
Q. Following the printing of these advertisements in the newspaper, workers would show up at seminars, right?
A. Yes.
Q. And the seminars would -- I mean, their attendance at the seminar would be based on their interest from the advertisements, right?
A. Yes.
Q. So, would it be fair to say that those who attended the seminars would be expecting they were getting permanent residency visas if they enrolled in this opportunity with Signal?
MR. ALEXIS:
Object to form.
MS. HAROWSKI:
Object to form.
A. I think they could expect to get exactly what it says here, temporary and

Pol
207:7-208:16

Page 208

permanent employment visas.
EXAMINATION BY MR. BHATNAGAR:
Q. But that would be a reasonable expectation?
MR. ALEXIS:
Object.
A. I think so.
EXAMINATION BY MR. BHATNAGAR:
Q. Throughout your initial conversations with Signal, it was your understanding that workers would be able to get H2B visas, possibly, but certainly permanent residency visas with Signal, right?
MS. BOLLMAN:
Object to form.
A. Yes.
EXAMINATION BY MR. BHATNAGAR:
Q. So, let me take you from the advertisement to the seminar. Do you remember when the Signal seminars took place in 2006?
A. Sometime April, the first seminar, sometime in April.
Q. The first one was in April. Do you remember when the last one was, approximately?
A. No, sir, but it would have to be

Pol
208:9-16

Pol
208:18-209:23

Page 209

before, you know, like, the last week in October. It was before then. It was between April and October.
Q. Okay. Sachin Dewan, on Page 445 of Dewan's transcript, said that the seminars took place in Vishakhapatnam, Bombay, Cochin, Delhi and Chennai, in India. Do you remember those being the cities that took place in India?
A. Yes.
Q. And he also said that there was one seminar in Dubai. Do you remember that?
A. Yes.
Q. Were you at these five seminars in India?
A. No.
Q. Were you at any of these seminars in India?
A. Yes.
Q. How many of the five were you at?
A. I made Cochin, Bombay and Chennai.
Q. Cochin, Bombay and Chennai. And were you at the Dubai seminar as well?
A. Yes.
Q. So, let me ask you about the Bombay seminar. Do you remember how it began?

Pol 226:21-25

Page 226

1  certain rules and standards that are only for
2  that facility and only on that property. So,
3  everybody knows that. That's common knowledge.
4      Q.  So, would the answer then be that
5  they weren't told that because, in your opinion,
6  it's common knowledge?
7      A.  It is common knowledge. I don't --
8      Q.  My question isn't whether it's
9  common knowledge or not. My question is: Were
10  they told that they would be retested at Signal?
11      A.  Probably, yes.
12      Q.  But you don't remember that?
13      A.  Not that detailed, no.
14      Q.  Okay. Were they told that if they
15  didn't pass the test at Signal that they might be
16  discharged and sent back to India?
17      MS. HAROWSKI:
18          Object to form.
19      A.  I don't think they were told that.
20  EXAMINATION BY MR. BHATNAGAR:
21      Q.  Now, you mentioned that it was
22  always your understanding from Signal that they
23  were intending to apply for green cards on behalf
24  of the workers.
25      A.  You bet.

Page 227

1      Q.  And I'm going to show you, actually,
2  a document. This is DEWAN 3412.
3      MR. ALEXIS:
4          I beg your pardon. Would
5      you please read back that
6      question?
7      THE COURT REPORTER:
8          Question: Now, you
9      mentioned that it was always your
10      understanding from Signal that
11      they were intending to apply for
12      green cards on behalf of the
13      workers.
14          Answer: You bet.
15  EXAMINATION BY MR. BHATNAGAR:
16      Q.  So, this is DEWAN 3412. I'm going
17  to mark it as Exhibit 540. Please take a look at
18  that, Mr. Pol, and let me know if you recognize
19  that document.
20          (Whereupon, Exhibit Number
21      540 was marked for identification.)
22      A.  I've never seen it.
23  EXAMINATION BY MR. BHATNAGAR:
24      Q.  Let me ask you: At the seminars,
25  were workers signing any -- I know you mentioned

Page 228

1  in the J & M context that there were workers who
2  signed contracts at the seminars. Were there
3  also workers who signed contracts at the Signal
4  seminars?
5      A.  There may have been.
6      Q.  Did you observe workers signing
7  contracts at the Signal seminars?
8      A.  Yes, I think so.
9      Q.  And would this have been given to a
10  worker, to the best of your knowledge, after they
11  had signed the contracts, or in the context of
12  signing the contracts?
13      MS. BOLLMAN:
14          Object to form.
15      A.  I'm not sure I understand what
16  you're getting at here.
17  EXAMINATION BY MR. BHATNAGAR:
18      Q.  In the context of the workers
19  signing the contracts at the seminars, would
20  this, to the best of your knowledge, would this
21  document or one like it be given to the workers?
22      A.  I have no idea.
23      Q.  Okay. I'm going to ask you: After
24  the workers were tested and assuming they pass
25  the tests, they would receive some kind of a

Page 229

1  document that suggested that they passed the test
2  and there was an opportunity to work at Signal,
3  right?
4      A.  Yes.
5      Q.  Would this document be something
6  that would be sent to the workers indicating that
7  they had passed the test and could now move
8  forward with the application to work at Signal?
9      MS. BOLLMAN:
10          Object to form.
11      A.  If I'm not mistaken, I think Signal
12  sent letters to these guys. I don't recall
13  seeing this one, but I just remember --
14  EXAMINATION BY MR. BHATNAGAR:
15      Q.  For the record, this letter is on
16  Dewan Consultants' letterhead, and it says:
17          "Subject: Migration to
18      United States of America Signal
19      International.
20          "With reference to your
21      application and subsequent test
22      passed with the clients, Signal
23      International, Pascagoula,
24      Mississippi, U.S.A. We are
25      pleased to inform you that you

58 (Pages 226 to 229)

Page 242

1          Objection.
2      A.   I don't know.  It doesn't look like
3  it.  It looks like somebody signed it for him.
4  EXAMINATION BY MR. BHATNAGAR:
5      Q.   Would you believe that to be
6  Salimon's signature?
7      A.   I've never seen Salimon's signature.
8      Q.   Okay.  The document that was
9  produced -- sorry.  It's dated 14th of November,
10 2006.
11         "Subject:  Migration for
12  United States of America Signal
13  International.
14         "With reference to your
15  application and subsequent test
16  passed with the client Signal
17  International, Pascagoula,
18  Mississippi, U.S.A.  We are
19  pleased to inform you that you
20  have been selected.  The company
21  shall proceed with your Employment
22  Based Permanent Residence Visa for
23  United States of America."
24         Did I read that right?
25      A.   Yes.

Page 243

1      Q.   So, this document, meaning Exhibit
2  543, also makes no mention of H2B visas and only
3  mentions permanent resident visas; is that right?
4      A.   That's what it says.
5      Q.   And it was your suggestion that the
6  previous exhibit might have been a mistake or a
7  duplicate or something else?
8      A.   It could be.  I mean, I just had
9  never seen it before.
10      Q.   But I would ask you again, if
11  looking at these two exhibits, that's 542 and
12  543, would it be your belief that there were
13  workers who thought they were coming to Signal
14  exclusively on a green card?
15      MS. HAROWSKI:
16         Object to form.
17      MR. SHAPIRO:
18         Object.
19      MS. BOLLMAN:
20         Object to form.
21      A.   Once again, it defies anybody's
22  imagination to think that somebody would have
23  been coming to the United States thinking that
24  they were coming on a -- on a permanent resident
25  visa during this process.  You would -- there's

*(Handwritten annotation:)* Pol 243:21-244:11

Page 244

1  no way that anybody could think that.  Now, let
2  me add that most of these guys thought that they
3  were going to -- they understood that Signal
4  International was going to continue after they
5  got here and that Signal International was going
6  to get their permanent residence eventually.
7  They were going to apply for it.  That was always
8  understood.  That was understood in my contract.
9  That was understood in personal conversations.
10  That was always understood with everybody that I
11  dealt with at Signal International.
12  EXAMINATION BY MR. BHATNAGAR:
13      Q.   But let me ask you:  Would it be
14  unreasonable to assume that if you got a letter
15  like that from a recruiter that says the terms
16  and conditions that you're going to go to work on
17  that you would not believe that to be the terms
18  and conditions that you're going to be work on?
19      MS. HAROWSKI:
20         Object to form.
21      MR. SHAPIRO:
22         Object to form.
23      MS. BOLLMAN:
24         Object to form.
25      A.   I think it would be unreasonable to

Page 245

1  say that this person didn't know that they were
2  going on an H2B visa.  I think it would be
3  unreasonable.
4  EXAMINATION BY MR. BHATNAGAR:
5      Q.   Well, let me show you one more,
6  5536, Dewan production.  I'm going to mark this
7  as 544, and ask you if you've seen this document
8  before?
9         (Whereupon, Exhibit Number
10  544 was marked for identification.)
11      A.   That's five days before I was
12  terminated.  I never saw that one.
13  EXAMINATION BY MR. BHATNAGAR:
14      Q.   Okay.  And in this document, it says
15  also on Dewan Consultants' letterhead:
16         "Subject:  Migration for
17  United States of America."
18         "With reference to your
19  application and subsequent test
20  passed with the clients, Signal
21  International, Pascagoula,
22  Mississippi, U.S.A.  We are
23  pleased to inform you that you
24  have been selected.  The company
25  shall proceed with your Employment

62 (Pages 242 to 245)

Page 250

1    Q.   At the same time?
2    A.   Yes.
3    Q.   And let me -- so, were there -- and
4  they were there to observe the testing; is that
5  right?
6    A.   They were there to do the testing.
7    Q.   Do the testing.  Okay.  Following
8  the testing, were there meetings with workers?
9  Were there seminars again?
10   A.   I don't think so.
11   Q.   Well, the reason I ask is you
12 mentioned earlier that they spoke to workers.
13   A.   Continually.
14   Q.   Did they speak to the workers
15 anecdotally, like one on one, or did they speak
16 to groups of workers?
17   A.   No.  I can't say that they spoke to
18 groups, but they certainly had interactions with
19 individuals.
20   Q.   Okay.  Beyond the individual
21 interactions, do you remember any Signal
22 employees addressing groups of applicants?
23   A.   No, sir, I don't remember that.
24   Q.   Okay.  Now, as this process for --
25 you mentioned that the H2Bs came due in around

Page 251

1  September or October of 2006, right?
2    A.   Did I say that?
3    MR. ALEXIS:
4         Object to form.
5    MS. HAROWSKI:
6         Yeah.  Object to form.
7    A.   I don't recall saying that, but --
8  EXAMINATION BY MR. BHATNAGAR:
9    Q.   I'll figure out another way.  It was
10 my recollection that you had said that around --
11 that the applicants who came later, after H2Bs
12 had materialized, had a different understanding
13 than applicants that had come earlier.  I think I
14 had asked you if you had -- if all the applicants
15 were the same, and you said that the later ones,
16 once the H2Bs had come due, were -- had a
17 different understanding.
18   MS. HAROWSKI:
19        I'm going to object to form.
20   A.   I'm very confused.
21   MS. HAROWSKI:
22        I think there's been some
23 miscommunication.  I don't think
24 that happened.
25   MR. BHATNAGAR:

Page 252

1         I'll ask it in a different
2  way then.
3  EXAMINATION BY MR. BHATNAGAR:
4    Q.   In the August/September period of
5  2006, did you become aware that the H2B
6  opportunity might move forward?
7    A.   What month did you say?
8    Q.   August or September of 2006.
9    A.   At some point in time, yes, we knew
10 that the -- and I don't recall whether it was
11 August or September.  We knew that the H2Bs had
12 been approved.
13   Q.   Do you remember when that was?
14   A.   It was a happy day.
15   Q.   A happy day in August and July and
16 September, in October?
17   A.   I really don't recall.  I mean, it's
18 easily verifiable.
19   Q.   I'm just asking your recollection.
20 That's all.
21        Now, you had earlier, and I think
22 I'm right on this one, had earlier testified that
23 you were aware that Sachin Dewan and Malvern
24 Burnett had been involved in a project with Dr.
25 Kurella Rao called Indo-Ameri Soft?

Page 253

**Pol**
**253:3-254:10**

1    A.   I've heard of that.  I never knew
2  his first name, though.
3    Q.   So, did Dr. Rao approach you at any
4  time in 2006 regarding the Indo-Ameri Soft
5  candidates?
6    A.   Yes.
7    Q.   And can you describe how that
8  process began?
9    MS. HAROWSKI:
10        While you're thinking --
11        (Whereupon, a discussion was
12        held off the record.)
13   A.   So, you know, Dr. Rao, apparently,
14 was involved with Mr. Dewan and Mr. Burnett, and
15 he was having trouble because of maybe Hurricane
16 Katrina or something -- I don't know -- he had
17 troubles.  That's all I know.  And at some point
18 in time, Sachin had some interest in this and, of
19 course, Malvern had some interest in this because
20 they had assisted Mr. -- excuse me -- Dr. Rao,
21 and he wanted to -- he wanted me or he wanted me
22 to agree with the group to let his candidates who
23 had been originally tested for his company -- I
24 guess -- I don't know if they ever tested or
25 not -- to come to the -- to work with the Signal

Page 254

1 group, and they wanted to go on H2Bs. It was a
2 decision that they wanted me to make because it
3 was going to be a cut for me. I wasn't going to
4 get -- maybe a little bit of money, but not much
5 from these guys as compared to other candidates,
6 but I agreed to do it, and as far as I know, a
7 good number of Dr. Rao's candidates, so to speak,
8 were recruited and tested for Signal and did go
9 to work or, at least, some did go to work at
10 Signal. I don't know how many.
11 EXAMINATION BY MR. BHATNAGAR:
12     Q.   And you mentioned that you would
13 take a cut on the fees for Dr. Rao's candidates.
14 You were losing money for every Rao candidate
15 that got on H2B going to Signal --
16     A.   Yes.
17     Q.   -- compared to the Signal
18 candidates?
19     A.   Yes.
20     Q.   How much money were you losing per
21 candidate?
22     A.   Somewhere around $2,000.
23     Q.   Let me ask you another way. How
24 much were you making per candidate on the Signal
25 candidates?

Page 255

1     A.   It was roughly about $3,000. Three
2 to -- 3,000 to 3,500, but it was different on
3 every one of them.
4     Q.   Let's start at the lower profit
5 margin and to the higher profit margin. What's
6 the range?
7     A.   On Dr. Rao's, I made a thousand
8 bucks.
9     Q.   Flat, with every candidate?
10    A.   Yeah.
11    Q.   There was no range with Dr. Rao?
12    A.   Yeah, right around there somewhere.
13    Q.   Okay.
14    A.   But, now, you see, what you have to
15 remember is, and you asked me earlier about
16 questions about Sachin and him saying he wanted
17 me to agree to pay back some money that he
18 supposedly, you know, had given to these guys,
19 and in the meantime, he gives me a cut on mine.
20 So, you can see where I'm a little reluctant --
21 do you follow me?
22    Q.   So, you were making $1,000 on Dr.
23 Rao candidates, and --
24    A.   This is approximate now.
25    Q.   Approximately. And on the Signal

Page 256

1 candidates, what was the lower -- the low level
2 of profit you'd be making for candidates?
3     A.   Zero.
4     Q.   Can you explain?
5     A.   I let some people come for free
6 because they were friends of mine.
7     Q.   Okay. Other than those people,
8 paying candidates, what was the high level?
9     A.   I'd be guessing. I mean, somebody
10 may not have paid. I don't know. Somebody may
11 not have paid all that they were supposed to pay.
12    Q.   People who paid the full amount that
13 they were supposed to pay, what was the low
14 threshold and what was the high threshold?
15    A.   I'd have to get back with you on
16 that. I don't remember. I just don't remember.
17    Q.   Well, you remember that you would be
18 losing $2,000 with every Dr. Rao candidate
19 compared to Signal, right? So -- and you were
20 making with some Signal candidates in the
21 ballpark of between three and $4,000 per
22 candidate; is that right?
23    A.   Sure. Some, I did.
24    Q.   So, would there be candidates where
25 you were making five to $6,000, in that range,

Page 257

1 per candidate?
2     A.   I don't remember any of those.
3     Q.   Were there any candidates where
4 you'd be making between four and $5,000 per
5 candidate?
6     A.   There may have been a few.
7     Q.   Were there candidates where you were
8 making between two and $3,000 per candidate?
9     A.   Yes.
10    Q.   So, what differentiated between
11 these candidates? Why were the fees varied?
12    A.   I think that's a better question for
13 Mr. Dewan, because he was the one that was
14 collecting the money. Candidates that I charged
15 nothing to, they were personal friends of mine,
16 and I -- I either got Mr. Burnett and Mr. Dewan
17 to agree not to charge them, or I just gave up
18 some money towards -- you know, towards that
19 person from what I was making.
20    Q.   So, let's put aside the people who
21 were friends of yours or people you had those
22 kind of arrangements with, the nonpay candidates.
23 The full-paying candidates, the lower threshold
24 is between two and 3,000, and the higher
25 threshold is between five and 6,000, right?

Page 398

1   in India when you call.
2       Q.   Right.  So, did you think to call
3   that 800 number and perhaps talk to someone from
4   India to see if your computer could be repaired?
5       A.   Actually, I was burnt out on talk.
6   I'm sorry.  I shouldn't kid.  I did not call.
7       MR. BHATNAGAR:
8           That's all I have for now.
9       MR. KUPPERMAN:
10          Why don't we go off the
11  record now.
12          (Whereupon, a discussion was
13  held off the record.)
14      MR. KUPPERMAN:
15          We've been off the record
16  discussing the continuation or
17  furtherance of Mr. Pol's
18  deposition, and what I have told
19  people, without making a
20  commitment as to how long or what
21  day or that we will reconvene, I
22  have told everybody that I will
23  get some dates, hopefully, within
24  the month of December that he
25  might be available for a

Page 399

1   deposition and send them around,
2   and then we can all talk and see
3   if we can work something out.
4       MS. BOLLMAN:
5           That's fine.  I just did
6   want to put on the record, though,
7   for Signal, that we are reserving
8   our rights to continue the
9   deposition, do our testimony
10  before the end of class cert
11  discovery, which that's really up
12  in the air.  Technically, that
13  deadline is November 30th, but
14  obviously, since we've already
15  scheduled depositions in December,
16  it's going to have to be
17  continued.  But whatever the final
18  cutoff is, we're going to finish
19  this deposition by then.
20          (Whereupon, the testimony of
21  the witness was adjourned at 6:23
22  p.m.)
23
24
25

Page 400

1           WITNESS' CERTIFICATE
2
3
4
5           I, MICHAEL L. POL, the undersigned,
6   do hereby certify that I have read the foregoing
7   deposition and it contains a true and correct
8   transcript of the testimony given by me:
9
10
11      ( ) Without corrections.
12      ( ) With corrections as reflected on
13          the errata sheet(s) prepared by me
14          and made a part hereof.
15
16
17
18
19
20
21          MICHAEL L. POL
22
23          DATE
24
25

Page 401

1           REPORTER'S CERTIFICATE
2
3
4           I, CAROL VALLETTE SLATER, Certified
5   Court Reporter, Registered Professional Reporter,
6   in and for the State of Louisiana, as the officer
7   before whom this testimony was taken, do hereby
8   certify that MICHAEL L. POL, after having been
9   duly sworn by me upon authority of R.S. 37:2554,
10  did testify as hereinbefore set forth in the
11  foregoing pages; that this testimony was reported
12  by me in the stenotype reporting method, was
13  prepared and transcribed by me or under my
14  personal direction and supervision, and is a true
15  and correct transcript to the best of my ability
16  and understanding; that I am not related to
17  counsel or the parties herein, nor am I otherwise
18  interested in the outcome of this matter.
19
20
21          CAROL VALLETTE SLATER (CCR 78020)
            CERTIFIED COURT REPORTER
22          REGISTERED PROFESSIONAL REPORTER
23
24
25

101 (Pages 398 to 401)

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
    KURIAN DAVID, SONY            CIVIL ACTION
 4  VASUDEVAN SULEKHA,
    PALANYANDI THANGAMANI,        NO. 08-1220
 5  MARUGANANTHAM KANDHASAMY,
    HEMANT KHUTTAN, ANDREWS       SECTION "A"
 6  ISSAC PADA VEETTIYL, AND
    DHANANJAYA KECHURA, ON        MAGISTRATE 3
 7  BEHALF OF OTHER SIMILARLY
    SITUATED INDIVIDUALS, AND
 8  SABULAL VIJAYAN, KRISHAN
    KUMAR, JACOB JOSEPH
 9  KADDAKKARAPPALLY, KULDEEP
    SINGH, AND THANASEKAR
10  CHELLAPPAN, INDIVIDUALLY,
11              PLAINTIFFS
12  VERSUS
13  SIGNAL INTERNATIONAL,
    LLC, MALVERN C. BURNETT,
14  GULF COAST IMMIGRATION
    LAW CENTER, L.L.C., LAW       VOLUME 2
15  OFFICES OF MALVERN C.
    BURNETT, A.P.C.,
16  INDO-AMERI SOFT L.L.C.,
    KURELLA RAO, J & M
17  ASSOCIATES, INC. OF
    MISSISSIPPI, GLOBAL
18  RESOURCES, INC., MICHAEL
    POL, SACHIN DEWAN, AND
19  DEWAN CONSULTANTS PVT.
    LTD. (a/k/a MEDTECH
20  CONSULTANTS).
21              DEFENDANTS.
22
23
24
25
```

Page 571

1  debts to me.
2  EXAMINATION BY MR. BHATNAGAR:
3      Q.   Do you recall Signal writing two
4  checks to you, one in November and one in
5  December of 2007?
6      MS. BOLLMAN:
7          Object to form.
8  EXAMINATION BY MR. BHATNAGAR:
9      Q.   2006.  Sorry.
10     A.   Okay.  We're talking about a totally
11 different subject here, but, yes, I do remember
12 that.
13     Q.   And can you explain what the checks
14 were for?
15     A.   I thought you were referring to the
16 recruiting process.  They didn't owe me anything
17 for that.  But those checks were for two weeks of
18 food -- the food that -- that Anjay Keswani --
19 the caterer had done two weeks worth of food and
20 he had his contract was with me and Signal took
21 out what I owed him -- in other words, Signal got
22 up with him and said how much does Michael -- you
23 and they paid him directly and they paid me the
24 difference of what the contract was that I had
25 with Signal versus the one I had with Anjay

Page 572

1  Keswani.
2      Q.   Okay.  Great.  Was one of the checks
3  in the amount of $7,243?
4      A.   I do not recall the amounts.  But
5  that would be easily verifiable.
6      Q.   Okay.  But it was reimbursed then
7  for catering.
8      A.   Yes.
9      Q.   Okay.  Lastly, and this is the last
10 thing I have, you mentioned that you had had some
11 friends that you let come in the program at a
12 great discount.
13     A.   Yes.
14     Q.   And do you know -- what are the
15 names of the people that you let come at a great
16 discount?
17     A.   I have no idea.  I know they were
18 friends of -- and relatives of James Kutty.
19     Q.   Do you remember how many people it
20 was?
21     A.   Not exactly.
22     Q.   And when you gave them a discount,
23 was that just on your recruiting fees or did Mr.
24 Dewan and Mr. Pol also offer the same discount?
25     MR. ALEXIS:

Page 573

1          Object to form.
2      MR. SHAPIRO:
3          Object to form.
4      MR. ALEXIS:
5          Asked and answered already,
6  but --
7      A.   Once again, I think you are
8  referring to Mr. Dewan and Mr. Burnett.
9  EXAMINATION BY MR. BHATNAGAR:
10     Q.   I'm sorry.  My apologies.
11     A.   I don't recall whether they
12 discounted them or not.
13     Q.   Did you ask Mr. Dewan and Mr.
14 Burnett to discount the people that you were
15 discounting?
16     A.   Yes, I did.
17     Q.   But you're not sure if they actually
18 did?
19     A.   I'm not positive on that.
20     Q.   And I think you just answered this,
21 but you don't remember how many people it was
22 that you discounted, right?
23     A.   I don't remember.
24     Q.   Okay.
25     MR. BHATNAGAR:

Page 574

1          Can we go off the record for
2  a quick second?
3      MS. HAROWSKI:
4          Sure.
5          (Whereupon, a discussion was
6  held off the record.)
7  EXAMINATION BY MR. BHATNAGAR:
8      Q.   I just want to ask you -- this is
9  the last question, Mr. Pol.  Exhibit Number 550,
10 if you could just take a look at that.
11     MR. BHATNAGAR:
12         For those that are playing
13 at home, it's Bates Number
14 SIGE0329048, 049 and 050.
15     MR. SHAPIRO:
16         A Signal document?
17     MR. BHATNAGAR:
18         Yes.
19     MR. ALEXIS:
20         SIGE what?
21     MR. BHATNAGAR:
22         0329048, 9049 and 9050.  It
23 was previously marked as Exhibit
24 Number 550.
25     MS. HAROWSKI:

Pol
574:8-576:15

Page 575

1      We have it, but we're
2   reviewing it now.
3      MR. BHATNAGAR:
4         Okay.
5         (Whereupon, a discussion was
6      held off the record.)
7   EXAMINATION BY MR. BHATNAGAR:
8      Q.   So, Mr. Pol, you had a chance to
9   look at the document, right?
10     A.   Yes.
11     Q.   When Mr. Sanders was asked about
12  this document, he testified that he never opened
13  the e-mail, and my question to you is whether you
14  ever received a response from Mr. Sanders in
15  regards to this e-mail, either telephonic or via
16  e-mail?
17     A.   Yeah, I talked to him about it on
18  the phone.
19     Q.   You talked to him about it on the
20  phone?
21     A.   I sure did.  In fact, he thanked me
22  for getting all the consulate -- he called me and
23  thanked me for getting the information from the
24  consulate for him so he'd have the numbers and
25  information.  That's why I remember the call.

Page 576

1      Q.   And do you remember around when the
2   call happened?
3      A.   I don't remember exactly when the
4   call happened, but it was certainly after the
5   e-mail.
6      Q.   So, in late August of 2006?
7      A.   Yeah, I guess that would be a good
8   time.
9      Q.   And can you just talk a little bit
10  about that phone conversation?
11     A.   Well, I just talked to him and he
12  called me on the phone and said thanks for
13  getting that, that was helpful, getting the
14  information, I didn't have to look all of that up
15  for the consulates.  So, I know he got it.
16     MR. BHATNAGAR:
17         Okay.  That's all we have,
18      Mr. Pol.  Thanks again for all of
19      your fortitude.
20     THE WITNESS:
21         Thank you, Chandra.
22     MS. BOLLMAN:
23         I don't have a question, but
24      I would just request that any
25      notes that Mr. Pol took during

Page 577

1   this deposition be attached as an
2   exhibit to the deposition.
3   MS. HAROWSKI:
4       We can do that, but --
5   MS. BOLLMAN:
6       Did he make other notes
7   earlier?
8   THE WITNESS:
9       Uh-uh.  I was scribbling.
10  MS. BOLLMAN:
11      I will put an exhibit number
12  on it.  Exhibit 761.  That's all I
13  have.
14      (Whereupon, Exhibit Number
15  761 was marked for identification.)
16  MR. SHAPIRO:
17      I may have one, one quick
18  one -- one or two.
19      (Whereupon, a discussion was
20  held off the record.)
21  EXAMINATION BY MR. SHAPIRO:
22     Q.   Mr. Pol, some of the lawyers have
23  asked you questions about what we have as the
24  hard copy of the PowerPoint presentation that was
25  shown to job candidates who attended seminars in

Page 578

1   various places in India.  Do you recall
2   testifying about that?
3      A.   Yes.
4      Q.   And you recall reviewing this
5   document, and it's Exhibit 684, and it's got
6   slides, information written in English, and then
7   further back, it has some photographs of what
8   appears to be, I think you testified, the Signal
9   facility in Pascagoula.
10     A.   Yes.
11     Q.   You've been going over to India a
12  pretty fair number of times since 1996?
13     A.   Correct.
14     Q.   Okay.  And you got a lot of friends
15  over in India?
16     A.   Yes.
17     Q.   Okay.  And they're from north India
18  and south India?
19     A.   Yes.
20     Q.   Okay.  And I think at some point in
21  your testimony, you indicated that -- correct me
22  if I'm wrong -- that the brand of English spoken
23  in India is rather imprecise.
24     MR. BHATNAGAR:
25         Object to form.

45 (Pages 575 to 578)

Page 587

```
1          WITNESS' CERTIFICATE
2
3
4
5        I, MICHAEL L. POL, the undersigned,
6   do hereby certify that I have read the foregoing
7   deposition and it contains a true and correct
8   transcript of the testimony given by me:
9
10
11   (  ) Without corrections.
12   (  ) With corrections as reflected on
13        the errata sheet(s) prepared by me
14        and made a part hereof.
15
16
17
18
19
20
21        MICHAEL L. POL
22
23        DATE
24
25
```

Page 588

```
1        REPORTER'S CERTIFICATE
2
3
4        I, CAROL VALLETTE SLATER, Certified
5   Court Reporter, Registered Professional Reporter,
6   in and for the State of Louisiana, as the officer
7   before whom this testimony was taken, do hereby
8   certify that MICHAEL L. POL, after having been
9   duly sworn by me upon authority of R.S. 37:2554,
10   did testify as hereinbefore set forth in the
11   foregoing pages; that this testimony was reported
12   by me in the stenotype reporting method, was
13   prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21        CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22        REGISTERED PROFESSIONAL REPORTER
23
24
25
```

# DEPOSITION EXCERPTS

## THOMAS RIGOLO

THOMAS RIGOLO
OCTOBER 18, 2010

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF LOUISIANA
 2
      KURIAN DAVID, et al.,      )
 3                               )
                Plaintiffs,      ) Case No. 2:08-cv-1220
 4                               )
                     v.          ) Judge Zainey
 5                               ) Magistrate Judge Knowles
      SIGNAL INTERNATIONAL,      )
 6    LLC, et al.,               )
                                 ) Class Action--
 7         Defendants.           ) Collective Action
 8
 9    ********************************************************
10                    ORAL DEPOSITION OF
11                     THOMAS RIGOLO
12                    OCTOBER 18, 2010
13    ********************************************************
14            ORAL DEPOSITION OF THOMAS RIGOLO, produced as
      a witness at the instance of the Plaintiffs and duly
15    sworn, was taken in the above-styled and numbered cause
      on the 18th day of October, 2010, from 8:19 a.m. to
16    2:48 p.m., before Joy H. O'Halla, Certified Shorthand
      Reporter in and for the State of Texas, reported by
17    machine shorthand at the offices of Dewey & LeBoeuf,
      LLP, 1000 Main Street, Suite 2550, Houston, Texas
18    77002, pursuant to the Federal Rules of Civil Procedure
      and the provisions stated on the record.
19
20
21
22
23
24
25
```

THOMAS RIGOLO
OCTOBER 18, 2010

Rigolo 66:7-67:2

Page 66

1    Q. (BY MR. SANDLER)  -- is that correct?  And
2   again, Mr. Rigolo, I'm limiting it just to your
3   understanding.  I'm not saying that you're gonna speak
4   for Mr. Marler or Mr. Schnoor.  I'm just -- your
5   understanding.
6       A.  My understanding is that promise was not made.
7       Q.  But if a promise were made that they could get
8   a green card if they came to Signal, that would be
9   untrue; is that correct?
10       MR. ALEXIS:  Object to form.  Excuse me.
11       THE WITNESS:  Could you read that again?
12   What are -- what did he just say?  I mean, I missed that
13   question completely.
14       (The record was read as requested.)
15       A.  My understanding was if the workers came to
16   Signal via the H2B visa program, that there was an
17   avenue available where the company, "company" being
18   Signal, could sponsor an individual to get a green card.
19       Q. (BY MR. SANDLER)  So representation to the
20   worker that he would not contingent but he would, get a
21   green card, if that representation were made to him in
22   India, that would be false.
23       MR. ALEXIS:  Object to form.
24       A.  I would surmise that would be false.  My
25   understanding is that even if a company sponsors an

Page 67

1   individual for a green card, that there's no assurances
2   that they will get it.
3       Q. (BY MR. SANDLER)  What do you mean you surmise
4   that would be false?  Does that mean that you believe it
5   is false?
6       A.  Believe what is false?
7       MR. ALEXIS:  Object to form.
8       Q. (BY MR. SANDLER)  That a promise to an Indian
9   H2B worker to come over to Signal, that he would get a
10   green card if he came.
11       MR. ALEXIS:  I beg your pardon.  Again,
12   this is Ralph Alexis.  I just wanna object to the form,
13   and I'll make it continuing so I won't have to interrupt
14   any more if that's okay.
15       MR. SANDLER:  I appreciate that, Ralph.
16       A.  Okay.  So that -- that's -- the question again,
17   please.
18       MR. SANDLER:  Can you read back the Q and
19   A where Mr. Rigolo gives a -- puts "surmise" in his
20   answer.  It was, like, two or three questions back.
21       (The record was read as requested.)
22       A.  Okay.
23       Q. (BY MR. SANDLER)  So what do you mean by
24   "surmise" there, that you would conclude that that is a
25   false --

Page 68

1       A.  I -- I would conclude that --
2       Q.  -- statement at that time?
3       A.  -- that for the limited knowledge I have of the
4   green card process, that a com -- commitment could not
5   be made by anybody.  I do not know if a commitment was
6   made, but there are no guarantees.
7       Q.  So if a commitment were made, it would be a
8   false commitment.
9       A.  As I said, I don't know all the workings of it;
10   but my understanding is it's -- there's no givens in it,
11   so I don't know how that could be made if that agreement
12   that was purported.  I do not know.
13       Q.  Just assume that the promise was made.  I'm not
14   saying you're saying that the promise was made.  I'm not
15   saying you were in India.  I'm not saying that you knew
16   the promise were made.  Assume that that promise was
17   made --
18       A.  Yes.
19       Q.  -- that if you come to Signal, you will get a
20   green card.
21       A.  Uh-huh.
22       Q.  At that time, in September of '06, and prior --
23       A.  Uh-huh.
24       Q.  -- to that, that would not be true, correct?
25       A.  My understanding is that for a person to get a

Page 69

1   green card, Signal would have to sponsor them; and I --
2   maybe I'm wrong on that, but my understanding is Signal
3   would have to sponsor them.
4       Q.  Just --
5       A.  Therefore, unless Mr. Marler said that we, at
6   the time Signal, was going to sponsor them, it would not
7   happen.  I do not know -- I had never heard that we made
8   that commitment; that I recall discussions where it was
9   very specific that we were bringing them in as H2B
10   workers.
11       Q.  So if that commitment were made, it would be
12   untrue.  Just "yes" or "no," and then you can expand
13   afterwards.  Just do you agree with me that a commitment
14   that you're gonna get a green card if you come to Signal
15   would be untrue.
16       MS. BOLLMAN:  Object to form.
17       Q. (BY MR. SANDLER)  If the promise were made in
18   India before they came over.
19       A.  If the person making the commitment believes
20   that they have the ability to follow through on that
21   commitment, then -- then I have no issues with that; you
22   know, if they have that ability.  My understanding of
23   the green card process is nobody can make that promise.
24       Q.  And the issue about it not being guaranteed is
25   that you weren't sure -- part of the reason is that

Rigolo 69:24-71:17

O'HALLA REPORTING
713-664-8398

THOMAS RIGOLO
OCTOBER 18, 2010

Page 70

1 Signal couldn't be sure if they wanted to sponsor that
2 worker until after the worker got here and he had the
3 skills and it worked out; is that correct?
4      A.  My understanding was that as we assessed the
5 workers, we would look at them for extending the H2B
6 visa because I -- as I said, you -- individuals get
7 named to come over.  Then you have to file for the
8 extension to assess whether we would extend them for the
9 period of time on the H2B visa.  Then if we identified
10 workers that the company, "the company" being Signal,
11 wanted to sponsor for green cards, we would identify
12 them and consider whether we would do that.
13      Q.  So for Signal's own evaluation process, there's
14 no way they could promise a green card to a worker who
15 hadn't even yet arrived; is that correct?
16      A.  And my understanding is that Signal would have
17 to be the one to do it or another company that they were
18 working for in the United States, so they would --
19      Q.  But they --
20      A.  -- therefore making a commitment for Signal,
21 and I do not know think they had that latitude.
22          MR. SANDLER:  Can you read back my last
23 question.
24          (The record was read as requested.)
25      Q.  (BY MR. SANDLER)  Okay.  But in August and

Page 71

1 September of '06, you knew that workers were gonna come
2 over and you were gonna evaluate them and then decide if
3 you were gonna renew them and then if a green card would
4 happen thereafter --
5          MS. BOLLMAN:  Object to form.
6      Q.  (BY MR. SANDLER)  -- on behalf of Signal.
7      A.  If Signal would choose to pursue getting a
8 green card.
9      Q.  And part of that choice is whether they --
10 Signal felt that the worker worked -- had the skill
11 level and worked well enough in -- at Signal to justify
12 it, correct?
13          MS. BOLLMAN:  Object to form.
14      A.  Okay.
15      Q.  (BY MR. SANDLER)  By "okay," do you agree with
16 me?
17      A.  Yes.
18      Q.  After this e-mail, this August 23rd, 2006,
19 e-mail from Mr. Sanders to you?
20      A.  Uh-huh.
21      Q.  When -- did you discuss green cards with anyone
22 before the workers arrived?
23      A.  When the idea of bringing in workers via the
24 H2B visa program was discussed, I think that there was
25 some -- and I'm talking going way back.  Just from

Page 72

1 looking at e-mail dates, probably May, June, early
2 summer of '06, that there were a lot of unknowns
3 specific to how the program worked; and I know in very,
4 very early discussions, probably before -- but I don't
5 know the exact timeline -- before Michael Pol/Global
6 Resources were retained by Signal, that visas, green
7 cards, those terms were probably used synonymously
8 because we did not understand the -- the true process.
9          So to get to your question green cards,
10 I -- from my understanding and from my memory, as the
11 process became more clear, as Global Resources was
12 retained, as the paperwork, the filings for the H2B visa
13 program was initiated, letters were written, that it was
14 very clear that this was for an H2B visa and this was
15 completely different than a green card.
16          So was it -- green cards discussed?  Yes,
17 they were discussed.  I -- as I said, very early in the
18 process that there was probably some misunderstanding
19 and visa and green card were used synonymously.
20      Q.  After August 2006?
21      A.  I don't -- I believe it's as Mr. Marler,
22 Mr. Schnoor, Mr. Bingle, and myself became I guess
23 educated in the process, we understood the difference
24 between visas and green cards.  To your question was
25 green cards discussed, green cards was discussed in the

Page 73

1 context of identifying workers once they were in the
2 facilities that Signal may want to sponsor to get their
3 green cards.
4      Q.  Okay.  So before the workers arrived, then, you
5 knew that green cards were for citizenship or permanent
6 residency --
7      A.  Correct.
8          MS. BOLLMAN:  Object to form.
9      Q.  (BY MR. SANDLER)  -- in America.
10          When the workers first came over --
11      A.  Uh-huh.
12      Q.  -- in December of '06 to the Texas yard, did
13 they ask about green cards?
14      A.  I -- they did not directly ask me about green
15 cards.
16      Q.  Do you know if they asked people who worked at
17 Signal at Texas?
18      A.  I -- I do not know whether in Texas they did.
19 I had heard that in Mississippi they had asked about it.
20      Q.  So you never conveyed a message about green
21 cards to workers in Texas, is that what you're saying?
22      A.  I did not convey a message to workers regarding
23 green cards.
24      Q.  Did anyone at Signal convey a message to
25 workers of green card in Texas?

19 (Pages 70 to 73)

THOMAS RIGOLO
OCTOBER 18, 2010

Rigolo 88:1-10

Page 86

1  maybe $10,000 is the standard amount.  I do not know.
2  So I do not know what is an inordinate amount of money.
3     Q.  (BY MR. SANDLER)  Who ran the mancamp in Texas?
4     A.  When -- clarify "ran."  Set it up or tried
5  to --
6     Q.  The day-to-day person who was interacting with
7  the workers as they moved there.
8     A.  Signal Texas employed an individual, Robbie,
9  Reedy, something to that effect.
10    Q.  Ravinder Reddy?
11    A.  That's correct.  I'm sorry.  Yes.
12    Q.  Do you know when he was hired?
13    A.  I would say it was -- late November of '06 I
14  believe it was.  It was really before the workers --
15  maybe a month before the workers came in.
16    Q.  And what was his job -- did you hire him?
17    A.  "We" being Signal Texas, yes, we hired him.
18    Q.  Were you part of the interview process or the
19  hiring process?
20    A.  After he interviewed with Malon Scogin, yes, I
21  talked to him.
22    Q.  And what was the job description for him?
23    A.  To manage the camp, to be an interface between
24  the workers and Signal management, to try and assist in
25  the transition working -- to come into work with Signal.

Page 88

1     Q.  So if you only had workers coming in for ten
2  months, did it make sense to spend $3 million on a
3  mancamp?
4        MS. BOLLMAN:  Object to form.
5        MR. ALEXIS:  Object to form.
6     A.  The way it was discussed is the initial
7  application for the H2B visa was ten months, could
8  extend it for another period of time.  From what I
9  remember, we -- "we" being management -- discussed a
10  two-year time frame is what we were really shooting for.
11    Q.  (BY MR. SANDLER)  Okay.  So you had an
12  expectation of workers to be there for two years.
13    A.  Eighteen months to 24 months, correct.
14    Q.  Did you tell the workers in Texas that they
15  were coming -- that you had an expectation of work for
16  two years when they arrived?
17        MS. BOLLMAN:  Object to form.
18    A.  Clarify that.  I told the workers.  Which
19  workers?
20    Q.  (BY MR. SANDLER)  The workers come -- the
21  workers coming in from India under the H2B program.
22    A.  I do not believe it was conveyed to them what
23  contracts we had or the duration of those contracts.
24    Q.  So it's fair to say workers would not know how
25  long they would be at Signal Texas.

Page 87

1     Q.  And how long was his job for?
2     A.  Envisioned it for the length of time that the
3  workers would be at Texas.
4     Q.  So what did you tell him?
5     A.  That it was for H2B visa workers.
6     Q.  So how long of a time did you tell him he was
7  gonna work at Signal?
8     A.  I don't remember.  At the -- I know from what I
9  remember at that time that only the original -- it was
10  ten-month permits at that time had been granted.  I
11  don't believe at that time I knew where the extension
12  filings were; so, I would assume it would have been in
13  the less-than-one-year time period.
14    Q.  So you told him that he was hired for less than
15  a year?
16    A.  While the workers are there.
17    Q.  Do you know how much money was invested in the
18  building of the mancamp?
19    A.  Not specifically, but it was -- it was a good
20  amount of money.
21    Q.  Is it -- if I were to say to you that each camp
22  cost approximately $3 million, would that sound right to
23  you?
24    A.  I would think when you factored everything in,
25  that's probably not an unrealistic number.

Page 89

1        MR. ALEXIS:  Object to form.
2        MS. BOLLMAN:  Object to form.
3        (Cell phone interruption.)
4        THE WITNESS:  Excuse me.
5        MR. SANDLER:  No problem.
6     A.  Okay.  I'm sorry, could you please repeat that.
7     Q.  (BY MR. SANDLER)  Sure.
8        MR. SANDLER:  Can you repeat the question?
9     A.  Let me turn the ringer off so...
10       THE WITNESS:  Okay.  What was the
11  question, now?
12       (The record was read as requested.)
13    A.  I believe the workers had the ability to
14  understand the contracts they signed, knew about the
15  paperwork for the H2B visa program and knew the dates
16  that were on that; so I think it was clear to them the
17  dates that were on it.
18    Q.  (BY MR. SANDLER)  Why do you think it was --
19  that was clear to them?
20    A.  Because the visa process defines a period of
21  time that they could work for a company in the States.
22    Q.  Did you ever talk to them about this green card
23  opportunity that -- that existed --
24    A.  No, I did not --
25    Q.  -- at Signal?

THOMAS RIGOLO
OCTOBER 18, 2010

Rigolo 90:8-13

Page 90

1    A.  -- talk directly with the workers about a green
2 card opportunity.
3    Q.  Did anyone at Signal Texas talk to the workers
4 about a green card opportunity?
5    A.  I do not know specifically.  I would surmise
6 that if the discussion were held, it would be to have
7 identified workers that the company could sponsor.
8    Q.  How early in the process did you begin
9 identifying workers who you would potentially renew the
10 H2B visa for?
11    A.  We -- because of the time frame, it was very
12 early.  I would think by February we were trying to
13 identify workers.
14    Q.  Did you advise the workers that you were in the
15 process of identifying whether you would renew them for
16 visas?
17    A.  I believe we did.
18    Q.  How did you convey that message to them?
19    A.  Down through Malon and the camp manager.
20    Q.  Were you there when that message was conveyed?
21    A.  There was a couple of meetings where one or two
22 of the Indian workers wanted to sit down primarily with
23 Mr. Duhon and others; but this was regarding their
24 performance in the yard and working with the workforce,
25 "workforce" being the entire entity; and that topic I

Page 91

1 believe came up with regard to evaluating them and
2 extensions for the visa program.
3    Q.  And were you at those meetings?
4    A.  I -- I -- I recall one meeting where I was at
5 that, yes, with workers.
6    Q.  How many workers were at that meeting?
7    A.  I believe it was either two or three.
8    Q.  And Mr. Duhon was there, too?
9    A.  Yes.
10    Q.  And do you know what was said?
11    A.  The initial topic of discussion was trying to
12 get the workers -- when I say "the workers," the Indian
13 workers --
14    Q.  Sure.
15    A.  -- to where they were working better with the
16 Signal workers and to make sure -- understanding what
17 the expectations were between the different work groups
18 and trying to get them in.
19        With regard to visas, from what I remember
20 was evaluating the workers because we needed to
21 identify -- to provide a list of which workers would --
22 whose names would go on the extension for the visa.
23    Q.  Okay.  So at that meeting you told the workers
24 you're making a list?
25    A.  That we are evaluating them for the visa

Page 92

1 extension.
2    Q.  And did they at that point raise to you that
3 they had been promised green cards?
4    A.  I do not remember them saying that.
5    Q.  So what was their reaction?
6    A.  What do you mean what was their reaction?
7    Q.  You told --
8    A.  I think --
9    Q.  You told them that you were making a list that
10 they may or may not be on for which you will renew
11 workers -- you will renew visas.  How did they react to
12 that?
13    A.  I believe they accepted it as Signal and
14 supervision was -- was evaluating their abilities for
15 doing an extension.
16    Q.  So when did you tell them that their visa would
17 expire?
18    A.  I don't remember --
19        MS. BOLLMAN:  Object to form.
20    A.  -- telling them when their visa would expire.
21 I was of the belief they understood the paperwork that
22 was in place and when -- what was on their current
23 visas.
24    Q.  (BY MR. SANDLER)  So you conveyed to them that
25 if they didn't work to Signal's level of satisfaction,

Page 93

1 they would be sent home at the end of their visa?
2        MS. BOLLMAN:  Object to form.
3    Q.  (BY MR. SANDLER)  End of their ten-month visa?
4        MS. BOLLMAN:  He hasn't testified to that.
5        MR. SANDLER:  I'm asking the question.
6    A.  Can you clarify the question?
7    Q.  (BY MR. SANDLER)  Certainly.
8        MR. SANDLER:  Can you read it back.
9        (The record was read as requested.)
10    A.  As I said, we were putting together a list for
11 the workers for a visa extension.  They were aware of
12 this, "they" being the workers, were aware of this.  I
13 did not specifically say, "Your visa states that on this
14 date you go home."  They were -- but --
15    Q.  (BY MR. SANDLER)  Then --
16    A.  -- my understanding is they understood their
17 current visas had specific dates.
18    Q.  And they knew that if they didn't meet Signal's
19 acceptance level, that they would be sent home.
20    A.  I -- I would surmise that they knew that, yes.
21    Q.  Did you convey that to any other -- any workers
22 other than the two or three who were in that meeting at
23 that time?
24    A.  I know that Mr. Duhon was aware of that.
25    Q.  So Mr. Duhon was advising the workers in Texas

24 (Pages 90 to 93)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 150

1    Q.  Have you ever met Mr. Dewan?
2    A.  I believe I have not.
3    Q.  Okay.  Have you ever communicated with
4  Mr. Dewan or Dewan Consultants -- well, I'm gonna
5  represent to you that there are some e-mails between you
6  and --
7    A.  Correct.
8    Q.  -- Mr. Dewan and Dewan Consultants.
9    A.  I -- I would surmise there may have been phone
10  conference calls where he may have been a party to the
11  conference call.
12    Q.  And you have some e-mail correspondence between
13  him.
14    A.  Okay.  I don't have any.  I -- I have no
15  correspondence from those days --
16    Q.  Okay.
17    A.  -- in my possession.  I'm sure you have some;
18  so...
19    Q.  All right.
20        MR. SANDLER:  I'm gonna enter Dewan
21  000648.  It's a March 22nd, 2007, e-mail from Sachin
22  Dewan to Tom Rigolo and Susan Carlquist; and the subject
23  is balance candidates; and the exhibit number is --
24        MS. FERRIS:  822.
25        MR. SANDLER:  -- 822.

Page 151

1    A.  Okay.
2    Q.  (BY MR. SANDLER) Are you ready?  I'm not
3  trying to trip you up.  I just wanna get a clear idea.
4  This -- how soon did you leave Signal after this
5  March 22nd e-mail?  Because I know you said you left in
6  March and -- is it possible you left in April, or you --
7    A.  No.
8    Q.  -- definitely left in March?
9    A.  It -- I -- I went back to try and ascertain
10  that.  You have HR from Signal here.  I'm sure they have
11  my employment record.  Why don't we pull that --
12    Q.  Okay.
13    A.  -- instead of playing games.  The best I could
14  tell from looking at my own e-mail, I sent e-mails to
15  some headhunters that I have known for many, many years,
16  and based on those dates, I believe it was the Friday
17  prior to this that I resigned.
18    Q.  Oh, okay.
19        MR. SHAPIRO:  Excuse me.  Steve Shapiro.
20  I -- I had a phone problem.  A call was lost and -- or,
21  excuse me, you were about to ask Mr. Rigolo about
22  Exhibit 8 -- 822.
23        MR. SANDLER:  Yes.  I've on --
24        MR. SHAPIRO:  Okay.
25        MR. SANDLER:  I on -- yeah, I haven't

Page 152

1  asked him anything contentwise on that e-mail yet.
2        MR. SHAPIRO:  Okay.  Thank you.
3    Q.  (BY MR. SANDLER) Okay.
4        MR. SANDLER:  I'm gonna read the whole
5  e-mail into the record.
6    Q.  (BY MR. SANDLER) The e-mail from Sachin Dewan
7  to you -- to you, Mr. Rigolo, and Susan Carlquist:
8  "Mr. Tom, I have been waiting for your reply regarding
9  the pending candidates.  Based on your answer I can
10  release their passports, as I have a lot of pressure
11  from the candidates."  Did I read that correctly?
12    A.  You read it correctly.
13    Q.  Do you -- can you describe the background of
14  the issue that is going on here; or if you need me to be
15  more specific, I can ask you --
16    A.  Please be more specific --
17    Q.  Okay.
18    A.  -- on this one.
19    Q.  Okay.  At some point in February --
20    A.  Uh-huh.
21    Q.  -- did you decide to stop bringing workers over
22  from India for Texas?
23    A.  I know that we wanted to hold off on bringing
24  workers over.
25    Q.  And you -- or via Susan Carlquist indicated

Page 153

1  that to Mr. Dewan in an -- in February?
2    A.  I know that --
3        MS. BOLLMAN:  Object to form.
4    A.  I -- I know that it was conveyed out that
5  Signal Texas did not want to at that point bring in more
6  workers.
7    Q.  (BY MR. SANDLER) So, Mr. Dewan, then, in this
8  e-mail he's writing to you --
9    A.  Uh-huh.
10    Q.  -- with that understanding.  So -- so you
11  understood Mr. Dewan's policy, then, of holding onto
12  workers' passports until the point in time in which
13  Signal was ready to take the workers?
14        MS. BOLLMAN:  Object to form.
15        MR. SHAPIRO:  Object to form.
16    A.  I do not know what his policies are.  I do not
17  know if holding the passports is required to be with, what are
18  required to be with, one of the steps in the application
19  process, or how everything is done for an H2B visa.
20  I -- I -- so I do not know what his policies are.  I
21  have never read his policy and procedure manual.
22    Q.  (BY MR. SANDLER) Was this the first time
23  Mr. Dewan had indicated to you in an e-mail that he was
24  holding the workers' passports?
25    A.  I do not know.  I -- I don't remember e --

[Rigolo
153:22-154:19]

THOMAS RIGOLO
OCTOBER 18, 2010

Page 154

1  e-mails to that level of detail and holding passports.
2      Q.  Did you feel any additional urgency to give
3  Mr. Dewan an answer after he told you he was holding
4  passports of the workers?
5          MS. BOLLMAN:  Object to form.  He's
6  already said that he believes he didn't work here
7  anymore at this time; and I'll tell you for the record
8  that his termination date was March 18th, 2007; and this
9  e-mail is dated March 22nd, 2007, so he wasn't employed
10  at Signal at the time this e-mail was sent.
11      Q.  (BY MR. SANDLER)  Can you answer the question?
12      A.  Please restate or --
13          MR. SANDLER:  Can you restate my question.
14          (The record was read as requested.)
15      A.  One, besides the obvious, I did not read this
16  e-mail; but regarding holding passports, I probably
17  would have assumed that holding passports is part of the
18  application process, and therefore I would not have had
19  any concerns with it.
20      Q.  (BY MR. SANDLER)  Okay.  Okay.  Can you tell
21  me what the rationale was for putting a stop to bringing
22  over the workers from India under Sachin Dewan?
23          MS. BOLLMAN:  Object to form.
24      A.  Slowing down or delaying bringing in workers,
25  multiple things:  One, we being Signal Texas was still

Page 155

1  working out some of the logistics, everything from
2  ability of workers to be able to make phone calls to
3  what TV channels they really wanted to watch to what
4  clothing and tools they really needed to be on the job
5  to also getting them working effectively with the
6  workforce, number of supervisors I had available to get
7  them into the workforce.
8          Also, we quickly realized that we needed
9  to have more room in the camp for one of the buildings
10  just for luggage; so, that was encroaching on places
11  where we had envisioned berthing some of the candidates.
12          So because of multiple little factors, we
13  felt it was prudent to delay it until we got the -- the
14  workers we were working with up-to-speed and then see
15  how many more we could effectively accommodate.
16      Q.  (BY MR. SANDLER)  I think the answer to this is
17  obvious; but between the time that you told Mr. Dewan to
18  stop sending workers and the time you left, you never
19  changed that instruction.  Signal Texas never then
20  brought on new workers.  And I know you can't speak for
21  after you left.
22      A.  Brought on new workers?
23      Q.  Accepted new waves of workers from India.
24      A.  I know that there was obviously -- once, my
25  understanding, a wave -- quote, unquote -- of workers

Page 156

1  was in the process, that they would process through and
2  come in, which based on timing means we could say stop
3  for now, but we still may have inbound workers.  I don't
4  remember the exact timing of the events.
5      Q.  But you never changed the instruction to
6  Mr. Dewan to bring in new workers be -- before you left.
7      A.  As I said, we wanted to hold off for a period
8  of time.  I don't think we ever specified what that
9  period of time was.
10      Q.  And to your knowledge you never resumed
11  bringing workers back in.
12      A.  Not under my tenure.
13      Q.  Okay.  So -- now, you said some of the
14  logistics.  Was the skills of the Indian workers a
15  problem that led you to decide to stop bringing them in?
16      A.  Ensuring that, based on skills, being able to
17  utilize them effectively was part of it.  Certainly --
18  as I said, we had -- we had a myriad of little issues.
19      Q.  So what was the phone call issue, then?
20      A.  Well, for example, we -- "we" being Signal --
21  wanted to have -- to give the workers access to phones
22  to be able to call back to their families; concerns and
23  comments that came back to me that wanted access to more
24  phones, more access to Internet for e-mails, more
25  satellite channels on the satellites we were providing

Page 157

1  in the break room, et cetera.
2      Q.  Okay.  So the -- the desire of the workers to
3  have more phones, more channels, was material -- was a
4  material consideration for you to ask Mr. Dewan to stop
5  sending workers?
6      A.  That was only part of it.
7      Q.  Okay.
8      A.  But I -- I -- certainly you want to have an
9  environment when the workers come in that is conducive
10  to them being able to then go in and work; when they get
11  back to where they're domiciling, that they have a place
12  that they're comfortable with, meets their needs, so
13  they can effectively work.  If you already have -- some
14  of the facilities have individuals in it and you're
15  still working out logistics, let's try and resolve all
16  those logistics before we keep bringing more people in.
17          Similar in production, it takes time as
18  you -- as a -- when a worker comes into a group to work
19  into his team; and if you have too many new workers,
20  it -- it takes time to assimilate them into a team, so
21  you can only really effectively bring so many on in so
22  much time; work off that backlog, and then look at how
23  it's working and then try and move forward.
24      Q.  So at that time you believed that bringing in
25  more workers was not conducive to the mancamp that you

40 (Pages 154 to 157)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 198

1  facility, Signal decided that because they might not
2  have cars and because they don't speak English, better
3  to keep them on Signal property than to have them in the
4  community where Signal thought that their lives would be
5  harder; is that...?
6      A.  Well, to ensure that they would be able to get
7  to work every day and do their job, not spend a lot of
8  their time having to deal with or be concerned with the
9  basic necessities.  If that's provided for them, then
10  during the workday they can concentrate on work.
11     Q.  And it's easier for Signal to keep an eye on
12  them if they're all central on the property.
13         MS. BOLLMAN:  Object to form.
14     Q.  (BY MR. SANDLER)  You write:  Housing/
15  monitoring these workers in Orange is actually a good
16  response to the safety concerns raised by the Orange
17  community.  I'm paraphrasing a little bit, but you know
18  what I'm saying.
19         So is that right that by virtue of placing
20  them all on the same plot of land on Signal property,
21  you're able to keep an eye on them and just kind of know
22  that they're not getting up to mischief or they're not
23  being unproductive or that they can maintain their --
24  their ability to get to work at a certain time and leave
25  at a certain time; is that right?

Page 199

**Rigolo 199:17-201:11**

1         MS. BOLLMAN:  Object to form.
2      A.  You -- you cited some good reasons why having
3  them in one location.  There are benefits to it.
4  Certainly we wanted workers that would be at work that
5  were not concerned with how they would live because do
6  not know language skills, family connections in the
7  United States, knowledge of working in another country.
8         Whether it was right to assume that these
9  workers could come in, get off a plane, do orientation,
10  go to work, and then expect them to go find where to
11  live, I'm sure there are individuals in the group who
12  could do that.  I'm sure there are a lot of individuals
13  in the group who can't do that -- or could not do that.
14  So collectively it was agreed that this is the best all-
15  around solution to be able to -- to help provide for the
16  workers.
17     Q.  (BY MR. SANDLER)  But also you write about
18  monitoring the workers --
19     A.  Yes.
20     Q.  -- because the Orange community had safety
21  concerns about men coming from India and the UAE to live
22  in their community.
23     A.  And those safety concerns go both ways.
24     Q.  Okay.
25     A.  The Orange facility is, pardon the expression,

Page 200

1  on the other side of the tracks.  It is a very tough
2  area you go through, especially after the hurricanes.
3  There are neighborhoods where, regardless of ethnicity,
4  walking through them after dark is not in your best
5  interests.
6         By being able to help monitor these
7  individuals, hopefully we could ensure that they don't
8  go into parts of town where they get injured or jumped,
9  which would certainly look very bad in the media and
10  certainly look very -- very bad for everybody involved.
11  So it -- that safety goes both ways.
12     Q.  Sure.  You could monitor them to keep them from
13  getting into trouble and to keep them from causing
14  trouble.
15     A.  To the best I know of in Texas --
16     Q.  Yeah.
17     A.  -- we never said, You cannot go somewhere.  You
18  cannot -- not go to this store, go to this mall.  I know
19  that recommendations were made to try and keep them
20  safe.
21     Q.  Right, but monitoring -- I mean, I guess
22  monitoring doesn't mean that you're prohibiting them
23  from going to X, Y, or Z.  What it means is you just
24  know when they go to X, Y, or Z.  You know when --
25     A.  We do not know --

Page 201

1      Q.  -- they're in and out.
2      A.  We do not always know where they are going.  We
3  wanted to know when -- that they had come back in, gone
4  back out.  Certainly you wanna keep your -- your -- the
5  environment of your camp safe --
6      Q.  Yep.
7      A.  -- and you wanna keep it quiet and conducive
8  for the individuals to be able to live in the camp.
9      Q.  So, you wanted to know when they were there and
10  when they were not there.
11     A.  Correct.
12     Q.  Okay.
13         Okay.  I wanna talk to you about the
14  35-dollar per diem.
15     A.  Okay.
16     Q.  During Mr. Cunningham's deposition, he
17  testified that you, along with him and Signal CEO
18  Marler, as well as senior VP Ron Schnoor, collaborated
19  to determine an amount of money to deduct daily from the
20  Indian workers' salary.  Do you remember that process?
21     A.  I know there were discussions where initial
22  what the -- the cost was envisioned to be and that it
23  escalated from there.
24     Q.  Okay.
25     A.  I know that at one point discussions were made

51 (Pages 198 to 201)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 206

1 may have multiple rain-out days that influences number
2 of hours a worker works.  The intent was at least 40.
3     Q.  Sure.
4     A.  Then more.
5     Q.  On a rain-out day, does a worker get paid?
6     A.  There's a way it works that they get so many
7 hours.  Don't ask me to quote all the specifics.
8     Q.  Okay.
9     A.  But, yes, there is...
10    Q.  Given -- I mean, there are fluctuations.  Some
11 people --
12    A.  Of course.
13    Q.  Some weeks are overtime, some weeks there's
14 rain-outs, whatever; but the $35 a day that they were
15 deducted never changed.
16    A.  That is my understanding.
17    Q.  Okay.  And regardless of whether the workers
18 lived in the mancamp or not, they had to pay that fee.
19    A.  That is my understanding, yes.
20    Q.  What do you think of that policy?
21    A.  Which policy?
22    Q.  The policy that says that once a worker
23 arrives, his first day at Signal Texas, and looks around
24 and says, You know, I'd kind of just like to get an
25 apartment on my own, that Signal says, Sure you can do

Page 207

1 that, but you still have to pay $35 a day.
2         MS. BOLLMAN:  Object to form.
3     A.  What do I think of that policy?
4     Q.  (BY MR. SANDLER)  Yeah.
5     A.  I have no issues with that policy.
6     Q.  Okay.
7     A.  For Signal to commit to bring the workers in,
8 to make the commitment to house them, to ensure that
9 they have food, laundry taken care of, TVs to watch,
10 Internet, telephone best we could provide for 'em, to do
11 that, had to make the assumption we could spread it
12 across the workforce.
13        If an individual decides then that they
14 want to go live in town, I'm okay with that; but to say
15 that then they do not have to pay that $35, no, it --
16 it -- for it to work collectively as a group, this is
17 what had to be done.
18    Q.  But you recognize that it's financially onerous
19 to pay a thousand fifty a month to Signal and rent
20 independent of that in Orange to live, correct?
21        MS. BOLLMAN:  Object to form.
22    A.  Whether it's financially onerous or not, each
23 individual has to make that decision.  If eight or ten
24 individuals go in together and rent a place, it's much
25 less money.  I can't -- whether it's onerous to them or

Page 208

1 not, that's not my -- that's not my call.
2     Q.  (BY MR. SANDLER)  Do you live -- when you were
3 working there, did you live in the Beaumont/Orange area?
4     A.  Beaumont.
5     Q.  Okay.  What would a thousand fifty a month get
6 you in Beaumont?  How many rooms or...?
7     A.  Very subjective.
8         MS. BOLLMAN:  Object to form.
9     A.  I -- I -- I mean --
10        VOICE ON PHONE:  Form.
11    A.  It's different.  If -- if you're signing a
12 long-term lease, you could -- sorry -- you could
13 probably lease a two-bedroom apartment, I would surmise,
14 on a long-term lease.
15    Q.  (BY MR. SANDLER)  What's a long term?
16    A.  A year.
17    Q.  I wanna talk to you about the conditions of the
18 mancamp in Texas.
19    A.  Uh-huh.
20    Q.  How will -- were there any problems with the
21 housing for the workers such that there were complaints?
22    A.  Define "problems."  Did toilets back up?  Yes.
23 Does the Internet sometimes not work?  Yes.  Do light
24 bulbs go out?  Yes.
25    Q.  Did workers --

Page 209

1     A.  Specific --
2     Q.  -- feel that they were overcrowded in
3 bunkhouses?
4     A.  That was conveyed back to me that they felt
5 that it was overcrowded.
6     Q.  What efforts were made to remedy the
7 overcrowding?
8     A.  When the buildings were first set up, looking
9 at the furniture layouts, some of the numbers of bunks
10 in each of the buildings was reduced because of the
11 layout and to try and allow space for it, trying to have
12 all the individuals on the same shift so they were
13 coming and going at the same time.
14        In Texas I know we ended up dedicating one
15 of the buildings to do nothing more than house luggage,
16 other effects, to try and minimize the amount of
17 material that each individual had near them in their --
18 their dorm area or quarters area.
19    Q.  Okay.  Just generally, when the first wave of
20 workers arrived, say it was, like, 30 workers or
21 whatever -- I -- is that a fair estimate, about 30
22 arrived in a wave, 30 to 40?
23    A.  Fair estimate.
24    Q.  Okay.  So when the first wave arrived, did you
25 put the first 20 or so in Bunkhouse 1 and then the

Rigolo
209:19-210:15

53 (Pages 206 to 209)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 210

1  remainder in Bunkhouse 2; or were the workers dispersed
2  across the bunkhouses until there were enough workers
3  that arrived and to fill them up?  And if you need
4  clarification, I can rephrase it.
5      A.  I do not know specifically how many we put in
6  each of the houses when the first wave came in.  I know
7  we did not put two or three in one and two or three in
8  the other, generally kept them all together.  Exact
9  numbers I do not recall.
10     Q.  So the policy was fill up Bunkhouse 1, then
11  open Bunkhouse 2; fill up Bunkhouse 2, then open
12  Bunkhouse 3; fill up Bunkhouse 3, then open Bunkhouse 4,
13  et cetera.
14     A.  There was no written policy to that effect, but
15  I'm sure that's the way that we went about doing it.
16     Q.  Okay.  I wanna show you an e-mail from Malon
17  Scogin to you November 14th, 2006.  It is a number of
18  pages.
19         MR. SANDLER:  The Bates for it is
20  SIGE0038525.
21         MR. ALEXIS:  This is 826?
22         MR. SANDLER:  It is Exhibit 826.
23         MR. SHAPIRO:  And what -- what is it?
24         MR. SANDLER:  Sorry.  It's an e-mail from
25  Malon Scogin to Mr. Rigolo November 14th, 2006.  The

Page 211

1  subject is forward bunkhouse capacities.  There's a
2  number of e-mails below it I think exclusively between
3  Mr. Sanders and Malon Scogin.
4         MR. SHAPIRO:  Are we gonna take a lunch
5  break anytime soon?
6         MR. SANDLER:  We'll ask the witness after
7  this set of questions.
8         THE WITNESS:  I would prefer to keep
9  going.
10        MR. SANDLER:  Did you get that, Steve?
11        MR. SHAPIRO:  Well, I mean, yeah.  I'm
12  glad -- I'm -- I'm glad that the witness got a chance to
13  say something, but I don't know how that -- how everyone
14  else feels at this point in time.
15        MR. SANDLER:  Okay.
16        MR. SHAPIRO:  Sorry?
17        MR. SANDLER:  Well, we can discuss it.
18  For plaintiffs personally, I'm happy to keep going as
19  well.  I don't know how everyone else feels; so...
20        MR. SHAPIRO:  Well, any other opinions?
21        MR. SANDLER:  I think he said are there
22  any other opinions.
23        MR. ALEXIS:  Lunch is for losers.  Ralph's
24  good.
25        MR. SANDLER:  Great.

Page 212

1         MR. SHAPIRO:  How about did anybody ask
2  the court reporter how she's doing?
3         MR. ALEXIS:  If the court -- that's a good
4  question.
5         MR. SANDLER:  How are you doing?
6         THE REPORTER:  Doing okay.
7         MR. SANDLER:  Are you okay if we don't
8  take a lunch right now?
9         THE REPORTER:  Yeah.
10        MR. SANDLER:  I'm sorry.
11        THE REPORTER:  That's okay.
12        MR. SANDLER:  I should have asked you.
13        MR. ALEXIS:  That's a good question,
14  Steve.
15        MR. SHAPIRO:  Thanks, Ralph.
16        MR. ALEXIS:  You're not even from the
17  south and you're a southern gentleman.  I'm proud of
18  ya'.
19        MR. SANDLER:  This is all on the record?
20        THE REPORTER:  Uh-huh.
21        MR. SHAPIRO:  Well, let's plow through it.
22  You've only got seven hours here.
23        MR. SANDLER:  I'm -- I'm waiting for
24  Mr. Rigolo.  He'll advise me when he's ready.
25        MR. SHAPIRO:  Oh, I didn't know that he

Page 213

1  was --
2         MR. SANDLER:  He's reading.  We're on the
3  record, Steve, and he's reading the e-mail that I just
4  handed to him.
5         MR. SHAPIRO:  All right.  And please don't
6  put this idle conversation on the record.  I don't think
7  it's needed or appropriate.
8         MR. SANDLER:  Maybe we can all consent to
9  strike it.
10     A.  Okay.
11     Q.  (BY MR. SANDLER)  Okay.  Okay.  So in this
12  e-mail Mr. Sanders has sent to Mr. Scogin the OSHA
13  housing requirements, OSHA being the Occupational Safety
14  Housing Administration -- or Act, housing guidelines.
15  Did the Texas mancamp comply with these guidelines?
16     A.  Are you saying OSHA is housing?  Just so I
17  heard you correctly.
18     Q.  I believe it is, yes.
19     A.  Okay.  We'll -- we'll -- we'll go down that
20  road.
21     Q.  Does it help?
22     A.  You're asking the questions.
23     Q.  I am.
24         Do you want me to tell you what OSHA
25  stands for before I continue?

54 (Pages 210 to 213)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 214

1    A.  No.  Just continue with the questions.
2    Q.  Did the Texas mancamp comply with the OSHA
3  requirements?
4    A.  I do not know every one of the OSHA
5  requirements.  I know that when the facilities -- or
6  layout was proposed, I believe it was GE, as we
7  discussed, that those layouts were shared with the City,
8  in particular the concerns with the City over egress,
9  sprinkler systems, fire monitors, fire means, to meet
10  compliance with the City's requirements for occupying
11  the buildings.  Whether they met every one of the OSHA
12  requirements, I do not know.
13    Q.  Okay.  OSHA is the Occupational Safety and
14  Health Administration.  It's a federal administration,
15  and it has -- and these guidelines are set by the
16  Federal Government.
17        Do you know whether the Texas mancamp
18  exceeded the 16.7 people that Mr. Sanders said would be
19  the maximum under OSHA?
20    A.  Well, from math, 30 divided by 13 -- or, excuse
21  me, 300 divided by 13 would give you more than 16 or 17
22  in a bunkhouse if we were trying to get 300 in there; so
23  it appears that if 16.7 is the right number, which I
24  cannot validate, that we would have exceeded the
25  guidelines.

Page 215

1    Q.  Did you feel that you had to follow the OSHA
2  guidelines?
3    A.  I knew that we had multiple codes that you
4  needed to try and be in compliance with and that there
5  are guidelines that you try and meet.
6    Q.  Was OSHA one of those guidelines that you tried
7  to meet?
8    A.  OSHA, I'm sure, would have been on the list of
9  ones to try and meet, yes.
10    Q.  So you did -- did you ever investigate to
11  confirm whether the mancamp complied with OSHA or not?
12    A.  I did not specifically.  As I said, we worked
13  with the City, the fire marshal, and the city
14  inspectors.  We also entrusted with our contract to the
15  provider of the buildings, who knew that our intent was
16  to house up to 300 individuals in these buildings, would
17  do that correctly.
18    Q.  So you felt that if the city inspector and the
19  fire marshal and the vendor who was preparing the
20  mancamps were satisfied, then Signal was in compliance?
21    A.  That efforts would have been made to ensure we
22  were in compliance with the guidelines; that is correct.
23    Q.  What do you mean by "efforts would have been
24  made"?  You believe that if those entities were
25  satisfied, then that was all that Signal needed to do?

Page 216

1    A.  There was nobody on my staff who was an expert
2  on OSHA guidelines.  While Mr. Malon Scogin in
3  environmental issues very knowledgeable, a lot of
4  training, a lot of certificates in it, building
5  occupancy was not his specialty.  That's why you expect
6  your vendors providing buildings that are going to be
7  occupied by people and when you bring in the city --
8  i.e., the fire marshal and their building inspectors --
9  that they would look at compliance for the applicable
10  codes.
11    Q.  Okay.  But you knew -- or at least you were
12  informed in November 14th, 2006, that the OSHA limit is
13  16.7 people.  Did that indicate to you that you needed
14  to make sure that you didn't exceed 16 people in a
15  trailer?
16    A.  What I am reading here from Mr. John Sanders,
17  who, the best I know, not an expert on OSHA housing
18  guidelines, he's saying he is reviewing a guideline and
19  he quotes a number he says that works out to.  I -- I --
20  I don't see anything in here that states that is the
21  number.
22    Q.  Okay.
23    A.  The intent was that the buildings would meet
24  the required code.
25    Q.  But you made no positive attempts to comply

Rigolo 217:7-218:9

Page 217

1  with it except to rely on the other entities, which was
2  the fire marshal, the city inspector, and your vendor;
3  is that correct?
4    A.  From what I remember, the drawings of the
5  buildings actually had statements on them regarding
6  code; which codes, I cannot remember specifically.
7    Q.  Okay.  So you made no specific attempts to
8  comply with OSHA.
9    A.  No.  We wanted to ensure best we could, but
10  we're not an expert on OSHA.  That's why, as I said, the
11  vendor, you expect his expertise, this is what he does
12  for a living.  Certainly the city fire marshal to me
13  would be a authority you would consult with with regard
14  to compliance with regard to safety issues for
15  personnel.
16    Q.  So if the mancamp was out of OSHA compliance --
17  i.e., not compliant with OSHA -- it's the vendor's fault
18  and the City's fault?
19    A.  I did not say it was their fault.
20    Q.  It was their burden to make sure you were OSHA
21  compliant?
22    A.  I would expect with their knowledge of it that
23  if -- if we were potentially in violation of a
24  guideline, that they would have apprised us of it.
25    Q.  So the fact that they didn't is their fault.

55 (Pages 214 to 217)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 218

1    A. I did not say it was their fault that we -- if
2  we were not in compliance it's their fault.
3    Q. Whose duty was it to -- to be sure, the top
4  level duty, that your mancamp was in compliance?
5        MS. BOLLMAN: Object to form.
6    A. In compliance with a guideline --
7    Q. (BY MR. SANDLER) OSHA guidelines.
8    A. Ultimately, it was in my facility, it's my
9  responsibility.
10   Q. Do you know if the Texas operation ever turned
11  a profit based on the thousand fifty a month it
12  collected from each worker it inhabited?
13   A. I --
14       MS. BOLLMAN: Object to form.
15       MR. SANDLER: I'm just asking if he knows.
16   A. Our intent was to never make a profit on those
17  buildings. We didn't ever -- we never turned a profit.
18  That was not the intent.
19   Q. (BY MR. SANDLER) In no months the revenue that
20  you took in never exceeded the costs of the camp,
21  including whatever you had allocated that month to a
22  fixed cost?
23   A. I do not know the exact numbers. Considering
24  the costs, the debt loading against it, the costs of
25  running the facility, hard to imagine that Signal ever

Page 219

1  came close to recouping their -- the money that was
2  invested in those facilities.
3        MR. SANDLER: Okay. I'm gonna enter
4  another document. It's an e-mail from John Sanders to
5  Ron Schnoor, Greg Bishop, Darrell Snyder, and Bill
6  Bingle.
7    Q. (BY MR. SANDLER) And you're mentioned in it,
8  Mr. Rigolo, and I'm just gonna ask you about that
9  portion.
10   A. Okay.
11       MR. SANDLER: It's SIGE0024521; and it's
12  an e-mail from December 18th, 2006.
13   Q. (BY MR. SANDLER) I'm only gonna ask you about
14  the last paragraph at the bottom, but feel free to read
15  through it. And there is a back to it, too.
16       MR. SANDLER: And it's Exhibit No. 827.
17   A. Okay.
18   Q. (BY MR. SANDLER) Okay. The last paragraph,
19  which is titled "Overcrowding"?
20   A. Uh-huh.
21   Q. Mr. Sanders says that he spoke at length with
22  you about C&M Marine Services?
23   A. Uh-huh. Yes.
24   Q. And it's pursuant to adding new bunkhouses; is
25  that correct? Do you recall?

Page 220

1    A. Yes.
2    Q. Okay. When you left Signal in March of 2007,
3  had those bunkhouses been added?
4    A. No. From what I remember, there were
5  discussions and looking at options and requesting
6  further quotes in adding additional houses at the camps.
7  I do not believe a contract had been let for the
8  additional buildings at that point.
9    Q. In March 2007.
10   A. Correct.
11   Q. Do you recall in your tenure at Signal during
12  the period in which the mancamp existed whether the
13  kitchen and cooking facilities were in an unsanitary
14  state?
15   A. I do not have firsthand knowledge that they
16  were in an unsanitary state. I heard up through the
17  channels that some of the workers thought it was, some
18  of the food was not up to standard, whatever "standard"
19  is. I never became aware of a violation in the kitchen.
20   Q. Do you recall a conversation you had with
21  Ms. Spears, who had advised you that the kitchen
22  facilities were -- needed to be improved?
23   A. I'm not sure I recall that specific
24  conversation.
25   Q. I'm gonna give you this --

Page 221

1        MR. SANDLER: I'm gonna enter another
2  document, SIGE0048939 to 940. It's a June 14th, 2007,
3  e-mail, which is months after Mr. Rigolo left, although
4  a conversation is referenced in it. It's Exhibit 828.
5    Q. (BY MR. SANDLER) Just for your own knowledge,
6  Mr. Rigolo, you're mentioned in the e-mail that starts
7  with "Rodney."
8    A. Uh-huh.
9    Q. Okay. That's the only time you're mentioned in
10  this e-mail, I think.
11   A. Okay.
12   Q. I'm just gonna read the sentence that pertains
13  to you. It's a June 13th e-mail from Lisa Spears to
14  Rodney Meisetschlaeger, cc: Chris Cunningham and Lewis
15  Harkey. "Rodney, several months back I toured the
16  mancamp to find disgusting cooking facilities. I
17  brought this to the attention of Tom, who indicated he
18  would take care of it." Do you recall that conversation
19  with Ms. Spears?
20   A. Not directly, no.
21   Q. Do you have any recollection of it?
22   A. I know she would come out to Texas and we
23  talked about the facility; specifically on conditions in
24  the kitchen, no.
25   Q. Okay.

56 (Pages 218 to 221)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 226

1    Q.  Okay.  You read it before you signed it,
2  though.
3    A.  Yes, I did.
4    Q.  Okay.  And that is your signature on 487?
5    A.  That is my signature on 487.
6    Q.  Okay.  Turning to 490, that is your signature
7  above where it says "Thomas Rigolo" towards the bottom
8  of the page?
9    A.  That is my signature.
10    Q.  And on the right it says June 13th, 2006.
11    A.  I believe that's the date that's on there.
12    Q.  And the same on the next page, 491, same
13  question?
14    A.  Yes.
15    Q.  Okay.  And again the date looks to be
16  June 13th, 2006?
17    A.  Correct.
18    Q.  And the same question for 493 and 494.
19    A.  Correct.
20    Q.  And by "correct," you mean those are your
21  signatures on 493 --
22    A.  Those are my signatures.
23    Q.  -- and 494.
24        And the final one for this exhibit is 496,
25  which is a letter that starts on 495.

Page 227

1    A.  On 496 that is my signature.
2    Q.  Okay.  And again, my question -- okay.  That's
3  fine.
4        Is this the same letter as the one you
5  read at the earlier exhibit -- in the earlier portion of
6  the exhibit?
7    A.  I -- I have not compared it word for word.
8    Q.  Okay.  But it looks to be the same?
9    A.  It appears that the context is the same.
10    Q.  Okay.  And the same origins of drafting is what
11  you would expect it to be as you answered in the prior
12  question, which is that it went through Lisa Spears and
13  then came to you for your signature?
14    A.  That this came from Signal corporate for my
15  signature is correct.
16    Q.  Okay.  Thank you.
17        Okay.  That's it for this exhibit.
18        The next exhibit is Signal 02599 and it
19  goes to 2604 and it is an I-129 petition.
20    MR. ALEXIS:  I'm sorry.  Would --
21    MR. SANDLER:  No problem, Ralph.  It's
22  from your production.  It's Signal 02599, and it goes to
23  2604.  It's an I-129 petition.
24    Q.  (BY MR. SANDLER)  I'm just gonna ask you about
25  the signature on the last page, but you're welcome to

Page 228

1  read it.
2    A.  Okay.  The last page?
3    Q.  Yes.  Is that your signature?
4    A.  That is my signature.
5    Q.  All right.  Now, when I -- when we spoke
6  earlier today and I had asked you about the expense on
7  the mancamp, you had indicated that there was perhaps a
8  two-year need.  Did it concern you at all that you were
9  signing a government document that indicated a need for
10  ten months --
11    MS. BOLLMAN:  Object to form.
12    Q.  (BY MR. SANDLER)  -- when you knew that there
13  was a two-year need at Signal for workers?
14    A.  This document is for ten months.  As was from
15  the recruiter to Mr. Marler to the discussions I had
16  with Mr. Marler, that the ability is there to file an
17  extension for these workers which could extend it out
18  upwards of 19 months, and that is the process.
19        Did it concern me?  Mr. Marler made the
20  strategic decision to build the mancamps for a period of
21  time.  At that point, not my concern.  Now I need to get
22  workers working to get the contracts done.
23    Q.  So you felt compelled to fill out these
24  government documents by way of Dick Marler's
25  construct -- decision to construct the mancamps?

Page 229

Rigolo 229:8-19

1    A.  Not --
2    MS. BOLLMAN:  Object to form.
3    A.  Not because he made the mancamps but to get the
4  workers in, we utilized -- we hired a recruiter.
5  Counsel, legal counsel, provided the forms and the
6  paperwork necessary for us to abide by the H2B visa
7  program.
8    Q.  (BY MR. SANDLER)  Right.  But I'm just asking
9  if you ever had any hesitation or concern about putting
10  your signature under pain of perjury on a document that
11  says that you want workers for ten months when you knew
12  Signal was angling for two years --
13    MS. BOLLMAN:  Object to form.
14    Q.  (BY MR. SANDLER)  -- at least.
15    A.  I had absolutely no reservation signing this
16  form --
17    Q.  Okay.
18    A.  -- to get those workers for ten months.
19    Q.  Okay.
20        Okay.  I'm now gonna give you a new
21  document.  That last one was Exhibit 830.  This is 831.
22  The Bates for it is Burnett-CY-00331, and it goes to
23  342.  It's the same as the last two.
24    A.  If I may, once we get through to a good
25  stopping point, I'm sure there are some people that need

58 (Pages 226 to 229)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 230

1   a restroom break; so, when we're at a good stopping
2   point, but let's go through this one.
3       Q.   Okay.
4       A.   All right.
5           So, I'm sorry, what was the question on
6   this one?
7       Q.   There was no question --
8       A.   Okay.
9       Q.   -- yet.
10      A.   Yet.
11      Q.   On 334, is that your signature at the top above
12  where it says "Thomas Rigolo"?
13      A.   That is my signature.
14      Q.   Okay.  And on 338, it goes to 339.  I'm gonna
15  ask you about the letter and whether you -- that's your
16  signature at the end of the letter.  Note that it's
17  similar; but it's from August 24th, 2006.  The other
18  letters that we looked at were from June 2006.
19      A.   That appears to be my signature.
20      Q.   On 339.
21      A.   On 339.
22      Q.   Okay.  And again, you did not draft this
23  letter, correct?  To your knowledge.
24      A.   Allow me to read it.
25      Q.   Sure.

Page 231

1       A.   No, I did not draft that letter.
2       Q.   But you certainly read it before signing it.
3       A.   Correct.
4       Q.   Okay.  Then finally, on the back last page,
5   that is -- is that your signature?  This is 342.
6       A.   On 342 that is my signature in two places on
7   the bottom of the form.
8       Q.   No -- well, yes, right; and the date is
9   July 3rd, 2006?
10      A.   That's either a --
11      Q.   7/03?
12      A.   -- 03 or 13.  I agree it's '06.  It appears to
13  be '03.
14      Q.   Okay.  And the month appears to be the seventh
15  month of the year.
16      A.   Correct.
17      Q.   Okay.
18           MR. SANDLER:  Okay.  We can take a break
19  if you'd like.  I'm done with that exhibit.
20           THE WITNESS:  Okay.  Five minutes?  Ten
21  minutes in your world?
22           MR. SANDLER:  Let's do a hard ten, a hard
23  ten.
24           (Recess from 1:35 to 1:48.)
25      Q.   (BY MR. SANDLER)  All right, Mr. Rigolo.  I

Page 232

1   wanted to ask you about March 9th, 2007.  We spoke about
2   it earlier; but just to remind you, it's the day in
3   Miss -- the Mississippi camp where several workers were
4   placed into a bunkhouse with the intention of deporting
5   them.  Do you --
6           MS. BOLLMAN:  Object to form.
7       Q.   (BY MR. SANDLER)  Do you remember that event?
8       A.   I know that on that date that there were issues
9   in the Mississippi camp.  What exactly transpired, I do
10  not know the details.
11      Q.   No, of course not.
12      A.   I remember the day.
13      Q.   All right.  Did you know prior to that date
14  that Signal was planning to remove certain workers?
15      A.   I know that there were discussions that there
16  were workers that were going to be removed from the
17  program, yes.
18      Q.   How much time did you know before, roughly?
19      A.   Very little.
20      Q.   Okay.
21      A.   General discussions I had -- I did not know
22  what the timeline was.
23      Q.   But it was in that week leading up to it that
24  you learned, or was it prior?
25      A.   Best I can remember.

Page 233

1       Q.   Okay.  Did you or anyone in Texas discuss with
2   the Texas workers what had happened that day?
3       A.   After the -- I do not believe it was that day.
4   I think it was in the day or two afterwards.  I know
5   that questions were brought up with regard to what
6   transpired.
7       Q.   What did you tell them?  First of all, was it
8   you who spoke to the workers or was it someone else?
9       A.   I'm trying to remember who was involved in it.
10  From what I remember, as events were unfolding in
11  Mississippi, it was heard about in Texas.
12      Q.   That morning?
13      A.   I believe it was late in that morning --
14      Q.   Okay.
15      A.   -- that starting to hear about it, and I can't
16  remember the exact sources.  Different conversations
17  transpired at different times.
18           I know either that day or the ensuing days
19  that -- the way it came back to me and I can't remember
20  the exact context, but that the workers in Texas did
21  wanna understand what transpired in Mississippi.  While
22  I had no firsthand knowl -- you know, specifically who,
23  it was fairly obvious, you could surmise, that workers
24  in Texas had cell phones talking to workers in
25  Mississippi.  So what they're hearing and their

Rigolo 231:25-233:13

O'HALLA REPORTING
713-664-8398

THOMAS RIGOLO
OCTOBER 18, 2010

Page 242

1    extensions on the H2B visa, and if they're gonna start
2    asking questions on green cards, that that should be
3    fielded by the recruiter.  They may not ask those
4    questions if senior management of Signal is sitting
5    there.
6        Q.  Why wouldn't they ask the questions if senior
7    management from Signal is there?
8        A.  I think that human nature that, you know, you
9    have a discussion with people you are more comfortable
10   with.  They had worked with a recruiting company, had a
11   contract in place with it, be more willing to work with
12   them.
13       Q.  So they were not comfortable talking about
14   their visa status with Signal management in Texas.
15       A.  I don't know if they were or were not.
16       Q.  You said perhaps --
17       A.  My supposition would be that they would be more
18   comfortable talking to somebody representing the
19   recruiting side.
20       Q.  And they would be uncomfortable talking about
21   it with Signal personnel.
22       A.  Possibly.
23       Q.  Okay.  And what is the reason for their -- for
24   what you thought might be their uncomfortableness?
25       A.  These workers were a long way from home.  Prior

Page 243

1    to coming to Signal, their contact with -- was with a
2    recruiting company.  If there is any uncertainties,
3    considering events that -- and rumors out of the other
4    camp, I would think that the individuals would be more
5    comfortable talking to the people that brought them over
6    to the United States.
7        Q.  Okay.  But just work with me.  I'm not --
8        A.  Yes.
9        Q.  -- saying that Mr. Burnett wouldn't be the one
10   answering the questions, but --
11       A.  Right.
12       Q.  -- you were saying that you thought they'd be
13   uncomfortable if just a Signal person were sitting
14   there.
15       A.  Correct, listening to them.
16       Q.  Okay.  So, why would they be uncomfortable with
17   a Signal person just sitting there?
18       A.  In general terms, when people are sitting in a
19   group, if somebody from outside is sitting there, you
20   tend to couch your questions so that -- I -- I consider
21   that human nature.  Comfort with who is in the room on
22   what is a -- could be a very sensitive topic.
23       Q.  So would -- were there just some immigration
24   questions that workers would not ask if Signal were
25   around?

Page 244

1        A.  I do not know what questions they would or
2    would not wanna ask.  My point of not attending the
3    meeting was so that these workers had the ability to ask
4    the recruiter at this point specifically from that
5    perspective what their status is.
6        Q.  And they would be intimidated from doing that
7    if a Signal person were there, too.
8        A.  Possibly.
9        Q.  Okay.  Now, if somebody from Signal got up and
10   said to the workers that they're still part of the
11   long-term solution for Signal, would that be true?
12           MS. BOLLMAN:  Object to form.
13       A.  I'm sorry, could you say that again?
14       Q.  (BY MR. SANDLER)  If Mr. Scogin would have got
15   up at that meeting and said, "You guys are part of our
16   long-term solution at Signal" --
17       A.  Uh-huh.
18       Q.  -- would that be true?
19       A.  It was envisioned that these workers would be a
20   solution to our labor demands for a period of time.
21   "Long-term" is -- is nebulous.
22       Q.  Sure.
23       A.  In shipbuilding contracts, we have some
24   projects that come in that are three weeks long but you
25   work 24 hours a day.  We have other contracts which are

Rigolo 245:16-247:1

Page 245

1    six months or a year long.  "Long-term" is rather
2    nebulous.  "Long-term," six months or a year is long in
3    the shipbuilding business.
4        Q.  But you already knew by March that some workers
5    were gonna be sent home at the end of their --
6        A.  Yes.
7            MS. BOLLMAN:  At the end of their what?
8    Can you finish?
9        Q.  (BY MR. SANDLER)  At the end of the first term
10   of their H2B visa, which --
11           MS. BOLLMAN:  Just so we have a clear
12   record.
13           MR. SANDLER:  No, no, no --
14           MS. BOLLMAN:  Thank you.
15           MR. SANDLER:  -- that's fine.
16       Q.  (BY MR. SANDLER)  Did you know that Mr. Schnoor
17   at his speech in Mississippi told the workers that if
18   they pursued a lawsuit, then no one would get visa
19   extensions?
20           MS. BOLLMAN:  Object to form.
21           MR. ALEXIS:  Object to form.
22       A.  Was not aware of that.
23       Q.  (BY MR. SANDLER)  Would that bother you?
24           MR. ALEXIS:  Object to form.
25       A.  Would what bother me?

62 (Pages 242 to 245)

THOMAS RIGOLO
OCTOBER 18, 2010

Rigolo
246:14-247:1

Page 246

1    Q.   (BY MR. SANDLER)  That to tell the workers that
2  if they pursued a lawsuit, then their visas would not be
3  extended.
4    A.   That's not --
5         MS. BOLLMAN:  Object to form.
6    A.   -- a statement that I would make.
7    Q.   (BY MR. SANDLER)  Why wouldn't you make that
8  statement?
9    A.   Well, to me you extend the visas based on the
10  merits of the worker and the worker's ability.  Don't --
11  I mean, you can't hold something back because the person
12  threatens a lawsuit.  To me if a worker is a good
13  worker, then certainly we would want to extend that.
14    Q.   Do you think there's something wrong with
15  telling someone that if he pursues his -- a lawsuit, his
16  visa won't get extended?
17         MS. BOLLMAN:  Object to form.
18    A.   I think that statement could be taken in
19  the wrong context very easily.
20    Q.   (BY MR. SANDLER)  What would the wrong context
21  be?
22    A.   That -- to me that could come across as a
23  threat.
24    Q.   A threat to prohibit the person from pursuing a
25  lawsuit.

Page 247

1    A.   Correct.
2    Q.   Did Mr. Scog -- Scogin or any -- sorry.  I just
3  wanna be clear.  At the speech in Texas, Mr. Burnett was
4  there; but you said also Mr. Scogin attended or not?
5    A.   No, I did not say.  He may have --
6    Q.   Oh, he may have --
7    A.   -- attended.
8    Q.   -- attended.  Okay.
9         Did anyone from Signal brief you, so to
10  speak, on what happened at that speech?
11    A.   I believe there was a follow-up afterwards.
12    Q.   Do you remember with whom the follow-up took
13  place?
14    A.   No, I don't recall.  Possibly Malon.
15    Q.   Okay.
16    A.   Mr. Scogin.
17    Q.   Do you know anything that was said to the
18  workers in Texas based on what Malon told you?
19    A.   Nothing specific.
20         MS. BOLLMAN:  Object to form.
21    Q.   (BY MR. SANDLER)  Nothing specific?
22    A.   Do not remember anything specific.
23    Q.   Okay.  And generally?
24    A.   Generally that -- conveyed back to me that the
25  workers in Texas did not wanna be lumped in -- quote,

Page 248

1  unquote -- with the workers in Mississippi.  They were
2  concerned about their performance on the job and -- and
3  doing their work.  That was their concern.
4    Q.   That's what they expressed to Malon?
5    A.   I don't know -- that -- that is what was
6  conveyed back to me.
7    Q.   Okay.
8    A.   Who they expressed it to I -- I do not know
9  specifically.
10    Q.   So you don't know what Mr. Burnett told them
11  about different visas that might be available to them or
12  what the --
13    A.   I do not know --
14    Q.   -- H2B process --
15    A.   I do not know any of those discussions.
16    Q.   Did Mr. Burnett tell you anything about a T
17  visa at any time?
18    A.   I've heard that term.  Where I've heard it
19  from, I -- I don't know.
20    Q.   Do you remember when you heard it?  Like --
21    A.   No.
22    Q.   -- was it early or --
23    A.   No.  I mean, it's -- it's not -- it's not an
24  un -- I mean, I've heard the term --
25    Q.   Okay.

Page 249

1    A.   -- but I'd have to think about and try and
2  place when I heard it.
3    Q.   Did you know that Mr. Burnett was speaking to
4  the workers about T visas?
5    A.   I believe I did not know that.
6    Q.   Did your decision to leave Signal have anything
7  to do with March 9th --
8    A.   No, it did not.
9    Q.   -- or the events thereof?  Did it --
10    A.   Let -- let -- let's be clear.  I had actually
11  many months before that made the decision to transition
12  away from Signal, and I was trying to ensure that a lot
13  of contracts were in place or at least moving in a
14  better direction before leaving.  I had established my
15  own timeline.  I was already several weeks past my own
16  timeline when I wanted to have resigned.  And -- so I --
17  I almost was gone much bef -- much before those events
18  transpired, so they had no direct influence on when I
19  left.  I had already made plans for leaving.
20    Q.   Once you learnt about what happened in
21  March 9th in Mississippi --
22    A.   Uh-huh.
23    Q.   -- did it concern you that workers were
24  detained and then for the purposes of being deported?
25         MS. BOLLMAN:  Object to form.

63 (Pages 246 to 249)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 250

1    A. One, I -- I -- I don't think that I ever
2  understood everything that transpired in Mississippi.
3    Q. (BY MR. SANDLER) On March 9th.
4    A. On March 9th. And probably -- there was no
5  need for me to be apprised of all of it. So, to know
6  what -- I said -- I mean, I've -- now I've read the
7  media reports of it. I still don't know what the truth
8  is; so -- please restate your question. I've rambled.
9  What was your question?
10   Q. Did the events of March 9th --
11   A. Uh-huh.
12   Q. -- concern you in the sense that you thought --
13  and I'm gonna use a colloquial term -- that Signal had
14  gone too far or that this was an excessive act or
15  anything like that? Did that ever --
16       MS. BOLLMAN: Object to form.
17   Q. (BY MR. SANDLER) -- cross your mind?
18   A. Whether it was an excessive act or who was in
19  the right or wrong was not as much concern to me as
20  having several hundred or a hundred and fifty, however
21  many, workers in my facility that are not happy with the
22  work conditions, concerned about their status or
23  concerned about whether management -- company of Signal
24  management was gonna treat them correctly.
25   Q. Okay. I wanna ask you one more small topic.

Page 251

1    A. Uh-huh.
2    Q. Were you aware of any efforts undertaken by
3  Signal to take the company public?
4    A. Yes.
5    Q. When did you first learn of them?
6    A. I would think summer, maybe spring of '06 time
7  frame, maybe earlier.
8    Q. Were you involved at all in this process?
9    A. By "process," process of going public, I did
10  not develop any of the financial statements, I did not
11  put together the -- quote, unquote -- road show. I did
12  not go out with Mr. Cunningham to talk to financial
13  institutions who would represent Signal in a public
14  offering; so, no, I was not involved at that level.
15   Q. Did you discuss it with Mr. Cunningham or
16  Mr. Marler?
17   A. Discuss what?
18   Q. The potential of going public.
19   A. Did I --
20   Q. In '06.
21   A. -- discuss it? I was aware that they were
22  exploring the options to go public.
23   Q. Did they tell you? Is that how you were
24  aware -- came to --
25   A. Tell me what?

Page 252

1    Q. That they were planning to go public.
2    A. I believe the -- it was they were exploring the
3  options with regard to raising capital by going public.
4    Q. Okay. I have one more document, and then I
5  think I'm basically done. SIGE 9410.
6        MR. SANDLER: Okay. This is SIGE0009410.
7  It is a letter dated February 14th, 2007, from
8  Mr. Rigolo to Brian Knight of Knights Marine.
9        MR. ALEXIS: Would you please repeat the
10  SIGE.
11       MR. SANDLER: No problem. SIGE0009410.
12       MR. ALEXIS: And it's a letter dated what?
13       MR. SANDLER: It's a letter dated
14  February 14th, 2007, from Mr. Rigolo to Brian Knight of
15  Knights Marine and Industrial.
16       MR. ALEXIS: Thank you.
17   A. Okay.
18   Q. (BY MR. SANDLER) Okay. I'm just gonna ask you
19  about a portion of the letter, a very short letter. I'm
20  just gonna read a part of it. "This is to advise" --
21  this is a letter from you to Mr. Knight. "This is to
22  advise that due to our current workload, Signal
23  International Texas anticipates the need to continue
24  utilizing H2B visa workers for the period March 15th,
25  2007, through January 15th, 2008. This letter is

Page 253

1  presented for planning purposes of a possible need of
2  400 to 600 additional workers during our peak load."
3  Did I read that correctly?
4    A. You read the words correctly.
5    Q. Okay. So, please explain. In this month, this
6  February 2007, you are canceling workers to come in via
7  Sachin Dewan, the Indian H2B workers; but you're also
8  writing a letter to Knights Marine about a need for 400
9  to 600 workers. Can you just explain the -- how those
10  can both be happening at the same time?
11   A. Well, there -- there's no signature on this, so
12  I'm trying to recall why this was written and whether I
13  actually wrote it. Certainly it's not signed, so I have
14  no idea of the basis of this.
15       From what I remember, Signal was
16  continue -- continuing to explore other options on
17  availability of workers long term. As was learned on
18  the previous efforts, it is not an overnight process.
19  It does take a very long time. So the context of this
20  letter I do not remember directly; but it's, like a lot
21  of other things, you know, the phrase three bids and a
22  buy applies. You don't ever have one source. You
23  certainly want to have multiple options available to
24  you. But I can't remember the exact context of why that
25  was put together.

Rigolo
251:2-252:3

THOMAS RIGOLO
OCTOBER 18, 2010

Page 266

1  requirements.
2      Q.  Did you ever sign an immigration petition for
3  Signal that you believed violated federal law?
4      A.  I -- I do not believe I violated any federal
5  laws.
6          MS. BOLLMAN:  That's all I have.
7          MR. ALEXIS:  Back -- back -- back to
8  Ralph, then?
9          MR. SANDLER:  Yeah.
10         MR. ALEXIS:  Okay.  Give me a couple
11  seconds, please.
12              EXAMINATION
13  BY MR. ALEXIS:
14     Q.  Mr. Rigolo, I'm Ralph Alexis and I represent
15  Malvern Burnett and the so-called Burnett defendants.
16  Thank you very much for making yourself available today.
17  I just have a few questions.
18         Mr. Rigolo, would you say again when you
19  left Signal?
20     A.  I'm -- hold on.  I -- I -- I'm going to pull
21  out a one-page calendar that just has days and dates for
22  years.
23     Q.  Sure.  I think Patricia stated earlier, and I
24  certainly would accept that date.
25         MS. BOLLMAN:  March 18th, 2007.

Page 267

1      A.  March --
2      Q.  (BY MR. ALEXIS)  Okay.
3      A.  Which on this calendar shows that to be a
4  Sunday; and the best I can remember, my resignation
5  letter was dated on a Sunday, the 18th.
6      Q.  Okay.  In approx -- in John Sanders'
7  deposition, I went into a subject with him that I just
8  wanna ask you if you are aware of since the e-mails that
9  form the basis of the conversation were after the date
10  of your leaving; and the subject is conversations
11  between Mr. Burnett, who is an immigration attorney, as
12  you know, and Mr. Sanders about placing workers who are
13  going to be let go from Orange with other employers.
14  Were you at all involved in that process?
15     A.  No, I was not.  I --
16     Q.  Okay.
17     A.  This is the first I've heard of anything like
18  that.
19     Q.  And before you left, then, I think you said
20  that you -- that you probably let go of about three
21  workers.  You're not aware of what happened after you
22  left --
23         MR. ALEXIS:  Strike that.
24     Q.  (BY MR. ALEXIS)  The -- the process which
25  occurred after you left of apparent -- of, according to

Page 268

1  e-mails from Signal, not renewing the H2B visas of --
2  of -- of a number of -- of Orange employees and moving
3  some others to Pascagoula, that conversation didn't
4  start occurring while you were at Signal.
5          MS. BOLLMAN:  Object to form.
6      A.  I -- I don't remember any conversation where
7  there was a discussion about moving workers from Texas
8  to Mississippi.
9      Q.  (BY MR. ALEXIS)  I'm -- I'm sorry.  You don't
10  recall that conversation?
11     A.  I do not --
12     Q.  Okay.
13     A.  -- recall --
14     Q.  Okay.
15     A.  -- discussing moving workers from Texas to
16  Mississippi.
17     Q.  Okay.  I didn't think so since you had -- or
18  since you had left, but I just -- I needed to make sure.
19         Mr. Rigolo, you have -- you referred on
20  one occasion to Mr. Burnett as the -- quote, unquote --
21  recruiter.  Are you aware that Mr. Burnett is not a
22  recruiter but an immigration attorney?
23     A.  Yes, and -- and I -- no offense was intended.
24  I understand --
25     Q.  Okay.  No, I understand.

Page 269

1      A.  -- he's an immigration attorney.
2      Q.  I understand.
3          You indicated -- and this is where
4  inadvertently y'all didn't know I wasn't at the phone
5  and had started a conversation about meeting with
6  Mr. Burnett in March of 2007.  Do you recall that?
7      A.  I -- I remember some of the questions that I
8  was asked, yes.
9      Q.  Okay.  So, it's your testimony that you met
10  with Mr. Burnett in March of 2007 approximately?
11     A.  At that time there were a lot of meetings going
12  on.  The best I can remember, yes, I did meet with
13  Mr. Burnett.
14     Q.  Okay.
15     A.  The date I do not know.  The best I can
16  remember, it was in the March time frame, yes.
17     Q.  Okay.  And do you recall if you had called
18  Mr. Burnett to come to Orange, or how did that happen?
19     A.  I believe him visiting Orange was arranged by
20  Mr. Sanders and that it was a -- basically a follow-up
21  from -- it was going to be a follow-up from Mississippi
22  and having a meeting in Mississippi.
23     Q.  And -- and you met with Mr. Burnett and you --
24  I think you recalled --
25         MR. ALEXIS:  Strike that.

Rigolo
269:9-22

68 (Pages 266 to 269)

THOMAS RIGOLO
OCTOBER 18, 2010

Rigolo
274:14-19

**Page 274**

1  in Mumbai, India?
2      A.  I know that at one point I saw an address for
3  them that indicated they were in Mumbai, India.  I do
4  not know where all their offices are around the world.
5      Q.  Okay.  That's fair enough.
6          MR. SHAPIRO:  That's all the questions I
7  have.
8          FURTHER EXAMINATION
9  BY MR. SANDLER:
10     Q.  I just have one follow-up.  I take it you were
11 not aware that Mr. Dewan came to Mississippi in
12 March 2007.
13     A.  Not that I'm specifically aware of, no.
14     Q.  Okay.  And although you didn't see the meeting
15 with the Texas workers and Mr. Burnett, you were briefed
16 on it by Mr. Scogin or someone from Signal, correct?
17     A.  Correct.  I did not specifically see the
18 meeting transpire, but subsequent conversations
19 indicated a meeting did transpire.
20     Q.  Okay.  Thank you very much.
21         MR. SANDLER:  Guys, I think we're done
22 here if --
23         MR. ALEXIS:  Wait.  This -- this is -- I
24 got one follow-up.  This is Ralph.
25

**Page 275**

1          FURTHER EXAMINATION
2  BY MR. ALEXIS:
3      Q.  Mr. Rigolo?
4      A.  Yes.
5      Q.  Because I missed that.  Who -- what sub -- who
6  did you have subsequent conversations with about the
7  meeting?
8      A.  Best I can remember, Mr. Scogin.
9      Q.  Okay.
10         MR. ALEXIS:  Thank you.
11         THE WITNESS:  Thank you.
12         MS. BOLLMAN:  We're done.
13         MR. SANDLER:  I think we're done,
14 Mr. Rigolo.
15         THE WITNESS:  Okay.
16         (Proceedings concluded at 2:48 p.m.)
17         (Exhibit Nos. 814 through 833 marked.)
18
19
20
21
22
23
24
25

**Page 276**

1          CHANGES AND SIGNATURE
2  WITNESS:  THOMAS RIGOLO        DATE: OCTOBER 18, 2010
3  PAGE LINE  CHANGE              REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Page 277**

1      I, THOMAS RIGOLO, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
6          THOMAS RIGOLO
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10     Before me, _____, on this day
11 personally appeared THOMAS RIGOLO, known to me or proved
12 to me through _____ (description
13 of identity card or other document) to be the person
14 whose name is subscribed to the foregoing instrument and
15 acknowledged to me that he executed the same for the
16 purpose and consideration therein expressed.
17     Given under my hand and seal of office on this
18 _____ day of _____, _____.
19
20     _____
20         NOTARY PUBLIC IN AND FOR
21         THE STATE OF _____
22 My Commission Expires: _____
23
24
25

70 (Pages 274 to 277)

THOMAS RIGOLO
OCTOBER 18, 2010

Page 278

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4         REPORTER'S CERTIFICATE
5      ORAL DEPOSITION OF THOMAS RIGOLO
6           OCTOBER 18, 2010
7
8      I, the undersigned Certified Shorthand Reporter in
9  and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11     I further certify that I am neither attorney nor
12 counsel for, related to nor employed by, any parties to
13 the action in which this testimony is taken; and
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17     SUBSCRIBED AND SWORN TO under my hand and seal of
18 office on this the 29th day of October, 2010.
19
20     _____
       Joy H. O'Halla, CSR
21     Texas CSR 3159
       Expiration:  12/31/10
22     O'Halla Reporting (#147)
       P.O. Box 20101
23     Houston, Texas  77225-0101
       Ph. 713-664-8398
24     Fax 713-665-7226
25

71 (Page 278)

# DEPOSITION EXCERPTS

## JOHN SANDERS

## Volume I (Nov. 19, 2009)

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
    KURIAN DAVID, SONY          *     CIVIL ACTION
 4  VASUDEVAN SULEKHA,          *     NO. 08-1220
    PALANYANDI THANGAMANI,      *
 5  MARUGANANTHAM KANDHASAMY,   *     SECTION:  "A"
    HEMANT KHUTTAN, ANDREWS     *
 6  ISSAC PADA VEETTIYL, AND    *     MAGISTRATE:  3
    DHANANJAYA KECHURA, ON      *
 7  BEHALF OF OTHER SIMILARLY   *
    SITUATED INDIVIDUALS, AND   *
 8  SABULAL VIJAYAN, KRISHAN    *
    KUMAR, JACOB JOSEPH         *
 9  KADDAKKARAPPALLY, KULDEEP   *
    SINGH, AND THANASEKAR       *
10  CHELLAPPAN, INDIVIDUALLY,   *
        PLAINTIFFS              *
11                             *
    VERSUS                      *
12                             *
    SIGNAL INTERNATIONAL, L.L.C., *
13  MALVERN C. BURNETT,         *
    GULF COAST IMMIGRATION LAW  *
14  CENTER, L.L.C., LAW OFFICES *
    OF MALVERN C. BURNETT,      *
15  A.P.C., INDO-AMERI SOFT,    *
    L.L.C., KURELLA RAO, J & M  *
16  ASSOCIATES, INC. OF         *
    MISSISSIPPI, GLOBAL         *
17  RESOURCES, INC., MICHAEL POL, *
    SACHIN DEWAN, AND DEWAN     *
18  CONSULTANTS PVT. LTD.(a/k/a *
    MEDTECH CONSULTANTS),       *
19      DEFENDANTS.             *
                               *
20  *  *  *  *  *  *  *  *  *   *
21
                    VOLUME I
22
            Deposition of JOHN SANDERS, c/o Tracy
23  Binion, 601 Bayou Cassotte Parkway, Pascagoula,
    Mississippi 39581, taken in the offices of Middleberg,
24  Riddle & Gianna, 31st Floor, 201 St. Charles Avenue,
    New Orleans, Louisiana 70170, commencing at 10:27
25  o'clock a.m., on Thursday, the 19th day of November,
```



Page 42

1  workers were coming from there and it was my project.
2      Q.   When was Mr. Shouse's last trip to India
3  before he said this?
4      A.   I don't know.
5      Q.   Has he ever been to India?
6      A.   He -- I believe that he had been before,
7  but you would have to ask him.
8      Q.   Okay.  Now, the shipyard guys, those are
9  guys, I guess, working on the shipyard.  What did they
10  think about this -- I guess this housing facility, man
11  camp that was being constructed within plain view of
12  where they were working?  Did they have any kind of
13  impressions of it?  Did they have any nicknames for
14  it, anything like that?
15      A.   They thought it was an interesting concept,
16  and with communication from Signal as to why it was
17  being done understood and --
18      Q.   Well, this is -- I'm sorry.  We're
19  talking -- my fault.  This is my fault.  I'm not
20  giving you a time frame context.
21      A.   Okay.
22      Q.   Let's just talk about August 2006.
23      A.   Okay.
24      Q.   At that point had Signal adverted through
25  the workers that there were Indian workers coming?

Page 43

1      A.   I don't remember if there had been a full
2  announcement at that time.
3      Q.   Okay.  So if I were to say to you that
4  there wasn't, you'd have no reason to contradict that?
5      A.   I don't know one way or the other.
6      Q.   Okay.  So I asked you previously in August,
7  you know, whether there was like any kind of like
8  nicknames or anything used for the housing facility.
9  And you don't recall if there was or wasn't?
10      A.   Could you help refresh my memory?
11      Q.   Sure.  Let me do that.  Let me enter
12  another document, SIGE0556543.  And it will be Exhibit
13  No. 604.
14          Just read it over and then we'll talk about
15  it.
16          (Whereupon the document as described above
17  is marked as "Exhibit No. 604.")
18      A.   (Witness reviews document.)
19          Okay.
20  EXAMINATION BY MR. SANDLER:
21      Q.   Okay.  You see in the first sentence
22  there -- I'm just going to read it.  "I got into work
23  this morning and went immediately out to the trailer
24  site which the shipyard folks are now calling the
25  'Reservation.'"

Sanders
43:21-45:23

Page 44

1      Q.   Why do you think they called it a
2  reservation?
3      A.   You would need to ask them.
4      Q.   What did you think of them calling it a
5  reservation?
6      A.   Attractive land that had not been used for
7  anything and now was reserved for the use of the
8  Indian workers.
9      Q.   So this was just a clinical or in more like
10  kind of technical term that they were using?
11      A.   Again, you would have to ask them.  And
12  these were just the regular craft workers in the yard
13  who were -- I mean, they were excited about the fact
14  that Indians were coming, a new culture and what would
15  they be like and -- So it didn't have a negative
16  connotation at all in their minds.
17      Q.   Oh, okay.  So then in the second sentence
18  when you wrote, "Quite a sense of humor they have,"
19  that was because they were using the technical term
20  for it, attractive land?
21      A.   Again, you'd have to ask them.  I'm saying
22  that my -- they were happy about having the Indian
23  workers come.
24      Q.   But that's not my question, Mr. Sanders.
25  My question is why did you think that meant they had a

Page 45

1  good sense of humor?  Let's go with that.
2      A.   I would say that -- I would say that
3  because they were excited about the workers coming and
4  here was this tract of land that had been reserved for
5  them.
6      Q.   Okay.  In the U.S., land that is lived on
7  by First Nations people, Native Americans, is called
8  what?
9      A.   Territorial lands.
10      Q.   Is it ever referred to as a reservation?
11      A.   Yes.
12      Q.   And are Native Americans ever referred to
13  as Indians?
14      A.   Yes.
15      Q.   Do you think potentially -- now, I'm just
16  going to throw this out, and if you don't think that,
17  then that's fine.  Do you think there was a double
18  entendre there?
19      A.   It's possible.
20      Q.   So maybe that's why it was funny, too?
21      A.   Yes.  But there was no -- there was no
22  negative connotation in their minds, if that's what
23  you're driving at.
24      Q.   I'm not driving at anything.  I just want
25  to know -- I'm reading these things.  I want to know

12 (Pages 42 to 45)

Page 70

1 think, is there anything that needs to be added or
2 modified.
3    Q.   Okay.  Did you perceive this e-mail to them
4 as important?
5    A.   My sense was that I had a good
6 understanding of where things needed to go and had
7 laid things out pretty clearly.  So if I didn't hear
8 back right away, my inference would have been my
9 understanding is okay.
10    Q.   But there are three questions at the end of
11 your e-mail, right?
12    A.   Yes.
13    Q.   So the first one -- second one -- do you --
14 I mean, you wanted answers to these questions, did you
15 not?
16    A.   Yes.
17    Q.   In the sense like you didn't write:  If I
18 don't hear back from you, I'm going to assume that
19 October 1st.  You didn't write it like that.  You
20 wrote in the interrogatory form requiring a response?
21    A.   Yes.
22    Q.   Okay.  And that's because time was of the
23 essence and you had to answer to management at Signal
24 about what was going on.
25    MS. FENTON:

Page 71

1    Objection to form.
2 EXAMINATION BY MR. SANDLER:
3    Q.   Did you write this e-mail to get answers
4 that you could then relay to management at Signal?
5    A.   Yes, but also to make sure I understood the
6 process myself.  Because it was brand-new for me.  I
7 was completely unfamiliar with all of this prior to
8 coming to Signal and this was -- As I'd mentioned,
9 Michael Pol was our recruiter.  It was in a large
10 sense a black box to us.  They will handle that.  You,
11 John, handle getting the housing facility set up.
12    And so when I constructed this, it was a
13 matter of:  I think this is the right understanding,
14 but I'm not sure.  Could you clarify?  And then once
15 that was out of the way as far as I hit "send," now I
16 can refocus on the myriad of other tasks requiring
17 direct and full attention.
18    Q.   So it's your testimony under oath that when
19 the e-mail came back and the subject said, "Time-line
20 of H-2B worker arrivals," you didn't read it?
21    MS. FENTON:
22        Object.
23    MR. ALEXIS:
24        Object to the form.
25    A.   What I'm saying is that I almost certainly

Page 72

1 did not read it and 100 percent explicitly did not
2 process the information that it contained, did not
3 process.
4 EXAMINATION BY MR. SANDLER:
5    Q.   What does it mean you didn't process?
6    A.   Okay.  I cannot -- I cannot say that -- I
7 am confident -- I am confident that I did not even
8 open this e-mail at that time in 2006.  The time lapse
9 supports that, also, the fact that this e-mail was
10 unresponded to.
11    Q.   I don't mean to interrupt, but what do you
12 mean the time lapse supports that?  What time lapse?
13    A.   From -- we talked about August 22nd --
14    Q.   Oh, okay.  Right.
15    A.   -- and 24th.  Yes.
16        So there was a two-day time lapse, as we
17 discussed.  And, furthermore, there's no -- This
18 e-mail hangs out alone, as I know that you are aware.
19 And so that -- both of those support the contention
20 which I am giving under oath that this information was
21 not digested or processed by me.
22        And I will also say that it is, therefore,
23 extremely likely, with the highest possible
24 probability short of saying it under oath, that I did
25 not even open or read the e-mail.

Page 73

1    Q.   You were Signal's point man for Global?
2    A.   I was.
3    Q.   Mr. Sanders, prior to me introducing this,
4 we talked about your suspicion that Mr. Pol was not to
5 be trusted, and you said there was another incident.
6 Do you recall?
7    A.   I do.
8    Q.   Okay.  Was that incident in August or
9 September?
10    A.   September.
11    Q.   Okay.  Let's read this e-mail now.  Okay?
12 What do you -- let's -- if you want to reread the
13 fourth paragraph, because I want to ask you a couple
14 of questions about it, then we can go from there.
15    A.   Okay.
16    Q.   So if you want to reread it or if you
17 feel -- Take a quick look at that.
18    MR. ALEXIS:
19        Hugh, which e-mail are you referring to?
20    MR. SANDLER:
21        I'm sorry.  It's the last one that we were
22 talking about.  It's SIGE0329048.
23    THE WITNESS:
24        (Witness reviews document.)
25        Okay.  I've reread it, Hugh.

Sanders 71:18-72:25

Sanders 73:1-2

19 (Pages 70 to 73)

Sanders
110:9-111:13

Page 110

1    Q.   But what did that give him?
2    MR. ALEXIS:
3        Object to form.
4    A.   I don't know.  I was just in the movie
5    theater or watching it at home.  I just kind of
6    enjoyed the movie.  I didn't digest the particulars
7    and the details related to each form of status.
8    EXAMINATION BY MR. SANDLER:
9    Q.   All right.  Was green card part of the
10   program that Signal was undertaking to bring Indian
11   workers over?
12   A.   We brought the workers under an H-2B visa
13   that had validity of ten months.  That's all that we
14   could promise the workers once they came.
15   Q.   Now, the e-mail that you didn't read, the
16   one that Michael Pol sent you --
17   A.   Yes.
18   Q.   -- there's green card chatter in there,
19   right?
20   A.   Okay.  So had you seen that, wouldn't that
21   have like raised an alarm bell?
22   MR. ALEXIS:
23       Object to form.
24   A.   Definitely.  Yes.  Yes, it would have,
25   because even in a -- even in Malvern's e-mail, which

Page 111

1    is more nuanced, less explicit, I said, "No.  We're
2    going to say exactly what the issue is.  We're going
3    to be transparent and forthright."
4    EXAMINATION BY MR. SANDLER:
5    Q.   We'll get to that --
6    A.   Okay.
7    Q.   -- and we're going to talk about those
8    e-mails.
9    A.   Okay.  Then I maybe -- could you --
10   Q.   No.  I think that that -- I just wanted to
11   ask you that had you seen the Michael Pol --
12   A.   Oh.  That would have been a huge problem.
13   Absolutely.
14   Q.   Okay.
15   A.   Absolutely.
16   MR. ALEXIS:
17       I'm sorry.  Had he seen what?
18   MR. SANDLER:
19       Can we go off the record for a second?
20   THE VIDEOGRAPHER:
21       We're going off the record.  It's 2:09.
22       (Whereupon, there was a discussion off the
23   record.)
24   THE VIDEOGRAPHER:
25       We're back on the record.  It's 2:10.

Page 112

1    EXAMINATION BY MR. SANDLER:
2    Q.   Okay.  So I'm going to show you a document
3    that's already been entered into evidence in a
4    previous deposition.  It's Exhibit 513.  And the Bates
5    for it is GR-1701 to GR-1703.  I know that doesn't
6    mean anything until you see the document.
7        We're going to call this -- Well, it's
8    already been entered, so I'm not going to give it an
9    exhibit number.  I'll let you read it.
10   MS. HANGARTNER:
11       What was the prior exhibit number?
12   MR. SANDLER:
13       Right.  That was 513.
14   EXAMINATION BY MR. SANDLER:
15   Q.   And, also, John, I'd like to say for the
16   record that this predates you starting at Signal.  So
17   you're not like on these e-mails.  You're not
18   implicated by these e-mails.  But let's read.
19   A.   (Witness reviews document.)
20       Okay.  I've read the document.
21   Q.   Just by way of background, when it's a "GR"
22   at the bottom, that's a document produced to us by the
23   Global defendants.  And so this wasn't something we
24   got from Signal's --
25       Okay.  Now, I want to ask you about the

Page 113

1    middle e-mail which starts on GR-1701.  And the last
2    paragraph that Michael writes to Bill Bingle --
3    A.   Uh-huh (indicating affirmatively).
4    Q.   -- I'll read it to you.
5    A.   Uh-huh (indicating affirmatively).
6    Q.   "Overall, I'm very satisfied about the
7    quality of the candidates.  And now that we know
8    exactly what you want, I do not feel there will be any
9    problems getting the numbers that you need,
10   particularly for the long-term green card candidates."
11       So some of -- What would you interpret that
12   paragraph to mean?
13   A.   That, from what Michael Pol is saying, some
14   of the candidates pertain to long-term green card.  I
15   mean, that's what he's saying.
16   Q.   Now, does Mr. Bingle reply that that's not
17   what they have in mind?
18   A.   He's -- As I read this, he's silent in
19   response to that issue.
20   Q.   But he did reply to the e-mail?
21   A.   Yes, but he didn't address --
22   Q.   But not that particular --
23   A.   I mean, this is the first time I'm reading
24   this.
25   Q.   Yeah.  I know.

29 (Pages 110 to 113)

Sanders
126:23-127:21

Page 126

1   Object to the form.
2   EXAMINATION BY MR. SANDLER:
3       Q.   Okay.  Did you ever learn that the Indian
4   workers thought they were going to get green cards?
5       MR. SHAPIRO:
6           A little louder, please.
7       MR. SANDLER:
8           Sorry.
9   EXAMINATION BY MR. SANDLER:
10      Q.   Did you ever learn that the Indian workers
11  thought they were going to get green cards?
12      A.   Yes.
13      Q.   Okay.  When was that?
14      A.   Okay.  You're talking about the Indian
15  workers that I saw at Signal when, and the answer to
16  that is that when they arrived to Signal in different
17  waves, as we called them, one of the questions which
18  they posed was when are we going to get the green
19  cards.
20      Q.   So the first wave was in the third week --
21  when was the first wave?
22      A.   Approximately October, late October 2006.
23      Q.   Okay.  So that's when you learned for the
24  first time that the Indian workers had an expectation
25  of green card status?

Page 127

1       A.   No.
2       Q.   Oh.  Okay.  Sorry.  Then I misunderstood.
3   Do you have like an approximate time frame?
4       A.   Yes.  I was in India when the first wave
5   and possibly wave two came.
6       Q.   Okay.  Right.
7       A.   So when I returned, that's when I heard the
8   question from the Indian workers about when will we
9   get green cards.
10      Q.   Did that surprise you?
11      A.   No.  Because Michael Pol had mentioned
12  green cards to me over a lunch in Ocean Springs with
13  Malvern Burnett.  So I --
14      Q.   When was that lunch?
15      A.   That was like maybe October, earlier
16  October time frame.  I think.  I'm not sure of the
17  exact time frame.
18      Q.   So when Mr. Pol said it, did it surprise
19  you?
20      A.   That was the first mention that I had known
21  about green cards.
22      Q.   Were you surprised?
23      A.   Well, he -- Yes, I was surprised.  Because
24  I hadn't heard any discussion about green cards.
25      Q.   Right.  So is there any other way to

Page 128

1   characterize it?  Is there a better way to
2   characterize your reaction?
3       A.   Well, I mean, he was posing to me things
4   that I didn't understand.
5       Q.   So how would you characterize your
6   reaction?
7       A.   Confused.
8       Q.   Confused.  Okay.
9       A.   Surprised.
10      Q.   So you're confused, you're surprised.  Does
11  this make its way into your journal, your diary?
12      A.   I don't remember.
13      Q.   How often were the Indian workers asking
14  you about green card?
15      A.   Frequently.
16      Q.   Okay.  So how did Mr. Pol pitch it to you
17  in October?  What did he say?
18      A.   It was over lunch, a lunch between Michael
19  Pol, Malvern Burnett and me in Ocean Springs.  And the
20  context was there's somebody else that we're working
21  with and would it be okay if Signal relinquishes -- I
22  don't know if he used that term.
23      Q.   Yeah.  I'm following.
24      A.   That's the context.  Would Signal be
25  willing to relinquish its ability to sponsor the

Page 129

1   workers it's bringing over for green cards when it
2   comes time for green cards.  And I didn't understand
3   that, but it didn't seem logical to me that we would
4   spend all of this effort only to -- training the
5   workers and all of that, only to give them over to
6   somebody else when -- when something could be -- when
7   we might be able to -- why would we give them away?
8   It just didn't strike me as a proper question.
9       Q.   But Mr. Pol framed it in the sense that
10  these are the green card workers that you -- that he
11  wanted you to relinquish?
12      A.   No.  No, no, no.  The H-2B workers, when it
13  comes time for their green card application, will
14  Signal relinquish an ability to sponsor them so that
15  another company I'm working with can take them on a
16  green card basis after you've had them for an H-2B
17  process.  And that just didn't -- that confused me and
18  so I didn't know what to make of it.
19      Q.   So from that conversation you didn't
20  think -- did you think -- what did you think about
21  Signal and green cards?
22      A.   I thought -- well, again, that was the
23  first I'd heard of it, but my natural thought, being
24  brand-new to the whole process --
25      Q.   Absolutely.

Page 230

1    A.  I think I remember something with Dewan
2  that may have been that, but I don't remember the
3  exact term for it, as far as was it power of attorney,
4  was it something else.  So I don't remember.
5  EXAMINATION BY MR. SANDLER:
6    Q.  Okay.  So they told you only maybe about
7  Sachin Dewan, that there is something that might be a
8  power of attorney or some other -- What was the --
9  like what was the core of that thing, even if you
10  don't remember the name for it?
11    A.  I'm not -- I'm not -- I'm not sure.  I'm
12  just trying to tell you that there may have been
13  something, but I don't know the particulars of it,
14  can't remember the particulars of it.
15    Q.  And what did that something pertain to?
16    A.  I don't recall.
17    Q.  Why in the fourth sentence -- and I'll read
18  it.  You're talking still about the fee and you
19  thought that Signal thought it was about $3,000.  You
20  say, "This sounded like a reasonable fee, I'm sure."
21    A.  Yes.
22    Q.  Is that what you thought on the 17th?
23    A.  That $3,000 was reasonable?
24    Q.  Uh-huh (indicating affirmatively).
25    A.  Yes.

Page 231

1    Q.  For what did you think the workers were
2  buying?  What did you think they were buying for
3  $3,000 that you thought was reasonable?
4    A.  The plane ticket, the one-way plane ticket
5  to the United States, the processing fees --
6  processing fee for the H-2B visa, plus reasonable and
7  modest commission to Signal's recruiters whom they
8  were interacting with.
9    Q.  And what was the period of time that they
10  were buying in the U.S.?
11    A.  Ten months.
12    Q.  Right.  Okay.
13      I just want to be clear.  Contracting with
14  the recruiters, Sachin Dewan, Mr. Burnett, that's not
15  really part of your job, right?
16  MR. SHAPIRO:
17      Object to form.
18    A.  Correct.
19  EXAMINATION BY MR. SANDLER:
20    Q.  Your job is communication, point person?
21    A.  Yes.
22    Q.  What did you think -- Why did you think it
23  was important that the Indians received a refund?
24  MR. ALEXIS:
25      I'm sorry.  I couldn't hear the end of that

Page 232

1  question.
2  EXAMINATION BY MR. SANDLER:
3    Q.  Why do you think it was important that the
4  Indians received a refund?
5  MR. SHAPIRO:
6      Object to form.
7  EXAMINATION BY MR. SANDLER:
8    Q.  Let me -- Did you think it was important
9  that the Indians received a refund?
10  MR. SHAPIRO:
11      Object to form.
12    A.  Yes.
13  EXAMINATION BY MR. SANDLER:
14    Q.  Okay.  Why?
15    A.  Because that was way too much money to pay,
16  and we didn't want the workers to be so heavily
17  indebted.  We wanted this to be a win/win for the
18  Indian workers and Signal.
19    Q.  Okay.  Did the fees that they paid to
20  Michael Pol directly -- in your opinion, did the fees
21  they paid to Michael Pol directly impact their ability
22  to pay the $35 a day fee that Signal was going to
23  begin charging them?
24  MS. HANGARTNER:
25      Object to form.

Page 233

Sanders
233:6-21

1  MR. SANDLER:
2      Okay.
3  MS. HANGARTNER:
4      I mean, it's almost impossible to answer.
5  I mean --
6  EXAMINATION BY MR. SANDLER:
7    Q.  Well, let's read the first paragraph of the
8  e-mail.  Okay?  I'm just going to read it into the
9  record.
10      "Lisa, I was at the man camp yesterday
11  evening and got to meet the workers.  They complain
12  about the $35/day boarding charge.  After this is
13  deducted they say it's not worth their while
14  economically to be here.  Apparently that's because
15  they paid Global Resources a great deal of money to
16  get here, incurring a third-party debt in the process.
17  The North Indians I spoke with last night told me they
18  paid $12,000 to get here.  This morning an approved
19  worker from Chennai called me to say he's being asked
20  to pay 15,000 and can he come through Signal directly
21  to avoid the high recruiting fee (no)?"
22      I mean, in this paragraph, how are the --
23  What is the connection between the $35 a day boarding
24  charge and Michael Pol's fee?  Well, not Michael Pol's
25  fee.  The fee that the workers paid.

59 (Pages 230 to 233)

Page 234

1    A.    The fee that they actually paid instead of
2  what we had been told they paid.
3    Q.    The fees that they at that time were
4  telling you that they paid?  I think we're talking
5  about the --
6    A.    12 to $15,000 instead of 3,000 or so.
7    Q.    What is the connection between that fee and
8  the $35 a day fee?
9    A.    It's this:  That they had to make payments
10  on the 12 to $15,000 of debt.  And with their net pay,
11  having the 200 and maybe $45 a week, 35 times 7, taken
12  out, that reduced their net pay thereby impeding their
13  ability to make progress on the debt at the rate they
14  hoped.
15    Q.    Did you think the $35 a day fee was
16  important for Signal?
17    A.    Could you define what you mean by
18  "important"?
19    Q.    All right.  Let's do it the other way.
20         How much money -- and I realize, you know,
21  you may not know to the exact dollar, but how much
22  money had Signal paid for the GE Mod company to build
23  the man camp?
24    A.    Probably over a million dollars.
25    Q.    Okay.

Page 235

1    A.    And that was just for the -- for the
2  buildings.
3    Q.    How much in total do you think they paid?
4         I'm not quizzing you.  And if you don't
5  remember, it's fine.  You're not required to remember.
6    A.    I understand.  And I mean, those questions
7  should be deferred -- I would defer those questions to
8  our chief financial officer, Chris Cunningham, but the
9  amount was -- was very significant.
10    Q.    Okay.
11    A.    Into the millions of dollars --
12    Q.    Okay.
13    A.    -- is my understanding.
14    Q.    Right.  And this $35 a day -- well, let's
15  just call it a thousand fifty a month.  Because in
16  November and December it was that.
17    A.    Okay.
18    Q.    -- per worker, some of that was going to be
19  used to pay Signal back for the man camp.  And I can
20  even be more specific.  Earlier on today we agreed
21  that that was about $21 that was going to like living
22  and about 14 --
23    A.    Yes.
24    Q.    So let's just do $21 a day per worker
25  times, say, 30 days in the month.  That's like $630

Page 236

1  per worker that Signal was getting.  That money was
2  important -- well, was that money designed to go back
3  to the bill that had accrued from building the man
4  camp?
5    A.    Yes, but also to cover the operating
6  expenses involved with the camp.
7    Q.    So there was a capital expenditure and --
8    A.    And operating expense.
9    Q.    -- and a variable cost?
10    A.    Yes.

Sanders
236:11-237:13

11    Q.    Okay.  I want to ask you about the Chennai
12  worker who called you.  It's in that e-mail to Lisa.
13    A.    Yes.
14    Q.    You have in parens "no."  What does that
15  mean?
16    A.    That he can't come directly to Signal.  He
17  had to go through our recruiters.
18    Q.    And this was November 17th.  That was
19  Michael Pol?
20    A.    Yes.
21    Q.    Okay.  And you told him that on the phone?
22    A.    I told him that he can't come to Signal
23  directly.
24    Q.    Yeah.  On the phone?
25    A.    Yes.  I mean, I'm almost certain that it

Page 237

1  was a phone call because I would get them from time to
2  time.  And I'm pretty sure this would have been one.
3    Q.    All right.  How many other workers asked
4  you to come to Signal directly?
5         Let me rephrase.
6         Did other workers ask you to come to Signal
7  directly?
8    A.    Not -- not many, but probably more than
9  just this one.
10    Q.    Okay.
11    A.    I'd get a few phone calls.  Not many.
12    Q.    And your answer was consistent?
13    A.    Yes.
14    Q.    Okay.
15    A.    Yes.
16    Q.    All right.
17         Why -- Well, if we want to wrap for today,
18  then we can do that.
19    A.    Okay.
20    MR. SANDLER:
21         Can we go off the record?
22    THE VIDEOGRAPHER:
23         We're going off the record.  This is
24  Videotape No. 7.  It's 6:27.
25    (Deposition was adjourned at 6:27 p.m.)

60 (Pages 234 to 237)

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Page 238

```
 1
 2        WITNESS' CERTIFICATE
 3
 4
 5
 6        I, JOHN SANDERS, the undersigned, do hereby
 7   certify that I have read the foregoing deposition and
 8   it contains a true and correct transcript of the
 9   testimony given by me:
10
11
12
13   ( )  Without corrections.
14   ( )  With corrections as reflected on
15        the errata sheet(s) prepared by me
16        and made a part hereof.
17
18
19
20
21
22        --------------------------------
          WITNESS' SIGNATURE
23
24
25        --------------------------------
```

Page 239

```
 1
 2     REPORTER'S CERTIFICATE
 3
 4
 5     I, WENDY MAJORIA, Certified Court Reporter, in
 6   and for the State of Louisiana, as the officer before
 7   whom this testimony was taken, do hereby certify that
 8   JOHN SANDERS, after having been duly sworn by me upon
 9   authority of R.S. 37:2554, did testify as hereinabove
10   set forth in the foregoing 237 pages; that this
11   testimony was reported by me in the stenotype
12   reporting method, was prepared and transcribed by me
13   or under my personal direction and supervision, and is
14   a true and correct transcript to the best of my
15   ability and understanding; that I am not related to
16   counsel or to the parties hereto, nor am I otherwise
17   interested in the outcome of this matter.
18
19
20
21
       WENDY MAJORIA, CCR
22     Certified Court Reporter
       (No. 84106)
23     Huffman & Robinson, Inc.
       One Shell Square, Suite 250 Annex
24     New Orleans, Louisiana  70139
       (504) 525-1753   (800) 749-1753
25
```

61 (Pages 238 to 239)

# DEPOSITION EXCERPTS

## JOHN SANDERS

## Volume II (Nov. 20, 2009)

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
      KURIAN DAVID, SONY         *    CIVIL ACTION
 4    VASUDEVAN SULEKHA,         *    NO. 08-1220
      PALANYANDI THANGAMANI,     *
 5    MARUGANANTHAM KANDHASAMY,  *    SECTION:  "A"
      HEMANT KHUTTAN, ANDREWS    *
 6    ISSAC PADA VEETTIYL, AND   *    MAGISTRATE:  3
      DHANANJAYA KECHURA, ON     *
 7    BEHALF OF OTHER SIMILARLY  *
      SITUATED INDIVIDUALS, AND  *
 8    SABULAL VIJAYAN, KRISHAN   *
      KUMAR, JACOB JOSEPH        *
 9    KADDAKKARAPPALLY, KULDEEP  *
      SINGH, AND THANASEKAR      *
10    CHELLAPPAN, INDIVIDUALLY,  *
          PLAINTIFFS             *
11                               *
      VERSUS                     *
12                               *
      SIGNAL INTERNATIONAL, L.L.C.,  *
13    MALVERN C. BURNETT,        *
      GULF COAST IMMIGRATION LAW *
14    CENTER, L.L.C., LAW OFFICES *
      OF MALVERN C. BURNETT,     *
15    A.P.C., INDO-AMERI SOFT,   *
      L.L.C., KURELLA RAO, J & M *
16    ASSOCIATES, INC. OF        *
      MISSISSIPPI, GLOBAL        *
17    RESOURCES, INC., MICHAEL POL, *
      SACHIN DEWAN, AND DEWAN    *
18    CONSULTANTS PVT. LTD.(a/k/a *
      MEDTECH CONSULTANTS),      *
19        DEFENDANTS.            *
                                 *
20    *  *  *  *  *  *  *  *  *  *   *
21
                        VOLUME II
22
              Deposition of JOHN SANDERS, c/o Tracy
23    Binion, 601 Bayou Cassotte Parkway, Pascagoula,
      Mississippi 39581, taken in the offices of Middleberg,
24    Riddle & Gianna, 31st Floor, 201 St. Charles Avenue,
      New Orleans, Louisiana 70170, commencing at 9:44
25    o'clock a.m., on Friday, the 20th day of November,
```

Page 18

1    Was that an issue with the previous -- the
2 man camps built under GE, the number of toilet, sink
3 and shower buildings?
4    A.  No.  We felt -- Again, we were doing it for
5 the very first time --
6    Q.  In '06?
7    A.  In '06 -- and went with, you know, the best
8 recommendations that we could come up with, which I
9 think included GE's input.
10    Q.  Okay.  And the next sentence, "That's
11 important because we get one chance to do it right,
12 and it happened because I went out to the camp after
13 hours and spoke with about 30 Indians."
14    Okay.  So you consulted the people who were
15 living there to see kind of the needs that were
16 required?
17    A.  Yes.
18    Q.  Okay.  Is that because under the GE --
19 under the man camps that were previous to this, the GE
20 man camps, the man camps built by GE, there was an
21 issue as to these factors?
22    A.  Yes.  When we specified the number of, you
23 know, toilet, sink, shower facilities, et cetera, with
24 what we gave to GE, like I said, we did that based on,
25 you know, the best input that we could receive.  But

Page 19

1 there were no workers to give input who were living in
2 them day by day.
3    Q.  Right.  So now you had an opportunity to
4 get feedback, so you took that opportunity to make it
5 more appropriate, so to speak.
6    A.  Yes.  And I involved the Indians because
7 they were the ones who would know best.  And we wanted
8 to satisfy their needs and fix everything in the very
9 best way for them.
10    Q.  Yeah.
11    So -- Okay.  I just wanted to introduce
12 another document, SIGE0556991.  And this will be
13 Exhibit 621.
14    Read over it.
15    (Whereupon, the document as described above
16 is marked as "Exhibit No. 621.")
17    A.  (Witness reviews document.)
18    I've read the document.
19 EXAMINATION BY MR. SANDLER:
20    Q.  Okay.  So I'm concerned with the paragraph
21 on the 991 page.  And for the record, at the bottom
22 here it says, "Thursday, February 8th, 2007."  And
23 then there's nothing there and then if you turn over,
24 it goes to February 7th, 2007.
25    So I'm going to state -- and you can

Page 20

1 contradict me and then we can get more documents if
2 you do -- that this is from February 9th, 2007.
3    A.  That would be my presumption as well.
4    Q.  Okay.  Okay.  So I'm just going to read a
5 bit and then we'll talk.
6    "Our Indians have been dropping with
7 sickness like flies.  Two Sundays ago," someone who's
8 been redacted out, "got double pneumonia.  Someone in
9 Wave 9 broke his ankle.  Someone else in it got a
10 staph infection last week and almost had to be
11 hospitalized."  A redacted person "had a virus attack
12 his heart and had to be put in the hospital today
13 since he was subject to 'spontaneous heart failure' at
14 any moment."
15    I'm skipping one sentence.
16    "The Indians are getting worried and
17 believe there are unhealthful conditions in the camp.
18 It is true.  The reason is because the plumbing was so
19 shoddily done by GE's subcontractors, and water has
20 leaked everywhere and stagnated as a result, which
21 serves as a bacterial breeding ground.  As I was out
22 at Bunk-house 16 today, one of the workers came up to
23 me and said many of them are getting sores such as
24 they have not had before.  Even myself, I have noticed
25 between today and yesterday that a couple of pimples

Page 21

1 have broken out on my legs which appear to have a
2 black center.  I suspect may be a staph infection.  It
3 is a very serious matter, most of all because of the
4 impact it will have on the Indians' morale if it
5 continues."
6    Did that staph infection that you
7 suspected, did it become a staph infection?
8    A.  It proved not to be.
9    Q.  Okay.  So was this -- This was just the
10 result of like what you had been seeing going on at
11 the man camp, people were being hospitalized, people
12 were getting sick?
13    A.  Could you repeat the question?
14    Q.  I don't know that I asked a question,
15 but --
16    What did you mean by "Indians have been
17 dropping with sickness like flies"?
18    A.  That there seemed to be a higher than I
19 would have expected number coming down with various
20 forms of illness.
21    Q.  And in fairness to what you said earlier,
22 that it seems to be related to a plumbing issue?
23    A.  Well, that's what I -- that's what I
24 thought at the time that I wrote this.
25    Q.  Uh-huh (indicating affirmatively).

6 (Pages 18 to 21)

Page 78

1    certification purposes only.
2        So to the extent that someone attempts to
3    use this deposition for merits or deprives me of
4    my opportunity to seek merits discovery, I will
5    object.  And that's the only reason I am now
6    raising the subject.
7    MS. TSU:
8        Understood.  And I can tell you that I
9    don't see -- I don't foresee plaintiffs opposing
10   you noticing Mr. Sanders' deposition or
11   subpoenaing him as a witness.  So I don't think
12   that this will in any way prejudice your rights.
13   MR. KUPPERMAN:
14       Well, I appreciate your thought about
15   whether it will or will not prejudice me or
16   whether I have the obligation or the right to
17   subpoena him or notice him for deposition, but
18   that really is not the question.
19       The question is is this being taken for
20   class purposes only, which is my understanding of
21   what the order from the judge says.  And I would
22   like a confirmation on that.
23   MS. TSU:
24       This is being done for class certification.
25   MR. SANDLER:

Page 79

1        We contend that these questions all pertain
2    to class.
3    MR. KUPPERMAN:
4        Okay.  So as far as you are concerned, this
5    is being taken for class certification purposes
6    only.
7    MR. SANDLER:
8        If the -- We're asking questions that
9    pertain to class.
10   MR. KUPPERMAN:
11       Okay.  As long as we do have an
12   understanding that we are reserving our questions
13   on the merits by and large until a subsequent
14   time because we understand that these questions
15   are being posed for class certification issues.
16   MR. SANDLER:
17       We have no problem with you reserving on
18   that.
19   MR. ALEXIS:
20       For the record, this is Ralph Alexis.  And
21   I would just like to say that that has been my
22   understanding about every deposition we have
23   taken is that it is only for class certification.
24   MR. KUPPERMAN:
25       Mine, too.

Page 80

1    MR. SANDLER:
2        And that's why, I mean, now we're three
3    quarters of the way through the deposition of
4    Mr. Sanders and we're hearing about it for the
5    first time.
6    MR. KUPPERMAN:
7        No, not really, because that's always
8    been --
9    MR. SANDLER:
10       Right.  That's because it was your
11   understanding the whole time.  So nothing has
12   been established right now that differs from your
13   understanding prior.
14   MR. KUPPERMAN:
15       Okay.
16   EXAMINATION BY MR. SANDLER:
17   Q.   Okay, Mr. Sanders.
18   A.   Yes.
19   Q.   I just want to clear up something we were
20   discussing right before lunch.  You said that when you
21   were doing the man camp, prep work for it and getting
22   the vendors in and all that, you said earlier that the
23   final determinant was -- we were talking about the
24   OSHA document, and we were talking whether those were
25   requirements or whether they were guidelines or a

Page 81

Sanders 81:4-20

1    checklist.
2        Do you recall that conversation we had?
3    A.   Yes.
4    Q.   And I think you said -- and correct me if
5    I'm wrong -- that the final determinant was the
6    Pascagoula City Council or someone in Pascagoula to
7    determine the standard, and the OSHA was just
8    another -- another entity or element that you were
9    considering as well?  Is that -- I need you to
10   elaborate because I don't think I understood.
11   A.   Okay.  The OSHA information was used as a
12   reference for us because there were aspects of it
13   which clearly did not apply.  There were others which
14   we -- which we reviewed and had questions about.
15       But as far as whether the camp met
16   liveability and suitability for its purpose, we wanted
17   to ensure that we conformed to the codes of the City
18   of Pascagoula as far as their building inspector as
19   well as -- if I could add this part too -- the fire
20   marshal, what he required.
21   Q.   Actually, that was my next question.  Who
22   at the City of Pascagoula were you like in contact
23   with or who was the liaison?
24   A.   There were -- There were two entities.  One
25   was building inspector individuals.  I don't remember

21 (Pages 78 to 81)

Page 82

1  their names.  The other was the fire chief or fire
2  marshal.  And Todd McClum, I believe, may have been
3  his name.
4      Q.   Okay.  So he's the fire chief?
5      A.   Yes.
6      Q.   He's one entity and then there is a housing
7  inspector?
8      A.   A building inspector.
9      Q.   A building inspector.
10     A.   Yes.  And we felt that if we satisfied
11 their requirements, that we would be in accordance
12 with the guidelines that were imposed.
13     Q.   Okay.  So I just wanted to get a sense of
14 what the thinking was at the time.
15     A.   (Witness nods head affirmatively.)
16     Q.   You're nodding?
17     A.   Yes.
18     Q.   And that was the thinking?
19     A.   Yes.
20     Q.   All right.  I just want to switch back.
21 We're going to go back and forth.  I just want to go
22 back into this document.  It's the OSHA standards.
23     A.   Okay.
24     Q.   I think it was the last exhibit we were
25 looking at.

Page 84

1  is approximately 17.
2      Q.   Okay.  I know there's like a decimal in
3  there and so it's not exactly, but approximately.
4      A.   Approximately 17.
5      Q.   And that's by this document.  That's what
6  you get from following the standards that are laid out
7  here?
8      A.   Yes.
9      Q.   Okay.  Okay, Mr. Sanders.  I want to enter
10 a document, SIGE0010567 and that goes up to 71.
11     MR. KUPPERMAN:
12         Seven --
13     MR. SANDLER:
14         71.  There's four pages.
15         This will be Exhibit 631.  I'll have you
16 take a look at it.  It's an e-mail thread.
17         (Whereupon, the document as described above
18 is marked as "Exhibit No. 631.")
19     MS. TSU:
20         Oh, stop.
21         Can I see that, please?
22     MR. ALEXIS:
23         This one?
24     MS. TSU:
25         Yeah.  Can I have it?

Page 83

**Sanders 83:2-84:8**

1      A.   Yes.
2      Q.   For the record, it's Exhibit No. 630.  And
3  I just want to go to Bates page SIGE0000322.
4          And do you see No. 21 there, Point No. 21?
5      A.   Yes.
6      Q.   All right.  "Does each room used for
7  sleeping --" I'm reading from it now.  Sorry.  "Does
8  each room used for sleeping purposes contain at least
9  50 square feet of floor space for each occupant?"
10 I want to ask you about this
11 handwriting here.  Is that your handwriting?
12     A.   Yes.
13     Q.   Okay.  Can you just explain to me the
14 formula that you're using here and just what the
15 numbers represent?
16     A.   Yes.  The square footage of each bunkhouse
17 was 864 gained by multiplying 24 by 36.
18     Q.   And this is feet?
19     A.   Square feet.
20     Q.   Okay.
21     A.   Yes.  And so per this, this document, this
22 reference document, we took 864 and divided it by the
23 50.  In other words, how many men according to this
24 could -- could sleep in or were recommended for
25 sleeping in an 864-square-foot area.  And the answer

Page 85

1      MS. HANGARTNER:
2          This is going to be yours.  Sorry.
3      MR. SANDLER:
4          Sorry.
5      MS. HANGARTNER:
6          I'm not trying to make it more difficult.
7      MR. SANDLER:
8          Oh, I see.  Sorry.
9  EXAMINATION BY MR. SANDLER:
10     Q.   Mr. Sanders, have you --
11     A.   I have read the document.
12     Q.   We may come back to it.  I just want to ask
13 you about one question on it.
14         In SIGE0010567, it's the front page, the
15 e-mail that starts at the bottom and then obviously
16 goes on to a second page is from Rhonda George.
17         Who is Rhonda George?
18     A.   I've not ever met her, but my understanding
19 is that she was the workers' housing facility in this
20 time frame of the e-mail in Mississippi.
21     Q.   Okay.  So in her e-mail, March 19th,
22 2008 -- I'm just going to read it quickly and then --
23 sort of read the relevant part.
24         "I also would like you to know that I
25 addressed the issue of the Man Camp not complying with

22 (Pages 82 to 85)

Page 246

```
 1        Sounds great.
 2   MR. SHAPIRO:
 3        We'll do that for you.
 4   THE WITNESS:
 5        Okay.
 6   MR. KUPPERMAN:
 7        Again, for the record, my understanding is
 8   we're going to stop.  We're already late from
 9   where we said we were going to stop.  Ralph still
10   has or may still have questions.  So when we
11   reconvene, whenever that may be, Ralph -- Ralph
12   will have -- finish up with his questions, Steve
13   and I have some questions, and I guess Erin may
14   have some she wants to ask, too.
15   MS. HANGARTNER:
16        Yes.
17   MR. KUPPERMAN:
18        Thanks very much.
19   MR. ALEXIS:
20        Mr. Sanders, thank you very much.
21   THE VIDEOGRAPHER:
22        This is the conclusion of the deposition
23   today.  We're going off the record.  It's 7:28.
24   This is the end of Videotape No. 8.
25        (Deposition was adjourned at 7:28 p.m.)
```

Page 247

```
 1            WITNESS' CERTIFICATE
 2
 3
 4
 5        I, JOHN SANDERS, the undersigned, do hereby
 6   certify that I have read the foregoing deposition and
 7   it contains a true and correct transcript of the
 8   testimony given by me:
 9
10
11
12   ( )  Without corrections.
13   ( )  With corrections as reflected on
14        the errata sheet(s) prepared by me
15        and made a part hereof.
16
17
18
19
20
21   ----------------------------------
22        WITNESS' SIGNATURE
23
24   ----------------------------------
25        DATE
```

Page 248

```
 1            REPORTER'S CERTIFICATE
 2
 3
 4        I, WENDY MAJORIA, Certified Court Reporter, in
 5   and for the State of Louisiana, as the officer before
 6   whom this testimony was taken, do hereby certify that
 7   JOHN SANDERS, after having been duly sworn by me upon
 8   authority of R.S. 37:2554, did testify as hereinabove
 9   set forth in the foregoing 246 pages; that this
10   testimony was reported by me in the stenotype
11   reporting method, was prepared and transcribed by me
12   or under my personal direction and supervision, and is
13   a true and correct transcript to the best of my
14   ability and understanding; that I am not related to
15   counsel or to the parties hereto, nor am I otherwise
16   interested in the outcome of this matter.
17
18
19
20
21        WENDY MAJORIA, CCR
          Certified Court Reporter
22        (No. 84106)
          Huffman & Robinson, Inc.
23        One Shell Square, Suite 250 Annex
          New Orleans, Louisiana  70139
24        (504) 525-1753    (800) 749-1753
25
```

63 (Pages 246 to 248)

# DEPOSITION EXCERPTS

## JOHN SANDERS

## Volume III (Jan. 20, 2010)

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
       KURIAN DAVID, SONY            CIVIL ACTION
 4     VASUDEVAN SULEKHA,
       PALANYANDI THANGAMANI,        NO. 08-1220
 5     MARUGANANTHAM KANDHASAMY,
       HEMANT KHUTTAN, ANDREWS       SECTION "A"
 6     ISSAC PADA VEETTIYL, AND
       DHANANJAYA KECHURA, ON        MAGISTRATE 3
 7     BEHALF OF OTHER SIMILARLY
       SITUATED INDIVIDUALS, AND
 8     SABULAL VIJAYAN, KRISHAN
       KUMAR, JACOB JOSEPH
 9     KADDAKKARAPPALLY, KULDEEP
       SINGH, AND THANASEKAR
10     CHELLAPPAN, INDIVIDUALLY,
11              PLAINTIFFS
12     VERSUS
13     SIGNAL INTERNATIONAL,
       LLC, MALVERN C. BURNETT,
14     GULF COAST IMMIGRATION
       LAW CENTER, L.L.C., LAW
15     OFFICES OF MALVERN C.
       BURNETT, A.P.C.,
16     INDO-AMERI SOFT L.L.C.,
       KURELLA RAO, J & M
17     ASSOCIATES, INC. OF
       MISSISSIPPI, GLOBAL
18     RESOURCES, INC., MICHAEL
       POL, SACHIN DEWAN, AND        VOLUME 3
19     DEWAN CONSULTANTS PVT.
       LTD. (a/k/a MEDTECH
20     CONSULTANTS).
21              DEFENDANTS.
22
           Deposition of JOHN SANDERS,
23                                          ,
       taken in the offices of Middleberg, Riddle &
24     Gianna, 31st Floor, 201 St. Charles Avenue, New
       Orleans, Louisiana  70170, on Wednesday, the 20th
25     day of January, 2010, beginning at 9:40 a.m.
```

Page 62

1 that we tried very hard from the start and all
2 the way to show the workers we cared about them.
3 EXAMINATION BY MR. KUPPERMAN:
4     Q.   There was no scheme or plan
5 involving Mr. Pol that was ever intended to
6 coerce anybody into believing they would suffer
7 serious harm if they left the man camps; is that
8 fair?
9     MR. SANDLER:
10         Object to form.
11     MS. HANGARTNER:
12         Object to form.
13     A.   I'm sorry.  Could you repeat?
14 EXAMINATION BY MR. KUPPERMAN:
15     Q.   Sure.  You're not aware of any
16 scheme or plan that involved Mr. Pol that was
17 intended to coerce any of the Indian workers into
18 believing they would suffer serious harm if they
19 left Signal's employ, correct?
20     MR. SANDLER:
21         Object to form.
22     A.   I'm not aware of one.
23 EXAMINATION BY MR. KUPPERMAN:
24     Q.   And, in fact, you're not aware of
25 any conspiracy involving Mr. Pol, correct?

Page 63

Sanders
63:19-64:19

1     MR. SANDLER:
2         Object to form.
3     A.   When you say "conspiracy," could you
4 define the parameters of conspiracy and so forth?
5 EXAMINATION BY MR. KUPPERMAN:
6     Q.   Yeah, but let me move on because --
7 let me ask you this:  You are not aware --
8     A.   Because I do think he had a
9 conspiracy.  I just don't know that it related to
10 what might happen to Indian workers if they left
11 Signal's employ.  I don't know.
12     Q.   Now, you say you think he had a
13 conspiracy.  Did anyone ever tell you that Mr.
14 Pol -- did Mr. Pol -- scratch that.
15         Who do you believe he conspired
16 with?
17     A.   With Dewan Consultants and with
18 Malvern Burnett's law firm.
19     Q.   And did Mr. Burnett, Mr. Dewan, Mr.
20 Pol or anyone connected with them ever tell you
21 that there was a conspiracy?
22     A.   No.
23     Q.   Okay.  And your view that there was
24 a conspiracy is based on your own personal
25 deduction and opinions; is that fair?

Page 64

1     A.   Not only that.  I would say that Mr.
2 Pol himself in the -- in the meeting with Signal
3 on 11/20/06, he said that he had told us that the
4 amount was 2,000 or $3,000, but then, you know,
5 that it was really 10,000, and he didn't know
6 what Sachin was charging and so forth, but that
7 there had been -- so, he told us -- he told us
8 one thing and yet in that meeting, it came out
9 that it was higher, and we learned that it was
10 even higher still.  And, so, why would he tell us
11 one thing, and then outside of Signal's
12 knowledge, because, again, as our -- as Signal's
13 recruiters, it was what -- what they did was
14 black box to us.  So, it was a conspiracy in the
15 sense that let's tell Signal one thing and then
16 once they agree to have the workers, well, we'll
17 actually charge the workers much more and bring
18 them into Signal.  So, I do see a conspiracy in
19 that sense.
20     Q.   And, obviously, you're not offering
21 any legal opinion, right?
22     MR. SANDLER:
23         Object to form.
24 EXAMINATION BY MR. KUPPERMAN:
25     Q.   You're not a lawyer?

Page 65

1     A.   I'm not.
2     Q.   Okay.  Let me ask you this:  When
3 you referred a minute ago to what Mr. Pol had
4 stated earlier when he told Signal one thing and
5 then it turned out it was something else --
6     A.   Yes.
7     Q.   Okay.  You're referring to the
8 conversation between Mr. Pol and Mr. Bingle
9 before any of the workers came to the United
10 States; is that fair?
11     A.   Yes.
12     Q.   Okay.  Is there anything else that
13 you're referring to other than that one
14 conversation between Mr. Pol and Mr. Bingle?
15     A.   That's the -- that's what we have in
16 writing, just the general perspective that -- or
17 the general sense that I'm trying to convey is
18 that Michael Pol --
19     Q.   I know the general sense.  I'm
20 trying to pinpoint a specific conversation
21 between Mr. Pol and someone else at Signal, and
22 my question to you is:  The only one you're aware
23 of before any of the workers came to the United
24 States is this one conversation between Mr.
25 Bingle and Mr. Pol, correct?

17 (Pages 62 to 65)

Page 166

1  don't know exactly how much either of those two
2  workers had to borrow to come up with the total.
3  I don't know.
4  EXAMINATION BY MR. SHAPIRO:
5      Q.   You just accepted the fact that this
6  is what they told you and this was correct?
7      A.   Well, I accepted it was correct
8  because when they told me that they had -- in the
9  same conversation, if they're telling me we paid
10 more than the two to $3,000 that Global Resources
11 has told you, here's the proof, you want to see
12 receipts --
13     MR. SANDLER:
14         Objection.  Counsel for Mr.
15 Pol has just stepped out of the
16 room -- if you want to wait for
17 him to come back.
18     THE WITNESS:
19         It's up to you, Mr. Shapiro.
20     MR. SANDLER:
21         I'm not sure that it is.
22     MS. HANGARTNER:
23         Because he represents
24 Michael Pol.  If you're discussing
25 Michael Pol --

Page 167

1      THE WITNESS:
2          Yeah, I can wait.
3      MR. SHAPIRO:
4          I guess he had to go out on
5  an emergency.
6      MR. SANDLER:
7          We'll probably pick up
8  right -- right where you left off.
9      THE WITNESS:
10         Okay.
11     MS. TSU:
12         Can we go off the record for
13 a moment?
14     THE VIDEOGRAPHER:
15         Off the record.  The time is
16 3:09.  This is the end of Tape 5.
17         (Whereupon, a discussion was
18 held off the record.)
19     THE VIDEOGRAPHER:
20         This is the continued
21 videotaped deposition of John
22 Sanders.  This is the beginning of
23 Tape 6.  The time is now 3:20.
24 EXAMINATION BY MR. SHAPIRO:
25     Q.   Okay.  Mr. Sanders, you indicated

Sanders
167:25-170:3

Page 168

1  that you had spoken with two Signal workers about
2  the debt they incurred in order to afford the
3  recruitment, legal and broker fee in order to be
4  able to come over to Signal; is that correct?
5      A.   More specifically, about the amount
6  that they paid, and then it was with the group of
7  workers clustered around me on that day that they
8  told me that they had variously had to come up
9  with money from land that they owned or borrow
10 from relatives or sell jewelry or borrow at
11 usurious interest rates, but I don't remember
12 that it was specifically those two workers that
13 told me that, just the group gathered around me.
14     Q.   Okay.  And that's one group out of
15 the entire man camp?
16     A.   A representative group.
17     Q.   Why do you characterize that group
18 as a representative group?
19     A.   Well, the group was different in
20 many ways, but they did share in common the fact
21 that they had to come up with many thousands of
22 dollars from somewhere and that their way of
23 getting that, of course, is going to vary by the
24 person, but that those ways encompassed the
25 things I just described.

Page 169

1      Q.   Did you ask each one of them how
2  much they had to borrow, how much jewelry they
3  had to sell or what they had to do to come up
4  with the money to be able to pay the recruitment,
5  legal, the broker fees?
6      A.   Each one, no.
7      Q.   Okay.  Did you ask -- so, are you
8  saying that they all shouted at you en masse,
9  indicating that they had paid -- they had
10 borrowed a lot of money and sold their wives'
11 jewelry and did all sorts of things to come up
12 with money to pay for the recruitment, legal and
13 broker fees?
14     A.   They were -- I wouldn't say they
15 were shouting at me, but that was information
16 that I garnered from that interaction and there
17 were other interactions, for instance, with Sony,
18 whose last name begins with V -- he was Worker
19 500173, if I remember, that he had to borrow
20 money at usurious interest rates, if I'm
21 remembering correctly, and then there were just
22 other workers who, in the course of my time as
23 the manager over the housing facility, that would
24 tell me the same thing.  So, I viewed it as a
25 common situation among the workers that many of

43 (Pages 166 to 169)

Page 170

1   them, even the majority, had had to come up with
2   the money, the thousands of dollars in these
3   various ways.
4       Q.   It was pretty important to you when
5   you heard them -- when I say "them," talking
6   about the workers at Signal who approached you or
7   you approached them, however you approached each
8   other -- when they shared with you they borrowed
9   a lot of money to pay these fees, that was pretty
10  important to you, wasn't it?
11      A.   Yes.
12      Q.   And why was that so important to
13  you?
14      A.   Because I cared about them and
15  wanted them to be treated fairly.
16      Q.   Okay.  And did you ask them to give
17  you any documents showing that they had borrowed
18  this kind of money?
19      A.   No.
20      Q.   Did you ask them for any documents
21  showing that they had sold jewelry or done
22  anything else in order to come up with money to
23  pay for the recruitment, legal and broker fees?
24      A.   No.  As far as borrowing the money,
25  no, just that they had obviously gotten it from

Page 171

1   somewhere in order to have the receipts that they
2   did.  The receipts for having -- the Indian
3   workers having the receipts for monies paid to
4   Michael Pol, Malvern Burnett and Dewan
5   Consulting.  They got that money from somewhere.
6   They told me that they got it from these
7   different ways described.  And so although I
8   didn't see receipts of land mortgages or jewelry
9   sales or contracts with -- with a high-interest
10  lender, I didn't see those, but, certainly, they
11  got the money from somewhere and were, in these
12  two examples, showing me quite credibly that what
13  they said was true.  I took what they told me
14  about -- I took what that group of workers told
15  me is here's how we got it at face value, that
16  those were ways that they really did engage in
17  borrowing the money or getting the money.
18      Q.   Firstly, please tell me why you felt
19  that these two individuals were so credible in
20  your mind.
21      A.   Because they said we have paid
22  thousands of dollars.  Do you want to see the --
23  do you want to see the proof?  Yes, I said.  And,
24  so, they were able to produce it from their
25  personal documents right there in front of me and

Page 172

1   show it to me.
2       Q.   And yet you didn't ask them for any
3   proof about the debt they incurred or the land
4   sold or the jewelry sold?
5       A.   Correct.
6       Q.   You just accepted their word?
7       A.   Because they had proven their
8   credibility in that sense, and so, I didn't ask
9   for the other documents that -- for other
10  documents that might have shown receipts from the
11  way that they got the money.
12      Q.   You had no personal knowledge about
13  their financial backgrounds or anything of that
14  nature that -- how they might have been able to
15  come up with money by any other means?
16      A.   Other than what they told me, that
17  was what I based things on.
18      Q.   And you took it upon yourself to
19  accept the word of two workers as a
20  representative of a group of workers?
21      A.   No.  I only had -- all of the
22  workers were telling me the same thing, that they
23  had had to pay many, many thousands of dollars.
24  And, so, I said, show me, and these two workers
25  did exactly that, and if I had wanted more, I

Sanders
172:18-173:7

Page 173

1   could have requested more, but the pattern was
2   clear, and the pattern shows that the total
3   amount paid by these workers was far higher,
4   multiples higher, than the two to $3,000 that
5   Michael Pol told Signal and that Signal believed
6   to be true that our whole acceptance of this plan
7   was -- was predicated on.
8       Q.   Getting back to the original
9   question, that is, you accepted the word of two
10  individuals and deemed them to be representative
11  of a much larger group of workers; is that
12  correct?  Is that correct, yes or no?
13      A.   As a concept of them paying more
14  money than we had been told, yes.
15      MR. SANDLER:
16          Just for a second, she
17      stepped out.
18      MS. HANGARTNER:
19          Can we go off the record
20      real quick?
21      THE VIDEOGRAPHER:
22          Off the record.  The time is
23      3:29.
24          (Whereupon, a discussion was
25      held off the record.)

Page 198

1      A.   Yes.
2   EXAMINATION BY MR. SANDLER:
3      Q.   Many, all -- and I'm talking about
4   large meetings where most all of the Indian
5   workers would be in attendance.
6      A.   Most of those meetings, I was there.
7   The main block of time that I was not there was
8   approximately three weeks, when I was on vacation
9   in Africa.
10      Q.   Right.  And those three weeks ended
11   when?
12      A.   Approximately March 10th or 11th.
13      Q.   Okay.
14      A.   Of 2007.
15      Q.   Okay.  So, I think Mr. Kupperman
16   also asked you if workers were ever forced -- I
17   think he was trying to use the term forced labor,
18   and he was like were they ever forced through
19   fear or coerced to work at Signal, and you said
20   no, you had not seen any of that.  Do you recall
21   that?
22      MR. KUPPERMAN:
23         Object to form of the
24   question.
25      A.   Yes.

Page 200

1      A.   Many voiced that concern.
2      Q.   Okay.  And I think we kind of went
3   over this with Mr. Shapiro as well, but as to the
4   issue of cost that they had paid to come over,
5   did many, all voice a concern about the expense
6   that they had incurred to afford the opportunity
7   to come to Signal?
8      A.   Yes, but the amounts that they paid
9   were different, the time that they paid those
10   amounts were different.
11      Q.   But they all were concerned about --
12   that the costs were high?
13      MR. ALEXIS:
14         Object to form.
15      MR. KUPPERMAN:
16         Object to form of the
17   question.
18      A.   Yes, they were concerned.  The
19   Indian workers were concerned.
20   EXAMINATION BY MR. SANDLER:
21      Q.   I think with Mr. Kupperman as well,
22   he had asked you -- you were talking about an
23   e-mail, and he had asked you about an explanation
24   you had given that one worker had explained to
25   you that if he could get one extension, the

Sanders
199:5-200:19

Page 199

1   EXAMINATION BY MR. SANDLER:
2      Q.   I just want to confirm, you were not
3   at Signal on March 9th, 2007?
4      A.   I was not.
5      Q.   Mr. Kupperman also asked you about
6   the issues workers had, and he had indicated that
7   perhaps some of them -- the Indians had different
8   issues from -- amongst each other, they didn't
9   all have the same issues when they were coming to
10   you with complaints, et cetera.  Do you recall
11   that portion of the conversation with Mr.
12   Kupperman earlier today?
13      A.   Not so much that they weren't coming
14   to me with -- when they were coming to me with
15   complaints, but just that the workers were
16   different one from another in many ways.
17      Q.   Okay.
18      A.   I did -- I did agree with him on
19   that.
20      Q.   Okay.  So, what I want to ask are
21   some of the issues, I'm going to ask you if they
22   were the same or if they were different amongst
23   the workers.  So, the expectation of permanent
24   visa, was that an issue that all of the workers
25   who came to you had?

Page 201

1   economics would work out.  Do you recall that
2   conversation?
3      MR. ALEXIS:
4         Object to form.
5      A.   Yes.
6   EXAMINATION BY MR. SANDLER:
7      Q.   I just want to get the record
8   straight, that was one individual worker who said
9   that to you?
10      MR. KUPPERMAN:
11         Object to the form.
12      A.   One that I remember specifically.
13   EXAMINATION BY MR. SANDLER:
14      Q.   Maybe I'll be more clear.  When you
15   wrote that e-mail, you were talking about a
16   conversation you had with one worker; is that
17   right?
18      A.   Yes.
19      Q.   Okay.  And I'm going to enter a
20   document here, and for the record, the Bates on
21   it is SIGE0005083, and it will be Exhibit Number
22   700.  I'm just going to ask you to look it over
23   and then we can talk about it.  And it's two
24   sides, and I brought copies for everyone.
25         (Whereupon, Exhibit Number

51 (Pages 198 to 201)

Page 202

```
 1        700 was marked for identification.)
 2    A.   Okay.
 3    MR. KUPPERMAN:
 4        This is 700?
 5    MR. SANDLER:
 6        Yeah, the Excel spreadsheet
 7    is 700.
 8    MR. ALEXIS:
 9        We need one more.
10    MR. SANDLER:
11        And it's two-sided, for the
12    record.
13    MR. ALEXIS:
14        It's Exhibit 700?
15    MR. SANDLER:
16        It's Exhibit 700.
17    A.   I've reviewed the document.
18    EXAMINATION BY MR. SANDLER:
19    Q.   Okay.  Both sides?
20    A.   Yes.
21    Q.   Okay.  During Mr. Shapiro's -- while
22    Mr. Shapiro was deposing you, you had talk -- he
23    had referred to two particular workers for whom
24    you had recorded the fees, et cetera, and then
25    you had memorialized it somehow.  Is that what
```

Sanders
202:16-205:3

Page 203

```
 1    this document is?
 2    A.   Yes.
 3    Q.   Okay.  So, you drafted this
 4    document?
 5    A.   I did.
 6    Q.   Do you recall when?
 7    A.   Yes.
 8    Q.   When?
 9    A.   Mid-November, 2006.
10    Q.   Okay.  And just for the record, this
11    document is a breakdown of the recruiting fees
12    paid by the Indian workers.
13    MR. ALEXIS:
14        Object to form.
15    A.   Yes, and there's also an entry about
16    airfare, $1,289.
17    EXAMINATION BY MR. SANDLER:
18    Q.   Okay.  So, it's recruiting fees and
19    travel to get to the U.S.?
20    A.   Yes.
21    Q.   Okay.  What do the Employee Number
22    79 and 42 signify?
23    MR. ALEXIS:
24        Object to form.
25    A.   An abbreviation where 79 would be
```

Page 204

```
 1    I'm almost certain of this, 500179.
 2    EXAMINATION BY MR. SANDLER:
 3    Q.   Okay.
 4    A.   And Employee Number 42 would be
 5    500142.  And, so, Employee 79 is Thampy.
 6    Q.   Okay.
 7    A.   That -- I think the cross-
 8    referencing will confirm that.
 9    Q.   Sure.  Who did you show this
10    document to?
11    A.   I showed it to Signal management;
12    specifically, Bill Bingle, Ron Schnoor and Lisa
13    Spears.
14    Q.   Is that all?
15    A.   I don't think Darrell was quite
16    involved at this point, so, those would be the
17    three that I remember.
18    Q.   And Lisa Spears works directly under
19    Chris Cunningham; is that right?
20    A.   Yes, I believe that she does.
21    Q.   Or at least did at that time?
22    A.   Yes.
23    Q.   Okay.  So, you didn't show it to Mr.
24    Cunningham, necessarily?
25    A.   No.  No.
```

Page 205

```
 1    Q.   Okay.
 2    A.   But Ron was -- Ron Schnoor was my
 3    direct manager and, so, I showed it to him.
 4    Q.   Mr. Kupperman and you and I also
 5    believe you and Mr. Shapiro and you discussed
 6    this $10,000 number as a fee that Mr. Pol had
 7    said was paid by the workers?
 8    A.   Yes.
 9    Q.   Okay.  So, does this document
10    contradict that number?
11    MR. SHAPIRO:
12        Object to form.
13    MR. KUPPERMAN:
14        Object to form of the
15    question.
16    A.   Yes, it does.
17    EXAMINATION BY MR. SANDLER:
18    Q.   Explain, please.
19    A.   In the meeting that Signal
20    management had with Michael Pol on 11/20/06,
21    where I wrote down the things that Mr. Pol said
22    and that Mr. Schnoor said, Mr. Pol was quite
23    specific about the fact that the number -- the
24    amount of money charged to the Indian workers was
25    right at $10,000.  That's a direct, verbatim
```

52 (Pages 202 to 205)

(504)525-1753                          HUFFMAN & ROBINSON, INC.                          (800)749-1753
ONE SHELL SQUARE,#250                CERTIFIED COURT REPORTERS                NEW ORLEANS, LA 70139

Page 206

1  statement from him, which since I had gathered
2  this breakdown a few days before, I knew that
3  what he was saying on 11/20/06 was not true,
4  because I had seen receipts that contradicted it.
5      Q.   Right.  And that's where all of
6  these values came into the spreadsheet?  That's
7  based on receipts that the workers had shown you?
8      A.   These two workers in particular.
9      Q.   I believe you testified earlier with
10 Mr. Shapiro, I think, that these workers were
11 representative of -- correct me if I'm wrong --
12 but both the complaints about fees that you were
13 hearing and the amounts and the details thereto?
14     MR. SHAPIRO:
15         Object to form.
16     A.   I don't know if I would use the term
17 representative because each one was different in
18 terms of time and amount, and you can even see
19 that in the dates here that Worker -- Employee
20 Number 79, he paid money in -- as early as June
21 of 2003, whereas, the other one was only in 2006.
22 So, there were differences and, also, as far as
23 who the payee was.
24 EXAMINATION BY MR. SANDLER:
25     Q.   Yeah.

Page 207

1      A.   So, many differences in that regard,
2  but in terms of the fact that the very vast --
3  the very vast majority of workers paid more,
4  these are two examples of that.
5      Q.   So, would exemplars be a good word,
6  then?
7      MR. ALEXIS:
8          Object to form.
9      MR. SHAPIRO:
10         Object to form.
11     A.   I'm not sure.                    Sanders
12     MR. SANDLER:                          207:15-208:8
13         Withdrawn.
14 EXAMINATION BY MR. SANDLER:
15     Q.   Just for the record, just to be
16 sure, I think you said earlier paid more, and I
17 wanted to be sure you meant paid more than
18 $10,000?
19     A.   Yes.  These two workers paid more
20 than $10,000 and their information contradicted
21 what Michael Pol told Signal.
22     Q.   And every entry in the G, F, E
23 column and assumedly also the D column, you
24 verified with documentation?
25     A.   With receipts.

Page 208

1      Q.   With receipts, which is like
2  documentation?
3      A.   Yes.  I saw them myself.
4      Q.   And they were given to you on the
5  spot by workers?
6      A.   Yes.  And I could have gotten more,
7  but how many could I -- could I get right then.
8      Q.   Exactly.  Thank you.
9      I'm going to enter another document.
10 It is DEWAN 000798.  I know it's been entered
11 already.  I brought copies for everyone.  So, I'm
12 going to add the exhibit number as well to it.
13 So, if you could just have a look at it, Mr.
14 Sanders, and for the record, you aren't -- for
15 the record, you're not on these e-mails at all.
16     (Whereupon, Exhibit Number
17 701 was marked for identification.)
18     MR. SHAPIRO:
19         What's it?
20     MR. SANDLER:
21         It's 701.
22     MR. ALEXIS:
23         Just so I don't waste any
24 time, I'm going to object to the
25 form of -- I'm going to object to

Page 209

1  the entire line of questioning, if
2  you please, because, as I think
3  you just said, he is not a party
4  to this e-mail.
5      MR. SANDLER:
6          Right, but doesn't it matter
7  what the question is that I ask
8  him?
9      MR. ALEXIS:
10         Okay.  I'll wait.  I'll wait
11 for the question and I'll retract
12 what I just said.
13     MR. SANDLER:
14         Okay.
15     MR. ALEXIS:
16         But I don't see how it could
17 be relevant.
18     A.   Okay.  I've read this document.
19 EXAMINATION BY MR. SANDLER:
20     Q.   Okay.  I'm going to ask you about
21 the e-mail on the first page --
22     A.   Okay.
23     Q.   -- from Billy Wilks to Malvern
24 Burnett and cc'd is John Wilks.  Do you see that
25 e-mail?

Page 290

1 two of them. That's the newer,
2 revised housing agreement.
3 MR. SANDLER:
4     Okay. Thank you again for
5 all your time, Mr. Sanders.
6 THE WITNESS:
7     Okay.
8 MR. SANDLER:
9     I hope you have a safe ride
10 back to Orange. Take care.
11 THE WITNESS:
12     Thank you.
13 MR. KUPPERMAN:
14     We're through? So soon?
15 MS. HANGARTNER:
16     Ralph?
17 THE VIDEOGRAPHER:
18     This is the conclusion of
19 the videotaped deposition of John
20 Sanders. We're going off the
21 record. The time is 6:53.
22     (Whereupon, the testimony of
23 the witness was concluded at 6:53
24 p.m.)
25

Page 291

1     WITNESS' CERTIFICATE
2
3
4
5     I, JOHN SANDERS, the undersigned, do
6 hereby certify that I have read the foregoing
7 deposition and it contains a true and correct
8 transcript of the testimony given by me:
9
10
11 ( ) Without corrections.
12 ( ) With corrections as reflected on
13     the errata sheet(s) prepared by me
14     and made a part hereof.
15
16
17
18
19
20
21     JOHN SANDERS
22
23     DATE
24
25

Page 292

1     REPORTER'S CERTIFICATE
2
3
4     I, CAROL VALLETTE SLATER, Certified
5 Court Reporter, Registered Professional Reporter,
6 in and for the State of Louisiana, as the officer
7 before whom this testimony was taken, do hereby
8 certify that JOHN SANDERS, after having been duly
9 sworn by me upon authority of R.S. 37:2554, did
10 testify as hereinbefore set forth in the
11 foregoing pages; that this testimony was reported
12 by me in the stenotype reporting method, was
13 prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21     CAROL VALLETTE SLATER (CCR 78020)
       CERTIFIED COURT REPORTER
22     REGISTERED PROFESSIONAL REPORTER
23
24
25

# DEPOSITION EXCERPTS

# RONALD WAYNE SCHNOOR

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
    KURIAN DAVID, SONY           CIVIL ACTION
 4  VASUDEVAN SULEKHA,
    PALANYANDI THANGAMANI,       NO. 08-1220
 5  MARUGANANTHAM KANDHASAMY,
    HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6  ISSAC PADA VEETTIYL, AND
    DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7  BEHALF OF OTHER SIMILARLY
    SITUATED INDIVIDUALS, AND
 8  SABULAL VIJAYAN, KRISHAN
    KUMAR, JACOB JOSEPH
 9  KADDAKKARAPPALLY, KULDEEP
    SINGH, AND THANASEKAR
10  CHELLAPPAN, INDIVIDUALLY,
                PLAINTIFFS
11
    VERSUS
12
    SIGNAL INTERNATIONAL,
13  LLC, MALVERN C. BURNETT,
    GULF COAST IMMIGRATION
14  LAW CENTER, L.L.C., LAW
    OFFICES OF MALVERN C.
15  BURNETT, A.P.C.,
    INDO-AMERI SOFT L.L.C.,
16  KURELLA RAO, J & M
    ASSOCIATES, INC. OF
17  MISSISSIPPI, GLOBAL
    RESOURCES, INC., MICHAEL
18  POL, SACHIN DEWAN, AND
    DEWAN CONSULTANTS PVT.       VOLUME 1
19  LTD. (a/k/a MEDTECH
    CONSULTANTS).
20             DEFENDANTS.
21
22  Rule 30(b)(6) deposition of SIGNAL INTERNATIONAL,
    L.L.C., through its designated representative,
23  RONALD WAYNE SCHNOOR, 601 Bayou Cassotte Parkway,
    Pascagoula, Mississippi  39581, taken at the
24  Hampton Inn Moss Point, 6730 Highway 63, Moss
    Point, Mississippi  39583, on Wednesday, the 16th
25  day of December, 2009, beginning at 9:04 a.m.
```

Page 22

1   facts, what would you have done?
2       A.   We would not have employed those
3   candidates.
4       Q.   Why?
5       A.   Because of the issues that were
6   involved with other companies and, of course, we
7   learned this after the fact as well, that the
8   legal counsel, Malvern Burnett, were working with
9   these companies after we had brought the
10  individuals over from India and while they were
11  under our employment to give them visas for work
12  with other companies.  In essence, stealing the
13  employees away from Signal.
14      Q.   I want to focus on the time frame
15  before any of the H2B workers came to work for
16  Signal.  Okay?
17      A.   Yes.
18      Q.   Okay.  Had you known prior to a
19  single worker coming to work for Signal that they
20  had previously been recruited by your
21  codefendants in this matter to work for other
22  companies, if you'd known that, what would you
23  have done?
24      MR. ALEXIS:
25          Object to form.

Page 23

1       MS. HANGARTNER:
2           Can I just clarify
3       something?  Are you talking about
4       the group as a whole or only the
5       individuals who were actually
6       recruited for J & M, Zito and IAS?
7       MR. HOWARD:
8           Well, that's a good point.
9       Let's break it down into both.
10  EXAMINATION BY MR. HOWARD:
11      Q.   For the people who were previously
12  recruited to work for other companies, had you
13  known that among the candidates being recruited
14  for Signal were such workers, what would you have
15  done?
16      A.   As I just indicated, we probably
17  would not have hired those individuals.
18      Q.   Why not?
19      A.   I can only tell you that based on
20  the current circumstances that I'm aware of and
21  the issues that we're dealing with today.  We
22  would not have hired those had we known.
23      Q.   Okay.  I'm trying to get your mind
24  set, say, back in October of 2006.
25      A.   Uh-huh.

Page 24

1       Q.   If your codefendants, Malvern
2   Burnett, Sachin Dewan and Michael Pol, had told
3   you, you know, among the candidates that we're
4   recruiting to come work for you are people that
5   we tried to get visas for other companies and
6   were unsuccessful and now we're offering them to
7   you, what difference would that have made?
8       MS. HANGARTNER:
9           Object to form.
10      MR. SHAPIRO:
11          Object to form.
12      A.   You know, the fact that they were --
13  they were being recruited or had been recruited
14  and other facts, to include the fees that were
15  paid over time, was the other issue, had we known
16  those two things, we probably would not have
17  hired the employees.
18  EXAMINATION BY MR. HOWARD:                    Schnoor
19      Q.   Okay.  What is it with respect to   24:19-25:15
20  the fees that had you known in October of 2006
21  would have made you decide not to hire the
22  employees?
23      A.   The amount of the fees.
24      Q.   And what was it about the amount of
25  the fees that would have led you to decide not to

Page 25

1   hire the employees had you known then in October
2   of 2006?
3       A.   We understood that the fees were
4   significantly less than what had been collected
5   or paid by the H2B visa -- the individuals, a
6   significant amount of money, in our -- in our
7   view, and we would have reconsidered the entire
8   deal that we had made at that time.
9       Q.   Just so I understand, the fact that
10  the fees paid by the workers that you hired were
11  significantly higher than what you had been led
12  to believe they were --
13      A.   Yes.
14      Q.   -- was problematic for you?
15      A.   Yes.
16      Q.   And had you known the true amount of
17  the fees in October of 2006, you would not have
18  hired these individuals; is that correct?
19      A.   Possibly, yes.
20      Q.   Why do you say "possibly"?
21      A.   It was our goal to have Indian
22  workers who were first-class, skilled employees,
23  and who were, let's just say, with positive
24  attitudes to do the work that we -- we had for
25  them.  In our case, early on in the process, once

7 (Pages 22 to 25)

Schnoor 26:4-18

Page 26

1   we got individuals in country, they did not --
2   let's just say there was a significant amount of
3   disgruntled folks.
4       Q.   And you understood they were
5   disgruntled in part because of the high fees they
6   had paid?
7       A.   Yes.
8       Q.   Going back to your counsel's point
9   earlier, distinguishing between candidates who
10  had previously been recruited for other companies
11  and candidates who recruited specifically to
12  Signal, would you say that the concern that the
13  high fees generated at Signal was common to all
14  the candidates, or would you draw a distinction
15  between the two groups?
16      MS. HANGARTNER:
17          Object to form.
18      A.   Common to all the candidates.
19  EXAMINATION BY MR. HOWARD:
20      Q.   So, is it your testimony that had
21  you known the true amount of the fees paid by the
22  H2B workers you hired in October of 2006, you
23  would not have hired a single one of them?
24      MR. SHAPIRO:
25          Object to form.

Page 27

1       A.   To the extent we understood the
2   amounts based on what was represented to us, yes.
3   EXAMINATION BY MR. HOWARD:
4       Q.   In other words, based on the fact
5   that it had been represented to you that the fees
6   were lower, if you'd known the true amounts, you
7   would not have hired a single one of those
8   employees?
9       A.   Yes.
10      MR. SHAPIRO:
11          Object to form.
12  EXAMINATION BY MR. HOWARD:
13      Q.   And what were the representations of
14  the fees to which you're referring that had been
15  made to Signal prior to October of 2006?
16      A.   Mr. Pol represented two to $3,000
17  was the fees paid by the individuals, and that,
18  we thought, was reasonable and that's what we
19  understood the fees to be.
20      Q.   And to whom did he make that
21  representation?
22      A.   Our production vice president, Bill
23  Bingle.
24      Q.   Was that made orally?
25      A.   I believe so, yes.

Page 28

1       Q.   And did Mr. Bingle report to you Mr.
2   Pol's representation of two to $3,000 per worker?
3       A.   Yes.
4       Q.   And when did he do that, to the best
5   of your recollection?
6       A.   Around that time frame.  Somewhere
7   between April and before the workers showed up in
8   Pascagoula.
9       Q.   And your reaction was the two to
10  $3,000 sounded reasonable to you?
11      A.   Yes.
12      Q.   Based on what?
13      A.   Based on travel, based on fees that
14  the workers would pay to be employed by -- by
15  Signal.  Seemed like a reasonable number to us.
16      Q.   Had Signal had any experience
17  recruiting H2B workers prior to this?
18      A.   No.
19      Q.   Had Signal recruited foreign workers
20  of any kind prior to this?
21      A.   No.
22      Q.   Other than just in your head
23  thinking that this would be a reasonable amount based
24  on what it would cost for travel and what
25  recruiting fees should be, did you have any

Page 29

1   benchmark to determine reasonableness?
2       A.   No.
3       Q.   What did you understand the workers
4   were paying for?
5       A.   The process, travel.
6       Q.   What process?
7       A.   The recruiting process, the visa
8   process, travel.
9       Q.   When did you learn that the
10  representations made by Mr. Pol concerning the
11  amount of fees paid by the workers had been
12  false?
13      MS. HAROWSKI:
14          Object to form.
15      A.   I believe November of 2006.
16  EXAMINATION BY MR. HOWARD:
17      Q.   How did you learn that?
18      A.   Through our camp management and the
19  workers who had first arrived.
20      Q.   So, the very first workers, in that
21  first wave of workers, they informed people
22  working for Signal about the fees they had paid,
23  correct?
24      A.   Yes.
25      Q.   And one of those persons was John

8 (Pages 26 to 29)

Page 34

1    A.   I've seen excerpts, very, very small
2  excerpts from the journals, but I have not
3  reviewed the journal language or what's in the
4  journals, no.
5    Q.   And is it correct that Mr. Sanders
6  has been terminated based on certain entries in
7  his journals?
8    A.   Yes.
9    Q.   What specifically led to Mr.
10 Sanders' termination?
11   A.   I think -- I think, primarily, the
12 fact that certain journals were not produced
13 early on in the process, as they should.  They
14 were discovered late in the process, and that's,
15 to the best of my knowledge, the primary reason.
16   Q.   Was any of the substance of any of
17 the journal entries in any way considered in the
18 termination decision of Mr. Sanders?
19   MS. HANGARTNER:
20      Just for the record, Mr.
21   Schnoor was not involved in the
22   decision to terminate.
23   THE WITNESS:
24      Yeah.
25   MR. HOWARD:

Page 35

1      He can say so.
2    A.   Yeah.  I was not involved in the
3  decision to terminate.
4  EXAMINATION BY MR. HOWARD:
5    Q.   Were you made aware of the fact that
6  certain journal entries have a substantive
7  problematic element to them?
8    A.   I'm not sure about substantive
9  problematic element to them, but -- and like I
10 said, I haven't reviewed all the journals, but I
11 understand there was some things in there that
12 were, you know, considered, let's just say, odd.
13   Q.   Would you agree that there were
14 things in there inappropriate?
15   A.   Inappropriate, yes.
16   Q.   Including a suggestion that Mr.
17 Sanders was racist against Muslims?
18   A.   Have no knowledge of that.
19   Q.   Did you read the entry of Mr.
20 Sanders from Tuesday, February 6th, 2007, where
21 he talks about:
22      "The Muhammad part is my own
23   prejudice.  I have the image that
24   Muslims are terrorists who hate
25   the U.S. and everything we stand

Page 36

1  for."
2    A.   No.
3    Q.   You never heard that?
4    A.   No.
5    Q.   Would it cause you concern that the
6  person that you had on behalf of Signal managing
7  the Indian workers was prejudiced against
8  Muslims?
9    MS. HANGARTNER:
10      Object to form.  Mr. Schnoor
11   didn't know that at the time.
12   A.   I had no knowledge of that.
13 EXAMINATION BY MR. HOWARD:
14   Q.   I'm not asking about at the time.
15 I'm asking today.  Does it concern you that the
16 person that Signal had managing the Indian H2B
17 workers was prejudiced against Muslims?
18   MS. HANGARTNER:
19      Object to form.
20   A.   I would have to tell you that
21 surprises me based on how John treated the
22 workers, his coworkers and the Indians.  He cared
23 very much for them.  So, there was no indication
24 to me whatsoever at any time that Mr. Sanders was
25 prejudiced against any Indians or did anything

Page 37

1  that would imply any prejudicial treatment
2  against those employees.
3  EXAMINATION BY MR. HOWARD:
4    Q.   Okay.  That said, though, I take it
5  it would concern you if he had such a prejudice?
6    A.   It would concern me if he
7  demonstrated a prejudice; he did not.
8    Q.   To your knowledge, correct?
9    A.   To my knowledge, correct.
10   Q.   Going back to the November, 2006
11 time period, was it Mr. Sanders who informed you
12 that these initial -- the initial wave of workers
13 who came to Signal had paid fees in excess of
14 what you had been led to believe they were
15 paying?
16   A.   Yes.
17   Q.   And do you recall how much Mr.
18 Sanders told you the workers had paid?
19   A.   As I recall, it varied.  12,000,
20 15,000, above that amount in some cases, but it
21 varied.
22   Q.   Was that significant to you?
23   A.   Yes.
24   Q.   At that point, what percentage of
25 the workers that were ultimately hired by Signal

Schnoor 37:10-23

Schnoor 37:24-38:14

10 (Pages 34 to 37)



Page 38

1  had come to Signal?
2      A.  I don't recall specifically what
3  percentage.  It was probably less than a third.
4      Q.  Why did Signal choose to continue to
5  hire H2B workers to come over from India after
6  learning that the first wave of workers had paid
7  significantly more in fees than you had been led
8  to believe?
9      A.  The process had already started was
10 the primary reason.  The visa applicants had been
11 approved.  We had a number of groups in country.
12 We had a number coming in country that had been
13 authorized or were in the process of being
14 authorized.
15     Q.  Did you have any reason to believe
16 that the two-thirds who had not yet come to
17 Signal had paid any less in fees than the one-
18 third that had already come to Signal?
19     A.  I did not know.
20     Q.  Did you do anything to find out?
21     A.  Yes.
22     Q.  What did you do?
23     A.  I called Mr. Pol in and had a
24 meeting with Mr. Pol.
25     Q.  We'll get to the meeting in a

Page 39

1  minute.  What I want to know is your mind set
2  going into that meeting.  You've testified that
3  had you known the true amounts of fees that these
4  workers had actually paid --
5      A.  Yes.
6      Q.  -- in October of 2006, you wouldn't
7  have hired a single one of them, correct?
8      A.  October may not have been the
9  correct date.  It could have been earlier.  Had
10 we known originally the amount of the fees, we
11 wouldn't have started the process.
12     Q.  Well, what is starting the
13 process -- let me step back.
14         Let me ask:  What does starting the
15 process have to do with changing your mind about
16 whether it was appropriate to hire workers who
17 had paid substantially more in fees than you
18 originally thought they'd be paying?
19     A.  Repeat the question, please.
20     Q.  Let me ask it a different way.
21     A.  Sure.
22     Q.  When you heard the fees were going
23 to be 2,000 to $3,000 per worker, you thought
24 that was reasonable, correct?
25     A.  Yes.  Yes.

Page 40

1      Q.  I take it that when you heard that
2  it was 12 to $15,000 more than that --
3      A.  Yes.
4      Q.  -- that some of these people had
5  paid $15,000 apiece --
6      A.  Yes.
7      Q.  -- you did not think that was
8  reasonable, correct?
9      A.  Correct.
10     Q.  Did that ever become reasonable,
11 that amount of fees, in your mind?
12     A.  No.
13     Q.  So, why would you continue to bring
14 in workers when you'd known they'd paid an
15 unreasonable amount of fees?  What changed for
16 you?
17     A.  What changed for me was that was,
18 apparently, and what we understood to be -- you
19 know, let's just say, I thought they were
20 unreasonable, but more -- more a matter of the
21 fee structure that this process worked on in
22 India, and it wouldn't change if we did anything
23 differently.
24     Q.  Well, if you thought it was
25 unreasonable, you didn't have to be party to it,

Page 41

1  right?
2      A.  I terminated the people who
3  misrepresented that to us, for starters.
4      Q.  You terminated --
5      A.  I also attempted to get money
6  refunded from the agents and from Mr. Pol,
7  unsuccessfully.
8      Q.  Which agents?
9      A.  Dewan, Sachin, and Mal Burnett.
10     Q.  Well, you terminated Mr. Pol,
11 correct?
12     A.  Yes.
13     Q.  You didn't terminate Mr. Dewan?
14     A.  Correct.
15     Q.  You didn't terminate Mr. Burnett?
16     A.  Correct.
17     Q.  And you were unsuccessful in getting
18 them to refund any money, correct?
19     A.  Yes.
20     Q.  But you kept bringing more workers
21 in, correct?
22     A.  Yes.
23     Q.  Why?
24     A.  We needed the workers, and they
25 didn't misrepresent us directly.

Schnoor
40:24-41:19

Schnoor
41:10-22

Schnoor
41:20-25

11 (Pages 38 to 41)

**Schnoor**
**46:10 - 50:20**

Page 46

```
 1        MR. ALEXIS:
 2             Object to form.
 3        A.   My understanding was that following
 4   the H2B visa process, that green cards was
 5   another step in the sequence, and there would not
 6   be any break requiring the individuals to return
 7   to India for an extended period of time.  That's
 8   what I initially understood.
 9   EXAMINATION BY MR. HOWARD:
10        Q.   When you first heard about the
11   prospect of bringing H2B workers to Signal,
12   you're saying, you initially understood that --
13   that -- what?  That they would stay as H2B
14   workers and then get green cards?
15        A.   Yes.
16        Q.   And was it your intent on behalf of
17   Signal to file for green cards for each of the
18   workers who you brought from India?
19        A.   To the extent everything worked out,
20   yes.
21        Q.   What do you mean by "to the extent
22   everything worked out"?
23        A.   The need continued.  I mean, it was
24   a long -- the whole -- the whole process was --
25   we were looking for a long-term solution to the
```

Page 47

```
 1   fact that we had inadequate workers that we could
 2   hire direct, and we were looking for a long-term
 3   solution.  We didn't know how long term "long
 4   term" was, but we saw this as a possible way to
 5   provide the additional workers and skills we
 6   needed given the aftermath of Katrina, and that's
 7   why we initiated the process to begin with.
 8        Q.   I want to explore a little more your
 9   phrase "provided everything worked out," and I
10   want your mind set when you make the decision to
11   go through this process of bringing in H2B
12   workers from India.  One of the things for these
13   workers to continue on at Signal permanently
14   would be that there would be a continued need for
15   them, correct?
16        A.   Yes.
17        Q.   So, if the demand for work that
18   Signal faced dried up and you had no more need
19   for these workers, then, you would not keep them
20   permanently, correct?
21        A.   Correct.
22        Q.   What else did you mean by
23   "everything working out"?
24        A.   Well, we now know that some workers
25   absconded and weren't here.  So, obviously, if we
```

Page 48

```
 1   didn't have them in our employment for whatever
 2   reason, we wouldn't continue the process for
 3   them, but it's demand, it's the fact that they
 4   remained employees of the company were the
 5   primary two -- two things.
 6        Q.   You mentioned earlier about skill
 7   set and attitude.  Were those also conditions to
 8   continued employment and permanent employment
 9   with Signal?
10        A.   Yes.
11        Q.   If the workers did not demonstrate
12   the skills that Signal required, then, you would
13   not keep them permanently, correct?
14        A.   Possibly.
15        Q.   Why do you say "possibly"?
16        A.   We kept some that didn't have the
17   skills because we have other jobs to fill.  So,
18   again, it's the nature of the need and the demand
19   for the workers and the skill sets, to the extent
20   they complied with visa requirements and to the
21   extent we had a need for that skill set, albeit
22   less or greater than the -- than the requirement
23   was when -- when the workers were brought over,
24   then, we would retain them.
25        Q.   So, if the workers, if you could
```

Page 49

```
 1   find different jobs for them or even train them
 2   to be skilled enough, they could stay, correct?
 3        A.   Yes.
 4        Q.   And if not, they couldn't?
 5        A.   Correct.
 6        Q.   And you mentioned attitude.  You
 7   wanted the workers to display the appropriate
 8   attitude to stay employed at Signal?
 9        A.   Yes.
10        Q.   And if they were disgruntled, that
11   would be a problem, correct?
12        A.   Could be.
13        Q.   And that was part of the problem you
14   had with the first wave of workers who came
15   because of the fees, they were disgruntled
16   because of the high fees they paid, correct?
17        A.   They were disgruntled --
18        MR. ALEXIS:
19             Object to form.
20        A.   -- but disgruntled doesn't mean we
21   wouldn't necessarily keep an employee.  Depends
22   on how they complied with company policy and what
23   their work results were, and to the extent it
24   wasn't effected by certain issues, then, they may
25   be retained.
```

13 (Pages 46 to 49)

Page 50

EXAMINATION BY MR. HOWARD:

1  EXAMINATION BY MR. HOWARD:
2      Q.   Or maybe not?
3      A.   Or maybe not.
4      Q.   So, to the extent that each and
5  every worker in India had been promised that they
6  would ultimately get green cards, that was false,
7  correct, at least as Signal was concerned?
8      MR. ALEXIS:
9          Object to form.
10     A.   We didn't authorize that, if that's
11  what you're asking.
12  EXAMINATION BY MR. HOWARD:
13     Q.   Well, not only didn't you authorize
14  it, it would have been a false statement,
15  correct?
16     MR. ALEXIS:
17         Object to form.
18     MR. SHAPIRO:
19         Object to form.
20     A.   Yes.
21  EXAMINATION BY MR. HOWARD:
22     Q.   When did you first learn that
23  workers who Signal hired from India had been
24  promised that they would get green cards?
25     MR. ALEXIS:

**[Schnoor 50:4-11]**

Page 52

1  workers where he says:  "Assurance of green card
2  is why they came"?
3          You see that?
4      A.   No.  Which page is that on?
5      Q.   First page.
6      A.   First page.  Oh, yes, I see it.
7      Q.   Okay.  Did Mr. Sanders ever tell you
8  that in November of 2006?
9      A.   Not that I recall.
10     Q.   What do you -- when do you first
11  recall and what were the circumstances learning
12  that the workers in India had been assured green
13  cards?
14     A.   I'm not aware of Indians being
15  assured green cards.
16     Q.   In your cross-claims, you say that
17  the Indian workers were falsely promised that
18  they would get green cards, correct?
19     A.   Correct.
20     Q.   So, that's Signal's position, they
21  understand that the workers were falsely promised
22  green cards, right?
23     A.   Falsely promised, to me, is not
24  assured.  Perhaps it is.
25     Q.   What's the difference between a

Page 51

1          Object to form.
2      A.   You know, I don't -- I don't
3  specifically recall, but it would had to have
4  been late 2006, maybe earlier 2007.  I don't
5  recall the exact time.
6  EXAMINATION BY MR. HOWARD:
7      Q.   Do you recall Mr. Sanders telling
8  you in advance of the November, 2006 meeting with
9  Mr. Pol that the promise of a green card is why
10  these workers came?
11     A.   Not specifically, no.
12     Q.   Mr. Schnoor, I'm going to show you
13  what's been previously marked as Exhibit 521.
14  For the record, it's a three-page document, Bates
15  SIGE0002084 through -- I'm sorry -- 2082 through
16  2085.  SIGE0002082 through 2085.  These are
17  handwritten notes of Mr. Sanders.  The first two
18  pages of the exhibit, which are 2084 and 2085,
19  are dated 11/17 and 11/18, respectively, and the
20  last two pages of the exhibit, which are 2082 and
21  2083, are notes from a meeting Monday, 11/20.
22          Have you seen this document before?
23     A.   I think so, very recently.
24     Q.   You see in the front -- first page
25  where Mr. Sanders is recounting discussions with

Page 53

1  promise and an assurance?
2      MR. ALEXIS:
3          Object to form.
4      A.   In my mind, assurance means almost a
5  guarantee.
6  EXAMINATION BY MR. HOWARD:
7      Q.   And what's that -- how's that
8  different from a promise?
9      A.   You know, a promise could be an
10  attempt to get something, but, ultimately, no one
11  would make that decision but the U.S. government,
12  and I'm not sure anyone can speak for the U.S.
13  government but the U.S. government.  So, Signal
14  did not promise, assure, guarantee workers would
15  receive green cards.
16     Q.   Did Signal ever promise the workers
17  that they will file for green cards on behalf of
18  all of them?
19     A.   Yes.
20     Q.   When?
21     A.   I don't recall specifically, but we
22  told workers, you know, that we would -- we would
23  follow the visa process and file for permanent
24  residency status in accordance with U.S. law.
25     Q.   You told --

**[Schnoor 53:16-19]**

14 (Pages 50 to 53)

Schnoor
54:4-56:6

Page 54

1      A.   To the extent they retained -- and,
2  you know, that they were employed with the
3  company.  Yeah.
4      Q.   What do you mean by to the extent
5  they were retained and employed by the company?
6  Here's my question:  Did you tell every worker
7  you hired on H2B visa coming from India, we will
8  file for a green card for you, or didn't you?
9      A.   I did not, no.
10      Q.   Did anyone from Signal tell them
11  that?
12      A.   Not to my knowledge.
13      Q.   Okay.  Would any from Signal have
14  been authorized to tell them that?
15      A.   No.
16      Q.   Because you hadn't made a
17  determination.  That -- that would depend upon
18  your need, their skills, their attitude, correct?
19      A.   Correct.
20      Q.   So, Signal did not have it in its
21  mind that it would file for every single worker,
22  did it?
23      A.   No.
24      Q.   So, who did you tell, if anyone,
25  that, yes, we're going to file for a green card

Page 55

1  for you?
2      MS. HANGARTNER:
3          I don't understand that
4      question.
5      MR. HOWARD:
6          Mr. Schnoor's testimony is
7      he recalls that he did make the
8      statement to certain workers that
9      we're going to file for a green
10      card for you, but he also said he
11      didn't make it to every worker.  I
12      want to know who he told and why.
13      MS. HANGARTNER:
14          Okay.
15      A.   I can't say specifically.
16  EXAMINATION BY MR. HOWARD:
17      Q.   Did you say that to any specific
18  worker, to your recollection?
19      A.   I recall telling the workers that we
20  would continue the process, again, to the extent
21  there was a need, to the extent we had them in
22  our employment, and we would take its course with
23  permanent residency status, yes.
24      Q.   It was not a sure thing, right?
25      A.   No.

Page 56

1      Q.   And it was not a sure thing not just
2  because the government determines ultimately who
3  gets green cards, but because Signal had not
4  determined for itself that it was even going to
5  file for everyone, correct?
6      A.   Correct.
7      MR. HOWARD:
8          Why don't we take a break?
9      THE VIDEOGRAPHER:
10          We're now going off the
11      record.  The time is 9:59 a.m.
12          (Whereupon, a discussion was
13      held off the record.)
14      THE VIDEOGRAPHER:
15          We are now back on the
16      record.  The time is 10:09 a.m.
17  EXAMINATION BY MR. HOWARD:
18      Q.   Mr. Schnoor, I want to go back to
19  the timing and -- of when you learned that
20  workers that Signal had hired believed they were
21  going to get green cards.  I believe you said it
22  was, to the best of your recollection, in late
23  2006; is that correct?
24      A.   That's approximately, yes.  I don't
25  specifically recall, but, yes, that sounds right.

Schnoor
56:18-25

Page 57

1      Q.   Do you have any specific
2  recollection of how you learned that?
3      A.   No.
4      Q.   And at the time you learned that,
5  what did you do?
6      A.   You know, again, as I tried to
7  explain earlier, we -- we understood, I
8  understood that the process at some -- would go
9  from H2B visas to ultimately to a green card.  I
10  guess -- I guess hearing that green cards were
11  part of the process didn't, you know -- I didn't
12  do anything.  Didn't -- didn't think that was an
13  issue at the time.
14      Q.   Well, you have an understanding that
15  all the workers that Signal was hiring believed
16  they were going to get green cards.
17      A.   You know, I -- I can't speak for all
18  the workers that Signal hired, nor what they
19  believed, nor wasn't party to whatever they were
20  promised.  So, no, I don't know what they were
21  told, frankly.
22      Q.   But you learned that they had been
23  told --
24      A.   I heard.
25      Q.   You heard that they had been told

15 (Pages 54 to 57)

**Schnoor 62:8-63:2**

Page 62

```
 1   the camp was, you know, in good shape and the
 2   process worked as well as it could.  Darrell was
 3   one of our production superintendents.  His focus
 4   was primarily the physical camp initially, as I
 5   recall, but working in assisting John Sanders in
 6   various activities and needs of the workers that
 7   were arriving.
 8       Q.   Would you say that on behalf of
 9   Signal, it was Mr. Sanders and Mr. Snyder that
10   had the most day-to-day contact with the workers
11   at the man camp?
12       A.   Yes.
13       Q.   And you don't recall instructing
14   them as far as what to say when asked about green
15   cards?
16       A.   I do not.
17       Q.   Was anyone at Signal authorized to
18   talk to the Indian workers about green cards?
19       A.   No.
20       Q.   So, is it fair to say that to the
21   extent that these workers had been given
22   assurances that they would get green cards by Mr.
23   Burnett, Mr. Pol or Mr. Dewan, no one at Signal
24   was doing anything to correct that statement?
25       MR. ALEXIS:
```

Page 63

```
 1           Object to form.
 2       A.   Not that I'm aware of.
 3   EXAMINATION BY MR. HOWARD:
 4       Q.   Let's go back a little bit prior to
 5   the time any workers came from India to work at
 6   Signal when the decision was first made to
 7   recruit Indian workers.  Were you part of that
 8   decision?
 9       A.   I was.
10       Q.   And what were the factors that led
11   to that decision?
12       A.   Well, one was the need post-Katrina.
13   We had an inability after Katrina to hire
14   workers, skilled workers, direct.  That was the
15   first time in the history of our organization
16   where the local workforce could not support our
17   needs.
18       Q.   Now, when you say "direct," you mean
19   people who would become direct employees of
20   Signal?
21       A.   Yes.
22       Q.   And that's in contrast to contract
23   workers, people who are employees of another
24   company that get contracted out to work for
25   Signal?
```

Page 64

```
 1       A.   Yes.
 2       Q.   And contract workers are more
 3   expensive than direct workers?
 4       A.   Yes.
 5       Q.   So, you were looking for an
 6   alternative source of direct workers, correct?
 7       A.   Correct.
 8       Q.   And what -- what sources did Signal
 9   consider?
10       A.   Well, to supplement our needs, we
11   had contracts with a number of supplemental labor
12   suppliers.  That was our initial means of
13   satisfying the needs for the work we had, and
14   then we were approached, I was approached, as I
15   recall, by Michael Pol about the H2B visa
16   process.  Prior to that, was really not familiar
17   with the H2B visa program.  And he told us about
18   past experience with another shipyard industry on
19   the Gulf where he had supplied skilled Indian
20   workers and told us more about the -- the
21   program, and that's where we first learned about
22   it.
23       Q.   Do you recall approximately when
24   that was?
25       A.   Early 2006, I think, February-ish,
```

Page 65

**Schnoor 65:2-66:16**

```
 1   something like that, maybe January, 2006.
 2       Q.   Did you -- had you ever had prior
 3   business dealings with Mr. Pol?
 4       A.   No.
 5       Q.   Did you know him personally?
 6       A.   Yes.
 7       Q.   In what capacity?
 8       A.   He had been in the -- I think in the
 9   '90s a supervisor, Jackson County supervisor, and
10   I had met Michael before when he was a supervisor
11   in Jackson County.
12       Q.   Were you acquaintances with him
13   personally, on a personal level at all?
14       A.   No.
15       Q.   When he -- how did he contact you or
16   approach you about this program?
17       A.   I think he called me.
18       Q.   How long had it been since you'd
19   heard from him?
20       A.   A significant period of time.  I
21   don't recall specifically, but I hadn't talked to
22   Michael or -- as I recall for quite some time
23   prior to that.
24       Q.   Did he explain to you why he thought
25   you might be interested in his program?  Like, he
```

17 (Pages 62 to 65)

Page 66

1  had heard that Signal was looking for workers?
2      A.   Yes.
3      Q.   Where had he heard that?
4      A.   Newspaper ads, certainly around
5  town.  I don't know specifically.  He just knew
6  we were looking for workers, and we were.
7      Q.   And what specifically did he tell
8  you he could do for you?
9      A.   He could provide us first-class
10 fitters and welders and deliver them to us at no
11 cost to Signal, and we could hire them direct.
12     Q.   When you say "at no cost to Signal,"
13 you understood that whatever fees there were,
14 those were going to be paid by the workers
15 themselves?
16     A.   Yes.
17     Q.   Did he tell you who was going to be
18 on the team bringing in these workers?
19     A.   I don't specifically recall, but I
20 believe that he did say there was a lawyer and an
21 Indian agent involved.
22     Q.   Had you ever heard of Mr. Dewan or
23 Mr. Burnett before this conversation with Mr.
24 Pol?
25     A.   No.

Page 67

1      Q.   What did you tell him in this
2  conversation?  Did you say yes or you'd think
3  about it or get me more information?  What
4  happened?
5      A.   I think we set up a meeting after
6  the call and met with Michael to discuss it
7  further.
8      Q.   Who was there for Signal?
9      A.   I think myself, Bill Bingle and
10 perhaps Chris Cunningham.
11     Q.   That's the CFO?
12     A.   Yes.
13     Q.   Do you recall when that meeting took
14 place?
15     A.   Early 2006, same time frame, I
16 think, February.
17     Q.   Was anybody else there not from
18 Signal?
19     A.   I recall Michael at the first
20 meeting.  I don't recall anyone else there with
21 us.
22     Q.   And what happened at this meeting?
23     A.   We simply discussed the program and,
24 you know, the fact that, again, they could --
25 they could provide workers to us that were

Page 68

1  skilled from -- from facilities in India and --
2  or regions in India, and we could hire them
3  direct as direct Signal employees.
4      Q.   And did he confirm to you again that
5  this would not cost Signal anything?
6      A.   I believe he did, yes.
7      Q.   Did you ask him at that point how
8  much it would cost the workers?
9      A.   No, not that I recall.
10     Q.   Why not?
11     A.   I don't recall the details of the
12 conversation.  So, I -- I don't recall what all I
13 asked him.
14     Q.   So, you don't recall him making a
15 specific representation to you as to how much the
16 workers would be paying?
17     A.   I thought he did eventually, but,
18 again, I don't specifically recall.
19     Q.   That he did eventually make a
20 specific representation to you as well?
21     A.   Yes.  Yes.
22     Q.   And that was before any worker came
23 to Signal?
24     A.   Yes.
25     Q.   And did he tell you specifically the

Page 69

1  same 2,000 to $3,000 number he had told Mr.
2  Bingle?
3      A.   I recall that, yes.
4      Q.   At what point in time did you learn
5  the identity of Mr. Dewan and Mr. Burnett as the
6  Indian agent and the attorney working on this
7  project?
8      A.   A little bit later, I think.  Once
9  we decided to initiate a contract with Global
10 Resources, I think, we probably learned the
11 Indian agent's name, and Malvern Burnett.  In
12 fact, we might have had a meeting with Malvern
13 Burnett, Michael subsequent to signing the
14 agreement with Global Resources, which, I think,
15 was in April of 2006, mid-April or so.
16     Q.   And the meeting that you had with
17 Mr. Burnett, that occurred before October, 2006?
18     A.   Yes.
19     Q.   How many times did you meet with Mr.
20 Burnett prior to October, 2006?
21     A.   More than once, but I don't recall
22 specifically.
23     Q.   What was discussed at those
24 meetings?
25     A.   I don't specifically recall.

18 (Pages 66 to 69)

Page 70

```
1      Q.   Do you recall what Mr. Burnett said,
2   if anything, concerning the prospect of the
3   workers getting green cards?
4      A.   I don't recall.
5      Q.   Do you recall anything Mr. Burnett
6   said about the H2B visa process?
7      A.   I -- I understood, and all I can
8   speak to is the fact that I understood, H2B
9   extension, extension, permanent residency status.
10     Q.   Your understanding was that after
11  the extensions of the H2B visa, it would be
12  converted into permanent residency, a green card?
13     A.   It could be converted.
14  MR. ALEXIS:
15       Object to form.
16     A.   It could be converted.
17  EXAMINATION BY MR. HOWARD:
18     Q.   It could be converted?
19     A.   Yep.
20     Q.   And that conversion could take place
21  without the need for the workers to go back to
22  India?
23     A.   Correct.
24     Q.   And is it fair to say that that
25  understanding you gained was through your
```

Page 71

```
1   conversations with Mr. Burnett?
2      A.   Yes.
3      Q.   And the qualification that you had
4   that it could be converted as opposed to would
5   be, that would be a function of first whether
6   Signal determined to file for the green cards,
7   correct?
8      A.   Yes.
9      Q.   And, secondly, whether the
10  government determined to issue the green card,
11  correct?
12     A.   Yes.
13     Q.   Was there any other condition to the
14  conversion of an H2B visa into a green card, as
15  far as you understood it, from your conversations
16  with Mr. Burnett?
17     A.   No.
18     Q.   And at the time you were having
19  these discussions with Mr. Burnett, is it correct
20  that your intent and Signal's intent was to
21  follow the process through and file for green
22  cards if they had the need at the time for the
23  workers and if the workers were working out well?
24     A.   Yes.
25     Q.   So, would it be fair to say, in your
```

Page 72

```
1   own mind, in the summer of 2006, as you
2   understood the process and we're engaged in these
3   conversations with Mr. Burnett, that Signal had
4   discretion as to whether or not to go through the
5   whole process and file for green cards?
6      A.   Yes.
7      Q.   And Signal was not going to give up
8   that discretion, correct?
9      A.   Correct.
10     Q.   Did you tell Mr. Pol and Mr. Burnett
11  in these meetings that, well, we'll see about the
12  green cards at the end of the day, if we have a
13  need and how the workers are working out, but
14  we're not committing to that?
15  MR. ALEXIS:
16       Object to form.
17     A.   I don't specifically recall, but
18  perhaps.
19  EXAMINATION BY MR. HOWARD:
20     Q.   During this time period, 2006, prior
21  to October, did you have any discussions or
22  meetings with Mr. Dewan?
23     A.   Can you -- the time frame again,
24  please?
25     Q.   Prior to October of 2006.
```

Page 73

```
1      A.   No.
2   MS. HANGARTNER:
3        Alan, I think we need to
4   change the tape.
5   MR. HOWARD:
6        Okay.  Let's change the
7   tape.
8   THE VIDEOGRAPHER:
9        Going off the record.  The
10  time is 10:31 a.m.
11       (Whereupon, a discussion was
12  held off the record.)
13  THE VIDEOGRAPHER:
14       We're now back on the
15  record.  The time now is 10:32
16  a.m.
17  EXAMINATION BY MR. HOWARD:
18     Q.   Mr. Schnoor, I'm showing you now
19  what has been marked as Exhibit 665.  For the
20  record, it's a one-page document on Signal
21  International letterhead with the Bates
22  SIGE0000446, a June, 19, 2006, letter to Dewan
23  Consultants Pvt. Ltd.  Do you recognize this
24  document?
25       (Whereupon, Exhibit Number
```

19 (Pages 70 to 73)

Page 86

1  understood, period.
2     Q.   But it's possible maybe that Mr.
3  Dewan did not understand that and, so, on behalf
4  of Signal, was telling all of these workers
5  Signal will file for a green card for you?
6     A.   I think that's highly unlikely that
7  he wouldn't have known that.
8     Q.   I show you what's been marked as
9  Exhibit 59 in a prior deposition.  For the
10  record, this is a one-page document dated
11  December 6th, 2006, has no Bates number, but it
12  was previously marked as Exhibit 59 to one of the
13  early depositions in this matter.  It is a
14  letter, form letter, with the name Mr. Santhosh
15  G. filled in, and signed by Sachin Dewan.  Have
16  you ever seen this before?
17     A.   No.
18     Q.   It states:
19        "With reference to your
20        application and subsequent test
21        passed with the clients Signal
22        International, Pascagoula
23        Mississippi, U.S.A.  We are
24        pleased to inform you that you
25        have been selected.  The company

Page 87

1        shall proceed with your green card
2        for United States of America."
3        You didn't know that in December,
4  2006, Mr. Dewan was representing on behalf of
5  Signal that Signal would proceed with green card
6  processing for the workers?
7     A.   No.
8     Q.   But you did know by late 2006, when
9  the workers were coming, that they were expecting
10  that they were going to end up with green cards,
11  right?
12     A.   They would -- I think they had an
13  expectation that the process would go forward,
14  yes.
15     Q.   And did you understand they had that
16  expectation based on representations that had
17  been made by your agent in India, Mr. Dewan?
18     A.   I don't know that I understood this
19  was given, no, I did not have that understanding.
20     Q.   Did any one of the workers show you
21  a letter like Exhibit 59?
22     A.   No.
23     Q.   If they had, what would you have
24  done?
25     MR. ALEXIS:

Page 88

1     Object to form.
2     A.   We probably would have talked
3  further about it, I'm sure.
4  EXAMINATION BY MR. HOWARD:
5     Q.   Talked further at Signal or with Mr.
6  Dewan?
7     A.   Yes.
8     Q.   Both?
9     A.   Yes.
10     Q.   And what would you have told Mr.
11  Dewan?
12     MR. SHAPIRO:
13        Object to form.
14     A.   You know, again, there's --
15  there's -- there's no guarantee that green cards
16  could be promised, assured, guaranteed or
17  otherwise.  And that's the gist of the
18  conversation we would have had with them.
19  EXAMINATION BY MR. HOWARD:
20     Q.   Okay.  But you can give a promise to
21  file for a green card for anyone, can't you?
22     A.   You could.
23     Q.   And if -- would you have told Mr.
24  Dewan not to make that promise because Signal's
25  not going to file for a green card for everyone?

Page 89

1     A.   No.
2     MR. SHAPIRO:
3        Object to form.
4  EXAMINATION BY MR. HOWARD:
5     Q.   You wouldn't have told them that?
6     A.   No.
7     Q.   Why not?
8     A.   We may have filed for green cards
9  for some based on demand and based on the
10  employee, based on the employment at the time,
11  based on our understanding of the process.
12     Q.   But based on your intent and just
13  what you told me, wouldn't it have been wrong for
14  your agent, Mr. Dewan, to give every single
15  employee who was coming to Signal a letter that
16  promised that Signal was going to file for a
17  green card for them?
18     MR. SHAPIRO:
19        Object to form.
20     A.   Without understanding the basis for
21  it, it could be misunderstood perhaps.
22  EXAMINATION BY MR. HOWARD:
23     Q.   I won't quibble with words.  I mean,
24  either you were going to file for everybody or
25  you weren't.  You've told us repeatedly this

Schnoor
89:12-21

23 (Pages 86 to 89)

Page 90

1   morning that your mind set was you couldn't say
2   you were going to file for everyone, it depended
3   upon too many circumstances, correct?
4       A.   Correct.
5       Q.   So, why in that case wouldn't it
6   have been wrong for your agent to be telling
7   every one of the workers, Signal's going to file
8   for a green card for you?
9       MR. SHAPIRO:
10          Object to form.
11      A.   We didn't understand the process,
12  frankly.
13  EXAMINATION BY MR. HOWARD:
14      Q.   Do you recognize now that it's a
15  problem that your Indian agent was telling all
16  the workers that Signal was going to file for a
17  green card for them?
18      A.   Again, if there was a demand and
19  they were -- they remained in our employ, yes.
20      Q.   But that couldn't be guaranteed in
21  December of 2006, could it?
22      A.   No.
23      Q.   So, it would have been wrong in
24  December of 2006 to tell every one of these
25  workers that Signal's going to file for a green

Page 91

1   card for you, correct?
2       MR. ALEXIS:
3           Object to form.
4       A.   Perhaps.
5   EXAMINATION BY MR. HOWARD:
6       Q.   Well, in what way wouldn't it have
7   been --
8       A.   The potential was and did exist in
9   our mind to file at some point in time if the
10  demand existed and if the people were in our
11  employ.  That was an intent, not a guarantee.
12      Q.   So, the potential existed, but it
13  wasn't guaranteed?
14      A.   Yeah.
15      Q.   Do you see anywhere in Exhibit 59
16  where it says that Mr. G will get -- have Signal
17  file for a green card for him if there is demand,
18  if Mr. G works out to the satisfaction of Signal?
19      A.   No.
20      Q.   There's no condition in there
21  whatsoever, correct?
22      A.   Not that I see.
23      Q.   In the summer of 2006, as Signal was
24  going through the process, you say it was your
25  intent to have the workers as long as there was a

Page 92

1   need, correct?
2       A.   Correct.
3       Q.   How long did you envision in the
4   summer of 2006 that need being?
5       A.   We didn't have a definitive time.
6   We didn't know how long term "long term" was.  We
7   didn't know what the recovery of the coast was
8   post-Katrina.  So, the honest answer was we did
9   not know.
10      Q.   So, you didn't know whether it would
11  be a few months or a few years, correct?
12      A.   We thought it would be longer than a
13  few months.  We didn't know.
14      Q.   How much longer?
15      A.   We really didn't know, but we
16  expected it to be for several years, perhaps
17  more.
18      Q.   Signal made a capital investment in
19  man camps in Texas and Mississippi based on its
20  expectations, correct?
21      A.   Correct.
22      Q.   How much money in all did Signal
23  expend as a capital cost to build those man
24  camps?
25      A.   On the order of $7 million,

Page 93

1   something like that.
2       Q.   Would that capital cost investment
3   have been made if Signal thought that the demand
4   for the Indian H2B workers was going to be less
5   than a year?
6       A.   No.
7       Q.   I show you what's been previously
8   marked as Exhibit 515.  For the record, it's a
9   two-page document entitled Application For Alien
10  Employment Certification.  The Bates range is
11  BURNETT-CY-00024 through 00025.  Have you seen
12  this document before?
13      A.   No.
14      Q.   Give you an opportunity to review
15  it.  I want to direct your attention to the box
16  at the top of the second page where it asks for
17  the exact dates you expect to employ alien, and
18  it says:  From October 1st, 2006, to July 31st,
19  2007.  Do you see that?
20      A.   Yes.
21      Q.   And this was signed under oath by
22  Bill Bingle on June 2nd, 2006.
23      A.   Yes.
24      Q.   Is it fair to say that as of June,
25  2006, Signal expected to employ the Indian

24 (Pages 90 to 93)

Page 106

1  you understood the true nature of the H2B visas
2  as they relate to green cards?
3      A.   I believe so, yes.
4  MR. ALEXIS:
5      Form.
6  EXAMINATION BY MR. HOWARD:
7      Q.   What would you have told them?
8      A.   I would have clarified our
9  understanding of the process so that they
10 understood the process.
11     Q.   But since you yourself did not
12 understand the process correctly, you could not
13 do that; is that correct?
14     A.   Correct.
15     Q.   You terminated Mr. Pol after that
16 meeting in November of 2006, correct?
17     A.   Yes.
18     Q.   And that termination letter was sent
19 out in November of 2006; is that right?
20     A.   Yes.  Close to that time period,
21 yes.
22     Q.   Look at what was previously marked
23 as Exhibit 520.  Hope that's the right number.
24 It's SIGE0002092 through 093, a letter dated
25 November 22nd, 2006, from yourself to Mr. Michael

Page 107

1  Pol.  Is this a letter that you sent to Mr. Pol
2  after your meeting with him in November, 2006?
3      A.   Yes.
4      Q.   And what was the purpose of this
5  letter?
6      A.   To formally notify Mr. Pol that he
7  had misrepresented the fees to us and had made
8  misrepresentations that we believed were
9  material, and then to request on behalf of our
10 employees that he manage the reimbursement of
11 fees back to those employees.
12     Q.   And didn't Mr. Pol tell you that he
13 was going to, in fact, offer refunds to the
14 employees?
15     A.   We didn't get Mr. Pol's position on
16 the matter until he responded to this letter,
17 which was shortly after November 22nd.  Later in
18 the month, I believe.
19     Q.   I show you what has been previously
20 marked as Exhibit 559.  For the record, it's a
21 November 27th, 2006, letter to yourself from
22 Michael Pol, with a Bates range SIGE0002087
23 through 2088.  Is this the response that you're
24 referring to?
25     A.   Yes.

Page 108

1      Q.   Before we discuss the details
2  concerning these letters, I want to ask you about
3  another paragraph in Exhibit 664, which is the
4  cross-claims of Signal, and that is Paragraph 30,
5  which you will find on Page 10.  It reads:
6          "In an effort to provide
7      some satisfaction to these
8      workers, Signal, on these workers'
9      behalf, requested that the cross-
10     claim defendants refund a
11     substantial portion of the money
12     they had paid by these workers,
13     but the cross-claim defendants
14     refused.  In response to their
15     refusal, and believing that
16     cross-claim defendants poll and
17     Global had a major role in leading
18     these workers to believe they
19     would obtain green cards, Signal
20     terminated its contract with Pol
21     and Global."
22          Did I read that correctly?
23     A.   Yes.
24     Q.   So, is it fair to say that in
25 November of 2006, when you were meeting with Pol

Page 109

1  and having exchange of correspondence with Pol,
2  you had an understanding that Pol and Global had
3  a major role in leading the workers to believe
4  that they would obtain green cards?

Schnoor
109:11-23
109:11-110:9

5  MS. HANGARTNER:
6      Object to form.
7      A.   I think it was my understanding
8  during this time period that green cards were an
9  issue.
10 EXAMINATION BY MR. HOWARD:
11     Q.   In what way were they an issue?
12     A.   If they were guaranteed green cards,
13 that was something we weren't in a position to
14 do, could not do, couldn't guarantee green cards,
15 and that was an issue.
16     Q.   You couldn't guarantee that Signal
17 would even file for green cards, correct?
18     A.   Correct.
19     Q.   And, so, that was an issue that was,
20 in part, contributed to Signal's decision to
21 terminate its contract with Pol and Global,
22 correct?
23     A.   Correct.
24     Q.   And that termination was in November
25 of 2006, correct?

28 (Pages 106 to 109)

Page 110

1    A.   Yes, late November, 2006.
2    Q.   So, at least by late November, 2006,
3  Signal understood that Pol and Global had had a
4  role in leading workers to believe that they
5  would obtain green cards, and that was a problem
6  for Signal, correct?
7       MS. HAROWSKI:
8            Object to form.
9       A.   It would have been a problem, yes.
10 EXAMINATION BY MR. HOWARD:
11   Q.   What, if anything, did Signal do to
12 make sure that any workers who came to Signal
13 after late November, 2006 had been properly
14 informed that Signal would not necessarily file
15 for green cards on their behalf?
16      MS. HANGARTNER:
17           Object to form.
18      A.   Talk to the employees.
19 EXAMINATION BY MR. HOWARD:
20   Q.   The ones still in India?
21   A.   No.
22   Q.   My question --
23   A.   The ones in Mississippi.
24   Q.   Those are the ones you said you met
25 with in March of '07, correct?

Page 111

1    A.   Yes, and probably before that as
2  well.  I just don't recall the specific dates.  I
3  know I met with them before that time.  Don't
4  recall exactly when.
5    Q.   And I think you told us this morning
6  that in the discussions you had with the workers
7  prior to March, 2007, you don't recall having any
8  conversations about green cards.  Those were more
9  in the nature of welcome to Signal, correct?
10   A.   Those were the initial meetings,
11 correct.
12   Q.   So, my question is:  If Signal knows
13 in November, 2006 that workers who were coming to
14 Signal, having been recruited on Signal's behalf,
15 are being told or led to believe that they are
16 going to get green cards and that's a problem,
17 what did Signal do to make sure those workers who
18 were still in India, waiting to come to Signal,
19 were informed of the true fact that Signal would
20 not necessarily file for green cards for them?
21      MS. HANGARTNER:
22           Form.
23      A.   Again, we believed they were being,
24 you know, informed properly.  We weren't the --
25 and I certainly wasn't an expert in visas and

Page 112

1  green cards and the entire process.  We were
2  relying on Mal Burnett, Dewan and Michael Pol,
3  Global Resources, to inform those people
4  correctly.
5  EXAMINATION BY MR. HOWARD:
6    Q.   But at least as of late November,
7  2006, you were terminating Michael Pol and Global
8  Resources in part because of their roll in
9  leading workers to falsely believe that they
10 would get green cards, correct?
11   A.   My -- my -- my basic issue with Mr.
12 Pol and the primary reason for terminating was
13 misrepresenting to Signal the fees that they were
14 charging to the workers.  That was the primary
15 reason he was terminated, as far as I was
16 concerned.
17   Q.   Well, as far as Signal's cross-
18 claims are concerned, on which you've been
19 designated to speak, it says in Paragraph 30,
20 does it not, that the belief by Signal that Pol
21 and Global had a major role in leading the
22 workers to believe they would obtain green cards
23 was a basis for Signal terminating its contract
24 with Pol and Global.
25      MS. HANGARTNER:

Page 113

1           Object to form.
2  EXAMINATION BY MR. HOWARD:
3    Q.   Was that a mistake?
4    A.   It could be.  Again, my primary
5  reason for terminating Michael was he basically
6  lied to us.  Couldn't trust anything he told us
7  beyond that point.  And because he wouldn't make
8  the fees right, which were the -- based on what I
9  put in the letter and what we expected him to do,
10 he was terminated.
11   Q.   Well, based on his having lied to
12 you about fees, were you concerned that he had
13 lied to the workers as well about material
14 issues?
15      MS. HAROWSKI:
16           Object to form.
17      A.   Obviously, I didn't trust anything
18 he said beyond that.  I didn't know what he said
19 to the others.  And he could have lied to
20 others.  Had no direct knowledge of that.
21 EXAMINATION BY MR. HOWARD:
22   Q.   Is it fair to say, though, that
23 after firing Mr. Pol and Global in late November,
24 2006, Signal did not reach out to Mr. Dewan or
25 Mr. Burnett to make sure that they were telling

Schnoor
113:22-114:9

29 (Pages 110 to 113)

Page 114

1  the other Indian workers who were still in India
2  and waiting to come to Signal to make sure and
3  tell them that they will not necessarily have
4  green cards filed for them by Signal?  You didn't
5  do that?
6      MS. HANGARTNER:
7          Object to form.
8      A.   I don't recall.  We made agreements
9  with Pol and Dewan.  After that, I don't recall.
10 EXAMINATION BY MR. HOWARD:
11     Q.   I'd like to show you now what's
12 previously marked as Exhibit 92.  This is a two-
13 page Memorandum of Understanding between Dewan
14 Consultants and one of the Indian workers.  I
15 want to ask whether you've ever seen this before.
16     A.   No.
17     Q.   If you take a look at Paragraph 5,
18 it reads in the first sentence:
19         "The applicant is fully
20     aware that Signal International,
21     L.L.C. has orally promised the
22     facilitator herein that upon the
23     applicant reaching the U.S.A. and
24     resuming employment with them,
25     after successfully passing

Page 115

1  respective skilled trade test,
2  they will be willing to file and
3  process their employment-based
4  green card under EB3 category."
5      Do you see that?
6      A.   Yes.
7      Q.   Are you aware under what basis Mr.
8  Dewan and Dewan Consultants was representing to
9  the applicants that Signal had orally promised
10 Dewan that it would be willing to file and
11 process for green cards for the workers?
12     A.   No.
13     Q.   Would this have been, to your mind,
14 a misrepresentation by Dewan Consultants to the
15 workers?
16     MR. ALEXIS:
17         Object to form.
18     A.   I'm sure it could have been worded
19 better, frankly, but, again, based on our
20 understanding of the green card, I'm not sure we
21 would have -- understand the difference.
22 EXAMINATION BY MR. HOWARD:
23     Q.   Well, would it have been more
24 accurate to have said that if the applicant
25 reaches the U.S. and at the time there's a need

Page 116

1  for the work and the applicant meets with
2  Signal's criteria, at that time, then, Signal may
3  be willing to file a green card for them -- file
4  for a green card for them?
5      MS. HANGARTNER:
6          Form.
7      A.   That would be more accurate, yes.
8  EXAMINATION BY MR. HOWARD:
9      Q.   I think you have in front of you
10 already Exhibit 521.  These are the handwritten
11 notes, including notes of the November 20th
12 meeting that you had with Mr. Pol.  Do you recall
13 who was at that meeting?
14     A.   Myself, Michael Pol, Bill Bingle,
15 John Sanders, maybe Lisa Spears.
16     Q.   Did you ask Mr. Sanders to take
17 notes at that meeting?
18     A.   I did not.
19     Q.   He did that on his own?
20     A.   He did.
21     Q.   Did he ever share them with you
22 afterwards to confirm their accuracy?
23     A.   Not that I recall.
24     Q.   First note he has is:  "MP - $35 a
25 day is ridiculous."

Page 117

1          Do you remember Mr. Pol making a
2  statement at that meeting to the effect of his
3  view of the charge of $35 a day to the workers?
4      A.   He may have made a comment that they
5  were ridiculous.  I'm not sure what -- if he did
6  or if he didn't.
7      Q.   Okay.  Much of the discussion was
8  over the fees; is that correct?
9      A.   That is correct.
10     Q.   And on the second page of the notes,
11 the last page of the exhibit, the second note:
12         "MP - I can fix my part.
13     I'm going to talk with Malvern and
14     Sachin."
15         Do you recall Mr. Pol saying that he
16 would make a refund of the money he had
17 collected?
18     A.   I do recall he did say he would fix
19 his part.
20     Q.   What did you interpret that to mean?
21     A.   He would make a refund.
22     Q.   Did you believe him?
23     A.   Let's say I wanted to.
24     Q.   And he said he would talk to Malvern
25 and Sachin about refunding part of their money?

Schnoor
118:12--14

Page 118

1    A.   Yes.
2    Q.   If they had offered to make a refund
3  to reduce the fees paid to two to $3,000 per
4  worker, would that have satisfied you?
5    A.   Yes.
6    Q.   And the decision not to issue a
7  refund, that had consequences as well, correct?
8    A.   Correct.
9    Q.   And one of the consequences was that
10  you terminated Mr. Pol?
11    A.   Yes.
12    Q.   But you chose not to terminate
13  either Malvern Burnett or Sachin Dewan, correct?
14    A.   Correct.
15    Q.   Did you ever personally speak to
16  them about issuing a refund?
17    A.   I believe so, yes.
18    Q.   Was that before January of 2007 or
19  in a meeting in January of 2007?
20    A.   May have been, but I think we
21  also talked about it with Sachin in 2007, January
22  meeting.
23    Q.   And what did they tell you?  Were
24  they willing to do it or not?
25    A.   I think they basically said they

Page 119

1  would consider it and give me a response -- or
2  respond to the request, which they subsequently
3  did, I believe.
4    Q.   We'll look at that in a moment.
5    A.   Uh-huh.
6    Q.   But sticking with the November, '06
7  meeting with Michael Pol, the next reference is
8  that you said that:
9        "If the whole deal blows up,
10  I'll blow it up in a heartbeat."
11        Do you recall saying words to that
12  effect?
13    A.   I do.
14    Q.   What did you mean by that?
15    A.   I'd terminate Mr. Pol, blow his deal
16  up and whatever else we needed to do, but it was
17  primarily pointed to Mr. Pol for lying to us, not
18  conveying the truth.
19    Q.   Did you give consideration at that
20  meeting or at any time in November of 2006 of
21  saying there's something wrong here and I'm
22  stopping this whole process, we are not going to
23  bring in any more workers who have paid these
24  fees and potentially been lied to by our agents?
25    A.   No.

Page 120

1    Q.   Why not?
2    A.   Because with respect to Malvern and
3  Dewan, they didn't make any misrepresentations to
4  us that I was aware of.
5    Q.   Well, you knew they had collected
6  fees that were unreasonable, in your view,
7  correct?
8    A.   In total, yes, correct.
9    MR. ALEXIS:
10        Object to form.
11  EXAMINATION BY MR. HOWARD:
12    Q.   And you knew, whether in November,
13  2006, before you terminated Mr. Pol, or by late
14  2006, that somebody was telling these workers
15  that they're going to get green cards, right?
16    A.   Sometime, yes.
17    Q.   And neither of those facts led you
18  to even think about terminating Mr. Burnett or
19  Mr. Dewan and stopping the rest of the Indian
20  workers from coming?
21    A.   No.
22    Q.   In Mr. Pol's reply to your letter,
23  which is Exhibit 559, he says in the last
24  paragraph, on Page 2 -- I'll give you a moment to
25  get there.

Page 121

1    A.   Last paragraph?
2    Q.   Yes.
3        "Global, the Indian
4        recruiter and the immigration
5        attorney will be glad to discuss
6        this matter with any employee that
7        is unhappy and who wants to return
8        to India within 45 days of his
9        arrival."
10        When you saw that, did you
11  understand that to be Mr. Pol offering on behalf
12  of himself and Mr. Dewan and Mr. Burnett, whom he
13  said he would speak with, that any worker who is
14  unhappy could go back to India and get a refund
15  of his money?
16    A.   No.  Just that they would talk to
17  any unhappy worker.  I didn't understand it to
18  mean they would get a refund.
19    Q.   Let's mark this as the next exhibit,
20  please.  668.
21        (Whereupon, Exhibit Number
22        668 was marked for identification.)
23  EXAMINATION BY MR. HOWARD:
24    Q.   I've marked as Exhibit 668 a two-
25  page document with the Bates Numbers GR-2355,

31 (Pages 118 to 121)

Page 146

1 people had already paid these fees, and I want to
2 know what gave you that impression.
3     A.  I guess I'd understood more clearly
4 after we had discussions with Pol and we
5 terminated Pol that what they were paying was
6 what they were willing to pay, and those were the
7 fees that were being charged, and I didn't have
8 any means to change that even though I tried.
9     Q.  Well --
10     A.  So, it ended after the
11 correspondence, some of these letters back and
12 forth, and we continued with the process, and I
13 accepted the fact that the workers agreed to pay
14 them fees without Signal's knowledge, without
15 Signal's participation, freely and willfully and
16 there was nothing more I could do about it.
17     Q.  Well, did you ever think that maybe
18 the reason these workers were paying these
19 unreasonable fees is because they were being
20 promised green cards?
21     MR. ALEXIS:
22         Form.
23     A.  I didn't know the details of the fee
24 structure, still don't.
25 EXAMINATION BY MR. HOWARD:

Page 147

1     Q.  Did you ever put two and two
2 together and say, I understand they're paying
3 these high fees and I understand they believe
4 they're getting green cards, maybe they're paying
5 that amount of money because they think they're
6 going to get green cards?
7     MR. ALEXIS:
8         Object to form.
9     A.  I didn't -- I didn't understand all
10 their motivations.
11 EXAMINATION BY MR. HOWARD:
12     Q.  Well, with respect to continuing the
13 process, if in November, 2006, you had decided to
14 blow the whole deal up --
15     A.  With Mr. Pol.
16     Q.  -- vis-a-vis -- yeah, I understand
17 that's what you did.  My question is:  If you
18 decided to blow the whole deal up vis-a-vis Mr.
19 Dewan and Mr. Burnett and not bring in any more
20 workers, you might have saved those workers some
21 money.
22     A.  They might have saved themselves the
23 money.  I mean, I had no input into what they
24 paid or what they agreed to.  Zero.
25     Q.  They were doing that with your

Page 148

1 representatives and agents.
2     MS. HANGARTNER:
3         Object to form.
4     A.  Without our knowledge.
5 EXAMINATION BY MR. HOWARD:
6     Q.  But you got the knowledge in
7 November of 2006, and what I'm asking you is:
8 Why didn't you act on that knowledge with respect
9 to the two-thirds of workers who were still
10 sitting over in India and say now that I know
11 what you're paying, I'm not going to be party to
12 this anymore, I'm not going to bring in 300 more
13 people to work at Signal who've paid what I view
14 to be unreasonable fees?
15     A.  We didn't make --
16     MR. ALEXIS:
17         Form.
18     A.  -- the decision.
19     MR. SHAPIRO:
20         Form.
21 EXAMINATION BY MR. HOWARD:
22     Q.  I understand you didn't make the
23 decision and I'm asking you why?
24     A.  Because we learned more about the
25 fees.  They paid a lot of money, more than what

Page 149

1 was represented to us.
2     Q.  And when you, despite learning about
3 the fees in November, '06, you did not make the
4 decision not to bring in any more workers?
5     A.  I did not make the decision not to
6 bring in any more workers, correct.
7     Q.  Did you have any reason to believe
8 those other workers that you would be bringing in
9 in December of '06, in January of '07, in
10 February of '07 would be paying any lesser fees
11 than the ones who had already come in November of
12 '07 -- '06?
13     A.  No.
14     Q.  Did you have any reason to believe
15 that those workers would be less disgruntled
16 about the fees they'd paid than the ones who had
17 already arrived in November of '06?
18     MR. SHAPIRO:
19         Object to form.
20     A.  I would have to say as time went on,
21 past the March workers, we had less issues.
22 EXAMINATION BY MR. HOWARD:
23     Q.  After March, you had less issues,
24 right?
25     A.  Yeah.

Schnoor
149:23-150:6

38 (Pages 146 to 149)

Page 150

1    Q.   That would be after the March 9th
2  incident --
3    A.   That's correct.
4    Q.   -- when you had less disgruntlement,
5  right?
6    A.   To a degree.
7    Q.   Mr. Schnoor, did the fact that
8  Signal had invested $7 million in building man
9  camps to accommodate H2B workers and needed to
10  recoup those costs from having the workers come
11  pay $35 a day and work at Signal factor in any
12  way, shape or form into your decision to continue
13  bringing workers from India after November of
14  2006 despite knowing the extent of the fees that
15  they were paying?
16    A.   It was part of the investment.
17  Certainly, our investment was there, and our
18  desire to find a long-term solution was still
19  there, and the need was still there.  Absolutely.
20    Q.   So, the fact that you built the
21  camps was part of your decision process?
22    A.   Oh, absolutely.
23    Q.   And the fact that you had a need for
24  workers and that these direct hires from India
25  were less expensive than contract help, correct?

Page 151

1    A.   Business decisions are always made
2  about business, what was good in the best
3  interest of the business and its employees.  It
4  always is.
5    Q.   And business decisions are about
6  money and profits, too, correct?
7    A.   In part.
8    Q.   Well, did you give any thought to
9  what was in the best interests to the Indian
10  workers who were still in India in making the
11  decision and continue to bring them in to Signal?
12    A.   Eventually.
13    Q.   Eventually when?
14    A.   When we made the second -- or
15  started the second process to apply for more --
16  more H2B visas.
17    Q.   That's in --
18    A.   Later in 2007.
19    Q.   The September, 2007 time frame, when
20  you reengaged Mr. Burnett, correct?
21    A.   Correct.
22    Q.   That doesn't apply to the workers
23  who were brought over in late '06 and early '07,
24  correct?
25    A.   No.  It was after they were brought

Page 152

1  in.  They arrived before that, in January, I
2  think, of '07, most of the workers were there.
3    Q.   Did Signal ever do or have done for
4  Signal an economic analysis of the money that
5  Signal would save by having H2B workers from
6  India?
7    A.   Oh, I'm sure we did.
8    Q.   Was that ever written?
9    A.   I'm not sure it was.
10    Q.   So, those numbers were in someone's
11  head?  I mean, did you ever see a written
12  analysis showing the numbers of the cost savings?
13    A.   We estimated cost savings over what
14  we were paying supplemental labor.
15    Q.   And those estimates were not reduced
16  to writing?
17    A.   I don't know.
18    Q.   Do you know who would have done that
19  analysis?
20    A.   Likely, our CFO.
21    Q.   Mr. Cunningham?
22    A.   Yes.
23    Q.   Do you have a recollection as you
24  sit here today at what those cost savings were?
25    A.   No.

Page 153

1    Q.   If you look back at Exhibit 664,
2  again, for the records record, these are Signal's
3  cross-claims and answer in this case, and if I
4  can direct your attention to Page 14 and
5  Paragraph 41, this paragraph reads:
6        "The consequence of the
7        cross-claim defendants' actions
8        has been damages to Signal,
9        financial and otherwise.  Instead
10        of having direct employees
11        consisting of H2B workers, Signal
12        has been required to use
13        subcontract labor at greatly
14        increased cost.  The amount of
15        this loss has not been precisely
16        calculated but it is estimated at
17        ten to $15 million."
18        Do you know how that estimate was
19  arrived at?
20    A.   I don't know if it was just the
21  differential on hourly costs, but it's likely to
22  deal with all the costs associated with the
23  process, to include man camp investments, I would
24  guess, but I don't -- I don't have recollection
25  of all the details, but if it's total cost, it

39 (Pages 150 to 153)

(504)525-1753                HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS        NEW ORLEANS, LA 70139

**Schnoor 154:16-19**

Page 154

 1  would include all of the costs that we
 2  experienced.
 3      Q.   Do you know what time period the ten
 4  to $15 million is supposed to cover with respect
 5  to differing -- differing hourly rates?
 6      A.   No.
 7      Q.   The total man camp investment, you
 8  said, was about $7 million, correct?
 9      A.   Yes.
10      Q.   How much of that $7 million was
11  recouped from fees paid by the Indian workers or
12  fees deducted from the Indian workers' paychecks?
13      A.   I'd say very little.
14      Q.   Do you know how much?
15      A.   No.
16      Q.   It's correct, is it not, that a
17  portion of that $35 a day fee was intended to
18  apply to the reduction of the capital costs?
19      A.   Yes.
20      Q.   Do you know what portion?
21      A.   No.
22      Q.   So, even assuming a $7 million
23  figure for the investment in the man camps, aside
24  from that, what other costs would be included in
25  this ten to $15 million damage calculation other

**Schnoor 155:9-12**

Page 155

 1  than the differential in hourly rates between the
 2  rate that Signal was paying the Indian workers
 3  versus the rate Signal had to pay for contract
 4  employees when they no longer had the Indian
 5  workers?
 6      A.   That would be the primary one.
 7  There was other investments, but they would be
 8  smaller by comparison.
 9      Q.   So, is it fair to say that had this
10  H2B program worked out as Signal hoped, you would
11  have saved millions of dollars in hourly costs?
12      A.   Yes.
13      Q.   While we're on the subject of the
14  $35 a day fee, can you tell me how that amount
15  was arrived at?
16      A.   That came from our CFO and our
17  president/CEO.
18      Q.   Did you have input into that
19  decision?  First, the amount.
20      A.   The amount came from our president/
21  CEO and our CFO, and I actually thought it was
22  smaller than it should have been.
23      Q.   You were actually recommending an
24  amount of about $53 a day, right?
25      A.   Or 50 or something above 35.  I

Page 156

 1  don't recall specifically.
 2      Q.   Let me show you now what's been
 3  marked as Exhibit 671.
 4      MS. HANGARTNER:
 5          I'm sorry.  671?
 6      MR. HOWARD:
 7          Yep.  For the record, it's a
 8      one-page e-mail, one-page set of
 9      two e-mails, dated October 9th and
10      October 10th, 2006, and bears the
11      Bates Number SIGE0012036.
12          (Whereupon, Exhibit Number
13      671 was marked for identification.)
14      MR. ALEXIS:
15          Please say again.
16      MR. HOWARD:
17          SIGE0012036.
18      MR. ALEXIS:
19          Thank you.
20  EXAMINATION BY MR. HOWARD:
21      Q.   Apparently, on October 9th, 2006,
22  Mr. Sanders forwarded to you a man camp cost file
23  for your review; is that right?
24      A.   I'm sorry.  Ask the question again.
25      Q.   Sure.  If you need more time to

Page 157

 1  review it -- I shouldn't be asking while you're
 2  looking at the document.
 3      A.   No.  Ask the question.
 4      Q.   Okay.  On October 9th, did Mr.
 5  Sanders forward for your review a man camp cost
 6  file?
 7      A.   Apparently, he did, according to
 8  this e-mail, but I don't -- I don't recall it at
 9  the time, but looks like he did, yes.
10      Q.   And you say that operating costs
11  plus fixed costs is 5.35 an hour.  That's the
12  operating costs plus fixed costs of the facility?
13      A.   Yes.
14      Q.   And the fixed costs of the facility
15  are amortized over two- to ten-month terms.
16      A.   Yes.
17      Q.   Are you familiar with the accounting
18  treatment of the capital costs investment that
19  Signal made in the man camp?
20      A.   Not exactly.
21      Q.   Okay.  What amortization are you
22  referring to there then?
23      A.   That's just the basis.  I was
24  explaining the number and the 5.35 an hour.
25      Q.   You were coming up with an

40 (Pages 154 to 157)

**Schnoor 162:10-15**

Page 162

1  the U.S., and they were all retested in
2  accordance with our standard practice and
3  procedure.
4      EXAMINATION BY MR. HOWARD:
5      Q.   Well, the new hires that you hire
6  directly in the U.S., nonforeign workers, do you
7  give them written offers of employment and then
8  they come and they get retested?
9      A.   No.
10     Q.   So, this Offer of Employment given
11 to the H2B workers in India which said that they
12 would be getting $18 an hour, that was something
13 unique to the Indian workers, correct?
14     A.   Based on passing the test in India.
15 This was unique.  We tested them twice.
16     Q.   Do you know whether any of the
17 Signal representatives, the people who
18 administered the test, the people who interviewed
19 the workers or the people who monitored the
20 application of the tests, told the workers that
21 they would be retested upon arrival in the U.S.
22 and potentially be subject to having their wages
23 reduced or even being terminated?
24     MS. HANGARTNER:
25         Object to form.

Page 163

1      A.   I can't speak to that because I
2  didn't talk to the workers, but I'd have to say
3  yes, I believe they did.
4      EXAMINATION BY MR. HOWARD:
5      Q.   Have you talked to any of the people
6  who actually went and administered the tests in
7  India to see if they told the workers that?
8      A.   No recently, no.
9      Q.   Well, whenever you spoke to them,
10 did they tell you, yes, we told the workers they
11 would be retested?
12     A.   I just showed you a document where
13 Sachin said they would be, and there was a range
14 subject to that.  I wasn't personally there, so,
15 I can't specifically tell you what all was said
16 or what wasn't said.
17     Q.   Coming back now, assume that the
18 workers who were first-class, they would be paid
19 $18 an hour to start, which was on a par with the
20 prevailing first-class wage at the time, correct?
21     A.   Yes.  It was identical to.
22     Q.   Are you sure that it was identical,
23 or was it a little bit below what you were
24 already paying first-class workers at the time?
25     A.   No.  I believe it's our first-class

Page 164

1  rate at the time.
2      Q.   If Mr. Bingle testified there was a
3  little room for, you know, improvement or
4  raises --
5      A.   Well, there is room for adjustments
6  and -- well, that may be a little bit lower than
7  our first-class rate.  Likely was, now that I
8  think about it.  Yep.
9      Q.   Okay.  And you were recommending
10 that about 30 percent of that first-class rate be
11 deducted from each Indian H2B worker as a charge
12 for the man camp, correct?
13     A.   Your percentage is probably a little
14 bit higher, but that's based on a 40-hour week,
15 and we often work more than that.  Customarily
16 do.  So, it's probably a lower percentage, I
17 would say.
18     Q.   That would be a deduction, the $5.35
19 per hour off the $18 per hour, correct?
20     A.   Off their wages, yes.
21     Q.   You were actually assuming a
22 ten-hour day, because your -- the deduct would be
23 a total of $53.50, correct?
24     A.   Correct.
25     Q.   So, they would be netting

Page 165

1  approximately $109 a day.  So, actually, it's a
2  little more than 30 percent that would be
3  deducted?
4      A.   For the straight time portion of
5  their wage, yes.
6      Q.   So, you're not taking into account
7  the overtime then?
8      A.   Correct.

**Schnoor 165:9-166:15**

9      Q.   Now, were there any other workers
10 Signal for whom there were wage deductions to
11 reimburse Signal for capital investments that
12 Signal made?
13     A.   No.
14     Q.   This was something unique to the
15 Indian workers, correct?
16     A.   This applied to the man camp and the
17 Indian workers and providing houses -- or
18 housing, room and board, yes.
19     Q.   But just so we're absolutely clear,
20 the amount of money that you were suggesting and
21 the amount of money that was actually charged to
22 the Indian H2B workers included a component to
23 allow Signal to recoup some of its capital
24 investment in building the man camps, correct?
25     A.   Certainly, over time, yes.

42 (Pages 162 to 165)

Schnoor
168:3-11

Page 166

1    Q.   Okay.  Now, Signal invests in lots
2  of assets to help its business, does it not?
3    A.   Yes.
4    Q.   Equipment, correct?
5    A.   Yes.
6    Q.   Land?
7    A.   Yes.
8    Q.   You have lots of costs that are
9  costs of doing the business to allow you to make
10  a profit, right?
11    A.   Yes.
12    Q.   Do any other workers other than the
13  H2B workers that you brought in from India pay
14  for any of that?
15    A.   Absolutely not.
16    Q.   But these Indian H2B workers who
17  were coming to provide a source of cheaper labor
18  than were -- were being asked to pay you back to
19  pay for the man camps?
20    A.   Mr. Howard, I don't pay anybody's
21  rent, I don't buy their houses, I don't feed
22  them.  That's the distinction.  That's the
23  difference here.  I don't house any of our other
24  employees, to include myself.  I don't buy their
25  food.  I don't cater to them.  I don't do their

Page 168

1    those issues.
2  EXAMINATION BY MR. HOWARD:
3    Q.   But you also did not give these
4  workers a choice to live outside the camp and pay
5  whatever rent or food or laundry your other
6  workers were paying.
7    A.   Some lived outside the camp.
8    Q.   And they still had to pay the $35 a
9  day?
10    A.   They did.  That was a provision that
11  they signed up to.
12    Q.   But you understood, did you not,
13  that the $35 a day mandatory fee would make it
14  financially difficult for people to live outside
15  the camp?
16    A.   I did not.
17    THE VIDEOGRAPHER:
18      We have to go off the record
19  just a moment.
20    MR. HOWARD:
21      Okay.
22    THE VIDEOGRAPHER:
23      The time now is 2:28.
24      (Whereupon, a discussion was
25  held off the record.)

Page 167

1  laundry.  I don't do any of those things for any
2  of our other employees.  This was a special
3  circumstance related to post-Katrina and the
4  provision for housing and room and care and board
5  on behalf of these employees.
6    Q.   I understand that you don't pay for
7  housing and food for other employees, but you
8  were charging these workers --
9    A.   For housing and food and care and
10  laundry that I don't do for other employees.
11    Q.   And the recoupment of your capital
12  costs, correct?
13    A.   Yeah, over time, a long time.  A
14  long time.  And do you want to ask me if we
15  recouped the capital?  No, we didn't.  You want
16  to ask me what the term is to recoup all the
17  capital?  It's a long, long, long time, Mr.
18  Howard.
19    Q.   Did you take depreciation on it on
20  your taxes?
21    A.   Don't ask me.  I'm not the
22  accountant.
23    MS. HANGARTNER:
24      Mr. Cunningham will be
25  provided to testify and address

Page 169

1    THE VIDEOGRAPHER:
2      We are back on the record.
3      The time now is 2:34.
4  EXAMINATION BY MR. HOWARD:
5    Q.   Mr. Schnoor, following up on the
6  last question, do you agree or disagree that it
7  would have been economically foolish for any of
8  the H2B workers to live outside the camp when
9  they were still required to pay $1,000 a month to
10  live in the camp?
11    MS. HANGARTNER:
12      Object to form.
13    A.   The intent was for them to live in
14  the camp.  That's the agreement we made with the
15  workers.  Some chose to live outside.  I don't
16  know that I considered that foolish, but they
17  did.
18  EXAMINATION BY MR. HOWARD:
19    Q.   Do you know whether those were
20  people who actually had family that came over to
21  the U.S.?
22    A.   I believe -- I believe that's the
23  case, yes.
24    Q.   And family was not allowed to live
25  with them in the camp, correct?

Page 170

1      A.   Correct.
2      Q.   So, if they wanted to live with
3  their family, they had to live outside the camp?
4      A.   Again, I didn't think that was
5  foolish, and they did is my only point.
6      Q.   I'm talking about the economics of
7  it.  Do you think that for a single person
8  choosing to live in the camp or live outside the
9  camp and still have to pay $35 a day in the camp
10  would have been economically foolish?
11      A.   I think they would weigh that in
12  their decision process, and I didn't consider
13  them foolish.  So --
14      Q.   Do you recall in August of 2007
15  consideration being given when Signal was
16  discussing bringing more H2B workers in from
17  India that if you were able to fill the camps to
18  capacity, you would let some of the original H2B
19  workers live outside on a lottery basis?
20      A.   You know, I recall we discussed
21  different things regarding the camp and the fee
22  we collected at different points in time.
23      Q.   At what point in time did you first
24  learn that the workers thought that having to pay
25  the $35 a day for living in the man camp was

Page 171

1  problematic?
2      A.   Probably early in the process,
3  coupled with the fees.
4      Q.   What was the reaction of the others
5  when you suggested the $53 a day?
6      MS. HANGARTNER:
7      Objection.  "Others"
8      meaning --
9  EXAMINATION BY MR. HOWARD:
10      Q.   "Others" meaning Mr. Cunningham, Mr.
11  Marler, the ones who were making the decision on
12  the amount that would be charged.
13      A.   They -- they didn't agree with it.
14  I don't remember a specific reaction or a
15  response.  I think they came out with $35 a day,
16  that was less than what I was recommending, and
17  didn't think any more about it.
18      Q.   I'm going to read from Exhibit 671,
19  your October 10th, 2006, e-mail to Mr. Marler,
20  and that, again, is the president and CEO of the
21  company, correct?
22      A.   Yes.
23      Q.   You say that:
24      "If they work 60 hours per
25      week (which they'll have every

Page 172

1      opportunity to do) and make $18 an
2      hour, they'll net after tax and
3      after $53.50/day deduct, they'll
4      net approximately $109.55 per
5      day."
6      That was your calculation?
7      A.   I guess it was.
8      Q.   "I've assumed we could do
9      the housing deduct before taxes,
10      if not they'd net less."
11      Do you know whether the deductions
12  were done before taxes or on an after-tax basis?
13      A.   I don't recall.
14      Q.   "That's nearly 11 times
15      more per day than they're
16      currently making."
17      How did you know that?
18      A.   I think we were given some
19  information from various locations overseas on
20  what was being paid to Indians at that point in
21  time.
22      Q.   And what was the relevance to you of
23  the fact that the net amount they would make,
24  even if they had to pay Signal $53 a day, would
25  be 11 times more than they were making in India

Page 173

1  or in the Middle East?
2      A.   Just simply some rationale being
3  applied to a recommendation, no more, no less.
4      Q.   And part of your rationale, a
5  relevant point for you, is how much they were
6  making in India versus how much your other
7  workers were making in the U.S., correct?
8      A.   Or how much they could make in the
9  U.S., correct.  Had nothing to do with our other
10  workers.
11      Q.   You were analyzing them separately?
12      A.   I was specifically addressing the
13  H2B visa -- the workers.
14      Q.   It says:
15      "All they'll have to do is
16      roll out of bed and walk to work.
17      Virtually anything else is taken
18      care of for them.  Plus that care
19      will" be likely -- "will likely be
20      an improvement over their current
21      living conditions.  I would think
22      they'll be happy campers."
23      What were you thinking when you
24  wrote that?
25      A.   I was thinking the facility was

44 (Pages 170 to 173)

Page 174

1  nice, the income was good, the jobs were good.
2  They'd be happy campers.  That was our goal, to
3  make them happy campers to the extent we could.
4      Q.    Now, you understood that they would
5  be living up to 24 people per trailer?
6      A.    Initially, yes.
7      Q.    And that they would be operating
8  under rules which said they could have no
9  visitors, correct?
10     A.    In the camp, correct.
11     Q.    No alcohol?
12     A.    Correct.
13     Q.    And yet your view was this would be
14 an improvement over their current living
15 conditions in India; is that true?
16     A.    Yes.  Uh-huh.
17     Q.    And how did you know that?
18     A.    I don't have firsthand knowledge.
19 Based on what I was told, based on where they
20 came from, based on their economic situation,
21 from what I understood, this was an improvement.
22     Q.    And was that the standard you were
23 applying to determine that they would be happy
24 campers, that it's better than they have it in
25 India?

Page 175

1      MS. HANGARTNER:
2          Object to form.              Schnoor
3      A.    One of them.               175:5-177:25
4  EXAMINATION BY MR. HOWARD:
5      Q.    We've been talking about the amount
6  of the fee charged to the workers for the man
7  camp.  Whose decision was it to make that charge
8  mandatory for every worker?
9      A.    Signal's.
10     Q.    Who specifically at Signal?
11     A.    The group.
12     Q.    You were involved in that decision
13 as well?
14     A.    Yes.
15     Q.    Now, Signal had never built, owned
16 or operated a man camp before for its employees;
17 is that correct?
18     A.    Correct.
19     Q.    Let me ask you this:  Part of the
20 problem that Signal was facing, as you've
21 described it, was there was not enough supply of
22 skilled workers because of Hurricane Katrina; is
23 that right?
24     A.    Correct.
25     Q.    And do I understand that the kind of

Page 176

1  reason for that problem was that the hurricane
2  destroyed a lot of people's homes and there was a
3  housing shortage?
4      A.    Correct.
5      Q.    So, people who would otherwise might
6  be available to work at Signal didn't have
7  housing?
8      A.    They were displaced, correct.
9      Q.    Did Signal ever give thought to
10 building a man camp to bring those workers back
11 to work at Signal?
12     A.    I don't think we did.
13     Q.    Why not?
14     A.    We didn't.
15     Q.    I mean, if you had to build a man
16 camp to accommodate the workers you were going to
17 be bringing from all the way from India, why
18 couldn't you just build camps to let the American
19 workers who were displaced come back and work at
20 Signal?
21     A.    There's no guarantee they would
22 come.
23     Q.    Well, was there a guarantee the
24 Indian workers would come?
25     A.    No.

Page 177

1      Q.    Did you ever offer to any non-Indian
2  workers the opportunity to live in the man camp?
3      A.    We considered it.
4      Q.    Did you reject that as a
5  possibility?
6      A.    Just didn't materialize.
7      Q.    At what point did you consider it,
8  before the Indian workers came or after?
9      A.    After.
10     Q.    And other than considering it, did
11 you ever come to a decision on that?
12     A.    Just didn't work out.
13     Q.    In what way?
14     A.    We had -- until we closed the camp,
15 we had Indians working in it, we had an Indian
16 caterer with Indian food, et cetera.  We had
17 talked to some of our labor suppliers about
18 possibly staying in the facility, and conditions
19 just didn't work out so that we needed the
20 work -- or the workers over time, and it didn't
21 work out.  But it was contemplated.
22     Q.    Okay.  But for all relevant points
23 in time, these stayed exclusively Indian man
24 camps?
25     A.    Yes.

Page 178

1    Q.   Having never been an operator of a
2  man camp before, what did Signal do to educate
3  itself as to the best way to operate a man camp?
4    A.   We hired people that had man camp
5  experience to help manage the facility.
6    Q.   Who was that?
7    A.   Rhonda George.
8    Q.   When did you hire Rhonda George?
9    A.   I don't recall specifically, but it
10 wasn't -- maybe early 2007, late 2006.  I
11 don't -- I don't recall when she was hired.
12 Maybe 2007, I would think, but I'm not sure of
13 the date.
14   Q.   Would it be fair to say it was after
15 the March 9th, 2007, events?
16   A.   It could have been.
17   Q.   I believe -- the original head of
18 the man camp was Mr. Sanders, correct?
19   A.   Yes.
20   Q.   And Mr. Snyder was helping him out,
21 according to your direction?
22   A.   Yes.  Yes.
23   Q.   And then there was another -- was it
24 Frank Tipton who then became one of the camp
25 bosses?

Page 179

1    A.   I believe so.  Uh-huh.
2    Q.   And if the record is that Mr. Tipton
3  was kind of the camp boss on March 9th, 2007,
4  would that be inconsistent with your
5  recollection?
6    A.   I think that may be the case, but I
7  don't -- can't say for sure.
8    Q.   And did he take over from Mr.
9  Sanders?
10   A.   I believe so, yes.
11   Q.   Why was that decision made?
12   A.   We were transferring John into
13 another department within the company.
14   Q.   To which department?
15   A.   I think our Industrial Engineering
16 Department.
17   Q.   Whose decision was that, his or
18 yours or mutual?
19   A.   I don't recall.  I'm not sure it was
20 my decision originally, but I don't recall the
21 circumstances.
22   Q.   And Rhonda George was hired to
23 replace Mr. Tipton?
24   A.   That may have been the case, yes.
25   Q.   What previous experience did she

Page 180

1  have in operating man camps?
2    A.   She had some responsibility with the
3  military over in Afghanistan or Iraq managing
4  camp-type facilities like this for the -- either
5  the U.S. Army or one of the branches of the U.S.
6  military involved in the conflicts in the Middle
7  East.
8    Q.   Was there in your mind a kind of
9  comparability between the military camps and the
10 man camps that you were operating at Signal?
11   A.   I would say there's a relationship,
12 but I don't know that I'd considered that or
13 thought about that.
14   Q.   Well, was that part of her relevant
15 experience that got her hired?
16   A.   Yes, I'd say so.
17   Q.   Prior to hiring Rhonda George, did
18 Signal have anyone working in connection with the
19 man camps who had experience operating man camps
20 or camps of that nature?          Schnoor 180:25-181:14
21   A.   I'm not certain.
22   Q.   Other than Rhonda George, did Signal
23 hire anyone else with that kind of experience?
24   A.   Not that I recall.
25   Q.   There were rules that were put in

Page 181

1  place governing the operation of the man camp
2  prior to the Indian workers coming; is that
3  right?
4    A.   That's correct, yes.
5    Q.   Were you involved in determining
6  those rules?
7    A.   I'm certain I was.
8    Q.   Can you recall who else was
9  involved?
10   A.   I would think a number of people,
11 you know:  Mr. Bingle, our contracts people,
12 likely Dick and Chris.
13   Q.   Dick Marler and Chris Cunningham?
14   A.   Yes.  Perhaps Tracey.
15   Q.   Did you go outside the company to
16 get any advice or models for the creation of
17 these rules?
18   A.   I don't recall that we did that.
19   Q.   Is it fair to say that you at Signal
20 management sat around and tried to figure out
21 what the best rules would be for the operation of
22 the camp?
23   A.   That might -- that's my
24 recollection, and it's also coupled with other
25 Signal policy that was in existence at the time.

46 (Pages 178 to 181)

Page 182

```
 1        Q.    What other Signal policy are you
 2   referring to?
 3        A.    Like, alcohol and drug abuse and all
 4   the other portions of the rules that are part of
 5   the housing rules, and the rest of it's somewhat
 6   common sense and there could be other sources for
 7   the -- for what was contained in those rules.
 8        Q.    Well, the no-alcohol policy, I take
 9   it there's a policy of having no alcohol on the
10   work site, correct?
11        A.    Correct.
12        Q.    That would be a danger.
13        A.    That would be a danger.
14        Q.    But in the man camp itself, that was
15   fenced area, correct?
16        A.    Uh-huh.
17        Q.    That was just housing, correct?
18        A.    Correct.
19        Q.    That's where the H2B workers were
20   going to live when they weren't working, correct?
21        A.    Correct.
22        Q.    And there was no work equipment
23   on-site there, was there?
24        A.    Sometimes there's maintenance work
25   and other work that's there, but there are
```

Page 183

```
 1   hazards there that Signal was concerned about.
 2        Q.    What types of hazards?
 3        A.    Trips, fall, any -- any number of
 4   things could happen on that piece of property
 5   that were related to intoxication.  A lot of
 6   things can happen.  Slipping in the shower or
 7   breaking their neck in some respects, but
 8   ultimately becoming injured or having an accident
 9   that's related to being intoxicated.  That's not
10   a policy that Signal would endorse.
11        Q.    Also, you were concerned about
12   liability since this was on Signal property,
13   correct?
14        A.    We're always concerned about
15   liability.  It's normal.
16        Q.    But you don't tell your workers, the
17   non-H2B workers, that when they leave the Signal
18   site, they should not drink because they may fall
19   in the shower or --
20        A.    We didn't tell these employees if
21   they left the Signal site that they couldn't
22   drink either.
23        Q.    Correct.
24        A.    The point was this was on Signal
25   property, is Signal property, and we managed our
```

Page 184

```
 1   property differently than households manage their
 2   own personal property.
 3        Q.    Understood.  That's the point I
 4   wanted to make sure we were on the same page.
 5        A.    We are, I guess.
 6        Q.    That because these camps were on
 7   Signal property, they had to be operated in a
 8   different way than a private home, correct?
 9        A.    Yes.
10        Q.    So, these H2B workers, the Indian
11   workers who lived there, had to give up and
12   sacrifice certain privileges and rights they
13   might have if they lived on private property,
14   correct?
15        MS. HANGARTNER:
16             Object to form.
17        A.    They had to comply with the rules.
18   EXAMINATION BY MR. HOWARD:
19        Q.    One of those rules --
20        A.    That was -- that was a source of
21   their living and their staying in the man camp.
22        Q.    Right.  And if they didn't want to
23   abide by those rules, they could live elsewhere,
24   right?
25        A.    In some cases, they did.
```

Schnoor
184:10-185:25

Page 185

```
 1        Q.    But they still would have to pay
 2   Signal $35 a day, just as if they were living in
 3   the camp?
 4        A.    I believe that's in the agreement
 5   that they signed, yes.
 6        Q.    Well, that was in the agreement they
 7   signed when they got to Signal in Mississippi or
 8   in Texas, having come over from India, correct?
 9        A.    I believe that's correct.  That's
10   when they were signed.  All of our Employment
11   Agreements were signed at that time.
12        Q.    And if an employee had chosen at
13   that time not to sign that agreement, their only
14   choice would have been to fly back to India and
15   eat the $15,000 in fees that they paid to come to
16   Signal; is that right?
17        A.    That would have been one of their
18   options.
19        Q.    What other option do they have?
20        A.    Absconding.
21        Q.    And --
22        A.    They did that, too.
23        Q.    And becoming out of legal status in
24   the U.S., correct?
25        A.    Yes.
```

Schnoor
185:12-25

Page 190

1          3:01.
2    MR. HOWARD:
3          3:01.  Do you want to break
4    for the day?
5    THE WITNESS:
6          Fine.  That's up to you.
7    MR. HOWARD:
8          I think we can do that and
9    accommodate you tomorrow as well.
10   THE WITNESS:
11         Okay.
12   MR. HOWARD:
13         I made an agreement with
14   your counsel to respect your
15   situation and I want to continue
16   with it because sometimes you
17   don't even know when you're
18   getting tired and I don't want to
19   find out after the fact that
20   that's an issue.
21   THE WITNESS:
22         That's fine.  I'm okay to
23   quit.
24         (Whereupon, the testimony of
     the witness was adjourned at 3:01
25   p.m.)

Page 191

1          WITNESS' CERTIFICATE
2
3          I, RONALD WAYNE SCHNOOR, the
     undersigned, do hereby certify that I have read
4    the foregoing deposition and it contains a true
     and correct transcript of the testimony given by
5    me:
6
         (  ) Without corrections.
7        (  ) With corrections as reflected on
             the errata sheet(s) prepared by me
8            and made a part hereof.
9
10
11
12
13         RONALD WAYNE SCHNOOR
14
15         DATE
16
17
18
19
20
21
22
23
24
25

Page 192

1          REPORTER'S CERTIFICATE
2
3
4          I, CAROL VALLETTE SLATER, Certified
5    Court Reporter, Registered Professional Reporter,
6    in and for the State of Louisiana, as the officer
7    before whom this testimony was taken, do hereby
8    certify that RONALD WAYNE SCHNOOR, after having
9    been duly sworn by me upon authority of R.S.
10   37:2554, did testify as hereinbefore set forth in
11   the foregoing pages; that this testimony was
12   reported by me in the stenotype reporting method,
13   was prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21         CAROL VALLETTE SLATER (CCR 78020)
           CERTIFIED COURT REPORTER
22         REGISTERED PROFESSIONAL REPORTER
23
24
25

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
    KURIAN DAVID, SONY          CIVIL ACTION
 4  VASUDEVAN SULEKHA,
    PALANYANDI THANGAMANI,       NO. 08-1220
 5  MARUGANANTHAM KANDHASAMY,
    HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6  ISSAC PADA VEETTIYL, AND
    DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7  BEHALF OF OTHER SIMILARLY
    SITUATED INDIVIDUALS, AND
 8  SABULAL VIJAYAN, KRISHAN
    KUMAR, JACOB JOSEPH
 9  KADDAKKARAPPALLY, KULDEEP
    SINGH, AND THANASEKAR
10  CHELLAPPAN, INDIVIDUALLY,
                 PLAINTIFFS
11
    VERSUS
12
    SIGNAL INTERNATIONAL,
13  LLC, MALVERN C. BURNETT,
    GULF COAST IMMIGRATION
14  LAW CENTER, L.L.C., LAW
    OFFICES OF MALVERN C.
15  BURNETT, A.P.C.,
    INDO-AMERI SOFT L.L.C.,
16  KURELLA RAO, J & M
    ASSOCIATES, INC. OF
17  MISSISSIPPI, GLOBAL
    RESOURCES, INC., MICHAEL
18  POL, SACHIN DEWAN, AND
    DEWAN CONSULTANTS PVT.       VOLUME 2
19  LTD. (a/k/a MEDTECH
    CONSULTANTS).
20                 DEFENDANTS.
21
22  Rule 30(b)(6) deposition of SIGNAL INTERNATIONAL,
    L.L.C. through its designated representative,
23  RONALD WAYNE SCHNOOR, 601 Bayou Cassotte Parkway,
    Pascagoula, Mississippi  39581, taken at the
24  Hampton Inn Moss Point, 6730 Highway 63, Moss
    Point, Mississippi  39583, on Thursday, the 17th
25  day of December, 2009, beginning at 8:48 a.m.
```

Schnoor
198:12-199:10

Page 198

```
 1            We are back on the record.
 2       The date is Thursday, December
 3       17th, 2009, continuation of
 4       deposition of Ron Schnoor.  The
 5       time is 8:48 a.m.
 6            RONALD WAYNE SCHNOOR,
 7  having been previously duly sworn in the cause by
 8  the court reporter, testified as follows:
 9  EXAMINATION BY MR. HOWARD:
10       Q.   Morning, Mr. Schnoor.
11       A.   Morning.
12       Q.   When Signal made the decision to
13  recruit workers from India, was it contemplated
14  from the very start to recruit for both
15  Mississippi and Texas?
16       A.   Yes.
17       Q.   Were there any differences in the
18  recruiting process as applied to workers being
19  recruited for Mississippi versus workers for
20  Texas?
21       A.   Not that I'm aware of.
22       Q.   And when you learned in November of
23  2006 that the workers had paid higher fees than
24  had been represented to Signal, did you
25  understand that both workers recruited for Texas
```

Page 199

```
 1  and workers recruited for Mississippi had paid
 2  those higher fees?
 3       A.   I don't know that I differentiated
 4  between the two.
 5       Q.   And when you made your decisions
 6  first to terminate Mr. Pol and also to continue
 7  recruiting workers to Signal after November,
 8  2006, did you make any differentiation between
 9  workers for Texas and workers for Mississippi?
10       A.   I did not.
11       Q.   Were you making the decisions for
12  both Mississippi and Texas as far as recruitment
13  of Indian H2B workers is concerned?
14       MS. HANGARTNER:
15            Object to form.
16       A.   You know, I would have to say that
17  the decisions were common between the two
18  operations.  My counterpart in Texas at the time,
19  Tom Rigolo, was involved in the discussions and
20  decision-making processes.  I didn't specifically
21  make Texas decisions, but he was engaged in that
22  process, just like I was.
23  EXAMINATION BY MR. HOWARD:
24       Q.   And the testimony you gave yesterday
25  about decisions that were made, did Mr. Rigolo,
```

Page 200

```
 1  on behalf of Texas, the Texas facility of Signal,
 2  agree with those decisions?
 3       A.   I believe he did.
 4       Q.   Can you think as you sit here now
 5  any difference of opinion or different approach
 6  that Mr. Rigolo wanted to take for Texas versus
 7  the decisions you were making?
 8       A.   Initially, no.
 9       Q.   Did there come any point in time
10  where he had a difference in view?
11       A.   I'm not certain, but perhaps.
12       Q.   Well, when you say "initially, no,"
13  that suggests to me that eventually there was
14  some distinction that you have in mind.  Can you
15  explain?
16       A.   There was issues with respect to the
17  skill levels of the workers.  They were less than
18  first-class.
19       Q.   And was that particular to Texas, or
20  did that apply to Mississippi as well?
21       A.   Both.
22       Q.   When did those issues concerning the
23  skill level of the workers come to light?
24       A.   It started shortly after arrival and
25  became apparent within weeks or perhaps the first
```

Page 201

```
 1  months, several months of the employment of these
 2  workers.
 3       Q.   Was it apparent with the first wave
 4  of workers that arrived at Signal?
 5       A.   I don't recall, but it could have
 6  been, yes.
 7       Q.   What steps, if any, did Signal take
 8  to try to improve the skill level of the later
 9  waves of workers?
10       A.   Training.
11       Q.   So, it was Signal's decision to wait
12  for the workers to arrive and then try to train
13  them to get them up to the appropriate skill
14  level?
15       A.   Well, until they arrived, we weren't
16  certain of their skill level.  Once -- once they
17  arrived and they started work, then, their skill
18  level became more apparent.
19       Q.   I understand that, but to the extent
20  that Signal recognized with the initial wave of
21  workers that their skill level was not first-
22  class, as you put it, did Signal have a concern
23  that the later waves of workers coming from India
24  might also show a deficiency in skill level?
25       A.   If we had problems with the first
```

3 (Pages 198 to 201)

Page 202

```
 1   wave, I'd have to say, yes, we were concerned
 2   about it and certainly expressed a concern, but I
 3   don't recall that the first wave of workers
 4   specifically had skill issue problems.
 5       Q.   When do you recall the first
 6   discussions at Signal concerning the skill level
 7   of the workers that were arriving from India?
 8       A.   Probably late 2006, early 2007.
 9       Q.   And to the extent you were having
10   those discussions, was any consideration given to
11   putting a halt on the waves of workers coming to
12   Signal until you could determine or get some
13   assurance that the new workers arriving would
14   have the appropriate skill level?
15       A.   Yes.
16       Q.   And what was done in that regard?
17       A.   We actually didn't proceed, as I
18   recall, with all of the open applications that we
19   had at the time.  We actually stopped some of the
20   waves because of the issues we were having.
21       Q.   And how many workers were in those
22   waves that were stopped, do you know?
23       A.   I don't know exactly, but I'm
24   certain we didn't receive all of the workers in
25   either Mississippi and Texas, and perhaps less
```

**Schnoor 203:8-205:12**

Page 203

```
 1   employees were received in Texas than Mississippi
 2   as a result.
 3       Q.   Do you recall about when that
 4   decision was made to halt the process?
 5       A.   January, February -- early 2007.  I
 6   don't know exactly when, but somewhere in
 7   those -- in that time frame.
 8       Q.   At some point, did Signal make a
 9   decision that it was not going to even file -- or
10   extend the H2B visas of some of the workers?
11       A.   I believe so, yes.
12       Q.   Do you recall when that was?
13       A.   I think the first extensions or the
14   first visa term ended July 2007, end of July,
15   2007.
16       Q.   Correct.  And my question, though,
17   is:  At what point in time prior to July, 2007
18   did Signal make a determination that it was not
19   going to extend the visas of some of the workers?
20       A.   Before the end of July.
21       Q.   Do you recall how much before?
22       A.   No.
23       MR. ALEXIS:
24           Excuse me.  This is Ralph.
25       I couldn't hear the tail end of
```

Page 204

```
 1   that answer.
 2       THE WITNESS:
 3           Before the end of July.
 4       MR. ALEXIS:
 5           Thank you very, very much.
 6       THE WITNESS:
 7           You're welcome.
 8   EXAMINATION BY MR. HOWARD:
 9       Q.   I'd like to show you now what has
10   been previously marked as Exhibit 526.  For the
11   record, this is a chain of e-mails from March,
12   2007, bearing the Bates range SIGE0011825 through
13   11827.  If you could take a moment, please, and
14   review these.
15           Have you had an opportunity to
16   review them?
17       A.   I think so.
18       Q.   The bottom of the first page, going
19   onto the second page, there's an e-mail from you
20   dated March 24th, 2007, to Chris Cunningham,
21   Tracey Binion, John Sanders and Richard Marler,
22   and the body of the first full paragraph says:
23           "Given we will not likely
24           extend all our current H2B
25           personnel particularly those in
```

**Schnoor 204:9-207:14**

Page 205

```
 1   Texas, in conversations John had
 2   yesterday with Malvern Burnett,
 3   Malvern is asking if Signal would
 4   authorize the transfer to another
 5   unnamed company those H2Bs.  We
 6   did not want to extend."
 7           Is it fair to say, based on this
 8   e-mail, at least by March 24th, 2007, you
 9   understood that Signal was likely not going to
10   extend the visas of some of its H2B workers from
11   India?
12       A.   Yes.
13       Q.   And what was the basis for the
14   decision not to extend the visas of all the H2B
15   workers?
16       A.   Skill level.
17       Q.   Did a decline in demand particularly
18   in Texas factor into that decision in any way?
19       A.   I don't specifically recall, but it
20   could have.
21       Q.   Do you recall the name of a program
22   called the Yes/No program adopted by Signal?
23       A.   Yes.
24       Q.   What was that?
25       A.   It was an evaluation process that we
```

4 (Pages 202 to 205)

Page 206

1   started to document the skill level, attitudes,
2   other -- other qualities of the workforce, and I
3   think we started that primarily as a result of
4   the fact that we got less than first-class skills
5   in a number -- in numerous instances and, in some
6   cases, absolutely no skill whatsoever.
7       Q.   Just to clarify, when you say an
8   evaluation process to document the skill level,
9   attitudes and other qualities of the workforce,
10  the workforce you're referring to there is the
11  Indian H2B workforce, correct?
12      A.   Yes, in this instance.
13      Q.   Right.  And Yes/No referred to a
14  decision that Signal was going to make, yes, do
15  we extend the visas of the individual worker
16  being evaluated, or, no, do we not extend the
17  visa of the individual worker being evaluated,
18  correct?
19      A.   I believe that's correct, yes.
20      Q.   And is it fair to say that every
21  single H2B worker from India recruited by Signal
22  in late 2006 and early 2007 was subject to this
23  Yes/No evaluation?
24      MS. HANGARTNER:
25          Object to form.

Page 207

1       A.   All our personnel is subject to
2   evaluation.  It's a common practice.  We evaluate
3   all of our people, 100 percent of them.
4   EXAMINATION BY MR. HOWARD:
5       Q.   I'm sure you do, but --
6       A.   Including everyone that reports to
7   us, so, it's a normal process.
8       Q.   I understand that, but particularly
9   with respect to the decision, yes, we will extend
10  your H2B visa or, no, we will not extend your H2B
11  visa, was that specific evaluation process
12  applied to every Indian H2B worker?
13      A.   That we had at the time, I believe
14  that's correct, yes.
15      Q.   Now, you mentioned yesterday that
16  you sent from Signal personnel to conduct
17  testing of applicants in India, correct?
18      A.   Yes.
19      Q.   And the only workers who were
20  extended an offer of employment by Signal in
21  India were workers who passed the tests that
22  Signal personnel applied, correct?
23      A.   Yes.
24      MR. HOWARD:
25          Why don't we change the tape

Page 208

1   now.
2   THE VIDEOGRAPHER:
3       We're now going off the
4   record.  The time is 9:03 a.m.
5       (Whereupon, a discussion was
6   held off the record.)
7   THE VIDEOGRAPHER:
8       We are back on the record.
9   The time is 9:04 a.m.
10  EXAMINATION BY MR. HOWARD:
11      Q.   Mr. Schnoor, I'm going to show you
12  what I've marked as Exhibit 672.  For the record,
13  it's a two-page document with the Bates range
14  SIGE0360428 -- actually, it's SIGE0360428 and
15  attaches a document that's SIGE0548482.
16          (Whereupon, Exhibit Number
17  672 was marked for identification.)
18  EXAMINATION BY MR. HOWARD:
19      Q.   The first page is an e-mail chain
20  between John Sanders and Lisa Spears, and the
21  attachment is a draft Offer of Employment dated
22  August 21, 2006, similar to the Offer of
23  Employment that's Exhibit 381 that we looked at
24  yesterday.  Who is Lisa Spears?
25      A.   She's our risk manager.

Page 209

1       Q.   Was she tasked with -- was she and
2   John Sanders tasked with the job of coming up
3   with a Offer of Employment that would be given to
4   successful applicants in India who passed
5   Signal's skill tests and were being given an
6   offer to come work at Signal?
7       A.   She was certainly involved in that
8   process, yes.
9       Q.   Who had the final authority over the
10  wording of the Offer of Employment?
11      A.   I'm sure that, you know, majority of
12  us looked at it.  I don't recall specifically who
13  had the final authority, but risk management is a
14  part of our group that reports through our CFO.
15  So, ultimately, Lisa and Chris Cunningham are
16  responsible for our contract issues, which this
17  would fall under.  That's why she was involved in
18  the process.
19      Q.   Do you recall having any comments or
20  issues with the wording of the Offer of
21  Employment?
22      A.   Not that I recall.
23      Q.   Is it correct that Signal insisted
24  on sending its own personnel to conduct the
25  testing of the applicants in India, correct?  It

5 (Pages 206 to 209)

Page 210

1  was not going to rely on Mr. Dewan or anybody
2  else or any other agent in India to do that for
3  Signal?
4      A.   Correct.
5      MS. HANGARTNER:
6          Object to form.
7  EXAMINATION BY MR. HOWARD:
8      Q.   As part of the Yes/No evaluation
9  program -- let me step back.  Strike that.
10         In -- by March of 2007, as we saw
11 from your e-mail, Signal had made a determination
12 that it was going to likely not extend some of
13 the H2B workers' visas, correct?
14     A.   Yes.
15     Q.   Did Signal tell the workers that you
16 were being subject to an evaluation process and
17 if you don't meet our standards by the end of
18 July, we will not extend your visas?
19     A.   I believe they did, yes.
20     Q.   Were there no instructions to keep
21 the fact that these workers were being evaluated
22 confidential and not tell the workers for fear
23 that workers would abscond?
24     A.   I don't recall.
25     Q.   I'm marking as Exhibit 673 another

Page 211

1  e-mail chain.  This is from May of 2007.  The
2  Bates range, SIGE0009978 through 0009980.  Take a
3  moment to review that, please.
4          (Whereupon, Exhibit Number
5          673 was marked for identification.)
6  EXAMINATION BY MR. HOWARD:
7      Q.   There's a reference in the e-mail at
8  the bottom of the page from Bill Bingle to
9  numerous people, including yourself, asking about
10 a Mississippi extensions list and a Texas
11 extensions list, and it says any lists with pay
12 scales and grades should be treated as extremely
13 confidential.  Was the purpose for the
14 confidentiality the fact that the lists included
15 pay scales and grades, or were the extension
16 lists themselves to be treated confidential, or
17 do you not know?
18     A.   It has to do with the fact that we
19 keep pay scales and grades -- grades, as in skill
20 level -- confidential.  It's not something we
21 make public.
22     Q.   Okay.

Schnoor 211:24-212:13

23     A.   It's a standard policy, no more.
24     Q.   My question is:  In March of 2007,
25 when Signal had made the determination that it

Page 212

1  was likely not going to extend the visas of some
2  of the H2B workers, your testimony is that Signal
3  told the workers that, correct?
4      A.   My testimony is that we told the
5  workers a lot of things regarding their skill
6  level, their pay wage, et cetera, and we did an
7  evaluation, and those employees were aware of
8  their scores, they were aware of what they needed
9  to do to improve those skill levels.  We trained,
10 we gave them opportunity to increase their own
11 skill levels in order to reach a minimum standard
12 that we needed to support the work we were doing
13 and to get their visas extended.
14     Q.   And did Signal also view the
15 evaluation process and the prospect of whether or
16 not a worker would get their skill -- have their
17 visa extended as leverage to improve the workers'
18 skill level and attitudes?
19     A.   We always incentivize our people to
20 do better, Mr. Howard.  If you want to call that
21 leverage, then, it's what we do to improve people
22 and performance in our work, in our services to
23 our customers every day.
24     Q.   And do you recall that not only I,
25 but you -- you -- you referred to that as

Page 213

1  leverage, correct?
2      A.   That's a word.  That's leverage.
3  That's whatever you want to call it.  I'd prefer
4  to call it "incentive," but you call it
5  "leverage."  I don't recall using the term
6  "leverage."
7      Q.   Let me show you what was previously
8  marked as Exhibit 448.  It's another e-mail chain
9  from March, 2007.  Bates range, SIGE0009567
10 through 9570.
11         Have you had an opportunity to
12 review it?
13     A.   Yes.
14     Q.   Referring to your -- well, there's
15 an e-mail from Bill Bingle to you, among others,
16 on March 16th, 2007, regarding visa extensions --
17     A.   Uh-huh.
18     Q.   -- in which he says:
19         "We need to discuss how we
20     approach the 'maybe' and the 'no'
21     candidates in discussions on
22     improvement.  I would like to give
23     them every opportunity to improve
24     without scaring them into thinking
25     they were going to get fired."

6 (Pages 210 to 213)

Schnoor 214:23-215:16

Page 214

```
 1          And you respond:
 2          "Bing,
 3          "Agreed, and the extension
 4     is leverage we could use to
 5     incentive improvement in skill and
 6     attitude."
 7          So, you, in fact, used the word
 8     "leverage," correct?
 9      A.   And "incentive," used both of them,
10     actually.
11      Q.   Leverage to incentive improvement?
12      A.   That's correct.  That's my writing.
13      Q.   And what were you suggesting that
14     Signal could use as leverage with the H2B workers
15     was the prospect of whether they could have their
16     visas or not, correct?
17      A.   Yes.
18      Q.   And you understood, certainly by
19     March, 2007, that visa extensions were extremely
20     important to these Indian H2B workers, correct?
21      A.   Can't speak for them individually,
22     but --
23      Q.   But would you agree that
24     collectively, getting visa extensions was
25     important to these workers?
```

Page 215

```
 1      A.   I'm sure that it was.
 2      Q.   Because if they didn't get their
 3     visas extended past July of 2007, their only
 4     other options were to go back to India or to
 5     abscond and be in the country illegally, correct?
 6      A.   Correct.
 7      Q.   And you knew that these workers had
 8     paid a lot of money to come to work at Signal?
 9      A.   We've already been through that, Mr.
10     Howard.  I was aware that they'd paid more than I
11     thought.
12      Q.   And you knew that they -- the
13     opportunity to keep working at Signal was
14     important from a financial perspective to these
15     workers?
16      A.   It was.  It was.
17      Q.   Now, did you -- well, you sent that
18     e-mail not just to Bill Bingle, but to John
19     Sanders, Tracey Binion and Darrell Snyder,
20     correct?
21      A.   Yes.
22      Q.   John Sanders and Darrell Snyder had
23     responsibility for overseeing the man camps and
24     working with the Indian workers?
25      A.   Yes.
```

Page 216

```
 1      Q.   Did you ever have conversations with
 2     either Mr. Sanders or Mr. Snyder about what they
 3     should tell the workers about visa extensions?
 4      A.   Perhaps.
 5      Q.   And what do you recall telling them
 6     in that regard?
 7      A.   Nothing specifically.
 8      Q.   Do you recall telling them in words
 9     or substance, you know, tell the workers if they
10     want to get their visas extended, they've got to
11     improve their skills and attitude?
12      A.   Perhaps.  I think I told the entire
13     group of Indians personally and individually.
14      Q.   When did you have individual
15     communications with workers?
16      A.   There was a number of them that I
17     reviewed their evaluations and made them
18     understand what they needed to do and what
19     opportunity they had to improve.  I don't
20     remember the number, but it was March, April,
21     probably, of 2007.
22      Q.   And how did those communications
23     come about?  I mean, did they come and seek you
24     out or did you seek them out?
25      A.   I seek -- I sought them out.  They
```

Page 217

```
 1     came in our offices.  I personally went through
 2     their evaluation with them, made sure they
 3     understood it, and I did it with -- with a number
 4     of the workers.
 5      Q.   How did you select which workers you
 6     were going to call into the office to review
 7     their evaluations?
 8      A.   Probably the lowest scoring ones.  I
 9     don't remember the exact criteria.  It was a
10     while back.  But based on the ones that if they
11     did not improve, we would not keep, I brought in
12     and talked to them about opportunities to
13     improve, about their specific scores and the
14     evaluations and gave them all the information I
15     had based on the evaluations that were performed
16     by their supervisors.
17      Q.   Did you do that in Mississippi only,
18     or in Texas as well?
19      A.   I only did it in Mississippi.
20      Q.   Do you know what was done in Texas?
21      A.   I do not.
22      Q.   Did you ever talk to Tom Rigolo
23     about --
24      A.   Not that I recall.
25      Q.   -- the issue?  Okay.
```

Page 222

1     this is talking specifically about
2  Orange, and Ron was not over
3  Orange at that time.
4     MR. HOWARD:
5        That's fine.
6     A.   No.
7  EXAMINATION BY MR. HOWARD:
8     Q.   Do you have any understanding as to
9  what Mr. Sanders was talking about when saying we
10  have not done best job we can?
11     A.   I have no knowledge of this.
12     Q.   The next page goes on.  It says:
13        "The NO's who have not yet
14  run away, perhaps (30 of the 40)
15  have options to stay in this
16  country legally.  They need to be
17  informed of these . . . ."
18        Are you aware of what Mr. Sanders is
19  referring to?
20     A.   No.
21     Q.   Do you have any knowledge as to what
22  options the people that Signal had determined
23  they would not extend their visas had for staying
24  in the country legally?
25     A.   No.

Page 223

**Schnoor 223:14-225:23**

1     Q.   So, as far as you understood when
2  you were making the decision not to extend H2B
3  workers' visas, to your mind, their only options
4  were to return to India or abscond and be in the
5  country illegally?
6     A.   Absconding wasn't an option that I
7  considered, perhaps they did, but if they were --
8  from the company's perspective or my perspective,
9  if their extension wasn't -- you know, if their
10  visa wasn't extentioned or authorized, then,
11  their only legal remedy would have been to return
12  to India.  That's what I understood the options
13  were.
14     Q.   Okay.  Now, in addition to being
15  subjected to evaluation and potentially having a
16  decision made by Signal that their H2B visas
17  would not be extended, workers who came to Signal
18  with skill levels not to Signal's standards were
19  also subject to wage reductions; is that correct?
20     A.   Correct.
21     Q.   And they would be reduced to a
22  second-class wage?
23     A.   It varied, depending on their skill
24  level.
25     Q.   And how low could those wages go?

Page 224

1     A.   To the prevailing wage.
2     Q.   Do you recall what that was?
3     A.   12-something.  12.78, 12.80,
4  something like that, at the time.
5     Q.   Do you recall what percentage of
6  workers had their wages reduced to that level?
7     A.   No.
8     Q.   For any workers whom Signal
9  determined once they got to the United States did
10  not possess first-class skill levels and Signal
11  made the determination to reduce their wages to
12  the $12 level, or thereabouts, did the worker
13  have any choice in the matter?
14     A.   Demonstration of his skill level and
15  the ability to improve those skills, as you just
16  talked to me about, as a way to increase their
17  wages.
18     Q.   Just so I understand, the wages
19  would be reduced, but if through training or
20  additional work experience they got their skill
21  level up to what Signal determined to be
22  first-class, their wages would be increased at
23  that point back to the first-class level?
24     A.   Correct.
25     Q.   My question is:  At the point of

Page 225

1  time that Signal makes the determination that a
2  worker's skill level is not first class, Signal
3  makes a decision that this worker's wages are
4  going to be reduced, correct?
5     A.   Yes, based on the individual's
6  performance, it sets the scale and it sets a
7  skill level.  Those two are tied.  Then, that's
8  the skill level that's paid for that ability or,
9  you know, level of competency, yes.
10     Q.   And would you agree with me that
11  every worker who came to Signal on this H2B visa
12  was subject to having their wages reduced if they
13  did not meet the first-class skill levels once
14  they got to the United States?
15     A.   Yes.
16     Q.   At the time that Signal informed
17  workers who did not demonstrate first-class skill
18  levels that their wages would be reduced, am I
19  correct to assume the worker had no option but to
20  accept the wage reduction or leave Signal?  Is
21  that fair to say?
22     A.   That's fair.  They don't have to
23  accept the wage.
24     Q.   But if they don't want to accept the
25  wage reduction, their option is to leave Signal,

9 (Pages 222 to 225)

1  deal with Mr. Burnett?
2      A.   We communicated with him, but we
3  didn't micromanage what they did or approve
4  everything that they did.  We relied on them to
5  do their jobs and to represent Signal legally and
6  otherwise in accordance with our agreement, and
7  they were the experts in the process and had the
8  experience and we relied on them.
9      Q.   If you look at the e-mail that's
10 Exhibit 522, Mr. Sanders lists some points to
11 consider, and it says in the third bullet point:
12          "It will be more complicated
13      to get visa extensions for our
14      workers if we change from Malvern
15      Burnett.  He has all the paperwork
16      and is a known entity of the
17      Department of Homeland Security."
18          Was there consideration being given
19 at the time going into this meeting of changing
20 lawyers?
21     A.   Perhaps.  It was on the table, it
22 appears.
23     Q.   Do you have a recollection of that?
24     A.   Not specifically.
25     Q.   How about generally?

1      A.   I said perhaps.  I don't recall.
2      Q.   How about Mr. Dewan, was it on the
3  table to terminate Mr. Dewan and Dewan
4  Consulting?
5      A.   I don't specifically recall.
6      MR. ALEXIS:
7          Form.
8  EXAMINATION BY MR. HOWARD:
9      Q.   The next bullet point says:
10         "Workers feel taken
11      advantage of by Dewan Consulting.
12      They paid 12 to $15,000 apiece and
13      were promised green cards and
14      permanent settlement in the
15      U.S. for themselves and their
16      families . . . ."
17         Do you see that?
18     A.   Uh-huh.
19     Q.   Is it fair to say that at least by
20 January 15th, 2007, and before the meeting with
21 Mr. Dewan and Mr. Burnett, you understood from
22 Mr. Sanders that the workers were telling Signal
23 they had been promised green cards and permanent
24 settlement in the U.S. for themselves and their
25 families?

1      A.   As I explained yesterday, our
2  understanding was that the green card process
3  would, you know, carry forward to the extent we
4  could -- it could.  So, yes.
5      Q.   And as we discussed yesterday, the
6  fact that these workers were promised green cards
7  was problematic in two respects:  First, because
8  you can't guarantee what the U.S. government's
9  going to do, right?
10     A.   Correct.
11     Q.   And, second, because Signal had not
12 even determined for itself that it was going to
13 even file for green cards for any or all of these
14 workers, correct?
15     A.   Correct.
16     Q.   And that was the case in January of
17 2007, when you met with Mr. Dewan and Mr.
18 Burnett, correct?
19     A.   Correct.
20     Q.   So, having been told by Mr. Sanders
21 in this e-mail prior to this meeting that these
22 workers had been promised green cards and
23 permanent settlement by Mr. Dewan, what did you
24 tell to Mr. Dewan, if anything, about what he
25 could and could not represent about green cards

Schnoor 232:5-15

1  for the workers who were still over in India and
2  hadn't yet come to work at Signal?
3      A.   I didn't, again, have any knowledge
4  or understanding of the process.  I was relying
5  on them to convey to the Indians what could be
6  done, and the green cards or permanent residency
7  was always, in our minds, a potential here, not
8  guaranteed, not assured, but it was potential.
9  We were looking for a long-term solution.  So, I
10 had no knowledge that what was going on here was,
11 you know, correct or incorrect or anything else.
12     Q.   Well, Mr. Sanders goes on to say:
13 "My view is that Sachin" -- that's Dewan,
14 correct?
15     A.   Uh-huh.
16     Q.   -- "stated as fact things that are
17 uncertain."
18         Did you share that view with Mr.
19 Sanders, or did that raise a concern with you
20 when Mr. Sanders told you that?
21     A.   I don't recall the e-mail.  Don't
22 recall.
23     Q.   So, do you recall saying anything to
24 Sachin Dewan in the meeting in January of 2007
25 about what he should or should not tell workers

Page 234

1 concerning green cards?
2     A.   I do not.
3     Q.   Mr. Sanders writes next: "I doubt
4 the U.S. consulates would be pleased."
5          Did you have an understanding as to
6 what he meant?
7     A.   No.
8     Q.   Did you ever ask him what he meant?
9     A.   I don't recall.
10    Q.   The next bullet point:
11         "Michael Pol told us on
12         11/20/06 that 'we may never know
13         how much money Sachin was
14         charging.'"
15         Do you recall Mr. Pol telling you
16 that?
17    A.   Do I recall Mr. Pol?
18    Q.   Mr. Pol telling you that on the
19 meeting in November of '06?
20    A.   Yeah, he could have said that, yes.
21    Q.   Did that raise a concern with you?
22    A.   Yes.
23    Q.   What did you do about it?
24    A.   Demanded they repay some money.  We
25 talked about that yesterday.

Page 235

1     Q.   Right.  Which they decided not --
2 they told you they were not going to do.
3     A.   Yes.
4     Q.   He goes on that:
5          "Meanwhile, Sachin says he
6          is the bill collector and postman
7          for Michael.  He also says it is
8          'complete bull     that workers
9          are paying $15,000'" -- that's in
10         quotes attributable to Dewan --
11         "yet, the attached Excel file says
12         otherwise.  I have heard numbers
13         as high as $17,800 from workers I
14         consider to be credible."
15         Is it fair to say what Mr. Sanders
16 is telling you is that Mr. Dewan is denying
17 charging up to $15,000 to the workers, but Mr.
18 Sanders believes that Mr. Dewan is being
19 untruthful and finds more credible the workers'
20 claims and evidence that they paid as high as
21 $17,800.
22    A.   That's what John's saying.
23    MR. SHAPIRO:
24         Alan, with all due respect,
25 I just did not understand the

Page 236

1 question.
2     MR. HOWARD:
3          Okay.  Then, your objection
4 is noted.
5 EXAMINATION BY MR. HOWARD:
6     Q.   Did you understand the question?
7     A.   Yes.
8     Q.   Okay.  Now, did you confront Mr.
9 Dewan about this issue at this meeting?
10    A.   I don't recall.
11    MR. SHAPIRO:
12         Object to form.
13 EXAMINATION BY MR. HOWARD:
14    Q.   Is it fair to say you did not in the
15 meeting of January, 2007, terminate either Mr.
16 Dewan or Mr. Burnett?
17    A.   Correct.
18    Q.   And you continued, even after
19 January 15th, 2007, to bring in more H2B workers
20 from India who had been recruited by Mr. Dewan?
21    A.   Yes.
22    Q.   I show you now what's being marked
23 as Exhibit 674.  For the record, it's an e-mail
24 chain from December, 2006, with a Bates range
25 SIGE0057695 through 57697.

Schnoor
236:14-21

Page 237

1          (Whereupon, Exhibit Number
2          674 was marked for identification.)
3 EXAMINATION BY MR. HOWARD:
4     Q.   You can take a moment to review
5 that, or have you?
6     A.   I've reviewed it in general.  If
7 you've got questions, I think I understand it
8 enough to --
9     Q.   Okay.  Start with the first e-mail
10 chronologically, which appears on the bottom of
11 the second page.  This is an e-mail from you to
12 John Sanders and Darrell Snyder dated December
13 18th, 2006, Subject:  Man camp food.  Says:
14         "John, Darrell,
15         "Greg Bishop brought me this
16         evening some biscuits from the man
17         camp that had mold on them."
18         Do you recall that?
19    A.   Yes.
20    Q.   What do you recall about that
21 situation?  What happened?
22    A.   One of our safety representatives,
23 who is Mr. Bishop, night shift, came in with a
24 biscuit from the man camp and told me about some
25 upset workers, and I addressed it in these

12 (Pages 234 to 237)

Page 254

1  specifically recall talking to Tom about trailer
2  capacity.
3      Q.   The trailers in Texas, were they the
4  same GE trailers, 24 feet by 36 feet, that were
5  used in Mississippi?
6      A.   Yes, and I think they were -- maybe
7  I'm mistaken, but I thought the trailers was 24
8  by 40, and maybe this square footage is
9  accommodating the toilet facility and shower that
10 you describe, but anyway --
11     Q.   Well, the GE specs would determine
12 that, correct?
13     A.   Yes.  Yes.

Schnoor 254:14-25

14     Q.   I take it, though, that if 24 by 36
15 was the trailer size and there was a mistake in
16 its -- applying the formula by including the
17 bathroom space, that was kind of an innocent
18 mistake.  Your intent was to be OSHA-compliant,
19 correct?
20     A.   Yes.  Yes.
21     Q.   But it's possible if you were
22 housing 17 people per each trailer, you were not
23 OSHA-compliant, if the actual dimensions were 24
24 by 36?
25     A.   Perhaps.

Page 255

1      Q.   Do you know, in fact, after the new
2  trailers became operational in Mississippi in
3  2007 how many workers were living per trailer?
4      A.   I think the intent was 14 to 16 per
5  trailer, something like that.  Sixteen seems to
6  be the right number, but I think it was in
7  that -- in that range.
8      Q.   Do you know for certain?
9      A.   I recall 16.
10     Q.   Do you recall hearing complaints
11 from the initial waves of workers about the bunks
12 being overcrowded?
13     A.   I do.
14     Q.   And were those pretty common
15 complaints?
16     A.   I recall the complaints.
17     Q.   Were there complaints also about
18 lack of privacy?
19     A.   I don't recall that, but I wouldn't
20 be surprised.
21     Q.   And you recall that there were
22 complaints about the food?
23     A.   Uh-huh.
24     Q.   And were there also complaints about
25 the times in which food was served, that is, the

Page 256

1  fact that workers wanted more flexibility about
2  when to eat, when they could eat?
3      A.   I'm not sure I recall that.
4      Q.   And do you recall that one of the
5  near-riot experiences of the dining hall was
6  because some workers showed up a few minutes past
7  when the dining hall closed and they were told
8  they would not be served?
9      A.   I don't recall that.
10     Q.   In your e-mail of December 18th that
11 we were looking at in Exhibit 674, it says:
12          "According to Greg, last
13     night the workers nearly rioted,
14     had the cooks outside threatened
15     to beat them up, all much to do
16     with bad, stale, molded and
17     otherwise poor quality food."
18          So, in fact, the complaints were not
19 just that the south Indians wanted south Indian
20 food as opposed to north Indian food, there were
21 complaints about the quality of the food,
22 correct?
23     A.   In this instance, yes.
24     Q.   Is that the sole instance you can
25 recall about complaints about quality of food?

Page 257

1      A.   That's the most significant one
2  recall.  I don't recall others, but I do recall
3  that one.
4      Q.   They say:  "They also complained
5  about our '24' issue."
6          Do you know what that's in reference
7  to?
8      A.   Probably what we were just talking
9  about.
10     Q.   The fact that there were 24 workers
11 to a trailer?
12     A.   Uh-huh.
13     Q.   I'm sorry.  You have to say "yes" or
14 "no" for the record.
15     A.   Yes.  Yes.  Sorry.
16     Q.   Thank you.
17          You go on to say:
18          "Let's get Anjay in here to
19     take corrective action and to
20     remedy this.  He's getting the
21     extra $1.50 and he needs to get
22     this rectified immediately."
23          The extra $1.50, as I understand it,
24 is that when -- that Michael Pol prior to his
25 termination, was going to be getting a $1.50 cut

17 (Pages 254 to 257)

Schnoor 270:8-271:8

Page 270

1  legal counsel?
2      A.   Basically, wanting repayment of the
3  fees, which we had -- and that's the demand that
4  they made on us, which I just explained to you a
5  minute ago, guarantee for green cards, and
6  there's other items in this e-mail that are part
7  of that.
8      Q.   Now, in making the determination to
9  terminate these two workers, did you direct Mr.
10 Snyder to handle that termination?
11     A.   Yes.
12     Q.   What instructions, if any, did you
13 give him on how to handle that termination?
14     A.   I gave him instructions based on
15 guidance I was given from Immigration and Customs
16 enforcement about how to handle this termination.
17     Q.   You had direct communications with
18 U.S. officials?
19     A.   Yes.
20     Q.   Could you tell me what those were,
21 with whom, when?  What was discussed?
22     A.   Day or two before the 9th of March.
23 In fact, I had asked Darrell earlier in the week
24 to talk to Customs, the local Customs officials,
25 and we'd contacted a gentleman -- I don't recall

Page 271

1  his last name -- his first name was Lars, who was
2  an ICE official, ICE enforcement official, who,
3  from time to time, frequented Signal and checked
4  on certain individuals regarding immigration
5  status, et cetera, and I had communicated with
6  him from time to time and asked Darrell to call
7  him and find out how we deal with the
8  termination, and not just of these two employees.
9  There was another group of employees that
10 ultimately did not have any skill whatsoever, and
11 we had spent approximately five, six weeks, or
12 thereabouts, trying to train and advance their
13 skills.  In any event, had lowered wages of some,
14 but in the case of these six without skill, they
15 fell below the prevailing wage that was a
16 requirement of the visa, and I was advised
17 several days before, perhaps the 7th of March, by
18 Malvern Burnett that we could not keep these
19 people or otherwise we would be in violation of
20 the H2B visas.
21     Q.   You could not keep them at below $13
22 an hour, correct?
23     A.   Yes, correct.
24     Q.   I think at the time they were being
25 paid $9 an hour.

Page 272

1      A.   Something like that, which was our
2  unskilled wage comparable to the rest of the
3  organization's pay scale for that skill level.
4      Q.   So, your options were either to
5  raise them to $13 an hour or terminate them?
6      A.   Yes.
7      Q.   And you chose to terminate them?
8      A.   Because I couldn't raise them above
9  the prevailing wage with no skills, yes.
10     MR. HOWARD:
11         We need to change the tape.
12     THE WITNESS:
13         Sure.
14     THE VIDEOGRAPHER:
15         Going off the record.  The
16     time is 10:35.
17         (Whereupon, a discussion was
18     held off the record.)
19     THE VIDEOGRAPHER:
20         We're back on the record.
21     The time is 10:36.
22 EXAMINATION BY MR. HOWARD:
23     Q.   Could you tell me in more detail
24 about the conversations and contacts you had with
25 Lars at U.S. Immigration, ICE, prior to March

Page 273

1  7th?
2      A.   We had talked previously.  He would
3  call us or call Signal and want access to a
4  certain individual who at the time was employed
5  by Signal.  In most instances, they could have
6  been Hispanic workers working for us, and I
7  think, most of the time, were supplemental
8  contract employees, but would ask for permission
9  to access that individual to ensure that they
10 were documented properly and U.S. citizens or at
11 least legal, you know, U.S. workers.
12     Q.   So, you had a kind of working
13 relationship with Lars prior to the Indian H2B
14 workers coming to work at Signal?
15     A.   Yeah, infrequent, but, yes, we had
16 communications prior to this.
17     Q.   What communications, if any, did you
18 have with Lars or anyone else in the U.S.
19 government between the time that the H2B workers
20 arrived at Signal in the fall of 2006 and March
21 7th, 2007?
22     A.   I don't know that I recall any,
23 but Lars.  There could have been others, but I
24 don't specifically recall talking to other
25 government officials.

21 (Pages 270 to 273)

Page 298

```
1   calm things down after the incident, correct?
2       A.  Yes.  Yes.
3       Q.  On March 9th, John Sanders was away
4   on a personal mission, correct?
5       A.  Yes.
6       Q.  He had had a close relationship with
7   the Indian workers.
8       A.  Yes.
9       Q.  Did he weigh in at all on the
10  decision to terminate?
11      A.  I don't recall.
12      Q.  Was there any consideration given to
13  waiting till he was back to help keep things calm
14  while this termination was going on?
15      A.  No.
16      MR. HOWARD:
17          All right.  Why don't we
18      take a brief break.
19      MS. HANGARTNER:
20          Okay.
21      THE VIDEOGRAPHER:
22          Going off the record.  The
23      time is 11:06.
24          (Whereupon, a discussion was
25      held off the record.)
```

Page 300

```
1   transcript.  I'm less concerned -- I'm not going
2   to play the whole thing.
3       A.  That's fine.
4       Q.  And I'm less concerned with
5   correcting if there are errors in the
6   transcript -- that's not your job, is to --
7       A.  Exactly.
8       Q.  -- to tell me whether the words are
9   correct.
10      A.  Right.
11      Q.  I am interested in the first
12  instance whether this is the meeting you recall
13  that occurred within days of the March 9th, 2007,
14  meeting --
15      MR. ALEXIS:
16          Alan, this is Ralph.  If I
17      may, just as a continuing
18      objection, make the same objection
19      I made in Mr. Burnett's deposition
20      about the tape and the transcript,
21      and subject to that, I'm going to
22      shut up.
23      MR. HOWARD:
24          Okay.  No problem.  You have
25      the objection.
```

Page 299

```
1       THE VIDEOGRAPHER:
2           We're back on the record.
3       The time is 11:19.
4   EXAMINATION BY MR. HOWARD:
5       Q.  Mr. Schnoor, this is what I'd like
6   to do now.  I've marked as Exhibit 676 an audio
7   CD of a camp meeting.  I've also provided you
8   with what has been previously marked as Exhibit
9   524, which is an unofficial transcription of
10  what's heard on the audiotape.
11          Before I play the audiotape, let me
12  ask you first:  Did you learn at some point in
13  time that the meeting that you convened in the
14  camp after the events of March 9th had been
15  recorded?
16          (Whereupon, Exhibit Number
17      676 was marked for identification.)
18      A.  Yes.
19  EXAMINATION BY MR. HOWARD:
20      Q.  Have you had an opportunity before
21  this occasion to actually hear the recording?
22      A.  No.
23      Q.  Well, I'm going to play -- it's
24  actually broken into two pieces.  I'm going to
25  play the start and you can follow along from the
```

Page 301

Schnoor 301:4-302:9

```
1       MR. ALEXIS:
2           Thank you.
3   EXAMINATION BY MR. HOWARD:
4       Q.  Going back to what I was saying, I'm
5   interested in the first instance whether this is
6   the meeting that you testified about that
7   occurred within days of the March 9th, 2007,
8   incident.
9       A.  Yes.
10      Q.  And whether this is, in fact, your
11  voice on the tape.  You'll see the beginning is
12  an actual introduction where you give your name,
13  so, that might make it easy.
14      A.  Sure.
15      Q.  I will tell you the volume isn't
16  great.  It's a little hard to hear.  I will
17  accommodate you and move it over if it helps.
18      A.  That's fine.  I'll try.
19      Q.  I appreciate that.
20          (Audio recording played.)
21          (Live testimony resumed.)
22      THE WITNESS:
23          That's me.
24          (Audio recording played.)
25      MR. SCHNOOR:
```

28 (Pages 298 to 301)

Page 302

```
 1        Most of you here, my name,
 2   for those of you that don't know
 3   me, my name is Ron Schnoor.  I'm a
 4   senior vice president for Signal
 5   and I'm responsible for this
 6   operation.
 7        (Live testimony resumed.)
 8   THE WITNESS:
 9        That's me.
10        (Audio recording played.)
11   MR. SCHNOOR:
12        Some things have come to our
13   attention that need to be
14   addressed, so, I want everybody to
15   understand clearly the discussion
16   this evening.
17        I've also got our CFO, Chris
18   Cunningham, with us.  Chris is
19   responsible for the company's
20   governance, human resources,
21   safety, HS and E benefits,
22   basically, personnel requirements.
23        I've also got Malvern
24   Burnett here with me, who many of
25   you know.  Malvern's an
```

Page 303

```
 1   immigration attorney.  He's also
 2   going to address some issues for
 3   me this evening.
 4        And we've also got an
 5   attorney from our law firm in New
 6   Orleans, Matt Guy, who is also
 7   here.
 8        But let me start by saying:
 9   Signal -- I'm sorry --
10        (Live testimony resumed.)
11   MR. HOWARD:
12        I think you had to wait for
13   some interpretation there.
14   A.   Yeah.
15   EXAMINATION BY MR. HOWARD:
16   Q.   While the interpretation is playing,
17   just to confirm again for the record, that is
18   you?
19   A.   Correct, that is me.
20   Q.   And that is the meeting that
21   occurred on March 12th, 2007, within a few days
22   of the March 9th incident?
23   A.   Yes.
24   Q.   The person you referred to, Matt
25   Guy, he was outside counsel to Signal, correct?
```

Page 304

```
 1   A.   Yes.
 2   Q.   Not an immigration lawyer, correct?
 3   A.   I would say he was more into labor
 4   issues, perhaps not immigration, but a labor
 5   attorney.
 6        (Audio recording played.)
 7   MR. SCHNOOR:
 8        Signal initiated this
 9   process, which was to apply for
10   H2B visas and to bring in more
11   workers to its operation well over
12   a year ago, and Signal did this
13   because it was its long-term
14   solution for supplementing our
15   workforce at Signal so that we
16   could provide services to our
17   customers.  And the key I want you
18   to understand, long term.  That
19   was our goal.
20        (Live testimony resumed.)
21   MR. HOWARD:
22        I'm going to pause it right
23   there.
24   EXAMINATION BY MR. HOWARD:
25   Q.   When you told the workers at this
```

Schnoor
304:6-19

Page 305

```
 1   meeting that the key was you want to understand
 2   that it's long term, what were you trying to
 3   communicate to them?
 4   A.   That the term was long, it wasn't
 5   short, as we talked about yesterday.
 6   Q.   Okay.  Were you trying to give
 7   assurances to these workers in the wake of the
 8   March 9th incident that it was Signal's intent to
 9   keep them employed long term?
10   A.   It was the incident and I was
11   trying to tell them about what our initial term
12   was and what our initial -- you know, why we
13   engaged in this process to start with, long term,
14   just as I described to you yesterday.
15   Q.   Okay.  But now we're in March of
16   2007.
17   A.   Uh-huh.  Yeah.
18   Q.   Had Signal's intent changed in any
19   way?
20   A.   No.  We were still engaged in the
21   process.
22   Q.   And the process was, as you were
23   telling these workers, long term, correct?
24   A.   Correct.
25   Q.   Now, as of March, 2007, though,
```

Schnoor
305:6-306:6

29 (Pages 302 to 305)

Page 306

1   Signal was already in the process of the Yes/No
2   program and it determined that it was not even
3   going to extend the visas for some of the
4   workers, correct?
5       A.   We were evaluating people at that
6   time.  Yes.
7       Q.   Did you draw any distinction for the
8   camp assembly on March 12th, 2007, and tell them
9   that for some of you, it's long term, for others,
10  it may not be?
11      A.   I don't recall.
12      Q.   Was this meeting of the entire camp,
13  that is, day shift and night shift?
14      A.   Yes.
15      Q.   Did you conduct any similar meeting
16  in Texas?
17      A.   Again, I did not -- I did not
18  conduct any similar meeting in Texas with the
19  Indians, no.
20      Q.   Did you have an understanding,
21  though, that the Indian workers in Mississippi
22  communicated regularly with the Indian workers in
23  Texas?
24      A.   Yes.
25      Q.   Did you anticipate that what you

Page 307

1   told the workers in Mississippi on March 12th,
2   2007, would be passed along to the workers in
3   Texas?
4       A.   No.
5       Q.   Did you think it would not be, or
6   you just didn't give any consideration to that?
7       A.   I was addressing Mississippi.
8       Q.   Were the words that you were using
9   applicable to the workers in Texas as well?
10      A.   The words I was using was applicable
11  to the workers in Mississippi, who I was talking
12  to.
13      Q.   To the extent you told them that it
14  was Signal's intent to employ these workers long
15  term, was that applicable to Texas as well?
16      A.   Initially.
17      Q.   Well, what do you mean by
18  "initially"?
19      A.   When we started the program, as I
20  described yesterday, it was initially intended to
21  be a long-term solution to supplement labor for
22  as long as the need required.
23      Q.   I understand.  So --
24      A.   Okay.
25      Q.   -- as of March 12th, 2007 --

Page 308

1       A.   Yeah.
2       Q.   -- for Mississippi, that intent
3   hadn't changed, correct?
4       A.   Correct.
5       Q.   Had it changed for Texas?
6       A.   I, again, was not speaking for
7   Texas, had no responsibility for Texas, was not
8   addressing Texas, and this meeting had nothing to
9   do with Texas.
10      Q.   Did you have an understanding in the
11  wake of March 9th incident that there was unrest
12  and concern among the Texas workers?
13      A.   No.
14      Q.   You hadn't heard that they'd learned
15  about the March 9th event at all?
16      A.   I'm certain they did.  That was not
17  my concern.  If there were issues in Texas, it
18  was going to be addressed by Texas management,
19  not by myself.
20      Q.   Okay.  Now, what, if anything, did
21  you tell the workers on March 12th about their
22  prospects for getting green cards?
23      A.   I don't recall talking to them about
24  prospects for green cards.
25      Q.   Did you mean to imply when you told

Page 309

1   them that you had a long-term view of their
2   employment to imply that Signal would go ahead
3   and file for their green cards, or not?
4       A.   Not necessarily, no.  Again, I
5   didn't know what long-term -- how long long-term
6   was.
7       Q.   So, when you told them it was long
8   term, you had no idea how long term that was
9   going to be?
10      A.   I didn't have a crystal ball, no.
11      Q.   Did you make a determined decision
12  not to discuss green cards at that meeting?
13      A.   I didn't think about green cards at
14  that meeting.
15          MR. HOWARD:
16              What I'm going to try to do
17      here is get to a certain point.
18      Can we pause the videotape until
19      this is ready?
20          THE VIDEOGRAPHER:
21              Going off the record.
22      11:32.
23          (Whereupon, a discussion was
24      held off the record.)
25          THE VIDEOGRAPHER:

30 (Pages 306 to 309)

Page 310

1          We're back on the record.
2          The time is 11:34.
3    EXAMINATION BY MR. HOWARD:
4          Q.   I want you to listen to the next
5    section and ask you questions.  It appears at the
6    19-minute, 39-second mark, and it's starting now.
7              (Audio recording played.)
8          MR. SCHNOOR:
9              You know, my point is now,
10   we have lawyers, and we have to
11   comply with the law.  We don't
12   believe in doing anything less.
13   This company is going to be here
14   for a long time.  We are being,
15   let's just say, chased by all our
16   customers in the industry to do
17   their work because we are the
18   best, because we are compliant
19   with the law.  The Department of
20   Labor just told me so, and I know
21   it anyway.  So, I want you to
22   think very, very carefully about
23   suing Signal and about suing us
24   for things that I know are, let's
25   just say, uncalled for.  It's what

*Schnoor 310:7-312:15*

Page 311

1    I call a frivolous suit because I
2    know we're fully compliant.  We
3    have lawyers, too, very good
4    lawyers.  We will fight this, like
5    we do in Signal's interest.  Okay?
6    That won't be good for this
7    program.  That won't be good for
8    this program.  If we have to spend
9    a lot of energy and effort
10   fighting frivolous lawsuits, then,
11   the process will impact all of
12   you.  We won't be doing any visa
13   extensions or anything with
14   Signal.  This program will be
15   terminated and ended when the
16   visas are complete, and that's
17   July 31st.  That's not very far
18   away.  So, to satisfy our long-
19   term commitment, we want this to
20   work.  We want to make sure we do
21   the right thing by you.  That's
22   how we run our business.  And we
23   are doing that.  We are looking
24   after your interests.  Even those
25   who don't have the skill that they

Page 312

1    said or we thought you did when
2    you came, we're trying to find
3    work for you, too, because we
4    understand your financial
5    situation.  We understand that.
6    And also be advised that when we
7    found that out, we fired the agent
8    that charged you the money that
9    you had paid.  Signal wasn't part
10   of that.  Signal was not part of
11   that.  That was a deal each of you
12   made with agents in India, not
13   Signal's responsibility.  So, we
14   fired the person who didn't quite
15   tell us the full story.
16             (Live testimony resumed.)
17   EXAMINATION BY MR. HOWARD:
18        Q.   Let's stop there.  That was still
19   you speaking, correct?
20        A.   Yes.
21        Q.   Now, when you said to the workers
22   that I want you to think very carefully about
23   suing Signal, is it fair to say that you had
24   thought at the time that there was a potential
25   that the workers would bring a lawsuit against

Page 313

1    Signal?
2         A.   I think I described it as frivolous,
3    yes.
4         Q.   Regardless of whether you would
5    think the suit was frivolous or not, you
6    understood when you made that statement that
7    there was a potential for the workers bringing a
8    lawsuit against Signal?
9         A.   Potential.
10        Q.   And your thought was informed, in
11   part, I would imagine, by your knowledge that
12   Sabulal and Jacob Joseph and other workers were
13   seeking legal counsel?
14        A.   In part.
15        Q.   What else informed that
16   understanding?
17        A.   Feedback from other sources within
18   the camp that were describing what we've talked
19   about previously.
20        Q.   Describing that there were workers
21   unhappy and were seeking legal counsel and
22   considering a lawsuit against Signal?
23        A.   In part.
24        Q.   And you told the workers at this
25   meeting that if the workers sued Signal, then,

*Schnoor 313:4-314:3*

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250         CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Page 314

1  the program would be terminated and all the visas
2  would not be extended, correct?
3      A.   Yes.
4      Q.   And that was your mind set at the
5  time?
6      A.   Yes, that the potential for the
7  whole process to be terminated existed.
8      Q.   And you were --
9      A.   Conveying that.
10     Q.   You were conveying that --
11     A.   Yes.
12     Q.   -- that if you sue us, we end this
13 program?
14     A.   I was communicating.
15     Q.   On the other hand, your view was if
16 they cooperated with Signal and demonstrated the
17 right attitude, then, you would satisfy your
18 long-term commitment, correct?
19     A.   To the extent we could, correct,
20 yes.
21     Q.   Okay.  But you didn't tell them what
22 that long-term commitment meant?
23     A.   Not specifically.
24     Q.   Well, what were you intending to
25 imply to them about long-term commitment?

Schnoor
314:15-315:7

Page 315

1      A.   We would continue to do our part.
2      Q.   And what did you view your part to
3  be, to do the visa extensions and the green card
4  application or not?
5      A.   Potentially, yes.
6      Q.   But potentially not?
7      A.   Potentially not.
8      Q.   When you say "because we understand
9  your financial situation," what did you mean by
10 that?
11     A.   We understood the wages that were
12 paid or the fees that were paid to come to the
13 U.S.
14     Q.   And you understood that that put the
15 workers in a difficult financial situation,
16 correct?
17     A.   Yes.
18     MR. ALEXIS:
19        Object to form.
20     A.   Or a more difficult situation.
21     MR. HOWARD:
22        Mr. Schnoor, at this point,
23 I have no further questions.  And
24 I thank you for your time over the
25 last two days.

Page 316

1      THE WITNESS:
2        Sure.
3      MR. HOWARD:
4        I know some others have some
5  questions for you, but I believe
6  we've reached the lunch break.
7      MS. HANGARTNER:
8        Yep.
9      MR. HOWARD:
10        I will defer to the three
11 counsel who want to examine you
12 and perhaps your own counsel who
13 might want to examine you as to
14 timing, as to how long a lunch
15 break to take to accommodate
16 everyone and accommodate your
17 schedule and your schedule.
18     MS. HAROWSKI:
19        Well, Alan, I've spoken with
20 Ralph, and I think we anticipate I
21 will go first on behalf of Michael
22 Pol and Global Resources, and I'll
23 probably take about 45 minutes,
24 and that should clear up some of
25 the things that Ralph was going to

Page 317

1  ask as well.  Hopefully, after
2  that, we won't be much longer, but
3  I'll defer to the folks on the
4  phone.
5      MR. HOWARD:
6        Ralph, Steve, do you guys
7  want to weigh in?
8      MR. ALEXIS:
9        I'll go second.  Steve, you
10 go third.  Is that the way you
11 want to do it?  Steve?
12     MR. HOWARD:
13        I think we can go off the
14 record.
15     THE VIDEOGRAPHER:
16        Going off the record.  The
17 time is 11:41.
18        (Whereupon, a discussion was
19 held off the record.)
20     THE VIDEOGRAPHER:
21        We are on the record.  The
22 time is 12:48.
23 EXAMINATION BY MS. HAROWSKI:
24     Q.   Good afternoon, Mr. Schnoor.  My
25 name is Christy Harowski, and I represent Michael

32 (Pages 314 to 317)

Page 446

1   done.  Thank you.
2   THE WITNESS:
3       Very good.  Thank you.
4       (Whereupon, the testimony of
5   the witness was concluded at 4:21
6   p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 447

1       WITNESS' CERTIFICATE
2
3
4
5       I, RONALD WAYNE SCHNOOR, the
6   undersigned, do hereby certify that I have read
7   the foregoing deposition and it contains a true
8   and correct transcript of the testimony given by
9   me:
10
11
12   ( ) Without corrections.
13   ( ) With corrections as reflected on
14       the errata sheet(s) prepared by me
15       and made a part hereof.
16
17
18
19
20
21
22       RONALD WAYNE SCHNOOR
23
24       DATE
25

Page 448

1       REPORTER'S CERTIFICATE
2
3
4       I, CAROL VALLETTE SLATER, Certified
5   Court Reporter, Registered Professional Reporter,
6   in and for the State of Louisiana, as the officer
7   before whom this testimony was taken, do hereby
8   certify that RONALD WAYNE SCHNOOR, after having
9   been duly sworn by me upon authority of R.S.
10   37:2554, did testify as hereinbefore set forth in
11   the foregoing pages; that this testimony was
12   reported by me in the stenotype reporting method,
13   was prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21       CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22       REGISTERED PROFESSIONAL REPORTER
23
24
25

65 (Pages 446 to 448)

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS                   NEW ORLEANS, LA 70139

# DEPOSITION EXCERPTS

# DARRELL SNYDER

```
 1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2

 3   KURIAN DAVID, SONY VASUDEVAN   *  CIVIL ACTION
     SULEKHA, PALANYANDI THANGAMANI, *  NO. 08-1220
 4   MARUGANANTHAM KANDHASAMY,       *
     HEMANT KHUTTAN, ANDREWS ISSAC   *  SECTION "A"
 5   PADA VEETTIYL, AND DHANANJAYA   *
     KECHURA, ON BEHALF OF OTHER     *  MAGISTRATE 3
 6   SIMILARLY SITUATED INDIVIDUALS, *
     AND SABULAL VIJAYAN, KRISHAN    *
 7   KUMAR, JACOB JOSEPH             *
     KADDAKKARAPPALLY, KULDEEP SINGH,*
 8   AND THANASEKAR CHELLAPPAN,      *
     INDIVIDUALLY,                   *
 9             PLAINTIFFS            *
                                     *
10   VERSUS                          *
                                     *
11   SIGNAL INTERNATIONAL, LLC,      *
     MALVERN C. BURNETT, GULF COAST  *
12   IMMIGRATION LAW CENTER, L.L.C., *
     LAW OFFICES OF MALVERN C.       *
13   BURNETT, A.P.C., INDO-AMERI SOFT*
     L.L.C., KURELLA RAO, J&M        *
14   ASSOCIATES, INC. OF MISSISSIPPI,*
     GLOBAL RESOURCES, INC., MICHAEL *
15   POL, SACHIN DEWAN, AND DEWAN    *
     CONSULTANTS PVT. LTD. (a/k/a    *
16   MEDTECH CONSULTANTS).           *
                                     *
17             DEFENDANTS.          *
18
19
20   Videotaped Rule 30(b)(6) deposition of SIGNAL
     INTERNATIONAL, L.L.C., given through its
21   designated representative, DARRELL SNYDER, 601
     Bayou Cassotte Parkway, Pascagoula, Mississippi
22   39581, taken in the offices of Middleberg, Riddle
     & Gianna, 31st Floor, 201 St. Charles Avenue,
23   New Orleans, Louisiana 70170, commencing at 11:15
     a.m., on Thursday, the 1st day of October, 2009.
24
25
```

Snyder 12:6-13:6

Page 10

1  the warehouse into production.
2      Q.  How long have you held that position?
3      A.  Four years.
4      Q.  Since 2005 thereabouts?
5      A.  Roughly, yes.
6      Q.  Mr. Snyder, I'm going to show you what
7  I've marked as Exhibit 441.  For the record, it's
8  a multi-page document entitled, "Statement of
9  Events on 3/9/07" bearing a Bates range
10 SIGE0235333 through 5337 on the fifth page.  I
11 believe that's your name and it's dated 3/15/07.
12     A.  (The witness reviews.)
13     Q.  Do you recognize this document?
14     A.  Yes.
15     Q.  What is this document?
16     A.  It's a statement that I recorded after
17 the events on 3/9.
18     Q.  What I would like you to do for me if
19 you would, please, sir, is take a look through
20 the document and tell me as you sit here today if
21 there are any inaccuracies in it.
22     A.  (The witness reviews.)  It's the one I
23 remember writing.
24     Q.  Okay.  And my question is today,
25 testifying here today, is everything in that

Page 11

1  Exhibit 441 statement that you wrote 100 percent
2  accurate?
3      A.  To the best of my recollection, yes.
4      Q.  Did you write this on or about
5  March 15th, 2007?
6      A.  On or about March 15th.  I don't recall
7  the specific day.  It was soon after the event.
8      Q.  Did you notice the date, March 15th,
9  2007 on page 5?
10     A.  Then that would be correct.  That would
11 be the day that I -- that it was written.
12     Q.  So do you actually recall writing this
13 statement?
14     A.  Yes.
15     Q.  Did anyone ask you to write this
16 statement?
17     A.  It was recommended to me to make the
18 statement, yes.
19     Q.  Recommended by whom?
20     A.  HR.
21     Q.  Who in HR?
22     A.  Tracey Binion.
23     Q.  And did she recommend it -- for you to
24 write it on that day, March 15th, 2007?
25     A.  Yes.

Page 12

1      Q.  And why was it that it was recommended
2  to you to write a statement of the account of
3  events that took place a week earlier on
4  March 9th, 2007 on March 15th?  Do you recall?
5      A.  Because of the severity of the event.
6      Q.  Did the fact that you were interviewed
7  by Pascagoula police on March 14th, the day
8  before the statement was written, have anything
9  to do with the recommendation to write the
10 statement in your view?
11     A.  No.
12     Q.  Do you recall being interviewed by the
13 Pascagoula police?
14     A.  Yes.
15     Q.  Do you recall what the interview was
16 about?
17     A.  It was concerning the events of 3/9.
18     Q.  Did you have an understanding of what
19 specific charge the Pascagoula police were
20 investigating?
21     A.  Yes.
22     Q.  What was that?
23     A.  Kidnapping.
24     Q.  Did you have an understanding of what
25 the kidnapping charge entailed?  As a layperson,

Page 13

1  did you have an understanding as to what they
2  were concern -- "they," the police, were
3  concerned had happened?
4      A.  Yes.
5      Q.  What was that?
6      A.  Someone was held against their will.
7      Q.  So at the time you wrote this statement
8  on March 15, 2007 you had been interviewed by the
9  police the day before, correct?
10     A.  Yes.
11     Q.  You understood from that interview that
12 the Pascagoula police were investigating the
13 charge of kidnapping, correct?
14     A.  Yes.
15     Q.  And you understood that the charge of
16 kidnapping entailed holding someone against their
17 will, correct?
18     A.  Yes.
19     Q.  So it would be fair to say that in
20 writing this report, your intent was to describe
21 that the workers who were terminated by Signal on
22 March 9th, 2007 were not detained against their
23 will; is that right?
24         MR. BUCKLEY:
25             Objection.  He's already answered

4 (Pages 10 to 13)

(504)525-1753                          HUFFMAN & ROBINSON, INC.                          (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Page 38

1     A.  I did not answer to John, but it was put
2  to me in no uncertain terms that the man camp and
3  the H-2B workers were his responsibility.
4     Q.  Do you recall having discussions with
5  your direct boss, Bill Bingle, about hearing from
6  the workers early on that they were expecting to
7  receive green cards from the company?
8        MR. BUCKLEY:
9            Objection.
10       MR. ALEXIS:
11           Object to form.
12 EXAMINATION BY MR. HOWARD:
13    Q.  You may answer.
14    A.  No.  I don't recall early on having any
15 conversations with Bill.  I was too busy with
16 other --
17    Q.  What do you recall in your conversations
18 with John Sanders when you told him what you were
19 hearing?
20    A.  Did he -- he seemed to be -- he seemed
21 to rely on Malvern Burnett's expertise to
22 immigration law.
23    Q.  In what way?
24    A.  In all ways, I mean.
25    Q.  Well, did he tell you what Mr. Burnett

Page 39

1  had advised you to say to the workers when asked
2  about their green cards?
3        MR. ALEXIS:
4            Object to form.
5        THE WITNESS:
6            No.
7  EXAMINATION BY MR. HOWARD:
8     Q.  Did you discuss with Mr. Sanders at all
9  how you were to respond to these workers when
10 they asked you about their green cards?
11    A.  I recall a conversation and -- that we
12 had and he -- we determined that there was no
13 green card.  So that's what we -- we told them we
14 didn't understand, that there was no green card.
15 They were here to H-2B visas.
16    Q.  This was a conversation you had with
17 John Sanders?
18    A.  John and I would have had this
19 conversation, yes.
20    Q.  Do you recall when?  **Snyder 39:24-41:6**
21    A.  No.
22    Q.  Would it have been before March of 2007?
23    A.  March of -- yes.
24    Q.  Would it have been in that November 2006
25 time frame?

Page 40

1     A.  It would have been in the November,
2  December -- November, December.
3     Q.  Just so I understand, workers had been
4  coming to you as part of their complaints asking
5  when they were going to get their green cards
6  from the company, correct?
7     A.  I had heard that, yes.
8     Q.  Directly from the workers you heard
9  that --
10    A.  Yes.
11    Q.  -- right?
12    A.  Yes.
13    Q.  You heard that more than once?
14    A.  Yes.
15    Q.  Did you hear that more than ten times?
16    A.  I would say that would be fair to say,
17 yes.
18    Q.  It would be fair to say you heard that a
19 lot from the workers.
20    A.  A lot, yes.
21    Q.  It would be fair to say to you that as a
22 general matter the group of workers, H-2B workers
23 in Mississippi, the Indians, thought they were
24 getting green cards.
25       MR. ALEXIS:

Page 41

1            Object to form.
2        MR. BUCKLEY:
3            Objection.
4        THE WITNESS:
5            Based on what they were asking,
6        yes.
7  EXAMINATION BY MR. HOWARD:
8     Q.  And then you had a conversation with
9  Mr. Sanders in which you discussed the fact that
10 you didn't know what they were talking about,
11 they're not getting green cards.  Is that what
12 your testimony is?
13    A.  No.  The conversation I would have had
14 with John was based upon I didn't understand how
15 they could be here on H-2B visas and get green
16 cards.
17    Q.  Did -- did John understand how that
18 could be?
19    A.  I don't think so.
20    Q.  So the two of you had no understanding
21 how these workers could be expecting to get green
22 cards when they were at Signal on H-2B visas; is
23 that correct?
24       MR. ALEXIS:
25           Object to form.

11 (Pages 38 to 41)

Page 54

1       That's not true.
2   EXAMINATION BY MR. HOWARD:
3       Q.  Well, did you -- did you make sure they
4   had spoons?
5       A.  Yes.
6       Q.  Did you do anything to change the route
7   of the van?
8       A.  It wasn't a van.  It was a bus.
9       Q.  Did you do anything to change the
10  route --
11      A.  No.  We didn't -- we didn't -- given --
12  at the time that we had the bus, given the -- the
13  state of the town that we lived in with the
14  debris from Katrina, there was very little that
15  we could do with that bus route that -- other
16  than what we were doing.
17      Q.  Was any thought to be given to having a
18  van on demand when a worker wanted it?
19      A.  We -- we did that.
20      Q.  When?
21      A.  I don't recall the specific dates.
22      Q.  Would it have been after March of 2007?
23      A.  Yes.
24      Q.  In what way did your conversations with
25  Sabular and Joseph Jacob become more abrasive or

Page 55

1   confrontational over the weeks you were having
2   these conversations?
3       A.  They would just be -- they would be more
4   confrontational and loud with their -- what they
5   were voicing.
6       Q.  And loud?
7       A.  Loud, loud.
8       Q.  Did they ever threaten you physically?
9       A.  Threaten me physically?
10      Q.  Correct.
11      A.  No.  I never felt threatened physically
12  at any point.
13      Q.  Did you understand the two of them to be
14  good workers?
15      A.  I never heard anything derogatory about
16  them.
17      Q.  Did you have anything to do with them at
18  the work site?
19      A.  No.  The only interaction that I would
20  have with the work site is if they would ask me
21  how to go about resolving something if they had
22  an issue within the work site, and it would be in
23  the evening and they would ask, so no.
24      Q.  So other than the fact that Sabular and
25  Joseph Jacob become more loud in communicating

Page 56

1   their complaints to you over the course of
2   several weeks, was there any other reason why you
3   recommended to Signal management that they be
4   terminated?
5       A.  Yes.
6       Q.  What?
7       A.  I felt that they were more or less --
8   I'm not going to say blackmailing me, but they --
9   you know, they put it to me either we get a green
10  card or, you know, our money back.  And that's
11  the only -- that's the only way that they would
12  stop what they were doing.
13      Q.  What is it they were doing other than
14  complaining?
15      A.  Some of the other workers were also
16  complaining about them.
17      Q.  In what way?
18      A.  They were creating unrest.
19      Q.  In what way?
20      A.  Specifically, I couldn't tell you other
21  than they were making the other workers
22  uncomfortable.
23      Q.  The other workers told you this?
24      A.  Yes.
25      Q.  And what did they tell you specifically

Snyder
56:13-18

Page 57

1   how Sabular and Joseph Jacob were making them
2   uncomfortable?
3       A.  Wanting them to participate in making
4   more petty complaints.
5       Q.  In other words, to accompany them to
6   talk to you in making complaints?
7       MR. BUCKLEY:
8           Objection.
9       THE WITNESS:
10          No.
11  EXAMINATION BY MR. HOWARD:
12      Q.  In what way?  What kind of participation
13  are you talking about?
14      A.  Just make the complaints.
15      Q.  You became aware in early March, around
16  March 5th, 2007, that Sabular and Joseph Jacob
17  had sought legal counsel, did you not?
18      A.  No.
19      Q.  You didn't know that?
20      A.  No.
21      Q.  Did you have an understanding --
22      MR. HOWARD:
23          Let's mark this as the next exhibit
24      please.  443?
25      THE COURT REPORTER:

15 (Pages 54 to 57)

Page 66

1      A.   That was my assignment.
2      Q.   And you came up with a plan as to how to
3  do that.
4      A.   Yes.
5      Q.   And you communicated that plan to Frank
6  Tipton, Mark Tanner and Colline Stevens on the
7  afternoon of March 8th.
8      A.   Yes.
9      Q.   Whose idea was it as part of that plan
10  to engage the services of Swetman security
11  guards?
12      A.   That would have been Colline at that
13  point.  I -- Colline.  She was the, I think,
14  supervisor of security or -- at that point.
15      Q.   Was it her responsibility too to
16  identify which Swetman security guards would be
17  involved?
18      A.   Yes.
19      Q.   Did she make a recommendation to you or
20  let you know that afternoon which guards she was
21  going to assign?
22      A.   I don't recall.
23      Q.   Do you recall having any input in the
24  selection of the guards?
25      A.   I wanted somebody that could carry

Page 67

Snyder 67:2-24

1  suitcases.
2      Q.   So you wanted physically strong guards?
3      A.   I wanted somebody that could -- yeah.  I
4  mean, there's some of the guards there that
5  aren't capable of lifting and carrying.
6      Q.   Do you know the guards that were chosen?
7      A.   Do I know --
8      Q.   -- which guards were selected.  Do you
9  recall which guards helped you on March 9th?
10      A.   There were two -- two guys.  I think
11  there was two guys there.
12      Q.   Were there actually four?
13      A.   I just remember the -- I just remember
14  the two.  I just remember two.
15      Q.   So you remember the two really big ones?
16  Are those the two you're remembering?
17      A.   The two -- the two I'm remembering are
18  the ones that were in -- that locked themselves
19  in the bunkhouse.
20      Q.   Can you describe them for me physically?
21      A.   Maybe 5-10, 5-11, 220, 230.
22      Q.   Both of them?
23      A.   Best of my recollection.  They were
24  healthy boys.
25      Q.   In fact one of them, Mr. Andy Buford,

Page 68

1  was he in fact over 300 pounds?
2      A.   Oh, I don't re -- I don't recall that.
3  I mean, I don't -- I don't know a name.  I don't
4  know that name.
5      Q.   Do you know the name Dan Antee?
6      A.   No.
7      Q.   Trent Turner?
8      A.   No.
9      Q.   When you arrived the morning of
10  March 9th, what time was that?
11      A.   Early.
12      Q.   Would that have been about 5:00 a.m.?
13      A.   Prob -- maybe a little after.
14      Q.   Now, at 5:00 a.m., is the man camp full?
15      A.   The day shift will be there.  I don't
16  think the night shift -- it depends on who's
17  working.
18      Q.   The night shift ends at three or four in
19  the morning, correct?
20      A.   Unless they're working twenty -- 24
21  hours a day, so, you know, 24 hours they would be
22  showing up late.
23      Q.   Do you know what the --
24      A.   No.
25      Q.   -- story was that day?

Page 69

1      A.   No.
2      Q.   So if the night shift was not working 24
3  hours straight, they would be in the camp at that
4  time too, correct?
5      A.   Yes.
6      Q.   And did you have a meeting with the
7  people who were going to be involved in this
8  operation for taking the terminated workers out
9  of the camp before you started that morning?
10      A.   Yeah.  I wanted to make sure everybody
11  was there.  I'm sure I -- I'm sure we would have
12  met for a minute, yes.
13      Q.   And do you recall who was at that
14  meeting?
15      A.   Mark Tanner, I think Frank was there,
16  Frank Tipton, and security guards and there was
17  one other -- one other employee.
18      Q.   Who was that?
19      A.   Vince somebody.  He was one of our
20  employees.
21      Q.   Mr. Snyder, did you ever give any
22  consideration to waiting until the workers who
23  were being terminated went to the job site and
24  then going there to remove them one by one?
25      A.   Yes.

18 (Pages 66 to 69)

Page 74

1  unrest; is that right?
2      A.  That's correct.
3      Q.  And did you want to make an example to
4  the other workers that you are not to cause
5  unrest in my camp?
6      A.  From that aspect, in that context, I
7  could have made that statement.
8      Q.  Now, looking at Exhibit 441, you mention
9  that the first worker to be terminated that you
10 identified was 500376, correct?
11     A.  Yes.
12     Q.  By the way, looking at 441 and 443, was
13 it your routine practice to refer to the Indian
14 workers in e-mails and documents by badge number
15 and not by name?
16     MR. BUCKLEY:
17         Objection.
18     THE WITNESS:
19         Yes.
20 EXAMINATION BY MR. HOWARD:
21     Q.  Why was that?
22     A.  I couldn't pronounce most of their
23 names, and everything that we tied to internally,
24 our job costing, your identification within our
25 systems is by badge number.  So even to go

Page 75

1  through the camp and when talking to these guys,
2  whenever I would make a note about an issue that
3  they were having it was always just a badge
4  number.
5      Q.  When you talked to them did you call
6  them by badge number?
7      A.  Sometimes, sometimes.  I would always --
8  I'd pretty much always ask for their badge number
9  just as a way of reference.
10     Q.  Was it common practice within Signal to
11 refer to these Indian workers by badge number
12 rather than name?
13     MR. BUCKLEY:
14         Objection.
15     THE WITNESS:
16         It was my -- it's the way I
17         commonly did it.
18 EXAMINATION BY MR. HOWARD:
19     Q.  And your recollection is
20 that when you identified 500376 as one of the
21 workers to be terminated, you asked him to go to
22 Bunkhouse 15 and wait for him there, correct --
23 wait for you there, correct?
24     A.  Yes.
25     Q.  And your recollection is he went without

Page 76

1  being escorted; is that right?
2      A.  Yes.
3      Q.  If one of the security guards were to
4  testify that he was in fact directed by you to
5  escort that worker to the bunkhouse, he would be
6  mistaken?
7      A.  I don't recall that.
8      Q.  Your recollection is there was already a
9  security guard waiting in Bunkhouse 15 for the
10 arrival of those workers selected for
11 termination, correct?
12     A.  Yes.
13     Q.  Which security guard was waiting in
14 Bunkhouse 15 for the arrival of the terminated
15 workers?
16     A.  I don't recall.
17     Q.  Was it one of these big boys?
18     MR. BUCKLEY:
19         Objection.
20     THE WITNESS:
21         I don't recall.
22 EXAMINATION BY MR. HOWARD:
23     Q.  Was it one of the two that you described
24 that later locked the bunkhouse door?
25     A.  Yes.

Page 77

1      Q.  And those two, as you recall, were
2  around 5-11, 220 pounds?
3      A.  To the best of my recollection.
4      Q.  Was that security guard already waiting
5  in Bunkhouse 15 because you sent him there?
6      A.  I would have -- yes.
7      Q.  And what instructions did you give that
8  security guard when dispatching him to go wait in
9  Bunkhouse 15 for the arrival of the terminated
10 workers?
11     A.  Just wait in there.  Wait in there with
12 them.  Stay in there with them.
13     Q.  And do what?
14     A.  Stay in there with them.
15     Q.  If the workers wanted to leave, they
16 were free to leave?
17     A.  If the workers were to leave to let me
18 know because I wanted them in a group.  I didn't
19 want to have to -- it was my experience dealing
20 with these guys that they would wander away and
21 we'd have to go find one and it was hard to keep
22 them together in a group sometimes.
23     Q.  Well, was the guard told that if one of
24 them left to follow him so he could tell you
25 where he went?

20 (Pages 74 to 77)

Page 78

1    A.  I don't remember the specific directions
2  I gave him.
3    Q.  Did you tell the workers, "Go wait in
4  Bunkhouse 15, but if you want to go somewhere
5  else, that's okay"?
6    A.  No.
7    Q.  You told them to go wait in Bunkhouse
8  15, right?
9    A.  I asked them to wait in Bunkhouse 15 and
10  I'd be there and explain and we would talk about
11  what was going on.
12    Q.  And when they arrived there, there was
13  this 220-pound security guard in that bunkhouse,
14  correct?
15    A.  I don't recall the size of the security
16  guard or which security guard it was.
17    Q.  And your testimony is the only job
18  assignment for this security guard to let you
19  know if any of the workers left the bunkhouse.
20    A.  And to keep order, yes.
21    Q.  Well, if you got to the bunkhouse and
22  some of the workers weren't there, you would have
23  known they had left, right?
24    A.  Well, yes.  But I was --
25    Q.  I'm trying to understand if these people

Page 79

1  were free to go, come and go as they pleased, why
2  did you need a security guard in the bunkhouse
3  where you directed them to go?
4    MR. BUCKLEY:
5      Objection.
6    THE WITNESS:
7      Well, I guess it could have just as
8      easily have been one of our other
9      employees instead of a security guard.
10  EXAMINATION BY MR. HOWARD:
11    Q.  Why did you need anybody there?  If you
12  were sending these workers to go wait in an
13  office for you or wait in a trailer for you to
14  come and talk to them, why did anybody have to be
15  there?
16    MR. BUCKLEY:
17      Objection.
18    THE WITNESS:
19      To keep order, I mean.
20  EXAMINATION BY MR. HOWARD:
21    Q.  What kind of order?  What -- I mean,
22  what --
23    A.  I didn't -- I didn't know what to
24  expect.  I didn't -- I didn't know what to expect
25  with these guys.

Page 80

1    Q.  Did you think maybe that these workers
2  who were being sent by their boss, their
3  employer, to go to sit and wait for him in a
4  trailer and there's a guard sitting there that
5  maybe they would feel that they were not free to
6  leave?  Did that ever cross your mind?
7    MR. BUCKLEY:
8      Objection.
9    THE WITNESS:
10      No.
11  EXAMINATION BY MR. HOWARD:
12    Q.  Mr. Snyder, if the other security
13  guards, former Swetman security guards who were
14  on assignment for you that day were to testify --
15  testify that you directed them specifically that
16  they were not to let these workers leave
17  Bunkhouse 15, would they be lying?
18    MR. BUCKLEY:
19      Objection.
20    THE WITNESS:
21      In a literal term, yes.
22  EXAMINATION BY MR. HOWARD:
23    Q.  Why do you use the word "literal"?
24  They're either lying or they're not.
25    MR. BUCKLEY:

Snyder
80:12-82:18

Page 81

1      Objection.  That's not so.  They
2      could be mistaken.
3    THE WITNESS:
4      It could have been a
5      misunderstanding.  I don't remember -- I
6      don't recall giving a direction, "These
7      guys do not leave this bunkhouse for any
8      reason."
9  EXAMINATION BY MR. HOWARD:
10    Q.  You don't recall it.  So you're saying
11  you could have told them to keep the workers in
12  the bunkhouse but you don't recall it, or is it
13  impossible?  You just absolutely did not give an
14  instruction to the security guards --
15    A.  It's not -- no.  Nothing is impossible.
16    Q.  So it is possible that you told these
17  guards "Keep these terminated workers in the
18  bunkhouse.  We don't want them running.  We want
19  to get them.  We're going to hold them until
20  their flight and put them on a plane back to
21  India."
22    MR. BUCKLEY:
23      Objection.  Compound question,
24      mischaracterized his answer, and now
25      you're testifying instead of him.  I

21 (Pages 78 to 81)

Page 82

1    don't think you're under oath, though,
2    Counsel.
3        MR. HOWARD:
4            I'm not.
5        MR. BUCKLEY:
6            Well, then quit testifying.  Ask
7    him a simple question, not a compound
8    question.
9    EXAMINATION BY MR. HOWARD:
10       Q.   So is it possible that you gave the
11   instruction to these guards to keep these
12   terminated workers in Bunkhouse 15?
13       A.   It is possible that I said something
14   that they interpreted as that, yeah.
15       Q.   All right.  What is it that you think
16   you might have said that they interpreted as
17   that?
18       A.   "Keep them here.  I'll be right back."
19       Q.   When you returned to the bunkhouse -- at
20   some point you returned to Bunkhouse 15 that
21   morning, correct?
22       A.   Yes.
23       Q.   And how many workers to be terminated
24   were in the bunkhouse when you returned there for
25   the first time that morning?

Page 83

1        A.   I'm thinking maybe three.
2        Q.   And how many security guards were in
3    there at that point?
4        A.   I don't recall.
5        Q.   At that time did you tell them they were
6    being terminated?
7        A.   I told -- if Jacob was in there, Jacob
8    asked me.  Yeah, they knew.  They all knew before
9    they went in.
10       Q.   How did they know?
11       A.   Because before they went in there they
12   were told.
13       Q.   By whom?
14       A.   By one -- two of them didn't speak
15   English, so I asked -- one of them's brother told
16   him and I forget who the other one is, but they
17   were told by other employees that were there.
18       Q.   So you told the workers as you found
19   them in the camp that they were being terminated
20   and now go to Bunk 15 and wait for you?
21       A.   Yes.
22       MR. HOWARD:
23           Let's mark this as the next
24   exhibit.
25           (Exhibit 444 was marked for

Page 84

1    identification.)
2    EXAMINATION BY MR. HOWARD:
3        Q.   Mr. Snyder, I'm going to show you now
4    what's been marked as Exhibit 444 to your
5    deposition.  It is a multi-page document, no
6    Bates number, entitled, "Pascagoula Police
7    Department" incident report.  I will tell you and
8    state for the record it's a combination of two
9    incident reports, actually several incident
10   reports, the first two pages dated March 15th,
11   2007 discussing an investigation into the
12   disturbance and kidnapping that was said to have
13   taken place at Signal International on the 9th of
14   March '07.  I'd ask you to take a look at that.
15       MR. ALEXIS:
16           While he's taking a look at that,
17   can we go off the record and take a
18   break?
19       MR. HOWARD:
20           Sure.
21       THE VIDEOGRAPHER:
22           Off the record.  It's 1:07.
23           (Whereupon a short break was taken
24   at this time.)
25       THE VIDEOGRAPHER:

Page 85

1            Returning to the record.  It is
2    1:16, start of Tape 3.
3    EXAMINATION BY MR. BUCKLEY:
4        Q.   Mr. Snyder, looking at Exhibit 444, the
5    Pascagoula Police Department report, the coverage
6    page of a report entered March 15th, 2007 by
7    officer Dale Gordon, do you recall giving an
8    interview with Officer Gordon on March 14th,
9    2007?
10       A.   I don't recall a Dale Gordon.  I recall
11   speaking to some police department personnel.
12       Q.   Did they come visit you at Signal?
13       A.   Yes.
14       Q.   And they explained to you that they were
15   investigating the incidents of March 9th, 2007?
16       A.   Yes.
17       Q.   And was it at that time that you
18   understood the police were investigating a
19   possible kidnapping charge or did you already
20   know that when they came to talk to you?
21       A.   I don't recall.
22       Q.   But clearly, you know, as of the time of
23   that interview, you were made aware that they
24   were investigating a kidnapping charge?
25       A.   Yes.

22 (Pages 82 to 85)

1  exact flight, but it was out of Mobile.
2      Q.  When -- when were -- when were you told
3  this, what flight it was going to be?
4      A.  I don't know when the tickets were
5  purchased.
6      Q.  Would it be fair to say they were
7  purchased before March 9th?
8      A.  Yes.
9      Q.  Do you know why the workers weren't told
10  on the day that these tickets were purchased to
11  send them back to India that they were being
12  terminated and give them more than a few hours to
13  take care of their affairs and make the flight?
14      A.  No.
15      Q.  Were you part of that decision?
16      A.  I don't recall a specific conversation
17  addressing that issue.
18      Q.  You knew at least by March 8th which
19  workers were being terminated, correct?
20      A.  Yes.
21      Q.  Were you told not to tell them until the
22  morning of March 9th or was that your decision?
23      A.  I don't recall any instructions, but
24  normally, in our business we don't prebroadcast a
25  termination.

1      Q.  Well, this wasn't really normal, right?
2  These guys are going back to India, correct?
3      A.  Correct.
4      Q.  And as you said, you anticipated they
5  would have some things they would have to do,
6  like go to the bank and other things, correct?
7      A.  Correct.
8      Q.  You were told, at least by March 8th,
9  who was being terminated and that they were going
10  to be on a 12:15 flight on March 9th.  Did it
11  ever occur to you that maybe I ought to give them
12  24 hours advanced notice that they're be sent
13  home to India?
14          MR. BUCKLEY:
15              Objection.
16          THE WITNESS:
17              No.
18  EXAMINATION BY MR. HOWARD:
19      Q.  Take a look at Exhibit 444, page 5 of
20  the fax is a Pascagoula Police Department
21  incident report entered on March 12th, 2007
22  regarding the police response to a call on
23  March 9th, 2007 at Signal International in
24  response to a complaint of a large disturbance.
25  The report says that the officer, Richard Palmer,

1  was met by Frank Tipton, facilities manager.
2  Mr. Tipton was someone working with you that day
3  on March 9th, correct?
4      A.  Yes.
5      Q.  And according to this police report, it
6  says, "Mr. Tipton informed me that he was
7  instructed by his superiors to locate, detain,
8  terminate and transport to the airport
9  Mr. Sabulal Veluthedathu, Employee
10  Number 500304."  Were you one of Mr. Tipton's
11  superiors?
12      A.  No.
13      Q.  Who was Mr. Tipton's superiors?
14      A.  He worked for John Sanders.
15      Q.  Was John Sanders involved at all in the
16  events of March 9th?
17      A.  No.
18      Q.  Were any other superiors of Mr. Tipton
19  involved in the planning and execution of
20  March 9th?
21      A.  I don't -- I'm not aware of them.
22      Q.  Do you know why Mr. Tipton, according to
23  the police report, informed the officer that he
24  was instructed by his superiors to locate,
25  detain, terminate and transport Sabulal to the

1  airport?
2          MR. BUCKLEY:
3              Object to the form of the question.
4          Are you asking him to clarify whether
5          Mr. Tipton said this or whether this is
6          what the police report said or what?
7  EXAMINATION BY MR. HOWARD:
8      Q.  We know this is on the police report.
9  Do you have any understanding as to why
10  Mr. Tipton may have said that to the police
11  officer?
12      A.  No.
13      Q.  Is it your testimony that at no time was
14  any person involved with March 9th, 2007 and the
15  termination of these workers, either Mr. Tipton,
16  anyone else from Signal or any of the Swetman
17  security guards, instructed to detain any of the
18  workers?
19      A.  Not that I recall.

**Snyder 101:20-102:5**

20      Q.  Is there any instruction that could have
21  been given that Mr. Tipton or one of the -- or
22  one or more of the security guards may have
23  interpreted as being an instruction to detain
24  these workers?
25          MR. BUCKLEY:



Page 102

1       Objection.
2    THE WITNESS:
3       Maybe the instruction to keep them
4    in Bunkhouse 15 until we talked to them
5    as a group.
6  EXAMINATION BY MR. HOWARD:
7    Q.  Looking back at the first page of
8  Exhibit 444, do you recall explaining to the
9  police officer that you wanted to meet and
10 explain to the terminated employees what was
11 going to happen as a group because otherwise, if
12 you did it one by one, the employees would have
13 absconded or left the plant?
14   A.  I would have made that statement that
15 there was a chance of that.
16   Q.  And was the chance of one or more of the
17 workers absconding or leaving the plant something
18 you prepared for in planning the events of
19 March 9th?
20   A.  No.
21   Q.  Did you care one way or the other
22 whether they absconded or left the plant?
23   A.  It was -- yes.
24   Q.  Again, why did you care?
25   A.  Trying to fulfill the obligations of

Page 103

1  their H-2B visas --
2    Q.  Well --
3    A.  -- as I understood them.
4    Q.  So is it your testimony that if you got
5  them all together in Bunkhouse 15 and you said,
6  "I've got tickets for a flight.  I've got a van
7  ready to take you to the airport.  If you would
8  rather walk out the door, you're free to go.  Go
9  do that."
10   MR. BUCKLEY:
11      Objection.
12   THE WITNESS:
13      No.
14 EXAMINATION BY MR. HOWARD:
15   Q.  Why not?
16   A.  Because they would have -- still, to me,
17 that wouldn't have been giving them the
18 opportunity that we could provide them.
19   Q.  What more opportunity could you provide
20 them?
21   A.  Take them to the airport.
22   Q.  What if they didn't want to go?
23   A.  That's -- I've done my thing.
24   Q.  That's what I was asking you.  If they
25 said after, "Thanks for the offer of the tickets.

Page 104

1  We don't want them.  We're going to walk out the
2  door," that would have been okay with you.
3    A.  No.  Because they've gone -- in that --
4  in that context, yes.  But I would -- my whole
5  intent was to take them to the airport or to
6  Mobile, to make the effort.  And whether they got
7  on the airplane was no consequence to me.
8    Q.  How did you come to learn that Sabulal
9  had attempted suicide?
10   MR. BUCKLEY:
11      Objection.
12   THE WITNESS:
13      I -- either Mr. Tanner came around
14   the corner and told me and then -- or
15   very shortly after I saw Sabulal being
16   carried out.
17 EXAMINATION BY MR. HOWARD:
18   Q.  Carried out by whom?
19   A.  Other employees.
20   Q.  And you say that you were met in the
21 back of the cafeteria by a security guard and he
22 questioned what was going on.  Do you recall
23 which security guard that was?
24   A.  No.
25   Q.  Did you talk to Mr. Tanner and ask him

Snyder
104:8-105:6

Page 105

1  what had happened?
2    A.  Very quickly.  He said -- yes.
3    Q.  What did he tell you?
4    A.  He cut his wrist.
5    Q.  You say you told --
6    A.  Or he was bleeding from the wrist.
7    Q.  You said he told someone -- you told
8  someone -- you told him, the security guard,
9  someone needed medical help and to call 911.  Do
10 you know if that guard did that?
11   A.  I'm not -- I'm not real sure.
12   Q.  Did you do anything to follow up to see
13 if 911 had been called?
14   A.  From the point that I called 911 to the
15 point -- or I made the call to call 911 until he
16 was gone was a matter of minutes.
17   Q.  When you say "made the call," did you
18 tell the security guard --
19   A.  Yes.
20   Q.  -- or did you actually call it in?
21   A.  I couldn't.  I didn't have access to a
22 phone right then.
23   Q.  Did you have a cell phone?
24   A.  No.
25   Q.  And by the time you said you could have

27 (Pages 102 to 105)

Page 106

1  checked, he was already gone.
2      A.  He was -- he was gone before I could get
3  my hands on a first aid kit.
4      Q.  Okay.  And it was a group of Indian
5  workers --
6      A.  Yes.
7      Q.  -- who took him off the premises?
8      A.  Yes, yes.
9      Q.  And did anyone from Signal follow the
10  Indian workers to the hospital?
11      A.  I don't know.
12      Q.  Did you give the instruction for anyone
13  to follow the Indian workers with Sabulal to the
14  hospital?
15      A.  No.
16      Q.  Did you go to the hospital at all that
17  day?
18      A.  No.
19      Q.  Did you instruct anyone from Signal to
20  go to the hospital that day?
21      A.  That -- no.
22      Q.  Do you know if anyone from Signal went
23  to the hospital that day?
24      A.  I don't know.
25      Q.  Did you call the hospital to see how he

Page 107

1  was?
2      A.  Yes.
3      Q.  When did you make that call?
4      A.  That afternoon.
5      Q.  Had you talked to any of the workers who
6  had taken him there and come back?
7      A.  No.
8      Q.  So at the time you made the call in the
9  afternoon, did you have any idea if he was okay
10  or not?
11      A.  I had heard that he was -- he was okay.
12      Q.  Did you speak to him when you called the
13  hospital?
14      A.  No.
15      Q.  Who did you speak to?
16      A.  The one -- whoever answered the phone in
17  the emergency room.
18      Q.  Okay.  A hospital worker, not one of the
19  workers?
20      A.  Correct, correct.
21      Q.  Did they give you any information since
22  you're not a relative?
23      A.  No.  Other than -- than he was out of
24  danger is all they would tell me.
25      Q.  They told you he's out of danger.

Page 108

1      A.  He's out of danger.
2      Q.  Did you take it from their statement
3  that he had been in danger?
4      MR. BUCKLEY:
5          Objection.
6      THE WITNESS:
7          No.  I took it as a standard
8  response to a question.
9  EXAMINATION BY MR. HOWARD:
10      Q.  At -- Mr. Snyder, when preparing for the
11  events of March 9th you said that the workers
12  were emotional, correct?
13      A.  Yes.
14      Q.  And you didn't know how they would
15  respond to being terminated, correct?
16      A.  Correct.
17      Q.  You also understood that by being
18  terminated it meant they had to go back to India.
19      A.  That is correct.
20      Q.  And you physically had airplane tickets
21  to send these terminated workers back to India,
22  correct?
23      A.  That's correct.
24      Q.  And you also knew that these workers had
25  incurred debt and spent a lot of money for the

Page 109

1  opportunity to come to work at Signal, correct?
2      A.  Yes.
3      Q.  Did you understand that by sending them
4  back to India they were going to be in a
5  difficult economic situation?
6      MR. BUCKLEY:
7          Objection.
8      THE WITNESS:
9          The thought had occurred to me,
10  yes.
11  EXAMINATION BY MR. HOWARD:
12      Q.  Did the thought occur to you that they
13  would be very distraught, very upset?
14      A.  Yes.
15      Q.  Did the thought occur to you that one of
16  them might try something like suicide?
17      MR. BUCKLEY:
18          Objection.
19      THE WITNESS:
20          Specifically, no.  I mean, I do
21  know that was part of the emotional
22  thing though.
23  EXAMINATION BY MR. HOWARD:
24      Q.  It was a possibility.
25      A.  I guess anything's possible.

Snyder
108:10-109:22

28 (Pages 106 to 109)

Page 118

1    A.  Not to my knowledge.
2    Q.  For any other reason?
3    A.  No.
4    Q.  When you wrote out that statement did
5 you give it to anyone, Exhibit 441?
6    A.  Did I give it to anyone.  Yes.  I gave
7 it to -- I gave it to HR.  I gave it to Tracey.
8    Q.  Anybody else?
9    A.  I don't recall that.
10    Q.  Did you give it to any lawyers?
11    A.  Then?
12    Q.  Then.
13    A.  I would not have, no.  I don't -- I
14 don't know.
15    Q.  You don't know if Tracey did?
16    A.  No, I don't know.
17    Q.  After giving it to Tracey, did you hear
18 from her or from anyone else that any content
19 should be changed in any way?
20    A.  No.
21    Q.  Was there only the one draft?  You just
22 typed it out and that was it?
23    A.  Yes.
24    Q.  Or did you revise it?
25    A.  No.  I don't recall revising it.

Page 120

1    Q.  When she showed up did you talk to her,
2 this female from Swetman?
3    A.  She introduced herself to me, yes.
4    Q.  Do you remember her name?
5    A.  No, I do not.
6    Q.  And when she introduced herself, what
7 did she say?
8    A.  She introduced herself as a security
9 supervisor from Swetman and I asked her why she
10 was there and she said she was checking on her
11 employees.
12    Q.  Did you notice at the time that she was
13 armed?
14    A.  I did.
15    Q.  Did you comment on that?
16    A.  Not out loud.
17    Q.  You said something to yourself?
18    A.  Yeah.
19    Q.  What did you say to yourself?
20    A.  What's she doing here?
21    Q.  More importantly, what's a gun doing in
22 this camp?
23    A.  Well, we hardly -- none of our
24 security's ever carried a weapon or anything, so
25 it was unusual.  It was out of place.

**Snyder 119:6-120:25**

Page 119

1    Q.  Did you ever confer with any of the
2 Swetman security guards or other Signal personnel
3 about what happened that day to make sure the
4 content was correct?
5    A.  No.
6    Q.  At some point was Swetman asked to send
7 an armed guard to the man camp on the morning of
8 March 9th, 2007?
9    A.  Yes.
10    Q.  At what point during the morning was
11 that request made?
12    A.  I don't know.
13    Q.  Who made that request?
14    A.  I don't know.
15    Q.  It wasn't you?
16    A.  No.
17    Q.  Did someone from Signal make the
18 request?
19    A.  I would assume that.
20    Q.  Who else was involved with this
21 operation that could have made that request?
22    A.  Well, by the time she shown up it could
23 have just about been anybody or it could have
24 been one of her -- one of -- it was a female and
25 it could have been one of her employees.

Page 121

1    Q.  Did you ask her to leave or to leave the
2 weapon outside the camp?
3    A.  No.
4    Q.  Why not?
5    A.  I thought she had a right to check on
6 her employees.  I'm sure that she was licensed to
7 carry the firearm and the police department was
8 still around.  I didn't see her as a threat.
9    Q.  How long did the police stay around that
10 morning?
11    A.  I really don't know.  I don't remember.
12    Q.  Do you recall when they arrived?
13    A.  Not specifically, no.  It was -- it
14 would have been soon after -- soon after
15 Sabulal's -- whatever time frame that was, but I
16 don't remember a specific time.
17    Q.  Did they ask to go talk to the people in
18 Bunkhouse 15?
19    A.  I wasn't there when they first arrived.
20    Q.  Who on behalf of Signal spoke to the
21 police?
22    A.  I don't know.
23    Q.  Where were you?
24    A.  I had gone to I think look for Bingle.
25 It was still early.  I had gone back over to the

31 (Pages 118 to 121)

Snyder 122:22-123:6

Page 122

1   building to see who else was there.
2       Q.  Which building?
3       A.  The administrative building where my
4   offices are.
5       Q.  And this was early enough in the morning
6   that people may not have arrived yet?
7       A.  Yes.
8       Q.  Did you leave anyone kind of in charge
9   at the camp?
10      A.  There was Frank Tipton, which he was the
11  camp manager.  He should have -- he should have been there.
12      Q.  And at this point, the three workers
13  were in the Bunkhouse 15 with the guards?
14      A.  I'm assuming so, yes.
15      Q.  Had -- at this point had Jacob asked you
16  to go get someone from management or was this
17  kind of an earlier visit to inform him as to what
18  was going on?
19      A.  I don't recall when Jacob asked me that,
20  but it was -- it was early but I don't
21  specifically recall that.
22      Q.  Do you have a sense as to how much time
23  elapsed from the time you told the three workers
24  in Bunkhouse 15 to wait here for me and the time
25  that you returned to Bunkhouse 15 and Jacob asked

Page 123

1   you to go find someone from management?
2       A.  I don't recall.
3       Q.  No estimate at all?
4       A.  It wouldn't have been more than a couple
5   hours.  I can't see it being more than a couple
6   hours.
7       Q.  During those couple of hours that these
8   workers were in there with the guards, was anyone
9   else from Signal authorized to go into Bunkhouse
10  15?
11          MR. BUCKLEY:
12              Objection.
13          THE WITNESS:
14              Frank Tipton.
15  EXAMINATION BY MR. HOWARD:
16      Q.  Do you know if he went in there?
17      A.  I would assume that he did.
18      Q.  But you don't know one way or the other?
19      A.  No.  I wasn't -- I wasn't out there.
20      Q.  Is it the same Mr. Tipton who is
21  referred to in the police report?
22      A.  Yes.
23      Q.  What about Kathy Blessy, was she someone
24  who may have gone into Bunkhouse 15?
25      A.  She was -- Kathy -- Kathy was a super --

Page 124

1   she worked for security, so yes, she -- there
2   would have been -- her employees were there in
3   there, so there would be no reason why she
4   wouldn't.
5       Q.  Do you know if in fact she did go into
6   Bunkhouse 15 during that morning of March 9th?
7       A.  I don't know.
8       Q.  Did you ever hear from one of the guards
9   or from anyone else that Ms. Blessy had gone into
10  Bunkhouse 15 and one of the guards said that the
11  workers wanted to go to the bathroom and
12  Ms. Blessy said they could pee in a cup?
13      A.  I heard that they requested to go to the
14  restroom, but I haven't heard that -- that
15  statement you just made.
16      Q.  When did you hear that they had
17  requested to go to the restroom?
18      A.  When I had gone back out to the facility
19  and Frank Tipton approached me.
20      Q.  And what did you -- what did he say,
21  "The workers want to go to the restroom"?
22      A.  "The workers want to go to the
23  restroom."
24      Q.  At what point in time was this?
25      A.  It was still early morning.  It was

Snyder 125:3-9

Page 125

1   early morning.  It had been a couple hours, I
2   would imagine.
3       Q.  Why did Mr. Tipton come to you to tell
4   you that the workers wanted to go to the
5   restroom?
6       A.  Because apparently they wouldn't let
7   them go to the restroom.
8       Q.  Who wouldn't let them?
9       A.  Security.
10      Q.  The guards, the Swetman guards working
11  for you?
12      A.  That is -- that is what Mr. Tipton --
13  that is what Mr. Tipton said.
14      Q.  And Mr. Tipton needed to come to you
15  instead of just telling the guards, "Let them go
16  to the bathroom"?
17      A.  That was part of my conversation.  I
18  couldn't believe that he had said that to me,
19  yeah.
20      Q.  Did he explain why he came to you with
21  this?
22      A.  I guess to -- I guess to get my
23  permission or to get me to go tell the security
24  people to tell them to let them out.
25      Q.  Mr. Tipton wasn't prepared to do that

32 (Pages 122 to 125)

(504)525-1753                HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250      CERTIFIED COURT REPORTERS      NEW ORLEANS, LA 70139

Snyder 166:3-22

Page 166

1    A.   My recollection is it was mostly from
2  the Indian, the Indian -- the employees.
3    Q.   If Mr. Tipton had replaced you -- well,
4  after Mr. Tipton replaced you in January as the
5  unofficial camp boss, what, if any, role did you
6  continue to have in communicating with the Indian
7  workers?
8    A.   Mostly medical.
9    Q.   If someone needed medical attention, you
10  would deal with it?
11    A.   I would arrange for their treatment,
12  yes.
13    Q.   How often would that happen?
14    A.   Quite often.
15    Q.   Was that on a daily basis someone was
16  getting sick?
17    A.   It seemed like it.
18    Q.   What kinds of illnesses?
19    A.   All types.  It would run the gamut from
20  a cold, the flu, to thyroid cancer, heart
21  problems, serious -- there were -- there were
22  some serious issues with some of the guys.
23    Q.   Were there also issues of contagious
24  diseases kind of running through the camp?
25    A.   That was a concern that we had voiced on

Page 167

1  the Signal side, but we never -- I don't recall
2  any -- other than one incidence that we thought
3  may be an upper respiratory thing was going
4  around, that we had -- we had concerns with that
5  and we tried to address them.
6    Q.   Ever had any snake bites?
7    A.   Not to my knowledge.
8    Q.   Any snake sightings in the camp?
9    A.   Yes, yes.  It was quite the excitement.
10    Q.   How often did that happen?
11    A.   Not real often, but it apparently didn't
12  take a whole lot to -- for a snake to make an
13  impact with some of the employees out there.  And
14  he didn't last long.
15    Q.   "He" the snake?
16    A.   "He" the snake.
17    Q.   Who took care of the snake?
18    A.   I don't know, but I know he was taken
19  care of.
20    Q.   Other than dealing with the medical
21  issues that arose after January of 2007, did you
22  have any other day-to-day responsibilities for
23  the Indian workers in the man camp?
24    A.   It was -- now, once -- once Frank or the
25  replacement was brought on, I stayed out there

Page 168

1  and tried to pass on the -- more or less pass on
2  the phone book, the experience within the yard,
3  who to call and what to -- and while I was out
4  there doing that, I was still taking care of the
5  workers.
6    Q.   Workers would still come to you with
7  complaints?
8    A.   Yes.
9         THE VIDEOGRAPHER:
10           Excuse me, Counsel.  I have to
11       change tapes.
12         MR. HOWARD:
13           All right.  Let's go off the
14       record.
15         THE VIDEOGRAPHER:
16           We're now off the record.  It is
17       3:42.
18           (Whereupon a short break was taken
19       at this time.)
20         THE VIDEOGRAPHER:
21           Returning to the record.  It is
22       3:52.
23  EXAMINATION BY MR. HOWARD:
24    Q.   Mr. Snyder, so after January of 2007 you
25  would continue to be around the camp and get

Page 169

1  complaints from the workers, but you were not
2  officially responsible for dealing with those; is
3  that fair to say?
4    A.   Yes.
5    Q.   Between the time Mr. Tipton replaced you
6  as camp boss at the man camp in Mississippi in
7  January 2007 and the first week of March of 2007,
8  were you reassigned in any way to deal with
9  issues involving the Indian workers?
10         MR. BUCKLEY:
11           Objection.
12         THE WITNESS:
13           I don't understand the question.
14  EXAMINATION BY MR. HOWARD:
15    Q.   Were you put back in charge of the
16  Indian workers or any of the issues relating to
17  the Indian workers?
18    A.   No.
19    Q.   I imagine you had other responsibilities
20  around Signal, right, as the general
21  superintendent --
22    A.   Yes.
23    Q.   -- and head of the materials department?
24    A.   Yes.
25    Q.   What do those involve?

Page 178

1    Q.   At what times of year were -- there was
2    more complaints for alcohol?
3    A.   Yes.
4    Q.   Which times?
5    A.   It seemed to coincide somehow with a --
6    with a holiday schedule in India.
7    Q.   They wanted to be able to have alcohol
8    for holidays?
9    A.   Yes.
10   Q.   And that was not allowed?
11   A.   Actually, I think the rule was suspended
12   on at least one occasion.
13   Q.   One time?
14   A.   That comes to mind.
15   Q.   Do you recall an occasion when Signal
16   learned that alcohol had been snuck into the camp
17   by a group of workers around Easter in 2007?
18   A.   Vaguely.
19   Q.   Do you have a vague recollection of what
20   Signal's reaction was to that?
21   A.   My recollection is that security
22   didn't -- didn't appreciate it too much.
23   Q.   Do you recall that Signal authorized a
24   search of the bunkhouses for alcohol?
25   A.   I heard of that afterwards.

Page 179

1    Q.   You weren't part of that decision?
2    A.   No.
3    Q.   Would you have done that?
4    A.   No.
5         MR. BUCKLEY:
6             Objection.
7    EXAMINATION BY MR. HOWARD:
8    Q.   Why not?
9    A.   I didn't feel it was right.
10   Q.   Why not?
11   A.   Didn't feel it was the right thing to
12   do.  I mean, that's just -- it's his space.
13   Q.   You think that's an invasion of privacy?
14        MR. BUCKLEY:
15            Objection.
16   THE WITNESS:
17            Yes.
18   EXAMINATION BY MR. HOWARD:
19   Q.   Did the security guards at the man camp
20   while you were camp boss in November and December
21   search the workers' bags when they would come
22   into the camp?
23        MR. BUCKLEY:
24            Objection.
25   EXAMINATION BY MR. HOWARD:

Page 180

1    Q.   Coming back from Wal-Mart or places like
2    that?
3    A.   I never witnessed anything like that.
4    Q.   Do you know if it was done?
5    A.   No.
6    Q.   Is that something you authorized?
7    A.   No.
8    Q.   Why not?
9         MR. BUCKLEY:
10            Objection.
11   THE WITNESS:
12            Security was an independent
13        department.
14   EXAMINATION BY MR. HOWARD:
15   Q.   So you had no responsibility while you
16   were the camp boss for what security did?
17   A.   Not at that gate.
18        MR. BUCKLEY:
19            Objection.
20   EXAMINATION BY MR. HOWARD:
21   Q.   I'm talking about the gate of the man
22   camp.
23   A.   Yes.
24   Q.   Okay.  Who directed the security at the
25   man camp?

Page 181

1    A.   Whoever was running the security
2    department at that point.
3    Q.   Did any of the workers complain to you
4    that their bags were checked by security?
5    A.   Yes.
6    Q.   What did you do about it?
7    A.   Nothing I could do about it.  Nothing.
8    Q.   Did you go to the security department
9    and say, "The workers don't like having their
10   bags checked"?
11   A.   Yes.
12   Q.   So you at least did that.  What happened
13   then?
14   A.   I don't know.  I didn't -- I didn't get
15   involved with security's -- the -- when I -- the
16   times that I was told about it, I addressed it
17   and it was -- it wasn't an issue.  It was like a
18   one-time occurrence.  It wasn't something that I
19   heard a lot about.
20   Q.   But complaints were more than one about
21   that, right?
22   A.   I just -- I recall one instance but it
23   was probably multiple people, so there was more
24   than one complaint, one time frame.
25   Q.   And they complained that they didn't

46 (Pages 178 to 181)

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS        NEW ORLEANS, LA 70139

Page 182

1  like having their bags checked because they
2  thought it was an invasion of privacy?
3      MR. BUCKLEY:
4          Objection.  He didn't say that.
5      MR. HOWARD:
6          I'm asking if that's what they
7  said.
8      MR. BUCKLEY:
9          All right.  That's a better
10  question.
11      THE WITNESS:
12          Yes.
13  EXAMINATION BY MR. HOWARD:
14      Q.  Did you agree with them?
15      A.  No.
16      Q.  Why did you view a check of the
17  bunkhouses to be an invasion of privacy but not a
18  check of the bags coming into the man camp?
19      A.  My understanding they were only checking
20  Wal-Mart bags, and it's one thing to check
21  Wal-Mart bags and something else to go through
22  someone's personal effects.
23      Q.  Did any of the workers who complained to
24  you ask if they could live outside the camp?
25      A.  They made mention of that to me, yes.

Page 183

1      Q.  And what did you tell them?
2      A.  That wasn't my decision.
3      Q.  Whose decision was it?
4      A.  Management's.  Above me, beyond me.
5      Q.  Do you know who in management?
6      A.  That would have been an executive
7  management decision up there somewhere.
8      Q.  Would you refer to Bill Bingle, your
9  boss, as executive management or is it above him?
10      A.  Him and above.
11      Q.  Did you have an understanding that the
12  workers were paying a daily fee for living in the
13  man camp?
14      A.  Yes.
15      Q.  Did you know how much it was?
16      A.  That information was available to me,
17  yes.
18      Q.  Did you have any role or responsibility
19  whatsoever in setting that fee?
20      A.  None.
21      Q.  Did you have any role or responsibility
22  at all in Signal's policy that the fee would be
23  charged whether or not the Indian worker lived in
24  the man camp or did not?
25      A.  None, no.

Page 184

1      Q.  Did you have an understanding that the
2  fee would be charged to the workers even if they
3  chose to live outside the camp?
4      A.  I had heard that statement made, yes.
5      Q.  By whom?
6      A.  I don't recall.
7      Q.  Did you have an understanding as to why
8  the workers were being charged the fee for the
9  man camp whether or not they chose to live there?
10      A.  Yes.
11      Q.  And what was that?
12      A.  It was a formulation that John Sanders
13  had come up with.
14      Q.  I'm not asking now about the amount.
15  I'm asking about the reason the workers were
16  charged a fee even if they wanted to live outside
17  the man camp.
18      A.  Oh, no.
19      Q.  You have no idea why that was the case?
20      A.  One more time.  Ask the question one
21  more time.
22      Q.  You understood that it was Signal's
23  policy to charge the Indian H-2B workers a daily
24  fee for living in the man camp and that that fee
25  would be charged to even those workers who wanted

Page 185

1  to live outside the camp.
2      MR. BUCKLEY:
3          Objection.
4  EXAMINATION BY MR. HOWARD:
5      Q.  Correct?
6      A.  Yes.
7      Q.  I want to know whether you understood
8  why that was Signal's policy.
9      A.  Yes.
10      Q.  Why?
11      A.  Because they had signed a housing
12  agreement.
13      Q.  Do you understand why Signal wanted
14  these workers to sign a housing agreement to pay
15  that fee regardless of whether they lived in the
16  man camp or not?
17      A.  No, I can't -- I can't say that I would.
18      Q.  Did you have an understanding at any
19  time that Signal was looking to recoup from the
20  workers the costs expended by Signal to build the
21  man camps?
22      A.  Yes.
23      Q.  And that was the reason they were
24  charging the fee, was it not?
25      A.  That -- yes.

Snyder
185:18-187:9

47 (Pages 182 to 185)

Page 186

1    Q.  Did you have a problem with that?
2    A.  It wasn't my decision.
3    Q.  I know it wasn't your decision, but when
4  you heard it did you have any reaction?
5    A.  No.
6    Q.  Did you have a position one way or the
7  other, a view one way or the other whether Signal
8  should recoup its capital investment in the man
9  camps by charging the workers and making them
10 live there?
11    MR. BUCKLEY:
12       Objection.
13    THE WITNESS:
14       I was told that once the -- once
15       the debt had been paid down on the
16       facility, then the intent was long term
17       not to charge them that.
18 EXAMINATION BY MR. HOWARD:
19    Q.  My question was did you have a view that
20 Signal should recoup its capital investment in
21 the man camps by maximizing the number of
22 employees who lived in those camps?
23    MR. BUCKLEY:
24       Objection.
25    THE WITNESS:

Page 187

1       Yes.
2  EXAMINATION BY MR. HOWARD:
3    Q.  That was your view.
4    A.  Yes.  If we're going to have the
5  facility, let's put the people in the facility,
6  yes.
7    Q.  And make them pay for it so Signal can
8  recoup its capital investment.
9    A.  Yes.
10    Q.  Mr. Snyder, were you aware of a program
11 at Signal to evaluate workers and determine
12 whether yes, Signal would file extensions of
13 their H-2B visas or no, they would not file
14 extensions of the H-2B visas?
15    A.  Yes.
16    Q.  Was that referred to in Signal as the
17 yes/no program?
18    A.  I've never heard it termed like that.
19    Q.  Have you ever seen e-mails which have --
20 titled, "Yes/No"?
21    A.  Yes.
22    Q.  What role did you play with that
23 program?
24    A.  I was asked if there was anyone that I
25 would like to add to a list to not --

Page 188

1    Q.  To not extend their --
2    A.  -- renew their visas.  Yeah, to extend
3  their visas.
4    Q.  To not extend their visas.
5    A.  To not extend their visas.
6    Q.  Who asked you that?
7    A.  I don't recall.
8    Q.  And if I recall your testimony this
9  morning, you had absolutely no interaction with
10 the workers on the work site; is that correct?
11    A.  Not when they're on the job, that's
12 correct.
13    Q.  So for what reason were you being asked
14 to recommend to Signal which workers should not
15 have their visas extended?
16    A.  If I thought that they were involved
17 with any unrest or any -- anything that would be
18 detrimental to the group as a whole in the
19 housing facility.
20    Q.  Was that your -- what you were
21 specifically tasked to do?  You were told,
22 "Mr. Snyder, we want to know from you a list of
23 any of the Indian workers that we should not
24 extend their H-2B visa because they're causing
25 unrest or are detrimental to the group as a whole

Page 189

1  in the man camp"?
2    A.  Yes.
3    Q.  And you can't recall who gave you that
4  instruction?
5    A.  Not specifically.  I mean --
6    Q.  Did you get it from more than one
7  person?
8    A.  I don't recall.
9    Q.  That would have come from one of your
10 superiors; is that correct?
11    A.  Yes.
12    Q.  Did you follow that instruction?
13    A.  Yes.
14    Q.  How many names did you give them?
15    A.  I don't recall.
16    Q.  Was it more than ten?
17    A.  I don't think so.
18    Q.  How did you make the determination as to
19 which individuals Signal -- you were going to
20 recommend that Signal not extend their H-2B visa?
21    A.  Based on my personal interactions with
22 them.
23    Q.  This would have been after March of
24 2007, correct?
25    A.  Yes.

48 (Pages 186 to 189)

Snyder 187:10-188:19

Page 190

1    Q.  In what way were you continuing to have
2  personal interaction with the workers now two
3  months after you've been relieved by Mr. Tipton
4  as camp boss?
5        MR. BUCKLEY:
6            Objection.
7        THE WITNESS:
8            I was still in and out.
9  EXAMINATION BY MR. HOWARD:
10   Q.  Other than for attending to medical
11 issues, for what purpose?
12   A.  Responding to a request from one of
13 them.
14   Q.  Did you continue to have sources among
15 the workers who informed you as to which workers
16 were meeting with lawyers or immigration
17 advisors?
18       MR. BUCKLEY:
19           Objection.
20       THE WITNESS:
21           There were employees that would
22           approach me about many things.
23 EXAMINATION BY MR. HOWARD:
24   Q.  Including those?
25   A.  Sometimes.

Page 191

1    Q.  Was that information you took into
2  account in determining which workers you would
3  recommend to not be extended?
4    A.  No.
5    Q.  What unrest continued after March 9th,
6  2007 in the Mississippi man camp that was
7  attributable to individual workers that you
8  recommended not be extended?
9    A.  Things -- fighting, alcohol, just a
10 general bad attitude with one -- you know, with
11 the groups.
12   Q.  Were you instructed one way or the other
13 whether to inform the workers that you were
14 recommended to not have their visas extended?
15 That is, were you told "The people you're
16 recommending to us not to have their visas
17 extended, keep that confidential, don't tell
18 them," or were you told "Go ahead and tell them,"
19 or were you given no instruction at all?
20   A.  I don't recall.
21          (Exhibit 448 was marked for
22          identification.)
23   Q.  Mr. Snyder, I'm going to show you now
24 what I've had marked as Exhibit 448, Bates Number
25 SIGE0009567 through 9570.  It's an e-mail chain

Page 192

1  from March 15th and 16th, 2007.  My first
2  question is do you recall seeing these e-mails in
3  March of 2007?
4    A.  I don't recall.
5    Q.  Do you know why you were copied on these
6  e-mails which tend to discuss visa extensions
7  based on work performance?
8    A.  Other -- no.
9    Q.  If you look at the e-mail on the top of
10 page 2, it's a March 16th, 2007 e-mail from Ron
11 Schnoor to Bill Bingle, John Sanders, Tracey
12 Binion and yourself regarding visa extensions.
13 It says, "Bing, agreed, and the extension is
14 leverage we could use to incentive improvement in
15 skill and attitude."  Do you see that?
16   A.  Yes.
17   Q.  Did Mr. Schnoor or any of your superiors
18 tell you, instruct you that you could use the
19 progress of a visa extension with the workers in
20 the man camp to leverage a better attitude in the
21 camp?
22   A.  No, outside of this.

<span style="border:1px solid red; color:red; padding:2px;">Snyder 192:23-194:9</span>

23   Q.  Did you ever tell any of the workers
24 that you were dealing with in the man camp, Hey,
25 listen, you know, you better not cause any unrest

Page 193

1  because if you do, we're not going to extend your
2  visa?
3    A.  No.  I would have told them just the
4  opposite.
5    Q.  What is that?
6    A.  That is your chances of getting your
7  visa extended are much better if you follow
8  company policy.
9    Q.  Was it your intent to have the workers
10 understand by that that if they didn't follow
11 company policy that they would not have their
12 visas extended?
13   A.  Not at all.
14   Q.  What was your intent in telling them
15 this?
16   A.  My -- it was just that, that Signal
17 wanted -- Signal wanted employees that -- that
18 followed Signal's policies and rules.
19   Q.  And you told them that as long as they
20 did that they would get their visas extended?
21   A.  No.  I said that that would increase the
22 likelihood of getting their visa's extended.
23   Q.  Was this your common response to any of
24 the workers with whom the issue of visa
25 extensions came up in conversation with you?

49 (Pages 190 to 193)

HUFFMAN & ROBINSON, INC.
CERTIFIED COURT REPORTERS

Page 194

1    A.  I would hope so.
2    Q.  How often did the issue come up in
3  conversations with workers?
4    A.  Visa extensions were quite the topic for
5  a while.
6    Q.  You understood that these workers cared
7  very much about having their visas extended,
8  correct?
9    A.  Absolutely.
10    Q.  Did you ever discuss or were you party
11  to any conversation among others at Signal that
12  the Indian workers for whom it was contemplated
13  that they would not have their visas extended
14  should not be told because they would likely
15  abscond?
16    A.  I don't recollect a conversation like
17  that.
18    Q.  Did the discussion of workers absconding
19  in connection with the yes/no program come up at
20  all, to your recollection?
21    MR. BUCKLEY:
22      Objection.
23    THE WITNESS:
24      Yes.
25  EXAMINATION BY MR. HOWARD:

Page 195

1    Q.  And what do you recall?  Who did you
2  have the conversation with, when, and what do you
3  remember about it?
4    A.  I don't -- I don't recall, but it was --
5  it was a topic of -- it was a topic of
6  conversation.  I mean, the workers wanted the
7  extensions and it -- the filings were done, but
8  there was no guarantee so they were nervous.
9    Q.  So you also understand that even if they
10  filed the extensions they didn't have to execute
11  them?
12    A.  I'm sorry?
13    Q.  That they didn't have to exercise them,
14  the extensions for these workers.  They could
15  terminate them even if the visas were extended,
16  right?
17    MR. ALEXIS:
18      Object to form.
19    THE WITNESS:
20      I don't understand.
21  EXAMINATION BY MR. HOWARD:
22    Q.  If you take a look at the e-mail that
23  begins on the bottom of page 2 of Exhibit 448
24  from John Sanders to Ronald Schnoor, Bill Bingle,
25  Tracey Binion and yourself regarding these

Page 196

1  extensions, "Malvern says we can request as many
2  renewals as we like but we don't have to exercise
3  each one.  He recommends we overshoot.  This
4  would give" us "the maybes and the nos some time
5  to improve, yet lets us decide if we want to
6  extend after July or not."  Did you understand
7  that to be Signal's thinking in March of 2007?
8    A.  No.
9    Q.  In what way does this differ from what
10  your understanding was?
11    A.  I --
12    MR. ALEXIS:
13      Object to form.
14    THE WITNESS:
15      I didn't have any -- a whole lot or
16      very little to do with this subject.
17  EXAMINATION BY MR. HOWARD:
18    Q.  If there were workers that Signal was
19  not intending to extend or to keep on, did Signal
20  care one way or the other whether they absconded?
21    A.  Yes.
22    Q.  Which way?  I mean, did Signal actually,
23  you know, feel relief that they absconded because
24  they didn't have to keep them on any more?
25    A.  No.

Page 197

1    Q.  Your statement is that Signal did not
2  want workers absconding, is that it?
3    A.  Correct.
4      (Exhibit 449 was marked for
5      identification.)
6    Q.  I'm showing you now Exhibit 449, an
7  e-mail chain from October of 2007 bearing Bates
8  SIGE0017011 through 17014.  I'm going to ask if
9  you recognize these e-mails.
10    A.  (The witness reviews.)  Yes.
11    Q.  You recall these?
12    A.  Yes.
13    Q.  In the e-mail that begins on the bottom
14  of page 1, you to Tracey Binion dated
15  October 1st, 2007, you state first, "I follow his
16  reasoning," referring to an e-mail from Malvern
17  Burnett, "but he gives no consideration to the
18  issue of recouping our capital investment in the
19  man camp or our ongoing struggle with contract
20  labor costs.  The quickest way to address these
21  two issues is to maximize the number of employees
22  in the camp."
23      That's a reference to maximizing the
24  number of Indian workers in the camp, correct?
25    A.  Yes.

50 (Pages 194 to 197)

Page 218

```
1      with the H-2B visas.
2   EXAMINATION BY MR. HOWARD:
3      Q.  Did you review the applications made by
4   Signal for the original H-2B visa workers brought
5   from India?
6      A.  No.
7      Q.  Did you learn in your research that
8   workers eligible for H-2B visas are workers who
9   have a permanent residence outside the U.S. and
10  intend to return to their home country at the end
11  of their temporary visa period?
12     MR. BUCKLEY:
13        Objection.
14     MR. ALEXIS:
15        Object to form.
16     THE WITNESS:
17        Repeat the question, please.
18  EXAMINATION BY MR. HOWARD:
19     Q.  Sure.  As part of your research, did you
20  come to learn that only workers eligible for
21  H-2B visas are those who maintain a permanent
22  residence outside the United States and intend to
23  return to their home country at the end of their
24  temporary visa period?
25     MR. ALEXIS:
```

Page 219

```
1         Same objection.
2      THE WITNESS:
3         It was my understanding that after
4      the H-2B visa expires they had to return
5      to their home country, yes.
6   EXAMINATION BY MR. HOWARD:
7      Q.  And did you understand that in fact
8   applying to get H-2B workers, Signal has to
9   represent to the U.S. government that these
10  workers intend to go back to their home country
11  at the end of their visa period?
12     MR. BUCKLEY:
13        Objection.
14     THE WITNESS:
15        No.
16  EXAMINATION BY MR. HOWARD:
17     Q.  Did you ever review the application made
18  by Signal for H-2B workers in the summer of 2007?
19     A.  I don't -- I don't recall.
20     Q.  Do you recall you yourself signing a
21  letter on behalf of Signal submitted to USCIS
22  concerning the H-2B petition filed by Signal in
23  July of 2007?
24     A.  I signed some documents.  I don't
25  remember which specific documents they were.
```

Page 220

```
1      MR. HOWARD:
2         What are we up to?
3      THE COURT REPORTER:
4         450.
5         (Exhibit 450 was marked for
6      identification.)
7   EXAMINATION BY MR. HOWARD:
8      Q.  Mr. Snyder, I'm going to show you now
9   what has been marked as Exhibit 450 to your
10  deposition.  It's a letter dated July 26, 2007.
11  The Bates range is BURNETT-CY-01873 through
12  01878.  It is a letter bearing your name
13  addressed to USCIS Vermont Service Center
14  regarding H-2B petition for 91 welders.  Do you
15  recall signing this letter?
16     A.  This is the attestation letter.  This is
17  the extension behind it.
18     Q.  Is this the letter for the extension of
19  the H-2B visas?
20     A.  This is the extension letter, yes.  This
21  is not --
22     Q.  Looks like I grabbed the wrong one.
23     A.  This is not the new recruitment.
24     Q.  Okay.  And you signed this one, right?
25     A.  Yes.
```

220:8-225:4

Page 221

```
1      Q.  Did you prepare this letter?
2      A.  I did not.
3      Q.  Did you read it before you signed it?
4      A.  Yes.
5      Q.  Do you see the end of the letter it says
6   that they, the workers, will work for the length
7   of the prescribed dates of need, will be paid in
8   accordance with the prevailing wage, and will
9   return to their home country at the end of
10  employment.  Do you see that?
11     A.  I'm looking.
12     Q.  The very last sentence of the letter.
13     A.  Yes.
14     Q.  How was it that you were able to
15  represent to the U.S. government that these
16  workers were going to return to their home
17  country at the end of employment when they had
18  been telling you that they were looking for green
19  cards to stay permanently in the United States?
20     MR. BUCKLEY:
21        Objection.
22     THE WITNESS:
23        This was their H-2B visas, so we
24     felt that our obligation was to provide
25     them the ticket home and they -- they
```

56 (Pages 218 to 221)

Page 222

```
 1        agreed -- they agreed to do that.
 2   EXAMINATION BY MR. HOWARD:
 3        Q.  How did they agree to do that?
 4        A.  They said that if we get the extensions,
 5   we'll abide by the H-2B visas.  That was --
 6        Q.  The workers told you that?
 7        A.  That was the assumption.  Yeah, I mean,
 8   that's what -- that's what they were -- it wasn't
 9   an assumption on my part.  That's what they were
10   telling me.
11        Q.  All the workers were telling you, "If
12   you get us the extension, one 10-month extension,
13   when that's over we'll go home."  That's what
14   they told you?
15        A.  Not in -- not all of them in their
16   entirety, no.
17        Q.  How many of them?
18        A.  A percentage of them.  I don't know --
19   have an exact number.
20        Q.  Did all the people on the list attached
21   to your letter to the government, the Attestation
22   of H-2B Returning Workers, tell you in person
23   that "If you get me an extension on my H-2B visa,
24   when it expires I will go home"?
25        A.  No, I can't say that.
```

Page 223

```
 1        Q.  In fact, a percentage of the H-2B --
 2   Indian workers in Mississippi in July 2007 were
 3   still telling you that they had been promised
 4   green cards and were expecting green cards; isn't
 5   that true?
 6        A.  Not by this point they weren't expecting
 7   green cards from Signal, I don't believe.
 8        Q.  What makes you say that?
 9        A.  Because there were no promises of green
10   cards from Signal.
11        Q.  Had Signal told them by July 2007 you
12   are not getting green cards from us?
13        MR. ALEXIS:
14            Object to form.
15        THE WITNESS:
16            I don't know that.
17   EXAMINATION BY MR. HOWARD:
18        Q.  Isn't it fair to say a large percentage
19   of the workers in Mississippi even as of
20   July 2007 were hoping to stay in the United
21   States permanently?  They told you that, didn't
22   they?
23        A.  It was -- it was a possibility.
24        Q.  They didn't want to go back to India.
25   They needed to stay in the United States to make
```

Page 224

```
 1   money to pay off the debts they paid to come to
 2   this country; isn't that right?
 3        MR. ALEXIS:
 4            Object to form.
 5        THE WITNESS:
 6            By this point, most of the
 7        worker -- or a lot of the workers or
 8        some of the workers were telling me that
 9        those debts had been relieved.
10   EXAMINATION BY MR. HOWARD:
11        Q.  How many workers told you that?
12        A.  I couldn't give you a number, but I
13   heard that more than once.
14        Q.  Were any of the workers telling you that
15   they wanted to stay in the United States
16   permanently even in July of 2007?
17        A.  Only if they could do it legally.
18        Q.  Did you make a distinction when telling
19   the U.S. government applying on behalf of the
20   workers for an extension of the H-2B visa among
21   those workers who told you they wanted to stay in
22   the U.S. permanently and those who told you they
23   didn't care?
24        MR. BUCKLEY:
25            Objection.
```

Page 225

```
 1        MR. ALEXIS:
 2            Object to form.
 3        THE WITNESS:
 4            No.
 5   EXAMINATION BY MR. HOWARD:
 6        Q.  When you got involved in the summer of
 7   2007 with the efforts to bring more H-2B workers
 8   to Signal from India, did you have any
 9   reservations about working with Malvern Burnett?
10        A.  Yes.
11        Q.  What was the basis for those
12   reservations?
13        A.  Secondhand knowledge from the workers of
14   different issues.
15        Q.  What issues?
16        MR. ALEXIS:
17            Object to form.
18        THE WITNESS:
19            The moneys that they had paid and
20        their expectations for the H-2B visas.
21   EXAMINATION BY MR. HOWARD:
22        Q.  What expectations are you referring to?
23        A.  The green cards.
24        Q.  That the workers had expectations of
25   green cards based on things they heard from
```

(504)525-1753                     HUFFMAN & ROBINSON, INC.                     (800)749-1753
ONE SHELL SQUARE,#250         CERTIFIED COURT REPORTERS         NEW ORLEANS, LA 70139

Page 302

```
1        Returning to the record.  It is
2    7:57.
3    MR. BUCKLEY:
4        For the record, we don't have any
5    questions.  Thank you.
6    THE VIDEOGRAPHER:
7        This concludes this deposition.  It
8    is 7:57.
9        (Whereupon the deposition was
10   concluded.)
11          *    *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 304

```
1             REPORTER'S CERTIFICATE
2
3        I, Deanna Mancuso, Certified Court
4    Reporter, in and for the State of Louisiana, as
5    the officer before whom this testimony was taken,
6    do hereby certify that DARRELL SNYDER, after
7    having been first duly sworn by me upon authority
8    of R.S. 37:2554, did testify as hereinabove set
9    forth in the foregoing 303 pages; that this
10   testimony was reported by me in the stenotype
11   reporting method, was prepared and transcribed
12   under my personal direction and supervision, and
13   is a true and correct transcript to the best of
14   my ability and understanding; that I am not
15   related to counsel or the parties hereto, nor am
16   I otherwise interested in the outcome of this
17   matter.
18
19
20   _____
     DEANNA MANCUSO
21   Certified Court Reporter (No. 95005)
     Huffman & Robinson, Inc.
22   One Shell Square, Suite 250 Annex
     New Orleans, Louisiana 70130
23   (504) 525-1753   (800) 749-1753
24
25
```

Page 303

```
1           WITNESS' CERTIFICATE
2
3        I, DARRELL SNYDER, the undersigned, do
4    hereby certify that I have read the foregoing
5    deposition and it contains a true and correct
6    transcript of the testimony given by me:
7
8
9    ( ) Without corrections.
10   ( ) With corrections as reflected on
11       the errata sheet(s) prepared by me
12       and made a part hereof.
13
14
15
16   _____
17   DARRELL SNYDER
18
19   _____
20   DATE
21
22
23
24
25
```