Oct. 28, 2009 Dep. of
W. Bingle at 57:12 – 61:21
(Rec. Doc. 995)

Page 54

```
 1    that you were telling the government that
 2    you were only going to employ these
 3    aliens until July 31st, 2007, and you
 4    testified here that it was Signal's
 5    intent to apply for extensions and green
 6    cards and give them permanent employment.
 7        A.  Under the advice of our
 8    immigration attorney at the time, Malvern
 9    Burnett, this is the process used to file
10    for the H-2B process.  You can only file
11    for an H-2B Visa for 10 months, and that
12    was the 10-month period on this
13    application for filing the extensions.
14    He told us that would be taken care of at
15    a later date.
16        Q.  Did you ask Mr. Burnett though,
17    I am a little uncomfortable signing
18    something under oath that tells me we are
19    only going to employ the aliens for 10
20    months when we have the intent to keep
21    them longer?
22        MS. HANGARTNER:  Object to form.
23        A.  He said that is the way the
24    process works.
25    BY MR. HOWARD:
```

Page 55

```
 1        Q.  I am asking you though, did you
 2    express some discomfort to Mr. Burnett
 3    before signing this document?
 4        A.  Yes.
 5        Q.  And he told you that was the way
 6    the process worked?
 7        A.  Yes.
 8        Q.  And so you just followed his
 9    advice?
10        A.  Yes.
11        Q.  Did you discuss that document
12    with anybody else at Signal before
13    signing it?
14        A.  I probably would have discussed
15    it with Lisa Spears.
16        Q.  Who is she?
17        A.  She is our contracts
18    administrator or contracts manager.
19        Q.  Does she have a legal
20    background?
21        A.  I don't know.
22        Q.  Did you express to her your
23    concern about signing that document?
24        A.  I don't recall if I did.
25        Q.  Mark this please.  Just for the
```

Page 56

```
 1    record, before you look at this document.
 2    When you sign Exhibit 515 on June 2nd,
 3    2006, your understanding was it was
 4    Signal's intent to employ the H-2B
 5    workers for longer than July 31st, 2007;
 6    correct?
 7        A.  That's correct.
 8        MR. HOWARD:  The next document
 9    Exhibit 516, is a two-page letter over
10    your signature dated July 26th, 2006.
11    The Bates range here is Burnett-CY-00358
12    through 359.  I ask you to review this
13    document, please.
14        (Plaintiff's Exhibit 516 was
15    marked for identification by the court
16    reporter and said exhibit is attached
17    hereto.)
18        Q.  BY MR. HOWARD:  Have you had an
19    opportunity to review that?
20        A.  Yes.
21        Q.  And this is a letter that you
22    sent July 26, 2006, to the United States
23    Department of Homeland Security in St.
24    Albans, Vermont?
25        A.  Yes.
```

Page 57

```
 1        Q.  And that is your signature?
 2        A.  Yes.
 3        Q.  And how was this sent?  Was this
 4    sent by U.S. Mail or by fax over the
 5    wire?
 6        A.  I don't recall how it was sent.
 7        Q.  It was sent to the US Department
 8    of Homeland Security?
 9        A.  I believe this was sent.  We
10    signed the letter and gave them to
11    Malvern Burnett and he sent them off.
12        Q.  Did Malvern Burnett prepare the
13    letter?
14        A.  Yes.
15        Q.  Did you read it before you
16    signed it?
17        A.  Yes.
18        Q.  The last two sentences, "these
19    peak load temporary workers will not
20    become part of the permanent work force.
21    They will work for the length of the
22    prescribed dates of need, will be paid in
23    accordance with the prevailing wage, and
24    will return to their home country at the
25    end of employment."  Those are the
```

Bingle
57:12 - 61:21

15 (Pages 54 to 57)

Page 58

```
 1   references to the Indian workers being
 2   recruited; correct?
 3       A.  That is correct.
 4       Q.  Were those accurate statements?
 5       A.  They were --
 6       MS. HANGARTNER:  Object to form.
 7       A.  They were statements that were
 8   again directed by Malvern Burnett as part
 9   of the process to get the guys over here
10   under an H-2B Visa.
11   BY MR. HOWARD:
12       Q.  I understand that.  Were they
13   accurate and truthful statements?
14       MR. ALEXIS, III:  Object to form.
15       A.  At the time of signing this
16   letter with the H-2B process yes that was
17   a correct statement.
18   BY MR. HOWARD:
19       Q.  When you signed this letter in
20   July, 2006, did you intend for the Indian
21   recruits that you were bringing over to
22   this country to work on a temporary basis
23   and go back to Indian at the end of their
24   employment or were you intending to bring
25   them permanently and file for green cards
```

Page 59

```
 1   for them?
 2       A.  We were intending to file for
 3   green cards for them.
 4       Q.  So if you intending to file for
 5   green cards and had that intent in your
 6   mind when you signed this letter, how is
 7   it that you can say that it was an
 8   accurate statement to tell the US
 9   Government that they will work only
10   temporarily and go back to India when the
11   work is done?
12       MS. HANGARTNER:  Object to form.
13   Asked and answered.
14       MR. ALEXIS, III:  Object to form.
15       A.  That is what we were told by
16   Malvern Burnett the way the process
17   works.
18   BY MR. HOWARD:
19       Q.  I understand you are saying that
20   Malvern Burnett told you to say this.  I
21   understand that he drafted the letter.
22   I'm asking you if those two sentences, as
23   drafted by Malvern Burnett, were
24   consistent with Signal's intent or not?
25       A.  No.
```

Bingle 59:19--60:20

Page 60

```
 1       Q.  They were inconsistent with
 2   Signal's intent?
 3       A.  Yes.
 4       Q.  So they were inaccurate
 5   statements to tell the government this in
 6   July 2006?
 7       MS. HANGARTNER:  Object to form.
 8       MR. ALEXIS, III:  Object to form.
 9       A.  Yes.
10   BY MR. HOWARD:
11       Q.  Did you have any problem signing
12   a letter with inaccurate statements even
13   though your attorney was telling you to
14   do it?
15       MR. ALEXIS, III:  Object to form.
16       A.  Yes, we had problems -- I mean,
17   I had a problem with it, but it's what
18   the immigration attorney who was versed
19   in the H-2B process told us this is how
20   the process works.
21   BY MR. HOWARD:
22       Q.  When you say "told us" did he
23   tell someone else besides yourself?
24       A.  I don't recall who all he told.
25       Q.  Did you go to Mr. Schnoor and
```

Page 61

```
 1   say, look, I have a problem.  Our
 2   immigration lawyer is asking me to lie to
 3   the US Government?
 4       MS. HANGARTNER:  Object to form.
 5       MR. ALEXIS, III:  Object to form.
 6       A.  We discussed it and were told by
 7   who we thought was a reputable
 8   immigration attorney at the time that
 9   that's the way the process worked.
10   That's just the US Government.
11   BY MR. HOWARD:
12       Q.  So you just said Mr. Burnett
13   says, you know, it is okay to lie to the
14   US Government, that's the way it works,
15   and you accepted it?
16       MS. HANGARTNER:  Object to form.
17       MR. ALEXIS, III:  Object to form.
18       A.  Yes.
19   BY MR. HOWARD:
20       Q.  And you signed this letter?
21       A.  Yes.
22       Q.  Did you ask him to change
23   anything in the letter?
24       A.  I don't recall if we asked him
25   to change anything or not.
```

16 (Pages 58 to 61)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022