UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KURIAN DAVID, ET AL.                    CIVIL ACTION


VERSUS                                  NO: 08-1220


SIGNAL INTERNATIONAL, LLC,              SECTION: "A" (3)
ET AL.


## ORDER AND REASONS

The following motions are before the Court: **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC;[1] **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC.

All motions are opposed.[2]

---

[1] Defendants Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, and the Law Offices of Malvern C. Burnett, A.P.C., Sachin Dewan, and Dewan Consultants, Pvt. Ltd. have formally moved to join in the Motion to Strike-1012. (Rec. Docs. 1039 & 1053).

[2] Defendants J & M Associates Inc. of Mississippi, J & M Marine & Industrial, LLC, and Billy Wilks adopt Signal's and the Burnett Defendants' arguments in opposition to class

1

The Motion to Strike-1012 was taken under submission on March 16, 2011, and the Motion for Leave was taken under submission on March 23, 2011, but the Court elected to take up those motions in conjunction with the issue of class certification.  The motion(s) for class certification were taken under submission on April 29, 2011 (Rec. Doc. 1076), upon receipt of the parties' rebuttal submissions.[3]  The Motion to Strike-1082 was taken under submission on June 22, 2011.

For the reasons that follow, the Motions to Certify are DENIED, the Motion to Strike-1012 is DENIED, the Motion for Leave to File a Third Amended Complaint is DENIED AS MOOT, and the Motion to Strike-1082 is DENIED.

I.   **INTRODUCTION**

Plaintiffs are seven (7) citizens of India who secured H-2B guest-worker visas to work in the United States for defendant

---

certification.  (Rec. Doc. 992).  Defendant Kurella Rao has indicated that he will be a "passive" defendant.  (Rec. Doc. 897).

[3] In this case, all parties consented to waive a live evidentiary hearing and to submit the issue of certification to the Court on the briefs.  (Rec. Docs. 907 & 926).  Rule 23 does not itself require an evidentiary hearing on the question of class certification.  Merrill v. So. Methodist Univ., 806 F.2d 600, 608 (5th Cir. 1986).  However, any factual uncertainties trigger the necessity for a hearing.  Id. at 609.

Signal has requested oral argument on its Motion to Strike-1012 and Plaintiffs have requested oral argument on their Motion for Leave to File a Third Amended Complaint.  The Court finds that the parties' memoranda more than adequately expound upon the issues presented and that oral argument would not be helpful to the Court.

Signal International, LLC.  These seven plaintiffs, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil Issac Andrews, and Kechuru Dhananjaya, seek to represent a putative class of approximately 500 ship and rig workers to pursue federal class claims against the defendants under the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985.[4]

Defendants are immigration attorney Malvern C. Burnett and his business Gulf Coast Immigration Law Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); labor recruiter/broker Michael Pol and his company Global Resources, Inc. (collectively "Pol"); labor broker Billy Wilks and the two companies through which he operated, J & M Associates Inc. of Mississippi and J & M Marine & Industrial, LLC; Kurella Rao and his company Indo-Ameri Soft, LLC ("IAS"); Indian labor recruiter Sachin Dewan and his company Dewan Consultants Pvt., Ltd. (collectively "Dewan"); and American employer Signal

---

[4] Plaintiffs also assert claims for fraud, negligent misrepresentation, and breach of contract.  Plaintiffs are not seeking certification to pursue these claims as a class so those claims are not before the Court at this time.

International, LLC.[5]

Plaintiffs' claims are numerous and at times complex but the gist of their claims is that Defendants engaged in a fraudulent scheme built around the fictitious promise of employment-based green cards to obtain permanent residence in the United States.[6] Plaintiffs assert that they relied on this core false promise, as well as other misrepresentations by Defendants, when deciding to pay exorbitant labor recruiting fees to travel to the United States to work at Signal's marine fabrication facilities in Mississippi and Texas.  Once there, Plaintiffs allege that they were subjected to segregated housing, severe discrimination, and adverse working and living conditions--that given their debts--reasonable persons in their position would have felt compelled to endure.  Plaintiffs contend that the scheme yielded Dewan, Pol, and Burnett millions of dollars in fees, and procured for Signal a compliant and expendable labor pool that saved the company millions of dollars in wages that it would otherwise have had to pay to contract laborers and American direct hires.

Plaintiffs seek to have a class certified pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of

---

[5] Defendants Pol and Rao and their associated companies are not represented by counsel at this time.

[6] The term "green card" is used colloquially for an alien registration receipt card, which denotes legal permanent resident status in the United States.  See Ascencio-Guzman v. Chertoff, No. B-94-215, 2009 WL 1064962, at *4 (S.D. Tex. Apr. 15, 2009).

4

> All Indian guest-workers who were recruited by one or
> more Defendants and who traveled and/or were transported
> to the United States at any time through September 30,
> 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(B) ("H-
> 2B") visas assigned to Defendant Signal International.

Plaintiffs contend that the core facts of the case as well as Defendants' main defenses are equally applicable to the claims of all class members, and that the "pernicious scheme" underlying this case had no individualized dimensions.  According to Plaintiffs, they satisfy Rule 23's legal requirements for certification and equity militates in favor of Defendants having to answer for their conduct in the same fashion that they treated Plaintiffs in their prior dealings with them:  As a nameless and faceless class of fungible migrant workers who could be misled and exploited without regard to individual rights or interests.

## II. <u>BACKGROUND</u>

The factual background for this case separates well into two phases.  The Phase 1 events began in 2004 and did not involve defendant Signal or the H-2B visa process.  But the Phase 1 events, and the pre-existing relationships between the various other defendants, laid the ground work for much of the Phase 2 events.  The Phase 2 events began in 2006 when Signal's domestic labor pool was adversely affected by Hurricanes Katrina and Rita. It was in the aftermath of the hurricanes that Signal sought to supplement its labor pool with foreign workers via the H-2B visa process.  Thus, many of the plaintiffs in this case were

originally recruited for employers other than Signal, although all of the plaintiffs eventually came to the United States to work for Signal under the auspices of the H-2B guest-worker program.[7]

## A.   Factual Background--Phase 1

At all material times, defendant Global was a Mississippi corporation engaged in the business of recruiting foreign workers for employment in the United States. Defendant Michael Pol was Global's president. Pol had an existing business relationship with defendant Billy R. Wilks, defendant J & M's corporate principal. (Pla. Exhs. 520(Pol); 521(Pol)). J & M is in the business of recruiting laborers to then subcontract them out to other companies for a profit. Together Pol and Wilks were supplying labor to a shipyard client in California.

Pol also had a prior business relationship with defendant Sachin Dewan. Dewan is a businessman and he resides in India. As far back as 1996, Pol and Dewan had worked together, along with defendant Malvern Burnett, to bring Indian H-2B welders and pipe fitters into the United States for Avondale Shipyards. (Signal Exh. C).

---

[7] At least 38 putative class members were denied employment at Signal even though they paid the recruiting fees and came to the United States. (Rec. Doc. 994-1, at 4). Plaintiffs' claim under 42 U.S.C. § 1981 for discriminatory conditions at Signal does not apply to these 38 plaintiffs. Plaintiffs suggest that a sub-class as to these plaintiffs might be appropriate.

According to Pol, Dewan contacted him in early 2004 to see if Pol was interested in placing foreign workers with his customers.[8]  Pol then presented Billy Wilks with a plan to recruit foreign workers through the green card program that he and Dewan had discussed.  Global and J & M executed a contract whereby Global would find qualified foreign workers to be acquired for employment with J & M under the I-140 "permanent resident" process.  (Pla. Exh. 522(Pol)).  Under the agreement Global was to provide the services of an immigration attorney to facilitate bringing workers into the country legally--that attorney was Malvern Burnett.  Wilks sent Pol a demand letter for 300 workers.  (Pla. Exh. 520(Pol)).

To facilitate the J & M/Global deal, in March 2004, Global, Sachin Dewan (for Dewan Consultants), and Malvern C. Burnett (for Gulf Coast Immigration Law Center, Inc.) executed a contract, the Multi-Lateral Business Agreement, pursuant to which Dewan would recruit suitable foreign workers, Burnett would handle the immigration legal work, and Global would provide suitable employment in the United States.  (Pla. Exh. 455).  Each applicant-employee was to be charged a fee of roughly $10,000-$12,000 USD.  The Multilateral Agreement states that the workers would be coming to the United States under the "'permanent residence' process for migration."  Id.

---

[8] Dewan asserts that it was Pol who contacted him.

7

In early 2004 defendant Kurella Rao (for IAS) also entered the picture.  Rao and his company IAS had been in the business of recruiting foreign information technology personnel since 1997 and Rao wanted to branch out into shipyard workers.  Rao and Dewan executed a contract, the Bilateral Business Agreement, to memorialize their business arrangement.[9]  (Pla. Exh. 756).  Dewan was to recruit the foreign workers and Rao (via his company IAS) was to sponsor them for employment in the United States.

Burnett acted as immigration counsel for the J & M and IAS recruits.  But the workers recruited by IAS had no direct contact with Burnett.  Rather, Rao retained Burnett for legal services in connection with IAS's recruitment of workers and IAS made payments to Burnett for legal services provided.

Thus, as of 2004 Dewan was recruiting foreign workers on behalf of Global, for the ultimate benefit of J & M and its clients, and for IAS.  Dewan recruited 232 workers for the benefit of J & M.  Dewan recruited around 130 workers for the benefit of IAS.  According to Dewan, he used the same recruitment process for the Global/J & M and IAS contracts.  (Dewan depo at 216).  Dewan was the lead recruiter but Pol, Burnett, and Rao each participated in some recruiting seminars overseas in order to assist Dewan with the process.  It is undisputed that all of

---

[9] Plaintiffs' Exhibit 746 is an unsigned copy of the agreement.

the recruitment and placement was done with permanent residence in the United States as part of the program and the workers were told that this would take about two years.  At this stage, H-2B visas were not part of the arrangement.[10]

As of February 2006 none of the green card promises to the J & M and IAS recruits had come to fruition.[11]  The workers had paid

---

[10] At this point it bears noting that an H-2B guest-worker visa is fundamentally different than an employment-based green card.  H-2B visas are *temporary, non-immigrant* visas.  Under the H-2B program, a worker may come to the United States *temporarily* to work for an employer who has petitioned for the right to employ H-2B guest-workers and whose petition has been approved by the Department of Labor.  Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 405 n.2 (5th Cir. 2010) (en banc) (Dennis, J., dissenting) (quoting 8 C.F.R. § 214.2(h)(1)(i)).  Once admitted, the guest-worker's legal status is tied to performing labor for the specific employer who petitioned for the visa.  Id. (citing § 214.2).  If at any point the H-2B visa expires or the worker is dismissed from his job, then he is required to immediately leave the country.  Id. (citing § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C)).  Under no circumstances can the worker remain in the country longer than three years.  Id. (citing § 214.2(h)(15)(ii)(C)).

An employment-based green card, on the other hand, is given to someone who has obtained an immigrant visa to enter the United States on a permanent basis and to reside here indefinitely.  Green card holders are permanent resident aliens and they have nearly all of the rights of a citizen.  Generally speaking, a permanent resident alien can live and work in the United States without restriction.

Thus, as a practical matter, H-2B employees cannot simultaneously be sponsored for an H-2B visa and a green card, given the fundamental difference in the temporal aspects of the two types of visas.

[11] According to Burnett, in 2003-2004 the process of obtaining labor certifications was extremely long--in some cases in excess of three years.  (Burnett memo at 6).  It was anticipated that the Department of Labor was going to institute a streamlined process for granting labor certifications or PERMs.  Burnett contends that he delayed the filing of any PERMs to take

significant fees up front and were naturally becoming frustrated with the process and irate with the lack of progress toward their legal, permanent immigration to the United States.  By this point some of the workers had been waiting for over two years to come to the United States with green cards.  Some workers even demanded refunds, which none of the recruiter/broker defendants were interested in providing.[12]

Those Plaintiffs who were originally recruited during the

_____

advantage of the new system, which itself was delayed for nearly a year.

The employment based green card process is a three step process.  The first step requires that an ETA 9089 ("PERM") be filed with the Department of Labor and certified. The second step requires the filing of an I-140 with the United States Citizenship and Immigration Services.

The third step depends on a "window of opportunity" opening and this can take a matter of months or even years depending on the allocation of immigrant visas by the State Department.  The third step differs depending on whether the beneficiary of the PERM and the I-140 is in the United States or a foreign country when a green card becomes available for him in the quota.  If the beneficiary is in a foreign country then he processes through the consulate and receives his green card.  If the beneficiary is already lawfully in the United States then he files an I-485 for adjustment of status.  Once the I-485 is approved then the applicant receives permanent resident status in the United States.  (Signal memo at 3 n.8; Burnett memo at 9).


[12] As of the end of 2006 IAS was no longer a functional company and Burnett had filed no I-140 petitions on behalf of the IAS recruits.  The filing of an I-140 petition with the United States Citizenship and Immigration Services is the second step of three for obtaining a green card.  Rao knew by January 2006 that IAS was no longer financially viable and that no green cards would be processed for his recruits.  (Signal Exhs. K, L).  He nonetheless continued to accept installment payments from the recruits.  (Id.).

Phase 1 events are referred to as "Group I Plaintiffs."  Second Amended Complaint ("SAC") (Rec. Doc. 944).  Named plaintiffs Issac Andrews Padaveettiyil and Kechuru Dhananjaya are in this group.  (Id. at 5).

### 1.   Issac Andrews Padaveettiyil

Padaveettiyil was working in Dubai in 2004 when he was recruited for employment with J & M.  According to Padaveettiyil, Dewan advertised in the paper in Dubai for jobs in America and permanent residence in this country.  Padaveettiyil recalls attending an information seminar in Dubai with Dewan, Burnett, and Pol present.  Padaveettiyil sold his land to finance his way in the program and he asserts that he was promised a permanent job and permanent residency in the United States.  Padaveettiyil claims that in 2006, still with no green card, Dewan told him that he would be going to the United States on an H-2B visa to work for Signal, to forget about the current green card processing, and that Signal would file for a green card on his behalf.  According to Padaveettiyil, he had no choice but to go because he had already paid his money.  After arriving in the United States in 2007 Padaveettiyil worked at Signal's Pascagoula, Mississippi facility.

