DESIGNATIONS & OBJECTIONS KEY

| | |
|---|---|
| ▬▬▬ Plaintiffs' Affirmative Designations | ┄┄┄ Plaintiffs' Counter Designations |
| ▬▬▬ Signal Defs.' Affirmative Designations | ┄┄┄ Signal Defs.' Counter Designations |
| ▬▬▬ Dewan Defs.' Affirmative Designations | ┄┄┄ Dewan Defs.' Counter Designations |
| ▬▬▬ Burnett Defs.' Affirmative Designations | ┄┄┄ Burnett Defs.' Counter Designations |

P = Plaintiffs   S = Signal Defs.   D = Dewan Defs.   B = Burnett Defs.

---

**Page 1**

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2

3

KURIAN DAVID, SONY          *   CIVIL ACTION
4    VASUDEVAN SULEKHA,         *   NO. 08-1220
     PALANYANDI THANGAMANI,     *
5    MARUGANANTHAM KANDHASAMY,   *   SECTION: "A"
     HEMANT KHUTTAN, ANDREWS    *
6    ISSAC PADA VEETIYIL, AND   *   MAGISTRATE: 3
     DHANANJAYA KECHURA, ON     *
7    BEHALF OF OTHER SIMILARLY  *
     SITUATED INDIVIDUALS, AND  *
8    SABULAL VIJAYAN, KRISHAN   *
     KUMAR, JACOB JOSEPH        *
9    KADDAKKARAPPALLY, KULDEEP  *
     SINGH, AND THANASEKAR      *
10   CHELLAPPAN, INDIVIDUALLY,  *
     PLAINTIFFS                 *
11                              *
     VERSUS                     *
12                             *
     SIGNAL INTERNATIONAL, L.L.C., *
13   MALVERN C. BURNETT,        *
     GULF COAST IMMIGRATION LAW  *
14   CENTER, L.L.C., LAW OFFICES *
     OF MALVERN C. BURNETT,     *
15   A P.C., INDO-AMERI SOFT,   *
     L.L.C., KURELLA RAO, J & M  *
16   ASSOCIATES, INC. OF        *
     MISSISSIPPI, GLOBAL        *
17   RESOURCES, INC., MICHAEL POL, *
     SACHIN DEWAN, AND DEWAN    *
18   CONSULTANTS PVT. LTD (a/k/a *
     MEDTECH CONSULTANTS),      *
19   DEFENDANTS                 *
                                *
20   * * * * * * * * * *
21
22                    VOLUME I

23   Deposition of JOHN SANDERS, c/o Tracy
     Binion, 601 Bayou Cassotte Parkway, Pascagoula,
24   Mississippi 39581, taken in the offices of Middleberg,
     Riddle & Gianna, 31st Floor, 201 St. Charles Avenue,
25   New Orleans, Louisiana 70170, commencing at 10:27
     o'clock a.m., on Thursday, the 19th day of November,

---

**Page 2**

1    APPEARANCES:
2
     DEWEY & LeBOEUF
3    Attorneys at Law
     (By: Hugh Sandler, Esquire)
4    Suite 2550
     1000 Main Street
5    Houston, Texas  77002-5009
     (Attorneys for the Plaintiffs)
6
7    SOUTHERN POVERTY LAW CENTER
     Immigrant Justice Project
8    (By: Naomi Tsu, Esquire)
     Suite 2150
9    233 Peachtree Street
     Atlanta, Georgia  30303
10   (Attorneys for the Plaintiffs)
11
     MIDDLEBERG, RIDDLE & GIANNA
12   Attorneys at Law
     (By: Erin Casey Hangartner, Esquire)
13   31st Floor
     201 St. Charles Avenue
14   New Orleans, Louisiana  70170
15            - AND -
16   PATRICIA A. BOLLMAN, APLC
     Attorneys at Law
17   (By: Patricia A. Bollman, Esquire)
     Post Office Box 13707
18   New Orleans, Louisiana  70185
     (Attorneys for Signal International, L.L.C.)
19
20   PORTEOUS, HAINKEL & JOHNSON
     Attorneys at Law
21   (By: Ralph R. Alexis, III, Esquire)
     704 Carondelet Street
22   New Orleans, Louisiana  70130-3774
     (Attorneys for Gulf Coast Immigration
23    Law Center, L.L.C.)
24
25

---

**Page 3**

     Suite 2400, LL&E Building
     909 Poydras Street
4    New Orleans, Louisiana  70112
     (Attorneys for Global Resources,
5     Inc. and Michael Pol)
6
7    LAW OFFICE OF STEPHEN H. SHAPIRO
     Attorneys at Law
8    (By: Stephen H. Shapiro, Esquire)
     200 Maine Street
9    Jefferson, Louisiana  70121
     (Attorneys for Sachin Dewan and
10    Dewan Consultants Pvt. Ltd,
      a/k/a Medtech Consultants)
11
12
13   ALSO PRESENT:
14
     Tracey Binion
15   SIGNAL INTERNATIONAL, L.L.C.
16
17
18   VIDEOGRAPHER:
19   Karl Stiegman
     Depo-Vue
20
21
22   REPORTED BY:
23   WENDY MAJORIA, CCR
     Certified Court Reporter
24   (No. 84106)
     Huffman & Robinson, Inc.
25   One Shell Square, Suite 250 Annex
     New Orleans, Louisiana  70139

---

**Page 4**

1           E X A M I N A T I O N   I N D E X
2
3                                          PAGE
4    EXAMINATION BY MR. SANDLER.................7
5
6
7           E X H I B I T   I N D E X
8
9    Exhibit No. 601.................26
       (Diary entry dated 8/4/06)
10
     Exhibit No. 602.................29
11     (Diary entry dated 8/2/06)
12   Exhibit No. 603.................39
       (Diary entry dated 8/8/06)
13
     Exhibit No. 604.................42
14     (Diary entry dated 8/30/06)
15   Exhibit No. 605.................50
       (E-mail from R. Marler dated 9/27/06)
16
     Exhibit No. 606.................62
17     (E-mail from Global Resources
        dated 8/24/06)
18
     Exhibit No. 607.................88
19     (Diary entry dated 8/22/06)
20   Exhibit No. 608.................104
       (E-mail entries)
21
     Exhibit No. 609.................135
22     (Diary entry dated 10/21/06)
23   Exhibit No. 610.................140
       (E-mail thread dated 10/18/06 thru 10/26/06)
24
     Exhibit No. 611.................161
25     (Diary entry)

---



**Page 5**

1    Exhibit No. 612................................198
          (Write-up by Mr. Pol of meeting on
2       November 20th with Mr. Schnoor)
3    Exhibit No. 613................................203
          (Notes taken by witness at meeting)
4

     Exhibit No. 614................................211
5       (Diary entry dated 9/26/06)
6    Exhibit No. 615................................215
          (E-mail from J. Sanders dated 9/23/06)
7

     Exhibit No. 616................................217
8       (E-mail from R. Marler dated 9/19/06)
9    Exhibit No. 617................................220
          (E-mail from G. Duke dated 11/15/06)
10

     Exhibit No. 618................................225
11      (E-mail from L. Spears dated 11/17/06)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 6**

1                STIPULATION
2
3        It is stipulated and agreed by and among counsel
4    for the parties hereto that the deposition of the
5    aforementioned witness is hereby being taken under the
6    Federal Rules of Civil Procedure, for all purposes, in
7    accordance with law;
8        That the formalities of reading and signing are
9    specifically not waived;
10       That the formalities of filing, sealing and
11   certification are specifically waived;
12       That all objections, save those as to the form of
13   the question and the responsiveness of the answer, are
14   hereby reserved until such time as this deposition, or
15   any part thereof, may be used or sought to be used in
16   evidence.
17
18              *    *    *    *
19
20       WENDY MAJORIA, Certified Court Reporter, State of
21   Louisiana, officiated in administering the oath to the
22   witness.
23
24
25

**Page 7**

1               PROCEEDINGS
2    THE VIDEOGRAPHER:
3        This is the videotaped deposition of
4    Jonathan Sanders.  This deposition is being held
5    at 201 St. Charles Avenue in New Orleans,
6    Louisiana on November the 19th, 2009 at the time
7    indicated on the video screen, 10:27.
8        My name is Karl Stegman.  I'm a certified
9    legal video specialist with Depo-Vue.  The court
10   reporter is Wendy Fair with Huffman & Robinson.
11       Will the court reporter please swear in the
12   witness.
13             JOHN SANDERS,
14   after having been first duly sworn by the above-
15   mentioned Certified Court Reporter, was examined and
16   testified as follows:
17   EXAMINATION BY MR. SANDLER:
18       Q.   Good morning, Mr. Sanders.
19       A.   Good morning.
20       Q.   My name is Hugh Sandler and I'm an attorney
21   at Dewey & LeBoeuf, and I'm co-counsel to plaintiffs
22   in this putative lawsuit.  We met earlier off the
23   record just outside.  But that is the first time we've
24   met; is that right?
25       A.   Yes.

**Page 8**

1        Q.   Okay.  I just want to give you a couple —
2    a bit of preamble before we start with any questions.
3        But, as I said, I represent plaintiffs in a
4    putative class action.  It's filed against a number of
5    defendants, including Signal International.  I also
6    want to say that I understand earlier this week your
7    tenure at Signal came to an end.  And I want to say
8    I'm sorry to hear that.  And I'd like to thank you for
9    making the drive out from Orange.
10       I did that drive, actually, a couple of
11   months ago.  So I know it's like — it's a good chunk
12   of time.  And I appreciate you doing that this
13   morning.
14       A.   Sure.
15       Q.   Before I begin, I just want to confirm you
16   are not represented by counsel.
17       A.   (Witness nods head affirmatively.)
18       Q.   And while there are a lot of attorneys in
19   this room, none of them is here on your behalf.  So
20   you understand that?
21       A.   I do.
22       Q.   Okay.  I wanted to add that, despite that,
23   any conversations that you had with Ms. Hangartner or
24   any other lawyers retained by Signal for the purpose
25   of this litigation is privileged and I'm not entitled

**Page 17**

1  A.   Okay.  I was working in Pascagoula,
2  Mississippi in connection with a relief effort post-
3  Hurricane Katrina.
4  Q.   Okay.  And before that?
5  A.   Before that at Texas Instruments in
6  Attleboro, Massachusetts.
7  Q.   Was there anyone from Texas Instruments
8  that worked at Signal who you met?  Was there any of
9  the same personnel there?
10  A.   No.
11  Q.   No?
12  A.   Not that I'm aware of.
13  Q.   And then you started at Signal in
14  July 2006?
15  A.   Correct.
16  Q.   Actually, before we go there, what were you
17  doing at TI?  You were --
18  A.   I was a project manager.  Well, I had
19  several positions.
20  Q.   Did you -- Was it like a combination of
21  your engineering background and your business
22  background, or what were you kind of employed to do?
23  A.   Project manager was the highest position
24  that I had.
25  Q.   Okay.

**Page 18**

1  A.   And before that, business development and
2  some purchasing experience also.
3  Q.   So dealing with like vendors and dealing
4  with management?
5  A.   Yes.
6  Q.   Somewhat similar to some of the things you
7  were doing at Signal, at least when you first started?
8  A.   Yeah.  Corporate America-type things.
9  Q.   All right.  Sounds good.
10         You started at Signal -- I know you already
11  stated this, but you started at Signal in July 2006?
12  A.   Yes.
13  Q.   And the date?  Do you remember your first
14  day?
15  A.   July 26th, I believe.
16  Q.   July 26th.  Okay.
17         And who specifically hired you at Signal or
18  can you tell me the application process?
19  A.   Sure.  I found out about a potential job
20  opportunity and interviewed first with Ron Schnoor,
21  who was the senior vice president and general manager
22  at Signal.  That was his title at the time.  And then
23  after that I interviewed with Signal's president and
24  CEO, Richard Marler.
25  Q.   Okay.  So before you started, the

**Page 19**

1  executives who you had met were Ron Schnoor and Dick
2  Marler and that's it?
3  A.   They -- they were the two who interviewed
4  me, yes.
5  Q.   Okay.  All right.  So when you started,
6  what was your first job at Signal?  What was kind of
7  the project that you were first given?
8  A.   I was hired to -- My title at the time was
9  special projects manager.  I think that's the title.
10  And the special project was to -- was to oversee the
11  construction of a workers' housing facility for some
12  full-time Signal employees who would be coming from
13  India to the United States on H-2B visas.
14  Q.   Did they explain to you the H-2B program
15  when they hired you, given that your job pertained to
16  a big element of their -- of that program?
17  A.   Did they --
18  Q.   Did Signal, whomever, whether it was --
19  whomever it was at Signal, did that executive, whether
20  it was Mr. Bingle or Mr. Schnoor or Mr. Marler, did
21  they explain to you what the H-2B program was that
22  they were undertaking?
23  MR. ALEXIS:
24         Object to form.
25         Go ahead and answer.

**Page 20**

1  A.   Just -- just general -- general
2  information.  We want to get some Indian workers in to
3  Signal on an H-2B visa.  That's one of many issues
4  that you will be responsible for coordinating.  To
5  assist in that process, you would be working with
6  Global Resources, that they're handling the recruiting
7  aspects.
8  EXAMINATION BY MR. SANDLER:
9  Q.   And did they tell you anything about these
10  workers that were coming over?
11  A.   Well, they were from India.
12  Q.   Okay.  When was that described to you?
13  A.   That was the project that they had in mind
14  for me when the interviews had gone well.
15  Q.   Okay.  And so who told you that
16  specifically?
17  A.   I believe it was both Ron Schnoor and Dick
18  Marler.
19  Q.   And developing the man camp was -- How
20  would you describe it as kind of a project?  Was it
21  like -- How much time did you have to commit to it?
22  And do you want to tell me a little bit about kind of
23  ramping up?
24  A.   Sure.  It began in -- for me, of course, in
25  late July and had to happen on a very condensed time

## Page 21

1  frame. Because the first workers came in late
2  October. So within three months Signal had to
3  coordinate developing an entire workers' housing
4  facility, which we had never done before, had to
5  coordinate that from a green field, so to say, where
6  there was nothing.
7        So it was my responsibility to coordinate
8  the selection of vendors to meet with them, convey
9  that information to senior management, get their
10 approval, and then once their approval was granted, to
11 interact with many other departments within Signal to
12 effect the construction of this facility.
13     Q.   And this was -- this took up your whole
14 day, at least at the outset. I mean, this was a lot
15 of work; is that right?
16     MS. FENTON:
17        Objection to form.
18 EXAMINATION BY MR. SANDLER:
19     Q.   You can answer that.
20     A.   Yes. It took up all of my time.
21     Q.   How many hours were you putting in? Let's
22 say for the month of August roughly.
23     A.   I don't know, but it was -- there were some
24 days that I worked in excess of 12 hours. That
25 happened, if I recall, fairly regularly.

## Page 22

1      Q.   Okay. And you said earlier that they were
2  putting up a man camp for the first time ever. Sorry.
3  I think you said housing facility for the first time
4  ever. Did they explain to you why they were doing
5  this? I mean, I know that they -- Indian workers were
6  coming over. Did they explain to you why they were
7  bringing Indian workers over, why a housing facility
8  needed to be constructed for them?
9      A.   Yes.
10     Q.   Please explain.
11     A.   July 2006 was not even a year after
12 Hurricane Katrina had, as -- as we know, devastated
13 much of the Gulf Coast, including Pascagoula.
14 Pascagoula was flooded. There were no homes, no
15 places available yet for people to live. Workers had
16 gone, full-time Signal employees.
17        This was seen, the H-2B process, as a way
18 to get workers in to fill Signal's needs for its
19 business and provide these workers with a place to
20 stay in the absence of other housing in the community
21 for that many people.
22     Q.   How would you describe yourself as an
23 employee of Signal if there were a couple of
24 adjectives to describe it?
25     A.   I cared very much about everyone that I

## Page 23

1  worked with including the Indian workers, and others
2  could see that. Another adjective is hard working and
3  diligent. That would be two.
4      Q.   Okay. You were being asked to cover off
5  work in both Texas and Mississippi for the housing
6  facility?
7      A.   Could you repeat the question?
8      Q.   Sorry. Which yards were you responsible
9  for building a housing facility in?
10     A.   Okay. I was responsible for Pascagoula,
11 Mississippi in its fullness as far as the -- it was my
12 job to coordinate those things.
13        In Texas, it was a somewhat different
14 situation. We would use the same vendors as far as
15 the buildings and the kitchen equipment and -- many of
16 the same vendors, but the actual construction of that
17 camp, of that housing facility, was done by Texas
18 management with regular updates given to me since I
19 couldn't oversee that construction plus Pascagoula
20 being in Pascagoula.
21     Q.   So the decisions, say, to -- just by, for
22 instance, to go with whatever vendor to put a housing
23 facility down, to build the actual housing facility,
24 you decided the Pascagoula one, who it would be for
25 Pascagoula?

## Page 24

1      A.   Well, it wasn't -- it wasn't my sole
2  decision.
3      Q.   Okay.
4      A.   Rather, I was the one who would be the
5  point man, if you will, who would interact with
6  potential vendors, get their quotes, consider them
7  along with purchasing, and then arrive at what we at
8  our level felt would be a good decision and then get
9  senior management's approval. Because they -- they're
10 the ones with that authority, not -- not me.
11     Q.   Right. You had a reporting authority to
12 people at Signal about what was going on, right?
13     A.   When you say "reporting authority" --
14     Q.   You had to tell -- you had to keep
15 management apprised of the developments as they were
16 taking place in the process from whenever you started
17 at the end of July right through --
18     A.   Yes.
19     Q.   -- into the fall and winter?
20     A.   Yes.
21     Q.   Okay. And how periodically were you
22 updating?
23     A.   I kept Signal management, including Signal
24 senior management, apprised on a weekly basis
25 beginning, I believe, in August and continuing into

## Page 25

1  September and even October.

2  **Q.   And you were — but you were traveling**

3  **between Pascagoula and Orange, Texas?**

4  A.   I did make some trips to Orange, but most

5  of my time was spent in Pascagoula.

6  **Q.   Was there anyone in Pascagoula who was**

7  **going to Orange as frequently as you were?**

8  A.   Are you referring to this particular

9  purpose?

10  **Q.   Yeah, for this purpose.  For the purpose of**

11  **working on the housing facility.**

12  A.   I was the one who went the most, though

13  those visits were, I think, relatively few in number.

14  **Q.   What would you say about one objective**

15  **being — well, what would you say were the main**

16  **objectives of your job kind of on a larger scale at**

17  **Signal?  What were some of the things that were**

18  **important to management in terms of your project?  And**

19  **let's think big picture here, like what you think like**

20  **Mr. Marler, Mr. Schnoor would value in terms of what**

21  **you were putting forward.**

22  A.   To make sure that things were completed as

23  far as this workers' housing project, completed in an

24  expeditious fashion and with -- even though we had

25  never done it before and needed to defer to our

## Page 26

1  vendors, especially -- especially GE for the facility

2  itself, what do you recommend, how should we do this.

3  We hadn't done it before.  A lot of people, short

4  time.

5         So they wanted to make sure that that

6  process went as smoothly as possible and as quickly as

7  possible so that when workers came, they would be able

8  to adapt comfortably and quickly into the new

9  environment in the United States and work for us

10  effectively.

11  **Q.   Was cost a factor?**

12  A.   Could you describe?

13  **Q.   Was saving money a factor or that was**

14  **important for Signal?**

15  A.   We wanted to provide the very best facility

16  that we could for -- for the price at hand.

17  **Q.   Okay.  John — Mr. Sanders --**

18  A.   Does that answer your question?

19  **Q.   Yeah.  I just want to show you a couple of**

20  **documents, and then we can talk about them.**

21  A.   Sure.

22  MR. SANDLER:

23         For the record, it's SIGE0004560.

24  MR. ALEXIS:

25         Would you repeat that, please?

## Page 27

1  MR. SANDLER:

2         Sure.  It's SIGE -- I've got a copy for

3  you.

4  EXAMINATION BY MR. SANDLER:

5  **Q.   This is for the -- I'm going to give this**

6  **to you, Mr. Sanders.**

7  A.   Okay.

8  **Q.   This is taken out of like, I guess what**

9  **we'll just call for the sake of ease, your diary.**

10  A.   Yes.

11  **Q.   This will be marked as Exhibit 601.  Can**

12  **you just read it over and then we can talk?  It's very**

13  **short.**

14         **(Whereupon, the document as described above**

15  **is marked as "Exhibit No. 601.")**

16  A.   Yes.  It's dated Friday, August --

17  EXAMINATION BY MR. SANDLER:

18  **Q.   You don't need to read it out loud.  You**

19  **can just read it and then we'll talk about it.**

20  A.   Okay.

21         (Witness reviews document.)

22         I've read the document.

23  **Q.   Okay.  Right.  Do you see in the second**

24  **sentence that you said:  I've already saved the**

25  **company $3 million?**

## Page 28

1  A.   Yes.

2  **Q.   Was that like -- that was considered quite**

3  **a good accomplishment, I guess?**

4  A.   Yes.

5  **Q.   Why was that considered important to you?**

6  A.   Because Signal was going to go with a

7  different vendor than GE Modular Space -- I think it

8  was, if I remember, General Marine Leasing, perhaps --

9  and had a quote for somewhere between 5 and

10  $6 million, if I remember.  And yet I was -- I found

11  out about GE Modular Space and recognized that name --

12  GE is obviously a very well-known brand -- and

13  therefore felt that -- after meeting with them that

14  the solution that they offered would meet our needs

15  and provide a good quality camp for a price that

16  was -- at the time that I was writing this felt would

17  be approximately $3 million less.

18         So if you can get a BMW -- a new BMW -- or

19  if you can get a BMW from one dealer for one price and

20  a very similar car for a lower price, then most people

21  would opt for that.  And that was sort of the context

22  that this is written in.

23  **Q.   Okay.  So cost was important as a factor?**

24  A.   It was not the only factor.  It was one of

25  many factors, comfort and ability of the vendors to

**Page 29**

1  construct quickly also being very important.  So
2  numbers of things including cost, yes.
3       Q.  Mr. Sanders, did you -- in your
4  correspondence with senior management, was there a lot
5  of e-mail traffic about the comfort of Indian workers
6  at the camp?  Was this like something that was
7  discussed, like how comfortable are the Indian workers
8  going to be?
9       A.  Yes, we had discussions.
10      Q.  There are e-mails about that?
11      A.  I don't know if they were over e-mail or
12  not.  You might know better than me.  But yes,
13  discussions were had.  And it was very important to
14  them, as well as, of course, to me.
15      Q.  Okay.  Mr. Sanders, I'm going to show you
16  another document --
17      A.  Okay.
18      Q.  -- similar to the one I just showed you.
19  This is going to be Exhibit No. 602.
20          I'll ask you to read it over.
21      A.  Okay.
22          (Witness reviews document.)
23          (Whereupon, the document as described above
24  is marked as "Exhibit No. 602.")
25  EXAMINATION BY MR. SANDLER:

**Page 30**

1       Q.  Let me know when you're done, Mr. Sanders.
2       A.  I've read the document.
3       Q.  Okay.  All right.  Can you read to me
4  precisely what's said?  You know there's like a phrase
5  in there that says, "you've earned your salary," one
6  of the date entries.  I think it's towards the bottom.
7       A.  Yes.
8       Q.  Okay.  That's the only date entry I'm going
9  to ask you about right now.  Right?
10      A.  Okay.
11      Q.  So can you just read to me, "you've earned
12  your salary" and then the rest of that paragraph.
13      A.  Yes.  It says --
14      Q.  Just read it, if you will.
15      A.  Okay.  I'm not sure exactly where to start.
16  I said, "He read the draft email --" he being Ron
17  Schnoor "-- I had prepared for the CEO, Dick Marler,
18  and said, 'Well, it looks like you've earned your
19  salary!'"
20          And then I say, "Nothing like having --" in
21  the diary I put "Nothing like having an immediate
22  impact and putting cash right where the senior
23  executives want it most - into the bottom line.  This
24  will help immensely in salary negotiations down the
25  road."

**Page 31**

1       Q.  Okay.  So cash -- I mean, saving the bottom
2  line, as you referred to it in your entry, that was
3  important at Signal?
4       A.  Within a given context of high quality for
5  the workers, yes.
6       Q.  All right.  There's two things I want to
7  ask you about.  There's one, the saving money for
8  Signal, and then the second one, salary negotiations
9  down the road that you put on the end of that.
10          So saving money, if I under -- tell me if
11  I'm understanding that entry correctly.  Saving money
12  for Signal is good for -- would have been good for you
13  in your future salary negotiations.  Is that a correct
14  interpretation?
15      A.  Yes.  That was my thought as I wrote this
16  in early August '06.
17      Q.  Okay.  And who -- just remind me, it was
18  Ron Schnoor who said, "You've earned your salary"?
19      A.  Yes.  Yes.
20      Q.  So Mr. Schnoor was happy that you had saved
21  money for Signal?
22      A.  Yes.
23      Q.  So it was an important factor?
24      A.  Yes.  I think that's common practice at
25  most companies.

**Page 32**

1       Q.  Are there similar instances you can just
2  recall, not off the document, obviously, where you've
3  been told that you've earned your salary because of
4  things that you've done that have, say, helped with
5  worker comfort or other considerations in the housing
6  facility?
7       A.  I don't remember right now.
8       Q.  Okay.  Okay.  Thank you.
9          Now, is it fair to say that in August 2006
10  you were still getting familiar with Signal and the
11  people and the culture?
12      A.  Yes.
13      Q.  You had just started in July and everyone
14  else there had obviously been there when you were
15  coming in?
16      A.  Yes.
17      Q.  Okay.  What was your first impression of
18  the structure of Signal?  And I realize that's vague.
19  I want to know were the executives separate and
20  detached or was the company like one big family where
21  everyone down from like a shipyard worker would be
22  comfortable with talking with, say, Mr. Marler or
23  Mr. Schnoor?  And this is just your impression.  I
24  mean, it's not anything more.
25      A.  Sure.  Sure.

**Page 33**

1    My impression -- my initial impression upon
2  joining was that Ron was -- Ron Schnoor was very
3  approachable. Dick Marler less -- less so, but I came
4  later, you know, let's say well into 2007 and further,
5  to realize, well, he's the executive of a large
6  company and has many things on his mind more than --
7  more than just the things that I'm concerned with.
8    And so some impressions that I might have
9  had and even wrote about in my diary, I realized after
10  the fact just might have caught him at a moment and
11  interpreted something on my side wrongly. And then in
12  that moment wrote about it and yet would revise
13  things.
14    Q.  All right.  I'm just curious to know what
15  your thought of the whole Signal company was, what
16  your impression was, not -- perhaps I was wrong
17  because I stipulated Mr. Marler and Mr. Schnoor. What
18  I just mean is --
19    A.  Okay.
20    Q.  -- was there a general community feeling at
21  Signal or was it more you have your management here,
22  you have your office people here, and you have your
23  shipyard workers there as separate entities. Just --
24  just --
25    A.  Sure.  I -- I viewed Signal, my time there,

**Page 34**

1  as being part of a big family.
2    Q.  Okay.
3    A.  In fact, they even in -- I can't remember
4  if it was -- I think it was 2007 maybe more than 2006,
5  but, at any rate, we would have Signal family days
6  in Pascagoula where all of the Signal employees from
7  the very top, Mr. Marler and Mr. Schnoor, along with
8  their wives and loved ones would come, as well as all
9  of Signal management and all of the shipyard workers
10  with their families who were able to. So it was an
11  environment that I enjoyed in that regard.
12    Q.  Was that often, those -- those -- were they
13  picnics?  Is that what you said?
14    A.  The picnic was an annual event.
15    Q.  Once a year?
16    A.  Yes. But I think that it showed the spirit
17  that the company sought to convey and the
18  inclusiveness of it as it did so.
19    Q.  I'm going to ask you about an instance and
20  then you can reflect on it as you like.  One day I
21  think quite early in your tenure -- I think it was
22  like beginning of August 2006 --
23    A.  Okay.
24    Q.  -- you let Anjay Keswani, who is the man
25  who was in charge of the food, move food in and out of

**Page 35**

1  the kitchen by accessing the hallway where the
2  executive offices were.
3    Do you recall that instance?
4    A.  Yes.
5    Q.  Okay.  Did that create a problem for any of
6  the executives?
7    A.  They wondered why -- they wondered why the
8  office area that -- that they worked in was being come
9  through with the wait staff and just the vendor
10  people. But I -- you know, I --
11    Q.  Sorry.  Who spoke to you about that?  Who
12  like alerted you to that fact?
13    A.  It was Mr. Marler's secretary, Diane Davis,
14  who -- I mean, as I wrote in this -- earlier in this
15  same document, when I realized what I had done, I was
16  mortified. I think that's the term that I used.
17    Q.  What did she say that led you to be
18  mortified?
19    A.  She said, "John, it's not a big deal.
20  Nobody is upset. But in situations like this, please
21  have -- it would be best if you had the vendors go
22  through the primary Signal entrance instead of the
23  executive entrance."
24    And so I on my own realized, oh, my
25  goodness, and made sure not to do it again.

**Page 36**

1    Q.  Right.  Right.  Because it was pretty -- I
2  mean, no -- regardless of the words that Diane, I
3  think you said her name is, what Diane said, there was
4  a certain amount of gravitas to that, right?  I mean
5  this is --
6    MS. FENTON:
7    Objection to the form.
8    A.  I mean -- No. She was very -- she was very
9  cordial. And it was a big deal only for me because I
10  wanted to respect our senior managers in that way and
11  I could have been more considerate and made sure, too.
12  That was the sense I'm trying to convey.
13  EXAMINATION BY MR. SANDLER:
14    Q.  So to be fair, then, you having Anjay or
15  perhaps another vendor use a hallway where
16  Mr. Marler's office is would be a sign of disrespect
17  to Mr. Marler?
18    A.  Just not showing the full -- full proper
19  thinking on my part. Because not even all of Signal's
20  employees have access to that area.
21    Q.  Okay. So that's a detached area?
22    A.  I mean, it's -- it's -- it's accessible and
23  their doors are open.
24    Q.  Wait. Did you just say all Signal
25  employees didn't have access to that area?

## Page 37

1     A.   Their -- I had -- I had access to it, but
2  the vendors -- the vendors really should have used
3  another door.  That's the thing I'm trying to convey.
4  And I want to emphasize that they were very, very kind
5  in the way that they informed me of that.
6     Q.   Now, what about the testers?  And I know --
7  I don't know if that's a word that was used at Signal.
8  I don't know if that's a test word.  It's a word that
9  I've kind of come up with.  I mean people like, say,
10 W.A. Shouse or people like that.
11         Would "tester" be a good word for -- to
12 describe people in his -- what his job was?
13    A.   Well, he was a pipe superintendent.
14    Q.   A pipe superintendent.  Okay.
15         Did they strike you -- Let me be more
16 specific.  At some point later on, Signal sent certain
17 employees to India to test the workers, right?
18    A.   Yes.
19    Q.   Okay.  So when I say "testers," those are
20 the people who I mean.
21    A.   Yes.
22    Q.   Specifically Mr. Shouse was sent?
23    A.   Yes.
24    Q.   So did he strike you as someone who would
25 be open and accepting to workers from another country?

## Page 38

1     A.   He didn't strike me wrong in any way in
2  that regard.  I don't remember him striking me wrong.
3     Q.   So he didn't -- There's nothing -- He never
4  expressed anything to you that would make you think
5  that he'd be less than accommodating -- or less than
6  happy to have, say, Indian workers come from -- come
7  to work at Signal?
8     A.   No.  I mean, his -- Signal's perspective is
9  that we want to have workers who are well qualified.
10 And within that we have all kinds of workers from
11 different races, different cultures, and those are
12 welcomed.
13    Q.   What was -- Did he express to you his
14 perspective on India, the country?
15    A.   He said it's different from the United
16 States.
17    Q.   Did he give you any specific examples of
18 that?
19    A.   There's a lot more people, obviously.  I'm
20 not sure if I remember anything -- I don't remember
21 anything right now.
22    Q.   All right.  I have a document.  So I'll
23 just give it to you and we'll talk about it.
24    A.   Okay.
25    Q.   I'm going to enter this document as 603.

## Page 39

1  And for the record, it's SIGE0556555.
2          (Whereupon, the document as described above
3  is marked as "Exhibit No. 603.")
4  EXAMINATION BY MR. SANDLER:
5     Q.   I'm just going to ask you to read it.  Oh.
6  You're already ahead of me.
7     A.   Okay.  I've read the document.
8     Q.   Okay.  Does this document recollect for
9  you -- this is -- the date is Tuesday, August 8th,
10 2000.  You wrote this?
11    A.   Yes.
12    Q.   Okay.  And this -- I think we're just going
13 to talk about, right now at least, just the second
14 sentence.
15    A.   Okay.
16    Q.   I'm going to read it into the record.
17         "I talked with W. A. Shouse --" "I" being
18 you, Mr. Sanders, right?
19    A.   Yes.
20    Q.   "-- who told me about India and how it's
21 like another planet, teeming with hordes of
22 poverty-stricken people clogging chaotic streets and
23 smelling like a hot, humid combination of incense and
24 sweat."
25         What do you think Mr. Shouse was telling

## Page 40

1  you that for?
2     A.   Well, first of all, I don't think those are
3  his words.  If you met him, he doesn't talk like that.
4     Q.   Okay.  I have not met him.
5     A.   But, basically, like I said, there are lots
6  of people there.  I mean, they're the most -- the
7  second-most populated country on the plant.  And
8  that's immediately obvious to anyone who goes and --
9     Q.   What did Mr. Shouse say to you that would
10 get you to record that sentence?  And I understand
11 this is over three years ago, so you're not going to
12 remember.
13    A.   Right.  Right.  Right.  I don't remember.
14 And as far as the poverty-stricken people, that might
15 have been my own interpretation based on never having
16 been there.
17    Q.   Right.
18    A.   For instance, I had a wonderful impression
19 of Mumbai and would love to go back.  It's like New
20 York City in many ways.  You might like it, too.
21 Anyhow, yeah, I knew that India was a developing
22 country, very poor.  And so when he said "teeming with
23 hordes" -- I mean, he -- well, he didn't say.  That
24 was my impression from what he said.  I don't even
25 remember him saying "poverty-stricken people."  It was

## Page 41

1 probably my impression based on developing countries.
2    **Q.  Was he saying something to you to the**
3 **effect -- just tell me yes or no because I'm trying to**
4 **understand a little bit about this -- I'm really**
5 **excited that we're having people come from India**
6 **because it's a really busy metropolis filled with lots**
7 **of people. I can't wait for them to get here? Was**
8 **that what you took away from Mr. Shouse?**
9    A.  I would say just that it's another -- it's
10 another culture, another environment. And we want to
11 have well-qualified workers come to Signal from there.
12 And he worked with me on many aspects and just to have
13 those aspects be carried out well so that the workers
14 could perform on the job. That was his main concern,
15 workers fitting in comfortably with the rest of the
16 workforce and performing well.
17    **Q.  And because that was his concern, he told**
18 **you that the country they're coming from was a humid**
19 **combination of -- or that he told you about the**
20 **country and that it was teeming with lots of people;**
21 **is that right?**
22    A.  Uh-huh (indicating affirmatively).
23    **Q.  Because he wanted high-quality workers?**
24    A.  He just wanted to give me an impression of
25 what India was like since that was -- since the

## Page 42

1 workers were coming from there and it was my project.
2    **Q.  When was Mr. Shouse's last trip to India**
3 **before he said this?**
4    A.  I don't know.
5    **Q.  Has he ever been to India?**
6    A.  He -- I believe that he had been before,
7 but you would have to ask him.
8    **Q.  Okay. Now, the shipyard guys, those are**
9 **guys, I guess, working on the shipyard. What did they**
10 **think about this -- I guess this housing facility, man**
11 **camp that was being constructed within plain view of**
12 **where they were working? Did they have any kind of**
13 **impressions of it? Did they have any nicknames for**
14 **it, anything like that?**
15    A.  They thought it was an interesting concept,
16 and with communication from Signal as to why it was
17 being done understood and --
18    **Q.  Well, this is -- I'm sorry. We're**
19 **talking -- my fault. This is my fault. I'm not**
20 **giving you a time frame context.**
21    A.  Okay.
22    **Q.  Let's just talk about August 2006.**
23    A.  Okay.
24    **Q.  At that point had Signal adverted through**
25 **the workers that there were Indian workers coming?**

## Page 43

1    A.  I don't remember if there had been a full
2 announcement at that time.
3    **Q.  Okay. So if I were to say to you that**
4 **there wasn't, you'd have no reason to contradict that?**
5    A.  I don't know one way or the other.
6    **Q.  Okay. So I asked you previously in August,**
7 **you know, whether there was like any kind of like**
8 **nicknames or anything used for the housing facility.**
9 **And you don't recall if there was or wasn't?**
10    A.  Could you help refresh my memory?
11    **Q.  Sure. Let me do that. Let me enter**
12 **another document, SIGE0556543. And it will be Exhibit**
13 **No. 604.**
14    **Just read it over and then we'll talk about**
15 **it.**
16    **(Whereupon, the document as described above**
17 **is marked as "Exhibit No. 604.")**
18    A.  (Witness reviews document.)
19    Okay.
20 EXAMINATION BY MR. SANDLER:
21    **Q.  Okay. You see in the first sentence**
22 **there -- I'm just going to read it. "I got into work**
23 **this morning and went immediately out to the trailer**
24 **site which the shipyard folks are now calling the**
25 **'Reservation.'"**

## Page 44

1    **Why do you think they called it a**
2 **reservation?**
3    A.  You would need to ask them.
4    **Q.  What did you think of them calling it a**
5 **reservation?**
6    A.  Attractive land that had not been used for
7 anything and now was reserved for the use of the
8 Indian workers.
9    **Q.  So this was just a clinical or in more like**
10 **kind of technical term that they were using?**
11    A.  Again, you would have to ask them. And
12 these were just the regular craft workers in the yard
13 who were -- I mean, they were excited about the fact
14 that Indians were coming, a new culture and what would
15 they be like and -- So it didn't have a negative
16 connotation at all in their minds.
17    **Q.  Oh, okay. So then in the second sentence**
18 **when you wrote, "Quite a sense of humor they have,"**
19 **that was because they were using the technical term**
20 **for it, attractive land?**
21    A.  Again, you'd have to ask them. I'm saying
22 that my -- they were happy about having the Indian
23 workers come.
24    **Q.  But that's not my question, Mr. Sanders.**
25 **My question is why did you think that meant they had a**

(504)525-1753              HUFFMAN & ROBINSON, INC.        (800)749-1713
ONE SHELL SQUARE,#250     CERTIFIED COURT REPORTERS   NEW ORLEANS, LA 70139
                  Plaintiffs (P)  Signal Defs (S)  Dewan Defs (D)  Burnett Defs (B)

## Page 45

1  good sense of humor? Let's go with that.
2      A.   I would say that -- I would say that
3  because they were excited about the workers coming and
4  here was this tract of land that had been reserved for
5  them.
6      Q.   Okay.  In the U.S., land that is lived on
7  by First Nations people, Native Americans, is called
8  what?
9      A.   Territorial lands.
10     Q.   Is it ever referred to as a reservation?
11     A.   Yes.
12     Q.   And are Native Americans ever referred to
13  as Indians?
14     A.   Yes.
15     Q.   Do you think potentially -- now, I'm just
16  going to throw this out, and if you don't think that,
17  then that's fine.  Do you think there was a double
18  entendre there?
19     A.   It's possible.
20     Q.   So maybe that's why it was funny, too?
21     A.   Yes.  But there was no -- there was no
22  negative connotation in their minds, if that's what
23  you're driving at.
24     Q.   I'm not driving at anything.  I just want
25  to know -- I'm reading these things.  I want to know

## Page 46

1  what's going on.
2      A.   Right.
3      Q.   Mr. Sanders, I mean -- and we're going to
4  continue here, obviously, but I also want to say that,
5  I mean, you were in like quite a unique position in
6  2006.  You had a lot of contact with a lot of people.
7  And you know a lot of things that were going on.
8  You -- just by way of example, I mean, there's more
9  e-mails from you than anyone else, you know, in the
10  e-mails.
11         So what I'm hoping to get out of today and
12  tomorrow is that you know a lot and you're going to
13  help us understand what happened.  So it's not what
14  I'm driving at or anything.  A lot of the times I'm
15  just asking you --
16     A.   Okay.
17     Q.   -- and I just want to know.
18     A.   Sure.
19     Q.   What was your impression of Signal's cash
20  flow in August 2006?  Let me -- if that -- well,
21  that's the question.  Would you like me to explain it
22  further?
23     A.   Yes.
24     Q.   Did they have a -- did you get the sense --
25  well, did they have any cash problems?

## Page 47

1      A.   It was not my area to -- to oversee.  I
2  just interacted with people that would have known.
3      Q.   Were customers paying their bills, to your
4  knowledge, Signal customers?
5      A.   There was need for -- work performed to be
6  paid.
7      Q.   So there was I guess what we call like
8  outstanding accounts?
9      A.   Accounts payable.
10     Q.   Accounts payable.
11     A.   It's normal -- normal in businesses.
12     Q.   That would be an accounts receivable
13  because it's money coming in to Signal.
14     A.   I'm sorry.  And I should know that.
15  Absolutely.  Accounts receivable.  That's right.  I'm
16  sorry.
17     Q.   Okay.
18     A.   We needed to have our accounts receivable
19  be -- be paid.
20     Q.   Right.  And they weren't being on -- in a
21  timely way?
22     A.   If I remember from some diary entries, that
23  was the concern.
24     Q.   Okay.  So work is going out the door, so to
25  speak, and money is not necessarily coming in in the

## Page 48

1  same time frame.  So money could be said to be tight?
2  Would that be --
3      A.   Cash flow management was a priority.
4      Q.   Okay.  Thank you.  That helps.
5         Would you say that Signal was cost
6  sensitive at this time?  We're still in August 2006.
7      A.   The company always wants to control its
8  costs, again, given the level of quality that we
9  always want to convey.
10     Q.   All right.
11     MR. SANDLER:
12         Can we take a break?  Is that all right if
13  we take a break right now?
14     THE VIDEOGRAPHER:
15         We're going off the record.  It's 11:23.
16  This is the end of Videotape No. 1.
17         (Whereupon, a recess in the proceedings was
18  taken.)
19     THE VIDEOGRAPHER:
20         We're back on the record.  It's the
21  beginning of Videotape No. 2.  It's 11:33.
22     EXAMINATION BY MR. SANDLER:
23     Q.   Mr. Sanders, I think when we left off last
24  time we were talking about Signal's cash flow issues.
25  I had asked you some questions about that.

## Page 53

1  to interpret it. He wrote it to you as well as
2  others?
3     A.  Yes.
4     Q.  So he -- in his mind when he drafted it up,
5  he was thinking I have to write this in a way that
6  John and others will understand.
7     A.  Sure.
8     Q.  So I think it's fair to ask you what you
9  understood the e-mail to mean.
10    A.  Okay.
11    Q.  And I understand that Mr. Marler could
12 contradict you. It's possible, but I don't think
13 that's something we have to worry about today. I want
14 to know what you understood it to mean. Because I
15 know what I understand it to mean, but I want to know
16 what you understand it to mean.
17    A.  Okay. I mean, ultimately, Mr. Marler is
18 wondering what the cost of using contract workers from
19 Mexico would be, what is that cost. That's what he's
20 asking.
21    Q.  Because -- was that brought on by a concern
22 that the cost was getting high on bringing the Indian
23 workers over?
24    A.  Just that there were -- per this flux-core
25 issue and workers not trained for it, that that was --

## Page 54

1  that was new and unexpected information. So what will
2  it cost to bring these workers up to the skill level
3  that --
4     Q.  Okay. So Mr. Marler's -- Now there's new
5  information that's leading Mr. Marler possibly to
6  think that now the costs are getting higher than maybe
7  they anticipated?
8     A.  Again, I'm not going to speak for him.
9     Q.  Who -- Did anyone provide him with the
10 Mexican rate, to your knowledge?
11    A.  I don't know.
12    Q.  So that certainly wasn't you, then?
13    A.  No.
14    Q.  All right. If the Mexican rate were really
15 low, what do you think would make sense for Signal to
16 do?
17    A.  That was not my role.
18    Q.  No, it wasn't.
19    A.  So I won't speculate.
20    Q.  If it were your role -- strike that.
21    Okay. Thank you.
22    Okay. I'm going to ask you some questions
23 about the co-defendants, and it's going to begin with
24 Michael Pol, who you've met, I believe?
25    A.  I have met him.

## Page 55

1     Q.  When did you first meet Michael Pol?
2     A.  I believe it was in early August 2006.
3     Q.  And what were the circumstances or the
4  contact under which you met him?
5     A.  Are you talking about my first meeting with
6  him?
7     Q.  Yes.
8     A.  Very quick in the wing of Signal where I
9  had an office and where Lisa Spears, Signal's
10 contracts manager and risk manager, had an office.
11 And he came by to see her, and I met him very quickly
12 as she introduced me to him as somebody who would be
13 coordinating the workers' housing project for the H-2B
14 workers who would come.
15    Q.  Okay. And subsequently you met him or
16 e-mailed with him a number of times over that period,
17 say, from August into, say, the end of the year. Did
18 you say you had regular contact with him or how would
19 you characterize the contact?
20    A.  I didn't see him through the end of the
21 year.
22    Q.  Right. What I mean to say is from that
23 first meeting, how periodically would you be in
24 contact with Mr. Pol?
25    A.  By "contact" do you mean e-mail and in

## Page 56

1  person or --
2     Q.  Yeah. Let's not distinguish.
3     A.  Okay. Fairly frequently. Fairly
4  frequently.
5     Q.  And what did you understand Mr. Pol's
6  function to be?
7     A.  He was Signal's recruiter.
8     Q.  Okay. For what?
9     A.  For the H-2B process.
10    Q.  For the workers in India?
11    A.  Yes.
12    Q.  Okay. And so he was going to provide
13 workers to Signal's shipyards in the Gulf?
14    A.  To --
15    Q.  Pascagoula and Orange, Texas?
16    A.  Yes. Yes.
17    Q.  At some point did you begin to suspect that
18 Mr. Pol was not to be trusted?
19    A.  Yes.
20    Q.  Okay. Did you share that suspicion with
21 anyone?
22    A.  Not immediately.
23    Q.  When did you first come to that
24 realization?
25    A.  Are you distinguishing between realization

**Page 57**

1   and suspicion?
2       Q.   No.  You're right.  Sorry.  My bad.
3           When did you first suspect he was perhaps
4   not to be trusted?
5       A.   In the early to middle part of August 2006,
6   if I remember.
7       Q.   All right.  So that's quite soon after you
8   met him?
9       A.   Yes.
10      Q.   Was there -- Can you speak to a thing that
11  might have happened that would have -- just your first
12  kind of like intuition -- and I must say, it might be
13  quite -- but what your first intuition was that he was
14  not to be trusted?
15      A.   Actually, my first impression was that he
16  was outgoing, winsome --
17      Q.   Right.
18      A.   -- et cetera.  That was my very first
19  impression.
20      Q.   Right.
21      A.   That changed at a lunch that I had with him
22  in Pascagoula.
23      Q.   On site or off site?
24      A.   Off site.
25      Q.   Who was at the lunch?

**Page 58**

1       A.   Only he and me -- he and I.
2       Q.   Okay.  Where was the lunch at?
3       A.   It was held at LY Buffet on Highway 90 in
4   Pascagoula.
5       Q.   So what happened at that lunch?
6       A.   We were discussing the catering aspect of
7   the project.
8       Q.   Okay.  Can you give a bit of background
9   then?  Because -- what was his role in the catering
10  aspect?  If you'd give me like the full kind of
11  background of that lunch meeting.
12      A.   He was responsible for coordinating the
13  catering at that point, as well as the recruitment.
14      Q.   All right.  So what did he say at that
15  lunch that led you to perhaps not to trust him or to
16  suspect that he might be not trustworthy?
17      A.   I had -- As I mentioned earlier in my
18  testimony, I was responsible for meeting with
19  prospective Signal vendors and, within the overriding
20  priority of good quality and convenience for the
21  workers, find the best price.
22           And so with regard to the food vendors, I
23  had done some investigation and found that the $14 per
24  day per worker for three meals was by far the best
25  rate.  And so -- and yet, in spite of that, I still

**Page 59**

1   wanted to see if there was any negotiating
2   possibility.  Okay?
3       Q.   Uh-huh (indicating affirmatively).
4       A.   And so at this luncheon, Michael Pol and I
5   had that discussion.  And I asked him, I said, "Would
6   it be possible to come down from your $14 a day rate?"
7   Even though I knew that it was good, standard.
8       Q.   I mean, this is standard.
9       A.   Right.  And he got -- he seemed to get
10  perturbed.  And I remember him banging his fist on the
11  table and saying, "If I'm going to be involved in
12  this, I'm going to make -- I'm going to make some
13  money at it."  And he said it in a raised and
14  irritated voice.
15      Q.   Okay.
16      A.   And with him banging his fist on the table,
17  it struck me as an extreme response to a standard
18  question.  And so I began at that point to think that
19  he might be greedy.
20      Q.   Did you think there was an intimidation
21  element there by him like pounding --
22      MS. FENTON:
23          Object to the form.
24      THE WITNESS:
25          Could you repeat the question?

**Page 60**

1       MR. SANDLER:
2           Sure.  Well, I will repeat, but let me ask
3       a question prior to that.
4   EXAMINATION BY MR. SANDLER:
5       Q.   How much older did you think Mr. Pol was to
6   you, just roughly?
7       A.   He had told me his age, so approximately
8   ten years.
9       Q.   Approximately ten years.  Did you -- how
10  did you interpret him pounding his fist and raising
11  his voice?
12      A.   He was -- he was seeking to be emphatic and
13  express his frustration that I would question the
14  price.
15      Q.   So you didn't perceive that as just a
16  standard negotiating technique like you were doing.
17  You were just asking for a lower price, which was just
18  standard negotiating, but you didn't perceive his
19  response to be that.  Is that fair to say?
20      A.   Correct.  I would respond a little bit
21  further in this way.  For instance, I mentioned that
22  at Texas Instruments I had been involved in a
23  purchasing role.  I had negotiations with vendors.
24  There was -- I had not encountered a response like
25  that to that point.

---

**Page 61**

Q.   Okay.  So how would you -- what did you
make of it, then, that he --
A.   Well, I -- We moved on with the
conversation, but I noted in my mind why was he so
focused on the money.  It struck me as noteworthy.
Q.   Okay.
A.   And I -- though I didn't share it with
anyone, I filed it away in my mind.
Q.   And this is pertaining strictly to the $14
or the whole scheme?  I mean, because Mr. Pol is
obviously involved not just with the catering.
A.   Well, there was the -- there was the
catering and that was what our discussion was about.
In that meeting he -- at that luncheon he also
mentioned that he had a friend in the gravel
construction business, and maybe they could help with
our preparation of the roads.  And he would be able to
get -- he would be able to coordinate that for us as
well.  And he seemed eager to do that, also.  But I
said, "No.  We have the capability to do that for
ourselves."
Q.   Okay.  When did this suspicion -- and I
appreciate you may not have a date specifically, but
when did this suspicion move from suspicion to I've
now concluded in my mind, I've realized or -- wait.

---

**Page 62**

Did this suspicion ever further -- did you ever
further your suspicion to conclusion that Mr. Pol is
not to be trusted?
A.   There was one other incident prior to full
realization which stands out.
Q.   Okay.  So when was full realization that
Mr. Pol was not trustworthy?
A.   Mid-November 2006.
Q.   Oh, okay.  So before that it was just
suspicion.
Okay.  I want to specifically ask you about
an e-mail that --
MS. FENTON:
I'm sorry.  Could you speak up?
MR. SANDLER:
Sure.
EXAMINATION BY MR. SANDLER:
Q.   I want to specifically ask you about an
e-mail that Mr. Pol sent to you on August -- on August
24th, 2006.  And the Bates for it is SIGE0329048.
Give me a second.  It will be Exhibit No. 606.
As we do, I'm going to give you a chance to
read it and then we'll talk about it.  But I'd also
like to say that this is already entered as
Exhibit 550 and 569.

---

**Page 63**

(Whereupon, the document as described above
is marked as "Exhibit No. 606.")
A.   (Witness reviews document.)
I've read the document.
EXAMINATION BY MR. SANDLER:
Q.   All right.  I want to ask you about the
fourth paragraph that begins "One of us" and then open
parens.
A.   (Witness nods head affirmatively.)
Q.   What did you understand the fourth
paragraph to mean?  If you want to reread it, that's
fine, too.  What did it mean to you when you read
that?
MR. ALEXIS:
Object to form.
EXAMINATION BY MR. SANDLER:
Q.   You can still tell me what you think it
means.
A.   The problem is that I did not process and
probably very high probability did not even read this
information when it came into my inbox in August 2006.
I only noticed it much further down the line into
2008.
Q.   2008?
A.   Yes.

---

**Page 64**

Q.   Mr. Sanders, at the beginning I asked you
what kind of employee you were at Signal, right?
A.   Yes.
Q.   Do you remember the adjectives that you
used?
MR. ALEXIS:
I'm going to object to form.
MR. SANDLER:
What is the objection?
MR. ALEXIS:
Argumentative.
MR. SANDLER:
You can tell me what you --
MR. ALEXIS:
Please answer.  I'm sorry.
For the record, let me just say in front of
the witness, we have an agreement among us that
if there's any kind of objection at all to the
question, we just say "object to form."  And
that's a shorthand way of saying we object to the
question.  But as the witness, you can still
answer the question.  So I apologize for not
telling you that in advance.
THE WITNESS:
Okay.

---

## Page 65

1  MR. ALEXIS:
2      And if -- You still answer.
3      And I guess, Erin, the only time that he
4  would not have to answer is if you felt it
5  invaded attorney-client privilege --
6  MS. HANGARTNER:
7      Correct.
8  MR. ALEXIS:
9      -- and then you'd instruct him not to.
10  MS. HANGARTNER:
11      Correct.
12  MR. ALEXIS:
13      I beg your pardon.
14  MR. SANDLER:
15      Thank you for that.
16  MR. ALEXIS:
17      And, also, Hugh, I don't think I've ever --
18  I don't know if we've ever told you that. I
19  can't remember.
20  MR. SANDLER:
21      Well, I think at the -- I think in a prior
22  deposition. I think Mr. Duhon. And I've read a
23  lot of the transcripts, too. I was waiting for
24  you to say that in the beginning, Ralph.
25  MR. ALEXIS:

## Page 66

1      Yes. Yes. I forgot.
2  EXAMINATION BY MR. SANDLER:
3      Q.   Okay. Do you remember what the adjectives
4  were?
5      A.   I cared about the workers, was hard working
6  and diligent.
7      Q.   Okay. So -- but you didn't read all your
8  e-mails. Is that what you're saying now?
9      A.   Yes.
10      Q.   Why wouldn't you read an e-mail from
11  Michael Pol?
12  MR. ALEXIS:
13      Same objection.
14      A.   Because within a very short amount of time
15  there was an awful lot of work to be done. And I got
16  many e-mails. And as is the case even now in my
17  personal e-mails and as was the case in my employment
18  with Signal, there are and there were ones that did
19  not get read or processed at the moment that they were
20  sent. This was one of those.
21  EXAMINATION BY MR. SANDLER:
22      Q.   But this e-mail is not just a sua sponte
23  e-mail. He's replying to an e-mail that you sent out,
24  correct?
25  MS. HANGARTNER:

## Page 67

1      I'm going to object. Can you just define
2  "sua sponte"? Not everybody knows that term. I
3  mean, I do.
4  MR. SANDLER:
5      Okay. You have a friend.
6  EXAMINATION BY MR. SANDLER:
7      Q.   This is a reply, right? I mean, you can
8  even see in the subject line it says, "RE" of the
9  e-mail, right?
10      A.   Yes. Yes.
11      Q.   "RE" usually means that it's replying to an
12  e-mail that was sent prior?
13      A.   Yes.
14      Q.   Okay. And, in fact, the preceding e-mail
15  is here in this exhibit, right?
16      A.   Yes.
17      Q.   So what was the purpose of sending this
18  e-mail that you drafted on August 22nd, 2006 predating
19  his reply?
20      A.   Predating by two days.
21      Q.   By two days, yes. Well, Greenwich Mean
22  Time, probably only one day given the different time
23  zones.
24      A.   Okay. I think that August 24th to
25  August 22nd is two days.

## Page 68

1      Q.   Mr. Sanders --
2      A.   I know. I'm just saying.
3      Q.   -- it says August 24th, GMT.
4      A.   Uh-huh (indicating affirmatively).
5      Q.   GMT stands for Greenwich Mean Time, which
6  is about five hours or six hours ahead of Mississippi
7  time. So by Central Standard Time, it would be
8  August 23rd late in the evening.
9      A.   Yes. So --
10      Q.   And you wrote your e-mail on August 22nd.
11  So it's a day.
12      A.   Yes, but I would have seen this e-mail on
13  August 24th, not August 23rd.
14      Q.   I just said to you when -- we were just
15  talking about when he sent it, not when you didn't
16  read it.
17      A.   I'm simply stating that two days when --
18  there were approximately two days of lapse between my
19  preceding e-mail to him and his reply. And it is
20  highly likely, even inevitable, that within that space
21  of time I would have received many other e-mails about
22  many other subjects. And in the great busyness of my
23  job of coordinating, not just the H-2B process, but so
24  many other aspects, that this e-mail was not processed
25  and almost certainly did not even get opened at that

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 69

1    point.
2         That's what I'm saying. And with the lapse
3    of two days, that to me is very plausible and
4    understandable.
5         Q.   Okay. Let's talk about the e-mail that you
6    sent out.
7         A.   Okay.
8         Q.   The preceding one. What was the purpose --
9    If you want to reread it, that's fine.
10        A.   Okay.
11        Q.   It seems like a very well-structured
12   e-mail. There's like -- You've organized it. And
13   you've asked Mr. Pol and, it looks like, Mr. Burnett,
14   who is also in this e-mail, to kind of live work with
15   these dates, right, that you've sent out to --
16   because -- What are these dates pertaining to?
17        A.   My understanding of the schedule that we
18   would seek to follow.
19        Q.   And we said -- we discussed earlier this
20   morning that expeditiously getting the workers here
21   was a very important factor for Signal.
22        A.   Yes.
23        Q.   Okay. So now we're talking about the
24   timeline of getting them here.
25        A.   My understanding of that and what do you

## Page 70

1    think, is there anything that needs to be added or
2    modified.
3         Q.   Okay. Did you perceive this e-mail to them
4    as important?
5         A.   My sense was that I had a good
6    understanding of where things needed to go and had
7    laid things out pretty clearly. So if I didn't hear
8    back right away, my inference would have been my
9    understanding is okay.
10        Q.   But there are three questions at the end of
11   your e-mail, right?
12        A.   Yes.
13        Q.   So the first one -- second one -- do you --
14   I mean, you wanted answers to these questions, did you
15   not?
16        A.   Yes.
17        Q.   In the sense like you didn't write: If I
18   don't hear back from you, I'm going to assume that
19   October 1st. You didn't write it like that. You
20   wrote in the interrogative form requiring a response?
21        A.   Yes.
22        Q.   Okay. And that's because time was of the
23   essence and you had to answer to management at Signal
24   about what was going on.
25        MS. FENTON:

## Page 71

1         Objection to form.
2    EXAMINATION BY MR. SANDLER:
3         Q.   Did you write this e-mail to get answers
4    that you could then relay to management at Signal?
5         A.   Yes, but also to make sure I understood the
6    process myself. Because it was brand-new for me. I
7    was completely unfamiliar with all of this prior to
8    coming to Signal and this was -- As I'd mentioned,
9    Michael Pol was our recruiter. It was in a large
10   sense a black box to us. They will handle that. You,
11   John, handle getting the housing facility set up.
12        And so when I constructed this, it was a
13   matter of: I think this is the right understanding,
14   but I'm not sure. Could you clarify? And then once
15   that was out of the way as far as I hit "send," now I
16   can refocus on the myriad of other tasks requiring
17   direct and full attention.
18        Q.   So it's your testimony under oath that when
19   the e-mail came back and the subject said, "Time-line
20   of H-2B worker arrivals," you didn't read it?
21        MS. FENTON:
22             Object.
23        MR. ALEXIS:
24             Object to the form.
25        A.   What I'm saying is that I almost certainly

## Page 72

1    did not read it and 100 percent explicitly did not
2    process the information that it contained, did not
3    process.
4    EXAMINATION BY MR. SANDLER:
5         Q.   What does it mean you didn't process?
6         A.   Okay. I cannot -- I cannot say that -- I
7    am confident -- I am confident that I did not even
8    open this e-mail at that time in 2006. The time lapse
9    supports that, also, the fact that this e-mail was
10   unresponded to.
11        Q.   I don't mean to interrupt, but what do you
12   mean the time lapse supports that? What time lapse?
13        A.   From -- we talked about August 22nd --
14        Q.   Oh, okay. Right.
15        A.   -- and 24th. Yes.
16        So there was a two-day time lapse, as we
17   discussed. And, furthermore, there's no -- This
18   e-mail hangs out alone, as I know that you are aware.
19   And so that -- both of those support the contention
20   which I am giving under oath that this information was
21   not digested or processed by me.
22        And I will also say that it is, therefore,
23   extremely likely, with the highest possible
24   probability short of saying it under oath, that I did
25   not even open or read the e-mail.

## Page 77

1  at that time?
2      A.  Yes.  Not until 2008 when it struck me that
3  I was reading it for the very first time.  I'd like to
4  add that.
5      Q.  Okay.  That's fair.
6          If you can kind of go -- put your head
7  space back into 2006, this is -- you, Signal, is
8  working with Global to bring in H-2B workers at this
9  point in time?
10     A.  Yes.
11     Q.  Okay.  So at that point, what do you
12 think -- why do you think he would send that e-mail to
13 you?
14 MS. FENTON:
15     Objection to form.
16     A.  You would need to ask him.  I didn't ask
17 for that information.  You would need to ask him.
18 EXAMINATION BY MR. SANDLER:
19     Q.  Do you read -- As you sit here today, do
20 you read that paragraph as suggestive of anything?
21 MS. FENTON:
22     Objection.
23     A.  Yes.
24 EXAMINATION BY MR. SANDLER:
25     Q.  What do you read it as?

## Page 78

1  MR. ALEXIS:
2      Objection.
3      A.  Now, you're stating with my current
4  knowledge in November 2009?  Is that the context of
5  your question?
6  EXAMINATION BY MR. SANDLER:
7      Q.  Yes.
8  MR. ALEXIS:
9      I'd like to object to the form.
10     Go ahead.
11     A.  As I sit here today with my present
12 understanding of the H-2B process, which is vastly
13 greater than in August 2006, though not comprehensive,
14 it appears that he is instructing the workers to
15 mislead the U.S. Consulate.
16 EXAMINATION BY MR. SANDLER:
17     Q.  Okay.  And he's candidly sharing that with
18 Signal in August 2006?
19     A.  Again --
20 MR. ALEXIS:
21     Object to form.
22     A.  -- I don't agree that the information was
23 shared because of the fact that if somebody does not
24 receive a message, was the message shared?  Answer:
25 No.

## Page 79

1  EXAMINATION BY MR. SANDLER:
2      Q.  Earlier on you said that you understood
3  Global as handling the workers' side; is that right?
4  Is that a fair characterization of what you said
5  earlier on today?
6      A.  As far as the H-2B process?
7      Q.  Yes.
8      A.  They and the parties they were working
9  with, yes.
10     Q.  Who are the parties they were working with?
11     A.  Malvern Burnett and Dewan Consultants.
12     Q.  What did you mean by them handling it?
13     A.  That they would deliver to Signal or
14 provide to Signal well-qualified, first-class
15 craftsmen from India in accordance with our needs and
16 they would handle the immigration details on our
17 behalf.  They were the recruiters.
18     Q.  And that understanding came from where?
19     A.  There was a contract between Signal and
20 Global Resources.
21     Q.  So in the contract.  That's where you got
22 it from, the written contract?
23     A.  The contract specifies those things is my
24 understanding.
25     Q.  Do you think that -- again, we're going to

## Page 80

1  talk about this e-mail -- that Mr. -- does this text
2  to you as a reader -- you were the intended recipient.
3  And I don't think when matters for this question.  But
4  if it does, ask me and I'll stipulate.
5      A.  Okay.
6      Q.  Do you think that the fourth paragraph is
7  written in a way for a reader who is familiar with
8  what's going on to -- do you think this fourth
9  paragraph is written in a way for the reader to
10 understand what you just said a couple of answers ago
11 your interpretation of this paragraph is?
12 MR. ALEXIS:
13     Object to form.
14     A.  I think you just said is my
15 understanding that -- Is another way to say that is --
16 is this fourth paragraph intended to show an effort at
17 misleading the consulate?  Is that what your question
18 is?
19 EXAMINATION BY MR. SANDLER:
20     Q.  Yeah.  Is it to share that information in a
21 candid way?
22 MR. ALEXIS:
23     Same objection.
24     A.  Yes, but that effort to share it with us
25 failed due to my lack of reading the e-mail.

**Page 81**

1  EXAMINATION BY MR. SANDLER:
2      Q.   Okay. So in your mind, this -- now --
3  sorry. I want to be clear. The August 22nd e-mail,
4  the preceding e-mail, was never answered?
5      A.   I'm not sure. As far as the questions that
6  I posed, I'm not sure if they were answered or not.
7  Certainly this e-mail didn't do it if I didn't read
8  it.
9      Q.   Right. So either -- just correct me if I'm
10  wrong. I'm just trying to understand. So either
11  these questions were answered through another means
12  that we haven't discussed here today that I don't know
13  about or it was just never answered.
14      A.   Those are the two possibilities.
15      Q.   You agree.
16      A.   Yes.
17      Q.   Do you think that Signal, your bosses,
18  Signal management, for lack of a better term, cared
19  about this timeline, cared about when people were
20  arriving, when the interviews were?
21      A.   They cared about the entire process and the
22  workers, so yes.
23      Q.   Because they were going over to India,
24  right? People from Signal were going over to India?
25      A.   We were committed to following the

**Page 82**

1  instructions which our recruiter gave us to the best
2  of our ability. We would follow his instructions to
3  the best of our ability within the confines of the
4  law.
5      Q.   So Mr. Schnoor's unhappiness that you write
6  about in the first line of your e-mail --
7      A.   Yes.
8      Q.   -- it's the second sentence -- did that --
9  was that a factor or the factor, a major factor in
10  writing this e-mail?
11      A.   Yes.
12      Q.   Which one would you say?
13      A.   Well, he wanted to know -- the expectation
14  within Signal was that workers would be available on
15  or about October 1st. And so when -- when that's the
16  expectation, questions are going to come as to whether
17  that expectation is being met.
18      Q.   And Mr. Schnoor wanted to know?
19      A.   He wanted to know. And when I expressed
20  some questions about that might not happen, "Well, why
21  not?"
22      Q.   That was Mr. Schnoor to you?
23      A.   Yes. He wanted to know the details about
24  the whole company needs -- needs these workers. And
25  we have a significant plan in place and millions of

**Page 83**

1  dollars being expended to facilitate this plan. The
2  timeline for the ten-month H-2B process starts on
3  October 1st. What do you mean that that date might
4  not happen? That was his concern.
5          Because, again, the expectation, prior to
6  me, I think, had been set at October 1st by our
7  recruiters. At least that was my understanding, that
8  October 1st would be when they could come.
9      Q.   Okay. So this was something Signal
10  management told you, that's our date?
11      A.   That's our target.
12      Q.   That's our target.
13      A.   Yes.
14      Q.   So that's not something that Mr. Pol said
15  to you, October 1st?
16      A.   He may have had discussions with Signal
17  senior management about October 1st. That date came
18  from somewhere. But I was not a part of those initial
19  discussions.
20      Q.   Right. I'm saying between you and Mr. Pol,
21  you have no direct information that gave you that
22  date. That was only from Signal management,
23  October 1st?
24      A.   Well, that was the date that the H-2B
25  ten-month window began.

**Page 84**

1      Q.   Right.
2      A.   So I think it's probably predicated upon
3  that.
4      Q.   Okay. So Mr. Schnoor is unhappy. You
5  write this e-mail. Does Mr. Schnoor ever ask you what
6  the results were? Did he ever like follow up with
7  you?
8      A.   I don't remember. But I, in my mind,
9  wanted to give -- make sure I understood clearly what
10  would happen when so that I could articulate that
11  properly to him.
12      Q.   Did you tell him -- These dates you put in
13  that e-mail, the ones that start 8/24 -- 8/24, 8/25 --
14      A.   Yes.
15      Q.   -- those are the dates that you shared with
16  Mr. Schnoor when he was unhappy?
17      A.   Well, he wanted to know what's going to
18  happen when, and this would have been my attempt to
19  answer so that he would have information. And then it
20  would be shared with others from there.
21      Q.   So you shared that with Mr. Schnoor. You
22  then wrote this e-mail to Mr. Pol?
23      A.   No, no, no.
24      Q.   Sorry.
25      A.   I'm saying that I had -- "John, what's the

## Page 85

1  timeline going to be?"
2      "Let me figure it out."
3      Here's -- so to myself, here's my
4  understanding. Michael Pol, Malvern Burnett, could
5  you confirm so that as I need to give answers to
6  Signal management, I will have your support as the
7  ones we've outsourced the process to, you're the
8  experts in it, is this right. And that way,
9  especially with me being so new, I would have good
10  information.
11      Q.  See, when you just said outsourced them,
12  they were not Signal employees. They were their own
13  company, Global Resources --
14      A.  Right.
15      Q.  -- Burnett Law Offices --
16      A.  Uh-huh (indicating affirmatively).
17      Q.  -- and Dewan Consulting. And they were
18  like agents of Signal through contracts and they were
19  then stipulated to do work?
20      A.  No. I --
21      MR. ALEXIS:
22          Object to form.
23      A.  No. I disagree. I disagree, Hugh. They
24  were not our agents. They were recruiters who were
25  engaged -- who were required per the contract to

## Page 86

1  perform a specific task. That's much different from
2  an agent.
3  EXAMINATION BY MR. SANDLER:
4      Q.  They were under contract with Signal?
5      MR. SHAPIRO:
6          Object to form.
7      A.  No. We had one contract with Global
8  Resources. And then he coordinated things based on
9  his experience and chose to work with Malvern Burnett
10  and Dewan Consultants. So, no, they were not our
11  agent. Michael Pol was not our agent.
12  EXAMINATION BY MR. SANDLER:
13      Q.  In your understanding?
14      A.  They were not our agent.
15      Q.  If I -- I'm still going to stick with this
16  August 22nd e-mail.
17      A.  Okay.
18      Q.  Did you ever write in your diary about
19  writing this e-mail, to your recollection?
20      A.  I --
21      Q.  You don't recall?
22      A.  -- don't remember right now, no.
23      Q.  If I were to say that you described it as
24  an instrument to get information, would that ring a
25  bell?

## Page 87

1      A.  Could you show me?
2      Q.  Well, I want to ask you if you recall that.
3      A.  I don't. Could you show me?
4      Q.  Okay. Well, perhaps this afternoon, but
5  not right now.
6      A.  Okay.
7      Q.  What do you think -- What was your
8  understanding of the legal status of the workers who
9  were coming to Signal?
10      MR. ALEXIS:
11          Object to form.
12      A.  When you say "legal status," could you
13  amplify that a little bit?
14  EXAMINATION BY MR. SANDLER:
15      Q.  We're going to stick with that e-mail.
16      THE VIDEOGRAPHER:
17          We're going off the record. It's 12:31.
18  This is the end of Videotape No. 2.
19          (Whereupon, a recess in the proceedings was
20  taken.)
21      THE VIDEOGRAPHER:
22          We're back on the record after lunch. It's
23  1:29. Beginning of Videotape No. 3.
24  EXAMINATION BY MR. SANDLER:
25      Q.  Okay, John. When we finished off before

## Page 88

1  lunch, we were talking about the e-mail that you sent
2  to Michael Pol and then the reply that you didn't see.
3      A.  The August 22nd followed by August 24th.
4      Q.  Precisely.
5      I just want to ask you about -- Sorry. I
6  just wanted to ask you about a diary entry that was
7  around that time. And the Bates number for this entry
8  is SIGE0556546. And it will be Exhibit No. 607.
9      So I'm just going to hand it to you and you
10  can look at it and we'll talk about it.
11          (Whereupon, the document as described above
12  is marked as "Exhibit No. 607.")
13      A.  (Witness reviews document.)
14      I've read the document.
15  EXAMINATION BY MR. SANDLER:
16      Q.  Okay. Towards the end of the paragraph --
17  I'm talking about the portion pertaining to
18  August 22nd, 2006 -- you write about having to stay
19  late to send out an e-mail to Michael Pol and Malvern
20  Burnett.
21      Is that -- you know, to the best of your
22  recollection, would this e-mail that we've been
23  talking about earlier be that e-mail?
24      A.  Most likely.
25      Q.  Okay. So this e-mail, you stayed late to

Page 109

1  approximation by Signal.
2      Q.   Did you understand getting a green card to
3  be part of that process?
4      A.   Part of what process?
5      Q.   Sorry.  My mistake.  Did you understand
6  getting a green card to be part of bringing over
7  Indian workers under the H-2B scheme?
8      A.   I knew that there was a difference between
9  H-2B and green card, but I didn't understand all of
10 the particulars that related to the two types, the
11 status.
12     Q.   What did you know about these two statuses
13 that indicated they were different?
14     A.   That one was short term, H-2B.  Green card
15 was long term.  That was the extent of my
16 understanding at that point.
17     Q.   Okay.  But by long term, how long is the
18 long term?
19     A.   However -- I don't know.  Just longer than
20 H-2B.
21     Q.   In the movie Green Card, did the person --
22 what kind of status was the person seeking?
23     A.   I don't remember.
24     Q.   All right.
25     A.   I mean, presumably he wanted a green card.

Page 110

1      Q.   But what did that give him?
2      MR. ALEXIS:
3          Object to form.
4      A.   I don't know.  I was just in the movie
5  theater or watching it at home.  I just kind of
6  enjoyed the movie.  I didn't digest the particulars
7  and the details related to each form of status.
8  EXAMINATION BY MR. SANDLER:
9      Q.   All right.  Was green card part of the
10 program that Signal was undertaking to bring Indian
11 workers over?
12     A.   We brought the workers under an H-2B visa
13 that had validity of ten months.  That's all that we
14 could promise the workers once they came.
15     Q.   Now, the e-mail that you didn't read, the
16 one that Michael Pol sent you --
17     A.   Yes.
18     Q.   -- there's green card chatter in there,
19 right?
20     A.   Okay.  So had you seen that, wouldn't that
21 have like raised an alarm bell?
22     MR. ALEXIS:
23         Object to form.
24     A.   Definitely.  Yes.  Yes, it would have,
25 because even in a -- even in Malvern's e-mail, which

Page 111

1  is more nuanced, less explicit, I said, "No.  We're
2  going to say exactly what the issue is.  We're going
3  to be transparent and forthright."
4  EXAMINATION BY MR. SANDLER:
5      Q.   We'll get to that --
6      A.   Okay.
7      Q.   -- and we're going to talk about those
8  e-mails.
9      A.   Okay.  Then I maybe -- could you --
10     Q.   No.  I think that that -- I just wanted to
11 ask you that had you seen the Michael Pol --
12     A.   Oh.  That would have been a huge problem.
13 Absolutely.
14     Q.   Okay.
15     A.   Absolutely.
16     MR. ALEXIS:
17         I'm sorry.  Had he seen what?
18     MR. SANDLER:
19         Can we go off the record for a second?
20     THE VIDEOGRAPHER:
21         We're going off the record.  It's 2:09.
22         (Whereupon, there was a discussion off the
23 record.)
24     THE VIDEOGRAPHER:
25         We're back on the record.  It's 2:10.

Page 112

1  EXAMINATION BY MR. SANDLER:
2      Q.   Okay.  So I'm going to show you a document
3  that's already been entered into evidence in a
4  previous deposition.  It's Exhibit 513.  And the Bates
5  for it is GR-1701 to GR-1703.  I know that doesn't
6  mean anything until you see the document.
7          We're going to call this -- Well, it's
8  already been entered, so I'm not going to give it an
9  exhibit number.  I'll let you read it.
10     MS. HANGARTNER:
11         What was the prior exhibit number?
12     MR. SANDLER:
13         Right.  That was 513.
14 EXAMINATION BY MR. SANDLER:
15     Q.   And, also, John, I'd like to say for the
16 record that this predates you starting at Signal.  So
17 you're not like on these e-mails.  You're not
18 implicated by these e-mails.  But let's read.
19     A.   (Witness reviews document.)
20         Okay.  I've read the document.
21     Q.   Just by way of background, when it's a "GR"
22 at the bottom, that's a document produced to us by the
23 Global defendants.  And so this wasn't something we
24 got from Signal's --
25         Okay.  Now, I want to ask you about the

---

**Page 113**

1  middle e-mail which starts on GR-1701. And the last
2  paragraph that Michael writes to Bill Bingle --
3      A.  Uh-huh (indicating affirmatively).
4      Q.  -- I'll read it to you.
5      A.  Uh-huh (indicating affirmatively).
6      Q.  "Overall, I'm very satisfied about the
7  quality of the candidates. And now that we know
8  exactly what you want, I do not feel there will be any
9  problems getting the numbers that you need,
10 particularly for the long-term green card candidates."
11         So some of -- What would you interpret that
12 paragraph to mean?
13     A.  That, from what Michael Pol is saying, some
14 of the candidates pertain to long-term green card. I
15 mean, that's what he's saying.
16     Q.  Now, does Mr. Bingle reply that that's not
17 what they have in mind?
18     A.  He's -- As I read this, he's silent in
19 response to that issue.
20     Q.  But he did reply to the e-mail?
21     A.  Yes, but he didn't address --
22     Q.  But not that particular --
23     A.  I mean, this is the first time I'm reading
24 this.
25     Q.  Yeah. I know.

---

**Page 114**

1      A.  But he didn't address or respond to the
2  green card issue that Michael raised.
3      Q.  Okay. Did you know that in June 2006 --
4  did anyone at Signal ever tell you -- because this is,
5  again, before you started --
6      A.  Uh-huh (indicating affirmatively).
7      Q.  -- that Mr. Bingle signed documents for the
8  U.S. government indicating that the need for workers
9  was ten months?
10     A.  I didn't know that -- well, I don't
11 remember that he had signed, although maybe things
12 came across my desk afterwards. I'm not sure.
13     Q.  Right. You weren't even at Signal at this
14 time. This is June 2006. I'm just asking you if
15 anyone at Signal ever told you: We've signed
16 documents to the U.S. government saying that we only
17 want workers for ten months?
18     A.  I don't remember.
19     Q.  Okay. Is that something that you think you
20 might remember?
21     A.  I don't -- I mean, I don't remember.
22     Q.  I'd like to revert back to -- We may come
23 back to this e-mail, but I want to talk about the
24 e-mail preceding it, which is Exhibit, I think, 608.
25 It's Dewan 00457 to 459.

---

**Page 115**

1      A.  Okay.
2      Q.  Now, Mr. Burnett writes an e-mail to you
3  that cc's Michael Pol and Sachin Dewan on the front
4  page. And that's the September 15th, 2006 e-mail,
5  12:02 p.m.
6         Do you see that one?
7      A.  Yes.
8      Q.  Okay.
9      A.  Yes.
10     Q.  What -- I mean, you replied to it, so you
11 know you've seen it and you just reread it. So what
12 is this e-mail saying? What is Mr. Burnett saying
13 here or what was your understanding of what he was
14 saying?
15     A.  He was responding to my statement to
16 Mr. Waldman in Senator Lott's office that we would
17 need -- we anticipated the need for temporary workers
18 to last another two to three years. And he was
19 saying, "Don't say that. Keep it at ten months."
20     Q.  Okay. Then you write back -- and I'm just
21 going to paraphrase it -- but you're not comfortable
22 with that?
23     MR. ALEXIS:
24         Object to form.
25     A.  No.

---

**Page 116**

1  EXAMINATION BY MR. SANDLER:
2      Q.  Okay. Why don't you tell me what you're
3  writing back, what your intention is with that e-mail
4  that you reply to Mr. Burnett in.
5      A.  Okay. I deferred to him as the expert in
6  the nuances of the H-2B process because that's his
7  profession. It's not mine.
8      Q.  Right.
9      A.  So I'm deferring to his knowledge and
10 seeking to follow his guidance, but, at the same time,
11 I'm not going to say something that is -- that I
12 perceive not to be exactly and explicitly true. And
13 so I did not feel comfortable with changing what
14 ultimately Ron Schnoor and Dick Marler had told me
15 about two to three years. I was not going to change
16 that even at our recruiter -- at the suggestion of our
17 recruiter and -- or, more specifically, the
18 immigration attorney that he had put Signal in touch
19 with.
20        And so I tried to be pretty clear in polite
21 terms --
22     Q.  Yes.
23     A.  -- that it's more than ten months and it's
24 pretty obvious and we're going to say it.
25        And, if I could add, that we'll let the

---

## Page 117

1  chips fall where they may, but we're going to be
2  truthful with stating the -- our view of the expected
3  need.
4      Q.   And when you wrote that, you didn't know
5  about maybe other documents that Signal had signed
6  before you started because -- you didn't know about
7  those documents?
8      A.   No.  I didn't -- I didn't really know all
9  of the many details before.
10     Q.   Because before when I asked, you said you
11  couldn't remember if you knew that Mr. Bingle had
12  signed documents that went to the federal government
13  that stated only ten months was the need for the
14  workers.
15          Do you think that -- and now -- and I
16  realize you can't give me a definitive answer.  Do you
17  think that if you knew about that document, you would
18  have not -- you would have written this reply back to
19  Malvern?
20     MR. ALEXIS:
21          I object to form.
22     A.   I mean, all I can -- all I can say is that
23  I knew what Signal's need was as Dick Marler and Ron
24  Schnoor conveyed it and I followed those instructions.
25  And where I -- where Malvern said ten months, I

## Page 118

1  said -- I said that.  And so that's where -- that's
2  where this paragraph comes from.
3  EXAMINATION BY MR. SANDLER:
4      Q.   Okay.  And now Mr. Burnett replies to it at
5  the top, "John:  It is important that the embassy/
6  consular staff not be advised that the work will
7  extend beyond 10 months regardless of how long Signal
8  may believe the temporary need will exist.  Malvern."
9          What did you make of that reply?
10     A.   I didn't know -- I didn't know what to
11  think.  Because I'm not the expert.  I don't know how
12  things are done, but it raised a question in my mind.
13  And so when he told me that, I think it was even in
14  the weekly report that I noted that.
15     Q.   Right.
16     A.   And yet I didn't respond to him.  At least
17  I don't remember responding to him.  But, ultimately,
18  this was --
19     Q.   There was an alarm going off in your head,
20  right, there's something up or --
21     MR. ALEXIS:
22          Object to form.
23     A.   Not -- I don't want to say that.  All I
24  knew was that we've got a need of two to
25  three months -- sorry -- two to three years.  Let me

## Page 119

1  make that correction, two to three years.  And I'm
2  going to follow the instructions that I have from
3  Signal management in that regard letting that trump
4  even our immigration attorneys in terms of what I
5  convey.
6  EXAMINATION BY MR. SANDLER:
7      Q.   Well, is it Signal's instructions that
8  trump it or is it the truth that trumps it?
9      MR. ALEXIS:
10          Object to form.
11     A.   Well, it's -- the two are synonymous.
12  EXAMINATION BY MR. SANDLER:
13     Q.   In this instance?
14     A.   Well, we always seek to make them
15  synonymous as far as --
16     Q.   As far as you knew?
17     A.   We tell the truth.
18     Q.   As far as you knew.
19     A.   Signal tells the truth.  And I tell the
20  truth.
21     Q.   Okay.  You said you put it in the weekly
22  report.  You said you put it in the weekly report.
23  Did you raise it with anyone else specifically or --
24     A.   I think that that was the forum that I
25  used.  I don't remember another posing of it.

## Page 120

1  Because, again, I've got lots of things going on, and
2  I'm trying to cover all of the bases.
3      Q.   All right.
4          Do you think -- What did -- I think we
5  already got this.  I just want to confirm.  Malvern's
6  instructions to you in that e-mail on September 15th
7  at 12:34 p.m. were to state a falsehood; is that
8  right?
9      MR. ALEXIS:
10          Object to form.
11  EXAMINATION BY MR. SANDLER:
12     Q.   Sorry.  Sorry.  That's not the e-mail I
13  meant.  I just said the e-mail that you wrote.  I
14  meant the first and third e-mails.
15     MR. ALEXIS:
16          Same objection.
17     A.   I'm only going to comment on what I wrote.
18  And that was simply that my understanding -- Signal
19  had conveyed to me that we had a need of two to three
20  years.  And so I would imagine that that had -- the
21  reality of things on the Gulf Coast it seemed, well,
22  maybe what we thought was ten months is really going
23  to be, you know -- with regard to Bill Bingle and
24  those other things that I don't know much about, ten
25  months might have been the view at that point, but

## Page 125

MR. SANDLER:

I'm asking him now as he reads this e-mail, but he knows the date it was written. Because he didn't read it back then, so...

MR. SHAPIRO:

I join in the objection.

EXAMINATION BY MR. SANDLER:

Q. Why do you think Mr. Pol would be worried about them saying that?

A. Well, he explains it in the next parentheses where it says, "The reason --" he's explicit. "The reason is that the temporary worker -- if the temporary worker has immigrant intent, he is denied entry."

Q. But why would it even be in the head of the Indian worker to say that, do you think?

MS. FENTON:

Objection.

A. I wasn't -- I wasn't there in the interviews with the Indians or in the coaching process.

EXAMINATION BY MR. SANDLER:

Q. When did you learn that the Indian workers thought they were going to get green cards?

MR. ALEXIS:

## Page 126

Object to the form.

EXAMINATION BY MR. SANDLER:

Q. Okay. Did you ever learn that the Indian workers thought they were going to get green cards?

MR. SHAPIRO:

A little louder, please.

MR. SANDLER:

Sorry.

EXAMINATION BY MR. SANDLER:

Q. Did you ever learn that the Indian workers thought they were going to get green cards?

A. Yes.

Q. Okay. When was that?

A. Okay. You're talking about the Indian workers that I saw at Signal when, and the answer to that is that when they arrived to Signal in different waves, as we called them, one of the questions which they posed was when are we going to get the green cards.

Q. So the first wave was in the third week -- when was the first wave?

A. Approximately October, late October 2006.

Q. Okay. So that's when you learned for the first time that the Indian workers had an expectation of green card status?

## Page 127

A. No.

Q. Oh. Okay. Sorry. Then I misunderstood. Do you have like an approximate time frame?

A. Yes. I was in India when the first wave and possibly wave two came.

Q. Okay. Right.

A. So when I returned, that's when I heard the question from the Indian workers about when will we get green cards.

Q. Did that surprise you?

A. No. Because Michael Pol had mentioned green cards to me over a lunch in Ocean Springs with Malvern Burnett. So I --

Q. When was that lunch?

A. That was like maybe October, earlier October time frame. I think. I'm not sure of the exact time frame.

Q. So when Mr. Pol said it, did it surprise you?

A. That was the first mention that I had known about green cards.

Q. Were you surprised?

A. Well, he -- Yes, I was surprised. Because I hadn't heard any discussion about green cards.

Q. Right. So is there any other way to

## Page 128

characterize it? Is there a better way to characterize your reaction?

A. Well, I mean, he was posing to me things that I didn't understand.

Q. So how would you characterize your reaction?

A. Confused.

Q. Confused. Okay.

A. Surprised.

Q. So you're confused, you're surprised. Does this make its way into your journal, your diary?

A. I don't remember.

Q. How often were the Indian workers asking you about green card?

A. Frequently.

Q. Okay. So how did Mr. Pol pitch it to you in October? What did he say?

A. It was over lunch, a lunch between Michael Pol, Malvern Burnett and me in Ocean Springs. And the context was there's somebody else that we're working with and would it be okay if Signal relinquishes -- I don't know if he used that term.

Q. Yeah. I'm following.

A. That's the context. Would Signal be willing to relinquish its ability to sponsor the

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

Page 129

1   workers it's bringing over for green cards when it
2   comes time for green cards. And I didn't understand
3   that, but it didn't seem logical to me that we would
4   spend all of this effort only to -- training the
5   workers and all of that, only to give them over to
6   somebody else when -- when something could be -- when
7   we might be able to -- why would we give them away?
8   It just didn't strike me as a proper question.
9      Q.   But Mr. Pol framed it in the sense that
10  these are the green card workers that you -- that he
11  wanted you to relinquish?
12     A.   No. No, no, no. The H-2B workers, when it
13  comes time for their green card application, will
14  Signal relinquish an ability to sponsor them so that
15  another company I'm working with can take them on a
16  green card basis after you've had them for an H-2B
17  process. And that just didn't -- that confused me and
18  so I didn't know what to make of it.
19     Q.   So from that conversation you didn't
20  think -- did you think -- what did you think about
21  Signal and green cards?
22     A.   I thought -- well, again, that was the
23  first I'd heard of it, but my natural thought, being
24  brand-new to the whole process --
25     Q.   Absolutely.

Page 130

1      A.      -- was that we would bring the workers in
2   on a ten-month H-2B visa. That was all we could count
3   on for sure at Signal. It was also all that we could
4   tell the workers that they were here for, was what the
5   government had approved. Because it wasn't in our
6   hands. We could solicit or request the government.
7   It was they who approved.
8          But we would also request an extension to
9   the H-2B. And then at the conclusion of that, if that
10  was granted, then another one. And so then when the
11  H-2B extension processes were exhausted, then we would
12  just say: Okay. Well, now we'd like to apply for a
13  green card for the workers which -- where there was a
14  match between Signal's needs and the workers
15  themselves.
16     Q.   How does that square with the two- to
17  three-year need?
18     A.   Well, if we got -- if we got two
19  extensions, plus the original ten months, that would
20  be 30 months, two and a half years.
21     Q.   And then you would put them up for green
22  cards?
23     A.   Where it made -- where there was a mutual
24  fit between Signal and the worker, we would then
25  sponsor them for a green card.

Page 131

1      Q.   So your understanding, then, and correct me
2   if I'm wrong, is some of these workers would -- Signal
3   would apply for green cards at the end of the H-2B
4   stream?
5      A.   Yes.
6      Q.   Is that what Mr. Burnett explained to you?
7      A.   No. Michael was the one who posed the
8   question. And it -- as I said, it confused me because
9   it was new information. And it didn't make sense that
10  we would -- if we had an ability to keep a worker, why
11  would we just let them go to some other company that
12  hadn't had any involvement with them and hadn't built
13  a rapport with them and -- and a relationship. So the
14  question struck me as odd.
15     Q.   The question was odd. It was posed to you
16  by Mr. Pol. But at that point you knew that some of
17  these workers would get green cards and some would
18  not?
19     A.   No, I didn't know any of that. But -- I
20  mean, I knew that we would hopefully apply for
21  extensions to the H-2B, which with extension one and
22  extension two, that would be 30 months. Ten months
23  for the original, plus two more ten months is 30. Two
24  to three years. And so -- Then I'm hearing the term
25  "green card." Well, why would we -- I don't know all

Page 132

1   the implications, but why would we just give somebody
2   up?
3      Q.   What did you reply to Mr. Pol when he said
4   this? I realize you're confused. What was your
5   reply?
6      A.   I demurred. I said that I wasn't -- I
7   wasn't sure that this was -- I think I said that this
8   was the first I was hearing of it.
9      Q.   Is it fair to say that, although you were
10  the point man for Mr. Pol, there was other
11  communications that were going on between Signal and
12  Mr. Pol and Mr. Burnett that you didn't know the
13  content of but you knew were going on?
14     A.   No. I thought -- I mean, my understanding
15  was that I was the individual within Signal who was
16  communicating with them on the issues pertaining to
17  immigration of workers for the H-2B process. I was --
18  I was the contact person. And I wasn't aware of other
19  people talking with him outside of me.
20     Q.   You're the contact person to whom
21  specifically?
22     A.   Michael Pol, Malvern Burnett, Sachin Dewan.
23     Q.   Okay. So if Mr. Bingle were to testify in
24  his deposition that Signal had intended green card
25  candidates from the outset to give green cards, that

Page 137

1  that you may have to send some workers back if they're
2  not flux-core competent; is that right?
3      A.   That we might not be able to train all of
4  the high numbers that might be coming and therefore
5  need to send them back.
6      Q.   And what did you think -- what did you
7  think the consequences were of having to send them
8  back or what did you express in your entry here?  This
9  is a journal entry from October 21st, 2006.  What did
10  you -- What was going on?  What conclusions were you
11  drawing by that possibility?
12      A.   That they had come to Signal expecting to
13  be put to work.  If they were then sent back, that
14  would make them very upset.
15      Q.   It would infuriate them, it would make them
16  upset, after having paid thousands of dollars to come?
17      A.   Yes.
18      Q.   And I realize that in the next month
19  there's issues as to fees.  I'm not going to ask you
20  how much those thousands were, but the other concern
21  would be that your man camp wouldn't be full, which
22  would mean you've spent the money poorly.
23          So that was a concern as well that was
24  contemplated by sending Indians back, right?
25      A.   I guess what I'm saying here is that we

Page 138

1  were concerned about the workers having paid money and
2  it not working out for them.  That's the concern I'm
3  expressing here.
4      Q.   What money would have been spent poorly?
5      A.   Could you --
6      Q.   Sorry.  The second to last sentence.  Just
7  read the whole sentence if you want and then --
8      A.   Okay.  Okay.  Okay.  Yes.  I see.
9          Yeah.  We -- We wanted to have our workers'
10  housing facility have as many workers as it -- as it
11  could comfortably allow.
12      Q.   But my question, Mr. Sanders, is what is
13  the money about?
14      A.   Well, we didn't want to set up a workers'
15  housing facility and not have the Indians be able to
16  stay there.
17      Q.   Right.  Because you owed -- you were paying
18  millions to General -- GE Mod Space, right?
19      A.   Well, there were other options that we
20  could have done with the camp, but we built it for the
21  Indian workers and we wanted it to work out for them.
22      Q.   More to the point, at this stage, third
23  week of October, you thought that getting
24  properly-training workers was the key for the success
25  of the H-2B project?  The last sentence.

Page 139

1      A.   Yes.  Yes.  That's what I felt at that
2  point.
3      Q.   Okay.  I just want to summarize, then.
4  Even before you learned about the high fees that the
5  Indians had to pay, you thought it would be a disaster
6  for them to return home?  Well, you thought they'd be
7  angry if they had to return home?
8      A.   I just put myself in their shoes and I know
9  I would have been.
10      Q.   Okay.  That sounds good enough.
11          So knowing that, it would be -- what would
12  be important for the Indians to know before they came
13  over, do you think?  Just like tell me the main -- I'm
14  not saying -- not saying this will be all, but tell me
15  the main things that you think would be important for
16  the Indian workers to know before they got to America.
17      MS. HANGARTNER:
18          Object to form.  I mean, about Signal,
19      about America, about --
20      MR. SANDLER:
21          About their investment.
22      MR. ALEXIS:
23          About their what?
24      MR. SANDLER:
25          About their investment, their investment in

Page 140

1  the H-2B visa.
2      MR. ALEXIS:
3          I object to form also.
4      MR. SANDLER:
5          Let me rephrase.
6  EXAMINATION BY MR. SANDLER:
7      Q.   The workers -- as you indicate in your
8  entry, the workers had spent some amount of money or
9  were in the process of spending some amount of money
10  to come to America to work for Signal, right?
11      A.   Yes.
12      Q.   So they had some expectations about what
13  they were going to get when they got here.  You know,
14  what those were is not what I'm asking, but obviously
15  they had some.  And I'm wondering, given your position
16  at Signal, what did you -- what information would they
17  need to know to make a wise investment or not in the
18  process?
19      MR. ALEXIS:
20          Object to form.
21      A.   They would need to know how long they would
22  be staying for.
23  EXAMINATION BY MR. SANDLER:
24      Q.   And that decision is made by whom?
25      A.   Ultimately, the U.S. government.

Page 177

1  regard to the catering and all that.
2      Q.  Sure.
3      A.  He was very emphatic on that point.
4      Q.  You also had an e-mail -- well, you had a
5  correspondence with Mr. Burnett that we spoke about
6  earlier today where you were given instructions about
7  how to draft a letter to Mr. Waldman?
8      MR. ALEXIS:
9          Object to form.
10     A.  Where he said not to say more than ten
11 months.  Is that the one you're referring to?
12 EXAMINATION BY MR. SANDLER:
13     Q.  Yeah.  He said not to say more than ten
14 months which had raised some suspicions in your mind;
15 is that right?
16     A.  Just -- just -- I wouldn't necessarily call
17 them suspicions.  A lack of understanding.  And in the
18 absence of understanding all the details, I'm going to
19 do what I always do, which is simply tell the truth as
20 I understand it.
21     Q.  But the instruction was to not do that?
22     MR. ALEXIS:
23         Object to form.
24 EXAMINATION BY MR. SANDLER:
25     Q.  How did you understand the instruction to

Page 178

1  tell ten months to Mitch Waldman?
2      MR. ALEXIS:
3          Object to form.
4      A.  I wasn't comfortable with it, so I didn't
5  do it.  That's -- That's all I can say.
6  EXAMINATION BY MR. SANDLER:
7      Q.  Why were you not comfortable with it?
8      A.  Because I didn't believe it to be the whole
9  truth.
10     Q.  Okay.
11         What was -- Sorry.  When do you get back to
12 Signal from India?
13     A.  I think it's approximately November 8th,
14 thereabouts.
15     Q.  And by approximately when do you first
16 start to hear worker complaints?
17     A.  Maybe a little bit more than a week later.
18 About a week later.  Essentially after the first two
19 waves, if you will, one that arrived approximately
20 October 31st and then maybe November 7th, roughly,
21 when they would have gotten their paychecks, which
22 would put it mid-November.  That's when I began to
23 hear complaints from the workers and wanting to -- my
24 whole goal was to show them that I really did care
25 about them, so I went out and tried to understand the

Page 179

1  situation.  And that's -- that's when I found out new
2  information.
3      Q.  What was that new information?
4      A.  That the Indian workers had, in fact, paid
5  far more than 2 to $3,000 in order to come to the
6  United States.
7      Q.  Which is what you had suspected?
8      A.  But not shared with anybody.
9      Q.  Okay.  But not shared with anyone.
10     A.  In the sense of no one at Signal knew that
11 I was thinking that because I didn't have anything to
12 go on.
13     Q.  Were they thinking it?
14     A.  You would have to ask them.
15     Q.  Well, you're right, but what I'm
16 interpreting, and I just want to clarify, nobody at
17 Signal ever expressed doubts to you about this fee?
18     A.  No.  No.  I don't remember anyone
19 expressing any -- any doubts about that.  It was -- it
20 was -- the doubts came from inside of me.
21     Q.  Right.  What was your title again at
22 Signal?
23     A.  It was special projects manager or
24 something along those lines.
25     Q.  Okay.  It is at this point that you learn

Page 180

1  of the high fees that the Indians had paid?
2      MR. ALEXIS:
3          Object to form.
4  EXAMINATION BY MR. SANDLER:
5      Q.  It is at this point that you learn of the
6  fees that the Indians claim to have paid?
7      MR. ALEXIS:
8          Object to form.
9      A.  Yes.  In mid-November.
10 EXAMINATION BY MR. SANDLER:
11     Q.  In mid-November.
12         But what were their complaints to you about
13 that?  And if that's not clear -- There was another
14 fee that the workers had to pay once they arrived at
15 Signal, right?
16     A.  They didn't pay any -- well, to whom, I
17 guess, are you referring?
18     Q.  I would -- I'm asking about a fee that
19 might have incorporated housing and food, a per diem.
20     A.  Yes.
21     Q.  Okay.  How much was that fee?
22     A.  Thirty-five dollars per day.
23     Q.  Which is about a thousand fifty a month?
24 Is that fair to say?
25     A.  If charged for seven days a week, yes.

Page 181

1   Q.   Were they being charged for seven days a
2   week in November?
3   A.   Yes.
4   Q.   What portion of that $35 a day was for
5   housing the man camp?
6   A.   Right.  Well, $14 -- Well, okay.  $14 a day
7   was the agreement with Global Resources, but it was a
8   graduated scale based on the actual number of workers
9   in the camp.
10      In other words, when the number of workers
11  in the camp reached 290, it would be $14 a day.  If
12  there were fewer workers, the fee -- the catering
13  aspect, if you will, would have been higher because
14  there's a lower number of workers and yet there is
15  still the same amount of staff for the catering that
16  needed to be paid and so on and so forth.
17      So it was a graduated scale.  Signal
18  charged $35 a day, though, regardless of how many
19  workers were there.  We didn't graduate our fees up
20  from 35.
21  Q.   So some of it -- so approximately 14 was
22  going to --
23  A.   Catering.
24  Q.   -- catering and approximately 21 to the man
25  camp.  Does that make sense?

Page 182

1   A.   That's a good generalization, when the camp
2   was full especially.
3   Q.   And so what were the Indians saying about
4   this fee?
5   A.   They wanted to know what -- what it -- what
6   it consisted of as far as the elements of it, and they
7   wanted to know if it could be less.
8   Q.   And what was Signal's response to whether
9   it could be less?
10  A.   We explained to them all of the many, many
11  things that $35 a day encompassed so that they would
12  understand why we were charging them what we were.
13  Q.   So the answer -- Did Signal reduce the fee?
14  A.   Yes.
15  Q.   In November 2006?
16  A.   At that point, no.  We didn't reduce it
17  until later.
18  Q.   But not until March of 2007?  Would that
19  sound about right?
20  A.   I don't remember the exact time frame,
21  but --
22  Q.   Would you generally say that was
23  probably -- that my guesstimate is probably about
24  right?
25  A.   I don't know exactly when it -- when it

Page 183

1   happened, but we certainly wanted -- Okay.
2   Q.   All right, John.  When did you finish at
3   the man camp?  Because I remember -- You finished at
4   the man camp at some time, right?
5   A.   Yes.
6   Q.   Okay.  When was that?
7   A.   April.  In Mississippi, April 2007.
8   Q.   And by then had the fee been dropped?
9   A.   I believe it had been.
10  Q.   Was that a recent occurrence or had it been
11  dropped for a long time?
12  A.   I would say probably more recent than long
13  time, but I don't know the exact date that it -- that
14  Signal said:  Okay.  Not all of the workers are able
15  to work for more than 40 hour -- or more than four
16  days a week and so forth.  Because those things were
17  factored in.  We wanted to show them that we cared
18  about them by reducing that fee where we could.  So...
19  Q.   Can you just characterize the complaints
20  that you were getting now back from middle of November
21  of '06?  You learn about the fees they had paid in
22  India.  They're talking to you about the $35 fee.  So
23  what -- I mean, what are they saying like fiscally,
24  economically?
25  A.   They were concerned that their net

Page 184

1   take-home pay after taxes and after the boarding
2   deduction was not -- even at the approximately $18 an
3   hour that we were paying them, very fair wage, that
4   even with that, they were not able to see the same net
5   pay that they had expected to receive in order to
6   amortize their -- their debt that they had incurred to
7   get here.  That was their concern expressed to me.
8   Q.   What was Signal's reaction when they -- I
9   mean -- You learned of this and then did you tell
10  anyone at Signal about --
11  A.   Yes.  Yes.
12  Q.   Who did you tell?
13  A.   I told Ron Schnoor, Lisa Spears and Bill
14  Bingle right away, you know.
15  Q.   What was Mr. Schnoor's reaction?
16  A.   He was very surprised to hear that news and
17  said that he wanted to have Michael Pol come in
18  immediately and provide -- Just answer our questions.
19  This is what we're hearing.  It's completely different
20  from what you've told us.  Why the difference?
21  Explain yourself.
22  Q.   Prior to this, did Signal -- did you hear
23  from management at Signal any discussion of the fees
24  that the H-2B workers had paid?
25  A.   Again, just the --

Page 229

1   and ask you a question.  "In one sense this issue is
2   between Michael Pol and the workers."  And "this
3   issue" I'm going to assume is the fee that was like --
4       A.   Yes.  Yes.
5       Q.   "Each Indian knows the game up-front and
6   has a decision to make."  What's "the game"?
7       A.   That was a euphemism that I used to express
8   that that agreement between Michael Pol, Malvern
9   Burnett, Sachin Dewan and each Indian worker, that was
10  something that they had worked out without Signal
11  knowing anything about it and that the Indian workers
12  knew that they would have to pay that money and chose
13  to and that was a decision that they made that
14  Signal had no -- no knowledge of as far as the amount,
15  nor was it party to.
16      So that's -- that's what I'm saying is just
17  there was a set of parameters that both the Indian
18  workers -- that the Indian workers were told and that
19  they then agreed to pay.  That's what I mean by that
20  euphemism.
21      Q.   Did anyone at Signal ever tell you that
22  there was a power of attorney agreement between Signal
23  and any of those three people?
24      MR. SHAPIRO:
25          Object to form.

Page 230

1       A.   I think I remember something with Dewan
2   that may have been that, but I don't remember the
3   exact term for it, as far as was it power of attorney,
4   was it something else.  So I don't remember.
5   EXAMINATION BY MR. SANDLER:
6       Q.   Okay.  So they told you only maybe about
7   Sachin Dewan, that there is something that might be a
8   power of attorney or some other -- What was the --
9   like what was the core of that thing, even if you
10  don't remember the name for it?
11      A.   I'm not -- I'm not -- I'm not sure.  I'm
12  just trying to tell you that there may have been
13  something, but I don't know the particulars of it,
14  can't remember the particulars of it.
15      Q.   And what did that something pertain to?
16      A.   I don't recall.
17      Q.   Why in the fourth sentence -- and I'll read
18  it.  You're talking still about the fee and you
19  thought that Signal thought it was about $3,000.  You
20  say, "This sounded like a reasonable fee, I'm sure."
21      A.   Yes.
22      Q.   Is that what you thought on the 17th?
23      A.   That $3,000 was reasonable?
24      Q.   Uh-huh (indicating affirmatively).
25      A.   Yes.

Page 231

1       Q.   For what did you think the workers were
2   buying?  What did you think they were buying for
3   $3,000 that you thought was reasonable?
4       A.   The plane ticket, the one-way plane ticket
5   to the United States, the processing fees --
6   processing fee for the H-2B visa, plus reasonable and
7   modest commission to Signal's recruiters whom they
8   were interacting with.
9       Q.   And what was the period of time that they
10  were buying in the U.S.?
11      A.   Ten months.
12      Q.   Right.  Okay.
13      I just want to be clear.  Contracting with
14  the recruiters, Sachin Dewan, Mr. Burnett, that's not
15  really part of your job, right?
16      MR. SHAPIRO:
17          Object to form.
18      A.   Correct.
19  EXAMINATION BY MR. SANDLER:
20      Q.   Your job is communication, point person?
21      A.   Yes.
22      Q.   What did you think -- Why did you think it
23  was important that the Indians received a refund?
24      MR. ALEXIS:
25          I'm sorry.  I couldn't hear the end of that

Page 232

1   question.
2   EXAMINATION BY MR. SANDLER:
3       Q.   Why do you think it was important that the
4   Indians received a refund?
5       MR. SHAPIRO:
6           Object to form.
7   EXAMINATION BY MR. SANDLER:
8       Q.   Let me -- Did you think it was important
9   that the Indians received a refund?
10      MR. SHAPIRO:
11          Object to form.
12      A.   Yes.
13  EXAMINATION BY MR. SANDLER:
14      Q.   Okay.  Why?
15      A.   Because that was way too much money to pay,
16  and we didn't want the workers to be so heavily
17  indebted.  We wanted this to be a win/win for the
18  Indian workers and Signal.
19      Q.   Okay.  Did the fees that they paid to
20  Michael Pol directly -- in your opinion, did the fees
21  they paid to Michael Pol directly impact their ability
22  to pay the $35 a day fee that Signal was going to
23  begin charging them?
24      MS. HANGARTNER:
25          Object to form.

Page 233

1    MR. SANDLER:
2        Okay.
3    MS. HANGARTNER:
4        I mean, it's almost impossible to answer.
5    I mean --
6    EXAMINATION BY MR. SANDLER:
7    Q.   Well, let's read the first paragraph of the
8    e-mail. Okay? I'm just going to read it into the
9    record.
10       "Lisa, I was at the man camp yesterday
11   evening and got to meet the workers. They complain
12   about the $35/day boarding charge. After this is
13   deducted they say it's not worth their while
14   economically to be here. Apparently that's because
15   they paid Global Resources a great deal of money to
16   get here, incurring a third-party debt in the process.
17   The North Indians I spoke with last night told me they
18   paid $12,000 to get here. This morning an approved
19   worker from Chennai called me to say he's being asked
20   to pay 15,000 and can he come through Signal directly
21   to avoid the high recruiting fee (no)?"
22       I mean, in this paragraph, how are the --
23   What is the connection between the $35 a day boarding
24   charge and Michael Pol's fee? Well, not Michael Pol's
25   fee. The fee that the workers paid.

Page 234

1    A.   The fee that they actually paid instead of
2    what we had been told they paid.
3    Q.   The fees that they at that time were
4    telling you that they paid? I think we're talking
5    about the --
6    A.   12 to $15,000 instead of 3,000 or so.
7    Q.   What is the connection between that fee and
8    the $35 a day fee?
9    A.   It's this: That they had to make payments
10   on the 12 to $15,000 of debt. And with their net pay,
11   having the 200 and maybe $45 a week, 35 times 7, taken
12   out, that reduced their net pay thereby impeding their
13   ability to make progress on the debt at the rate they
14   hoped.
15   Q.   Did you think the $35 a day fee was
16   important for Signal?
17   A.   Could you define what you mean by
18   "important"?
19   Q.   All right. Let's do it the other way.
20       How much money -- and I realize, you know,
21   you may not know to the exact dollar, but how much
22   money had Signal paid for the GE Mod company to build
23   the man camp?
24   A.   Probably over a million dollars.
25   Q.   Okay.

Page 235

1    A.   And that was just for the -- for the
2    buildings.
3    Q.   How much in total do you think they paid?
4        I'm not quizzing you. And if you don't
5    remember, it's fine. You're not required to remember.
6    A.   I understand. And I mean, those questions
7    should be deferred -- I would defer those questions to
8    our chief financial officer, Chris Cunningham, but the
9    amount was -- was very significant.
10   Q.   Okay.
11   A.   Into the millions of dollars --
12   Q.   Okay.
13   A.   -- is my understanding.
14   Q.   Right. And this $35 a day -- well, let's
15   just call it a thousand fifty a month. Because in
16   November and December it was that.
17   A.   Okay.
18   Q.   -- per worker, some of that was going to be
19   used to pay Signal back for the man camp. And I can
20   even be more specific. Earlier on today we agreed
21   that that was about $21 that was going to like living
22   and about 14 --
23   A.   Yes.
24   Q.   So let's just do $21 a day per worker
25   times, say, 30 days in the month. That's like $630

Page 236

1    per worker that Signal was getting. That money was
2    important -- well, was that money designed to go back
3    to the bill that had accrued from building the man
4    camp?
5    A.   Yes, but also to cover the operating
6    expenses involved with the camp.
7    Q.   So there was a capital expenditure and --
8    A.   And operating expense.
9    Q.   -- and a variable cost?
10   A.   Yes.
11   Q.   Okay. I want to ask you about the Chennai
12   worker who called you. It's in that e-mail to Lisa.
13   A.   Yes.
14   Q.   You have in parens "no." What does that
15   mean?
16   A.   That he can't come directly to Signal. He
17   had to go through our recruiters.
18   Q.   And this was November 17th. That was
19   Michael Pol?
20   A.   Yes.
21   Q.   Okay. And you told him that on the phone?
22   A.   I told him that he can't come to Signal
23   directly.
24   Q.   Yeah. On the phone?
25   A.   Yes. I mean, I'm almost certain that it



Page 237

1   was a phone call because I would get them from time to
2   time.  And I'm pretty sure this would have been one.
3       Q.   All right.  How many other workers asked
4   you to come to Signal directly?
5           Let me rephrase.
6           Did other workers ask you to come to Signal
7   directly?
8       A.   Not -- not many, but probably more than
9   just this one.
10      Q.   Okay.
11      A.   I'd get a few phone calls.  Not many.
12      Q.   And your answer was consistent?
13      A.   Yes.
14      Q.   Okay.
15      A.   Yes.
16      Q.   All right.
17          Why -- Well, if we want to wrap for today,
18   then we can do that.
19      A.   Okay.
20   MR. SANDLER:
21          Can we go off the record?
22   THE VIDEOGRAPHER:
23          We're going off the record.  This is
24   Videotape No. 7.  It's 6:27.
25          (Deposition was adjourned at 6:27 p.m.)

Page 238

1
2           WITNESS' CERTIFICATE
3
4
5
6       I, JOHN SANDERS, the undersigned, do hereby
7   certify that I have read the foregoing deposition and
8   it contains a true and correct transcript of the
9   testimony given by me:
10
11
12
13   ( ) Without corrections.
14   ( ) With corrections as reflected on
15       the errata sheet(s) prepared by me
16       and made a part hereof.
17
18
19
20
21
22   ---------------------------------
        WITNESS' SIGNATURE
23
24
25   ---------------------------------

Page 239

1
2           REPORTER'S CERTIFICATE
3
4
5       I, WENDY MAJORIA, Certified Court Reporter, in
6   and for the State of Louisiana, as the officer before
7   whom this testimony was taken, do hereby certify that
8   JOHN SANDERS, after having been duly sworn by me upon
9   authority of R.S. 37:2554, did testify as hereinabove
10  set forth in the foregoing 237 pages; that this
11  testimony was reported by me in the stenotype
12  reporting method, was prepared and transcribed by me
13  or under my personal direction and supervision, and is
14  a true and correct transcript to the best of my
15  ability and understanding; that I am not related to
16  counsel or to the parties hereto, nor am I otherwise
17  interested in the outcome of this matter.
18
19
20
21
        WENDY MAJORIA, CCR
22      Certified Court Reporter
        (No. 84106)
23      Huffman & Robinson, Inc.
        One Shell Square, Suite 250 Annex
24      New Orleans, Louisiana 70139
        (504) 525-1753   (800) 749-1753
25



**DESIGNATIONS & OBJECTIONS KEY**

| | |
|---|---|
| ▬▬▬ Plaintiffs' Affirmative Designations | ╌╌╌ Plaintiffs' Counter Designations |
| ▬▬▬ Signal Defs.' Affirmative Designations | ╌╌╌ Signal Defs.' Counter Designations |
| ▬▬▬ Dewan Defs.' Affirmative Designations | Dewan Defs.' Counter Designations |
| ▬▬▬ Burnett Defs.' Affirmative Designations | ╌╌╌ Burnett Defs.' Counter Designations |

P = Plaintiffs   S = Signal Defs.   D = Dewan Defs.   B = Burnett Defs.

---

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
 2
 3
    KURIAN DAVID, SONY      *  CIVIL ACTION
 4  VASUDEVAN SULEKHA,      *  NO. 08-1220
    PALANYANDI THANGAMANI,  *
 5  MARUGANANTHAM KANDHASAMY, *  SECTION: "A"
    HEMANT KIRUTTAN, ANDREWS *
 6  ISSAC PADA VEETTIYL, AND *  MAGISTRATE: 3
    DHANANJAYA KECHURA, ON   *
 7  BEHALF OF OTHER SIMILARLY *
    SITUATED INDIVIDUALS, AND *
 8  SABULAL VIJAYAN, KRISHAN *
    KUMAR, JACOB JOSEPH      *
 9  KADDAKKARAPPALLY, KULDEEP *
    SINGH, AND THANASEKAR    *
10  CHELLAPPAN, INDIVIDUALLY, *
    PLAINTIFFS               *
11                           *
12  VERSUS                   *
                             *
13  SIGNAL INTERNATIONAL, L.L.C., *
    MALVERN C. BURNETT,      *
14  GULF COAST IMMIGRATION LAW *
    CENTER, L.L.C., LAW OFFICES *
    OF MALVERN C. BURNETT,   *
15  A.P.C., INDO-AMERI SOFT, *
    L.L.C., KURELLA RAO, J & M *
16  ASSOCIATES, INC. OF      *
    MISSISSIPPI, GLOBAL,     *
17  RESOURCES, INC., MICHAEL POL, *
    SACHIN DEWAN, AND DEWAN  *
18  CONSULTANTS PVT. LTD (a/k/a *
    MEDTECH CONSULTANTS),    *
19  DEFENDANTS.              *
                            *
20  * * * * * * * * * *      *
21
22                VOLUME II
          Deposition of JOHN SANDERS, c/o Tracy
23  Binion, 601 Bayou Cassotte Parkway, Pascagoula,
    Mississippi 39581, taken in the offices of Middleberg,
24  Riddle & Gianna, 31st Floor, 201 St. Charles Avenue,
    New Orleans, Louisiana 70170, commencing at 9:44
25  o'clock a.m., on Friday, the 20th day of November,
```

**Page 2**

```
 1  APPEARANCES:
 2    DEWEY & LeBOEUF
        Attorneys at Law
 3      (By: Hugh Sandler, Esquire)
        Suite 2550
 4      1000 Main Street
        Houston, Texas  77002-5009
 5      (Attorneys for the Plaintiffs)
 6
      SOUTHERN POVERTY LAW CENTER
 7      Immigrant Justice Project
        (By: Naomi Tsu, Esquire)
 8      Suite 2150
        233 Peachtree Street
 9      Atlanta, Georgia  30303
        (Attorneys for the Plaintiffs)
10
11    MIDDLEBERG, RIDDLE & GIANNA
        Attorneys at Law
12      (By: Erin Casey Hangartner, Esquire
         Hal D. Ungar, Esquire)
13      31st Floor
        201 St. Charles Avenue
14      New Orleans, Louisiana  70170
        (Attorneys for Signal International,
15       L.L.C.)
16
      PORTEOUS, HAINKEL & JOHNSON
17      Attorneys at Law
        (By: Ralph R. Alexis, III, Esquire)
18      704 Carondelet Street
        New Orleans, Louisiana  70130-3774
19      (Attorneys for Gulf Coast Immigration
         Law Center, L.L.C.)
20
21    BARRASSO, USDIN, KUPPERMAN,
        FREEMAN & SARVER
22      Attorneys at Law
        (By: Stephen H. Kupperman, Esquire)
23      Suite 2400, LL&E Building
        909 Poydras Street
24      New Orleans, Louisiana  70112
        (Attorneys for Global Resources,
25       Inc. and Michael Pol)
```

**Page 3**

```
                 200 Maple Street
 3  Jefferson, Louisiana  70121
      (Attorneys for Sachin Dewan and
 4    Dewan Consultants Pvt. Ltd.
      a/k/a Medtech Consultants)
 5
 6
 7  ALSO PRESENT:
 8
      Tracey Binion
 9    SIGNAL INTERNATIONAL, L.L.C.
10
11
12  VIDEOGRAPHER:
13    Karl Stiegman
      Depo-Vue
14
15
16
17  REPORTED BY:
18    WENDY MAJORIA, CCR
      Certified Court Reporter
      (No. 84106)
19    Huffman & Robinson, Inc.
      One Shell Square, Suite 250 Annex
20    New Orleans, Louisiana  70139
      (504) 525-1753   (800) 749-1753
21
22
23
24
25
```

**Page 4**

```
 1       E X A M I N A T I O N   I N D E X
 2
                                          PAGE
 3
 4  EXAMINATION BY MR. SANDLER...............8
 5  EXAMINATION BY MR. ALEXIS...............220
 6
 7
 8        E X H I B I T   I N D E X
 9
10  Exhibit No. 619......................13
      (Diary entry dated 1/11/07)
11
      Exhibit No 620......................17
12      (Diary entry dated 1/12/07)
13  Exhibit No. 621......................19
      (Diary entry dated 2/9/07)
14
      Exhibit No. 622......................23
15      (Diary entry dated 3/26/07)
16  Exhibit No. 623......................32
      (Diary entry dated 8/23/06)
17
      Exhibit No. 624......................35
18      (Diary entry dated 10/23/06)
19  Exhibit No. 625......................48
      (Diary entry dated 9/15/06)
20
      Exhibit No. 626......................55
21      (E-mail from M. Scogin dated 11/14/06)
22  Exhibit No. 627......................61
      (Diary entry)
23
      Exhibit No. 628......................65
24      (E-mail correspondence)
25  Exhibit No. 629......................66
```

**Page 5**

1   Exhibit No. 630...................69
2     ("Housing Inspection Check List
        OSHA Migrant Housing Standards")
3   Exhibit No. 631...................84
4     (E-mail thread from Rhonda George
        dated 3/19/08)
5   Exhibit No. 632...................91
      (Excel spreadsheet titled "Cost savings
6       given by John.xls")
7   Exhibit No. 633...................96
      (Excel printout titled
8       "Pending man camp issues")
9   Exhibit No. 634...................99
      (Diary entry dated 12/11/06)
10
11  Exhibit No. 635...................109
      (E-mail from J. Sanders dated 8/3/06)
12  Exhibit No. 636...................118
      (Diary entry dated 10/6/06)
13
14  Exhibit No. 637...................119
      (E-mail from R. Schnoor dated 12/18/06)
15  Exhibit No. 638...................143
      (Diary entry dated 12/18/06)
16
17  Exhibit No. 639...................146
      (Diary entry dated 1/16/07)
18  Exhibit No. 640...................165
      (Diary entry dated 12/15/06)
19
20  Exhibit No. 641...................170
      (E-mail from T. Binion dated 1/18/07)
21  Exhibit No. 642...................176
      (Document titled "Declaration")
22
23  Exhibit No. 643...................177
      (E-mail from J. Sanders dated 4/30/07)
24  Exhibit No. 644...................190
      (Document titled "Undertaking")
25

**Page 6**

1     (Diary entry dated 12/19/06)
      Exhibit No. 646...................199
2     (Diary entry dated 3/12/07)
3   Exhibit No. 647...................200
      (Diary entry dated 3/10/07)
4
5   Exhibit No. 648...................204
      (Diary entry dated 3/29/07)
6   Exhibit No. 649...................215
      (Diary entry dated 4/18/07)
7
8   Exhibit No. 650...................228
      (E-mail from T. Binion dated 4/12/07)
9   Exhibit No. 651...................229
      (E-mail from H. Lewis dated 6/1/07)
10
11  Exhibit No. 652...................238
      (E-mail from R. Schnoor dated 3/27/07)
12  Exhibit No. 653...................239
      (E-mail from J. Sanders dated 1/29/07)
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1              S T I P U L A T I O N
2
3        It is stipulated and agreed by and among counsel
4    for the parties hereto that the deposition of the
5    aforementioned witness is hereby being taken under the
6    Federal Rules of Civil Procedure, for all purposes, in
7    accordance with law;
8        That the formalities of reading and signing are
9    specifically not waived;
10       That the formalities of filing, sealing and
11   certification are specifically waived;
12       That all objections, save those as to the form of
13   the question and the responsiveness of the answer, are
14   hereby reserved until such time as this deposition, or
15   any part thereof, may be used or sought to be used in
16   evidence.
17
18                *    *    *    *
19
20       WENDY MAJORIA, Certified Court Reporter, State of
21   Louisiana, officiated in administering the oath to the
22   witness.
23
24
25

**Page 8**

1              P R O C E E D I N G S
2    THE VIDEOGRAPHER:
3        This is the continuation of the videotaped
4    deposition of John Sanders.  This deposition is
5    being held at 201 St. Charles Avenue in New
6    Orleans, Louisiana on November 20th, 2009.  The
7    time indicated on the video screen is 9:44.
8        My name is Karl Stiegman. I'm a certified
9    legal video specialist with Depo-Vue.  The court
10   reporter is Wendy Fair with Huffman & Robinson.
11       Would the court reporter please reaffirm
12   that the gentleman is sworn in.
13   EXAMINATION BY MR. SANDLER:
14   Q.   Again, good morning, Mr. Sanders.
15   A.   Good morning.
16   Q.   My name is Hugh Sandler.  We met yesterday.
17   A.   Yes.
18   Q.   And this is the continuation of the
19   questions we were talking about yesterday.
20   A.   Okay.
21   MR. SANDLER:
22       Just a couple of things.  Steve Shapiro,
23   who was here yesterday is not in yet, but he
24   called and has stated that we can start without
25   him.  And I understand that he'll be joining us

Page 13

1  Q.  Let's say Pascagoula.
2  A.  Yes.  There were plans to expand.
3  Q.  Were there plans to expand in the same way
4  the camp in Orange?
5  A.  There were initial preliminary plans which
6  were eliminated in the end.  We didn't follow through
7  on those.  And this was not an expansion of the number
8  of workers but rather the living space for existing
9  ones.
10  Q.  Okay.  And, now, that vendor was who?
11  A.  That vendor was Ameri-Tech in Leesville,
12  Louisiana.
13  Q.  Okay.  I want to show you a couple of
14  documents.  And, actually, I'm going to jump to the
15  Ameri-Tech and then we're going to go back --
16  A.  Okay.
17  Q.  -- to the Mod Space.
18      The first document I want to look at is
19  SIGE0557015.  And this will be Exhibit No. 619.
20      (Whereupon, the document as described above
21  is marked as "Exhibit No. 619.")
22  EXAMINATION BY MR. SANDLER:
23  Q.  I'm just going to ask you to read it over
24  and then we'll talk.
25  A.  (Witness reviews document.)

Page 14

1  MS. HANGARTNER:
2      Did we need to start a call for people to
3  call?
4  MR. SANDLER:
5      Maybe at the break.
6  MS. HANGARTNER:
7      Okay.
8  MR. ALEXIS:
9      This is Exhibit --
10  MR. SANDLER:
11      619.
12  THE WITNESS:
13      I've read it.  Yes.
14  EXAMINATION BY MR. SANDLER:
15  Q.  Just to -- This is a journal entry of yours
16  from January 11th --
17  A.  Yes.
18  Q.  -- 2007?
19      And just to be clear, you kept a daily
20  journal over the period, say, 2006 and 2007?
21  A.  Yes.
22  Q.  But you also had a different kind of
23  journal.  And maybe it's not properly called a
24  journal, but a note pad where you would record things
25  during the day and that was like kind of by longhand;

Page 15

1  is that right?
2  A.  Yes.  Tasks that needed to be done and
3  comments relative to that.
4  Q.  Okay.  So there's these two kind of like
5  daily reports, so to speak?
6  A.  Yes.
7  Q.  Okay.  And this is from January 11th on
8  your electronic one which is -- When did you record
9  these?  Are these -- What time of day were these
10  usually recorded?
11  A.  Typically at night.
12  Q.  Kind of like a way to like digest what had
13  happened that day or something?
14  A.  And sometimes I'd fall a little bit behind,
15  but yeah.
16  Q.  Fair enough.  I just want to ask you.  So
17  now I'm just going to read a little bit of it and ask
18  you.
19      "The reason for the trip to Leesville,
20  Louisiana was so that Darrell Snyder and I could see
21  Ameri-Tech Building Systems' manufacturing plants for
22  oilfield housing and determine whether the good price
23  we'd been quoted would translate to good or bad
24  quality.  Definitely very good, we discovered.  As
25  Darrell said in the meeting with Ameri-Tech's

Page 16

1  management, we wish we'd have known about them six
2  months before - it would have saved us a huge amount
3  of headache with GE."
4  Q.  Was there a headache with GE?
5  A.  Yes.
6  Q.  What is -- What were some of the things
7  about GE that were causing a headache, so to speak?
8  A.  Everything needed to be done on a very
9  tight timeline because, you know, essentially from
10  late July until late October, those three months, we
11  had to go from nothing, just a field, to a housing
12  facility for 290 workers in Pascagoula.  And GE
13  committed themselves to that timing.  They outsourced
14  a lot of the plumbing work in particular.
15  Q.  Okay.
16  A.  They outsourced, I think, plumbing and
17  electrical, but the plumbing had lots of problems
18  because the contractor that they subbed the work out
19  to did a -- did a job that was not at all the quality
20  which GE expected or which Signal required.
21  Q.  All right.  So it was of a low quality
22  work?
23  A.  Yes.
24  Q.  And that's the plumbing and the electrical?
25  A.  Principally the plumbing.  I remember most

## Page 17

of the problems being with the plumbing inside the buildings.

Q.   Were there any other quality issues that come to mind?

A.   That was the main one that I remember right now.

Q.   Okay. I just want to enter one more document, SIGE0557014. And this will be Exhibit No. 620. It's a short one.

(Whereupon, the document as described above is marked as "Exhibit No. 620.")

A.   (Witness reviews document.)

EXAMINATION BY MR. SANDLER:

Q.   Okay. So this is the next day from the one we just spoke about. It's January 12th, another diary entry?

A.   Yes.

Q.   Okay. I read here – I'm not going to read the whole thing but the first sentence.

"I did get some important things done like attend the man camp rules meeting to hammer out with the other managers what punishment drinking should receive, and yes, I was able to define the number of toilet, sink, and shower buildings we'll need to buy from Ameri-Tech."

## Page 18

Was that an issue with the previous – the man camps built under GE, the number of toilet, sink and shower buildings?

A.   No. We felt -- Again, we were doing it for the very first time --

Q.   In '06?

A.   In '06 -- and went with, you know, the best recommendations that we could come up with, which I think included GE's input.

Q.   Okay. And the next sentence, "That's important because we get one chance to do it right, and it happened because I went out to the camp after hours and spoke with about 30 Indians."

Okay. So you consulted the people who were living there to see kind of the needs that were required?

A.   Yes.

Q.   Okay. Is that because under the GE -- under the man camps that were previous to this, the GE man camps, the man camps built by GE, there was an issue as to these factors?

A.   Yes. When we specified the number of, you know, toilet, sink, shower facilities, et cetera, with what we gave to GE, like I said, we did that based on, you know, the best input that we could receive. But

## Page 19

there were no workers to give input who were living in them day by day.

Q.   Right. So now you had an opportunity to get feedback, so you took that opportunity to make it more appropriate, so to speak.

A.   Yes. And I involved the Indians because they were the ones who would know best. And we wanted to satisfy their needs and fix everything in the very best way for them.

Q.   Yeah.

So – Okay. I just wanted to introduce another document, SIGE0556991. And this will be Exhibit 621.

Read over it.

(Whereupon, the document as described above is marked as "Exhibit No. 621.")

A.   (Witness reviews document.)

I've read the document.

EXAMINATION BY MR. SANDLER:

Q.   Okay. So I'm concerned with the paragraph on the 991 page. And for the record, at the bottom here it says, "Thursday, February 8th, 2007." And then there's nothing there and then if you turn over, it goes to February 7th, 2007.

So I'm going to state -- and you can

## Page 20

contradict me and then we can get more specifics if you do -- that this is from February 9th, 2007.

A.   That would be my presumption as well.

Q.   Okay. Okay. So I'm just going to read a bit and then we'll talk.

"Our Indians have been dropping with sickness like flies. Two Sundays ago," someone who's been redacted out, "got double pneumonia. Someone in Wave 9 broke his ankle. Someone else in it got a staph infection last week and almost had to be hospitalized." A redacted person "had a virus attack his heart and had to be put in the hospital today since he was subject to 'spontaneous heart failure' at any moment."

I'm skipping one sentence.

"The Indians are getting worried and believe there are unhealthful conditions in the camp. It is true. The reason is because the plumbing was so shoddily done by GE's subcontractors, and water has leaked everywhere and stagnated as a result, which serves as a bacterial breeding ground. As I was out at Bunk-house 16 today, one of the workers came up to me and said many of them are getting sores such as they have not had before. Even myself, I have noticed between today and yesterday that a couple of pimples

## Page 21

1  have broken out on my legs which appear to have a
2  black center. I suspect may be a staph infection. It
3  is a very serious matter, most of all because of the
4  impact it will have on the Indians' morale if it
5  continues."
6          Did that staph infection that you
7  suspected, did it become a staph infection?
8      A.  It proved not to be.
9      Q.  Okay. So was this -- This was just the
10  result of like what you had been seeing going on at
11  the man camp, people were being hospitalized, people
12  were getting sick?
13      A.  Could you repeat the question?
14      Q.  I don't know that I asked a question,
15  but --
16          What did you mean by "Indians have been
17  dropping with sickness like flies"?
18      A.  That there seemed to be a higher than I
19  would have expected number coming down with various
20  forms of illness.
21      Q.  And in fairness to what you said earlier,
22  that it seems to be related to a plumbing issue?
23      A.  Well, that's what I -- that's what I
24  thought at the time that I wrote this.
25      Q.  Uh-huh (indicating affirmatively).

## Page 22

1          And did you ever change that thought?
2      A.  Yes.
3      Q.  Okay.
4      A.  It was -- The thought was at least
5  significantly modified with doctor's information as
6  opposed to my own --
7      Q.  Oh, I see.
8      A.  -- unmedical person. Actually, that's not
9  a word. I'm sorry. But just amplified by outside
10  information.
11      Q.  About the plumbing?
12      A.  No. From a doctor about what was likely to
13  be causing some of these things.
14      Q.  Okay. The sentence where it says, "The
15  Indians are getting worried and believe there are
16  unhealthful conditions in the camp. It is true."
17          And the next sentence says, "The reason is
18  because the plumbing was so shoddily done by GE
19  subcontractors, and water has leaked everywhere and
20  stagnated as a result, which serves as a bacterial
21  breeding ground."
22          Did you ever change your opinion that the
23  water had leaked everywhere and stagnated as a result?
24      A.  Well, when I say "everywhere," that is sort
25  of a colloquialism.

## Page 23

1      Q.  Sure.
2      A.  There were -- there were places where the
3  PVC plumbing hadn't been properly connected together
4  and it would leak in certain parts. And when we would
5  fix one it -- or GE would fix one, it seems to pop up
6  elsewhere. That's what I'm referring to there.
7      Q.  Right. Okay. I wanted to enter another
8  document, SIGE0556957. And that will be Exhibit 622.
9          Have a read and we'll --
10          (Whereupon, the document as described above
11  is marked as "Exhibit No. 622.")
12      MS. HANGARTNER:
13          Thank you.
14      A.  (Witness reviews document.)
15          Okay. I've read the document.
16  EXAMINATION BY MR. SANDLER:
17      Q.  I just want to ask you right now just about
18  the title of Monday, March 26th, 2007.
19      A.  Yes. About the Judas? That was me --
20      Q.  No, no, no.
21      A.  -- in play, not me in person.
22      Q.  I wasn't going to ask you.
23      A.  I just want to make that very clear here.
24      Q.  Okay. Fair enough.
25          After the comma --

## Page 24

1      A.  Understood.
2      Q.  -- "Kelly curses my staff infection,"
3  where did you get -- I don't, you know -- did you have
4  a staph infection? Is that what this person is
5  cursing?
6      A.  Yes, but it wasn't on my legs. That was
7  your question.
8      Q.  No. I know. I just wanted -- Because I
9  have my notes, and I just need to make it all make
10  sense.
11      A.  Understood.
12      Q.  So where did you contract the staph
13  infection? Not on your body but where in the world?
14      A.  Oh. While living in Pascagoula.
15      Q.  And working at Signal?
16      A.  I was an employee at Signal.
17      Q.  Did you at any time suspect that you might
18  have contracted the staph infection by your frequent
19  interaction in and around the man camp?
20      A.  That -- that was what I thought before
21  going to a doctor.
22      Q.  What did the doctor say?
23      A.  He said that ever since Hurricane Katrina,
24  that there had been a much, much higher frequency of
25  staph infections all throughout the county area,

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 25

1 that -- many, many cases, and that his opinion as a
2 medical professional was that it had to do with the
3 fact of the devastation left by Hurricane Katrina and
4 just the bacteria and other factors that it left
5 behind, which that's what modified my opinion about it
6 being something relative to Signal. Because that's
7 what -- that's what he told me --
8    Q.   Okay.
9    A.   -- and I relied on his judgment --
10    Q.   Okay.
11    A.   -- which came after the March -- or --
12 sorry -- the February diary entry.
13    Q.   Did you ever correct that entry in your
14 diary? Did you ever say: Oh, I learned today that
15 the staph infection came from Hurricane Katrina? Do
16 you recall ever -- ever making that modification in
17 your diary?
18    A.   You mean to -- modifying the February
19 entry?
20    Q.   No, not going back over it, but like at
21 some point you saw this doctor, you learned this
22 information. Did you ever put that in your diary?
23    A.   I don't remember.
24    Q.   Okay.
25    A.   I don't remember.

## Page 26

1    Q.   All right. One of the documents we've
2 talked about was the number of toilets, sinks and
3 showers that you were getting. You were getting input
4 from Ameri-Tech -- or input from the workers in
5 January. Okay? How many were there in the bunkhouses
6 in GE -- under the GE regime?
7    A.   How many --
8    Q.   How many toilets were there?
9    A.   I think that there were two in each
10 bunkhouse. That's my -- that's my recollection.
11    Q.   And how many beds were there in the
12 bunkhouse?
13    A.   It varied. When we first set up the
14 workers' housing facility, depending on the layout of
15 the bunkhouses, between 20 and 24, I think.
16    Q.   Beds?
17    A.   Yes.
18    Q.   And that was the same in Pascagoula as it
19 was in Orange?
20    A.   I'm not as sure about the details in Orange
21 because I was focused on Pascagoula.
22    Q.   Okay. Sometimes in your journal entry you
23 write that you're in charge of the Pascagoula and the
24 Orange man camps.
25    A.   Okay.

## Page 27

1    Q.   Would that be an accurate reflection of how
2 you understood your job?
3    A.   Well, I guess I would say that I was in
4 charge of Pascagoula and Orange in the sense of
5 specifying vendors and reporting how both projects
6 were going to senior management, but as far as the
7 day-to-day aspects in Texas and the construction of
8 that facility and how many beds would be in each of
9 the Texas bunkhouses, I wasn't nearly as involved in
10 those details as I was in Mississippi.
11    Q.   You didn't know how many beds were in the
12 Texas man camps?
13    A.   I knew how many there were, but how many --
14 how many Indian workers would be staying in what
15 bunkhouse, I don't --
16    Q.   I didn't ask you that.
17    A.   Okay.
18    Q.   How many beds were in the bunkhouses in
19 Orange, Texas?
20    A.   I don't remember.
21    Q.   Do you remember them being different from
22 Pascagoula?
23    A.   I believe that they were, but my
24 recollection is not as good as it was in Mississippi.
25    Q.   So e-mails from that time would probably

## Page 28

1 speak more clearly to that --
2    A.   Yes.
3    Q.   -- or maybe diary entries?
4    A.   Yes, yes, yes. Because, again, I was
5 focused day to day in Mississippi.
6    Q.   How many sinks and showers were in the
7 bunkhouses that you can recall?
8    A.   Well, I believe that there were -- four
9 showers is the number that comes to mind. I'm sure
10 that other information could confirm or disconfirm
11 that, but I think it was four. And each restroom
12 facility had a sink.
13         Sometimes the sink -- if I remember,
14 sometimes the sink was inside the bathroom and
15 sometimes it was out -- outside in the bunkhouse
16 living space.
17    Q.   Okay. Now, can you just tell me where the
18 plumbing problems were in relation to any of these
19 things I just asked you about?
20    A.   Yes. Yes. The plumbing problems were
21 stemming from the work done by the GE contractors,
22 which their scope of work was essentially inside the
23 trailers stubbing out through the bottom where our
24 maintenance personnel would connect the manifolds --
25 well, the stub-outs connect to a manifold and then the

(504)525-1753                    HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 29

1  manifolds to a -- to a header.

2      I learned some of these things, although

3  I'm not an expert in those things. But, anyway,

4  Signal took care of the outside aspect and GE's

5  subcontractor was inside. That's the general --

6      Q.  Okay. Well, that makes sense. So the

7  inside, that's like the toilet, the showers, the sink

8  area.

9      A.  Yes, yes, yes.

10      Q.  And so when we talked about plumbing

11  problems before, if I'm trying to imagine in my head,

12  that's where -- that's where the issues were?

13      A.  That's the -- that was the key problems.

14      Q.  Okay.

15      A.  Those were the key problems, yes.

16      Q.  How were the beds stacked in the

17  bunkhouses?

18      A.  They were double stacked in the end. That

19  was the best decision.

20      Q.  Okay. Like there's a space saving there, I

21  guess, because if you have a bed on top of one bed,

22  you can fit more beds in?

23      A.  Well, we went with two stacked bunkbeds,

24  you know, one on top of the other.

25      Q.  Do you know why you chose to do bunking?

## Page 30

1      A.  Yes.

2      Q.  Okay. Why?

3      A.  Because we felt that that would be -- It's

4  common practice in the industry for bunkbeds, and

5  we -- we wanted to do it the way others did.

6      Q.  Sorry. Let me correct myself. A bunkbed

7  is by definition a bed on top of another bed?

8      A.  Correct.

9      Q.  Okay. So what I'm asking you is why you

10  went with bunkbeds and not just regular beds.

11      A.  Okay. Well, we -- we wanted -- having

12  never done this before, we wanted to see how other

13  places had done it. And bunkbeds seemed to be a

14  common method. And that's how we -- that's how we

15  went with it.

16      Q.  Do you see a cost savings in doing bunkbeds

17  versus regular beds?

18      A.  You would need to check with -- with --

19  with the CFO on financial issues.

20      Q.  All right. You had a laundry room?

21      A.  Yes. There was a laundry room.

22      Q.  Okay. Did you use stackable washer and

23  dryer or did you use a washer and a dryer next to one

24  other?

25      A.  We used a washer and dryer next to one

## Page 31

1  other. I'm sorry. They were next to one another, but

2  the set was stacked on top of each other and then we

3  had another set stacked.

4      Q.  Did you have a reason for choosing to stack

5  the washer and dryer as opposed to having them next to

6  each other?

7      A.  Yes.

8      Q.  Oh. What was the reason?

9      A.  Okay. Well, you know how when you go to a

10  laundromat that -- you know, sometimes if a washing

11  machine -- you're in a washing machine here and there

12  is a dryer, you know, a little bit further down,

13  that -- you know, it's easy to mix up where your

14  clothes are. Whereas, if it's stackable, it's pretty

15  simple to think, okay, this is the dryer that I'm

16  going to use because the washer is right there.

17      Q.  Okay. Did you recognize any cost savings

18  by doing stackable because of the space saving that

19  you would have, you'd save more space by stacking?

20      A.  I think we may have, but I don't know if

21  there's anything to show that in writing. I'm not

22  sure.

23      Q.  But you can see how it would save money?

24      A.  Well, I can see especially how it would be

25  convenient for the workers. Because when you have 290

## Page 32

1  workers trying to figure out, well, where are my

2  clothes, it's a lot easier if it's right on top.

3      Q.  Right.

4      I'm going to enter in SIGE0004548. And

5  this will be Exhibit 623. I only have one copy. So

6  it's going to you, Mr. Sanders. I'll also state for

7  the record that there is some highlighting on here,

8  but if you want to look at it first.

9      (Whereupon, the document as described above

10  is marked as "Exhibit No. 623.")

11  MR. ALEXIS:

12      Do you mind if I --

13  MR. SANDLER:

14      Not at all.

15  MR. ALEXIS:

16      -- do my usual and look at this document?

17  MR. SANDLER:

18      Sure.

19  MR. ALEXIS:

20      Do you mind if I show them?

21  MR. SANDLER:

22      Not at all.

23      I'll read out the number again. The number

24  is SIGE0004548.

25  EXAMINATION BY MR. SANDLER:

Page 33

1    Q.   Just have a quick read and then we can talk
2  about it.
3    A.   (Witness reviews document.)
4        Okay.  Yeah.
5    Q.   Do you want to just read it into the
6  record?
7    A.   Starting from the top?
8    Q.   From the entry -- This is a journal entry.
9  From what date is it?
10    A.   August 23rd, 2006.
11    Q.   Okay.  Just read it.
12    A.   It says, "If we didn't have to use the coin
13  laundry, we could get residential washers.  These
14  could be stacked dryer-on-top-of-washer throughout the
15  trailer, which would save half the space.  And saving
16  half the space meant we would cut from two Laundry
17  trailers down to one!  This would save $50,000 and the
18  lower expense delta was $100,000 for a total savings
19  of $150,000.  I have saved Signal money again."
20    Q.   There's more.
21    A.   Okay.  "Someone could argue that the
22  $100,000 should never have been in there anyway since
23  only Dick's intervention had saved us, but it was my
24  idea to stack that saved us $50,000.  I was pleased
25  with the result of my thinking and went into Dick's

Page 34

1  office to tell him.  He said," he, Dick, said, "'So, I
2  earned my salary today?  Make sure Diane's aware.'
3  (She's his secretary.)  I replied, 'With the savings
4  we'll be seeing -- With the savings we'll be seeing
5  I'll even give you two days' credit, to which he
6  responded with a chuckle.  It's nice to be in the good
7  graces of the CEO."
8    Q.   Mr. Marler has a sense of humor, I take it?
9    A.   Yes.
10    Q.   Okay.  Do you want to revise your testimony
11  as to why you went with stacked?
12    A.   Well --
13    Q.   Just yes or no.
14    A.   I'd like to amplify it --
15    Q.   Sure.
16    A.   -- with this helpful recollection.  That in
17  addition to helping the workers with regard to the
18  convenience aspect, it also was able to save Signal
19  money.
20    Q.   Did you record that convenience aspect in
21  your diary?  Do you recall recording that?
22    A.   I don't remember.
23    Q.   Okay.
24    A.   I don't remember.
25    Q.   Do you think you might have recorded it in

Page 35

1  that entry if it had to do with the laundry?
2    A.   I'm not sure.  I recorded many things, but
3  not everything.
4    Q.   Yes.  Okay.
5        Thank you.
6    A.   Thank you.
7    Q.   What condition would you describe the man
8  camps in even before -- say one week before the H-2B
9  workers arrived?  If you don't recall -- Do you
10  recall?
11    A.   They seemed to be very good to us.
12    Q.   Can I enter document SIGE0004501?  Okay.
13  This will be Exhibit No. 624.
14        (Whereupon, the document as described above
15  is marked as "Exhibit No. 624.")
16    A.   (Witness reviews document.)
17        Okay.
18  EXAMINATION BY MR. SANDLER:
19    Q.   Now, Mr. Sanders, I recognize this is over
20  three years ago, the stuff I'm asking you about, so I
21  realize that I don't remember -- you know, if you were
22  to ask me what I was doing in 2006, except for one of
23  those dates, which is my birthday, I probably -- you
24  know, I would not necessarily -- it's not like
25  yesterday.

Page 36

1    A.   Yeah.
2    Q.   Okay?
3    A.   Yeah.
4    Q.   So I just want to confirm a couple of
5  things.  Because these diary entries are
6  contemporaneous with the time?
7    A.   Yes.
8    Q.   So they're probably a more accurate
9  reflection of what was going on than when I ask you
10  today.
11    MR. KUPPERMAN:
12        Object to form.
13    A.   I would say that certain aspects, there are
14  details in here which I couldn't remember without
15  that.  At the same time, my reflections and thoughts
16  about certain things, those could and indeed have
17  certainly changed in numbers of ways.
18  EXAMINATION BY MR. SANDLER:
19    Q.   Sure.  So they've changed, but at the time
20  that you entered it, you were entering your true
21  thoughts.  That's what you thought at that time.  Now,
22  granted, a month later you might have changed your
23  mind?
24    A.   Yes.
25    Q.   All right.  So this is -- Towards the

Page 53

1    A.   I don't remember.
2    Q.   You don't remember?
3    A.   The main point I remember was just with
4  regard to how do they do it with regard to living
5  space in bunkhouses and so forth.
6    Q.   What is offshore by definition, if you
7  could give me like a layman's term?
8    A.   Okay.  For instance -- Well, let's -- A
9  drilling rig offshore, it would have workers that --
10   Q.   Yeah.  Like in the water, like not on land,
11 right?
12   A.   Yes.
13   Q.   Okay.  That's what I wanted to know.
14   A.   Yes.  But also there are onshore drilling
15 operations that have similar accommodations, similar
16 facilities.  So the oil industry, whether offshore or
17 onshore, there's applications to both.
18   Q.   Right.  And do people tend to live offshore
19 for two to three years?
20   A.   They would work -- They would work offshore
21 for that amount of time.
22   Q.   And live offshore for two to three years?
23         Well, let me put it to you this way.
24 Signal was building a man camp, right?
25   A.   Yes.

Page 54

1    Q.   People were going to live there?
2    A.   Yes.
3    Q.   We said earlier the thinking was two to
4  three years?
5    MR. SHAPIRO:
6         Object to form.
7    A.   Well, we had workers that would be there
8  for ten months, so that was their ten-month -- their
9  duration would be ten months, not two to three years,
10 because they were there on the H-2B visa for ten
11 months.
12 EXAMINATION BY MR. SANDLER:
13   Q.   But the building which you said earlier
14 today, the thinking was you were constructing it for
15 two to three years?
16   A.   Yes, but not necessarily for all the
17 same -- all of the same workers.  Workers would come
18 in different --
19   Q.   Okay.  So maybe Signal was thinking about
20 sending some guys home?
21   A.   No.  I didn't -- I didn't --
22   Q.   Oh.
23   A.   I didn't say that.  They were there for --
24 I think you're implying the scope.  All I'm saying is
25 that we had workers there for ten months, and we hoped

Page 55

1  to get extensions for existing workers.
2    Q.   Who were going to live there?
3    A.   Yes.  They would --
4    Q.   Okay.  Thank you.
5    A.   -- live there.
6    Q.   All right.  I want to enter another
7  document.  It's SIGE0038525-38528.  The dash is
8  because it's a number of documents.
9         Okay.  This is Exhibit No. 626.  I'm going
10 to ask you to read it over.
11       (Whereupon, the document as described above
12 is marked as "Exhibit No. 626.")
13   A.   (Witness reviews document.)
14       Okay.  I've read the document.
15 EXAMINATION BY MR. SANDLER:
16   Q.   Okay.  Let's turn to the e-mail from Malon
17 Scogin to you on November 13th, 2006 at 2:55 p.m.  Do
18 you see it there?  It's at the bottom of the --
19   A.   Yes.  Yes.
20   Q.   She's talking about having -- "The bunk
21 houses should be ready this week."  I'm reading from
22 it directly.  "My understanding is that Mr. Marler and
23 Mr. Schnoor determined that 12 bunks to a building is
24 not acceptable in Mississippi and that more buildings
25 were to be ordered.  Until we know how many folks will

Page 56

1  be coming this way, we are going to breakdown beds and
2  store in one of the bunk houses (12 bunk houses
3  instead of 13), rather than order more housing."
4         Okay.  So it's fair to say, then, from this
5  e-mail that there were about 12 bunkhouses in Orange?
6    A.   That -- that seems to be in context.
7    Q.   Okay.  And we agreed there were 13 in
8  Pascagoula?
9    A.   Yes, I think that's right.
10   Q.   Now, Mr. Marler and Mr. Schnoor determined
11 that 12 bunks to a building was not acceptable in
12 Mississippi?
13   A.   Could you repeat the question?
14   Q.   I'm just reading -- I'm just asking you
15 about -- Just move to the top of SIGE0038527.
16   A.   Yes.
17   Q.   "... Marler and Mr. Schnoor determined that
18 12 bunks to a building was not acceptable in MS --"
19 which is Mississippi?
20   A.   Yes.
21   Q.   "-- and that more buildings were to be
22 ordered."
23   A.   Correct.
24   Q.   This is a November 13th, 2006 e-mail.  Were
25 more buildings ordered in 2006?

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 57

1    A.  No.  Not till two thousand -- early 2007.
2    Q.  Okay.  And I'm going to ask you why you
3 don't think it was acceptable -- why you think Marler
4 and Schnoor didn't think it was acceptable?  Do you
5 have any insight as to that?
6    MS. HANGARTNER:
7       Object to form.
8    MR. SANDLER:
9       Strike it.
10 EXAMINATION BY MR. SANDLER:
11    Q.  Now I want to turn to an e-mail from you to
12 Malon Scogin on November 14th, 2006 at 8:25 in the
13 morning.
14       I'm just going to read the first paragraph.
15 Is that okay?  "I will be working with Chris
16 Cunningham to analyze the financial impact of adding
17 trailers to Pascagoula and Orange.  I will prepare
18 something which balances the practical
19 side of things.  What is your view of 24 men per
20 bunk-house, given your military experience?  Is it
21 tight but do-able?  I think so."
22       What did you mean "the practical side of
23 things"?  This sentence here, "I'll prepare something
24 which balances this," I'm going to ask you to confirm
25 that "this" is the financial impact from the preceding

## Page 58

1 sentence?
2    A.  Yes.
3    Q.  And the practical side of things?
4    A.  Okay.  And what did I mean by "practical
5 side"?
6    Q.  Uh-huh (indicating affirmatively).
7    A.  In other words, there is a financial cost
8 to adding more trailers.
9    Q.  Uh-huh (indicating affirmatively).
10    A.  And we wanted to -- we wanted to see what
11 the right number of men per bunkhouse at a maximum
12 would be.  And I thought 24 might be okay.  Again,
13 this was still early in the worker arrival process.
14    Q.  Right.
15    A.  Okay?
16    Q.  That's right.
17    A.  And so I thought 24 might be okay, but I
18 knew that he had been in the military.  I don't
19 remember which branch.  But he would have a lot more
20 living insight into that than me.  And so I wanted to
21 gain that experience.  Because his wasn't even ten
22 months.  He was there longer in the military than ten
23 months, I believe, so I wanted to get his insight
24 which was outside my own experience.
25    Q.  You at least thought it was tight, though,

## Page 59

1 even though you had limited experience?
2    A.  Thought that the --
3    Q.  Twenty-four men in a trailer was tight?
4    A.  Yes.  That was tight.
5    Q.  Do you recall how many men ended up being
6 placed in the trailers in '06?
7    A.  I think -- Depending on the trailer, I
8 believe it varied between 20 and 24.
9    Q.  Okay.  Now, Malon replies, "If these folks
10 were to be here for only a short period, say 2 to 4
11 weeks, the cramped quarters would probably work out.
12 However, if this is to be their," open quotation,
13 "'humble abode,'" closed quotation, "for 10 months or
14 more, we need to give them a little more space.
15       "I'm thinking more like 18 men per bunk
16 house.  This also works out for the right number of
17 lockers as they are in groups of 3."
18       There's some stuff in parens, but --
19       So what did you make of that?  Malon, he
20 had more experience than you, as you said, telling you
21 that two to four weeks would be okay for the tight but
22 doable number that you were talking about.  How did
23 you fit that into the analysis?
24    A.  That his view, which was based on more
25 experience than mine, was that the 20 to 24 number,

## Page 60

1 depending on the bunkhouse, was going to be too tight.
2 And he recommended lowering the capacity per bunkhouse
3 so that the workers would have more space and be
4 comfortable.
5    Q.  What did you make of that recommendation?
6 If you want to read the e-mail above before answering,
7 you're welcome to.
8    A.  Yeah.  Yeah.
9       I mean, all I can do is, you know, put
10 myself back --
11    Q.  Yep.
12    A.  -- via this e-mail.
13    Q.  That's why --
14    A.  I don't have any specific recollections
15 outside of this.  But he's -- We have 20 to 24 in
16 Mississippi.  He's saying 18.  And OSHA housing
17 guideline would come out to 16.7.  So we're not going
18 to go above that.
19       Ron Schnoor and Dick Marler are saying 16,
20 so that's sort of where things are moving to in the
21 analysis.  And, therefore, with it being 16 and Malon
22 saying 18 would be comfortable, I likely felt that 16
23 would be fine.
24    Q.  Okay.  And you ended up with 20 to 24?
25    A.  No.  No.  No.  We had 20 to 24.

(504)525-1753                HUFFMAN & ROBINSON, INC.                (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS         NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

Page 61

1    Q.   Okay.
2    A.   But we wanted to move towards 16, as indeed
3    we did in 2007.
4    Q.   Okay.  I want to enter another document.
5    It's SIGE0004503.
6         Scratch that.  I'm sorry.
7         I'm going to enter SIGE0004510.  It's
8    Exhibit No. 627.
9    A.   Thank you.
10   Q.   It's just a portion of your journal.
11        (Whereupon, the document as described above
12   is marked as "Exhibit No. 627.")
13   A.   (Witness reviews document.)
14        I've read the document.
15   EXAMINATION BY MR. SANDLER:
16   Q.   I just want to ask you about the two
17   sentences in the middle.
18   A.   Okay.
19   Q.   "Each day I spend at work between now and
20   the first Indians' arrival on October 29th is
21   potentially worth thousands in savings to Signal if I
22   make good choices.  What I'm referring to is things
23   like the shuttle transportation most of all.  I have
24   yet to figure out what we'll do and it actually
25   concerns me quite a bit since that is critical to have

Page 62

1    once the workers get here."
2         Okay.  So you were also involved in shuttle
3    van of some kind or what was the shuttle?
4    A.   We were -- We knew that the workers would
5    want to go places in the town.
6    Q.   Okay.
7    A.   And, obviously, we wanted to provide that
8    service for them in the very best possible way.
9    Q.   In the best possible way?
10   A.   Yes.  And -- and so --
11   Q.   All right.
12   A.   And so as we would do that, we needed to
13   find a balance between where they wanted to go and
14   just all of the parameters that would tie into shuttle
15   service.
16   Q.   Okay.  Okay.  In the sentence prior to that
17   is -- you have a concern about costs, is that right,
18   in the first sentence that begins with "Each day ..."?
19   A.   Yes.  I wanted to save Signal --
20   Q.   Right.
21   A.   -- money at the same time as providing
22   services to the workers on time and with high quality.
23   Q.   Right, but you didn't write about the
24   latter, the high quality and on time?
25   A.   Well, if you see here -- if you see here,

Page 63

1    it says, "I have yet to figure out what we'll do," in
2    regard to shuttle transportation, "and it actually
3    concerns me quite a bit since this is critical to have
4    once the workers get here."
5         So why doesn't concern me quite a bit?  It
6    concerned me quite a bit because I wanted the workers
7    to be able to go where they wanted and needed to go.
8    And so I was determined to make it happen.
9    Q.   But you didn't mention that.  You were
10   concerned about the cost each day that you're there.
11   Each day that you make good choices, you're saving
12   Signal money and you're concerned about the shuttle.
13   Those are the two things in there, right?
14   A.   Well, here.  What I'm saying is -- again,
15   I'll reread it.
16   Q.   Sure.
17   A.   What I'm referring to -- as far as making
18   good choices, what I'm referring to is things like
19   shuttle transportation most of all.  I have to figure
20   out what we'll do and it actually concerns me quite a
21   bit since that is critical to have once the workers
22   get here.
23        Why was it critical to have?  It was
24   critical to have because the workers needed to know
25   that they would be able to get where they needed to go

Page 64

1    in the town.  So that was concern for the workers'
2    well-being and comfort and happiness in the camp.  And
3    it's in there explicitly.
4    Q.   It's not in there explicitly.
5    MS. HANGARTNER:
6         Objection.
7    A.   I disagree because it was important to
8    me --
9    EXAMINATION BY MR. SANDLER:
10   Q.   Could you read it to me explicitly?
11   A.   Okay.
12   Q.   Just read directly from the text, the
13   explicit part.
14   A.   Okay.
15   Q.   No other commentary.
16   A.   Okay.
17   Q.   And you can read as much as you want to --
18   A.   "... it actually concerns me quite a bit
19   since it's critical to have," have being shuttle
20   transportation, "once the workers get here."  And so
21   that shows -- Like I said, it shows my concern.
22   Q.   That's the explicit part.  Okay.  I just
23   wanted to know what the explicit part was in the text.
24   That's all.
25   A.   Okay.  And so, like I said, this shows

Page 65

1  concern for the workers so that they can get where
2  they needed to go. That's -- that's clear from
3  context, as I'm stating.
4     Q. As you're stating.
5      I want to take a look at a document,
6  SIGE009498.
7    MR. ALEXIS:
8     Does it have an exhibit number?
9    MR. SANDLER:
10     Yes. It's Exhibit 628.
11    MS. HANGARTNER:
12     Can you say the Bates number again? I'm
13  sorry.
14    MR. SANDLER:
15     Absolutely. I'm just about to hand it to
16  you.
17    MS. HANGARTNER:
18     Okay.
19     Thanks.
20    MR. SANDLER:
21     It goes from 9498 to 9499 on the flip side.
22  There's a back page.
23    THE WITNESS:
24     Okay.
25     (Whereupon, the document as described above

Page 66

1  is marked as "Exhibit No. 628.")
2    THE WITNESS:
3     I've read the document.
4  EXAMINATION BY MR. SANDLER:
5     Q. Okay. I'm sorry. I'm going to put it
6  aside for now.
7     A. Okay.
8     Q. But you've read it. Forgive me.
9     A. No problem.
10     Q. I just want to go — I want to enter
11  another document. It's SIGE0004787. And it's Exhibit
12  No. 629.
13     (Whereupon, the document as described above
14  is marked as "Exhibit No. 629.")
15     A. (Witness reviews document.)
16  EXAMINATION BY MR. SANDLER:
17     Q. Specifically, Mr. Sanders, right now I'm
18  only going to ask you about Cell 14, but you're
19  welcome to read the whole thing, Row 14.
20     A. Okay.
21     Okay. I've read the --
22     Q. Okay. What is this document?
23     A. A punch list in a sense.
24     Q. Okay. It's kind of what we were talking
25  about before but not for GE?

Page 67

1     A. Just open issues, yes.
2     Q. And you -- This is Microsoft Excel, the
3  program?
4     A. Yes.
5     Q. Okay. And you put this together on a
6  weekly basis or a monthly or just whenever it needed
7  to be done or --
8     A. It may have been on a whenever as needed,
9  but I don't remember exactly how often.
10     Q. Did anyone else use Excel in the office
11  to -- to like put out information?
12     A. Yes.
13     Q. Okay. But this is what you put together?
14     A. Yes. This is me.
15     Q. Okay. I just want to look at Row 14. We
16  may come back. I just want to look at Row 14 for now.
17  It's the tenth item in the list.
18     A. Yes.
19     Q. And the topic is minibus and driver and the
20  priority of this punch list item is high.
21     A. As are all of the others.
22     Q. That's right. Quite right. Although there
23  are other spreadsheets where there's low. In this
24  one --
25     A. Okay.

Page 68

1     Q. Sorry.
2     A. Okay.
3     Q. You -- I'm just reading Column D. You were
4  looking for a shuttle bus, a bus for the workers; is
5  that right?
6     A. Yes.
7     Q. Okay. And you've got some prices here.
8  I'm just going to read it and if something is like not
9  quite -- If you want to amplify it, please do.
10     A. Okay.
11     Q. "Unable to get decent used vehicle for less
12  than 25 to 30,000 and ideal is high 40,000s. Yellow
13  school buses are cheaper since built for practicality,
14  not comfort. Cruz --" Is that Freddie Cruz?
15     A. Yes.
16     Q. Okay. "Freddie Cruz has given possible
17  vendors."
18     So -- And that's all stuff that you then
19  submitted to whom at Signal?
20     A. Probably Ron Schnoor would have been
21  apprised of this. I don't remember specifically who,
22  but he was my manager.
23     Q. Okay. I want to talk about another
24  document. We may come back to that document. For now
25  I want to talk about document or enter document

(504)525-1753
ONE SHELL SQUARE,#250

HUFFMAN & ROBINSON, INC.
CERTIFIED COURT REPORTERS

(800)749-1753
NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

**Page 69**

1  SIGE0000 -- four zeros -- 319.  And it goes to 326.
2  So there's a lot in here.  It's going to be Exhibit
3  No. 630.
4      (Whereupon, the document as described above
5  is marked as "Exhibit No. 630.")
6      A.   Thank you.
7      (Witness reviews document.)
8  MR. ALEXIS:
9      What exhibit number are you on?
10  MR. SHAPIRO:
11      630.
12  THE WITNESS:
13      Okay.
14  EXAMINATION BY MR. SANDLER:
15      Q.   What is this, Mr. Sanders?  Or at least
16  everything but, say, the last page.  What is this?
17      A.   It's called -- On Page SIGE0000320 it's
18  called a "Housing Inspection Check List OSHA Migrant
19  Housing Standards."
20      Q.   And just -- What's in the footnote there?
21      Actually, you know what?  Don't worry about
22  it.  We've already established that.
23      So is this the document that you felt the
24  man camp had to comply by?  We had some earlier -- We
25  showed you some earlier e-mails where we were talking

**Page 70**

1  about OSHA standards.  I think we were talking about
2  that earlier.
3      A.   Okay.  You asked if this was the document
4  which --
5      Q.   Is this the document -- If your bosses say
6  to you: We have to be OSHA compliant, is this the
7  document that you have to comply with?
8      A.   I don't know.  Because it talked about
9  growers on the back, and the context seems to be
10  different in certain ways to what we were having,
11  but -- different in some ways, but certainly similar
12  in others, too.
13      So we didn't -- We viewed it as a
14  reference, not as a strict set of conditions.  We
15  wanted to benefit where we could.
16      Q.   Have you seen this document before?
17      A.   Yes.
18      Q.   Okay.  And is this your handwriting on
19  SIGE0000319?
20      A.   Yes.
21      Q.   Okay.  And that says, "OSHA Requirements"?
22      A.   Yes.  I think a better term for it would
23  be -- would be what I just said.
24      Q.   That's your view now, but your view then
25  was these were the requirements?

**Page 71**

1      A.   I think an incomplete understanding would
2  have caused me to write "requirements." Because,
3  again, like I said, there's -- there's a lot of things
4  in here that are not requirements for Signal as far as
5  growers and then --
6      Q.   Okay.  But there are some that are
7  requirements and there's some that are not
8  requirements?
9      A.   Right.  And so there -- Well, when you say
10  "requirements," I'm saying it's a -- it's a -- they
11  call it the checklist.  They don't call it
12  requirements.  And not all of the things applied to
13  us.  So how could the things that OSHA calls
14  requirements be requirements for us when they didn't
15  apply.
16      Q.   I agree with you.  If it doesn't apply to
17  your man camp, then you're not required to follow
18  them?
19      A.   Right.  And so I misstated when I said
20  requirements.  Our final authority was the City of
21  Pascagoula as far as was the camp in an acceptable
22  condition.  They were the final authority.
23      Q.   Let's turn to SIGE0000326.  Does this
24  document look familiar?
25      A.   I'm looking at it for the first time in

**Page 72**

1  three-plus years.
2      Q.   That's right.  Sorry.
3  MR. SHAPIRO:
4      Is it an exhibit already?
5  MR. SANDLER:
6      This is all that same exhibit, but 326 is
7  the specific page number.
8  MR. SHAPIRO:
9      Sorry about that.
10  EXAMINATION BY MR. SANDLER:
11      Q.   Is this your handwriting at the bottom?
12      A.   It is.
13      Q.   So what I meant to say is had you seen this
14  document before, not are you familiar with this
15  document.  You've seen this document before?
16      A.   Yes.
17      Q.   There's five points here that seem to be
18  highlighted.  "I have questions about the following
19  points in these OSHA guidelines."  I'm just going to
20  jump down to Point 13, which is the second point.
21      "If bunk beds are used, are they at least
22  48 inches apart from other beds?"  Did you ever get an
23  answer to that question?
24      A.   I don't remember.
25      Q.   Do you remember if the bunkbeds were 48

## Page 81

1  checklist.

2      Do you recall that conversation we had?

3   A.  Yes.

4   Q.  And I think you said -- and correct me if

5  I'm wrong -- that the final determinant was the

6  Pascagoula City Council or someone in Pascagoula to

7  determine the standard, and the OSHA was just

8  another -- another entity or element that you were

9  considering as well?  Is that -- I need you to

10  elaborate because I don't think I understood.

11   A.  Okay.  The OSHA information was used as a

12  reference for us because there were aspects of it

13  which clearly did not apply.  There were others which

14  we -- which we reviewed and had questions about.

15      But as far as whether the camp met

16  liveability and suitability for its purpose, we wanted

17  to ensure that we conformed to the codes of the City

18  of Pascagoula as far as their building inspector as

19  well as -- if I could add this part too -- the fire

20  marshal, what he required.

21   Q.  Actually, that was my next question.  Who

22  at the City of Pascagoula were you like in contact

23  with or who was the liaison?

24   A.  There were -- There were two entities.  One

25  was building inspector individuals.  I don't remember

## Page 82

1  their names.  The other was the fire chief or fire

2  marshal.  And Todd McClum, I believe, may have been

3  his name.

4   Q.  Okay.  So he's the fire chief?

5   A.  Yes.

6   Q.  He's one entity and then there is a housing

7  inspector?

8   A.  A building inspector.

9   Q.  A building inspector.

10   A.  Yes.  And we felt that if we satisfied

11  their requirements, that we would be in accordance

12  with the guidelines that were imposed.

13   Q.  Okay.  So I just wanted to get a sense of

14  what the thinking was at the time.

15   A.  (Witness nods head affirmatively.)

16   Q.  You're nodding?

17   A.  Yes.

18   Q.  And that was the thinking?

19   A.  Yes.

20   Q.  All right.  I just want to switch back.

21  We're going to go back and forth.  I just want to go

22  back into this document.  It's the OSHA standards.

23   A.  Okay.

24   Q.  I think it was the last exhibit we were

25  looking at.

## Page 83

1   A.  Yes.

2   Q.  For the record, it's Exhibit No. 630.  And

3  I just want to go to Bates page SIGE0000322.

4      And do you see No. 21 there, Point No. 21?

5   A.  Yes.

6   Q.  All right.  "Does each room used for

7  sleeping --" I'm reading from it now.  Sorry.  "Does

8  each room used for sleeping purposes contain at least

9  50 square feet of floor space for each occupant?"

10      I just want to ask you about this

11  handwriting here.  Is that your handwriting?

12   A.  Yes.

13   Q.  Okay.  Can you just explain to me the

14  formula that you're using here and just what the

15  numbers represent?

16   A.  Yes.  The square footage of each bunkhouse

17  was 864 gained by multiplying 24 by 36.

18   Q.  And this is feet?

19   A.  Square feet.

20   Q.  Okay.

21   A.  Yes.  And so per this, this document, this

22  reference document, we took 864 and divided it by the

23  50.  In other words, how many men according to this

24  could -- could sleep in or were recommended for

25  sleeping in an 864-square-foot area.  And the answer

## Page 84

1  is approximately 17.

2   Q.  Okay.  I know there's like a decimal in

3  there and so it's not exactly, but approximately.

4   A.  Approximately 17.

5   Q.  And that's by this document.  That's what

6  you get from following the standards that are laid out

7  here?

8   A.  Yes.

9   Q.  Okay.  Okay, Mr. Sanders.  I want to enter

10  a document, SIGE0010567 and that goes up to 71.

11   MR. KUPPERMAN:

12      Seven --

13   MR. SANDLER:

14      71.  There's four pages.

15      This will be Exhibit 631.  I'll have you

16  take a look at it.  It's an e-mail thread.

17      (Whereupon, the document as described above

18  is marked as "Exhibit No. 631.")

19   MS. TSU:

20      Oh, stop.

21      Can I see that, please?

22   MR. ALEXIS:

23      This one?

24   MS. TSU:

25      Yeah.  Can I have it?

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS            NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

Page 97

1    Ralph, that's what's coming in right now.
2        And just so you know, Mr. Sanders, as per
3    right now, I'm only going to ask you about D6,
4    so -- Please read the whole thing, but just so
5    you know.
6    THE WITNESS:
7        Okay. Okay.
8    MR. SHAPIRO:
9        This is 634?
10   MR. SANDLER:
11       This is on Bates SIGE0004790.
12       Oh, sorry. Sorry. I misunderstood. It's
13   Exhibit 633. We pulled back the last one.
14   MR. SHAPIRO:
15       Okay.
16   MR. SANDLER:
17       My mistake.
18   THE WITNESS:
19       Okay.
20   EXAMINATION BY MR. SANDLER:
21   Q.  Okay? This is -- The title of this -- This
22   is an Excel printout from Microsoft Excel?
23   A.  Yes.
24   Q.  And the title is "Pending Man Camp Issues"?
25   A.  Yes.

Page 98

1    Q.  And it's from November 2006?
2    A.  Yes.
3    Q.  Okay. D6, I'm just going to read it and
4    just ask you one question. The date on it is November
5    22nd on that cell entry.
6    A.  Yes.
7    Q.  "Indians can't sit on lower bunks since too
8    low. Must be raised approximately 16 inches for all
9    150 bunks. Steven Arnold to coordinate through
10   Cooney." And you put it down as a high priority?
11   A.  As with everything else on the page.
12   Q.  As with everything else.
13       Did the bunks get raised?
14   A.  I believe that they did.
15   Q.  When did they get raised?
16   A.  I don't remember the timing.
17   Q.  Did they get raised before the new trailers
18   were put in in '07?
19   A.  I don't remember the timing.
20   Q.  Did they get raised close in time, do you
21   recall, to November 22nd, 2006?
22   A.  It was a large project because there were
23   150 bunkbeds to work on. So although I don't remember
24   the exact timing, I know that -- I think I'm recalling
25   correctly that they set to work on it quickly.

Page 99

1    Q.  Okay. But you said it's a big project and
2    you don't know when they did it?
3    A.  I don't know when it would have been
4    finished, but I believe that it was started quickly,
5    soon after the problem was identified.
6    Q.  Would this be something that you would
7    record in your daily journal? And I distinguish here
8    from the typed journal the handwritten journal that
9    you -- that you kept when you were at work to record
10   things like action items and things you had to take
11   care of at work.
12   A.  It was an action item here, so it's
13   possible that it would have been in my handwritten
14   spiral-bound notebook.
15   Q.  Okay. I just want to ask you, what is --
16   Well, let me give you this document. This doc will be
17   Exhibit No. 634 and it's SIGE0556457.
18       (Whereupon, the document as described above
19   is marked as "Exhibit No. 634.")
20   MS. HANGARTNER:
21       Thank you.
22   EXAMINATION BY MR. SANDLER:
23   Q.  I'm going to ask you about the
24   December 11th entry, Mr. Sanders --
25   A.  Okay.

Page 100

1    Q.  -- just so you know. But please read the
2    whole thing.
3    MR. ALEXIS:
4        This is Exhibit 634?
5    MR. SANDLER:
6        I believe so, yes.
7    THE WITNESS:
8        (Witness reviews document.)
9        I've read the document.
10   EXAMINATION BY MR. SANDLER:
11   Q.  Okay. What is an OSHA-recordable incident?
12   It's in the last sentence of the opening paragraph of
13   the December 11th, 2006 journal entry.
14   A.  That would be within the production context
15   on the rigs where this worker, Satyanarayana, broke
16   his hand on the job as opposed to inside the facility.
17   That's what we refer to on-the-job accidents or
18   recordable incidents.
19   Q.  Okay. I understand. So if you injure
20   yourself in the man camp, that's not recordable --
21   that's not a recordable incident?
22   A.  I don't believe so.
23   Q.  Okay. I don't want to like pick out like
24   little things here and there, but I just wanted to ask
25   you one other thing about it.

Page 101

1    A.   Sure.  Sure.
2    Q.   You say here that there's an intention --
3  let me be more specific.  There's a sentence about a
4  third of the way up that begins with "Sabulal and
5  Cheton ...."  Is that the correct pronunciation?
6    A.   Yes, Cheton.
7    Q.   Cheton.
8       And it's talking about an intention on your
9  behalf to perhaps spend a night in the man camp.  And
10  I -- you know, you had -- you know, you're busy,
11  obviously, and you're setting it up and all that
12  stuff.  So I understand that you hadn't done it by
13  this date here, December 11th.  Did you ever?
14    A.   I don't -- I don't remember ever doing it.
15  Maybe if I'd worked a little later that night, it
16  might have been feasible.
17    Q.   I'm not asking about that.
18    A.   I know.
19    Q.   I just had another question.  Did Signal
20  ever establish a separate company to own the man
21  camps?
22    A.   It was a consideration at the outset.  I
23  don't think that that ever happened, but you would
24  need to ask Chris Cunningham for a definite answer.
25    Q.   For confirmation?

Page 102

1    A.   Yes.  I don't think so, but I'm not a
2  hundred percent.
3    Q.   Right.  How many OSHA-recordable incidents
4  did you have?
5    A.   I've never had one.
6    Q.   You personally.
7    A.   I'm pretty safe.
8    Q.   How many OSHA-recordable incidents,
9  roughly, were you aware of that happened at Signal?
10    MS. HANGARTNER:
11       Object to form.
12    A.   That was a production issue, and I was not
13  involved in working on the rigs.  And, also, that
14  was -- OSHA-recordable incidents and keeping up with
15  them was outside of my purview.
16  EXAMINATION BY MR. SANDLER:
17    Q.   I just want to switch gears slightly a bit.
18       You were in charge of the workers at the
19  camp, right?
20    A.   I was not in charge of them on production
21  matters.  I was only in charge of the workers' housing
22  facility and issues pertaining to that scope.
23    Q.   But you had like a relationship with them?
24    A.   With --
25    Q.   The workers who lived in the man camp.

Page 103

1    A.   Yes.
2    Q.   And how would you characterize the
3  relationship?
4    A.   A good one.
5    Q.   You learned all of -- well, did you learn
6  their names?
7    A.   Yes.  I -- I learned many, many of their
8  names.
9    Q.   And that's how you would refer to them?
10    A.   Yes.  In fact, they were so amazed at my
11  ability to remember and properly pronounce their names
12  that they were constantly remarking upon it.
13    Q.   Did anyone else at Signal learn their names
14  that you know of?
15    A.   Yes.
16    Q.   Who?
17    A.   Human resources.
18    Q.   Knew all -- Okay.
19    A.   I mean, they had all of their names.
20    Q.   My question is in correspondence about the
21  workers when you were talking with other Signal
22  people, you knew the names of the workers, but how
23  were they referenced?
24    A.   Well, I know that -- I mean, for instance,
25  out on the -- out on the rigs in the production work

Page 104

1  that we do, there would be a superintendent, like a
2  W.A. Shouse, for instance, at the top.  And then he
3  would have general foremen who would have foremen.
4  And then the foremen would have multiple crews.
5       And so in the crews, the workers would give
6  nicknames to one another.  And the Indian workers got
7  nicknames, too.  And so they were referred to by that.
8  And many times they seemed proud of their nicknames.
9  They would put them on their hardhats and even
10  sometimes call one another that, if I remember.
11       So, yeah, they were known out -- in
12  production by nicknames.  I called them by their
13  names.  Human resources knew their names.  Darrell
14  knew at least some of their names.  I don't know that
15  he knew as many as me.  You'd have to ask him.  But,
16  yeah, they were referred to by name.  Absolutely.
17    Q.   Were they referred to by name more than
18  referred to by their badge number in your
19  correspondence and e-mails and stuff just generally?
20  I mean, obviously, you're not going to know the exact
21  quantity.  But if you are talking about a worker,
22  would you say there was more reference to them by way
23  of badge number or by way of name?
24    A.   I don't know which one I used more because,
25  again, I knew many, many of their names and would try

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250             CERTIFIED COURT REPORTERS             NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

## Page 105

1  to use them whenever -- whenever possible.
2      Q.  But badge number was another way to
3  reference them?
4      A.  Another way to reference the worker?
5      Q.  Uh-huh (indicating affirmatively).
6      A.  Yes.
7      Q.  And it was a nameless one.  You didn't need
8  to know the person's name to reference them by badge
9  number?
10     A.  Oh, I did know the person's name.
11     Q.  I know you know their names.
12     A.  But you said you didn't need to know the
13 worker's name, but I did know them.
14     Q.  One didn't need to know.  One could
15 correspond about a worker --
16     A.  Okay.
17     Q.  -- not knowing their name by use of the
18 badge number; is that right?
19     MR. KUPPERMAN:
20         Object to form.
21     MS. HANGARTNER:
22         Object to form.
23 EXAMINATION BY MR. SANDLER:
24     Q.  How were the badge numbers used in
25 correspondence?

## Page 106

1      MS. HANGARTNER:
2          Can I just ask a question?  Are you talking
3      about when John referenced someone?  And the only
4      reason I want to make a distinction is, when HR
5      and e-mails and correspondence go out about any
6      worker, Indian or not, their badge number is used
7      to protect their privacy.
8          So that's why I'm -- Well, like what --
9      MR. SANDLER:
10         I'll specify.
11     MS. HANGARTNER:
12         -- instances are you talking about?
13     MR. SANDLER:
14         Okay.  I'll specify.
15 EXAMINATION BY MR. SANDLER:
16     Q.  Okay.  I'm going to move on to the per
17 diem.
18     A.  Okay.
19     Q.  The $35 a day.
20     A.  Sure.
21     Q.  We established this yesterday, but just so
22 we're all on the same page.  It's about $21 or so for
23 the housing and about $14 or so for the food?
24     A.  General overview, yes.
25     Q.  How many meals were served a day to -- how

## Page 107

1  many meals were available to workers per day?
2      A.  There were -- there was a breakfast time in
3  the morning, they would prepare a tiffin for lunch,
4  and then there was a separate time.  So three separate
5  meals.
6      Q.  Is a tiffin like a lunch box?  Is that
7  right?
8      A.  Well, it's not a box.  It's more like a
9  kind --
10     Q.  A container?
11     A.  -- of cylinder that would -- like a Thermos
12 in a way that could keep meals warm and stuff like
13 that.
14     Q.  Okay.  So it's like -- What would go in
15 there?  Would that be like soup or would it be food?
16 I mean, I really just -- I don't understand.
17     A.  Yeah.  I mean, just think of something like
18 this.  It's cylindrical.
19     Q.  What is this?  What are you holding?
20     A.  Oh, this is a cylindrical drinking bottle.
21     Q.  Okay.
22     A.  And inside of it would be little stainless
23 steel cups and they would stack on top of each other,
24 if I remember.  And inside each one of those cups,
25 they could put a serving of whatever food they wanted

## Page 108

1  to have and take that out to the rig with them.
2      Q.  So the food they would eat at lunch was
3  prepared at breakfast time?
4      A.  It was -- It was their lunch and it was --
5  They would take it in the morning just like all of
6  other Signal employees that they worked with would
7  have to prepare a lunch and eat it on the rigs.
8  Because they only have half an hour, and you can't get
9  off the rig and out into town or back home in that
10 short space.
11         So it was common practice for all Signal
12 workers who wanted to eat lunch to bring one.  And
13 this was the way we -- that the catering service
14 provided that for the Indians so that the treatment
15 between them would be the same as everybody else.
16     Q.  Were there fridges out on the rigs?
17     A.  I'm not sure.
18     Q.  Okay.  So we're talking about the food and
19 we agreed it's about $14 a day that they were paying
20 for it?
21     A.  Yes.
22     Q.  Can you tell me how that dollar figure was
23 originally arrived at?
24     MR. KUPPERMAN:
25         Object to form.

Page 109

1    A.   It was arrived at when, as I described in
2  testimony yesterday, upon trying to negotiate with
3  Michael Pol about the $14 a day, he banged his fist on
4  the table and, you know, said that he was going to be
5  making money at this and that $14 a day was fair or
6  words to that effect and that he wasn't moving from
7  that 14. And so that was -- that was the price that
8  we agreed on and how we agreed to it.
9  EXAMINATION BY MR. SANDLER:
10       I'm going to enter doc SIGE0055717 and it's
11  Exhibit No. 635.
12       (Whereupon, the document as described above
13  is marked as "Exhibit No. 635.")
14  THE VIDEOGRAPHER:
15       Counsel, I need to change tapes.
16       We're going off the record. This is the
17  end of Videotape No. 3. It's 1:43.
18       (Whereupon, a recess in the proceedings was
19  taken.)
20  THE VIDEOGRAPHER:
21       We're back on the record. It's 1:53. This
22  is the beginning of Videotape No. 4.
23  EXAMINATION BY MR. SANDLER:
24    Q.   Okay, Mr. Sanders. I've handed you
25  SIGE0055717. Have you had a chance to read it?

Page 110

1    A.   Yes.
2    Q.   I just want to ask you a few questions
3  about it. The date of this is August 3rd, 2006?
4    A.   Yes.
5    Q.   And when was that meeting with Michael Pol
6  that we talked about yesterday? And let me be more
7  specific. The one where you talked about the food and
8  I think that he had said some things that had
9  indicated to you that he might be greedy. I think he
10  pounded the table. Do you recall this?
11    A.   Yes, yes.
12    Q.   Okay. When was that meeting in conjunction
13  with --
14    A.   It was after this date.
15    Q.   Okay.
16    A.   Perhaps by about a week or so.
17    Q.   Okay. So this was before that happened?
18    A.   Yes.
19    Q.   You write in the second paragraph that you
20  have done some like due diligence on this $14. You
21  called around to see if it's a good price; is that
22  right?
23    A.   Yes. Yes.
24    Q.   And the last sentence you write "A typical
25  low-end menu for three meals can run 15 to $25 per

Page 111

1  day"?
2    A.   Yes.
3    Q.   So --
4    A.   That's what I wrote.
5    Q.   Right. So the standards by which you were
6  deciding whether this was a good price low-end
7  meals?
8    A.   No. What this refers to is in this same
9  time frame, this is when Anjay came.
10    Q.   Anjay Keswani?
11    A.   Anjay Keswani who was the caterer Michael
12  Pol was intending to use if we went with him. And he
13  catered a very fancy, very nice, very elaborate
14  dinner.
15    Q.   Right. We talked about that. That is when
16  you met Mr. Burnett?
17    A.   Yes. And so by using that term there,
18  "low-end," I was trying, as I'm recalling and I think
19  it's correct, not that, you know, this is, you know,
20  poor quality, you know, only -- not like that. Rather
21  just trying to draw distinction that we're not going
22  to be able to provide hundreds of five star, you know,
23  Ritz-Carlton-Signal-main-conference-room-type dinners
24  every singe day. So it's just drawing for Lisa a
25  distinction between the two and shouldn't be

Page 112

1  interpreted in a context other than that.
2    Q.   And so the price that Mr. Pol quoted you at
3  was less than the prices that you had seen for low-end
4  meals?
5    A.   Well, let me say again, when you -- when
6  you reference low end, I'm not -- I don't think I'm
7  talking about low end in the same way that you may be
8  implying. I'm just drawing a distinction between --
9    Q.   Not five-star quality.
10    A.   Well, the fancy Signal -- Signal meal that
11  could be had at, you know, for instance, Anjay's
12  Indian restaurant, and this was -- this was food that
13  was very good quality, this menu, that the intent was
14  that it be very good quality but affordable.
15    Q.   All right. But I mean, in fairness,
16  Mr. Sanders, there's no reference to good quality in
17  this e-mail?
18    A.   Again, that's -- if you get back in
19  context --
20    Q.   Yes.
21    A.   -- it was with, wow, we've just had an
22  Indian meal that might be had at a very high-end
23  Indian restaurant. Is that what the workers are going
24  to be seeing --
25    Q.   Right.

## Page 113

1   A. -- each day on a daily basis? No. So,
2   again, I was trying to draw that distinction.
3   **Q. Okay. That's fair. And what -- I mean,**
4   **let me ask you if you recall what that purpose of that**
5   **luncheon was that we agreed yesterday?**
6   A. Yes. It was to show Signal management that
7   Anjay was very good at preparing Indian food.
8   **Q. Okay.**
9   A. And that he had years of experience in
10  doing so.
11  **Q. So that food that you had at the luncheon,**
12  **this is where Mr. Burnett is there, Signal management**
13  **is there, you're there, that's some kind of quality,**
14  **but that's not reflective of the food that you're**
15  **paying for for the workers?**
16  A. Again, it might be the difference between
17  going to the Ritz Carlton and eating a meal versus
18  going to one of the places here in the food court on
19  Floor 2, which hundreds of people in this building
20  find very good --
21  **Q. That is not what we're talking --**
22  A. I'm just trying to draw the parallel so
23  that you understand the distinction and in the term
24  that I used and how it was intended to mean. Because
25  I know that that's what your interest is, is the

## Page 114

1   interpretation. And that's what I'm giving.
2   **Q. Right. Okay. And that's the**
3   **interpretation of low end?**
4   A. In this context --
5   **Q. That's your interpretation.**
6   A. -- immediately -- Again, remember that this
7   e-mail is dated in the immediate --
8   **Q. Aftermath?**
9   A. -- proximity of Signal management having
10  enjoyed what, at least for me to that point, was the
11  best Indian meal I'd ever had.
12  **Q. It was like a deluxe Indian meal?**
13  A. Yes.
14  **Q. But we agreed yesterday the purpose of that**
15  **luncheon was for Signal people to get a sense of the**
16  **kind of food that the workers would be eating?**
17  A. I would say, again, that meal was to show
18  that Anjay had good experience and could -- could
19  provide things at a very good level.
20  **Q. All right.**
21  A. And that his price, in order just to show
22  that we were very concerned about minimizing the cost
23  to the workers, that $14 a day was an outstanding
24  price in comparison to other options that were out
25  there, that we did our due diligence, and $14 was --

## Page 115

1   **Q. Cheaper?**
2   A. Was cheaper, yes. For -- In fact, if I
3   could elaborate just a moment.
4   **Q. Please.**
5   A. One of the vendors that we went to, he even
6   said: My goodness. If you can get something like
7   that from somebody with Anjay's experience for $14, I
8   can't touch it. Go with him.
9   **Q. But Anjay Keswani was a -- was affiliated**
10  **with Michael Pol, right?**
11  **MR. KUPPERMAN:**
12      **I object to the form of the question.**
13  A. Describe affiliation.
14  EXAMINATION BY MR. SANDLER:
15  **Q. How did you come to meet Anjay Keswani?**
16  A. I met him at the luncheon for Signal
17  management.
18  **Q. How did -- Why was he there at that**
19  **luncheon?**
20  **MR. KUPPERMAN:**
21      **I object to the form of the question.**
22  A. He who?
23  EXAMINATION BY MR. SANDLER:
24  **Q. Why was Anjay Keswani at the luncheon?**
25  **MR. KUPPERMAN:**

## Page 116

1       Same objection.
2   A. He was the Indian caterer.
3   EXAMINATION BY MR. SANDLER:
4   **Q. How did Signal learn about Anjay Keswani?**
5   A. Through Michael Pol.
6   **Q. Did you -- Did Michael Pol have any part in**
7   **that $14 fee as far as you understood?**
8   A. Yes.
9   **Q. Okay. Please elaborate.**
10  A. That he would be earning $1.50 of the $14.
11  **Q. Per day per worker?**
12  A. Per day per worker.
13  **Q. And that is -- If I were to say to you**
14  that's about $325,000 a year, would that sound about
15  right to you?
16  A. Yes. If you multiply it across both camps
17  at a rate of 600 people, which was never achieved.
18  **Q. Okay. But the intent at the time was that**
19  **calculation?**
20  A. Yes.
21  **Q. Okay. That's a good point.**
22      Now, does Mr. Pol stay involved in the
23  catering arrangements up until when the Indians begin
24  to arrive?
25  **MR. KUPPERMAN:**

## Page 117

1    Object to the form.
2    A.   Yes.
3    EXAMINATION BY MR. SANDLER:
4    Q.   Was he stipulated to receive that dollar
5    fifty that we talked about?
6    MR. KUPPERMAN:
7    Object to the form.
8    A.   Yes.
9    EXAMINATION BY MR. SANDLER:
10   Q.   When the Indians arrived?
11   A.   I'm sorry.  Could -- When you say was he
12   stipulated to receive the dollar fifty, maybe you
13   could elaborate.
14   Q.   Sorry.  Let me restate.
15        We agreed that there's a $14 amount.  And
16   of that 14, a dollar fifty was -- in August the
17   discussion was a dollar fifty that would be paid to
18   Michael Pol.  And then I guess 12.50 would be paid to
19   whomever, presumably Anjay?
20   A.   Laxmi Catering --
21   Q.   Laxmi.  Thank you.
22   A.   -- was the company Anjay was with.
23   Q.   Okay.  So that's how I understand it.  And
24   my question to you is did that arrangement that I've
25   just described to you that was in contemplation in

## Page 118

1    August, did it come to fruition when the workers
2    arrived in November?
3    MR. KUPPERMAN:
4    Object to form.
5    A.   Yes, but there was a -- Without getting
6    into too much detail, there was a graduated pricing
7    scale that depended on how many workers were in the
8    camp.
9    EXAMINATION BY MR. SANDLER:
10   Q.   I'm going to enter into evidence doc number
11   SIGE0004518.  It is Exhibit No. 636.  And just for the
12   record, it is a journal entry from October 6th, 2006
13   that I think you authored, Mr. Sanders.
14        (Whereupon, the document as described above
15   is marked as "Exhibit No. 636.")
16   A.   (Witness reviews document.)
17        I've read the document.
18   EXAMINATION BY MR. SANDLER:
19        Okay.  This is dated October 6th, 2006?
20   A.   Yes.
21   Q.   And it's -- This is just one of your
22   journal entries?
23   A.   Yes.
24   Q.   There seems to be an intention here to
25   transfer -- It looks like from the last portion here

## Page 119

1    that, regardless of who would provide the food,
2    whether it were Anjay, Michael Pol, the plan as you
3    saw it was that it would be at $14 a day?
4    A.   Yes.
5    Q.   Okay.  I think that's all.
6    MS. HANGARTNER:
7    Can we take a quick break?
8    MR. SANDLER:
9    Of course.
10   THE VIDEOGRAPHER:
11   We're going off the record.  It's 2:10.
12   This is Videotape No. 4.
13        (Whereupon, a recess in the proceedings was
14   taken.)
15   THE VIDEOGRAPHER:
16   We're back on the record.  It's 2:16.
17   Videotape No. 4.
18   EXAMINATION BY MR. SANDLER:
19   Q.   Okay, Mr. Sanders.  I want to enter another
20   document into the record.  It is SIGE0057696.  And
21   it's Exhibit 637.  And just so you know, I'm going to
22   ask you about the e-mail from December 18, 2006 at
23   6:08 p.m.
24        (Whereupon, the document as described above
25   is marked as "Exhibit No. 637.")

## Page 120

1    A.   Okay.  So just this page --
2    EXAMINATION BY MR. SANDLER:
3    Q.   You can read it, but I'm just going to ask
4    you about this one.
5    A.   Okay.  Would there be other pages
6    connected to this exhibit?
7    Q.   There would be.  This would be.  There
8    would be further e-mails.
9    A.   Do you want to show me those, also?
10   Q.   Well, my point is that I'm going to ask you
11   about the content of this e-mail from Mr. Schnoor.
12   A.   Okay.
13   Q.   And all of those e-mails were later in
14   time.
15   A.   Okay.
16   Q.   So if I ask you a question and you feel
17   that a later-in-time e-mail is pertinent, then let's
18   do that.
19   A.   Sure.
20   Q.   But I have a suspicion we're not going to
21   need to go there.
22   A.   No problem.
23   Q.   So if you're ready --
24   A.   Ready.  Yes.  Thanks.
25   Q.   Just in connection with the last exhibit we

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS            NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

Page 129

1    A.  It may have been my idea.  I don't remember
2  specifically, but it may well have -- it may have been
3  mine.
4    Q.  You were the man camp manager.  You were
5  like the liaison and --
6    A.  Right.
7    Q.  -- you had recognized that there was a need
8  to communicate more?
9    A.  Right.  And just -- without remembering the
10  exact details right now about how it came up, it would
11  make sense to me that it would be easier to address
12  the questions the workers had all at once in a group
13  setting than many, many times one on one or a few on
14  one.
15    Q.  Right.
16    A.  It facilitated efficiency of time.
17    Q.  More of time.  Sure.
18        Who from Signal management was at these
19  meetings aside from you?
20    A.  Darrell Snyder would be present and there
21  was also an assistant man camp manager which would be
22  Darrell -- Darrell and I were at an equal level
23  basically.
24    Q.  Okay.
25    A.  And then a step down in the management

Page 130

1  hierarchy from that was an assistant whose name was
2  also John.
3    Q.  What was his last name?
4    A.  I don't remember offhand.
5        John Perry.
6    Q.  John Perry?
7    A.  Yes.
8    Q.  Okay.  How many workers attended these
9  meetings?  And I know you're not going to give me a
10  precise number, but --
11    A.  Okay.  There were day shift workers and
12  night shift workers.  And so there would be day shift
13  community meetings and night shift community meetings.
14    Q.  And how many were at these independent
15  meetings?
16    A.  I mean, the numbers would vary from meeting
17  to meeting, but, on the whole, the -- I would say the
18  overwhelming majority of the workers would come to
19  them.  Greater than two-thirds for sure and probably
20  significantly higher than that.
21    Q.  Where were they held?
22    A.  They were held in the dining room/
23  cafeteria area.
24    Q.  What were like some of the more common
25  subject matters that were attended to at these

Page 131

1  meetings?
2    A.  They would -- They would question about the
3  bunkhouses as far as the number of workers in them and
4  what can be done to alleviate that.
5    Q.  I want you to continue, but is that the 24
6  issue --
7    A.  Yes.
8    Q.  -- from Ron Schnoor's?
9    A.  Yes.  Yes.  Yes.
10        Just facility-related issues such as that.
11  And the food was another frequent topic of
12  conversation.
13    Q.  Its quality?
14    A.  Yes.
15    Q.  Was plumbing raised at these meetings?
16    A.  Well, I would -- It may have been.  I would
17  include that in facility-related issues.
18    Q.  Oh.  Okay.  Correct.
19        I know this is going to be a subjective
20  question, but how would you characterize the mood at
21  the meetings?
22    MS. HANGARTNER:
23        Can I just ask you to clarify kind of which
24    meetings?  Because I'm going to assume as they
25    progressed there were differing moods.

Page 132

1    MR. SANDLER:
2        Okay.  Right.
3  EXAMINATION BY MR. SANDLER:
4    Q.  The meetings started after December 18th,
5  correct?
6    A.  Yes.
7    Q.  So let's just talk about whatever meetings
8  you held between then and before, say, the new year,
9  just like those kind of early meetings.
10    A.  Uh-huh, uh-huh.
11    Q.  What was the mood at these?
12    MR. SHAPIRO:
13        Object to form.
14  EXAMINATION BY MR. SANDLER:
15    Q.  What was your opinion of the mood?
16    MR. SHAPIRO:
17        Same objection.
18    A.  I felt that the workers appreciated the
19  opportunity to have Signal listen to their concerns
20  and explain how we would strive to address them.
21  EXAMINATION BY MR. SANDLER:
22    Q.  How often would you say, approximately,
23  were these meetings happening in the early stages?
24  Let's just think about December of 2006.
25    A.  Maybe a couple of times a month,

Page 133

1   something -- something like that.
2       Q.   Oh, okay.
3       A.   I mean, fairly regularly, but not every
4   week.
5       Q.   Okay.
6       A.   I don't believe they were every week.
7       Q.   Maybe three times every two weeks. Does
8   that sound about right?
9       A.   No. No. Not every -- three times every --
10  three times in two weeks. That would be more than
11  once a week.
12      Q.   Sorry. Sorry. Quite right. Quite right.
13          Was -- You said facilities was an issue.
14  You said food was an issue.
15      A.   Uh-huh (indicating affirmatively).
16      Q.   What about green cards? Were they ever
17  brought up as an issue?
18      A.   I believe that they were, but I don't -- I
19  can't remember specifically, but it would not surprise
20  me at all if they would be brought up because they
21  were on the workers' minds quite regularly.
22      Q.   Right. You heard about them when --
23      A.   Yes.
24      Q.   -- when you had these meetings?
25      A.   Yes.

Page 134

1       Q.   Do you recall how you responded to
2   requests -- queries about green cards?
3       A.   Yes.
4       Q.   Okay. What did you say?
5       A.   I would say the same thing that I had
6   always said ever since I heard the first question when
7   probably wave three came when I would have been back
8   from India. And I think it quite likely that each
9   successive wave asked that question. When are we
10  getting the green cards? When are we getting the
11  green cards?
12          And as I believe I testified yesterday, the
13  response that I gave was consistent, which is -- which
14  is to say that: You are here, you as Indian workers,
15  on a ten-month H-2B visa. That's what we can promise
16  you. Because the approval process is not in Signal's
17  hands. It's in the U.S. government's hands. What we
18  will do is we will apply for extensions for the yes
19  workers.
20      Q.   Oh, okay. You told them that there was a
21  yes worker and a no worker in December of 2006?
22      A.   I don't think we were -- I don't think we
23  were at that stage of the process at that point. So
24  that wouldn't have been December.
25      Q.   Okay. So you didn't say that?

Page 135

1       A.   You didn't -- My understanding was these
2   meetings, how did they go.
3       Q.   Yeah. I was asking you about the December.
4       A.   Oh, okay. Okay. Well, then, that yes/no
5   would not have been part of December. It wouldn't
6   have been part of December. But just you're here on
7   an H-2B visa for ten months and extensions would be
8   applied for after that.
9       Q.   For all of them?
10      A.   Just talking -- I'm just talking a general
11  process.
12      Q.   But you didn't distinguish amongst the
13  workers?
14      A.   Again, I'm just saying a general process.
15      Q.   So it would be reasonable to assume, then,
16  that all workers are going to get H-2B extensions
17  applied for?
18      MR. ALEXIS:
19          Object to form.
20      MR. KUPPERMAN:
21          Object to form.
22  EXAMINATION BY MR. SANDLER:
23      Q.   John, let me rephrase because I think
24  that -- There's a meeting. There are meetings in
25  December of 2006. Stop me when this is not a true

Page 136

1   reflection of what we've already discussed.
2       A.   Okay.
3       Q.   There's meetings in December 2006. You
4   have meetings for day workers, you have meetings for
5   evening --
6       A.   I think there probably would have been not
7   many meetings in December. Because the first one came
8   December 18th and then we had Christmas and the
9   holidays. So I don't -- You say meetings. I don't
10  know how many there were in December.
11      Q.   We've already agreed that in December the
12  green card issue was raised.
13      A.   I didn't -- I said that it may have been,
14  and I can't remember specifically, but it was one of
15  the frequent topics. So I can't say specifically that
16  it was addressed.
17      Q.   All right. And you -- your answer to that
18  to the group was: You're here on a ten-month H-2B
19  visa. Signal's intent is to apply for an extension.
20  And the decision as to who gets the extension is to
21  the U.S. government.
22          Is that what we just agreed to?
23      A.   Yes.
24      Q.   What else did you tell them on that topic,
25  if anything?

## Page 137

1     A.   You would need to specify the time frame.
2     Q.   Whether -- **Let's say the first meeting in**
3  **December of 2006.**
4     A.   Well, I -- I'll say it again.  I think that
5  the focus in the -- Well, let --
6     Q.   **Let me work it the other way.**
7     A.   Okay.
8     Q.   **You said that, these meetings, you were**
9  **giving the same consistent message that you had given**
10 **since you'd heard about these green card things being**
11 **raised when the workers arrived in November.  The**
12 **third wave arrived, you heard about it.  You gave an**
13 **answers then.**
14    A.   Yes.
15    Q.   **And you were always consistent.**
16    A.   Yes.
17    Q.   **So let's talk about what, if anything,**
18 **additionally you said about the green cards in**
19 **November and December.  I mean, you're giving a**
20 **consistent message, so I would assume that you -- you**
21 **know, you knew what you were saying?**
22    A.   And I've articulated that.
23    Q.   **Oh, okay.  I was just wondering if there**
24 **was anything else.**
25    A.   No.  Not to my recollection.

## Page 138

1     Q.   **Okay.  Yeah.  And I think you're right.**
2  **You only had one meeting in December 2006.  My point**
3  **was that we agreed also that you had talked about it**
4  **prior to this meeting, and it may have come up at this**
5  **meeting.  But, in any case, you talked about it in**
6  **November when the third wave arrived and all that?**
7     A.   Yeah.  I talked about it whenever they
8  asked.
9     Q.   **Okay.**
10    A.   I don't know if it was at this meeting,
11 especially since the focus of this meeting was dealing
12 with the incident which had just occurred.
13    Q.   **Okay.  Can we look at -- I'm going to enter**
14 **another document, Bates No. SIGE -- scratch that.**
15         **Let me just ask you a couple more**
16 **questions.**
17    A.   Okay.
18    Q.   **We were just talking about the consistent**
19 **message that you were giving to workers.  Did you --**
20    A.   With regard to green cards.
21    Q.   **With regard to green cards.**
22         **Did you ever tell the H-2B workers that**
23 **Signal would sponsor some or all of them for green**
24 **cards?**
25    A.   Again, are you talking in December,

## Page 139

1  November time frame or just in general?
2     Q.   **Let's start in general.**
3     A.   Okay.  That -- What I told them was that
4  Signal would apply for the extensions until extensions
5  were no longer possible and that where there was a
6  mutual fit between Signal and the employee, we would
7  apply for green cards at the conclusion of H-2B
8  extension process.
9     Q.   **So the language you used was "mutual fit"?**
10    A.   Words to that effect.  That it had to make
11 sense -- You know, in a case-by-case basis, worker by
12 worker, it had to make sense for Signal and for the
13 worker.  And that where it did, we would apply for --
14    Q.   **Okay.**
15    A.   -- green cards.  Because some Indian
16 workers didn't in the end -- well, some of them chose
17 to go back to India and not return.  So even if Signal
18 wanted to keep them, it wouldn't have been possible
19 because those individual workers did not want a green
20 card in the end.  So, again, mutual fit.
21    Q.   **When did you first tell the workers that --**
22 **or was that part of the consistent message that you**
23 **were always telling them?**
24    A.   That was -- I mean, I tried to be, I tried
25 to be consistent.

## Page 140

1     Q.   **Okay.**
2     A.   That's -- that's all that I can say.
3     Q.   **Did they ask you what mutual fit meant?**
4     A.   I don't know that I used that term.
5     Q.   **Sorry.**
6     A.   That's the concept I'm conveying.
7     Q.   **Did they ask you to explicate that concept?**
8     A.   I don't remember specific instances of them
9  requesting explications.
10    Q.   **So you would say something to the effect**
11 **of:  If it still makes sense for both of us, Signal**
12 **and you, the worker, then Signal will apply for a**
13 **green card?**
14    A.   In the due course of time.
15    Q.   **In the due course of time?**
16    A.   Yes.
17    Q.   **And they were satisfied with that answer?**
18 **What was their response when you gave that answer?**
19    A.   Well, they -- they saw that no matter how
20 many times they asked me, I gave a consistent response
21 and they understood that response.
22    Q.   **Okay.  That was from November of 2006?**
23    A.   Yes.
24    Q.   **John -- Sorry.  Mr. Sanders, did you ever**
25 **learn that the H-2B visa and the green card had some**

Page 165

1    A.  No.  I --
2  EXAMINATION BY MR. SANDLER:
3    Q.  I'm listening.
4    A.  I don't believe that following the
5  January 29th letter from Ron Schnoor to -- I think it
6  was sent to both Malvern Burnett and Sachin Dewan.
7  After that point, I don't recall being involved in any
8  of the follow-up pursuant to that.  And so because I
9  don't recall any follow-up, then obviously I can't
10 know if there was any money returned or not.
11   Q.  Okay.  I just want to jump back to
12 something in December '06.
13   A.  Okay.
14   Q.  And I just -- I'm going to give you a
15 document and I'm just going to ask you one question.
16 It's SIGE0556453.  It will be Exhibit No. --
17   MR. KUPPERMAN:
18     640 is what I have.
19   MR. SANDLER:
20     Yeah.  That's correct.  640 is the exhibit
21 number.
22     (Whereupon, the document as described above
23 is marked as "Exhibit No. 640.")
24 EXAMINATION BY MR. SANDLER:
25   Q.  I'm just going to ask you to read it.

Page 166

1    A.  (Witness reviews document.)
2      I've read the document.
3    Q.  All right.  This is your diary entry from
4  December 15th, 2006?
5    A.  Yes.
6    Q.  Okay.  There's a press release that you
7  discuss in this entry?
8    A.  Yes.
9    Q.  What was that press release for?  Do you
10 recall?
11   A.  I don't remember.
12   Q.  I'm just going to read a bit of this and
13 I'm going to ask you.
14     Okay.  You're discussing about the things
15 you get done at work.  And then you say, "Among those
16 things were [sic] sending out the press release
17 written yesterday, but I then became amazed as Diane
18 told me Dick liked his initial version better ...."
19     I'm going to skip a bit.  And you say, "So
20 I spent a few hours figuring out how to send a press
21 release that contradicted what we'd told the press
22 before in terms of how long the workers would be here
23 and was unclear in crucial places."
24     Does that jog your memory?
25   A.  No.

Page 167

1    Q.  Okay.
2      You -- Towards the end of that paragraph
3  that I just read from, you draw an analogy.  It looks
4  like a naval analogy or a wartime analogy --
5    A.  Yes.
6    Q.  -- that you had learned from somebody in
7  your family?
8    A.  Yes.
9    Q.  Can you interpret in layman's terms what
10 that analogy means and how it pertains to the press
11 release unless -- I mean -- Let's just do that.  Can
12 you interpret how the analogy pertains to the press
13 release?
14   A.  Right.  Dick Marler is the CEO of Signal
15 International.  He has final authority on many
16 matters.  I'm way down the totem pole --
17   Q.  Sure.
18   A.  -- way down the chain of command.  And so
19 he has a lot more information than I do.  And so even
20 when I don't understand his instructions and even when
21 I don't agree with them, I'm still going to carry them
22 out.
23   Q.  Right.
24   A.  Because he's the boss, not me.
25   Q.  Right.  I mean, in this analogy, the

Page 168

1  officer was on a destroyer and had received wrong
2  instructions from a deck officer, but he still
3  followed through even though collision was imminent?
4    A.  Yeah.  And in the end, the collision didn't
5  happen.
6    Q.  I don't see that.
7    A.  I'm just telling you because I remember the
8  story.
9    Q.  Oh, okay.  That would seem like an
10 important thing to put in here, but I guess not.
11   A.  I mean, the key point for me was that I was
12 going to follow what he said even when I didn't
13 understand his reasoning.  Because he's the boss.  I'm
14 not.
15   Q.  Right.  Where did you learn that he doesn't
16 respect undegreed people?  Sorry.  It's the second
17 paragraph.
18   MR. ALEXIS:
19     I'm going to object to form.
20   MS. HANGARTNER:
21     I'm also going to object because I think
22 that that probably should have been redacted.  It
23 is not directly linked or related to the housing
24 facility or anything that has to do with the
25 class action.

## Page 193

1  of that.
2  Q.   Can you elaborate on what you said, what
3  countries, for instance, you believe the accounts were
4  in?
5  MR. ALEXIS:
6      I'm going to object to form.
7  MR. KUPPERMAN:
8      I'm going to object to the entire line of
9  questioning.
10  A.   I thought the UAE and possibly India.
11  EXAMINATION BY MR. SANDLER:
12  Q.   Okay.
13  A.   There's not anything wrong with having an
14  offshore account.
15  Q.   No.  Not that I know of.
16      Okay.  Okay, Mr. Sanders.  I'm going to
17  enter another document.  And this one is Bates
18  SIGE0556450.
19  MS. HANGARTNER:
20      Thank you.
21  MR. SANDLER:
22      It's Exhibit No. 645.
23      (Whereupon, the document as described above
24  is marked as "Exhibit No. 645.")
25  THE WITNESS:

## Page 194

1      (Witness reviews document.)
2      I've read the document.
3  EXAMINATION BY MR. SANDLER:
4  Q.   Okay, Mr. Sanders.  This is your
5  December 19th, 2006 redacted journal entry?
6  A.   Yes.
7  Q.   And beneath it is December 18th or at least
8  part of December 18th?
9  A.   Yes.
10  Q.   We discussed earlier there was a meeting --
11  you held like a meeting in December, what I think you
12  termed as a "community meeting"?
13  A.   Yes.
14  Q.   Okay.  I see here you have in the -- in the
15  diary entry -- It's the last paragraph of your
16  December 19th entry.  The last thing of the day was
17  the man camp meeting.  "I called it for 8:00 p.m. to
18  address the day shift workers all at one - all 200 of
19  them."
20      I'm just going to read it into the record
21  and then I'm just going to ask you a quick question
22  about it.
23      Okay.  You're discussing the meeting that
24  you held with them and you said, "I was very firm with
25  them and told them they must act like adults and that

## Page 195

1  there would be no next time: we would shut down the
2  camp.  During this time of interaction I also listened
3  though.  They were very grateful for the chance to
4  vent as a group and I promised progress on the things
5  that were most important - things like more
6  bunk-houses, toilets, and a quiet lounge."
7      And the final sentence is, "It is this sort
8  of things that helps me earn their respect, because
9  they see I care a lot about them."
10      What did you mean when you said that you
11  would shut down the camp?
12  A.   That Ron -- Ron Schnoor had said that more
13  incidences like that would not be tolerated.  And so I
14  was conveying his message to the workers.
15  Q.   That wouldn't be tolerated at Signal?
16  A.   Yes, that it would not be tolerated.  We
17  didn't want rioting workers or we didn't want riots
18  within the workers' housing facility.  That was the
19  message.
20  Q.   Right.
21      Between this point in time and, say, the
22  summer of 2007, I know you've now switched over to IE
23  for part of that time, but was the man camp ever
24  closed, ever shut down?
25  A.   No.  Not to my knowledge.

## Page 196

1  Q.   Okay.  What would happen if the man camp
2  were shut down?
3  A.   I was conveying Ron Schnoor's message,
4  so...
5  Q.   No.  I know that.
6  A.   He was -- I would -- I would say he would
7  be a good one to answer that.
8  Q.   Yeah.  He'd be good to tell us what his
9  intention was by shutting down the man camp, but I'm
10  asking you what you think the -- you, John Sanders,
11  given your special role in the man camp facility, what
12  you think the consequence would be of shutting down
13  the man camp?
14  A.   I would move on to another project.
15  Q.   And for the workers?
16  A.   They would not have to pay the $35 a day.
17  Q.   Were they happy with the $35 a day, paying
18  the $35 a day?
19  MR. SHAPIRO:
20      Object to form.
21  EXAMINATION BY MR. SANDLER:
22  Q.   You can still answer.
23  A.   Were they happy with $35 a day?  They
24  expressed concerns about that because of the impact on
25  their net pay.

Page 217

1  frequent, though not as frequent, contact with
2  Mr. Marler.
3      Q.  Okay.  Did you ever conclude things about
4  Mr. Marler that would be — did you draw conclusions
5  about Mr. Marler that might be construed as negative
6  in polite society?
7      MR. KUPPERMAN:
8          Object to form.
9      MS. HANGARTNER:
10         Object to form.
11     MR. SANDLER:
12         Okay.
13     EXAMINATION BY MR. SANDLER:
14     Q.  I'm going to enter document — Before I do
15  that, was anyone in Signal management -- was everyone
16  at Signal management Caucasian?
17     A.  No.
18     Q.  Was everyone — and by Signal management,
19  let me limit that to say Mr. Marler, Mr. Schnoor,
20  Mr. Bingle, let's say Mr. Snyder.  And am I missing
21  anyone who would be kind of at their level?  I mean, I
22  know -- I think you said earlier Snyder was at your
23  level, but am I missing anyone who was, say, in
24  Pascagoula at least, say, at the Bingle, Marler,
25  Schnoor level?

Page 218

1      MR. KUPPERMAN:
2          I object to the form of the question.
3      MR. ALEXIS:
4          Object to form.  Let me just say, I don't
5      know that this has anything conceivably to do
6      with class.  I only mention that because we're
7      pressed for time.  Was any of this alleged in our
8      complaint?
9      MS. HANGARTNER:
10         No.
11     MR. ALEXIS:
12         Okay.  I only mention it because it's like
13     6:10 right now.
14     MR. SANDLER:
15         Oh, okay.  As I said, I'll be done very
16     shortly.
17     MR. KUPPERMAN:
18         I'll still object to form.
19     EXAMINATION BY MR. SANDLER:
20     Q.  Okay.  Who was the vice president and up at
21  Signal?
22     A.  Are you referring to Pascagoula?
23     Q.  Yeah, Pascagoula.
24     A.  Bill Bingle, Lee Stokes, Chris Cunningham,
25  Ron Schnoor, Dick Marler.

Page 219

1      Q.  Okay.  And in Texas?
2      A.  Tom Rigolo, Barney Duhon.
3      Q.  Did you ever conclude that — let's just
4  stick with Pascagoula -- that the people who we named,
5  the VPs and up, might be uncomfortable with people of
6  a certain race?
7      A.  I never saw any evidence of that.
8      MR. KUPPERMAN:
9          Object to form.
10     EXAMINATION BY MR. SANDLER:
11     Q.  Was it ever something that you thought?
12     MR. KUPPERMAN:
13         Object to the form.
14     A.  It was something that I was told was
15  someone else's opinion.
16     EXAMINATION BY MR. SANDLER:
17     Q.  What do you mean?  Someone else's opinion
18  of them?
19     A.  Someone else shared their opinion with me.
20     Q.  Okay.  Was that person who shared their
21  opinion with you a Signal employee?
22     MS. HANGARTNER:
23         Object to form.
24     EXAMINATION BY MR. SANDLER:
25     Q.  Who was that person?

Page 220

1      MS. HANGARTNER:
2          Object to form.
3      A.  I'm not going to answer any more -- Let me
4  say something for your -- for your knowledge.  These
5  journals were not shared with anybody until they
6  happened to -- one of them happened to be on Signal's
7  server unknown -- unbeknownst to me.  So I'm not
8  willing at this point to talk about these sorts of
9  confidential things.
10         I will tell you clearly and explicitly and
11  forthrightly that in all of my time at Signal
12  International, I never saw a single action that would
13  be construed as racist or discriminatory on other
14  people's parts.
15     EXAMINATION BY MR. SANDLER:
16     Q.  Okay.
17     A.  They strove to be fair.  They showed by
18  their words, by their actions, by their comportment in
19  many different ways, at many different times, how much
20  they cared about the workers.  That's what this record
21  should reflect.
22     MR. SANDLER:
23         I have no more questions for the witness.
24     EXAMINATION BY MR. ALEXIS:
25     Q.  Good evening, Mr. Sanders.  As you know,

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS            NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 221

1   I'm Ralph Alexis.  And I represent the so-called
2   Burnett defendants; Malvern C. Burnett, Law Office of
3   Malvern C. Burnett, Gulf Coast Immigration Law Center.
4   Those are the three defendants in this case.
5         Yesterday you mentioned that you had an
6   October luncheon with Michael Pol and Mr. Burnett in,
7   I believe, October you said, and I wanted to clarify.
8   That's October of 2006?
9      A.   Correct.
10     Q.   Okay.  And you stated that at that
11  luncheon, it was brought up by either one of them,
12  Mr. Pol or Mr. Burnett, that they wanted to know if it
13  was okay with Signal if another company sponsored
14  green cards for the Signal workers after the H-2B
15  process had concluded.
16        Do you recall that?
17     A.   Yes.  And it was Michael Pol who posed the
18  question, if I remember correctly, and I think I do.
19     Q.   And do you recall that that was brought up
20  because -- because he wanted to know if it was okay
21  with Signal if some workers who had previously been --
22  I'll use the word "vetted," V-E-T-T-E-D, by other
23  employers and signed up for employment under the green
24  card process, that he wanted to use them to come over
25  as H-2B workers for Signal?  Do you recall that?

## Page 222

1      A.   Well, I wouldn't say it was vetted.  If I
2   remember the context, it was that these would be
3   Signal H-2B visa workers and would they -- would we be
4   willing to relinquish our ability to apply for green
5   cards for them.
6         That's the context that I remember.
7      Q.   What I'm asking is do you recall if the
8   question was asked of you because there was a desire
9   to bring over workers -- to include as H-2B workers
10  workers who had been involved with another employer
11  previously?  Do you recall that?
12     A.   There was another company mentioned, but
13  the only thing that I remember was would Signal be
14  willing to give its H-2B visa-approved workers to
15  another company so that these workers -- after the --
16  I think it was after the H-2B visa process had ended
17  so that these workers could go to this other company
18  on green cards, which would mean Signal would have to
19  relinquish our ability to sponsor them in the future.
20        And this was the first clear time or the
21  first time that I remember clearly a mention about
22  green cards, but as I think I may have testified
23  yesterday, it just didn't strike me as logical that we
24  would invest time in a relationship with workers only
25  to forgo an ability to work with them down the road.

## Page 223

1   So that's -- It just didn't -- I didn't understand
2   everything, but it didn't sound right to me.
3      Q.   What employer was mentioned?  Do you
4   recall?
5      A.   I think Rao was the name.
6      Q.   Could J & M have been mentioned?
7      A.   Possibly.
8      Q.   Could Intercoastal Repair Services been
9   mentioned?
10     A.   I don't remember that name.
11     Q.   Is it possible that it could have been
12  mentioned that it was necessary in order to fill
13  the -- the number of workers that Signal was looking
14  for that it was -- it was needed to bring over some
15  workers that had previously been involved with those
16  companies?  Is it possible that that could have been
17  discussed?
18     MS. HANGARTNER:
19        Object to form.
20     A.   I don't -- The only thing that I remember
21  was what I've said, that:  You have workers that will
22  be coming on an H-2B visa.  Would you be willing to
23  forgo visa sponsorship for them -- green card -- green
24  card sponsorship for them down the road.  And I said I
25  didn't know, but -- but that I would get back to them.

## Page 224

1   And it just didn't strike me as -- as logical that we
2   would do that.
3   EXAMINATION BY MR. ALEXIS:
4      Q.   My question is, is it possible that they
5   discussed that with you, that the -- that there was a
6   desire to bring workers over in order to meet Signal's
7   H-2B needs that it had previously involved with other
8   companies such as Indo-Ameri Soft?  Is it possible
9   they could have raised that with you and you don't
10  recall it?
11     MS. TSU:
12        Objection.
13     A.   I don't -- I don't remember that -- I don't
14  remember that such a conversation took place.
15  EXAMINATION BY MR. ALEXIS:
16     Q.   Fair enough.  Could it have taken place?
17     A.   I don't know.  The only thing I remember is
18  what I've testified.
19     Q.   Okay.  And did you -- I think you testified
20  that you did not get back with them; is that correct?
21     A.   I wouldn't be surprised if I didn't get
22  back with them and I don't remember doing so.
23     Q.   You testified that there was a meeting at
24  Signal on or about January 15th, 2007.  Do you recall
25  that?

## Page 225

1     A. Yes. I think the exact date was
2 January 16th, based on an entry.
3     Q. Okay. But 15th or 16th —
4     A. Mid-January.
5     Q. Yes. And at that meeting, would you agree
6 that it was made clear to the workers at Pascagoula
7 that an extension was going to be requested of the
8 H-2Bs?
9     A. Okay. Could you repeat the question?
10     Q. Certainly.
11       The meeting that we were talking about
12 occurred at Pascagoula, correct?
13     A. Okay. Which meeting? Because there
14 were -- there were several.
15     Q. Okay. You testified about a meeting at
16 which Malvern Burnett appeared, a camp-wide meeting?
17     A. Okay.
18     Q. And Sachin Dewan appeared and yourself?
19     A. Yes, yes.
20     Q. And y'all addressed the workers in two
21 separate meetings, I believe you said?
22     A. Day shift and night shift.
23     Q. That's correct. Have I oriented you good
24 enough?
25     A. Thank you. Yes.

## Page 226

1     Q. Good. I'm sorry. It's late. I know.
2       And my question is would you agree that it
3 was made clear by the three of you, namely, yourself,
4 Burnett and Dewan, that Signal was going to apply for
5 an extension of the H-2Bs?
6     A. I don't remember exactly what we discussed,
7 but that would be a natural topic to --
8     Q. But did you intend to convey that to the
9 workers?
10     A. That would be something we would want to
11 convey as far as extensions would be applied for, yes.
12     Q. Do you feel like you successfully conveyed
13 that to the workers?
14     A. Again, I don't remember exactly what we
15 discussed since it's been nearly three years, but that
16 would have been an important point to cover with the
17 workers and very well may have been part of the
18 conversation.
19     Q. I'm going to change subjects.
20       You testified just a short while ago when
21 you were shown Exhibit 643, which was an e-mail chain,
22 you testified concerning approximately 55 workers who
23 came over on their own.
24       Does that jog your memory? If you want to
25 look at 643 --

## Page 227

1     A. Yes. Please let me find that.
2     Q. Certainly.
3     A. Okay. I'm looking at Exhibit 643.
4     Q. Right. My question is, if you look at
5 especially the e-mail from Bill Bingle to you —
6     A. Yes.
7     Q. -- does that — in the middle of the first
8 page, does that jog your memory that approximately 56
9 workers came to this country on their own, meaning
10 that Signal had indicated it did not need them?
11     A. No. To me, as I -- as I read this, what
12 Bill Bingle says is "I have an e-mail from Malvern
13 stating that Sachin refunded the payments made by 56
14 of the guys who did not get to come over."
15     Q. Right.
16     A. I thought you said who did come over.
17     Q. Okay. So you're not aware of individuals
18 who came over on their own?
19     A. I am aware of individuals, but I don't know
20 if it was 56 or how many.
21     Q. Okay.
22     MR. ALEXIS:
23       What's the next exhibit?
24     MR. SHAPIRO:
25       50.

## Page 228

1     EXAMINATION BY MR. ALEXIS:
2     Q. I am going to show you an e-mail that is
3 identified as SIGE0009946 from Tracey Binion to, I
4 believe, you, and ask if you recall that and if that
5 jogs your memory.
6       (Whereupon, the document as described above
7 is marked as "Exhibit No. 650.")
8     MS. HANGARTNER:
9       Thank you.
10     A. Yes. What was the -- what was the date of
11 this?
12     EXAMINATION BY MR. ALEXIS:
13     Q. Hold on one second. It purports to be
14 April 12th of '07? Is that the one I gave you?
15     A. Yes. And it's part of an e-mail chain?
16     Q. Wait a minute. Just to make sure -- I'm
17 going to put it on the one that has the date. I'm
18 sorry. And I'm going to give you another SIG number.
19 SIGE0020419.
20     A. Okay.
21     Q. I'm sorry. I'll take this one back.
22     A. No problem.
23     Q. Does this jog your memory?
24     A. Yes. Could I have a couple -- I'll read it
25 quickly. Just a little bit more time.

(504)525-1753          HUFFMAN & ROBINSON, INC.          (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS        NEW ORLEANS, LA 70139
Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

Page 237

1  may have thought one thing, but another thing turned
2  out to be correct?
3      A.  Yes.  However, when we had a given
4  understanding, it was important to me and important to
5  Signal as a company to go forward on that
6  understanding at the present time rather than
7  something else.  And to the extent that those
8  circumstances might have changed, in this case gone
9  from two to three years expectation down to ten or so,
10  then that's -- that's what happens.
11      But in the moment, we were -- in the moment
12  and at each moment, we're going to express how things
13  are as we see them at the time, which was two to three
14  years.  That's why I felt it important to say that.
15      Q.  But in the end, it was not?
16      MS. HANGARTNER:
17      Form.
18  EXAMINATION BY MR. ALEXIS:
19      Q.  It was not two to three years?
20      A.  It was not two to three years.  That is --
21  that is true.  Because the circumstances changed with
22  regard to the business, not the situation on the Gulf
23  Coast quite as quickly as our business situation
24  changed.
25      Q.  But business conditions is part of what is

Page 238

1  considered by the Department of Labor.  Did you not
2  understand that?
3      A.  That is correct.  Business conditions are
4  considered.
5      Q.  You've got to excuse me.  I'm tired, too.
6      MR. KUPPERMAN:
7      This is 652?
8      MR. ALEXIS:
9      Yeah.
10      (Whereupon, the document as described above
11  is marked as "Exhibit No. 652.")
12      THE WITNESS:
13      (Witness reviews document.)
14      Okay.  I've read the document.
15  EXAMINATION BY MR. ALEXIS:
16      Q.  I just have really one question.  Do you
17  recall that Mr. Schnoor communicated to, among other
18  people, you that it was his belief that the $35 a day
19  housing cost was putting such a significant burden on
20  the Indians working 40 hours that -- that some of them
21  were absconding?  Do you recall that?
22      A.  That's what -- that's what Ron --
23      Q.  That is what his opinion was?
24      A.  That's what Ron's opinion was, yes,
25  according to this document.

Page 239

1      Q.  I've marked as an exhibit, 653, an e-mail
2  dated January 29th, 2007 from you to Ronald Schnoor
3  identified as SIGE0019354.
4      A.  (Witness reviews document.)
5      (Whereupon, the document as described above
6  is marked as "Exhibit No. 653.")
7      MS. HANGARTNER:
8      Thank you.
9  EXAMINATION BY MR. ALEXIS:
10      Q.  Have you had a chance to read it?
11      A.  Yes, I have.
12      Q.  I wanted to focus on the last part of the
13  e-mail that you sent.  And I'm going to read it out
14  loud, if you please, the last couple of, I guess,
15  sentences -- or maybe just the last sentence.
16      You were talking about a proposed refund by
17  Sachin and Malvern in the beginning, but then you
18  concluded: "It is not bad for workers either: they
19  tell me that if they get the 10-month extension, the
20  economics work for them regardless of whether or not
21  they get a green card."
22      And my question to you is, you actually had
23  conversations with these Indian workers in Pascagoula
24  that you had developed a bond with and they told you
25  this?

Page 240

1      A.  Yes.
2      Q.  So do I take from this that even given
3  the -- the loans they allegedly had to make to pay
4  recruiting fees and legal fees, even given Signal's
5  $35 fee, that if they could stay here for 20 months
6  and work for Signal, they were happy, that it was all
7  worthwhile to them?
8      A.  That is what workers told me.
9      Q.  Okay.  Now, as a matter of fact, we took
10  some depositions in the beginning of this case of -- I
11  don't know how many workers, you know, six workers
12  perhaps -- I know Erin can correct me -- that stayed
13  at Signal -- that were representative of the workers
14  who stayed at Signal until the H-2B process had
15  completed.  And these workers --
16      A.  Are you talking beyond July 31st, then, of
17  2006 -- 2007?
18      Q.  That's correct.
19      A.  Okay.
20      Q.  I remember Solomon Arava, I think is one of
21  them.  And these workers were perfectly happy with the
22  economics of what had happened.
23      And my question to you is, would you agree
24  that that opportunity was available to all the workers
25  who came over here?

Page 241

1    A.   The opportunity to --
2    Q.   To work hard, do your job, stay at Signal
3  and make a lot of money?
4    A.   That opportunity did exist, yes.  It was up
5  to them how well they performed on the job, but that's
6  up to them.  Signal sought to carry out its end of the
7  bargain as far as providing work.
8    Q.   No matter who -- Would you not agree, no
9  matter who you are -- no matter who you are, you've
10  got to perform on the job to keep your job?  You'd
11  agree with that, whether you're an Indian worker or a
12  regular worker --
13    A.   Yes.  Within Signal, yes.
14    Q.   -- you've got to do that.
15       Going back to the January -- excuse me --
16  mid-January 2007 -- let's please call it camp-wide
17  meetings that we discussed --
18    A.   Okay.
19    Q.   -- and you had indicated your recollection
20  of what was stated was not that good?
21    A.   Correct.
22    Q.   Would you defer, then, to Malvern Burnett,
23  who was there also, as to what happened as far as
24  representations to the workers about green cards?
25    A.   I would have no reason to contradict what

Page 242

1  he says in the sense that if he says he remembers and
2  I don't, then --
3    Q.   Would you also defer to him as far as what
4  was represented to the workers concerning extensions
5  of the H-2B visas?
6    A.   In what regard?
7    Q.   Well, do you recall that the workers were
8  told that there would be extensions, that at least --
9  At that time, I think there was concern on the part of
10  the workers -- I think you said that they were
11  concerned about whether or not Signal was going to ask
12  for an extension; is that correct?
13    A.   Yes.  And we wanted to assure the workers
14  that we would request extensions.  And then that's how
15  the yes/no process came about.
16    Q.   But you recall that?
17    A.   I don't remember the exact date or the
18  exact meeting, but that was the general framework.
19    Q.   Do you recall that Malvern Burnett's office
20  actually did the legal work for those extensions and
21  that that first extension was granted?
22    A.   Yes.
23    Q.   Do you know all the effort that goes into
24  the legal work to underlie an H-2B visa?
25    MR. SANDLER:

Page 243

1    Objection.
2    A.   I do not know all of it.
3  EXAMINATION BY MR. ALEXIS:
4    Q.   I mean, would you defer to Malvern Burnett
5  in that regard to explain what is entailed in the
6  legal work?
7    A.   Yes.
8    Q.   Would you agree you do not have the
9  expertise to know what a reasonable legal fee would be
10  for charging workers to come over to the United
11  States?  Do you?
12    MR. SANDLER:
13    Objection.
14    A.   Well, it would surprise me very much if it
15  was -- if reasonable was as high as 12 to $15,000.
16  That does not sound reasonable to me.
17  EXAMINATION BY MR. ALEXIS:
18    Q.   As a legal fee.
19    A.   Oh, I don't -- well --
20    Q.   I'm talking about legal fees.
21    A.   Okay.  I don't know the exact cost of the
22  legal fees.
23    Q.   Okay.  Fair enough.
24    MR. ALEXIS:
25    Can we go off the record and take a break a

Page 244

1  second?  I think I'm finished, but I just want to
2  consult.
3    THE VIDEOGRAPHER:
4    We're going off the record.  The time is
5  7:02.  This is Videotape No. 8.
6    (Whereupon, a recess in the proceedings was
7  taken.)
8    THE VIDEOGRAPHER:
9    We're back on the record.  This is
10  Videotape No. 8.  It's 7:26.
11    MR. KUPPERMAN:
12    Erin, do you want to say --
13    MS. HANGARTNER:
14    Yes.  Obviously, due to the time, we're not
15  going to be able to finish this evening.
16    Mr. Sanders is no longer employed by Signal
17  International.  Mr. Kupperman expressed some
18  concerns as to how he could be contacted.  And
19  Mr. Sanders had asked that his address, his home
20  address, not be provided on the deposition, nor
21  produced to any of the parties' counsel.
22    As such, I have agreed to accept service on
23  behalf of Mr. Sanders, even though I do not
24  personally represent Mr. Sanders.  I represent
25  Signal International.  However, he has given me

DESIGNATIONS & OBJECTIONS KEY

▬▬▬ Plaintiffs' Affirmative Designations          ⋯⋯⋯ Plaintiffs' Counter Designations
▬▬▬ Signal Defs.' Affirmative Designations        ⋯⋯⋯ Signal Defs.' Counter Designations
▬▬▬ Dewan Defs.' Affirmative Designations         ⋯⋯⋯ Dewan Defs.' Counter Designations
▬▬▬ Burnett Defs.' Affirmative Designations       ⋯⋯⋯ Burnett Defs.' Counter Designations

P = Plaintiffs   S = Signal Defs.   D = Dewan Defs.   B = Burnett Defs.

**Page 1**

```
 1    UNITED STATES DISTRICT COURT
 2    EASTERN DISTRICT OF LOUISIANA
 3
      KURIAN DAVID, SONY        CIVIL ACTION
 4    VASUDEVAN SULEKHA,
      PALANYANDI THANGAMANI,      NO. 08-1220
 5    MARUGANANTHAM KANDHASAMY,
      HEMANT KHUTTAN, ANDREWS      SECTION "A"
 6    ISSAC PADA VEETTIYL, AND
      DHANANJAYA KECHURA, ON       MAGISTRATE 3
 7    BEHALF OF OTHER SIMILARLY
      SITUATED INDIVIDUALS, AND
 8    SABULAL VIJAYAN, KRISHAN
      KUMAR, JACOB JOSEPH
 9    KADDAKKARAPPALLY, KULDEEP
      SINGH, AND THANASEKAR
10    CHELLAPPAN, INDIVIDUALLY,
11        PLAINTIFFS
12    VERSUS
13    SIGNAL INTERNATIONAL,
      LLC, MALVERN C. BURNETT,
14    GULF COAST IMMIGRATION
      LAW CENTER, L.L.C., LAW
15    OFFICES OF MALVERN C.
      BURNETT, A.P.C.,
16    INDO-AMERI SOFT L.L.C.,
      KURELLA RAO, J & M
17    ASSOCIATES, INC. OF
      MISSISSIPPI, GLOBAL
18    RESOURCES, INC., MICHAEL
      POL, SACHIN DEWAN, AND      VOLUME 3
19    DEWAN CONSULTANTS PVT.
      LTD. (a/k/a MEDTECH
20    CONSULTANTS),
21        DEFENDANTS.
22
      Deposition of JOHN SANDERS,
23
24    taken in the offices of Middleberg, Riddle &
      Gianna, 31st Floor, 201 St. Charles Avenue, New
25    Orleans, Louisiana 70170, on Wednesday, the 20th
      day of January, 2010, beginning at 9:40 a.m.
```

**Page 3**

```
 3    (...TO LIST NOT LEGIBLE...)
      Suite 2400
 4    909 Poydras Street
      New Orleans, Louisiana 70112
 5
      ATTORNEYS FOR GLOBAL RESOURCES,
 6    INC. AND MICHAEL POL
 7
      STEPHEN H. SHAPIRO
 8    200 Maine Street
      Jefferson, Louisiana 70121
 9
      ATTORNEYS FOR SACHIN DEWAN AND
10    DEWAN CONSULTANTS PVT. LTD. ALSO
      KNOWN AS MEDTECH CONSULTANTS
11
12
13    ALSO PRESENT:
14    TRACEY BINION
      SIGNAL INTERNATIONAL, L.L.C.
15
16
17    VIDEOGRAPHER:
18    AARON PALMER
      Depo-Vue, Inc.
19    749 Aurora Avenue
      Metairie, Louisiana 70002
20    (504) 828-8856 or (888) 337-6883
21
22    REPORTED BY:
23    CAROL VALLETTE SLATER
      Certified Court Reporter
24    Registered Professional Reporter
25
```

**Page 2**

```
 1    APPEARANCES:
 2    NAOMI TSU
      Immigrant Justice Project
 3    Southern Poverty Law Center
      Suite 2150
 4    233 Peachtree Street
      Atlanta, Georgia 30303
 5
          AND
 6
      DEWEY & LeBOEUF
 7    (BY: HUGH SANDLER)
      1301 Avenue of the Americas
 8    New York, New York 10019
 9    ATTORNEYS FOR THE PLAINTIFFS
10
      MIDDLEBERG, RIDDLE & GIANNA
11    (BY: ERIN CASEY HANGARTNER)
      31st Floor
12    201 St. Charles Avenue
      New Orleans, Louisiana 70170-3100
13
14    and
      PATRICIA A. BOLLMAN
15    A Professional Law Corporation
      Post Office Box 13707
16    New Orleans, Louisiana 70185
17    ATTORNEYS FOR SIGNAL INTERNATIONAL,
      L.L.C.
18
19    PORTEOUS, HAINKEL & JOHNSON
      (BY: RALPH R. ALEXIS, III)
20    704 Carondelet Street
      New Orleans, Louisiana 70130-3774
21
      ATTORNEYS FOR GULF COAST IMMIGRATION
22    LAW CENTER, L.L.C.
23
24
25
```

**Page 4**

```
 1              I N D E X
 2
 3    EXAMINATION BY:                PAGE
 4    MR. ALEXIS                      8
 5    MR. KUPPERMAN                   36
 6    MR. SHAPIRO                     132
 7    MS. HANGARTNER                  188
 8    MR. SANDLER                     192
 9    MR. KUPPERMAN                   262
10    MR. SANDLER                     287
11
12
13    EXHIBITS:
14    Exhibit Number 696             34
        E-mail chain
15      SIGNAL 04034
16    Exhibit Number 697             12
        E-mail chain
17      SIGNAL 04377
18    Exhibit Number 698             25
        E-mail chain
19      SIGNAL 04023 - 04026
20    Exhibit Number 699             31
        E-mail chain
21      SIGNAL 04318
22    Exhibit Number 700             201
        Spreadsheet
23      SIGE0005083 - 0005084
24    Exhibit Number 701             208
        E-mail chain,
25      DEWAN000798 - 000801
```

Page 5

1               I N D E X
2  EXHIBITS:                    PAGE
3  Exhibit Number 702              214
       April 5, 2007, e-mail from John
4      Sanders to Kathy Moser
       SIGE0019615
5
   Exhibit Number 703              233
6      E-mail chain
       SIGE0020386 - 0020387
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1
2            S T I P U L A T I O N
3        IT IS STIPULATED AND AGREED by and
4  between counsel for the parties hereto that the
5  deposition of the aforementioned witness is
6  hereby being taken under the Federal Rules of
7  Civil Procedure, for all purposes, in accordance
8  with law;
9        That the formalities of reading and
10 signing are specifically not waived;
11       That the formalities of sealing,
12 certification and filing are specifically waived;
13       That all objections, save those as
14 to the form of the question and the responsiveness
15 of the answer, are hereby reserved until such
16 time as this deposition, or any part thereof, may
17 be used or sought to be used in evidence.
18
19             *  *  *  *
20
21       CAROL VALLETTE SLATER, Certified
22 Court Reporter, Registered Professional Reporter,
23 in and for the Parish of Orleans, State of
24 Louisiana, officiated in administering the oath
25 to the witness.

Page 7

1  THE VIDEOGRAPHER:
2        This is the videotaped
3  deposition of John Sanders.  This
4  deposition is being held at 201
5  St. Charles Avenue, Suite 3100, in
6  New Orleans, Louisiana, on January
7  20th, 2010.  The time indicated on
8  the video screen is 9:40.  My name
9  is Aaron Palmer, and I'm a
10 certified legal video specialist,
11 with Depo-Vue, Inc.  The court
12 reporter is Carol Vallette Slater,
13 with Huffman & Robinson, Inc.
14       Would Counsel please
15 introduce themselves for the
16 record?
17 MS. HANGARTNER:
18       Erin Casey Hangartner, on
19 behalf of Signal International.
20 MS. BOLLMAN:
21       Patricia Bollman, on behalf
22 of Signal International.
23 MR. SANDLER:
24       Hugh Sandler, on behalf of
25 plaintiffs.

Page 8

1  MR. SHAPIRO:
2        Stephen Shapiro, on behalf
3  of Sachin Dewan and Dewan
4  Consultants.
5  MR. KUPPERMAN:
6        Steve Kupperman, on behalf
7  of Michael Pol and Global
8  Resources.
9  MR. ALEXIS:
10       Ralph Alexis, on behalf of
11 the so-called Burnett defendants.
12 THE VIDEOGRAPHER:
13       Would the court reporter
14 please swear in the witness.
15       JOHN SANDERS,
16 after being first duly sworn in the cause by the
17 court reporter, testified as follows:
18 EXAMINATION BY MR. ALEXIS:
19    Q.   Mr. Sanders, good morning.
20    A.   Good morning.
21    Q.   And I know you remember I'm Ralph
22 Alexis.
23       And I want to show you some
24 exhibits.  First, Exhibits 694 and 695.
25    MS. HANGARTNER:

Page 25

1  record reflect that this e-mail
2  chain, which I'm marking as one
3  document, 698, is identified by
4  Bates numbers SIGNAL 4023, 4024,
5  4025, 4026.
6      A.  I've read through this document.
7  EXAMINATION BY MR. ALEXIS:
8      Q.  Okay.  I really don't have much.  I
9  just want to touch on a couple of points.  Would
10 you go to the page marked SIGNAL 04026, please,
11 which is part of Exhibit 698?
12     A.  Okay.
13     Q.  And is that not an e-mail from
14 Malvern Burnett to you, subject:  RE:
15 Transferring H2B workers?
16     A.  Yes, dated April 27th.
17     Q.  Correct, 2007.
18     A.  Yes.
19     Q.  And in it, if I can read aloud:
20         "John:  I am still in
21     discussions with my client about
22     using Indians and the client is
23     seeking contracts so he will have
24     a place to work them.  The
25     transfer process is simple.  The

Page 26

1  petitioning company files an H2B
2  petition listing the workers who
3  it wishes to have H2B status
4  extended."
5      Did I read that correctly?
6      A.  Yes.
7      Q.  Okay.  So, the discussion concerning
8  transferring Signal workers, according to this
9  e-mail, seems to have occurred -- begun, rather,
10 between you and Burnett prior to April 27th?
11     MR. SANDLER:
12         Object to form.
13     A.  I don't know the exact -- exact
14 date, but this is an April reference, yes.
15 EXAMINATION BY MR. ALEXIS:
16     Q.  Right.  But he's referring -- he's
17 telling you I'm still in discussions with my
18 client, and I'm assuming, or I'm asking, that
19 since he just comes out and talks about it, that
20 you had had conversations with him about the
21 issue of transfer prior to April 27th.
22     MR. SANDLER:
23         Object to form.
24     MS. HANGARTNER:
25         Object to form.

Page 27

1      A.  I would agree, I don't know when
2  those discussions were --
3  EXAMINATION BY MR. ALEXIS:
4      Q.  Okay.
5      A.  -- were had.
6      Q.  Would you defer to Mr. Burnett on
7  that?
8      A.  If there are other e-mails, that
9  would be what I would prefer to defer to.
10     Q.  Okay.  Now, let's go to the first
11 page of this e-mail -- I'm sorry -- of this
12 e-mail chain, first page of Exhibit 698.  Is this
13 not an e-mail from you to Kathy Moser and Mr.
14 Burnett, RE:  Transferring H2B workers?
15     A.  It is.
16     Q.  Okay.  And let me -- if I may --
17 read the first part of the e-mail so that I can
18 ask you a question.
19         "Kathy, Mal,
20         "After reviewing things and
21     trying to understand how the
22     various pieces fit together,
23     here's where I believe we stand:
24     The 390 MS," for Mississippi,
25     "petitions have plenty of room for

Page 28

1      the MS and TX," for Texas,
2      "'keepers,' which number about
3      273, with approximately 416
4      Indians between the two camps (244
5      plus 172).  It means there are 144
6      nonkeepers.  (FYI, the number of
7      keepers and nonkeepers will change
8      over time as workers increase in
9      skill level or run away.  But
10     don't worry about this for now.)"
11         Does this paragraph mean that there
12 are 144 Indian workers who Signal doesn't plan at
13 this point in time to extend?
14     MS. HANGARTNER:
15         Object to form.
16     MR. SANDLER:
17         Object to form, and I
18     think -- Ralph -- sorry.  Never
19     mind.
20 EXAMINATION BY MR. ALEXIS:
21     Q.  I'm just asking --
22     A.  Could you repeat the question?
23     Q.  Does this e-mail that I just read
24 part of indicate that you're saying that there
25 are 144 Indian workers who are, quote-unquote,

## Page 29

1 nonkeepers, meaning Signal doesn't want to extend
2 them?
3     MS. HANGARTNER:
4         Object to form.
5     A.   I wouldn't put it quite like that.
6 I would say that what is meant by nonkeepers is
7 that these are -- these 144 are individuals who
8 are on a track to not be extended if they do not
9 show improvements over the remaining three months
10 of their H2B validity.
11 EXAMINATION BY MR. ALEXIS:
12     Q.   And these nonkeepers would be,
13 therefore, candidates to be transferred, if
14 possible, to another company?
15     A.   Yes.
16     Q.   Okay.  Now, I finally found the
17 document I was looking for.  I'm going to mark --
18 Mr. Sanders, let me apologize in advance for not
19 having this readily available.  I'm going to mark
20 as Exhibit 699 a document -- I'm going to let you
21 look at it while I talk about it -- a document
22 that contains two e-mails, one at the top dated
23 May 4th, 2007, from you to Mr. Burnett, carbon
24 copy Kathy Moser, reference transferring H2B
25 workers.

## Page 30

1     Wait a minute.  Strike my -- strike
2 that.  No.  Throw away.  I made a mistake.  You
3 have to strike my testimony -- I mean my
4 questioning, please, about the e-mail because I
5 had the wrong e-mail.  I had the wrong e-mail.
6 I'm going to start over.  I'm sorry, Mr. Sanders.
7 Okay.
8     MR. SANDLER:
9         Ralph, are you withdrawing
10     it from the record?
11     MR. ALEXIS:
12         I'm withdrawing that from
13     the record because I -- it's not
14     what I intended.  I'm going to
15     take this back from you.  I'm
16     sorry.
17         I'm going to start over
18     again for the record.  Exhibit 699
19     is a document marked as SIGNAL
20     04318, Bates-stamped, rather,
21     04318.  It is a document that
22     contains an e-mail from, at the
23     top, Susan Carlquist, to John
24     Sanders, and at the bottom, it
25     contains an e-mail from John

## Page 31

1     Sanders to Susan Carlquist.
2         (Whereupon, Exhibit Number
3     699 was marked for identification.)
4 EXAMINATION BY MR. ALEXIS:
5     Q.   And I'm going to ask you, Mr.
6 Sanders, to please, if you would, would you read
7 this, so that I can ask you one or two questions?
8     A.   I've read it.
9     Q.   Okay.  Mr. Sanders, at the bottom,
10 there's an e-mail, and I'm going to ask -- and
11 it's from you to Miss Carlquist.  I'm going to
12 ask if you would compare that e-mail to the one
13 in Exhibit 694.
14     A.   Yes.  It's -- that portion of it is
15 the same.
16     Q.   It's the same.  Okay.  And your
17 e-mail on -- referring to 694 -- your e-mail to
18 Susan Carlquist attaches a letter which is
19 Exhibit 694, correct?
20     A.   No.
21     Q.   It does not?
22     A.   Exhibit 695.
23     Q.   Oh, I'm sorry.  Thank you.  The
24 letter is 695, correct?
25     A.   Yes.

## Page 32

1     Q.   So, you're now -- you're now -- I
2 had asked you earlier if you knew if Susan
3 Carlquist actually distributed the letters.  I'm
4 going to ask you to look at Exhibit 699, her
5 e-mail to you, where she -- I'll read it out
6 loud:
7         "Yes, I plan on distributing
8     all the letters at one time.
9         "I am on my way to the
10     Orange yard; therefore I will
11     print and present to Rodney."
12         Rodney, I assume, means Rodney
13 Meisetschlaeger --
14     A.   Yes.
15     Q.   -- who is the signatory on the
16 letter of Exhibit 695, correct?
17     A.   Correct.
18     Q.   So, does now having read her e-mail,
19 can you -- does that refresh your memory as to
20 whether or not Exhibit 695 was filled in and sent
21 out to various workers who weren't going to be
22 extended?
23     MS. HANGARTNER:
24         Object to form.
25     A.   It does not refresh my memory.  I

(504)525-1753                 HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS           NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

## Page 37

1  **Q.   Good morning.**
2  A.   Good morning.
3  **Q.   We met for the first time at the**
4  **second day of your deposition, correct?**
5  A.   Correct.
6  **Q.   And this is the next time we've had**
7  **the opportunity to meet, is on the third day of**
8  **your deposition, right?**
9  A.   Yes.
10  **Q.   And we have not spoken at all to**
11  **each other other than in the presence of all the**
12  **other counsel, correct?**
13  A.   Correct.
14  **Q.   Mr. Sanders, tell me when you**
15  **stopped work at Signal.**
16  A.   On November 16th, 2007.
17  **Q.   Was that voluntary or involuntary?**
18  A.   Involuntary.
19  **Q.   Can you tell me the reasons you were**
20  **given?**
21  A.   You would need to talk with Human
22  Resources.
23  **Q.   Yes, sir.   They didn't give you any**
24  **reasons?**
25  A.   You would need to talk with Human

## Page 38

1  Resources.
2  **Q.   Yes, sir, but I'm asking what**
3  **reasons they gave you.**
4  A.   I'm saying that you would need to
5  talk with Human Resources for that answer.
6  **Q.   They didn't give you any reasons?**
7  **MR. SANDLER:**
8      **Object to form.**
9  A.   I've stated, I'll state again, if
10  you wish to get that answer, you would need to
11  talk with Human Resources.
12  EXAMINATION BY MR. KUPPERMAN:
13  **Q.   Are you refusing to answer my**
14  **question --**
15  A.   Yes.
16  **Q.   -- as to the reasons given to you?**
17  A.   I'm sorry?
18  MR. SANDLER:
19      Object to form.
20  MS. HANGARTNER:
21      Object to form.
22  EXAMINATION BY MR. KUPPERMAN:
23  **Q.   Let me ask you this:  Were you given**
24  **any reasons for your termination?**
25  A.   I did not sign anything related to

## Page 39

1  my termination.
2  **Q.   Right.  I didn't ask if you signed**
3  **anything.  I was just asking if you were given**
4  **any reasons for your termination?**
5  **MR. SANDLER:**
6      **Object to form.**
7  A.   I repeat again, I'll repeat it as
8  many times as you need, you'll need to ask Human
9  Resources for that answer.
10  EXAMINATION BY MR. KUPPERMAN:
11  **Q.   Yeah, Mr. Sanders, I'm not asking**
12  **you what the reasons were right now.  I'm asking**
13  **you if you were given any reasons by anyone at**
14  **Signal for your termination?**
15  **MR. SANDLER:**
16      **Object to form.**
17  EXAMINATION BY MR. KUPPERMAN:
18  **Q.   And by "given," I mean told, given**
19  **something in writing, anything of the sort.**
20  A.   I'm not going to answer that
21  question.
22  **Q.   Just to make sure I understand, you**
23  **will not answer the question as to whether you**
24  **were given any reasons or what the reasons were**
25  **that you were given, correct?**

## Page 40

1  A.   Correct.
2  **Q.   All right.  You're not married,**
3  **correct?**
4  A.   I am not.
5  **Q.   Never have been?**
6  A.   Correct.
7  **Q.   No kids?**
8  A.   None.
9  **Q.   Okay.  From reading your diary, or**
10  **the parts of it we were provided, it almost**
11  **strikes me that you were looking at the Indian**
12  **workers kind of as your children to take care of**
13  **them.  Would that be a fair assessment?**
14  A.   As children, no.
15  **Q.   Well, not as children, but -- I'll**
16  **come back.  I'll come back to it.  It was a**
17  **poorly phrased question.**
18      **Did you have any discussions with**
19  **Mr. Schnoor about your deposition?**
20  A.   No.
21  **Q.   With anybody about your deposition,**
22  **anybody at Signal?**
23  A.   I've not talked to anybody at Signal
24  about any aspect of my deposition, from when --
25  you know, November 19th and 20th, until now.

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 41

1   Q.   What about preparation for your
2 deposition, did you speak to anybody at Signal
3 about going to your deposition or what might be
4 asked of you?
5   A.   Within Signal, no, I have not had
6 any contact with Signal management about any
7 aspect of my deposition in the time since
8 November 19th and 20th.
9   Q.   Yeah.  I'm trying to back that up.
10 I'm saying before you went to your deposition, in
11 preparation for your deposition, did you discuss
12 the fact that you were having your deposition
13 taken or the questions that might be asked or the
14 facts of the case or what you might say, any of
15 that, did you discuss in preparation for your
16 preparation with anyone at Signal?
17   A.   While I was still employed with
18 them, you're saying?
19   Q.   Yes.
20   A.   Yes.
21   Q.   Okay.  And who did you talk to?
22   A.   I talked in very general terms with
23 Bill Bingle.
24   Q.   Who else?
25   A.   Barney Duhon.

## Page 42

1   Q.   Who else?
2   A.   Nobody else.
3   Q.   Okay.  And what is Mr. Duhon's
4 position?
5   A.   He just said keep your answers
6 short, tell the truth, you'll be fine.
7   Q.   Okay.  What is his position?
8   A.   Oh, I thought you meant his position
9 with regard to --
10   Q.   No.  No.  No.  At Signal.
11   A.   Oh, he's the vice president of
12 production.
13   Q.   And what about Mr. Bingle, what did
14 he and you discuss?
15   A.   Same -- same thing.  He just said
16 essentially keep your answers short, don't get
17 into, you know, long discussions, and you'll be
18 just fine.
19   Q.   Did you talk about anything
20 substantive with either of them?
21   A.   No.
22   Q.   You saved the substantive questions
23 and discussion for counsel for Signal?
24   A.   Yes.
25   Q.   We know you've kept a diary.  Is

## Page 43

1 that what you call it?
2   A.   Yes.
3   Q.   Can you tell me why you kept a
4 diary?
5   A.   Just as a way to organize my
6 thoughts and just reflect on things.
7   Q.   Have you always kept one?
8   A.   For some years, but not always.
9   Q.   You kept one throughout the time you
10 were at Signal?
11   A.   Yes.
12   Q.   Was the diary that we have seen, or
13 the pages that we have seen, recorded
14 contemporaneously with the events?
15   A.   For the most part.  There were some
16 instances where I would, after the fact, go back
17 and fill in dates, but, in many instances, even
18 most, they were contemporaneous.
19   Q.   Do you recall which dates you went
20 back and filled in later?
21   A.   No, but that was, again --
22   Q.   It wasn't the majority?
23   A.   No.
24   Q.   Did you ever go back and add words
25 or add sentences to an entry you previously had

## Page 44

1 made in the diary?
2   A.   Some -- sometimes, not frequently,
3 though, again.
4   Q.   And you don't remember, I assume --
5   A.   No.
6   Q.   -- which entries those might have
7 been?
8   A.   There were several entries, needless
9 to say.
10   Q.   Okay.  And when -- did you ever
11 intend anybody else to read your diary?
12   A.   No.
13   Q.   In your -- one of your other
14 deposition days, you talked about having a
15 transcript of -- I think there was a transcript
16 that you talked about of the meeting between Mr.
17 Schnoor and Mr. Pol in November.  You recall --
18 you recall that meeting?
19   A.   November, 2006?
20   Q.   Yes.
21   A.   I do.
22   Q.   Okay.  And do you remember talking
23 about having a transcript?
24   A.   Yes.
25   Q.   What did you mean by "transcript"?

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250           CERTIFIED COURT REPORTERS           NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

**Page 45**

1  A.  Just that during that meeting of, I
2  think, November 20th, 2006, as a participant, I
3  had written down what each party had said as far
4  as Michael Pol and Ron Schnoor.
5  **Q.  And that is the document that we saw**
6  **earlier that are your notes of what you**
7  **interpreted everybody to say?**
8  A.  Yes.
9  **Q.  Was there a verbatim transcript**
10  **taken by anyone?**
11  A.  No.
12  **Q.  Was there a --**
13  A.  Could I add to that?
14  **Q.  Yeah.**
15  A.  We didn't have a court reporter.
16  **Q.  Did you have a tape recorder?**
17  A.  No, but what I wrote there is an
18  accurate reflection of statements that were made
19  and, in many cases, it is -- you know, it is a
20  reliable transcript of the discussion as it
21  transpired that day.
22  **Q.  Right.  From your perspective,**
23  **correct?**
24  A.  It's what was said.
25  **Q.  Okay.  All right.  But it's not --**

**Page 46**

1  you don't purport to have it stated verbatim,
2  correct?
3  A.  I do.  I do say that that transcript
4  is word for word as far as many of the things
5  that it says and, certainly, the intent of both
6  parties as they were talking is accurately and
7  truly reflected.
8  **Q.  You're not really professing to tell**
9  **us what Mr. Pol intended, do you?**
10  A.  No.  I'm saying I simply wrote what
11  he said in that meeting, and it's a reliable,
12  accurate version and information about what he
13  did say.
14  **Q.  And some of what was said, you**
15  **recorded verbatim, and some you did not record**
16  **verbatim, correct?**
17  A.  I wasn't able to capture everything
18  that everybody had said, but the things that are
19  in there are verbatim words that Mr. Schnoor said
20  and that Mr. Pol said.
21  **Q.  Okay.  Are you aware of any**
22  **documents that were at Signal either that you**
23  **created or somebody else created that relate to**
24  **the Indian workers or to Mr. Pol that you have**
25  **not seen in your depositions -- deposition dates?**

**Page 47**

1  **MR. SANDLER:**
2      **Object to form.**
3  **MS. HANGARTNER:**
4      **Object to form.**
5  A.  I don't know if I've seen everything
6  or not.
7  EXAMINATION BY MR. KUPPERMAN:
8  **Q.  Do you know of any documents that**
9  **were created by or at Signal that have been**
10  **discarded or destroyed?**
11  A.  No.
12  **Q.  Your job at Signal, as I understand**
13  **it, was that you were responsible for the**
14  **facilities at man camp -- I think I'm using Mr.**
15  **Sandler's word -- the man camp; is that fair to**
16  **say?**
17  **MR. SANDLER:**
18      **Object to form.  That's not**
19  **my word.**
20  A.  Could you repeat the question?
21  EXAMINATION BY MR. KUPPERMAN:
22  **Q.  Yeah, that would be probably a**
23  **pretty good idea.**
24  **Am I correct that your job**
25  **responsibility in connection with the Indian**

**Page 48**

1  workers was to be responsible for the facilities
2  and food and the operation of the man camp?
3  A.  Yes.
4  **Q.  Pol and -- Mr. Pol and Global were**
5  **not responsible for facilities there, correct?**
6  A.  No, they were not.
7  **Q.  Okay.  And same with Mr. Burnett and**
8  **Mr. Dewan, right?**
9  A.  They weren't responsible for
10  facilities, no.
11  **Q.  Okay.  And Mr. Pol found a caterer**
12  **for the camp that you liked; is that fair?**
13  A.  Yes.
14  **Q.  And that was Keswani?**
15  A.  Yes.
16  **Q.  And you agreed on behalf of Signal**
17  **to pay approximately $14 a day per worker?**
18  **MS. HANGARTNER:**
19      **Object to form.**
20  A.  When there was the full contingent
21  of workers, yes.  When there were fewer workers,
22  it would be somewhat higher, a graduated scale.
23  EXAMINATION BY MR. KUPPERMAN:
24  **Q.  Okay.  With a full contingent,**
25  **though, on behalf of Signal, you agreed to pay**

## Page 57

1  MR. SANDLER:
2      Object to form.
3      A.  Correct.
4  EXAMINATION BY MR. KUPPERMAN:
5      Q.  And not everybody, not all of the
6  Indian workers complained to you about the cost
7  to them of getting to the United States and being
8  employed at Signal, correct?
9      A.  They -- they did not talk with me
10  or --
11      Q.  I said:  Not all of the workers
12  complained to you about that?
13  MR. SANDLER:
14      Object to the form.
15      A.  It was a complaint that was voiced
16  by many, many workers.
17  EXAMINATION BY MR. KUPPERMAN:
18      Q.  Yes, sir.  But not all, correct?
19  MR. SANDLER:
20      Object to form.
21      A.  I would -- I would say that in some
22  of the community-wide meetings, which all or
23  almost all workers attended, that was a concern
24  that was expressed and which everyone that I
25  could see shared in that concern, even if -- even

## Page 58

1  if they were not one of the ones voicing that
2  concern, that they agreed that it was a
3  legitimate one.
4  EXAMINATION BY MR. KUPPERMAN:
5      Q.  And the -- scratch that.
6      Not all Indian workers attended
7  every camp meeting, correct?
8  MR. SANDLER:
9      Object to form.
10      A.  That is true.
11  EXAMINATION BY MR. KUPPERMAN:
12      Q.  Sir, nobody used any force or fear
13  to keep any of the Indian workers in the camp; is
14  that fair?
15  MR. SANDLER:
16      Object to form.
17      A.  Signal did not, no.  In fact, I
18  cared about them, Darrell Snyder cared about
19  them, and we -- we sought to treat them well, and
20  we did.
21  EXAMINATION BY MR. KUPPERMAN:
22      Q.  And to the best of your knowledge,
23  nobody, in fact, used fear or force to keep them
24  in camp, correct?
25  MR. SANDLER:

## Page 59

1      Object to form.
2      A.  No.
3  EXAMINATION BY MR. KUPPERMAN:
4      Q.  No, meaning that's correct?
5      A.  We did not use force or fear; quite
6  to the contrary.
7      Q.  Nobody, none of the Indian workers
8  were threatened with serious harm if they left
9  the camp; fair?
10  MR. SANDLER:
11      Object to form.
12      A.  They were free to come and go to the
13  camp whenever they pleased and as time progressed
14  and they chose to abscond, you know, on every
15  time that I was there, which excludes the March
16  9th incident, there was never any -- encouraged
17  them not to, but if they were intent on it, they
18  were --
19  EXAMINATION BY MR. KUPPERMAN:
20      Q.  They were free to go?
21      A.  -- not restricted by Signal.
22      Q.  No one, to your knowledge, ever made
23  any effort to -- I'm trying to think of the right
24  way to phrase this in English -- there was never
25  any forced labor to any of the Indian workers, to

## Page 60

1  the best of your knowledge, correct?
2  MR. SANDLER:
3      Object to form.
4      A.  Well, could you define what you mean
5  by "forced labor"?
6  EXAMINATION BY MR. KUPPERMAN:
7      Q.  That's what I was afraid you were
8  going to ask me, because I can think of about a
9  thousand different ways of defining that.
10      A.  Could I -- could I say what did
11  happen?
12      Q.  Please.
13      A.  The Indian workers who came to
14  Signal, they were treated as other full-time
15  Signal employees, with all of the, you know,
16  benefits and, you know, first-class wages for
17  first-class workers that was our expectation and
18  treated in that way, and in return, they were
19  expected, as all other Signal workers, to show up
20  for work on time and complete their assigned
21  duties within the context of ship or oil rig
22  construction and repair, just normal, full-time
23  workers who Signal wanted to see integrated into
24  the company's life and activities in every way.
25      Q.  None of these workers were treated

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS            NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

## Page 61

1 differently than regular Signal workers as a
2 result of their race or national origin; is that
3 fair?
4     MR. SANDLER:
5         Object to form.
6     A.   Signal treated -- treated the
7 Indians very fairly, and I don't know of any
8 discrimination against them, certainly, not by
9 Signal management.  In fact, I know that I and
10 Tracey Binion in Human Resources and Darrell
11 Snyder, folks in Texas, we went even out of our
12 way to make sure that the workers were treated
13 fairly, with dignity, with respect, sought to --
14 in terms of vacation times and things like that
15 to be very lenient with them.  Medical
16 emergencies that arose, they were encouraged
17 to -- encouraged and permitted to return to their
18 families to help with that.  I mean, I even paid
19 money out of my own pocket at one time, in late
20 December of '06, I guess it would be, for one of
21 the workers to go back because he didn't --
22 wasn't able to come up with it on his own and
23 then he was supposed to repay me and then, you
24 know, ran away.  So, Signal refunded the --
25 repaid me for the balance, but the point is is

## Page 62

1 that we tried very hard from the start and all
2 the way to show the workers we cared about them.
3 EXAMINATION BY MR. KUPPERMAN:
4     Q.   There was no scheme or plan
5 involving Mr. Pol that was ever intended to
6 coerce anybody into believing they would suffer
7 serious harm if they left the man camps; is that
8 fair?
9     MR. SANDLER:
10         Object to form.
11     MS. HANGARTNER:
12         Object to form.
13     A.   I'm sorry.  Could you repeat?
14 EXAMINATION BY MR. KUPPERMAN:
15     Q.   Sure.  You're not aware of any
16 scheme or plan that involved Mr. Pol that was
17 intended to coerce any of the Indian workers into
18 believing they would suffer serious harm if they
19 left Signal's employ, correct?
20     MR. SANDLER:
21         Object to form.
22     A.   I'm not aware of one.
23 EXAMINATION BY MR. KUPPERMAN:
24     Q.   And, in fact, you're not aware of
25 any conspiracy involving Mr. Pol, correct?

## Page 63

1     MR. SANDLER:
2         Object to form.
3     A.   When you say "conspiracy," could you
4 define the parameters of conspiracy and so forth?
5 EXAMINATION BY MR. KUPPERMAN:
6     Q.   Yeah, but let me move on because --
7 let me ask you this:  You are not aware --
8     A.   Because I do think he had a
9 conspiracy.  I just don't know that it related to
10 what might happen to Indian workers if they left
11 Signal's employ.  I don't know.
12     Q.   Now, you say you think he had a
13 conspiracy.  Did anyone ever tell you that Mr.
14 Pol -- did Mr. Pol -- scratch that.
15         Who do you believe he conspired
16 with?
17     A.   With Dewan Consultants and with
18 Malvern Burnett's law firm.
19     Q.   And did Mr. Burnett, Mr. Dewan, Mr.
20 Pol or anyone connected with them ever tell you
21 that there was a conspiracy?
22     A.   No.
23     Q.   Okay.  And your view that there was
24 a conspiracy is based on your own personal
25 deduction and opinions; is that fair?

## Page 64

1     A.   Not only that.  I would say that Mr.
2 Pol himself in the -- in the meeting with Signal
3 on 11/20/06, he said that he had told us that the
4 amount was 2,000 or $3,000, but then, you know,
5 that it was really 10,000, and he didn't know
6 what Sachin was charging and so forth, but that
7 there had been -- so, he told us -- he told us
8 one thing and yet in that meeting, it came out
9 that it was higher, and we learned that it was
10 even higher still.  And, so, why would he tell us
11 one thing, and then outside of Signal's
12 knowledge, because, again, as our -- as Signal's
13 recruiters, it was what -- what they did was
14 black box to us.  So, it was a conspiracy in the
15 sense that let's tell Signal one thing and then
16 once they agree to have the workers, well, we'll
17 actually charge the workers much more and bring
18 them into Signal.  So, I do see a conspiracy in
19 that sense.
20     Q.   And, obviously, you're not offering
21 any legal opinion, right?
22     MR. SANDLER:
23         Object to form.
24 EXAMINATION BY MR. KUPPERMAN:
25     Q.   You're not a lawyer?

Page 81

1    Q.   What I want to focus on, Mr.
2  Sanders, is towards the bottom of that, about
3  five lines up, where you say she -- and I believe
4  that refers to Lisa Spears -- agrees he -- and I
5  think that is Mr. Pol -- is untrustworthy and
6  says she believes we can get out of the catering
7  contract with him by giving him 30 days' notice,
8  and then you tell her Anjay, the caterer, would
9  pick up the contract and you argued successfully
10  that the contract should be held at $14 a day
11  even without Pol, and then you said that Anjay
12  would love you to death because that's an extra
13  $1.50 per man per day, which comes out to about
14  325,000 a year, right?
15       MS. HANGARTNER:
16           Object to form.
17       A.   Predicated on close to 600 people,
18  which never materialized.
19  EXAMINATION BY MR. KUPPERMAN:
20       Q.   Okay.  Is it fair that as of this
21  date, which is about October 6, 2006, you wanted
22  to eliminate Mr. Pol's involvement with the
23  Indian workers?
24       MR. SANDLER:
25           Object to the form.

Page 82

1       A.   There was concern within Signal
2  International that he was untrustworthy and, so,
3  within the confines of the contract, how could
4  we -- how could we bring that contract to a
5  close.
6  EXAMINATION BY MR. KUPPERMAN:
7       Q.   Okay.  And that process in Signal or
8  thought process in Signal started at least no
9  later than the day that Mr. Pol had a breach of
10  etiquette with Diane Davis, as you put it in
11  here; is that fair?
12       MS. HANGARTNER:
13           Object to form.  I don't
14       understand the question.
15       A.   Could you rephrase?
16  EXAMINATION BY MR. KUPPERMAN:
17       Q.   That one, I didn't think, was too
18  bad, but I'll be more than happy to rephrase it.
19       MS. HANGARTNER:
20           I may be just lost, but --
21  EXAMINATION BY MR. KUPPERMAN:
22       Q.   The idea of trying to figure out how
23  to bring Mr. Pol's contracts with Signal to an
24  end started at least no later than Mr. Pol's
25  breach of etiquette with Miss Davis?

Page 83

1       A.   I wouldn't -- I wouldn't necessarily
2  put it at that date, but, certainly, October 6th
3  or so, we could say --
4       Q.   Okay.
5       A.   -- in terms of Signal's concern with
6  regard to him causing us to think along the lines
7  of how can we -- how can we terminate the
8  contract based on this lack of trust that we
9  feel.
10       Q.   Okay.  Now, the -- the $14 a day
11  that was being charged for catering, the 14 a day
12  per worker -- I'll just use shorthand of 14 a
13  day, if that's okay.
14       A.   Yes.
15       Q.   You were comfortable with that,
16  correct?
17       A.   I became comfortable with it in
18  August, yes.
19       Q.   Okay.  And, in fact, you looked
20  around and couldn't find anything less expensive,
21  correct?
22       A.   Correct.
23       Q.   And that $14 a day was part of the
24  $35 a day that each worker was paying, correct?
25       A.   Yes.

Page 84

1       Q.   So, the cost to Signal just passed
2  through to each worker on the catering?
3       MS. HANGARTNER:
4           Object to form.
5       A.   Yes, that was the -- the way the
6  plan was designed.
7  EXAMINATION BY MR. KUPPERMAN:
8       Q.   And that is the way it worked,
9  correct?
10       MS. HANGARTNER:
11           Object to form.
12       A.   There were times into 2007 where we
13  would give the workers a -- instead of charging
14  them $35 a day times seven days, that we would
15  charge them times four if -- times four days if
16  their hours on the job were less than four per
17  week, but, in general, that was the plan.
18  EXAMINATION BY MR. KUPPERMAN:
19       Q.   Okay.  And that change that you just
20  described didn't come about until March or April
21  of '07, correct?
22       A.   Correct.
23       Q.   Okay.
24       MR. SANDLER:
25           I'm just going to interrupt

(504)525-1753                HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS         NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 85

1  for a second, Mr. Kupperman. Just
2  for the record, all these
3  questions relate to class; is that
4  right?
5  MR. KUPPERMAN:
6     I think a lot of them do, if
7  not all of them, yeah.
8  MR. SANDLER:
9     Okay. Just wanted to --
10 EXAMINATION BY MR. KUPPERMAN:
11    Q.  When Mr. Pol was terminated --
12 MR. KUPPERMAN:
13    Well, let's put it this way,
14 they certainly relate to class
15 every bit as much as all your
16 questions did.
17 EXAMINATION BY MR. KUPPERMAN:
18    Q.  When Mr. Pol was terminated, am I
19 correct that Signal could, in fact, have saved
20 each of the workers $1.50 a day by paying the
21 caterer what he had always received and then
22 letting the workers have that $1.50 that had gone
23 to Mr. Pol?
24    A.  Anjay was able to provide a better
25 level of -- of service getting $14 a day, and it

## Page 86

1  was already a good deal even at that, as I knew.
2  So, he used that -- that $1.50 to increase his
3  service level and provide for some things in the
4  menu that weren't possible at the lower level.
5  So, the money didn't go completely -- he had cost
6  that the $1.50 would have helped to cover.
7     Q.  When he started receiving the extra
8  $1.50, did he add people to help him with the
9  catering?
10    A.  You would need to ask him.
11    Q.  Did -- how did his menu change?
12    A.  Again, you would need to ask him,
13 but there were improvements, I think, maybe a
14 different, more expensive type of fish could have
15 been an example.
16    Q.  Okay. But nonetheless, the workers
17 still complained as late as, I think it was, in
18 April that we saw of '07 about the food, correct?
19 I'm sorry. March of '07, which was Exhibit 628,
20 they were still complaining about the food,
21 correct?
22    A.  Yes.
23    Q.  Okay. So, let me just get back to
24 my original question, that when Pol was
25 terminated, it was Signal who made the decision

## Page 87

1  to give that $1.50 Mr. Pol had been receiving to
2  the caterer and rather than to remit it back or
3  lower the cost to the workers, correct?
4     A.  Yes.
5     Q.  And at the time that Mr. Pol was
6  terminated, the workers had been complaining to
7  you about the cost they were paying of $35 a day,
8  correct?
9     A.  They were, yes.
10    Q.  Was it your view at the time that
11 the workers, in coming over to the United States,
12 had agreed to pay $35 a day for room and board?
13    A.  I don't -- I don't remember those --
14 those details as far as what each worker knew
15 prior to coming over.
16    Q.  Was it fair to say that, in your
17 view at the time, there was no need to reduce the
18 $35 a day to the workers because they had already
19 agreed to the $35 a day?
20    A.  Could you say that again?
21 MR. KUPPERMAN:
22    Why don't we read it back
23 because I don't know if I can.
24 THE COURT REPORTER:
25    Question: Was it fair to

## Page 88

1     say that in your view at the time,
2     there was no need to reduce the
3     $35 a day to the workers because
4     they had already agreed to the $35
5     a day?
6     A.  No, that wasn't the consideration as
7  far as they signed up to it and, so, we're not
8  going to reconsider. We had rather hoped that
9  the problem that -- the Indians wanted to see the
10 $35 a day reduced. The reason for that is
11 because their net pay after taxes were taken out
12 from gross pay, and after the $35 a day was taken
13 out from that, was that they didn't have enough
14 money left over, in their view, to quickly or as
15 quickly as they hoped amortize their high debt.
16 So, in terms of addressing the root issue of high
17 debt, which as one of its symptoms had complaints
18 about the $35 a day, we tried to get to the root
19 of the problem, high debt, by having Mr. Pol
20 repay as, indeed, on 11/20/06, he said he would,
21 though he later reneged.
22 MR. ALEXIS:
23    Excuse me a second. I want
24 to object on the record to the
25 lack of responsiveness of the

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

Page 133

1    Q.   Good.  Actually, between Mr. Alexis
2  and Mr. Kupperman, a lot of my questions have
3  been eliminated or asked already, so, I'll try to
4  make this as brief as I can.
5    A.   No problem.
6    Q.   I thought you might like that.
7         You indicated previously in your
8  testimony that you met Mr. Dewan at one point in
9  time.
10    A.   Yes.
11    Q.   Okay.  And was that first time you
12  met him, was that in India?
13    A.   It was.
14    Q.   Okay.  And your job on behalf of
15  Signal was to go to India and to oversee the
16  consulate interviews?
17    A.   No.  I wouldn't state it that way.
18  It was to be on stand by in case a Signal
19  representative were needed by the consular
20  officials.  That was the prime reason.  While I
21  was there, as I testified in a previous
22  deposition, other than saying hello to somebody
23  at the consulate counter, I didn't talk to
24  anybody from the consulate.  So, me being on
25  standby, they turned out not to need me.  So,

Page 134

1  while I was there, I filled out some form
2  letters, if you will, or signed them to say that
3  such and such an Indian worker had an opportunity
4  to work for Signal.
5    Q.   Okay.  Were you required to do that
6  for every worker?
7    A.   I took the list of workers that
8  Sachin gave me and, in fact, I think he may have
9  already had the names filled in and I signed
10  them -- signed my name at the bottom of the form
11  letter.
12    Q.   Okay.  And do you remember how many
13  you signed?
14    A.   It was several hundred.
15    Q.   Okay.  Now, as I recall, you went to
16  more than one city in India; is that correct?
17    A.   Yes.
18    Q.   Okay.  And would that include Delhi?
19    A.   No.  I went to Chennai, and that was
20  the business part of my trip.  Over a weekend, I
21  went to Mumbai, but that was more just to see
22  India a little bit and get to know it.  It wasn't
23  really related to Signal business, but I had to
24  be there over a weekend.  I said, well, I'd like
25  to go to Mumbai, and that was made possible.

Page 135

1    Q.   Excellent.  That's something I
2  didn't have a chance to do when I was over there.
3         Now, did anybody from Dewan
4  Consultants explain to you how long the -- Dewan
5  Consultants had stationed themselves in Chennai
6  in the recruitment process?
7    A.   I don't remember specifically.
8    Q.   Okay.  Now, I want to fast forward a
9  little bit to late 2006, when, apparently, there
10  were some problems at the Signal camp.  Do you
11  recall Mr. Dewan coming to Signal in late -- in
12  early 2007, actually?
13    A.   Yes.  It was mid-January, 2007, as I
14  recall.
15    Q.   And do you know whether he was
16  requested to come or if he came on his own?
17    A.   He was requested to come.
18    Q.   Okay.  And when he arrived, when did
19  you first meet with him?
20    A.   I think it was -- well, it was in
21  mid-January, and I think the setting was in Ron
22  Schnoor's office.
23    Q.   Okay.  And do you know why Mr. Dewan
24  was requested by Signal to come over to visit the
25  Signal facility?

Page 136

1    A.   I think I remember, and that was
2  because we had -- our contact had been with
3  Michael Pol, and that relationship had been
4  terminated in mid-November, two months --
5  approximately two months previous.  And, so, Mr.
6  Dewan and Malvern Burnett came to Signal to meet
7  with Ron Schnoor, and I was also a part of that
8  meeting, just to talk about could there be --
9  about a potential way forward with them, with
10  Dewan Consultants and Malvern Burnett.
11    Q.   Okay.  And did Signal request Mr.
12  Dewan to offer any assistance with respect to the
13  problems some of the workers were having at
14  Signal?
15    A.   Could you elaborate as far as
16  problems that workers were having at Signal?
17    Q.   Well, for example, the food problem.
18  At that point in time, the food problem had not
19  been resolved; is that correct?
20    A.   I don't remember.  The food problem
21  seemed to come and go with time.  There were
22  times of complaint.  There were also times that
23  the workers said they were happy with the quality
24  of the food.  So, where on that up-and-down scale
25  it was in mid-January, I don't know.

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS             NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 141

1  Schnoor. I don't remember them, but afterwards,
2  he also wanted to see the workers' housing
3  facility and while -- so, I was out there with
4  him and I think Malvern may have been a part of
5  that, too, and there was a meeting with many of
6  the workers and there was some heated exchange in
7  that meeting between Arvind Kumar, one of the
8  workers, and Mr. Dewan in Hindi, so, I couldn't
9  understand, but just by the expressions on faces
10 and level -- just it was a very loud volume,
11 almost shouting, I could see that there was a
12 problem, and tried to intervene in that to calm
13 things down. So, I remember that was another
14 thing out there that he did. He talked to the
15 workers.
16     Q.  He talked to the workers. And with
17 respect to his conversation that he had with
18 Kumar, did you feel like whatever difficulty
19 there was, that that was resolved?
20     A.  I wasn't sure that it was resolved,
21 but I -- if I'm remembering correctly, I felt
22 that my presence as somebody that the workers
23 trusted helped to keep things calm or calmer.
24     Q.  Your presence?
25     A.  Yeah. Yeah, I would say so.

## Page 142

1      Q.  Okay. You've held yourself out,
2  you've called yourself a pretty good public
3  speaker; is that correct?
4      MR. SANDLER:
5          Object to form.
6      A.  Others -- others consider me to be.
7  EXAMINATION BY MR. SHAPIRO:
8      Q.  And did you feel like Mr. Dewan had
9  a calming effect on the Indian workers?
10     A.  No, certainly not with regard to
11 Arvind Kumar. His presence made that worker
12 angry is how it appeared to me.
13     Q.  Okay. And, again, you don't know --
14 you don't recall how that was resolved or whether
15 it was resolved?
16     A.  I don't recall. I just remember me
17 trying to keep -- keep the peace, so to say, so
18 that it didn't escalate, and I thought I did that
19 successfully.
20     Q.  What did you do to intervene?
21     A.  I don't -- I don't remember exactly.
22 Just tried to be a peacemaker.
23     Q.  Okay. Now, were they speaking in
24 English or in a foreign tongue?
25     A.  The argument was in Hindi, but I

## Page 143

1  don't speak Hindi. I could just tell. I mean,
2  you can know, regardless of the language, if
3  somebody's yelling, I mean, because it's their
4  expression and how loud things are. So, I knew
5  that things weren't calm and wanted them to be.
6      Q.  Okay. So, what did you do to calm
7  things down?
8      A.  Again, I don't remember exactly,
9  but, quite possibly, I might have interrupted and
10 said, hey, let's -- in English, of course -- just
11 let's keep everything calm and so forth. I don't
12 remember the specifics.
13     Q.  Did you ask Mr. Dewan what was being
14 discussed?
15     A.  I don't -- I don't remember if I did
16 or not.
17     Q.  Did you ask Mr. Kumar what was being
18 discussed?
19     A.  Again, I don't remember. I just
20 know that he told me after that just he felt he
21 had been cheated and so forth, but I don't
22 remember the specifics of that very well, just
23 that I thought it might have gotten out of hand,
24 but that it didn't in the end.
25     Q.  Okay. When you say it didn't at the

## Page 144

1  end, do you mean that somehow there was a
2  resolution to the matter?
3      A.  The volume quieted down and didn't
4  get -- there was no more shouting or yelling.
5  And, so, even if the parties saw things from a
6  different point of view, at least it was more
7  civil than otherwise might have been.
8      Q.  Okay. You never asked Kumar whether
9  the problem was resolved to his satisfaction?
10     A.  I don't remember one way or the
11 other.
12     Q.  Okay. You write things down in your
13 journals pretty frequently, on a daily basis?
14     A.  I've actually ceased that habit.
15     Q.  Okay.
16     A.  Yeah.
17     Q.  But you did at one time?
18     A.  I did at one time.
19     Q.  Okay. And you write down things
20 that strike you as important, don't you?
21     A.  Or my interpretation of them at the
22 time.
23     Q.  Okay. Do you recall writing down
24 that there was an incident like this, argument
25 between Mr. Dewan and Mr. Kumar?

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS            NEW ORLEANS, LA 70139

Plaintiffs (P)   Signal Defs. (S)   Dewan Defs. (D)   Burnett Defs. (B)

Page 149

1    strike later.
2    EXAMINATION BY MR. SHAPIRO:
3        Q.   Are you aware of what expenses are
4    needed to recruit approximately 600 workers in
5    India?
6        MR. SANDLER:
7            Object to form.
8        A.   I've never done all of them, so, no,
9    I don't know how the expenses would break down.
10   At the same time, there's a general ballpark that
11   I would expect it to fall within.
12   EXAMINATION BY MR. SHAPIRO:
13       Q.   Okay.  Well, you understand, for
14   example, that Mr. Dewan has an office that he
15   runs in Mumbai.
16       A.   Yes.
17       Q.   Okay.  You understand that he had to
18   do extensive traveling to undertake this
19   recruitment process.
20       A.   He or his workers, or both.
21       Q.   Okay.
22       A.   Yes.
23       Q.   That means sometimes taking a large
24   contingent of his staff with him.
25       A.   Yes.

Page 150

1        Q.   Okay.
2        A.   By large, I mean, I saw maybe two
3    others in Chennai, for instance --
4        Q.   Okay.
5        A.   -- so --
6        Q.   Were you aware that in some
7    instances, at some points in time, Mr. Dewan had
8    to station himself in Chennai, for example, for
9    weeks at a time?
10       A.   It doesn't surprise me.
11       Q.   Okay.  And would it surprise you
12   that that creates an enormous amount of expenses?
13       A.   I think "enormous" is a relative
14   term, especially in comparison to the amount of
15   money collected.
16       Q.   You'd agree then that there are
17   expenses that need to be paid in the recruitment
18   effort, and the expenses -- well, I'm not asking
19   you and I'm not trying to pin you down to a
20   number because I'm not giving you a number --
21       A.   Sure.
22       Q.   -- but there are hours that need to
23   be spent on the recruitment, there are out-of-
24   pocket expenses that need to be made, and then,
25   at some point, there has to be perhaps a profit

Page 151

1    for Dewan Consultants.  Would you agree that
2    that's a -- that would be a fair way to assess
3    the -- strike the -- strike that question.
4            You threw out a number in the
5    millions of dollars.  Wouldn't that number be
6    less than significantly by the expenses that I'm
7    mentioning about recruiting workers, almost 600
8    workers in India?
9        MR. ALEXIS:
10           Object to form.
11       A.   It's important to keep in mind the
12   relative nature of things, where when the money
13   was collected from at least approximately 500
14   workers, just 500 being the number Mr. Kupperman
15   used, multiplying that times, again, to use
16   Michael Pol's term of $10,000, which I know to be
17   higher in at least two instances, and think that
18   it's higher in the overwhelming majority, but
19   anyway, 500 and 10,000 -- times 10,000 is five
20   million.  I would be very surprised if the
21   significant amount of expenses, to use the term
22   you used, "significant," would be even 20 percent
23   of that five million.  I'd be very, very
24   surprised.  So, is something less than 20 percent
25   significant compared to 100 percent?  No.

Page 152

1    EXAMINATION BY MR. SHAPIRO:
2        Q.   Well, you're coming up with
3    percentages, and that's fine.
4        A.   I'm just trying to use the numbers
5    that you all have given, or Michael Pol with the
6    10,000.
7        Q.   Let me expand on this further.  If
8    Mr. Dewan had, for example -- I'm not accepting
9    this -- but if he had 20 percent expenses,
10   wouldn't Mr. Burnett and Mr. Pol have had 20
11   percent as well?
12       A.   No.  I'm saying combined together,
13   the three parties, I'd be surprised if it --
14       Q.   You don't have any basis for that
15   either?
16       A.   The flights would be the largest
17   part for sure because, let's say, 1,000 to 2,000,
18   in that range, you know, that's 500,000 to $1
19   million in expense, just in plane fare, plus you
20   have the other expenses of the three parties
21   going against at least five million.  And, so, if
22   the other expenses -- let's use $500,000 --
23       Q.   Let me interrupt you for just a
24   second.  Go ahead.  Finish your answer.
25       A.   Outside -- outside of the plane

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250            CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 161

1  Mr. Dewan, Mr. Pol, Mr. Burnett, nor do you have
2  any personal knowledge about the expenses that
3  each of them incurred in the recruitment process,
4  is that correct?  Yes or no.  You have no
5  personal knowledge about it?
6      A.  Correct.
7      Q.  Okay.  Now, you mentioned in your
8  previous testimony that workers had come up to
9  you complaining they had gone into -- if I'm
10  using the word right, and correct me if I'm
11  wrong -- massive amounts of debt in order to pay
12  the recruitment in legal and broker fees --
13     A.  Yes.
14     Q.  -- or large amounts of debts, or
15  words to that effect?
16     A.  Yes.  Yes.
17     Q.  Okay.  And do you remember which
18  workers told you that?
19     A.  I think one of them might have been
20  Thampy.  I don't remember his last name, and I
21  don't remember the name of the other worker.
22     Q.  So, there were two workers that came
23  up to you and shared that with you, shared that
24  they went into large amount of debt?
25     A.  No.  There was actually a lot of

## Page 162

1  workers, but as far as specifics about who paid
2  how much to who on what day, I got information
3  from two workers who showed me receipts and other
4  documentation signed by Malvern Burnett, Michael
5  Pol and Dewan Consultants, and those two
6  individuals, they were two among an entire
7  bunkhouse of workers that was sharing this
8  information with me.  So, I said, okay, well, let
9  me take detailed information from two of you as
10  representative of the whole, and both of those
11  workers -- both of them had numbers that were
12  higher than the $10,000 which Michael Pol later
13  stated, on November 20th, where he was quite
14  specific about it was right at $10,000, pending
15  exchange rate fluctuations.  So, I knew just from
16  that and from the agreement of the workers, yeah,
17  we all paid a -- lots of money, here's two
18  examples, that the numbers were high.
19         There was also another worker, Sony
20  was his name, and he shared with me after the
21  fact, not with showing receipts or anything, but
22  he just gave specific details about a number even
23  higher than those other two.
24     Q.  Well, you're talking about receipts.
25     A.  Yes.

## Page 163

1      Q.  Receipts from whom?
2      A.  Receipts from the three parties
3  which you lawyers represent.
4      Q.  And what -- what -- what were those
5  receipts of?  Help me out with this.
6      A.  Of money paid to them totalling more
7  than $10,000, significantly more.
8      Q.  And were all of the amounts stated
9  in dollars?
10     A.  Some were -- some were in dollars.
11  We'd have to check the breakdown to see, but the
12  breakdown was quite clear and specific and there
13  were amounts in dollars, there may have been
14  amounts in Indian rupees, also, but at the
15  prevailing exchange rate, would have translated
16  to dollars that, in aggregate, totalled, as I
17  said, more than 10,000.
18     Q.  So, if there was a number in rupees,
19  did you do some kind of calculation?
20     A.  Well, just, foreign an exchange
21  rate, divide rupees by the foreign exchange rate
22  to the dollar and you come up with the dollars.
23     Q.  No.  Did you actually undertake a
24  calculation to figure out how much money was
25  involved?

## Page 164

1      A.  Yes.
2      Q.  Did you ever write it down anywhere?
3      A.  Yes.
4      Q.  Did you ever make copies of the
5  documents?
6      A.  Yes.
7  MR. SHAPIRO:
8         Have they been furnished in
9  discovery?
10 MS. HANGARTNER:
11        Yes.
12 MR. SHAPIRO:
13        Okay.
14 EXAMINATION BY MR. SHAPIRO:
15     Q.  I think I was asking you about -- I
16  wasn't asking you about how much the workers paid
17  to Mr. Dewan -- allegedly paid to Mr. Dewan, Mr.
18  Pol and Mr. Burnett.  I was asking you whether or
19  not -- I was asking you how you came to know that
20  they went into large amounts of debt in order to
21  be recruited to Signal.
22     A.  Well, to use these two workers as
23  examples, that's a lot of -- that's a lot of
24  money.  You know, significantly more than
25  $10,000.  So, where did -- the question comes,

Page 165

1   where did they get it from?  They told me where
2   they got it from.  That's where the information
3   came.
4       Q.   They told you where they got it
5   from.  Where did they get it from?  With respect
6   to Worker Number 1, and you haven't identified
7   his name in full.
8       A.   I think it could be identified from
9   Thampy, T-h-a-m-p-y, first name.  I think the
10  badge number was 500278 -- 8 or 9.
11      Q.   Okay.
12      A.   Maybe 178, 179 -- anyhow.
13      Q.   Do you know how much he went into
14  debt?
15      A.   I don't know.
16  MR. SANDLER:
17      Object to form.
18      A.   I don't know.  All I know is that
19  he -- I just know that in that meeting on that
20  day, workers told me that they had to, for
21  instance, sell land in India, borrow money from
22  relatives, sell jewelry or borrow at usurious
23  interest rates, in order to come up with the
24  aggregate amount, which was then paid to Michael
25  Pol, Malvern Burnett and Dewan Consultants, but I

Page 166

1   don't know exactly how much either of those two
2   workers had to borrow to come up with the total.
3   I don't know.
4   EXAMINATION BY MR. SHAPIRO:
5       Q.   You just accepted the fact that this
6   is what they told you and this was correct?
7       A.   Well, I accepted it was correct
8   because when they told me that they had -- in the
9   same conversation, if they're telling me we paid
10  more than the two to $3,000 that Global Resources
11  has told you, here's the proof, you want to see
12  receipts --
13  MR. SANDLER:
14      Objection.  Counsel for Mr.
15      Pol has just stepped out of the
16      room -- if you want to wait for
17      him to come back.
18  THE WITNESS:
19      It's up to you, Mr. Shapiro.
20  MR. SANDLER:
21      I'm not sure that it is.
22  MS. HANGARTNER:
23      Because he represents
24      Michael Pol.  If you're discussing
25      Michael Pol --

Page 167

1   THE WITNESS:
2       Yeah, I can wait.
3   MR. SHAPIRO:
4       I guess he had to go out on
5   an emergency.
6   MR. SANDLER:
7       We'll probably pick up
8       right -- right where you left off.
9   THE WITNESS:
10      Okay.
11  MS. TSU:
12      Can we go off the record for
13  a moment?
14  THE VIDEOGRAPHER:
15      Off the record.  The time is
16  3:09.  This is the end of Tape 5.
17      (Whereupon, a discussion was
18  held off the record.)
19  THE VIDEOGRAPHER:
20      This is the continued
21  videotaped deposition of John
22  Sanders.  This is the beginning of
23  Tape 6.  The time is now 3:20.
24  EXAMINATION BY MR. SHAPIRO:
25      Q.   Okay.  Mr. Sanders, you indicated

Page 168

1   that you had spoken with two Signal workers about
2   the debt they incurred in order to afford the
3   recruitment, legal and broker fee in order to be
4   able to come over to Signal; is that correct?
5       A.   More specifically, about the amount
6   that they paid, and then it was with the group of
7   workers clustered around me on that day that they
8   told me that they had variously had to come up
9   with money from land that they owned or borrow
10  from relatives or sell jewelry or borrow at
11  usurious interest rates, but I don't remember
12  that it was specifically those two workers that
13  told me that, just the group gathered around me.
14      Q.   Okay.  And that's one group out of
15  the entire man camp?
16      A.   A representative group.
17      Q.   Why do you characterize that group
18  as a representative group?
19      A.   Well, the group was different in
20  many ways, but they did share in common the fact
21  that they had to come up with many thousands of
22  dollars from somewhere and that their way of
23  getting that, of course, is going to vary by the
24  person, but that those ways encompassed the
25  things I just described.

## Page 169

1    Q.   Did you ask each one of them how
2  much they had to borrow, how much money they
3  had to sell or what they had to do to come up
4  with the money to be able to pay the recruitment,
5  legal, the broker fees?
6    A.   Each one, no.
7    Q.   Okay.  Did you ask -- so, are you
8  saying that they all shouted at you en masse,
9  indicating that they had paid -- they had
10  borrowed a lot of money and sold their wives'
11  jewelry and did all sorts of things to come up
12  with money to pay for the recruitment, legal and
13  broker fees?
14    A.   They were -- I wouldn't say they
15  were shouting at me, but that was information
16  that I garnered from that interaction and there
17  were other interactions, for instance, with Sony,
18  whose last name begins with V -- he was Worker
19  500173, if I remember, that he had had to borrow
20  money at usurious interest rates, if I'm
21  remembering correctly, and then there were just
22  other workers who, in the course of my time as
23  the manager over the housing facility, that would
24  tell me the same thing.  So, I viewed it as a
25  common situation among the workers that many of

## Page 170

1  them, even the majority, had had to come up with
2  the money, the thousands of dollars in these
3  various ways.
4    Q.   It was pretty important to you when
5  you heard them -- when I say "them," talking
6  about the workers at Signal who approached you or
7  you approached them, however you approached each
8  other -- when they shared with you they borrowed
9  a lot of money to pay these fees, that was pretty
10  important to you, wasn't it?
11    A.   Yes.
12    Q.   And why was that so important to
13  you?
14    A.   Because I cared about them and
15  wanted them to be treated fairly.
16    Q.   Okay.  And did you ask them to give
17  you any documents showing that they had borrowed
18  this kind of money?
19    A.   No.
20    Q.   Did you ask them for any documents
21  showing that they had sold jewelry or done
22  anything else in order to come up with money to
23  pay for the recruitment, legal and broker fees?
24    A.   No.  As far as borrowing the money,
25  no, just that they had obviously gotten it from

## Page 171

1  somewhere in order to have the receipts that they
2  did.  The receipts for having -- the Indian
3  workers having the receipts for monies paid to
4  Michael Pol, Malvern Burnett and Dewan
5  Consulting.  They got their money from somewhere.
6  They told me that they got it from these
7  different ways described.  And so although I
8  didn't see receipts of land mortgages or jewelry
9  sales or contracts with -- with a high-interest
10  lender, I didn't see those, but, certainly, they
11  got the money from somewhere and were, in these
12  two examples, showing me quite credibly that what
13  they said was true.  I took what they told me
14  about -- I took what that group of workers told
15  me is here's how we got it at face value, that
16  those were ways that they really did engage in
17  borrowing the money or getting the money.
18    Q.   Firstly, please tell me why you felt
19  that these two individuals were so credible in
20  your mind.
21    A.   Because they said we have paid
22  thousands of dollars.  Do you want to see the --
23  do you want to see the proof?  Yes, I said.  And,
24  so, they were able to produce it from their
25  personal documents right there in front of me and

## Page 172

1  show it to me.
2    Q.   And yet you didn't ask them for any
3  proof about the debt they incurred or the land
4  sold or the jewelry sold?
5    A.   Correct.
6    Q.   You just accepted their word?
7    A.   Because they had proven their
8  credibility in that sense and, so, I didn't ask
9  for the other documents that -- for other
10  documents that might have shown receipts from the
11  way that they got the money.
12    Q.   You had no personal knowledge about
13  their financial backgrounds or anything of that
14  nature that -- how they might have been able to
15  come up with money by any other means?
16    A.   Other than what they told me, that
17  was what I based things on.
18    Q.   And you took it upon yourself to
19  accept the word of two workers as a
20  representative of a group of workers?
21    A.   No.  I only had -- all of the
22  workers were telling me the same thing, that they
23  had had to pay many, many thousands of dollars.
24  And, so, I said, show me, and these two workers
25  did exactly that, and if I had wanted more, I

## Page 173

1  could have requested more, but the pattern was
2  clear, and the pattern shows that the total
3  amount paid by these workers was far higher,
4  multiples higher, than the two to $3,000 that
5  Michael Pol told Signal and that Signal believed
6  to be true that our whole acceptance of this plan
7  was -- was predicated on.
8      Q.  Getting back to the original
9  question, that is, you accepted the word of two
10  individuals and deemed them to be representative
11  of a much larger group of workers; is that
12  correct?  Is that correct, yes or no?
13      A.  As a concept of them paying more
14  money than we had been told, yes.
15      MR. SANDLER:
16          Just for a second, she
17      stepped out.
18      MS. HANGARTNER:
19          Can we go off the record
20      real quick?
21      THE VIDEOGRAPHER:
22          Off the record.  The time is
23      3:29.
24          (Whereupon, a discussion was
25      held off the record.)

## Page 174

1      THE VIDEOGRAPHER:
2          Back on the record.  The
3      time is 3:36.
4  EXAMINATION BY MR. SHAPIRO:
5      Q.  Mr. Sanders, I see you qualified
6  that last answer by saying as a concept of
7  workers paying money, more money than they should
8  have, I think, in your words?
9      A.  More money than Signal had been told
10  by Mr. Pol.
11      Q.  Okay.  Now, how do you draw the
12  conclusion based on the word of two individuals
13  that, basically, that what they told you was they
14  had paid a certain amount of money for
15  recruitment and legal and labor fees -- how do
16  you accept the word of two of them and have it
17  have a blanket effect on a whole group of
18  workers?
19      MR. SANDLER:
20          Object to form.
21      A.  Because those two workers were --
22  their information was taken, if you will, at
23  random, and I could have spoken with any of the
24  workers in the bunkhouse at that time, and there
25  may have been 15 or 20 or so.  I could have

## Page 175

1  gotten very similar information from any of them,
2  I'm certain.  So, that's -- that's one way.
3  EXAMINATION BY MR. SHAPIRO:
4      Q.  Let me ask you this:  Did you ever
5  go to any of the -- did you ever go to the
6  individual workers and ask them exactly how much
7  they paid in recruitment fees, legal fees and
8  broker fees, yes -- did you ever go to each one
9  of the workers in Signal -- at the Signal camp
10  and ask them how much they paid?
11      A.  No.  I just established the pattern,
12  and that pattern was confirmed at each point that
13  it was -- that it came up and never denied.
14      Q.  Your answer is no; is that correct?
15  I'm asking you -- I'm asking you:  Did you go to
16  each and every worker at Signal and ask them?
17      A.  No.
18      Q.  Okay.  You only actually went to a
19  group of workers who told you that they paid --
20  they went into debt, they sold land, they sold
21  their wife's jewelry, and you accepted that on
22  face value; is that true?
23      A.  Yes.
24      Q.  Okay.  Now, you accepted that as
25  true without any documentary proof; isn't that

## Page 176

1  true?
2      A.  Yes.
3      Q.  Okay.  Now, after Mr. Pol's
4  termination -- after Signal terminated Mr. Pol,
5  seem important to you and to Signal to keep Mr.
6  Dewan and Mr. Burnett assisting in the
7  recruitment process; is that correct?
8      MS. HANGARTNER:
9          Object to form.
10  EXAMINATION BY MR. SHAPIRO:
11      Q.  You can answer.
12      A.  Could you repeat?
13      Q.  Okay.  After Signal terminated Mr.
14  Pol, it was important to you and to Signal to
15  continue -- put it to you this way -- to continue
16  using services of Mr. Dewan for recruitment and
17  of Mr. Burnett for legal services; is that
18  correct?
19      MS. HANGARTNER:
20          Object to form.
21      A.  It was our -- it was our preference
22  to do that, yes.
23  EXAMINATION BY MR. SHAPIRO:
24      Q.  Okay.  In fact, Signal did indeed
25  continue to use Mr. Dewan, utilize the services

(504)525-1753                    HUFFMAN & ROBINSON, INC.              (800)749-1753
ONE SHELL SQUARE,#250        CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 189

1    MR. ALEXIS:
2        Thank you.
3    MR. KUPPERMAN:
4        You got a copy?
5    MS. HANGARTNER:
6        Uh-uh.
7    MR. KUPPERMAN:
8        Let me take a look at that
9    before you go on and ask him any
10   questions.
11   MR. SANDLER:
12       We'll just look before John
13   answers.
14   EXAMINATION BY MS. HANGARTNER:
15   Q.   Mr. Sanders, if you could read those
16   two lines into the record, please, that are
17   highlighted.
18   A.   I'm stating in a spiral-bound
19   notebook on 12/22/06 that:
20       "It is inconsistent to file
21   for green card at same time as H2B
22   since green card is for permanent
23   need."
24   Q.   And what was your understanding at
25   that time when you wrote that entry — and what

## Page 190

1    was that date again?
2    A.   12/22/06.
3    Q.   Okay.  So, on 12/22/06, what was
4    your understanding of the H2B process versus the
5    green card process?
6    MR. ALEXIS:
7        Object to form.
8    A.   That the H2B process represented a
9    temporary need and that a green card was for a
10   more permanent need, permanent status, and that
11   you can't have both a temporary need and a
12   permanent need for the same person at the same
13   time.  Though a temporary need can, after time,
14   or over time, become a permanent need, you can't
15   file for both types of needs for the same person
16   at the same time.
17   EXAMINATION BY MS. HANGARTNER:
18   Q.   And when you say over time can
19   become a permanent need, what do you mean by
20   that?
21   MR. ALEXIS:
22       Object to form.
23   A.   As, for instance, that an H2B visa
24   would be valid for ten months, but could be
25   extended, and that after the extensions ran out,

## Page 191

1    that maybe the company's business situation -- or
2    over the course of time, the company's business
3    needs could have changed, so, it might be then a
4    permanent need, so, we'll now apply for a green
5    card.
6    EXAMINATION BY MS. HANGARTNER:
7    Q.   Okay.  So, you believed it went H2B,
8    H2B, green card?
9    A.   Yes.
10   Q.   And did you have --
11   A.   That one could flow into the other
12   quite naturally over the course of time, but you
13   couldn't apply for both at the same time.
14   Q.   And just one last question:  When
15   you say one can flow into one or into one
16   another, what do you mean by that?
17   A.   That the same worker could be in the
18   United States working for the same company, let's
19   say Signal, on an H2B visa and that at the end of
20   the extensions, then, that person could -- could
21   apply for a green card and continue in the
22   country.
23   Q.   Continue working for that same
24   employer?
25   A.   Yes.

## Page 192

1    Q.   In the United States?
2    A.   Yes.
3    Q.   Okay.
4    MS. HANGARTNER:
5        That's all I have.  Thank
6    you, Mr. Sanders.
7    THE WITNESS:
8        Okay.
9    MR. SANDLER:
10       Plaintiffs are ready to go
11   without a break, if that's
12   amenable, although, I do feel like
13   Mr. Shapiro should be here, just
14   in case.
15   THE VIDEOGRAPHER:
16       Off the record.  The time is
17   4:01.
18       (Whereupon, a discussion was
19   held off the record.)
20   THE VIDEOGRAPHER:
21       This is the continued
22   videotaped deposition of John
23   Sanders.  This is the beginning of
24   Tape 7.  The time is now 4:11.
25   EXAMINATION BY MR. SANDLER:

**Page 193**

1  Q.  Good afternoon, Mr. Sanders.
2  A.  Good afternoon.
3  Q.  We've met before during your first
4  two days of deposition, November 9th and November
5  20th, 2009; do you recall?
6  A.  Yes.
7  Q.  I'm just going to ask you some
8  questions that have arisen since then, based on
9  questions that have been asked here or
10  clarifications from our original discussion.
11  MS. HANGARTNER:
12  Mr. Sandler, it's the 19th
13  and 20th, not the 9th and 20th.
14  MR. SANDLER:
15  Oh, I thought I said 19th.
16  EXAMINATION BY MR. SANDLER:
17  Q.  I'm just going to go over some of
18  the testimony.  Today I'm just going to ask you
19  some clarifications to begin.
20  Before I begin, Miss Hangartner was
21  asking you about a document, Exhibit 638.  Do you
22  have it in front of you?
23  A.  No.  She has it.
24  Q.  Do you recall —
25  A.  Yes.

**Page 194**

1  Q.  You described a process whereby you
2  understood that H2Bs would flow into a green
3  card.  Is that a fair evaluation?
4  A.  Could.
5  Q.  Could flow.  Okay.  What is the
6  basis of your knowledge for that?
7  MR. ALEXIS:
8  Object to form.
9  A.  Just my own understanding at that
10  point in time, a little bit more than three years
11  ago, not being an expert in the immigration
12  statuses, but just my own interpretation.
13  EXAMINATION BY MR. SANDLER:
14  Q.  Did anyone tell you that?
15  A.  I don't remember anyone telling me
16  that.
17  Q.  Okay.  That document, I actually
18  originally introduced back in November, I don't
19  know if you remember or not.
20  A.  Yes.
21  Q.  And if back then, if you had said
22  that Mr. Burnett had told you that, would you
23  defer to that testimony?
24  MR. ALEXIS:
25  Object to form.

**Page 195**

1  A.  Yes, I would, if that were what I
2  testified previously.
3  EXAMINATION BY MR. SANDLER:
4  Q.  Sure.
5  Okay.  To Mr. Shapiro earlier today,
6  you were describing how you came to meet Anjay
7  Keswani.
8  A.  Yes.
9  Q.  And you described that it was in
10  August, 2006?
11  A.  Yes.
12  Q.  And I believe you said that it was a
13  dinner that he catered.
14  A.  Well, it was a dinner that occurred
15  at the lunch hour.
16  Q.  Okay.  But it was — okay.  All
17  right.  Well, that's fine.  So, it was during the
18  lunch —
19  A.  It was a meal.
20  Q.  Okay.  A meal in the middle of the
21  day.
22  A.  Yes.
23  Q.  To Mr. Kupperman, he asked you when
24  you ended your work at Signal, when you were no
25  longer working for them, and I believe you said

**Page 196**

1  November 16th, 2007.  Do you want to correct
2  that?
3  A.  That would be 2009.
4  Q.  Okay.  November 16th, 2009.
5  A.  Yes.  If I said the wrong -- if I
6  said 2007, that was the wrong year.
7  Q.  Okay.  Mr. Kupperman earlier today
8  asked you about meetings that you had with the
9  workers.  There were meetings, obviously, in
10  India, there were like these seminars and then
11  there were subsequently meetings in the U.S. with
12  workers that Signal held; is that right?  Do you
13  recall Mr. Kupperman discussing with you meetings
14  earlier today?
15  A.  Well, I didn't have meetings with
16  the workers in India.
17  Q.  What I mean to -- there --
18  workers -- the H2B workers at Signal attended
19  meetings in India and I believe Mr. Kupperman
20  asked you if you attended those meetings, too.
21  Do you recall?
22  A.  I guess, not specifically.  They
23  weren't meetings so much as I had a different
24  role to fulfill.  Maybe that's what you're
25  referring to.

## Page 197

1     Q.  No.  What I'm referring to is -- I'm
2  not talking about the time that you were in
3  India.
4     A.  Okay.
5     Q.  I'm just talking about the fact --
6  you weren't in India at the time -- that there
7  were meetings held in India, seminars, and there
8  were meetings held at Signal, worker meetings.
9  Do you recall this discussion with Mr. Kupperman?
10    A.  Yes, but I guess I was confused a
11 little bit from how you phrased it.
12    Q.  Right.  My mistake.  My mistake.
13    A.  Okay.  No problem.
14    Q.  And I think what you said in your
15 testimony was that you didn't really attend those
16 meetings in India, which is again what you said
17 to me right now.
18    A.  Yes, I did not.
19    Q.  I just want to confirm that the
20 meetings in the U.S. at the Signal camp in
21 Pascagoula, you attended those meetings?
22    MR. ALEXIS:
23        I'm going to object to form.
24    MR. SANDLER:
25        Okay.

## Page 198

1     A.  Yes.
2  EXAMINATION BY MR. SANDLER:
3     Q.  Many, all -- and I'm talking about
4  large meetings where most all of the Indian
5  workers would be in attendance.
6     A.  Most of those meetings, I was there.
7  The main block of time that I was not there was
8  approximately three weeks, when I was on vacation
9  in Africa.
10    Q.  Right.  And those three weeks ended
11 when?
12    A.  Approximately March 10th or 11th.
13    Q.  Okay.
14    A.  Of 2007.
15    Q.  Okay.  So, I think Mr. Kupperman
16 also asked you if workers were ever forced -- I
17 think he was trying to use the term forced labor,
18 and he was like were they ever forced through
19 fear or coerced to work at Signal, and you said
20 no, you had not seen any of that.  Do you recall
21 that?
22    MR. KUPPERMAN:
23        Object to form of the
24        question.
25    A.  Yes.

## Page 199

1  EXAMINATION BY MR. SANDLER:
2     Q.  I just want to confirm, you were not
3  at Signal on March 9th, 2007?
4     A.  I was not.
5     Q.  Mr. Kupperman also asked you about
6  the issues workers had, and he had indicated that
7  perhaps some of them -- the Indians had different
8  issues from -- amongst each other, they didn't
9  all have the same issues when they were coming to
10 you with complaints, et cetera.  Do you recall
11 that portion of the conversation with Mr.
12 Kupperman earlier today?
13    A.  Not so much that they weren't coming
14 to me with -- when they were coming to me with
15 complaints, but just that the workers were
16 different one from another in many ways.
17    Q.  Okay.
18    A.  I did -- I did agree with him on
19 that.
20    Q.  Okay.  So, what I want to ask are
21 some of the issues, I'm going to ask you if they
22 were the same or if they were different amongst
23 the workers.  So, the expectation of permanent
24 visa, was that an issue that all of the workers
25 who came to you had?

## Page 200

1     A.  Many voiced that concern.
2     Q.  Okay.  And I think we kind of went
3  over this with Mr. Shapiro as well, but as to the
4  issue of cost that they had paid to come over,
5  did many, all voice a concern about the expense
6  that they had incurred to afford the opportunity
7  to come to Signal?
8     A.  Yes, but the amounts that they paid
9  were different, the time that they paid those
10 amounts were different.
11    Q.  But they all were concerned about --
12 that the costs were high?
13    MR. ALEXIS:
14        Object to form.
15    MR. KUPPERMAN:
16        Object to form of the
17        question.
18    A.  Yes, they were concerned.  The
19 Indian workers were concerned.
20 EXAMINATION BY MR. SANDLER:
21    Q.  I think with Mr. Kupperman as well,
22 he had asked you -- you were talking about an
23 e-mail, and he had asked you about an explanation
24 you had given that one worker had explained to
25 you that if he could get one extension, the

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 201

1   economics would work out.  Do you recall that
2   conversation?
3       MR. ALEXIS:
4           Object to form.
5       A.  Yes.
6   EXAMINATION BY MR. SANDLER:
7       Q.  I just want to get the record
8   straight, that was one individual worker who said
9   that to you?
10      MR. KUPPERMAN:
11          Object to the form.
12      A.  One that I remember specifically.
13  EXAMINATION BY MR. SANDLER:
14      Q.  Maybe I'll be more clear.  When you
15  wrote that e-mail, you were talking about a
16  conversation you had with one worker; is that
17  right?
18      A.  Yes.
19      Q.  Okay.  And I'm going to enter a
20  document here, and for the record, the Bates on
21  it is SIGE0005083, and it will be Exhibit Number
22  700.  I'm just going to ask you to look it over
23  and then we can talk about it.  And it's two
24  sides, and I brought copies for everyone.
25          (Whereupon, Exhibit Number

## Page 202

1           700 was marked for identification.)
2       A.  Okay.
3       MR. KUPPERMAN:
4           This is 700?
5       MR. SANDLER:
6           Yeah, the Excel spreadsheet
7   is 700.
8       MR. ALEXIS:
9           We need one more.
10      MR. SANDLER:
11          And it's two-sided, for the
12  record.
13      MR. ALEXIS:
14          It's Exhibit 700?
15      MR. SANDLER:
16          It's Exhibit 700.
17      A.  I've reviewed the document.
18  EXAMINATION BY MR. SANDLER:
19      Q.  Okay.  Both sides?
20      A.  Yes.
21      Q.  Okay.  During Mr. Shapiro's -- while
22  Mr. Shapiro was deposing you, you had talk -- he
23  had referred to two particular workers for whom
24  you had recorded the fees, et cetera, and then
25  you had memorialized it somehow.  Is that what

## Page 203

1   this document is?
2       A.  Yes.
3       Q.  Okay.  So, you drafted this
4   document?
5       A.  I did.
6       Q.  Do you recall when?
7       A.  Yes.
8       Q.  When?
9       A.  Mid-November, 2006.
10      Q.  Okay.  And just for the record, this
11  document is a breakdown of the recruiting fees
12  paid by the Indian workers.
13      MR. ALEXIS:
14          Object to form.
15      A.  Yes, and there's also an entry about
16  airfare, $1,289.
17  EXAMINATION BY MR. SANDLER:
18      Q.  Okay.  So, it's recruiting fees and
19  travel to get to the U.S.?
20      A.  Yes.
21      Q.  Okay.  What do the Employee Number
22  79 and 42 signify?
23      MR. ALEXIS:
24          Object to form.
25      A.  An abbreviation where 79 would be

## Page 204

1   I'm almost certain of this, 500179.
2   EXAMINATION BY MR. SANDLER:
3       Q.  Okay.
4       A.  And Employee Number 42 would be
5   500142.  And, so, Employee 79 is Thampy.
6       Q.  Okay.
7       A.  That -- I think the cross-
8   referencing will confirm that.
9       Q.  Sure.  Who did you show this
10  document to?
11      A.  I showed it to Signal management;
12  specifically, Bill Bingle, Ron Schnoor and Lisa
13  Spears.
14      Q.  Is that all?
15      A.  I don't think Darrell was quite
16  involved at this point, so, those would be the
17  three that I remember.
18      Q.  And Lisa Spears works directly under
19  Chris Cunningham; is that right?
20      A.  Yes, I believe that she does.
21      Q.  Or at least did at that time?
22      A.  Yes.
23      Q.  Okay.  So, you didn't show it to Mr.
24  Cunningham, necessarily?
25      A.  No.  No.

## Page 205

1  Q.  Okay.
2  A.  But Ron was -- Ron Schnoor was my
3  direct manager and, so, I showed it to him.
4  Q.  Mr. Kupperman and you and I also
5  believe you and Mr. Shapiro and you discussed
6  this $10,000 number as a fee that Mr. Pol had
7  said was paid by the workers?
8  A.  Yes.
9  Q.  Okay.  So, does this document
10  contradict that number?
11  MR. SHAPIRO:
12  Object to form.
13  MR. KUPPERMAN:
14  Object to form of the
15  question.
16  A.  Yes, it does.
17  EXAMINATION BY MR. SANDLER:
18  Q.  Explain, please.
19  A.  In the meeting that Signal
20  management had with Michael Pol on 11/20/06,
21  where I wrote down the things that Mr. Pol said
22  and that Mr. Schnoor said, Mr. Pol was quite
23  specific about the fact that the number -- the
24  amount of money charged to the Indian workers was
25  right at $10,000.  That's a direct, verbatim

## Page 206

1  statement from him, which since I had gathered
2  this breakdown a few days before, I knew that
3  what he was saying on 11/20/06 was not true,
4  because I had seen receipts that contradicted it.
5  Q.  Right.  And that's where all of
6  these values came into the spreadsheet?  That's
7  based on receipts that the workers had shown you?
8  A.  These two workers in particular.
9  Q.  I believe you testified earlier with
10  Mr. Shapiro, I think, that these workers were
11  representative of -- correct me if I'm wrong --
12  but both the complaints about fees that you were
13  hearing and the amounts and the details thereto?
14  MR. SHAPIRO:
15  Object to form.
16  A.  I don't know if I would use the term
17  representative because each one was different in
18  terms of time and amount, and you can even see
19  that in the dates here that Worker -- Employee
20  Number 79, he paid money in -- as early as June
21  of 2003, whereas, the other one was only in 2006.
22  So, there were differences and, also, as far as
23  who the payee was.
24  EXAMINATION BY MR. SANDLER:
25  Q.  Yeah.

## Page 207

1  A.  So, many differences in that regard,
2  but in terms of the fact that the very vast --
3  the very vast majority of workers paid more,
4  these are two examples of that.
5  Q.  So, would exemplars be a good word,
6  then?
7  MR. ALEXIS:
8  Object to form.
9  MR. SHAPIRO:
10  Object to form.
11  A.  I'm not sure.
12  MR. SANDLER:
13  Withdrawn.
14  EXAMINATION BY MR. SANDLER:
15  Q.  Just for the record, just to be
16  sure, I think you said earlier paid more, and I
17  wanted to be sure you meant paid more than
18  $10,000?
19  A.  Yes.  These two workers paid more
20  than $10,000 and their information contradicted
21  what Michael Pol told Signal.
22  Q.  And every entry in the G, F, E
23  column and assumedly also the D column, you
24  verified with documentation?
25  A.  With receipts.

## Page 208

1  Q.  With receipts, which is like
2  documentation?
3  A.  Yes.  I saw them myself.
4  Q.  And they were given to you on the
5  spot by workers?
6  A.  Yes.  And I could have gotten more,
7  but how many could I -- could I get right then.
8  Q.  Exactly.  Thank you.
9  I'm going to enter another document.
10  It is DEWAN 000798.  I know it's been entered
11  already.  I brought copies for everyone.  So, I'm
12  going to add the exhibit number as well to it.
13  So, if you could just have a look at it, Mr.
14  Sanders, and for the record, you aren't -- for
15  the record, you're not on these e-mails at all.
16  (Whereupon, Exhibit Number
17  701 was marked for identification.)
18  MR. SHAPIRO:
19  What's it?
20  MR. SANDLER:
21  It's 701.
22  MR. ALEXIS:
23  Just so I don't waste any
24  time, I'm going to object to the
25  form of -- I'm going to object to

## Page 233

1    5:09. This is the end of Tape 7.
2        (Whereupon, a discussion was
3    held off the record.)
4    THE VIDEOGRAPHER:
5        This is the continued
6    videotaped deposition of John
7    Sanders. This is the beginning of
8    Tape 8. The time is now 5:27.
9    EXAMINATION BY MR. SANDLER:
10       **Q.  Okay, Mr. Sanders.  I want to show**
11   **you a document, and the Bates on the document is**
12   **SIGE0020386, and the exhibit number will be 703.**
13   **And I brought copies for everybody.**
14       (Whereupon, Exhibit Number
15       703 was marked for identification.)
16   **EXAMINATION BY MR. SANDLER:**
17       **Q.   Read the whole thing and then I'll**
18   **ask you a few questions.**
19       A.  I've read this document.
20       **Q.  Okay.  In the last e-mail -- just**
21   for the record, it begins with an e-mail between
22   you and Malvern Burnett, it's an e-mail thread.
23   There's an e-mail from Malvern to you, you to
24   Malvern and then you forward that communiqué to
25   Chris Cunningham with a bit of an explanation; is

## Page 234

1    that right?
2        A.  Yes.
3        **Q.   And these e-mails begin on May 11th,**
4    **2007, and you finally forward it to Chris**
5    **Cunningham on May 16th, 2007.**
6        A.  Yes.
7        **Q.   What -- in the very last paragraph**
8    **in the first e-mail from Malvern Burnett to you,**
9    **what is "the uprising," in quotation marks, that**
10   **he's referring to?**
11   **MR. ALEXIS:**
12       **Object to form.**
13       A.  My sense is that he's probably
14   referring to when he was apparently there after
15   the March 9th incident --
16   EXAMINATION BY MR. SANDLER:
17       **Q.  Okay.**
18       A.  -- which I was not present at.
19       **Q.  Right.**
20       A.  Or maybe it was before the March
21   9th, I don't know, but I wasn't there.
22       **Q.   Or maybe it was before the March**
23   **9th?  What do you mean by that?**
24       A.  Well, the March 9th was, I think, a
25   Friday and, so, I don't -- I wasn't there at that

## Page 235

1    point in time. If he's talking about that March
2    9th incident being the first uprising, then, I
3    don't -- I mean, I remember --
4        **Q.   Is that what it meant to you, the**
5    **March 9th -- that's what I'm asking?**
6        A.  I think so.
7        **Q.   You can't get into Mr. Burnett's**
8    **head. So, I just wanted to know what it meant to**
9    **you whether you read it.**
10       A.  That's what it would mean to me as I
11   read it right now. Yes.
12       **Q.  Okay.  Do you think it would be**
13   **different than what you thought back then?**
14   **MR. ALEXIS:**
15       **Object to form.**
16       A.  No, because that was the uprising
17   that I can -- that I can point to as far as his
18   being involved, because, for instance, in late --
19   well, maybe it would be mid-December, there was
20   what I would refer to as the food riot.
21   EXAMINATION BY MR. SANDLER:
22       **Q.  Right.**
23       A.  And he didn't have any involvement
24   in that.
25       **Q.  Okay.**

## Page 236

1        A.  And didn't come to Signal that I
2    remember until mid-January, '07. So, that's why
3    I think that he's referring to the March
4    incident.
5        **Q.   So, Mr. Burnett -- this is May,**
6    **2007.  You are now an industrial engineer at**
7    **Signal?**
8        A.  In Texas.
9        **Q.  In Texas.**
10       A.  Yes.
11       **Q.  Okay.  But Mr. Burnett still likes**
12   **sending you, I guess, immigration-related issues**
13   **vis-a-vis the Signal H2B workers?**
14       A.  Especially in regard to Texas --
15       **Q.  Okay.**
16       A.  -- Indians, yes.
17       **Q.  Okay.  In the first question -- in**
18   **the first question -- sorry -- in the first**
19   **e-mail and in the last paragraph, Mr. Burnett**
20   **asks you: "Is it safe to assume that those who**
21   **Signal will extend. . . ," and I'm going to**
22   **suggest that what he's saying there are Signal**
23   **H2B workers.**
24       A.  Yes.
25       **Q.  Okay. ". . . will also be those it**

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250          CERTIFIED COURT REPORTERS          NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 237

1  will petition for permanent residence."
2      A.   Yes.
3      Q.   Okay.  Did Mr. Burnett advise you --
4  it's not going to be in this e-mail, but just I'm
5  asking you if you learned this from Mr.
6  Burnett -- that transitioning from an H2B to a
7  permanent visa was likely going to include a
8  period of time where the worker would have to
9  leave the United States?
10      MR. ALEXIS:
11          Object to form.
12      A.   I did not know that.
13  EXAMINATION BY MR. SANDLER:
14      Q.   Okay.  But did Mr. Burnett tell you
15  that or anything to that effect?
16      A.   I don't have any remembrance that he
17  did, and I don't think that he did.
18      Q.   Okay.  So, then, at this mess hall
19  meeting in the last paragraph -- last sentence of
20  the last paragraph --
21      A.   Yes.
22      Q.   -- did Mr. Burnett advise the
23  workers --
24      A.   I don't -- I don't know --
25      MR. ALEXIS:

## Page 238

1          Object to form.
2      A.   -- because --
3  EXAMINATION BY MR. SANDLER:
4      Q.   You were there or you were not
5  there?
6      A.   I was not -- I was -- I do not
7  remember being there, especially if it's the
8  meeting that he's talking about here.
9      Q.   The uprising is March 9th, 2007.
10      A.   Right.
11      Q.   But you're back at Signal on what,
12  March 11th, the Monday?
13      A.   The Monday after, which might have
14  been the 12th.
15      Q.   Okay.  Right.  The 12th.
16      A.   And the only meeting that I remember
17  Malvern Burnett at with workers was in mid-
18  January when Sachin Dewan was also there in terms
19  of me being present when Malvern Burnett was to
20  talk with workers in the mess hall, as he says.
21      Q.   That January meeting was in the mess
22  hall?
23      A.   Yes, when Malvern Burnett and Sachin
24  Dewan came to Signal.
25      Q.   Did Mr. Burnett make this promise he

## Page 239

1  described at that January meeting?
2      MR. ALEXIS:
3          Object to form, but go
4      ahead.
5      A.   I don't remember him talking in that
6  meeting.  I'm not saying that he didn't.  I'm
7  saying that I don't remember, and in any event,
8  that wasn't -- I don't think that he's referring
9  to that anyway.
10  EXAMINATION BY MR. SANDLER:
11      Q.   But I'm going to ask you something.
12  In this last sentence, in the last clause of the
13  last sentence, i.e., the last line in this case,
14  it says:  "as we promised the men in the mess
15  hall. . .," and this is an e-mail strictly
16  between you and Mr. Burnett, right?
17      A.   Yes.
18      Q.   So, what do you think he's talking
19  about when he says "we"?
20      MS. HANGARTNER:
21          Object to form.
22      A.   That he told workers six months
23  after filing the first H2B extension and, you
24  know, I think it would be the "he" part of "we"
25  as far as Mr. Burnett saying that because he was

## Page 240

1  the -- as I've testified earlier, he was the
2  expert in terms of who -- in terms of what needed
3  to be done when and how to do it.  So, I don't --
4  I didn't know those details and especially if I
5  wasn't even at the meeting, I wouldn't --
6  EXAMINATION BY MR. SANDLER:
7      Q.   But I'm suggesting to you that this
8  is a meeting that you both were at because I'm
9  going to read it into the record and we'll talk
10  about it.  This is the last sentence of the
11  e-mail besides keep me informed.
12          "I still intend to try to
13      keep my original timeline for the
14      permanent residency process and
15      file within six months of filing
16      the first H2B extension, as we
17      promised the men in the mess hall
18      meeting after the first
19      'uprising.'"
20      MR. ALEXIS:
21          Object to form, but -- I'm
22      sorry.  Did you ask a question
23      yet?
24      MR. SANDLER:
25          No.

(504)525-1753                    HUFFMAN & ROBINSON, INC.                    (800)749-1753
ONE SHELL SQUARE,#250              CERTIFIED COURT REPORTERS              NEW ORLEANS, LA 70139

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

## Page 241

MR. ALEXIS:

I'm sorry. Go ahead and ask it. I'm sorry.

EXAMINATION BY MR. SANDLER:

Q. So, what I'm suggesting to you is that "we" is at least you and him.

MR. ALEXIS:

Object to form.

EXAMINATION BY MR. SANDLER:

Q. Do you see how one would read that?

A. I do, but my interpretation of that is that the "we" could be Malvern Burnett and Signal, which would not necessarily include John Sanders.

Q. Okay. Okay. That, I understand.

Sounds like the answer to this is going to be -- I don't want to put the answer in your head. I think we've already gone over this, but were you ever in the presence of Mr. Burnett when he discussed immigration matters with the workers?

A. The only -- there's a possibility that if he talked with the workers about immigration matters in mid-January of 2007, that, yes, I would have been present at that. I don't

## Page 242

have any recollection of what was said, if anything, but that's the only time that I can point to when he and I were present together at Signal for talking to Indian workers.

Q. Okay, Mr. Sanders. In the first e-mail on this thread, you want to just reread the second paragraph to yourself, and then I'm going to ask you a question.

A. I've read the second paragraph.

Q. Earlier on when we started -- when I started asking you some questions, I asked you about what Signal's plan was for the "No" workers, and you, I think -- correct me if this is not how you recall, but I think you said something to the effect of Signal was concerned about all the workers and they wanted even the "No" ones to find something somewhere. Does that sound about right?

A. That was our desire.

Q. Okay. That was your desire. I suggest to you that the way that you've recapitulated to Chris Cunningham Dick Marler's and Ron Schnoor's concerns that it might have been your desire, John Sanders', and maybe not Signal International's; is that fair?

## Page 243

A. I was the one who dealt with the workers. I don't -- I don't --

Q. Did you get -- Mr. Schnoor and Mr. Marler, I think, raised concerns about trying to facilitate transfers with the "Nos," right? That's what that second paragraph is about.

A. Could you repeat the question?

Q. I'm going to read the second paragraph into the record. This is an e-mail from you to Chris Cunningham, May 16th, 2007. "I realized after we hung up" -- that "we," that's you and Malvern Burnett -- that -- "that Monday's details were" -- actually, I think "after we hung up" might have been a phone conversation you had with Chris.

A. Yes, I think that's correct.

Q. So, I'm going to start again. "I realized after we" -- that's you and Chris Cunningham -- "hung up that Monday's details were actually the second mention of a transfer possibility. In late March there was a related discussion having to do with straight pay versus per diem wages."

And before I go on, the transfer possibility is transferring H2B workers. That's

## Page 244

what you're talking about?

A. To another company, yes.

Q. "Ron," and I'm going to say that's Ron Schnoor.

A. Yes.

Q. "Expressed concern that if we released nonkeepers" -- those would be also described as "Nos"?

A. Yes.

Q. -- "to another company, the more productive Indian workers might desert for the higher pay being offered. (See attached e-mail chain). Dick" -- and I'm going to suggest to you that's Dick Marler?

A. Yes.

Q. -- "also mentioned that we would get nothing in exchange."

So, my point is very simple. It's just that as far as ensuring that even the "No" workers would be taken care of, that was maybe your concern, John Sanders', and Signal had -- was not as concerned with it?

MS. HANGARTNER:

Object to form.

A. I don't -- I don't read that into

## Page 245

1  this.
2  EXAMINATION BY MR. SANDLER:
3     Q.   Okay.  What do you read?
4     A.   That I was concerned and --
5     Q.   Yes.
6     A.   -- wanted to make things -- make a
7  transfer -- or have a transfer be possible for
8  the workers within the confines of H2B
9  immigration law and that Ron Schnoor and Dick
10  Marler, who have a larger picture view than I do,
11  since they're senior managers of the company --
12     Q.   Yes.
13     A.   -- that in addition to that fact of
14  me being -- wanting to -- me wanting to show
15  concern for the workers and let them go somewhere
16  else, if possible, that as long as that is a
17  priority within Signal -- or an interest --
18     Q.   What's the interest?  Say that
19  again.
20     A.   Transferring the workers so that
21  they can work legally somewhere else and reduce
22  their debt, that Signal is interested in that.
23  John Sanders is interested in that and that Ron
24  Schnoor and Dick Marler are also interested in
25  that because we're concerned about the high level

## Page 246

1  of the debt -- I mean, that's what Ron
2  Schnoor's -- that's why he back in November had
3  said half back to the workers because he was
4  concerned.
5     Q.   We're not talking about that.  I
6  know we've got testimony on that already and I'm
7  aware that back in November, 2006 --
8     A.   Right.  Right.  Right.  I'm just
9  trying to show you that Signal senior management
10  is also concerned about the workers.
11     Q.   Right.  In November, 2006 it was --
12     A.   And that didn't change.
13     Q.   -- it was Michael Pol, Malvern
14  Burnett, and Sachin Dewan's money going back to
15  the workers?
16     A.   Because he cared about the workers.
17     Q.   But now I'm asking you, and I'm
18  going to read the third paragraph of the e-mail:
19       "Two months later, many in
20     Orange would like to see the
21     nonproductive Indians leave
22     quickly.  If some of them were
23     transferred very soon as the
24     Atlantia concludes" --
25       Just before I go on, what is the

## Page 247

1  Atlantia?
2     A.   It's a rig that we were building in
3  Texas at the time.
4     Q.   Oh, oh, I see.  So, the Atlantia is
5  like a project?
6     A.   A project.
7     Q.   Okay.  So -- as the Atlantia project
8  wraps up?
9     A.   Yes.
10     Q.   Okay.
11       ". . .it would free up jobs
12     for higher quality workers who are
13     also U.S. citizens and could work
14     on LPD."
15       LPD is like U.S. government work
16  that only American citizens can work.
17     A.   Correct.
18     Q.   "I don't know, but perhaps
19     this new dynamic on our side
20     might change the transfer
21     decision thought process."
22       So, what is it changing the thought
23  process from?
24     A.   That Signal would be perhaps able to
25  let the nonkeepers go right away or very soon

## Page 248

1  after.
2     Q.   You said "the transfer decision
3  thought process."  So, what your --
4     A.   That they could -- I mean, what I'm
5  trying to say is that if a transfer possibility
6  comes up and it can happen soon after May 16th,
7  2007, date of this e-mail, then maybe Texas's
8  desire to have higher quality workers could be
9  filled sooner --
10     Q.   So, what is the change that you're
11  talking about in that last interrogative, the
12  second-to-last interrogative of the third
13  paragraph?  I can reread it:
14       "I don't know, but perhaps
15     this new dynamic on our side might
16     change the transfer decision
17     thought process."
18     A.   Well, the new dynamic, from context,
19  is that there's potentially an opportunity to
20  transfer workers soon.
21     Q.   Okay.
22     A.   That's what I read as the new
23  dynamic.
24     Q.   Okay.
25     A.   And --

(504)525-1753          HUFFMAN & ROBINSON, INC.       (800)749-1753
ONE SHELL SQUARE,#250       CERTIFIED COURT REPORTERS    NEW ORLEANS, LA 70139
                  Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

Page 249

1    Q.   So, what is the standing transfer
2  decision thought process that you thought that
3  might change?
4    A.   That -- that Signal's senior
5  management would be willing to let the less
6  productive workers --
7    Q.   But what's the standing transfer
8  decision thought process?  You're, like, look,
9  I'm giving you new information, there's transfer
10  opportunities, whatever.  This might change the
11  transfer decision thought process.  So, at that
12  time, what was the transfer decision thought
13  process?
14    MS. HANGARTNER:
15      Object to form.
16    A.   The concern from Ron Schnoor about
17  the transfer was that these workers might earn
18  more than the first-class wages that we were
19  paying because different companies pay different
20  things.
21  EXAMINATION BY MR. SANDLER:
22    Q.   Sure.
23    A.   And that that fact of their Indian
24  worker friends, the "Nos," these "Nos," earning more would
25  incentivize "Yes" workers to leave Signal.

Page 250

1    Q.   So, Mr. Schnoor was concerned that
2  workers that Signal deemed as "Nos," these
3  low-quality guys, might get picked up by another
4  company and earn more than the first-class
5  workers at Signal?
6    MS. HANGARTNER:
7      Object to form.
8    A.   Yes.
9  EXAMINATION BY MR. SANDLER:
10    Q.   Okay.
11    A.   But I -- you -- to go back --
12    Q.   Okay.  So, just -- so, the standing
13  thought process on this May 16th e-mail at the
14  time at Signal was that Signal wasn't willing to
15  transfer nonkeepers, right?
16    MS. HANGARTNER:
17      Say the last part again.
18  EXAMINATION BY MR. SANDLER:
19    Q.   Was that Signal wasn't willing to
20  transfer nonkeepers.  At May 16th, 2007, the
21  standing thought process was that they weren't
22  willing to transfer nonkeepers, right?
23    A.   Well, I'm not going to say that
24  explicitly.  All I'm going to say is that Ron
25  expressed concerned.

Page 251

1    Q.   Right.  We talked about that, that's
2  right.  And, also, I think, Dick Marler expressed
3  concerned, the CEO of the company, right?  "Dick
4  also mentioned that we would" -- I'm quoting now
5  from the e-mail:  "Dick also mentioned that we
6  would get nothing in exchange," and he's talking
7  about transferring workers.
8    A.   Yes.
9    Q.   Okay.  So, I'm just saying that the
10  standing -- the standing position of Signal at
11  this juncture in time was not to transfer
12  workers.
13    MS. HANGARTNER:
14      Object to form.  I'm not
15    sure that he's the proper person
16    to answer that question.
17    MR. SANDLER:
18      He drafted an e-mail and --
19    MS. HANGARTNER:
20      But he expresses statements,
21    but I don't think he's the proper
22    person to testify as to what
23    Signal's position was at that
24    time.  In other words, that's
25    going to be Schnoor or Marler.

Page 252

1    MR. SANDLER:
2      But at least his vision, his
3    understanding of their position, I
4    can ask that.
5    MS. HANGARTNER:
6      Okay.
7  EXAMINATION BY MR. SANDLER:
8    Q.   Your understanding was at that time,
9  May 16th, 2007, Signal's view was that they were
10  not going to transfer the nonkeepers?
11    A.   I don't say that.  I only say that
12  Ron Schnoor and Dick Marler had expressed
13  concern, but the fact that they have concerns --
14    Q.   I'm not --
15    A.   -- doesn't mean that it's an
16  absolute no.
17    Q.   Right.  But I'm asking you about the
18  third paragraph.  Ron and Dick, you kind of
19  summarize in the second paragraph.  I'm asking
20  about the third paragraph and, again, I'm just
21  going to read it.
22      "I don't know, but perhaps
23    this new dynamic on our side might
24    change the transfer decision
25    thought process."

Page 273

1    MR. SANDLER:
2        Object to form.
3    EXAMINATION BY MR. KUPPERMAN:
4        Q.   -- because, as you said, you were
5    attempting to be precise in your language to your
6    boss, correct?
7        A.   Yes, I do try to be --
8        Q.   Okay.
9        A.   I do try to be accurate, but whether
10   it was just one worker or multiple workers, I
11   don't remember at this time without further
12   documentation.
13       Q.   Okay.
14   THE VIDEOGRAPHER:
15       One minute.
16   MR. SANDLER:
17       May I see that?
18   MR. KUPPERMAN:
19       Yeah.  Would you take it
20   down to Ralph?
21   THE VIDEOGRAPHER:
22       Off the record.  It is 6:24.
23   This is the end of Tape 8.
24       (Whereupon, a discussion was
25   held off the record.)

Page 274

1    THE VIDEOGRAPHER:
2        This is the continued
3    videotaped deposition of John
4    Sanders.  This is the beginning of
5    Tape 9.  The time is now 6:27.
6    EXAMINATION BY MR. KUPPERMAN:
7        Q.   Mr. Sanders, do you recall when the
8    Signal contract with Mr. Pol was entered into,
9    what the date of that contract was?
10       A.   I don't remember exactly.
11       Q.   Does about April of '06 sound about
12   right?
13       A.   Yes.
14       Q.   With reference to Exhibit 700, can
15   you take a quick look at that, when did you do
16   this document?
17       A.   When did I what?
18       Q.   Create this document.
19   MR. SANDLER:
20       I'm going to object to that
21   because it's been asked and
22   answered.
23   MR. KUPPERMAN:
24       I don't remember it.
25   EXAMINATION BY MR. KUPPERMAN:

Page 275

1        Q.   Can you tell me?
2        A.   Mid-November, 2006.
3        Q.   And what happened to the supporting
4    documents?
5        A.   The two workers retained them.
6        Q.   You didn't make copies of them?
7        A.   I don't remember if I did or not.  I
8    may have -- I would have had to write them down
9    somewhere because I didn't have my laptop with me
10   when I was out at the man camp, but I don't know
11   where that piece of paper would have been.  It
12   might have been just a piece of scrap paper.
13       Q.   So, if the paper doesn't exist and
14   we don't have these particular invoices that you
15   are -- or receipts that you used, there would be
16   no way for us to check the work, correct?
17       A.   Incorrect.  You would be able to go
18   to these two individuals and, also, you could get
19   specific breakdowns from other Indian workers
20   besides these two because all of them that I
21   remember speaking to had paid significantly more.
22       Q.   I'm not asking about others.  I'm
23   asking about what's on this sheet, and these are
24   the two.  So, there's no way for us to check this
25   through you or Signal if you didn't retain the

Page 276

1    documents, correct?
2        A.   Correct.
3        Q.   Okay.  What do you use for currency
4    conversion?
5        A.   The -- well, we could know exactly
6    by dividing 1,500 by 33.
7        Q.   No.  No.  What do you use to
8    determine the currency conversion?
9        A.   The rate -- the foreign rate of
10   exchange.
11       Q.   As of what, the day you did this?
12       A.   I don't remember, but I think that
13   if anyone went back and checked the -- and any
14   financial charts of the foreign exchange rate, of
15   the U.S. dollar to the Indian rupee for this time
16   frame of mid-November, you would find that the
17   exchange rate in those charts, in that data,
18   which is historical and you could find out, very
19   closely -- or would be very close to the exchange
20   rate that is implicit here.
21       Q.   Okay.  Now, let's see if we can
22   answer my question.  Do you recall what the
23   source was for the currency conversion that you,
24   in fact, used in this document?
25       A.   It would be one of the online

## Page 277

1 sources. For instance, if you google foreign
2 exchange, a number of options come up, and I
3 think that's what I would have used.
4     Q.   So, you don't remember which one,
5 but it was something you got off the internet?
6     A.   Correct.
7     Q.   Okay.  Now, let me ask you:  On the
8 first one, did you use the currency conversion
9 for June 12, 2003, in creating that conversion --
10 in converting that number, or did you use the one
11 as of the date in November of 2006 that you
12 created the document?
13     A.   I think it was in -- just in
14 mid-November, 2006.
15     Q.   Okay.  All right.
16     A.   And you would therefore find a
17 common exchange rate through if you went back and
18 did that calculation.  I think so.
19     Q.   Now, looking at this document, in
20 the top, Worker, Employee 79, in fact, if you
21 look to see what that worker supposedly paid
22 according to your chart -- scratch that.
23     Let me ask you:  Under the
24 Description, where did that description come from
25 for both of these workers?

## Page 278

1     A.   From what they told me and/or showed
2 me when I met with them about this issue.
3     Q.   So, when you have Installment 1A,
4 Installment 1B, for example, that was something
5 that they told you was Installment 1A?
6     A.   No, that's my terminology.
7     Q.   What did they tell you?
8     A.   That --
9     Q.   Or what did this worker tell you
10 about Installment 1A and 1B?
11     A.   That -- I don't remember the
12 specifics of what they told me as far as the -- I
13 don't have a transcript of that conversation, but
14 the general sense that is being conveyed, which
15 they conveyed to me and then I put into
16 Installment 1A, 1B, 2A, 2B, et cetera, is that
17 they had to pay different amounts of money at
18 different times, and within a particular time,
19 they would pay different parties.
20     Q.   And did they show you any contracts
21 or agreements to back up any of these
22 installments?
23     A.   I don't remember.  Those, I
24 remembered more seeing the receipts.  That was
25 the focus of what they were showing me.

## Page 279

1     Q.   Okay.  And the receipts just set out
2 the amount that they had paid and the day?
3     A.   And the party who received that
4 money.
5     Q.   Okay.  Now, looking at Employee 79,
6 if you take the time frame after which Mr. Pol
7 became involved when he had a contract with
8 Signal, that would include only the November
9 payments in 2006, correct?
10     A.   No.  Oh, are you talking just this
11 Worker 79?
12     Q.   Correct.
13     A.   Yes, I agree with you.
14     Q.   I mean, you can't hold Mr. Pol
15 responsible for payments made by people prior to
16 the time he even had a contract with Signal or
17 was involved, can you?
18     MR. SANDLER:
19         Object to form.
20     A.   No.  With regard to Signal.  But why
21 then did this worker, Employee 79, who on January
22 2nd, 2004, did he pay $2,750 to Michael Pol?
23 EXAMINATION BY MR. KUPPERMAN:
24     Q.   He did not.
25     MR. SHAPIRO:

## Page 280

1     I object to the
2 responsiveness of the answer.
3 EXAMINATION BY MR. KUPPERMAN:
4     Q.   He paid Indo-Ameri Soft.  Do you see
5 that, sir?
6     A.   Oh, I'm sorry.  I'm reading from
7 Column I.
8     Q.   Yes.  In fact, if you turn over, I
9 think you pointed out that it's backsided.
10     MR. SANDLER:
11     I pointed it out.
12     MR. KUPPERMAN:
13     Oh, I'm sorry.  Mr. Sandler,
14 he gets credit for that.
15 EXAMINATION BY MR. KUPPERMAN:
16     Q.   I think all I and J are, and you
17 tell me if I'm wrong, is a summary of the amounts
18 paid to each party, which are reflected in
19 Columns B through G; is that fair?
20     A.   Could you repeat that?
21     Q.   Yeah.  I think that I and J are just
22 summaries of the amounts paid in total to each
23 party listed in Columns B through G, correct?
24     A.   Oh, oh, oh, yes, you are correct.  I
25 follow you and agree, yes.

(504)525-1753          HUFFMAN & ROBINSON, INC.         (800)749-1753
ONE SHELL SQUARE,#250       CERTIFIED COURT REPORTERS     NEW ORLEANS, LA 70139
Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

Page 285

1    Q.   And the individual payment amounts
2  differ between Employee 79 and Employee 42, don't
3  they?
4    A.   Yes.
5    Q.   And neither one of these workers,
6  Employee 79 or Employee 42, ever told you that
7  they paid Dewan, Burnett or Pol any more than
8  they had agreed to pay them, correct?
9    A.   They did not mention anything one
10  way or the other in that regard.
11    Q.   As far as you were concerned or
12  knew, they had, in fact, agreed to make these
13  payments and they made them, right?
14    A.   Yes.
15    Q.   And no worker, not just these two,
16  but no worker, in fact, ever told you that they
17  ended up paying more than they had agreed to pay,
18  correct?
19    MR. SANDLER:
20      Object to form.
21    A.   That wouldn't make sense for them to
22  do.
23  EXAMINATION BY MR. KUPPERMAN:
24    Q.   Right.  And none of them ever told
25  you that, right?

Page 286

1    A.   Correct.
2    MR. SANDLER:
3      Object to form.
4  EXAMINATION BY MR. KUPPERMAN:
5    Q.   Do you have any sheet that is
6  similar to this, by meaning showing recruiting
7  fee breakdown, other than this single page with
8  Employee 79 and Employee 42?
9    A.   No, I don't.  This is the most
10  detailed information that I have.
11    MR. SANDLER:
12      I'm going to stipulate it's
13  two pages.
14    MR. KUPPERMAN:
15      Well, I was going to say
16  one, but it includes the back, but
17  whatever it is, it's fine with me.
18    THE WITNESS:
19      One Excel file.
20    MR. SANDLER:
21      One Excel spread --
22    MR. KUPPERMAN:
23      I don't have any other
24  questions right now.  Thank you.
25    MR. ALEXIS:

Page 287

1      I may have one question.
2    MR. SANDLER:
3      And I have two.
4    THE VIDEOGRAPHER:
5      Off the record.  The time is
6  6:44.
7      (Whereupon, a discussion was
8  held off the record.)
9    THE VIDEOGRAPHER:
10      Back on the record.  The
11  time is 6:50.
12  EXAMINATION BY MR. SANDLER:
13    Q.   Mr. Sanders, Mr. Kupperman was
14  asking you about Exhibit 700, which is the Excel
15  spreadsheet.
16    A.   Yes.
17    Q.   I just want to clarify, Column F is
18  the amount paid denominated in rupees, correct?
19    A.   Not always.  There's an example, for
20  instance, in Cell --
21    Q.   I see what you're saying.  Let me
22  retract that.
23    MR. KUPPERMAN:
24      You want to let him answer
25  the question?

Page 288

1    MR. SANDLER:
2      Well, I'm going to correct
3  because I think I can make the
4  record clear.
5  EXAMINATION BY MR. SANDLER:
6    Q.   Column -- the amounts -- the
7  currency in Column F corresponds with the
8  currency described in Column E for the same row
9  numbers, i.e., the currency depicted at E7 would
10  indicate what the currency is in F7.
11    A.   Yes.
12    Q.   And that's all the way down for the
13  whole document?
14    A.   Yes.
15    Q.   Thank you.
16      Earlier today, you were asked about
17  Exhibit 641, and it had to do with getting a new
18  housing agreement signed, and you said that you
19  didn't really remember it.
20    A.   Okay.
21    Q.   Do you recall what I'm saying?
22    A.   If you could refresh my memory a
23  little bit.
24    Q.   It's Exhibit 641.  There's an e-mail
25  exchange about a new housing agreement, getting