Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF LOUISIANA
2

KURIAN DAVID, et al.,        )
3                            )
               Plaintiffs,   )  Case No. 2:08-cv-1220
4                            )
                    v.       )  Judge Zainey
5                            )  Magistrate Judge Knowles
SIGNAL INTERNATIONAL,        )
6  LLC, et al.,              )
                             )  Class Action--
7          Defendants.       )  Collective Action
8
9  ***********************************************************
10                    ORAL DEPOSITION OF
11                      THOMAS RIGOLO
12                     OCTOBER 18, 2010
13  ***********************************************************
14          ORAL DEPOSITION OF THOMAS RIGOLO, produced as
    a witness at the instance of the Plaintiffs and duly
15  sworn, was taken in the above-styled and numbered cause
    on the 18th day of October, 2010, from 8:19 a.m. to
16  2:48 p.m., before Joy H. O'Halla, Certified Shorthand
    Reporter in and for the State of Texas, reported by
17  machine shorthand at the offices of Dewey & LeBoeuf,
    LLP, 1000 Main Street, Suite 2550, Houston, Texas
18  77002, pursuant to the Federal Rules of Civil Procedure
    and the provisions stated on the record.
19
20
21
22
23
24
25

| DESIGNATIONS & OBJECTIONS KEY | |
| --- | --- |
| Plaintiffs' Affirmative Designations | Plaintiffs' Counter Designations |
| Signal Defs.' Affirmative Designations | Signal Defs.' Counter Designations |
| Dewan Defs.' Affirmative Designations | Dewan Defs.' Counter Designations |
| Burnett Defs.' Affirmative Designations | Burnett Defs.' Counter Designations |

P = Plaintiffs   S = Signal Defs.   D = Dewan Defs.   B = Burnett Defs.

## Page 2

1         APPEARANCES
2  FOR THE PLAINTIFFS:
3    Mr. Hugh Sandler
      Ms. Ashleigh L. Ferris
4    Mr. Alan Howard - Via Telephone
      Dewey & LeBoeuf, LLP
5    1301 Avenue of the Americas
      New York, New York 10019-6092
6
7  FOR DEFENDANT SIGNAL INTERNATIONAL, LLC:
8    Ms. Patricia A. Bollman
      A Professional Law Corporation
9    3616 S. I-10 Service Rd. W., Suite 111
      Metairie, Louisiana 70001
10
      Ms. Erin Hangartner
11   Middleberg, Riddle & Gianna
      201 St. Charles Avenue, 31st Floor
12   New Orleans, Louisiana 70170-3100
13  FOR DEFENDANT GULF COAST IMMIGRATION LAW CENTER, LLC:
14   Mr. Ralph R. Alexis, III - Via Telephone
      Porteous, Hainkel & Johnson
15   704 Carondelet Street
      New Orleans, Louisiana 70130-3774
16
      FOR SACHIN DEWAN AND DEWAN CONSULTANTS PVT. LTD. ALSO
17  KNOWN AS MEDTECH CONSULTANTS:
18   Mr. Stephen H. Shapiro
      Attorney at Law
19   200 Main Street
      Jefferson, Louisiana 70121
20
      ALSO PRESENT:
21
      Ms. Tracey A. Binion
22   Signal International, LLC
23
24
25

## Page 3

1          INDEX
2                          PAGE
3  Appearances................................ 2
   Stipulations............................... 7
4  Examination
     By Mr. Sandler........................ 7
5    By Ms. Bollman....................... 264
     By Mr. Alexis......................... 266
6    By Mr. Shapiro........................ 271
   Further Examination
7    By Mr. Sandler........................ 274
     By Mr. Alexis......................... 275
8  Changes and Signature pages........... 276
   Reporter's Certificate................. 278
9
10        EXHIBIT INDEX
11  NO.      DESCRIPTION          PAGE
12  423    Global Resources, Inc., and     52
         Signal International, Inc.,
13       Skilled Worker Recruitment
         Agreement [SIGE0005441 through
14       5449]
15  814    String of e-mails, top e-mail   44
         from Bill Bingle to Tom Rigolo
16       dated 05/25/06 [SIGE0347564]
17  815    String of e-mails, top e-mail   53
         from Tom Rigolo to Bill Bingle
18       dated 06/01/06
         [BURNETT-CY-00755 and 00756]
19
20  816    String of e-mails, top e-mail   57
         from Tom Rigolo to David
21       Yarwood dated 08/23/06
         [SIGE0347348 through 0347349]
22  817    String of e-mails, top e-mail   60
         from John Sanders to Tom Rigolo
23       dated 08/23/06 [0024612]
24
25

## Page 4

1  818    String of e-mails, top e-mail   101
         from Richard Marler to Chris
2        Cunningham, et al, dated
         03/17/08 [SIGE0055918 and
3        0055919]
4  819    String of e-mails, top e-mail   123
         from Tom Rigolo to Richard
5        Marler dated 10/29/06
         [SIGE013223 and 0013224]
6
7  820    String of e-mails, top e-mail   131
         from Ken Inabinett to John
         Sanders dated 08/30/06
8        [SIGE55691]
9  821    String of e-mails, top e-mail   134
         from Tom Rigolo to John Sanders
10       dated 09/27/06 [SIGE0550688 and
         0550689]
11
12  822    String of e-mails, top e-mail   150
         from Sachin Dewan to Malvern C.
12       Burnett dated 03/22/07 [000648]
13
14  823    String of e-mails, top e-mail   160
         from Tom Rigolo to Tracey
         Binion and Susan Carlquist
15       dated 02/27/07 [SIGE0028450 and
         SIGE0024451]
16
17  824    String of e-mails, top e-mail   183
         from Tom Rigolo to John Sanders
         dated 08/15/06 [SIGE0357546
18       through 0357548]
19  825    String of e-mails, top e-mail   191
         from Tom Rigolo to John
20       Sanders, et al, dated 09/18/06
         [SIGE0358722 and 0358723]
21
22  826    String of e-mails, top e-mail   210
         from Malon Scogin to Tom Rigolo
         dated 11/14/06 [SIGE0038525
23       through 0038528]
24
25

## Page 5

1  827    String of e-mails, top e-mail   219
         from John Sanders to Ronald
2        Schnoor dated 12/18/06
         [SIGE0024521 and 0024522]
3
4  828    String of e-mails, top e-mail   220
         from Rodney Meisetschlaeger to
         Lewis Harkey, et al, dated
5        06/14/07 [SIGE0048939 and
         0048940]
6
7  829    07/06/06 Ltr from Thomas Rigolo  224
         to Maria S. Lau w/attachments
         [SIGE0000468 through 000507]
8
9  830    I-129, Petition for a           227
         Nonimmigrant Worker [SIGNAL
         02599 through 02604]
10
11  831    I-129, Petition for a           229
         Nonimmigrant Worker
12       [BURNETT-CY-00331 through
         00342]
13  832    02/14/07 Ltr from Thomas A      252
         Rigolo to Brian Knight
14       [SIGE0009410]
15  833    String of e-mails, top e-mail   256
         from Tracey Binion to Malon
16       Scogin dated 03/15/07
         [SIGE0247782 and 0247783]
17
18
19
20
21
22
23
24
25

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

2 (Pages 2 to 5)

O'HALLA REPORTING
713-664-8398

**Page 6**

1    THE REPORTER: Today is October 18, 2010.
2  The time is approximately 8:19 a.m. We are located at
3  Dewey & LeBoeuf, 1000 Main, Suite 2550, Houston, Texas.
4    This is the deposition of Thomas Rigolo in
5  the matter of Kurian David, et al., versus Signal
6  International, LLC, et al., in the United States
7  District Court for the Eastern District of Louisiana,
8  Case No. 2:08-cv-1220.
9    My name is Joy O'Halla, certified
10  shorthand reporter, representing O'Halla Reporting, P.O.
11  Box 20101, Houston, Texas 77225-0101.
12    Will all persons present please state
13  their appearances and whom they represent.
14    MR. SANDLER: Hugh Sandler for Dewey &
15  LeBoeuf, representing the plaintiffs.
16    MR. HOWARD: And Alan Howard from Dewey &
17  LeBoeuf on the phone representing plaintiffs.
18    MS. FERRIS: Ashleigh Ferris for the
19  Southern Poverty Law Center representing plaintiffs.
20    MS. HANGARTNER: Erin Casey Hangartner on
21  behalf of Signal International.
22    MS. BOLLMAN: Patricia Bollman on behalf
23  of Signal International.
24    MR. SHAPIRO: Stephen H. Shapiro on behalf
25  of Sachin, S-A-C-H-I-N, Dewan, D-E-W-A-N, and Dewan

**Page 7**

1  Consultants, Ltd. -- I'm sorry -- Pvt., Ltd.
2    MR. ALEXIS: Sorry. This is Ralph Alexis.
3  I just disconnected myself. For the record, I represent
4  the Burnett def -- the so-called Burnett defendants.
5    THOMAS RIGOLO,
6  having been first duly sworn, testified as follows:
7    THE REPORTER: Please state any
8  stipulations.
9    MR. SANDLER: I'll simply state that on
10  September 10th of this year Mr. Rigolo was served with a
11  subpoena commanding his attendance at this deposition.
12  He was also served on that same day with a duces tecum
13  or a document subpoena. Both subpoenas were circulated
14  to all parties in this action prior to being served upon
15  Mr. Rigolo; and further, all parties received notice two
16  weeks ago that this deposition would take place on this
17  date.
18    EXAMINATION
19  BY MR. SANDLER:
20    Q.  Good morning, Mr. Rigolo.
21    A.  Morning.
22    Q.  My name is Hugh Sandler. I am co-counsel for
23  plaintiffs in their putative class action against your
24  former employer, Signal International, as well as a
25  number of other defendants. Are you familiar with this

**Page 8**

1  case?
2    A.  Vaguely.
3    Q.  Okay. Have you ever testified at a deposition
4  before?
5    A.  Yes, I have.
6    Q.  How many times?
7    A.  Once.
8    Q.  What was the nature of the deposition?
9    A.  It was a lawsuit against Signal pertaining to
10  an incident that happened during a hurricane.
11    Q.  How long ago was that?
12    A.  The incident or the deposition?
13    Q.  The deposition.
14    A.  Approximately three and a half years ago.
15    Q.  And it was in federal court, do you know?
16    A.  It was federal court.
17    Q.  And who were the plaintiffs, do you know?
18    A.  Well, you have Signal International; and the
19  plaintiff was -- I'm sorry. I can't remember the name
20  of it. It was an organization that represented a ship
21  that was a museum.
22    Q.  Okay. I'm just gonna go over some of the
23  ground rules of the deposition. Even though you've been
24  through it once, I just wanna state it.
25    If you don't understand a question that I

**Page 9**

1  ask, please say so and I'll rephrase it. If you do
2  answer, I will assume you've understood my question.
3    Please let me finish my questions before
4  answering; and I will, of course, make every effort to
5  let you finish your answers. That way the court
6  reporter will be able to record easily the questions and
7  the answers sequentially.
8    Please also give verbal answers; head
9  nodding or other nonverbal communication are not easily
10  recorded on the record.
11    Are you on any medications or are there
12  other impediments keeping you from giving your best
13  testimony today?
14    A.  Not that I'm aware of.
15    Q.  And the testimony you give today is equivalent
16  to that which would be given by a witness in a
17  courtroom. Do you understand that?
18    A.  I understand that.
19    Q.  All right. And do you understand that you are
20  here pursuant to a subpoena and that you are required to
21  answer all questions truthfully under pain of perjury?
22    A.  Understand.
23    Q.  Have you prepared for this deposition today?
24    A.  If I may?
25    Q.  Yes.

