1              IN THE UNITED STATES DISTRICT COURT FOR

2                THE EASTERN DISTRICT OF LOUISIANA

3                        AT NEW ORLEANS

4
    DAVID, ET AL,                *    CIVIL ACTION
5                                 *
                 Plaintiffs,      *    No. 08-1220, Section E
6                                 *
         v.                       *
7                                 *    March 2, 2015
                                  *
8    SIGNAL INTERNATIONAL,        *
                                  *
9                Defendants.      *

10

11                    TRANSCRIPT OF PROCEEDINGS
              HEARD BEFORE THE HONORABLE SUSIE MORGAN,
12                 UNITED STATES DISTRICT JUDGE

13    Related Case:

14    EQUAL EMPLOYMENT OPPORTUNITY     CIVIL ACTION
      COMMISSION,
15                 Plaintiff,          No. 12-557
           v.
16    SIGNAL INTERNATIONAL, LLC,       SECTION "E"
      et al,
17                 Defendants.

18    Related Case:

19    LAKSHMANAN PONNAYAN ACHARI,      CIVIL ACTION
      et al,
20                 Plaintiffs,         No. 13-6218 (c/w 13-6219,
           v.                         13-6220, 13-6221, 14-732,
21                                     14-1818)
      SIGNAL INTERNATIONAL, LLC,
22    et al,                           SECTION "E"
                   Defendants.
23

24
      (Caption continued, Page 2)
25

```
 1    Related Case:

 2    REJI SAMUEL, et al,              CIVIL ACTION

 3              Plaintiffs,            No. 14-2811
              v.
 4                                     SECTION "E"
      SIGNAL INTERNATIONAL, LLC,
 5    et al,
              Defendants.
 6
      Related Case:
 7
      BIJU MAKRUKKATTU JOSEPH, et al  CIVIL ACTION
 8
              Plaintiffs,
 9       v.                            No. 14-2826

10    SIGNAL INTERNATIONAL, LLC,
      et al,                           SECTION "E"
11            Defendants.

12    Applies to:  ALL CASES

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **APPEARANCES:**

2    For Plaintiffs:
     David Kurian, et al          ALAN HOWARD, ESQ.
3                                 Crowell & Moring, LLP
     (Via Telephone)              590 Madison Avenue
4                                 New York, NY 10022

5
     For Plaintiffs:              DANIEL WERNER, ESQ.
6    Kurian David,                Southern Poverty Law Center
     Thomas, Plaintiffs           Immigrant Justice Project
7                                 233 Peachtree Street NE
                                  Atlanta, GA 30303
8
9    For Plaintiffs:              MEREDITH STEWART, ESQ.
     Kurian David,                Southern Poverty Law Center
10   Thomas, Plaintiffs           1055 St. Charles Avenue, Suite 505
                                  New Orleans, Louisiana  70130
11
12   For Plaintiff:               A. GREGORY GRIMSAL, ESQ.
     Lakshmanan Ponnayan          Gordon, Arata, McCollam,
13   Achari                       Duplantis & Egan
     Xavier Disoliyan             201 St. Charles Avenue, Suite 4000
14   Rajankunju Geevarghese       New Orleans, Louisiana  70170

15
     For Plaintiff:               EBEN P. COLBY
16   Chakkiyattil                 Skadden, Arps, Slate, Meagher &
                                  Flom, LLP
17                                500 Boylston Street
                                  Boston, Massachusetts 02116
18
     For Plaintiff:               JOSE ARVELO, ESQ.
19   Singh                        Covington & Burling, LLP
                                  One City Center
20                                850 Tenth Street, NW
                                  Washington, DC  20001
21
22   For Plaintiff:               DANIEL D. ADAMS, ESQ.
     Lakshmanan Ponnayan          Latham & Watkins, LLP
23   Achari                       885 Third Avenue, Suite 1000
                                  New York, New York 10022
24

25

```
 1      For SIGNAL ENTITIES:        BRIAN ROUX, ESQ.
                                    Hangartner Rydberg & Terrell
 2                                  One Shell Square
                                    701 Poydras Street
 3                                  Suite 310
                                    New Orleans, LA 70139
 4

 5      FOR SIGNAL INTERNATIONAL:   PATRICIA BOLLMAN, ESQ.
                                    Patricia Bollman, APLC
 6                                  P.O. Box 13707
                                    New Orleans, LA 70185
 7

 8      For Sachin Dewan:           STEPHEN SHAPIRO, ESQ.
                                    Law Office of Stephen Shapiro
 9                                  700 Camp Street
                                    New Orleans, LA 70130
10

11      For Malvern Burnett:        TIM CERNIGLIA, ESQ.
                                    Law office of Tim Cerniglia
12                                  1521 St. Charles Avenue
                                    New Orleans, LA 70130
13

14      For EEOC:                   ROBERT CANINO, ESQ.
        (Dallas                     Dallas District Office
15                                  207 S. Houston Street
                                    Dallas, Texas  75202
16

17      FOR EEOC:                   GERALD L. MILLER, ESQ.
        (Birmingham)                U.S. EEOC Birmingham
18                                  1130 22nd Street S. Suite 2000
                                    Birmingham, AL  35205
19

