1          IN THE UNITED STATES DISTRICT COURT FOR

2             THE EASTERN DISTRICT OF LOUISIANA

3                     AT NEW ORLEANS

4
    DAVID, ET AL,              *     Case No. 08-1220 Section E
5                              *
              Plaintiffs,      *
6                              *
         v.                    *     January 22, 2015
7                              *     DAY 8 - AFTERNOON SESSION
    SIGNAL INTERNATIONAL,      *
8                              *
              Defendants.      *     Daily Copy Transcript
9   _____
    Related case:
10
    EQUAL EMPLOYMENT OPPORTUNITY     CIVIL ACTION
11  COMMISSION,
              Plaintiff,            No. 12-557
12       v.
    SIGNAL INTERNATIONAL, LLC,      SECTION "E"
13  et al,
              Defendants.
14  _____
    Related case:
15
    LAKSHMANAN PONNAYAN ACHARI,     CIVIL ACTION
16  et al,
              Plaintiffs,          No. 13-6218 (c/w 13-6219
17       v.                        13-6220, 13-6221, 14-732,
    SIGNAL INTERNATIONAL, LLC,      14-1818)
18  et al,
              Defendants.          SECTION "E"
19  _____
         ____ Applies to David (08-1220)
20
                 TRANSCRIPT OF THE TRIAL PROCEEDINGS
21              BEFORE THE HONORABLE SUSIE MORGAN,
                  UNITED STATES DISTRICT JUDGE,
22                      AND A JURY.
    **REPORTED BY:**
23  TERRI HOURIGAN, CRR
    Official Court Reporter
24  500 Poydras Street
    New Orleans, Louisiana 70130
25  (504)589-7775
    terri_hourigan@laed.uscourts.gov

                   OFFICIAL TRANSCRIPT

1    **APPEARANCES:**

2

3    For Plaintiffs:              ALAN HOWARD, ESQ.
                                  HUGH D. SANDLER, ESQ.
4                                 MELIA AMAL BOUHABIB, ESQ.
                                  Crowell & Moring, LLP
5                                 590 Madison Avenue
                                  New York, NY 10022

6

7                                 DANIEL WERNER, ESQ.
                                  NAOMI TSU, ESQ.
8                                 KRISTI L. GRAUNKE, ESQ.
                                  Southern Poverty Law Center
9                                 Immigrant Justice Project
                                  233 Peachtree Street NE
10                                Atlanta, GA 30303

11                                CHANDRA S. BHATNAGAR, ESQ.
                                  American Civil Liberties Union
12                                Foundation (New York/Broad)
                                  125 Broad Street, 18th Floor
13                                New York, NY  10004

14

     For Signal Entities:         ERIN CASEY HANGARTNER, ESQ.
15                                ELHAM RABBANI, ESQ,
                                  HAL UNGAR, ESQ.
16                                BRIAN ROUX, ESQ.
                                  ALAN DEAN WEINBERGER, ESQ.
17                                Hangartner Rydberg & Terrell
                                  One Shell Square
18                                701 Poydras Street
                                  Suite 310
19                                New Orleans, LA 70139

20                                PATRICIA BOLLMAN, ESQ.
                                  Patricia Bollman, APLC
21                                P.O. Box 13707
                                  New Orleans, LA 70185

