```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3    KURIAN DAVID, et al.,                    CIVIL ACTION
              Plaintiffs
4
     versus                                   No. 08-1220
5

6    SIGNAL INTERNATIONAL, LLC., et al.,      Section "E"
              Defendants
7

8    Related Case:

9    EQUAL EMPLOYMENT OPPORTUNITY             CIVIL ACTION
     COMMISSION,
10            Plaintiffs

11   versus                                   No. 12-557

12
     SIGNAL INTERNATIONAL, LLC, et al.,       Section "E"
13            Defendants

14   Related Case:

15   LAKSHMANAN PONNAYAN ACHARI, et al.,      CIVIL ACTION
              Plaintiffs
16
     versus                                   No. 13-6218
17                                            (c/w 13-6219,
                                               13-6220,13-6221
18   SIGNAL INTERNATIONAL, LLC, et al.,        14-1818)
19            Defenants                       Section "E"

20   Applies to:
     David 08-1220
21

22                          DAY 12
                       January 28, 2015
23                     AFTERNOON SESSION

24            TRANSCRIPT OF THE TRIAL PROCEEDINGS
           BEFORE THE HONORABLE SUSIE MORGAN,
25             UNITED STATES DISTRICT JUDGE,
                        AND A JURY.


                     OFFICIAL TRANSCRIPT
```

1    **APPEARANCES:**

2

3    For Plaintiffs:                    ALAN HOWARD, ESQ.
                                        HUGH D. SANDLER, ESQ.
4                                       CHIEMI D. SUZUKI, ESQ.
                                        Crowell & Moring, LLP
5                                       590 Madison Avenue
                                        New York, NY 10022
6                                       212.803.4021

7                                       DANIEL WERNER, ESQ.
                                        NAOMI TSU, ESQ.
8                                       MELIA AMAL BOUHABIB, ESQ.
                                        MEREDITH STEWART, ESQ.
9                                       Southern Poverty Law Center
                                        Immigrant Justice Project
10                                      233 Peachtree Street NE
                                        Atlanta, GA 30303
11                                      404.521.6700

12                                      CHANDRA S. BHATNAGAR, ESQ.
                                        American Civil Liberties Union
13                                      Foundation (New York/Broad)
                                        125 Broad Street, 18th Floor
14                                      New York, NY  10004

15
     For Signal Entities:              ERIN CASEY HANGARTNER
16                                      ELHAM RABBANI, ESQ,
                                        HAL UNGAR, ESQ.
17                                      BRIAN ROUX, Ph.D., ESQ.
                                        LANCY RYDBERG, ESQ.
18                                      Hangartner Rydberg & Terrell
                                        One Shell Square
19                                      701 Poydras Street
                                        Suite 310
20                                      New Orleans, LA 70139

21                                      PATRICIA BOLLMAN, ESQ.
                                        Patricia Bollman, APLC
22                                      P.O. Box 13707
                                        New Orleans, LA 70185.
23
                                        ALAN WEINBERGER, ESQ.
24                                      Weinberger Law Firm
                                        201 St. Charles Avenue
25                                      New Orleans, LA  70170

**OFFICIAL TRANSCRIPT**

```
 1    For Sachin Dewan:              STEPHEN SHAPIRO, ESQ.
                                     Law Office of Stephen Shapiro
 2                                   700 Camp Street
                                     New Orleans, LA 70130
 3

 4    For Malvern Burnett:           TIM CERNIGLIA, ESQ.
                                     Law Office of Tim Cerniglia
 5                                   1521 St. Charles Avenue
                                     New Orleans, LA 70130
 6

 7

 8

 9
      REPORTED BY:
10
      MARY V. THOMPSON, RMR, FCRR
11    Official Court Reporter
      HB 273
12    500 Poydras Street
      New Orleans, Louisiana 70130
13    (504)589-7783
      mary_v_thompson@laed.uscourts.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

**OFFICIAL TRANSCRIPT**

1                          EXAMINATION INDEX

2                                                        PAGE NO.

3

4     HEMANT KHUTTAN

5
          Cross-Examination by Mr. Ungar.............    2322
6         Cross-Examination by Mr. Cerniglia.........    2372
          Cross-Examination by Mr. Shapiro...........    2376
7         Redirect Examination by Mr. Howard.........    2382

8

9     WILBERT A. SHOUSE

10
          Direct Examination by Mr. Rabbani..........    2389
11        Cross-Examination by Mr. Sandler...........    2422
          Cross-Examination by Mr. Shapiro...........    2433
12

13

14    DAVID COCHRAN

15
          Direct Examination by Mr. Ryberg..........     2450
16        Cross-Examination by Mr. Werner...........     2476

17

18    PATRICK KILLEEN

19
          Direct Examination by Mr. Rabbani..........    2487

20

21

22

23

24

25

                          OFFICIAL TRANSCRIPT

```
 1              P R O C E E D I N G S
 2                          (Call to order of the court.)
 3          THE COURT:  All right.  Have a seat.
 4          Y'all remember at 5:30 today, we're having a
 5   conference on the jury charges.
 6          MR. UNGAR:  Yes, Your Honor.  Mr. Weinberger and
 7   Mr. Hasenkampf will be here for that conference.
 8          THE COURT:  Okay.  And that will be in my
 9   conference room.
10          All right.  With respect to the exhibits that the
11   plaintiffs want to use during Mr. Shouse's testimony, I think
12   that Signal has objections to those exhibits.
13          So maybe I'll let you discuss it first, Signal
14   argue, and then the plaintiffs can respond.
15          MR. RABBANI:  Elham Rabbani for Signal.
16          There are three exhibits that the plaintiffs need
17   to introduce that Signal has objections to.
18          The first one is Exhibit 1972, and it's an e-mail
19   which is not written by Mr. Shouse.  It's overly prejudicial.
20   It uses -- in the e-mail, it's written by another person.
21   The nursery rhyme "One Little Indian" reference is in there.
22   And Mr. Shouse does not comment on that nursery rhyme.
23          Under 403, we think that the prejudicial value
24   outweighs it's very, very limited -- almost nonexistent --
25   probative value.
```

:32:56

:33:08

:33:36

:34:01

:34:26

OFFICIAL TRANSCRIPT

1          Also the e-mail is dated July 18, 2007, which is
2     after every one of those plaintiffs had left Signal.
3          THE COURT:  2000 --
4          MR. RABBANI:  2007.  July 18, 2007.
5          THE COURT:  And you're talking about?
6          MR. RABBANI:  Exhibit 1972, Your Honor.
7          THE COURT:  Okay.  Now I've got the right one.  And
8     this even -- this one is after all the plaintiffs left?
9          MR. RABBANI:  Yes, Your Honor.
10          THE COURT:  All right.
11          Mr. Sandler?
12          MR. SANDLER:  Thank you, Your Honor.
13          Just as a matter it was records, three of our
14     plaintiffs were still there.  Our plaintiffs left in early
15     2008.  Two plaintiffs had left by March of '07.
16          So I'm not sure -- maybe Mr. Rabbani was confused
17     about the years and mixed it up, but certainly, just to be
18     clear, three of the five plaintiffs were living in that
19     man camp at that time.
20          As to the initial point that Mr. Rabbani raised,
21     whether Mr. Shouse responded to the "One Little Indian"
22     reference, he responded to the e-mail.  And he didn't make
23     specific reference to the "One Little Indian" remark that was
24     made, but I don't see, if he is on the e-mail, if he read the
25     e-mail, if he responded to it, why his testimony about it, if

**OFFICIAL TRANSCRIPT**

1    we choose to enter it via cross, would be irrelevant.

2              THE COURT:  And what -- how do you think it's

3    relevant?

4              MR. SANDLER:  We think it's relevant because we

5    think Mr. Shouse is situated to discuss it and give testimony

6    about the connotations, sometimes racial, sometimes --

7    sometimes ethnic relating to our plaintiffs.  And we think

8    that "One Little Indian" is one example of that.

9              So this happens to be one e-mail in which

10   Mr. Shouse is on and --

11             THE COURT:  He can authenticate it because he can

12   say that he received it?

13             MR. SANDLER:  And responded to it.

14             THE COURT:  And then you would want to ask him

15   about the "One Little Indian" remark and --

16             MR. SANDLER:  Yeah.  If he thought that that was

17   the norm at Signal or if he was -- maybe he'll say that he

18   was appalled by it and he didn't know what to do.

19             But, in any case, I don't see why it is irrelevant

20   for plaintiffs to be able to ask Mr. Shouse about it.

21             THE COURT:  Any response?

22             MR. RABBANI:  Your Honor, I apologize if I

23   misstated something on the record.  I actually saw a

24   transposed number, so there were some plaintiffs there.

25             It's just that my original argument remains that

**OFFICIAL TRANSCRIPT**

1    Mr. Shouse does not comment on the actual reference, if it is

2    actually a reference.  The person that made that reference

3    will be called live on the stand.  That, I believe, is the

4    appropriate person to address the question with.

5                THE COURT:  And that's -- who is the person who

6    said it originally?

7                MR. RABBANI:  Darrell Snyder.

8                THE COURT:  All right.  Then how about

9    Exhibits 1930 and 1953?

10               MR. RABBANI:  Yes, Your Honor.

11               Exhibit 1930 is an e-mail chain where Mr. Shouse is

12   not either a recipient or a sender.

13               This e-mail references the subject line, Incident

14   April 8, 2009, which is certainly --

15               Correct me if I'm wrong.

16               -- after all of the plaintiffs had left Signal.

17               It's outside of the scope of the plaintiffs' case

18   right as we speak.  And we have hearsay issues as well,

19   Your Honor.

20               THE COURT:  Mr. Sandler?

21               MR. SANDLER:  Thank you, Your Honor.

22               This e-mail will be used only if Mr. Shouse were to

23   actually deny on the stand that he was the subject of an

24   incident report, which is Exhibit 1953.  And we'll have

25   another exhibit that Signal objects to that we will be

**OFFICIAL TRANSCRIPT**

1    entering.

2          So, you know, I understand Mr. Rabbani's point that

3    Mr. Shouse is not on these e-mails, but he's certainly

4    discussed in these e-mails.  And the head of HR identifies

5    him as the person who is associated with the security

6    incident report that -- in which he told a couple of Indians

7    that they need to go back to the fuck where they came from.

8          So we're going to want to ask him about that.  But

9    the e-mail, you know, may never see the light of day for the

10   jury so long as Mr. Shouse admits that it was him who said it

11   based on the security incident report which is 1930.

12         THE COURT:  Well, why is it relevant if it happened

13   in 2009?

14         MR. SANDLER:  Because we're not entering it to

15   establish that anything -- that there were wrongs that

16   happened to those two particular Indians.

17         We're entering it to show the racial animus that

18   happened at Signal.  And it's certainly our position that

19   just because it took a year or longer after our lawsuit to be

20   filed before racial animus is documented here in the security

21   incident report, that that racial animus was obviously

22   preexisting.

23         And it's not as though Signal is getting up and

24   saying Mr. Shouse only formulated that opinion about Indians

25   after our Indian plaintiffs had left Signal.

**OFFICIAL TRANSCRIPT**

1        So we don't think that there is actually a timing

2   issue beyond just the facial fact that it was only recorded

3   in 2009.

4        MR. RABBANI:  Your Honor, if I may respond to

5   Exhibit 15 -- excuse me, 1953, which is the incident report

6   Mr. Sandler was just discussing.

7        That incident report was also dated April 8, 2009.

8   Mr. Shouse's name does not appear anywhere in the document.

9        It's actually the person that was involved in this

10  incident is referenced as the unknown foreman.  Mr. Shouse at

11  this time was not a foreman, he was a superintendent.

12       That's all I have.

13       THE COURT:  Was he asked about this at his

14  deposition?

15       MR. SANDLER:  No.  These documents only came to

16  light in the subsequent e-discovery that plaintiffs were

17  granted access to.  Mr. Shouse was deposed in June 2013, and

18  we did not have these documents.

19       As to Mr. Rabbani's point, if I may respond just

20  quickly, Your Honor.  He is identified in the other e-mail

21  that Signal is trying to keep out by the Signal's HR director

22  as it being him; that it was him who was the subject of that

23  incident report.

24       And that's why I said in my opening point that

25  we're not going to enter this e-mail if Mr. Shouse admits

:40:14

:40:34

:40:48

:41:02

:41:23

**OFFICIAL TRANSCRIPT**

1    that it was him who was the subject of this security incident

2    report.

3          Should he contest it, then I think it's a

4    credibility issue for the jury to decide as to whether he

5    says it wasn't him or whether Signal's HR director,

6    Tracey Binion, records it as being him.

7          THE COURT:  So you really don't know whether he is

8    the subject of the report or not?

9          You think you do from the e-mail, but that's the

10   only -- you never asked anyone directly about it at a

11   deposition?

12         MR. SANDLER:  Rhonda George also confirms it in her

13   deposition.

14         THE COURT:  So she did confirm it was Mr. Shouse?

15         MR. SANDLER:  Yes.

16         THE COURT:  Okay.

17         So with respect to Exhibit 1972, I'm going to allow

18   the plaintiffs to use that, so the objection is overruled.

19         But the objection as to Exhibits 1930 and 1953 are

20   sustained because this is something that happened over a year

21   after all of the plaintiffs left Signal.  And I think any --

22   any relevance it has is outweighed by the risk of undue

23   prejudice given that it was a year after they left.

24         So we've got about 10 minutes before the jury comes

25   back, so I'm going to go back to chambers and I'll see you

OFFICIAL TRANSCRIPT

all at 12:50.

MR. RABBANI:  Thank you, Your Honor.

MR. SANDLER:  Thank you, Your Honor.

(A recess was taken.)

**AFTER THE RECESS**

(Call to order of the court.)

MR. RYDBERG:  Before we start, I need to bring something to your attention.  I'm the --

THE COURT:  Come to the microphone.

MR. RYDBERG:  Ms. Hangartner has been taken to the hospital by ambulance this morning around 11:00 or so, I understand.

I don't know any more about her condition than that.  I'm told she was ill in the ladies room over here and that a doctor was called and recommended that she be brought to the ER, and that's where she is.

I have spoken with opposing counsel about that, let them know.  We are, you know -- she is our lead counsel.  She is our field general.  She's the reservoir of facts about the case, strategy.  We're a bit at loose ends without her.

Mr. Ungar is prepared -- was going to handle the cross-examination of Mr. Hemant anyway, so we certainly can do that, but we need some time to regroup.

So I would like to gather information to be able to inform the Court and the parties about her condition.  I

**OFFICIAL TRANSCRIPT**

don't have that now.

I don't believe, from my conversation with Mr. Howard, that he has an opposition to a reasonable recess or break.  I'll let everybody speak for themselves, but --

:54:01

THE COURT:  We're -- the next witness is W.A. Shouse?

MR. RYDBERG:  Yes, ma'am.

THE COURT:  Who was going to do his direct?

MR. RYDBERG:  Mr. Rabbani.

:54:17

THE COURT:  Okay.  So he's prepared to proceed with that direct examination?

MR. RYDBERG:  I believe so, yes.

THE COURT:  And then what if you get some -- let's see who's next.

:54:25

Then we had David Cochran.  And you're doing his direct?

MR. RYDBERG:  Yes, ma'am.

THE COURT:  All right.  So we can move forward with that.  And maybe y'all could be sure that you got some

:54:40

depositions that we could use.

MR. RYDBERG:  I don't know --

MR. UNGAR:  Excuse me, Judge.  I do have one that we can read in my possession.  I don't know if Chandra -- somebody else can help update where we are in our

:54:57

designations.

**OFFICIAL TRANSCRIPT**

1          I have one that can be read.  It's short.  It's not
2     going to fill up much more than 15, 20 minutes.
3          THE COURT:  Chandra, do you have other depositions?
4          MR. BHATNAGAR:  Good afternoon, Your Honor.
:55:07
5          There are other designations.  There are about
6     three others, I think.  They are all relatively short, but
7     Signal had given us copies of them yesterday.  So I think all
8     three of those --
9          MR. UNGAR:  That would be Reverend Kelleher?
:55:16
10         MR. BHATNAGAR:  Kelleher, Caffrey, and Frank
11    Tipton.
12         MR. UNGAR:  We have those three that can be read,
13    but that maybe total is going to fill up about a half hour.
14         THE COURT:  All right.  Then the next person I had
:55:28
15    was Terry -- I guess Pat Killeen?
16         MR. UNGAR:  Right.
17         THE COURT:  Who was doing that direct?
18         MR. RABBANI:  I am, Your Honor.
19         THE COURT:  So you are prepared to proceed with
:55:41
20    that.
21         So it sounds to me like we've got some things we
22    can do while we see, you know, what her status is, but
23    obviously -- I can't recess for days and have the jury wait.
24    We're coming up on Mardi Gras, and I don't think anybody
:55:58
25    wants to start this trial over.


                        **OFFICIAL TRANSCRIPT**

1          So we're going -- what I want y'all to do is keep

2     me advised and let me know this afternoon.  We'll discuss it

3     at 5:30 and we'll see where we are.

4          But your team needs to be getting prepared with all

:56:12    5     of the depositions ready to go.  There are some others that

6     probably are longer that you could use for us to get us a

7     little time while you regroup, and/or Ms. Hangartner, we

8     hope, will be back with us before too long.

9          So will you give directions to your team to be sure

:56:33   10     that they are working on that to get as many depositions as

11     they can ready?

12          MR. RYDBERG:  I'll give those directions.  I don't

13     have the knowledge of what those depositions are, so --

14          THE COURT:  Okay.  But you just make sure the

:56:44   15     people who do know about them are working on those as quickly

16     as they can.

17          MR. RYDBERG:  I will do that, and we'll update you

18     when we know -- have some more information.

19          THE COURT:  All right.  Thank you.

:56:56   20     MR. RYDBERG:  Thank you.

21          Judge, if it's okay with the Court, when

22     Mr. Khuttan is done, I'll leave, I'll go make sure that the

23     designations will be worked on, and see if I can get a status

24     update and things like that.

:57:07   25          THE COURT:  Okay.


OFFICIAL TRANSCRIPT

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | So let's bring the jury in now.                                 |
|       | 2  | (Jury in at 12:57 p.m.)                                         |
|       | 3  | THE COURT:  All right.  Have a seat.                            |
|       | 4  | Good afternoon, ladies and gentlemen.                          |
| :57:51 | 5  | Mr. Ungar.                                                      |
|       | 6  | MR. UNGAR:  Thank you, Your Honor.                             |
|       | 7  | **CROSS-EXAMINATION**                                           |
|       | 8  | **BY MR. UNGAR:**                                               |
|       | 9  | **Q.**   Mr. Hemant, I'm Hal Ungar.  I represent Signal.  We   |
| :58:00 | 10 | met at your deposition, if you remember.                        |
|       | 11 | **A.**   Yes.                                                   |
|       | 12 | **Q.**   Okay.  I'm just going to ask you a few questions.     |
|       | 13 | You testified there was a time when you were                    |
|       | 14 | working at Signal where you went home to India, right?          |
| :58:09 | 15 | **A.**   Yes.                                                   |
|       | 16 | **Q.**   That was for about six weeks?                          |
|       | 17 | **A.**   Yes.                                                   |
|       | 18 | **Q.**   Originally the leave request was for four weeks,      |
|       | 19 | right?                                                          |
| :58:15 | 20 | **A.**   I don't remember exactly.                              |
|       | 21 | **Q.**   It was a shorter amount of time than six weeks?       |
|       | 22 | **A.**   Yes.                                                   |
|       | 23 | **Q.**   Okay.  And then while you were in India, you          |
|       | 24 | contacted Signal and you said, Signal, I need more time in      |
| :58:25 | 25 | India.  And the response from Signal was sure, no problem?      |

**OFFICIAL TRANSCRIPT**

1      **A.**   Yes, they just asked me send us the medical reports

2    of your father.

3      **Q.**   And you did that?

4      **A.**   Yes.

5      **Q.**   Okay.  And so Signal, who you're saying trafficked

6    you against your will and forced you into labor against your

7    will, that's the company that gave you a six-week leave to

8    India?

9            MR. HOWARD:  Objection, Your Honor.  Argumentative.

10           THE COURT:  Overruled.

11   **MR. UNGAR:   (CONTINUING)**

12     **Q.**   That's Signal, right?

13     **A.**   Yes.

14     **Q.**   And then you chose to get on a plane and come back

15   to Signal where you say you were forced to work against your

16   will?

17     **A.**   Yes.

18     **Q.**   Okay.  Now, when you were in India, you had money

19   in a bank account in Mississippi?

20     **A.**   Not much.

21     **Q.**   Right.  But there was a bank account in

22   Mississippi, and that's how you got paid at Signal?

23     **A.**   Yes.

24     **Q.**   Right.  When you showed up at Signal, there was a

25   representative from M & M Bank at your orientation, and with

:58:35
:58:49
:58:56
:59:09
:59:18

**OFFICIAL TRANSCRIPT**

1    them you signed up for a bank account?

2         A.   Yes.

3         Q.   Right.  And every time Signal paid you, you -- that

4    money would be directly deposited into your bank account?

:59:33    5         A.   Yes.

6         Q.   Now, you had testified that before the money was

7    deposited -- well, let me ask you this:  Before the money was

8    deposited is when taxes would be taken out?

9         A.   Yes.

:59:44    10        Q.   And before the money was deposited, the boarding

11   deduction would be taken out?

12        A.   Yes.

13        Q.   Once the money was deposited in the account, the

14   only person that ever accessed that money was you?

:59:55    15        A.   Yes.

16        Q.   Right.  And so if you wanted to send money home to

17   India, I think you testified that you did that?

18        A.   Yes.

19        Q.   Okay.  How did you do that?

:00:04    20        A.   I did Western Union.

21        Q.   Western Union?

22        A.   Yes.

23        Q.   You'd do that at Walmart or a place like that?

24        A.   Yes.

:00:12    25        Q.   Would you go take the money out of the bank and

OFFICIAL TRANSCRIPT

1    bring it to Walmart or would you use -- tell me how that

2    worked.

3         A.    Yes, I take it out from the bank and then go to the

4    Western Union.

5         Q.    So you would take cash with you?

6         A.    Yes.

7         Q.    All right.  So nobody at Signal -- Signal never

8    prevented you from sending money home, right?

9         A.    Yes.

10        Q.    You're agreeing with me?

11        A.    Yes.

12        Q.    Okay.  And so anytime you wanted to send money

13   home, if you had it, you would go in your bank account,

14   access it, and send it home?

15        A.    Yes.

16        Q.    Okay.  Now, you were told specifically in India

17   that the boarding deduction would be $35 per day?

18        A.    Yes.

19        Q.    And that is a deduction that came out before the

20   money ended up in the bank account?

21        A.    Yes.

22        Q.    Okay.  Now, when you first started working at

23   Signal, you were working as a fitter?

24        A.    Yes.

25        Q.    You were not a fitter?

**OFFICIAL TRANSCRIPT**

:00:23

:00:31

:00:42

:00:55

:01:11