### 2.   Kechuru Dhananjaya

Dhananjaya was recruited as part of the IAS employment program.  In December 2003, Dhananjaya was working in Dubai when

11

he saw one of Dewan's advertisements in the newspaper.
Dhananjaya went to the office listed in the advertisement and
spoke to Dewan about the recruiting program.  Dewan told
Dhananjaya about an upcoming meeting where Dhananjaya could learn
more about the program and pay his first installment for green
card processing if he was interested.  Defendants Rao, Burnett,
and Dewan were present at the meeting.  Dhananjaya borrowed money
from his brother and some of his friends to finance his way in
the program.  Dhananjaya and IAS executed an Agreement for U.S.
Permanent Residency/Green Card on January 18, 2004.  (Pla. Exh.
578). In the following two years Rao sent Dhananjaya encouraging
correspondence about the status of his green card.  (Signal Exhs.
I, J).  Dhananjaya  had worked at Avondale Shipyards in 1997
under the H-2B guest-worker program.  (Signal Exh. D).  When
Dhananjaya entered the IAS program he had never heard of a
company called Signal.  After arriving in the United States in
2007 Dhananjaya worked at Signal's Orange, Texas facility.

Plaintiffs do not suggest that Signal was involved in
recruiting the foreign workers during the 2004 time frame.  But
by 2006 when the Indian recruits were becoming disgruntled with
the green card program that Pol, Dewan, Burnett, and Rao had
concocted, Signal was experiencing its own labor problems in the
aftermath of Hurricanes Katrina and Rita.  Signal had a
legitimate and immediate need for laborers like those that Pol,

Dewan, Burnett, and Rao had recruited beginning in 2004 and who were now clamoring for results on the promised green cards. Thus, Signal's labor shortage in 2006 and its willingness to employ foreign workers, which it viewed as a cheap source of labor, created a seemingly perfect opportunity for Pol, Dewan, Burnett, and Rao to temporarily mollify the original J & M/IAS green card recruits by offloading them to Signal.  According to Dewan, some of the workers jumped at the opportunity to go to the United States sooner rather than later, even if that meant traveling on an H-2B visa to the detriment of the green card process.  (Signal Exh. AA).  But Plaintiffs contend that Dewan persuaded them to go to the United States on the H-2B visas and that they were told that Signal would take care of getting them their green cards once they arrived in the United States.

**B.   Factual Background--Phase 2--Enter Signal**

Signal is a marine and fabrication company with its home office in Pascagoula, Mississippi and an additional shipyard in Orange, Texas.   Signal is in the business of providing offshore drilling rig overhaul, repair, upgrade, and conversion.  Signal also offers services to the general marine and heavy fabrication markets.  In 2006-2007 Signal had a substantial amount of work after hurricanes Katrina and Rita because of damages to rigs in the Gulf of Mexico.  Hurricane-related housing shortages around Signal's shipyards had depleted its work force.

Sometime in the first quarter of 2006, Pol called Ron Schnoor (Sr. VP & General Mgr.) with Signal to talk to him about the possibility of Global providing Signal with foreign workers under the "permanent resident process." Schnoor called contacts with Avondale Shipyards to inquire about how the H-2B program had worked at that company. (Signal Exh. W). Bill Bingle (VP of Production) with Signal called Pol to set up a meeting. Bingle and Pol discussed bringing workers to the United States under the H-2B program for employment with Signal and Bingle eventually accompanied Pol to India on a recruiting trip. According to Pol, the plan was to get permanent residence visas for welders and fabricators to work at Signal's Pascagoula, Mississippi and Orange, Texas facilities. Using H-2B visas was an "afterthought" because Signal wanted the workers to arrive quickly, certainly more quickly than what green card processing could provide. Signal would not be required to pay any of the workers' fees and travel expenses––everything was to be paid by the workers themselves so Signal considered this to be a good deal.[13] Pol told Signal that the workers would be paying about $2,000 each to participate in the program, which was of course not accurate. Signal was adamant that it incur none of the costs of the

---

[13] Indian workers in particular were considered to be a cheap source of labor. (Pla. Exh. 517). Signal intended to use the Indian workers to displace subcontracted labor that was costing the company $100,000 to $200,000 per day.

14

program.

On April 18, 2006, Global and Signal executed a Skilled
Worker Recruitment Agreement (Pla. Exh. 423) to establish the
framework for their arrangement to bring foreign workers into the
United States under the H-2B temporary program and/or the I-140
"permanent residence" process. (Id. at 1). The agreement
clearly delineates the temporary nature of an H-2B visa versus
the long-term nature of an I-140 permanent residence visa. The
agreement also expressly notes that H-2B visas are not always
issued in a timely manner but that "[i]n any case, the permanent
resident (I-140) process will continue as agreed upon." (Id. at
3). With the Multi-Lateral Business Agreement between Pol,
Burnett, and Dewan already in place, Pol contacted Dewan and
Burnett about the Signal deal.

Signal executed a document appointing Dewan as its
representative in India to facilitate the recruitment of skilled
workers to the United States for employment under "the temporary
and permanent resident program." (Pla. Exhs. 463 & 665). In
that same document Signal granted Dewan a limited power of
attorney to sign any legal document or letter which may be
required to obtain permission from the government/immigration
agencies in India for advertising, conducting seminars, and trade
tests to further "our efforts." Id. On June 19, 2006, Signal
sent Dewan a demand letter for 600 skilled workers for a 10-24

15

month period.  (Pla. Exh. 461).  Accommodations, transportation, and food were all to be paid via salary deduction and travel expenses to Pascagoula, Mississippi were to be paid by the individual worker.  Id.  The workers were to be skills tested in India prior to any employment offer and the salary range would be $14 to $18 USD per hour depending on experience and skill level. Id.

On August 3, 2006, Signal executed yet another power of attorney in favor of Dewan making him the company's agent and giving him full authority to act on behalf of Signal, whether filing documents with the U.S. immigration authorities or executing contracts, in the process of bringing migrant workers to the United States for employment at Signal.  (Pla. Exh. 512). Signal retained Burnett and his law firm to represent the company in legally bringing the workers into the United States.  (Pla. Exhs. 563 & 574).  The terms of the agreement between Signal and Burnett dictated that all of the legal fees were to be paid by the workers, with Signal owing Burnett nothing for legal fees.

Dewan went to work recruiting workers for Signal.  Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in 2006 offering opportunities for welders and pipe fitters to immigrate to the United States under the auspices of Signal's guest-worker program.  (Pla. Exh. 460). Dewan and Pol held six recruitment seminars using a PowerPoint

presentation that Pol had prepared.  (Pla. Exh. 684).  Green
cards were expressly touted as part of the program but a second
set of advertisements only mentioned H-2B visas.  Nonetheless,
Dewan asserts that he believed that Signal was going to request
green cards for these workers too.  The average fee that each
worker paid was about $10,000[14] (split between Dewan, Pol, and
Burnett) which in some cases might exceed the worker's annual
salary in his home country.[15]  Plaintiffs contend that Dewan, Pol,
and Burnett used the Signal contract as a way to extract more
money from the existing and eager J & M and IAS recruits and to
generate fees from a whole new group of Signal recruits.  To be
sure, maximizing profits from importing foreign workers into the

---

[14] Plaintiffs contend that Rao, J & M, Pol, Dewan, and
Burnett eventually charged the recruits anywhere from $17,600 to
$20,000 for an "expedited option" when the H-2B program with
Signal came along.  Plaintiffs were charged more for H-2B visa
processing after the first set of H-2B visas were approved by the
consulate.

[15] The workers executed separate contracts with Global,
Burnett, and Dewan, agreeing to pay each of them separately for
their services in three installment payments.  Global was to be
paid $3750, (Pla. Exhs. 327, 345, 354, 500), Burnett was to be
paid $3750, (Pla. Exhs. 342, 350)and Dewan was to be paid
Rs.33,500 (Pla. Exhs. 344, 351, 502, 505).  Plaintiffs' Exhibit
59 indicates that Global and Burnett were to be paid $5373 USD
each.  Burnett was particularly adamant about receiving his fee.
(Pla. Exhs. 468 ("Mafiaso:  Tell them to pay up . . .", 572, 834
("Please see if you can't get Ramesh to 'persuade' him to pay me
. . . .  If he does not pay, I will see to it that his visa gets
mysteriously revoked.")).  Plaintiffs estimate that Dewan, Pol,
and Burnett collected about $7 million dollars from all of the
putative class members.  (Pla. Exhs. 865, 866, 867, 868 (repeated
recitation of "Cha Ching")).

17

United States was of the utmost importance to Dewan, Pol, and Burnett.  (Signal Exhs. Z, CC, FF).

In late May and early June 2006, Signal filed paperwork with the United States Department of Homeland Security-Citizenship and Immigration Services and the Department of Labor seeking permission to import and hire 590 foreign guest-workers pursuant to the government's H-2B guest-worker program.  Bingle, on behalf of Signal's Mississippi operation, and Thomas Rigolo (Sr. VP & General Mgr., Texas Operations), on behalf of Signal's Texas operation, executed the paperwork.  In the filings Bingle explained that Hurricanes Katrina and Rita had caused a tremendous but temporary shortage of labor in the Gulf region and that Signal sought to hire temporary H-2B workers until the labor force would return to normal.  (Pla. Exh. 516).  Bingle explained that the need for current workers reflected a peak load and would be a one-time occurrence.  Bingle also stated that the peak load temporary workers would not become part of Signal's permanent workforce--they would work for the length of time prescribed and then return to their home countries at the end of the employment period.  (Pla. Exh. 516).  In Signal's Application(s) for Alien Employment Certification to the Department of Labor, Bingle and Rigolo declared under penalty of perjury that the exact dates that the workers would be employed were 10/01/06 to 07/31/07.  (Pla. Exhs. 515, 595, 863, 864).

18

According to Bingle, Signal had always intended to file for green cards for the foreign workers, or at least those workers who proved to meet Signal's expectations.  When questioned at his deposition about the certifications of temporary employment made to the government, Bingle explained that he did have concerns about signing those documents and making those representations but that Malvern Burnett had told him that this was just the way the H-2B visa process worked.  Rigolo testified that Signal actually needed workers for about a two-year time frame but that he had no reservations about submitting forms to the government that cited the ten month time frame dictated by the H-2B program. Burnett's explanation was that the workers coming over on temporary visas were not going to be part of Signal's permanent workforce, at least in the beginning, and that it might be a year or two before they might return to Signal as permanent workers. (Burnett depo at 457-48).

Signal sent employees to India to personally test the workers' skills.  Therefore, everyone who was given an offer of employment with Signal had passed a test to the satisfaction of Signal's employees and no one with Signal told the workers that there would be further testing when they arrived at Signal and that their hourly pay would be subject to reduction or their employment subject to termination if they failed to pass. Signal's form letter offer of employment simply offers

congratulations for passing the skills test in India and the worker is told that "[a]s agreed, [his] salary will be $18.00 per hour." (Pla. Exh. 381).  Nothing in the offer of employment from Signal alluded to a second round of testing once the worker arrived in the United States.  The Signal employment agreement itself, however, specifically states that the worker would be subject to skills testing upon arrival at Signal and that his hourly rate might be reduced based on skill level.  (Pla. Exhs. 64, 179, 201, 294, 300, 348, 808, 854).[16]  But the Signal employment agreement was presented to the workers after they had already traveled to the United States from India and arrived at Signal.  (Signal Exhs. SSS, SSS-A).

In addition to the workers that Dewan, Pol, and Burnett actively recruited anew for Signal, Pol agreed to use Rao's IAS recruits to fill some of the employment slots at Signal, (Pla. Exh. 808 [Dhananjaya/Signal agreement]), even though Pol would receive significantly less of a fee for each of these recruits who had already paid their fees over to Rao, Dewan, and Burnett. Global's agreement with Signal also provided a U.S. employer onto which Dewan, Pol, and Burnett could offload the J & M green card recruits.  Nearly half of the Indian workers whom Burnett, Dewan, and Pol provided to Signal had been recruited for other

---

[16] The Memorandum of Understanding that each worker executed with Dewan also references the second round of testing.  (Pla. Exhs. 344, 351, 502, 505, at ¶¶ 5 & 9).

companies.

Dewan, Pol, and Burnett were well aware that U.S. immigration officials would not approve an H-2B visa for any worker who communicated to the consulate officials that he was participating in the Signal program with the intent of receiving a green card. (Pla. Exhs. 519, 550). The recruits were therefore escorted to their consulate interviews by a Dewan Consultants employee to ensure that all went well. The recruits were warned about not disclosing anything about green cards to the consulate officials. Dewan also warned them not to mention the amount of money that they had paid to participate in the Signal program. Several plaintiffs also contend that after their visas were issued Dewan (and perhaps on one occasion Burnett)[17] withheld their passports pending the final installment payment for the program. Plaintiffs contend that with their passports being held they feared that they must either pay the rest of the money to Dewan to go to Signal or forfeit all of the money that they had already paid. Plaintiffs claim that they were assured by Dewan that participation in the H-2B program would allow them to stay in the United States while their green card applications were being processed.

Those Plaintiffs who were recruited specifically for Signal

---

[17] Sony Sulekha testified that Burnett took custody of his passport after his H-2B visa was approved. (Sulekha depo at 182).

21

during the Phase 2 events are referred to as "Group II Plaintiffs."  SAC at 6.  Named plaintiffs Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, and Hemant Khuttan are in this group.  Id.

### 1.  Kurian David

David was working in Abu Dhabi as a high-level senior foreman when he saw one of Dewan's advertisements in a newspaper. David attended an information seminar in Dubai where employment opportunities at Signal were discussed.  He asserts that the attendees were told that they would receive green cards within 24 months but that the company needed workers immediately so they would be going on H-2B visas.  David says that Burnett explained that David would first go on an H-2B temporary visa which would eventually be extended two times.  During the 24 month waiting period and with the two extensions of the original H-2B visa, David would get the green card.  David says that he was assured that Signal was a good company with good accommodations and that the workers would be treated well.

David asserts that he came to Signal only because he expected a green card and that he would not have left his otherwise lucrative position at home to come to the United S tates solely for temporary employment.  David borrowed money from his brother-in-law to finance his participation in the program. David stayed with Signal through March 2008.  (Signal Exh. FFF).

22

After arriving in the United States in 2007 David worked at
Signal's Orange, Texas facility.

### 2. Sony Vasudevan Sulekha

Sulekha decided to participate in the program because of an
ad that he saw in a Malayalam newspaper. Sulekha attended a
seminar at the Hilton Hotel in Cochin in May 2006. Dewan, Pol,
and Salimon (another Dewan employee) were present. Sulekha was
told that Signal needed workers, the company would give permanent
residence, that Signal was a good company, and that this would be
a very good opportunity for him. Dewan and Pol explained that at
first the workers would be sent on an H-2B temporary visa, which
would be extended, and a green card would follow within 24
months. Sulekha pawned his ornaments and wife's jewelry and
borrowed money from a distant relative in order to finance his
participation in the program. Sulekha contends that he was
promised a green card and that he would be able to bring his
family to the United States but those promises never
materialized. After arriving in the United States in 2006
Sulekha worked at Signal's Orange, Texas facility.