Plaintiffs (P)  Signal Defs. (S) Dewan Defs. (D) Burnett Defs. (B)

3 (Pages 6 to 9)

O'HALLA REPORTING
713-664-8398

Page 14

1  contracts that were ongoing when I was working at
2  Signal; and, you know, I -- I ran a large operation.
3  There were a lot of contracts going on. There was a lot
4  to do at the divisions as a result of contracts, the
5  change of the economic environment, you know, catch up
6  on some of the people I know who have retired and what
7  they're doing with their lives.
8      Q.  Did you discuss the Indian workers who came
9  over to Signal in 2006 or 2007 under H2B visas?
10     A.  Yes.
11     Q.  Okay.  What did you discuss with them about
12  that?
13     A.  Well, primarily we talked about the documents,
14  the premise for which the workers were brought over to
15  Mississippi and Texas.
16     Q.  Was it the same premise between Mississippi and
17  Texas?
18     A.  This was a activity or -- I guess that's a bad
19  word -- a way that corporate wanted to go about trying
20  to alleviate the manpower shortage that we had.
21     Q.  In both Mississippi and Texas?
22     A.  Correct.
23     Q.  So you talked about the premise for the workers
24  coming over.  Was there anything else you talked about
25  about the workers coming over?

Page 15

1      A.  We talked a little bit about the camps, when
2  the workers came over.  Really that was about the extent
3  of it.
4      Q.  What did you discuss about the camps?
5      A.  Well, the -- the timing of it and how
6  Mississippi had taken the lead and had the first wave of
7  workers and then workers showed up in Texas.
8      Q.  The timing of when the camps were set up?
9      A.  Correct.
10     Q.  Okay.  Did you talk about the nature of the
11  camps?
12     A.  A little bit.
13     Q.  What did you discuss about the nature of the
14  camps?
15     A.  Well, we talked about the intent of in the
16  Texas camp trying to house a number of workers; but as
17  the facilities were set up, when my camp manager and
18  when we looked at it realized that we could not get that
19  number of beds in there, that it would not be a good
20  environment, so we had to scale back the number of
21  workers that we were gonna bring to Texas.
22     Q.  Okay.
23     A.  Can I walk down and get some water, please?
24     Q.  Absolutely.  Absolutely.
25     A.  Go ahead.  I'm listening.

Page 16

1      Q.  Sure.
2          When did you start at Signal?
3      A.  I started at Signal before it was actually
4  Signal.
5      Q.  Okay.
6      A.  I started with Ham Marine.
7      Q.  And when was that?
8      A.  To be honest with you, I can't remember the
9  date.
10     Q.  Well, just the year would be fine.
11     A.  2000 I believe it was.
12     Q.  Okay.  And you came in as an engineer?
13     A.  Correct.
14     Q.  Okay.  Did you come in as --
15     A.  Well, let's be clear.  Okay?  I came in as a
16  naval architect.
17     Q.  As a naval architect.  Okay.
18          When did you -- when were you promoted to
19  Signal's senior vice-president and general manager of
20  Texas operations?
21     A.  When I moved from the Mississippi division to
22  the Texas division.
23     Q.  Okay.  And when was that?
24     A.  Approximately summer of '04 I believe it was,
25  2004.

Page 17

1      Q.  So the first four years approximately you were
2  in Pascagoula?
3      A.  Correct.
4      Q.  And then you moved over to Orange in the middle
5  or summer of 2004.
6      A.  Well, I took over the Texas operations.  I did
7  not move to Orange.
8      Q.  Oh.  When did you move to Orange?
9      A.  I moved to Beaumont, Texas.
10     Q.  You moved to Beaumont, Texas.  When did you
11  move to Beaumont, Texas?
12     A.  As I said, it was somewhere in '04.
13     Q.  Okay.  Can you describe the responsibilities
14  that you had as Signal's senior vice-president and
15  general manager of Texas operations?
16     A.  Well, I think the title speaks for itself; but as the
17  senior vice-president and general manager, all four of
18  the operating yards fell underneath my purview as well
19  as the administrative staff that ran the Texas
20  operation, responsible for the day to day operations,
21  responsible for carrying out the contracts that Signal
22  had.
23     Q.  How many people formulated that administrative
24  staff approximately?
25     A.  Could you define "administrative staff"?

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

5 (Pages 14 to 17)

O'HALLA REPORTING
713-664-8398

1    Q.   How many employees reported to you?
2    A.   Including workers, it ranged from when I
3 started there in the low 250 range to close to 1500.
4    Q.   Okay.  But excluding the workers.
5    A.   I would say that administratively roughly a
6 hundred.
7    Q.   Okay.
8    A.   When you factored in accounting, HR,
9 purchasing, estimating groups, et cetera.
10    Q.   Right.  So that would --
11    A.   That was --
12    Q.   That would be everyone from Wilson Lee to Malon
13 Scogin --
14    A.   Correct.
15    Q.   -- to Susan Carlquist.
16    A.   Correct.
17    Q.   All of those people reported to you directly.
18    A.   That is correct.
19    Q.   Okay.
20    A.   Well, that's -- that's -- because we fell under
21 a corporate umbrella --
22    Q.   Uh-huh.
23    A.   -- for example, Susan Carlquist, HR --
24    Q.   Uh-huh.
25    A.   -- we also had a corporate HR; so, the majority

1 of HR matters were deferred back to corporate.  And, for
2 example, you mentioned Mr. Lee.  Mr. Lee as Texas
3 controller, obviously he then also reported to the chief
4 financial officer, which was a corporate position.
5    Q.   Right.  So just so we're clear, the corporate
6 office is the Pascagoula Mississippi office; is that
7 right?
8    A.   I believe --
9    Q.   At the time.
10    A.   I believe -- at the time.  Okay?
11    Q.   Yes?
12    A.   Yes.
13    Q.   And when you say corporate HR, you mean the HR
14 director who was stationed at the Pascagoula,
15 Mississippi, office at that time.
16    A.   Correct.
17    Q.   Okay.  And when you say the corporate CFO,
18 chief financial officer, you mean the one who was
19 stationed there, who was Chris Cunningham at that time.
20    A.   Correct.
21    Q.   Okay.  You left Signal in 2007?
22    A.   I resigned from Signal; that is correct.
23    Q.   Okay.  Do you remember what month?
24    A.   I believe it was very early in March.
25    Q.   And why did you leave?

1    A.   For family reasons.
2    Q.   And did you leave on what you might call good
3 terms?
4    A.   That's a subjective --
5    Q.   Sure.  And I --
6    A.   -- question.
7    Q.   Let me rephrase.  In your opinion, did you
8 leave on good terms?
9    A.   I think that I was doing a good job for the
10 company at the time.  I think that I adequately prepared
11 all the turnover information that was required for
12 whoever was gonna take over the position.  I'm sure that
13 Mr. Marler would have preferred I stay there.
14    Q.   Okay.
15    A.   I'm sure a lot of people would have preferred I
16 stayed there.
17    Q.   Do you know who replaced you?
18    A.   I know that initially it was announced as
19 interim --
20    Q.   Uh-huh.
21    A.   -- was Ronnie Meisetschlaeger I believe is how
22 you pronounce his name.  I know that John Haley for a
23 little bit was helping them oversee some of the
24 contracts.
25    Q.   Did you help pick your replacement?

1    A.   No, I did not.  I made recommendations, but I
2 did not pick him.
3    Q.   In 2007, before you left Signal, what -- and
4 this is just approximate, but what percentage of the
5 Texas work was government work and what percentage was
6 for private clients?
7    A.   I would -- if I had to venture a guess on
8 percentage, I would say it was probably a 70/30 split
9 where 30 percent was government.
10    Q.   Okay.  And was that the same proportion in
11 2006?
12    A.   It varied.  Roughly, if you were to average a
13 year, I would -- I would surmise it, yes.
14    Q.   Okay.  So even though it varied --
15    A.   Yes.
16    Q.   -- yes, it was 30 percent approximately.
17    A.   (Nods head.)
18    Q.   "Yes"?
19    A.   Correct.
20    Q.   Okay.
21    A.   Yes.
22    Q.   Okay.  I just wanna go back to 2006 and just
23 ask you some questions about the -- kind of the early
24 part of that year.  Were you involved in the planning
25 and decision making when Signal first decided to recruit

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

O'HALLA REPORTING
713-664-8398

6 (Pages 18 to 21)

Page 22

```
1    Indian workers?
2       A.  I was involved in the planning from facility-
3    based Texas where we could locate a facility for the
4    workers, yes.
5       Q.  But not the actual decision to bring the
6    workers.
7       A.  Decision to bring the workers in was made by
8    corporate.
9       Q.  Okay.  And you were not involved in that.
10      A.  The final decision rested with Mr. Marlin.
11      Q.  Did people from corporate consult you before
12   they concluded that they wanted to do this?
13      A.  We had conversations regarding our workforce,
14   labor shortages, ways that we could mitigate that
15   shortage; and this was one of the ideas that was put
16   forth.
17      Q.  Who would you say was the Signal personnel that
18   was part of the decision making to bring in workers from
19   India?
20      A.  Could you repeat that?
21      Q.  Who in your -- who would you say was the Signal
22   personnel that was responsible -- or that made the
23   decision to bring in workers from India?
24      A.  I'd say the ultimate decision was -- lies with
25   Mr. Marler.
```