20

21

22

23

24

25
```

1              A F T E R N O O N   P R O C E E D I N G S

2                          * * *

3          (March 2, 2015, Conference in Judge Morgan's Chambers

4     2:09 P.M.)

5

6          THE COURT:  Good afternoon, everybody.  Have a seat.

7          All right.  Let's go around the room and introduce

8     ourselves.  I see some new -- I guess, maybe new faces.  I know

9     that one.

10         MR. WERNER:  Daniel Werner for David plaintiffs and

11    intervenors in EEOC and the Thomas plaintiffs.

12         MS. STEWART:  Meredith Stewart for the David

13    plaintiffs, the EEOC, and the intervenors and the Thomas

14    plaintiffs.

15         MR. MILLER:  Gerald Miller for the EEOC.

16         MR. CANINO:  Robert Canino with the EEOC.

17         THE COURT:  That is our new face.  Welcome.

18         MR. COLBY:  Eben Colby on behalf of the Chakkiyattil

19    plaintiffs.

20         MR. ARVELO:  Jose Arvelo on behalf of the Singh

21    plaintiffs.

22         MR. GRIMSAL:  Greg Grimsal on behalf of the

23    consolidated Achari plaintiffs.

24         MR. SHAPIRO:  Steve Shapiro on behalf of Dewan

25    defendants.

1          MR. CERNIGLIA:  Tim Cerniglia on behalf of the Burnett

2     defendants.

3          DR. ROUX:  Brian Roux on behalf of Signal

4     International.

5          MS. BOLLMAN:  Patricia Bollman on behalf of Signal

6     International.

7          THE COURT:  We have a couple of folks in the back.

8          MS. WASHINGTON:  Tracey Washington, David and EEOC.

9     Same parties.

10          MR. ADAMS:  Daniel Adams on behalf of the Achari

11     plaintiffs.

12          THE COURT:  All right.  I have got -- oh, and on the

13     phone we have got Alan Howard and Erin Hangartner.

14          MR. HOWARD:  Good afternoon, Your Honor, I am here on

15     the phone, Alan.

16          MS. HANGARTNER:  Good afternoon, Your Honor, I'm here

17     on the phone as well.

18          THE COURT:  Anybody else on the phone?

19          All right.  So I have got an agenda.  I have the ones

20     you all sent that I incorporated into mine.

21          And unfortunately I don't know any really logical way

22     to do this, so we will just jump in and see what happens.

23          I guess the first thing maybe we should talk about is

24     the trial we just finished.

25          We have got a 54(b) motion from the David plaintiffs.

1        I'm wondering if anything has happened in the Signal

2   world as a result of this, if you know anything about how

3   Signal is planning to proceed.

4        Is it full steam ahead with the defense of these claims

5   or what is going on?

6        MS. BOLLMAN:  Well, I will see if Erin -- do you want

7   to address that, Erin?

8        MS. HANGARTNER:  Your Honor, we plan to oppose the

9   motion that has been filed by the plaintiff.  And we do plan to

10  appeal the matter.

11       THE COURT:  Well, but what the plaintiffs want is a

12  judgment so that that would allow you to appeal it.

13       I guess, you know, I thought maybe you would be in

14  favor of there being a judgment in the David case because you

15  wanted to get to the Fifth Circuit.

16       DR. ROUX:  Your Honor, I believe there is some issues

17  concerning the supersedeas bond, and I believe we have a

18  briefing that is due tomorrow, which we will be filing within

19  the deadline.  That is being finalized as we speak that

20  addresses all of these points, and the various circumstances in

21  which Signal sees the 54(b) playing out.

22       THE COURT:  So if you wanted to appeal it, then you

23  would have to post a bond?

24       DR. ROUX:  That seems to be -- I think that's the issue

25  the brief will address.

1          THE COURT:  You know, I was looking at very beginning
2    research about 54(b) and one of the things they talk about is
3    whether there will be other appeals on the same issue?
4          DR. ROUX:  Yes, Your Honor.
5          THE COURT:  Which seems to be your -- I guess, your
6    best argument.
7          So you will file something tomorrow?
8          DR. ROUX:  Yes, Your Honor.
9          THE COURT:  All right.  I guess I was really looking at
10   this more, not just your opposition to 54(b), but what is going
11   on with Signal?
12         You know, I don't want to spend a lot of time dealing
13   with the next five trials and figuring out the schedules if
14   Signal is going into the bankruptcy or -- I don't know what the
15   future holds or whether you know.
16         MS. BOLLMAN:  We don't know at this point.
17         MS. HANGARTNER:  We don't know at this time, Your
18   Honor.  There is internal discussions going on within Signal.
19   If and when a decision is made, I will notify the Court.
20         THE COURT:  All right.  So I guess I'm not commenting
21   on what the future holds in this litigation, except, you know,
22   obviously you have got attorneys' fees continuing, and the cost
23   of this litigation, which has already been a lot, and I know
24   it's going to continue to be.
25         So I think it's a legitimate question and legitimate

1    concern.  But I understand why you all may not know the answer
2    to that.
3           If you know, you let us know, and then we will figure
4    out where to go from there.
5           MS. HANGARTNER:  Yes, Your Honor, I certainly will.
6           THE COURT:  Let's see, the Signal cross-claims in the
7    David case, are the cross-claim defendants going to file a Rule
8    54(b) motion?
9           MR. CERNIGLIA:  I was waiting to see what -- I guess,
10   what the flavor was.  But yes, I probably will file on the
11   overall -- I'm in favor of an appeal at this time.
12          Of course, Burnett defendant, he has no assets.  We
13   don't care if they seize, you know, start proceedings, execute
14   on a judgment, which would still allow us to appeal.
15          But the Signal portion would all be part and parcel of
16   it.  I think it should go together.
17          THE COURT:  But if I grant it on the plaintiffs'
18   claims, that I should on the cross-claims.
19          Well, this is a question I had:  I'm trying to remember
20   on the cross-claims -- well, on the plaintiffs' claims against
21   Burnett and Dewan, they found -- they awarded damages against
22   the entities but not the individuals?
23          MR. CERNIGLIA:  Correct.
24          THE COURT:  Is that correct?
25          MS. BOLLMAN:  That is correct.

1    THE COURT:  And I wondered whether there is a basis for

2    -- and with respect to Burnett they didn't -- it wasn't a

3    malpractice claim, it was a fraud claim.

4        MR. CERNIGLIA:  Correct.

5        THE COURT:  So is there personal liability for an owner

6    of a corporation that commits fraud?

7        MR. CERNIGLIA:  I don't believe so.  It would be just

8    like any other corporation with a shareholder.

9        THE COURT:  I guess -- so you know, that is issue that

10   was just interesting the way the jury found --

11       MR. CERNIGLIA:  They found zero damages which, of

12   course, will be the basis, I guess, of a motion for new trial

13   on behalf of Burnett on the Phase 1 verdict, because it's

14   contrary to Phase 2 verdict.

15       They had a specific question:  "Do you find that

16   Burnett's actions caused damages for each of the different

17   causes of action."

18       Of course, all of the causes of action require a

19   finding of damages and for them to actually, you know, to go

20   through the amount of damages and come up with zero,

21   personally, and yet find, you know, figures from the

22   entities --

23       THE COURT:  But is it possible that if all of the

24   elements were duplicated elsewhere and that's why they put a

25   zero?

1      MR. CERNIGLIA:  That's not what they said.  The way it

2 was worded all the way through including the trafficking

3 claims, the Question 1, was always:  "Is there any damages

4 caused" and the Question 2 then was:  "If it's not already

5 taken care of then what are the amounts."

6      And Question 2, for all of the questions against

7 Burnett with the EEOC and Dewan Consultants, there were numbers

8 in both -- well there was numbers in Question 1 for all of

9 them.  But for Question 2 following the first one, it was zero

10 because it was already counted for.

11      THE COURT:  Uh-huh.

12      MR. CERNIGLIA:  Which in RICO, that gives you the

13 amount of damages to triple, because the first number was

14 whatever the number was.

15      THE COURT:  And I guess I don't know if there is any

16 solidary liability issues that even if they didn't find, you

17 know, could there be solidary liability on them for some

18 damages against some other defendant?

19      I mean, as you all know, it's complicated.  So I don't

20 know how all of this is going to work out.  Those are things

21 that I thought about after it was over.

22      MR. CERNIGLIA:  I was going through it -- I was going,

23 "Wait," I saw the pattern.  I said, "Gee, look at what they

24 did."

25      THE COURT:  Yes.  I thought that the oppositions were

1    due today.

2          Do you think it's tomorrow?

3          DR. ROUX:  I think it's tomorrow, or if it's today,

4    it's at the end of the day.

5          THE COURT:  Okay.  I had today.  So let's be sure.

6          DR. ROUX:  I thought it was tomorrow.

7          MR. CERNIGLIA:  Eight days before the hearing.

8          THE COURT:  Before the day it's submitted, even though

9    we are not having oral argument, but we calculated a day.

10          You all make sure you know how to do that and put that

11   right on your calendar.

12          If anybody submits one tomorrow since there is some

13   confusion, apparently, I'm not going to, you know, reject it as

14   untimely.  But that shouldn't continue.  So if there is

15   confusion about how you calculate, you all figure it out.  If

16   you have any questions, ask Philip.

17          MS. HANGARTNER:  I'm sorry, Your Honor, we did

18   calculate it as due tomorrow.

19          THE COURT:  On what date were you -- did you think it

20   was submitted, so you count back eight days?

21          MR. SHAPIRO:  The 11th.  The 11th was the submission

22   date.

23          THE COURT:  Okay.  We will look at it, too.  I want to

24   make sure we are all on the same page, not as much for this one

25   as for the future, because I don't want anybody to get in

1    trouble over that.

2           The post-trial -- are there any other -- I'm sorry.

3           MS. HANGARTNER:  We had March 11th as the submission

4    date.  We counted eight days out, which is March 3rd.

5           THE COURT:  Okay.  We will check.  But as I said, if

6    you all do it tomorrow, I'm not going to mark it as being late.

7    But if we're having a difference of opinion about how to count,

8    which is possible, we will let you know.

9           So I have got the Rule 54(b) motion from the

10   plaintiffs.  Apparently, I'm going to get some from Dewan and

11   Burnett.

12          Are there any -- the plaintiffs are going to file a

13   motion for attorneys' fees.

14          MR. WERNER:  That's right.

15          THE COURT:  What is the due date for that?

16          MR. WERNER:  I believe it's 14 days after the judgment

17   is entered.

18          THE COURT:  Do you know when that is?  Has it already

19   passed?  Have you filed a motion?

20          MR. WERNER:  It would be after the judgment is entered.

21          THE COURT:  Okay.  So under some of the statutes, I

22   believe that attorney's fees are automatic, and some of them

23   it's discretionary; is that correct?

24          MR. WERNER:  Under the RICO, plaintiffs are entitled to

25   attorneys' fees as a matter of right.  They are automatic.

1              And then I believe under -- there is no question about
2    TVPA.  After 1981, I believe they are discretionary.
3              MS. HANGARTNER:  My understanding is that RICO is the
4    one that triggers automatic fees.
5              MR. WERNER:  That's right.
6              THE COURT:  I guess then there is the question about
7    TVPA and 1981 discretionary.  Are those the only ones --
8    statutes?
9              MR. WERNER:  I believe that's correct.
10             MS. BOLLMAN:  The TVPA is still pending.
11             MR. WERNER:  That is still pending.
12             THE COURT:  All right.  So if I don't grant your 54(b)
13   motion then you don't -- then you don't ask for the attorneys'