22

23

24

25

```
 1    For Sachin Dewan:          STEPHEN SHAPIRO, ESQ.
                                 Law Office of Stephen Shapiro
 2                               700 Camp Street
                                 New Orleans, LA 70130
 3

 4    For Malvern Burnett:       TIM CERNIGLIA, ESQ.
                                 Law office of Tim Cerniglia
 5                               1521 St. Charles Avenue
                                 New Orleans, LA 70130
 6

 7    ALSO PRESENT:  BHABHA PADMANABHAN, INTERPRETER

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **EXAMINATION INDEX**

2

3    WITNESS:   ANDREWS ISSAC PADVAVETTIYIL    **PAGE**
              (Through Interpreter)

4

5    DIRECT EXAMINATION (RESUMED)
     BY:  MS. BOUHABIB...................................1332

6

     CROSS-EXAMINATION
7    BY:  MR. UNGAR.....................................1375

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (JURY ENTERS COURTROOM.)

2    THE COURT:  Be seated.

3    Go ahead.

4

5    DIRECT EXAMINATION RESUMED

6    BY MS. BOUHABIB:

7    Q.   Mr. Andrews, before our lunch break, we were talking about

8    your housing in Dubai, and I asked you if your housing facility

9    had anyplace to relax.

10   Do you remember that?

11   A.   Yes.  I remember.

12   Q.   Okay.  Can you describe to the jury the places you could

13   relax in Dubai?

14   A.   When I come back from work, after I take my shower and I

15   take my food, there is like -- it's not like a TV hall.  They

16   had theaters; they had two theaters which had cinemas.  And if

17   I want, I can go watch a cinema.

18   And there was a prayer room, and they had, like, nice

19   garden with all of the trees being planted there.  They had

20   enough space.

21   They had a library, if I need to read something, to get

22   some books.  They had all of these facilities there.

23   Q.   How about in your room?  Could you relax in your room?

24   A.   Yes.  In the room, there was four people in the room.  And

25   for each people -- they had four TVs.  So if you wanted to

OFFICIAL TRANSCRIPT

1    watch your own channel, you would plug in a headphone, and then

2    you would watch your own channel and you would relax.

3          And even in the room, by the bed, you have a curtain.

4    So you pull the curtain on, and so you could have your own

5    place that you could sleep in peace without any disturbance.

6    Q.   Okay.  Thank you.  I want to go back to the Signal man

7    camp now.  I want the jury to get a little feel of what it was

8    like at Signal.

9          Were you on the day shift at Signal?

10   A.   Yes.  I was working day shift.

11   Q.   Okay.  What time did you have to get up to report to work

12   on time?

13   A.   Actually, my duties started at 7:00 a.m., but I have to

14   wake up like 4:00, 4:30-ish in the morning.

15   Q.   Why did you have to get up two and a half hours earlier

16   than your shift?

17   A.   First of all, it is only two bathrooms for 24 people.  So

18   it was very difficult to manage.  So that's why I would wake up

19   early and clear out all of my things that I need to do.

20          And then I would go outside, and I would speak on the

21   telephone.  Like after two or three weeks, they had telephones.

22   So I would call my home, and I would speak with them and I

23   would relax.

24   Q.   Who did you call at home?

25   A.   Every day, especially, I would speak with my father.  I

1  would speak with my wife and my children, and I would call them

2  daily.  I would spend a lot of time.

3  Q.   When you spoke to your family, did you tell them you were

4  living in a room with 23 other men?

5  A.   No.  I did not.  They would be mentally sad.  They would

6  be worried, and so I did not want to do that.

7       They may think that, in Dubai, you were living in a

8  good place; and now you are in America and you are living like

9  this.

10      They would be concerned and they would be worried.  So

11 I did not want them to worry.  So I did not tell them that.

12 Q.   Okay.  You started work at 7:00 a.m.  How many hours

13 usually, on a typical day, would you work?

14 A.   They had a rule that in one day you had to work ten hours.

15      Usually, Saturday and Sunday were days off; and if

16 there is any work, then they would call for us for it.  If not,

17 then usually Saturday and Sunday are our days off.

18 Q.   Can you give the jury a sense of how physically demanding

19 ten hours of welding is?

20 A.   I have been welding for many years, and there is two kinds

21 of work you could do.

22      One is a repairing, and the other one is shipbuilding.

23      The new shipbuilding is very easy, but to do the

24 repairing work is very, very hard.  Very hard work.

25      Depending on what -- I mean, in Signal, this is the

1    first time I'm working on something like this where every

2    time -- all of the time when we go there, it's all -- it's

3    filled with grease, that area, where there are chances that you

4    may slip and fall.

5            It was an oil rig, and so that is why there was a lot

6    of grease everywhere.  And it was really hard to work there.

7            There would be a lot of smoke, and there was a small

8    hole.  Like it would be a big-sized -- as big as this room

9    where we work.  But then to enter there, it would be like two,

10   two-and-a-half feet hole where we have to get in and we have to

11   take all of the cable in, and that is where we were all

12   welding.

13           It was very hard work.  It was a very difficult job.

14   Q.   And after ten hours of welding, you'd go back to the man

15   camp?

16   A.   Yes, definitely.  After ten hours of work, I would return

17   back to man camp.  I would be very tired at the time.

18   Q.   Was there anywhere, other than your bunk bed, inside your

19   trailer where you could relax by yourself?

20   A.   That is the difference.  Any other places that I have

21   worked, if I'm -- after work, I'm very tired.  I could come

22   back from work, and I would take a shower, eat food, and I was

23   able to relax.

24           But here, I'm lying down on the bottom one.  There

25   would be another person lying on the top.  And if he moves, I

1    will also be moving.  And that was very -- that was very

2    disturbing.

3             There was a lot of disturbance.

4    Q.   Did Signal have a TV room?

5    A.   Yes.  There was one TV room -- not one.  There were two TV

6    rooms there.

7    Q.   Could you relax in the TV room?

8    A.   With the TV room, the reason for them to have that is,

9    after you come back from work, you can watch a movie or

10   something and enjoy and relax.

11            But it was too difficult to do that where -- when you

12   come back to a difficult place, it was very hard to enjoy

13   watching a TV.  So I very rarely went to the TV room to see

14   anything at all.

15   Q.   How much did you pay to live in the man camp?

16   A.   I think it was, like, $35 daily.  And then, per month, it

17   was over $1,000.

18   Q.   Mr. Andrews, why didn't you leave the man camp and get an

19   apartment outside of Signal?

20   A.   Well, I would like to go live outside in an apartment.

21   But the problem there is that I did not have any vehicle, so I

22   would have difficulty going and coming back.  And then, even if

23   I go out, they were saying that they would still deduct the

24   money, somewhere around $1,050 a month.

25            So I thought that I would not solve the purpose.

1    There's no use going and living like that outside.

2    Q.   Who told you that you would have to continue paying the

3    housing fees even if you moved out?

4    A.   When we have any problems, for myself or other coworkers

5    who are there with me, we would go there and we would talk to,

6    like, a supervisor there.  Like we call them, like, a camp boss

7    who was there.  And we would talk to him about our problems,

8    and he was the one who gave us that response.

9    Q.   Do you remember the name of the camp boss?

10   A.   I don't remember the name.  If I look at the face, then I

11   would be able to remember the person.  But I don't remember.

12        The lady named Rhonda, she was -- there were two

13   people -- she was also there.

14   Q.   Okay.  At some point, Signal brought in extra trailers,

15   right?

16   A.   That's right.

17   Q.   Did you move to one of the new trailers?

18   A.   No, I did not move.

19   Q.   Why not?

20   A.   When -- there were 24 people initially.

21        And about six months or so after that, a lot of people

22   have left from there.  And when these people started leaving,

23   then they freed up a lot of facilities there.

24        So I think it came down to, like, 18 people or so in

25   the room.

1    Q.   Okay.  So some people were leaving your bunkhouse.  And at
2    that point, you said you had around 18 people left in your
3    bunkhouse?
4    A.   Yes.  Yes.  I think it was load, like, 18 or 15 people in
5    there.  And because it was very less, it was easier using
6    bathrooms and other facilities was much more easier.
7         Well, even if I go to the new trailer house, the
8    bedding -- the beds are set up the same way.
9         Even in my own, even if there's only, like, 18 or
10   15 people, the bed still was there for 24 people.
11        So that's why I was not interested in moving to another
12   room.
13   Q.   Okay.  Where had the people in your bunkhouse gone, the
14   ones that had left?
15   A.   Well, there was a person named Sabulal, and he had the
16   problem.  And after the problem is when people started leaving.
17   Then some people had moved to the newer bunkhouses.
18   Q.   Okay.  You said there was a problem with Sabulal.  Is that
19   Mr. Sabulal who testified in Court earlier in the week?
20   A.   Yes.
21   Q.   And what is the problem you were referring to?
22   A.   The problem I was referring to -- there was a lot of
23   problem that happened -- I'm not sure with Sabulal.  And the
24   problem where he cut his arm.
25        And then there was also fear for the people there at the

1    time as to what is going to happen to them.

2            I think that is the reason they -- some of them left

3    from there as well.

4    Q.   Okay.  Let me talk to you a little bit about what happened

5    on March 9, 2007.  Were you at the Mississippi camp on that

6    day?

7    A.   Yes, I was.

8    Q.   What time did you wake up that day?

9    A.   My regular time that I wake up, like 4:00, 4:30-ish, like

10   that.

11   Q.   At some point did you notice anything unusual at the man

12   camp?

13           MR. UNGAR:  Objection, Your Honor.  Leading.

14           THE COURT:  Could you rephrase it?

15   BY MS. BOUHABIB:

16   Q.   What did you do after you woke up?

17   A.   I saw the friend's side that there were a group of people

18   gathered together, and I thought that it happens all of the

19   time.

20           Like Sabular always goes and complains that the food is

21   not good when we come back from work, and they have to fix

22   that, and that we were unable to sleep properly, and had to fix

23   those kind of things.

24           I thought they did something -- complaints similar to

25   that.  So I did not pay that much attention to it.  I was just

1    trying to get ready myself to go to work.

2    Q.    And did you go to work that day?

3    A.    Definitely, I went to work that day.

4    Q.    Did you eventually return to the man camp?

5    A.    Yes.  Only after I came back, I was told about all of

6    these things, that Sabulal had cut his arm and that there was a

7    security guard with the gun there, and then the police were

8    coming and going.

9         And I was also in fear at the time that if something

10   like this would also happen to me, and that's why I came back

11   from work that afternoon.

12        MR. UNGAR:  Objection, Your Honor.  I think what he was

13   told about an event that he didn't see, it's hearsay.

14        It's hard for me to object because of the narrative

15   nature of the response.

16        THE COURT:  So he's already answered that question.

17   I'm overruling that objection.

18        But maybe if you try to break it down into three

19   questions.

20        MS. BOUHABIB:  Do you want me to go over that again or

21   just --

22        THE COURT:  I think what you need to do is ask him

23   about his personal knowledge about that.

24        MR. UNGAR:  Thank you, Your Honor.

25   ///

1   BY MS. BOUHABIB:

2   Q.   So you returned from the man camp after working that day,

3   right?

4   A.   Yes.  I came back in the afternoon.

5   Q.   And what do you mean by "the afternoon"?

6   A.   Well, from the rig, I could see the camp.  And I'm seeing

7   all of these police vehicles coming and going there, and I'm

8   seeing people running here and there.

9        And I also learned that Sabular had cut his arm like this,

10  and he was taken to the hospital.  So -- and I heard that

11  people are really tense there.  So I was also afraid that

12  something like this could happen to me as well.

13  Q.   Okay.  So you saw the police from the rig?

14  A.   Yes.  I saw the police there, and I saw people running

15  here and there.

16       And mentally I was worried what is going to happen to

17  me as well.  So I did not stay to work there.

18       So in the afternoon I returned back from work.

19  Q.   Okay.  What happened when you returned back from work?

20  A.   Well, when I came back, that is when I learned that --

21  like this, that Sabular had been taken to the hospital, and I

22  was worried.  I was mentally affected by that, and I was

23  thinking that something like this could also happen to me.

24       And I was in fear at the time that something like this

25  also could happen to me.

1    Q.    Okay.  Following that event, did you stay working at

2    Signal?

3    A.    Yes.  I definitely -- the company had given me a promise

4    that if I am working there and being good, if I'm working very

5    good, then they would permanently keep me there.

6          It's not just permanently giving me the place to live,

7    but they would give the permanent resident visa for me to live

8    there.  The company had promised that.

9          So without making anything go wrong and totally fail, I

10   was following that rule, and I was going to work staying there

11   because of that.

12         That was what I believe in, and that's what I believed.

13   Q.    What did you understand had happened to Mr. Sabulal that

14   day?

15   A.    Well, I heard that Sabulal cut his arm, and only then I

16   came to know later.

17         So I returned back from work.  That's why I never

18   complained about anything.  I was bearing down everything and

19   patiently waiting.

20         I did not cause any problem or I did not complain.  I

21   was getting along with everything.

22   Q.    Okay.

23   A.    So that's why I did not complain, but then still I had the

24   fear in me that something may happen bad to me, and then also

25   that the living conditions were like this and -- but then still

1    the work was good, and my foreman -- I had support of the

2    foreman.

3         The work conditions were good, and so I had the

4    expectation that things -- these problems would settle and

5    everything will get better.

6    Q.    So let's talk about the green card promise.

7         You testified that before you left India Sachin Dewan

8    had promised you that Signal would get you a green card, right?

9    A.    Yes.  Definitely, Sachin said that the company would be

10   promising the green card and everything, and then only we left

11   from there.

12   Q.    After you arrived at Signal, did you ever tell anyone at

13   Signal that you had sold your land in order to pay for the

14   green card opportunity?

15   A.    Yes, I have.  The reason being there was this person,

16   Sanders or John Sanders, the camp boss, he was working for the

17   company, and he was a very good man.  I really liked him.  He

18   was a good person.

19        When we go to the church, he would -- he would call me,

20   and we would go to the church.  I liked him.  He was a very,

21   very nice person.

22        While -- during that time, I had told John Sanders

23   about all of these problems, that I had to sell my house and

24   land -- not house -- the land and the rubber -- the rubber

25   trees, about the plantation, that the way we were getting

1    income from that -- the assets that we had to sell to pay for

2    this and to come here.

3            And then I asked him if we would ever get the green

4    card.

5            So he said, "Yeah.  Yeah.  No problem.  Don't worry

6    about that.  We will definitely get you the green card, not to

7    worry."

8            He was saying it in a very nice way, that you would get

9    it and not to worry about it.

10   Q.   Okay.  I want to show you a picture.

11        Do you see the person that you told about selling the land

12   on this picture?

13   A.   Yes.  That is the person who I told about selling the

14   land.

15   Q.   Okay.  Thank you.

16        Do you remember when you told Mr. Sanders about selling

17   your land?

18   A.   Initially, when we came here, he was very friendly.  He

19   was the one who was there as camp boss initially in the --

20   first.

21        So I have told them that that is how we had come here,

22   that I sold the land and had to pay all of the money to come

23   here.

24        He was a very good person.  So, initially, I told him

25   this.

1        MS. BOUHABIB:  And I'm a little late, but let the

2    record reflect that the witness circled the picture of John

3    Sanders on the demonstrative.

4    BY MS. BOUHABIB:

5    Q.   Other than John Sanders, did anyone at Signal tell you

6    that if you worked hard you would get a green card?

7    A.   To John Sanders I had only told him what are the

8    difficulties that we faced; that after enduring all the

9    difficulties that -- how we came about here.

10       But other than John Sanders, there is one other person who

11   is here -- who had mentioned about getting the green card.

12   Q.   Who, other than John Sanders, told you that you would get

13   a green card at Signal?

14   A.   There was this big person from the company who had come to

15   the camp and with him.  Sachin Dewan was there.  Michael Pol

16   was there.  Malvern C. Burnett was there.

17       So at the camp, this big person from Signal

18   International had told us not to fear about anything.  "We will

19   get you the green card," and everything.

20   Q.   Okay.

21       MS. BOUHABIB:  Could we put that demonstrative back up?

22   BY MS. BOUHABIB:

23   Q.   Mr. Andrews, could you circle the Signal person that you

24   said told you, you could get the green card?

25   A.   Definitely this person.

1       MS. BOUHABIB:  Let the record reflect the witness has

2  circled Mr. Schnoor, senior vice president at Signal.

3  BY MS. BOUHABIB:

4  Q.    Was anyone else there when Mr. Schnoor told you that you

5  would get green cards?

6  A.    Definitely, there were.

7  Q.    Who else was there?

8  A.    Do you want me to make a circle around everyone that was

9  there?

10  Q.    Sure.

11  A.    This person, that person.  Other than that, those other

12  four people, I don't know who they are.

13       MS. BOUHABIB:  Let the record reflect the witness has

14  circled Darrell Snyder, John Sanders, Sachin Dewan, Malvern

15  Burnett, and Michael Pol.

16  BY MS. BOUHABIB:

17  Q.    Were there also workers present at the time?

18  A.    Yes.  Yes, it was in the mess hall where we were eating

19  food.  That's where -- the mess hall was filled with people,

20  with the workers.

21  Q.    Do you remember when this meeting happened?

22  A.    I don't correctly remember that.  I don't know if it was a