```
 1        A.    No.
 2        Q.    You were earning $18 when you were working as a
 3   fitter per hour?
 4        A.    Yes.
 5        Q.    All right.  For how long were you working as an
 6   unqualified fitter?
 7        A.    For a couple of weeks.
 8        Q.    Do you know how many exactly?
 9        A.    No.
10        Q.    Now, you ultimately started working as a welder?
11        A.    Can you repeat this?
12        Q.    Sure.  You ultimately started working as a welder?
13        A.    Yes.
14        Q.    But you did not make $18 per hour as a welder?
15        A.    Yes.
16        Q.    And the reason why you did not make $18 per hour as
17   a welder is because you're not actually a first-class welder;
18   isn't that correct?
19        A.    No.
20             MR. UNGAR:  Your Honor, if I can approach the
21   witness?
22             THE COURT:  (Nods head.)
23             MR. UNGAR:  I'm showing only the witness what is
24   Exhibit 2061, not to be published at the moment.
25   MR. UNGAR:  (CONTINUING)
```

:01:18
:01:26
:01:40
:01:51
:02:04

OFFICIAL TRANSCRIPT

1        Q.    Take a look and that, and then I'm going to ask you
2    a question.
3        A.    (Reviews document.)
4        Q.    Can you identify the photographs I just handed you
:03:03  5    as photographs of the welds that you performed?
6        A.    Yes.  Some of them.
7        Q.    Okay.
8              MR. UNGAR:  Your Honor, I would like to ask the
9    witness to identify which of the welds are his that he says
:03:16 10    he recognizes.
11             THE COURT:  All right.  Okay.
12   **MR. UNGAR:   (CONTINUING)**
13        Q.    Can you tell me which pages of the document I
14   handed you that you know are your welds?
:03:29 15        A.    The fourth one.
16        Q.    All right.  So in your packet, there is --
17        A.    The seventh.
18        Q.    -- there is a little number on the bottom of the
19   first one that says SIGE0585 -- excuse me, 0558539; is that
:03:52 20   right?
21        A.    It is 4-0.
22        Q.    4-0.  Okay.  I've got it.
23             And any others --
24        A.    And then the seventh.
:04:03 25        Q.    What is the number on that page?


                        **OFFICIAL TRANSCRIPT**

1          **A.**   SIGE0558543.

2          **Q.**   4-3.  All right.

3                THE COURT:  Two, I believe he said.  4-2 or 4-3?

4                THE WITNESS:  4-3.

:04:19    5                THE COURT:  4-O?  I did not understand.  4-3?

6    **MR. UNGAR:  (CONTINUING)**

7          **Q.**   It's three?

8          **A.**   Yeah.

9          **Q.**   Okay.  So you've identified 40 and 43.  Any others?

:04:29   10          **A.**   And 44.

11          **Q.**   Okay.

12          **A.**   And 45.

13          **Q.**   All right.

14                MR. UNGAR:  Your Honor, I would like to publish

:04:40   15    those four photos, and ask questions about them.

16                THE COURT:  All right.

17                MR. UNGAR:  Thank you.

18                So let's -- Scott, I e-mailed you the welding

19    photos.  Why don't you pull up the fifth image within the

:04:47   20    welding photos that I e-mailed to you.

21                Confirm it is 40 before you publish, please.

22    **MR. UNGAR:  (CONTINUING)**

23          **Q.**   So this is one of the welds that you said is yours,

24    right?

:05:01   25          **A.**   This one, yes, it has my badge number on it.


                         **OFFICIAL TRANSCRIPT**

1    **Q.**   Right.  Every time that you would do a weld at

2    Signal, you would put your badge number on it?

3        **A.**   Yes.

4        **Q.**   Right.  And so let's zoom into the corner of the

:05:18   5    weld.

6            This is your weld?

7        **A.**   Yes.

8        **Q.**   This is not a first-class weld, right?

9        **A.**   Yes.

:05:26   10       **Q.**   You're agreeing with me?

11       **A.**   Yeah.  But I have an explanation for that.

12       **Q.**   Sure.  Explain to the jury why this is not a

13   first-class weld.

14       **A.**   When they -- when they send me there to do this

:05:37   15   welding, they told me -- and they give me a time frame and

16   they told me if you don't pass, you are going back to India.

17           So I was in a huge stress at that time.

18       **Q.**   Who told you that?

19       **A.**   The -- someone in the Signal.  I don't remember his

:05:54   20   name.

21       **Q.**   You don't know his name?

22       **A.**   No.

23       **Q.**   So somebody told you that, but you don't know who

24   it was?

:05:59   25       **A.**   Yeah.

**OFFICIAL TRANSCRIPT**

1    Q.    This was -- this was part of a welding test, right?

2    A.    No.  It happened -- I was on the job.

3          They called me and they gave me this piece and they

4    said you have to weld this; this is your time frame.  And if

:06:20    5    you not pass, then you will go back.

6    Q.    Isn't the reason why you did this weld --

7          MR. UNGAR:  Let's blow back out to the full weld.

8    **MR. UNGAR:  (CONTINUING)**

9    Q.    Isn't the reason why you did this weld is because

:06:33    10   you had requested an increase in your wages and so you were

11   trying to improve your skill?

12   A.    No.

13   Q.    You did request an increase in your wages?

14   A.    I did, but this is not regarding with that.

:06:44    15   Q.    Okay.

16         MR. UNGAR:  Let's look at 43.

17   **MR. UNGAR:  (CONTINUING)**

18   Q.    So is this the same piece of -- is this the same

19   welding work?

:07:03    20   A.    Yes.

21   Q.    All right.  So that's not a first-class weld,

22   either, is it?

23   A.    Yes.

24   Q.    You're agreeing with me?

:07:09    25   A.    Yes.

**OFFICIAL TRANSCRIPT**

1       Q.   And this is your weld?

2       A.   Yes.

3       Q.   All right.  And then I think you identified 45,

4  right?  Is that right?

5       A.   Yes.

6       Q.   All right.  Let's look at 45.

7            This is your weld?

8       A.   Yes.

9       Q.   This is not a first-class weld, either?

10       A.   Yes.  But it's the same piece.

11       Q.   Same piece.  Different part of it or exact same

12  spot?

13       A.   It's the same piece.  Like this welding is at the

14  same time.

15       Q.   I understand.  The same piece as the picture we

16  just talked about?

17       A.   Yes.

18       Q.   Gotcha.

19            All right.  So there was -- these welds are not

20  first-class welds, you told me?

21       A.   Yes.

22       Q.   Okay.  And so Signal was not paying you as a

23  first-class welder because you were not showing them that you

24  were a first-class welder?

25       A.   Only on this piece.


OFFICIAL TRANSCRIPT

       1          Q.   Okay.  Do you remember the name of any Signal
       2   employee that saw this weld or talked to you about it in any
       3   way?
       4          A.   No.
:08:23 5          Q.   Okay.
       6               MR. UNGAR:  You can take it down.
       7   MR. UNGAR:  (CONTINUING)
       8          Q.   You would agree with me that Signal should be able
       9   to pay its employees depending on their skill level, right?
:08:34 10         A.   I don't know.
      11          Q.   You don't know?  You don't think Signal should be
      12   able to pay people based on their skill?
      13         A.   I don't know.
      14         Q.   Okay.  So your wage -- after you were a fitter at
:08:51 15  Signal, you were a welder.  And your wage started at what as
      16   a welder?
      17         A.   $13.
      18         Q.   $13 an hour, right?
      19         A.   Yes.
:08:58 20         Q.   Okay.  And then after you got -- you did get a
      21   raise when you were working as a welder?
      22         A.   Yes.
      23         Q.   And that raise was for $2?
      24         A.   Yes.
:09:05 25         Q.   So that was a raise to $15 per hour?


                              OFFICIAL TRANSCRIPT

1          A.   Yes.

2          Q.   That was the rate that you earned as a welder at

3     Signal up until the day that you chose to leave Signal?

4          A.   Yes.

5          Q.   Okay.  Were you ever disciplined on the job?

6          A.   Come again?

7          Q.   Sure.

8               Were you ever disciplined because of your

9     performance on the worksite?

10         A.   I didn't get this question.

11         Q.   Did you ever receive a warning while you were at

12    Signal?

13         A.   No.

14              MR. UNGAR:   Your Honor, I would like to approach

15    the witness again about another -- this will not be published

16    to the jury.

17              For the record, this is Exhibit 2143, Page 4.

18    BY MR. UNGAR:   (CONTINUING)

19         Q.   My question to you is this:  The document that I

20    handed you, did you receive a copy of this document?

21         A.   No.

22         Q.   Okay.  I'll move on.

23              Now, there were Americans on your crew, correct?

24         A.   Yes.

25         Q.   Sometimes you would work on Saturdays while you


                         OFFICIAL TRANSCRIPT

1    worked at Signal?

2         A.   On certain dates?

3         Q.   On Saturdays, like would you ever work on the

4    weekend?

:10:59   5         A.   Yes.

6         Q.   Would you make more money if you worked on the

7    weekend?

8         A.   Yes.

9         Q.   Americans on your crew would work on the weekend,

:11:05  10    too?

11         A.   Yes.

12         Q.   As far as job assignments, the Americans on your

13    crew and you would get the same kind of job assignments?

14         A.   Sometimes, sometimes not.

:11:15  15         Q.   Sometimes not.

16              Can you tell me what the sometimes not issue is?

17         A.   Sometimes we have to go in the oil rigs in the

18    greasy area inside the tanks.

19         Q.   Inside the tanks.  So you're saying like it's

:11:35  20    literally on the rig?

21         A.   Yeah.

22         Q.   And it's a tank where oil is held?

23         A.   Yes.

24         Q.   And you're being asked to weld within the tank?

:11:41  25         A.   Yes.


**OFFICIAL TRANSCRIPT**

1   **Q.**   Now, the Americans on your crew were also asked to

2   weld within the tank, right?

3   **A.**   Yes.

4   **Q.**   Okay.  Just like you?

:11:50   5   **A.**   (No response.)

6   **Q.**   Just like you?

7   **A.**   Yes.

8   **Q.**   So the way in which you were treated on the

9   worksite is exactly how the Americans were treated on the

:11:57   10   worksite?

11   **A.**   Yes.  But they be called by the name.  We be called

12   by the number.

13   **Q.**   Okay.  So you're saying on the worksite you were

14   referred to by your badge number?

:12:04   15   **A.**   Yes.

16   **Q.**   Only your badge number?

17   **A.**   Yes.

18   **Q.**   Isn't it true that employees on the worksite would

19   actually call you by your name?

:12:10   20   **A.**   No.

21   **Q.**   Isn't it true that sometimes on the worksite people

22   would use a nickname for you?

23   **A.**   No.

24   **Q.**   Your counsel asked you about the name Hollywood.

:12:20   25   Isn't that a name that people at Signal would use to refer to

**OFFICIAL TRANSCRIPT**

1    you?

2        A.    No.   The only person I told you that used to call

3    me is a cleaning guy, and it's only at the man camp.

4        Q.    What about -- do you remember Rhonda George?

:12:33    5        A.    Yes.

6        Q.    It was -- she was like a manager of the man camp

7    after a little while when you were there?

8        A.    Yes.

9        Q.    All right.  Didn't Rhonda George call you

:12:43    10   Hollywood?

11       A.    I don't remember.  She never called me that.

12       Q.    Okay.

13             You're not alleging that Signal asked you to do a

14   job that was unsafe?

:12:55    15       A.    Can you repeat this?

16       Q.    You never -- Signal never asked you to do a job

17   that was unsafe?

18       A.    Yeah.

19       Q.    You're agreeing with me?

:13:04    20       A.    Yes.

21       Q.    Now, as far as safety, sometimes you would act as a

22   translator, right?

23       A.    Yes.

24       Q.    You would do that on the worksite sometimes?

:13:13    25       A.    Yes.


                        **OFFICIAL TRANSCRIPT**

1      **Q.**    You even translated some safety signs at Signal
2  that were posted at Signal, right, into Hindi?
3      **A.**    Yes.
4      **Q.**    You were asked to do that because of your skill in
5  Hindi and English?
6      **A.**    Yes.  Ramesh asked me for that help.
7      **Q.**    Is that Ramesh Gunisetti, if you remember?
8      **A.**    Can you repeat this?
9      **Q.**    Sure.
10            Guinsetti, Ramesh Gunisetti.  Is that his name?
11      **A.**    Yes.
12      **Q.**    He was the safety guy at Signal?
13      **A.**    Yes.
14      **Q.**    Safety guy at Signal comes up to you and says, I
15  would like for you to translate some safety signs into Hindi,
16  and you did that?
17      **A.**    Yes.
18      **Q.**    And the reason why you were asked to do that was to
19  make sure that people that speak Hindi understand the concept
20  of that safety sign?
21      **A.**    Yes.
22      **Q.**    That was Signal's decision to ask you to translate
23  the signs?
24      **A.**    No.
25      **Q.**    You asked to translate the signs?

**OFFICIAL TRANSCRIPT**

1      **A.**   No.  I want to explain that.

2      **Q.**   Sure.

3      **A.**   Signal asked Ramesh to do that, but Ramesh came to

4    me because he can't do it.

:14:12    5      **Q.**   I understand.

6          So Signal wanted the signs translated, and Ramesh

7    decided that you're the best person to do it because you had

8    the skill to do it?

9      **A.**   Yes.

:14:16   10      **Q.**   All right.  Now, you testified about what you

11    thought were some problems at Signal.

12      **A.**   Can you repeat this?

13      **Q.**   Sure.

14          You testified about how you didn't like the

:14:34   15    conditions at the man camp; the housing, the food, things

16    like that?

17      **A.**   Yes.

18      **Q.**   All right.  You guys would talk about those

19    problems on the worksite while you were working?

:14:42   20      **A.**   Yes.

21      **Q.**   Now, you knew that if you were mistreated by your

22    foreman on the job, that there was a policy at Signal that

23    said what you should do about that abuse, right?

24      **A.**   No.

:14:58   25      **Q.**   You didn't know that you were supposed to report an

**OFFICIAL TRANSCRIPT**

1   abuse to your supervisor if it occurred?

2       A.   No.

3       Q.   Well, regardless, you didn't ever tell anyone at

4   Signal that you thought you were being abused?

:15:10   5       A.   I never did that, so I don't know.

6       Q.   Okay.  Now, you were asked before why it was that

7   you just felt like you couldn't go back to India if you

8   didn't like Signal.  And I think your answer was your debt;

9   is that right?

:15:29  10       A.   Yes.

11       Q.   It was this money that you felt like you had to

12   pay?

13       A.   Yes.

14       Q.   All right.  So you made some decisions to spend

:15:38  15   money on yourself while you were at Signal?

16       A.   Yes.

17       Q.   Instead of spending money on the debt that you say

18   was the reason why you were forced to stay at Signal, you

19   bought things for yourself?

:15:49  20       A.   I bought my needs.

21       Q.   So you bought a laptop?

22       A.   Yes.

23       Q.   $600 for the laptop?

24       A.   Yes.

:15:56  25       Q.   Within a month of arrival?

OFFICIAL TRANSCRIPT

1          **A.**    Yes.

2          **Q.**    You bought a cell phone?

3          **A.**    Yes.  I do that -- I do have that in India, too.

4          **Q.**    You bought a car?

:16:06    5          **A.**    Not in a month.  And I -- in India, I used to have

6     my own car.  I bought this car with three other people here.

7          **Q.**    All right.  You testified that in India you grew up

8     in a house with your own room and your own bathroom?

9          **A.**    Yes.

:16:20    10         **Q.**    And you had a car?

11         **A.**    Come again?

12         **Q.**    And you had a car?

13         **A.**    Yes.

14         **Q.**    And a cell phone there?

:16:25    15         **A.**    Yes.

16         **Q.**    Okay.  What I'm asking about is here.  Here you

17    bought a car?

18         **A.**    Yes.

19         **Q.**    The down payment on that car was $1,500?

:16:31    20         **A.**    Yes.

21         **Q.**    The monthly note on that car was $315 a month?

22         **A.**    Yes.

23         **Q.**    You -- I assume you paid for auto insurance while

24    you were driving?

:16:40    25         **A.**    Yes.

**OFFICIAL TRANSCRIPT**

1      Q.    How much was that?

2      A.    It was around $125 and something.

3      Q.    The debt that you say is so bad that you say is

4  forcing you to stay at Signal, instead of sending that money

:16:52  5  home, you're spending it in all the ways I just described?

6      A.    It was my need at that time.

7      Q.    You did other things for leisure, right?

8      A.    Yes.

9      Q.    Like what?

:17:01  10      A.    Can you repeat this?

11      Q.    Like what?

12      A.    The need?

13      Q.    Yeah.  What did you do for -- I'm asking what did

14  you do for leisure while you were at Signal, for fun?

:17:14  15      A.    For fun?

16      Q.    Yeah.

17      A.    We never had a fun day.

18      Q.    Did you ever spend money on yourself other than the

19  ways you've described to me?

:17:25  20      A.    Can you repeat that?

21      Q.    Yeah, sure.

22            Did you ever have an occasion to go to a spa while

23  you were in Pascagoula?

24      A.    The spa?

:17:37  25      Q.    A spa.

OFFICIAL TRANSCRIPT

1    A.   I never heard about that.

2    Q.   Okay.

3         MR. UNGAR:  Let's go to Exhibit 2142.  This is

4    already in evidence, Your Honor.  This is the M & M Bank

:17:50    5    record subpoena response.

6         Let's go specifically to Page 14 -- excuse me, 18.

7    Excuse me.

8         Thank you.  Let's blow that up.

9    MR. UNGAR:  (CONTINUING)

:18:07   10    Q.   That's your signature there, Mr. Khuttan?

11    A.   Yes.

12    Q.   This is a document you signed to open a bank

13   account when you arrived at Signal?

14    A.   Yes.

:18:15   15    Q.   So if we scroll to the next page, you recognize

16   this as a statement from your bank account?

17    A.   Yes.

18        MR. UNGAR:  All right.  Let's go to Page 31.

19   MR. UNGAR:  (CONTINUING)

:18:36   20    Q.   I'm going to ask you about some entries on

21   September 11th.  I think it's 2007.  You see here?

22    A.   Yes.

23    Q.   It says OK Spa?

24    A.   Yes.

:18:48   25    Q.   Do you remember going to the OK Spa on

OFFICIAL TRANSCRIPT

1    September 11, 2007, three times?

2         A.   I don't remember.

3         Q.   You did go to this place?

4         A.   Sometimes I just let them use my card to my

5    friends, so I don't know.

6         Q.   Okay.  So you're saying that there is a chance that

7    your friends used your card?

8         A.   Yes.

9         Q.   Like your debit card?

10        A.   Yes.

11        Q.   The debt that you say is so bad, you're just giving

12   your friends your card so that they could spend your money?

13        A.   Yes, because they pay me back once they got paid.

14        Q.   So you're saying that a friend of yours is a person

15   that -- it's not you, you didn't go three times to the

16   OK Spa?

17        A.   No, I never been nowhere.

18        Q.   You're saying you didn't spend $260 on the same

19   day?

20        A.   No.

21        Q.   Do you know about the OK Spa?

22        A.   I never.  The only thing I remember in Pascagoula

23   was Walmart.  That's all I used to go.

24             MR. UNGAR:  All right.  We can take this down.

25   **MR. UNGAR:   (CONTINUING)**


                         **OFFICIAL TRANSCRIPT**

1      **Q.**   Do you remember how much money total you earned at

2   Signal?

3      **A.**   Somewhere around $47,000.

4      **Q.**   About $47,000 gross?

5      **A.**   The gross income.

6      **Q.**   That's more than you had ever earned before?

7      **A.**   Yes.

8      **Q.**   Prior to March 9, 2007, nobody at Signal ever

9   threatened you that you would get sent back to India,

10   correct?

11      **A.**   Can you repeat that?

12      **Q.**   Sure.

13            Prior to March 9, 2007, nobody at Signal ever

14   threatened you that you would get sent back to India,

15   correct?

16      **A.**   No.

17      **Q.**   That's not correct?

18      **A.**   No one threatened me.

19      **Q.**   Right.  All right.

20            And so there is -- you spoke about March 9th.  I'm

21   going to talk to you about that in a second.  You witnessed

22   things happening to others on March 9th, right?

23      **A.**   Yes.

24      **Q.**   Those things weren't happening to you?

25      **A.**   No.


                        **OFFICIAL TRANSCRIPT**

1     **Q.**    You only know of one occasion where somebody at

2     Signal told you that you're going to get sent back to India,

3     and that was after March 9th, you personally?

4     **A.**    In man camp?

5     **Q.**    Yes.

6     **A.**    Yes.

7     **Q.**    Right.  And who said that to you?

8     **A.**    Mr. Snyder.

9     **Q.**    What did he say?

10    **A.**    He said I was complaining about food and the living

11    condition.  And he says I know how you live in India.  It's

12    better than that.  If you keep complaining, I'll send you

13    back to India.

14    **Q.**    Right.  Other than that in the man camp, you were

15    never threatened that you were going to get sent back to

16    India?

17    **A.**    No.

18    **Q.**    All right.  Your foreman never told you that you

19    would get sent back to India?

20    **A.**    No.

21    **Q.**    Now, you say if you don't -- I wrote down something

22    you said about time in the man camp.  And I think you said if

23    you don't show up for three days, you will be fired.  Do you

24    remember saying this?

25    **A.**    Yes.

**OFFICIAL TRANSCRIPT**

:21:18
:21:27
:21:40
:21:51
:22:06

1    **Q.**    So are you saying if you didn't -- if you wanted to

2    live outside the housing facility and you made that decision,

3    if you didn't come check in at the man camp, then you would

4    get fired?

:22:16    5    **A.**    Yes.

6    **Q.**    Now, you're going to work even though you're living

7    outside of the housing facility, right --

8    **A.**    Yes.

9    **Q.**    -- in this hypothetical that we're talking about.

:22:23    10    So you're saying that even though you're going to

11    work, you would still have to, like, come to the man camp

12    and, like, what, swipe your badge?

13    **A.**    Yes.  I have to come back to the man camp.  And

14    there is a security guard who do the attendance, so I have to

:22:39    15    tell him my badge number.

16    **Q.**    What is that security guard's name, do you know?

17    **A.**    I don't remember the name.

18    **Q.**    Now, Signal never injured your person while you

19    worked at Signal?

:22:50    20    **A.**    Come again?

21    **Q.**    Signal never injured you physically while you

22    worked at Signal?

23    **A.**    No.

24    **Q.**    Signal never threatened you with violence?

:22:57    25    **A.**    No.

**OFFICIAL TRANSCRIPT**

|       |                                                                            |
|-------|----------------------------------------------------------------------------|
| 1     | **Q.**   Signal never threatened your family with violence?                 |
| 2     | **A.**   No.                                                               |
| 3     | **Q.**   In fact, nobody at Signal ever said anything to you                |
| 4     | that you thought was hateful at all?                                        |
| 5     | **A.**   Can you repeat this?                                               |
| 6     | **Q.**   Nobody at Signal ever said anything to you that you               |
| 7     | thought was hateful?                                                        |
| 8     | **A.**   No.                                                               |
| 9     | **Q.**   You're agreeing with me or you're not?                            |
| 10    | **A.**   Actually, I'm not, because Mr. Snyder told me that                |
| 11    | if you keep complaining, I will send you back.  And he says                 |
| 12    | the food and the accommodation we are providing is better                  |
| 13    | than India.  So he did.                                                     |
| 14    | **Q.**   So that -- you thought that comment was hateful?                  |
| 15    | **A.**   Yes.                                                              |
| 16    | **Q.**   Other than that comment, nobody at Signal ever said               |
| 17    | anything that you thought was hateful to you?                               |
| 18    | **A.**   Yes.  One more comment.                                           |
| 19    | When I was in a meeting with the vice-president and                        |
| 20    | Darrell, when I told them, can we live outside, and they                    |
| 21    | said, no, you still have to pay this money.  So it's a                      |
| 22    | forceful -- they are getting money from me.                                 |
| 23    | **Q.**   You say that's hateful?                                           |
| 24    | **A.**   It's forcefully they are getting money from me,                   |
| 25    | because if they let me live outside, I can save more money.                |

:23:07 (line 5)
:23:17 (line 10)
:23:34 (line 15)
:23:45 (line 20)
:24:00 (line 25)

**OFFICIAL TRANSCRIPT**

1    And this is -- I can live outside, I have to pay more, and

2    still I have to pay $1,065 to them.

3        Q.    You actually knew that you would be paying $35 a

4    day in India?

:24:17    5        A.    Yes.

6        Q.    You agreed to that there?

7        A.    But nobody told me the conditions for which I'm

8    paying $35.

9        Q.    I understand.

:24:26   10        You mentioned the vice-president.  Do you know that

11    vice-president's name?

12        A.    I don't remember.

13        Q.    All right.  You testified about your arrival at

14    Signal.

:24:45   15        A.    Yes.

16        Q.    You testified -- how many people were in the

17    bunkhouse when you arrived?

18        A.    Around 15 to 16 people.

19        Q.    Right.  So it wasn't 24 when you arrived?

:24:56   20        A.    No.  After we arrived, it was full.  So after we

21    came, it's 24.  Very first day, I slept in the bunk with

22    altogether 24.

23        Q.    Okay.  I think I understand what you're telling me.

24        I think you showed up and there were already 15

:25:13   25    people in that bunkhouse, and then you guys filled that in


OFFICIAL TRANSCRIPT

1    and it became 24 total?

2        A.   Yes.

3        Q.   All right.  Now, before you left Signal, the number

4    in your bunkhouse went down?

5        A.   Yes.

6        Q.   It went down by several people?

7        A.   Yes.

8        Q.   For a few reasons.  One being that some people

9    left?

10       A.   Yes.

11       Q.   And some people moved into the Ameri-Tech trailers

12   that was part of the expansion?

13       A.   Yes.  And some people got fired from Signal.

14       Q.   Right.  And some people were terminated?

15       A.   Yes.

16       Q.   So for all of those reasons, there were a lot less

17   than 24 people in your bunkhouse when you were at Signal?

18       A.   Yes.  It still almost like 16 or 17 people.

19       Q.   So 16 or 17 people, not 24?

20       A.   Yes.

21       Q.   Almost a third less than 24?

22       A.   Just for the last couple of months.

23       Q.   All right.  Did you -- you knew you could move into

24   the Ameri-Tech -- I keep saying Ameri-Tech.  Forgive me.

25            You knew that you could move into the expansion

**OFFICIAL TRANSCRIPT**

1    trailers if you wanted to?

2         A.    Yes.  But it was the same.  Like I'm in this

3    trailer because they don't have -- they have the same room.

4         Q.    Okay.  Now, I think you testified that your showers

5    weren't working?

6         A.    Yes.

7         Q.    The showers in your bunkhouse?

8         A.    Yes.

9         Q.    For how long were they not working?

10        A.    I don't know -- I don't remember exactly, but they

11   be broken sometimes and they took long to fix it.

12        Q.    You said that they took what to fix it?

13        A.    The company took long to fix it.  Maybe sometimes

14   two days, three days.

15        Q.    Two days?

16        A.    Yeah.

17        Q.    You think that's a long time?

18        A.    For 24 people, it's a long time.

19        Q.    Those 24 people could shower in the shower trailer

20   for those two days to fix the shower, right?

21        A.    Can you repeat this?

22        Q.    There was a shower trailer and that's where

23   everybody showered for the few days when the shower wasn't

24   working?

25        A.    Yes.


                         **OFFICIAL TRANSCRIPT**

1    **Q.**   Now, when you arrived at Signal, you testified that

2    you were asked to sign a bunch of documents?

3    **A.**   Yes.

4    **Q.**   Just like your employer in India, you have to sign

5    an employment document, right?

6    **A.**   Yes.  But they give us time.

7    **Q.**   You could have read all the documents before you

8    signed them?

9    **A.**   I tried, but Ramesh told me that it is a long line

10   behind you, and really, we can't risk all day reading this so

11   just sign it and let it go because we have to finish it on

12   the same day.

13   **Q.**   So you're saying that it was Ramesh that told you

14   to sign the documents without reading them?

15   **A.**   Yes.  And some other person from Signal, too, but

16   they told me -- because Ramesh speak the same language as me,

17   the same language.

18   **Q.**   So you read English -- you read English at that

19   time?

20   **A.**   Yes.

21   **Q.**   All right.  So you could read the documents?

22   **A.**   I can read -- I can, but if I have a time.

23   **Q.**   You actually did have the time, and you actually

24   read some of them?

25   **A.**   No.

**OFFICIAL TRANSCRIPT**

:27:16

:27:33

:27:48

:27:58

:28:09

1    **Q.**   Now, Signal was telling you at the time that you

2    can either sign the contracts or you're not going to be able

3    to work for Signal?

4    **A.**   Yes.

5    **Q.**   And you knew that that meant that if you couldn't

6    work for Signal, you would have to return to India?

7    **A.**   Yes.

8    **Q.**   Are you saying you're having a problem with an

9    employer saying you need to sign my employment paperwork,

10   otherwise you can't work for me?

11   **A.**   It was not a problem, but the way they are saying

12   that was a problem.

13   **Q.**   The way Signal was saying it, it was like a

14   problem?

15   **A.**   Yes.  When I say Signal -- when I first -- first

16   day I came to Signal International in the man camp when I was

17   signing the paper, I had an impression that Ramesh is from

18   Signal, too, because he is a safety person and he is not

19   doing welding or fitting job.  So he told me that we don't

20   need to read this.  If you want to work there, just sign it.

21   **Q.**   That made you feel uncomfortable in some way?

22   **A.**   I won't because he don't let me read that.

23   **Q.**   And you're denying actually reading the documents?

24   **A.**   Come again?

25   **Q.**   You're denying that you read them at all?

**OFFICIAL TRANSCRIPT**

1    **A.**   I didn't read them all.

2    **Q.**   You didn't read them all.  You read some of them?

3    **A.**   No.

4    **Q.**   Now, you said you lost weight while you were at

5    Signal.

6    **A.**   Yes.

7    **Q.**   You didn't show the jury any document that proves

8    that.

9    **A.**   Signal has that.

10   **Q.**   Just your word, right?

11        What you're saying to the jury is, trust me, I lost

12   33 pounds?

13   **A.**   I did.

14   **Q.**   Now, before you came to Signal, you weren't

15   working?

16   **A.**   I was, but I took off.  I left the job because I

17   was in the process to get the job in Signal.

18   **Q.**   You weren't working for about a month?

19   **A.**   Yes.

20   **Q.**   Was it like six weeks before you came to Signal?

21   **A.**   Yeah.

22   **Q.**   All right.  So during that time, you were living at

23   home?

24   **A.**   Yes.

25   **Q.**   You didn't have to work because your father was

**OFFICIAL TRANSCRIPT**

1    supporting you?

2         A.   Yes.

3         Q.   Right.  And so you were sitting at home not

4    working, and then you come to Signal and you start working

:30:32    5    outside.  Didn't that contribute to your weight loss?

6         A.   Maybe.

7         Q.   Now, Signal made some improvements at the

8    housing facility, right?

9         A.   No.

:30:48    10        Q.   Never?

11        A.   Not to me.

12        Q.   Do you remember an occasion where the workers asked

13   Signal to add some drinking water coolers in the TV room?

14        A.   Yes.

:31:00    15        Q.   And then that happened?

16        A.   Yes.

17        Q.   Right.  And then also --

18        A.   I want to say one thing.  It's just two water

19   coolers for 300 people.

:31:12    20        Q.   There was water in the mess hall, too?

21        A.   But mess hall be closed.

22        Q.   Okay.  But when it's open, there's is water in the

23   mess hall, there's water in the TV rooms?

24        A.   Yes.

:31:24    25        Q.   Water on the worksite?


                         OFFICIAL TRANSCRIPT

1      **A.**   Yes.

2      **Q.**   All right.  Now, another example of the way in

3   which Signal improved the conditions at the housing facility

4   is that they made laundry easier for you to deal with?

:31:42   5      **A.**   Yes, but it don't work.

6          MR. UNGAR:  Your Honor, I would like to approach

7   the witness.

8          For the record, this is Exhibit 1544.  We're not

9   publishing it at this time.

:32:16   10  **MR. UNGAR:   (CONTINUING)**

11     **Q.**   I'm going to ask you a question.

12     **A.**   Yes.

13     **Q.**   Do you recognize this, what I just handed you, as a

14  photograph of the laundry at the man camp while you lived

:32:35   15  there?

16     **A.**   Yes.

17     **Q.**   Does the photograph depict the laundry room in

18  substantially the same condition as existed while you lived

19  at the man camp?

:32:45   20     **A.**   It looks the same, but it looks clean in this

21  photo, in picture.

22         MR. UNGAR:  Your Honor, I would like to publish the

23  photo.

24         THE COURT:  No.

:32:56   25         MR. UNGAR:  Okay.


                         **OFFICIAL TRANSCRIPT**

**MR. UNGAR:   (CONTINUING)**

    **Q.**   All right.  Did you ever cook your own food at the mess hall?

    **A.**   No.  We're not allowed to.

    **Q.**   You never did that ever?

    **A.**   No.

    **Q.**   Now, there was Family Day at Signal, right?

    **A.**   Can you repeat that?

    **Q.**   Do you remember playing cricket at Signal?

    **A.**   Just one day.

    **Q.**   And there was transportation for you at Signal?

    **A.**   Yes.  For certain time.

    **Q.**   Certain time.  Where would it take you?

    **A.**   Walmart.

    **Q.**   Would it take you to church?

    **A.**   I never been to church.

    **Q.**   It would take others to church?

    **A.**   I never been to church.

    **Q.**   I'm asking you if you know if the bus would take other people to church?

    **A.**   Yes.

    **Q.**   It would?

    **A.**   Yes.

    **Q.**   What about to like the mall?

    **A.**   I don't know.

**OFFICIAL TRANSCRIPT**

1     **Q.**   Do you know if the bus ever took anybody to the

2     mall?

3     **A.**   I don't know.

4     **Q.**   What about, do you know if the bus would ever pick

:33:58    5     people up from a bar?

6     **A.**   I never heard about it.

7     **Q.**   So if somebody were to say that the bus only went

8     to Walmart, that would be untrue?

9     **A.**   Yes.

:34:16    10    **Q.**   All right.  So while working for Signal, you took

11    some trips, vacations?

12    **A.**   I did took vacations whenever I got an off day.

13    **Q.**   Right.  One time you visited Florida?

14    **A.**   Yes.  But I came back same day.

:34:41    15    **Q.**   And then one time you went to Alabama?

16    **A.**   Yes.  For some grocery.

17    **Q.**   For what?

18    **A.**   For some grocery for me.

19    **Q.**   Curiosity?

:34:53    20    **A.**   The grocery.  Indian grocery.

21    **Q.**   Grocery, I'm sorry.

22    **A.**   Yeah.  And I came back the same day.

23    **Q.**   Okay.  What did you buy at the grocery?

24    **A.**   Come again?

:35:03    25    **Q.**   What did you buy at the Indian grocery?


**OFFICIAL TRANSCRIPT**

1    **A.**   Some soaps and some other stuff.

2    **Q.**   There's an Indian grocery in Alabama?

3    **A.**   Yes.

4    **Q.**   Where?

:35:11   5    **A.**   I don't remember exactly, but I did Google at that

6    time.

7    **Q.**   Okay.  And then you also went to Texas while you

8    were working for Signal?

9    **A.**   Yes.

:35:20   10   **Q.**   All right.

11   **A.**   And I came back same day.

12   **Q.**   Now, you're a clean person generally?

13   **A.**   I like to be clean.

14   **Q.**   You're cleaner than most welders that you worked

:35:43   15   with at Signal?

16   **A.**   I can't say that.  I can't comment on somebody

17   else.  But I can say I like to be clean.

18   **Q.**   And you testified that you expected at Signal to

19   get your own room with your own bathroom because that's how

:36:01   20   you lived in India?

21   **A.**   I didn't expected anything.  What I expected --

22   what I thought, it would be better.  Not -- I didn't expect

23   to live with 24 people in a bunkhouse.

24   **Q.**   And you didn't actually live with 24 people the

:36:21   25   whole time you were at Signal?

**OFFICIAL TRANSCRIPT**

1      **A.**   Just for a couple months.  Otherwise, for 10 or
2   11 months I did.
3      **Q.**   Now, let's speak about March 9th for a moment.
4           On March 9th, there were about 100 people
:36:39    5   surrounding the TV hall when you first saw it?
6      **A.**   Yes.
7      **Q.**   Lots of people?
8      **A.**   Yes.
9      **Q.**   Were they making noise?
:36:47   10      **A.**   No.
11      **Q.**   Were they creating any sort of a fuss?
12      **A.**   No.  They were just talking to each other, what's
13   going on.
14      **Q.**   Eventually people in that group started banging on
:36:57   15   the TV room, right?
16      **A.**   I never saw that.
17      **Q.**   Did you ultimately learn that that happened?
18      **A.**   No.
19      **Q.**   Now, you said that you saw Sabulal being taken away
:37:10   20   to the hospital.
21      **A.**   Yes.
22      **Q.**   How did you see -- was he on a stretcher?
23      **A.**   I don't remember, because the public surrounded --
24   everyone is around him so I can't really see him.  But I was
:37:27   25   there when he was taken to the hospital.


**OFFICIAL TRANSCRIPT**

1     **Q.**   All right.  So the particulars about what happened

2     with Sabulal at the hospital, you were deferring to what

3     Sabulal said about that?

4     **A.**   Can you repeat that?

5     **Q.**   Sure.  The particulars about what happened with

6     Sabulal and the hospital, you would defer to Mr. Sabulal

7     about all of that?

8     **A.**   I don't get you.

9     **Q.**   That's okay.  I'll ask a different question.

10         Now, you chose -- you ultimately chose to leave

11    Signal about a year after March 9, 2007?

12    **A.**   Yes.

13    **Q.**   Within two days of you leaving Signal, you sued

14    Signal?

15    **A.**   Yes.

16    **Q.**   All right.  Now, at the time that you left Signal,

17    you had been told by Signal specifically that Signal was

18    going to apply for a green card for you?

19    **A.**   Yes.

20    **Q.**   And you were told that there was a chance that that

21    green card application would be denied?

22    **A.**   Yes.

23    **Q.**   You were told that there was a chance that that

24    green card application would take a long time to come

25    through?

**OFFICIAL TRANSCRIPT**