### 3. Palanyandi Thangamani

Thangamani testified that he went to Signal expecting a
green card. Thangamani pledged his sister's ornaments and
jewelry in order to finance his participation in the program.
After arriving in the United States in 2006 Thangamani worked at

23

Signal's Orange, Texas facility.

### 4. Muruganantham Kandhasamy

Kandhasamy saw an advertisement in a paper called Dhinethandi that advised that workers were needed to work in the United States and would receive green cards.  Kandhasamy attended an interview with Pol, Dewan, Burnett, and representatives from Signal--everyone present spoke.  Kandhasamy was told that he would get a green card.  Kandhasamy contends that just a few days before he was to leave for the United States he was told by Dewan that he would be going on an H-2B visa instead of a green card. Kandhasamy contends that Dewan told him, in the presence of Pol, Burnett, and a Signal representative, that once he arrived in the United States his H-2B visa would become a green card.  After arriving in the United States in 2007 Kandhasamy worked at Signal's Orange, Texas facility.

### 5. Hemant Khuttan

Khuttan responded to an advertisement in the Hindustan Time newspaper in Delhi.  The advertisement did not mention Signal by name.  Khuttan attended an information meeting in Delhi where he first met Dewan.  Khuttan traveled from Delhi to Mumbai to speak with Dewan Consultants about the program and this is when he first heard about Signal.  Khuttan paid Dewan about $20,000 USD up front to participate in the employment program with Signal and he borrowed the money from a friend.  Khuttan contends that he

really didn't know which kind of visa he was supposed to get but that Dewan later informed him that he would be going to Signal on an H-2B visa and that once he arrived in the United States Signal would take care of him and get him a green card.  After arriving in the United States in 2007 Khuttan worked at Signal's Pascagoula, Mississippi facility.

All of the named plaintiffs, whether recruited for J & M, IAS, or Signal contend that they were promised green cards and that this is what their contracts with Defendants guaranteed to them.  Plaintiffs contend that it was in reasonable reliance on Defendants' assertions that they undertook such considerable personal, financial, and familial sacrifices in order to participate in the recruiting program, and they assert that they would not have made such sacrifices had they known that Defendants' assertions regarding permanent residence in the United States were false.

**C.    Factual Background--Phase 2--Employment/Life at Signal**

From the beginning, it was understood that housing and meals would be provided by Signal with the cost of these "accommodations" to be paid by the workers out of their paychecks.[18]  Originally, Global was going to provide the accommodations with Signal then reimbursing Global out of the

---

[18] Plaintiff Thangamani testified that someone told him that room and board would be free.  (Thangamani depo at 56).

workers' paychecks.  (Pla. Exh. 517).  But Signal opted to
construct man camp housing facilities onsite in Texas and
Mississippi to house the workers.  The decision was prompted in
large part by housing shortages after hurricanes Katrina and
Rita.  Meals would also be prepared and served onsite.  These
preparations did require capital and expense outlays by Signal
but it was always Signal's intention to recoup these expenditures
by deducting fees from the workers' pay.  Signal invested
millions of dollars building the camps and decided to charge the
workers $35 dollars per day (7 days a week) for room and board so
that the company could recoup its investment over a five year
period.[19]  At the $35/day rate Signal anticipated realizing a
profit from the man camps.[20]  (Pla. Exh. 871).  For this reason it
would eventually become important to Signal to ensure that the
man camps were filled to maximum capacity.  (Pla. Exhs. 528, 449,
850).  Signal implemented a policy that required each foreign
worker to pay the $35/day accommodations charge even if the
worker elected to live offsite and even if the worker earned no

---

[19] Signal also envisioned charging the workers for enlarging
its welder testing and training facilities.  (Pla. Exh. 846).

[20] One member of Signal's management proposed charging the
workers $53.50 per day for accommodations, reasoning that the
workers had only been making about $10 per day in India and that
even after the deduction they would still be making about 11
times more per day than what they were making at home.  (Pla.
Exh. 671).  Signal did not recoup its expenditures for the man
camps and in the end Signal spent about $6.5 million dollars more
than it recovered.  (Cunningham depo at 136).

pay for a given day.  Only the Indian H-2B workers were allowed to live at the man camps.  And only the Indian H-2B workers were charged the $35 per day accommodations fee regardless of whether they chose to live in the man camp or elsewhere.

By August 2006 Signal was eager to have the workers arrive given its increased workload and manpower shortage in that year and given the soaring costs that the company was incurring for subcontracted labor.  (Pla. Exh. 550).  The first workers began arriving at Signal in November 2006.  Each H-2B worker was given a second skills test--some workers had their wages reduced from the $18 per hour rate by as much as 30 percent to an amount commensurate with their skills and some were terminated.  Each worker also executed a Man Camp Housing Rules Agreement (Pla. Exhs. 48, 76, 811, 858, 859),[21] an H2B Resident Housing Agreement (Pla. Exhs. 63, 181, 779, 860,[22] and an Authorization Agreement for Payroll Deduction (Pla. Exhs. 75, 812, 845, 861, 862).[23]  Once arrived the workers were presented with new employment contracts

---

[21] The Rules prohibited alcohol, smoking, visitors/guests, and horse-playing in the man camp.  Also, all employees were required to enter the facility through security.

[22] The Housing Agreement expounds upon some of the rules contained in the Man Camp Rules, imposes the $35/day charge for room and board, and imposes stiff fines for violations of camp rules.

[23] Via this document each worker authorized Signal to deduct the $35/day "accommodations" or room/board charge from his paycheck.

27

terminable at will.  (Signal Exhs. SSS, SSS-A).

Perhaps Signal understood even before the first workers
arrived that they expected to receive green cards at some point.[24]
(Pla. Exhs. 550, 817).  But without question Signal knew of the
workers' green card expectations once they arrived on site
because the workers questioned Bill Bingle about green cards on
their first day at the camp.  According to Bingle, it was only
later in the process that Signal learned that the H-2B process
would not support the filing of green cards for the workers.
Signal maintains that it had believed early on that there was an
avenue available to convert the temporary visas to green cards
and that it intended to apply for green cards for those workers
who proved to be good employees.  (Pla. Exh. 817).  But green
cards would only be considered once the allowable H-2B extensions
were exhausted and only for valued workers.  Prior to the
expiration of the first H-2B visas in July 2007, Signal began
using a "yes/no" evaluation protocol for identifying potential
candidates for long term employment.

Signal concedes that its intention was never to seek green
cards for all H-2B workers without considering factors like skill

---

[24] Less clear, however, and perhaps ultimately more
important, is whether Signal understood the significance of the
references to green cards in the various emails and
correspondence that were exchanged before the workers arrived at
Signal.  See Rigolo depo at 72 ("[V]ery early in the process []
there was probably some misunderstanding and [the terms] visa and
green card were used synonymously.").

level, work ethic, attitude, etc.  Signal maintains that it never agreed to seek green cards on behalf of every worker without considering job performance and that it never felt obligated to do that.  According to Signal, if such broad promises pertaining to green cards were made to the workers then they were not authorized by Signal and were not true.  After all, green cards are issued by the government and with the government involved no employer could guarantee any worker a green card.

Plaintiffs contend that Defendants' green card scheme was grounded in part upon false representations about the living conditions at Signal.  Upon arriving at Signal, Plaintiffs were sorely disappointed in the man camp accommodations, including the food.  According to Plaintiffs, their $35 per day bought them life in overcrowded and cramped labor camps,[25] with insufficient bathroom and shower facilities for the number of men housed in each bunkhouse.  Plaintiffs assert that the facilities lacked privacy and were not conducive to regular sleep.  Signal believes that the facilities conformed to all applicable city codes but not necessarily to OSHA requirements.  (Pla. Exh. 940).  Plaintiffs contend that the squalid conditions in the man camp were conducive to the spread of disease and illness.  At one of

---

[25] Plaintiffs submitted numerous photographs and a video of the man camp living areas while they were occupied.  (Pla. Exhs. 838, 839).  Plaintiffs' assertions about overcrowded conditions are not exaggerated.

the camps water would leak and stagnate due to shoddy plumbing.
(Pla. Exh. 621).  One kitchen facility was described by Signal's
own staff as "disgusting."  (Pla. Exh. 828 ("I pray that the TX
Health Dept doesn't show up.  They will shut this place down
immediately.").

Plaintiffs also resented the man camp housing rules.  In
practice, Plaintiffs did not appreciate having to pass through
security to enter to the camps, and the attendant searches of
their parcels and requisite presentation of identification.
Alcohol and visitors were strictly prohibited in the camps, and
Plaintiffs contend that they often felt like prisoners while
living in the camps, and isolated or marginalized from the rest
of the workforce and the community.  Of course, no worker could
be forced to live at the man camp so long as he was willing to
pay room and board elsewhere on top of the $35 per day
(approximately $1050 per month) accommodations fee that Signal
would continue to charge him in light of his H-2B status.  Thus,
some of the workers felt financially compelled to live in the man
camps despite how miserable any particular worker might have felt
about that prospect.

Plaintiffs characterize the man camp as a "racialized
ghetto," (Pla. memo at 20), and they point to the man camp as
strong evidence of the discriminatory treatment that they claim
to have received at Signal.  Plaintiffs point out that they were

the only members of Signal's workforce who were allowed or required to live in the man camp, with its attendant security rules and hefty daily rates, and that they were required to pack their lunches from the food available at the man camp cafeteria, which often spoiled in the heat before they could eat it. Plaintiffs point out that only the migrant workers at Signal were subjected to these conditions.[26]   Plaintiffs also complain that they were given the most undesirable and dangerous work that Signal's non-foreign workers did not want to perform.   Plaintiffs contend that they were left with no choice but to endure the unpleasant and abysmal conditions at Signal or go back to India financially bankrupt and socially scarred.   Plaintiffs contend that Signal exploited their precarious financial situation and their vulnerable immigration status.

John Sanders was Signal's point man for the Global/Signal contract and he took what appears to be a genuine interest in the day to day concerns and welfare of the H-2B workers.[27]   In November 2006 Sanders learned from the workers about the onerous fees charged by Dewan, Pol, and Burnett.   Several workers told

---

[26] Plaintiffs have also submitted various emails from Signal personnel which they contend exemplifies the company's discriminatory attitude toward the Indian H-2B workers.   (Pla. memo at 23 n.25).

[27] Sanders kept a personal diary in which he recorded his dealings with the Indian workers and Signal management and his personal impressions of many of the events at issue in this case.

Sanders personal stories about pawning private possessions in order to raise the fees required to participate in the H-2B program, and of the significant debts that they had incurred in the process.  The workers also complained about the $35 per day accommodations fee, pointing out that after this fee was deducted from their pay, and in light of the debts already incurred, it was not economically advantageous to be at Signal.  Sanders relayed this information to upper management and noted how these issues were affecting morale amongst the workers.  (Pla. Exh. 618).

On November 20, 2006, a meeting took place to discuss the clear contradiction in the workers' assertions about the fees that they were claiming that they had paid to participate in the H-2B/green card program and Pol's statements to Signal that the workers had paid $2000 to participate.  (Pla. Exh. 521(Bingle)). Pol, Ron Schnoor, and John Sanders were present.  Signal maintains that it was during this meeting that it learned with certainty about the exorbitant fees that the workers had paid to Global, Burnett, and Dewan.  Ron Schnoor followed up with a letter to Pol demanding an accounting of the workers' payments and demanding that Pol refund 50 percent of the fees paid by the workers and reimburse them for airfare.  (Pla. Exh. 520(Bingle)). Schnoor copied Dewan and Burnett on the letter.  Pol replied via letter defending the fees charged and explaining why he could not

32

refund any of the money.  (Pla. Exh. 559).  Signal was convinced
that Pol had misrepresented to Signal the amount of money that
each worker would be paying to participate.  Signal terminated
its relationship with Pol and requested that Dewan and Burnett do
the same.  (Pla. Exh. 669).

    Thus, as of November 2006, Signal knew about the significant
fees that the workers had paid and about the workers' green card
expectations.  Around this time Signal also became concerned that
perhaps Dewan was not being honest with the testing in India
because the actual skill level of the workers who were arriving
at Signal was not commensurate with the tests that they were
passing in India.  Signal noticed that the workers coming over
were not the best and that perhaps the ability to pay hefty
recruiting fees was being given more weight than actual skill.
Plaintiffs assert that November 2006 presents a watershed moment
in the case because from this point onward Signal clearly knew
what was going on but nevertheless continued for months
thereafter to accept hundreds more workers into the program--
workers who were relying on false promises.  And while Signal
terminated its dealings with Pol, it nonetheless continued to
work with Dewan and Burnett.  (Pla. Exh. 522(Bingle)).
Plaintiffs contend that Signal took no corrective action because
it needed the workers to continue to save on labor costs and to
continue to pay for the man camp.  Plaintiffs contend that

33

Signal's decision to continue to bring in workers via Dewan and Burnett, all the while knowing the truth, makes the company liable in the scheme.

On March 9, 2007, Signal decided to terminate eight of the workers--six who were allegedly unproductive and two, Jacob Joseph Kaddakkarappally and Sabulal Vijayan, who might be characterized as "rabblerousers." (Pla. Exh. 646). Jacob and Sabulal had a reputation in Mississippi for creating unrest among the foreign workers even though they were otherwise skilled workers. By this time Signal also knew that some of the workers had contacted a lawyer about their rights, and that two of the workers in particular had been wheedling other workers to also speak to the lawyer. (Pla. Exh. 443). Signal undertook to terminate Jacob and Sabulal on the morning of March 9, 2007, in the presence of the other foreign workers, which Plaintiffs contend was a calculated decision in order to make an example of Jacob and Sabulal so that everyone would understand what happens to troublemakers. Signal called in Swetman security guards in advance of the terminations in the event that things got out of hand--which they did as the situation deteriorated into mayhem. The security guards allegedly detained the terminated workers unlawfully in one of the bunkhouses, and Plaintiffs contend that this was done at Signal's direction. Sabulal attempted suicide and the Pascagoula Police Department arrived on the scene after

34

someone called to report a kidnaping.  (Pla. Exh. 444).  The
Mississippi Immigrant Relief Association was present outside the
camp and so was the media.  (Pla. Exh. 646).  The Mississippi
debacle of March 9, 2007, became known as "Black Friday."
Plaintiffs contend that word of the Black Friday events in
Mississippi quickly spread to the workers in the Texas camp.