Page 23

```
1       Q.  Do you know who else was part of that decision-
2    making process?
3       A.  I'm sorry and -- and not to be flippant, but
4    I'm not clairvoyant.  I don't know how he made that
5    decision.  I know we had discussions pertaining to ways
6    we could bring in workers.
7       Q.  Who was involved in those discussions?
8       A.  Well, you had myself as running the Texas
9    operation; you had Ron Schnoor, ran the Mississippi
10   operation; Bill Bingle, I'm sure you know who he is; HR
11   was involved; Chris Cunningham was involved.
12      Q.  You said HR was involved?
13      A.  Yes.
14      Q.  And from HR would that be Tracey Binion?
15      A.  Yes.
16      Q.  And was Susan Carlquist involved?
17      A.  She generally did not participate when we would
18   have a conference call.  I certainly discussed labor and
19   ways we could bring in workers with Susan on a regular
20   basis.
21      Q.  Okay.
22      A.  I would not say she was involved in the
23   decision and the "yes" or "no" on bringing the workers
24   in.
25      Q.  Right.  So when did you first learn that Signal
```

Page 24

```
1    was going to be bringing in the workers from India?
2       A.  Sometime in I wanna say summer of '06, late --
3    or fall of '06.  You asked when I understood they would
4    come in or they would arrive at my facility?  I guess we
5    need to clarify that.
6       Q.  Let me rephrase.
7       A.  Okay.
8       Q.  When did you first learn that Signal had
9    decided to begin the process to bring workers in from
10   India?
11      A.  I can't remember the date.
12      Q.  Do you remember the month?
13      A.  No.  I would have to say it was summer of '06.
14   That's the best I can remember.
15      Q.  Okay.  What was your understanding of the costs
16   and the benefits of foreign workers to Signal?
17      A.  The cost, as I understood it, is the workers
18   would be compensated on an hourly basis using the same
19   pay scale that I was paying my workers.
20          From a cost perspective, I knew that we
21   committed to establishing a facility for them; by a
22   facility, I mean a place for them to live.  One of the
23   challenges we had -- let me clarify.  One of the
24   challenges that employers on the Gulf Coast had after
25   the hurricanes was not only workers but getting workers
```

Page 25

```
1    to come into the area because of the shortage of
2    housing; so, it was considered that having a place for
3    the workers to domicile was necessary to bring these
4    workers in; and so, from a -- when you asked what are --
5    I believe you used the term "financial"?
6       Q.  I didn't.  I was just wondering what the costs
7    and the --
8       A.  The costs?
9       Q.  -- benefits were that were considered.
10      A.  Cost and -- and benefits?
11      Q.  Yeah.  What were the benefits for Signal --
12      A.  The benefits --
13      Q.  -- obtaining the workers?
14      A.  -- were that the intent would be able to get
15   for a defined period of time a group of workers
16   purportedly with the skillset necessary to help us with
17   the contracts that we have, to not have concerns over
18   workers leaving because of the -- the rapidly changing
19   pay scale in the area, and that it would help to
20   supplement our workforce.  That's...
21      Q.  Can you explain the rapidly changing pay scale?
22      A.  We -- we kept and maintained in Texas a
23   published pay scale.  Mississippi also kept theirs.  And
24   there was a period of time where there was a disparity
25   between the two because of the prevailing environment.
```

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

7 (Pages 22 to 25)

O'HALLA REPORTING
713-664-8398

1 It was usual -- I guess "usual" is not a good term. We
2 would generally go a long period of time between having
3 to make adjustments to the pay scale. We knew exactly
4 what each class of worker in the yard would be
5 compensated based on the area. As the result of
6 hurricanes and as a result of other activities in the
7 Texas area, we were -- went through a period of it
8 seemed like it would not go more than four or six weeks
9 we'd have to adjust our pay scale because of what
10 competitors around us were doing.
11     Q. Were some of those competitors the US
12 Government? When the --
13     A. No.
14     Q. So this didn't have anything to do with FEMA or
15 any organization coming in to do cleanup?
16     A. Well, I mean, I would surmise, but I'm
17 guessing, but I would surmise FEMA coming in to do
18 cleanup and hiring contractors probably did have an
19 influence on that.
20     Q. Because they were paying more?
21     A. I'm not sure what FEMA was paying. I can't say
22 they were paying more.
23     Q. Why do you think they had an influence on it?
24     A. I would think that individuals may have made
25 the decision to work on their own and wanna do that. If

1 there was work that they could do as a contractor, maybe
2 they perceived that as being a better opportunity.
3     Q. So you were losing workers to become contract
4 workers?
5     A. I can't state that categorically. I would
6 assume that was one of the challenges. Also, refineries
7 and other large facilities in the area were aggressively
8 trying to hire workers.
9     Q. At higher rates of pay.
10     A. Of course.
11     Q. Okay. And you gained this understanding of the
12 rates of pay and the other issues from your
13 communications with other Signal executives?
14     A. I would hear about it from various ways,
15 certainly through my supervision up through my
16 supervision of my workforce, production side. Certainly
17 HR would hear about it. They know. They know when
18 people leave the facility, exit interviews or talking
19 with them. They know when people come in to apply for a
20 job. Certainly hearing, whether it's rumor-based, that
21 this facility or this operation requires workers and
22 what they're paying and how much overtime they're
23 willing to provide we hear about. Some of it, as I
24 said, is rumor-based; but certainly we then get a gist
25 for what the environment is.

1     Q. Sure. And did you hear about it from Signal's
2 corporate HR or from your Texas HR, would you say?
3     A. Both.
4     Q. Both. Did you discuss this issue with people
5 in Mississippi, such as Ron Schnoor or Bill Bingle?
6     A. We discussed our labor count, our workers, and
7 where we stood in contracts on a weekly basis; so, yes.
8     Q. And just so we're clear, Ron Schnoor at the
9 time was your opposite number, so to speak? He was --
10 he had your position in the Pascagoula site; is that
11 right?
12     A. Correct.
13     Q. When did you first hear of Michael Pol or
14 Global Resources?
15     A. I -- I don't remember the time. My
16 understanding was and when his name came up came up in
17 association with a discussion regarding bringing in
18 workers via the H2B program.
19     Q. Would you say it was around that same summer of
20 '06 time, maybe the May/June period where you first
21 heard of him?
22     A. I believe that would be correct.
23     Q. Have you ever met him?
24     A. I have met some of the individuals; but to say
25 if and when I specifically met Michael Pol, I cannot

1 recall.
2     Q. So you also wouldn't recall how many times you
3 met him, then?
4     A. No.
5     Q. Would you say --
6     A. He could -- he could walk through that door
7 right now, and I would not recognize him.
8     Q. Do you know for how long Signal met and
9 negotiated with Michael Pol before signing the
10 recruitment agreement in April 2006?
11     A. One, I did not know it was April 2006;
12 therefore, I have no idea how long they negotiated that.
13     Q. When you first learned of the plan to bring in
14 workers, which we'll say is May or June of 2006,
15 thereabouts, what was your impression, bringing workers
16 from India?
17         MR. ALEXIS: Object to form. That's Ralph
18 Alexis, for the record.
19     A. Because he objected to form, what does that --
20 that mean?
21     Q. (BY MR. SANDLER) It -- it's for the record
22 purposes. You can still answer.
23     A. Okay. Please repeat the question.
24     Q. Sure. When you first learned of the plan to
25 bring in workers from India, what was your impression?

Plaintiffs (P)  Signal Defs. (S) Dewan Defs. (D) Burnett Defs. (B)

8 (Pages 26 to 29)

O'HALLA REPORTING
713-664-8398

Page 58

1 can't say for sure. I don't think that this e-mail was
2 on that list.
3 　　　MR. ALEXIS: Thanks.
4 　　　MR. SANDLER: I don't believe so. To the
5 extent that I remember which ones were, I -- I'll so
6 stipulate.
7 　　　MR. ALEXIS: Thank you.
8 　　A. Okay.
9 　　Q. (BY MR. SANDLER) All right. Do you remember
10 this e-mail?
11 　　A. Vaguely.
12 　　Q. Do you remember why you were seeking this
13 information from Mr. Sanders; and by "this information,"
14 I mean --
15 　　A. I -- I think --
16 　　Q. -- a brief overview of the H2B process?
17 　　A. I think the e-mail does speak for itself when I
18 requested from John where I said, "Please put together a
19 brief overview of the" process, the process being H2B --
20 　　Q. Uh-huh.
21 　　A. -- and it says "one of my customers as well as
22 myself would like to have a better understanding."
23 　　Q. Do you remember what your understanding was
24 prior to getting this information from Mr. Sanders?
25 　　A. Well, my understanding of when I put in quotes

Page 59

1 "players," probably not a good choice of words at the
2 time --
3 　　Q. Okay.
4 　　A. -- however, to understand -- because there were
5 so many names, just like in the summary that was
6 provided by Mr. Sanders, you know, you see Global
7 Resources, you see Michael Pol, you see Malvern Burnett,
8 you see Dewan consultants; and trying to keep track of
9 who all these entities were was a challenge. I know
10 that this was arranged by corporate, and trying to keep
11 track of who all these individuals and companies were
12 and interests were.
13 　　Q. Why is "players" a bad word?
14 　　A. Well, I mean, it -- I guess it could have a bad
15 connotation considering what transpired.
16 　　Q. Okay. What did it mean to you at the time to
17 use that word, and I understand that that --
18 　　A. "Players," by that I mean who actually makes
19 this entire H2B process happen --
20 　　Q. Okay.
21 　　A. -- you know. I know -- and my perception was
22 that it's not a straightforward process. We just --
23 "we," being a company, just doesn't run to the
24 Government and say, "Hey, I wanna bring in workers."
25 　　Q. Right.