14   fees now, you would have to wait until the other date of
15   plaintiffs --
16             MR. WERNER:  Well have to double-check that.
17             THE COURT:  -- have been tried.  I have mixed feelings
18   about it.  In a way I would like for you to get to the Fifth
19   Circuit.  You know, that would be great for all of us if we
20   knew if they agreed with some of the rulings.
21             But I understand your issue and so I will have to look
22   at the law and see.
23             DR. ROUX:  And we have -- the brief addresses what we
24   will be filing tomorrow will address some of those points.
25             THE COURT:  Okay.

1          MR. SHAPIRO:  Your Honor, there is also the issue of

2     the FLSA claims.  That I know is pending.  The cross motions

3     for summary judgment.

4          THE COURT:  Also the motion for certification.

5          MR. SHAPIRO:  And the certification, so I don't know if

6     that is going to go into the Court's equation for the order to

7     certify the judgment.

8          THE COURT:  Not any more than the trial for the other

9     seven David plaintiffs.  I mean, those are different issues,

10    really.

11         I can see certifying the FLSA claims.  I mean, you have

12    a final judgment on those, even if you didn't have a final

13    judgment on the -- you know, the other claims.

14         So, no, to me it seems different.  My concern is the

15    other seven David claims.

16         So on the FLSA, I have got the motion for the

17    certification, and once I decide that then I have got the

18    motion on the merits.

19         You all had on your list the default judgments against

20    J&M and Global.

21         MR. WERNER:  The only reason we had it on there, it was

22    just an issue that was left open during the trial.

23         We are perfectly content waiting to file a default

24    judgment motion until after all of the claims are resolved.

25         We don't see any hurry to file that now if the Court is

1    okay with that.

2              THE COURT:  All right.  And what about Signal?

3              Signal has clerk defaults against either J&M or Global?

4              MS. BOLLMAN:  No.  It was both.

5              THE COURT:  Well, there is some issue about whether

6    it's both.  I mean, my inclination is let's just wait.  There

7    is no hurry on that.

8              MS. BOLLMAN:  Agreed, Your Honor.

9              MS. HANGARTNER:  I agree, Your Honor.

10             THE COURT:  All right.  So we all have enough to do

11   without worrying about that, that case being nonexistent

12   entities.

13             Another thing I have been thinking about is whether

14   there is any res judicata, either issue preclusion or claim

15   preclusion?

16             I remember when we were talking about the Signal

17   cross-claims.

18             DR. ROUX:  Cross-claims, yes.

19             THE COURT:  And Alan Weinberger said, "Yes, I agree

20   that some things are bigger than the David case, they apply to

21   all."

22             MR. CERNIGLIA:  I believe that all of Signal's

23   cross-claims, except for perhaps the indemnity issue is

24   definitely res judicata because they allege for all of their

25   damages based on the claims that they made.

1        So those -- once it's a final judgment would be res

2    judicata.

3        The last one, I believe, is going to be a form of issue

4    preclusion with collateral estoppel, especially in the David

5    cases.

6        THE COURT:  The indemnity issues?

7        MR. CERNIGLIA:  Especially in the David case because

8    under Mississippi law it can be two separately totally distinct

9    accidents that end up with one set of damages to the plaintiff

10    and the Supreme Court in Mississippi has said that there is no

11    indemnity because it's an all or nothing.  And if there is any

12    liability whatsoever against the other defendant, then there is

13    no indemnity.

14        Well, on the rest of the David case, it was all one

15    case and one time except we would like to go with five, so if

16    for no other reason I think all of the jury determination of

17    independent fault on behalf of Signal would preclude indemnity

18    as a matter of Mississippi law.

19        THE COURT:  So you are saying that with respect to the

20    indemnity claim that there is claim preclusion.

21        MR. CERNIGLIA:  Correct.

22        THE COURT:  They can't bring that claim again.

23        MR. CERNIGLIA:  I believe in the other cases as well

24    that I think it will be issue preclusion.

25        And the reason I say that is because it is not so much

1    the conduct towards any one individual, especially considering

2    in this past case that, you know, everybody was trying what

3    occurred to all Signal H-2B workers -- wasn't limited to just

4    five.

5           So as a result, I believe that issue as to whether or

6    not there is any fault on behalf of Signal has been resolved.

7           THE COURT:  Yeah.  I'm not sure about that.

8           Have you all had a chance to look at it?

9           MS. BOLLMAN:  No.  We have not looked at that.

10          THE COURT:  Because even though there is testimony

11   about other workers, it really was the trial about the David --

12   the five David plaintiffs.

13          So I'm not sure, but that is an issue we're going to

14   have to face.

15          The reason, of course, it's in all of these other

16   cases, so I guess the issue is going to be what are you

17   planning to do in Achari?

18          MR. CERNIGLIA:  You mean Signal?

19          THE COURT:  Because the next trial is Achari.  So are

20   you planning to --

21          DR. ROUX:  Well, from Signal's perspective, the next

22   trial is actually Joseph in Texas, which you have the

23   cross-claims before you that were severed and transferred.

24          THE COURT:  Right.  So you don't have to deal with it

25   there.

1        DR. ROUX:  We will have to deal with it here.  That

2   trial will occur before the Achari case.  That is set in April.

3        THE COURT:  Well but, that doesn't mean I'm doing it

4   now.  You know, I don't have it on my schedule to do anything

5   about that cross-claim.

6        What I need to figure out is, is it already resolved

7   because we tried it in the David case?

8        So I think maybe I need some deadlines about briefing

9   which may be a way to tee it up -- would be to do it in the

10  case that was severed and sent to me, which is Joseph, the

11  cross-claim and the Joseph case.

12       MR. CERNIGLIA:  Samuel, too.  They were both sent to

13  you.

14       THE COURT:  Okay.  But the first trial is --

15       MS. BOLLMAN:  Joseph.

16       DR. ROUX:  Joseph is in April, but the Samuel case was

17  continued with several other cases in Texas in August.

18       THE COURT:  So we will give you a deadline.  We will

19  have to figure out what to call it.  I guess -- is it a

20  12(b)(6) motion by the defendants in cross-claims?

21       MR. CERNIGLIA:  That would be a better way to do it.

22       THE COURT:  You know, they can't bring that any more

23  because it's precluded.

24       MR. CERNIGLIA:  There is only one claim.  The claim for

25  indemnity.

1      THE COURT:  Well then maybe -- well, you know, they had

2  other claims.

3      MR. CERNIGLIA:  Those claims -- in fact the Court ruled

4  in Texas that those other claims were identical.  If you read

5  them, they are word for word the exact claim in the David case

6  for all of the other claims.

7      THE COURT:  Well, you still have to argue that.  I

8  guess you have made the same -- four or five.

9      DR. ROUX:  Right.

10      THE COURT:  A lot of cross-claims -- ten maybe.

11      DR. ROUX:  I think what Mr. Cerniglia is referring to

12  is the malpractice claims and other similar claims.

13      I think we would argue that because Your Honor decided

14  those because we hadn't shown specific damage, that it may not

15  be res judicata with respect to the plaintiffs in the Texas

16  cases.

17      THE COURT:  You know I granted judgment as a matter of

18  law, and damages, I think, is an element of your cause of

19  action.

20      So I mean, those are all dismissed with prejudice, in

21  David for sure.  The issue is are they dismissed with prejudice

22  elsewhere.

23      MS. BOLLMAN:  In other cases.

24      THE COURT:  So I think the cross-claim defendants we

25  will give you a deadline for filing motions to dismiss based on

1   res judicata.

2        And let's do the Joseph -- what is the other?

3        DR. ROUX:  Samuel.

4        THE COURT:  Those are the ones that were severed and

5   transferred.

6        That will be -- now we could do it in every case so I

7   don't have to decide this again.

8        I mean, as a practical matter if I decide it once, I'm

9   not going to change my mind.  But maybe it should be in every

10  case where there are cross-claims -- will give you a deadline

11  for filing a 12(b)(6) motion.

12       You could even do it with respect to the other seven

13  plaintiffs in David.

14       So we can decide this once and for all, you know, is

15  that over, or do you need to include them as you are getting

16  ready for trial in Achari.

17       Okay.  That is a good plan.

18       MR. CERNIGLIA:  Do we have a deadline after the first

19  case is coming up in April 6?

20       THE COURT:  No.  I don't think so.

21       MR. CERNIGLIA:  They won't have any damages in that

22  case anyway.

23       THE COURT:  Well, but I'm just talking about whether --

24  they need to know -- well, it's not in the -- you can't bring

25  it in that case.

 1          MS. BOLLMAN:  Right.

 2          THE COURT:  I guess, you know, maybe we could do like

 3   at the beginning of May, so we would know before the Achari

 4   trial.

 5          MR. CERNIGLIA:  That would be fine.

 6          THE COURT:  Let's say around the beginning of May.

 7          Let's see, the remaining seven plaintiffs in David, are

 8   they all Texas?

 9          MR. WERNER:  No, Your Honor.  There are -- three or

10   four were Mississippi; is that right?

11          And I believe it was four in Mississippi and three in

12   Texas.

13          THE COURT:  Okay.  And we have got a trial date, I

14   think -- no, maybe we don't even have a trial date.

15          Do we have the trial date for those seven even if we

16   don't have deadlines?

17          MS. HANGARTNER:  I believe we do have a trial date,

18   Your Honor.  I just don't remember what it is.

19          MS. BOLLMAN:  December '16.

20          MR. HOWARD:  It's late 2016, Your Honor.  I think maybe

21   September.

22          THE COURT:  On my little chart I made for myself, I

23   didn't -- I don't have it.

24          MR. WERNER:  September 12th 2016.

25          THE COURT:  Okay.

1          MR. WERNER:  It's in Rec Doc 1965.

2          THE COURT:  All right.  I have written a note to

3    myself.  This is related to the bankruptcy question.

4          Is there any reason for us to try another settlement

5    conference or mediation?

6          MS. BOLLMAN:  I think that is a no, to the question.

7          MS. HANGARTNER:  At this point, Your Honor, I'm not

8    sure that I could answer that question.  But I will certainly

9    take it back to Signal.

10          THE COURT:  All right.

11          MR. HOWARD:  Your Honor, I am speaking from the

12    plaintiffs' perspective.

13          It's our position that it's always been that we're

14    willing to sit down and discuss settlement and we continue to

15    think -- and think even more at this point that a global

16    settlement is the best possible outcome.

17          And in consideration of potential for bankruptcy as we

18    said before, we think that the retirement systems in Alabama

19    would need to participate or should participate since they

20    would have a lot of money at risk in the bankruptcy, especially

21    now that there would be judgment creditors and a benchmark for

22    the value of the claims of all of the other workers with

23    individual claims against Signal.

24          THE COURT:  I guess they may just end up walking away.

25    I mean, they are an owner, correct, of a large part of the

1    shares, but that doesn't --

2          MR. HOWARD:  No.  Actually, Your Honor, well they are

3    owner of shares and then as an equity owner.  Our understanding