23  week before the incident with Sabulal or if it was a week after

24  the incident with Sabulal.  I don't exactly remember when it

25  was -- what the day it was.

1    But I remember 100 percent, with certainty, that all of

2    these people were there, attended the meeting.

3    Q.   Do you think it happened within the first six months of

4    your arrival?

5    A.   I don't exactly remember the date or the month it

6    happened, but, approximately, I think so.  That's what I

7    believe.

8    Q.   Mr. Andrews, at some point, did you take a vacation from

9    Signal?

10   A.   Definitely, I went.

11   Q.   Okay.  Where did you go?

12   A.   The reason being, the way I remember it, it was after six

13   months that this meeting had happened.

14        And then that's when I decided to go to India, because

15   in this meeting they had promised about the green card and

16   there's the reason for it.

17        In the meeting, they were saying that if you wanted to

18   go to India, you could go and come back, because the green card

19   process would take two or three years.

20        So, in my mind, I was thinking maybe I could go and

21   visit my family.  So that's why I took the vacation for a

22   month, to go and see my family.

23        So I told the company about it, and the company agreed

24   to it.  So I went on a one-month vacation to India and then

25   returned back.

1    Q.   Mr. Andrews, you've already testified that the living

2    conditions in the man camp were very difficult.  Why did you

3    come back to Signal?

4    A.   My understanding of what you are saying, but then, still,

5    even though I had worked here for six months, that they had

6    paid me the salary or the money I was getting.

7         It was only good for all of the expenses that I had to

8    spend.  I had to spend for my father, my older brother, my

9    younger brother, and I was unable to buy back the land that I

10   had sold.  So I did not have any other option.  I could not

11   go -- stay there.  I have to definitely come back to work here.

12        Not only that, the permanent job that I had, I had to

13   resign that to come here.  So this is the only job I had, and I

14   did not have any other way.  I had to definitely come back

15   here.

16   Q.   Mr. Andrews, I want to talk to you a little bit about the

17   food at Signal.

18   A.   Okay.

19   Q.   Did Signal provide you with meals?

20   A.   Definitely, they did.

21   Q.   Was the mess hall open 24 hours a day?

22   A.   No.  The mess hall was not open 24 hours.

23   Q.   When was it open?

24   A.   Well, they -- it was open in the morning before we went to

25   work at seven o'clock.  And then we would go to work.

OFFICIAL TRANSCRIPT

 1          And then when we come back in the evening, like about
 2   five o'clock or so, it was open from six o'clock to
 3   eight o'clock, I think, for us to take food at the time.
 4          There is -- there were three meals a day.
 5   Q.   And did the mess hall then close at the end of the
 6   dinnertime?
 7   A.   Yes, definitely.  Even the time from six o'clock to
 8   eight o'clock, or 8:30, and after that, they would close the
 9   mess hall.
10   Q.   Were there cooking facilities in the man camp that you
11   could cook your own food?
12   A.   No.  But we can all understand from what we see.  You
13   know, the room where 24 people are living, there is not even
14   space to walk or change our clothing.  And so there was no
15   place where we could cook our own food and eat.
16   Q.   So what would happen if you missed the time for a meal?
17   A.   Then you would miss your mess time.  You would not have
18   anything to eat.
19          So if you are planning to go out somewhere, that we
20   always look at these times and plan accordingly.  If not, if
21   you miss the time, then you would not get anything to eat.
22   Q.   Did you like the food served at the mess hall?
23   A.   Well, as I said earlier, my thought processes are not to
24   complain about anything, even about the food.  I wanted to be
25   there without any complaints.  I was just eating food to live.

1    But not that I liked the food that I ate.  So just I was eating

2    there to live.

3    Q.    Did you ever get sick from the food?

4    A.    Many times I had.  There was reason to it.

5    Q.    I'm sorry.  I didn't hear the end of that.

6    A.    Many times I have.  There are reasons to it.

7    Q.    Oh, there's a reason for it.  Okay.

8          Do you want to tell us the reason?

9    A.    The reason being that we get this food, like, 5:30 in the

10   morning to bring it to the job site.  And the job site, there

11   is no refrigerator or anything like that.

12         And during the hot times, it would be outside like

13   that, and the food would probably be prepared like the previous

14   evening.  So it would get spoiled.

15         Many, many times there are many people who were with me

16   had complained about this about the food.  The food is no good.

17         Many people had taken the food back and -- and then

18   showed them, "Sir, look at this food.  It's bad" and then had

19   thrown it out in front of them.

20         And many people had stomach problems, too, by eating

21   this food.  And many people had complained about it.  I did not

22   go and complain about this at all.

23         But I'm eating this food.  Many, many times I had

24   fallen ill.  Like that, I had stomach problems many times.

25   Q.    Did you ever go to the hospital while you were at Signal?

1   A.   Yes.  I have been once to see the doctor.  I had asked the

2   doctor why I'm getting stomach pain like that.  He was saying

3   that, "You are not eating the food with proper heat.  It could

4   have caused this."

5        Because of the stomach problems, many times I would not

6   eat anything.  I would go without eating.  I would probably eat

7   a banana or an apple.

8        All of us eat the Indian food, right.  I would go

9   without eating any food.

10       Because of that, I think, I had a boil or cyst on the

11  back of my body.

12       And the doctor was saying maybe it is because of the

13  body heat, that, "You have to eat proper food."  Because of the

14  problem from the stomach, it may come up like this.  So I

15  should eat regularly the food.  Then the doctor had to do

16  surgery and remove that from my back.

17  Q.   Okay.  Just to clarify, did you go to the doctor because

18  of the stomachache or because of the boil on your back?

19  A.   Well, because of the stomach problems, but because of not

20  eating the proper food and the stomach is not clear.

21       And there would be stomach pain, and there would be

22  body pain.  And it could have caused that.  And by not eating

23  properly, if it is the spoiled food, that I should not eat; I

24  should throw it away.  And if I eat it, things like this could

25  happen.  He said that.  Then he cleared it up.

1   Q.   Okay.  I just want to clarify that a little.  When you say

2   "he cleared it up," what are you talking about?

3   A.   After he asked me to follow the food practices properly,

4   then he cleared it up.  He did the surgery and put the

5   medicine.  And on the same day, I returned back.

6   Q.   Okay.  So you saw a doctor.

7        Was the doctor onsite at the man camp?

8   A.   No.  It was in Mississippi, at Moss Point.  There was a

9   clinic there, so I had to go out.

10  Q.   While you were at Signal, did Signal ever have a

11  doctor onsite at the man camp?

12  A.   Now, there was a little hospital.  It was a small place

13  where there was this one nurse there.  I had been there once.

14       I had dust in my eye that he poured some water and

15  removed it.  And if there is any small injuries, then you would

16  put some Band-Aid and things like that.  So there was a nurse

17  like that.

18       For anything big, like to do surgery or anything, you

19  have to go outside to the hospital.

20  Q.   Mr. Andrews, for days when you missed a meal because the

21  mess hall was closed or because you were sick and you could not

22  eat the food, does Signal still deduct money from your paycheck

23  for the food?

24       MR. UNGAR:  Objection, Your Honor.  I'm not sure he

25  said that.

1      THE COURT:  Well you could actually correct her if she

2  is wrong.  Overruled.

3      MR. UNGAR:  Thank you.

4      THE INTERPRETER:  Could you please repeat it?

5      MS. BOUHABIB:  You need me to repeat it.

6  BY MS. BOUHABIB:

7  Q.    For days when you missed a meal because the mess hall was

8  closed or because you were sick and could not eat the food, did

9  Signal still deduct money from your paycheck for the food?

10  A.    It does not matter if you are sick or if you are not sick

11  or if you are working or if you are not working, from the first

12  day that you arrive at the company up until the last, if you

13  you don't eat, they will just deduct your money, and that's how

14  it was.

15  Q.    I just want to go back to your testimony about the nurse

16  that you were able to see at Signal.

17      Was that a nurse who was available to the entire work

18  facility, or was it just for the man camp?

19  A.    Definitely it was for the company that they had it.  The

20  company, there were Americans; there were Indians; there were

21  Mexicans and other people.  So they just were for everybody.

22      It was -- if something small happens that they -- any

23  small injuries, that they can put some medicine on it.  It's

24  like a small clinic.

25      It's for everybody, not just for Indians.

1   Q.   I want to go on to security now, security at the man camp.

2   Then I'm going to show you a picture.  It's Exhibit 1190.

3        Mr. Andrews, can you tell what this is?

4   A.   Yes, I can.

5   Q.   What is it?

6   A.   That is the security office for the man camp.

7   Q.   Is this a picture of the man camp?

8   A.   Yes.  This in total is the man camp.

9   Q.   Can you circle the bunkhouse you lived in?

10  A.   That is the mess hall, and this is the Bunkhouse 1, and

11  that's where I was living in.  That is the mess hall.

12  Q.   Okay.  Can you show -- can you indicate on the screen

13  where the entrance and exit to the man camp was?

14  A.   That is the way from there.  That is the main way where

15  you come from the road, and that is the security there, and

16  that's how you enter.

17  Q.   Okay.  Was that the only entrance and exit to the man

18  camp?

19  A.   Yes.  Only that one.

20       MS. BOUHABIB:  Okay.  And let the record reflect that the

21  witness has pointed to the top left corner of the picture.

22  BY MS. BOUHABIB:

23  Q.   How many hours a day was there a security guard at the

24  security shack?

25  A.   Security was there 24 hours.  It's 24-hour security.

OFFICIAL TRANSCRIPT

1    Q.    Do you know why the security guards were there?

2    A.    I have told you earlier, in Dubai, if someone -- an

3    outsider is going to come, they have to sign in and then get

4    in.  But they had that system there.

5          But here I don't have any relatives.  So I don't know

6    why they had a security here.

7    Q.    Did the security guard --

8              THE COURT:  Let's take a break.

9              So we will come back at 2:20.

10             Jury, remember the instructions that I have given you.

11

12                      (JURY EXITS THE ROOM)

13                      (A recess was taken.)

14                  (JURY ENTERS THE COURTROOM.)

15             THE COURT:  All right.  Be seated.

16                  Proceed.

17   BY MS. BOUHABIB:

18   Q.    Mr. Andrews, before the break, we were discussing security

19   at the man camp.  Did the security guards stop you when you

20   were leaving the man camp?

21   A.    No.

22   Q.    Did they stop you when you were coming back into the man

23   camp?

24   A.    Yes.  Definitely, they would check me.

25   Q.    What did they stop you for when you were coming back into

1    the man camp?

2    A.    I don't know why, but then they would do checking.

3    Q.    Did they check you every time you came into the man camp?

4    A.    Definitely, they would.

5    Q.    Were they checking your person?

6    A.    When you are coming back from the company, they would look

7    at your ID and things.  That, I did not have any problem with

8    that.  That is -- normally, all of the companies do that.  But

9    when you are going out for shopping and then when you're

10   returning back with all your personal items, then they would

11   look through your bag as to what all you brought.

12   Q.    What were they looking for in your bag?

13   A.    That thing, I still do not understand today, as to what

14   they were looking for.

15   Q.    How did it affect -- how did it affect you mentally to

16   have your belongings checked whenever you came into your home?

17   A.    Well, when you are asking about how it mentally affected,

18   usually you go out to eat food.

19          I went two or three times a week.  You go to Wal-Mart,

20   and you do Buffalo Wild Wings, and you are bringing in your

21   things.

22          And they check what you are bringing in.  And then they

23   also come to your room, and then to the bunkhouses and check

24   there as well.

25          So it makes you think that if they are thinking that we

1   are thieves or something like that.  And that caused some

2   mental difficulties.

3   Q.   Did you say the security guards also checked your

4   bunkhouses?

5   A.   Yes.  That is what I was referring to is that we are like

6   thieves, that they are checking our rooms and everything like

7   that.

8        Well, when I'm saying about the mental difficulties, is

9   that I have gone to many places, many countries, just for work,

10  and leaving all my family.  We had come here just for work.

11        And to come into the room and check as if we were

12  thieves, it's -- you wonder, you know, mentally, why are they

13  doing all of these things.

14  Q.   How often did they check the bunkhouses?

15  A.   There is no set time.  They could come anytime.  They

16  could come during the day; they could come during the night.

17  They could come anytime to check.  There is no set times.

18  Q.   Do you know what they were looking for in the bunkhouses?

19  A.   I don't know that.  I don't even know why they came in.

20  Q.   Okay.  I think you also said that sometimes you went to

21  Buffalo Wild Wings; is that right?

22  A.   Well, when that doctor said that it's because of the bad

23  food we were eating, and then you go to outside to eat some

24  food, occasionally.  And that, too, is always like company to

25  Wal-Mart and Wal-Mart to company.  And then next to Wal-Mart

1    was the Radio Shack.  And after Radio Shack was the Buffalo

2    Wings.  So I would eat some there, and then I would pack some

3    to bring with me.

4    Q.   Okay.  How would you get to the Buffalo Wild Wings?

5    A.   They had this minibus from the company.  They had a set

6    time.  So you go to the Wal-Mart,.  And from Wal-Mart, you

7    could walk.  It was very close to Wal-Mart.

8    Q.   Okay.  Were you able to ask Signal to take you wherever

9    you wanted in the company bus?

10   A.   Not that I could go anywhere I want.  It's only to one

11   place:  company to Wal-Mart and Wal-Mart to company.

12   Q.   Eventually, did you buy a car, Mr. Andrews?

13   A.   I don't remember the exact date.  It's about ten months or

14   so, I think.  I'm not sure.

15        I think it's towards the end of 2007, I think, I

16   believe I bought the car.

17   Q.   Was it a new car?

18   A.   No.  It was a used car.

19   Q.   How much did the car cost?

20   A.   Well, as I said earlier, I really wanted to see America

21   privately.  And with them taking me to Wal-Mart and back, I

22   could not see anywhere else.

23        So I was very eager to see what is out there in

24   America.  That's one reason why I bought it.  There are other

25   reasons, too.

1       But if there's any time, I can tell more about it.  But

2   that is the reason why I had some other friends put in some

3   money and then we bought the car.

4   Q.   Okay.  How much did the car cost?

5   A.   Well, I borrowed some money from the friends, and then I

6   had $3,000.  I collected $3,000, and I had to go to Toyota

7   Finance, Toyota showroom.  And then I had to deposit this

8   3,000, ask them -- get a loan to buy the car.

9   Q.   Okay.  So just to clarify, you paid 3,000 of the down

10  payment?

11  A.   Yes.

12  Q.   You borrowed money from friends to help pay that down

13  payment?

14  A.   Yes.  Ever since we had come to the company, there were

15  some friends where we would give money to each other and get

16  money from each other.  So we were rolling the funds like that.

17  And so I had borrowed some money.  I paid them back, too.

18  Q.   Okay.  And I think I interrupted you earlier.  You were

19  telling why you bought the car.

20  A.   Well, as I said earlier, to come to America was my dream.

21  And that I can bring in my family, too, that was also my dream.

22      They were also saying that they will bring with me --

23  bring my permanent residency, here.  So for the reasons that

24  I'm going to be permanently, then I need a car.  So that's why

25  I was buying a car.

1      Then, also, the other reason was that if I need to go

2  anywhere privately to see anything, then I could go on my own

3  self.  So that was also another reason.

4  Q.    Okay.  Did you go anywhere with the car?

5  A.    Yes, definitely.  When I had the Christmas vacation, I had

6  taken some of my friends to Disney World in Florida and that

7  was a very happy moment for me.

8  Q.    Okay.  Mr. Andrews, I want to talk to you about your work

9  at Signal.  Leaving the housing conditions aside, did you like

10 your work at Signal?

11 A.    I always respect my work, and I take pride in my work, and

12 I am always interested in doing my work.  So always I had

13 enjoyed working there.

14 Q.    Were you a good worker?

15 A.    Rather than me telling about myself as a good worker,

16 others should be the one who should be saying that.

17      My foreman and other people have always said that I'm a

18 good worker.

19 Q.    Do you remember your foreman's name?

20 A.    Yes, definitely.  Even though I had worked in many

21 companies and other places, I still remembered this person.  I

22 also wanted to see him.  His name is Gab Branson.  And then

23 there is another person, who's Tony Markin.

24      The reason being for that is that even though I only speak

25 a little bit English, they -- related to work, 90 percent of

1    what I think, I totally understand.

2           And we were a good company together.  When I'm saying

3    "company," we were very good friends.

4           So there was no problem with the company.  We were

5    working together very well, and we were getting by.

6    Q.   Okay.  Let me show you Exhibit 131.

7         Do you recognize this, Mr. Andrews?

8    A.   Yes.  I know that.

9    Q.   Can you tell us what it is?

10   A.   It shows what is my wage and the wage rate.

11   Q.   And in the area where it says "pay rate," can you read

12   what it says on the left, pay rate?

13   A.   Yes.  $18 per hour, $18.

14   Q.   And on the right side at the pay rate, can you read what

15   that says?

16   A.   Yes, definitely.  They had raised the rate to $18.75.

17   Q.   So this document reflects a raise you received at Signal?

18   A.   Definitely, yes.

19   Q.   What is the date on this document?

20   A.   It's written there as 11/29/06.

21   Q.   Is that about a month after you arrived?

22   A.   Yes.

23   Q.   In the comment section, it says, "Andrews is a good hand.

24   He's very helpful by interpreting for me.  Does a good job on

25   whatever I ask of him.  Is just a good" -- "all-around good