```
 1         A.   Yes.
 2         Q.   You were told that Malvern Burnett didn't do the
 3    things that he had told you he was going to do?
 4         A.   Yes.
 5         Q.   Right.  And that -- so nobody from Signal ever told
 6    you that they weren't going to apply for a green card for you
 7    prior to your decision to leave Signal?
 8         A.   Yes.
 9         Q.   Now, before you left Signal, you met with someone
10    named Saket Soni?
11         A.   Yes.
12         Q.   Did he ask you to be an organizer of the men in the
13    man camp?
14         A.   Can you repeat this?
15         Q.   Sure.  Did he ask you to be an organizer of the men
16    in the man camp?
17         A.   No.
18         Q.   Did Saket Soni ask you to serve on an organizing
19    committee in the man camp?
20         A.   No.
21         Q.   Or a network in the man camp?
22         A.   No.
23         Q.   How many times did you meet with him before you
24    quit Signal?
25         A.   Before then?
```

:38:36
:38:56
:39:04
:39:16
:39:25

**OFFICIAL TRANSCRIPT**

1    **Q.**   Yeah.  Before --

2    **A.**   Before then?

3    **Q.**   Yeah, only before.  I want to know, before you left

4    Signal, how many times did you meet with Saket Soni before

:39:35   5    you left?  Don't tell me after.

6    **A.**   Yeah.  Maybe two or three times.

7    **Q.**   All right.  Did you ask him to do anything for you?

8    **A.**   I just told him what is going on in the man camp.

9    **Q.**   Did he ask you to do anything for him?

:39:53   10    **A.**   No.

11    **Q.**   All right.  So let's talk about the events that

12    brought you to Signal.

13           MR. UNGAR:  Can we pull up Exhibit 777.

14    **MR. UNGAR:  (CONTINUING)**

:40:09   15    **Q.**   This is the advertisement that you first saw that

16    showed -- that told you about the job?

17    **A.**   Yes.

18    **Q.**   This advertisement says H-2B, right?

19    **A.**   Yes.

:40:19   20    **Q.**   From the very beginning, you knew that an H-2B visa

21    was involved in this recruitment?

22    **A.**   When I talked to Mr. Dewan, they told me it is two

23    different things.  That's why it is all in there.

24    **Q.**   Right.  So from the beginning, you were talking to

:40:36   25    Sachin Dewan about H-2B visas and green cards, but that they

**OFFICIAL TRANSCRIPT**

1    were different?

2         A.   Yeah.  He told me that it is two different things,

3    but we are applying for you on permanent residency.

4         Q.   So did you ask Mr. Dewan, I'm responding to an

5    advertisement that says H-2B, but you're telling me I'm not

6    going to actually get the H-2B?

7         A.   Can you repeat that?

8         Q.   Sure.

9              You're saying that Mr. Dewan, Sachin Dewan, told

10   you that it says H-2B and green card, but that we're going to

11   apply for you for a green card?  Is that what you are telling

12   me?

13        A.   No.  I'm saying that he told me that it's two

14   different kinds of job, but the job I'm applying for you is

15   for the green card.  That's why it's the -- the "or" is in

16   there.

17        Q.   I understand.

18             And you say that Sachin Dewan told you that

19   personally?

20        A.   The group.

21        Q.   Told a group of people.  And was that at the first

22   recruitment meeting?

23        A.   Yes.

24        Q.   Nobody from Signal was at that meeting?

25        A.   No.


                         OFFICIAL TRANSCRIPT

**Q.**   You don't know if Signal knew that Sachin Dewan was saying those things to you?

**A.**   At that time, I thought Sachin Dewan is working for Signal International.  So whenever I see Sachin Dewan there, I thought he is representing Signal.

**Q.**   Right.  But you don't know if Signal, the Signal in America, knew the things that Sachin Dewan was telling you, that you thought were on Signal's behalf?

**A.**   I don't know.

MR. UNGAR:  So we can take this down.

**MR. UNGAR:  (CONTINUING)**

**Q.**   You say that you spent -- is it 850,000 rupees to come to the United States?

**A.**   Yes.

**Q.**   You never showed the jury any check or receipt or anything to prove those payments, right?

**A.**   They never gave me nothing.

**Q.**   Do you know if any of the other plaintiffs that are in this trial were able to show the jury checks, demand drafts, receipts?

**A.**   I don't know.

**Q.**   But you can't?  You cannot?

**A.**   Yeah.

**Q.**   So the jury is just supposed to believe your word that that's how much you paid?

**OFFICIAL TRANSCRIPT**

1          A.   I have my loan paper.

2          Q.   Now, that loan paper is the paper for the loan that

3     you took out.  That paper doesn't show what you paid to the

4     recruiter?

5          A.   I did pay 850,000 rupees.

6          Q.   Now, do you know if Sachin Dewan agrees that that's

7     how much you paid?

8          A.   I don't know.

9          Q.   Do you know who Shivram Dheer is?

10         A.   Huh?

11         Q.   Shivram Dheer, do you know who that is?

12         A.   I never heard about him.

13         Q.   Isn't it true that your father had a relationship

14    with Sachin Dewan's father prior to this recruitment?

15         A.   No.

16         Q.   Did you know Sachin Dewan prior to this

17    recruitment?

18         A.   No.

19         Q.   Now, as far as committing to pay 850,000 rupees,

20    the person that decided to make those payments was you?

21         A.   Can you repeat this?

22         Q.   The person that decided to commit to making those

23    payments, 850,000 rupees, was you?

24         A.   Yes.

25         Q.   You were the only one that decided to do that?


                         OFFICIAL TRANSCRIPT

1    **A.**   Yes.

2    **Q.**   Nobody forced you to do that?

3    **A.**   Yes.

4    **Q.**   Signal certainly did not force you to do that?

:43:28    5    **A.**   Yes.

6    **Q.**   Now, you described two types of loans that you took

7    out, and I want to make sure that I have this correctly.

8    Well, to pay the first installment, 250,000 rupees,

9    you borrowed money from a friend?

:43:44    10    **A.**   250,000.

11    **Q.**   Rupees?

12    **A.**   Rupees, yeah.

13    **Q.**   Okay.  Now, when you took the loan on the family

14    home, you took some of the money from that loan and paid back

:43:53    15    your friend?

16    **A.**   No.  My father took a loan from his government job

17    against his retirement fund.

18    **Q.**   I understand.

19    So there was a loan on his retirement.  You said he

:44:07    20    had a government job?

21    **A.**   Yes.

22    **Q.**   What was his job?

23    **A.**   He was in the police.

24    **Q.**   He was the assistant police commissioner of Delhi?

:44:15    25    **A.**   Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Right.  And so that retirement plan was a

2    government-run retirement plan?

3    **A.**   Yes.

4    **Q.**   So when you're taking a loan from that

:44:21   5    government-run retirement plan, you're taking that loan from

6    the government of India?

7    **A.**   Yes.

8    **Q.**   You're not taking it from some money lender with

9    goons?

:44:28   10   **A.**   No.

11   **Q.**   Okay.  Now, the money that you borrowed on the

12   house --

13          MR. UNGAR:  Let's look at Exhibit 827.

14   **MR. UNGAR:   (CONTINUING)**

:44:38   15   **Q.**   This is that document, right?

16   **A.**   Yes.

17   **Q.**   All right.  So can you tell me -- there are some

18   redactions here, but I'm actually trying to figure out who

19   you borrowed the money from, like who signed on the -- who's

:44:49   20   on the other side of this mortgage deed?

21   **A.**   It's a private lender.

22   **Q.**   Private lender.

23          So this is one of those lenders with the goons that

24   will hurt you if you don't pay them back?

:44:59   25   **A.**   Yes.  But this was my first time dealing with them.


**OFFICIAL TRANSCRIPT**

1    **Q.**   Right.  And you knew at the time that you took out

2    a note with those lenders, that those were the types of

3    people you were borrowing money from?

4    **A.**   Yes.

:45:10    5    **Q.**   And you knew at that time that there was a chance

6    that your green card application would be denied?

7    **A.**   No.

8    **Q.**   So you just thought at that time that everybody

9    that applies for a green card just gets one?

:45:23    10    **A.**   I don't know.

11    **Q.**   Right.  And so when you're taking out the loan with

12    shady guys, you're taking a risk?

13    **A.**   Yes.

14    **Q.**   And you're the only person that chose to take that

:45:33    15    risk?

16    **A.**   Yes.

17    **Q.**   Nobody forced you to do that?

18    **A.**   Yes.

19    **Q.**   And this is the debt that you said compelled you to

:45:39    20    stay at Signal?

21    **A.**   Can you repeat this?

22    **Q.**   This is the debt that you say compelled you to stay

23    at Signal?

24    **A.**   Yes.

:45:45    25    **Q.**   Now, you're saying, I think, that you made three

**OFFICIAL TRANSCRIPT**

1    installment payments --

2          MR. UNGAR:  We can take this down.

3    MR. UNGAR:  (CONTINUING)

4      Q.   Three installment payments total?

5      A.   Yes.

6      Q.   Right.  I think you said that you made two

7    installment payments before Sachin Dewan told you that you

8    would actually be traveling to the United States on an H-2B

9    visa?

10     A.   Yes.

11     Q.   I assume then you turned to Sachin Dewan and said,

12   Give me my money back.  Did you do that?

13     A.   No.

14     Q.   So you continued with the program even though you

15   knew you would be traveling on a work visa?

16     A.   Because he explained me that it is a part of

17   process, and once you make it there, company will change your

18   status and apply for a green card.

19     Q.   So did Sachin Dewan tell you that the H-2B visa was

20   the beginning part of a green card process?

21     A.   Yes.

22     Q.   Do you know how Sachin Dewan learned that

23   information?

24     A.   I don't know.

25     Q.   Did you ever meet Malvern Burnett in India?

                     OFFICIAL TRANSCRIPT

1       A.    No.

2       Q.    Do you know if Malvern Burnett is the person that

3    told Sachin Dewan how an H-2B visa works?

4       A.    That's what he told me.

:47:02    5       Q.    Sachin Dewan told you that Malvern Burnett told him

6    how an H-2B visa works?

7       A.    No.   Sachin Dewan told me that Malvern Burnett is

8    an immigration lawyer and he is working on your green card.

9       Q.    Right.  But you never met him?

:47:17    10       A.    No.

11       Q.    You knew when you walked into your consulate

12    interview that you were interviewing for an H-2B visa?

13       A.    Yes.

14       Q.    You just thought that you were going to get to the

:47:37    15    United States on the H-2B visa, and then Signal would pursue

16    your green card application?

17       A.    Yes.

18       Q.    Did you understand that Signal would file that

19    green card application from anew once you got to the U.S.?

:47:50    20       A.    Can you repeat this?

21       Q.    You knew when you came to Signal that you would

22    travel on an H-2B visa, and that once you were in the

23    United States, Signal would then apply for a green card for

24    you?

:47:59    25       A.    Yes.


                          OFFICIAL TRANSCRIPT

1    Q.   Okay.  And that's exactly what Signal said they

2    were -- excuse me.   Strike that.

3         That's exactly what Signal told you they were going

4    to do?

:48:07    5    A.   Yes.

6    Q.   And the reason why Signal didn't actually do that

7    for you is because you left Signal before they could, right?

8    A.   I don't know.  Because Signal never presented any

9    paperwork that they are doing -- they always say, but they

:48:25    10   never give me any paperwork which shows that.

11   Q.   Just like the paperwork that you're not showing us

12   about the fees you paid, right?

13   A.   Yes.

14   Q.   All right.  Now, your father.  Your father was the

:48:37    15   assistant police commissioner in Delhi?

16   A.   Yes.

17   Q.   And I understand that he passed away while you

18   worked at Signal?

19   A.   Yes.

:48:44    20   Q.   I would like to ask you about his involvement in

21   your recruitment.

22        You knew when -- Sachin Dewan held onto your

23   passport, you testified?

24   A.   Yes.

:48:54    25   Q.   You knew when he was holding onto your passport

OFFICIAL TRANSCRIPT

1   that that was illegal?

2       **A.**   Yes.

3       **Q.**   You didn't tell the police?

4       **A.**   No.

:49:01   5       **Q.**   The reason why is because you basically wanted to

6   ignore that illegality so that you can get to the

7   United States?

8       **A.**   Yes.

9       **Q.**   Let's talk about your consulate interview.

:49:21   10          You lied to a representative of the United States?

11      **A.**   I said what Sachin Dewan told me to say.

12      **Q.**   You told a representative of the United States that

13   you were a fitter and you're not a fitter?

14      **A.**   Yes.

:49:35   15      **Q.**   You lied to a representative of the United States?

16      **A.**   Yes.

17          MR. UNGAR:   Nothing further, Your Honor.

18                        **CROSS-EXAMINATION**

19   BY MR. CERNIGLIA:

:50:09   20      **Q.**   Mr. Hemant, my name is Timothy Cerniglia.  I

21   represent Mr. Burnett.

22          So you never met Mr. Burnett at all while you were

23   in India?

24      **A.**   No.

:50:22   25      **Q.**   You never spoke to him in India?

**OFFICIAL TRANSCRIPT**

1    **A.**   No.

2    **Q.**   You were told about your job which Signal offered

3    you while you were in India, and you were tested by Signal

4    while you were in India?

:50:39    5    **A.**   Yes.

6    **Q.**   So Mr. Burnett was not the reason you decided to

7    take the job at Signal?

8    **A.**   I don't know.

9    **Q.**   If you had never met him and if he never talked to

:50:56    10   you, you made the decision to go to Signal before ever even

11   knowing about Mr. Burnett, right?

12   **A.**   Yes.

13   **Q.**   So he could not have influenced your decision to go

14   to Signal?

:51:08    15   **A.**   Can you repeat this?

16   **Q.**   Mr. Burnett was not the reason you decided to go to

17   Signal and to go to the United States?

18   **A.**   No.  But I have an explanation that Sachin Dewan

19   told me that Mr. Malvern Burnett is working on immigration

:51:31    20   and he worked for Signal.

21   **Q.**   Okay.  He is the immigration lawyer, that's what

22   you understood?

23   **A.**   Yes.

24   **Q.**   Now -- so in India, Mr. Burnett never told you

:51:51    25   anything.  I want to ask you about while you were in the

**OFFICIAL TRANSCRIPT**

1    United States.

2            Mr. Ungar asked you if Mr. Burnett did what he told

3    you he would.

4            Isn't it true that you only saw Mr. Burnett once

5    while you were at Signal, and that was at a meeting?

6        A.   Yes.

7        Q.   And at that meeting, Mr. Burnett, along with Signal

8    managers, said they're going to file your extension and then

9    they are going to sponsor you for a green card?

10       A.   Yes.

11       Q.   But you left before it was time -- you left before

12   your first extension expired?

13       A.   Yes.  But before that, Signal had some other

14   lawyers and they fired Mr. Burnett.

15       Q.   Not Mr. Burnett.

16           You were told at the meeting Signal would file your

17   extension and then file for your green card?

18       A.   Signal told us -- when they hired the other lady

19   lawyer, they told us that Mr. Burnett didn't do the things

20   which he supposed to and he didn't file nothing.  That's why

21   we have new lawyer for you now.

22       Q.   So that was told to you by Signal?

23       A.   Yes.

24       Q.   Did Signal tell you that, in fact, Mr. Burnett did

25   get you an extension?

OFFICIAL TRANSCRIPT

1      **A.**   Yes.

2      **Q.**   So you knew that Mr. Burnett had filed the

3  necessary work for you to get an extension?

4      **A.**   For the first time.  Not for second time.

5      **Q.**   Right.  The first time -- this is the first

6  extension.  That's your name?  This is Exhibit 1282.

7      **A.**   Yes.

8      **Q.**   And do you see where it says, valid until

9  June 1, 2008?

10      **A.**   Yes.

11      **Q.**   And you left three months earlier, in March of

12  2008?

13      **A.**   Yes.

14      **Q.**   So up until the time that you left, Mr. Burnett did

15  everything he said in that meeting, that he would file for an

16  extension, but then you left?

17      **A.**   Yes.  But before -- for the next extension, company

18  says Mr. Burnett didn't file that.  And that's why they fired

19  him and they hired someone else.

20      **Q.**   Okay.  Let's talk about that.

21          The next extension is not until after June 1, 2008.

22  This one goes through June 1, 2008.  The next one is after

23  that, right?

24      **A.**   Yes.

25      **Q.**   So he was fired before he could file the second

**OFFICIAL TRANSCRIPT**

:53:52

:54:35

:54:46

:55:08

:55:24

1   extension; that's what they told you?

2       A.   Yes.

3       Q.   So at the time that you left, you knew -- not what

4   somebody else told you -- you knew you had an extension that

5   Mr. Burnett filed that was good until 2008, but you left

6   three months earlier?

7       A.   Yes.

8       MR. CERNIGLIA:  That's all I have, Your Honor.

9                CROSS-EXAMINATION

10  BY MR. SHAPIRO:

11      Q.   Good afternoon, Mr. Hemant.  I'm Stephen Shapiro,

12  and I represent Sachin Dewan.

13      A.   Good afternoon.

14      Q.   Good to see you again.

15          I've got a few questions for you.

16          The first question is, you were pretty close with

17  your father, weren't you?

18      A.   Yes.

19      Q.   Okay.  And spent a lot of time with him?

20      A.   Yes.

21      Q.   Okay.  Would it be fair to say that you knew a lot

22  of your father's friends?

23      A.   Yes.

24      Q.   Okay.  And isn't it true that Shivram Dheer was one

25  of your father's friends?

OFFICIAL TRANSCRIPT

1      A.   No.

2      Q.   You have never heard the name Shivram Dheer before?

3      A.   No.

4      Q.   "No" meaning you have never heard the name?

:56:59    5      A.   No -- yes, I never.

6      Q.   Okay.  Are you representing to the Court that you

7   met Shivram Dheer for the first time at the meeting that you

8   attended in Delhi?

9      A.   Yes.

:57:15   10      Q.   Now, I understand in observing you that you speak

11   English fluently; isn't that correct?

12      A.   Yes.

13      Q.   Okay.  And you read English fluently, don't you?

14      A.   Yes.

:57:46   15      Q.   Okay.  And you were given documents to read and

16   sign before you departed Mr. Dewan's office for the

17   United States; isn't that correct?

18      A.   No.  They give me documents and they didn't give me

19   enough time to read.  They just said sign it, otherwise you

:58:02   20   miss your flight, and then we not responsible for the

21   expense.

22      Q.   What time was your flight leaving?

23      A.   It was around 8:00 when I was in his office and my

24   flight was at 1:00.

:58:16   25      Q.   Okay.  You were at his office at 8:00 and the

**OFFICIAL TRANSCRIPT**

1    flight was at 1:00?

2         A.   Yes.

3         Q.   And you know Mr. Dewan's office is not very far

4    from the airport; isn't that correct?

:58:27   5    A.   Yes.  But due to traffic, it take long to make it

6    there.

7         Q.   Okay.  Five hours?

8         A.   Not five hours.  But still we have to go through

9    the check-in and all this.  And we have to be onboard at

:58:43   10   least two hours before.

11        Q.   Okay.  Isn't it true that even with traffic, you

12   can get to the Mumbai airport from Mr. Dewan's office with

13   traffic in no longer than 45 minutes?

14        A.   I never lived in Mumbai, so I don't know the roads

:59:02   15   and how long it takes.  And that's what he told me, that just

16   sign it and leave because you're going to be late for the

17   flight.

18        Q.   Okay.  And you were about to go on a journey to the

19   United States to come to work for Signal on an H-2B and

:59:19   20   subsequently a green card; isn't that correct?

21        A.   Yes.

22        Q.   And that's a big moment in your life, isn't it?

23        A.   Yes.

24        Q.   And didn't you care enough to read the document

:59:31   25   before you signed it?

**OFFICIAL TRANSCRIPT**

1    **A.**   I asked him and he denied to me, so I didn't ask

2  him again.

3    **Q.**   Are you saying that he denied you an opportunity to

4  read --

:59:41  5    **A.**   Yes.

6    **Q.**   -- and sign the documents that he gave you?

7    **A.**   Yes.

8    **Q.**   So you signed a document -- you signed several

9  documents, didn't you?

:59:50  10    **A.**   Yes.

11    **Q.**   Okay.  You understand that when you sign a

12  document, you're bound by its contents, don't you?

13    **A.**   Yes.

14    **Q.**   But you didn't care enough to read those documents,

:00:05  15  did you?

16    **A.**   As I told you before, he didn't let me do that.

17    **Q.**   Didn't he at least explain the documents to you in

18  small groups?

19    **A.**   Yes.

:00:16  20    **Q.**   He did.  Okay.

21    **A.**   Yeah.

22    **Q.**   And you had enough information, and you felt good

23  about that, didn't you?

24    **A.**   Yes.

:00:22  25    **Q.**   Okay.  Now, are you an attorney?


**OFFICIAL TRANSCRIPT**

1        **A.**    (No response.)

2        **Q.**    Are you a lawyer?

3        **A.**    No.

4        **Q.**    Okay.  Your testimony is that Mr. Dewan took your

:00:45   5   passport from you and would give it back to you -- told you

6   he would give it back to you only when you made the final

7   installment payment; isn't that correct?

8        **A.**    Yes.

9        **Q.**    Okay.  And that's what actually happened, isn't it?

:01:01  10       **A.**    Yes.

11       **Q.**    Now, this is the passport that was -- had the H-2B

12  visa stamped on it; isn't that correct?

13       **A.**    Yes.

14       **Q.**    Okay.  Now, you testified that, in your opinion,

:01:28  15  you thought it was illegal for him to hold onto your

16  passport; isn't that correct?

17       **A.**    Yes.

18       **Q.**    But you're not a lawyer, are you?

19       **A.**    No.

:01:36  20       **Q.**    You did not seek the advice of a lawyer, did you?

21       **A.**    No.

22       **Q.**    In fact, you didn't do anything to find out whether

23  it was illegal, so you didn't really know it was illegal, did

24  you?

:01:52  25       **A.**    No.


**OFFICIAL TRANSCRIPT**

1    **Q.**   Okay.  Now, when you go to the consulate for your
2    interview, your testimony is that Mr. Dewan told you to tell
3    the consulate that you were a fitter, not a welder; isn't
4    that correct?
:02:19    5    **A.**   Yes.
6    **Q.**   And you lied to the consular?  You said, I'm a
7    fitter?
8    **A.**   Yes.
9    **Q.**   Isn't it true that you brought documents with you
:02:30    10   showing exactly the kind of work you were going to do and
11   exactly where you were going to go?
12   **A.**   I don't know.  They prepared it for me, and it was
13   in a sealed bag.
14   **Q.**   So you never opened the package?
:02:42    15   **A.**   No.
16   **Q.**   So you don't know what was in the documents, do
17   you?
18   **A.**   What was my thinking is that it is my documents
19   which I'm presenting to them, because I just give them my
:02:54    20   documents.
21   **Q.**   So you never bothered opening the package to read
22   them on your own, did you?  You didn't care enough about
23   that, did you?
24   **A.**   They -- Dewan told us that not to open the paper,
:03:10    25   just turn it over there.

**OFFICIAL TRANSCRIPT**

```
 1        Q.   Right.  Right.  Like he told you just to sign the
 2   documents without reading them, right?
 3        A.   Yes.
 4             MR. SHAPIRO:  Okay.  No further questions.
 5             MR. HOWARD:  Briefly, Your Honor.
 6                        REDIRECT EXAMINATION
 7   BY MR. HOWARD:
 8        Q.   Mr. Hemant, you were asked by counsel for Signal,
 9   and I believe by counsel for Mr. Burnett, whether while you
10   were at Signal they gave you an indication that at some point
11   in the process they would file for a green card for you.  Do
12   you recall that?
13        A.   Yes.
14        Q.   And I believe you said that was the case?
15        A.   Yes.
16        Q.   When they were indicating that at the end of the
17   process they would file for a green card for you, did they
18   tell you that it would take up to 30 years for you to get
19   your green card?
20        A.   Yes.
21        Q.   During the time you were at Signal, they told you
22   that?
23        A.   Yes.
24        Q.   That it would take up to 30 years?
25        A.   I don't remember exact time, but they said it take
```

:03:20

:03:37

:03:46

:03:56

:04:03

                        OFFICIAL TRANSCRIPT

1    long and you -- maybe you have to go back to India and wait

2    there for the green card.

3        Q.    Who told you?  That's what I want to clarify in the

4    process.

5             I think you testified that when the new lawyer

6    came, that was when you heard you might have to go back to

7    India; is that right?

8        A.    Yes.

9        Q.    Was that the first time you heard from anyone from

10   Signal that you might have to go back to India before you got

11   your green card?

12       A.    Yes.

13       Q.    So before that time, during the time period when

14   they were giving indications they would file for a

15   green card, were they telling you you would have to go back

16   to India?

17       A.    No.

18       Q.    And were they telling you during that time that it

19   would take 30 years?

20       A.    No.

21       Q.    So at the end when the new lawyer came in and told

22   you the truth, that, you know, you're going to have to go

23   back to India and it could take up to 30 years, is that when

24   you decided to leave?

25       A.    Yes.


                        **OFFICIAL TRANSCRIPT**

1        MR. HOWARD:  Nothing further.

2        THE COURT:  All right.  Mr. Hemant, you are excused

3    from the witness stand.  You can go back to counsel's table.

4        THE WITNESS:  Thank you, Your Honor.

:05:18    5        THE COURT:  All right.

6        MR. RYDBERG:  Your Honor, may we approach?

7        THE COURT:  Yes.

8                   **SIDEBAR ON THE RECORD**

9        MR. RYDBERG:  A very preliminary report from the

:05:54   10    hospital is that Ms. Hangartner has had some kind of stroke,

11    an ischemic stroke.

12        THE COURT:  What is that?

13        MR. RYDBERG:  It doesn't sound good.  That's all I

14    know.  I presume the plaintiffs are about to rest.

:06:07   15        MR. CERNIGLIA:  No --

16        MR. HOWARD:  Your Honor, we have no more witnesses.

17    Technically -- I wanted to clarify this on the record since

18    some of the witnesses that are remaining to be called by

19    Signal are part of our affirmative case.  I don't technically

:06:20   20    want to rest in part because I know that I'm obligated to ask

21    for directed verdicts after the close of our case, and I want

22    to preserve that right until the end of the witnesses.  But I

23    have no more witnesses.

24        THE COURT:  But you have made designations in the

:06:34   25    depositions that will be read after this point in time,


                       **OFFICIAL TRANSCRIPT**

1    correct?

2            MR. HOWARD:  Correct.  You mean if they didn't call

3    these witnesses live?

4            THE COURT:  Live.  Okay.

5            MR. HOWARD:  I'm talking about someone like

6    Mr. Marler.  So I'd have direct of Mr. Marler, which will be

7    part of our affirmative case.

8            So technically I'm not resting.  Am I right on the

9    record that I don't have to do my directed verdicts now?

10           THE COURT:  Well, I don't know.  We agreed to this

11   procedure, and so I think that he doesn't have to ask for his

12   directed verdict right now, but at some point all that direct

13   will have been presented and then you need to let me know.

14           MR. HOWARD:  Absolutely.

15           THE COURT:  And to ask for a directed verdict.

16           MR. HOWARD:  Just clarifying the process.  I have

17   no more witnesses.  So I wanted to say I have no more live

18   witnesses other than the ones that Signal and the other

19   defendants are calling, if that's what you were asking.

20           MR. RYDBERG:  Well, I wasn't sure about where you

21   were on that, so I do appreciate that clarification.

22           Our team on the Signal side is a little shaken at

23   the news that Ms. Hangartner has had a stroke, of course --

24   more than a little.

25           THE COURT:  Well, you have to tell me exactly what

**OFFICIAL TRANSCRIPT**

1   you are asking for.

2          MR. RYDBERG:  I don't know what I'm asking for.

3   We're going to need some time to regroup.  I don't know if

4   these guys are capable of going forward today on our team and

5   having their wits about them.  I just found out this news on

6   the stroke literally five minutes ago by an e-mail.

7          THE COURT:  Well, I think that these next

8   witnesses -- that we have your person who is here who is

9   going to do direct, and we need to go forward with that.

10         And you all need to think about it tonight and talk

11  with your client.  If you are asking for a mistrial, you need

12  to clearly ask for that.

13         MR. RYDBERG:  I understand that.

14         THE COURT:  The problem is I also can't recess the

15  trial for days so -- you know...

16         MR. RYDBERG:  I don't know what we need.

17         THE COURT:  It is a terrible situation, and I'm

18  very sorry about Erin, but we've got to make a practical

19  decision here for all of the clients.

20         MR. HOWARD:  Your Honor, I know this is just your

21  area, but I just want to add some information that would be

22  helpful.

23         Erin did tell me this morning that they are

24  planning to cut back on their witnesses substantially.  I

25  think she even told Mr. Shapiro to make sure that Mr. Dewan

OFFICIAL TRANSCRIPT

1    was here for earlier in the week next week, that they could

2    be resting as soon as Tuesday.

3              And I feel very compassionate for the team, so if

4    they are looking for a break this afternoon, I don't want to

:09:12    5    step on your toes if you want the witnesses to go, but I feel

6    that way and I would not object.

7              THE COURT:  Well, you know, I know you know that

8    I'm compassionate toward her.  I just know that I've got to

9    do what is practical under the circumstances.

:09:32    10             And you know what I would prefer is that we do

11    these witnesses today, and y'all go back tonight and talk

12    about it and talk to your client and decide what you want to

13    do.

14             Maybe you'll find that -- or decide to cut back on

:09:48    15    some of your witnesses.  If you come tomorrow and tell me

16    that, and I can see a way that we can complete this trial,

17    that's going to make it easier.

18             MR. RYDBERG:  I just don't know about that right

19    now.  I'm doing the best to keep everybody informed.

:10:02    20             THE COURT:  Let's do this:  Let's not have our

21    charge conference so that all of your team can be together

22    after work, so we'll cancel that for today -- and if y'all

23    could let everybody know.

24             We'll go forward with, I think Mr. Shouse.

:10:19    25             MR. RYDBERG:  Shouse.

OFFICIAL TRANSCRIPT

            1          THE COURT:  And then y'all are going to go back and

            2   let me know what -- if y'all can let us know tonight, then

            3   maybe I can make a decision.  And if we weren't -- if we do

            4   have some flexibility, I could let the jury know not to come

:10:35      5   tomorrow.

            6          MR. RYDBERG:  Okay.

            7          THE COURT:  Okay?

            8          MR. RYDBERG:  Got it.

            9          THE COURT:  Do, please, let us know.

:10:41     10          MR. RYDBERG:  We'll do our best.

           11          MR. HOWARD:  Please pass along our best wishes.

           12          MR. RYDBERG:  And I appreciate counsel's courtesy.

           13          THE COURT:  I hope you understand the position I'm

           14   in.

:10:52     15          MR. RYDBERG:  I do.  It's a difficult situation for

           16   all of us.

           17          MR. HOWARD:  And I do as well.  I was just -- in

           18   case you were considering what plaintiffs asked for, that's

           19   all I was expressing.

:11:03     20          THE COURT:  I appreciate that.  I just know I have

           21   to look at the big picture and for your clients, for Signal,

           22   as well as for everybody else.

           23          MR. HOWARD:  I understand.

           24          THE COURT:  We'll talk about it later today.

:11:16     25          MR. RYDBERG:  Okay.


                            **OFFICIAL TRANSCRIPT**

1          **AFTER THE SIDEBAR IN OPEN COURT**

2                    MR. RYDBERG:  May we have one moment, Your Honor,

3    just to confer?

4                    THE COURT:  Yes.

5                              (A pause in the proceedings.)

6                    MR. RABBANI:  Your Honor, the witness is in the

7    restroom.

8                              (A pause in the proceedings.)

9                    THE CASE MANAGER:  Mr. Shouse.  Raise your right

10   hand, please.

11                             (The oath was administered.)

12                   THE CASE MANAGER:  Please be seated and state and

13   spell your name for the record.

14                   THE WITNESS:  My name is Wilbert A. Shouse, Jr.,

15   W-i-l-b-e-r-t  A  S-h-o-u-s-e, Jr.

16                        **WILBERT A. SHOUSE,**

17   having been first duly sworn, testified as follows, to wit:

18                        **DIRECT EXAMINATION**

19   BY MR. RABBANI:

20        Q.   Good afternoon, Mr. Shouse.  Thank you for being

21   here today.

22                   Mr. Shouse, would you please tell the jury what

23   your current position at Signal is.

24        A.   My current position at Signal is VP of production.

25        Q.   And how long have you held that position?


                        **OFFICIAL TRANSCRIPT**