Dewan flew from India to Mississippi on March 9, 2007, to
help settle some of the unrest amongst the foreign workers but he
was not present for the Black Friday events.  Dewan believed that
he might be able to calm the workers in light of the
troublemakers who were trying to create problems for everyone.
(Pla. Exh. 446).  Dewan suggested that the workers who had
initiated the problems should be deported first.  Burnett later
traveled to the Texas facility to similarly calm the workers.

On March 12, 2007, Schnoor and Burnett addressed the workers
in Mississippi to reassure them that they were part of Signal's
long term solution for supplementing its labor force.  Schnoor
advised the workers to think very carefully about suing Signal
because Signal would vigorously fight any such efforts and that a
bunch of frivolous lawsuits would mean no visa extensions for the
foreign workers so that they would all have to return to India
when the first H-2B visas expired on July 31, 2007.  Plaintiffs
contend that the events and aftermath of Black Friday emphasized
to the Indian workers the importance of being compliant while at

Signal because even good workers would be terminated and deported
if they complained.  Plaintiffs assert that Signal made false
assurances about the status of their green cards thereby
continuing the deception.  Plaintiffs characterize the working
and living conditions at Signal as psychologically coercive.

By April 25, 2007, Dewan, Burnett, and Pol were at odds when
Pol and Burnett came to suspect that Dewan had lied to them about
giving a refund to a candidate while he in fact took the
candidate's money.  (Pla. Exh. 469).  Signal's first H-2B
authorization was scheduled to expire on July 31, 2007, but on
the advice of Burnett Signal requested the first extension for
all of the workers because it was just easier that way.  By March
2008 when this lawsuit was filed more than three quarters of the
putative class had left Signal.  At present, none of the putative
plaintiff class members remain at Signal.

**D.   Procedural Background**

Plaintiffs filed this proposed class action on March 7,
2008, and amended their complaint twice.  Plaintiffs originally
moved for class certification on October 1, 2008.  (Rec. Doc.
165).  Plaintiffs filed their Second Amended Complaint (Rec. Doc.
944) on November 23, 2010.   The Court allowed discovery on class
issues and that discovery proceeded for over two years.

Plaintiffs successfully defeated numerous dispositive
motions but on November 10, 2010, the Court granted Signal's

motion to dismiss Plaintiffs' claim for certification of a Rule 23(b)(2) class for injunctive relief.[28]   (Rec. Doc. 926).

Plaintiffs filed their Supplemental Motion to Certify (Rec. Doc. 994) on February 1, 2011, and Defendants filed their submissions in opposition to certification (Rec. Docs. 997, 998, 992, & 1000).   Signal then filed its Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012) and Motion for Partial Stay of Class Certification Proceedings (Rec. Doc. 1013), in response to Plaintiffs' argument that certification of RICO claims predicated on 18 U.S.C. § 1546, insofar as Plaintiffs were urging that Signal defrauded the United States government, were never pled with the required specificity.   Plaintiffs then filed their Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031).   The Court granted Signal's Motion for Partial Stay such that Defendants would not be required to address the merits of the § 1546 claims in their rebuttal memoranda.   (Rec. Doc. 1043).   The Court

---

[28] When dismissing the (b)(2) claims the Court specifically noted that the ruling did not constitute a final adjudication of the class certification issue so as to trigger any party's right to seek an interlocutory appeal pursuant to Rule 23(f).   (Rec. Doc. 926).   In order to avoid the inefficiency of a piecemeal appeal process, all parties expressly agreed on the record to waive any subsequent argument that Plaintiffs' failure to seek immediate review in the Fifth Circuit would constitute a waiver of their rights under Rule 23(f).   Accordingly, the Court will incorporate its ruling on the (b)(2) claims as part of this Order and Reasons so that the parties can seek review of all certification claims at one time.

advised that it would issue an order inviting Defendants to respond to the § 1546 claims on the merits if the Court were inclined to deny the Motion to Strike-1012 and/or to grant the Motion for Leave, and if the § 1546 claims were otherwise certifiable.  (Rec. Doc. 1043).

The parties filed their rebuttal memoranda (Rec. Docs. 1073, 1070, 1074, $ 1071) on April 29, 2011, at which time the issue of class certification was taken under submission, along with the Motion to Strike-1012 and Motion for Leave to File, the latter two relating solely to the issue of RICO claims predicated on § 1546 insofar as Plaintiffs argue third-party reliance by the United States government.

After the rebuttal memoranda were filed, Signal filed its second motion to strike, Motion to Strike-1082, which was taken under submission on June 22, 2011.  This motion to strike, as with the first motion to strike, pertains solely to the RICO claims.

## III. <u>CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)</u>

Plaintiffs move to have a class certified pursuant to Federal Rules of Civil Procedure 23(b)(2)[29] and (b)(3) consisting of

---

[29] The Court has already rejected the (b)(2) injunctive relief class claims.  <u>See</u> note 28, <u>supra</u>.  The Court will therefore limit the substance of its analysis to the Rule 23(b)(3) class claims.

All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(B) ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs seek certification with respect to their claims for violations of 1) the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); 2) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); 3) the Civil Rights Act of 1866, 42 U.S.C. § 1981; and 4) the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).

Federal Rule of Civil Procedure 23 governs class actions. The rule provides in relevant part:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. Pro. 23(a), (b)(2)-(3).  To obtain certification a party must satisfy Rule 23(a)'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of Rule 23(b)(1), (2), or (3).  <u>Gene & Gene, LLC v. Biopay, LLC</u>, 541 F.3d 318, 325

40

(5th Cir. 2008) (<u>citing</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591 (1997)).  District courts have discretion as to whether a class will be certified.  <u>Stirman v. Exxon Corp.</u>, 280 F.3d 554, 561 (5th Cir. 2002) (<u>citing</u> <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d 734, 740 (5th Cir. 1996)).  However, that discretion must be exercised within the framework of Rule 23.  <u>Id.</u>  The district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class."  <u>Gene & Gene</u>, 541 F.3d at 325 (<u>quoting</u> <u>O'Sullivan v. Countrywide Home Loans, Inc.</u>, 319 F.3d 732, 737-38 (5th Cir. 2003)).  The party seeking certification bears the burden of demonstrating that the Rule 23 requirements have been met.[30]  <u>Id.</u> (<u>citing</u> <u>Berger v. Compaq Comp. Corp.</u>, 257 F.3d 475, 479 (5th Cir. 2001)).

Rule 23(b)(3) is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in Rule

---

[30] Plaintiffs suggest that courts in the Fifth Circuit are urged to err on the side of certifying class actions because the order is always subject to modification in light of later developments.  (Rec. Doc. 994-1, at 35).  The Court has reviewed numerous class action decisions from this circuit and the Court does not glean such an urging.  To the contrary, the Fifth Circuit has specifically noted how certification can dramatically affect the litigation stakes for defendants by magnifying and strengthening the number of unmeritorious claims, <u>Castano</u>, 84 F.3d at 746 (<u>citing</u> <u>In re Agent Orange Prods. Liab. Litig.</u>, 818 F.2d 145, 165-66 (2d Cir. 1987)), and that certification cannot follow from mere instinct and a "figure-it-out-as-we-go-along approach," <u>Madison v. Chalmette Refining, LLC</u>, 637 F.3d 551, 557 (5th Cir. 2011).  The "rigorous" Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are met.

23(b)(1) and (b)(2) situations.  Amchem Prods., 521 U.S. at 615
(quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).  A party
seeking certification of a Rule 23(b)(3) class must demonstrate
inter alia that the questions of law or fact common to class
members predominate over any questions affecting only individual
members.  Gene & Gene, 541 F.3d at 325 (quoting Fed. R. Civ. Pro.
23(b)(3)).  Considering whether "questions of law or fact common
to class members predominate" begins with the elements of the
underlying cause of action.  Erica P. John Fund, Inc. v.
Halliburton Co., 131 S. Ct. 2179, 2184 (2011).

     The predominance inquiry requires a court to consider "how a
trial on the merits would be conducted if a class were
certified."  Gene & Gene, 541 F.3d at 325 (quoting Bell Atl.
Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003)).  This in
turn means that the court must identify the substantive issues
that will control the outcome, assessing which issues will
predominate, and then determine whether the issues are common to
the class--a process that ultimately prevents the class from
degenerating into a series of individual trials.  Id.  The court
must go beyond the pleadings to understand the claims, defenses,
relevant facts, and applicable substantive law in order to make a
meaningful determination of the certification issues.  Castano,
84 F.3d at 744 (citing Manual for Complex Litigation § 30.11 (3d
ed. 1995)).  The predominance requirement tests whether proposed

42

classes are sufficiently cohesive to warrant adjudication by representation.  Id. (quoting Amchem Prods., 521 U.S. at 623-24). The predominance of individual issues necessary to decide an affirmative defense may preclude class certification.  Gene & Gene, 541 F.3d at 327 (quoting In re Monumental Life Ins. Co., 365 F.3d 408, 420 (5th Cir. 2004)).

Generally, the strength of the plaintiff's claim on the merits should not affect the certification decision.  See Castano, 84 F.3d at 744.  Nonetheless, the determination of class action questions is often intimately involved with the merits of the underlying claims.  Id. at 744 n. 17 (quoting Cooper & Lybrand v. Livesay, 437 U.S. 463, 469 n.12 (1978)).  Frequently the "rigorous analysis" required for Rule 23 certification will entail some overlap with the merits of the plaintiff's underlying claim.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011).  "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  Id. (quoting Gen. Tele. Co. v. Falcon, 457 U.S. 147, 160 (1982)).  This is particularly true with the more complex determinations required for certification under Rule 23(b)(3).  Castano, 84 F.3d at 744 n.17.  "[I]n some cases there will be overlap between the demands of 23(a) and (b) and the question of whether plaintiff can succeed on the merits."  Huff v. N.D. Cass Co., 485 F.2d 710, 714

43

(5th Cir. 1973) (en banc).

In this case all aspects of the Rule 23 certification inquiry are contested except the numerosity requirement[31] and the adequacy of Plaintiffs' counsel.  (Rec. Doc. 994-1, at 40 n.42). All of the Rule 23(a) requirements are important and must be satisfied but the (b)(3) requirements usually present a far more challenging obstacle for certification than the Rule 23(a) requirements.  Therefore, for the various causes of action, the Court can appropriately begin its Rule 23 analysis by assuming arguendo that the Rule 23(a) requirements are satisfied and turning its attention to the more "exacting demands" of Rule 23(b)(3), in particular the predominance requirement.  Gene, 541 F.3d at 325.  If the predominance requirement is satisfied then the Court will necessarily address Rule 23(b)(3)'s superiority requirement, and if necessary, Rule 23(a)'s requirements.  Id. at 326.

**1. Trafficking Victims Protection Act**

The first set of claims that Plaintiffs seek to certify for class-wide treatment are their forced labor and trafficking claims brought under the auspices of the Trafficking Victims Protection Reauthorization Act of 2003.  These claims derive from alleged violations of two criminal statutes, 18 U.S.C. § 1589

---

[31] The proposed class numbers about 500 members.

44

(forced labor) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor). 18 U.S.C. § 1595 allows Plaintiffs to seek civil recovery for violations of the forced labor and trafficking criminal statutes, §§ 1589 and 1590.[32]  Plaintiffs' forced labor and trafficking claims are brought against defendants Signal, Pol, and Dewan.

Defendants contend that Plaintiffs' § 1589 claims cannot be tried on a representative basis and are therefore not amenable to certification because the claims are fundamentally about individual consent.  According to Defendants, the legislative history of § 1589, and the Supreme Court's decision in <u>United States v. Kozminski</u>, which actually predates the enactment of § 1589, demonstrate that Plaintiffs' forced labor claims cannot be certified as a matter of law under the facts of this case.  In other words, the very nature of a forced labor claim precludes Plaintiffs from meeting their burden of demonstrating that the predominance requirement of Rule 23(b)(3) is satisfied.

---

[32] "An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees."  18 U.S.C.A. § 1595(a) (West 2000 & Supp. 2004).  The civil remedies provision was enacted as part of the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (2003).  In 2008 Congress broadened the scope of the civil remedy statute but that amendment, which came subsequent to the events giving rise to this lawsuit, is not at issue in this case.

45

Plaintiffs argue that the Trafficking Victims Protection Act ("TVPA") does not require a showing of individualized consent because the TVPA focuses on the actions of the defendant, not the plaintiff.  Therefore, liability under the TVPA can be proven regardless of the number of plaintiffs bringing a claim. Plaintiffs point out that the TVPA introduced the concept of "serious harm" into the forced labor realm and that "serious harm" is assessed objectively on a reasonable person standard. Therefore, according to Plaintiffs, no one plaintiff's perspective, subjective position, or consent is legally relevant. The only question that need be answered is whether a reasonable person in Plaintiffs' shoes would feel compelled to provide his labor against his will--a question that can be answered on a class-wide basis.

The question of whether to certify a class for a TVPA claim is a question of first impression in the Fifth Circuit.  To determine whether issues of fact common to the class predominate over individual issues the Court turns its attention to the elements of the forced labor cause of action and the substantive issues that will control the outcome of the claims.

### A.   Forced Labor, 18 U.S.C. § 1589

Section 1589 of Title 18, pertaining to **Forced Labor**, provides:

> Whoever knowingly provides or obtains the labor or
> services of a person--
>
> (1)   by threats of serious harm to, or physical restraint
>       against, that person or another person;
>
> (2)   by means of any scheme, plan, or pattern intended to
>       cause the person to believe that, if the person did
>       not perform such labor or services, that person or
>       another person would suffer serious harm or physical
>       restraint; or
>
> (3)   by means of the abuse or threatened abuse of law or
>       the legal process,
>
> shall be [subject to criminal penalties].

18 U.S.C.A. § 1589 (West 2000 & Supp. 2001).[33]  The coercive means described in subsections (1)-(3) <u>supra</u> are taken nearly verbatim from the definition of "coercion" found at 22 U.S.C. § 7102(2), which is part of the civil provisions of the Trafficking Victims Protection Act.

Section 1589 became law on October 28, 2000, when President Clinton signed into law the Victims of Trafficking and Violence Protection Act of 2000.  The purposes of the Act were "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect

---

[33] Congress amended § 1589 in 2008 to make it even broader. That amendment was signed into law on December 23, 2008, and is not applicable to Plaintiffs' claims.

their victims."  22 U.S.C.A. § 7101 (West 2004).