Page 60

1 　　A. So you need to -- to use companies that this is
2 what they do for a living. That's what I mean by
3 "players."
4 　　Q. Right. So you --
5 　　A. The resources -- the companies that do this.
6 　　Q. You need to get people to --
7 　　A. Correct.
8 　　Q. -- do this for you, correct?
9 　　A. Correct.
10 　　　MR. SANDLER: Okay. I'm gonna enter
11 another document. The Bates for it is SIGE0024612. It
12 is on that plaintiff list for your benefit, Ralph, that
13 we circulated in June.
14 　　　MR. ALEXIS: 2412.
15 　　　MR. SANDLER: 24612. And it's an e-mail
16 from John Sanders to Mr. Rigolo.
17 　　Q. (BY MR. SANDLER) When you're finished, just
18 let me know.
19 　　　MR. SANDLER: And it's Exhibit No. 8--
20 　　　MS. BOLLMAN: 817.
21 　　　MR. SANDLER: -- 17.
22 　　A. Okay.
23 　　Q. (BY MR. SANDLER) Okay. So just to compare
24 with 816, this e-mail is sent to you about half an hour
25 after John sent you the H2B overview e-mail, if you

Page 61

1 wanna look at the previous document I just gave you just
2 to confirm.
3 　　A. Okay.
4 　　Q. Do you see that?
5 　　A. I'm sorry, no, I do not. I see...
6 　　Q. Not the one you forwarded to Mr. Yarwood,
7 the -- the one from John below?
8 　　A. Okay.
9 　　Q. Do you see that he sent that to you about half
10 an hour later?
11 　　A. Correct.
12 　　Q. Okay.
13 　　　Okay. Now, in this e-mail he's giving you
14 more of the overview information; is that fair to say?
15 　　A. I don't think that's fair to say. I think that
16 the other one asked for the process and who the players,
17 being the individuals, are and this one is specific to
18 Signal and its petition for H2B visa workers.
19 　　Q. Okay. And it -- okay. So he's apprising you
20 of Signal's lobbying efforts to solicit the assistance
21 of Trent Lott?
22 　　A. Correct.
23 　　Q. How the H2B timing works. And then in the
24 third --
25 　　A. Well, I don't -- he -- he alludes to that

Plaintiffs (P)　Signal Defs. (S)　Dewan Defs. (D)　Burnett Defs. (B)

16 (Pages 58 to 61)

O'HALLA REPORTING
713-664-8398

Page 62

1  there's a six-month wait. I do not know how the H2B
2  visa timing works. He does allude to a six-month wait
3  for the interviews.
4      Q. Okay. And then in the third paragraph --
5      A. Uh-huh.
6      Q. -- he says: "Once workers are here, they'll
7  apply for a 280-day extension."
8      A. Uh-huh.
9      Q. "This gives a total time at Signal of 19
10 months. At the end of this period, workers will likely
11 have received their green cards." Did I read that
12 correctly?
13     A. Yes.
14     Q. Did the mention of green cards surprise you?
15     A. I don't remember when I read this e-mail
16 whether it surprised me. There had been previous
17 discussions about H2B visa workers and how they were
18 here, "here" being in the States at Signal, for a
19 defined period of time working for us in that if the
20 company -- and I was not aware of the entire process --
21 wanted to then work with a worker -- I believe the term
22 is sponsored -- then possibly they could be sponsored
23 for a green card.
24     Q. I'm just gonna read part of that paragraph.
25     A. Okay.

Page 63

1      Q. At --
2      A. Go for it.
3      Q. "At the end of this period" -- and that period
4  being the 19 months --
5      A. Uh-huh.
6      Q. -- "workers will likely have received their
7  green cards."
8      A. Okay.
9      Q. So, is it fair to say that you knew from August
10 that workers coming in from India would likely obtain
11 their green cards within 19 months and while still at
12 Signal?
13     A. No --
14        MS. BOLLMAN: Object to form.
15     A. Now --
16        MR. ALEXIS: Object to form.
17     A. -- read that statement again -- or that
18 question again.
19     Q. (BY MR. SANDLER) Sure.
20        MR. SANDLER: Can you read that back.
21        (The record was read as requested.)
22        THE WITNESS: I'm sorry, one more time.
23 Be very clear on this one.
24        (The record was read as requested.)
25     A. One, I don't think it's fair to say I knew

Page 64

1  anything at that point with regard to whether they would
2  or not have green cards; so, fair.
3          My understanding of the process was that
4  the workers were coming in as H2B visa workers a defined
5  period of time. They could work for Signal. During
6  that period of time, if Signal elected, we could file
7  for extension for the workers; but considering the time
8  that it took to do the extensions on the H2B visas, we
9  would have to do that almost before the workers arrived.
10 It was my understanding that Signal could sponsor
11 workers to try and obtain green cards for them; not that
12 we were going to, but that we could obtain green
13 cards -- or potentially sponsor them.
14     Q. (BY MR. SANDLER) So when Mr. Sanders writes
15 "workers will likely have received their green cards" --
16     A. Uh-huh.
17     Q. -- was he mistaken?
18        MR. ALEXIS: Object to form.
19        MS. BOLLMAN: Object to form.
20     A. I do not know what he was thinking when he
21 wrote that. Was he mistaken? I don't know. I know the
22 discussions that were held with corporate -- to be very
23 clear, Mr. Marler, Mr. Schnoor, Mr. Bingle, and
24 myself -- regarding the H2B visa program, that I think
25 we were all very clear that it was for a defined period

Page 65

1  of time under the H2B visa program.
2      Q. (BY MR. SANDLER) And what was that defined
3  period of time?
4      A. That it was based on the application; and I
5  think this adequately summarizes it, about a ten-month
6  period, but it's defined dates and then you can do
7  extensions. I believe -- I was under the impression it
8  was up to two extensions.
9      Q. So if a represent -- if a promise was made to
10 the workers in India that they would get a green card if
11 they came to Signal, that would be untrue?
12        MR. ALEXIS: Object to the form.
13        MS. BOLLMAN: Object to form.
14     A. I do not know. I was not privy to any of the
15 discussions -- don't interrupt me -- between the
16 workers -- I knew you were going to, so don't -- between
17 the workers and anybody in India. I do not know what
18 promises were or were not made.
19     Q. (BY MR. SANDLER) Based on your understanding
20 as a senior V-P of Signal --
21     A. Correct.
22     Q. -- if a promise were made to a worker in India
23 that he would get a green card if he came to Signal,
24 that promise would be untrue; is that --
25        MR. ALEXIS: Object to form.

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

17 (Pages 62 to 65)

O'HALLA REPORTING
713-664-8398

Page 66

1    Q. (BY MR. SANDLER) -- is that correct? And
2 again, Mr. Rigolo, I'm limiting it just to your
3 understanding. I'm not saying that you're gonna speak
4 for Mr. Marler or Mr. Schnoor. I'm just -- your
5 understanding.
6    A. My understanding is that promise was not made.
7    Q. But if a promise were made that they could get
8 a green card if they came to Signal, that would be
9 untrue; is that correct?
10    MR. ALEXIS: Object to form. Excuse me.
11    THE WITNESS: Could you read that again?
12 What are -- what did he just say? I mean, I missed that
13 question completely.
14    (The record was read as requested.)
15    A. My understanding was if the workers came to
16 Signal via the H2B visa program, that there was an
17 avenue available where the company, "company" being
18 Signal, could sponsor an individual to get a green card.
19    Q. (BY MR. SANDLER) So representation to the
20 worker that he would, not contingent but he would, get a
21 green card, if that representation were made to him in
22 India, that would be false.
23    MR. ALEXIS: Object to form.
24    A. I would surmise that would be false. My
25 understanding is that even if a company sponsors an

Page 67

1 individual for a green card, that there's no assurances
2 that they will get it.
3    Q. (BY MR. SANDLER) What do you mean you surmise
4 that would be false? Does that mean that you believe it
5 is false?
6    A. Believe what is false?
7    MR. ALEXIS: Object to form.
8    Q. (BY MR. SANDLER) That a promise to an Indian
9 H2B worker to come over to Signal, that he would get a
10 green card if he came.
11    MR. ALEXIS: I beg your pardon. Again,
12 this is Ralph Alexis. I just wanna object to the form,
13 and I'll make it continuing so I won't have to interrupt
14 any more if that's okay.
15    MR. SANDLER: I appreciate that, Ralph.
16    A. Okay. So that -- that's -- the question again,
17 please.
18    MR. SANDLER: Can you read back the Q and
19 A where Mr. Rigolo gives a -- puts "surmise" in his
20 answer. It was, like, two or three questions back.
21    (The record was read as requested.)
22    A. Okay.
23    Q. (BY MR. SANDLER) So what do you mean by
24 "surmise" there, that you would conclude that that is a
25 false --

Page 68

1    A. I -- I would conclude that --
2    Q. -- statement at that time?
3    A. -- that for the limited knowledge I have of the
4 green card process, that a com -- commitment could not
5 be made by anybody. I do not know if a commitment was
6 made, but there are no guarantees.
7    Q. So if a commitment were made, it would be a
8 false commitment.
9    A. As I said, I don't know all the workings of it;
10 but my understanding is it's -- there's no givens in it,
11 so I don't know how that could be made if that agreement
12 that was purported. I do not know.
13    Q. Just assume that the promise was made. I'm not
14 saying you're saying that the promise was made. I'm not
15 saying you were in India. I'm not saying that you knew
16 the promise were made. Assume that that promise was
17 made --
18    A. Yes.
19    Q. -- that if you come to Signal, you will get a
20 green card.
21    A. Uh-huh.
22    Q. At that time, in September of '06, and prior --
23    A. Uh-huh.
24    Q. -- to that, that would not be true, correct?
25    A. My understanding is that for a person to get a

Page 69

1 green card, Signal would have to sponsor them; and I --
2 maybe I'm wrong on that, but my understanding is Signal
3 would have to sponsor them.
4    Q. Just --
5    A. Therefore, unless Mr. Marler said that we, at
6 the time Signal, was going to sponsor them, it would not
7 happen. I do not know -- I had never heard that we made
8 that commitment; that I recall discussions where it was
9 very specific that we were bringing them in as H2B
10 workers.
11    Q. So if that commitment were made, it would be
12 untrue. Just "yes" or "no," and then you can expand
13 afterwards. Just do you agree with me that a commitment
14 that you're gonna get a green card if you come to Signal
15 would be untrue.
16    MS. BOLLMAN: Object to form.
17    Q. (BY MR. SANDLER) If the promise were made in
18 India before they came over.
19    A. If the person making the commitment believes
20 that they have the ability to follow through on that
21 commitment, then -- then I have no issues with that; you
22 know, if they have that ability. My understanding of
23 the green card process is nobody can make that promise.
24    Q. And the issue about it not being guaranteed is
25 that you weren't sure -- part of the reason is that

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs (B)

18 (Pages 66 to 69)

O'HALLA REPORTING
713-664-8398

Page 70

1 Signal couldn't be sure if they wanted to sponsor that
2 worker until after the worker got here and he had the
3 skills and it worked out; is that correct?
4   A.  My understanding was that as we assessed the
5 workers, we would look at them for extending the H2B
6 visa because I -- as I said, you -- individuals got
7 named to come over.  Then you have to file for the
8 extension to assess whether we would extend them for the
9 period of time on the H2B visa.  Then if we identified
10 workers that the company, "the company" being Signal,
11 wanted to sponsor for green cards, we would identify
12 them and consider whether we would do that.
13   Q.  So for Signal's own evaluation process, there's
14 no way they could promise a green card to a worker who
15 hadn't even yet arrived; is that correct?
16   A.  And my understanding is that Signal would have
17 to be the one to do it or another company that they were
18 working for in the United States, so they would --
19   Q.  But they --
20   A.  -- therefore making a commitment for Signal,
21 and I do not know think they had that latitude.
22        MR. SANDLER:  Can you read back my last
23 question.
24        (The record was read as requested.)
25   Q.  (BY MR. SANDLER)  Okay.  But in August and