4    is that they infused another $75 million into Signal in 2014,

5    which would characterize as a loan secured by assets of Signal.

6          Our view is that in a bankruptcy proceeding, we would

7    challenge that and have that recapped as equity subordinate to

8    the creditor's claims, so that's why I think that given that we

9    would be right there, but certainly there would be significant

10   risks.

11         If they are to think they would be walking away with

12   the assets of Signal, which are worth in excess of $100 million

13   in bankruptcy proceeding because they somehow secured it by

14   some loan they put in as an equity holder, we would challenge

15   that and be litigating that and suggesting that we, the

16   creditors, have the rights to those assets ahead of the RSA.

17         So I don't think they would be walking away.  I think

18   in fact they think they are protected in bankruptcy, when in

19   our view they are not.

20         THE COURT:  Well I can see why they would definitely be

21   interested in a bankruptcy proceeding.

22         As a practical matter they should be interested in

23   settlement if they could resolve that because they have the

24   risk of getting an adverse ruling in the bankruptcy court.

25         DR. ROUX:  Unfortunately, we don't represent the RSA.

1          MR. HOWARD:  That is exactly our view, Your Honor.

2          DR. ROUX:  We can't say anything on their behalf.

3          MR. HOWARD:  That is exactly right, Your Honor.

4          THE COURT:  So that's interesting.  In 2014, they put

5     money in?

6          DR. ROUX:  It's slightly more complicated than that

7     because the RSA doesn't own shares in Signal directly, as I

8     understand it, because of the way the state of Alabama does its

9     investment.  In that regard, there is separate entities to the

10    ownership.

11         THE COURT:  But that would be the practical effect of

12    it -- whatever that conglomeration is, they put 75 million in

13    or 100 million?

14         MS. BOLLMAN:  72, I think, yeah.

15         THE COURT:  And secured by the assets which were not

16    encumbered already?

17         MS. BOLLMAN:  They were.  They paid off loans to --

18    it's a complicated transaction.  They paid off loans that

19    Signal already had that were encumbered by that security and

20    then they --

21         THE COURT:  So they got a first mortgage?

22         MS. BOLLMAN:  Right.  They got that secured, yes.

23         THE COURT:  Okay.  So that will be interesting.

24         So that makes me think about this motion that the EEOC

25    filed asking for notice of Signal's transfer sale or assignment

1    of property and then Signal's motion for sanctions.

2            I really -- I don't know if you have had a chance to

3    look at that, Mr. Canino.  I didn't see a lot of support for

4    the request.

5            I understand why you want to know, but I didn't see

6    support for your right to know it.

7            And, of course, this, you know, it illustrates why you

8    wanted to know it because you would like to know all of the

9    things that are going on within the company.  But I wondered if

10   you wanted to say anything about that.

11           MR. CANINO:  Well, we briefed it, Your Honor.  If you

12   don't think that there is enough basis there, you know, we will

13   defer to your judgment.

14           I have personally had the experience in two cases that

15   are similar to this in which we get to the end of the road, and

16   unfortunately, the nature of these kinds of cases is that when

17   the laborer is removed from the workplace, a lot of times the

18   revenue drys up or there are some sales of assets.  And by the

19   time we, as federal government, get there with the judgment

20   then everybody is saying, "Oh sorry, it's gone."

21           You have that happen a couple of times and you start

22   thinking about it --

23           THE COURT:  Oh yeah.

24           MR. CANINO:  -- before you get the judgment.  And that's

25   something I have learned over several years the hard way.  And

1    so, I didn't file that brief, but when I saw it, I thought

2    somebody was thinking ahead a little better than I have done in

3    the past.  And I was glad that they filed it -- that we filed

4    it, the EEOC.

5            Gerald, did you have anything to add?

6            MR. MILLER:  Well, just as Mr. Canino said, we briefed

7    it and the authority -- I'm sure, you have reviewed that, is in

8    the broad -- one thing that distinguishes the EEOC from other

9    -- meaning other entities -- from private entities is we're

10   litigating in the public interest.

11           And Courts have broad equitable powers when a

12   government entity is litigating in the public interests.

13           So we believe there is support for it, but maybe not as

14   direct as support as, you know, you may be thinking or looking

15   for.

16           THE COURT:  Looking for.

17           DR. ROUX:  Your Honor, I would respond.  I think

18   Signal's position is pretty clear that the case law seems black

19   and white on what in particular they are asking for in this

20   case.

21           THE COURT:  Well, you know, if it does happen, and then

22   the EEOC gets a judgment against you, it's going to lead to

23   wholly terror.  You know, they are going to rip up everybody

24   and try to follow the money.

25           So I hope Signal is not doing those things.

1        If, you know -- if you sell assets and you get money

2   fair market value, then that's one thing, you know, then they

3   have the money.  But if you are trying to pull shenanigans then

4   it's, you know, I predict it won't work.

5        There are laws that protect against that, and, you

6   know, if these things happen and then you go into bankruptcy,

7   that is going to be an issue, so even -- you are not without

8   remedies, if they do engage in this kind of behavior.

9        MR. CANINO:  Obviously, Judge, the thing we're most

10  concerned about is that if -- you can have -- obviously there

11  is legitimate transactions, but if what we have seen happens,

12  if the sale gets made and the purchaser does not take on the

13  liabilities, you know, they're purchasing the assets, but the

14  seller purposefully doesn't push that into --

15       THE COURT:  But you can avoid the transfer.  If they

16  don't pay fair market value -- if they pay fair market value

17  then you got the money in the company.

18       If they don't, then it's obviously, you know, it's not

19  a legitimate transaction.  And you do have some remedies.

20       I'm not -- I'm going to deny your motion but I'm also

21  denying Signal's motion for sanctions.  So I'm going to -- I

22  will do that in this minute entry.

23       MS. HANGARTNER:  Thank you, Your Honor.

24       THE COURT:  But on the other hand, I want the Signal

25  people to be the attorneys -- I think you need to be counseling

1   with your client about what they can and can't do in response

2   to the jury verdict and the remaining litigation that they

3   should be abiding by the law and doing things on the up and up

4   and not trying to hide or favor -- hide assets, transfer assets

5   for less than fair market value, do anything that is not proper

6   under the law.

7           MS. BOLLMAN:  Agreed.

8           MS. HANGARTNER:  Signal is fully aware of that, Your

9   Honor.

10          THE COURT:  In the EEOC case, there is some Daubert

11  motions.  Shelley and McAlear and Strobel, and let's see, those

12  oppositions are due tomorrow.

13          MS. BOLLMAN:  Those are today.

14          THE COURT:  In February.  I have got my numbers

15  changed.

16          THE LAW CLERK:  They are set for submission in

17  February.

18          THE COURT:  So did we get oppositions?

19          THE LAW CLERK:  No.

20          MR. MILLER:  There hasn't been any oppositions filed.

21          MS. BOLLMAN:  They are due today.

22          MR. MILLER:  The motions are due today.  We filed

23  ours -- we filed those motions early but in your prior

24  scheduling order you had laid out a schedule for the filing of

25  them and for the responses and for replying.

 1          THE COURT:  So the response is tomorrow.

 2          MS. BOLLMAN:  It's due today, I believe.

 3          THE COURT:  Well today or tomorrow?

 4          MS. BOLLMAN:  But those on the scheduling order were

 5     due today.  We're intending to file them today.

 6          THE COURT:  Okay.  And those are -- Shelley -- was she

 7     the expert on trafficking?

 8          MS. BOLLMAN:  On trafficking.

 9          THE COURT:  On trafficking.  And then McAlear, was he

10     on housing?

11          DR. ROUX:  No.  He was on standards in the shipyard

12     industry.

13          THE COURT:  Safety?

14          DR. ROUX:  Safety and just normal shipyard practices.

15          THE COURT:  But the reports are the same, correct?

16          The report that was submitted in David is the same as

17     the report in EEOC?

18          DR. ROUX:  I believe that they are substantially the

19     same.

20          MR. MILLER:  Almost identical.

21          THE COURT:  Yeah.  So I don't know what would make me

22     change my mind about that.

23          DR. ROUX:  We would have to file them anyway to

24     preserve the record, Your Honor.

25          THE COURT:  Right.  Okay.  And then Strobel.  Maybe

1    he --

2            DR. ROUX:  He was the laborer.

3            MR. WERNER:  Wage and hour.

4            THE COURT:  He was -- that is not --

5            DR. ROUX:  He wasn't pertinent to David once the

6    precedent was removed.

7            THE COURT:  Is it relevant to the EEOC claim?

8            MR. ROUX:  I think there would be some relevance as to

9    equal treatment based on wage and hour.

10           THE COURT:  Okay.  So that may be a little different

11   from the David case?

12           MR. MILLER:  We don't -- we all think that it is

13   relevant.

14           THE COURT:  To this stage, perhaps?

15           MR. CANINO:  To Phase 1, for sure.

16           MR. MILLER:  There are other grounds that would apply

17   to Strobel as well.

18           THE COURT:  Okay.  So I will look at that.  I'm

19   starting to try to turn to the EEOC, so you all can have --

20   know what the situation is so you can get ready for trial.

21           So I will look at that, and I think the Daubert filing

22   deadline was today?  Or tomorrow?

23           THE LAW CLERK:  I think it's today.

24           MR. MILLER:  March 2nd.  Today.

25           THE COURT:  Today.  Then we got a dispositive motion

1   deadline of March 16th.  So we're headed toward that.

2          All right.  After the fiasco with the jury charges and

3   jury interrogatories in David, I am changing the deadlines for

4   those for all of the cases.

5          And for the EEOC, the new deadline -- the same day -- I

6   wanted to do it the same day as the pretrial order was due.

7          MR. MILLER:  May 6th?

8          THE COURT:  May 6th.

9          Okay.  So what I want on that date is you have the

10  joint statement of the case which is about a two paragraph

11  neutral description.

12         It's something for me to read to the jury at the

13  beginning of the case just to give them an idea of what the

14  case is about.  It's not argument.  Keep it simple and factual.

15         And then I want the jury charges and the jury verdict

16  form.

17         I want you to look at the David case so that you will

18  know the format.  I'm anticipating these will be simpler

19  because there are not as many esoteric statutes that you are

20  proceeding under.

21         MR. CANINO:  I don't think we have anything like the

22  RICO one I saw.

23         THE COURT:  I will have to go back and remind myself

24  about what we're trying in Phase 1 of the EEOC cases.

25         We had a lot of motion practice about that.  I'm

1   assuming you are looking at that and trying to figure that out.
2   We will have to get back in to that mode.

3           And, you know, it became clear to me as we were going
4   through David, it seemed obvious to me that the lawyers should
5   know what the claims -- what the elements of the claims were
6   and what they needed to prove, which is -- but they didn't.
7   And you can't do the pretrial order without knowing that or you