1    hand" -- "is just an all-around good hand."

2         Is that right?

3    A.   Definitely.

4         MS. BOUHABIB:  Okay.  We can take it down.

5    BY MS. BOUHABIB:

6    Q.   Mr. Andrews, at some point in Signal, did you get any

7    written warnings?

8    A.   Not just one.  I think I got, like, two or something like

9    that.

10   Q.   Okay.  Do you remember what your first written warning

11   was?

12   A.   The one I remember, when I went to India and then came

13   back, I started getting these warnings.

14   Q.   Okay.  Let's look at Exhibit 1663.

15        Do you recognize this document?

16   A.   Yes, I remember.

17   Q.   Is this the document you were referencing that reflects a

18   written warning you got after you got back from India?

19   A.   Yes.

20   Q.   Okay.  And in the comment section, it says, "Lack of

21   quantity, was told he needed to step it up a notch or other

22   actions will be taken up to termination"?

23   A.   Yes.  I took it like that.

24   Q.   Do you know what "lack of quantity" means?

25   A.   Well, from this question, I remember what this paper is

OFFICIAL TRANSCRIPT

1    about.  I could tell you the insert, but I don't know if you

2    have time.  Maybe I could be brief about explaining it?

3    Q.    Could you give us a brief explanation?

4    A.    Definitely, yes.  When I came back from India, all the

5    company had different way of approaching.  They were asking us

6    to do a lot more work.  They would ask to do three or four

7    jobs.

8          When I see a mistake in the job, then I would tell the

9    foreman that, if a job takes five minutes, then this job may

10   take ten minutes because of these reasons.

11         Then -- when I was saying that, you know, the fitting

12   would come with some gap in it, and so I would call the foreman

13   and tell him that to fix this I would need more time.

14         And the foreman would say, "I understand what you are

15   saying, but I'm getting pressure from top above that you need

16   to do this very quickly."

17         I have always tried to work faster and be quicker.  I was

18   able to manage like that at the company.

19   Q.    Was this your first written warning?

20   A.    Yes.  Definitely, yes.

21   Q.    And the consequences here say that you could be

22   terminated?

23   A.    Yes.  During that time, it was also -- mentally and

24   emotionally it was affecting me.

25               If they are going to be sending me back to India, then

1  what would I be doing?  They told me they will give permanent

2  status here, that I could be here.  And what would I be doing

3  if I'm returned back to India?

4       So at that time, I had this mental and emotional stress

5  for me.

6       The reason I had all of this tension is because my

7  family, everyone in my family, they are all depending on me

8  from the money that I was making from this work and the money

9  that I was sending back home.  They were depending on this.

10       The food, the clothing that they buy, everything that I

11  have, to pay for it.  So that's the reason why I was mentally

12  tense as well when I saw this.

13  Q.   Mr. Andrews, did you ever get any more warnings about the

14  lack of quantity?

15  A.   Definitely.  The more -- it's correct that I was earning

16  more here, but then also I lost a lot more here as well.

17  Q.   Did you ever get -- did your foreman ever talk to you

18  about lack of quantity again?

19  A.   Yes.  As I said, you know, the foreman was a good person,

20  and he knows that I had -- these many years of work experience,

21  and he also had experience.

22       So he will tell me, "Andrews, I understand what you are

23  saying.  But from top above and getting all this pressure that

24  you have to work fast.  What can I do."

25       As I said earlier, you know, he was a very good

1    foreman, but he was getting pressure from top above.

2           THE COURT:  Just a second.

3           MR. UNGAR:  Again, Your Honor, I'm still concerned

4    about the narrative nature of the responses.  I don't know if

5    hearsay has been coming out.  I can't object.  It's hard for me

6    to do that when they are so long.  I'm concerned.

7           THE COURT:  Counsel is going to try to ask him specific

8    questions, but it's a little -- you understand the difficulty

9    we are having.

10          MR. UNGAR:  I do, Your Honor.

11   BY MS. BOUHABIB:

12   Q.    Okay.  Mr. Andrews, I'm just going to remind you to try to

13   listen to my question and answer specifically.  And I'll ask

14   the follow-up questions.

15   A.    Okay.  Definitely.

16   Q.    I want to show you one more document, which is 1578.

17         Do you recognize this document?

18   A.    Yes, I remember it.

19   Q.    And under the "Reason For Change" in the middle of the

20   page, it says, "Rolling up at 4:30 on 7/25/07.  Next will be

21   three-day layoff."

22         Can you briefly explain what the term "rolling up" means?

23   A.    Well, what they are saying is -- rolling up is, if I had

24   taken some cable or some equipment, and you put them back and

25   you clean the area you worked in and you do some housekeeping.

1    That is what they call them as well, rolling up.

2    Q.   Okay.  So when it says "rolling up at 4:30," can you

3    briefly tell us what that means?

4    A.   I wanted to give you some explanation on that.  I always

5    follow all of the rules.  Depending upon the safety, I do

6    follow all of the safety rules.

7         So the first thing is safety first, but they should not be

8    any endangerment to humans.  There should not be danger caused

9    to the coworker.  There should not be any accidents happening

10   at that place.

11        So the first thing that I would pay attention is for

12   the safety to avoid any dangers.

13        I have already indicated that the place that we worked

14   had a lot of grease there.  So before I start the work area, I

15   would clean that.  I was to -- towards the end, I would also

16   clean that.  I worked the day shift.  So by the time my shift

17   ended, I would clean up the area, prepare it for night shift so

18   they don't have any accidents.

19        And maybe I made a mistake there at the time.  I'm not

20   sure.  I rolled up a little bit early, and I was not staying

21   idle.  I was not working at the time.  I was cleaning the area.

22   I was cleaning up the area for the other people that would be

23   coming to work at that time.  I was doing it for the company,

24   and I was not doing -- I was not standing idle without doing

25   anything.  I was just cleaning up.

1    Q.   Okay.  Let me direct you to the chart that is right below

2    comments, "Other/Comments," where there is a column that says,

3    "Factors, Job Performance, Attendance, Attitude, Safety

4    Habits."

5         Do you see in this chart where the checks are?

6    A.   Yes, I understood that.

7    Q.   Okay.  Can you tell me what it says in the column where

8    the checks are?

9    A.   Yes.  It says it's good.  That's the choice.

10   Q.   Did you ever get any other warnings about rolling up

11   early?

12   A.   Well, I had some difficulties emotionally, because I was

13   doing some good things and I got this warning.  But they said

14   that I should not be repeating this again, so I did not repeat

15   that.  But I was emotionally upset that I got this, and I have

16   never gotten one again like this.

17   Q.   And for the rest of your time at Signal, did you stay on

18   good terms with your foreman, Mr. Branson?

19   A.   Yes, definitely.  He knows that I'm a good worker and it

20   was because of the pressure from top, above.  And even today,

21   I'm friendly with them.

22   Q.   Okay.  Mr. Andrews, earlier you testified that at some

23   point within the first six months of arriving at Signal, Signal

24   represented and told the workers that if you worked hard, you

25   would get a green card, right?

1    A.    I cannot give you a date as to if it was within the six

2    months or something like that.  But there was three people who

3    were there.  The company's main person and Sachin Dewan and

4    these three people, they were there.  And I'm openly telling

5    you now how they said, 100 percent sure, that they will get the

6    green cards.  And I don't remember the date, if you're asking

7    me the date.

8    Q.    Okay.  So you don't remember the date, but you remember

9    being told that they would get you green cards if you worked

10   hard?

11   A.    Yes, definitely.  And one other thing, too.  After this

12   meeting that they said, I know about this person who I met

13   initially, Malvern C. Burnett, so and I had come to New Orleans

14   to resolve this.

15          And I had spoken to him, and he said, yes, the

16   company -- do your hard work and Signal will definitely get you

17   the green card.  He had said that, and looking at my face.

18   Q.    Okay.  Was it your understanding that the green card would

19   come after two or three extensions of the H-2B visa?

20   A.    Yes.  That's what they had said.

21   Q.    Did Signal, in fact, extend your H-2B visa?

22   A.    Yes.  After ten months, they had extended my visa.

23   Q.    Did Signal sponsor you for a green card?

24   A.    I don't know if they did or not, but that's what they

25   said.

1    They had said that you would be given a visa for ten

2    months.  And after that, we would renew it once, and then we

3    will renew it again.  And then at that time, you will take your

4    permanent residency.  That's what they said.

5    One thing I want to clarify there is that the first ten

6    months was for the H-2B visa, and then they would renew that,

7    and then they would get the permanent residency.  That's what

8    they said.

9    Q.   Okay.  And you got the first extension, right?

10   A.   Yes, ma'am.

11   Q.   At some point, did a Signal representative tell the

12   workers that Signal would not be sponsoring them for green

13   cards?

14   A.   Yes.  I think.  I had renewed once.  I think like after

15   16 months, after I had gone to India and then I'd come back.

16   After the six months, that is when the problems were there

17   where they said they'd renewed it once, the visa, and then it

18   came time for the second renewal.

19   I think that's when they said that they cannot renew

20   it, that they are not going to sponsor.  That's what they said,

21   I think.

22   That's when they are saying they cannot renew it.  The

23   second time, that's when they are saying that.  "We cannot

24   process your permanent residence visa or we cannot do anything

25   for you."  That's when they were saying that.

1    Q.    Okay.  Who told you that Signal would not sponsor the
2    workers for green cards?
3    A.    Well, if we have any problems at the camp, we would have a
4    meeting with the camp boss.  In the lunchroom, we would gather
5    together and we'd have the meeting.  In one of these meetings
6    is where we were told about the green card, that they were
7    saying that if you are coming on H-2B visa, then we could not
8    apply for your green card.
9          So up until that time, they were saying that, "We will
10   give you a green card.  We will give you" -- then, but we did
11   not expect this thing, toward the end, when they said they
12   could not do it.
13   Q.    Okay.  Do you remember about when this meeting occurred?
14   A.    I cannot give you a correct date, but I think it was
15   sometime in December of 2007.
16   Q.    Okay.  Did you say it was a meeting?
17   A.    Well, when -- after the meeting, too, I had asked in
18   person, too, the camp boss that was there at the time who was
19   in the picture here.
20          And then, also, after that, there was this lady,
21   Rhonda, who had a small office.  And I had asked her, too.
22   "Madam, it's very difficult that we had to spend all of this
23   money to come here.  And can we get our green card."
24          And that's the time where she also said, "No.  We
25   cannot apply for your green card.  And that's -- I don't know

1    what I could do.  We don't know what -- I don't know what I

2    could do.  It is what -- the instructions I got from top,

3    above."

4    Q.   Let me show you a picture.  Okay.  Who was the camp boss

5    you just mentioned, who told you that?

6    A.   During the meeting, this is the person who told me that.

7    Q.   Okay.

8         MS. BOUHABIB:  Let the record reflect the witness has

9    circled Darrell Snyder.

10   BY MS. BOUHABIB:

11   Q.   Mr. Andrews, did you leave Signal after you found out they

12   would not be sponsoring you for a green card?

13   A.   Yes, ma'am.

14   Q.   How did you feel when they told you you would not be

15   getting the green card?

16   A.   Well, definitely, that these people made all of these

17   promises they gave, they would give me.  Sachin Dewan, Michael

18   Pol, and Malvern Burnett, everybody, they -- who had -- what I

19   feel is that they had defrauded me.  They had cheated me.

20        And I just wanted to remind this thing:  That even though

21   Sachin Dewan had told us all these things, he had come here, to

22   Signal International, and met with all of the management and

23   then had explained all of these things to them and was told

24   they were going to take care of you, it's their responsibility.

25   And he returned back from here happily.  So it should be Signal

1       International's responsibility to have done this.

2           So I personally feel that Signal International is the one

3       who had cheated me without giving me the green card.

4           Among all of us, if there is a person that is 80 or

5       84 years old, they could probably understand this.  My father

6       was -- he's that old.

7           And I had borrowed money from him to have to come here.

8       And up until now, I have not told him about all of these

9       problems that I'm going through.  Because of all of the

10      expectations I had, that I don't want to do this to him.

11          So even now, I don't want anything like this to be

12      happening to anybody else in the future.

13          If -- until today I've not told my father, informed my

14      father of this.  I have lived in the bunkhouse like that.  I

15      have lived in difficult situations.  I never informed my

16      family.  I never told my wife about it.  I never informed my

17      children of this.

18          Until today, I have not told anything to any other

19      person about all of the difficulties that I had.

20          In the future, I don't want anybody to go through these

21      same problems.

22          I had to say Signal was a big part of this.

23      Q.   Thank you, Mr. Andrews.

24          MS. BOUHABIB:  I have no further questions.

25          THE COURT:  Let's take a break, a ten-minute break.

1    And we will start back at 3:30.

2                   (JURY EXITS THE COURTROOM.)

3         THE COURT:  Will the people that are going to discuss

4    the Mehta and Mehta/Mowl objections be here at the next break,

5    if we take one, around 4:30?

6         MR. HOWARD:  I could get Mr. Sandler back.  He's

7    coming, anyway, at 5:00 for the charging conference.

8         THE COURT:  The charging conference is at 5:30.

9         MR. HOWARD:  Well, he's going to come at 5:00, so I'll

10   ask him to be here at 4:30.

11        THE COURT:  Okay.  So when we take our 4:30 break, I

12   want whoever is going to argue about those objections to be

13   here, ready to go.

14        MR. BHATNAGAR:  Your Honor, if I may, one little

15   housekeeping on the Pol designations.

16        As you've requested, we have come to an agreement, all

17   parties, regarding the time allocation.

18        THE COURT:  On the Pol?

19        MR. BHATNAGAR:  On the Pol designations, yes, ma'am.

20        For Pol, the parties have agreed to split the time

21   allocation three ways:  40 percent for Signal, 40 percent for

22   plaintiffs, and 20 percent for Mr. Burnett.

23        And for the John Sanders' designation, plaintiffs and

24   Signal have agreed to split it 50/50.

25        And, Your Honor, I also have a copy of a description

1    of -- a neutral description of Michael Pol that all parties

2    have agreed to as well as a sentence which explains why

3    plaintiffs will be reading the designations for all three

4    parties for Your Honor as well.

5            THE COURT:  Thank you.  So you can give that to me, and

6    I'll have it ready when you need it.

7            MR. BHATNAGAR:  Yes, Your Honor.

8            THE COURT:  Thank you.

9            MR. UNGAR:  Is it okay if I set up now so we're ready

10   to go?

11           THE COURT:  Yes, absolutely.

12           MR. UNGAR:  Thanks, Judge.

13                      (A recess was taken.)

14           THE COURT:  Wait a second.

15           MS. GRAUNKE:  I apologize.  Mr. Werner is going to be

16   absent from counsel table for the next round.  He is

17   unfortunately feeling unwell.

18           THE COURT:  Okay.  So someone has taken over his

19   duties?

20           MS. GRAUNKE:  Sure.

21           THE COURT:  Okay.  Now we're ready.

22

23                  (JURY ENTERS THE COURTROOM.)

24

25           THE COURT:  All right.  Have a seat.

OFFICIAL TRANSCRIPT

1            MR. UNGAR:  Thank you, Your Honor.

2

3                      CROSS-EXAMINATION

4    BY MR. UNGAR:

5    Q.    Mr. Andrews, my name is Hal Ungar.  I represent Signal.

6    We met at your deposition last year.

7    A.    Yes, definitely.  I remember.

8    Q.    Okay.  To pay the recruitment fees that you were talking

9    about today, you sold land?  Yes or no.

10   A.    Yes.

11   Q.    And you sold that land when you were recruiting to work

12   for J&M?  Yes or no.

13            THE COURT:  Mr. Ungar.  Mr. Ungar, I don't want you to

14   do that at the end of each question.  So just ask the question.

15            MR. UNGAR:  Okay.

16   BY MR. UNGAR:

17   Q.    And you sold that land when you were recruiting to work

18   for J&M?

19   A.    Yes.

20   Q.    You sold that land before you ever heard the name Signal?

21   A.    Yes.

22   Q.    That was in 2004?

23   A.    Yes.

24   Q.    In 2004, it had been a long time where you had felt that

25   it was your dream to live in America?

1    A.    There is wrong in that one.

2    Q.    It was your dream since childhood to live in America?

3    A.    Definitely.

4    Q.    All right.  Now, you don't know if Signal knew about your

5    earlier J&M recruit.

6    A.    That's right.

7    Q.    Signal is not responsible for the promises that were made

8    to you about the J&M recruitment?

9         MS. BOUHABIB:  Object.  Asking for a legal conclusion.

10         MR. SHAPIRO:  I join.

11         THE COURT:  I'm sorry.  Could you --

12         MS. BOUHABIB:  Asking for a legal conclusion.

13         THE COURT:  Sustained.

14   BY MR. UNGAR:

15   Q.    You don't know if Signal authorized any of the promises

16   made to you by J&M?

17   A.    Well, when I was selling my land, I was hearing the words

18   for J&M.  And then only towards the end, while I was making the

19   final payment for J&M, that I'm hearing about Signal.

20   Q.    You heard about Signal a couple of weeks before you came

21   to Signal?

22   A.    Definitely.

23   Q.    A little bit before your consulate interview?

24   A.    Yes.

25   Q.    Let's go back a moment to 2004 when you sold the land.

1    When you sold the land, did you know you were recruiting for

2    J&M?

3    A.    As I said earlier, that is correct.

4    Q.    You did know.

5    A.    Definitely I knew.

6    Q.    Okay.  Were you told before you sold the land how much

7    money you would earn at J&M?

8    A.    Yes.  We had an agreement.

9    Q.    Okay.  Now, when we're talking about promises made to you