```
 1        A.    Five years.
 2              THE COURT:  Mr. Shouse, will you pull that
 3   microphone closer to your mouth.
 4              Thank you.
 5              And speak a little louder also.
 6              MR. RABBANI:  Thank you.
 7              THE COURT:  Thank you.
 8   BY MR. RABBANI:  (CONTINUING)
 9        Q.    And how long have you worked for Signal or one of
10   its predecessor companies?
11        A.    Twenty-five years.
12        Q.    And what was your title back in 2006, 2007, 2008 at
13   Signal?
14        A.    Pipe superintendent.
15        Q.    Was that over Mississippi?
16        A.    Yes.
17        Q.    And what does a pipefitting superintendent do on a
18   day-to-day basis?
19        A.    Just make sure that the pipefitting systems are
20   being installed correctly as well as in a quality, safely
21   manner [sic].
22        Q.    Mr. Shouse, before we get into the facts
23   surrounding this case, I would like to go over a little bit
24   of your personal background.
25              Where did you grow up?
```

:14:19
:14:27
:14:37
:14:47
:14:58

**OFFICIAL TRANSCRIPT**

1      **A.**   Jackson County, Mississippi.

2      **Q.**   Are you married?

3      **A.**   Yes.

4      **Q.**   Do you have any children?

:15:07   5      **A.**   I have three children and three grandchildren.

6      **Q.**   How about any hobbies?  Do you have any hobbies?

7      **A.**   Fishing and playing with grandkids.

8      **Q.**   When you're not fishing, would you say you made a

9    career out of pipefitting?

:15:22   10      **A.**   Yes.

11      **Q.**   And how did you get into the field of pipefitting?

12      **A.**   Just graduated from high school and needed a job.

13   Went to work for Brown & Root at the -- working on a power

14   plant.

:15:34   15      **Q.**   So you got into fitting straight out of high

16   school?

17      **A.**   Yes.

18      **Q.**   And how much experience in the field of pipefitting

19   do you have?

:15:45   20      **A.**   Oh, 45, 40 years now -- close to it.  Well, not

21   quite that many.  About 35 years.

22      **Q.**   So 35 years.

23          And when did you become a pipefitting

24   superintendent?

:15:55   25      **A.**   Twenty years ago.


**OFFICIAL TRANSCRIPT**

1    Q.   What was your position at Signal before you were --

2    A.   I started at Signal as just a structural fitter.

3    Then I went to a pipefitter.  Went to a foreman.  Went to a

4    general foreman.  Went to a rig superintendent.  Then I went

5    to -- I became the pipe superintendent.

6    Q.   And do you do any recruiting for Signal?

7    A.   Yes.

8    Q.   Does that recruiting involve testing potential

9    candidates?

10   A.   Yes.

11   Q.   And have you done any traveling in order to recruit

12   for Signal?

13   A.   Many, many times.

14   Q.   Where have you traveled to recruit for Signal?

15   A.   I've been to India.  I've been to Puerto Rico

16   numerous times.  And I've been to Mexico several times.

17   Q.   When is the first time you went to India for

18   Signal?

19   A.   April/May of '06.

20   Q.   And was that for the purpose of testing and

21   recruiting Indian workers?

22   A.   Yes.

23   Q.   Had you ever traveled to India before 2006?

24   A.   No.

25   Q.   Let's talk a little bit about your involvement in

:16:16

:16:28

:16:37

:16:53

:17:01

OFFICIAL TRANSCRIPT

1    the testing process of the Indian H-2B workers.

2            As pipe superintendent, how involved were you in

3    that testing?

4        A.   Can you repeat the question?

5        Q.   As pipefitting superintendent, how involved were

6    you in that testing?

7        A.   Very.

8        Q.   How exactly were you involved?

9        A.   I did the testing in India.

10       Q.   And who did you test?

11       A.   The H-2B candidates.

12       Q.   What craft were you testing for?

13       A.   I tested for pipe fitting and structural fitting.

14       Q.   And do you know why Signal decided to recruit H-2B

15   workers?

16       A.   Yes.  The reason was we could not find or house

17   local people --

18       Q.   Okay.  So --

19       A.   -- because of Hurricane Katrina.  I mean, the

20   contractors -- or the supplement labor contractors, there was

21   no housing at that time.

22       Q.   So how many workers would you say Signal was

23   looking for at that time?

24       A.   In Mississippi, 300.  In Texas, 300.

25       Q.   And before your trip to India, had you ever tested

:17:14

:17:22

:17:39

:17:52

:18:07

OFFICIAL TRANSCRIPT

1    workers before?

2         A.   Many, many times, yes.

3         Q.   And what was the purpose of testing the workers

4    before they came to the United States?

:18:19    5         A.   To make sure they were qualified or to get people

6    as qualified as we possibly could.

7         Q.   Did everyone you test pass the exam process?

8         A.   Oh, no.

9         Q.   And how many times did you travel to India?

:18:34    10        A.   I went three times.

11        Q.   Can you recall the dates of those trips?

12        A.   I can't recall -- I can't recall dates, but it was

13   April, May, June, July, and October or November, the third

14   trip.

:18:51    15        Q.   Do you recall how many days you were on those

16   trips?

17        A.   I was gone -- the first trip was 10 days.  The

18   second trip was 14 days.  And the third trip was 10 days.

19        Q.   And do you recall the cities that you tested in

:19:07    20   during those trips?

21        A.   We always went to Cochin and Chennai, but one trip

22   we went to Vesak.  We went to Mumbai one trip.  And of course

23   we tested in Dubai all three trips.

24        Q.   Okay.  And who, if anybody, from Signal went with

:19:30    25   you on these trips?


OFFICIAL TRANSCRIPT

1        A.    His name was Albert Taft.

2        Q.    How many trips did Albert Taft go on with you?

3        A.    He went on all three with me.

4        Q.    Did anybody else accompany you -- accompany you on

5   these --

:19:41

6        A.    On the third trip it was a structural guy went.

7   Jose something from our Signal yard in Texas.

8        Q.    Does Pastrana sound right?

9        A.    Yeah.  I'm sorry.  I didn't remember his last name.

10       Q.    Just for clarification, Jose Pastrana was only on

:19:56

11  the last trip?

12       A.    Only on the last trip, yes, sir.

13       Q.    And Albert Taft was with you on all three trips?

14       A.    All three trips.

15       Q.    And what skills were you personally testing for in

:20:07

16  Mumbai --

17       A.    I was testing --

18             THE COURT:  Let him finish his question.

19             THE WITNESS:  I'm sorry.

20             THE COURT:  Finish the question.

:20:13

21             MR. RABBANI:  Yes, Your Honor.

22  BY MR. RABBANI:   (CONTINUING)

23       Q.    What skills were you personally testing for in

24  India and Dubai?

25       A.    Pipefitters and structural fitters.

:20:20


OFFICIAL TRANSCRIPT

1     **Q.**   And what skills was Albert Taft testing for?

2     **A.**   Albert was testing for structural welding and pipe

3     welding.

4     **Q.**   What facility and skills was Jose Pastrana testing

5     for on your third trip and his one and only trip to India?

6     **A.**   Pipe fitting and structural fitting, I think.   I

7     really a hundred percent don't know exactly what he was

8     testing for.

9     **Q.**   And for what facility?

10    **A.**   For the Orange facility -- or for Texas.   I don't

11    know if it was going to be Orange or where.

12    **Q.**   Let's talk a little bit about the quality of worker

13    you were looking for.

14         Was Signal looking to hire just any type of

15    craftsman?

16    **A.**   No.   We were looking for first class only.

17    **Q.**   Could you explain to the jury what a first-class

18    craftsman is?

19    **A.**   A first-class craftsman can come into the yard, you

20    hand him a drawing, he can fabricate and install safely,

21    productively, efficiently a piping system or any particular

22    structural component or part you're building to go on one of

23    the oil rigs.

24    **Q.**   And what, if any, limitation does, say, a

25    second-class craftsman have?


OFFICIAL TRANSCRIPT

1      **A.**   A second-class craftsman was almost at first-class

2    level, but he would probably need way more supervision than a

3    first class.  And he would need a lot more help on the

4    drawings, the blueprints and that kind of stuff.

:21:58    5      **Q.**   And how about a third-class craftsman?

6      **A.**   A third-class craftsman is more or less a helper.

7    We use them as -- a lots of the times we wound up using them

8    as hole watches, fire watches, that kind of stuff.

9      **Q.**   And what is a fire watch?

:22:18    10      **A.**   A fire watch is a person that is assigned a

11    particular area to watch while the welders or the fitters are

12    generating hot work to make sure it's not catching something

13    on fire.

14      **Q.**   And is there any difference in pay between, say, a

:22:37    15    first-class craftsman and a second-class craftsman?

16      **A.**   Yeah.  Sure.

17      **Q.**   What is that difference?

18      **A.**   Probably a couple or $3.  If you go from the high

19    class of first-class fitters to the low class, a second

:22:56    20    class, you're probably talking $4 or $5 an hour.

21      **Q.**   An hour.

22          And why is that?

23      **A.**   Because you're learning your skill.  You can't just

24    bring somebody into the shipyard and call them first class,

:23:09    25    give them all this high expensive money and them not know

**OFFICIAL TRANSCRIPT**

 1    what they're doing.

 2         Q.    And what types of tests were administered in India

 3    and Dubai to locate the craftsmen you were looking for?

 4         A.    It was a written test for the structural fitters

 5    and pipefitters.  And it was a practical test given for the

 6    structural welders and pipe welders.

 7         Q.    And just for clarification, you were over the

 8    fitters?  You were testing the fitters?

 9         A.    Correct.

10         Q.    And who graded the fitters' tests?

11         A.    I did.

12         Q.    Did you do that on the spot?

13         A.    Yes.

14         Q.    Okay.  Let's talk a little bit about the testing

15    environment.

16         A.    The testing environments were quite different than,

17    of course, here in the U.S.

18              We would arrive at a vo-tech center.  Sometimes it

19    could be, you know, 50 to 100 candidates standing there.  We

20    would bring them in.  Mr. Sachin and his guys would arrange

21    them.  We'd bring them into usually a table like right there

22    in the courtroom.  And we would sit down five or six people,

23    and hand them the written test.

24              THE COURT:  Mr. Shouse, pull that microphone to you

25    so you'll be comfortable.  Thank you.


                          **OFFICIAL TRANSCRIPT**

BY MR. RABBANI:   (CONTINUING)

Q.   You mentioned a vo-tech center.  Could you explain to us what that is?

A.   A vo-tech center is like -- personally myself, I elected not to go to college.  I had a half degree -- I mean a half scholarship to Mississippi State, but I decided to go to work.

And it's just where lots of young people learn pipefitting, pipe welding in a vo-tech center.  They teach you a trade instead of, you know, a degree or whatever.

Q.   And so is a vo-tech center sort of like a vocational school?

A.   Yeah.  That's what vo-tech stands for is vocational school.

Q.   And how were the candidates that you were testing in India located?

A.   I don't have any idea of that now.

Q.   How were the candidates selected for testing?

A.   It was more or less first come, first serve, I assume.  Mr. Sachin and the guys that worked for Mr. Sachin is the ones that pretty well -- we formed a line and it was more or less first come, first served.

Q.   And did you have any role in the setup of the facility?

A.   No.

OFFICIAL TRANSCRIPT

        Q.   Can you describe for the jury how this facility was
set up for testing?

        A.   We would always -- we would have one office that
was air-conditioned.  And me -- it would be me, Sachin, one
or two of his -- two of his guys.  And we would just bring in
five or six into the air-conditioned office.

             I would give them the test, pass it out.  And I
would stand right there and watch them.

             And every time -- you know, I brought five or six
in to hand out more tests.  Was I -- you know, I was
constantly asking them -- or telling them, if you have
questions, please ask, because I will help you.  If you don't
ask, I assume you don't know -- I mean, you know what the
question is asking.

        Q.   So I take it that you were in the room while the
candidates were testing?

        A.   Always.

        Q.   And how many hours a day would you generally test?

        A.   We would usually start around 9:00 or 10:00.  And
some afternoons, we'd go to 5:00, but normally 3:00 would be
a normal day.

        Q.   And was anyone else in the room other than the
candidates and yourself while you were testing?

        A.   Mr. Sachin was there most of the time, and, you
know, like I said, one or two of his guys that worked for

                    **OFFICIAL TRANSCRIPT**

1    him.

2         Q.   And I think you just mentioned you would speak with

3    the candidates while they were testing; is that right?

4         A.   Yes.

:27:26    5    Q.   And what language did you speak to them in?

6         A.   I spoke English.

7         Q.   Did Mr. Dewan or any of his associates speak with

8    the candidates while they were in the testing room?

9         A.   If I felt like I needed a translator, I would ask

:27:43    10   Mr. Sachin or one of his guys to translate for me.

11        Q.   Would Mr. Sachin or any of his associates ever just

12   talk to the candidates on their own without getting a prompt

13   from you?

14        A.   Yes.

:27:56    15   Q.   And what language would they speak in?

16        A.   It wasn't English.

17        Q.   So I take it you couldn't understand them?

18        A.   I couldn't understand it.

19        Q.   Did Mr. Dewan or any of his associates talk to the

:28:11    20   candidates outside of the testing process but in your

21   presence?

22        A.   Yeah.  Some afternoons they would discuss something

23   over, you know, out of the -- out from away from where we

24   were testing.

:28:24    25   Q.   And what language were they speaking in?


                              **OFFICIAL TRANSCRIPT**

1     **A.**   Again, I don't know.

2     **Q.**   Was it English?

3     **A.**   No.

4     **Q.**   Did you ever hear Mr. Dewan or any of his

5     associates make any representation to the candidates about

6     green cards?

7     **A.**   No.

8     **Q.**   Well, did you ever hear Mr. Dewan or any of his

9     associates make any representations regarding the 2004 J & M

10    campaign?

11    **A.**   No.

12    **Q.**   What languages do you speak, Mr. Shouse?

13    **A.**   English.

14    **Q.**   Any other ones?

15    **A.**   No.

16    **Q.**   While you were in India and Dubai, did any of the

17    candidates ask you about Signal?

18    **A.**   Signal as -- yes.  They asked about the length of

19    the job.  They asked about the weather.  They asked about the

20    man camp.

21          They just asked general -- you know, that's a long

22    ways to come from India without tools.  And, you know, they

23    asked about how they would be getting tools.

24          Just normal questions.  It seemed to me like it was

25    very intelligent questions, what they were asking.

**OFFICIAL TRANSCRIPT**

```
 1        Q.    Okay.  When they would ask you these questions,
 2   what language would they be using?
 3        A.    Either they were going through a translator or
 4   speaking English.
 5        Q.    When they asked you about the length of the job,
 6   what did you say?
 7        A.    Eight months.
 8        Q.    And what, if any, reaction was there to your
 9   statement that the job would last eight months?
10        A.    I don't remember any incident really sticking out.
11        Q.    No one ever said to you, what about a green card?
12        A.    No, not directly.
13        Q.    How about indirectly?
14        A.    No.
15        Q.    When they asked you about accommodations, what
16   would you say?
17        A.    I explained to them how we were building a
18   man camp.  Most of the -- most of the workers, the
19   candidates, had just came from Singapore or Dubai, and they
20   were very accustomed to living in man camps.
21        Q.    So what, if any, reaction did they have to your
22   statement about Signal building a man camp?
23        A.    It was no -- no reaction.  I mean, they -- they
24   were okay with it, as far as I know.  There was never any
25   complaints given until after they arrived.
```

:29:52

:30:07

:30:20

:30:38

:30:58

OFFICIAL TRANSCRIPT

1    **Q.**   And is a man camp a term that Signal came up with?

2    **A.**   No, it's an international term.  I mean, it's all

3    over the -- all over the world.  When they put a bunch of

4    people working together living like that, it is a man camp.

:31:14
5    **Q.**   So that's the term for a housing facility?

6    **A.**   A housing facility, yes.

7    **Q.**   When the workers asked you about tools, what would

8    you say?

9    **A.**   We were going to furnish the tools.  And they would

:31:29
10   have to -- they would have to buy them through payroll deduct

11   once they got here.

12   **Q.**   So they understood that they weren't going to be

13   bringing their own tools with them?

14   **A.**   Yeah.  You can't bring -- that's a long ways to

:31:41
15   bring a hammer and a crescent wrench.

16   **Q.**   So what, if any, reaction did they have to the

17   statement that the workers were expected to pay for their own

18   tools?

19   **A.**   That's very common too.  I mean, I personally, when

:31:54
20   I was a pipefitter, bought my own tools.  I kept up with my

21   own tools.  That's just part of the trade.

22   **Q.**   Does everyone at Signal pay for their own tools?

23   **A.**   Sure.

24   **Q.**   Does anybody have a problem with that at Signal?

:32:07
25   **A.**   No.


                          **OFFICIAL TRANSCRIPT**

1  **Q.**   Did any of the recruits ever come up to you and

2  say, Signal has promised me a green card, what do you know

3  about it?

4  **A.**   In India it was -- it was mentioned -- on the last

5  trip, it was mentioned.  But as soon as anything other than

6  recruiting or working in the shipyard was mentioned to me,

7  they were sent to Mr. Sachin.

8  **Q.**   Why didn't you just answer their question?

9  **A.**   Because I didn't know.

10  **Q.**   So did you ever sit down and have a discussion with

11  the workers about green cards?

12  **A.**   No.

13  **Q.**   Did any of the candidates ever ask -- excuse me,

14  discuss any of the money that they may have paid to Mr. Pol

15  or Mr. Dewan or Mr. Burnett in order to come to the

16  United States?

17  **A.**   Not in India.

18  **Q.**   So just for clarification, are you saying that no

19  Indian candidate talked to you directly about green cards or

20  the money they may have spent while you were in India or

21  Dubai?

22  **A.**   They did not.

23  **Q.**   Earlier you stated that the test you administered

24  in India was a written test, correct?

25  **A.**   Correct.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And what language was that test in?

2    **A.**   English.

3    **Q.**   Why wasn't the test written in another language?

4    **A.**   Because we wasn't looking for people that could

:33:54   5    speak another language.  We were assured when we went over

6    there that these people were English-speaking and can read

7    and write English.

8          And that's the biggest reason we went to recruit

9    there compared to more Hispanic that we knew couldn't speak

:34:11   10   English or understand English.

11   **Q.**   So was it important for Signal to have an

12   English-speaking workforce?

13   **A.**   Sure.  I mean, the more you can communicate

14   correctly, the more productive, more efficient than you

:34:33   15   possibly can be if you've got four different languages out

16   there and nobody is understanding them.

17   **Q.**   And did any of the recruits or candidates refuse to

18   take the exam because it was in English?

19   **A.**   No.

:34:42   20   **Q.**   Did any of the recruits ever complain that the test

21   was in English?

22   **A.**   No.  Back to what I said earlier, when I handed

23   them the test, I was constantly asking them, do you

24   understand, do you need help?

:34:58   25         If they would have asked -- most of the time, I

**OFFICIAL TRANSCRIPT**

would either answer the question for them or show them how to find the answer.

Q.   So aside from the test, was there anything else that you did with respect to a candidate before you would either pass or fail them?

A.   If a guy was borderline on the test, I would sit down and talk to them and more or less interview them.

Lots of times, just like right now, I'm kind of nervous.  And people taking tests gets nervous.  And, you know, they say or do things that they really should -- really don't mean to say or do.

And, you know, you can -- we have hired some really good people after the test.  You sit down and just have an interview with them, and realize the guy was nervous and he just screwed it up.  And, you know, we work people -- we have hired many people like that right there.

Q.   And you understood that because you've been in that position before?

A.   I understand it real well.  And that's not only the practice in India, but it was also the practice, as it is today, in the U.S.

Q.   How would you keep track of the applicants who actually passed their exam?

A.   What I would do before they were considered -- after we passed them, they would go -- if they didn't have a

OFFICIAL TRANSCRIPT

1    picture or their photo, they would go get a picture or their

2    photo, come back, and I would staple it to the front, the

3    cover page of the test.

4        Q.    And was that an effective way of keeping track of

:36:32   5    those who passed?

6        A.    Yes.

7        Q.    What was your impression of the candidates' skill

8    levels in India or Dubai?

9        A.    What was my impression of what, now?

:36:48  10        Q.    What was your impression of the candidates' skill

11   levels while you were testing in India or Dubai?

12       A.    Again, we were led to believe that they were far

13   superior than what we could get either local or through the

14   Hispanic population, but they were not any better than what

:37:08  15   we had been getting.

16             In fact, lots of -- lots of them was way less than

17   what the average here in the U.S. is.

18       Q.    So what system was there, if there was a system in

19   place, to help these workers get better at their craft?

:37:26  20       A.    I don't know of any system.

21       Q.    Did Signal have a training facility on its yard?

22       A.    Yes.

23       Q.    Did it offer that training facility to workers that

24   needed improvement?

:37:42  25       A.    Yes.


                        **OFFICIAL TRANSCRIPT**

Q.   To your knowledge, did any of the Indian workers
ever utilize that facility?

A.   Some of welders did.

Q.   Does Signal typically train its workers?

A.   No.

Q.   To your knowledge, did Signal train any of the
Indian H-2B workers they had recruited?

A.   They did, some of the welders -- or the training
was offered.

Q.   Did you pass any candidate in India that at the
time of testing you believed was not capable of being a
first-class craftsman?

A.   By no means.

Q.   And what class or classes of craftsmen did you
actually receive from India?

A.   The first few waves, the craftsmanship was good --
was pretty good.  We were pleasantly surprised, structural
and pipe.

But as the fourth, fifth, and sixth waves
started -- came, the quality got less and less.

Q.   Can you explain how something like that would
happen?

A.   I don't have any idea why it happened.

Q.   All right.  Once the workers arrived to the
United States, did they come all at one time?

**OFFICIAL TRANSCRIPT**

1      **A.**   No.

2      **Q.**   How did they come here?

3      **A.**   They came in what we call waves.  It was -- I

4   believe, if I'm -- I don't know the numbers totally.  Usually

:39:28      5   it was 20 or 30, up to 40, I think, came at a time.

6      **Q.**   And what, if anything, did you do when the first

7   wave arrived?

8      **A.**   The first wave arrived.  Albert Taft and I -- I'm

9   salaried.  I didn't get paid for this -- I got a meal from

:39:51     10   Signal International off it, but we went to Mobile and

11   welcomed them.

12          It was -- we were talking about it that day.  We

13   talked about how -- how Albert and I felt like when we landed

14   in Dubai and we knew nobody, and, you know, the guy standing

:40:06     15   there with a sign with my name on it.

16          So, you know, we just felt like going over and just

17   making sure that they got off the boat -- got off the plane,

18   got on the bus, and all that kind of stuff happened.

19          So we went over on -- I think a Tuesday or

:40:22     20   Wednesday night we went to Mobile.

21      **Q.**   And how long is that drive?

22      **A.**   For me, 30 minutes.  Probably 45 minutes or so for

23   Albert.

24      **Q.**   What reaction, if any, did the recruits have to

:40:37     25   seeing you at the airport?


**OFFICIAL TRANSCRIPT**

```
 1        A.    It was comical.  They -- Albert and I was standing
 2   there at the end of the terminal, and, you know, we could see
 3   they -- but we felt -- Albert and I was sitting there
 4   talking.  We know how these guys are feeling.  They are in a
 5   brand-new country.  They've never seen Mobile, Alabama,
 6   before.  They never -- and they are walking and they are
 7   all -- I mean, they were scared, just like Albert and I was
 8   the first time we landed in Dubai.
 9        But when they saw us -- I guess we were probably
10   30, 40 feet down the terminal from them.  When they saw us,
11   really they came running.  And, you know, it was like we were
12   their long-lost friends or something, you know.  And we had
13   just tested them.
14        But they were really, really pleased that we went
15   to Mobile and welcomed them.
16        THE COURT:  Mr. Rabbani, would you speak a little
17   louder.
18        MR. RABBANI:  Yes, Your Honor, I'm sorry.
19        THE COURT:  I want to be sure the jury can hear
20   you.
21        MR. RABBANI:  Absolutely.
22   BY MR. RABBANI:   (CONTINUING)
23        Q.    And did you, yourself, recognize the Indian workers
24   when they arrived at Signal?
25        A.    The first few waves, yes.
```

**OFFICIAL TRANSCRIPT**

Q.   Did something happen after the first few waves?

A.   About half or three-quarters of the way -- what we
did was every time -- we did not go back to Mobile anymore,
but the first day they were -- the wave was there, we would
go to the man camp and welcome them.  And we would just talk
to them.

        And like I said, the first four or five waves, you
know, when I would walk in there, even if I didn't recognize
them, they would recognize me.

        And they were all, you know, waving, and, you know,
just acknowledging me.  And then that got less and less as
the waves -- until we stopped receiving them.

Q.   And what, if anything, did that tell you?

A.   That told me that they didn't know me and I hadn't
tested them.

Q.   And what, if anything, did you notice in terms of
the quality of their work as the later waves started to
arrive?

A.   It got real bad.

Q.   Did you have an occasion to make friends with any
of the Indian workers?

A.   Oh, sure.  Lots of them.

Q.   Did you ever go fishing or anything with any of
them?

A.   I didn't go fishing.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Did you ever visit with any of them?

2    **A.**   Yeah.  Several times.  I mean -- can I name a name?

3    **Q.**   Please.

4    **A.**   Paul Vallentine.  I mean, I went to the hospital

:43:18    5    with him when he had a stent put in his heart.

6         You know, the same guy, Paul Vallentine had thyroid

7    cancer, and Darrell Snyder, you know, stayed in the room with

8    him while he was recovering from surgery.

9         You know, even I went to him, and one or two of

:43:42   10    them that I really, really liked, you know, when all of the

11    talk was going on about them running, and, you know -- I went

12    to them and said, look, if you've got family here, send them

13    back to India.

14         If you are going to run, you know, don't get your

:43:59   15    family -- because one or two of them already had their wife

16    and kids here, you know.

17         I had become -- and I'm not -- you know, people

18    think it's silly, but like a -- like a father to one or two

19    of them.  And, you know...

:44:15   20    **Q.**   Signal -- when you went to the hospital for -- I

21    believe you said Paul Vallentine.

22    **A.**   Right.

23    **Q.**   -- Signal didn't tell you you had to go to the

24    hospital?

:44:24   25    **A.**   No.  Signal didn't even know it was going on.  Some

**OFFICIAL TRANSCRIPT**

1    of the Indians called me.

2             In fact, I think the one that called me was Kandu

3    (phonetic) called me and told me that Paul was having, you

4    know, the heart catheterization, and they was putting a stent

5    in so I went up there on a Saturday afternoon.

6        Q.   Let's talk a little bit about the work the H-2B

7    workers were asked to perform once they arrived at Signal.

8             You stated earlier that you tested both pipefitters

9    and structural fitters in India; is that right?

10       A.   Correct.

11       Q.   Could you explain to the jury what a fitter does?

12       A.   A pipefitter, he assembles, installs, tests,

13   supports a piping system.

14       Q.   And how about a structural fitter, what does a

15   structural --

16       A.   A structural fitter will build like a modular --

17   like Her Honor's desk there, and it will be set up on the oil

18   rig.  But instead of out of wood, it will be out of steel.

19       Q.   And is fitting hard work?

20       A.   Very.

21       Q.   Is that any secret?

22       A.   No.

23       Q.   Does Signal's production -- excuse me.

24            Do Signal's production employees work in groups?

25       A.   Yes.

OFFICIAL TRANSCRIPT

1      Q.    And what are those groups called?

2      A.    Crews.

3      Q.    And how were the H-2B employees incorporated into

4  Signal's crews?

:45:57        5      A.    The way the H-2B employees were deployed into the

6  crews was I was pipe superintendent.  I knew what crews I was

7  lacking people in.  And as waves come in, I would assign so

8  many to Crew A, so many to Crew B, blah, blah, blah.  I mean,

9  it was -- it was just as a need -- as-need situation.

:46:20       10      Q.    So if Crew A needed, for instance, two pipefitters

11  and Crew B needed two ship fitters, you decided --

12      A.    I'm only speaking of the pipefitters.  I don't know

13  exactly how the pipe -- I mean, I'm speaking of the

14  pipefitters.

:46:36       15            I'm not sure how the ship fitters did it, but I'm

16  pretty sure it was about the same.

17      Q.    During 2006, 2007, and 2008, were there ever any

18  all-Indian crews?

19      A.    Not that I'm aware.  It was definitely not in the

:46:51       20  pipefitters.

21      Q.    I'd like to get a little bit of an understanding of

22  the expectation of the H-2B workers on the yard.

23            What time, for instance, would a fitter be expected

24  to report to work in the morning?

:47:08       25      A.    Everybody is expected to be at their safety meeting

OFFICIAL TRANSCRIPT

1    at 6:30 in the morning.

2         Q.   And what is the purpose of a safety meeting?

3         A.   Well, you go over -- if we've had an incident,

4    we've had a near-miss or we had anything, you know, on the

5    last prior shifts, we discuss it so -- trying to make sure it

6    doesn't happen again.

7              We go over our daily routine, PPE.

8              Just mostly an ordinary safety meeting.

9         Q.   How many safety meetings are there, generally?

10        A.   Per crew.  Every crew has one.

11        Q.   Every crew has a safety meeting?

12        A.   Yeah.  Except on Mondays.  On Monday mornings and

13   Monday afternoons, we have a yard-wide safety meeting.

14        Q.   So other than Monday, is there a safety meeting

15   every morning?

16        A.   Every morning.  And after lunch.

17        Q.   What is the purpose of the after-lunch safety

18   meeting?

19        A.   Because conditions can change.  It may have been a

20   beautiful day like it is today, this morning.  It may be

21   raining.  It may be foggy.  You know, just weather

22   conditions.  The rig could have had an oil spill on the rig.

23   You know, just make people aware of the changing conditions.

24        Q.   So after the 6:30 a.m. safety meeting is over, what

25   happens?

OFFICIAL TRANSCRIPT

1    **A.**   Well, of course during the 6:30 -- after the safety

2  meeting, the foreman lines out his particular little two- and

3  three-men crews.  Assigns them a work area.  And they go on

4  and head to work to their work areas.

5    **Q.**   And what does lining out mean?

6    **A.**   Telling them what to do.

7    **Q.**   Okay.  So after the workers start their day, are

8  they given any breaks?

9    **A.**   9:00 we have a company-paid break.  12:00 we have

10  lunch, which is, of course, not company paid.  And then no

11  more breaks the rest of the day.

12    **Q.**   And you said a little earlier that after lunch

13  there was another safety meeting, right?

14    **A.**   Yes.

15    **Q.**   And what time does Signal's day shift end?

16    **A.**   5:00.

17    **Q.**   And do the workers work all the way up to 5:00?

18    **A.**   The workers are told they need to knock off about a

19  quarter to 5:00, roll up and clean up their particular work

20  areas.

21    **Q.**   What does roll up mean?

22    **A.**   Roll your burning lines up, extension cords,

23  welding leads.

24    **Q.**   And is it everyone's responsibility to clean after

25  their --

**OFFICIAL TRANSCRIPT**

1     **A.**   It is everybody's responsibility to clean their own

2   work area.

3     **Q.**   Why is that?

4     **A.**   If not, in two or three days you wouldn't be able

:50:02   5   to walk on the rig.  There would be so much junk up there.

6     **Q.**   To your knowledge, did any of the Indian H-2B

7   workers have a problem with cleaning up after their shift?

8     **A.**   Yeah, some of them did.

9     **Q.**   What was the issue, do you know?

:50:13   10     **A.**   They didn't want to do it.

11     **Q.**   Do you know why?

12     **A.**   They -- back in -- what I was explained, back in

13   India they have labor crews that comes behind them and cleans

14   up everybody's mess.

:50:26   15     **Q.**   So why didn't Signal just hire a labor crew?

16     **A.**   Why should I?  I'm already paying a guy to do it.

17     **Q.**   Just a couple more questions.

18         As pipe superintendent, were you ever involved in

19   the discipline of an employee?

:50:43   20     **A.**   Yes.

21     **Q.**   Can you give us some examples of conduct that would

22   warrant discipline at Signal?

23     **A.**   Well, of course, not coming to work.  Early out.

24   Tardy.  Unsafe act.  Not performing quality work.

:51:07   25     **Q.**   What would happen if an employee is caught

**OFFICIAL TRANSCRIPT**

1   distracting other workers by holding personal conversations

2   on a rig?

3       A.   Normally they would be talked to by their foreman.

4   If that -- if it persisted, it would be a written warning

:51:22  5   given to them.  If it still persists, a three-day layoff

6   would be given to them.  And then if that doesn't fix things,

7   then termination would be in order.

8       Q.   And have you ever disciplined an employee for

9   talking on the rig?

:51:37  10      A.   Yes.

11      Q.   And did you ever cause an employee to sweep an

12  entire rig as a form of discipline for talking?

13      A.   No.  He'd be there six months.  But, no, I have not

14  done that.

:51:52  15      Q.   Why do you say that?  How big is the rig?

16      A.   Well, they are 360 -- normally 350, 360-by-350,

17  360.  And it's got three or four levels to it.  So it would

18  be a pretty good-size little deal.

19      Q.   Size wise, would you compare it to a mini mart or a

:52:13  20  shopping mall?

21      A.   A shopping mall.  I mean, it's got different

22  levels.  It has -- some of them have -- some of them got six

23  or seven levels to them.  I mean, it's huge.

24      Q.   Does causing a worker to sweep a rig as a form of

:52:31  25  discipline for talking sound like something that you would

**OFFICIAL TRANSCRIPT**

1   do?

2          **A.**    By no means.

3          **Q.**    Why not?

4          **A.**    Why would it be?  I mean, this is -- if you have a

5   problem with a guy, you address it.  You don't treat them

6   like children and make them go over there and sweep or stick

7   their nose in a corner or something.

8                I mean, it's -- if the rig were to get really,

9   really bad and we had to put laborers up there, you know, we

10  can hire laborers for half of what the first-class people

11  make.

12         **Q.**    So you're saying it would be a waste of --

13         **A.**    It would be a waste of money big time.

14               MR. RABBANI:  Thank you.  No further questions.

15               THE WITNESS:  Thank you.

16               THE COURT:  All right.  We're going to take a break

17  before we get started for 15 minutes.  So we'll come back at

18  3:05.

19               Please, ladies and gentlemen of the jury, remember

20  the instructions that I've given you previously.

21               So we'll return at 3:05.

22                             (Jury out at 2:59 p.m. )

23               MR. SANDLER:  Your Honor, before we break, may

24  plaintiffs raise one concern?

25               THE COURT:  Yes.


**OFFICIAL TRANSCRIPT**