It is widely recognized that Congress crafted § 1589 pertaining to forced labor to fill a significant gap in the scheme of involuntary servitude criminal laws that the Supreme Court had identified in United States v. Kozminski, 487 U.S. 931 (1988).  In Kozminski, the government prosecuted the defendants for criminal violations of 18 U.S.C. § 1584, which criminalized involuntary servitude.  The victims were two mentally retarded men who had been found laboring on the defendants' farm in poor health, in squalid conditions, and in relative isolation from society.  During the criminal prosecutions the government offered some evidence of physical abuse but also relied on various other methods of coercion--denial of pay, subjection to substandard living conditions, isolation--to establish that the victims believed that they had no alternative but to work on the farm. Kozminski, 487 U.S. at 936.  The government had argued that the two men were "psychological hostages" whom the defendants had "brainwashed into serving them."  Id.  The district court's jury charge specifically allowed the jury to consider various types of non-physical, psychological coercion when determining whether the two men had been held to involuntary servitude.  Id. at 939.  The jury voted to convict.  The appellate court en banc reversed the convictions.

The Supreme Court granted the government's writ to consider

48

the scope of conduct pertinent to the meaning of "involuntary servitude" for purposes of a criminal prosecution under § 1584. In light of the state of the law when Congress first enacted § 1584 in 1948, the Court concluded that "involuntary servitude" was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion-- psychological coercion would not suffice. Kozminski, 487 U.S. at 948. The government had urged the Court to adopt a broad construction of "involuntary servitude" so as to prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice. Id. at 949. But the Court refused to give such an amorphous interpretation to a criminal statute. Such an interpretation would give no notice to ordinary people who are required to conform their conduct to the law and the question of whether any specific acts would constitute a crime would depend solely on the specific victim's state of mind. Id. at 949-50. Further, the rule of lenity, which serves to promote fair notice to those subject to the criminal laws, requires that any uncertainty concerning the ambit of criminal statutes leads to a narrower interpretation, not a broader one. Id. at 951-52.

In summing up, the Supreme Court stated that *absent change by Congress*, for purposes of a criminal prosecution under § 1584,

the term "involuntary servitude" necessarily means a condition of
servitude in which the victim is forced to work for the defendant
by the use or threat of physical restraint or physical injury, or
by the use or threat of coercion through law or the legal
process.  Kozminski, 487 U.S. at 952.  The Court clarified,
however, that its holding did not imply that evidence of other
means of coercion, or of the victim's special vulnerabilities
would be irrelevant.  To the contrary, the vulnerabilities of the
victim would be relevant in determining inter alia whether the
physical or legal coercion or threats thereof "could plausibly
have compelled the victim to serve," as well as the "causal
effect" of any physical or legal coercion.  Id.  The Supreme
Court affirmed, thereby vacating the convictions and remanding
for a new trial.

Congress enacted § 1589 in the wake of Kozminski to provide
federal prosecutors with the tools to combat severe forms of
worker exploitation that do not rise to the level of involuntary
servitude as defined in Kozminski.  H.R. Rep. 106-939.  Section
1589 is intended to address the increasingly subtle methods of
traffickers who often use means other than overt violence.  Id.
With § 1589, prosecutors would no longer be required to
demonstrate physical harm or threats of force against victims
because the "serious harm" standard employed by the statute
encompasses a broad array of harms, both physical and non-

physical.  Id.

     The Kozminski Court did not directly confront the question
of whether a forced labor charge requires proof that the victim's
rendering of labor was involuntary or non-consensual, which of
course is the point of law that the parties dispute in this case.
But it is beyond dispute that the Court's discussion of the law
throughout the opinion confirms that the concept of involuntary
servitude or forced labor turns on whether the victim rendered
labor because of the verboten physical force or legal coercion.
In other words, the issue is whether the victim was coerced by
physical force or legal coercion into providing labor
involuntarily.  Nothing about Kozminski even remotely suggests
that a finding of involuntary servitude or forced labor could be
premised solely on the defendant's conduct and the fact that the
victim did in fact work for the defendant, while ignoring the
issue of causation.  Kozminski clearly suggests that a
determination of involuntary servitude or forced labor requires a
causal connection between what the defendant did, what the victim
did, and why the victim did it.  See Kozminski, 487 U.S. at 952
("[T]he vulnerabilities of the victim are relevant in determining
whether the physical or legal coercion or threats thereof could
plausibly have compelled the victim to serve.").  In other words,
the forced labor analysis cannot be confined solely to the
defendant's conduct but necessarily must take into account the

particular victim's vulnerabilities.[34]

The question then is whether the TVPA so changed the forced labor inquiry so as to focus solely on the defendant's conduct to the exclusion of the victim's perspective.  The TVPA included the new § 1589 statute on forced labor, that Plaintiffs rely upon herein, to counter Kozminski but the problem with Kozminski was not that the Supreme Court considered the individual victim's vulnerabilities to be relevant to the issue of compulsion but rather that the coercive means punishable for a forced labor violation were too narrow under Kozminski, particularly with respect to psychological coercion.  Section 1589 clearly recognizes that there are numerous types of harm beyond physical abuse or legal coercion that can be used to force an individual to work involuntarily.  So because of the TVPA the more subtle forms of coercion that escaped criminal punishment in Kozminski are now clearly unlawful.

But the Court does not read either the TVPA or § 1589 in particular as shifting the focus of the crime of forced labor

---

[34] Justice Brennan's concurring opinion in particular contains numerous points of discussion that confirm that the victim's perspective is crucial to a forced labor determination. See, e.g., Kozminski, 487 U.S. at 956-57 (Brennan, J., concurring) ("Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to make their service involuntary.").

solely to the defendant's conduct without concern for whether the defendant's conduct was sufficient to make *the specific alleged victim* render labor involuntarily.  The TVPA did not render the issue of consent irrelevant to a forced labor determination. Congress could have expressly rendered victim consent irrelevant to the determination, as is the case with the United Nations Protocol applicable to human trafficking, but Congress declined to do so.  See Jennifer M. Chacon, <u>Misery & Myopia:</u> <u>Understanding the Failures of U.S. Efforts to Stop Human</u> <u>Trafficking</u>, 74 Fordham L. Rev. 2977, 2982 (2006).[35]  And the House Report on the TVPA contains a discussion that talks about "the individual circumstances of the victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. 106-939.  Other courts continue to recognize implicitly that even in the aftermath of the TVPA the question of forced labor turns on whether the defendant's conduct or tactics reasonably coerced or forced the victim to provide labor.  <u>See,</u> <u>e.g.</u>, <u>United States v. Bradley</u>, 390 F.3d 145 (1st Cir. 2004), <u>rev'd on other grounds</u>, <u>Bradley v. United States</u>, 545 U.S. 1101 (2005); <u>United States v. Peterson</u>, 627 F. Supp. 2d 1359 (M.D. Ga.

---

[35]  In fact, this author has opined that the TVPA, contrary to earlier law, actually gives "central importance" to the question of victim consent.  Chacon, <u>supra</u>, at 2999.

2008). And one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved.

Moreover, the need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new § 1589 allows and which Plaintiffs rely upon in this case. Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with egregious forms of physical abuse the specific victim's vulnerabilities may become less important. But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor. This is exactly what § 1589 now recognizes. But because § 1589 is a criminal statute that potentially reaches a broad range of coercive conduct that standing alone might not be unlawful, two things are clear. First, the defendant's conduct must be the driving force behind the victim's "choice" to render the labor.[36]

---

[36] Justice Brennan sagaciously explained in <u>Kozminski</u> how at some level the laborer always has a "choice" no matter what the threat because he can choose to work or take a beating. But with less egregious forms of coercion it is particularly difficult to determine when a person's actions are "involuntary." <u>Kozminski</u>, 487 U.S. 959 (Brennan, J., concurring).

And second, the victim's response to the defendant's actions must pass the reasonable person test.  The reasonable person test injects an objective standard into the forced labor determination which is important given the criminal nature of the statute. After all, as Justice Brennan noted in Kozminski, criminal sanctions cannot depend on a completely subjective standard that criminalizes otherwise innocent behavior simply because a particularly sensitive victim reacts to it.  487 U.S. at 960-61 (Brennan, J., concurring).  Therefore, even though the "serious harm" that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor-- the criminal law of which § 1589 is a part requires no less. Thus, it is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor.  The defendant's conduct must also be objectively coercive enough to do so.[37]  But contrary to

---

[37] The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to § 1589:  "The term 'serious harm' means any harm, whether physical or nonphysical including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C.A. § 1589(c)(2) (West Supp. 2011).  The court in Bradley had used a very similar definition of "serious harm" in its pre-2008 charges to the jury.  390 F.3d at 150.

Plaintiffs' assertion, the injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime--the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats.  This is the very essence of the crime of forced labor and Plaintiffs' interpretation of their burden of proof on the forced labor claims is contrary to the statute.

Of course, Plaintiffs are not prosecutors, they are civil litigants seeking to recover money damages under § 1595 for a violation of a criminal statute, § 1589.  But § 1595 is a damages statute, not a statutory penalty provision that imposes a monetary sanction once the plaintiff establishes that the defendant has engaged in certain conduct.  The plaintiff must prove the damages that he sustains as a result of the defendant's violation of § 1589, and proving that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily is simply part of the causation analysis for the civil claim.  It would be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct.  And with a forced labor claim, the injury question is inextricably intertwined with the question of whether it was in fact the defendant's conduct that coerced labor from

the plaintiff.

That said, Plaintiffs do not suggest that they are completely irrelevant to whether a violation of § 1589 has occurred, only that individual characteristics that might make one individual less susceptible to coercion than his co-worker are irrelevant. Plaintiffs' contention is that certain broader characteristics shared by the class as a whole, e.g., immigration status, payment of exorbitant fees to recruiters, poor living conditions at Signal, would have compelled any reasonable person to stay at Signal and provide labor and therefore the focus should be on Defendants' conduct. Clearly, the members of the class do share some common characteristics. And broadly speaking, it may very well be a logical conclusion that a welder of Indian origin, who incurred significant debt and now finds himself in the United States on a temporary visa, might choose to stay in an unpleasant employment situation. But while all of these considerations surely factor into the decision to stay with the employment, it does not mean that these characteristics that apply class-wide can substitute for the subjective aspects of why any given Plaintiff chose to stay at Signal. The question in a forced labor case is not whether any reasonable person who finds himself in the victim's situation would have felt trapped by his circumstances and therefore stayed on the job with Signal. The question is whether Defendants' coercive conduct was such that it

57

could overcome the will of the victim so as to make him render his labor *involuntary*. The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof.

The Court does not agree, however, with Signal's contention that a § 1589 claim can never be suitable for class certification. Certainly, based on the type of coercion used, there may be cases where consent becomes irrelevant. In other words, some "choices" might be so illegitimate that any decision to work is "involuntary." See Kozminski, 487 U.S. at 959 (Brennan, J., concurring). But this case does not present one of those situations. To the contrary, this case involves paid workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law. The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars. The pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program. Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature. And the "threats" that Plaintiffs allege were made to

compel them to work were often made to individuals, not to the class as a whole.

Based on the foregoing this Court is persuaded that individual issues with respect to coercion and consent will predominate Plaintiffs' § 1589 forced labor claims.  This is true whether the question is viewed as one of coercion as an element of Plaintiffs' claims, <u>see</u> <u>Channer v. Hall</u>, 112 F.3d 214 (5th Cir. 1997), or as consent as an element of Defendants' defense. Plaintiffs cannot avoid the burden of proof that each individual plaintiff faces, <u>i.e.</u>, that it was conduct on the part of either Signal, Pol, or Dewan that was coercive so as to overcome his will and render his labor involuntary, by relying on the characteristics that apply broadly to the class as a whole. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their forced labor claims.  The motion to certify is therefore DENIED as to the § 1589 forced labor claims.

### B.   *Trafficking, 18 U.S.C. § 1590*

Section 1590 of Title 18, pertaining to **Trafficking** With Respect to Peonage, Slavery, Involuntary, Servitude, or Forced Labor, provides:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services *in violation of this chapter* shall be [subject to criminal penalties].

59

18 U.S.C.A. § 1590 (West 2000 & Supp. 2001) (emphasis added).[38]
The specific violations of Chapter 77 that Plaintiffs allege
underlie their § 1590 trafficking claims, in addition to the
violations of § 1589 regarding forced labor, are § 1583
(Enticement into slavery), § 1584 (Sale into involuntary
servitude), § 1592(a) (Unlawful conduct with respect to documents
in furtherance of trafficking, peonage, slavery, involuntary
servitude, or forced labor), and § 1594(a) (Attempted violations
of §§ 1583, 1584, 1589, & 1590).

    For the reasons explained in the § 1589 forced labor section
above, the Court is persuaded that a human trafficking claim
premised on a violation of the forced labor statute cannot be
tried on a class-wide basis.  Although a trafficking claim will
focus to a great extent on the conduct of the defendant, it
remains that a trafficking claim under § 1590 must be premised on
a violation of one of the involuntary servitude statutes, even if
indirectly so as is the case with § 1592(a), pertaining to the
claim that Dewan confiscated passports while Plaintiffs were
still in India.  Under the facts of this case, individual issues
will play a significant part in any claim premised on a violation
of the statutes prohibiting forced labor, slavery, and
involuntary servitude.  Plaintiffs cannot satisfy the

_____

    [38] Congress amended § 1590 in 2008.  That amendment is not
applicable to Plaintiffs' claims.

predominance requirement of Rule 23(b)(3) even though common issues are present in their trafficking claims.  Therefore, Plaintiffs' trafficking claims under § 1590 are not amenable to class certification and the motion is DENIED as to these claims.

## 2. Racketeer Influenced and Corrupt Organizations Act (RICO)

The second set of claims that Plaintiffs seek to certify for class-wide treatment pursuant to Rule 23(b)(3) are their claims under the Racketeer Influenced and Corrupt Organizations Act or RICO, 18 U.S.C. §§ 1962(c) and 1962(d).  Plaintiffs' RICO claims are brought against all defendants.