Page 71

1 September of '06, you knew that workers were gonna come
2 over and you were gonna evaluate them and then decide if
3 you were gonna renew them and then if a green card would
4 happen thereafter --
5        MS. BOLLMAN:  Object to form.
6   Q.  (BY MR. SANDLER)  -- on behalf of Signal.
7   A.  If Signal would choose to pursue getting a
8 green card.
9   Q.  And part of that choice is whether they --
10 Signal felt that the worker worked -- had the skill
11 level and worked well enough in -- at Signal to justify
12 it, correct?
13        MS. BOLLMAN:  Object to form.
14   A.  Okay.
15   Q.  (BY MR. SANDLER)  By "okay," do you agree with
16 me?
17   A.  Yes.
18   Q.  After this e-mail, this August 23rd, 2006,
19 e-mail from Mr. Sanders to you?
20   A.  Uh-huh.
21   Q.  When -- did you discuss green cards with anyone
22 before the workers arrived?
23   A.  When the idea of bringing in workers via the
24 H2B visa program was discussed, I think that there was
25 some -- and I'm talking going way back.  Just from

Page 72

1 looking at e-mail dates, probably May, June, early
2 summer of '06, that there were a lot of unknowns
3 specific to how the program worked; and I know in very,
4 very early discussions, probably before -- but I don't
5 know the exact timeline -- before Michael Pol/Global
6 Resources were retained by Signal, that visas, green
7 cards, those terms were probably used synonymously
8 because we did not understand the -- the true process.
9        So to get to your question green cards,
10 I -- from my understanding and from my memory, as the
11 process became more clear, as Global Resources was
12 retained, as the paperwork, the filings for the H2B visa
13 program was initiated, letters were written, that it was
14 very clear that this was for an H2B visa and this was
15 completely different than a green card.
16        So was it -- green cards discussed?  Yes,
17 they were discussed.  I -- as I said, very early in the
18 process that there was probably some misunderstanding
19 and visa and green card were used synonymously.
20   Q.  After August 2006?
21   A.  I don't -- I believe it's as Mr. Marler,
22 Mr. Schnoor, Mr. Bingle, and myself became I guess
23 educated in the process, we understood the difference
24 between visas and green cards.  To your question in the
25 green cards discussed, green cards was discussed in the

Page 73

1 context of identifying workers once they were in the
2 facilities that Signal may want to sponsor to get their
3 green cards.
4   Q.  Okay.  So before the workers arrived, then, you
5 knew that green cards were for citizenship or permanent
6 residency --
7   A.  Correct.
8        MS. BOLLMAN:  Object to form.
9   Q.  (BY MR. SANDLER)  -- in America.
10        When the workers first came over --
11   A.  Uh-huh.
12   Q.  -- in December of '06 to the Texas yard, did
13 they ask about green cards?
14   A.  I -- they did not directly ask me about green
15 cards.
16   Q.  Do you know if they asked people who worked at
17 Signal at Texas?
18   A.  I -- I do not know whether in Texas they did.
19 I had heard that in Mississippi they had asked about it.
20   Q.  So you never conveyed a message about green
21 cards to workers in Texas, is that what you're saying?
22   A.  I did not convey a message to workers regarding
23 green cards.
24   Q.  Did anyone at Signal convey a message to
25 workers of green card in Texas?

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

19 (Pages 70 to 73)

O'HALLA REPORTING
713-664-8398

1    that if they don't meet --
2    A.   I -- I do not know if he was advising them.
3    Q.   Okay.  So you don't know if the 200 -- or the
4    hundreds of workers other than these three who were
5    there were advised that they would be sent home if they
6    didn't meet Signal's sat -- standards?
7    A.   I do not know what they were advised.
8    Q.   But certainly if anyone were to ask you, that's
9    what you would say.
10   A.   Correct.
11   Q.   When the workers arrived at Signal Texas, did
12   you test them for their skill craft?
13   A.   They were evaluated for their skill craft.
14   Q.   In, like, a testing facility --
15   A.   Yes.
16   Q.   -- either a welding or a pipefitting facility;
17   is that correct?
18   A.   Yes.
19   Q.   Did you know that the workers were tested in
20   India before they came over?
21   A.   Yes, I was.
22   Q.   Are there any other workers at Signal who were
23   tested twice before starting work at Signal?
24   A.   Every individual that comes into Signal would
25   be tested.  Whether they were certified at another

1    facility to weld for -- under a class society was
2    irrelevant.  When they came into Signal, we tested them.
3    Q.   But Signal oversaw the testing in India,
4    correct?
5    A.   I do not know if all the testing was attended
6    to by Signal individuals.  I do not know if every test.
7    Q.   You sent Jose Pastrana over to India to conduct
8    testing for --
9    A.   He went over --
10   Q.   -- workers?
11   A.   -- for one of the trips --
12   Q.   Okay.
13   A.   -- for the testing.
14   Q.   And he tested workers in India.
15        MS. BOLLMAN:  Object to form.
16   A.   No, he did not test the workers.  He saw the
17   tests that were being conducted.
18   Q.   (BY MR. SANDLER)  And based on that, they were
19   offered jobs at Signal in India.
20   A.   Based on their test, they were offered jobs,
21   not based on what Mr. Pastrana saw.  As I said, he went
22   over to see how the tests were being conducted.  Prior
23   to Mr. Pastrana going over there, other individuals from
24   Signal out of the Mississippi division had gone over
25   there to see how the testing was being conducted.

1    Q.   So they oversaw the testing --
2    A.   Who oversaw it?
3    Q.   -- in India?  Signal personnel, Mississippi and
4    Mr. --
5    A.   I -- I --
6    Q.   -- Pastrana --
7    A.   I do not --
8    Q.   -- when he was there?
9    A.   I don't believe "oversaw" is a valid word.  I
10   think they observed.
11   Q.   Okay.
12   A.   -- the testing.
13   Q.   So Mr. Pastrana observed the testing in India?
14   A.   Correct.
15   Q.   And then when they --
16   A.   Part of it.
17   Q.   Okay.  And then when they came to Signal Texas,
18   you retested them.
19   A.   Yes.
20   Q.   Were they surprised that they had to be
21   retested?
22   A.   I -- I do not know whether they were surprised
23   or not.
24   Q.   Did it surp --
25   A.   Testing when an individual works -- walks into

1    a fabrication facility around the world, from what I
2    know, when you walk in, you test.  Whether they were
3    surprised or not, I do not know.  I don't think it
4    should have been a surprise to them.
5    Q.   Why did you test them in India if you were just
6    gonna retest them in America?
7         MS. BOLLMAN:  Object to form.
8    A.   My understanding is this was the recruiter
9    trying to ensure that the workers he was sending to us
10   possessed the skillsets necessary to do the job.
11   Q.   (BY MR. SANDLER)  So did you think -- did it
12   strike you as --
13        MR. SANDLER:  Strike that.
14   Q.   (BY MR. SANDLER)  Did you see a potential
15   problem with bringing a worker halfway across the world
16   only to then test him and then decide whether he was --
17   had the skillset that Signal required?
18   A.   If your question is do I see that as a
19   potential problem, yes, I see that as a -- a potential
20   problem.
21   Q.   Did you see it as a potential problem back in
22   December of '06?
23   A.   Yes.
24   Q.   Okay.  Why did you not remedy that problem or
25   seek to remedy that problem?

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

25 (Pages 94 to 97)

O'HALLA REPORTING
713-664-8398

1        MS. BOLLMAN: Object to form.
2     Q. (BY MR. SANDLER) Okay. Let me rephrase. Did
3   you seek to remedy that problem?
4     A. No, I did not seek to remedy that problem.
5     Q. Why not?
6     A. My understanding was this was an established
7   practice; i.e., the worker -- the recruiter said he was
8   looking for skillsets, the worker represented that he
9   understood and had those skillsets before trying to
10  apply and come through this program to get an H2B visa.
11  So my understanding is that the majority of the workers
12  should have the skillsets necessary to do the job.
13    Q. Did it bother you that these guys had paid all
14  this money for what they thought were permanent visas
15  only to then be at the peril of being sent home in ten
16  months?
17        MS. BOLLMAN: Object to form.
18    A. I do not know when they paid their money
19  whether they were under the assumption they were getting
20  a permanent visa, so I can't answer that.
21    Q. (BY MR. SANDLER) Okay. Moving on. Have you
22  ever met Malvern Burnett?
23    A. I believe I have. Believe. I do not know.
24    Q. Okay. Do you -- so --
25    A. If I may?

1     Q. Sure.
2     A. You know, I ran a very large division. We had
3   a lot of contracts going on. I interfaced with a lot of
4   customers, a lot of vendors. I dealt with a lot of
5   issues. I'm sure -- 99 percent sure along the way I met
6   Mr. Burnett; but once again, if he walked through that
7   door, I wouldn't recognize him right now. But go ahead.
8     Q. Do you remember any conversations you had with
9   Mr. Burnett?
10    A. Not specifically.
11    Q. Anything generally?
12    A. No, I do not.
13    Q. Mr. Burnett testified at his deposition that he
14  met with you prior to the H2Bs being approved to explain
15  the process. Do you recall that meeting?
16    A. I know that individuals -- and I'm not sure who
17  they were -- from I believe it was Global Resources came
18  out to Texas while we were trying to establish the
19  facility; i.e., get the houses in place, the catering
20  rooms, the break rooms in place. I do not remember a
21  specific meeting that this is the process.
22    Q. So is your understanding of the process from
23  what Mr. Sanders conveyed to you in those e-mails and
24  generally conversations you had with Mr. Schnoor,
25  Mr. Bingle? Would that be the universe of knowledge

1   from which you derived your understanding of the
2   program?
3     A. My knowledge of the program came from --
4   primarily from discussions that were held. We had
5   teleconferences between Mr. Marler and myself,
6   Mr. Schnoor, Mr. Bingle. Mr. Sanders was not always on
7   those conversations. So my knowledge of that primarily
8   came from those discussions.
9     Q. Okay. Did you make a hundred-dollar bet with
10  Mr. Burnett about radical immigration law changes that
11  were to occur at the end of 2007?
12    A. Yes.
13    Q. Do you know when you made that bet with him?
14    A. I don't even remember. Now that you bring that
15  up, I believe he was sitting in one of the conference
16  areas in Texas. I have no idea of the dates.
17    Q. What was the bet all about?
18    A. With regard to Hispanic workforce and the US-
19  Mexico laws pertaining to Hispanic workers in the United
20  States.
21    Q. What was your view and what was Mr. Burnett's
22  view that caused the bet?
23    A. What was the view of the bet? Well, I -- I'm
24  generally not a betting man, so I thought I was in very
25  safe grounds; and as it -- as it played out, he still

1   owes me a hundred dollars.
2     Q. So, what was the view of the bet?
3     A. The bet was whether there would be a -- a
4   substantive change in the process for Hispanic workers
5   to legally work in the United States.
6     Q. And your view was?
7     A. That it would not change appreciably to where
8   the purported large number of undocumented workers that
9   are in the United States could become legal to work for
10  a company such as Signal.
11    Q. And Mr. Burnett was of the view that ille --
12  that workers who were presently in America illegally
13  would subsequently be able to work at Signal legally
14  based on changes in the law?
15    A. That the process for them to legally work in
16  the United States would become much easier, and
17  therefore more workers would become available.
18    Q. Okay. Did you make this bet in the summer of
19  '06? I realize you say you didn't know specifically,
20  but do you have any general recollection? You were
21  still working at Signal, I assume?
22    A. Yes, I was still working at Signal. Late in
23  '06.
24    Q. Okay. I wanna show you another document. The
25  Bates for it is...