8   can't do it well.

9           So that's why I want you to do it at the same time as
10  the pretrial order.

11          You know, there is a provision in the pretrial notice,
12  I think that says more than ten days before the date they are
13  due, you all are supposed to consult to talk about -- well,
14  that is to do the pretrial order.

15          So you have got to start like two weeks at least ahead
16  of the time that these are due, going over the jury
17  instructions and the jury verdict form.

18          In the David case or the other plaintiffs' cases, not
19  EEOC -- EEOC is going to be easier, I believe.  I hope so.

20          But the other cases you all have to start -- you should
21  start now making sure that you understand what the elements of
22  the claims are and what the jury instructions are going to look
23  like and what the jury verdict form is going to look like,
24  because we are going to have the same issue.

25          But now at least you have got the David format.  So

1    let's hope it's not as difficult in any of the other cases.

2         But so we got -- we will give you that new deadline in

3    the EEOC case of May 6.

4         Are there any --

5    MR. ADAMS:  Your Honor, are you saying that you wanted

6    it to reflect the jury verdict forms in each of these cases on

7    the day the pretrial order is scheduled?

8    THE COURT:  Yes.  You can plan on that.  You have got

9    to get them done a lot more in advance than you are accustomed

10   to doing.

11        All right.  I think you all had on your list, are there

12   implications of the David trial record in evidence on the EEOC

13   proceedings?

14   MR. CANINO:  I thought I would throw that out there.

15   Being the new face, right?

16        Well, Your Honor, I just -- I put that out there

17   because, you know, I see all of the work you all have done to

18   construct this blueprint on how these trials would be laid out

19   and it looks -- I mean, it's amazing the amount of work that

20   has been done.

21        So in the interim this David trial occurs, and I

22   actually came for a couple of days and a weekend just to see

23   how that proceeded, and, you know, I think there was something

24   like 45 witnesses, thousands of exhibits, or whatever.

25        And I just had to ask the question, you know, is there

1    anything that we can do now that we have been through that

2    experience, and I say, "we," but you all certainly, Judge, I

3    know you were very attentive throughout the proceedings.

4         We have been through this presentation of all of the

5    evidence.  We have -- EEOC now has a Phase 1 trial coming up

6    that is amazingly dependent upon a lot of the very same

7    evidence.

8         In fact I was looking at the line-up of witnesses.

9    Whether you talk about somebody like Mr. Marler, Mr. Schnoor,

10   Ms. Binion -- these are all people who would be the same

11   witnesses in our case.

12        And so I started thinking, you know, I'm listening to

13   the questions, I'm listening to the answers, I know there were

14   at least one deposition and sometimes two.  I may have even

15   seen three on a couple of persons, so they have testified to

16   things -- it's multi-layered at this point.

17        The trial transcript now gives us a whole pool of

18   evidence -- a whole record of evidence, that it seems to me

19   that I just started thinking, can we utilize that?

20        Is there a way that we can use that to streamline -- I

21   don't know about everybody else's case, I'm looking at ours.

22        Okay, based on what our claims are, is there a way we

23   can streamline that process so that we don't have the exact

24   same parade of witnesses if they have already testified under

25   oath and examined and cross-examined and redirected and

1    rehabilitated.

2         And then you have the issue of the plaintiffs.  So you

3    have the plaintiff, the foreign workers, that is still -- some

4    of them obviously require the translator to help testify.

5         So that usually -- that has been my experience that the

6    trials take a lot longer, and any witness's testimony is twice

7    as long right there.  That is just natural to the process.

8         Then I think, okay, well a couple of those people are

9    our people, so the victims are the same.  Some of them have --

10   and the testimony is certainly going to be consistently the

11   same.

12        We're going to put those people on and they are going

13   to have to have the translator again.

14        We might add a couple of, you know, let's say, these

15   were mostly Mississippi, I think, witnesses, so maybe we pull

16   in couple of Texas, we pull in a couple of officials from

17   Signal from Texas to kind of have the umbrella or the

18   overarching case.

19        And I just -- I put that on the agenda, Your Honor,

20   because I wanted to throw this out and say, "Is there something

21   that we can do with this?  How can we utilize this evidence to

22   maybe streamline the proceedings."

23        I mean, I don't know that it would go as far as to even

24   like some form of a bench trial designating evidence from the

25   David proceedings, if everybody agreed that that was sufficient

1    and there was no problem with it, supplementing it with

2    additional witnesses or exhibits to complete it if it needs to

3    incorporate some of the Texas cases.

4          THE COURT:  Well, you know, an idea would be to --

5    particularly on the plaintiffs who testified with the

6    translator to read the transcript without the translation so it

7    would go a lot faster.

8          You know, then if you are saying you would be in favor

9    of something like that, that is one thing, but I guess the

10   plaintiffs' lawyers, the intervenors' lawyers would also have

11   to agree with that and, I guess, Signal would, too.

12         But that seems, you know, that was very time consuming

13   and tedious, so I would be in favor of that.

14         MR. CANINO:  There may be little pieces.  I'm thinking

15   out loud at everybody's expense, and I'm sorry about that, but

16   there may be little pieces, Your Honor, that we may say, "Well

17   let's not reinvent the wheel on this piece."  Maybe we can

18   agree to some things, reach some stipulations about some

19   people's testimony -- I don't know.  I haven't thought it all

20   the way through.

21         THE COURT:  Have you gotten together with other

22   counsel?

23         MR. CANINO:  No, I haven't.

24         THE COURT:  Well I want you all to do that within the

25   next couple of weeks to have a telephone conference with all of

1    the counsel in the EEOC case to discuss ways you can streamline

2    the trial.

3            And if you all -- if one or more of you come up with

4    ideas that seem workable and reasonable and practical, and you

5    hit a stone wall from the other side, then I want you to let me

6    know and we will have a telephone conference to talk about it.

7            So, you know, we did have a lot of witnesses and we had

8    a lot of exhibits, and I can see a lot of the testimony is

9    going to be repetitive.  And I understand you will want some --

10   some of your main witnesses maybe you would want them there

11   live to testify.  I understand that.  But maybe you could think

12   of some of the witnesses who you could either stipulate or use

13   their testimony and just have somebody read it.

14           So you all give some thought to that.  That would save

15   everybody some money.  You wouldn't have to prep the witnesses

16   again, you don't have to get them here.  It wouldn't take as

17   long.  There are a lot of advantages.

18           So I'm glad you are thinking about that.  So you all

19   are going to have a phone conference and talk about it and see

20   if you can come up with some ideas.

21           MR. CANINO:  I mean, I think, Your Honor, I throw it

22   out there, I think if it's possible, Your Honor, that there is

23   going to be some -- we may discuss it, and we may say, you know

24   what, there is some credibility issues that you can't

25   substitute for when you have a live person on the stand, and I

1    understand that.  And it may be that this is just -- this

2    discussion is just to stimulate some thought.  I don't know if

3    it will help or not, but I thought I would bring it up.

4          THE COURT:  Well, you may decide on the plaintiffs that

5    one side is they did -- apparently the jury connected with

6    their testimony but maybe you don't have to have all of them

7    live, you know, maybe that would be a way to --

8          MR. CANINO:  In Phase 1 we don't have any determination

9    as to damages for individuals, so that's also a little

10   different.

11         THE COURT:  Uh-huh.  So you all -- I'm all in favor of

12   trying to make it more efficient and to streamline it.

13         The April 1st, we have a status conference, and think

14   the Signal lawyers said that they wanted to participate by

15   phone.

16         MS. BOLLMAN:  We have our pretrial conference on Joseph

17   on April 2nd at 9:00 a.m. in Beaumont.

18         The April 1st conference is at 2:00, and some of us

19   older people don't drive well at night.  We're kind of hoping

20   we would already be in Beaumont.

21         MR. CERNIGLIA:  Two of the Burnett defendants probably

22   Steve as well, I'm going to have to be traveling to Texas.

23         THE COURT:  Well, you know, I guess this was -- this

24   was just a regularly scheduled status conference.

25         When is the -- the EEOC trial is not until June.  I was

1    just wondering -- I guess, let's do have it -- we will have a

2    telephone status conference for everybody just to check in with

3    everybody and be sure we're all on track.  So we will just make

4    it everybody on the phone.

5              MS. BOLLMAN:  Thank you, Your Honor.

6              THE COURT:  In the Achari case, have the plaintiffs

7    been decided or are there few enough that all of them are

8    plaintiffs in the first trial?

9              MR. COLBY:  For the June Achari trial?

10             MR. ADAMS:  Yes.  The plaintiffs have in the June trial

11   have been decided.  They were decided a while ago.  I don't

12   have all of their answers.

13             THE COURT:  It's in the record?

14             MR. ADAMS:  It's in the record.  The parties have all

15   agreed to those plaintiffs.

16             THE COURT:  Are they Mississippi and Texas?

17             MR. ADAMS:  They are all Mississippi, Your Honor.

18             THE COURT:  Okay.  That is good.

19             And are any of them ones who had these intentional

20   infliction of mental distress?

21             MR. ADAMS:  No.  Your Honor.

22             THE COURT:  Nobody who was detained?

23             MR. ADAMS:  Nobody.

24             THE COURT:  Okay.

25             MR. ADAMS:  Victims Protection Act filed those claims.

1          THE COURT:  Okay.

2          The choice of law issue -- let's see, you know, in the

3     David case, the plaintiffs did an exhibit to -- I'm not sure

4     what it was -- Exhibit 2, but it's a chart.

5          THE LAW CLERK:  The sixth amended complaint.

6          THE COURT:  The sixth amendment complaint.  It sets out

7     all of the claims, who they were brought against, and so I

8     was -- what I would like is -- this is Document 1706-2.  I

9     would like for the Achari plaintiffs to do this for your first

10    trial.

11         And if you could get that to me within the next two

12    weeks, that would be good.

13         MR. ADAMS:  Yes, Your Honor.

14         THE COURT:  So now I was looking at the choice of law

15    issues.  So I think, of course, you have got these federal

16    statutes.  It looks like you do have a trafficking -- TVPA

17    claim.  You don't have a RICO.

18         MR. ADAMS:  No, Your Honor.

19         THE COURT:  You have the Civil Rights Act in 1981.

20         MR. ADAMS:  Yes.

21         THE COURT:  And then it looks like you have a fraud and

22    negligent misrepresentation and breach of contract.

23         Do the plaintiffs say those are all Indian law or

24    Mississippi law?  I can't remember.

25         MR. ADAMS:  I will also defer to who has prepared some

1    of the briefing.  It's our position that all of those claims