10   about J&M, can you list for me again the names of the people

11   that made those promises?

12   A.    Are you asking about the people that I paid money to?

13   Q.    I'm wondering if you could name for me the people that

14   made promises to you about the J&M recruitment.

15         Just list their names, if you can.  And then I will ask

16   you a question about it right after.

17   A.    Definitely I can.

18   Q.    Go ahead.

19   A.    The first is Sachin Dewan.  Next is Michael Pol,

20   Malvern C. Burnett.

21   Q.    Those three people told you in April of 2004 that within

22   two years you would get a green card?

23   A.    Yes.

24   Q.    Nobody from Signal in 2004 told you that within two years

25   you would get a green card?

OFFICIAL TRANSCRIPT

1  A.   They have not said that.

2  Q.   In fact, the first time you ever met an employee of Signal

3  was in America?

4  A.   What did you say earlier about the first time I'm seeing

5  an employee?

6  Q.   I will repeat the question.

7       The first time you ever met a Signal employee was in

8  America.

9  A.   Yes.

10 Q.   You took no skills test prior to coming to work for Signal

11 to prove your skill?

12 A.   For Signal's skill test, after I came to Signal, there was

13 skill tests done here.

14 Q.   That's right.  The first time you ever tested for Signal

15 was in America?

16 A.   There is the reason for it.

17 Q.   If your lawyers are arguing that you and your fellow

18 coworkers were tested once abroad and then tested again in the

19 United States, that is not true with respect to you?

20 A.   I was working for a very respected company, a very good

21 company, a very well-known company in Dubai.

22       Because I was working for that company, these

23 recruiters they said that I would not need certification from

24 them.

25 Q.   Who told you that you didn't have to test before you came

1    to Signal?

2    A.   Sachin Dewan told me that the certificate showing that I

3    was working for the company and I had a card that shows three

4    years of work experience there.

5    Q.   You knew of other coworkers that ultimately worked at

6    Signal, that, like you, were never tested abroad before they

7    came to the United States, right?

8    A.   I don't know about other people.  If you are asking

9    anything about me, I am okay to give a reply to that.

10   Q.   Now, the two years that you thought it would take to get

11   the green card with J&M, that period started to run in April of

12   2004.

13   A.   Yes.

14   Q.   In fact, you thought you would get a work permit within

15   six months of April 2004, right?

16   A.   Well, the thing is that I don't know anything about green

17   card or H-2B visa or anything of that nature.  Whatever they

18   were saying, I would just say, "Yes."

19        The main thing that they have told me is that within

20   two years that I would be able to go to America.

21   Q.   That promise was April of 2004.

22   A.   Definitely.

23   Q.   That's the promise that was made by Michael Pol, Malvern

24   Burnett, and Sachin Dewan.

25   A.   Definitely.

1    Q.    It's not a Signal promise.

2    A.    After I came here, Signal promised.

3    Q.    Okay.  We'll talk about that in a moment.

4         Now, you said a minute ago that you didn't know anything

5    about the work permit or the green card; you were just trusting

6    what you were being told.

7    A.    What I was saying is that about getting that green card

8    within two years.  I would not know how long the time it would

9    take for getting work permit and green card and things like

10   that.

11   Q.    Now, you had a lot of experience working in other

12   countries before you came to work for Signal.

13   A.    Yes, definitely.  Yes.

14         MR. UNGAR:  Sorry, Judge.

15   BY MR. UNGAR:

16   Q.    Excuse me.

17         You worked in Dubai.

18   A.    Definitely, I worked there.

19   Q.    In Dubai, you were working on a work visa.

20   A.    Yes.

21   Q.    Sponsored by your employer.

22   A.    Yes.

23   Q.    You knew that that meant that you could only work for the

24   Signal employer in Dubai?

25   A.    Definitely.

1    Q.    Same thing in Bahrain.

2    A.    Yes.

3    Q.    Same thing in Qatar.

4    A.    Yes.

5    Q.    And you knew all of this at the time that you were working

6    in those places.

7    A.    Definitely, I knew.

8    Q.    You worked at all of those places before you came to

9    Signal.

10   A.    Definitely.

11   Q.    But you're saying you didn't understand the work visa you

12   came to Signal on?

13   A.    There are two different things.  There's a difference with

14   the visa in Gulf and then the green card in America is

15   different.

16   Q.    Now, in 2004, when Pol and Burnett and Dewan were talking

17   to you about the J&M recruitment, you were -- it was explained

18   to you that the green card process was three steps, right?

19   A.    Definitely, they said that like that.

20   Q.    You knew that because they explained it to you.

21   A.    They said that after six months you'd get your work

22   permit.  And then after that, there would be green card

23   processing.

24   Q.    Right.  And the first step of the green card process, they

25   didn't tell you that that occurred or was approved until

1    January of 2006, right?

2              THE INTERPRETER:  Could you restate that?

3              MR. UNGAR:  Sure.  Yeah.

4    BY MR. UNGAR:

5    Q.    The first step of the three-step process, you were not

6    informed until January of 2006 that that step was accomplished.

7    A.    Yes.

8    Q.    All right.  So that's almost the entire two-year period,

9    and you're only at step one.

10   A.    Well, what I said is exactly correct.

11   Q.    And your response to that long period of time before step

12   one was to pay these men more money.

13   A.    They follow step by step.  That when you agree to

14   participate in this, you give first payment.

15              And then when you get your work permit, then you make

16   the second payment.

17              And then, towards the end, that's when you pay the last

18   payment, and that's the third payment.

19   Q.    So you thought you would be making your second payment

20   within six months.  And, instead, you made your second payment

21   within 21 months?

22   A.    Yes.

23   Q.    You, nonetheless, continued to trust Pol, Burnett, and

24   Dewan.

25   A.    Because I was in a situation that I could not have done

1    anything else other than to trust them.

2    Q.    You didn't ask for your money back.

3    A.    As I said earlier, if I were -- after two years, if I am

4    getting this money back, I would not be able to buy my land

5    back.  Because the land price have gone like three or four

6    times more than what it was.

7    Q.    The entire time that you were recruiting to come to the

8    United States, you never once asked Sachin Dewan or Malvern

9    Burnett or Michael Pol for a refund.  Never.

10   A.    They had only made all of these promises, and I was

11   thinking that -- because of these promises, I sold this land.

12          And I was expecting that it to be today or tomorrow

13   that I would be getting these things.  And if I take the money

14   back from Michael Pol or Malvern C. Burnett, I would not

15   still be able -- would not be able to get my land back because

16   of the price have gone up.

17   Q.    You haven't answered my question.  My question is, you

18   never asked for a refund.

19   A.    Yes.  Because of this reason, I did not ask for it.

20   Q.    Now, sitting here today, you understand that green card

21   applications could be denied.

22   A.    They could be denying it.  I don't know about them.  But

23   they -- these people have made all of these promises, so I

24   don't know anything about those things.

25   Q.    So you are saying that, sitting here today, you don't

1    understand that green cards applications could be denied?

2    A.    Well, what was told to us was that, within about 30 months

3    or so, Signal International will be processing a green card.

4    And Signal International directly told us that they would get

5    us the green card.  And we don't have to worry about when or

6    how they would be -- where they would be processing and giving

7    us the green card.

8    Q.    You knew, in 2004, that green card applications could be

9    denied.

10   A.    I'm not understanding when you're saying "denied."  Nobody

11   had told me that I got denied.

12   Q.    You knew there was a chance you wouldn't get permanent

13   residence status at all.  As far back as 2004, you knew that.

14   A.    Well, first of all, since I rely on all of these people,

15   knowingly cheated me for six months or so.  They have sent me

16   letters saying that I got permanent residence authorization or

17   work permit or something like that.

18           Only after coming here, I came to know that they have

19   not even applied for something like that.  And how could I

20   trust what these people were saying.

21   Q.    Signal didn't do that to you.

22   A.    Since Signal had told us, after we came here, that "You

23   are on H-2B visa.  We will do it for you.  You do your work

24   good, you do a better job, and we will get you permanent

25   residency."  They did not say anything about work permit.

1    Q.    You -- we'll talk about that in a moment.  I'm still --

2    I'm still on the J&M recruiting, which was before Signal.

3          My question is, during that recruitment, you would call

4    Dewan Consultants a lot for updates.

5    A.    Definitely, I have called.

6    Q.    You were calling them because they were keeping you in the

7    dark about what was going on.

8    A.    Here is -- the reason was that I am selling my father's

9    land.  And so my father was asking all of the time what had

10   happened, what had happened.  So this is why I have to call and

11   ask them, so that I could tell my father that things are

12   getting processed.  So that's why.

13   Q.    Sometimes when you would call Buruna or Mannish Dewan,

14   they would tell you things that you thought were kind of --

15   sounded like excuses.

16   A.    Well, never.  But the reason was that to have a mental

17   peace for myself and for my father to have some mental peace.

18   That's why we are calling all the time.

19          They had given a time duration of two years.  So we

20   called and asked them what had happened, where is it now.

21   Q.    All of that was before Signal?

22   A.    Definitely, yes.

23   Q.    All right.  After you paid your second -- when you paid

24   your second installment -- so that's like January 2006, right?

25   A.    I don't know the exact date.  But if you look at the

1    documents, then I would be able to know.  But I had made the
2    second installment payment.
3    Q.    You were told at the time that you made the second
4    installment payment that you would expect -- you should expect
5    a green card by October of 2006, right?
6    A.    Definitely, yes.
7    Q.    All right.  You don't know if Signal authorized that
8    promise, because that was through J&M recruitment.
9    A.    Definitely, yes.  It was, yes.
10   Q.    Eventually, you learned about Signal.
11   A.    Yes.  That's when Sachin Dewan was saying that "You are
12   going for Signal International."  And then, again, he had come
13   here and told that Signal will be processing everything for us.
14   Q.    I think that you testified that you received a phone call
15   from some of your friends that were telling you that the work
16   permits were ready, which is why you called Dewan Consultants,
17   which is how you ultimately found out about Signal.
18   A.    I think maybe you heard me wrong.
19         When I had come back from Dubai, my friends had told me
20   that there is a visa had come to go to America and I should
21   contact the office as quickly as possible.
22   Q.    And you came to find out that that was the H-2B visa and
23   the Signal opportunity.
24   A.    Yes.  Once I go on H-2B visa over there, then they would
25   process the permanent residency, they said.

1    Q.    And you understood -- it was your understanding that the
2    permanent residency that was going to be processed by Signal
3    would start anew for you after you got to the United States?
4    A.    Yes.
5    Q.    You were abandoning your J&M green card recruitment.
6    A.    No, I did not.  But it was Sachin Dewan who said that
7    "Forget about J&M and go in for Signal International on this
8    visa for ten months.  And then they would renew for more ten
9    months, and then they will process the green card.  So you
10    would be able to live there for good.  And you would be able to
11    get these -- all of these processes done over there."
12    Q.    Okay.  After you found out about Signal, you made another
13    recruitment fee payment.
14    A.    It's not something that separate payment.  It is part of
15    the three steps.  That the first two payments that I paid,
16    that's the balance, and that I need to pay the last payment.
17    Q.    The last payment, though, the timing of it was after you
18    had learned about Signal.
19    A.    Yes.  What Sachin Dewan was saying was that all of these
20    three payments you were making is for going over there.  And
21    you heard about J&M now.  You are going to Signal International
22    there, and they will do the rest of the things.
23    Q.    Before you made that last payment, you got a letter that
24    talked about Signal, which your lawyer showed you earlier.
25    A.    I had received a letter.  I don't know if I got it over

1   there or after I came here.  I did receive a letter.

2   Q.   Let's take a look at Exhibit 0034.

3       This is the letter that I'm asking you to confirm for me

4   that you got before you made the last fee payment that is

5   actually described in the letter.

6   A.   Maybe I heard it wrong.  It was not Signal International

7   that gave this letter.  It is Dewan Consultants that I gave

8   this letter.

9       So I remember getting a letter from Signal

10   International, maybe after I came here or while I was over

11   there.

12   Q.   And the letter we're looking at now, Dewan Consultants

13   gave you this letter before you made your last fee payment.

14   A.   Definitely, I understood that now.

15   Q.   Do you see where it says right here, "Food and

16   accommodation" -- "Food and accommodation on salary reduction

17   basis."

18       Go ahead.  Go ahead.

19   A.   Definitely it says that.

20   Q.   Right.  You were told this before you made any fee

21   payments after hearing the name Signal.

22   A.   No.  One thing I wanted to remind here is that I've not

23   read any letters at all from the beginning.

24       They would show me and asked me to sign there, and I

25   would just sign there.

1  Q.    They handed you the letter.  The letter describes your
2  future employment at Signal, and you just decided not to read
3  it.
4  A.    Well, even though I did not read it, they will tell me
5  everything in Hindi to me, that this is why you are going
6  there, this is what it is, and then I signed for it.
7  Q.    Did you think that by not reading it you wouldn't be bound
8  to their terms or something?
9          THE INTERPRETER:  Could you repeat that.
10         MR. UNGAR:  Sure.
11 BY MR. UNGAR:
12 Q.    Were you thinking by not reading the letter, "Maybe I'm
13 not bound to it" or something?
14 A.    The thing is that we are all humans, and we wanted to
15 think all of the things positive, all good things.
16         And in that good thought, I sold the land.  I gave them
17 the money.  So I didn't want to ask them any small things as to
18 what this is and what this is.  And I didn't want to cause
19 anything bad.
20         So we were all thinking good things would happen.  And
21 we were expecting that.  And we were going along with that.
22 Q.    Okay.  There is no doubt that you knew before you made
23 your third installment payment that the visa you would be
24 traveling on to work for Signal was an H-2B?
25 A.    Definitely, I understood that.

1          MR. UNGAR:  All right.  Now, we can take this down.

2    BY MR. UNGAR:

3    Q.    Before you came to Signal, on one of the last days you

4    were in India, you signed some paperwork.

5    A.    Yes.  I have signed many documents.

6    Q.    One of the documents that you signed reminded you that

7    there was a chance that you would not get a permanent residence

8    visa.

9    A.    That is wrong.

10   Q.    Let's look at Exhibit 1141.

11         Have you seen this?

12   A.    I don't remember seeing a paper like this.

13   Q.    Look at page 2.  Blow up the bottom.

14         That's you?

15   A.    That is my handwriting, and that is my signature.  I am

16   telling you the truth from beginning to the end.  This is my

17   signature and my handwriting, but I had not read anything at

18   all on this.

19   Q.    By putting your name on the document, you understood that

20   you were binding yourself to its terms.

21   A.    That is what I was saying.  When they were giving -- I

22   mean, the ticket to come here, they asked me to sign all these

23   papers.  And so I have signed a lot of them, and they would

24   also be tearing off the J&M paperwork, too.

25         So I don't know what all they tore off and what they did

1    not.  But they have asked me to sign a lot of papers, and I

2    have signed a lot of papers.

3    Q.    And every paper that you signed you knew what it meant by

4    putting your name on it?

5    A.    Well, as I said earlier, you know, they -- had signed a

6    lot of papers for J&M, and that they were tearing them all up.

7          And then they were asking me to sign all of these

8    papers.  They were saying not to worry about J&M.  "This is

9    what you are going to do now.  This is where you are going for

10   now."

11   Q.    I'm not sure you are answering my question.  Let me ask

12   another question.

13         Were you telling me that somebody was tearing up your

14   paperwork?

15   A.    They were giving a reason as to why they were tearing it

16   up.

17   Q.    First, it wasn't Signal that was tearing up your

18   paperwork, right?

19   A.    While we were coming for Signal, they were saying, "You

20   can just keep the documents pertaining to Signal.  And the rest

21   of them, you don't need it."  And that's why they were tearing

22   it off.

23   Q.    Nobody from Signal ever tore up any of your paperwork.

24   A.    No.  But after coming to the Signal, too, I have signed a

25   lot of paperworks.  I have signed a lot of paperworks for

1    Signal, too, but I have not read them all.

2    Q.    You don't know if Signal knew that your paperwork abroad

3    before you came here was being torn up, do you?

4    A.    As I said, I have signed a lot of papers for J&M, and they

5    are tearing it all off.

6         And I'm coming here with all -- much expectations, and

7    they were -- then again asking me to sign a lot of paperwork

8    for here, for Signal as well.  And I was just getting by

9    without any problems with that.

10   Q.    Do me a favor.  Can you list for me -- just list for me

11   the names of the people that tore up your paperwork before you

12   came to Signal.

13   A.    Yes, I can.  Sachin Dewan.

14   Q.    I would like to talk to you a little bit about your

15   consulate interview, which you spoke with your lawyer before.

16        You understood when you were walking into the consulate

17   interview that you were required to tell the truth.

18   A.    Well, he told me that there is an interview there and that

19   I should go to the consulate.

20   Q.    You understood that you would have to answer the questions

21   posed to you at the consulate interview truthfully, before you