```
        1        MR. SANDLER:  Based on the testimony of Mr. Shouse,
        2   plaintiffs would like the opportunity, if it were granted, to
        3   reurge the admission of a document, 1953, which had to do
        4   with the incident report.
:54:44  5        This is based on Mr. Shouse's testimony about the
        6   fact that he had made many friends with the Indian workers
        7   and was quite close to them and that they had a strong bond.
        8        THE COURT:  1953 is the one that was the year after
        9   the plaintiffs left?
:55:01  10       MR. SANDLER:  Yes.
        11       THE COURT:  So I'm not -- you can reurge it, but
        12  I'm still not going to admit it.
        13       MR. SANDLER:  Thank you.
        14       MR. RABBANI:  Thank you, Your Honor.
:55:10  15                    (A recess was taken.)
        16                AFTER THE RECESS
        17                    (Call to order of the court.)
        18       THE COURT:  Bring the jury in.
        19       I'll tell you, Juror No. 9 sent me a note:  Thank
:07:43  20  you.  This old bladder needed a break.
        21       So they still have a sense of humor.
        22                    (Jury in at 3:08:00 p.m.)
        23       THE COURT:  All right.  Have a seat.
        24
:08:45  25                    * * * * *


                        OFFICIAL TRANSCRIPT
```

**CROSS-EXAMINATION**

BY MR. SANDLER:

    **Q.**   Good afternoon, Mr. Shouse.

    **A.**   Good afternoon.

    **Q.**   My name is Hugh Sandler.  I represent plaintiffs in this case.

    We've met before, correct?

    **A.**   Correct.

    **Q.**   Do you recall?

    **A.**   Yes.

    **Q.**   Do you recall it was at your deposition in 2013?

    **A.**   Yes, I do.

    **Q.**   Have you reviewed your deposition testimony recently?

    **A.**   Yes.

    **Q.**   When did you review it?

    **A.**   Last week.

    **Q.**   With your counsel this morning -- or this afternoon, I believe you testified that when you were in India, you told the workers that the job was eight-and-a-half months; is that correct?

    **A.**   No, I said eight months.

    **Q.**   You said eight months.

    **A.**   All I was doing was repeating what upper management had told me.

**OFFICIAL TRANSCRIPT**

1    **Q.**   But when I asked you in June of 2013, you told me

2    under oath that you didn't say -- you didn't tell them.

3    **A.**   I remember telling some of them eight months.

4    **Q.**   This is your testimony from June 2013.  I'm going

:10:08  5    to start at Line 24 where my finger is.

6    (As read:)  If this answer differs between the

7    first two trips, let me know, but how did you describe the

8    job to the recruits?

9    And then you said:  Same as the first trip.  Just

:10:21  10    like I told you how we, you know -- I don't remember

11    explaining it to you a while ago, but how I explained the

12    job.  It was no different between the first trip, second

13    trip, or third trip.

14    And how long did you say the job would last?

:10:31  15    I didn't say.  I didn't tell them.

16    So you are aware that is your testimony the last

17    time we met?

18    **A.**   Right.

19    **Q.**   Okay.  And you --

:10:41  20    THE COURT:  Mr. Sanders, remember when you are

21    going to use testimony, to tell the other attorneys the page

22    number.

23    MR. SANDLER:  I apologize.  It was Page 94,

24    Line 24, to 95, Line 9.

:10:53  25    THE COURT:  Thank you.  Just do it before you use

**OFFICIAL TRANSCRIPT**

1    it.

2    BY MR. SANDLER:   (CONTINUING)

3        Q.    You testified about a Mr. Sachin who you conversed

4    with in India, correct?

5        A.    Correct.

6        Q.    And just so the record is clear, Mr. Sachin is

7    Mr. Dewan, right?

8        A.    Right.

9        Q.    Sachin just happens to be his first name?

10       A.    Correct.

11       Q.    Okay.  You said that Signal had intended to bring

12   English-speaking workers; is that correct?

13       A.    Yes.  As many as we possibly could find.

14       Q.    So when you were in India, you couldn't work out if

15   the people who you were testing could speak English or not?

16   Is that your testimony?

17       A.    Yes, we did.

18       Q.    Pardon?

19       A.    Yes, we did.

20       Q.    Okay.  So you confirmed the people could speak

21   English who you offered jobs to.  Is that your testimony?

22       A.    No, that's not what I said.

23            What I said was we worked around the English -- the

24   non-English in a lot of instances.

25       Q.    Okay.  So you -- knowing that they didn't speak

OFFICIAL TRANSCRIPT

1    English as well as you would have liked, you, nonetheless,

2    offered them jobs at Signal, correct?

3        A.    Correct.

4        Q.    I'd like to ask you about some of the testing that

5    went on in India.

6              Now, as far as I know, in the U.S., when Signal

7    does testing for pipefitters and structural fitters, which is

8    what you were testing in India, you do both a written test

9    and a practical test, correct?

10       A.    Now.  Not in '06, we did not.

11       Q.    Okay.  So in '06 in the U.S., you were only doing

12   written tests?

13       A.    Correct.

14       Q.    And those were the same written tests that you

15   issued in India, correct?

16       A.    Correct.

17       Q.    And you can pass a written test even if you're not

18   a first-class fitter, correct?

19       A.    I assume.

20       Q.    And if you passed that test in India, Signal will

21   offer you a first-class fitter job, correct?

22       A.    No, that's not true.  That's when if -- I have seen

23   people that could take the test and during the interview, you

24   very well could realize that they were not pipefitters or

25   structural fitters and you couldn't get the job.


**OFFICIAL TRANSCRIPT**

1      Yes, if you can read and write and you know the

2    basics, you can pass the test.

3       **Q.**   Okay.  So what I'm saying to you -- well, then help

4    me with this.

5       If the Indian recruits took the written test and

6    they passed it, did you interview them notwithstanding the

7    fact that they got a high score on the test?

8       **A.**   Yes.

9       **Q.**   You did?

10      **A.**   Yes.  I interviewed everybody -- I interviewed a

11   lot of the people that didn't pass the test and told them

12   what they were lacking.

13      **Q.**   Okay.  But I'm talking to you about the people who

14   did pass the test that Signal ultimately offered jobs to,

15   right?

16      **A.**   Okay.

17      **Q.**   Right?  Because people in Indian wrote that -- or

18   took that test and they passed.  They had some kind of

19   interview with you, which I believe you testified in June of

20   2013 was about a five-minute interview, maybe ten minutes?

21      **A.**   No.  Most of them was about 15 minutes, probably,

22   up to 30 minutes.  If I had several of them I could do at one

23   time, it would turn into 30 minutes.  It was just how many

24   people we had waiting on us to whether we were rushed or not.

25      **Q.**   I understand.

**OFFICIAL TRANSCRIPT**

1        But what I want to establish is that for Signal's

2    testing purposes in India, they would issue a written test

3    that the Indian recruit would then take.

4        And that Indian recruit in some examples would pass

:14:41    5    that test, and then they might meet with you for maybe up to

6    15 minutes or maybe more if they -- if you were interviewing

7    multiple people at that time, correct?

8        **A.**    Correct.

9        **Q.**    And you would -- and assuming the interview went

:14:55   10   well, they would ultimately get an offer from Signal for a

11   first-class fitter position, correct?

12       **A.**    They were told that they would have a job if they

13   come to the U.S., yes.

14       **Q.**    As a first-class fitter?

:15:07   15       **A.**    As a first-class fitter.

16       **Q.**    Okay.  And you did that even though you knew that

17   it is possible to pass that written test even if you are not

18   a first-class fitter?  That's all I'm trying to establish.

19       **A.**    (No response.)

:15:22   20       **Q.**    Correct?

21       **A.**    Yeah.  But wait a minute.  I mean, I'm thinking

22   about that answer.

23       When you are processing or hiring people, it's not

24   a science.  It's not a -- whenever you do it, it's not a

:15:40   25   hundred percent good -- approved -- good.

**OFFICIAL TRANSCRIPT**

1          It is sometimes -- just like hiring here in the

2     U.S., you know, everybody -- I'm sure your lawyer firm hires

3     some you don't keep.  They look good on paper, they have a

4     great degree, but once they get working, it just doesn't work

5     out.

6          Same way with Indians.  Same way with Hispanics.

7     Same way with Americans.  It's nothing -- you're not going to

8     keep 100 out of 100 people.

9     Q.    I agree with you.  And I'm not asking you about

10    Signal's ultimate decision to fire workers in March of '07 or

11    February of '07 or sometime thereafter.

12         I'm just talking to you about the recruiting

13    process in India in 2006.  And I'm just trying to establish

14    with you that if an Indian recruit would pass the written

15    test, then do an adequate job in the interview with you that

16    would take five, ten, or maybe fifteen minutes, that then

17    they would get a first-class fitter position.

18         And you already testified that that is what

19    happened, correct?

20    A.    Correct.

21    Q.    And my final point was only that was happening even

22    though you knew that you could pass that written test even if

23    you didn't have first-class skills?

24    A.    And I just explained to you just a few minutes ago,

25    it is not a hundred percent when you hire people.  I mean, I

OFFICIAL TRANSCRIPT

1    don't -- I don't understand what you're trying to ask me.

2        Q.    And that might be my fault.  Maybe I need to

3    rephrase my question.

4              So my question is just a yes or no.

5              At the time at which Signal was offering

6    first-class fitter positions in India to Indian recruits, you

7    knew, and others at Signal I assume knew that the written

8    test -- that it was possible to pass the written test even

9    without being a first-class fitter?

10       A.    Yes.

11       Q.    I would like to ask you a little bit about some of

12   your observations while you were in India.

13             And just to be clear, you went to India in May of

14   2006, correct?

15       A.    Yes.

16       Q.    And then you went again in June into July of 2006,

17   correct?

18       A.    Yes.

19       Q.    And then you went finally in November 2006.  Does

20   that sound correct?

21       A.    Yes.

22       Q.    And these were the only three times you had ever

23   been to India, correct?

24       A.    Correct.

25       Q.    And your impression of the recruits when you met

**OFFICIAL TRANSCRIPT**

1    them in these instances were that they were poor, correct?

2        A.   Yes.

3        Q.   And with your counsel earlier today, you had

4    indicated that you had done some testing in India,

5    Puerto Rico, and Mexico, correct?

6        A.   Correct.

7        Q.   But, in fact, India was the first time you had ever

8    tested internationally, correct?

9        A.   Yes.  Because Puerto Rico is not considered

10   international.

11       Q.   So you had done some testing in Puerto Rico, then

12   India.  This Mexico testing was after you had done the India

13   testing, correct?

14       A.   Yes.

15       Q.   And when you were doing the testing in India,

16   Mr. Dewan, or who you refer to as Mr. Sachin, he brought the

17   recruits to you, correct?

18       A.   Correct.

19       Q.   So he provided these recruits to the testing

20   center.  And then you would show up at the testing center in

21   the morning and you will conduct the tests, correct?

22       A.   Correct.

23       Q.   And Signal -- and that would be you and Mr. Shouse.

24   And ultimately on the third trip, Mr. Pastrana, had full

25   discretion over which of these recruits would come to work

OFFICIAL TRANSCRIPT

| | |
|---|---|
|1| for Signal, correct?|
|2| A.   I'm Mr. Shouse.  But his name is Mr. Taft, yes.|
|3| Q.   I'm sorry if I misstated it.|
|4| But there was three of you?|
|5| A.   Right.|
|6| Q.   It was yourself and Mr. Taft who went on all three|
|7| trips?|
|8| A.   Right.|
|9| Q.   And on the third trip, Mr. Pastrana from Texas|
|10| joined?|
|11| A.   Right.|
|12| Q.   And it was the three of you who had full discretion|
|13| over who would come to work for Signal, correct?|
|14| A.   I was responsible for the people coming to|
|15| Pascagoula.  And he was responsible for the people going --|
|16| Jose was responsible for the people going to Texas.|
|17| Q.   When you say Jose, that's when I say Mr. Pastrana,|
|18| right?|
|19| A.   Yes.|
|20| Q.   And again, I just want to point out that Mr. Pol|
|21| had no input over who Signal would take on, correct?|
|22| A.   I don't know if he did or not.  I don't know if him|
|23| and Mr. Sachin was working together.  I don't know.  I don't|
|24| know the answer to that question.|
|25| Q.   Well, then, let me rephrase the question.|

:20:12  :20:20  :20:25  :20:37  :20:52

**OFFICIAL TRANSCRIPT**