The RICO statutory scheme is aimed at combating organized crime--RICO is located in Title 18 of the criminal code--and the Act imposes criminal and civil liability upon those who engage in certain "prohibited activities" which are listed in 18 U.S.C. § 1962 (a) through (c).[39]  Section 1962(c), which is Plaintiffs

---

[39] The prohibited activities are:

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

**(b)** It shall be unlawful for any person through a pattern

first RICO claim, prohibits "any person employed by or associated

with any enterprise" from participating in or conducting the

affairs of that enterprise through a "pattern of racketeering

activity."[40]  St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d

425, 445 (5th Cir. 2000); 18 U.S.C. § 1962(c).  Section 1962(d),

which is Plaintiffs' second RICO claim, prohibits a conspiracy to

_____

> of racketeering activity or through collection of an
> unlawful debt to acquire or maintain, directly or
> indirectly, any interest in or control of any enterprise
> which is engaged in, or the activities of which affect,
> interstate or foreign commerce.
>
> **(c)** It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection
> of unlawful debt.
>
>
> **(d)** It shall be unlawful for any person to conspire to
> violate any of the provisions of subsection (a), (b), or
> (c) of this section.

18 U.S.C.A. § 1962 (a) - (c) (West 2000).

[40] "Racketeering activity" means, in relevant part, any act
which is indictable under any of the following provisions of
Title 18 of the United States Code: section 1341 (mail fraud),
section 1343 (wire fraud), section 1546 (fraud and misuse of
visas, permits, and other documents), and sections 1581-1592
(peonage, slavery, and trafficking in persons).  18 U.S.C.A. §
1961(1)(B) (West 2000 & Supp. 2011).  The foregoing predicate
acts are only those relevant to this lawsuit.  The RICO statute
contains a lengthy and exhaustive list of criminal acts that can
serve as predicate acts.  A "pattern of racketeering activity"
requires at least two acts of racketeering activity.  Id. §
1961(5).

violate the provisions of § 1962(c).  Regardless of the
subsection, RICO claims under § 1962 have three common elements:
1) a person who engages in, 2) a pattern of racketeering activity,
3) connected to the acquisition, establishment, conduct, or
control of an enterprise.  <u>Abraham v. Singh</u>, 480 F.3d 351, 355 (5th
Cir. 2007) (<u>quoting</u> <u>Word of Faith v. Sawyer</u>, 90 F.3d 118, 122 (5th
Cir. 1996)).  Private individuals who are injured by criminal RICO
activity can recover damages in a civil action.[41]  18 U.S.C. § 1964
(c).

Plaintiffs allege three association-in-fact RICO enterprises
in support of their RICO claims.  "RICO Enterprise I" is defined
as "[a]ll Defendants and the United States Consular officers in
India." (SAC ¶ 290).  Plaintiffs allege that the common purpose
of this enterprise is recruiting, transporting, providing,
processing, and obtaining foreign workers to work on shipyards in
the United States, including Signal's operations in Texas and

---

[41] RICO's civil enforcement provision provides in relevant
part:

> Any person injured in his business or property by reason
> of a violation of section 1962 of this chapter may sue
> therefor in any appropriate United States district court
> and shall recover threefold the damages he sustains and
> the cost of the suit, including a reasonable attorney's
> fee . . . .

18 U.S.C.A. § 1964 (c) (West 2000).

Mississippi.  (Id. ¶ 293).

"RICO Enterprise II" is defined as the "Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal." (SAC ¶ 291).  Plaintiffs allege that the common purpose of this enterprise is selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and travel to the United States to work for companies, including Signal.  (Id. ¶ 299).

"RICO Enterprise III" is defined as the "Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank."[42]  (SAC ¶ 292).  Plaintiffs allege that the common purpose of this enterprise is providing and maintaining a consistent and acquiescent labor force at Signal's operations.  (Id. ¶ 304).

Plaintiffs rely upon the following predicate acts of racketeering activity for their RICO violations under 18 U.S.C. §§ 1962(c)-(d):  a) enticement into slavery in violation of 18

---

[42] Swetman Security and M & M Bank are not parties to this litigation.  Plaintiffs contend that Swetman Security assisted Signal in effectuating forced labor and trafficking at Signal by participating in the forced detention and attempted deportation of several plaintiffs and perhaps by conducting other security activities at Signal's Pascagoula facility.  (RICO Case Stmt. ¶ 3B).

Plaintiffs contend that M & M Bank, at the direction of Signal, opened accounts for Plaintiffs and agreed to have their wages directly deposited into these accounts.  Plaintiffs contend that when some workers departed Signal the bank denied them access to their bank accounts at Signal's behest.  (Id. ¶ 3J).

U.S.C. § 1583; b) involuntary servitude in violation of 18 U.S.C. § 1584; c) forced labor in violation of 18 U.S.C. § 1589; d) trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; e) unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a); f) mail fraud in violation of 18 U.S.C. § 1341; g) wire fraud in violation of 18 U.S.C. § 1343; and h) immigration document fraud in violation of 18 U.S.C. § 1546.

Plaintiffs allege that as a result of Defendants' RICO violations they have sustained similar injuries such as payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees. (SAC ¶¶ 327, 331). Plaintiffs seek treble damages, attorneys' fees, and costs. (Id. ¶ 332).

Plaintiffs argue that their RICO claims are amenable to certification because the answer to the core question of whether Signal and each of the other defendants conducted or participated in RICO enterprises through a pattern of racketeering activity will be the same for all putative class members. Plaintiffs contend that the trafficking and forced labor-based RICO claims are certifiable for the same reasons that the TVPA claims are certifiable. Regarding the mail/wire/visa fraud claims,

Plaintiffs contend that Signal and Burnett filed attestations with the Department of Labor and United States Citizenship and Immigration Services of a 10-month labor need in order to obtain H-2B visas for the plaintiff class all the while knowing that Signal's labor need was really two to three years and perhaps permanent; that Dewan, Pol, Burnett and Signal fraudulently promised United States green cards, visa extensions, and jobs; that all Defendants designed and carried out the fraudulent recruitment scheme by use of the phones, e-mail, and the mails.

Plaintiffs stress that they are not seeking to certify fraud claims that require proof of individualized reliance.  In that vein, the first theory that Plaintiffs rely upon in support of certifying their fraud claims is that in issuing the H-2B visas the U.S. government relied on the false attestations of a 10 month labor need at Signal.  Plaintiffs argue that they suffered injury as a direct result of this fraud directed at the U.S. government because but for the government having issued the H-2B visas, Plaintiffs would have never made the final installment payment to defendant Dewan, Pol, and Burnett.  Plaintiffs argue that because there is a direct relationship between their injury and Defendants' mail and wire fraud upon the U.S. government, they need not show individualized, first party reliance in order to support their RICO fraud claims.  This theory of third-party reliance is referred to throughout the parties' briefing as the

<u>Bridge</u>[43] claim.

Plaintiffs' second theory of RICO fraud is a "market approach" theory.  Plaintiffs contend that a jury could validly infer from the identical contracts that they signed and the exorbitant fees that they paid that the plaintiff class relied on Defendants' fraudulent representations regarding green cards. Without the promise of a green card no plaintiff would have paid the exorbitant fees that they paid to participate in the program and work at Signal.  Plaintiffs contend that the evidence adduced thus far demonstrates that the prices that Defendants charged were commensurate with what would be charged for green cards, not temporary work visas.  Plaintiffs advise that they will introduce expert testimony showing that in the Indian market for foreign visas no applicant would have paid the money that Plaintiffs paid without the expectation of a green card.  Thus, Plaintiffs argue that they can prove reliance for their fraud claims on a class-wide basis without the need for individualized proof.  According to Plaintiffs, there is no need to ask each of them individually if he relied on the contents of the contract that he signed.

Defendants argue that Plaintiffs' RICO claims cannot be certified for class treatment because RICO claims simply defy certification in any form and RICO's legal requirements preclude

---

[43] <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008).

certification of the trafficking and fraud-based claims.
Defendants argue that RICO claims premised on the trafficking and
involuntary servitude predicate acts cannot be certified for the
same reasons that the TVPA claims are not subject to
certification, i.e., that trafficking and other coercion claims
are implicitly based upon reliance on threats--something that can
only be proven on an individual basis.  Defendants also argue
that RICO causation cannot be proven on a class-wide basis
because a RICO plaintiff must establish that his injury is caused
by conduct that is wrongful under RICO--again, something that can
only be proven on an individual basis.  Signal argues that
Plaintiffs' fraud-based RICO claims are founded on allegations of
first-party individual reliance and under the law in this circuit
such claims cannot be certified under Rule 23(b)(3) because
individual issues will predominate.

## A.   Section 1962(c)--Substantive RICO Violation

### *Trafficking Predicate Acts*

Plaintiffs' RICO claims premised on the predicate acts of
enticement into slavery in violation of 18 U.S.C. § 1583,
involuntary servitude in violation of 18 U.S.C. § 1584, forced
labor in violation of 18 U.S.C. § 1589, trafficking persons with
respect to modern day slavery, involuntary servitude, and forced
labor in violation of 18 U.S.C. § 1590, and unlawful document-

related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a) cannot be certified for the same reasons that the claims cannot be certified when sued upon directly under the TVPA. Plaintiffs will be required to prove that the defendant committed the predicate acts upon which they rely for the pattern of racketeering activity. As previously explained in the section addressing certification of the TVPA claims, proof of these predicate acts, which are all premised on coercion, cannot be made without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate.

### *Fraud-Based Predicate Acts*

Plaintiffs also rely upon the following fraud-based predicate acts in support of their § 1962(c) RICO claims: mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and immigration document fraud in violation of 18 U.S.C. § 1546. As explained above, Plaintiffs urge two arguments in support of their contention that common issues will predominate under Rule 23(b)(3) with these fraud-based claims: 1) that a fraud-on-the-government <u>Bridge</u> claim requires no individualized proof of reliance, and 2) that first-party reliance can be proven via common evidence under Plaintiffs' market approach theory.

69

1)   **Bridge** claim

a.   **Motion to Strike-1012 and Motion to File Third Amended Complaint**

In response to Plaintiffs' Bridge claim of third party reliance, Signal has filed a Motion to Strike-1012 arguing that Plaintiffs did not adequately plead a third party reliance claim for the predicate acts of visa document fraud under 18 U.S.C. § 1546(a). According to Signal, Plaintiffs only pled first-party reliance and those claims are not subject to certification. Even so, Signal argues that the § 1546 Bridge claim cannot be certified because RICO proximate cause will not be satisfied.

The Motion to Strike-1012 is DENIED and the Motion to File Third Amended Complaint is DENIED AS MOOT. The Court is persuaded that Plaintiffs adequately pled their RICO claims and that there is no need to amend their complaint. Signal and the other defendants will suffer no prejudice at this juncture because the Court has determined that the RICO claims premised on predicate acts under 18 U.S.C. § 1546 are not amenable to certification anyway. As the case moves into the merits phase, notice as to the scope of Plaintiffs' § 1546 claims will not be an issue because Defendants are now all well aware of Plaintiffs' various fraud theories, and Defendants will be free to conduct whatever discovery they believe to be necessary to defend the

RICO claims premised on violation of § 1546.

The Court is not moved by Signal's contention that evidence elicited at their representatives' depositions should be stricken. Signal's representatives were testifying as to facts about which they had first-hand knowledge and the questions that Plaintiffs' counsel asked were fair game.

### b.   Analysis

Causation is a crucial element of every civil RICO claim. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992), the Supreme Court held that factual or "but for" causation alone is insufficient to prove causation for a civil RICO claim. Proximate cause is also required. Id. Proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged. Id. When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged RICO violation led directly to the plaintiff's injuries. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006). With RICO claims, the compensable injury at issue is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Sedima v. IMREX Co., 473 U.S. 479, 497 (1985). Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the predicate acts. Id.

71

When the predicate acts are fraud-based, proof of reliance on the fraud is often a necessary prerequisite to establishing the causation required by § 1964(c).  <u>Anza</u>, 547 U.S. at 478 (Thomas, J., concurring in part and dissenting in part).  Prior to the Supreme Court's decision in <u>Bridge</u>, the law in this circuit required a RICO plaintiff to prove individual, first-party reliance on alleged fraud as part of the element of causation.  <u>See</u> <u>Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.</u>, 319 F.3d 205 (5th Cir. 2003).  In <u>Sandwich Chef</u> the Fifth Circuit explained that RICO fraud actions require a showing of detrimental reliance *by the plaintiff* on the alleged fraud in order to satisfy proximate cause.  <u>Id.</u> at 219 (<u>quoting</u> <u>Summit Props., Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d 556, 560 (5th Cir. 2000)).  Fraud actions that require proof of individual reliance cannot be certified for class treatment under Rule 23(b)(3) because individual rather than common issues will predominate.  <u>Id.</u> at 211, 219; <u>Castano</u>, 84 F.3d at 745.  Essentially, <u>Sandwich Chef</u> all but foreclosed the possibility of Rule 23(b)(3) certification of fraud-based RICO actions in this circuit.[44]

In 2008 the Supreme Court decided <u>Bridge</u>, which held that

----

[44] <u>Sandwich Chef</u> expressly held open the possibility that proof of fraud upon a third party could constitute proof of reliance by the plaintiff under circumstances not present in that case.  319 F.3d at 223 n.13.

first-party reliance is not an element of a civil RICO claim premised on mail fraud.  553 U.S. at 641.  The plaintiffs in Bridge were participants in a local tax sale.  They claimed that the defendants' acts of mail fraud against the county gave the defendants an unfair advantage at tax sale auctions.  The district court dismissed the plaintiffs' RICO claims because the plaintiffs were not the direct recipients of the allegedly fraudulent statements and therefore could not have relied upon them.

The Seventh Circuit reversed and the Supreme Court granted certiorari to address whether first-party reliance is an element of a civil RICO claim predicated on mail fraud.  Bridge, 553 U.S. at 646.  The Supreme Court held that first-party reliance is not an element of a civil RICO claim predicated on mail fraud.  Id. at 649.  The Court reasoned that neither the mail fraud statute nor the RICO statute imposed a requirement of first-party reliance.  Id.  A person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations. Id. at 649.

The Court also rejected the contention that proof of first-party reliance is necessary to establish proximate causation. Bridge, 553 U.S. at 654-55.  But a RICO plaintiff will have to establish that *someone* relied upon the defendant's misrepresentation because without such reliance even "but for"

73

causation will probably be lacking.[45]   Id. at 658-59.

Thus, while Bridge overruled cases like Sandwich Chef to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim, see St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009), Bridge did not eliminate the need for reliance *by someone* when proof of the element of proximate cause necessitates it.   Bridge likewise does not foreclose that in some situations proof of first-party reliance might very well be necessary to establish causation. And where proof of first-party reliance breaks down into individual determinations of reliance then Sandwich Chef's admonitions about why certification under Rule 23(b)(3) is not likely still survive.   Further, causation can be more challenging to prove when the plaintiff relies upon fraud perpetrated on a third party.   See, e.g., Hemi Group, LLC v. City of New York, 130 S. Ct. 983 (2010); Anza, 547 U.S. at 457.