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

26 (Pages 98 to 101)

O'HALLA REPORTING
713-664-8398

Page 102

```
1          Okay.  The Bates for it is SIGE0055918,
2   and it's an e-mail that you sent to Rob Busby --
3       A.  Uh-huh.
4       Q.  -- who I take it you know, and then there's
5   some subsequent e-mailing.  You can read it over.
6          And, Mr. Rigolo, I just wanna confirm that
7   when you check your Blackberry, you're not receiving any
8   information about this dep from anyone who's -- who's
9   listening into the dep; is that correct?
10      A.  No, I am not receiving updates from somebody
11  telling me what to say.
12      Q.  But there's nobody giving you -- nobody who is
13  attendant at this dep is e-mailing you during this dep.
14      A.  That is correct.  Nobody is e-mailing me that
15  is party to this deposition.
16          MR. ALEXIS:  Hugh, this is Ralph --
17          MR. SANDLER:  Yes.
18          MR. ALEXIS:  -- Alexis again.
19          MR. SANDLER:  Do you want the Bates again?
20          MR. ALEXIS:  I -- no.  I just want -- you
21  said the e-mail was from Mr. Rigolo to whom?
22          MR. SANDLER:  Well, the top e-mail, which
23  might be easier for you to find, is from Dick Marler to
24  Chris Cunningham, Ron Schnoor, Lee Stokes, and Rodney
25  Meisetschlaeger, March 17th, 2008.  The subject is
```

Page 103

```
1   forward -- it's a forward, and the subject is Indian
2   Workers.  There are two e-mails below that and of which
3   the lowest one was sent by Mr. Rigolo.
4       A.  Okay.
5       Q.  (BY MR. SANDLER)  Okay.  This is an e-mail sent
6   by you to Signal's director of marketing after
7   litigation in this case was filed, and I'm just gonna
8   read part of your e-mail.  I'm just gonna ask you a
9   question --
10      A.  Sure.
11      Q.  -- about it.
12      A.  Okay.
13      Q.  "I always felt that Signal was trying to
14  'strong arm'" -- in quotations -- "these workers, and it
15  really surprised me that Dick" -- and I'm gonna assume
16  that's Dick Marler?
17      A.  Uh-huh.
18      Q.  -- "hadn't" -- and by "uh-huh," you mean "yes"?
19      A.  Yes, that was Dick Marler.
20      Q.  Okay -- "hadn't shut this whole thing down
21  quite some time ago."  Did I read that correctly?
22      A.  You read it correctly.
23      Q.  Okay.  Please describe how the workers were
24  strong-armed --
25      A.  Okay.
```

Page 104

```
1       Q.  -- in your opinion.
2          VOICE ON PHONE:  Form.
3       A.  Let's put the entire e-mail in context.  When I
4   left Signal, I had very little interaction with anybody
5   from Signal.  I did that intentionally.  I was
6   establishing a different career.  So I was not hearing a
7   lot of information.  And I came across an Internet -- as
8   it says here, it was on the Internet by the Chronicle --
9   "Chron," by that I refer to the Chronicle -- article,
10  and then I also found online at CNN the lawsuits
11  pertaining to the Indian workers; and as it says here,
12  it looks like you have some real challenges and out of
13  the Mississippi group; and I inquired -- I said it here:
14  I don't see any mention of the issues out of the Texas
15  camp, asked whether the camp was shut down or whether it
16  was just under the radar.
17      Q.  (BY MR. SANDLER)  Okay.
18      A.  All right.  With regard to "strong arm"
19  workers, two things:  When I was fishing to see what
20  Mr. Busby's whole thoughts were on this and where it was
21  going --
22      Q.  Uh-huh.
23      A.  -- to see where it was going, Mr. Marler, being
24  ex-military, is very straightforward.  If there was a
25  contract in place, he would live to the contract.  If
```

Page 105

```
1   workers wanted something outside of that, he was not
2   going to acquiesce.
3          My understanding from what I had heard
4   well after I had left is that obviously these workers
5   wanted to stay in the States.  I had heard that they
6   were demanding green cards.  Knowing enough of
7   Mr. Marler's personality, that he would live up to his
8   end of the contract, he was not going to do anything
9   else.
10      Q.  So living up to the end of -- his end of the
11  contract amounted to strong-arming?
12      A.  No, to -- he'll do what was required by the H2B
13  visas.  If these workers were demanding something
14  outside of that, he wasn't going to provide it.
15      Q.  So what did you mean by "strong arm," then?
16      A.  He -- as I said, he -- he will do what's in the
17  contract.  He is not -- he's very straightforward.
18      Q.  When you say, I always felt that he was
19  strong-arming them, did you feel that when you were
20  working at Signal?
21      A.  Mr. Marler in running such a large company
22  can't play favorites; and while some of these workers
23  who came in did not have the skillsets, typically we
24  would send them right out the gate; but both in Texas
25  and in Mississippi we would try and find other jobs that
```

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

27 (Pages 102 to 105)

Page 106

1 they could do, other skillsets they could do; and to
2 some extent he was accommodating, but generally in a
3 workforce you -- you have to say this is the established
4 pay scale, this is the skillset you have to have, and
5 this is the job you have to do. While he was
6 accommodating, there is only so many -- so far he can go
7 to accommodate the workers.
8    Q.  So what was something that he did that you
9 considered strong-arming?
10       MR. ALEXIS:  Object to form.
11    A.  I would -- I would consider sending any of
12 these workers back prior to con -- completing the first
13 period of the visas.
14    Q.  (BY MR. SANDLER)  As strong-arming.
15    A.  Yes.
16    Q.  And that did happen.
17    A.  It happened on a couple of limited occasions,
18 yes.
19    Q.  Is there any other incidents that you thought
20 were strong-arming?
21    A.  No.
22    Q.  When you said that you tried to accommodate the
23 workers by giving them other jobs?
24    A.  Yes.
25    Q.  Was that, like, crushing paint cans and

Page 107

1 sweeping up; or what was it?
2    A.  I don't know the specifics of it.  The intent
3 and what we required was first-class welders.  It means
4 they could come in, perform a welding test, meet the
5 requirements of the classification societies to weld and
6 perform welds on these projects.  That's what we
7 required.
8    Q.  Is that what you tested for in India?
9    A.  Welding pro -- proficiency was tested in India.
10 Whether they had the ability to weld to pass a test for
11 the classification society was not witnessed in India.
12    Q.  But you do agree with me that the jobs were
13 offered in India.
14    A.  The jobs were offered in India by the
15 recruiter.
16    Q.  But they received Signal offers of employment
17 in India.
18    A.  My understanding is the recruiter would
19 identify the individual and then Signal would then sign
20 that offer.
21    Q.  Okay.  So, do you know if that offer was
22 contingent on another round of testing?
23    A.  I do not know whether that offer said it was
24 contingent upon another round of testing.
25    Q.  Do you think --

Page 108

1    A.  To weld, to perform welds on certain structures
2 that are on vessels being classified by the
3 classification society, the welder must be a certified
4 welder.  For us to use them, "us" being Signal at the
5 time, to use them on contracts, they had to pass a test.
6 That test had to be witnessed by the surveyor; or if the
7 surveyor accepted, by one of my quality personnel.
8    Q.  So was that witness taking place, say, with
9 Mr. Pastrana in India?  Was that --
10    A.  That test is performed in my facilities.  It's
11 -- and at the time in Signal's facilities.
12    Q.  Does it make sense to you to offer employment
13 to a worker who lives overseas to come to Signal and
14 then to subject that worker to another test after you've
15 given them the offer, or would it make more sense to
16 give the offer after they've passed it to your
17 satisfaction?
18       MS. BOLLMAN:  Object to form.
19    Q.  (BY MR. SANDLER)  Well, as the senior V-P, what
20 is your opinion?
21    A.  My opinion on that is ideally you don't make an
22 offer to pay somebody until they've come in, passed the
23 test -- a full set of tests, and then you make them an
24 offer.  When somebody comes into the facility off the
25 street.

Page 109

1    Q.  Yeah.
2    A.  Okay?  They say they're a first-class welder.
3 When they go in and test, if they don't test as a first-
4 class welder, they test as a second-class welder or they
5 don't have the skillset, then they are brought on at
6 whatever skillset is appropriate to their abilities.
7 That is the most prudent way to do it.
8       My understanding, because of the way the
9 process worked, is they had, "they" being the Indian
10 workers, required an offer letter from Signal before the
11 visas would be granted which would allow them to travel
12 to the United States.
13    Q.  So --
14    A.  So my understanding is that is how the process
15 worked.
16    Q.  So do you think it was a mistake to give that
17 offer letter unless you could be sure that the person
18 had the skillset that you were offering --
19       MS. BOLLMAN:  Object to form.
20    Q.  (BY MR. SANDLER)  -- a job for?
21    A.  No, I -- I do not consider it a mistake.
22 Signal was working purportedly with the recruiter that
23 has done this, has done this for other large employers
24 providing this type of skilled worker; therefore, the
25 assumption could logically be made that the recruiter

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

28 (Pages 106 to 109)

Page 110

1 knows his business, understands the skillsets that
2 Signal required, and would provide workers to that
3 level.
4 Q. And you had authorized the recruiter to find
5 workers at that skill level, correct?
6 A. That is my understanding that that is the
7 recruiter's job.
8 Q. It was his job because you -- because Signal
9 authorized him to find those workers.
10 A. Correct.
11 Q. But you agree with me that ideally you would
12 want to test the worker in your own facility in -- in
13 America before making any representation about a job of
14 any length to him and the pay rate -- pay --
15 A. Ideally --
16 Q. -- wage scale.
17 A. Ideally you test a worker and he is offered a
18 position. That is the most ideal situation.
19 Q. So this is a suboptimal process that you were
20 working on here with offering jobs in India knowing that
21 you would have to retest them in America.
22 A. Suboptimal is a comparative phrase. My
23 understanding is the offer had to be made prior to
24 getting the visas for them to come to the States. That
25 is the process that had to be followed. Whether it's

Page 111

1 optimal or suboptimal is debatable. The process had to
2 be followed.
3 Q. So did Signal consider conducting the tests in
4 India to their satisfaction so they wouldn't have to
5 retest in America?
6 A. Signal wanted to understand the nature of the
7 tests that were conducted. Regardless of the magnitude
8 of the tests conducted overseas, the workers would have
9 to be tested in the United States.
10 Q. Do you think the workers should have been told
11 that before they came over?
12 A. No. I believe that a welder, a fitter, whether
13 it's in the United States or any of the shipbuilding
14 facilities in the world that work with the major
15 classification societies, that the workers understand
16 the testing requirements that are on them when they go
17 into a new facility.
18 Q. So you believe that although Signal gave an
19 offer of employment, that the workers all knew that that
20 offer would be contingent on being retested once they
21 had paid all their fees and come over to America. Was
22 that your understanding?
23 A. Restate that.
24 Q. Sure.
25 MR. SANDLER: Do you mind?