2    were governed by Mississippi law.

3                THE COURT:  So your plaintiffs -- it is all federal law

4    or Mississippi law?

5                MR. COLBY:  That's correct, Your Honor.  I believe the

6    only pending issue before the Court is whether or not this is

7    -- you may recall the briefing about the *Ferens* case.

8                THE COURT:  Uh-huh.

9                MR. COLBY:  Whether or not we get the benefit of

10   Mississippi choice of law rules by virtue of having filed in

11   Mississippi.

12               THE COURT:  And if you get the Mississippi choice of

13   law rules then it would be Mississippi law?

14               MR. COLBY:  Right.

15               THE COURT:  What does Signal -- what is your position

16   about choice of law?

17               MR. ROUX:  I think our position is similar to what was

18   in the David case.  I think on a lot of issues we had intended

19   to argue India law.  I know the David case we did that with

20   respect to fraud and contract.

21               THE COURT:  But we ended up in the David case with

22   Mississippi --

23               DR. ROUX:  Law for contract, and I believe India law

24   for fraud.

25               MR. CERNIGLIA:  It was for Mississippi law, too.

1    MR. COLBY:  Your Honor, Docket No. 426 in the

2    Chakkiyattil case.  I have got a copy of it that you can have.

3    We actually -- you gave us the opportunity to do a

4    supplemental brief on this issue after it had been decided in

5    David, and we did -- and I tried to lay out there sort of the

6    -- actually with a lot of what the state of play is and what

7    the party's positions are on this issue taking into account the

8    claims in the Chakkiyattil case and describing the --

9    THE COURT:  What number is that?

10    MR. ADAMS:  It's Document 426.  We filed it on January

11    15th.

12    DR. ROUX:  I am happy to defer on the choice of law

13    stuff.

14    THE COURT:  The plaintiffs and Signal want the

15    Mississippi breach of contract; is that right?

16    DR. ROUX:  You can have my copy of this as long as you

17    promise not to ask any hard questions about it.

18    THE COURT:  Okay.  So it looks like plaintiffs and

19    Signal agree on Mississippi law for breach of contract and the

20    difference would be fraud and negligent misrepresentation.

21    You know the *Ferens*, do you -- I guess the issue is

22    whether this was 1404, a more convenient form kind of transfer

23    or whether it was a first filed rule?

24    MR. COLBY:  Right.  And what we say is that because the

25    case was validly filed with Mississippi -- the plaintiffs'

1    choice of law, the plaintiffs' choice of law preference would

2    govern either under *Ferens* or if you look at *Ferens* or the *Van*

3    *Dusen* case, the principal there is the same.

4         So although the Court transferred the case, didn't

5    specifically identify 1404, it in effect must have been the

6    reason why the case -- and the mechanism by which the case was

7    filed, so our choice preference of law would apply.

8         THE COURT:  Did the Mississippi Judge who transferred

9    the case say what the basis of the transfer was?

10        I don't recall it was more convenient because I never

11   have thought Louisiana was more convenient.

12        MS. HANGARTNER:  I'm almost positive, Your Honor, it

13   was transferred under first filed rule.

14        MR. CERNIGLIA:  It was first filed rule.

15        THE COURT:  I always thought that.  There is nobody in

16   Louisiana.  How could it be more convenient?

17        MR. CERNIGLIA:  Can we file a motion for non

18   convenience back to Mississippi?

19        THE COURT:  Okay.  It's all right with me.

20        That Judge wouldn't be happy.

21        So what do you see as the difference -- this is a hard

22   question -- why is it different?  What is the difference

23   between Mississippi and India law that -- why are we fighting

24   over this?

25        MR. COLBY:  So one difference -- I'm not an expert on

1    the choice of law rules on the David case, it might have to be

2    availability of punitive damages on breach of contract claims.

3            THE COURT:  Well both of you have Mississippi.

4            DR. ROUX:  I think we had argued India law, but it

5    ended up being ruled as Mississippi law in David, as I recall.

6    I think Alan Weinberger was arguing for India law.

7            THE COURT:  On breach of contract.

8            DR. ROUX:  Correct.  Because it was a due diligence

9    defense that would be available under contract, and they also

10   argued it would be available under fraud, I believe.  But that

11   was not my briefing.

12           MR. COLBY:  I believe it boils down to, Your Honor, if

13   you hold that *Ferens* governs and *Van Dusen* -- either of those

14   cases expressly or implicitly govern, then Mississippi law

15   would apply on the fraud and negligent misrepresentation

16   claims.

17           If you hold that those cases don't govern the transfer

18   and we don't get our choice of law, then by virtue of where we

19   filed, then India law would apply for the fraud and negligent

20   misrepresentation.

21           DR. ROUX:  Correct.  One thing I think I said "due

22   diligence," I meant "ordinary diligence."

23           THE COURT:  Yeah, I remember that.  Well I remember in

24   David when I was looking at choice of law, I said I was using

25   Louisiana choice of law rules because this was the forum, but

1    that -- but I didn't consider applying Louisiana law because it

2    had no connection so I was looking at the difference of

3    Mississippi and India law.

4         Was it that on -- there was some that had punitive

5    damages under one or not the other, but he is asking for

6    Mississippi law.  I thought you all were asking for India on

7    some things because of the punitive damages.

8         MR. WERNER:  Right.

9         MR. COLBY:  I mean, the other issue we spent a fair

10   amount of paper on, is that the decision and the reason why

11   we're sort of hanging out here in a slightly different position

12   is the decision that you made in David is instructive to an

13   extent, but not entirely because they were made under the

14   Louisiana choice of law rules, whereas the Mississippi choice

15   of law rules, I believe, are slightly different, and that's

16   where you look at the substantial relationship test and other

17   things.

18        So when you do that, that is why once you look at what

19   choice of law applies, we think it's fairly clear that

20   Mississippi has the most substantial relationship to the claims

21   in the case.

22        THE COURT:  And then on Indian law, didn't you have a

23   problem with not proving Indian law?

24        DR. ROUX:  That was with regard, I believe, to the

25   Dewan defendant in which we wanted to argue about the

1   requirements of the Immigration Act of 1983.

2         MR. CERNIGLIA:  There was another issue on punitive

3   damages, I believe.  It was not proven sufficiently, I think,

4   in fraud perhaps.

5         THE COURT:  So, you may have that same issue.  I don't

6   know if you have given me any more support on this one for your

7   choice of law issue.  You know one of the things -- it also had

8   to do with your cross-claim, I remember.  But one of them was

9   on the plaintiffs' main demand, and one of the things that was

10  said was it's plaintiffs' burden.  They need the Indian law

11  expert.

12        But then on your cross-claim you needed an Indian law

13  expert.  But they are not asking for Indian law.  They want

14  Mississippi law.  So they are not going to provide you an

15  Indian law expert.

16        So you need to think about that ahead of time this time

17  or you are going to have the same problem.

18        I can't rely on Louisiana lawyers telling me what

19  Indian law is, from, you know, their own research.  I need more

20  if you want to argue Indian law.

21        DR. ROUX:  Yes, Your Honor.

22        THE COURT:  You all need to know that now.

23        But I have got to make this choice of law issue soon so

24  you all can --

25        MR. CERNIGLIA:  I agree with the choice is going to be

1    whether or not the *Ferens* case, if that's the way we pronounce

2    it, is whether or not it's the same principal of 1440 or not.

3    If it is, then you have to apply Mississippi law, choice of

4    law, too.

5            THE COURT:  Uh-huh.

6            MR. CERNIGLIA:  And I took the position -- the Burnett

7    defendants took the position as between Louisiana and

8    Mississippi, I think that there is a distinction between the

9    first filed rule and convenience, so I suggested Louisiana law

10   would apply.

11           But I think with Louisiana law that the proper choice

12   of most substantial contact is still going to be all

13   substantive Mississippi.

14           THE COURT:  You are talking about on the plaintiffs'

15   claims against Burnett, not the cross-claims.

16           MR. CERNIGLIA:  As far as I'm concerned the

17   cross-claims are gone, except for that one indemnity issue.

18           THE COURT:  All right.  So that is the thing I need to

19   focus on.

20           All right.  Let me look through the things I brought

21   with me and see -- is there somebody who in Chakkiyattil?

22           MR. ADAMS:  That is me, Your Honor.

23           THE COURT:  Are you also in Achari?

24           MR. ADAMS:  We are consolidated.  I'm Chakkiyattil, not

25   Achari.

1          THE COURT:  Because that is -- that's the only one that

2     brought claims under RICO -- oh, no, well, yeah -- it is

3     Krishnakutty.  That's the only one that has got a RICO -- civil

4     RICO claim after the David case.

5          MR. GRIMSAL:  Right.

6          THE COURT:  Maybe the Klu Klux Klan Act.  You all have

7     dropped that --

8          MR. WERNER:  We did, Your Honor.

9          THE COURT:  -- in the David case.

10         All right.  As I tell you there is not a great way to

11    do this.

12         I'm looking to see if I had any other.  As far as the

13    request for additional time, I think Signal filed a motion for

14    additional time to depose plaintiffs.

15         You didn't in the Achari file.

16         MS. BOLLMAN:  We have taken the ten Achari plaintiffs

17    for the first trial.

18         THE COURT:  Okay.  What I tried to do when we set these

19    -- when we did these scheduling orders was I tried to have

20    everything moving along at the same time.

21         I understand what Signal has said.  I saw your response

22    that you disagree about whether they could have deposed all of

23    these people.

24         I don't think the Fifth Circuit would look kindly on it

25    if I said I'm not going to let the defendants depose the

1    plaintiffs in a trial that is a year and a half away.  I mean,

2    they would think that is ridiculous.  So I have got to deal

3    with that.

4         What I'm going to allow additional time for deposing

5    plaintiffs, I'm going to -- but then that changes other

6    deadlines.

7         So I guess -- have you all continued to depose some of

8    these plaintiffs?

9         So when is the last time a plaintiff was deposed?

10   MS. BOLLMAN:  December.

11   THE COURT:  And so --

12   MS. BOLLMAN:  It was Achari plaintiffs.

13   THE COURT:  What is your plan if I would not allow you

14   additional time?

15   MS. BOLLMAN:  Well the problem is we, quite frankly,

16   didn't realize -- we thought that the plaintiff deadlines for

17   depositions were staggered.  And we thought only Achari ended

18   on November 29th.

19        You had given us permission to take a couple of Achari

20   plaintiffs in December and that's what we did.  We thought we

21   had more time and we didn't realize until then, so we didn't

22   have a plan.  We thought we had plan and then we realized we

23   didn't.  That is honestly what happened.

24   THE COURT:  So how are you going to, given the

25   complications you said, you are preparing for trial and you

1    have to have translators, what is your plan for getting this

2    done -- for getting the plaintiffs deposed?

3            MS. BOLLMAN:  I mean, we have a team now ready to go

4    and we have been looking for additional translators because

5    it's clear that with the calendar the way it is, we're going to