22   went in to the interview.

23   A.    Definitely.

24   Q.    All right.  Now, the consulate interviewer asked you how

25   much money you paid in fees.

1  A.   Yes.  They asked.

2  Q.   And you told the consulate interviewer a number much lower

3  than the amount of money you actually paid in fees.

4  A.   It is correct that you should tell the truth to the

5  consulate.  But before that -- before I was going to the

6  consulate interview, I was told that "This is what you should

7  say, that you have sold your land.  And you should say that

8  only you paid this much -- amount to go to USA, only then you

9  would be able to go to USA."

10  Q.   I understand you were told to say that.  What I'm asking

11  you to confirm is that you actually told the consulate

12  interviewer an amount of money in fees that was much lower than

13  the amount you had actually paid at that point.

14  A.   Well, yes.  I am saying this:  When I was sent there, I

15  don't have anything but -- the family land or anything like

16  that.

17       So I have to tell what Sachin is asking me to say.  So

18  I'm not really allowed, and I just have to tell what he was

19  saying.

20  Q.   In order to come to America, you lied to the United States

21  consulate.

22  A.   Sir, I am 53 years-old.  In my life, I have not deceived

23  anybody.  I have not cheated anybody.  I've always spoken truth

24  and be just.

25       In the consulate interview, I said that because Sachin was

1    telling me that "It's very good company.  You could take your

2    family there.  You could live there happily."

3         And Sachin saying that this is what I should tell, that

4    I paid and that -- that is what I had to say.  In my life, I

5    have never deceived anybody at all.

6    Q.    Other than that time at the consulate you are describing,

7    right?

8    A.    That is correct.  Because Sachin said that I would be able

9    to go if I say that at the consulate.  Yes, that's correct.

10   Q.    I would like to talk to you about your time at Signal.

11        You alleged you had to work against your will at Signal.

12   A.    I did not understand the question.  Could you please

13   repeat it again.

14   Q.    Sure.  I would be happy to.  I will try to use a different

15   word.

16        Do you understand that your lawsuit claims that you had to

17   continue to work for Signal even though you didn't want to?

18   A.    I did not understand what you are saying as even if I did

19   not want to.

20   Q.    Do you allege you felt obligated to work -- well, forget

21   "allege."

22        Do you think that you felt obligated to work for Signal?

23   A.    Definitely, I'm obligated.

24   Q.    You felt obligated the entire time you worked at Signal?

25   A.    I did not have any problem in working there in Signal.  I

1    was happy to work there.  I did not have any difficulties

2    working there.  I even had worked without eating any food from

3    morning until evening.  I -- still I had done hard work there,

4    because I did not have any problems working there at all.

5        I did not want to leave their employment.  The only reason

6    I have to leave is because they did not fulfill their promise.

7    And that is the only reason that I have to leave, not -- I

8    would be happy to be working there.

9    Q.   And in the middle of what you are saying is a time where

10   you felt obligated to work for Signal, you got on a plane and

11   flew to India, and you were there for a month, and then got on

12   the plane and flew back into that obligation?

13   A.   Definitely.  Definitely.

14   Q.   Okay.  When you were in India -- well, strike that.

15       There was nothing you were fearful of in India that

16   prevented you from going home for that month?

17   A.   Well, as I said, you know, for humans, you need to have

18   faith.  And the faith that you go.  They say that -- not to

19   worry.  "You go and come back, and we will process your

20   permanent residency."

21       So in that faith and that trust, I go and then come

22   back.

23   Q.   I was asking something differently.  Let me try different.

24       You didn't borrow any money from money lenders in order to

25   pay your recruitment fees.

1   A.    No.

2   Q.    So it has not made you afraid of money lenders or high

3   interest rates which would prevent you from going back to

4   India.

5   A.    No.  As I said, you know, I'm not from very big family.  I

6   am from ordinary, poor family.  And I had come here -- to come

7   here, I have to sell my land.

8         I did not have money to be able to borrow from money

9   lenders, or I cannot afford to do anything like that.  So

10  that's why I have to sell my land to come here.  I am from a

11  small, ordinary, poor family.

12        I lost my job and I lost my land to come here.

13  Q.    The only person that decided to sell the land that you

14  sold was you.

15  A.    Well, I decided it, but it was my father who made this

16  decision, too.  It's my family.  Whatever the money that I was

17  earning, I was spending for my family.  So they were thinking

18  about all of these things, that the family can come here, that

19  the children can have a good education; they can have a higher

20  level of lifestyle.  And my father and mother, their desire was

21  that:  To see that their children to grow -- to be bigger and

22  better life.

23        So, in that desire, that is how I ended up coming here.

24  Q.    That's how you ended up deciding to sell the land.

25  A.    Yes.  That's how I decided to sell the land.

1   Q.   I will ask you one more question, and then we're going to

2   move to time at Signal.

3        Before you came to Signal, if you would have been told in

4   India that Signal was shutting down its program and you

5   couldn't come, that would have disappointed you.

6   A.   Definitely, I would have been disappointed.  But it did

7   not happen like that.

8   Q.   Okay.  Let's talk about your time at Signal.  I want to

9   ask you a little bit about --

10       THE COURT:  Let's stop.  Let's take a break if you are

11  at a point for us to change.  So we'll take a ten-minute break.

12  We'll come back at -- in ten minutes, so 4:35.

13       Please remember the instructions I have given you

14  previously.

15              (JURY EXITS THE COURTROOM.)

16       THE COURT:  All right.  I want to talk about the --

17  the demonstratives that are proposed to be used tomorrow.

18       And, Mr. Sandler, I believe you're the person who's

19  going to argue for the plaintiffs.

20       I want to talk about the Cyrus Mehta demonstratives

21  first.  And I believe these are Signal's objections.

22       MS. HANGARTNER:  And I believe those have been worked

23  through.

24       MR. SANDLER:  Yeah, all of Cyrus Mehta's objections

25  have been accorded with Signal.  They're okay.

                    OFFICIAL TRANSCRIPT

1           We changed one of the slides in accordance with some of

2      the requests.  We have kept other pieces, and parties have

3      compromised.  And we're okay on Signal's objections.  They're

4      withdrawn.

5           THE COURT:  All right.  So -- but I want you to be sure

6      that you've looked at my order on the motion in limine and that

7      your testimony complies with that.

8           MR. SANDLER:  Yes, Your Honor.

9           THE COURT:  All right.  Then, let's talk about -- is it

10     Dr. Mowl?

11          MR. CERNIGLIA:  My objection has not been addressed at

12     all.  I don't want to agree.

13          Signal would love to have that in there.

14          THE COURT:  Wait.  Are we talking about Mehta?

15          MR. CERNIGLIA:  They've not -- yeah.  They would

16     certainly love to agree to that, but that's not their

17     demonstrative.  That's going to be -- they've got to do

18     something with their expert.  They still want -- it's not been

19     resolved at all.

20          THE COURT:  This was an objection to Opinion Nos. 1 and

21     2, filed by Burnett and Dewan.

22          MR. CERNIGLIA:  Yes.

23          MR. SANDLER:  All parties have objections to Mehta's

24     demonstratives.

25          Signal and plaintiffs have agreed -- compromised and

1    agreed.

2         Dewan's and Burnett's objections have not yet been

3    taken care of.  I think that was the -- those were the

4    objections you reviewed.

5         THE COURT:  All right.  So you want to speak,

6    Mr. Cerniglia?

7         MR. CERNIGLIA:  Yes, Your Honor.  This is not at all in

8    compliance with your order.

9         Your order is pretty clear for these attorneys to get

10   up and give opinions on the law, because to advise the jury on

11   the complexities of immigration law and whether certain conduct

12   is consistent or inconsistent with those laws...

13        As an example, I don't know if you have all of the rest

14   of it -- they do have up here -- like, H-2B visa and green

15   card.  And that's fine.  They can go into that.  They can go

16   into what the delays were.  They can go into, you know, all of

17   that.

18        But when they start saying what's unreasonable for an

19   immigration attorney to believe, that's what -- one, they

20   should decide, the jury.

21        But, two, I don't even know the relevance of that

22   except if they would have a case for malpractice against Signal

23   on behalf of the plaintiffs.

24        I mean, if the plaintiffs had malpractice individually,

25   whether his conduct was reasonable or unreasonable.  But it

1    certainly has no relevance to trafficking, mail fraud, wire

2    fraud.

3          So it certainly is not factual issues dealing with

4    immigration law and general processes, which that's fine.

5          And the next one is even worse.  They want to put up on

6    a screen that it is Mr. Burnett's plan.  There's been no

7    testimony of that.

8          Promising recruits green cards, there's been no

9    testimony of -- the promise has always been that Signal would

10   sponsor somebody for a green card.  So that's not even true.

11         And then to go on and to say, you know, have an expert

12   say that "This is my opinion that there was a promise, and it

13   was to recruit green cards," that's telling the jury, "This is

14   what the case is."

15         And that is not what an expert is supposed to do.

16         And then to say that, "Well, this was risky and highly

17   likely to fail," they can argue that in closing arguments all

18   they want, but it's not for an expert to advocate their case as

19   an argument for something the jury has to decide.

20         This does not comport with your order, Your Honor.

21         THE COURT:  Mr. Shapiro?

22         MR. SHAPIRO:  Yeah.  And I agree with Mr. Cerniglia in

23   his argument in its entirety.

24         It kind of reminds me of some of your previous orders

25   about prohibiting the experts to talk about legal conclusions

1   and supplying the jury with something that they need to decide

2   themselves.

3         THE COURT:  All right.  Mr. Sandler?

4         MR. SANDLER:  Thank you, Your Honor.

5         There's two opinions.  I think you have the slide

6   before you.

7         So the first one, Mr. Cerniglia has raised the issue.

8         Can I look at this, or does it have your notes on it?

9         MR. CERNIGLIA:  Yeah, that is it.

10        MR. SANDLER:  The first issue Mr. Cerniglia has pointed

11  out is that this has nothing to do with trafficking, mail

12  fraud, or wire fraud.  You know, that's obviously not the

13  entire universe of the claims the plaintiffs have against

14  Mr. Burnett.  And the claims include fraud, common law fraud,

15  negligent misrepresentation.

16        And -- but, really, what the -- and, therefore, there

17  is a relevance there.  But what -- and then I will speak to

18  Opinion 2 in a moment.

19        But what's really at issue here is that, for the jury,

20  there's really two steps for them.

21        The first one is that they have to understand a very

22  complex area of law that most practitioners who are not ex- --

23  who do not practice in it, have trouble understanding, and

24  that's immigration law.

25        So it's already a big ordeal to have them do that.

1        The next step that they're going to have to do is that

2   they're going to have to decide, okay, now that I think that

3   I've worked out how U.S. immigration law applied in 2004, 2005,

4   and 2006, they now have to decide what did Mr. Burnett do and

5   was that appropriate conduct under that legal regime.

6        And so, you know, for Mr. Mehta to get up there and

7   explain what the law is or was, but not for him to opine what

8   was going on in the immigration law community at that time, as

9   to promises of two years to get a green card, which is really

10  the core promise that Burnett made to all of the plaintiffs,

11  and whether that was even conceivable at that time, is

12  something that I think that Mr. Mehta needs to be able to do.

13       Otherwise, the only person who's going to give

14  testimony on that, the only person who can actually

15  authoritatively speak about immigration law, if not Mr. Mehta

16  or Mr. Gonzalez for Signal, is Mr. Burnett.

17       And I think that the jury needs to have a counterweight

18  to understand it is not just the plain, cold law -- this is how

19  an H-2B works; this is how a green cards works -- but also what

20  was appropriate conduct, what were -- what could even be

21  reasonable at that time.

22       Is it reasonable to promise a green card in two years

23  to somebody born in India at that time?

24       And Mr. Burnett will say it was and that's why he did

25  it.

1         And the fact of the matter is the immigration community

2    does not believe that.

3         And I think that the jury will feel -- will not have an

4    adequate basis to assess Mr. Burnett's testimony if they

5    haven't at least heard from an expert who can speak, from an

6    objective point of view, as to the state of the law at that

7    time for immigration law.  So that's for Opinion 1.

8         For opinion -- and so, for Opinion 2, Mr. Cerniglia

9    took issue with it, saying Mr. Burnett's plan of promising

10   recruits green cards -- we can change that language.

11        I don't have to assign a plan to Mr. Burnett.  And

12   that's something that Mr. Cerniglia and I haven't even

13   discussed.  But, of course, plaintiffs can change that.

14        But I think that he has a larger overarching issue with

15   respect to this, and that is the plaintiffs' expert's opinion

16   on how you can move somebody from a H-2B to a green card.

17        The fact of the matter is, in the immigration law

18   community, almost no one ever does it because of the things

19   that are stated in Opinion No. 2.

20        And, again, if Mr. Mehta is not allowed to comment on

21   that, then plaintiffs will not be able to articulate just how

22   far-fetched the plan was.

23        And for, you know, unschooled people, in U.S. law, much

24   less U.S. immigration law, to fall prey to it, you know,

25   they're not able to articulate these intricacies in their own

1    testimony.  And, therefore, they need the help of an expert.

2         All of this will be addressed by cross-examination.

3         MR. CERNIGLIA:  Your Honor, it's fine to talk about

4    what the law allows, what time limitations they may have, what

5    has to be filed here, what has to be filed there.

6         But to take it to the next step and start talking about

7    what the immigration community believes, well, now you're

8    getting into a standard-of-care argument.

9         But it's not what Mr. Burnett's going to be saying this

10   is or is not.  His testimony -- there's going to be testimony

11   that this did happen.

12        If they want to say you cannot do an H-2B and you

13   cannot do, add to an I-140 because these are the reasons, this

14   is the law, boom, boom, boom, boom, that's exactly what an

15   expert's supposed to do.  And that's what I have to

16   cross-examine.

17        THE COURT:  Well, what is Mr. Burnett going to testify

18   about with respect to the law?  Are you --

19        MR. CERNIGLIA:  The only thing that I --

20        THE COURT:  -- are you planning to have him testify

21   that what he did was reasonable or that --

22        MR. CERNIGLIA:  No.  I'm going to have him testify on

23   what he did.

24        THE COURT:  I'm not -- I'm not going to allow

25   Mr. Burnett to give legal opinions, either.

1        MR. CERNIGLIA:  No.  I have no -- now, I would say --

2        THE COURT:  Conclusions, legal conclusions.

3        MR. CERNIGLIA:  Oh, on conclusions.  But what the law

4    states, and that's fine.  I'm fine with that.

5        But, no, I'm not going to give a legal conclusion

6    either.

7        THE COURT:  He's not going to be able to say, "I didn't

8    commit malpractice."

9        MR. CERNIGLIA:  No, of course not.

10       THE COURT:  And that, you know, he can talk about what

11   he -- he can basically say the same things the other experts

12   can talk about.

13       MR. CERNIGLIA:  Exactly.  What is the law, what is --

14       THE COURT:  Whether certain conduct complies with the

15   law.

16       But then he can't reach the conclusions that what he

17   did was reasonable and that he didn't commit malpractice.

18       MR. CERNIGLIA:  Absolutely true, Your Honor.  He's also

19   going to determine what he did use.

20       Having stuff like this in the opinion from an expert,

21   saying, "Well, my opinion is that when he made that promise,

22   he's -- he's" -- first of all, as soon as you say that, now the

23   premise is it's been established.

24       But then he's going to go on and say the conclusions

25   from that.  That is not what this expert's for.

1      We have to educate the jury on I-140s, H-2Bs, when you

2  can file for extensions, when you can't file for an extension.

3  And that is absolutely fine.  I have no problem with that,

4  either.

5      THE COURT:  Ms. Hangartner, are you standing there for

6  a reason?

7      MS. HANGARTNER:  Your Honor, my concern is -- and I

8  believe that I share this with the plaintiffs, and I echo what

9  Mr. Sandler said -- is that it's a very intricate area of law.

10  It's not just the statutory schemes.

11      There are H-2B bulletins that come out.  You have to

12  factor that into conjunction with the H-2B or the I-140 as well

13  as the priority date that an individual may have or may have

14  lost.

15      THE COURT:  But I consider that part of the law.

16  That's part of the law.

17      MS. HANGARTNER:  But I think the concern is putting

18  those pieces together from an expert's point of view.  Because

19  in order -- it's my belief, and correct me if I'm wrong, but

20  for Mr. Burnett to defend himself, he's going to say these

21  things.

22      And the only way that we can rebut it is through expert

23  testimony.

24      THE COURT:  Anything else?

25      MR. SANDLER:  May I respond very quickly.

1      Mr. Burnett has been deposed in over 1,000 pages of

2  testimony.  So he has said these things.  He said that his plan

3  was reasonable.  He said it was totally --

4      THE COURT:  That's what he said in his deposition.

5      MR. CERNIGLIA:  You're right.

6      THE COURT:  It doesn't mean he's going to say it on the

7  stand.

8      MR. SANDLER:  Well, would a question to the expert be

9  "What is your opinion of a promise to an Indian-born person

10 that they could get a green card within two years in 2005?"

11     THE COURT:  I think you can -- I think you can say it

12 another way.  Like, "How long does it take" --

13     MR. CERNIGLIA:  Yes.

14     THE COURT:  -- "to get a green card?"

15     MR. SANDLER:  But, in immigration law, there is no