```
 1              None -- Mr. Sachin, Dewan, Mr. Burnett, and Mr. Pol
 2       were not involved in identifying which of the recruits would
 3       ultimately get offered a job to come work for Signal,
 4       correct?
 5            A.   No, they were not.
 6            Q.   It was only the three people we had mentioned
 7       before, yourself, Mr. Taft, and Mr. Pastrana, correct?
 8            A.   Correct.
 9            Q.   And you went to Mr. Dewan's home while you were in
10       India on one of the trips, correct?
11            A.   Correct.
12            Q.   And it was a nice home, right?
13            A.   Yes.
14            Q.   And you saw that he had at least two servants,
15       right?
16            A.   Yes.
17            Q.   And it was in a nicer part of the city, correct?
18            A.   From what I saw, yes.
19            Q.   Now, if any of the workers during the testing
20       raised any issue about the fees that they might be paying,
21       you directed them over to speak to Mr. Dewan, correct?
22            A.   Correct.
23            Q.   You wouldn't talk about that at all with them,
24       correct?
25            A.   No, I would not.
```

                         **OFFICIAL TRANSCRIPT**

1    Q.   So would a typical instruction be, oh, you're

2    talking to me about this and I don't know so you would have

3    to go speak to Mr. Sachin?  Would that be something you would

4    typically say?

:22:12      5    A.   Yeah.  I would -- yeah, I don't remember exactly

6    what I said -- exactly what I said, but that's what I meant.

7    I normally said something like that.

8    Q.   Okay.  And if they would talk to you about bringing

9    family over to the United States, you would again direct them

:22:26     10    to talk to Mr. Sachin, correct?

11    A.   Correct.  But I don't remember any really talking

12    to me about -- I never let it get into any detail.  When they

13    started bringing up anything other than what the test

14    consisted of, anything with the work at Signal.  I would send

:22:44     15    them to Mr. Sachin.

16    Q.   And another question about the testing.  You were

17    in charge of the pipefitters and structural fitter testing,

18    correct?

19    A.   Correct.

:23:11     20    Q.   And on that third trip, Mr. Pastrana was also in

21    charge of the fitter testing, correct?

22    A.   Correct.

23    Q.   And so when the workers had completed the tests,

24    they would just stand in line and they would either be

:23:25     25    reviewed by you or Mr. Pastrana, correct?

OFFICIAL TRANSCRIPT

1          **A.**     No.   When they came -- they were in a line.   When

2      they came into a room, they would go to whichever one of us

3      that was going to test them's table and we would hand the

4      test out.

:23:43          5          We would not just universally give them tests and

6      then fill out the tests and them stand in line.

7          They were brought and put at a table, tested,

8      whether he was handling it or I was handling it.

9          **Q.**     And then after the test, they then lined up for an

:24:22         10     interview, correct?

11         **A.**     No.   No.   They stayed at the table.   We graded the

12     tests just like if we were doing it on Trip 1 or 2.   And they

13     would know then if they passed or failed.

14         The only time they would be in line was before they

:24:38         15     went to either Jose's table or my table.

16         **Q.**     So in order to commence the testing process, they

17     might either start with Mr. Pastrana or start with you and it

18     would be just where they were in line; is that right?

19         **A.**     No.   They were -- yes.   When they were in line, I

:25:01         20     would get six, Jose would get six.   It was no order there.

21     It was just first come, first served.

22         **Q.**     Was there ever an instance when you would fail a

23     recruit, but then Mr. Pastrana would subsequently pass him?

24         **A.**     I believe it was, yes.

:25:17         25     **Q.**     Did that concern you?


                          **OFFICIAL TRANSCRIPT**

1        **A.**    Yes.

2        **Q.**    What did you do about that?

3        **A.**    I called my boss.

4        **Q.**    And who was your boss?

5        **A.**    My boss at that time was Bill Bingle.

6        **Q.**    What did Mr. Bingle do about that?

7        **A.**    More or less said worry about Mississippi.

8        **Q.**    And by worry about Mississippi, Mr. Bingle is

9    saying, you know, whoever goes over to Texas is not his

10    concern; is that right?

11        **A.**    I assumed that, yes.

12        **Q.**    And you are aware that ultimately workers who

13    worked in Texas were transferred to Mississippi in the 2007

14    period, correct?

15        **A.**    Not all of them, but some were, yes.

16        **Q.**    So, therefore, it is possible that people you

17    failed in India would have ended up working in Mississippi by

18    '07, correct?

19        **A.**    If I remember, what came in 2007 were more welders

20    than anything else.  A small amount possibly, but I -- if I

21    remember correctly, most of the people that came from Texas

22    to Mississippi were welders.

23        **Q.**    Did you confirm that at any time?

24        **A.**    No.  I cannot swear either way to that.

25        **Q.**    You testified earlier today that you believed that

**OFFICIAL TRANSCRIPT**

1  you didn't test some of the workers who ended up in

2  Mississippi; is that correct?

3       A.   Yes, you're correct.

4       Q.   How did you confirm that that was the case?

5       A.   I did not confirm it.  I didn't recognize them.

6       Q.   Okay.  So that was just a suspicion on your behalf,

7  correct?

8       A.   It was more than a suspicion.  It was the way it

9  was when they first started coming, they all recognized me.

10       And then halfway through, the ones that recognized

11  me -- I mean, the number that recognized me was -- got

12  smaller and smaller.  Like the last wave, I think two

13  recognized me out of 30 or 40 people.

14       Q.   So the basis of your suspicion is how they reacted

15  to you; is that right?

16       A.   And me.  Yes.  I have a very -- I do not remember

17  names well.  I do remember faces.

18       Q.   Okay.  But did you ever report that to HR?

19       A.   Yes.  I didn't report it to HR, I reported it to my

20  boss then.

21       Q.   To whom?  Mr. Bingle?

22       A.   Mr. Bingle, yes, sir.

23       Q.   How did you formulate that report to Mr. Bingle?

24       A.   I did not send an e-mail.  I told him.

25       Q.   You told him orally?


                    **OFFICIAL TRANSCRIPT**

1        A.    Yes.

2        Q.    And did he create a paper record of that?

3        A.    I don't know.  I don't know if he did or not.

4        Q.    Were you ever asked about that by anyone else at

5    Signal after you told Mr. Bingle?

6        A.    Ron Schnoor asked me about it.

7        Q.    Was that before or after the lawsuit was filed?

8        A.    Definitely before.

9        Q.    What did Mr. Schnoor ask you?

10       A.    Asked me if I was -- if the numbers had started

11   decreasing that recognized me and I recognized them, and I

12   said yes.

13       Q.    And that was the end of it?

14       A.    That's -- that was the end of it for me.

15       Q.    You said that you befriended some of the Indians;

16   is that right?

17       A.    That is correct.

18       Q.    And you said that you would even visit some of the

19   Indians; is that correct?

20       A.    That is correct.

21       Q.    And I think that with your counsel earlier you said

22   that you visited them in the hospital; is that right?

23       A.    That's correct.

24       Q.    And they were in the hospital because they had

25   fallen ill even in the man camp or on the job at Signal?

**OFFICIAL TRANSCRIPT**

1      A.   No, they had not.

2           It was a heart condition when I went and visited

3   with Paul.  They had stents put in his heart.

4      Q.   And you're not sure if Signal knew about that; is

5   that right?

6      A.   Well, why would Signal know about it?  He was off

7   the clock.  He was -- I don't know if HR knew about it or

8   not.

9      Q.   So then, just so I'm clear, the only visit that you

10  made was to Mr. Vallentine in the hospital?

11     A.   Me personally, yes.

12     Q.   And do you know where he suffered that heart

13  condition?

14     A.   I don't have any idea.

15          MR. SANDLER:  I want to put up Exhibit 1005.

16          Go to the second page.

17  MR. SANDLER:  (CONTINUING)

18     Q.   Okay, Mr. Shouse, if that's not big enough for you,

19  we can blow it up or I can give you a handwritten -- a

20  printed-out version, if that would be easier for you.

21     A.   I really can't read that here.

22     Q.   Okay.  As I say, we can blow it up or I can give

23  you the paper.

24     A.   That's fine.

25     Q.   Okay.  Just have a read of it, and then when you

:29:22

:29:35

:30:06

:30:29

:30:40

**OFFICIAL TRANSCRIPT**

1    are ready, go to the first page.  And let me know and we'll
2    move it up for you.
3         A.   That's okay.  Yeah, I want -- is that the whole
4    e-mail?
:30:49   5         Q.   No, no.  There is another page.
6         A.   Well, why don't you print it out.
7         Q.   The whole page -- or the printout?
8         A.   Yeah.
9              MR. SANDLER:  May I approach, Your Honor?
:31:00  10              THE COURT:  Yes.
11              MR. SANDLER:  (Tenders document.)
12              THE WITNESS:  (Reviews document.)
13              Okay.
14    MR. SANDLER:  (CONTINUING)
:31:33  15         Q.   So the first e-mail is to you from someone named
16    George; is that right?
17         A.   Correct.
18         Q.   And does that George work at Signal?
19         A.   He did.
:31:39  20         Q.   Okay.  What is his last name?
21         A.   George Lewis.
22         Q.   George Lewis.
23              And did he work on the yard where you worked?
24         A.   Yes.
:31:45  25         Q.   Okay.  Did he work at Signal at the time of 2006,

OFFICIAL TRANSCRIPT

1    2007?

2         A.    It says he was here May 11, 2006.

3               But, no, I don't know.  This man is talking about

4    he's dying from cancer, is what he's talking about here.

:32:06    5    Q.    I'm asking you --

6         A.    The port in.

7         Q.    I'm asking you about the highlighted portion.

8         A.    Yeah, I know, but I don't know if he was there.

9    This may be coming from his home computer.

:32:16    10   Q.    Okay.  So he might have been off because he was --

11        A.    Right.  Yeah.

12        Q.    I see.

13              So he indicated to you that he thinks you'll smell

14   better than most Indians.  Do you see that there?

:32:29    15   A.    Yes.

16        Q.    And then you replied and you said (as read:)

17   Actually, the smelling part is what concerns me more than

18   anything else.

19              Is that right?

:32:39    20   A.    That is correct.

21        Q.    So you had a concern that people from India smelled

22   worse than you?

23        A.    No, I was concerned about the cities and places I

24   would be living in smelling.

:32:48    25   Q.    Well, let's go back to the first line there.


                              OFFICIAL TRANSCRIPT

1          It says (as read:)  W.A., you'll love the trip to

2    India.  Most Indians are shorter than you.  You also will

3    smell better than most.

4          He is talking about Indian people, right?

:33:07   5    **A.**   I don't know what he's thinking.  I assume he's

6    thinking people.  I mean, I really don't know.

7    **Q.**   Okay.  But then you responded (as read:)  The

8    smelling part is what concerns me more than anything else.

9          And your testimony right now is it was the smell of

:33:25  10    the cities, not the people, that concerned you the most?

11    **A.**   Not just the city.  Yeah, the city, the hotels, the

12    restaurants, everything.

13    **Q.**   So you thought the whole country smelled?

14    **A.**   Yes.

:33:38  15    **Q.**   But not the people?

16    **A.**   I was not talking about people here.

17    **Q.**   In this e-mail, you were not talking about the

18    people, but I'm asking you, if you thought the whole country

19    smelled, I was wondering if you also thought the people who

:33:50  20    lived in that country smelled?

21    **A.**   If the country smells, the people are going to

22    smell the same as the country.

23    **Q.**   Okay.  And now this e-mail -- if we can just blow

24    up the recipients of the e-mail here.

:34:08  25          So this is to a variety of people who work at

                        **OFFICIAL TRANSCRIPT**

1    Signal, including Ms. Tracey Binion who works in HR; is that

2    correct?

3        **A.**   Correct.

4        **Q.**   Did Ms. Binion ever speak to you about e-mailing

5    about how Indian people or the country smells on work time or

6    on work e-mail?

7        **A.**   I don't remember her doing it.

8        **Q.**   And Mr. Schnoor, who was -- at that time, he was a

9    senior vice-president of Signal, correct?

10       **A.**   I really don't remember what his title was then.

11       **Q.**   He was senior to you, correct?

12       **A.**   He was my boss's boss.

13       **Q.**   He was your boss's boss.  He was Bill Bingle's

14   boss?

15       **A.**   Right.

16       **Q.**   And here's Bill Bingle right here.

17              So your boss and your boss's boss are on this

18   e-mail.

19              Did either one of them ever speak to you about the

20   appropriateness, or lack thereof, in describing people from

21   India or the country as smelling?

22       **A.**   No.

23              MR. SANDLER:  I have no further questions.

24              MR. CERNIGLIA:  No questions, Your Honor.

25              MR. SHAPIRO:  I've got a view, Your Honor.


**OFFICIAL TRANSCRIPT**

                          CROSS-EXAMINATION

BY MR. SHAPIRO:

     Q.   Good afternoon, Mr. Shouse.

     A.   Good afternoon.

     Q.   I'm Steve Shapiro, and I represent
Dewan Consultants and Sachin Dewan.

          Now, you indicated that Mr. Dewan was responsible
for bringing workers to you for testing; isn't that correct?

     A.   Correct.

     Q.   Okay.  And you also indicated that the quality --
let me backtrack a little bit for you.

          You indicated that workers that Mr. Dewan was to
send to Signal or to be tested by Signal, ultimately came
over to Signal in a number of different waves; isn't that
right?

     A.   Correct.

     Q.   Okay.  Now, just to clarify for me, in these waves,
now, you indicated that in the first few waves the workers
were pretty good, right?

     A.   Correct.

     Q.   And then in later waves, they sort of declined,
their quality of work declined?

     A.   Yes.

     Q.   Okay.  Now, when you took the three trips to India,
isn't it true that you were the one who tested all of these


                          OFFICIAL TRANSCRIPT

1    folks as fitters?  Isn't that correct?

2        A.    Correct.

3        Q.    Okay.  And that would include not just the first

4    three waves, but people who came subsequently in the later

5    waves?

6        A.    Correct.

7        Q.    Okay.  Did you ever wonder why -- why the people

8    who came in the later waves just were not of high quality

9    after you, yourself, tested them?

10       A.    I didn't remember testing a lot of them that came

11   in the 5th, 6th, 7th, and 8th and even 9th wave.  I didn't

12   remember their face.  They didn't remember my face.

13       Q.    I understand you don't remember their face, but you

14   were -- you and Mr. Taft and Mr. Pastrana were there to test

15   the workers.

16       A.    Correct.

17       Q.    Okay.  And you tested all of the workers that

18   ultimately came to Signal; isn't that correct?

19       A.    I'm not saying that we tested all the ones that

20   came to Signal because I'm saying I did not recognize their

21   faces, nor did they recognize me when they got there,

22   contrary to the first waves.

23       Q.    Okay.  Okay.

24             Now, you indicated that you had been to Mr. Dewan's

25   house; isn't that correct?

**OFFICIAL TRANSCRIPT**

1      **A.**   Yes, one time.

2      **Q.**   One time.  And what was the reason for coming to

3  Mr. Dewan's house?

4      **A.**   He invited us to come eat.

:39:11        5      **Q.**   Okay.  And you thought the house was kind of nice,

6  right?

7      **A.**   It was a nice house, yeah.

8      **Q.**   Okay.  You had no idea how many lived in that

9  house, did you?

:39:26       10      **A.**   No.

11      **Q.**   You didn't know that there were three families

12  living in that house, did you?

13      **A.**   No.  I had no idea.

14      **Q.**   Okay.  You saw servants.  You're not -- these --

:39:40       15  these trips to India were your first three times to India;

16  isn't that correct?

17      **A.**   Yes.

18      **Q.**   Okay.  And you're not terribly familiar with Indian

19  culture, are you?

:39:54       20      **A.**   No, sir.

21      **Q.**   And you don't know that it is quite common for

22  people in India that have -- that are sort of middle or

23  middle to upper middle class -- you don't know that it is

24  common for them to have servants?

:40:15       25      **A.**   I just said I saw two servants.  That's all I said.


**OFFICIAL TRANSCRIPT**

1     **Q.**   Okay.  I understand that.  But you don't know that?

2     **A.**   I don't know.

3     **Q.**   You don't know that that's a common thing?

4     **A.**   No.

5     **Q.**   Now, when you raised some concerns about

6 Mr. Pastrana's testing and actually passing some workers that

7 you had failed -- let me backtrack.

8         You talked to Mr. Bingle.  You were concerned that

9 Mr. Pastrana was actually passing a number of people that you

10 had failed; isn't that correct?

11    **A.**   Yes.

12    **Q.**   Okay.  And his reply was:  Focus on Pascagoula?

13    **A.**   Correct.

14    **Q.**   Okay.  Now, were you sitting in the same room

15 together -- or what was the configuration between you and

16 Mr. Pastrana?

17    **A.**   We were in a room that -- the one that really

18 sticks out, the room was about a quarter -- maybe half as big

19 as this room right here.

20         It was on the third or fourth floor of a building.

21 He had a table about like what the lawyers has got there.  I

22 had one about the same size.  You set five, six people down,

23 hand out the test.  And they would do the test.

24    **Q.**   Okay.

25    **A.**   We pulled the tables far enough away so when I was

:40:43

:41:01

:41:15

:41:32

:41:50

**OFFICIAL TRANSCRIPT**

1   talking, it wasn't distracting them and likewise.

2       Q.   Okay.  So you were handling the recruits who were

3   going to be going to Pascagoula, Mississippi, right?

4       A.   Correct.

5       Q.   And Mr. Pastrana was handling the testing for those

6   who would go to Orange, Texas, right?

7       A.   Correct.

8       Q.   And help me out with something here.

9            Signal International has yards located -- or had

10  yards located at that time in Orange, Texas, and Pascagoula;

11  isn't that correct?

12      A.   Correct.

13      Q.   And Signal, whether they are -- whether they have a

14  yard in Orange or whether they have a yard in Pascagoula, it

15  is all the same company, isn't it?

16      A.   At that time, yes.

17      Q.   Okay.  Did you ever confront Mr. Pastrana and say,

18  Look, I know what you're doing.  Why?  And why don't you stop

19  it?  Why don't you correct it?

20      A.   I told Mr. Pastrana, this is how I do things.  I've

21  got many years of experience at doing it, and, you know, this

22  is the way I do it.  I don't think you're getting accurate --

23  you're getting quality people.

24           And he more or less just ignored me.

25      Q.   Okay.  It sounds like Mr. Bingle really didn't care

OFFICIAL TRANSCRIPT

1    about that problem either, did he?

2        A.   I worked for Mr. Bingle at that time.

3        Q.   Okay.  Understood.

4             Did you share any of these problems on the testing

5    with Mr. Dewan?

6        A.   Are you talking about still the problems with Jose

7    or what are you talking about?

8        Q.   I'm talking about -- yes, the problems with

9    Mr. Pastrana.  In other words --

10       A.   I don't remember if --

11       Q.   The fact is, you didn't?

12       A.   Okay.

13       Q.   You didn't tell Mr. Dewan, did you?

14       A.   Okay.

15       Q.   Wouldn't that have been an important thing for you

16   to tell Mr. Dewan that?

17       A.   Evidently, at that time, I didn't think so, if I

18   didn't do it.  Because I really don't remember if I did or

19   not.

20       Q.   Okay.  Now, you indicated that if there were any

21   questions about the recruitment process -- any questions --

22   you would simply say, I'm sending you to Sachin Dewan, my

23   client?  Wasn't that your testimony?

24       A.   That's my testimony, yes.

25       Q.   Okay.  And did any of them ask you about the fees

:43:30

:43:49

:43:54

:44:07

:44:45

**OFFICIAL TRANSCRIPT**

1    that they had paid?

2         **A.**   No.

3         **Q.**   Okay.

4         **A.**   Never.

5         **Q.**   And none of them ever asked you about -- I think

6    you mentioned that maybe one or two talked about the length

7    of the stay --

8         **A.**   Right.

9         **Q.**   -- at Signal.  Okay.

10        And you told them the answer, right?  You didn't

11   send them to Mr. Dewan for that?

12        **A.**   Right.

13        MR. SHAPIRO:  I just wanted you to clarify that for

14   me.  And, actually, that's all the questions I have.  Thank

15   you, sir.

16        THE WITNESS:  Thank you.

17        MR. RABBANI:  No redirect, Your Honor.

18        THE COURT:  Okay.  Thank you.  You are excused.

19        Is Signal ready to call its next witness?

20        MR. RYDBERG:  Yes, Your Honor.  Signal calls

21   David Cochran.

22        THE CASE MANAGER:  Call David Cochran, please.

23        Raise your rate hand, please.

24                    (The oath was administered.)

25        THE CASE MANAGER:  Please be seated and state and


OFFICIAL TRANSCRIPT

1    spell your name for the record.

2          THE WITNESS:  My name is David Floyd Cochran,

3    D-a-v-i-d  F-l-o-y-d  C-o-c-h-r-a-n.

4                    **DAVID F. COCHRAN,**

5    having been first duly sworn, testified as follows, to wit:

6                    **DIRECT EXAMINATION**

7    BY MR. RYDBERG:

8          Q.   Good afternoon, Mr. Cochran.  How are you?

9          A.   Just fine, thank you.

10         Q.   It looks like you're doing well with that

11   microphone.  They can hear you fine.  If that changes, we'll

12   try to remind you to pull that closer.  All right?

13         A.   Okay, sir.

14         Q.   If you can't hear me, let me know.

15         A.   Yes, sir.

16         Q.   All right.  So you've just told us your name and

17   spelled it for us.

18              Where do you live?

19         A.   I live in Lucedale, Mississippi.

20         Q.   And what do you do?

21         A.   I'm a structural welding superintendent at Signal.

22         Q.   At Signal International; is that right?

23         A.   Yes, sir.

24         Q.   How long have you had that job?

25         A.   I've been there a little over 20 years now.


                    **OFFICIAL TRANSCRIPT**

:46:35
:46:45
:46:52
:46:58
:47:05

1      **Q.**   Okay.  How long have you been in the position of,

2  what did you call it, structural welding superintendent?

3      **A.**   When I hired in, I hired in as a structural welding

4  superintendent.

5      **Q.**   And what year was that?

6      **A.**   1994.

7      **Q.**   Thank you, sir.

8      What are your duties?

9      **A.**   My duties are to make sure on all the jobs we have

10  going on that I have the proper amount of people on the jobs.

11      Also, I have duties of sitting in on meetings,

12  giving budgets, working on schedules, and checking on the

13  jobs as they are going on each day.

14      **Q.**   When you say checking on the jobs as they are going

15  on each day, what kind of jobs are those?

16      **A.**   That would be the welding jobs down either in the

17  fab shops or on the assembly area or on the rigs down in the

18  platoons.  And checking with the foreman to see if he has

19  everything he needs going on where they are working at, how

20  the conditions are there.

21      **Q.**   As a superintendent, do you have people that report

22  to you?

23      **A.**   Yes, sir.  I have the foremen and the general

24  foremen.

25      **Q.**   What do the foremen do?

**OFFICIAL TRANSCRIPT**

1      A.    The foremen have crews.  In other words, the
2   welders and they may have a few helpers.  They are the ones
3   responsible for taking care of the welding duties.
4      Q.    And what about the general foremen, what do they
5   do?
6      A.    The general foreman, he'll be mainly on a rig and
7   he'll have two to three or maybe four welding foremen under
8   him.  And his job is also to check the foremen, where he's at
9   with his job, if he has enough people on the job.  Also the
10   conditions down in the job and how the work is going.
11      Q.    You have told us who reports to you.  Who do you
12   report to?
13      A.    I report to W.A. Shouse at this time.
14      Q.    That was the gentleman we just heard from.  He was
15   just in the courtroom?
16      A.    Yes, sir.
17      Q.    How big is your structural welding department in
18   terms of employees?
19      A.    It fluctuates due to the amount of work on the
20   yard.  It's been down as low as probably 12 to 16 and as high
21   500.
22      Q.    Okay.  About, say, 2006, 2007, 2008, how big was
23   it?
24      A.    The structure department, to the best of my
25   remembrance, was probably somewhere around maybe 250 to 300,

OFFICIAL TRANSCRIPT

1    something in that neighborhood.

2         Q.   Is that 250 to 300 welders?

3         A.   Yes, sir.  Welders and there may have been a few

4    fire watch involved in this group.

5         Q.   And I guess that number would include the foremen

6    and the general foremen?

7         A.   Yes, sir.

8         Q.   All right.  You said you're in the structural

9    welding department.

10        What other departments are there at Signal?

11        A.   There's also the pipe department, which has pipe

12   welders and pipefitters.  I don't have anything to do with

13   the pipe welders.

14        There is also the fitting department which does the

15   fitting ahead of the structural welders.

16        We have a rigging department.  We have a

17   maintenance department.  We have the machinist department.

18        Q.   All right.  I don't mean to stop you.

19        A.   That was it.

20        Q.   All right.  Are you over any of those other

21   departments?

22        A.   No, sir.  I only have responsibilities for

23   structural welders.

24        Q.   Okay.  Is -- why don't you tell the jury about the

25   welding work that goes on in the structural welding

OFFICIAL TRANSCRIPT

1    department at Signal.

2         A.    Mainly we work on oil rigs.  They come in out of

3    the Gulf or they may come from South America.  They may come

4    from Canada or somewhere.

5              We do repair work and we do upgrades on them.  In

6    other words, they may be down in the pontoons, which is the

7    lower part of the oil rig, or the footings where they use a

8    balance and all of that.  The saltwater deteriorates the

9    steel.  We'll have to go in there -- the fitters go in there

10   and cut it out.  And then we go behind them and weld it up.

11             It may be repair work on the main deck.  Same

12   thing, where steel has been wasted from saltwater

13   environment.

14             Quarters -- a lot of the rigs come in that can

15   drill at this time at 6,000 feet and they want to be upgraded

16   to be able to drill in 10,000 feet of water.

17             So we have to add pontoons, which is flotations on

18   the sides of the bottoms of them.  We a lot of times have to

19   increase the quarter sizes where they stay at on the rig to

20   increase the work there.

21        Q.    What sort of locations on these rigs do the

22   structural welders work in?

23        A.    We work down in columns, which is the leg parts of

24   the rigs.  We call them column.

25             The pontoons, which is the lower part, which is

OFFICIAL TRANSCRIPT

1    down in the holes in the bottom of the rig.

2          We may work under the main deck, which is right

3    under the bottom rig.  And we may work on top of it.

4          But like I said, the majority of the work is

:51:46    5    usually down in the footings, in the pontoons, and lower part

6    of the rig.

7       Q.   Is that interior work?  Are you inside of a room?

8       A.   You are kind of inside like a tank situation, but

9    it's got a lot of divisions in it.

:51:58    10      Q.   Do the structural welders work in cramped

11   conditions sometimes?

12      A.   Yes, sir.  There would be times that it might be

13   difficult to get to the spot you're reaching to make your

14   weld and all of that.

:52:11    15         THE COURT:  Mr. Rydberg, will you speak a little

16   louder?

17         MR. RYDBERG:  I'm sorry.

18   **MR. RYDBERG:   (CONTINUING)**

19      Q.   Do you have to work on ladders on occasion?

:52:18    20      A.   Yes, sir.

21      Q.   Is it -- what are the working conditions like?  Can

22   you explain that to the jury, please.

23      A.   In the oil rig field, it's dirty.  It's dusty.

24   It's hot in the summertime, and it's cold in the wintertime.

:52:40    25         It's smokey down in the holes.  But now we set up a

**OFFICIAL TRANSCRIPT**

lot of ventilations, and all of that, to pump out the smoke
and pump in fresh air and all of this.

       But like I said, it's a hot type of work, and it's
a cold type of work.

    Q.   Is it part of your job to assign welders to welding
crews?

    A.   Yes, sir.  Like my responsibility is to make sure
each job that's going on has enough people.  So if we're five
short, then it's my job to notify personnel that -- you know,
to hire some more.  And then we assign them to these crews
that are short people.

    Q.   In a situation where you have some new workers come
on, new welders come on and come to our department, how do
you assign them to the various crews?

    A.   I sit down with the general foremen and the foremen
and we talk about it.  Where are you working at?  Do you need
more?  Two more?  Do you need one more?  Do you need three
more?

       And we'll break it out.  Really, it's who needs the
most and what's the first thing that needs to be finished
first.

    Q.   All right.  And when a new man comes into the
structural welding department, is he assigned to the harder
work, the easier work, or does it matter?

    A.   Most of the time if a man comes on that the foreman

OFFICIAL TRANSCRIPT

1    knows nothing about, he's really put in the better job that

2    he has for that day, the easier area, just to make sure this

3    man is capable of doing what he's tested for.

4          And then if he -- as long as he progresses into

5    more difficult work -- but on any given day, he'll be put at

6    the best and the easiest thing he has.

7    Q.   And why is that?

8    A.   All our welds, we have to sell them to the QC

9    department, which after we sell them, then they sell them to

10   the customer and ABS.

11         So a welder that can't perform well that you don't

12   know, he can make more of a mess in two hours than you can

13   fix in about twenty.

14   Q.   Are you trying to assess the new man's capabilities

15   at first?

16   A.   That's correct, sir, to make sure he is able to

17   handle what we've tested him for.

18   Q.   You just used the words sell the welds to the QA

19   department.  Can you explain what that means to the jury?

20   A.   When we weld out a compartment or a room, the

21   quality -- first the welder, he initially looks at his work

22   to make sure he's satisfied with it.

23         Then the foreman evaluates it.  And he may see a

24   spot that needs repairing.  It may be a knot on the weld.  It

25   may be underbeads.  It could be undercut.  A defect is what

OFFICIAL TRANSCRIPT

1    we call it.  He'll mark it, and the welder will fix it at

2    that time.

3           When he's satisfied with it, then we call QC, which

4    is the QA department at our company.  They'll come in and

:55:26    5    look over the welds and all in there.  And then he'll -- may

6    put a few marks on it, and we'll have to catch them.

7           And then after he's satisfied with it, then he

8    brings in the regulatory bodies and the customer.

9       Q.    QC, QA, what does that mean?

:55:42   10       A.    That's means quality assurance.

11       Q.    Are those Signal people?

12       A.    Yes, sir.  That body is Signal people, but it's

13    more of like a third party as far as for me, you know.  It's

14    independent of me.  I can't tell them I'm not going to fix

:55:58   15    this, it's not right.

16       Q.    It sounds like quality control or quality assurance

17    has to accept the work from you; is that what you're saying?

18       A.    That's correct.

19       Q.    And you said you have to sell the welds to them?

:56:10   20       A.    Yes, sir.

21       Q.    Do they buy it?

22       A.    They don't -- they just buy the appearance of it,

23    that it's a satisfactory weld.

24       Q.    Do they accept it or what?

:56:20   25       A.    They accept it.  That's exactly what they do.

**OFFICIAL TRANSCRIPT**

1      **Q.**   All right.  So you recall back in 2006, 2007, when

2   some Indian H-2B workers arrived at Signal, I imagine?

3      **A.**   Yes.

4      **Q.**   Was it your duty to assign the structural welders

5   who were H-2B workers to work crews, to welding crews?

6      **A.**   Yes, sir.

7      **Q.**   How did you go about that?

8      **A.**   When they came in, they had to go to the Texas

9   facility --

10      **Q.**   Okay.

11      **A.**   -- and take a welding test, a certified test.

12      **Q.**   Well, what's the purpose of that?

13      **A.**   That's a qualified test.  In other words, the rigs

14   we work on, the majority of them are ABS rigs, which that's

15   the regulatory body for this rig.

16          Some of them are DNV and different things, but we

17   give an ABS test, which certifies our welders to be able to

18   go in and work on this rig.

19      **Q.**   What does ABS mean?

20      **A.**   That's American Bureau of Shipping.

21      **Q.**   And explain how they are involved with the rigs.

22      **A.**   In other words, they are -- from my understanding,

23   I know they're the regulatory bodies.  But now if your rig is

24   accepted by the American Bureau of Shipping, then insurance

25   and all of these other purposes are cheaper for you, you

:56:33

:56:43

:56:54

:57:10

:57:24

**OFFICIAL TRANSCRIPT**

1    know, because it's a qualified rig.

2          In other words, they are a third party theirself,

3    and they buy -- they accept all the work that is on this rig,

4    so it's at a higher standard.

5        Q.   Is there any requirement that Signal provide

6    welders on ABS rigs -- rigs that are regulated by the ABS,

7    provide welders that are certified to an ABS standard?

8        A.   Yes, sir.  That is the regulations for it.

9        Q.   And who requires that?  Is that the customer or

10   Signal?

11       A.   Mostly it's the customer, because he has got an ABS

12   class rig so he requires certified welders, ABS-certified

13   welders.

14       Q.   You said something about the testing and the ABS

15   regulations.  Can you explain what that means?

16       A.   A welder, when he comes in on the job, he has to

17   take, like I said, an ABS-certified test.  Our facility is

18   ABS-approved to give this test.

19          He's given -- there on ABS, a one-inch-thick plate

20   is classified as unlimited.  In other words, he can weld

21   anything structurally on the rig if he takes a one-inch

22   plate.

23          Now, if you go down from that, it changes.

24          So we give a one-inch plate, and we give a vertical

25   and overhead -- a vertical and a horizontal.

:57:39 :57:56 :58:08 :58:27 :58:45

**OFFICIAL TRANSCRIPT**

 1          And it's certified.  And he takes -- he then takes

 2   two straps.  After it's welded and the instructor that gave

 3   the test approves, he'll cut two traps out of it and bends

 4   these straps.

 5       Q.   And is the -- if the welder passes an ABS

 6   certification test, is he then okay to go weld on a rig that

 7   is regulated by the ABS?

 8       A.   Yes, sir.

 9       Q.   What if he fails that test?

10       A.   If he fails that test, he is unable to go out there

11   as a welder.

12       Q.   All right.  So I started asking you about how the

13   Indian H-2B workers were assigned by you to structural

14   welding crews.  Can you explain how you did that back at that

15   time?

16       A.   Like I said, after they had taken their tests, they

17   would send us a list of how many had passed the test.  All

18   right?

19          If it was four or five coming, then I would get

20   with my foremen and the general foremen and we discussed who

21   was in need, who was shorthanded at this time.

22       Q.   Okay.

23       A.   And we'd put -- one may go in this crew, two may go

24   in the next crew, and maybe three in this crew.

25          Now, most of the time, it was just one to two that

                        OFFICIAL TRANSCRIPT

1    went to each crew.

2        Q.   Why is that?  Why would one or two go to each crew?

3        A.   You really don't want a crew of a whole bunch of

4    brand-new people that you really don't know anything about

5    or, you know, don't know their way around the rigs and all

6    that.

7             Like I said, when the man come in, he was put with

8    one of the other men in his crew and he kind of helped him

9    through the day making sure, you know, he knew where his

10   machine was and how to get to where he was at and get out and

11   all of that.

12       Q.   Did you assign the new Indian workers to work with

13   more experienced hands who were already on the job?

14       A.   Yes, sir.  Like I said, the older hands that was

15   there.

16       Q.   All right.

17            What about the work locations where the Indian H-2B

18   workers were assigned?  Were they given a preference or were

19   they given dirtier jobs or easier jobs or what?

20       A.   As they was put in the crews, it was wherever the

21   crew of all the 8 to 12 people or whatever was in the crew

22   was.  They went where they was, you know.

23            It wasn't really -- like I said earlier, the

24   purpose was the new hands were really given the best spot

25   that that foreman has for the first few days so he can kind

OFFICIAL TRANSCRIPT

1    of check the man out and all that.

2         But as far as worse work or not, they all -- if

3    they was welding in this room, the whole crew was in this

4    room.  Some of them was out of the door and the rest of them

5    in.  It was just wherever the crew was, that's where they all

6    worked together.

7    Q.   Would that be true for the locations that you

8    mentioned earlier like down in the pontoons or in tanks?

9    A.   Yes, sir.  If that crew was in the pontoons, that's

10   where that man would be going to.  If it was on the

11   assembling area, that's where he would be going to.

12   Q.   Okay.  We talked about Indian H-2B workers.  We

13   know Signal had some of those on the welding crew based on

14   what you have told us.

15        I guess there were guys from South Mississippi,

16   locals, that were on the welding crews, right?

17   A.   Yes, sir, there was.

18   Q.   Any other nationalities?

19   A.   Yes, sir.  We have quite a few Asians and we have

20   quite a few Hispanic people.

21   Q.   And were those folks treated any differently than

22   any other worker on a welding crew?

23   A.   No, sir.  They all -- everybody -- most of the

24   crews is a mixture of people.

25   Q.   Mixture of additional nationalities?

OFFICIAL TRANSCRIPT

:01:17
:01:29
:01:39
:01:49
:02:02

1    **A.**   Yes.

2    **Q.**   Any reason for that?

3    **A.**   That's just when you hire in, whatever crew was in

4    need of somebody that day, you know, that's where you would

:02:14   5    be placed.  It wouldn't be based on your nationality.

6    **Q.**   How long has Signal had welders on its structural

7    welding crews from countries other than the United States?

8    **A.**   I went there in 1994.  And at that time, there was

9    a few Hispanics there.  And not too long after I came in,

:02:34   10    there was some Laotians came in.

11    **Q.**   I'm sorry.  What?

12    **A.**   Laotians.  People from Laos.

13    **Q.**   Okay.  Anything else?  Any other nationalities?

14    **A.**   Like I said, there's black and whites.  They are

:02:50   15    from America.

16    **Q.**   Okay.  As part of your job, I think maybe we

17    touched on this earlier, but my question to you is is part of

18    your job inspecting welds after the workers are finished?

19    **A.**   Yes, sir.  I go through checking what they have

:03:06   20    done, looking at it.  Seeing how it looks.  How -- what

21    progress is going on from one day to the next.

22    **Q.**   And is that part of the selling of the weld to QA?

23    **A.**   Well, if I look at it and if I'm really not

24    satisfied with it, then I'll get with the foremen.  Or if the

:03:24   25    hand is close that did the welding, I may bring it to his

OFFICIAL TRANSCRIPT

1    attention that, you know, this is not acceptable.

2         Q.   How will you know which hand did the weld?

3         A.   They put stencils on their work.  In other words,

4    that's there badge number.  In other words, each one has, you

5    know, an individual badge number.

6         Q.   We've heard something about badge numbers in this

7    case.

8              Does every structural welder have a badge number?

9         A.   Yes, sir.

10        Q.   And do they all put their stencil of their badge

11   number on their weld when they're finished?

12        A.   The majority of the time.  I mean, there are

13   times -- like I said, if I see a weld that doesn't have a

14   stencil on it, then I ask the foreman who he had there, and I

15   get with the man and bring it to his attention that he needs

16   to, you know, get his stencil.

17             Personally, if I see one that doesn't have a

18   stencil, then somebody doesn't want us to know who did it.

19   That's just the way I look at it.

20        Q.   They are supposed to do that?

21        A.   Yes, sir.  That's part of their responsibility.

22        Q.   Do you have a badge number?

23        A.   Yes, sir.  My badge number is 002021.

24        Q.   Okay.  Now, how is a bad welding job fixed if you

25   find one that's not acceptable?


**OFFICIAL TRANSCRIPT**

1     **A.**   If it's a large area, then you may have to set up a

2     gouge, which is a carbon arch.   It hooks to an airline.   It

3     hooks to your welding lead.   And you cut this weld out and

4     you have to reweld it.

5          Also it may be -- you may have to take a grinder

6     and grind most of the weld out.   It may be inaccessible to

7     get to it with the gouger, and you have to grind the welds

8     off and then reweld it, which takes more time.

9     **Q.**   So this may go without saying, but it sounds like

10    it's more efficient to do it right the first time.

11    **A.**   That's correct.

12    **Q.**   Okay.   Does the structural welding department have

13    first-class and second-class welders?

14    **A.**   Mainly we just have first-class welders.   I have --

15    at this time, I have no second class.   I've had none in quite

16    a while.   But mainly it's just first class.

17         I need to be able to -- the foreman needs to be

18    able really to put a man on anything.   You know, if he's

19    second class, then that says he is unable to perform in

20    harder areas or more difficult welding.

21    **Q.**   Okay.   From time to time, have you had second-class

22    welding work?

23    **A.**   A minimum amount, really, in the past.

24         MR. RYDBERG:   Can we see Exhibit 710, please.

25         Thank you.


**OFFICIAL TRANSCRIPT**

BY MR. RYDBERG:   (CONTINUING)

Q.   Can you see that, Mr. Cochran?

A.   Yes, sir.

Q.   And can you tell us what that is?

A.   This is a change of status form.  It's where a man has been -- money has been cut from $18.50 to $15 an hour.

Q.   What is a change of status form used for at Signal?

A.   They are used, like I said, for demotions, for promotions, for terminations, for resignations, and for vacations.

Q.   A variety of things, it sounds like?

A.   Yes, sir.

Q.   This one you said was for a demotion?

A.   Yes, sir.

Q.   All right.  Tell us what's going on here.  How does a welder in the structural welding department get demoted?

Is this the first thing that happens?  What leads to this, if anything?

A.   A demotion.  Well, what would lead to this would be this man formally would be observed.  The work that he's doing is not first-class work.  In other words, he is having trouble.  His welds have a lot of pickup.  A lot of it has to be cut out.

So he'll go with him and usually he'll work with him, you know, and maybe his machine or something.  And he'll

OFFICIAL TRANSCRIPT

1   work with him a few days.

2          If his quality does not improve, or quantity, then

3   he'll bring him to the general foreman, which he'll usually

4   holler at me and say, look, you may need to come look at

5   this.

6          So at that time, I'll be brought in, involved in

7   it.  And they'll show me where he has been working at, and

8   we'll discuss it.

9          And at this time, this was brought up to reduce his

10  pay.

11     Q.   Well, before you reduce his pay, how many times do

12  you talk to a worker?

13     A.   It may -- I would say somewhere between a week to

14  two weeks.  It could be a little longer than that.

15     Q.   Now, I'll represent to you that this form

16  references one of the plaintiffs in this case, one of the

17  Indian workers.

18          What if the Indian worker didn't speak English, how

19  do you talk to them?

20     A.   When they came in, there was several of the men

21  that spoke English quite well.  And if a foreman was having

22  problems communicating what he needed to with this man, he

23  would get what we call an interpreter, which would be another

24  one of the men.

25          And he'd come over.  He'd explain it to them and he

:07:15

:07:27

:07:40

:07:53

:08:11

OFFICIAL TRANSCRIPT

1    would explain it to this man.  And then if this man told him
2    what was going on, then he would explain it back to the
3    foreman what he had said.
4        Q.    Before you demote somebody or cut their pay, would
5    you make sure they understood what they're being --
6        A.    Yes.
7        Q.    -- counseled about or what the problem is?
8        A.    Yes, sir.  They don't -- I don't know of any time
9    that somebody has been cut back that he wasn't -- his foreman
10   had talked to him prior to working with him, trying to help
11   him with his work.  But when it came time for him to cut
12   back, he'd be told his money would be reduced to this amount.
13       Q.    Would that be true for the Indian workers?
14       A.    Yes, sir.  That would be true for all of them.
15       Q.    Even if they didn't speak English?
16       A.    If they didn't speak English, like I said, an
17   interpreter could be brought up and said, listen, we're
18   fixing to have to cut your money back because you're not
19   producing.  And then he would explain it to him.
20       Q.    Now, is this your signature on the lower-left
21   corner of that change of status form?
22       A.    Yes, sir.
23       Q.    And do you recognize any other signatures on that
24   form?
25       A.    All right.  The writing up in the top right-hand

1    corner -- right above my name.

2         Q.   Right above your name?

3         A.   Yes, sir.

4         Q.   What do you recognize about that?

:09:23    5         A.   That means it's Bill Bingle's signature.  The

6    little squiggly lines kicked up.

7         Q.   (Indicating.)

8         A.   Yes, sir.  Right there.

9         Q.   Right there?

:09:31    10         A.   That's Bill Bingle.

11         Q.   Okay.  Thank you.

12         A.   All right.  The other one would be the employee's

13    name.

14         Q.   Employee's name?

:09:41    15         A.   Yes, sir.  The other one right straight across from

16    Bill Bingle, that would be the employee's name.

17         Q.   Do you get the employee to sign that change of

18    status form?

19         A.   Yes, sir.

:09:50    20         Q.   What if it was an American worker, a guy from South

21    Mississippi that you were having issues with the quality or

22    the quantity of his work?

23         A.   Sir, most of them -- I don't remember any of them I

24    cut back.  What I would have to do with them is really

:10:06    25    terminate them.

**OFFICIAL TRANSCRIPT**

1    Q.   Why is that?

2    A.   He was in a position that he could go somewhere

3    else to look for a job.

4         My understanding with the Indians is they had an

:10:17    5    H-2B visa, which was saying that they can only work at

6    Signal.  And so they was -- the company elected that if we

7    cut him back, we'd work with him trying to get him in other

8    areas where it was easy.

9         We even started some classes for training welders

:10:39    10   that they could go to after work to get better at their

11   ability to weld -- not only them, anybody that was at the

12   yard at that time could go -- and bring them back up to

13   speed.

14   Q.   So were these classes teaching welding skills?

:10:53    15   A.   Yes, sir.  And other work.

16   Q.   Any other type classes?

17   A.   Yes, sir.  From my understanding there was like

18   blueprint reading for the fitting department.  There was also

19   English classes to learn how to speak English better.

:11:06    20   Q.   Who were the classes open to?  What workers?

21   A.   They was open to everyone that worked at Signal.

22   Q.   Including the Indian workers?

23   A.   Including the Indian workers.

24   Q.   Were the workers paid while they were taking the

:11:18    25   training classes?

**OFFICIAL TRANSCRIPT**

1     **A.**   No, sir.  It was given to them after hours.  In

2   other words, what time day shift got off, they could go on up

3   there and start practicing.  And same with the night shift.

4   When they got off in the morning, they could go and learn to

:11:35     5   work.

6     **Q.**   Did the -- I'm sorry.  Go ahead.

7     **A.**   But the company furnished all the material for them

8   and also furnished the instructor to train them.

9     **Q.**   To your knowledge, did any of the Indian H-2B

:11:43    10   workers take advantage of that training?

11     **A.**   I would like to say yes, but I can't say I actually

12   watched and seen any of them.

13          MR. RYDBERG:  Will you put up Exhibit 696, please.

14   **BY MR. RYDBERG:   (CONTINUING)**

:12:01    15     **Q.**   Do you recognize this, Mr. Cochran?

16     **A.**   Yes, sir.  This is a change of status form giving a

17   man a raise.  He's going from $15.25 to $17 an hour.

18     **Q.**   Same man as the last one, isn't it?

19     **A.**   Yes, sir.

:12:18    20     **Q.**   So this is, in effect, a promotion?

21     **A.**   Yes, sir.

22     **Q.**   What would be the reason for that?

23     **A.**   That his welding had improved and all.  His quality

24   and quantity had.  And his foreman had said, you know, he is

:12:38    25   at a higher rate, so we'll give him this raise.


**OFFICIAL TRANSCRIPT**

**Q.** And is that your signature again in the lower-left corner?

**A.** Yes, sir.

MR. RYDBERG: You can take it down. Thank you.

:12:54    **BY MR. RYDBERG:  (CONTINUING)**

**Q.** Let me ask you about the term "man camp." Have you heard that before?

**A.** Yes, sir.

**Q.** What does that mean?

:13:02    **A.** That's just a facility that workers go into -- you know, that companies provide or either -- the company you're working for provides for you.

It is living quarters, kitchen facilities, and all of that, that they put close to jobs that you're working on.

:13:21    **Q.** We know that there was one at Signal.

**A.** Yes, sir.

**Q.** Have you heard that term "man camp" in connection with other industries or other companies?

**A.** Yes, sir. In Alaska, there are some people around

:13:34    home that work up there that work on what they call the North Slope now. They fly in and they take them out there and they work just through the spring of the year and early part of the summer, and they're kept in man camps.

In other words, they're on the job because there is

:13:48    nothing else around there for them. That's the only place

**OFFICIAL TRANSCRIPT**

1    for them to stay.

2        Q.   Is that an oil industry term, man camp?

3        A.   I would say maybe it falls under mostly the oil

4    field work.

5        Q.   Okay.  There has been testimony in the case that

6    the Indian H-2B workers were unhappy with their living

7    conditions.

8             And my question to you is:  Did complaints about

9    the living conditions made by the H-2B workers, the Indian

10   H-2B workers, reach your ears?

11       A.   Not to the best of my knowledge.  I never heard any

12   complaints from them.  They may have said something to the

13   foremen, but it never was brought up to my attention.

14       Q.   Same question about the food.  In other words,

15   there's been testimony that the Indian workers were unhappy

16   with the food at Signal.

17            Did complaints about the food from the Indian

18   workers reach your ears?

19       A.   No, sir, not to the best of my knowledge.

20       Q.   What about complaints about the Indian workers

21   being sick, did you hear about that?

22       A.   No, sir.  I'm talking about sick -- I mean, even

23   today, we have people that call in sick, the workers that are

24   there that work for the structural welding department now.

25   So we know that's -- I've had to miss before because I got

OFFICIAL TRANSCRIPT

:13:57 (line 5)
:14:16 (line 10)
:14:28 (line 15)
:14:42 (line 20)
:14:59 (line 25)

1    sick.  I mean, that's just...

2         Q.   That happens, right?

3         A.   Yes, sir.  I mean, that's just -- I mean...

4         Q.   So I guess I'm talking about more widespread

5    complaints that lots of Indian H-2B workers in your

6    department were sick.

7         A.   Not to the best of my remembrance.  I don't

8    remember large quantities of them.

9         Q.   Did your department have Thanksgiving dinners and

10   Christmas dinners?

11        A.   Yes, sir.  We pretty much -- we've always had

12   Christmas dinners.  And most of the years, we have a

13   Thanksgiving lunch where all the welders bring in plates from

14   home and we all get together at lunch and eat.

15        Q.   What about the Indian H-2B workers, did that go on

16   while they were at Signal?

17        A.   Yes, sir, it went on.  But now they was not asked

18   to bring in any food or nothing.  The other welders brought

19   everything in for them.  Because, like I said, they was at

20   the man camp, so they weren't asked to bring anything.

21        Q.   Everybody eats together?

22        A.   Yes, sir.

23             MR. RYDBERG:  Those are all the questions I have,

24   Mr. Cochran.

25             I'll tender the witness, Your Honor.


                         OFFICIAL TRANSCRIPT

**CROSS-EXAMINATION**

BY MR. WERNER:

    **Q.**   Good afternoon, Mr. Cochran.

    **A.**   Good afternoon, sir.

    **Q.**   I'm Daniel Werner.  I'm one of the lawyers for the plaintiffs in this case.

    **A.**   Okay.

    **Q.**   Now, you testified just a few minutes ago that you had not heard any complaints from the Indian workers about the housing or the food?

    **A.**   Correct.

    **Q.**   The reality is you spent a lot of your time working in an office; is that right?

    **A.**   Yes, sir.

    **Q.**   And you interacted very little with the craft workers; is that correct?

    **A.**   Not totally correct, sir.  Pretty much every day I'll be a couple of hours or three where the workers are at now.

    **Q.**   You would be where the workers are at, but if you had a specific instruction, you would pass that along to the foreman or the general foreman, and that would be passed along to the workers; is that right?

    **A.**   That's correct.

    **Q.**   And if a worker had a concern, that worker

**OFFICIAL TRANSCRIPT**

1    would talk to -- know to talk to that worker's foreman.   That

2    worker wouldn't go directly to you; is that right?

3           A.    That's correct.

4           Q.    Now, you testified earlier that there were some

:17:29   5    training opportunities for the workers at Signal?

6           A.    Yes, sir.

7           Q.    And that Indians and non-Indians could participate

8    in this training?

9           A.    Yes, sir.

:17:40  10           Q.    And this training was designed to boost their

11    skills?

12           A.    Yes, sir.

13           MR. WERNER:   Could we please pull up Exhibit 278.

14    MR. WERNER:    (CONTINUING)

:18:15  15           Q.    Now, this is an e-mail --

16           MR. WERNER:   Actually, go ahead and zoom out.

17    MR. WERNER:    (CONTINUING)

18           Q.    This is an e-mail dated April 2, 2007, from

19    Bill Bingle.  And you're copied on this e-mail.  Do you see

:18:47  20    where your name is?

21           A.    Yes, sir.  Yes, sir.

22           MR. WERNER:   You can go ahead and zoom in on that

23    portion.

24    MR. WERNER:    (CONTINUING)

:19:04  25           Q.    Now, Signal stood to make more money if


                         OFFICIAL TRANSCRIPT

1    second-class welders could advance to first-class welders; is

2    that right?

3        A.    I didn't understand the question.

4        Q.    Signal would make more money as a company if the

:19:24    5    second-class welder advanced to the position of a first-class

6    welder; is that right?

7        A.    Signal -- I don't know if Signal would make more

8    money, but a foreman would be able to put a man in more

9    locations if he was a first-class welder versus if he was a

:19:39   10    second-class welder.

11        Q.    Okay.  Well, here it says, if you read the bottom

12    line (as read:)  Every second-class guy we can promote to

13    first class saves us about $12 per hour over contract labor

14    and helps reduce our overhead.

:19:54   15        A.    Contract workers are different from Signal workers.

16    In other words, Signal has contract labor come in.

17             I'm not in a position to say I can tell you what

18    the company pays for contract labor, because I don't know the

19    rates that they're paying.

:20:12   20             But what this is saying is if we can take a

21    second-class welder, train him, and get him to work to

22    perform first-class work, then at that time I can lay off a

23    contract laborer and move this man into his place.

24        Q.    Yeah, which helps Signal because contract labor is

:20:30   25    a lot more expensive?

**OFFICIAL TRANSCRIPT**

1       A.   Yes.

2       Q.   And if -- if you were to let, say, one of the

3   Indian welders go, you would have to replace that Indian

4   welder, very likely, with a contract laborer; is that right?

:20:46     5       A.   Yes, sir.  Some of the time it could be.

6       Q.   Now, the difference in wage between a first-class

7   and a second-class welder is what, $4 or $5 an hour?

8       A.   There is a range in there.  Like second class may

9   be from $14 an hour to $16.  I mean, I'm just giving you

:21:17     10  instances.  I can't say that's exactly what it is.  And first

11  class may have been from $16 to $19.  So there is a range in

12  each one of them.

13          First class -- just because you're first class,

14  that don't mean you are making top money.

:21:32     15      Q.   Sure, I understand.

16          And if a second-class welder was promoted to

17  first-class welder, that second-class welder would probably

18  start at the bottom of the first-class scale; is that right?

19      A.   Yes.

:21:41     20      Q.   So the -- a worker who was promoted from

21  second-class to first-class welder would stand to earn maybe

22  five more dollars an hour, is that right, in the range of?

23      A.   Yes, sir.  Over time.

24          MR. WERNER:  Go to second page of this document.

:22:34     25          And if you can just zoom in on the bottom e-mail,

**OFFICIAL TRANSCRIPT**

1    please.

2    MR. WERNER:  (CONTINUING)

3        Q.   This is a later e-mail from Mr. Bingle to several

4    individuals where you are copied.

5            And it says (as read:)  The students are not paid.

6            Is that right?

7        A.   That is correct.  For training.

8        Q.   For the training.

9            Now, this training actually benefits Signal in the

10   range of $12 per hour; is that right?  That's what we saw

11   earlier?

12       A.   I'm -- I don't understand your question completely,

13   sir.

14       Q.   Well, Signal stood to earn $12 -- stood to make

15   $12 -- or save $12 per hour for every worker that was moved

16   from second-class welder to first-class welder?

17       A.   If we replaced a contractor.

18       Q.   Correct.

19            And a worker who has advanced from second-class

20   welder to first-class welder might make maybe $4 or $5 an

21   hour more, somewhere in that range?

22       A.   Yes, sir.

23       Q.   Signal, therefore, likely benefited, as was

24   suggested in that earlier e-mail, significantly more, at

25   least twice as much, than any worker who was trained for that

OFFICIAL TRANSCRIPT

:22:45

:22:58

:23:12

:23:29

:23:44

1    advancement; is that right?

2        A.   Not necessarily.  I mean, when I was welding, there

3    was a job coming open that I knew of for pipe welders.  I was

4    a structural welder, so I had to go to the junior college and

:24:03    5    pay to take the training that we're offering these people so

6    I could apply for this job that was coming up.

7        Q.   Right.  But the reason why Signal offered this

8    training to the workers was to save Signal money over

9    contract labor?

:24:19    10       A.   And improve the quality of that worker.

11       Q.   Now, you would say, then, therefore, that the

12   benefit to the training is mostly to Signal?

13       A.   I would say it was mostly -- to me it would be

14   mostly for the man.

:24:36    15       Q.   Well --

16       A.   Or the lady.

17       Q.   Well, when we look at straight money, $12 an hour

18   is more than $5 an hour?

19       A.   Yes.

:24:43    20       Q.   So in that sense, there is more of a financial

21   benefit to Signal?

22       A.   To my understanding it wouldn't be, the way I look

23   at it.

24       Q.   You testified a little bit earlier about

:25:13    25   disciplining workers, about disciplining workers, say, for

**OFFICIAL TRANSCRIPT**

1    not having a good-quality weld.

2        A.    I didn't understand what you asked.

3        Q.    I'm sorry.

4              During your direct testimony, you were asked about

5    disciplining workers who maybe didn't have good welding

6    quality.

7        A.    Yes, sir.

8        Q.    And I assume in your position you've had to fire

9    workers before.

10       A.    Yes, sir.

11       Q.    And that's obviously not anything that anybody

12   likes to do.

13       A.    No, sir.

14       Q.    And when somebody is fired, you want to make sure

15   you create a paper record of that firing; is that right?

16       A.    Yes, sir.

17       Q.    So you might say -- you might -- that paper record

18   might say, Johnny was fired for sleeping on the rig?

19       A.    Speak a little louder.

20       Q.    That paper record might say, Johnny was fired for

21   sleeping on the rig?

22       A.    Yes.

23       Q.    Or Johnny was drunk at work, we had to fire him?

24       A.    Yes.

25       Q.    Or Johnny didn't tie off, we had to fire him?


                          **OFFICIAL TRANSCRIPT**

2483

         A.   Yes.

         Q.   Or the work quality was poor, didn't improve; the
person was reduced down, still didn't improve; and then we
had to let him go?

         A.   Yes, sir.

         Q.   So it would have that kind of a detail in it.  You
would never just say in a report, we fired Johnny because he
didn't follow the rules?

         A.   It could be he was -- he didn't follow the safety
rules or something.  That could be wrote on the report.

         Q.   But it would have enough detail?  You'd say he
didn't follow the safety rules because he was 50 feet off the
deck and didn't tie in?

         A.   Yes.

         Q.   Because if you said Johnny was fired just because
he didn't follow the rules, that wouldn't create enough of a
paper trail, which you need as a company; is that right?

         A.   Yes.

         Q.   During your direct testimony you saw the report
showing the Palanyandi Thangamani had his wages reduced?

         A.   Yes.

         Q.   Now -- and then Signal instituted what was called a
yes/no program where certain welders and fitters from India
were nos, which meant they were being terminated, and certain
welders and fitters were yeses, which meant they would have

                      OFFICIAL TRANSCRIPT

1    extensions applied for?

2         A.   Yes, sir.

3         Q.   And Mr. Thangamani was, in fact, a yes?  He got an

4    extension?

:28:18    5         A.   I could not tell you that, sir.

6         Q.   Now, the yes/no program was a program that you

7    helped oversee in a way, right?

8         A.   Yes, sir.

9         Q.   Okay.  You helped make the determinations; you

:28:40   10    helped decide who was a yes and who was a no?

11         A.   No, sir.  Mainly that was done by their foreman.

12         Q.   Your foreman and they report to you?

13         A.   I mean, I would sit with them and we went over the

14    list.  But like I said, between the foreman and general

:28:53   15    foreman, because they had so much more daily contact with

16    them then I did.

17         Q.   And that decision about whether to make them a yes

18    or a no was based in part on work quality?

19         A.   In part on what, now?

:29:06   20         Q.   On work quality.

21         A.   Yes, sir.  It wasn't just the quality, now.  It

22    would be their quantity.  It would be their safety habits.

23         Q.   And attitude?

24         A.   Attitude would be in there.

:29:17   25         Q.   And it also had something to do with their attitude

**OFFICIAL TRANSCRIPT**