Turning now to the Bridge claim herein, the contention is that defendants Signal and Burnett lied on forms submitted to the U.S. government in order to obtain approval to bring temporary H-2B workers into the United States to work for Signal.   The "lies"

---

[45] The Fifth Circuit made a very similar observation in Sandwich Chef, noting that for a misrepresentation to cause injury there must be reliance somewhere.   319 F.3d at 218-19, After all, knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages.   Id. (citing Summit, 214 F.3d at 560 n.19).

74

at issue are the assertions that Signal's labor needs were temporary and limited to a 10 month period.  According to Plaintiffs, the government clearly relied on these misrepresentations because otherwise Signal would not have received approval to hire H-2B foreign workers.  Plaintiffs contend that this third-party reliance by the government on Signal's and Burnett's fraudulent statements does not implicate individual proof the way that first-party reliance does and therefore does not create an impediment to certification under Rule 23(b)(3).  The <u>Bridge</u> claim implicates fraud under 18 U.S.C. § 1546[46] most strongly but §1341 and § 1343 are also implicated

---

[46] Section 1546, entitled Fraud and misuse of visas, permits, and other documents, provides in relevant part:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or

> . . . .

> Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any

because the mails and wires were surely used to transmit the H-2B documents to the government.

Plaintiffs are of course correct in their contention that proving that the government relied on misrepresentations in approving H-2B status for Signal, and ultimately in issuing the hundreds of H-2B visas when the individual plaintiffs applied for them, does not trigger the individual questions that can often derail certification of fraud-based RICO actions.  It does not necessarily follow, however, that Plaintiffs can nevertheless prove causation for their RICO injuries without resort to individual proof of reliance.  In fact, the Court is persuaded that they cannot.

In order to understand why individual proof of reliance is necessary to the element of causation in this case notwithstanding Plaintiffs' fraud on the government theory, one must consider the nature of the RICO violations alleged in this case and the specific injuries that Plaintiffs' attribute to

_____

      application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact--

      Shall be fined under this title or imprisoned not more than 25 years . . . .

18 U.S.C.A. § 1546(a) (West 2000 & Supp. 2011).

those RICO violations.  Plaintiffs' claim in a nutshell is that the defendants engaged in a scheme to defraud them by making false promises regarding green cards.  (RICO Case Stmt.¶ 5D). Fraud on the government aside, it has always been and remains Plaintiffs' contention that without the fraudulent promise of a green card they would not have paid the significant recruitment fees, would not have burdened themselves with massive amounts of debt, and would not have come to the United States to work for Signal.  (Id. ¶ 9).  Plaintiffs claim to have endured great financial, personal, and familial sacrifices in reliance on Defendants' misrepresentations.  The most significant of the specific injuries that Plaintiffs attribute to Defendants' fraudulent scheme are the exorbitant fees that they paid to Dewan, Pol, Rao, and Burnett, and the interest on the loans that Plaintiffs incurred to finance their way into the program.  (Id. ¶¶ 4, 17).  But these injuries were not the consequence of the alleged fraud that Signal and Burnett directed at the U.S. government when applying for H-2B status.  In fact, for many of the plaintiffs the green card scheme began before Signal even entered the picture and applied for H-2B status.  As to every plaintiff in this case, his RICO injuries arose directly out of the allegedly false and fraudulent green card promises that Dewan, Pol, Rao, and Burnett made to him.  And the only way that any individual plaintiff could sustain an injury from that fraud

was to rely upon it in ignorance of the truth.

Plaintiffs do not attempt to argue that the entirety of their injuries are attributable to Signal's and Burnett's alleged fraud on the government.  Instead, Plaintiffs point out that the third installment payment that they paid to the recruiters is attributable to the government having approved Signal's H-2B status, the government having done so in reliance on misrepresentations as to Signal's labor needs.  Moreover, Plaintiffs have made the allegation that once they arrived in the United States Signal continued to use the false promise of a green card in order to placate them, and therefore they continued to sustain injury from the fraudulent green card scheme after arriving at Signal via the H-2B program.

The fact that Signal received approval to bring H-2B workers into this country is surely a but for cause of some portion of each plaintiff's alleged injuries--for those plaintiffs who were recruited specifically for Signal after it had obtained approval to bring H-2B workers into the United States, the fraud on the government is probably *one* but for cause of every aspect of those plaintiffs' injuries; for those plaintiffs who were recruited and began incurring payments and debt *before* Signal entered the picture, the fraud on the government is perhaps one but for cause of a latter portion of their injuries.  But for every plaintiff in this case, the totality of the injuries alleged, or at the

78

very least the most significant of the injuries alleged, were not proximately caused by fraudulent representations made to the government--they were proximately caused by Defendants' false representations to the plaintiff of receiving a green card.  It was the fraudulent conduct directed specifically at the plaintiffs that injured them.

In a fraudulent scheme like the one alleged in this case that spans several years and the globe, and involves numerous players to effect its purpose, the instances of fraud that occur might very well be legion.  But the fact that Plaintiffs can identify one narrow aspect of fraud and prove that someone relied upon it, does not strip the question of RICO causation in this case of its individual nature.  It is important at this juncture to recognize exactly what <u>Bridge</u> teaches about reliance in a RICO fraud case--reliance is *not* an element of the case.  Reliance is important only insofar as it is necessary to prove causation. And while causation fails at the outset if no one relies on a fraudulent misrepresentation, it does not follow that causation between a RICO violation and the injury alleged is satisfied simply because the plaintiff can identify one aspect of fraudulent conduct that occurred in furtherance of the scheme to defraud and show that someone relied on it.  RICO injuries must arise out of the unlawful conduct that constitutes the predicate acts.  The injuries asserted in this case are not proximately

caused by any predicate act premised on fraud on the government. That's not to say that the alleged fraud on the government is not relevant to some aspect of Plaintiffs' RICO claims, including the element of causation. But the Court is persuaded that in light of the specific scheme to defraud that Plaintiffs allege in this case, they will still have to prove first-party reliance on the alleged fraud that was directed at them--the fraud that most proximately caused their injuries.

Furthermore, in Bridge, the entirety of the fraudulent conduct alleged was directed at third parties whose reliance on it *directly* injured the plaintiff. In this case, the majority of the injurious fraudulent conduct was directed specifically and directly to Plaintiffs. The fraud on the government that Plaintiffs allude to herein is not the fraud that directly injured Plaintiffs.

To be sure, there will be significant overlap in the evidence if each Plaintiff is required to present his RICO claim to a jury. And surely there will be numerous common issues amongst the cases. But in light of the issue of individual reliance, those common issues will not predominate even if they happen to outnumber the individual issues. The question of individual reliance will be paramount to resolving whether Plaintiffs' injuries were caused by a RICO violation. Therefore, Plaintiffs' reliance on Bridge in support of certification under

Rule 23(b)(3) is misplaced.

### 2)   Market Approach Theory

### a.   Motion to Strike-1082

Signal has filed a second Motion to Strike-1082 arguing in essence that Plaintiffs' contention that they can prove reliance via written contracts is new.  Plaintiffs' market approach theory is simply one way that they hope to show causation with respect to their RICO claims.  As explained above, reliance is not an element of the claims, and therefore neither is the method that Plaintiffs intend to rely upon to show it.  The motion is DENIED.

### b.   Analysis

Regarding Plaintiffs' "market approach" theory of reliance, Defendants argue that Plaintiffs cannot obtain certification in this manner because they are essentially arguing for a presumption of reliance based on circumstantial evidence. Defendants contend that certification on this theory would likely run afoul of Defendants' Seventh Amendment right to a jury trial.

In contrast to certification under <u>Bridge</u>, Plaintiffs' market approach theory is grounded on first-party reliance- -Plaintiffs' own reliance on Defendants' fraudulent promises regarding green cards.  However, Plaintiffs contend that first- party reliance can be proven via circumstantial, class-wide evidence that eliminates the need for individualized proof.

Plaintiffs point to the decision in <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241 (11th Cir. 2004), as an example of how common evidence can be used to establish first-party reliance.

Certainly evidence such as the contracts that Plaintiffs signed, the slide show presentations that were made at recruitment seminars, and even the quantum of the fees that Plaintiffs paid will be relevant to establishing individual reliance on the green card promise.  But the Court is not persuaded that this case presents a situation like <u>Klay</u> where first-party reliance can be established based solely on this type of evidence.  Plaintiffs' contention in this case is that they were defrauded by a false promise of a green card into joining Dewan's recruitment program, traveling to the United States to work for Signal under conditions so deplorable that they were violative of the criminal laws of this country, and then duped once again into staying on at Signal based on Signal's own false representations regarding green cards and permanent employment. Plaintiffs allege injuries arising out of each leg of the fraudulent scheme.  But while the circumstantial evidence that Plaintiffs point to for proving first-party reliance might be sufficient to permit a jury to infer that a plaintiff signed up for the program and paid the first installment in reliance on the promise of a green card,  it is not necessarily sufficient to carry the entire claim to its conclusion at Signal.

Each plaintiff who came to the United States had to apply for an H-2B temporary visa in order to enter the country.  Some plaintiffs like Dhananjaya had previously worked in the United States under the temporary H-2B guest-worker program and therefore must have understood the temporary nature of the visa. Plaintiffs understood that they could not divulge to consular staff that they were expecting to get green cards or to stay in the United States permanently.  Arguably, Plaintiffs had to be willing to misrepresent the truth during those interviews and some presumably did just that.  Plaintiffs arrived at Signal in waves and the first group to arrive began protesting immediately about the lack of green cards yet others continued to go to Signal voluntarily on H-2B visas, presumably based on representations made by Signal personal to other class members. Although Plaintiffs maintain that Dewan lied to them about the ramifications of going to Signal on temporary visas, Dewan testified that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card.  Once arrived at Signal some of the plaintiff class was in Texas and some was in Mississippi, and perhaps subject to differing representations by Signal personnel.

All of these facts, and many others, must be weighed in light of the fact that the plaintiff class as a whole did not

labor under any specific vulnerabilities when they decided to join the green card program.  That's not to say that they were not the victims of fraud but Plaintiffs are not a class of children or mentally challenged persons.  Plaintiffs were adult men, some of whom had worked overseas before and some of whom were well-educated and savvy.  All of the Plaintiffs knew that green cards were difficult to get and could only be obtained from the United States government.  Plaintiffs were clearly eager to come to the United States--some individuals tried to obtain employment with Signal even without going through the recruiting scheme.  A jury could find, for any given individual plaintiff, that given the nature of green cards, the significant money that Defendants were demanding, and a plaintiff's own complicity in doing whatever was necessary to enter this country, that the injuries alleged were not proximately caused by Defendants' conduct.  On the other hand, a jury could find, for any given individual plaintiff, that Defendants' conduct did cause the plaintiff's injuries.  The Court is persuaded that Defendants have the right to test each plaintiff's claim of reliance to the jury.

None of the foregoing necessarily means that any given plaintiff did not rely on Defendants' allegedly fraudulent representations when choosing to join the program, travel to the United States, and work for Signal.  And the Court is not

disputing Plaintiffs' contention that many members of the class faced a Hobson's choice of either coming to the United States on a temporary H-2B visa or losing all of their money.  But it is clear that in order to get from point A, which is joining the recruitment program, to point C, which is staying on as part of Signal's compliant workforce, far more fraud must have been involved than the class-wide evidence that Plaintiffs point to in this case.  In fact, Plaintiffs claim exactly that.  Plaintiffs contend that they were lied to about the temporary nature of an H-2B visa and lied to about whether green card processing would continue once they arrived at Signal.  But these alleged misrepresentations, which would have been crucial to understanding why Plaintiffs came to Signal, were made individually.  And in contrast to the Klay case, which seemingly involved no direct communication of misrepresentations by the defendants to the plaintiffs, the plaintiffs in this case had direct contact with the recruiters and the Signal personnel who allegedly lied to them about green cards and permanent residency. Those lies form a crucial part of each plaintiff's reliance on the fraud at issue in this case.

For the foregoing reasons the Court is persuaded that Plaintiffs cannot prove their § 1962(c) substantive RICO claims without resort to individualized proof in light of the facts of this case.  Common issues will not predominate and certification

under Rule 23(b)(3) is therefore not appropriate.[47]  The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(c).

**B.    Section 1962(d)--RICO Conspiracy**

RICO criminalizes conspiracy to violate any of its substantive provisions. <u>United States v. Delgado</u>, 401 F.3d 290, 296 (2005) (<u>citing</u> 18 U.S.C. § 1962(d)).  In the criminal setting, the government must establish that two or more people agreed to commit a substantive RICO offense, and that the defendant knew of and agreed to the overall objective of the RICO offense. <u>Id.</u> (<u>quoting</u> <u>United States v. Posada-Rios</u>, 158 F.3d 832, 855 (5th Cir. 1998)).  The conspirator need not have committed or agreed to commit two predicate acts.  <u>Id.</u> (<u>citing</u> <u>Salinas v. United States</u>, 522 U.S. 52, 61-66 (1997)).

The core of a RICO civil conspiracy is an agreement to commit predicate acts. <u>Abraham</u>, 480 F.3d 351, 357 (5th Cir. 2007).  A plaintiff can use § 1962(d) to sue a defendant or co-conspirator who might not have violated one of the substantive provisions of § 1962. <u>Beck v. Prupis</u>, 529 U.S. 494, 506-07 (2000).  But while § 1962(d) criminalizes an illegal agreement, §

---

[47] The Court also notes that some of the injuries/damages that Plaintiffs allege in conjunction with the RICO violations are highly individualized in nature and not subject to formulaic calculation:  Assumption of significant interest bearing debt, interest on loans, lost work and professional opportunities, and lost and unpaid wages.

1964(c) imposes civil liability and therefore asks whether an admittedly illegal agreement gives rise to damages.  Beck, 529 U.S. at 507 (Stevens, J., dissenting).  In Beck, the Supreme Court held that a civil RICO conspiracy plaintiff cannot establish injury for purposes of § 1962(d) by relying on an overt act that is not unlawful under the RICO statute.  Beck, 529 U.S. at 505-06.  The injury recoverable for a RICO conspiracy violation must result from either an act of racketeering or conduct otherwise unlawful under the statute.  Id. at 507.  An agreement alone will not give rise to civil liability under §§ 1962(d) and 1964(c).  Id. at 508 n.1 (Stevens, J., dissenting).