Page 112

1 (The record was read as requested.)
2 A. No. There -- my understanding is there was no
3 contingencies on the offer of employment in the offer
4 letter presented to the workers that was drafted by the
5 recruiter offering them a job, so there was no
6 contingency on it. Whether they would work in the
7 facility as a first-class welder on a project, or as a
8 first-class welder, is contingent upon the exam or the
9 test when they came into the facility.
10 Q. (BY MR. SANDLER) And my question was just
11 simply whether you thought it would be -- whether you
12 saw -- whether you see a problem with giving an offer at
13 a pay -- at a pay rate of whatever it is --
14 A. To -- to use your term, you said it is not
15 suboptimal. I will agree with you that it is not the --
16 the most optimal way to do that.
17 Q. Do you prefer that -- would you prefer, going
18 back in time, that Sig -- that Signal had done it a
19 different way?
20 A. My understanding is the methods that were
21 employed to bring the recruiters in is how it was
22 required to bring in the workers under the H2B visa
23 program.
24 Q. Okay. Just -- I wanna go back. You said that
25 the offer letter was drafted by the recruiter? The

Page 113

1 offer --
2 A. Yes.
3 Q. But it was signed by a Signal executive --
4 A. Yes.
5 Q. -- correct?
6 A. That's my understanding of the process.
7 Q. Did you ever discuss this strong-arming with
8 any of the other Signal executives?
9 MS. BOLLMAN: Object to form.
10 A. No.
11 Q. (BY MR. SANDLER) Okay. Did they -- I see here
12 that Mr. Marler informed them not to contact you. Did
13 any of them contact you?
14 A. Who's "them"?
15 Q. Mr. Cunningham, Mr. Schnoor, Mr. Stokes,
16 Mr. Meisetschlaeger, or Mr. Busby.
17 A. Mr. Busby and I have talked subsequent to this
18 e-mail, but not pertaining to this.
19 Q. And have you spoken with Mr. Cunningham,
20 Mr. Schnoor, Mr. Stokes, or Mr. Meisetschlaeger about
21 the contents of this e-mail?
22 A. No, I have not.
23 Q. So you -- so you have not discussed with them
24 the strong-arming notion.
25 A. Have not.

Plaintiffs (P) Signal Defs. (S) Dewan Defs. (D) Burnett Defs. (B)

29 (Pages 110 to 113)

O'HALLA REPORTING
713-664-8398

Page 170

1 was pipefitters. Did you -- more so than welders? Is
2 that --
3   A. Yes.
4   Q. -- what you said?
5   A. That is correct.
6   Q. So in addition to Mr. Pastrana's concern, you
7 also had the flux core issue that you had raised via
8 e-mails that we showed earlier, right?
9   A. We were desirous of having welders that were
10 qualified flux core, yes.
11   Q. And you knew in September that there is a
12 chance that you're gonna get workers from India who
13 cannot do flux core competently at a first-class level.
14       MS. BOLLMAN: Object to form.
15   A. Is there a chance that workers would come in
16 without that competency level? Yes.
17   Q. (BY MR. SANDLER) But you -- it was more than
18 just a chance because already you knew that Mississippi
19 corporate was building testing facilities to accommodate
20 for a lack of competency in flux core welding, correct?
21   A. Mississippi utilized more welders that were not
22 qualified flux core and used them on quite a lot of
23 contracts, which we did not do in Texas. I can speak
24 for the requirements that Texas had. Whether
25 Mississippi was accepting and why they were accepting

Page 171

1 workers and without those skillsets is not my concern or
2 my call.
3   Q. But by September of 2006 you were aware that
4 there were issues on both the pipefitting side and the
5 welding side to be at the level of competency that you
6 required at your yard -- yards.
7   A. There's always a concern when you bring workers
8 in whether they have the skillset that is necessary.
9   Q. Sure, there's a theoretical concern for anyone;
10 but you had specific and actual knowledge for both the
11 pipefitter and welder side that there were gonna be
12 concerns.
13   A. I had specific knowledge that there were going
14 to be concerns. I can agree that I had specific
15 knowledge that there were concerns.
16   Q. Okay. And did you share that -- those
17 concerns?
18   A. I'm sure that was discussed in conversations
19 that collectively there were concerns whether these
20 workers would have the skillset necessary to do the job
21 and work at the level that we anticipated and expected.
22   Q. But at no time did you ever suggest to
23 corporate that -- to stop the program before the workers
24 came over in December of '06.
25   A. I know that I questioned it, and certainly

Page 172

1 you -- like every decision, you wanna understand why a
2 decision was made. I was not in a position to stop it.
3 This was mandated by corporate and we'll follow that and
4 we will bring the workers in.
5   Q. Was your -- did you hold an opinion that it
6 should be stopped? I realize you didn't have the
7 authority to stop it, but did you hold that opinion?
8   A. My opinion was that considering some of the
9 constraints -- for example, a very defined period of
10 time -- that not truly knowing how workers would work
11 into the groove, that it would consume resources in
12 Texas that may be better utilized to try and keep
13 working to bring in other workers. That was my
14 assessment of it.
15   Q. Okay. I'm just gonna ask for just a "yes" or
16 "no"; and I realize you've given me an answer that leans
17 towards one or the other, but I wanted to kind of get a
18 clearer idea.
19   A. Okay.
20   Q. If it were your decision at that time, would
21 you have stopped the program?
22   A. Yes, I would have stopped the program.
23   Q. And this is September/October 2006, say?
24   A. To be clear --
25   Q. Yes.

Page 173

1   A. -- I don't think -- after exploring all the
2 facets of the program, I, if it were strictly my call,
3 would not have pursued this.
4   Q. And you would have stopped it in September/
5 October 2006?
6   A. Well before we brought in a recruiter, so -- in
7 terms of timeline, once I would have explored the
8 uncertainties on extensions, skillsets, if a worker
9 doesn't come in with a required skillset, I probably, if
10 it were strictly my call, would not have pursued this.
11   Q. Did you ever share that view with Mr. Marler,
12 Mr. Schnoor, or Mr. Bingle?
13   A. I can't recall when I specifically did. I'm --
14 I'm fairly outspoken. They probably understood that I
15 would -- was questioning this.
16   Q. Okay. And you were questioning it before --
17   A. Yes.
18   Q. -- workers set foot on US soil.
19   A. Well, I -- I ques -- if I did question it, it
20 was well before the decision was made; but once the
21 decision was made to bring 'em in, that was the
22 direction we were taking.
23   Q. When was the decision -- wasn't the decision to
24 bring them in in the fall -- or in the -- the spring of
25 2006?

Plaintiffs (P) Signal Defs. (S) Dewan Defs. (D) Burnett Defs. (B)

44 (Pages 170 to 173)

O'HALLA REPORTING
713-664-8398

Page 174

```
1      A.  I believe it was.
2      Q.  But you said that you weren't even familiar
3  with the negotiations until May or June, after the
4  contract was signed.
5      A.  As I said -- you asked if I would bring them
6  in.  I said once I understood about the program.  I
7  didn't put a timeline on it.  You tried to imply a
8  timeline.  I was very clear.  I said once I investigated
9  what the process was, if it were my call, I would not
10 have brought them in.
11     Q.  But in September or October 2006.  Okay?
12     A.  Okay.
13     Q.  So what's happened before that has happened --
14     A.  Uh-huh.
15     Q.  -- you've heard from Mr. Pastrana of the
16 pipefitter issue --
17     A.  Uh-huh.
18     Q.  -- you know about this flux core thing that's
19 going on.  At that point, would you have stopped the
20 program?
21     A.  No.  No, I would not have at that point.
22     Q.  Why not?
23     A.  Signal had invested in the facilities; and even
24 if not all the workers had the skillset specifically,
25 that use the workers.  If they're good individuals
```

Page 175

```
1  between the skillsets they do have or the ability to
2  bring them up a level, they would probably be effective
3  in the workforce.  At the point the decision is made,
4  you've invested, you've started the process, continue
5  the process.
6      Q.  Okay.  Was the main reason for you not stopping
7  the process in that September/October 2006 because of
8  the millions of dollars invested in the mancamp?
9          MS. BOLLMAN:  Object to form.
10     A.  No.  The decision -- that is -- is part of the
11 decision process.  If I were the one making the
12 decision, when I balance that against contracts that had
13 to be completed, contracted -- contracts that had very
14 large liquidated damages associated with not performing,
15 you certainly would then use whatever means are
16 available to get workers in to try and get the job done.
17 If that means that a percentage of the workers don't get
18 as much work done as you hoped but some of them do, it
19 is going to be effective at least advancing those
20 contracts.  The decision's made.  You've worked with a
21 recruiter.  You have facilities coming in place to house
22 these workers.  Use them the best you can.
23     Q.  (BY MR. SANDLER)  Fair enough.
24         To go back to -- to go back to Exhibit
25 821.  Do you have your numbers, like little stickers and
```

Page 176

```
1  numbers on yours?
2      A.  Here, why don't you -- why don't you make it
3  easy for me and --
4      Q.  Sure.  I'll find that for you.
5      A.  -- you find it.  Okay.
6      Q.  To go back to this exhibit.
7          MS. BOLLMAN:  Which exhibit are you going
8  back to?
9          MR. SANDLER:  The -- the exhibit number is
10 821; and the Bates --
11         MS. BOLLMAN:  Okay.
12         MR. SANDLER:  -- for ease of reference, is
13 SIGE0550688.
14         MR. ALEXIS:  Could you identify it,
15 please?
16         MR. SANDLER:  Yeah, sure.  It's an e-mail
17 from Mr. Rigolo to John Sanders, cc: Malon Scogin, Ken
18 Inabinett, and Dick Marler.
19         MR. ALEXIS:  The date?
20         MR. SANDLER:  September 27th, 2006.
21     Q.  (BY MR. SANDLER)  You were at the end of
22 September floating the idea of moving the -- doing an H2
23 per -- H2B personnel from Mexico instead of India,
24 correct?
25     A.  Well, I mean, as the -- the re -- e-mail reads:
```

Page 177

```
1  "I have had several contract labor companies that have
2  H2B personnel from Mexico and elsewhere interested in
3  offering very attractive rates in conjunction with using
4  our mancamp."  So, yes, that's what it reads.  Does that
5  mean that I floated the idea?  I conveyed to individuals
6  that there are other people that do this.
7      Q.  And to your knowledge this option was not
8  looked into by Signal?  Just to your knowledge.  I'm not
9  saying it did or didn't, just whether you know.
10     A.  I -- I do not know if they looked into a
11 recruiter bringing in Hispanics.
12     Q.  Okay.
13     A.  I don't know.
14     Q.  But if you were the person in charge, you would
15 have looked at this --
16     A.  As a person in charge --
17     Q.  -- option very seriously?
18     A.  -- knowing we're building a facility to house a
19 number of workers, the current workers coming in are
20 under a set period of time, at the end of that period of
21 time we may extend some of those workers, which would
22 leave room in a camp, or after these workers, perhaps
23 the labor demands went for years.  I have a camp.
24 Having other consultants available to provide H2B visa
25 workers is always beneficial.
```

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

45 (Pages 174 to 177)

O'HALLA REPORTING
713-664-8398

Page 242

1  extensions on the H2B visa, and if they're gonna start
2  asking questions on green cards, that that should be
3  fielded by the recruiter. They may not ask those
4  questions if senior management of Signal is sitting
5  there.
6      Q.  Why wouldn't they ask the questions if senior
7  management from Signal is there?
8      A.  I think that human nature that, you know, you
9  have a discussion with people you are more comfortable
10  with. They had worked with a recruiting company, had a
11  contract in place with it, be more willing to work with
12  them.
13     Q.  So they were not comfortable talking about
14  their visa status with Signal management in Texas.
15     A.  I don't know if they were or were not.
16     Q.  You said perhaps --
17     A.  My supposition would be that they would be more
18  comfortable talking to somebody representing the
19  recruiting side.
20     Q.  And they would be uncomfortable talking about
21  it with Signal personnel.
22     A.  Possibly.
23     Q.  Okay. And what is the reason for their -- for
24  what you thought might be their uncomfortableness?
25     A.  These workers were a long way from home. Prior

Page 243

1  to coming to Signal, their contact with -- was with a
2  recruiting company. If there is any uncertainties,
3  considering events that -- and rumors out of the other
4  camp, I would think that the individuals would be more
5  comfortable talking to the people that brought them over
6  to the United States.
7      Q.  Okay. But just work with me. I'm not --
8      A.  Yes.
9      Q.  -- saying that Mr. Burnett wouldn't be the one
10  answering the questions, but --
11     A.  Right.
12     Q.  -- you were saying that you thought they'd be
13  uncomfortable if just a Signal person were sitting
14  there.
15     A.  Correct, listening to them.
16     Q.  Okay. So, why would they be uncomfortable with
17  a Signal person just sitting there?
18     A.  In general terms, when people are sitting in a
19  group, if somebody from outside is sitting there, you
20  tend to couch your questions so that -- I -- I consider
21  that human nature. Comfort with who is in the room on
22  what is a -- could be a very sensitive topic.
23     Q.  So would -- were there just some immigration
24  questions that workers would not ask if Signal were
25  around?

Page 244

1      A.  I do not know what questions they would or
2  would not wanna ask. My point of not attending the
3  meeting was so that these workers had the ability to ask
4  the recruiter at this point specifically from that
5  perspective what their status is.
6      Q.  And they would be intimidated from doing that
7  if a Signal person were there, too.
8      A.  Possibly.
9      Q.  Okay. Now, if somebody from Signal got up and
10  said to the workers that they're still part of the
11  long-term solution for Signal, would that be true?
12         MS. BOLLMAN: Object to form.
13     A.  I'm sorry, could you say that again?
14     Q.  (BY MR. SANDLER) If Mr. Scogin would have got
15  up at that meeting and said, "You guys are part of our
16  long-term solution at Signal" --
17     A.  Uh-huh.
18     Q.  -- would that be true?
19     A.  It was envisioned that these workers would be a
20  solution to our labor demands for a period of time.
21  "Long-term" is -- is nebulous.
22     Q.  Sure.
23     A.  In shipbuilding contracts, we have some
24  projects that come in that are three weeks long but you
25  work 24 hours a day. We have other contracts which are

Page 245

1  six months or a year long. "Long-term" is rather
2  nebulous. "Long-term," six months or a year is long in
3  the shipbuilding business.
4      Q.  But you already knew by March that some workers
5  were gonna be sent home at the end of their --
6      A.  Yes.
7         MS. BOLLMAN: At the end of their what?
8  Can you finish?
9      Q.  (BY MR. SANDLER) At the end of the first term
10  of their H2B visa, which --
11        MS. BOLLMAN: Just so we have a clear
12  record.
13        MR. SANDLER: No, no, no --
14        MS. BOLLMAN: Thank you.
15        MR. SANDLER: -- that's fine.
16     Q.  (BY MR. SANDLER) Did you know that Mr. Schnoor
17  at his speech in Mississippi told the workers that if
18  they pursued a lawsuit, then no one would get visa
19  extensions?
20        MS. BOLLMAN: Object to form.
21        MR. ALEXIS: Object to form.
22     A.  Was not aware of that.
23     Q.  (BY MR. SANDLER) Would that bother you?
24        MR. ALEXIS: Object to form.
25     A.  Would what bother me?

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs  (D) Burnett Defs. (B)

62 (Pages 242 to 245)

O'HALLA REPORTING
713-664-8398

Page 246

```
 1      Q.  (BY MR. SANDLER)  That to tell the workers that
 2  if they pursued a lawsuit, then their visas would not be
 3  extended.
 4      A.  That's not --
 5          MS. BOLLMAN:  Object to form.
 6      A.  -- a statement that I would make.
 7      Q.  (BY MR. SANDLER)  Why wouldn't you make that
 8  statement?
 9      A.  Well, to me you extend the visas based on the
10  merits of the worker and the worker's ability.  Don't --
11  I mean, you can't hold something back because the person
12  threatens a lawsuit.  To me if a worker is a good
13  worker, then certainly we would want to extend that.
14      Q.  Do you think there's something wrong with
15  telling someone that if he pursues his -- a lawsuit, his
16  visa won't get extended?
17          MS. BOLLMAN:  Object to form.
18      A.  I think that that statement could be taken in
19  the wrong context very easily.
20      Q.  (BY MR. SANDLER)  What would the wrong context
21  be?
22      A.  That -- to me that could come across as a
23  threat.
24      Q.  A threat to prohibit the person from pursuing a
25  lawsuit.
```

Page 247

```
 1      A.  Correct.
 2      Q.  Did Mr. Scog -- Scogin or any -- sorry.  I just
 3  wanna be clear.  At the speech in Texas, Mr. Burnett was
 4  there; but you said also Mr. Scogin attended or not?
 5      A.  No, I did not say.  He may have --
 6      Q.  Oh, he may have --
 7      A.  -- attended.
 8      Q.  -- attended.  Okay.
 9          Did anyone from Signal brief you, so to
10  speak, on what happened at that speech?
11      A.  I believe there was a follow-up afterwards.
12      Q.  Do you remember with whom the follow-up took
13  place?
14      A.  No, I don't recall.  Possibly Malon.
15      Q.  Okay.
16      A.  Mr. Scogin.
17      Q.  Do you know anything that was said to the
18  workers in Texas based on what Malon told you?
19      A.  Nothing specific.
20          MS. BOLLMAN:  Object to form.
21      Q.  (BY MR. SANDLER)  Nothing specific?
22      A.  Do not remember anything specific.
23      Q.  Okay.  And generally?
24      A.  Generally that -- conveyed back to me that the
25  workers in Texas did not wanna be lumped in -- quote,
```

Page 248

```
 1  unquote -- with the workers in Mississippi.  They were
 2  concerned about their performance on the job and -- and
 3  doing their work.  That was their concern.
 4      Q.  That's what they expressed to Malon?
 5      A.  I don't know -- that -- that is what was
 6  conveyed back to me.
 7      Q.  Okay.
 8      A.  Who they expressed it to I -- I do not know
 9  specifically.
10      Q.  So you don't know what Mr. Burnett told them
11  about different visas that might be available to them or
12  what the --
13      A.  I do not know --
14      Q.  -- H2B process --
15      A.  I do not know any of those discussions.
16      Q.  Did Mr. Burnett tell you anything about a T
17  visa at any time?
18      A.  I've heard that term.  Where I've heard it
19  from, I -- I don't know.
20      Q.  Do you remember when you heard it?  Like --
21      A.  No.
22      Q.  -- was it early or --
23      A.  No.  I mean, it's -- it's not -- it's not an
24  un -- I mean, I've heard the term --
25      Q.  Okay.
```

Page 249

```
 1      A.  -- but I'd have to think about and try and
 2  place when I heard it.
 3      Q.  Did you know that Mr. Burnett was speaking to
 4  the workers about T visas?
 5      A.  I believe I did not know that.
 6      Q.  Did your decision to leave Signal have anything
 7  to do with March 9th --
 8      A.  No, it did not.
 9      Q.  -- or the events thereof?  Did it --
10      A.  Let -- let -- let's be clear.  I had actually
11  many months before that made the decision to transition
12  away from Signal, and I was trying to ensure that a lot
13  of contracts were in place or at least moving in a
14  better direction before leaving.  I had established my
15  own timeline.  I was already several weeks past my own
16  timeline when I wanted to have resigned.  And -- so I --
17  I almost was gone much bef -- much before those events
18  transpired, so they had no direct influence on when I
19  left.  I had already made plans for leaving.
20      Q.  Once you learnt about what happened in
21  March 9th in Mississippi --
22      A.  Uh-huh.
23      Q.  -- did it concern you that workers were
24  detained and then for the purposes of being deported?
25          MS. BOLLMAN:  Object to form.
```

Plaintiffs (P)  Signal Defs. (S)  Dewan Defs. (D)  Burnett Defs. (B)

63 (Pages 246 to 249)

O'HALLA REPORTING
713-664-8398