6    have potentially a trial going on and need to be taking

7    depositions in other cases.

8            So we have done that over the past few weeks, to reach

9    out and locate other translators.

10           THE COURT:  Did you ask for an extension of deadlines

11    in EEOC or --

12           MS. BOLLMAN:  No.  I don't think there is plaintiffs

13    that had to be taken yet, so.

14           MS. HANGARTNER:  Not as related to Phase 1, no.

15           THE COURT:  Okay.  So we don't have a problem with the

16    EEOC or Achari in July.  But then you have got Joseph and

17    Marimuthu and all of these that are in August.

18           What is going to happen in August?  Is that really a

19    trial date?

20           MS. BOLLMAN:  At most, only one would go forward.

21           DR. ROUX:  I believe all of those are before Judge

22    Crohn.

23           She moved the Samuel case from March into the same

24    docket call date with the other Texas cases that are before

25    her.

1          MS. HANGARTNER:  I would think that Samuel would likely
2     go in August.
3          DR. ROUX:  It's the most advanced of the four of them.
4          THE COURT:  Do you have a date by which you have those
5     depositions done?
6          MS. BOLLMAN:  April 1st.  Well, for the plaintiffs in
7     the first trial.
8          DR. ROUX:  Samuel.
9          MS. BOLLMAN:  Samuel and Joseph we have already taken,
10    the plaintiffs for the first trial.
11         THE COURT:  So who is April 1st?  That was for Samuel
12    which you have already done that?
13         MS. BOLLMAN:  No.  Samuel and Joseph have already past
14    and we took everybody for the three that are set in August.
15    It's April 1st to take the plaintiffs for the first trial.
16         THE COURT:  All right.  So the 1st.
17         MS. BOLLMAN:  Marimuthu, Muruganantham and Kambala.
18         MS. HANGARTNER:  Kambala.
19         THE COURT:  So the first trial that we have where you
20    still need to take depositions is Chakkiyattil and then ten
21    plaintiffs?
22         MS. BOLLMAN:  Yes, Your Honor.
23         THE COURT:  The trial is January but you know I want --
24    I'm not going to extend the date to close again because I want
25    all of the motions and things done so we can get ready for

1    trial.

2            So I guess you all have got to get -- you have got to

3    have a plan.  I'm going to give you some more time and you have

4    got to do it.

5            So you won't get another extension.

6            DR. ROUX:  Yes, Your Honor.

7            THE COURT:  So some --

8            MS. BOLLMAN:  We will start reaching out for dates

9    right away.

10           THE COURT:  Right.  You have got to do it in

11   Chakkiyattil, Krishnakutty, Disoliyan, but I start on

12   Chakkiyattil, because that is the first one.

13           MS. BOLLMAN:  Right.

14           MR. COLBY:  Your Honor, that is 27 additional

15   plaintiffs' deposition in order to take care of the first trial

16   plaintiffs in each of those cases.

17           THE COURT:  Which ones are you saying?

18           MR. COLBY:  Chakkiyattil, we have ten.  Devassy has 13

19   plaintiffs in total, so I believe you set them up to have one

20   trial.

21           THE COURT:  Uh-huh.

22           MR. COLBY:  Then Krishnakutty and Singh each have two.

23           THE COURT:  So that's quite a few depositions.

24           MR. COLBY:  I think the issue I have run in to in

25   looking at this is not just how Signal is going -- they're not

1    any better off or they don't have any time or flexibility that

2    they did before when they said they couldn't do this.

3         But depending upon their proposal was to stagger the

4    completion of fact discovery in each of those cases which would

5    then have the effect of staggering completion of Daubert

6    briefing.

7         It impacts expert reports which have plaintiffs'

8    specific analysis.

9         I understand you have ruled on those but in a sense we

10   may need to go through the motions on that, and then it affects

11   the dispositive motion briefing as well.

12        THE COURT:  Right.  That's why I was trying to keep it

13   altogether.

14        MR. COLBY:  Right.  I think that is doable.

15        THE COURT:  Well, I don't.  I no longer think it is.

16   How long it's taken Signal to get these depositions done --

17        MR. COLBY:  If I could, just there is one other thing

18   that -- I mean, we would be willing to make an effort to form a

19   schedule that would keep those cases together just for the sake

20   of our and your efficiency for the briefing that would have to

21   take place after the fact the discovery is complete.

22        But, we would also ask in light of how we got here that

23   we would be given some consideration in light of the fact that

24   we think Signal's failure to take these depositions earlier is

25   inexcusable, and we think they are having twice as long to

1    conduct discovery in a case where allocation of resources in

2    the discovery period in prioritizing is critical.

3         We will be suffering prejudice as a result of this

4    extension.  And we would be asked that that be offset in some

5    way with a few things.

6         I think that there are probably some additional

7    depositions that we would have taken had we had an extra eight

8    months to conduct discovery.

9         I would also ask another way to sort of try to set

10   things right in light of the position that Signal has put us

11   in, that the plaintiff depositions be limited to a day a piece.

12   That is another way in which they could have accomplished this

13   during the actual discovery period that you set up.

14        And we would also ask that the plaintiff depositions

15   take place at a location of plaintiffs' choosing as opposed to

16   being required to come here to New Orleans.

17        Now it may be the case that is the most convenient

18   place to have the depositions anyway, but we would ask to be

19   given the option to control that.

20        THE COURT:  Okay.

21        MS. BOLLMAN:  We think it's not really practical to do

22   it in one day with the translator.  We could potentially do it

23   in two instead of the three we have been doing, but it takes so

24   long with the translator.  You saw that in Court.  It's just we

25   can't get through -- and the number of causative actions they

1   have and questions we have to ask.

2           We have worked to try to consolidate our outlines.  We

3   understand and we have learned a lot from what we have done.  I

4   don't think it's feasible in one day.  Likewise, traveling all

5   across the country isn't going to make it easier, either.  We

6   have to take a translator with us.

7           That is one issue about having them in New Orleans.  We

8   can bring the translator and all work at the same place.

9           DR. ROUX:  I would just add in --

10          MS. HANGARTNER:  And do back-to-back depositions, which

11  would make it more economic.

12          DR. ROUX:  I would just add, one of the difficulties

13  with the length of time with the deposition varies in how

14  responsive the individual plaintiff is.

15          There is some we have taken where we can get done in a

16  day and a half, and there are some that take as much time as we

17  can get answers straight forward to the question.

18          MR. COLBY:  That is -- that is true with any

19  deposition.

20          DR. ROUX:  It's particularly challenging with the

21  translator.

22          THE COURT:  I think we have all seen the challenges

23  with the translator.

24          MR. COLBY:  We did offer as a way to resolve this and

25  get going on these back in December to do the depositions in a

1   day and a half a piece which permits doing two depositions in

2   three days, which would significantly cut down the number of

3   deposition days that we need to be involved in with these

4   additional 27 depositions.

5        Signal didn't think that was suitable, but I would

6   offer that again as a way to resolve this.

7        THE COURT:  Okay.  So we will deal with that in the

8   minute entry.

9        So I'm going to do new scheduling orders giving Signal

10  some additional time.

11       But I'm not doing this again.  It is unpleasant.

12       I'm not continuing trial dates -- you know that.  And

13  I'm not doing another scheduling order for all of these cases.

14       So if you -- it's just tough luck.  If you don't get it

15  and I don't give you an extension, go talk to the Fifth Circuit

16  about it, because I'm not doing it.

17       It's just too complicated and hard for us to do it, and

18  I'm not going to do it again.

19       MR. COLBY:  If you might, Your Honor, I would also

20  request just a little bit of time to think about this and

21  potentially seek some other relief.

22       I was a little bit struck by what Ms. Bollman just said

23  when she said that the only reason why plaintiffs didn't do

24  this earlier was because they made a mistake in reading the

25  schedule order.

1           We have filed four briefs combined on this issue and

2      that she said that is honestly what happened.

3           Signal has filed two briefs offering a variety of

4      others reasons and other explanations and excuses for its

5      failure to do this earlier and never once, apparently, honestly

6      said why they didn't take these depositions earlier.

7           MS. BOLLMAN:  We told that you.  I stood there when

8      Erin told you that outside of Court one day.

9           I was right there with Erin.  You told us the day we

10     first brought it up to the Court, so it's not a big surprise.

11          MS. HANGARTNER:  That is exactly what I told you, Eben,

12     in the hallway.

13          THE COURT:  So as I have told the David plaintiffs,

14     some day you will need some help from me, if you need some

15     additional time on something, so just keep that in mind.

16          I'm going to try -- the important thing to me is

17     getting this to the jury and having the facts come out.

18          I'm on a truth-seeking mission and sometimes things

19     happen that I'm not happy about, and I know the lawyers aren't

20     proud about it, but you know, we all just try to deal with it

21     and move on.

22          So you said you wanted to depose -- you might have done

23     some additional depositions?

24          MR. COLBY:  That's right.

25          THE COURT:  Who were you thinking of?

1    MR. COLBY:  I would need to consult with our -- with

2    the other Achari counsel, but I believe we had -- there are a

3    couple that come to mind immediately.

4        I think we would make a request to depose perhaps a

5    couple of additional former Signal workers.

6        We did a subpoena just before the end of discovery for

7    John Sanders.  And we would, I think, seek to take the

8    deposition of Ms. Bollman.

9        THE COURT:  Of who?

10       MR. COLBY:  Ms. Bollman.

11       THE COURT:  You know you will have to deal with the

12   rules about deposing.

13       MR. COLBY:  And an objection, I'm sure.

14       THE COURT:  What I want you to do is you talk to your

15   other counsel and by the end of the day tomorrow, let me know

16   through Philip who it is you would want to depose, because

17   we're not opening up everything.

18       This is going to be limited to plaintiffs and if you

19   just give me -- if you are reasonable and there is a good

20   reason then I will consider letting you have a few more.

21       Of course, John Sanders, they used his video deposition

22   which, you know, I thought about it during the trial -- well I

23   would rather have the person there live.

24       Well, I think the jury -- here you have this giant

25   person on the wall, I think they have -- that was good, you

1    know, it's like I think I would like to have everybody up on

2    the giant screen.

3            So you may not want to do it any more.  I mean, they

4    had hours of video deposition testimony.

5            MR. COLBY:  True.  Although we have discovered

6    obviously many more documents which were significant part of

7    the trial that we did not have at the time that certain

8    depositions were taken.  So that would certainly change some of

9    those earlier depositions.

10           THE COURT:  Well let me say to all of you, this case

11   has suffered from over-lawyering for years.

12           And one of the reasons I've said we're setting these

13   cases for trial, because I'm tired of depositions.

14           You took way too many depositions and didn't spend

15   enough time thinking about what claims you were bringing and

16   what elements were of the claims.

17           And, you know, it's like there is all of these

18   depositions being taken which was leading nowhere, and suddenly

19   here we are at trial.

20           And so I'm not a fan of more depositions in this case.

21   I will tell you that to start out.  I think there have been so

22   many depositions, it's just been too many.

23           Everything has been overdone.  Every motion has to be,

24   you know, everybody has to weigh in three times and it's way

25   too much.  I'm ready to just try these cases.

1           MS. HANGARTNER:  I might be able to simplify this a

2    little, Your Honor.  My understanding is that John Sanders is

3    currently working in Brazil.

4           THE COURT:  Well that may take care of that.

5           But you, by the end of the day tomorrow, the

6    plaintiffs' lawyers get together and talk about who else you

7    might want to depose and let Philip know and I will think about

8    that.

9           But I'm going to change as few dates as possible.

10   We're not opening up things that have already happened.  You

11   know, we are trying to keep moving on.  And you all know that

12   and appreciate it, I'm sure.

13          Can you all think of anything else we should talk

14   about?

15          The EEOC, of course, we're moving toward trial, you

16   know, it will be here before we know it.  So you know to -- I

17   have a pretrial -- standard pretrial notice you should look at

18   that goes out with the case.

19          It's changed probably since -- and I think the one I

20   use now is more descriptive.  So it might be helpful for you to

21   look at it, because this case has been pending a long time.

22   Why don't we send them the new pretrial notice.

23          I think -- well, we have one more conference between

24   now and the pretrial conference if we meet on April 1st.

25          You need to know when you start putting it together,

1   you know, your pretrial order that -- and the Signal lawyers

2   will know this because we went through it that I want -- I

3   don't want a representative of so and so, as a witness.  I want

4   the name of the person who is going to be a witness.

5           No general categories of witnesses, or exhibits.  It's

6   all got to be very specific.

7           The exhibits you need Bates numbers, and, you know, I

8   want you all to get together and try to work out any

9   differences you have.

10          Remind me what the Phase 1 is -- pattern of practice?

11          MR. CANINO:  Pattern of practice on the terms and

12  conditions of employment.  So that's why I say it's very

13  similar to what we saw in business decisions and employment

14  policies and practices, living conditions.

15          We heard all about that.  All of those terms and

16  conditions of the contracts as to the rules, the payments, and

17  all of that.  And it's just a matter of establishing whether

18  that was actually the rule as opposed to the exception.

19          That is basically what the trial is about.  That's why

20  I'm thinking, you know, I don't know -- I don't see it being a

21  month-long trial.  But at the same time we have to incorporate

22  maybe some Texas elements.

23          THE COURT:  And then, you know, we had the motion

24  practice about the next stage, you know, how that impacts the

25  next stage, but we will figure all of that out when we get

1    through the first one.

2         MR. CANINO:  Right.  The first phase there would be no

3    decision made about individual claims, hostile harassment --

4    hostile environment claims, there would be no award of damages.

5    It would be simply a finding of whether it was the manner of

6    practice as to all of the Indians that were working there, and

7    living in the man camp, or it was just some extraordinary

8    happening.

9         I think everybody in this room probably knows the

10   answer to that question, but apparently we have to go through a

11   proceeding just to get there.

12        THE COURT:  I mean, it's not really been disputed with

13   respect to the Indian workers that you treated them all the

14   same way, whether there is anything wrong with it or not, you

15   don't dispute the fact that you treated them all the same way,

16   and you treated them differently in some ways from the other

17   workers.

18        So, I have the same reaction, but we will see.

19        Okay.  So anything else?

20        MR. WERNER:  I apologize, Your Honor.  This is

21   something that just came up, and it may just be that we will

22   have to brief it.

23        But as Your Honor is aware the protective order

24   prohibits counsel from disclosing documents or information that

25   was gleaned from the discovery.

1          THE COURT:  Uh-huh.

2          MR. WERNER:  I think there is -- we have since now, of

3    course, had a public trial where some 300 to 350 exhibits were

4    admitted, and we have a question as to whether the protective

5    order would prohibit disclosure of admitted evidence from the

6    trial itself or how that might work.

7          THE COURT:  It does not.  I mean, those are in the

8    public record now.  So they were not admitted into evidence

9    under seal.

10         Does anybody have a different opinion?

11         MS. HANGARTNER:  No, Your Honor.

12         THE COURT:  Anything that was admitted as an exhibit --

13   it didn't seem like there was anything really confidential

14   among those.

15         MR. WERNER:  Okay.  Thank you, Your Honor.

16         MR. CANINO:  One related question.  If we have trial

17   transcripts, for instance, Your Honor, where whoever the

18   witness may be, you have testimony, we would be -- I assume, it

19   would be permissible to utilize that testimony that was given

20   under oath just as we would a deposition.

21         So like federal rules say you can use a deposition of

22   any party for any purpose, that could include read-ins and that

23   kind of thing in your case in chief -- let's say you don't call

24   that person in your case, let's say I don't call a company

25   official in my case in chief, I could read transcript testimony

1    from that trial?

2            THE COURT:  If the person is going to be there to

3    testify, then that is what I want them to do, and not be

4    reading -- Alan Howard was not happy with me about that, but

5    that is still my feeling about it.

6            So you all need to talk about who is going to be there,

7    who Signal is bringing, and if they are not bringing them,

8    whether they are subject to subpoena power.

9            And then when people are called up, I want them, if

10   they testify, to testify once.  I let Signal call Mr. --

11           MS. BOLLMAN:  Schnoor.

12           THE COURT:  -- Schnoor, in its case in chief, even

13   though the plaintiff called them in their case in chief, but

14   that was an exception to the rule.

15           So usually if somebody goes on the stand, I want them

16   to just do it all.

17           So you all -- really, I mean, a good start would be if

18   you all talked about who your witnesses are going to be.

19           Do you anticipate any more depositions or hasn't the

20   deadline past?

21           MR. CANINO:  Yes.  It's past.

22           THE COURT:  Yes.  So it would be -- aren't you all

23   getting together within the next couple of weeks to talk about

24   ways to streamline?  I would like for you all to talk about who

25   you plan to call as witnesses, and then that will lead to this

1    discussion of, well, we're also going to call, you know, these

2    people and we will have them there and put them on the stand

3    once, and then, you know, you may be have the same thing with

4    Mr. Schnoor that you want to put him on the stand in your case

5    in chief.

6        But what I said to Signal last time, pick your most

7    important person, and I will let you call them in your case in

8    chief, but the rest of them just take them on cross -- or on

9    direct during that.

10       You know there were lots of depositions during the

11   David trial, and I don't know if that is going to happen again,

12   but maybe that will be smoother too, because the depositions

13   you all worked out the designations and I ruled on objections,

14   and so maybe that will be smoother.

15       MR. CANINO:  That's one of the things I was doing,

16   Your Honor.  I know you all color-coded them and so forth.  We

17   could take a look at those and see if some of those -- if we

18   can use some of those designations.

19       Our designations may be a subset to some extent.

20       THE COURT:  You know, so you know what was objected to

21   and you know how I ruled.  I shouldn't have to get involved in

22   that.

23       MR. CANINO:  Yes.

24       THE COURT:  That is the other thing that was kind of a

25   continuing issue during the trial, which I hope can get

1     resolved ahead of time for your trial.

2          We also had the issue of demonstrative exhibits with

3     the experts -- and I don't think with any witnesses, maybe it

4     was all experts, that we had to deal with as the trial was

5     unfolding.  I also hope -- those should be listed on your

6     exhibit list and you have got, you know -- you have got the

7     benefit of the David trial.

8          I don't think your trial is going to be as complicated

9     so we shouldn't have as many things happening during the trial

10    as we did in David.

11         For your other plaintiffs' lawyers, I don't want it to

12    be that way.  That was too hard on everybody and so you -- if

13    you want to use demonstrative exhibits, put them on your

14    witness list.  You know, you all need to get better prepared.

15         I think you got the tools to do that because you just

16    sat through the David trial and a lot of things have been done.

17    So take advantage of that and it will be easier on you all and

18    it will be easier on me.

19         Is there anything else?

20         MR. COLBY:  As an observer of the David trial, I would

21    just commend both parties and the Court for how they worked on

22    putting that together.  It was impressive by all sides.

23         THE COURT:  I agree.  It was hard on everybody and

24    there was a lot of going on, and I know that is why some things

25    were happening at the last minute.  But everybody lived through

1    it apparently -- you are all here.

2            I think it's going to be easier as we go forward.  I

3    hope so, for everybody's sake.

4            MR. WERNER:  It has to be.

5            THE COURT:  It has to be.

6            Well good, I will talk to you on April 1st and then --

7    let's see when is the EEOC pretrial?

8            Do you remember that?

9            MR. CANINO:  It's in May.  The pretrial conference is

10   in May -- May the 11th.

11           THE COURT:  Okay.  So we will have to give some thought

12   to it before April 1st, and you know, kind of look at the

13   pretrial notice and the pretrial order in David so we can have

14   a discussion.  It will help you get ready.

15           All right.  Thank you all.

16           (Whereupon, the proceedings were concluded at

17   3:45 p.m.)

18                      REPORTER'S CERTIFICATE
             I, Terri A. Hourigan, Certified Realtime Reporter,
19   Official Court Reporter for the United States District Court,
     Eastern District of Louisiana, do hereby certify that the
20   foregoing is a true and correct transcript to the best of my
     ability and understanding from the record of the proceedings in
21   the above-entitled and numbered matter.

22                              *s/Terri A. Hourigan*
                                Terri A. Hourigan, CRR, RPR
23                              Certified Realtime Reporter
                                Registered Professional Reporter
24                              Official Court Reporter
                                United States District Court
25                              Terri_Hourigan@laed.uscourts.gov