16 fixed period of time.

17     For some of these guys, they still wouldn't have it

18 under the -- under the old scheme.

19     THE COURT:  Well, then he'll -- he can answer that

20 there's no fixed period of time.

21     MR. SANDLER:  But it's possible there is a

22 one-in-a-million chance that you could get it.  And what I'm --

23 what plaintiffs are nervous of is that possibility, that

24 infinitesimal possibility, being amplified so Mr. Burnett's

25 essentially, as if it were of equal weight to it not having it.

 1        THE COURT:  I think your expert can say, "In my

 2   experience, it's very rare for this to happen, for these

 3   circumstances to result in a green card within two years."

 4        I think he can testify to that.

 5        MR. SANDLER:  Okay.  Fair enough.  And if I could ask

 6   him by what percentage, if I could give him a percentage?  Is

 7   it a -- you know, is it a 10 percent chance?  Is it 20 percent

 8   chance?  He could give that?

 9        THE COURT:  He can say that.  Yes.

10        MR. SANDLER:  Very well, Your Honor.

11        THE COURT:  So I'm sustaining the Burnett and Shapiro

12   objections.

13        You cannot use this demonstrative or go beyond the

14   limits of what I ruled in the order on the motion in limine.

15        I think I've clarified it somewhat for you this

16   afternoon.

17        MR. SANDLER:  Thank you, Your Honor.

18        MR. SHAPIRO:  I want to add one thing.

19        I appreciate your ruling, but it seems to me that

20   something has come up again and again in this case.

21        THE COURT:  Stand closer to the mic.

22        MR. SHAPIRO:  I'm terribly sorry.

23        The issue of just asking a witness that -- what was

24   promised here.

25        I think there has to be -- somehow it has to be

1    established that there was a promise before that question could

2    be asked.

3          I mean, it's a statement.  It has to be a promise of

4    some kind.

5          THE COURT:  Well, you know, this is -- you're going to

6    have a chance to question your witnesses.

7          And I assume they'll say there was no promise.

8          All right.  Let's talk about Amy Mowl.  Who is this?

9    This is Signal.

10         DR. ROUX:  Yes, Your Honor.  And I think that our

11   concerns stem from the same interpretation of your order

12   concerning the motion in limine with respect to Ms. Mowl.

13         Signal's understanding of your motion -- or your order

14   regarding the motion was that she'd be limited to testifying

15   about debt and collection practices in India.

16         But we're worried that the demonstratives that the

17   plaintiffs have presented with respect to two bullet points

18   going beyond that limitation and may be indicative of her

19   testimony, going beyond that limitation as well.

20         One of the bullet points concerns opinions related to

21   the debt or protection laws in India and their lack of

22   enforcement, which is a legal opinion.

23         We would urge -- and she is an economist, not a lawyer,

24   much less an Indian lawyer.  So it's not in her competence to

25   render such an opinion.

1          The second point has to do with her opinion regarding

2   newspaper articles.

3          In the motion in limine order, Your Honor ruled that

4   she may not render opinions or make mention of suicide as it

5   relates to Indian debt practices.

6          In her expert report, that primarily came from

7   newspaper articles.

8          Further, the newspaper articles don't have anything to

9   do specifically with debt and collection practices in India.

10  They have to do with what the plaintiffs would have known or

11  would have heard of, and those go to other aspects of the

12  motion in limine that were granted in Signal's favor.

13          THE COURT:  All right.

14          MS. GRAUNKE:   Thank you, Your Honor.

15          As regards the bullet point -- we're talking about laws

16  protecting debtors in India are weak and poorly enforced.

17          What we're trying to get at here, and I think what

18  Ms. Mowl will testify to, is that there just aren't many laws

19  that protect debtors, specifically in India.

20          But more than that -- and perhaps some wordsmithing

21  could be done to convey this -- but more than that, that the

22  police just don't take action against money lenders who resort

23  to violent acts or threats to try to get their loans repaid,

24  that they see this as a private matter between lender and

25  borrower, and that they don't even enforce criminal laws often

1     until it's very late, if at all.

2            So that's what we're seeking to have her discuss.

3            THE COURT:  Where is it in her report that she gives

4     that opinion?

5            MS. GRAUNKE:  Your Honor, I'm sorry.  I don't have that

6     report in front of me.

7            THE COURT:  I have two.  By the way, are there two?  I

8     have two different reports.

9            Maybe one was in Texas.

10           MS. GRAUNKE:  Yeah.  No, I think there was one report.

11           THE COURT:  One was in Louisiana.

12           I have a copy.  Do you want to see it?

13           MS. GRAUNKE:  Sure.  I apologize.

14           THE COURT:  I tell you what.  We're going to start the

15    testimony, and you find that, and we will continue this at

16    5:30.

17           MS. GRAUNKE:  Okay.

18           DR. ROUX:  Yes, Your Honor.  Thank you.

19           THE COURT:  All right.  So let's bring the jury back.

20

21                      (JURY ENTERS THE COURTROOM.)

22

23           THE COURT:  All right.  Have a seat.  Thank you.

24           MR. UNGAR:  Thank you, Your Honor.

25    ///

                        OFFICIAL TRANSCRIPT

1    BY MR. UNGAR:

2    Q.    Mr. Andrews, I would like to talk to you a little bit

3    about your money while you were working at Signal and how it

4    was handled.

5          You were paid by direct deposit into an M&M Bank account.

6    A.    Yes.

7    Q.    Okay.  Once the money ended up in your M&M Bank account,

8    you are the only person that would ever take it out, right?

9    A.    Yes.  Because it is my money, only I could take it out.

10   There is nobody else of mine who are living around here.

11   Q.    Right.  And then you would take that money out, and some

12   of that money you would send to your family in India.

13   A.    No, not some money.  Mostly, most of the money that I

14   earned I spent for my family.

15   Q.    Signal did not interfere with your sending money home,

16   right?

17   A.    No.  Definitely, they did not.

18   Q.    You never suffered physical injury while you were at

19   Signal.

20   A.    Even though at the workplace I did not get any physical

21   injury.  Mentally and emotionally I was injured.

22   Q.    Right.  You were never physically injured at Signal.

23   A.    It never happened.

24   Q.    Nobody at Signal ever threatened you with physical injury.

25   A.    Initially, it was not there.  But after the Sabulal

1   incident happened, in my mind I had a fear like that, but

2   nobody had done anything like that.

3   Q.   And nobody at Signal ever threatened your family.

4   A.   Definitely.  It never happened.

5   Q.   Right.  Nobody at Signal ever said anything to you that

6   you thought was hateful.

7   A.   The company, nothing like hateful was said, but then they

8   were badly pushing us.  "Because these guys are Indians, we

9   could make them do a lot more work."

10         Towards the end, they were doing these things.

11  Q.   You liked your day-to-day work at Signal, I think you

12  testified.

13  A.   Definitely.  That's right.

14  Q.   In fact, you cannot remember a single time when you did a

15  job at Signal that you thought was unsafe?

16  A.   Never.  I never desired to have anything like that.

17  Q.   There were Mexican people on your work crew?

18  A.   They were.

19  Q.   Those Mexican people would get the same work assignments

20  as you.

21  A.   There is some difference in it.

22  Q.   More or less same jobs, everybody on your crew.

23  A.   There is a small difference.

24  Q.   What's the small difference?

25  A.   When they were asking us to be quick, they are saying --

1    saying us to be fast and do it quickly, then we say, "Okay."

2    We listen to them.

3           But if they are saying the same thing to a Mexican or

4    an American worker, then they will say, "Okay."  And they would

5    just grab their tools, and they would walk away from there.  So

6    that small difference was there.

7    Q.    Okay.  But as far as the job assignment, what you were

8    actually doing when you were welding, the job assignments were

9    the same.

10   A.    Definitely, yes, yes.

11   Q.    Now, your lawyer put up a couple of documents that said

12   that you got some warnings that you disagreed with.

13   A.    The thing -- the reason I was disagreeing is that you are

14   working truthfully.  You are doing good work.  You are a hard

15   worker.  And then still when you are getting one letter for all

16   of your hard work and things like that, then no matter who you

17   are, then you would still feel emotionally -- it would affect

18   you.  Mentally, it would affect you.

19   Q.    Signal never lowered your wages while you were working

20   there?

21   A.    It never happened, no.

22   Q.    You were getting these warnings, but you were getting

23   raises, too?

24   A.    No.  I had not gotten any raise after the warning.  When I

25   initially came, I did the test, and they increased my rate.

1    And then I continued performing good work, and then they had --

2    I believe they just increased my wages once.

3    Q.    What do you think your final hourly rate was at Signal for

4    work as a welder?

5    A.    I always respect my salary that I was getting from Signal.

6    I had worked in other countries as well.  So I do not know the

7    value of -- or the money that I was getting from Signal, and I

8    was really happy, and I was proud of it.

9    Q.    What was that number per hour?

10   A.    $18.75.

11   Q.    And that is where your salary stayed -- well, that is

12   where your hourly rate stayed until you left Signal?

13   A.    Definitely, yes.

14   Q.    All right.  Let's talk a little bit about the bunkhouse.

15         You were at Signal for, like, 16 months; is that about

16   right?

17   A.    Definitely, I was there.

18   Q.    All right.  So over half the time that you were at Signal,

19   your bunkhouse has less than 18 people in it.

20   A.    Yes.

21   Q.    So when people were saying that the plaintiffs' bunkhouses

22   had 24 people in it, that's not true for you for over half the

23   time you were at Signal?

24   A.    As I said, initially when I came there for four or

25   five months, it was very tight.  The bunkhouse was full.  But

1    then later on, new bunkhouses have come, and people have left

2    from there.  So then it became better.

3    Q.    Right.  Within six months of you being at Signal, the

4    number of people in your bunkhouse was 18 or lower.

5    A.    I have told you already.  Yes.

6    Q.    Okay.  Did you have a top bunk or bottom bunk?

7    A.    I was at the bottom.

8    Q.    You could sit up on your bottom bunk without hitting your

9    head, right?

10   A.    When we came here initially, my head would hit.  But then

11   later on, after, we told them, and they had brought in some

12   carpenters, and then they corrected it.

13   Q.    So you guys complained to Signal and said, "Can you lift

14   the top bunks up a little bit higher so that the people on the

15   bottom bunk won't hit their heads?"

16         And then that change was made by Signal, is what you

17   are saying?

18   A.    As I said earlier, I have never written a complaint.  It

19   was my coworkers who had complained about these things.  And

20   based on that, Signal had made the changes, and I enjoyed the

21   good deeds from that.

22         Sorry.  I cannot say that I enjoyed -- I had -- I lived

23   there with -- withstanding the difficulties.

24   Q.    Now, when you arrived at Signal, there was a shower

25   trailer, right?

1    A.    No.

2    Q.    There was certainly a shower trailer at Signal while you

3    were working there?

4    A.    No.

5    Q.    Never?

6    A.    No, I have not seen it.

7    Q.    Okay.  Do you remember while you were at Signal that

8    Signal created, like, a boot rack or a boot shelf for the work

9    boots so that they wouldn't be brought into the bunkhouse?

10   A.    As I said, that I was a person that came on the first

11   group of people, and that is correct.

12          They had a small box by the bunkhouse to keep our

13   shoes.

14   Q.    Was that there when you arrived?

15   A.    No.  But they brought it in after we arrived there.

16   Q.    Right.  It was brought in because some of your coworkers

17   were asking for it.

18   A.    It could be.

19   Q.    Okay.  Let's talk about the food for a second.

20          You never ate spoiled food inside the mess hall, right?

21   A.    I ate it, and I got ill because of it.  And it was very

22   sad that I had eaten there.

23   Q.    The spoiled food that I thought you said you ate was the

24   food that you would bring with you and it got spoiled on the

25   worksite.

1    A.    Definitely, yes.

2    Q.    The food wasn't spoiled when it was in the mess hall.

3    A.    Well, there is, like, a difference there.

4          The food that they were preparing, they were preparing

5    in the evening.  And because there was a time change, then that

6    makes a difference.

7          And it's all true that 90 percent of the time the food

8    that was taken was the one that got spoiled.  I'm not saying

9    that my stomach illness came basically because -- as far as

10   food.

11         But then it is -- the reason being that there is no

12   fridge that was provided at the worksite.  That is why the food

13   got spoiled.

14   Q.    You never ate spoiled food inside the mess hall, right?

15   A.    We cannot say that.  There may not be any smell when you

16   take the food to eat.  But only after you go to the company,

17   then you may have some stomach problem or some gas.

18         But, so, you know, you take food that is hot to avoid

19   all of these problems.

20   Q.    I think you testified that there was a bus or a van at

21   Signal that you could take to Wal-Mart.  That is how you would

22   get to the Buffalo Wild Wings.

23   A.    Definitely.  I said that.

24   Q.    Couldn't you spend a couple of bucks at Wal-Mart to get

25   yourself a thermos, make sure you weren't eating spoiled food?

1    A.    I don't know if we got it or the company provided us.

2          They had given us a box, a thermos box, so that we

3    could carry our food without it getting spoiled.

4    Q.    Right.  Then when you realized that that box might not

5    actually be good enough to prevent the spoiling, instead of

6    going and spending a few dollars to get a box that would

7    prevent it, you kept using the box and kept getting sick.

8    A.    Well, so that is around there.  Even though if you spend

9    $100 to buy a box, if the food that you are putting in that

10   box, if it's spoiled, what good is it?

11         The box that we were carrying, it was a very good box.

12   Q.    Okay.  I want to ask you a couple of questions about the

13   boil that you told us was removed off of your back.

14         You testified that a doctor told you that you got a

15   boil on your back because of food that you ate; is that right?

16   A.    Yes.  Definitely.  The doctor asked me, "What food are you

17   eating?"  And so I told him the food I eat.  Then, because of

18   that, if you are not eating proper food, then you would have

19   gas and you will have stomach problems and you have to go to

20   bathroom like two or three times because of the food.  So the

21   doctor was saying you should eat good food.

22         "So that time you don't have any stomach problems and

23   things like this, you would have acne on all of your body if

24   you are not eating proper food, and this could happen along

25   with the stomach problem."

1    Q.    Tell me the name of the doctor that told you that.

2    A.    I don't remember the doctor's name.  He was in Moss Point.

3          It's been five, eight years ago.  So I have been there

4    only once, and he was a very good doctor.

5          He did the surgery and put on the medication and asked

6    me to control the food.

7          And up until today, I never had the diarrhea occur

8    again.

9    Q.    I'm assuming that it was a dermatologist that removed the

10   thing off your back?

11   A.    I don't know which doctor that I went and saw.

12         It was an ordinary doctor, and he did a very good

13   treatment at that time.

14         He was asking about the food and what -- the responses

15   I just gave, he gave me those responses.

16   Q.    While you were working at Signal, you had many days off.

17   A.    I did not take time off on my own accord.

18         Whenever the company was giving time off, so that's

19   what I had.

20   Q.    Sometimes you would go fishing on your time off?

21   A.    I remember one or two times that I went along with my

22   friends.

23   Q.    And then you also bought a car while you were at Signal.

24   A.    Definitely, I bought it.

25   Q.    After you bought the car, whenever you were off of work,

1   you could use that car and go wherever you wanted, and you did

2   that.

3   A.    Yes.  Yes.

4   Q.    You drove the car all the way to Disney World?

5   A.    That is -- this is something that I had very much desire

6   to do at the time.

7         I was living in that room that is like a jail, and I

8   was having a difficult life.  So I thought, you know, "Let me

9   buy a car and let me go look around America when I'm not at

10  work."

11        So I did that.  That is a truthful thing.  Yes, I did

12  that, definitely.

13  Q.    And you knew while you were working at Signal you were

14  free to quit whenever you wanted to?

15  A.    No.  I never thought about my quitting.  I never had a

16  plan.

17        The reason I was buying the car, too, when my family

18  comes here, that I could take them around; I can show them

19  around.  I don't have to ask someone else to drive us.

20        So that's the reason I had to buy a car, too.

21  Q.    I understand it wasn't your plan.  What I'm asking you to

22  confirm for me is that you knew while you were working at

23  Signal, that if you want to, you were free to leave that

24  employment whenever you wanted.

25  A.    To quit my job and go, I never thought that.  I know when

1    I do not have any work I could go out and look around, but I

2    never talked about quitting my job and leaving from there.

3    Q.    I understand that you never thought about it.  It's

4    something you knew you could do, though.

5    A.    Definitely.

6    Q.    You also knew that if you chose to leave Signal, Signal

7    would not sponsor you for an employment-based green card.

8    A.    No.  For however long I have worked there, I'm expecting

9    that they would be getting me a green card.

10         So I worked with dedication there.  But expecting that

11   they would get -- give me the green card, I would come to work

12   there.

13   Q.    You knew, though, that in order for Signal to sponsor you

14   for a green card, you actually had to be working for them.

15   A.    Definitely.  That's why I was staying there, right?

16         Only, later on, the company was saying that they would

17   not give me the green card.

18   Q.    All right.  You testified about seeing a part of the

19   March 9th events and then proceeding to work.

20   A.    Yes.

21   Q.    So anything about that day, you were told by others?

22   A.    Yes.

23   Q.    After that day, you stayed at Signal for, like, 11 more

24   months.

25   A.    Yes.  Whatever the promise I gave for Signal, I fulfilled.

1    Q.    Now, when you left Signal, I think you testified that

2    somebody at Signal told you that they would not be able to get

3    you a green card.

4         Is that what you are saying?

5    A.    I did not say that.  When I was leaving, while I was

6    working at Signal, the campers had a meeting at the mess hall,

7    and he was saying that they would not give us green card.

8    Q.    Isn't it true that what actually happened is that at a

9    meeting with Signal you were told by a Signal representative

10   that Signal would indeed apply for a green card for you, but

11   that's -- because you traveled on an H-2B visa, you would have

12   to go home to India while that was pending?

13   A.    So I have only told you that, that I came here with

14   expectation of a green card.  And after working for six months,

15   they are saying they are going to apply for it, and that I

16   could go back.

17        So I went to India, and then I came back.

18        And they were saying, "You can't continue working, and

19   we will get you the green card."  And with that expectation, I

20   was working continuously there.

21   Q.    Signal told you that it would actually apply for a green

22   card for you; it's just you would have to go back to India to

23   wait for it.

24        Isn't that what Signal told you?

25   A.    No.  No.  What they told me is that they -- that I would

1    be getting a H-2B visa and they would renew that, and they

2    would also apply for my green card.

3         Because of them saying that, that's why I went to India

4    for six months.

5    Q.    Okay.  Now, while you were at Signal, you had some

6    meetings with Mr. Burnett in New Orleans, right?

7    A.    The meeting that I had with Mr. Burnett was after one or

8    two weeks of after me coming here.

9    Q.    While you were working for Signal, weren't you meeting

10   with Malvern Burnett to pursue your J&M green card opportunity?

11   A.    Well, Mr. Malvern Burnett is the first person that I'm

12   meeting to come to America, right.

13        So while I'm here, then I wanted to go see him, and I

14   asked him about the green card processing and bought my work

15   permit for an opportunity to stay here permanently, the

16   permanent residence thing.

17        So while I'm also here, I thought I would go and talk

18   to him and ask him face to face.

19   Q.    You asked him about J&M.

20   A.    Well, I met him for J&M.  So I went to his office and I

21   was asking about my green card.

22        So he says not to worry about anything.  "You just work

23   good at Signal International, and they will make all of the

24   arrangements.  Do not worry at all."

25        So with all of those hopes, I was having greater

1    expectations that Signal International will process my green

2    card.

3          Well, regarding one more thing I have to say, is

4    regarding the green card processing that Malvern C. Burnett had

5    come to the office at Signal with the Signal representative

6    there at Signal, and told us that "You continue doing work so

7    Signal will process and get the green card for you."

8          So I cannot hold responsible for Malvern C. Burnett or

9    Sachin Dewan.  I can only ask Signal International, because

10   they were the one who are supposed to process the green card.

11   Q.   Isn't it true that at your deposition last year I asked

12   you, "While you were working for Signal, weren't you meeting

13   with Malvern Burnett to pursue your J&M green card

14   opportunity?" And you said, "Yes"?

15   A.   Yes.  Definitely, that is what had happened.  Initially,

16   we had applied for J&M, and they were processing this for J&M.

17   And at the last minute, they were saying that you would go for

18   Signal International.

19        And Sachin Dewan and Michael Pol and -- they all met with

20   the top person of Signal, and they decided that Signal is the

21   one who is going to process the green card.

22   Q.   You don't know if Signal knew you were talking with

23   Malvern Burnett while you were working for Signal about J&M, do

24   you?

25   A.   Well, that is why I'm telling you again, I -- initially,

1    we were processing for J&M.  And then they say, "Forget about

2    that, and Signal International is the one who is going to

3    process it from now on."

4        And all of these people, they had come here and spoken to

5    the main person here at Signal International.  And then Signal

6    International themselves tell us that they would be the one who

7    is going to process the green card.

8        Only after the meeting, Sachin Dewan goes back to India,

9    and then Malvern C. Burnett comes back over here.  And after

10   that, I have never contacted Malvern C. Burnett.

11   Q.   I'm talking about a meeting you attended with Malvern

12   Burnett where you were talking about J&M, which you confirmed

13   for me occurred.

14       You don't know if Signal knew about that meeting?

15   A.   That is what I was saying, that I had come here to

16   New Orleans to meet Malvern C. Burnett.  And I asked him, "What

17   about the permanent residency?  Are you processing with the J&M

18   or Signal International?"

19           That is when he was saying that -- not to worry about

20   it at all, do not see about J&M at all, not to worry, that "You

21   go back and work good."  And Malvern C. Burnett was saying not

22   to worry about it at all.

23   Q.   I'm going to ask to pull up the deposition testimony.

24   This is Volume 3 of the deposition of Andrews Padavettiyil,

25   page 589.  So the date of that deposition is March 25, 2014.

1     Starting on Line 25, I'm going to read, which is the exact

2  question I asked you earlier:

3     "QUESTION:  While you were working for Signal" -- next

4  page -- "weren't you meeting with Malvern Burnett to pursue

5  your J&M green card opportunity?

6     And your answer was:  "Yes."

7     Right?

8     MS. BOUHABIB:  Objection, Your Honor.  Improper

9  impeachment.  He agreed that he met with Mr. Burnett to talk

10  about J&M.

11     THE COURT:  I assume you are setting up or going to

12  show something now.

13     MR. UNGAR:  I actually wasn't sure that he actually

14  confirmed it.  If he can confirm for me that it was true, that

15  was really all I was trying to establish.  I just want to

16  ensure that he actually said that.

17     THE COURT:  Okay.  I think he said that.

18     Let's move on.

19     MR. UNGAR:  Okay.  I'll take that.

20     Last thing, I'm nearly done.  Five minutes maybe.

21  BY MR. UNGAR:

22  Q.   When you sold the land in 2004, you got five lakhs, right?

23  A.   Yes.

24  Q.   That is about $12,000, U.S.?

25  A.   No.  Approximately $20,000.

OFFICIAL TRANSCRIPT

1    Q.    Really?

2    A.    Well, there is a difference.  Every year the Indian rupee

3    and U.S. dollar exchange is different.  So it goes up or comes

4    down.

5          So it could be, like, 12,000 or 20,000.  And if you are

6    looking at current rate, then it would be even more.

7    Q.    In 2004, it was about 12,000 for 100,000 rupees?

8    A.    I don't know exactly.  I don't remember.  So if you look

9    every year at the dollar rate to India rupee rate, then you

10   would be able to know that.  I don't know exactly.  I don't

11   remember it.

12   Q.    Right.  But it was no more than $20,000.

13   A.    Yes.  Yes.

14   Q.    Do you remember how much money you made at Signal?

15   A.    Well, is there something that I can tell?  Would it be

16   okay if I could say something?

17         At this time period, I want to remind you as well that

18   land that I sold had actually gone up four or five times in its

19   price.

20   Q.    Every time you sell land, you take that risk, right?

21   A.    No.  I only have sold my land once.

22   Q.    You recognize the document -- okay.  So this is

23   Exhibit 2098, which has been admitted already.

24         You recognize this as your 2006 W-2 from Signal?

25   A.    Definitely.

1    Q.    You grossed $9,889.39 in 2006 from Signal?

2    A.    Definitely.

3    Q.    Do you recognize this as your 2007 W-2 from Signal?

4    A.    Definitely.

5    Q.    In 2007, you grossed $64,533.55 while working for Signal?

6    A.    Yes, sir.  But I have a small thing that I need to say on

7    that, too.

8          In this, it does not show $12,000 that has been deducted

9    from this 64,533.

10          And then also when I was not employed for two or

11   three years in India, when I was hungry, my father and

12   brothers, they -- for two years, that they had borrowed a lot

13   of money to feed themselves with the money that -- I'm able to

14   support them with the money that I was sending them.

15          Did you know that?

16   Q.    That is your 2008 W-2 from Signal?

17   A.    Yes.

18   Q.    You grossed $3,982.88 in 2008 at Signal?

19   A.    Yes.

20   Q.    So total you grossed about $80,000 while you worked for

21   Signal?

22   A.    Well, sir, in that 16 months that I worked there for,

23   every month they had deducted $1,050 from that.  So if you

24   could use that amount also from that money -- if you could say

25   that.

1        THE COURT:  Stop.

2        THE WITNESS:  For the two years that I was working

3   here, my family had to borrow money to feed themselves.

4        I'm very happy that I have come here to America and I

5   was able to make this amount of money.

6   BY MR. UNGAR:

7   Q.   Which was in gross at Signal -- yes-or-no question --

8   $80,000.

9   A.   No.  I have not received that amount.  They have taken the

10  money out.  The company had deducted the money from that.  The

11  reason being that they did not take out the money that they

12  deducted for food from this.  This includes all of those, too.

13       THE COURT:  I think we need to move on.

14       MR. UNGAR:  Nothing further.  Thank you, Your Honor.

15       THE COURT:  So we're going to break for the day.

16       I want to remind the jury of the instructions I have

17  given them.  Until the trial is over, you are not to discuss

18  the case with anyone, including your fellow jurors, members of

19  your family, people involved in the trial, or anything else.

20       If anyone approaches you and tries to talk about the

21  case, do not tell your fellow jurors, but advise me about it

22  immediately.

23       You must not communicate with or provide any

24  information to anyone, by any means, about the case.  You may

25  not discuss the case, even among yourselves, until it's

1   concluded and you are instructed to begin your deliberations.

2        Please remember you are not to reach any conclusions

3   until all of the evidence has been presented, the Court has

4   instructed you on the law applicable to the case, and it's

5   given to you for deliberation and decision.

6        We will resume at nine o'clock tomorrow.

7

8                    (JURY EXITS THE COURTROOM.)

9

10       THE COURT:  The witness can leave.  The witness

11  tomorrow -- would you please tell him that because he is under

12  cross-examination, he is not to discuss his testimony with

13  anybody until he goes back on the stand tomorrow, and that is

14  to include his lawyers.

15

16                    (WITNESS EXITS STAND.)

17

18       THE COURT:  All right.  Thank you.  You may all leave

19  the stand.  Thank you.

20       And you-all, I'm going to finish up this argument

21  about -- you-all can have a seat -- about the expert opinions

22  before we go to my conference room to have our first charge

23  conference.

24       For the record, I want to clarify that the -- with

25  respect to the Cyrus -- yes -- the Cyrus/Mehta objections by

1   Burnett and Dewan, the objections were to demonstratives that

2   had this information.

3          Cyrus Mehta Opinion No. 1:  "From 2004 to 2006, it will

4   be unreasonable for U.S. immigration attorney to believe that a

5   person with the skill sets of the plaintiffs, in this case,

6   born in India could obtain permanent residency status in the

7   U.S. within two years through a U.S. employer."

8          And Cyrus Mehta Opinion No. 2:  "Mr. Burnett's plan of

9   promising recruits green cards when moving those recruits into

10  the U.S. under an H-2B visa was dubious, risky, and highly

11  likely to fail."

12         So I don't want more discussion.  I just wanted the

13  record to be clear of what we were arguing about earlier.

14         Then, with respect to, let's see, Amy Mowl.

15         Just for the record, the Signal objections are to the

16  fourth bullet point under Amy Mowl Opinion No. 2, which reads:

17  "Laws protecting debtors in India are weak and poorly

18  enforced."

19         And the fourth bullet point under Amy Mowl, Opinion

20  No. 3, which reads:  "The Indian media frequently reports on

21  lender violence against borrowers, raising public awareness of

22  the consequences of failure to repay loans."

23         All right.  So, Ms. Graunke, did you find the pages

24  where these opinions are?

25         MS. GRAUNKE:  I did, Your Honor.  And I'm sorry for not

1   having brought my own copy.  If you would like yours back I am

2   happy return it.  Thank you.

3           So, first of all, Paragraph 18, references weak

4   consumer protection laws in India.

5           In Paragraph 26, she talks about anti-usury laws as

6   being one of the few laws that exist that might protect a

7   debtor in India.

8           She also reference laws that might govern illegal

9   practices to collect the debt, which is causing bodily harm to

10  someone.

11          Then, in Paragraph 35, she also references the few

12  criminal charges faced by money lenders, who act abusively

13  towards borrowers who are in default.

14          And, finally, I would just note that she also, in

15  Paragraph 4, is describing her qualifications and references

16  she has led research projects, and investing those financial

17  management and financial decision-making in Indian households.

18          And I know that she will be able to testify that one of

19  the things she has done is actually interviewed -- or

20  supervised the staff that has interviewed debtors about their

21  experiences with debt, and some of these issues do come up in

22  that.

23          We think it's a fair point.  I don't know if Your Honor

24  has particular questions on that bullet point or would like me

25  to move on to the other ones.

1       THE COURT:  I do want you to give me the paragraphs for

2   the other one.  Then I do need my copy back.

3       MS. GRAUNKE:  Sure.

4       THE COURT:  For the Opinion No. 3.

5       MS. GRAUNKE:  Sure.  I think this is encompassed

6   largely in pages 17 through 20.  And -- sorry -- let me go

7   on -- through to 21.

8       And this is, you know -- and I understand that the

9   Court has ruled that Ms. Mowl is not to discuss instances of

10  debtor suicide.  But there is -- and this is something we

11  argued in response to motion in limine -- there's also the

12  media attention that has come to when borrowers are taking --

13  I'm sorry -- when lenders are taking certain action -- abusive

14  actions to enforce loans or to enforce debts, that this is

15  reported in the media, in Indian media.  And this creates

16  awareness.  And this awareness is relevant to what people like

17  the plaintiffs might have known about.

18      And, in fact, Mr. Thangamani referenced that yesterday,

19  that he had read a newspaper account of harm coming to someone

20  who hadn't repaid his debt.

21      And it's important because it creates a perception in

22  the minds of people like the plaintiffs as to what might happen

23  to them.

24      And understanding the Court's ruling on the motion to

25  exclude, she will not be testifying as to specific plaintiffs.

OFFICIAL TRANSCRIPT

1  That is clear.

2       But we think that she should be able to testify as to

3  what the Indian media reports on incidents like this, not

4  referencing suicide.

5       THE COURT:  Give me my copy, please.

6       MS. GRAUNKE:  Sure.  Let me do that.

7       THE COURT:  Give me a second.  I want to look at it.

8       MS. GRAUNKE:  Sure.

9       THE COURT:  All right.  Mr. Roux, do you want to

10 respond?

11      DR. ROUX:  Your Honor, I would just like to say, again,

12 like just before the break, that the ruling on the motion in

13 limine specifically excluded Ms. Mowl from testifying about the

14 specific factors that the individual plaintiffs would have

15 thought or known or would have influenced their decisions,

16 because she did not interview these plaintiffs.  I think that

17 the attempt to offer a general knowledge of what may be

18 available in India is just an attempt to back-door that

19 information in.

20      I also think it's beyond the scope of what Your Honor

21 did allow them to offer:  testimony which was very specific and

22 very concise to debt and collection practices in India.

23      With respect to the legal point, I would reiterate that

24 this is a legal opinion, and she is neither an attorney nor,

25 more specifically, an attorney practicing in India.  She's

1    merely an economist, and her research project that deals with

2    debt collection surveys is just that.

3            It's a survey.  It doesn't do any empirical research as

4    to the legal history in India or into the full totality of what

5    protections are available under Indian law.

6            So I would just say that she lacks the competency to

7    testify in the matter, altogether.

8            THE COURT:  All right.  So I think that the -- I'm

9    going to sustain the objection with respect to the laws.  She's

10   not an attorney or legal expert in the U.S. or India.  And I

11   think the opinion lacks adequate support, and I'm not sure,

12   even if she was a legal expert, that I would let her do it.

13           And then, with respect to the Indian media reports, you

14   know, I think that goes beyond what I said that she could

15   testify about.

16           And I also don't think that that -- that also doesn't

17   have adequate support.  So I'm granting Signal's objections.

18           So those -- the demonstratives cannot include those

19   bullet points, and she -- and the expert cannot testify about

20   that.

21           What I want to do now is go into my conference room to

22   talk about the jury charges.  There is a court reporter in

23   there, and we will maybe be a little more comfortable.

24           And so you all go quickly so we can do this and you

25   won't be here too late.

1        DR. ROUX:  Thank you, Your Honor.

2        THE COURT:  I'll see you there.

3        (Whereupon, the proceedings were concluded at

4    5:47 p.m.)

5                        *    *    *

6                   REPORTER'S CERTIFICATE

7

8        I, Terri A. Hourigan, Certified Realtime Reporter,

9    Official Court Reporter for the United States District Court,

10   Eastern District of Louisiana, do hereby certify that the

11   foregoing is a true and correct transcript to the best of my

12   ability and understanding from the record of the proceedings in

13   the above-entitled and numbered matter.

14

15

16                        *s/Terri A. Hourigan*
                          _____

17                        Terri A. Hourigan, CRR, RPR
                          Certified Realtime Reporter
18                        Registered Professional Reporter
                          Official Court Reporter
19                        United States District Court
                          Terri_Hourigan@laed.uscourts.gov
20

21

22

23

24

25

                        OFFICIAL TRANSCRIPT