```
1    at the man camp?
2         A.    Not to my knowledge.
3         Q.    Not to your knowledge?
4         A.    That's correct.
5         Q.    But it may have been?
6         A.    Not to my knowledge.
7              MR. WERNER:  I have nothing further.  Thank you.
8              MR. CERNIGLIA:  No questions, Your Honor.
9              MR. SHAPIRO:  No questions, Your Honor.
10             MR. RYDBERG:  No redirect, Your Honor.
11             THE COURT:  All right.  Thank you.  You are
12   excused.
13             THE WITNESS:  Thank you, ma'am.
14             THE COURT:  All right.  Why don't y'all approach
15   the bench.
16                    SIDEBAR ON THE RECORD
17             THE COURT:  All right.  Are you planning next to go
18   to deposition designation?
19             MR. RYDBERG:  That's a good question.  I think we
20   have one live witness.  I believe he will take more than an
21   hour.
22             THE COURT:  Who is that?
23             MR. RYDBERG:  Pat Killeen is his name.
24             MR. HOWARD:  We had the agreement yesterday we
25   wouldn't put him on.  They can put him on for an hour and we
```

**OFFICIAL TRANSCRIPT**

1   can do the cross in the morning, that's fine.  We are just

2   not prepared to cross.

3            THE COURT:  Who is taking him?

4            MR. RYDBERG:  Mr. Rabbani.

:30:56   5            THE COURT:  He is ready to go, Rabbani?

6            MR. RYDBERG:  He is ready to go, I think.

7            In the meantime, I'll try to get an update on

8   Ms. Hangartner's condition.

9            THE COURT:  I think Mr. Ungar was going to check

:31:07   10   about depositions and what the status was -- not for today

11   but just in general.  So then we'll talk at 5:30 about

12   what -- where we are and you let me know what you know.

13            And it may be y'all have to get together and talk

14   tonight, and then you could call my clerk and let me know.

:31:29   15   And we'll figure that out tonight and maybe we'll need some

16   time to get together.

17            MR. RYDBERG:  I realize you would probably let the

18   jury know something this evening.

19            THE COURT:  Even if it is later tonight, we can

:31:40   20   call them on the cell phones and tell them not to come,

21   because we've got cell numbers for everybody, so we can.

22            MR. RYDBERG:  Okay.

23            THE COURT:  We can do that tonight.  So let's start

24   with the direct of Mr. Killeen, and whenever we get through

:31:55   25   with direct, we'll break.


                         **OFFICIAL TRANSCRIPT**

1          MR. RYDBERG:  All right.  Very good.

2          MR. HOWARD:  Thank you.

3              **AFTER THE SIDEBAR IN OPEN COURT**

4          THE CASE MANAGER:  Raise your rate hand.

:33:05   5                  (The oath was administered.)

6          THE CASE MANAGER:  Please be seated and state and

7    spell your name for the record and speak directly into the

8    mic.

9          THE WITNESS:  My name is Patrick Killeen,

:33:15  10   P-a-t-r-i-c-k  K-i-l-l-e-e-n.

11                  **PATRICK KILLEEN,**

12   having been first duly sworn, testified as follows, to wit:

13              **DIRECT EXAMINATION**

14   By MR. RABBANI:

:33:27  15       Q.   Good afternoon, Mr. Killeen.  Sorry for keeping you

16   out there so long.

17           What do you do for Signal?

18       A.   I'm the corporate EHS, Environmental, Health &

19   Safety director.

:33:46  20       Q.   And how long have you held that position?

21       A.   Since Signal's inception in 2003.

22       Q.   So is that about 12 years?

23       A.   Yes, sir.

24       Q.   Are you the corporate director for Environmental,

:34:01  25   Health & Safety for all of Signal's operations?

                    **OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | **A.**   Yes, sir, I am. |
| 2 | **Q.**   And that includes Mississippi? |
| 3 | **A.**   Yes, sir. |
| 4 | **Q.**   And where is your main office? |
| :34:09   5 | **A.**   My main office is in Pascagoula, Mississippi. |
| 6 | **Q.**   Is that where you spend most of your time? |
| 7 | **A.**   Yes, sir. |
| 8 | **Q.**   So before we get into the facts of this case, I'd |
| 9 | like to go over a little bit of your personal background. |
| :34:25   10 | Did you grow up in Pascagoula? |
| 11 | **A.**   No, sir, I didn't. |
| 12 | **Q.**   Where did you grow up? |
| 13 | **A.**   In Algiers.  Across the river in New Orleans. |
| 14 | **Q.**   What do you do for fun? |
| :34:38   15 | **A.**   What do I do for fun? |
| 16 | **Q.**   Yeah.  What do you do for fun? |
| 17 | **A.**   Music.  I'm a musician.  Fitness.  Love to exercise |
| 18 | outdoors. |
| 19 | THE COURT:  Mr. Rabbani, speak up. |
| :34:53   20 | MR. RABBANI:  Yes, Your Honor.  I'm sorry. |
| 21 | **MR. RABBANI:   (CONTINUING)** |
| 22 | **Q.**   Are you married, Mr. Killeen? |
| 23 | **A.**   Yes, sir, I am. |
| 24 | **Q.**   Do you have any children? |
| :34:59   25 | **A.**   Yes, sir, I do. |

**OFFICIAL TRANSCRIPT**

1    **Q.**    How many?

2    **A.**    Two.

3    **Q.**    Could you tell us a little bit about your

4    educational background, please.

:35:09     5    **A.**    Yes, sir.  I went to LSU; graduated with a degree

6    in nutrition many, many years ago.

7        Past history or professional accomplishments, I

8    guess is what you asked?

9    **Q.**    Sure.  Please tell me.

:35:28     10    **A.**    Yes, sir.  I'm a member -- active member of the

11    American Society of Safety Engineers.

12        I am a certified shipyard competent person.  That

13    means I was trained by a marine chemist to be able to

14    understand the hazards associated with the confined space

:35:45     15    issues.

16        A registered member of the National Registry of

17    Environmental Professionals.

18        I'm a Registered Environmental Manager.

19        I'm on the American Equities Underwriters.  That's

:35:59     20    our Workers' Comp insurance commission.  They have a safety

21    committee across the country.  I'm on the safety committee.

22        I'm a member of both the safety and environmental

23    committees of the Ship Builders Council of America.  That's

24    our kind of trade association up in Washington, DC.

:36:19     25        And I'm on my second term as elected chairman of

**OFFICIAL TRANSCRIPT**

the National Shipbuilding Research Program Environmental

Technology Panel.  That is a program that is funded through

Congress to kind of keep shipyards competitive in the

international market.  And my little deal is the emerging --

up-and-coming environmental technologies that can help the

company be in compliance.

        I was chairman of the board of the Shipyard

Association for Environmental Responsibility that was started

locally here by Mr. Boysie Bollinger, who is from Bollinger

Shipyards, in environmental responsibilities there.

        And I am OSHA 5400 certified.  That means I'm able

to train the trainer.  That's in maritime courses.  OSHA does

things underneath hours, and it's a 10-hour course and a

30-hour course.  So I've taken that and certified.

Q.    That sounds like you have a lot of experience in

Environmental, Health & Safety?

A.    Yes, sir.  I'm old.

Q.    How many years would that be?

A.    I started in 1985.

Q.    And you've been in safety ever since '85?

A.    Yes, sir.

Q.    Mr. Killeen, are you aware that Signal hired and

housed H-2B workers in 2006?

A.    Yes, sir.

Q.    And were you involved in the planning or

OFFICIAL TRANSCRIPT

1    construction of the housing facility on Greenwood Island?

2         A.   Very remotely.  But, yes, sir, I knew about it.

3    Yes, sir.

4         Q.   Can you tell us what Greenwood Island is?

5         A.   Greenwood Island is a -- now closed dredged -- you

6    know, water-bottom disposal site that was the mud that they

7    took out of Bayou Casotte.  They pumped it over there to keep

8    the water depth of the channel for the Port of Pascagoula,

9    but it's been closed.

10        Q.   And what does a site being closed mean?

11        A.   During the process of, you know, removing the

12   material, the Corps of Engineers does that, and they test the

13   stuff.  And in that, they discovered they had lead

14   contamination in that.

15             And there is a plan that you submit to the local

16   environmental regulatory authority, which in this case would

17   be the Mississippi Department of Environmental Quality.  And

18   it's a planning procedure to basically seal and cap the site

19   so that no further dredge spoils would go into that.

20        Q.   And is that called a closure plan?

21        A.   Yes, sir, closure plan.

22        Q.   We'll talk about the closure plan in just a moment.

23             Just for clarification, is Greenwood Island an

24   actual island?

25        A.   No, sir.


                          OFFICIAL TRANSCRIPT

1    Q.   All right.  I would like to show you Exhibit 1191.

2         Do you recognize this image?

3    A.   Yes, sir.

4    Q.   What is it?

:39:40
5    A.   It's the Greenwood Island peninsula and the Signal

6    facility.

7    Q.   And are you familiar with Greenwood Island?

8    A.   Yes, sir.

9    Q.   Do you see Signal's administrative offices on

:39:54
10   Exhibit 1191?

11   A.   Yes, sir, I do.

12   Q.   Could you draw a circle around the administrative

13   offices with your finger, please.

14   A.   Yes, sir.

:40:02
15   Q.   Touch the screen.

16   A.   (Complies.)

17        MR. RABBANI:  Let the record reflect the witness

18   has circled the white-roofed building on the left of the

19   image.

:40:16
20   MR. RABBANI:  (CONTINUING)

21   Q.   Now, do you have an office in that building?

22   A.   Yes, sir, I do.

23   Q.   And did you have an office, in that building that

24   you circled, in 2006, 2007, and 2008?

:40:25
25   A.   Yes, sir, I did.


                        OFFICIAL TRANSCRIPT

1    **Q.**    Does Richard Marler, the CEO of Signal -- did he

2    have an office in that building in 2006, 2007, and 2008?

3    **A.**    Yes, sir.  He currently has an office.

4    **Q.**    Did Chris Cunningham, the CFO of Signal, have an

5    office in that building in 2006, 2007 and 2008?

6    **A.**    Yes, sir.

7    **Q.**    And did Ron Schnoor, the senior vice-president and

8    general manager of Signal's Mississippi operations, have an

9    office in that building in 2006, 2007, and 2008?

10   **A.**    Yes, sir, he did.

11   **Q.**    And do you see the man camp on this image?

12   **A.**    Yes, sir, I do.

13   **Q.**    Would you draw a circle round it, please.

14   **A.**    (Complies.)

15        MR. RABBANI:  Please let the record reflect that

16   the witness has circled the cluster of white-roofed buildings

17   to the right of Signal's administrative offices.

18   **MR. RABBANI:  (CONTINUING)**

19   **Q.**    You stated earlier that that Greenwood Island was

20   part of a closure plan.  Can you discuss what exactly that

21   means?

22   **A.**    Yes, sir.  Basically what you do is you grid off

23   the section of what you want to close, quote, unquote.  And

24   so you independently have different factions within that

25   whole facility.

**OFFICIAL TRANSCRIPT**

1          Then you basically take a big backhoe and each

2     grid, you mix what equates to cement to solidify all that

3     material into one area.

4          And then you take core samples out of each grid to,

:42:11   5     you know, understand where the stuff falls within the

6     regulatory limits so that eventually it's below all of the

7     regulatory limits and you can cap it and close it.

8          Q.    When you say you cap it, what does that mean?

9          A.    Traditionally what they do with those things is

:42:29   10    they put clay caps on the top.  You know, we, living down

11    here, there is a lot of water.

12         And it's basically what they do is put a protective

13    layor over it, an umbrella per se, so that the water sheds

14    off to the side rather than over time it penetrates it.

:42:46   15         Their whole purpose for that is -- the purpose on

16    that is to reduce any water so that the material stays solid.

17         Q.    Was the closure plan approved by any local or

18    federal agency?

19         A.    Yes, sir.  Mississippi Department of Environmental

:43:02   20    Quality had to approve that.

21         Q.    And that's MDEQ for short?

22         A.    Yes, sir.

23         Q.    Could you draw a circle around, with your finger,

24    Greenwood Island that was part of the closure plan.

:43:17   25         A.    Yes, sir.  (Complies.)


OFFICIAL TRANSCRIPT

```
 1            MR. RABBANI:  Let the record reflect that the
 2   witness has circled the majority of the image, including
 3   Signal's -- which includes Signal's administrative office, as
 4   well as the man camp as part of Greenwood Island closure
 5   plan.
 6   MR. RABBANI:  (CONTINUING)
 7      Q.   The clay cap you were just talking about, was that
 8   used to protect people or animals from the mixture below?
 9      A.   Actually, it's mainly put there to -- for water
10   shed.  That's the purpose in the closure plan, yes.
11      Q.   And water shed, does that mean it prevents, you
12   know, runoff from going --
13      A.   Yes.  When it rains, it moves away from the island
14   itself.  Like I said, an umbrella is the best way to explain
15   that.
16      Q.   And when was the Greenwood Island closure?
17      A.   1997, '98.
18      Q.   And when was the man camp built?
19      A.   2006, latter part of 2006.
20      Q.   So after 1997, did Greenwood Island pose any danger
21   to people at all?
22      A.   No, sir, not according to the MDEQ.
23      Q.   Let's talk a little bit about the decision-making
24   on Greenwood Island.
25            Who owns it?
```

:43:48

:44:07

:44:26

:44:39

:44:59

**OFFICIAL TRANSCRIPT**

A.   Port of Pascagoula.

Q.   And so how is Signal even on the property?

A.   We lease that property from the port for the shipyard operations.

Q.   And did Signal notify the port before it built the man camp?

A.   Yes, sir, we did.

Q.   And did Signal inform the MDEQ that it was building a man camp on Greenwood Island before it began construction?

A.   No, sir, we didn't.

Q.   Why not?

A.   We had had discussions with the Port of Pascagoula, their engineer and their -- their head guy.  And part of the closure plan says that if you conduct shipyard operations consistent with running a shipyard, you didn't have to notify the agency.

Q.   So how was building a man camp consistent with the shipyard?

A.   Well, it was post-Katrina.  A lot of the houses were gone, including mine.  And we needed employees.  We kind of believed that you don't have a shipyard unless you have employees.  So the shipyard -- employees actually run the shipyard.

So it was surely consistent with shipyard operations.

**OFFICIAL TRANSCRIPT**

1    **Q.**    And did Signal ever end up reaching out to the MDEQ

2    regarding the construction of the man camp?

3    **A.**    Yes, sir, we did.

4    **Q.**    And when was that?

5    **A.**    November -- if I can remember correctly, November

6    of 2006.

7    **Q.**    And why did you end up reaching out?

8    **A.**    Subsequent discussions with the port.  The port

9    felt like, you know, we should err on the side of caution,

10   and we agreed.  And so then we notified the MDEQ through the

11   port.

12   **Q.**    And how did you communicate -- I'm sorry, you just

13   said that.

14         I would like to show you Exhibit 482, please.

15   **A.**    Can I put on my glasses?

16   **Q.**    Yes.

17   **A.**    I said I was old.

18   **Q.**    Do you recognize this document?

19   **A.**    Yes, sir, I do.

20   **Q.**    What is it?

21   **A.**    It's the original letter that I wrote to the MDEQ

22   with regards to a notification of the building of the

23   man camp.

24         And I describe in that -- you know, our reasoning.

25   And, you know, the Katrina situation with lack of housing

**OFFICIAL TRANSCRIPT**

1    facilities, that we really needed this to put the folks in to

2    run the shipyard.

3            MR. RABBANI:  Can you bring up the second full

4    paragraph, please.

:48:00    5            THE COURT:  Mr. Rabbani, remember to speak up,

6    please.

7            MR. RABBANI:  I'm sorry.

8            THE COURT:  If I'm having trouble hearing you, so

9    is the jury.

:48:06   10            MR. RABBANI:  I'll try and lean over the mic.  I'm

11   sorry.

12   **MR. RABBANI:  (CONTINUING)**

13       **Q.**   Would you mind reading that for the jury?

14       **A.**   Yes, sir.

:48:13   15           (As read:)  As recognized on August 29, 2005,

16   Hurricane Katrina struck the Mississippi Gulf Coast

17   destroying approximately 70,000 homes.  This impact created a

18   critical shortage of laborers at Signal, as well as other

19   regional employers, since workers were displaced by the loss

:48:33   20   of their homes and apartments.

21       **Q.**   Thank you.

22           Did Signal submit any drawings to the MDEQ?

23       **A.**   Yes, sir, we did.

24       **Q.**   Were any of those drawings rejected?

:48:47   25       **A.**   Yes, sir, it was.


                         **OFFICIAL TRANSCRIPT**

1    **Q.**    Do you know why?

2    **A.**    Yes, sir.  The first drawing, our engineering

3    department drew it up on their own kind of, and they didn't

4    know actually the construction of the cap and those kind of

5    things.

6            So our first drawing actually did not show the cap.

7    And obviously the MDEQ knew it had a cap, so they rejected

8    that drawing.

9            MR. RABBANI:  Can we go to Exhibit 1147, Page 14 of

10   36, please.

11   **MR. RABBANI:  (CONTINUING)**

12   **Q.**    Do you recognize this?

13   **A.**    Yes, sir.

14   **Q.**    Is that the incorrect drawing you were just talking

15   about?

16   **A.**    Yes, sir.  You can tell because it says both

17   contaminated earth and there's no stratus or the section of

18   the cap included in that.

19   **Q.**    And did Signal ever submit a corrected drawing?

20   **A.**    Yes, sir, we did.

21           MR. RABBANI:  Can we do a split screen, please,

22   with 503.

23   **MR. RABBANI:  (CONTINUING)**

24   **Q.**    And do you recognize this document?

25   **A.**    Yes, sir, I do.

**OFFICIAL TRANSCRIPT**

:49:04

:49:19

:49:35

:49:51

:50:08

1    Q.   What is it?

2    A.   That is the corrected drawing that was submitted to

3    the DEQ.

4    Q.   Can you explain to the jury the distinctions on

:50:17   5    these drawings that make the second one, Exhibit 5034, the

6    corrected drawing?

7    A.   Yes, sir.  It indicates the clay cap area.  It also

8    indicates the sea level area, 17-feet above sea level.  And

9    it also indicates the fill material that was added.

:50:44   10   Q.   All right.  Let me ask you this:  Even though

11   Signal initially submitted an incorrect drawing, did Signal

12   ever breach the clay cap?

13   A.   No, sir.

14   Q.   How do you know that?

:50:56   15   A.   Well, as I mentioned, during the construction of

16   the closure of it, it's concrete underneath the clay cap.

17        And to the best of my knowledge, we never hit any

18   concrete because the guys would have told me, hey, we're

19   hitting concrete, we can't go any lower.

:51:16   20   Q.   And would there be a noticeable change in

21   consistency if they hit concrete?

22   A.   Oh, absolutely.

23   Q.   Can you explain that for us?

24   A.   Well, if you even hit the clay, it is gooey, mucky,

:51:30   25   greasy kind of stuff.  And I mean, concrete is -- I don't

**OFFICIAL TRANSCRIPT**

1    mean to be smart, but concrete.

2        Q.   Thank you.

3            And after Signal submitted this corrected drawing,

4    did the MDEQ approve the building of the man camp?

:51:49    5        A.   Yes, sir, it did.

6        Q.   And did you receive correspondence from the MDEQ

7    notifying you of the approval?

8        A.   Yes, sir.  I received it via the Port of

9    Pascagoula.

:52:00    10           MR. RABBANI:  Can we see 1147, Page 33 of 36.

11           Could we blow it up a little bit, please.

12   **MR. RABBANI:  (CONTINUING)**

13       Q.   Do you recognize this document?

14       A.   Yes, sir.

:52:24    15       Q.   What is it?

16       A.   It is the letter from the MDEQ to the Jackson

17   County Port Authority giving us the approval about the site.

18           MR. RABBANI:  Can we bring out the second-to-last

19   sentence in the second full paragraph, please.  Starting with

:52:48    20   "this changed."

21   **MR. RABBANI:  (CONTINUING)**

22       Q.   Would you mind reading that?

23       A.   Yes, sir.

24           (As read:)  This changed terminal depth is above

:52:59    25   the minimum 17 feet above mean sea level requirement.

**OFFICIAL TRANSCRIPT**

1    Therefore, the proposal is hereby approved.  To review, the

2    existing cap cannot be breached or disturbed in any way

3    during the excavation activities.

4         Q.   Thank you.

5              And did Signal ever invite the MDEQ to come out and

6    inspect the man camp?

7         A.   Yes, sir, we did.

8         Q.   I would like to show you Exhibit 405.

9              Do you recognize this document?

10        A.   Yes, sir.

11             MR. RABBANI:  Could we bring out the last sentence

12   in the third paragraph.

13   MR. RABBANI:  (CONTINUING)

14        Q.   Would you mind reading that for the jury.

15        A.   Yes, sir.

16             (As read:)  This was the basis of our request for

17   agency approval.  Though we cannot provide the MDEQ with a

18   ten-day notice prior to construction, we would welcome the

19   agency -- welcome an agency review of the complex at any time

20   that would be convenient.

21        Q.   And did the MDEQ ever take Signal up on its offer

22   to come out and inspect the man camp?

23        A.   No, sir.

24        Q.   And did the MDEQ need an invitation from Signal?

25        A.   No, sir.  The regulatory agencies can come as they

:53:20

:53:37

:53:56

:54:13

:54:26

OFFICIAL TRANSCRIPT

1    wish.

2         Q.    And when Signal first reached out to the MDEQ, did

3    it make any sort of estimate with regards to the time that

4    the man camp would be utilized?

:54:40    5         A.    Yes, sir, we did.

6         Q.    What was that estimate?

7         A.    Eighteen months.

8         Q.    And did that estimate turn out to be correct?

9         A.    No, sir, it didn't.

:54:47   10         Q.    How do you know that?

11         A.    Well, the camp is still there.

12         Q.    And do you have any reason to believe that the MDEQ

13    would have treated Signal's proposal differently if you gave

14    an estimate of 18 months or an estimate of 36 months?

:55:09   15         A.    No, sir, I don't.

16         Q.    Has the MDEQ ever required Signal to take down the

17    housing facility?

18         A.    No, sir, it didn't.

19         Q.    I would like to show you Exhibit 1190, please.

:55:23   20               Do you recognize this image?

21         A.    Yes, sir.

22         Q.    What is it?

23         A.    It is the housing facility.

24         Q.    And is that facility currently being used?

:55:36   25         A.    Yes, sir.  Occasionally, yes, sir.


                         **OFFICIAL TRANSCRIPT**

Q.   What for?

A.   Our customers -- we work on oil rigs, so our customers house their employees within that facility onsite when we're working on the rig in lieu of having to send them off to hotels and those kind of things.

They can set up, you know, eating facilities and bed facilities and all of that there.  And then they're directly adjacent to the oil rig that they normally live on.

Q.   Does Signal require its customers to use this housing?

A.   No, sir.

Q.   And does Signal still run a day and a night shift?

A.   Yes, sir, we do.

Q.   And to your knowledge, have any of Signal's customers ever complained that they couldn't sleep because of the noise of the operations at night?

A.   No, sir, they didn't -- haven't.

Q.   Let's talk a little bit about the interior of the housing facility.

As the director for Environmental, Health & Safety, do you make OSHA determinations?

A.   Yes, sir, I do.

Q.   And are you ever consulted about the applicability of an OSHA regulation to an operation at Signal?

A.   Yes, sir, that's my job.

OFFICIAL TRANSCRIPT

1    **Q.**    And once you make a determination regarding OSHA,

2    does anybody outrank you?

3    **A.**    No, sir.

4    **Q.**    And were you approached concerning the

5    applicability of OSHA to this man camp?

6    **A.**    Yes, sir, I was.

7    **Q.**    Who asked you to make that determination?

8    **A.**    Senior management, basically.

9    **Q.**    When were you asked to make the determination?

10    **A.**    Oh, mid-2006.

11    MR. WERNER:  Objection, Your Honor.  May we

12    approach?

13    THE COURT:  Yes.  Approach the bench.

14    **SIDEBAR ON THE RECORD**

15    MR. WERNER:  Your Honor, we were precluded from

16    providing expert testimony on the applicability of OSHA, and

17    this witness is testifying as to his opinion regarding the

18    applicability of OSHA.  And we feel like this is improper

19    opinion testimony.

20    MR. RABBANI:  Rule 701 allows lay witness opinion.

21    If his job is to look at OSHA regulations --

22    THE COURT:  Remind me about the ruling on the

23    motion *in limine*.  Who was your witness?

24    MR. WERNER:  I'm blanking on his name.  I

25    apologize.  Stopher --

**OFFICIAL TRANSCRIPT**

```
1          MR. RABBANI:  Stopher wasn't ours.  We had
2     Ron Signorino.
3          THE COURT:  Both of them worked for you.
4          MR. RABBANI:  I believe Your Honor ruled that the
5     applicability of OSHA was a question of law.
6          MR. WERNER:  Payne was the expert who was with us.
7          MR. RABBANI:  Your Honor, Mr. Killeen isn't
8     offering opinion, he is offering lay witness opinion.
9          THE COURT:  On the same topic, right?
10          MR. RABBANI:  It was part of his --
11          THE COURT:  It was the topic that was the problem.
12          Let me look at it.  It is Document 2132.  Both are
13     inadmissible.
14          First, both experts offer legal conclusions.
15     Whether OSHA applies in a particular case is a legal
16     conclusion within the exclusive province of the court.
17          Second, the opinions will not help the trier of
18     fact understand the evidence or determine a fact in issue.
19     Signal's alleged violation of OSHA has no bearing on the
20     remaining claims or defenses in this case.
21          All right.  So I have already said that experts
22     can't testify about the applicability of OSHA, and the
23     reasons for that applies the same to whether somebody is an
24     expert or a layperson.
25          If I said it is a legal conclusion, it is not
```

:58:39

:59:03

:59:37

:59:53

:00:14

**OFFICIAL TRANSCRIPT**

1    relevant, and then he shouldn't be able to testify about it

2    either.

3            So the objection is sustained.

4            MR. RABBANI:  Yes, Your Honor.

:00:23    5                    **AFTER THE SIDEBAR IN OPEN COURT**

6    **MR. RABBANI:   (CONTINUING)**

7        **Q.**    Mr. Killeen, to your knowledge, did the man camp

8    ever receive a certificate of occupancy?

9        **A.**    Yes, sir, it did.

:00:56   10        **Q.**    Certificate of occupancy, did the man camp ever

11   receive a certificate of occupancy?

12       **A.**    Yes, sir, it did.

13       **Q.**    I would like to show you Exhibit 60.

14            Do you recognize this document?

:01:12   15       **A.**    Yes, sir, I do.

16       **Q.**    What is it?

17       **A.**    It's the certificate of occupancy for the facility.

18       **Q.**    And what entity issued this certificate?

19       **A.**    The City of Pascagoula.

:01:29   20       **Q.**    Let's talk a little bit about the health of

21   Signal's workers.

22            As the director of Environmental, Health & Safety,

23   do you keep track of injuries at Signal?

24       **A.**    Absolutely, sir.

:01:51   25       **Q.**    And how do you keep track of those things?

**OFFICIAL TRANSCRIPT**

1      **A.**    Well, we're required by OSHA law.  And we have a

2  weekly report that goes out to all the principals on any

3  environmental health or safety event.  And I'm in that loop.

4      **Q.**    Are injuries classified by severity at Signal?

5      **A.**    Yes, sir, they are.

6      **Q.**    How are they classified specifically?

7      **A.**    Specifically as a non-OSHA recordable, which means

8  a much less severe type thing.

9          And OSHA has specific rules, specific guidelines on

10  what is a recordable incident and a non-recordable incident.

11  So we -- that's the way we classify them underneath OSHA

12  guidelines.

13      **Q.**    Can you give us an example of what a non-recordable

14  injury would be?

15      **A.**    Yes, sir.  It could be a scratch.  Or if someone

16  got a bump on their wrist and they went and got an x-ray, and

17  if the x-ray comes back negative, it is a diagnostic event,

18  and if no prescriptions are given it's a non-recordable.

19      **Q.**    Can you give us an example of an actual recordable

20  injury?

21      **A.**    Yes, sir.

22          Using that same example, if it comes back negative,

23  but even if the emergency room or the attending physician

24  writes the prescription -- it doesn't have to be filled, but

25  if he writes a prescription for that, it's a recordable

:02:19

:02:33

:02:46

:03:12

:03:28

1    incident.  Even though it was the same result as the

2    previous, the prescription designation makes it OSHA

3    recordable by OSHA rules.

4         Q.    Okay.  So if someone sustains a minor injury, a

5    non-recordable injury at Signal, where do they go?

6         A.    Our first aid medical station.

7         Q.    What types of services are provided at the first

8    aid station?

9         A.    Per OSHA regulations, we can't do anything beyond

10   first aid.  There is a list of that, that protocol that we

11   have to follow.

12        Q.    So can an employee go there and get a Band-Aid

13   or --

14        A.    Band-Aid, eyes washed out, blood pressure taken,

15   aspirins, things like that.

16        Q.    Someone has a cough, would they go into the first

17   aid station maybe?

18        A.    Yes, sir.  They do it all the time.

19        Q.    Did Signal operate its first aid station during the

20   H-2B program?

21        A.    Yes, sir, we did.

22        Q.    And was the first aid station made available to the

23   H-2B workers?

24        A.    Yes, sir.  It's available to everyone.

25        Q.    And who manned Signal's first aid station?

                    **OFFICIAL TRANSCRIPT**

1      **A.**   I'm sorry?

2      **Q.**   Who manned the first aid station?

3      **A.**   Guys that work in my group, in the Environmental,

4    Health & Safety group.  Specifically, fellows named

:04:52   5    David Melton, Greg Bishop, and Tim Honeycutt were the three

6    guys that took care of that in our group.

7      **Q.**   And what qualified those men to man the station?

8      **A.**   Well, I aspire to the theory that you surround

9    yourself with people smarter than you.  And so we hired --

:05:10   10   these guys are all ex-military triage.  They call them IDMT.

11   That's independent duty medical technicians.

12        I believe that that was the best way for us to go,

13   because it's usually in a trauma thing that we have to deal

14   with in the event of an injury.

:05:27   15        So those three guys had a minimum of 20 years

16   military experience before they came to work for us.

17     **Q.**   In preparation for your testimony, did you have the

18   opportunity to review the man-hours worked at Signal and the

19   OSHA recordables that occurred in 2006, 2007, and 2008?

:05:50   20     **A.**   Yes, sir, I did.

21     **Q.**   Do you recall how many man-hours were worked in

22   Signal's Mississippi yard in 2006?

23     **A.**   Yes, sir.  It is 3.5 million.

24     **Q.**   You said 3.5 million, right?

:06:41   25     **A.**   Yes, sir, that's correct.


**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| :07:08 | |
| :07:27 | |
| :08:00 | |
| :08:17 | |
| :08:45 | |

1    **Q.**   And how many man-hours were worked in 2007?

2    **A.**   5.2 million and change.

3    **Q.**   How about in 2008?

4    **A.**   5.2 million and change again.

5    **Q.**   Is that a lot of man-hours?

6    **A.**   It was for us, yes, sir.

7    **Q.**   How about the OSHA recordables in 2006?

8    **A.**   Eleven.

9    **Q.**   Is that 11, you said?

10   **A.**   Eleven, yes, sir.

11   **Q.**   How about in 2007?

12   **A.**   Thirteen.

13         MR. WERNER:  Objection, Your Honor.  He is

14   testifying as to OSHA recordables and this indicates

15   injuries.

16         MR. RABBANI:  I will change the wording.

17   **MR. RABBANI:  (CONTINUING)**

18   **Q.**   And in 2008, how many OSHA recordables were there?

19   **A.**   Ten.

20   **Q.**   In 2006, how many of these 11 recordable injuries

21   involved an Indian H-2B worker?

22   **A.**   One.

23   **Q.**   How about in 2007?

24   **A.**   One.

25   **Q.**   One.

**OFFICIAL TRANSCRIPT**

1          How about in 2008?

2     A.   One.

3     Q.   Does Signal take safety seriously?

4     A.   Absolutely.

:09:07    5     Q.   Is that concept reflected by these numbers?

6     A.   Yes, sir, it is.

7     Q.   Does Signal have a motto?

8     A.   Yes, sir, we do.

9     Q.   What is it?

:09:26    10    A.   Actions speak louder than words.

11    Q.   What does that mean?

12    A.   Well, I came up with it, but it's for everything.

13   For management, for administrative people, for employees,

14   quality, coming to work on time, doing the best job that you

:09:46    15   can.  You know, the whole gambit of performance as it related

16   to our jobs.

17    Q.   Is Signal a safe place to work, Mr. Killeen?

18    A.   Absolutely.

19    Q.   Does Signal have a reputation in the industry in

:10:03    20   terms of its safety?

21    A.   Yes, sir, we do.

22    Q.   What is it?

23    A.   Well, they say it ain't bragging if it's true.

24         That we're the best marine operation in the

:10:14    25   country.

**OFFICIAL TRANSCRIPT**

1    **Q.**   In terms of safety?

2    **A.**   In terms of safety, yes, sir.

3    **Q.**   Let's talk about your involvement in Signal's

4    operations.

:10:26    5         As the director of Environmental, Health & Safety,

6    what steps do you take to prevent potential risks?

7    **A.**   We've developed a program and protocol that we go

8    through.  We risk-assess every job.

9         And what I mean by that is we understand the risks

:10:46   10    associated with the task.  It is graded on a scale of

11    severity.

12        And in that, our department issues a permit to work

13    in that.  And no operator, whether it's a janitor, the truck

14    driver, the electrician, or anyone else can perform a task at

:11:09   15    the facility unless our department issues the permit to work,

16    which in turn demonstrates that the task has been properly

17    risk-assessed.

18    **Q.**   And do the employees have any role at all in the

19    safety of Signal?

:11:25   20    **A.**   Oh, absolutely.  Yes, sir.

21    **Q.**   How so?

22    **A.**   Well, we dialog in that risk assessment.  They give

23    us what they want to do and we dialog with the employees.

24        So they tell us how they are going to do it so we

:11:41   25    understand the risks that are going to be associated with

**OFFICIAL TRANSCRIPT**

1    what they are going to do.

2        Q.   Are employees permitted to stop work if they see an

3    unsafe condition?

4        A.   Oh, absolutely.  Yes, sir.

:11:55   5        Q.   How are they given that authorization?

6        A.   Well, at new employee orientation, we go through a

7    whole gambit of things, but one of the things we wanted the

8    guys to do -- or employees to do is understand that they had

9    the authorization.  So I came up with a safety license.  It

:12:18   10   is stop work authority.

11       Q.   How big is the safety license?

12       A.   Do you want to see it?  I've got one.  I'm the

13   director of safety, so I keep it in my pocket.

14            MR. RABBANI:  Your Honor, may I approach the

:12:34   15   witness and display the safety license for the jury?

16            THE COURT:  Is this something that was identified

17   as an exhibit?

18            MR. RABBANI:  I don't believe so.

19            THE COURT:  Or demonstrative?

:12:41   20            MR. RABBANI:  I don't believe so.

21            THE COURT:  So you can't show it.

22            THE WITNESS:  Okay.  But that safety --

23            THE COURT:  Keep it private.

24            THE WITNESS:  Yes, ma'am.

:12:52   25            That safety license, it is signed by the senior

OFFICIAL TRANSCRIPT

1    official in that area, which would be, in this case,

2    Mr. Ron Schnoor.  He was the senior vice-president.

3            And it demonstrates -- you know, it's got some

4    verbiage that says, you know, you are authorized to stop any

5    work that you believe is unsafe or it can be harmful with no

6    repercussions taken against you.

7            And Mr. Schnoor authorizes it and he puts his phone

8    number and he signs it.

9    **MR. RABBANI:   (CONTINUING)**

10       Q.   All right.  And it's something that I think you

11   said can just go in your wallet?

12       A.   Yes, sir.

13       Q.   And you said that every employee gets one at

14   orientation?

15       A.   Yes, sir.  Every employee.

16       Q.   And does Signal require its production employees to

17   wear personal protective gear?

18       A.   Yes, sir, we do.

19       Q.   How did the employees get this gear?

20       A.   Once again, new employee orientation.  We

21   understand, you know, if you are a welder or fitter or

22   whatever your job task is going to be, and we issue all of

23   the personal protection equipment to them.

24       Q.   Does Signal charge the workers for their protective

25   gear?

:13:08 (line 5)
:13:21 (line 10)
:13:30 (line 15)
:13:42 (line 20)
:14:03 (line 25)

**OFFICIAL TRANSCRIPT**

1    A.   No, sir, we don't.

2    Q.   And did Signal provide personal protective gear to

3    the Indian H-2B employees?

4    A.   Yes, sir, we did.

5    Q.   Do you know the specific items that were provided?

6    A.   Yes, sir, I do.

7    Q.   Can you tell them to us, please?

8    A.   Hard hats.  Safety glasses.  Ear plugs.  Gloves.

9    Protective sleeves if necessary.  Again, it just depended

10   upon the task.

11       Respirators, that -- we all go through a respirator

12   fit test, so as protocol we follow in that.  That's done in

13   new employee orientation also to make sure you got a seal.

14   Beards aren't allowed for those guys that wear the

15   respirators.

16       And in the H-2B visa workers, we also issued

17   steel-toed boots because we knew they were coming over and

18   needed it.  And they didn't have nowhere to get them, so the

19   company --

20   Q.   So does Signal normally issue steel-toed boots to

21   its employees?

22   A.   No, sir, we don't.

23   Q.   Just for clarification, did Signal charge the

24   workers for their boots, the H-2B workers for their boots?

25   A.   No, sir, they didn't.

**OFFICIAL TRANSCRIPT**

1      **Q.**    And you mentioned the respirator a moment ago.

2             Does anyone need permission to use a respirator if

3      they determine that they think they need one?

4      **A.**    No, sir.

5      **Q.**    I just have a couple more questions.

6             The plaintiffs in this case claim they were unable

7      to sleep properly because of the noise that they could hear

8      in the man camp.

9             If someone was tired at work, would that be a

10     safety issue?

11     **A.**    Oh, absolutely.

12     **Q.**    How so?

13     **A.**    Well, with all of us, it would be loss of focus,

14     cognitive skills.  You know, function.  It may be even

15     blurred vision.  Just being tired, you're just not going to

16     focus and you're not going to react like you should in all

17     operations.

18     **Q.**    In your experience, would a workforce experiencing

19     sleep deprivation increase OSHA recordables?

20     **A.**    Yes, sir, absolutely.

21     **Q.**    How many OSHA recordables were there again in 2006,

22     2007, and 2008?

23     **A.**    A total of 34 with just about 14 million man-hours

24     worked over that time span.

25     **Q.**    And how many of the five plaintiffs in this lawsuit

**OFFICIAL TRANSCRIPT**

1    were hurt on the job during those years?

2         **A.**    To my knowledge, none, sir.

3              MR. RABBANI:  No further questions.  Thank you.

4              THE COURT:  All right.  We're going to take --

:16:45    5    we're going to break for the day and we'll continue

6    Mr. Killeen's testimony tomorrow.

7              I want to remind you all of the instructions that I

8    have given you throughout the trial.

9              You are not to discuss the case with anyone,

:17:00    10    including your fellow jurors, members of your family, people

11    involved in the trial, or anyone else.

12             If anyone approaches you and tries to talk about

13    the case, do not tell your fellow jurors, but advise me about

14    it immediately.

:17:13    15             You must not communicate with or provide any

16    information to anyone by any means about this case.

17             You may not discuss the case, even among

18    yourselves, until it's concluded and you are instructed to

19    begin your deliberations.

:17:28    20             Please remember you are not to reach any

21    conclusions in the case until all of the evidence has been

22    presented, the Court has instructed you on the law applicable

23    to the case, and it's given to you for deliberation and

24    decision.

:17:41    25             And of course, remember not to use any electronic

**OFFICIAL TRANSCRIPT**

1    devices to communicate any information about the case or to

2    attempt to find any information about the case.

3              So I'll see y'all in the morning at 8:30.

4                        (Jury out at 5:17 p.m.)

:18:15    5         THE COURT:  All right.

6              Mr. Killeen, you can leave the stand.  I need to

7    speak to the lawyers at this point.

8              I guess first, maybe you could give us a report if

9    you know anything about Erin's status.

:18:34   10         MR. RYDBERG:  Just all I know is that she has been

11    admitted to Touro Hospital, and I don't know any further word

12    on her condition.

13              We haven't talked to the client.  We haven't -- I

14    haven't talked to the client.  We haven't really conferred

:18:50   15    with co-counsel.

16              You know, at this point, it's difficult for me to

17    envision a scenario where would not be in a position

18    requesting to take tomorrow off, requesting that the Court

19    recess the trial to give us time to regroup.

:19:03   20         THE COURT:  I guess the only issue would be whether

21    we should -- well, let me preface this with saying I'm trying

22    to think of the clients who have put a great deal of time and

23    money into this trial, and our goal is to get it to the jury

24    and for them to be deliberating in that week before

:19:28   25    Mardi Gras.  And so we've got, you know, some time

                         **OFFICIAL TRANSCRIPT**

1    constraints.

2            MR. RYDBERG:  Right.

3            THE COURT:  And the way that I planned the trial

4    out was using every day to the fullest with the jury.

5            And so I'm sympathetic to you, but I don't want to

6    do something that in the long run is harmful to you or to

7    your client.

8            So I guess that's why I want you to think about it

9    and let me know later tonight whether you want to take

10   tomorrow off.

11           If you do, I'm going to do that.  And we'll call

12   the jury and let them know not to come in.

13           But think about whether there are depositions that

14   are ready to go that someone who is not critical to your

15   process of regrouping could come and handle, you know.  Or

16   whether Mr. Rabbani could come and we could finish the cross

17   of this witness and then do some depositions that are already

18   in the can.

19           But, I know y'all need to think about that and then

20   let us know.

21           Now, one thing I thought about was if the -- if

22   Signal decides -- is in the process and eventually decides

23   that it doesn't -- won't call some of the witnesses that it

24   listed, there may be some of those witnesses who the

25   plaintiff -- we had agreed with the plaintiff that they would

**OFFICIAL TRANSCRIPT**

1   be called in Signal's case, but that the plaintiff would be

2   able to examine.

3           Maybe that is not going to be a problem because the

4   people you would take off your list wouldn't be those people,

5   you know.  That's probably likely.

6           But that's something that we need to think about.

7   If you are going to take some witnesses off, we need to check

8   with the plaintiffs, see what their intentions were, and

9   figure out how to deal with that.

10          MR. RYDBERG:  I understand.

11          THE COURT:  And anything else that we need -- that

12  would be helpful for us to talk about while we're here

13  together.

14          Maybe Mr. Ungar can tell us about depositions.

15          MR. UNGAR:  Depositions, as I told the Court, we

16  are ready to read five of them.  I'll give the last name now.

17          Sager, S-a-g-e-r.

18          Kelleher, K-e-l-l-e-h-e-r.

19          Caffrey, Caffrey.

20          Tipton, T-i-p-t-o-n.

21          And just recently, objections to Wilks, W-i-l-k-s,

22  were withdrawn, resolved.

23          Mr. Cerniglia has withdrawn a lot of his

24  designations in that deposition and so we can parse that down

25  and edit it down.

**OFFICIAL TRANSCRIPT**

1          I think what's going to -- the reality of the

2     depositions are that they are all very short.  And so maybe

3     Mr. Wilks would be the longest of the ones that I talked to

4     you, and maybe that will take 20 to 30 minutes to read.

:22:40    5          And so those are the five.  It's my understanding

6     now they are ready and can be read.  I have four of them

7     here.  I'm waiting for the copies for the fifth one.

8          And that there are nine depositions at the moment

9     remaining that have not been finalized by the parties.

:22:55   10          And then also there are a couple of designations

11    that are awaiting Your Honor's ruling.  Specifically

12    Mr. Arava --

13          THE COURT:  I can't do that until later.

14          MR. UNGAR:  Right.

:23:08   15          THE COURT:  Who is the other one?

16          MR. UNGAR:  Well, the other one happened today

17    while we were in the Court, which is Mr. Saket Soni.  And so

18    you ruled on those designations today.

19          So there are only like two remaining.  So if those

:23:17   20    are read, it will be maybe like a minute.

21          So that's where we are.  Mr. Bhatnagar can correct

22    me if I'm wrong.

23          MR. BHATNAGAR:  Yes, I would just add to that that

24    with Your Honor's ruling on Saket Soni's deposition, that is

:23:30   25    a sixth that would be ready to go presumably.


**OFFICIAL TRANSCRIPT**

```
 1              MR. UNGAR:  Oh, yeah, I'm sorry.  Absolutely,

 2       Saket Soni can be read.

 3              I think that Signal may not read it at all.

 4       Your Honor left a little bit, and it may be that what's left

 5       might not tell -- we don't know if we want to just present

 6       those two designations to the jury and we may not.

 7              THE COURT:  Were the other ones the plaintiffs'

 8       designations?

 9              MR. BHATNAGAR:  The -- there are some other

10       designations that Signal is, as I understand it, weighing

11       whether or not it would actually want to submit those

12       designations in its case.  And so presumably we'll have some

13       more information later tonight after we talk about that.

14              MR. UNGAR:  Are you talking about Saket Soni?

15              MR. BHATNAGAR:  No, I'm talking about others --

16              THE COURT:  Saket Soni, if Signal said it only had

17       a couple --

18              MR. BHATNAGAR:  Yeah, we don't have any for

19       Saket Soni.  I'm sorry, Your Honor.  I was thinking about --

20              MR. UNGAR:  It was just ours, and Your Honor ruled

21       and took out most of them.  And so what's left is like two

22       pages.

23              And it may be that we -- we may decide not to read

24       it at all.  But if we do, then we can.  And we can do that

25       whenever it's time to do it, but it will be a minute.
```

OFFICIAL TRANSCRIPT

1    THE COURT:  What are the longer depositions that
2    are left?
3    MR. UNGAR:  Well, Mr. Pol's was read.  Mr. Sanders'
4    was played.  And then the others are not as long by a long
5    shot.
6    So we're talking about a fifth of the length of
7    Mr. Pol -- or an eighth of the length of Mr. Pol.
8    MR. BHATNAGAR:  Mannish Dewan.
9    MR. UNGAR:  Oh, I'm sorry.  I was confused about
10   Mannish Dewan.  I didn't know if that was still coming in.
11   The person that I was talking to on my end had a
12   question about Mannish Dewan, so I'm going to yield to the
13   plaintiff and then --
14   MR. SHAPIRO:  We haven't discussed how we're going
15   to do it yet, but I don't think there are any -- are there
16   any outstanding objections?
17   MR. BHATNAGAR:  Mr. Mannish Dewan was going to come
18   in, in Mr. Dewan's case.  And so we haven't yet gone through
19   the designations for Mannish Dewan, but we can shortly do so
20   expeditiously.
21   He had longer designations than some of the other
22   witnesses.
23   So just to answer the Court's questions, it could
24   be slightly longer at the present, but those designations may
25   be trimmed in the process as others have been.

**OFFICIAL TRANSCRIPT**

1    I just -- what I was trying to say earlier -- and I

2    apologize if it was confusing with the Saket Soni issue --

3    was that there are some witnesses that Signal has in their

4    case through designation.

5    And if Signal elects not to utilize those

6    witnesses, there are designations for plaintiffs that we may

7    want to use from those witnesses.

8    So just to alert the Court to that and we'll

9    obviously confer among counsel regarding that.

10    THE COURT:  All right.

11    So I guess the issue is if Signal is still thinking

12    that it's going to need to use all of its time, then that

13    means that we need to keep a more rigid trial schedule and

14    use all the time we have available.

15    And so maybe tomorrow we would want to finish

16    Mr. Killeen and do as many depositions as we can so that we

17    can use that time.

18    That's -- that's my concern about -- you know, we

19    don't want to get in the position where all of you are --

20    that we're running out of time and it's the week before

21    Mardi Gras.

22    And y'all want a long time for closings.

23    And jury instructions take a long time.

24    And we want to make sure the jury has enough time

25    to deliberate.

OFFICIAL TRANSCRIPT

```
 1              So that's -- I guess I'm thinking down the road.
 2              So if you -- I'm going to give you a cell phone
 3    number for my law clerk.
 4              And we also -- I want cell phone numbers for others
 5    to be sure we have every -- somebody from each team so we can
 6    let everybody know what the plan is tomorrow.
 7              MR. RYDBERG:  One of our tasks for tonight will be
 8    to try to figure out what witnesses we actually have left and
 9    how long we think they'll be.
10              THE COURT:  That's right.
11              MR. RYDBERG:  Okay.
12              THE COURT:  All right.  So we have contact numbers
13    for everybody, so that's good.  So we'll --
14              MR. UNGAR:  I think the parties are going to try to
15    get together tonight on those depositions and see if we can
16    work out some more of what is left.
17              THE COURT:  That's great.  Especially if they're
18    short, there shouldn't be a lot of objections.
19              MR. UNGAR:  A lot of them are short, foremen and
20    things like that.
21              THE COURT:  Okay.
22              MR. UNGAR:  We may not call them at all.
23              THE COURT:  All right.  Well, I'm very sorry about
24    the circumstances and very sympathetic, but, as I said, I
25    just want to make sure that we do the best thing for all the
```

**OFFICIAL TRANSCRIPT**

1    clients.

2                MR. RYDBERG:  Thank you, Your Honor.

3                THE COURT:  And for the jury, too.

4                All right.  Thank you.  And I'll -- we'll expect to

5    hear from you later tonight.

6                MR. UNGAR:  Thank you, Judge.

7                              (Afternoon session ended.)

8

9                              *  *  *  *

10                           **CERTIFICATE**

11

12       **I hereby certify this 28th day of January, 2015, that**

13   **the foregoing is, to the best of my ability and**

14   **understanding, a true and correct transcript of the**

15   **proceedings in the above-entitled matter.**

16

17                              */s/ Mary V. Thompson*

18                           _____

                                **Official Court Reporter**

19

20

21

22

23

24

25

                         **OFFICIAL TRANSCRIPT**

:28:12