The implication of the foregoing discussion is clear. Proving the mere existence of a RICO conspiracy might be sufficient to trigger criminal sanctions but it is not sufficient to recover damages in a civil suit.  Plaintiffs will have to prove that their injuries were caused by the predicate acts that they have alleged.  But as the Court explained in the section discussing RICO liability under § 1962(c), the predicate acts are not amenable to certification under Rule 23(b)(3) because common issues will not predominate.  The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(d).

### 3.    Civil Rights Claims (42 U.S.C. § 1981)

The third set of claims that Plaintiffs seek to certify for class-wide treatment are their disparate treatment claims under

42 U.S.C. § 1981 for discriminatory employment practices. Plaintiffs' § 1981 claims are brought against defendant Signal. In support of their § 1981 claims, Plaintiffs allege that Signal discriminated against them with respect to the mandatory room and board arrangements at the Signal labor camps, which the non-Indian and/or U.S. citizen employees were not subject to. (SAC ¶ 336, 337). Plaintiffs also allege that Signal discriminated against them with respect to job assignments and other conditions of employment. (Id. at ¶ 378). Plaintiffs allege that Signal maintained an objectively hostile and abusive work environment based on their race, national origin, and/or alienage. (Id. at ¶¶ 339-342). Plaintiffs seek damages, including compensatory and punitive damages, attorney's fees, and costs.[48] (Id. at ¶ 345).

Section 1981, Equal Rights Under the Law, provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

---

[48] Again, this claim does not include all members of the plaintiff class because it only involves those plaintiffs who actually worked at Signal. See note 7, supra.

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (West 2003).

Section 1981 provides a federal remedy for workplace discrimination in private employment on the basis of race or ethnicity. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975); St. Francis College v. Al-Khazraji, 481 U.S. 604 (1987). To establish a prima facie case under § 1981, a plaintiff must show: 1) that he is a racial minority, 2) that the defendant intended to discriminate against him on the basis of race, and 3) that the discrimination concerns one or more of the activities enumerated in the statute. Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745, -- F.3d --, 2011 WL 4579133, at *2 (5th Cir. Oct. 5, 2011) (citing Felton v. Polles, 315 F.3d 470, 483 (5th Cir. 2002), abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). Proof of intentional discrimination is essential for relief under § 1981. Id. (citing Gen. Bldg. Contractors Ass'n v. Penn., 458 U.S. 375,

389 (1982)).

Plaintiffs argue that their § 1981 claims are amenable to certification because they are grounded on Signal's uniform corporate policies toward the putative class.  Plaintiffs contend that they will prove their § 1981 claims with generalized proof applicable to the class as a whole--Signal's executives' testimony, Signal's emails, employee writings, etc.  According to Plaintiffs, common issues not only predominate the § 1981 claims, they constitute the only issues.

Plaintiffs point out that Signal's basis for resisting certification of their § 1981 claims is that individualized proof will be necessary to prove subjective harm and mental distress injury.  But Plaintiffs contend that this will not be an issue because they will not seek emotional distress injury as part of their claim for compensatory damages.  Further, the compensatory damages that they do seek are "refund-type" recovery  of the recruitment fees and man camp fees, which are subject to a formulaic calculation.  Therefore, according to Plaintiffs, issues pertaining to individual damage awards do not foreclose certification.

In Allison v. Citgo Petoleum Corp., the Fifth Circuit addressed the issue of whether claims of disparate treatment race discrimination were subject to class certification under either Rule 23(b)(2) or (b)(3).  151 F.3d 402 (5th Cir. 1998).  The Fifth

Circuit explained that compensatory damages *for intangible injuries* are not presumed merely because the plaintiff proves that a statutory violation has occurred.  <u>Id.</u> at 416-17. Specific individualized proof is necessary and compensatory damages may be awarded only if the plaintiff submits proof of actual injury.  <u>Id.</u> at 417 (<u>citing</u> <u>Patterson v. P.H.P. Healthcare Corp.</u>, 90 F.3d 927, 938-40(5th Cir. 1996); <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 717-20 (5th Cir. 1998)).  The very nature of compensatory damages for intangible injuries necessarily implicates the subjective differences of each plaintiff's circumstances so that they constitute an individual, not a class-wide remedy.  <u>Allison</u>, 151 F.3d at 417.  <u>Allison</u> explains why a plaintiff class seeking compensatory damages for a discrimination claim faces great difficulty in obtaining certification under Rule 23(b)(3) because individual issues will typically predominate.

While Plaintiffs are likely correct in their assertion that intentional discrimination by Signal can be proven via class-wide, non-individualized evidence, Plaintiffs' attempt to circumvent the predominance problem surrounding damages is unconvincing for several reasons.  Aside from punitive damages, all of the relief that Plaintiffs seek for the § 1981 claims are compensatory in nature.  In other words, there are no back pay issues or front pay issues or other remedies that would normally

91

pertain to an ongoing employment relationship.[49]  But compensatory damages arising out of workplace discrimination are not presumed to be owed simply because the plaintiff establishes that the employer maintained a discriminatory work environment.  In order to obtain compensatory damages the plaintiff must prove actual injury to himself and that injury must be attributable to (caused by) the defendant's disparate treatment.  Thus, while Plaintiffs have attempted to define their compensatory damage claims in formulaic "refund" terms, it is clear that the significant recruitment fees that they are trying to recoup as compensatory damages--fees that were paid to third parties before the plaintiffs even arrived at Signal--are not an element of damages attributable to discrimination at Signal's facilities.  Plaintiffs cannot change the nature of § 1981 recovery by defining their own damages scheme based on what they believe would be a just result under the bigger picture of facts.  Plaintiffs are only entitled to recover for those damages that they can prove were caused by Signal's alleged race discrimination.

Further, the Court finds Plaintiffs' suggestion that they will forego any type of emotional distress recovery perplexing.  The class representatives willingness to forego a claim that

---

[49] None of the members of the plaintiff class remain employed at Signal.

would preclude certification is not per se invalid but the Court
is persuaded that it does create serious concerns for the rights
of the plaintiff class.  See Colindres v. Quietflex Manuf., 235
F.R.D. 347, 375 (S.D. Tex. 2006).  Based on Plaintiffs' own
assertions about employment at Signal, the Court would assume
that emotional injury would not be an insignificant part of
Plaintiffs' claims.  Plaintiffs have argued repeatedly about how
Signal created a psychologically coercive work environment that
basically turned them into modern day slaves.  Their entire cause
of action under the TVPA was based on conduct supposedly so
psychologically coercive as to cause them to render labor
involuntarily.  Plaintiffs have characterized life at Signal as a
"racialized ghetto" where they experienced feelings of isolation
and segregation, as "prisoners" in the man camps, subject to
abuse, threats, and exploitation.  Plaintiffs allege that some
class members became physically ill and required hospitalization
while living in the man camps.  Plaintiffs have pointed to the
Black Friday suicide incident as evidence of how emotionally
abysmal and untenable the situation at Signal had become for
them.  Plaintiffs allege that they were subjected to offensive
language and threats (SAC ¶ 210) and that they were frightened
and confused while at Signal (SAC ¶ 233-35).  The Court finds it
questionable that this case, which again is a case grounded on
claims of psychological coercion and manipulation, can be

certified for class treatment based on the assertion that the class representatives are not making claims for psychological injury--an assertion that would eventually bind the entire plaintiff class if the § 1981 were certified.  And to the extent that the class representatives are willing to waive emotional damages in this case, this militates against a finding of adequacy under Rule 23(a)(4) for these representatives.

Moreover, Plaintiffs have pled a claim for punitive damages in addition to the compensatory damages that they seek.  (SAC ¶ 345).  Punitive damages cannot be assessed merely upon a finding that the defendant discriminated against the class and the award is based only in part upon the defendant's conduct.  Allison, 151 F.3d at 417.  A punitive damage award turns on the recovery of compensatory damages and must be reasonably related to the plaintiff's compensatory damage award.  Id. at 417-18 (citing Patterson, 90 F.3d at 943-44).  Punitive damages are not capable of computation by reference to objective standards.  Id. at 418.

Plaintiffs have not suggested that the issues of liability and damages can be severed and tried separately in order to facilitate certification.  Of course, bifurcation carries with it the danger of Seventh Amendment problems if a second jury is called upon to reexamine facts and issues addressed by the first jury.  Castano, 84 F.3d at 750; Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 628 (5th Cir. 1999).  The Court is persuaded

94

that at the very least the claim for punitive damages would carry the risk of Seventh Amendment problems in a bifurcated scenario. Punitive damages are necessarily based in part upon the evidence used to establish liability because punitive damages are a measure of the reprehensibility of the defendant's discriminatory conduct.  But punitive damages are not appropriate until the plaintiff proves actual harm and compensatory damages and therefore cannot be awarded in the liability phase of a trial.

Finally, even aside from the predominance problem that the damages aspect of the § 1981 claims creates, the most compelling rationale for finding superiority in a class action is not present in this case.  Plaintiffs' § 1981 claims do not present a negative value suit situation in which the paltry award that each plaintiff might recover precludes prosecution of individual claims.  See Castano, 84 F.3d at 748.  And the potential for recovery of attorney's fees and punitive damages makes the case even less compelling for finding class action treatment superior to individual trials.  See id.

In sum, the Court is persuaded that neither the predominance nor superiority requirements of Rule 23(b)(3) are satisfied for Plaintiffs' § 1981 claims.  The motion to certify is therefore DENIED as to the § 1981 discrimination claims

**4.    The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985, and the**

**Thirteenth Amendment**

The last set of claims that Plaintiffs seek to certify for class-wide treatment are their claims under 42 U.S.C. § 1985(3). Plaintiffs' § 1985 claims are brought against defendants Signal, Pol, and Dewan.  The gist of Plaintiffs' § 1985 claim is that Defendants conspired to subject Plaintiffs to involuntary servitude based on their race, ethnicity and alienage.  (Rec. Doc. 994-1, at 67-68).  In support of the § 1985 claim, Plaintiffs allege that Signal, Pol, and Dewan conspired with other non-defendant parties, including Swetman Security and M & M Bank, for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment and its implementing and enforcing statutes, 18 U.S.C. §§ 1589 and 1590, to be free from forced labor, involuntary servitude, and trafficking in persons.  (SAC ¶ 348).  Plaintiffs allege that Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights.  (Id. ¶ 349).  Plaintiffs allege that they have suffered damages as a result and they seek compensatory damages, punitive damages, and attorney's fees and costs.  (Id. ¶¶ 351-52).

Section 1985(3), Conspiracy to Interfere With Civil Rights, provides in relevant part:

If two or more persons in any State or Territory conspire

> . . . for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal
> protection of the laws, or of equal privileges and
> immunities under the laws; . . . in any case of conspiracy
> set forth in this section, if one or more persons engaged
> therein do, or cause to be done, any act in furtherance of
> the object of such conspiracy, whereby another is injured
> in his person or property, or deprived of having and
> exercising any right or privilege of a citizen of the
> United States, the party so injured or deprived may have
> an action for the recovery of damages occasioned by such
> injury or deprivation, against any one or more of the
> conspirators.

42 U.S.C.A. § 1985(3) (West 2003).

In order to prove a conspiracy under § 1985(3), a plaintiff must show inter alia 1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action, and 2) that the conspiracy aimed at interfering with rights that are protected against "private as well as official, encroachment." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68 (1993) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Carpenters v. Scott, 463 U.S. 825, 833 (1983)). Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates. Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979).

Conspiracies among private actors (as opposed to state actors) are within the scope of § 1985(3) so long as the right at issue is one guaranteed against private (as opposed to state)

97

infringement.  Id. (citing Carpenters, 463 U.S. at 833).  There
are few such rights but the Supreme Court has expressly
acknowledged that the right to involuntary servitude, as
guaranteed by the Thirteenth Amendment, is one such right.[50]  Id.
(citing Kozminski, 487 U.S. at 942).

The Thirteenth Amendment states that "[n]either slavery nor
involuntary servitude, except as a punishment for crime whereof
the party shall have been duly convicted, shall exist within the
United States, or any place subject to their jurisdiction."  U.S.
Const. amend. XIII, § 1.  The primary purpose of the amendment
was to abolish the institution of African slavery as it had
existed in the United States at the time of the Civil War,
although the amendment has not been limited to that application.
Kozminski, 487 U.S. at 942.  Rather, the Thirteenth Amendment
extends to cover "those forms of compulsory labor akin to African
slavery which in practical operation would tend to produce like
undesirable results."  Id. (quoting Butler v. Perry, 240 U.S.

---

[50] The contours of a § 1985(3) claim are often nebulous in
light of the varied jurisprudence addressing the cause of action.
This Court is convinced that the "right" to be free from
involuntary servitude for purposes of a § 1985(3) claim derives
not from §§ 1589 & 1590, as Plaintiffs suggest, but from the
Thirteenth Amendment itself otherwise every criminal statute that
involves a victim could potentially give rise to a "right."  This
would be contrary to the admonition that the Supreme Court has
long held since Griffin v. Breckenridge, 403 U.S. 88 (1971), that
§ 1985(3) cannot be interpreted in such a way so as to render it
"a general federal tort law."  Bray, 506 U.S. at 268 (quoting
Griffin, 403 U.S. at 102).

328, 332 (1916)).

The Court is persuaded that Plaintiffs' § 1985(3) claim cannot be certified for class treatment. In <u>Kozminski</u>, the Supreme Court discussed the types of coercion that must be shown under the Thirteenth Amendment. Those types of coercion are physical coercion and legal coercion in which the victim is compelled to work by law. Neither type of coercion is at issue in this case. The TVPA, which sought to criminalize involuntary servitude based other forms of coercion, did not change the scope of the Thirteenth Amendment. And even if this Court errs as a matter of law in concluding that Plaintiffs have no "rights" under §§ 1589 and 1590 to vindicate via § 1985(3), <u>see</u> note 50, <u>supra</u>, a claim premised on a violation of §§ 1589 and 1590 is not subject to certification for the same reasons that none of the TVPA claims are certifiable, as explained above. The motion to certify is therefore DENIED as to the § 1985(3) conspiracy claims.

## IV.   <u>CLASS CERTIFICATION PURSUANT TO RULE 23(b)(2)</u>

For the reasons given on the record in open court on November 10, 2010, the Motions to Certify are DENIED insofar as Plaintiffs seek certification of a class under Rule 23(b)(2).

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Certify Class (Rec. Doc.**

99

165) and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al. is **DENIED**;

**IT IS FURTHERED ORDERED** that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC is **DENIED**;

**IT IS FURTHERED ORDERED** that the **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al. is **DENIED AS MOOT**;

**IT IS FURTHERED ORDERED** that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC. is **DENIED**.

January 3, 2012

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE