```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3    KURIAN DAVID, et al.,                  CIVIL ACTION
               Plaintiffs
 4
      versus                                 No. 08-1220
 5

 6    SIGNAL INTERNATIONAL, LLC., et al.,    Section "E"
               Defendants
 7

 8    Related Case:

 9    EQUAL EMPLOYMENT OPPORTUNITY           CIVIL ACTION
      COMMISSION,
10             Plaintiffs

11    versus                                 No. 12-557

12
      SIGNAL INTERNATIONAL, LLC, et al.,     Section "E"
13             Defendants

14    Related Case:

15    LAKSHMANAN PONNAYAN ACHARI, et al.,    CIVIL ACTION
               Plaintiffs
16
      versus                                 No. 13-6218
17                                           (c/w 13-6219,
                                              13-6220,13-6221
18    SIGNAL INTERNATIONAL, LLC, et al.,      14-1818)
19             Defenants                     Section "E"

20    Applies to:
      David 08-1220
21

22                          DAY 19
                       February 9, 2015
23                     MORNING SESSION

24         TRANSCRIPT OF THE TRIAL PROCEEDINGS
          BEFORE THE HONORABLE SUSIE MORGAN,
25            UNITED STATES DISTRICT JUDGE,
                     AND A JURY.


                    OFFICIAL TRANSCRIPT
```

1    **APPEARANCES:**

2

3    For Plaintiffs:                    ALAN HOWARD, ESQ.
                                        HUGH D. SANDLER, ESQ.
4                                       CHIEMI D. SUZUKI, ESQ.
                                        Crowell & Moring, LLP
5                                       590 Madison Avenue
                                        New York, NY 10022
6                                       212.803.4021

7                                       DANIEL WERNER, ESQ.
                                        NAOMI TSU, ESQ.
8                                       MELIA AMAL BOUHABIB, ESQ.
                                        MEREDITH STEWART, ESQ.
9                                       Southern Poverty Law Center
                                        Immigrant Justice Project
10                                      233 Peachtree Street NE
                                        Atlanta, GA 30303
11                                      404.521.6700

12                                      CHANDRA S. BHATNAGAR, ESQ.
                                        American Civil Liberties Union
13                                      Foundation (New York/Broad)
                                        125 Broad Street, 18th Floor
14                                      New York, NY  10004

15
     For Signal Entities:              ERIN CASEY HANGARTNER
16                                      ELHAM RABBANI, ESQ,
                                        HAL UNGAR, ESQ.
17                                      BRIAN ROUX, Ph.D., ESQ.
                                        LANCY RYDBERG, ESQ.
18                                      Hangartner Rydberg & Terrell
                                        One Shell Square
19                                      701 Poydras Street
                                        Suite 310
20                                      New Orleans, LA 70139

21                                      PATRICIA BOLLMAN, ESQ.
                                        Patricia Bollman, APLC
22                                      P.O. Box 13707
                                        New Orleans, LA 70185.
23
                                        ALAN WEINBERGER, ESQ.
24                                      Weinberger Law Firm
                                        201 St. Charles Avenue
25                                      New Orleans, LA  70170

**OFFICIAL TRANSCRIPT**

```
 1    For Sachin Dewan:              STEPHEN SHAPIRO, ESQ.
                                     Law Office of Stephen Shapiro
 2                                   700 Camp Street
                                     New Orleans, LA 70130
 3

 4    For Malvern Burnett:           TIM CERNIGLIA, ESQ.
                                     Law Office of Tim Cerniglia
 5                                   1521 St. Charles Avenue
                                     New Orleans, LA 70130
 6

 7

 8

 9

10    REPORTED BY:

11    MARY V. THOMPSON, RMR, FCRR
      Official Court Reporter
      HB 273
12    500 Poydras Street
      New Orleans, Louisiana 70130
13    (504)589-7783
      mary_v_thompson@laed.uscourts.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

**OFFICIAL TRANSCRIPT**

1                          EXAMINATION INDEX

2                                                    <u>PAGE NO.</u>

3

4     **MALVERN BURNETT**

5          Cross-Examination (Continued) by Mr. Howard..   4461
           Cross-Examination by Ms. Bollman.............   4499
6          Redirect Examination by Mr. Cerniglia........   4529

7

8     **SACHIN DEWAN**

9          Direct Examination by Mr. Shapiro............   4565

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          **OFFICIAL TRANSCRIPT**

```
1                     P R O C E E D I N G S
2                         (Call to order of the court.)
3            THE COURT:   All right.  Good morning, everybody.
4    Have a seat.
5            Are we still missing one?
6            THE CASE MANAGER:   Two.
7            THE COURT:   We're missing two jurors, so I thought
8    I would come in and visit with you about some other things
9    while we're waiting for them.
10           Let me get organized.
11           I asked for someone to give me the chart of the
12   objections on the underlying exhibits to Mr. Shapiro's
13   summary.
14           I think it was Rule 1104.  Maybe it was -- what is
15   the rule number?  Let me see.  I looked at it, but now I've
16   forgotten what the number is.
17           But -- you know, the underlying exhibits have to be
18   admissible for you to use the summary.  And they also have to
19   be voluminous and complicated so that it makes it easier for
20   the jury to understand it by a summary rather than by just
21   looking at the documents.
22           So I need to know the exhibit numbers for the
23   documents and what objections there were to those documents,
24   because I'm assuming that y'all have not resolved that issue;
25   is that correct.
```

08:01:59
08:02:09
08:02:37
08:02:58
08:03:14

**OFFICIAL TRANSCRIPT**

```
 1              MR. WERNER:  That is correct.
 2              THE COURT:  All right.  So, Mr. Werner, are you
 3     going to send me the chart with the exhibits and objections?
 4              MR. WERNER:  Yes, Your Honor.  I'll send that to
 5     Philip.
 6              THE COURT:  The sooner the better so I can look at
 7     that.
 8              MR. SHAPIRO:  Your Honor, I decided not to pursue
 9     that exhibit.
10              THE COURT:  So you're not going to use the summary
11     exhibit?
12              MR. SHAPIRO:  No, decided not to.
13              THE COURT:  All right.  So are you going to try to
14     use the underlying exhibits?
15              MR. SHAPIRO:  I might try to use one or two, which
16     I don't believe there have been any objections to.
17              THE COURT:  Well, can you tell us -- we need the
18     number so that I can -- so we can resolve it before your
19     witness goes on the stand.
20              MR. SHAPIRO:  Okay.  Are there any objections to
21     those?
22              MR. WERNER:  There are, absolutely.  And on the
23     bench book exhibits, they were listed as objected to and for
24     a number of reasons.
25              THE COURT:  All right.  We need to know the numbers
```

08:03:26 (line 5)
08:03:33 (line 10)
08:03:41 (line 15)
08:03:54 (line 20)
08:04:08 (line 25)

OFFICIAL TRANSCRIPT

1   of the exhibits that you want to use.

2           MR. SHAPIRO:  I'm not pursuing that.

3           THE COURT:  So you won't use any of those exhibits?

4           MR. SHAPIRO:  No.

5           THE COURT:  All right.  So that is resolved.

6           MR. SHAPIRO:  Thank you.

7           THE COURT:  Friday we had some issue with respect

8   to the exhibits that Mr. Cerniglia used during --

9           MR. CERNIGLIA:  Kathy Moser's.

10          THE COURT:  -- Kathy Moser's examination.

11          That objection has been withdrawn, correct?

12          MR. WERNER:  Yes, Your Honor.  With apologies

13  for --

14          THE COURT:  All right.  So I want to make clear

15  that all the exhibits that Mr. Cerniglia offered are

16  admitted.

17          And the ones that I have that were particularly in

18  dispute were 1873, 1878, 1870, 1875, 2111, 2120, 1877, and

19  1876.

20          So I wanted to specifically say that those are

21  admitted as well as -- along with all the other documents

22  that you used.

23          MR. CERNIGLIA:  Your Honor, on that point, though,

24  because of the objection, which, you know, I -- I argued was

25  an unfounded objection, I did not go into two other exhibits

OFFICIAL TRANSCRIPT

1    that deal with Thoma-Sea.

2            And now that she is off the stand -- and although I

3    did not cover it with Mr. Burnett, because I was still

4    subject to the same ruling, I'm thinking I'll probably go

08:05:54  5    into it a little bit, and I would just like to advise both

6    sides that I would like to, on redirect, just have him

7    identify Exhibits 525, which are the receipt notices for the

8    J & M Associates' I-140s.  It should be 525.

9            THE COURT:  525?

08:06:18  10            MR. WERNER:  525 was never objected to.

11            MR. CERNIGLIA:  Oh, okay.  I didn't refer to them,

12    then.  I don't think I'm --

13            THE COURT:  Do you want to do it on --

14            MR. CERNIGLIA:  I will not do it with those.  I

08:06:30  15    had -- had my opportunity, and I was not objected to, so I

16    agree I don't get them in.  And I don't need them.

17            But there is an Exhibit 526 --

18            MR. WERNER:  That was not objected to.

19            MR. CERNIGLIA:  No, it was, because this was all --

08:06:42  20    was it 528?  Was that Thoma-Sea?

21            THE COURT:  We show 526 was previously admitted.

22            MR. CERNIGLIA:  Oh, previously admitted?  Okay.

23    Then that's fine.  That's good.  That's it.

24            THE COURT:  Okay.  All right.  So that is resolved.

08:07:02  25    That is good.


                        OFFICIAL TRANSCRIPT

1          We sent you another draft of almost all the jury

2     instructions and jury verdict forms last night.  I know

3     you've probably noticed, as you've reviewed those, that

4     some -- that some substantive decisions have been made by me.

08:07:37    5          So I wanted to put on the record that with respect

6     to the jury instructions on Plaintiffs' Claims 5 and 6, I

7     reviewed the plaintiffs' expert reports and declarations, the

8     briefs, and oral arguments of counsel.  Plaintiffs have the

9     burden of establishing Indian law.  I find that the

08:07:59   10     plaintiffs have not met their burden of establishing that

11     Signal and Dewan had a fiduciary relationship with the

12     plaintiffs.  Burnett, as their attorney, did have a fiduciary

13     relationship with the plaintiffs.  And the jury instructions

14     and verdict form have been drafted accordingly.

08:08:23   15          Okay.  And on another matter that was reflected in

16     the draft that we sent to you, in Cross-Claim 4, Signal seeks

17     an instruction -- well, I don't think this is necessarily

18     reflected.

19          In Cross-Claim 4, Signal seeks an instruction that

08:08:42   20     Indian law does not allow a recruiter to charge more than

21     20,000 rupees as a recruiting fee.

22          Signal provided the 1983 Indian Immigration Act and

23     accompanying rules.  The section in the rules referred to by

24     Signal is misnumbered.  It should be Section 25, but it looks

08:09:09   25     like it has an "11."  And it was amended in 2009 after these

**OFFICIAL TRANSCRIPT**

1    actions take place.

2         And it appears from a footnote that the applicable

3    language pre-2009 provided that an agent could not charge

4    more than 5,000 rupees from a skilled worker, but I don't

5    have the actual pre-2009 statute.

6         Also there are exceptions under the

7    Immigration Act.

8         Under Section 2(O) of the Act, the Central

9    Government may accept categories of workers as it sees fit,

10   and I don't know whether any of these categories of workers

11   have been accepted so I don't know if that applies.

12        Section 41 of the rule says, the Central Government

13   can exempt certain classes of foreign employers.  I also

14   don't know what classes of foreign employers have been

15   exempted to know if that affects this case.

16        And Section 42 of the act says it doesn't apply to

17   recruiting for service of foreign states to which the Foreign

18   Records Act -- or to which some act of 1874 applies.  But

19   that is Section 42 of the act.  And I don't know what that --

20   what that statute says.

21        And, importantly, there has been repeated testimony

22   that the workers were told to tell the consulate that they

23   had paid 35,000 rupees, and that apparently that would be

24   okay if they paid 35,000 rupees.

25        So it's unclear to me what the rule is about

**OFFICIAL TRANSCRIPT**

1    what -- during the relevant time period of what amounts could

2    be -- a recruiting agent could charge and for what.

3         So I think Signal has failed to carry its burden of

4    proving Indian law on this point.

08:11:17    5         And so far, this has been the -- Claim 4 is a --

6    Cross-Claim 4 is one that says that Burnett and -- let's see,

7    whoever had the power of attorney -- Dewan, failed to perform

8    the power of attorney lawfully.

9         And the thing that has been pointed out thus far

08:11:51   10    about why it was unlawful is because he violated this section

11    of the Immigration Act.

12         And so I don't -- I find that Signal has not met

13    its burden of proving that he has violated that.

14         So if that's the only basis for the claim that

08:12:09   15    there was unlawful action under Cross-Claim 4, then I'll have

16    to consider whether that cross-claim should be dismissed when

17    we discuss the Rule 50 motions.

18         So -- all right.  Now the jury is here, so we'll

19    get started.

08:12:26   20                    (Jury in at 8:12 a.m.)

21         THE COURT:  All right.  Good morning, everyone.  Be

22    seated.

23         MS. HANGARTNER:  Morning, Your Honor.

24         MR. HOWARD:  Morning.

08:13:13   25         THE COURT:  Morning.


                         **OFFICIAL TRANSCRIPT**

1              CROSS-EXAMINATION (CONTINUED)

2    BY MR. HOWARD:

3         Q.    Morning, Mr. Burnett.

4         A.    Morning.

5         Q.    When we broke on Friday, we had been walking

6    through the sequence of events about one of the J & M

7    recruits, Mr. Jacob.  Do you recall that?

8         A.    Yes.

9         Q.    And would it be fair to say that the sequence of

10   events was the same for the other J & M recruits like

11   Mr. Andrews, who is back with us today?

12        A.    Sequence of events in terms of?

13        Q.    Well, to recap, for example, the first thing that

14   would happen is the recruit would fill out some forms and

15   make his first installment payment, correct?

16        A.    Yes.

17        Q.    Okay.  And then you waited for the PERM process to

18   roll out, which took, in Mr. Jacob's case, about 11 months

19   after he made his first payment?

20        A.    No.  There was a letter introduced into evidence to

21   Billy Wilks of J & M indicating that we had initiated

22   reduction-in-recruitment advertising.  I believe it was in

23   October of 2004.

24              So we had considered doing the reduction in

25   recruitment as a way to speed the process up.  And it was

                    OFFICIAL TRANSCRIPT

1    while that process was pending that the PERM was introduced,

2    was rolled out.

3        Q.    Okay.  But you used the PERM process not just for

4    Mr. Jacob, but for Mr. Andrews and the other J & M recruits,

5    correct?

6        A.    Yes, correct.

7        Q.    And for Mr. Jacob, we saw that that PERM filing --

8    actually going online and filing in the system -- was done in

9    August of 2006 -- '05, correct?

10       A.    Yes.  That was for his.  I'm not sure about

11   Mr. Andrews, if it was contemporaneous with that or not.

12       Q.    But it would have been roughly the summer of 2005?

13       A.    Well, again, I think that we had started in August

14   actually filing them.  And then Katrina hit and that threw

15   things off a bit, and we had to operate a remote office to

16   upload.

17             So I'm not sure if it was -- if it was further

18   delayed until December or November for some of those.

19       Q.    Got it.

20       A.    I just don't remember.

21       Q.    Got it.

22             And then for Mr. Jacob, the PERM was approved in

23   December of 2005, correct?

24       A.    I believe that's the case.  I believe that's the

25   case, yes.

OFFICIAL TRANSCRIPT

1    **Q.**   Okay.  But by then, the priority date had

2    retrogressed four years, so you did not go ahead and file an

3    I-140 for him, correct?

4    **A.**   Correct.  Well, that wasn't the only reason.  I

5    think there was a problem with data that was missing on some

6    of the applications as well.

7    **Q.**   You don't know for Mr. Jacob whether that was the

8    case?

9    **A.**   I don't remember.

10         Maria Lau was on the stand.  I think she testified

11   as to some of those issues about missing information.  I

12   believe she did.

13   **Q.**   Okay.  And just to be clear for the jury, that

14   retrogressing date applied for all EB-3 category skilled

15   workers from India so it would have applied to Mr. Jacob, it

16   would have applied to Mr. Andrews, or any of the other J & M

17   recruits, correct?

18   **A.**   Yes, it did.

19   **Q.**   And we also saw, on Friday, that, notwithstanding

20   the fact that the date had retrogressed and you were not

21   going to be able to actually get a green card until the date

22   became current again, when that would ever happen, Mr. Jacob,

23   nonetheless, was told by Mr. Pol that he had a week to

24   file -- to pay his second installment, correct?

25   **A.**   I'm not sure.  Was that a letter that was

08:15:38

08:15:44

08:15:59

08:16:11

08:16:30

1    introduced or an e-mail that was introduced?

2        **Q.**    That was Exhibit 497.

3            MR. HOWARD:  The top half, please.

4    **MR. HOWARD:   (CONTINUING)**

5        **Q.**    This is February 26, 2006.  It says (a read:)  If

6    you fail to make the second payment by the end of this week,

7    you'll be substituted with someone on the waiting list.

8        **A.**    Okay.  Yeah, this refreshes my memory.

9        **Q.**    Now, under immigration law, is this notion of

10   substitution legitimate?

11           Meaning, you put in a labor cert for Mr. Jacob, but

12   if he doesn't make his payment, could you just take that

13   labor cert and give it to someone else?

14       **A.**    No.  It's the employer that does that.  The

15   employer decides whether or not to continue with the labor

16   certification, with the PERM.

17           And if the employer desires to substitute -- under

18   a law that existed at that time, you could substitute

19   John Smith for Jacob George's PERM and use that to apply for

20   permanent residency.

21       **Q.**    So from Mr. Jacob's perspective, this threat that

22   he would be substituted with someone else had legitimacy, he

23   could really be substituted?

24       **A.**    I don't know if it would necessarily call it a

25   threat.  I think if you look at the agreement that was

**OFFICIAL TRANSCRIPT**

08:16:51
08:17:08
08:17:21
08:17:42
08:17:53

1    provided, that there was some provision that stated if --
2    that substitution might be possible.
3        Q.   And that contract also said you have got to make
4    your second payment when you get PERM'd even though it could
5    be five, ten, or twenty years before you actually could file
6    for a green card, right?
7        A.   No, it didn't say five, ten, or twenty years.  It
8    said there could be administrative delays that were
9    unforeseeable.
10       Q.   And you categorized those priority dates as
11   administrative days?
12       A.   They were administrative delays.  There was
13   testimony earlier that the State Department chief that deals
14   with setting the priority dates, Charlie Oppenheim, actually
15   is the chief administrator.
16       Q.   I understand Mr. Oppenheim is the chief
17   administrator.
18       A.   And he sets the priority dates.
19       Q.   If Mr. Oppenheim is out sick for two weeks and it
20   could cause a two-week delay, I could see that being an
21   administrative delay.
22            But when Mr. Oppenheim says, as a matter of
23   national policy, we are now going to backlog and not take any
24   Indian H-2B -- EB-3 workers from India for like four years,
25   you're calling that an administrative delay?

**OFFICIAL TRANSCRIPT**

 1      **A.**   It's not a statement of policy.  I think you
 2  misunderstand.
 3          What happens is the USCIS immigration notifies the
 4  Department of State how many adjustment status applications
 5  have been filed under that preference category.
 6          And they also look at the number of immigrant visa
 7  petitions that are approved at the various consulates abroad.
 8          And they add all those numbers together every
 9  month, and they determine how many total can be charged
10  against the worldwide availability.
11          So it's not really a policy, it's a numerical
12  system that literally advances, stops, and retrogresses.
13          And we went through -- as we discussed, you know,
14  back from the '80s and '90s, it would be current for several
15  years and it would bounce back for three years.
16      **Q.**   Okay.  But I think you just made my point,
17  Mr. Burnett.
18          It's not just an unforeseen delay, that, gee, I'm
19  out sick for two weeks?  It's a calculated process by
20  Mr. Oppenheim on behalf of the government, who takes a look
21  at all the applications and makes a decision like a
22  gatekeeper, as to how many people are actually going to be
23  allowed to apply for green cards right now?
24      **A.**   Yeah, right.  But it can't be predicted with
25  certainty.


                          **OFFICIAL TRANSCRIPT**

1    **Q.**   Correct.

2    **A.**   With certainty.

3    **Q.**   Understood.

4    **A.**   All you can do is make a best guess.

08:20:24    5    **Q.**   Understood.

6    **A.**   And some guesses that are made are optimistic.

7    Some are pessimistic.

8    **Q.**   I understand.

9    **A.**   And guesses are -- I mean, a realistic guess?  It

08:20:35    10    is what it is.

11    **Q.**   Did you say in writing to Mr. Jacob, Mr. Andrews or

12    any of your J & M recruits, by the way, this two years is a

13    best guess, but Mr. Oppenheim of the government will decide

14    whether it's two years, one year, five years, ten years?

08:20:53    15    **A.**   Again, I think in the fee agreement it states -- on

16    the attorney services agreement it states that this is -- you

17    know, that delays can be caused for unforeseen reasons.

18    We also sent letters out to the applicants

19    notifying them that the priority dates were backlogged and

08:21:10    20    that we predicted that hopefully within 12 months that it

21    would be become current again.

22    But, again, we stated that there is no way we can

23    actually firmly set a date on when it would be available.

24    **Q.**   In those contracts, you just called it "there could

08:21:24    25    be unforeseen delays," right?


**OFFICIAL TRANSCRIPT**

1      **A.**   I forget the langue, the exact language, but it is

2   something similar to that.

3      **Q.**   Okay.  Let's move on.

4          So to complete the sequence of events for Mr. Jacob

08:21:38   5   and Mr. Andrews, at some point they were moved from the J & M

6   green card process into the Signal H-2B program, correct?

7      **A.**   They were selected.

8      **Q.**   They were selected to the H-2B program?

9      **A.**   Correct.

08:21:54   10     **Q.**   But they were still told that that program would

11   result in them being sponsored for a green card by Signal,

12   correct?

13     **A.**   In its agreement, Signal's agreement with Global,

14   it was stated specifically that they would file -- they would

08:22:13   15   process the applicants for permanent residency applications.

16   And on that representation, that was what was explained to

17   the candidates.

18     **Q.**   Understood.  So -- and that's why the fees didn't

19   get reduced?  That's why the fees that these recruits paid

08:22:29   20   did not get reduced when they went over to the U.S. on an

21   H-2B?

22     **A.**   I don't understand.

23     **Q.**   In other words, you didn't say, hey, you paid --

24   you know, you agreed to pay me $3750, but since you're going

08:22:41   25   on an H-2B, I'll take less, $200 or $300, like in the

**OFFICIAL TRANSCRIPT**

1    Avondale situation?  They were still going to get green cards

2    so the fees stayed the same?

3        A.    $200 or $300 less like the Avondale situation?  I'm

4    not --

5        Q.    I'm not going to rehash everything from Friday.

6        A.    Oh, sorry.

7        Q.    Let's move on.

8              And we saw that, in fact, in Mr. Jacob's case he

9    received the letter, Exhibit 784, which said that the company

10   shall proceed with your employment-based permanent residence

11   visa, correct?

12       A.    Yes.

13       Q.    And that same language was used in letters given to

14   each of the J & M recruits and the Signal recruits, correct?

15       A.    I can't be certain which letters were given to

16   which recruits, because I specifically wasn't there when

17   these letters were handed out.

18             I can only assume that that's the case.  I don't

19   know if it's in evidence already or not.

20       Q.    All right.  And so it's fair to say, though,

21   Mr. Jacob was told -- and this is when Mr. Jacob was asked to

22   give his third payment, his third and final installment,

23   correct?  Do you see that down at the bottom of the page?

24       A.    Yes.

25       Q.    And this letter does not tell Mr. Jacob that, in

**OFFICIAL TRANSCRIPT**

1    fact, he would have to go back to India after the H-2B visa

2    expired and wait until the priority date became current, does

3    it?

4        A.    No.  It says clearly that the permanent residency

08:24:18    5    would be filed for.  Mr. Jacob was aware of the priority

6    dates.

7        Q.    And do you recall personally telling Mr. Jacob

8    about the priority dates?

9        A.    I don't know if there have been e-mails showing

08:24:34   10    that yet, that we stated that they were backlogged -- that

11    the priority dates are backlogged or not.  I have seen them.

12        Q.    But you haven't presented to this jury any such

13    e-mail, have you?

14        A.    No.

08:24:44   15        Q.    And, in fact, there is not a single document -- an

16    e-mail, a memo, or a letter -- that you have shown this court

17    or that you're specifically aware of telling Mr. Jacob, or

18    any one of your Indian worker clients, that they will have to

19    go back to India after their H-2B visa expires and wait for

08:25:05   20    the green card, correct?

21        A.    No.  But this was discussed.

22        Q.    All right.  So you agree there is no document, but

23    you're saying you discussed it orally; is that your testimony

24    here?

08:25:16   25        A.    Yeah.


                         OFFICIAL TRANSCRIPT

 1      Q.   But you testified on Friday you didn't meet with
 2  all of the workers, so of course you could not have discussed
 3  this point orally with all of the workers, correct?
 4      A.   The ones that I did not meet with who obtained
 5  visas -- I think it was in January or February of 2007, I did
 6  not meet with.
 7      Q.   And you didn't keep any written records of which
 8  workers you met with at all, correct?
 9      A.   None contemporaneous, no.
10      Q.   These were your clients, and as a lawyer you did
11  not keep records of even which workers you met with, let
12  alone what process you explained to them?
13      A.   I believe I did the best I could.
14      Q.   And for some of the meetings, you relied on
15  Mr. Dewan and Mr. Dewan's employees to share immigration
16  information with the workers, correct?
17      A.   You mean in terms of translating the documents, the
18  information or --
19      Q.   Well, I know in terms of translating when you were
20  there.  But for the workers you didn't get to meet with
21  personally, you were relying on Mr. Dewan and his employees
22  to explain the process to them, weren't you?
23      A.   Yes.  If I was not available.
24      Q.   Right.  And if Mr. Dewan has testified in his
25  deposition in this case that he didn't even know that these

OFFICIAL TRANSCRIPT

1    workers were going to have to come back to India, after the

2    H-2B visas expired, and wait for their green cards, there

3    would have been no way for him to tell the workers that;

4    would that be fair to say?

08:26:46    5        A.   That would be a fair assessment, yes.

6        Q.   Now, you also gave Mr. Dewan authorization to sign

7    your name on some agreements for you, correct?

8        A.   I know that he was authorized to sign receipts on

9    my behalf.  And if there are any agreements, attorney

08:27:06   10    services agreements, if I was not available, he could sign

11    those.  Typically --

12            MR. HOWARD:  Let's find those.  Exhibit 740,

13    please.

14    MR. HOWARD:  (CONTINUING)

08:27:17   15        Q.   This is an attorney services agreement with one of

16    the five plaintiffs, Mr. Sony, which was signed on

17    November 19, 2007.

18            If you look at the second page, the signature block

19    above the name Malvern Burnett, that is not your signature,

08:27:30   20    is it?

21        A.   No.  That would be Sachin's signature.

22        Q.   And he was authorized to do that?

23        A.   Again, yes.

24            I typically don't need my signature on a fee

08:27:41   25    agreement, the typical fee agreement I sign with my office.

OFFICIAL TRANSCRIPT

            If you will notice the one I did with Signal, there
is no signature.  Just the client signs and sends it back to
me.
            So I don't consider myself bound by -- any less by
not having my signature on a fee agreement.
       Q.    Understood.  But my point is, in essence, Mr. Dewan
was kind of your agent in that he was authorized to sign your
signature on this attorney services agreement, right?
       A.    I don't dispute that.
            MR. HOWARD:  Can we look at the first page.
            And I want to blow up the last paragraph on the
first page of the attorney services agreement, please.
MR. HOWARD:   (CONTINUING)
       Q.    It says (as read:)  Attorney will do everything
within its power to assist the worker to obtain permanent
resident status in the United States within 24 months.
            Did I read that correctly?
       A.    Yes.
       Q.    Now, Mr. Sony, in November 2006 when this agreement
is signed, is coming to the United States on an H-2B visa,
correct?
       A.    Yes.
       Q.    And I think you testified on Friday on direct
examination with your counsel that an H-2B visa can't be done
simultaneously or contemporaneously with a green card

                        OFFICIAL TRANSCRIPT

1    processing, correct?

2        A.    No.  I ex plained you have to do the extensions.

3    And after the extensions are done, then start the permanent

4    residence process.

5        Q.    And the extensions could go up to 30 months,

6    correct?

7        A.    It can.  Or it can be just ten months.  If they

8    deny it after ten months, you file it at that point, and the

9    person leaves just as they would after the 30-month period if

10   the priority dates are backlogged.

11       Q.    What could you do to get Mr. Sony his permanent

12   residence green card within 24 months of November 2006 if he

13   is going to the U.S. on an H-2B visa?  It would be very

14   difficult, wouldn't it?

15       A.    Again, as I said earlier in my testimony, this fee

16   agreement was used basically as a fallback.  And it

17   represents -- in very vague terms but it does represent --

18   the agreement whereby we get the temporary labor

19   certification first.  That's, I think, in a previous example.

20   And then after that, get the visa to come to the

21   United States.

22       Q.    Mr. Burnett --

23       A.    The three payments are made at that time.

24       Q.    --the statement "obtain permanent resident status

25   in the United States within 24 months" isn't very vague, is

**OFFICIAL TRANSCRIPT**

1   it?  That's pretty precise.

2       A.   This is the exact agreement that he signed

3   previously.

4       Q.   But he's signing it now in November 2006 when he is

5   going to the U.S. on an H-2B visa, and you're telling him

6   you, the immigration lawyer, are going to do everything in

7   your power to get him a green card within two years?

8       A.   This is the same agreement that he would have

9   signed in 2004.

10      Q.   Okay.  So you're saying that this is really not

11  valid to tell him this --

12      A.   No --

13      Q.   -- in 2006?

14      A.   No, if you look above, it has the payment schedule.

15  Okay?  And the payment schedule doesn't apply in this case.

16           Can you go up?

17      Q.   Sure.

18      A.   Go up a little bit.

19      Q.   Sure.

20      A.   Okay.  So if you look at the payment -- look at the

21  second paragraph.

22      Q.   Yes.

23      A.   Okay.  Excuse me, third paragraph.

24           (As read:)  The payments will be as follows:  At

25  the beginning of employment contract, $1250.


                    **OFFICIAL TRANSCRIPT**

1        All right?

2    **Q.**   Yes.

3    **A.**   Second one, $1250 at the issuance of the labor

4    certification.

08:31:12   5    **Q.**   Yeah.  I see that.

6    **A.**   Third one, $1250 at the time the I-140 is approved.

7    **Q.**   Yeah.

8    **A.**   The I-140 wasn't approved.  The I-140 wasn't even

9    file yet, but he made that payment.

08:31:26   10       Do you see what I'm saying?

11   **Q.**   I see what you're saying.  You are saying this

12   agreement is pretty much useless.

13   **A.**   He signed the agreement.  He made the last payment.

14   You know?  And he was understanding that he came for the

08:31:35   15   duration of the ten-month H-2B, thereafter extension.

16   **Q.**   You're a lawyer, Mr. Burnett.  You authorized

17   Mr. Dewan to give one of your clients an agreement, and

18   you're now pointing out to the jury that the agreement is

19   basically useless.

08:31:50   20       Should Mr. Sony be responsible for not knowing the

21   agreement or you?

22   **A.**   It shows he made the payments.

23       Could there have been a better agreement?

24   Absolutely.  There is no doubt about it.

08:32:04   25   **Q.**   And you gave this same agreement not just to

**OFFICIAL TRANSCRIPT**

```
       1    Mr. Sony and Mr. Jacob and Mr. Andrews, you gave it to
       2    Mr. Hemant in January of 2007, and he was a pure Signal
       3    recruit, right?
       4         A.   I believe that's the case, yes.
08:32:27   5              MR. HOWARD:  Let's take a look, please, at
       6    Exhibit 1140.
       7    MR. HOWARD:  (CONTINUING)
       8         Q.   This is Mr. Khuttan's attorney services agreement.
       9              Now, you didn't sign this one, right?
08:32:42  10         A.   No, I did not.
      11         Q.   But it has the same language we were just looking
      12    at, including that the attorney will do everything within its
      13    power to assist the worker to obtain permanent residence
      14    status in the U.S. within 24 months, correct?
08:32:54  15         A.   Yes.  And it also breaks down the three payments in
      16    Paragraph III.
      17         Q.   Correct.  And just to be clear for the record, it
      18    would have been impossible to get Mr. Khuttan a green card
      19    within 24 months from January 2007, right?
08:33:05  20         A.   No doubt about it.
      21         Q.   And other than the H-2B visa, you did nothing to
      22    try and get Mr. Khuttan a green card, right?
      23         A.   (No response.)
      24         Q.   I believe you told me that in your deposition.
08:33:19  25         A.   Other than doing an H-2B visa, I did nothing to get
```

**OFFICIAL TRANSCRIPT**

1  him a green card.

2       I will tell you that -- I will say that I'm not

3  sure if I applied for extensions for him, while he was in the

4  United States in the H-2B status, or not, that would permit

5  him to apply for a green card thereafter, or if I assisted

6  him in staying in the United States long enough to apply for

7  a green card under some other status.  So on that I can't

8  really give you a definitive response.

9       Q.   All right.  And in your deposition -- maybe --

10  maybe your recollection is a little clearer.

11       This is Page 111.  This is from July 30th of this

12  year.  111 -- or 112, rather, Lines 8 to 14.

13       QUESTION:  What did you do within your power to

14  assist Mr. Hemant Khuttan in getting permanent resident

15  status within 24 months of January 2007?

16       ANSWER:  I assisted Mr. Khuttan apparently in

17  getting his H-2B status to come to the United States, and

18  that's as far as it got.

19       Fair to say?

20       A.   Yeah.  I'll stand by that.

21       Q.   Okay.  Now, we talked on Friday that -- and you

22  repeated it this morning, that you understood Signal had made

23  the commitment to get -- to sponsor all these workers for

24  green cards at the end of the H-2B process, right?

25       A.   Yes.


                    OFFICIAL TRANSCRIPT

1      Q.    And that was at 30 months, correct?

2      A.    No.  It could be anytime within the process that

3    they are in the United States, because we could not be

4    certain that they would get an extension after ten months.

08:35:10    5      Q.    Got it.

6      A.    They could have started at Month 10 or Month 11.

7      Q.    If they didn't get the first extension, Signal had

8    to start the process then?

9      A.    Absolutely.

08:35:19   10      Q.    Okay.  And that was the basis on which you made the

11   representation to the workers that they would be sponsored

12   for green cards by Signal, and would -- ultimately that would

13   allow them to stay in the U.S. permanently, correct?

14      A.    They would obtain permanent residency at some point

08:35:36   15   in the future, yes.

16      Q.    But at the same time, you told Signal it was okay

17   in its immigration filing, the petition filings, to tell the

18   government that these workers were only going to be here for

19   ten months and were going to go back to India, correct?

08:35:55   20      A.    Yes.

21      Q.    And, in fact, I believe you told Signal under no

22   circumstances should you tell the government that these guys

23   are going to be here for more than ten months, right?

24      A.    Absolutely.  And I explained that.  That's the

08:36:10   25   basis -- the H-2B visa is a temporary visa.  It's valid for


OFFICIAL TRANSCRIPT

1    at ten months most.

2        Q.    Got it.

3        And you understood -- and you made sure that Signal

4    understood, that if you tell the government that your need is

08:36:25  5    longer than ten months, the government will not issue these

6    H-2B visas, right?

7        A.    The H-2B visas are designed for ten-month periods,

8    which are subject to extensions.  Okay?

9        Q.    I understand.

08:36:38  10       A.    And you have to couch it in ten-month terms.  And

11   it is difficult to predict --

12       Q.    I understand.  Please answer my question.

13       A.    Okay.

14       Q.    Can you please answer my question?

08:36:46  15       A.    Yes.

16       Q.    It's true, is it not, that you told Signal, and

17   Signal understood, that under no circumstances could it

18   represent to the government that it needed these workers

19   beyond ten months, because then Signal wouldn't get issued

08:37:05  20   the H-2B visa petitions to get these workers it needed,

21   correct?

22       A.    I advised them concerning the regulations as it

23   affects H-2B visas.  There are only certain numbers of months

24   that you can request under H-2B visa, and that's precisely

08:37:23  25   what I advised.


                        OFFICIAL TRANSCRIPT

1           And as I explained before, many employers have

2    different grandiose ideas about keeping H-2B visas for many

3    years, and you have to bring them down to reality.  You have

4    to advise them to petition for these people within the law in

5    ten-month periods.

6           And as I explained, that's what happened in Orange,

7    Texas.  They ended up shutting down the program and moving

8    people to Mississippi.

9       Q.   And not even extending the visas for some of those

10   people, right?

11      A.   That's the case as well.

12      Q.   The people that you understood Signal had promised

13   they would apply for for green cards, right?

14      A.   Correct.

15      Q.   And they never did it?

16      A.   I don't know -- for the ones that they didn't

17   extend?

18      Q.   For the one they didn't extend?

19      A.   I don't believe so.  I don't know who they applied

20   for.  They did indicate that they filed for 80 people.  I'm

21   not sure who was there and who those people were.

22      Q.   But coming back to my question again, I understand

23   you are giving your explanation for the reason you gave the

24   advice.

25           My question is, in giving that advice is it fair to

**OFFICIAL TRANSCRIPT**

1    say that Signal understood that if it told the government

2    that its need for these workers was indeed actually longer

3    than ten months, then the government would not have issued

4    the H-2B visas?

08:38:45   5      **A.**   Whether the government would have issued the

6    ten-month visa after a request for evidence to show that the

7    periods were actually shorter, I can't say.  But if you

8    request -- if you request an H-2B visa for two years, they'll

9    get denied.

08:38:57   10     **Q.**   It will get denied?

11      **A.**   Absolutely.  By regulation.

12      **Q.**   By regulation.  So if Signal had put on its visa

13    application that we need these workers for a minimum of two

14    years and then we are going to sponsor them for a green card,

08:39:12   15    that would have been -- the visa would have gotten --

16      **A.**   There was no mechanism to do so at that time,

17    correct.

18        And the reason that was so is because the

19    Department of Labor has to test the job market and do that

08:39:23   20    within ten-month chunks of time.

21      **Q.**   Now, these visa applications -- I just want to

22    understand the process.  You would prepare them in your

23    office and put little "sign this" stickies where the

24    signature for the Signal person --

08:39:40   25      **A.**   The visa application -- the visa petition filed on

**OFFICIAL TRANSCRIPT**

1    behalf of Signal?

2         Q.   Correct.

3         A.   We did that for the Department of Labor and we did

4    that for Signal as well -- I'm sorry, the USCIS immigration

08:39:50   5    as well.

6         Q.   So you prepared multiple of these petitions,

7    correct?

8         A.   Yes.

9         Q.   And they were prepared in your office?

08:39:57   10        A.   Correct.

11        Q.   And then you FedExed them to Signal's office for a

12   Signal officer to sign them?

13        A.   I think sometimes they were FedExed.  I think

14   Darrell Snyder testified he would pick things up and drop

08:40:10   15   things off from time to time.

16             So I can't tell you with certainty that they were

17   FedExed.  I know we did FedEx documents to the government.  I

18   know we did that.

19        Q.   So you would get them back with Mr. Bingle's

08:40:21   20   signature -- and he was the one that signed in 2006, right?

21        A.   I believe that's the case.

22        Q.   And, in fact, you did this all again in 2007, in

23   the summer of 2007, because Signal wanted even more Indian

24   workers, right?

08:40:35   25        A.   Bring in again --


                              OFFICIAL TRANSCRIPT

1      Q.   You did another around of petitions?

2      A.   I think there were two sets of petitions that were

3 filed in February of 2007, if I'm not mistaken.

4      Q.   I thought it was July?

5      A.   That was the extensions in July of 2007.

6      Then there was a group that was filed subsequent to

7 that when I was retained to bring in -- to file for the

8 balance of the total number that had not come to the

9 United States, and they wanted to bring a fresh group in from

10 India.

11      Q.   That's the point.

12      A.   Yeah.

13      Q.   Signal, even late in 2007, after everything at the

14 man camp and March 9th and everything else, came to you and

15 said, Mr. Burnett, we're hiring you to go back and get a

16 whole new fresh crop of Indian workers for us, right?

17      A.   Yeah.  That was based on labor certifications that

18 were already approved, if I'm not mistaken.

19      Q.   And I think it was Mr. Snyder who had signed those

20 petitions; is that right?

21      A.   I'm not certain.

22      Q.   Okay.  And then you said once you got them back

23 signed from Signal, you would FedEx them to the government?

24      A.   Yes.

25      Q.   Now, Mr. Burnett, I want to talk to you a little

**OFFICIAL TRANSCRIPT**

```
 1  bit, though, about your relationship with your worker
 2  clients.
 3         And I showed the jury a couple of e-mails in my
 4  opening -- I think you were there -- were you there for the
 5  opening statement?
 6      A.   Yes, I was.
 7      Q.   And I want you to have an opportunity to explain
 8  yourself to the jury with respect to these e-mails.
 9         MR. HOWARD:  Let's see first, please, Exhibit 564.
10         Can we blow that up, please.
11  MR. HOWARD:  (CONTINUING)
12      Q.   This is an e-mail from you February 3, 2006, to
13  Sachin Dewan?
14      A.   Yes.
15      Q.   You refer him to as Mafioso?
16      A.   Yes.  A nickname.
17      Q.   Yeah.
18         (As read:)  And you tell them to pay up or we will
19  substitute with willing candidates.  What can't you make the
20  dolts understand?  Confused and pissed, I remain, yours
21  truly, Mal.  By the way, tell Rao to show me the money."
22      A.   Yeah, I'll explain all that.
23         Okay.  So the original proof he's asking for are
24  the labor certification applications.  These are the PERMs.
25         The PERMs have to be -- when they are issued by the
```

08:42:05
08:42:28
08:42:35
08:42:49
08:43:06

OFFICIAL TRANSCRIPT

1    government, you receive about a eight- or a nine-page

2    document which is the actual PERM application.

3           The PERM application has to be signed by the

4    employer, by the alien worker, and by the attorney.  Okay?

08:43:28    5           Accompanying that document is an actual approval

6    notice from the Department of Labor.  All right?

7           Back around this time period, the Department of

8    Labor was having problems and there were problems with

9    generating approval notices in many cases.  And so sometimes

08:43:48   10    what we'd get in the mail would be just the approval notice,

11    but we wouldn't get the actual PERM application that was --

12    that required signatures.  And many times we would get the

13    entire packet.

14           So what I was doing is providing -- I was sent the

08:44:06   15    copies of the approval notice and copies of the PERMs over to

16    show that they were approved.  All right?

17       Q.   And just let me stop you there.

18           You were doing that because you understood that by

19    showing the proof that the PERMs had been approved, that

08:44:22   20    first step in the process, that entitled you and Mr. Dewan

21    and Mr. Pol to get your second payments from these guys?

22       A.   That.  And also to advise them that they were, in

23    fact, approved, because these people had been waiting for the

24    approvals, the labor certifications.

08:44:36   25           So I sent them over to them and they requested --

                              OFFICIAL TRANSCRIPT

```
 1   they said they don't -- they don't want to accept the copies
 2   as evidence, they want to see the originals.  And so I was
 3   frustrated.  Okay?
 4          And I will -- you'll see other e-mails when I get
 5   frustrated.  I used indelicate language with Sachin.  I would
 6   never make statements like this to clients.
 7      Q.   But that reference of "dolts" is a reference to
 8   your clients, the workers?
 9      A.   Yeah.  Like I said, it was a sharp statement, a
10   rough statement.  Yes.  And I apologize for that, you know.
11      Q.   And believe me, I appreciate an apology in this
12   court.
13          MR. HOWARD:  Let's see 1894, please.
14          THE WITNESS:  Can I explain the "Rao, show me the
15   money," by the way?
16          MR. HOWARD:  No.  I'm not interested in that.  You
17   can explain it with your attorney on redirect.
18          THE WITNESS:  Okay.
19          MR. HOWARD:  Thank you.
20          Let's take a look at 1894.
21   MR. HOWARD:  (CONTINUING)
22      Q.   Now, here's one where you are writing to Mr. Dewan,
23   at the bottom of the page.  And in this one I take it you're
24   frustrated because one of the workers stopped payment on a
25   check; is that right?
```

OFFICIAL TRANSCRIPT

1           (As read:)  Lastly, the check which the idiot
2    stopped payment on.
3        A.   Yes.
4        Q.   And you also wanted Mr. Burnett [sic] to make sure
5    to send you the checks promptly, because if he delayed
6    sending you the checks, it would give these idiots tons of
7    time to stop payment.  That's what you are telling them,
8    right?
9        A.   I've got a real problem with stop payment of
10   checks.  I had it happen here in the States and I had it
11   happen twice with this program.  And it really got me
12   irritated.  And I used indelicate language, I've got to say.
13       Q.   And just for the record, the term idiots is a
14   reference to your Indian worker clients?
15       A.   I'm not sure -- in fact, I'm not sure if Pravin did
16   not send this check.  I think it was maybe a relative that
17   sent the check.
18       Q.   I'm talking in this paragraph, just generally when
19   you are saying send me the checks promptly because otherwise
20   it gives these idiots tons of time to stop payment, that's a
21   reference to the Indian workers?
22       A.   It upset me I was having stop payment on checks.  I
23   mean, yes.  And, again, this is between me and Sachin.
24       Q.   Understood.
25           MR. HOWARD:  And if we could see 1893, please.


                        **OFFICIAL TRANSCRIPT**

**MR. HOWARD:  (CONTINUING)**

1

2    Q.    And one of the issue that has come up a little bit

3    in this trial concerns refunds, and I want to show you

4    Exhibit 1893.

08:47:20    5         Here you are writing to Mr. Dewan with respect to

6    someone who wanted to back out of the program because his

7    father was dying of cancer, and he wanted to get a refund.

8         And your view was that was not a reason to give a

9    refund; is that fair to say?

08:47:41   10    A.    I believe it wasn't a refund request.  He stopped

11   payment on the check.  If the guy had asked me to refund

12   because his father was dying, it would have been a little bit

13   different.  But stopping a payment on a check, like I said,

14   that really, really irritated me.

08:47:56   15    Q.    Obviously.  Okay.  We can --

16   A.    And, you know, I apologize for being indelicate

17   but, you know, it was just -- it's obviously really, really

18   wrangled me, really upset me.

19   Q.    Understood.

08:48:08   20        Now, with respect to money and fees, let's talk a

21   little bit about the time period in the summer of 2006 or the

22   spring of 2006.

23        Signal, through Mike Pol, has now approached the

24   three of you, Mr. Pol and Mr. Dewan and yourself, about

08:48:27   25   getting 500 to 600 workers, correct, from India?

**OFFICIAL TRANSCRIPT**

1    A.   In the summer of 2006?

2    Q.   I think it was the spring, like April.

3    A.   Well, I met initially with Signal in February, I

4    think it was, of 2006.

08:48:41    5    Q.   And the Pol agreement -- Global Resources agreement

6    was signed in April?

7    A.   Yes.

8    Q.   So this is the time period I'm talking about.

9    A.   Yes, correct.

08:48:49    10    Q.   And as of this time period, you've got about 200

11    workers kind of in that green card pipeline for J & M, right?

12    A.   Yes.

13    Q.   And now you've got another employer, Signal, who

14    says we could use 500 to 600 workers, right?

08:49:05    15    A.   Yes.

16    Q.   And you and Mr. Dewan and Mr. Pol thought about it,

17    and your view initially was those 200 workers have already

18    paid us two-thirds of their fee, and if we move those guys

19    over to the Signal program, we can only collect one-third of

08:49:29    20    our fee from them, correct?

21    A.   And I would have to do the work all over again,

22    plus I would do the H-2B work.

23    Q.   Understood.  But what you thought would be better

24    is let's leave those 200 guys over here and when and if their

08:49:44    25    priority date ever becomes current, we'll file the I-140s and

**OFFICIAL TRANSCRIPT**

1   then we'll collect the rest of the money from them; but let's

2   get a whole new fresh batch for Signal because, from them, we

3   can collect the entire fee all over again, right?

4       A.   Correct.

5       Q.   And if we take a look at Exhibit 501 --

6            MR. HOWARD:  And if we can kind of blow up in the

7   middle.

8   **MR. HOWARD:  (CONTINUING)**

9       Q.   -- you actually are doing the math on this, and you

10  come up with the fact that if you use the J & M recruits for

11  Signal, each of you is leaving about $2 million on the table,

12  right?  That's the way the math worked out?

13      A.   I'm not sure exactly on the math, but that's what I

14  said in this e-mail, correct.

15      Q.   Mr. Dewan, though, disagreed with that approach,

16  because he was getting calls on a daily basis -- 24 hours a

17  day, 7 days a week -- from these J & M recruits, the 200, who

18  had been waiting now for up to two years, and he said, we

19  have got to take care of these people and move them into the

20  Signal program; is that fair to say?

21      A.   Yes.

22      Q.   And you ultimately agreed?

23      A.   Basically.  It was not my agreement to make.

24      Q.   They made that agreement?

25      A.   J & M had agreed to make the -- to allow their

**OFFICIAL TRANSCRIPT**

08:50:03

08:50:26

08:50:42

08:51:06

08:51:20

1    workers to be sent to Signal, and Signal had to agree to

2    accept the workers.

3        Q.    But you and your partners, Mr. Dewan and Mr. Pol,

4    were discussing among yourselves how best to deal with that,

08:51:38    5    and ultimately you came to the agreement to move those

6    workers over?

7        A.    Again, there was no agreement for me to make.  I

8    mean, it was -- Signal picked up the workers.  J & M allowed

9    for Signal to pick up the workers.

08:51:49    10        Q.    And by the way, it's fair for me to refer to you

11    and Mr. Dewan and Mr. Pol as partners, as you did in your

12    e-mail?

13        A.    Well, I will say that we worked together in this

14    project, but there was no legal document that referenced us

08:52:03    15    as partners.

16        Q.    Just the agreement that we showed yesterday -- or

17    Friday, Exhibit 17, the multilateral business agreement?

18        A.    Yeah.  That agreement had expired at that point,

19    because it was a two-year validity.  That was for J & M

08:52:16    20    workers.

21        Q.    But you were still working together on the Signal

22    recruitment, right?

23        A.    Oh, yeah.  We worked together, yes.

24             MR. HOWARD:  Take that down.

08:52:27    25    MR. HOWARD:  (CONTINUING)

OFFICIAL TRANSCRIPT

1    Q.   Mr. Burnett, I want to talk now about the week of
2  March 4th that led up to March 9, 2007, and the termination
3  of Mr. Jacob and Mr. Sabular.
4         MR. HOWARD:  Can we see, please, Exhibit 940.
5  MR. HOWARD:   (CONTINUING)
6    Q.   This is an e-mail chain -- we'll go back to the
7  first page.  I want to show the first page.
8         This is an e-mail chain -- the jury has seen
9  this -- with respect to a letter that was sent to Signal from
10 the Southern Poverty Law Center asking to sit down with
11 Signal to discuss some of the issues with respect to the
12 Indian workers.  Do you recall that or --
13   A.   Is that the one that I responded to, and I said
14 that the Immigrant Justice Project was a tenacious advocate
15 of workers rights in my response?
16   Q.   I think it is.
17   A.   Yes.  And I said that they were right, and that
18 they needed to pay the prevailing wage.  I did, in fact.
19   Q.   Okay.  But my point is, the jury has seen --
20        MR. HOWARD:  Let's see the next page.
21        Next one.
22        This is what the jury has seen.
23        Go blow up the top.
24 MR. HOWARD:   (CONTINUING)
25   Q.   This is Mr. Schnoor's response, which is (as read:)


                    OFFICIAL TRANSCRIPT

1    The best defense is a strong offense and before the week is

2    over, the Indians will know we're not afraid to fight and so

3    should their liberal lawyers.

4              I guess he was picking up on your language about

08:54:17    5    the SPLC?

6              But the point I'm making is, do you recall, as the

7    first page indicates, that that SPLC letter was forwarded to

8    you to give your own advice for the company?

9              They were consulting you when this letter came in,

08:54:35    10    correct?

11        A.   They were asking me -- I think it was more about

12    the prevailing -- wasn't it a prevailing wage issue?

13        Q.   There was that issue and others.

14        A.   Can we look at that, by any chance?

08:54:44    15        Q.   I'll call it up, but that's not --

16        A.   The best I know --

17        Q.   Here is -- I'll get to the point more quickly.

18        A.   Okay.

19        Q.   The SPLC letter, as well as another event I'll show

08:54:55    20    you, led to you physically being present at a meeting with

21    Mr. Schnoor and others at Signal that week of March 9th,

22    correct?  I think a Wednesday, March --

23        A.   I'm not sure of a date.  I did attend a meeting,

24    yes.

08:55:09    25        Q.   Okay.

OFFICIAL TRANSCRIPT

1        **A.**   I recall it very well, and I recall what I said.   I
2    told the workers that I know that there is disagreements, but
3    y'all have to get together with management and work things
4    out.
08:55:18    5        **Q.**   You are confusing a few things.   And let me just
6    set the chronology, sir, because I don't want you to be
7    confused.   And I'm not trying to trick you here.
8            You were forwarded a letter from Signal saying, we
9    got this from the SPLC, take a look at it?
08:55:31   10        **A.**   Can I see that letter?
11        **Q.**   In a minute.
12        **A.**   All right.
13        **Q.**   I'll show it to you.
14        **A.**   Thank you.
08:55:35   15        **Q.**   From my point, that's not the issue.
16        **A.**   Okay.
17        **Q.**   You were also told to please come to a meeting?
18    Not the speech Ron Schnoor gave on March 8th --
19        **A.**   Okay.   Okay.   I misunderstood.   I see what you are
08:55:48   20    saying.
21        **Q.**   That's what --
22        **A.**   Yeah, yeah, yeah.
23            THE REPORTER:   Please just one at a time.
24            MR. HOWARD:   By the way, can we have that March
08:55:58   25    week thing?   That may make things easier.


                      **OFFICIAL TRANSCRIPT**

1   MR. HOWARD:   (CONTINUING)

2       Q.    Okay.  So March 9th we'll call the termination

3   date, correct?

4       A.    (No response.)

08:56:23   5       Q.    You have seen the evidence of that here.  I'm not

6   going to even discuss that date with you, but if you will go

7   with me that March 9th was the date that Mr. Jacob and

8   Mr. Sabulal were terminated.

9       A.    Okay.

08:56:36   10       Q.    You were present for Mr. Schnoor's speech to the

11   workers that we've heard the audiotape of.  That was on the

12   8th, correct?

13       A.    That's the one when I told the workers to get

14   together with management and work things out, correct.

08:56:47   15       Q.    Okay.  But you also attended a private meeting with

16   Signal on the 6th or the 7th, correct?

17       A.    Either one of those days, I was there, yes.  I

18   think they had a labor lawyer there as well.

19       Q.    And is it fair to say that at that meeting, you got

08:57:06   20   an understanding that Signal was about to terminate some

21   workers?

22       A.    Yes.  And I think even before that date they had

23   already let some workers go or that had left.  But, yeah,

24   that's correct.

08:57:22   25       Q.    So at that meeting, you're told we, Signal, are

OFFICIAL TRANSCRIPT

1  going to terminate some workers?  And I believe you were

2  asked to give immigration advice as to how to do that within

3  the immigration laws; is that right?

4      A.   About the requirements that a worker on an H-2B

5  visa, if he is terminated before the expiration of the H-2B

6  period, has to -- the employer has to repatriate them or send

7  them back to the -- abroad.

8      Q.   The workers that were about to be terminated, they

9  were your clients too, right?

10     A.   Yeah.  I was making sure they had -- basically they

11 got advice how they would repatriate these people back to

12 India.

13     Q.   But at that meeting, Mr. Burnett, you didn't even

14 ask Signal the names of your clients that they were about to

15 terminate; isn't that true?

16     A.   I just knew the badge number, I believe.

17     Q.   No, I think you didn't even know that.  You told me

18 that you didn't know the names, you didn't know the badge

19 numbers, that that's meaningless to me.  Do you recall that?

20     A.   The badge number would be meaningless to me because

21 I can't put the face to a badge number.

22     Q.   Okay.  But you said:  I don't know who is getting

23 fired.  I don't know these people.  I don't know the badge

24 numbers.  That's meaningless to me.

25     A.   The badge number would have been meaningless to me.

**OFFICIAL TRANSCRIPT**

```
 1        Q.   But you also agreed you didn't know who was getting
 2   fired, you didn't even know the names of those people?
 3        A.   This is correct.
 4        Q.   And they were your clients?
 5        A.   Yes, indeed they were, as were 500 -- or 470 other
 6   people.
 7             MR. HOWARD:  I have nothing further, Mr. Burnett.
 8   Thank you.
 9             THE WITNESS:  You are welcome.
10             THE COURT:  Ms. Bollman.
11                      CROSS-EXAMINATION
12   BY MS. BOLLMAN:
13        Q.   Good morning, Mr. Burnett.  Patricia Bollman for
14   Signal International.
15        A.   I know you well.  We went to law school together.
16        Q.   We did.
17             You have practiced immigration law for over
18   25 years, correct?
19        A.   Yes.
20        Q.   And you've spoken to professional legal
21   organizations, such as the Federal Bar Association and the
22   American Immigration Lawyers Association, on how to properly
23   handle consular processing, correct?
24        A.   I believe that -- I'm not sure if it was on how to
25   handle consular processing or whether or not it was dealing
```

08:58:52
08:59:03
08:59:22
08:59:29
08:59:49

OFFICIAL TRANSCRIPT

1    with pitfalls in consular processing.

2        Q.   Okay.  So you have lectured to these groups on

3    pitfalls of the consular processing?

4        A.   Yeah.  And, actually, I think I clarified that at

5    the deposition -- or if I didn't, I should have -- there were

6    two panel members that had -- on that panel that did not show

7    up.

8             And Jane Peters, who was the world expert on

9    consular processing, was there and I just sort of moderated

10   the discussion.  She basically -- I asked softball questions

11   and she expounded on immigration law.

12       Q.   And you have spoken to professional legal

13   organizations, such as the Federal Bar Association and the

14   American Immigration Lawyers Association, on the H-2B

15   process, correct?

16       A.   Yes.

17       Q.   And prior to your representation of Signal, you had

18   substantial experience in the H-2B process, correct?

19       A.   Yes.

20       Q.   And prior to your representation of Signal, you had

21   substantial experience in the employment-based green card

22   process, correct?

23       A.   Yes.

24       Q.   And I believe you testified on Friday that prior to

25   representing Signal, you had substantial experience working

OFFICIAL TRANSCRIPT

1    with employers in the shipyard industry, correct?

2        A.   Yes.

3        Q.   Now I want to spend a minute looking at a document

4    that has been marked as Exhibit 1374.  And Mr. Howard showed

09:01:13    5    you this document.  I think he had a different exhibit

6    number.

7             And this is the multilateral --

8             MS. BOLLMAN:  Next page, please.

9    MS. BOLLMAN:  (CONTINUING)

09:01:28    10       Q.   -- multilateral business agreement between yourself

11   and Mr. Dewan and Mr. Pol, correct?

12       A.   It appears to be.

13            MS. BOLLMAN:  Let's go to the last page.

14   MS. BOLLMAN:  (CONTINUING)

09:01:38    15       Q.   Is that your signature on the agreement?

16       A.   Yes.

17       Q.   And the agreement is dated March 2, 2004?

18       A.   Yes.

19       Q.   And the purpose of this agreement was to recruit

09:01:49    20   and process Indian skilled workers through the

21   employment-based green card process, correct?

22       A.   Yes.

23       Q.   And pursuant to this agreement, you handled the

24   permanent resident process for J & M Associates of

09:02:03    25   Mississippi, correct?

OFFICIAL TRANSCRIPT

1    A.   Yes.

2    Q.   And you began meeting with Indian workers about the

3  permanent resident process for J & M in 2004?

4    A.   Yes.

5    Q.   And you told those candidates that they would

6  receive their green cards in 18 to 24 months, correct?

7    A.   I believe that there was also an advisal that there

8  could be delays.

9    Q.   And in 2005, you filed 162 labor certification

10  applications or PERMs for J & M, correct?

11    A.   I'm not sure if that is the exact number, but it

12  would appear to be close.

13    Q.   And so although you told those workers that they

14  would get their green cards in 18 to 24 months, it actually

15  took almost 24 months to just get the first part of the

16  process completed, correct?

17    A.   The labor certification?

18    Q.   Yes.  Because you filed them in 2005, but they

19  weren't certified until early 2006, correct?

20    A.   We had filed the PERMs in August of 2005, and some

21  of them got certified, if I'm not mistaken, in 2005, December

22  of 2005, January 2006.  Is that what you are referring to?

23    Q.   Yes.  But you began meeting with them in 2004.  So

24  it took 18 to 24 months just to complete the first step of

25  the process, getting --

OFFICIAL TRANSCRIPT

1    **A.**    Yeah.  We've heard a lot of discussion how what we
2    did is we were hoping to rely on the PERM system to get
3    rolled out, and it got delayed.  And that J & M started the
4    reduction in recruitment under the old process to try to
5    speed things up.  And then in the interim, the fast-track
6    PERM system was rolled out.

7    **Q.**    And you knew in 2006 when the J & M workers' PERM
8    applications were certified, that the EB-3 category for India
9    had retrogressed by over five years, correct?

10   **A.**    It was retrogressed at that time, I think, to
11   either 2002 or 2001.

12   **Q.**    Which would be over five years, correct?

13   **A.**    Approximately, yes.

14   **Q.**    And now I want to go and look at Document No. --
15   Exhibit 1300.  And this is the Global recruitment agreement,
16   correct?

17   **A.**    Yes.

18   **Q.**    And you testified on Friday that you were provided
19   with a copy of this agreement, correct?

20   **A.**    Yes.

21   **Q.**    I want to draw your attention to Paragraph 3 at the
22   end of the page.

23        And pursuant to this paragraph, you were the
24   attorney who was provided to Signal to handle the immigration
25   work, correct?

**OFFICIAL TRANSCRIPT**

         1       **A.**   But it doesn't name me as the person, but I was the
         2   lawyer that did it.
         3       **Q.**   Correct, but you were the lawyer that was provided?
         4       **A.**   Yes.
09:04:46 5       **Q.**   And you understood that you owed a duty of loyalty
         6   to Signal, correct?
         7       **A.**   Correct.
         8       **Q.**   And I want to go to Paragraph 2, the first
         9   Paragraph 2 of this agreement on this page -- in the middle
09:04:56 10  of the page where it says (as read:)  The I-140 permanent
        11   resident visas are for long-term needs and are generally
        12   available from 18 to 24 months after labor certification
        13   approval.
        14          And at the time you began representing Signal under
09:05:10 15  this agreement, you knew that the backlog for permanent
        16   resident visas for India for the EB-3 category was backlogged
        17   over five years, correct?
        18       **A.**   Yes.  Do you see the language?  It says "generally
        19   available."  And we discussed that.
09:05:23 20          And, in fact, in meetings with the Signal
        21   management, we discussed the backlog and the priority dates
        22   bouncing backwards and forward.
        23       **Q.**   Did you discuss the actual five-year date or, as
        24   you testified on Friday, did you say that the process was
09:05:38 25  problematic and you held out the hope and belief that the

1   EB-3 category would become current again?

2       A.   It was problematic that the priority dates bounced

3   backwards and forwards.

4       Q.   And so you never specifically told Signal that the

5   EB-3 category at that point in time was backlogged by five

6   years, did you?

7       A.   Oh, I'm not -- actually, I'm pretty sure I

8   mentioned that it was backlogged.  I'm not sure if I told

9   them the exact date or whether it was going to be three,

10  four, or five years, but they were aware that it was

11  backlogged and that there was no likelihood that these

12  workers were going to get visas right away, correct.

13      Q.   You have produced nothing in writing to confirm

14  this, have you?

15      A.   Well, that's your contract right there.

16      Q.   That contract says 18 to 24 months.  And at the

17  time you met with Signal, you knew the EB-3 category for

18  India was backlogged by over five years, correct, so it

19  wasn't generally possible to obtain a visa in 18 to

20  24 months?

21      A.   Yes, it could be possible.  In fact, if you look at

22  what happened with the priority dates, it did bounce back to

23  current in 2007.  It was current.  It went current within

24  basically a year.

25      Q.   So you advise your clients based on what's

OFFICIAL TRANSCRIPT

1    generally possible as opposed to what is the date that's out

2    there at the time on the Visa Bulletin?

3        A.   I advise my clients with the information I have

4    available.  And I give them an historical prospective of how

5    priority dates do retrogress.

6        Q.   And the information that available was that the

7    EB-3 category was backlogged by over five years, correct?

8        A.   I stated that it was generally available -- that it

9    was previously generally available.  It was subject to the

10   priority date's backlog.

11       Q.   So you never advised Signal that the time frame of

12   18 to 24 months was inaccurate, did you?

13       A.   I never -- say it again, please?

14       Q.   You never advised Signal that the time frame of 18

15   to 24 months was inaccurate?

16       A.   I did not -- no, I never told them it was

17   inaccurate.

18       Q.   And you never put anything in writing to Signal to

19   indicate that there was a visa backlog of over five years for

20   workers in the EB-3 --

21       A.   No, I did not put that in writing.

22            And when I discuss this with clients, I often don't

23   put it in writing because of the way it varies -- bounces

24   back and forth.

25       Q.   I want to direct your attention -- I want to go

OFFICIAL TRANSCRIPT

1  back to Exhibit 1300, and I want to direct your attention to

2  Paragraph 22.

3          And this paragraph says that Signal understands and

4  agrees that it is possible that temporary H-2B visas may not

5  be issued in a timely manner due to the caps set by the

6  U.S. government.  In any case, the permanent resident I-140

7  process will continue as agreed upon.

8          And on Friday you testified that your Plan B for

9  Signal was that if the H-2B visas were denied, you would file

10 for permanent residency for the workers, correct?

11     A.   Correct.

12     Q.   And so does this paragraph encompass your Plan B?

13     A.   Yes, it does.  I mean -- but if you look, it

14 actually states "may not be issued in a timely manner due to

15 caps."  They also could not be issued due to a determination

16 by the Department of Labor and the USCIS that they could be

17 denied due to --

18     Q.   On Friday --

19     A.   Go ahead.  I'm sorry.

20     Q.   On Friday you also testified that Signal had a dire

21 need for workers, correct?

22     A.   Yes.  As described by Signal.

23     Q.   And so if you had gone with Plan B, this plan, none

24 of the workers would be at Signal as of this date, correct?

25     A.   As of what date?

**OFFICIAL TRANSCRIPT**

1      Q.   Today.   None of those workers would have been
2   eligible to enter the country and come to work at Signal on a
3   permanent resident visa?
4      A.   Under current priority dates, correct.
5      Q.   So over eight years later, none of them would have
6   been able to immigrate to Signal on a permanent resident
7   visa?
8      A.   Correct.
9      Q.   So this was not really a viable option for an
10   employer with a dire need, was it?
11      A.   It would be the only way if you could not get them
12   in under H-2B visas.
13           And again, you know, hindsight is 20/20.   You can't
14   predict.   You could not have known for sure that it was going
15   to take eight years for the visas to become available for
16   green card applicants.
17      Q.   But at the time you began representing Signal, you
18   could have told them it was possible that it could be over
19   five years before anyone could enter the United States on
20   a --
21      A.   I had discussions about the backlogs -- the
22   priority dates being backlogged, with them.   I already said
23   that.
24      Q.   And, again, you have nothing in writing to confirm
25   that, do you?

**OFFICIAL TRANSCRIPT**

1    **A.**   No.

2    **Q.**   And at no point during your representation of

3    Signal did you put in writing for Signal details of how the

4    H-2B process worked, did you?

5    **A.**   In terms of going to the Department of Labor and --

6    **Q.**   Writing out for the client step by step how the

7    process worked?

8    **A.**   I'm not sure if we forwarded -- I do have a form

9    letter.  I'm not sure if we forwarded one to Signal in

10   relation to this or not.

11   **Q.**   And you have not produced anything in this case

12   that shows that during your representation of Signal, you put

13   in writing the details of the H-2B process, have you?

14   **A.**   I believe there is a letter that is somewhere in

15   evidence about advertising and applicants -- keeping an

16   applicant record of recruitment of U.S. workers.  And if U.S.

17   workers contact them, give -- write down when they contact,

18   send certified letter within ten days.  I believe that is in

19   the record.  I've seen that.

20   **Q.**   That's just one part of the process, though,

21   correct?

22   **A.**   That's a major part of the process.

23   **Q.**   But it's only one part of the process, correct?

24   It's the temporary labor certification process, correct?

25   **A.**   Yes.  And it may state in that letter -- again, I

**OFFICIAL TRANSCRIPT**

1   haven't seen the letter in a while, but it may state in that

2   letter that thereafter you file with USCIS H-2B petitions.

3       Q.   And at no point in your representation of Signal

4   did you put in writing the details of the employment-based

09:11:54  5   green card process, did you?

6       A.   I don't believe.

7       Q.   Now, I want to take a minute and look at a document

8   that has been marked as Exhibit 1571.  And this is an e-mail

9   from Mr. Dewan to you on July 31, 2006.  And it says at the

09:12:16  10  top:  This is confidential.  Do not forward to Signal.

11          Why was this marked confidential, do not forward to

12  Signal?

13      A.   Because he did not have candidates names.  He did

14  not want candidates to be submitted to Signal that were not

09:12:32  15  going to be going to Signal.

16      Q.   Did you feel you had a greater duty of loyalty to

17  your partner Mr. Dewan than you did to your client, Signal?

18      A.   No.  I just -- it was pre -- these were prescreened

19  candidates.  They weren't ones that were even tested by

09:12:46  20  Signal by that time.

21          You know, he was -- I think what he was trying to

22  relate to me is that there were candidates that were

23  considering going to Signal, but had not yet made up their

24  mind.

09:12:59  25          So he didn't want this information to go to Signal

**OFFICIAL TRANSCRIPT**

1    so that they would anticipate that they would get these

2    workers.

3         Q.    I want to move on now and talk about the testimony

4    you gave today and Friday about the green card promise to

5    all.

6           As an attorney with significant immigration

7    experience, you did not believe that all 476 workers that you

8    processed for H-2B work at Signal would remain there for two

9    extensions, and that each and every one of them would be

10    working at Signal at the end of the program so that you could

11    file for permanent residence for them, did you?

12         A.    It was certainly a possibility.  It was an offer

13    that was made by Signal for every employee that came over in

14    H-2B status.  They were prepared to file permanent residency

15    applications for each and every one of them pursuant to that

16    agreement.

17         Q.    But did you anticipate that each and every one of

18    those candidates would stay there for the entire time?

19           In other words, you never anticipated that some of

20    them might have been terminated or would abscond or decide to

21    return to India?

22         A.    You never know who is going to remain with an

23    employer.  I mean, that's a given in every employment

24    situation.

25         Q.    Correct.  It's a given that they could decide not

**OFFICIAL TRANSCRIPT**

1    to stay or they could leave or they could be terminated.

2           Workers -- in your 25 years, have you ever done an

3    non-immigrant visa for an employer who intended to file for

4    permanent residence, and that worker didn't work out and the

5    permanent residence process never proceeded?

6        A.    Yes.  Yes.

7        Q.    And so it was possible that not all 476 workers who

8    came to Signal would work out, correct?

9        A.    Of course that's a possibility.

10        Q.    And in your experience, wouldn't it have been

11    prudent to advise Signal to file the H-2B visas, because

12    those address their dire need, and then assess permanent

13    residence down the road after the workers were there?

14        A.    You mean advise Signal that they should wait before

15    making a determination on permanent residency?

16        Q.    Yes.

17        A.    No, because they said that they wanted to pursue

18    both.  They wanted to go to H-2B first and thereafter file

19    for permanent residency.

20        Q.    But they said that without having been fully

21    advised about how the process worked, correct?

22        A.    They knew how the process worked.

23        Q.    You have nothing in writing to show --

24        A.    I don't have to put everything in writing.

25           THE COURT:  Let her finish.


                        OFFICIAL TRANSCRIPT

MS. BOLLMAN:   (CONTINUING)

Q.   -- about every aspect of the program, including the five-year backlog for visas?

A.   You are correct.

Q.   I want to move now to the decision to use J & M workers for Signal.

At the time you began representing Signal, you still represented J & M with respect to workers in India for whom you were pursuing permanent residence, correct?

A.   Correct.

Q.   And you testified on Friday that the decision to use J & M workers was brought on because Mr. Dewan could not recruit 500 workers for Signal, correct?

A.   Correct.

Q.   And Mr. Howard showed you an exhibit this morning where, in October of 2006, the workers with J & M certified PERMs started complaining to Mr. Dewan that people were going to Signal on an H-2B visa and they had been waiting for over three years, correct?

A.   I'm not sure if the e-mail specified the time, the period of time that they had been waiting, but I know that there was frustrations.

Q.   Okay.  I'm going to show you an exhibit that is marked 1268.  And it is dated October 10, 2006.

And I want to focus on the first paragraph where it

OFFICIAL TRANSCRIPT

1    says (as read:)  We, Michael and Malvern, have met and
2    discussed the impending H-2B visa process for
3    Signal International.  As this process only began less than
4    six months ago, we did not contemplate using J & M or
5    Indo-AmeriSoft candidates to fulfill this process.  After
6    thoughtful consideration, we believe that this is quite
7    possibly a one-time deal after all the copycats and frauds
8    come out of the woodwork.  It will likely shut this process
9    down for India for another six to ten years.  Therefore, we
10   want to assume a position that will maximize profits for us.
11        So maximizing profits was very important for you,
12   correct?
13        A.   There was a lot of work involved.  I wanted to be
14   paid for my efforts.
15        Q.   And then I want to show you another document marked
16   1895.
17        And this is an e-mail from Mr. Dewan to you and
18   Global Resources, and it is dated October 11th, the next day,
19   2006.
20        And I want to focus on a portion of the first
21   paragraph that says (as read:)  I understand completely what
22   y'all are trying to say, and we all now -- know I think it
23   should be -- the answers to these questions.  It's, in simple
24   words, we want to get out of this mess and daily stress which
25   we cannot carry on any longer.  You and Mal have seen with

OFFICIAL TRANSCRIPT

1   your own eyes what me, Mannish, and Saliman are facing.  Our
2   cell phones are constantly ringing and we get calls 24/7 by
3   IAS, J & M, and Zito candidates.  I want you and Mal to be in
4   my position and put these questions across.

09:18:43   5           MS. BOLLMAN:  And then I want to go down and look
6   at another portion, at Number 4.
7   **MS. BOLLMAN:  (CONTINUING)**
8       **Q.**   Where it says (as read:)  You and Mal know the
9   reason why 500 candidates passed the test during Signal

09:18:54   10   interviews and only 200 came forward with the advance.  The
11   reason are the old groups who have been waiting three years.
12           So the Indian workers for whom you were doing
13   permanent resident visas for J & M were unhappy they had been
14   waiting for over three years for their visas, and now you

09:19:12   15   were recruiting for workers to go to the U.S. immediately on
16   H-2B visas, weren't they?
17       **A.**   Yes.  They were frustrated.
18       **Q.**   So ultimately, despite your desire to maximize your
19   profits and not use the J & M workers, the pressure from

09:19:26   20   these workers caused you to send many of them to Signal on
21   H-2B visas, correct?
22       **A.**   I think it was more difficult for Sachin to locate
23   the necessary workers for Signal than he could --
24       **Q.**   Because the old group was causing problems,

09:19:39   25   correct?

**OFFICIAL TRANSCRIPT**

1      **A.**    That and other reasons, which I'm sure Sachin will
2    testify to.
3      **Q.**    And, in fact, 116 workers for whom you had obtained
4    a certified PERM through J & M went to work at Signal on an
5    H-2B visa, correct?
6      **A.**    Did you say 116?
7      **Q.**    Yes.
8      **A.**    Yes.
9      **Q.**    And when you made the decision to send some of the
10   Indian workers with J & M certified PERMs, you did not notify
11   Signal that you represented these same workers for permanent
12   residence for J & M, did you?
13     **A.**    Incorrect.  We testified earlier that we met with
14   John Sanders.  I was at a meeting with Michael Pol and we met
15   with John Sanders and discussed this.
16     **Q.**    And if Mr. Sanders' testimony was that Mr. Pol
17   asked him if Signal would be willing to take some candidates
18   on H-2B visas who had started the green card process with
19   another employer, and Mr. Sanders told Mr. Pol that he did
20   not think it sounded right, you would agree that this does
21   not constitute consent by Signal to have the J & M workers?
22     **A.**    I was at the meeting.  And what comes clear from
23   the -- from his deposition testimony was that he confused the
24   fact that the J & M workers were giving up their permanent
25   residency and were going to be sponsored by Signal, as

**OFFICIAL TRANSCRIPT**

1   opposed to them coming to Signal and being applied for by

2   J & M.

3       Q.   And when the workers, who had certified PERMs

4   through J & M, were sent to Signal on an H-2B visa, you never

09:21:08   5   notified Signal that these workers were coming to Signal

6   because they were unhappy, that they had been waiting for

7   over three years already for their permanent resident visa,

8   which they were told they would have in 18 to 24 months,

9   correct?

09:21:21   10      A.   These were a highly-skilled group of laborers -- of

11  skilled workers who were basically -- had incredible

12  international experience.  And Signal was getting absolute

13  cream of the cream, and these were workers who were ready to

14  come and work.

09:21:38   15      Q.   That wasn't my question, was it, Mr. Burnett?

16          My question was:  Did you notify Signal that these

17  workers were unhappy that they had been waiting over three

18  years for their permanent resident visa that they had been

19  told they would get in 18 to 24 months?

09:21:51   20      A.   I think they were very happy to come to the

21  United States to work.  They were ready to come.

22      Q.   You never told Signal that they had been waiting

23  over three years to get their permanent resident visa that

24  they had been promised in 18 to 24 months, did you?

09:22:05   25      A.   I did not.


                        **OFFICIAL TRANSCRIPT**

1      Q.    Thank you.

2            And when the workers with certified PERMs to J & M

3      came to work at Signal, you never notified Signal in writing

4      of any potential conflict of interest with respect to your

5      representation of Signal and J & M, did you?

6      A.    I did not.  I did not perceive a conflict of

7      interest.

8      Q.    I want to talk now about the filing of the I-140s

9      for workers who were at Signal.  I would like to look at

10     Exhibit 0574.

11           MS. BOLLMAN:  Go to the fourth page, please.

12     **MS. BOLLMAN:   (CONTINUING)**

13     Q.    And this is an e-mail from Sachin to you and

14     others, correct?

15     A.    Yes.

16     Q.    Dated June 12, 2007.

17     A.    Yes.

18     Q.    There is a list on this e-mail of some of the J & M

19     workers who were at Signal, and it's noted "deployed at

20     Signal," correct?  Correct?  I think there are four workers

21     here on this first page --

22     A.    Yes.

23     Q.    -- that we can mark as deployed at Signal.  Five,

24     actually -- no, six.

25           And if we go to the next page, there are two more

**OFFICIAL TRANSCRIPT**

1      names of workers who are deployed at Signal, correct?

2          A.   Correct.

3          Q.   And if we go to the next page, there are another

4      16 names of workers who are deployed at Signal, correct?

5          A.   (No response.)

6          Q.   It will take a minute to highlight those.

7               And so as of June 12, 2007, you were aware that

8      there were at least 24 J & M candidates for whom you were

9      going to be filing an I-140 who were deployed at Signal,

10     correct?

11         A.   Yes.

12         Q.   And so in June of 2007, you began filing I-140s for

13     workers who had a certified PERM for J & M, correct?

14         A.   Let me back up and say something.

15              I'm looking at the notations on this, and it says:

16     Will send ETA back on the ones that were deployed at Signal.

17              So I had not yet received the PERMs back that were

18     signed, and that's what we were waiting on.

19              So I can't tell you for sure if these I-140s were

20     filed or not, because the signed ETAs would have been a

21     necessary requirement to file the I-140s.

22              So as of this date, I can't tell you that they were

23     filed.  This was sent to me -- well, to my associate who

24     handled the I-140s.

25         Q.   But you could -- but you certainly were aware that

OFFICIAL TRANSCRIPT

1    many J & M workers were at Signal?

2         A.   Well, I knew there were 116 J & M workers at

3    Signal.

4         Q.   And so you testified just a few minutes ago that

5    when you talked to John Sanders about the potential of

6    sending J & M candidates to Signal, he understood that they

7    were giving up their permanent residence process with J & M,

8    correct?

9         A.   Correct.  That Signal would be filing for them.

10        Q.   But in June of 2007, you began filing I-140s for

11   workers who had a certified PERM for J & M, correct?

12        A.   Yes.  And the reason I did that is because the

13   permanent residency applications, or the PERMs, were getting

14   ready to expire.

15             And it's going to take an explanation, but what

16   happens is when these -- when these PERMs are approved and

17   the Department of Labor promulgates a rule -- makes a rule

18   that says that these -- that these PERMs are valid for only

19   six months, you had to file the I-140s to preserve the PERM.

20             You had to do that within six months of the date of

21   that rule, which meant at that time, if I'm not mistaken,

22   that you had to file the I-140s by January of 2008, and I did

23   so to preserve the priority dates.

24             Now, once an I-140 is filed by an employer, once it

25   is approved -- and this is a very important concept.

                         OFFICIAL TRANSCRIPT

1          Once the I-140 gets approved for a worker, that

2  worker can use that I-140 and use it for another employer.

3          In other words, Signal could use that I-140

4  approved for that employee in order to obtain permanent

09:26:58   5  residence.  What they do is they interfile it or they file it

6  with a new I-140 application.

7     Q.   You never discussed this with Signal, did you?  You

8  never notified Signal that you were filing I-140 petitions on

9  behalf of J & M for workers that were at Signal on an H-2B

09:27:13  10  visa, did you?

11     A.   Well, I did not tell them, no.  But it was done --

12     Q.   Thank you.

13     A.   -- and they benefited from it.

14     Q.   You didn't tell them, did you?

09:27:20  15     A.   Right.

16     Q.   And during the same time frame that you were filing

17  the I-140s for J & M, weren't you also filing H-2B extensions

18  for those same workers?

19     A.   Yes.

09:27:32  20     Q.   And we're going to look at a document marked as

21  Exhibit 0689.

22          And this is a receipt notice for some of the H-2B

23  extensions that you did for Signal, correct?

24     A.   Yes.

09:27:50  25     Q.   And you can see that this is for Signal.  We can

**OFFICIAL TRANSCRIPT**

```
 1    highlight Signal's name.  This is the approval notice,
 2    actually.  And we can see the receipt date of
 3    August 10, 2007.
 4            And then on the second page, we can see -- blow it
 5    up a little, but we can see the name of one of the
 6    plaintiffs, Andrews Issac Padavettiyil.
 7       A.   So this is the actual receipt --
 8       Q.   This is the approval notice.
 9       A.   -- approving the status through March 2008.
10       Q.   Right.  But it shows a receipt date of August.
11            And then next I want to go to Exhibit --
12       A.   Could we back up and let me look at the first page
13    of this, please, just for a second?
14       Q.   (Complies.)
15       A.   Okay.  Okay.  So this shows for these -- all those
16    listed employees, H-2B extensions were filed by Signal.
17       Q.   Correct.
18       A.   And they were approved all the way through March, I
19    believe -- is it March or June 2008?  I can't see.  If you
20    could blow that up.
21       Q.   (Complies.)
22            June.
23       A.   Okay.  So this H-2B petition is approved so these
24    workers could continue working at Signal through
25    June 1, 2008.
```

OFFICIAL TRANSCRIPT

         1     Q.   Next I want to look at Exhibit 1503.

         2          MS. BOLLMAN:  And we need to go to Page 124 of that

         3     exhibit, please.

         4     MS. BOLLMAN:  (CONTINUING)

09:29:44 5     Q.   And this is a receipt notice for Andrews Issac

         6     Padavettiyil for an I-140 for J & M Associates of

         7     Mississippi, correct?

         8     A.   Correct.

         9     Q.   Filed by you?

09:29:54 10    A.   Yes.

         11    Q.   Your name is there?

         12    A.   Correct.

         13    Q.   And filed on June 11, 2007, correct?

         14    A.   Correct.

09:30:02 15    Q.   And so at the same time -- the same time frame that

         16    you filed his I-140, you also filed his H-2B petition?

         17         You filed an I-140 for J & M and you filed his H-2B

         18    extension for Signal, correct?

         19    A.   The I-140 was filed in June.  The H-2B extension

09:30:23 20    would have been filed a month later.

         21    Q.   Well, it was actually filed in June, but returned

         22    to you, correct?  Because the original H-2B visas expired on

         23    July 31st -- or was filed in July -- by July 31, 2007,

         24    correct?

09:30:37 25    A.   No, I'm not sure that's correct.  Could you

                              OFFICIAL TRANSCRIPT

1    explain?

2        Q.   It doesn't matter.  It was filed -- the receipt

3    date of the petition was August 10, 2007.

4            So it was still within a couple months of each

5    other you filed an I-140 for J & M and an H-2B extension for

6    Signal for the same beneficiary, correct?

7        A.   Well, many of the -- there were many other

8    beneficiaries listed on that H-2B extension, correct.

9        Q.   And the filing of the I-140 for Mr. Padavettiyil

10   for J & M could have had an adverse effect on

11   Mr. Padavettiyil's H-2B extension, correct?

12       A.   No.  Why?

13       Q.   Because it indicated immigrant intent when he was

14   also filing for an extension of a nonimmigrant visa?

15       A.   No.  What makes you say that when the priority date

16   is backlogged?

17       Q.   It still indicates immigrant intent.  It still

18   indicates that he wishes to stay --

19       A.   What's your basis for that?

20       Q.   Well, this is my question to you, Mr. Burnett:  If

21   Mr. Gonzalez testified to the contrary of what you're saying,

22   that the filing of an I-140 for one employer and an H-2B visa

23   for another employer could result in the denial of the H-2B

24   visa, would you disagree with him on that?

25       A.   Yes, I did -- I do.  And it did not have any effect

OFFICIAL TRANSCRIPT

1    on it.  I mean, as they say, the proof is in the pudding.

2        Q.   The fact that the results turned out okay for

3    Signal doesn't mean that you shouldn't have properly advised

4    them about the potential that it wouldn't work out properly,

5    wouldn't you agree?

6        A.   I didn't see a potential problem.

7        Q.   So in July 2007, the immigrant visa quota went

8    current for the EB-3 category for India, correct?

9        A.   Correct.

10       Q.   And you worked with Ram Cheerath, an attorney in

11   New York, to file adjustment applications for some of the

12   J & M candidates who were H-2B workers at Signal?

13       A.   I was requested by J & M to provide file materials

14   to them.

15       Q.   And you filed one adjustment application yourself

16   for an J & M candidate who was an H-2B worker at Signal,

17   correct?

18       A.   I did.  It was at the last moment, and he asked for

19   my help and I provided that help.  I did not charge him a

20   penny.

21       Q.   And you knew as a result of filing the adjustment

22   application, these Signal H-2B workers could obtain

23   employment authorization, correct?

24       A.   A general work authorization which allows the

25   beneficiary, the worker, to continue working where they are

OFFICIAL TRANSCRIPT

1    presently working, i.e. Signal.

2        Q.   And you never notified Signal that these workers

3    were going to be obtaining employment authorization

4    documents, did you?

09:33:05   5        A.   No.

6        Q.   And you never notified Signal that you had a

7    conflict of interest in representing them with respect to

8    some of the H-2B workers, did you?

9        A.   I didn't perceive it as a conflict of interest.

09:33:16  10        Q.   In your experience, isn't it true that once a

11   person gets an employment authorization document from an --

12   where an employer sponsored them for a green card, generally

13   that employer wants them to come and work for them?

14        A.   It's not always the case.  You've got to

09:33:31  15   remember --

16        Q.   But generally?  Generally?  Generally isn't that

17   the case, that the employer that has put the time and effort

18   into the green card application, they want the employee, who

19   now has employment authorization, to come and work for them?

09:33:45  20        A.   You have to remember, at the time this was going on

21   J & M just lost -- or was losing its contract and its

22   employment at NASSCO in California.  They did not have work.

23   In fact, that's why they agreed to allow Signal to pick up

24   their employees.

09:33:56  25        Q.   Actually, wasn't there still a lot of work on the

OFFICIAL TRANSCRIPT

1    Gulf Coast in Mississippi in the different shipyards, and
2    labor suppliers were looking for laborers to do work in that
3    area?
4        A.   I don't know if that is your testimony or
5    Billy Wilks' testimony.
6        Q.   Isn't it what Mr. Gonzalez spoke about in his
7    testimony, that where you have a worker who can work for the
8    nonimmigrant employer for a limited period of time and you
9    have the green card employer who now can have that person
10   come to work with them on an employment authorization, that
11   the magnet is to pull the worker towards the green card
12   employer because that employment is going to be permanent?
13       A.   I would think that the ability of the employer, the
14   Signal employer, to retain its employee would be stronger.
15       Q.   You think it would be stronger for a worker to stay
16   where they had a limited period of time as opposed to going
17   to the employer that sponsored them for their green card and
18   could keep them in the United States permanently?
19       A.   Now they can stay with Signal for longer.  They're
20   not bound by their H-2B.  They can stay for the full length
21   of time of the work authorization document.
22       Q.   But they are bound by the green card employer.  The
23   green card employer has to continue to pursue that green card
24   for them.  And that person -- that employer has sponsored
25   them for the green card and wants them to come to work for

OFFICIAL TRANSCRIPT

1   them on that employment authorization.  Correct?

2        A.   Well, as it turns out, J & M did not have any

3   problem with them continuing to work at Signal.  And if you

4   will note also, the I-140s for J & M were ultimately denied.

5        Q.   But not at this time, the time we're talking about

6   in July of 2000 -- or November of 2007 when you're

7   representing J & M and Signal and the workers are starting to

8   get employment authorization and J & M is pulling them to

9   work for them and Signal only has a temporary visa for them.

10       A.   And workers are permitted to remain at Signal.

11       Q.   I want to talk now about December of 2007 when

12  Signal terminated its employee/client relationship with you.

13            Mr. Howard tried to suggest on Friday that this was

14  because Signal wanted to hold onto its workers and that's why

15  Mr. Schnoor called you and was upset.

16            But, in fact, what you testified on Friday was that

17  Mr. Schnoor told you that you had divided loyalties and that

18  Signal was not going to tolerate that; isn't that correct?

19       A.   That's an absolute proper characterization.

20       Q.   And so the reason Mr. Schnoor terminated you was

21  not because he wanted to hold onto the workers, but because

22  he had become aware that, as Signal's lawyer, you were not

23  exercising your duty of loyalty to it?  That you were

24  partners with Mr. Dewan and Mr. Pol in bringing these J & M

25  workers to Signal when they had permanent resident visas, and

OFFICIAL TRANSCRIPT

1    that you were representing the interests of Signal and J & M
2    at the same time?  And that those interests opposed each
3    other?  And that you were part of the magnet with J & M that
4    was pulling workers away from it.  Isn't that correct?

09:36:53
5        A.   Can you break this question down a little bit into
6    some manageable parts?
7        Q.   Signal terminated you because you had breached your
8    duty of loyalty to it --
9        A.   That is what --
09:37:06
10       Q.   You were representing Signal and you were
11   representing J & M?
12       A.   That is what Mr. Schnoor said.  I tried to explain
13   to the contrary, just as I just did to you.  He said I
14   believe --
09:37:18
15            MS. BOLLMAN:  Those are all my questions,
16   Mr. Burnett.  Thank you very much.
17            THE WITNESS:  You are welcome.
18            MR. SHAPIRO:  I have no questions for this witness,
19   Your Honor.
09:37:26
20            THE COURT:  All right.  Thank you.
21                       REDIRECT EXAMINATION
22   BY MR. CERNIGLIA:
23       Q.   Mr. Burnett, let me first start with Signal's
24   questions.
09:37:48
25            You filed an I-140 for Mr. Andrews, Issac Andrews,

OFFICIAL TRANSCRIPT

1   correct?

2        A.   Correct.

3        Q.   If that had been approved and if an employment

4   authorization document had been issued, Signal could sponsor

5   him for a green card?

6        A.   It could use the I-140 and basically have filed for

7   his permanent residency, exactly.

8        Q.   So they could have kept their agreement with

9   Mr. Andrews by simply now filing, just like they said they

10  would do, their own application for a green card?

11       A.   Absolutely.   Even though it was not inconsistent.

12       Q.   Even though J & M filed one, now they could file

13  one?   If they wanted him, they could file for one?

14       A.   Correct.

15       Q.   And they would then get J & M's earlier priority

16  date?

17       A.   Correct.

18       Q.   You were asked about filing an I-140 by J & M for

19  Mr. Andrews and whether that is inconsistent with filing an

20  H-2B extension.   Do you remember being asked those questions?

21       A.   Yes.

22       Q.   Isn't it correct that the regulations specifically

23  state that if it was two different employers, it's okay?

24       A.   8 CFR 214, yes, it provides for that.

25       Q.   Now, there were a lot of questions about their

                        **OFFICIAL TRANSCRIPT**

```
 1    Exhibit 1300, the agreement between Global and Signal.  I've
 2    been using Exhibit 200, because it seems to be not as fuzzy.
 3    It's not blurred with lines and stuff through it, so I will
 4    continue to use 200.
 5                 Now, this is that agreement that you were shown
 6    between Global and Signal?
 7          A.   Yes.
 8          Q.   And we've already established that it was signed on
 9    April 18, 2006, right?
10          A.   Yes.
11          Q.   So prior to this date, you were not tendered to
12    Signal to do the filing of immigration papers, correct?
13          A.   None.  None whatsoever.
14          Q.   And you met with Mr. -- you talked to Signal
15    management first on the telephone in early February?
16          A.   That was it.  It was a conference call, yes.
17          Q.   Any decision reached?
18          A.   No.
19          Q.   Did Signal say, oh, based on everything you have
20    said, Mr. Burnett, I'm signing up right now today?  Did they
21    do that?
22          A.   No.
23          Q.   Then you had another meeting, right?
24          A.   Yes.
25          Q.   That's also in February?
```

09:40:10 (line 5)
09:40:54 (line 10)
09:41:16 (line 15)
09:41:28 (line 20)
09:41:36 (line 25)

**OFFICIAL TRANSCRIPT**

1    A.   I believe that's the case.

2    Q.   And you explained to them again the problems with

3  priority dates being backlogged, right?

4    A.   Yes.  And the problems with the H-2B process.

5    Q.   Now, at that point in time, is Signal your client?

6  February of 2006.

7    A.   No.

8    Q.   You're just giving them general information because

9  Michael Pol asked you to?

10    A.   Yes.

11    Q.   Were you aware that in this same time period, from

12  February all the way until they executed this, that Signal

13  was consulting its own attorneys on this contract?

14    A.   I'm sure they were.

15    Q.   You were here for the testimony?

16    A.   Yes.

17    Q.   Okay.  And if the testimony and the evidence show

18  that they had access to their own immigration lawyer, and it

19  was recommended by their own managers to consult with

20  Signal's own immigration lawyers, does that mean they are

21  relying on you for anything?

22    A.   They could rely on their own lawyers.  They could

23  rely on whomever they wish.

24    Q.   Your meetings with them were informational only?

25    A.   Correct.


**OFFICIAL TRANSCRIPT**

1     Q.   You don't represent them at all?

2     A.   I did not.  Not at that time.

3     Q.   And they knew that?  They knew you didn't represent

4  them in February?

09:43:02    5     A.   They had not inked the agreement until April.

6     Q.   Now -- did you prepare this agreement?

7     A.   I did not.

8     Q.   Who drafted it?

9     A.   I think Signal testified that one of their lawyers

09:43:16   10  prepared it.

11     Q.   So with their own lawyers, and access to an

12  immigration lawyer, the language in it is essentially

13  Signal's language, it's not yours, is it?

14     A.   No.

09:43:32   15     Q.   You were asked about the different J & M workers.

16  And of course, it's not unusual that Signal's lawyer wants to

17  use the words that you sent J & M workers.  Did you send

18  anybody anywhere?

19     A.   No.

09:43:52   20     Q.   Did you know in -- at any time before the

21  extensions were due who Signal had selected?

22     A.   No.  I did not have a list of those workers.

23     Q.   But you do know that Signal was advised by

24  Michael Pol that some of these workers had applied for J & M?

09:44:16   25     A.   Yes.


                        OFFICIAL TRANSCRIPT

1    **Q.**   And the agreement -- this agreement says that
2    Global will advise, pretest, and select and qualify the
3    workers, right?

4    **A.**   Yes.

09:44:35
5    **Q.**   You didn't select the workers that Michael Pol
6    presented to Signal to test?

7    **A.**   I had nothing to do with testing or selection of
8    the workers, no.

9    **Q.**   And when all the workers came over, did Signal
09:44:49
10   gather up everybody's I-94 cards and make copies and send
11   them to you for your records?

12   **A.**   No.

13   **Q.**   In fact, when we got near the time for extensions,
14   were you having a difficult time trying to determine exactly
09:45:05
15   who they were keeping and who they weren't keeping?

16   **A.**   Yes.

17   **Q.**   You were asked by Mr. Howard -- and I'll show you
18   the document.  Exhibit Number 564.  And this is -- we'll call
19   it the "by the way, tell Rao to show me the money."

09:46:29
20        First of all, what is "show me the money"?  What
21   are you talking about?

22   **A.**   He still owed me money from two years ago prior to
23   that date.

24   **Q.**   Who is that?

09:46:36
25   **A.**   Dr. Rao and Indo-AmeriSoft.

**OFFICIAL TRANSCRIPT**

1    Q.    For what?  What did he owe you the money for?

2    A.    He still owed me travel fees for my staff.

3    Q.    And what about for the actual filing of the

4    paperwork for his candidates?

5    A.    He also owed me attorneys fees for filing the

6    Indo-AmeriSoft PERM applications.

7    Q.    Which brings me to this question, which Mr. Alan

8    was asking you:  Did any of the candidates for Indo-AmeriSoft

9    contract with you to file paperwork?

10   A.    No.  I represented Indo-AmeriSoft, the company that

11   Rao owned, and he paid me directly to handle the legal work.

12   Q.    And you testified about the origin of this

13   particular e-mail which you are responding to.

14         I'll now show you Exhibit 563.

15         That was from Mr. Dewan to you dated February 3rd,

16   '06, at 6:40 p.m.

17   A.    Yes.

18   Q.    And of course the e-mail that -- in which you

19   responded is the same day, but almost two-and-a-half hours

20   later or so, right?

21   A.    Yes.

22   Q.    And does this explain what you were -- tried to

23   explain, that they wanted to see the original as proof?

24   A.    They wanted -- yeah, we sent copies, and they

25   wanted to see the original PERMs.  And that, you know, I was


OFFICIAL TRANSCRIPT

1    very leery of sending them, because if they got lost, it

2    would be extremely difficult to get new ones from the

3    Department of Labor.

4        Q.   You were asked about whether you had done anything

5    beyond an original extension for Mr. Khuttan -- I mean an

6    original -- beyond the original H-2B visa.  I'll show you a

7    couple of exhibits.

8            This is Exhibit 1481.  Was this the actual original

9    application for the extension that you filed on behalf of

10   Signal, one of them?

11       A.   Yes, it is.

12       Q.   And is this document part of that application?

13       A.   Yes.  This is the attachment wherein you submit the

14   alien's name and the I-94 number, which is that document that

15   is listed below it.

16           That's what we had a hard time getting from Signal

17   in order to file these on a timely basis.

18       Q.   But Mr. Hemant Khuttan is one you did file a --

19       A.   Yes.  He is listed, correct.

20       Q.   I believe --

21       A.   That would have been the extension going through

22   2008.

23       Q.   Correct.  I'm going to show you an exhibit that

24   Patricia Bollman had just shown you.  I can't call them up

25   quite as fast.


                        OFFICIAL TRANSCRIPT

1        This is Exhibit 689.  And this was the approval

2   notice?

3        A.   Yes.  This would have been the first extension

4   making the H-2B workers valid through June 2008.

5        Q.   And this is the list of people that have been

6   approved.  Hemant Khuttan is one of them?

7        A.   Yes, it is.

8        Q.   If Mr. Khuttan left Signal's employment after the

9   date that this authorized him to work for, even if Signal had

10  not fired you, is there any way that you could file a

11  green card for him or sponsorship for him?

12       A.   If he had left Signal after this date, and if

13  Signal wished to apply for him?  Is that your question?

14       Q.   If he left -- if he just walked off the job and

15  took off, doesn't work for Signal anymore, and assuming

16  Signal hadn't terminated you, could you file anything?

17       A.   No.  Not if Signal was not going to petition for

18  him, absolutely not, no.

19       Q.   Because he is not there anymore?

20       A.   Right.

21       Q.   Now, you were also asked about whether or not

22  Mr. Jacob Joseph was aware, at the time that he came over to

23  Signal, I presume, that the priority dates had been

24  backlogged -- or had been advised about the priority dates

25  being backlogged.


                          **OFFICIAL TRANSCRIPT**

1    **A.**   Yes.  And I had indicated that I had supplied a
2   letter -- or some documentation to establish the fact that
3   the third preference priority date was backlogged, and that
4   it would be difficult to take -- state with any certainty
5   when it would become current.
6    **Q.**   And now I'm going to show you Exhibit 2017.
7         That was an e-mail to you January 11, 2006.
8         Due to the backlog of the third-preference labor
9   category.  You saw this on Friday?
10   **A.**   Yes, I did.
11   **Q.**   And I think you were shown this also.  This is
12  Exhibit 498.  This is called an Annexure to Agreement for
13  Mr. Joseph Jacob?
14   **A.**   Yes.
15   **Q.**   Now, is that same information in here about the
16  third-preference visa category, that you talked about in July
17  of '05 was a mistake, but that it was backlogged all the
18  same?
19   **A.**   Correct.
20   **Q.**   So if this was executed by Mr. Jacob Joseph before
21  he signed up for Signal -- or at the same time he signed up
22  for Signal, then he understood, when he signed up for Signal,
23  that the J & M process was backlogged?
24   **A.**   Absolutely.
25   **Q.**   Now, Mr. Howard asked a lot of questions Friday and

**OFFICIAL TRANSCRIPT**

1    some today about, quote, promises that you had made.

2          I want you to describe exactly what communications

3    you are talking about.  Did you come in and say, listen, I

4    hereby promise you no matter what?

09:56:07   5          When you met with these people, what took place?

6          A.   I told them -- well, basically there were various

7    forms where the Signal opportunity was discussed, and it was

8    stated that Signal would be petitioning for their H-2B status

9    and after the extensions, Signal would petition for their

09:56:32   10   permanent residency.  That was the promise that was made.

11          I mean, if you want to call that a promise.  It was

12   a statement.  It was a declaration of what Signal had stated

13   they would do.

14         Q.   And that's all you were doing?

09:56:43   15        A.   Yes.

16         Q.   Would -- we looked at this on Monday.  This is

17   Exhibit 1, preparing candidates for their interviews.  You

18   said that this would not have gone out until September, but

19   you did the same thing.

09:56:59   20          Would you have discussed these types of things with

21   all of these individuals when you met with them?

22         A.   Absolutely.  I had to go over all this

23   documentation with them.

24         Q.   If at the time you met with these people, they had

09:57:17   25   already decided to accept Signal's offer and they wanted the

**OFFICIAL TRANSCRIPT**

1   job, and they were going to go to the job, and they were

2   going to go on an H-2B to start off with, would you have

3   anything to do with them making that decision?

4        A.   No.

5        Q.   You were shown the -- Friday you were shown, and

6   you talked about it today, the labor -- the PERM for

7   Jacob Joseph being approved like in either late December '05

8   or early January 2006.

9        A.   Yes.

10       Q.   If you had -- when you returned from that trip in

11  April of '04, which the evidence shows that's when you met

12  with him -- you had filed -- with advertising and whatever is

13  required, what would have been the earliest time you could

14  have filed for a permanent labor certification under any

15  circumstance?

16       A.   Well, you had to wait six months from the date of

17  filing the advertisement under the old system -- well, under

18  the reduction in recruitment.  So it would --

19       Q.   Not the reduction in recruitment.  Let's just say

20  the old style.

21       A.   Okay.

22       Q.   You just file it automatically or you have to do

23  any steps?

24       A.   No, you have to file -- under the old system, you

25  would file documents with the Department of Labor to start

OFFICIAL TRANSCRIPT

1  the recruitment process, and it would start what is called

2  supervised recruitment.

3    Q.   Now, do you have any idea how long it would have

4  been under the old system before you would have gotten a

09:59:07    5  response?

6    A.   The old system at that point had been backlogged

7  several years.

8    Q.   So then you decided to go with the PERM -- I mean

9  with the reduction in recruitment?

09:59:14    10    A.   Reduction in recruitment was a revised permanent

11  residence system within the Department of Labor that was

12  supposed to speed up the process.  But it, likewise, was --

13  experienced problems and delays.

14    Q.   My question is:  Do you believe that going the way

09:59:39    15  you eventually did with the PERM resulted in a labor

16  certification -- permanent labor certification sooner or

17  later than you would have if you filed -- you started the

18  process back in May of 2004?

19    A.   I have no idea -- I have no doubt that it was a

09:59:54    20  faster system.

21    Q.   The PERM?

22    A.   The PERM.  Because the reduction in recruitment was

23  sent to this, as I said, the black hole, the backlog

24  reduction center.  And many applications languished there

10:00:09    25  well after the PERM was rolled out and was available.


OFFICIAL TRANSCRIPT

1    Q.   And you were asked about collecting the fees at
2  that time.  The fee structure before, was it like result
3  oriented?  You paid to play?
4    A.   Yes.  You paid a fee to start the process.  And
5  once the labor certification was approved, you paid a fee.
6    Q.   So Jacob Joseph and everybody else made that
7  agreement, right?
8    A.   Yes.
9    Q.   And you did the PERM?  You got it, and you expended
10  time, effort, and money, including bringing people over to
11  get that accomplished?
12    A.   I brought my staff over there, yes.
13    Q.   And under that same program, if it went on for the
14  I-140, when would you get the third payment?
15    A.   Upon approval of the I-140.
16    Q.   So you don't get your third payment as long as it
17  can't get approved?
18    A.   Correct.
19    Q.   So it's a risk that you would take, and it's a risk
20  they would take that the I-140 may take a long time?
21    A.   Yeah.  And if the PERM didn't get approved, I
22  wouldn't get paid likewise.
23    Q.   And when you switched over -- and that was another
24  thing.  You keep saying -- or they kept asking you when you
25  switched over or when you sent somebody to Signal.


OFFICIAL TRANSCRIPT

l0:00:32
l0:00:43
l0:01:00
l0:01:10
l0:01:29

1          Who made the decision whether they were going to go

2    to Signal or not, the people that were J & M candidates?

3      A.   Well, the J & M candidates decided if they wanted

4    to go to Signal.  And Billy Wilks decided -- had to make a

10:01:50    5    decision to allow them to do so.

6      Q.   And did you have any knowledge of which of the

7    J & M candidates had made that decision in 2006?

8      A.   No, I did not.

9      Q.   You explained how once that finally was agreed to

10:02:13   10   switch over, you applied all the fees that had previously

11   been paid to now doing the temporary labor certification and

12   everything else?

13     A.   Correct.  Basically, yes.

14     Q.   So basically you did it over again?

10:02:26   15     A.   Exactly.

16     Q.   With the extensions especially?

17     A.   Exactly.

18     Q.   And you talked about that on your first day about

19   front-loading for the H-2B process, because it was going to

10:02:38   20   be doing extension and extension and then a green card,

21   right?

22     A.   Yes.

23     Q.   And we heard a lot of testimony about all these --

24   the individuals for -- that Signal terminated, that you found

10:02:55   25   other employers that were willing to do the H-2B extension,

OFFICIAL TRANSCRIPT

1    and you filed for a transfer and then the extension for them?

2        A.    Yeah.   Not only did the extension with Signal, but

3    I also did extensions with two other employers.

4        Q.    Did the workers pay you any more money for any of

5    that work?

6        A.    They did not pay me any money to do the extensions,

7    no.

8        Q.    Lastly, I want to ask you about you -- you were

9    asked for what we sometimes call a compound question.   I want

10   to explain it to you.

11            You agreed that -- you, in fact, said you don't

12   dispute that Dewan was authorized to sign those attorney

13   services agreements.

14       A.    No.

15       Q.    You don't dispute that?

16       A.    I mean, I -- basically, I will stand by the

17   agreements.

18       Q.    My question to you, though, is:   To what extent did

19   you ever appoint Mr. Dewan to be your agent on your behalf

20   for all purposes, for any and everything?

21       A.    I never gave him a power of attorney.

22       Q.    And as far as an agent, he was authorized to sign

23   your name on those documents, right, the attorney services

24   agreement?

25       A.    I did not specifically authorize him to do so.


                          **OFFICIAL TRANSCRIPT**

1    **Q.**   And he was authorized to collect the fees and send

2    them to you?

3    **A.**   Yes.

4    **Q.**   But other than that, he was not your agent, was he?

10:04:29    5    **A.**   No.

6           Are you asking me, like, if we had an agreement

7    like between -- like he had with Signal to act on their

8    behalf?  Did he have that type of agreement with me?

9    **Q.**   That type of agreement with you?

10:04:45   10    **A.**   No, he did not.

11   **Q.**   Did you ever intend to give him any authority to

12   act on your behalf or say things on your behalf?

13   **A.**   No, I did not give him that, nor did I give Michael

14   Pol that authority.

10:04:59   15           MR. CERNIGLIA:  Your Honor, that's all I have.

16           THE COURT:  All right.  Thank you, Mr. Burnett.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  All right.  We're going to take our

19   morning break.  I want to remind you of the instructions that

10:05:12   20   I have been giving you throughout the trial.

21           Until the trial is over, you're not to discuss the

22   case with anyone, including your fellow jurors or anyone

23   else.

24           If anyone approaches you and tries to talk about

10:05:24   25   the case, do not tell your fellow jurors, but advise me about

**OFFICIAL TRANSCRIPT**

1   it immediately.

2          You are not to communicate with or provide any

3   information to anyone by any means about this case.

4          You are not to reach any conclusions in the case

5   until all the evidence has been presented, the Court has

6   instructed you on the law applicable to the case, and it is

7   given to you for deliberation and decision.

8          And of course you are not to use any cell phones,

9   iPads, other electronic devices to communicate to anyone

10  about the case or to attempt to get any information about the

11  case.

12         We'll come back at 10:20.

13                          (Jury out at 10:06 a.m.)

14         THE COURT:  All right.  Have a seat.  I have a

15  couple of questions I wanted to ask.

16         So the deposition of Mannish Dewan is next?

17         MR. SHAPIRO:  Yes, it is, Your Honor.  And I have a

18  reader that I need to get here, and I need to go down to the

19  second floor and get him.

20         THE COURT:  Do you think he is at the door

21  downstairs?

22         MR. SHAPIRO:  No.  He is at the Federal Public

23  Defender's office.

24         THE COURT:  Okay.  You need to make sure he is here

25  and on the stand.  Have you contacted him?

                        **OFFICIAL TRANSCRIPT**

1          MR. SHAPIRO:  I have tried to contact him.

2          In the event he is not here, I'm going to have to

3    just put on Mr. Dewan.

4          THE COURT:  Oh, you're just saying put on Mr. Dewan

5    first.  All right.  We have got to keep going.

6          MR. SHAPIRO:  I understand.

7          THE COURT:  My desire is to finish the testimony

8    today, and that's why we're having a half-hour lunch and

9    we're going to go late tonight.

10          That would allow me in the morning to tell the jury

11    to come a little later, and we can do any motions you have.

12    And we can do any objections you have to the jury

13    instructions, and they won't be sitting there waiting.

14          So I would -- that's why we cannot waste a second.

15    So if he is not here ready to go, then we need to put

16    Mr. Dewan on the stand.

17          And the same for this afternoon.

18          I had a couple of questions about the comments that

19    the plaintiffs sent about the jury instructions.

20          I think the e-mail was from -- I think it may have

21    been from Ms. Graunke, but maybe Ms. Tsu or somebody else can

22    address my question.

23          The first one is on Claim 2, discrimination.  Is

24    there anybody here who can talk about this?

25          MR. WERNER:  Yes, Your Honor.


                          OFFICIAL TRANSCRIPT

1      THE COURT:  I don't think -- they're not that

2 difficult.  The questions aren't that difficult.

3      MR. WERNER:  Okay.

4      THE COURT:  All right.  So do you have that e-mail?

10:08:23  5      MR. WERNER:  I'll bring it up.  Yes, I do.

6      THE COURT:  I think it is on the second page under

7 Claim 2, discrimination.

8      Question 1:  Plaintiffs are concerned about the use

9 of "forced" and "forcing" with reference to Signal's housing

10:08:57  10 plaintiffs in the man camp.

11      And you say:  Section 1981 does not require that an

12 employee be forced into a discriminatory term or condition to

13 have a claim.

14      Would it be discrimination if Signal had the

10:09:17  15 man camp facilities and just offered them to the Indian H-2B

16 workers?  Never said you have to live here, never said we're

17 going to deduct money whether you live here or not.  Would

18 just offering those facilities be discrimination?

19      MR. WERNER:  It may or may not be -- well, our

10:09:36  20 problem is not with -- is really just with the word "forced."

21 And we would ask that it be changed to "required" because

22 "force" suggests that there was some --

23      THE COURT:  Maybe "required" will work, but to me,

24 there has to be some element of you have got to live here.

10:09:55  25      MR. WERNER:  Yeah.  In our Sixth Amended Complaint,

OFFICIAL TRANSCRIPT

1  we said they were required to live there, so that was our
2  concern with that term.
3       THE COURT:  Does Signal or anybody have any
4  objection to "required" as opposed to "forced"?  That seems
5  like a good solution to me.
6       MS. HANGARTNER:  I don't believe so, Your Honor.
7  I'm not sure if Mr. Weinberger or Mr. Hasenkampf has
8  addressed that previously, but that doesn't seem to
9  necessarily be a problem.
10       THE COURT:  If they have a problem, they can let me
11  know.
12       MR. WERNER:  Your Honor, that change would be made
13  in the jury verdict form as well?
14       THE COURT:  Right.
15       MR. WERNER:  Okay.
16       THE COURT:  Then the next is Number 2 under
17  discrimination, and the issue is whether we need this
18  instruction about prompt remedial action.
19       And my question to you is in that Section 2, you
20  talk about:  In contrast, all the evidence adduced thus far
21  shows that the decision to house plaintiffs in the
22  man camp -- I know that decision to -- was by the management,
23  so I'm okay with that.
24       Then you say:  And decisions about allegedly
25  harassing conditions.

10:10:08
10:10:19
10:10:25
10:10:48
10:11:08

OFFICIAL TRANSCRIPT

1        Now, I'm not sure what that is, so I would need to

2   know what that is to know if those were made by Signal

3   management.

4        MS. GRAUNKE:  Yes, Your Honor.  And by that we mean

5   the decisions about overcrowding, the decisions about running

6   the day-to-day life in the man camp, how employee complaints

7   about the man camp were not responded to.

8        Those kind of issues would have been dealt with by,

9   it's my understanding Mr. Sanders, and later Ms. George, and

10  there is another individual I'm blanking on now.  But these

11  are all management employees.  They have the title manager in

12  their title in many cases -- in fact, all cases, I believe.

13       So our position would be that it wouldn't be

14  appropriate to use a non supervisory employee instruction for

15  these individuals.

16       THE COURT:  Well, let me be sure that we know

17  exactly.  It would have to be specific things and not

18  day-to-day life.

19       You said overcrowding conditions?

20       MS. GRAUNKE:  Correct.

21       THE COURT:  And complaints not being responded to?

22       MS. GRAUNKE:  That's right.

23       MS. HANGARTNER:  There is no testimony -- I mean,

24  the testimony is contradicting that.

25       THE COURT:  Well, I just want to be sure we

**OFFICIAL TRANSCRIPT**

1    understand what they are talking about first.

2            MS. HANGARTNER:  Got it.

3            THE COURT:  So when you talk about decisions that

4    were made by management, it's putting them in the man camp,

5    having the man camp be overcrowded, and not replying to --

6    responding to complaints?

7            MS. GRAUNKE:  Right.

8            The decision also to charge them $35 a day, of

9    course, for the man camp accommodations.

10           THE COURT:  All right.  And your position is that

11   those are -- were made by management so the instruction is

12   not needed?

13           MS. GRAUNKE:  Yes.

14           THE COURT:  Ms. Hangartner?

15           MS. HANGARTNER:  Obviously, the $35 per day was

16   made by Signal management.

17           What we disagree with are the allegedly harassing

18   conditions that were made by Signal management.

19           I understand the overcrowding.  However, the

20   refusal of Signal management to address complaints does not

21   fall within the testimony that has been adduced.

22           THE COURT:  Well, I guess the issue right now is,

23   if they didn't, would that have been something done by Signal

24   management?

25           Whether the evidence proves it or not is a


                        OFFICIAL TRANSCRIPT

1    different issue, but just talking about the jury instruction.

2          MS. HANGARTNER:  And I think it gets a little muddy

3    because it is going to depend on what was the complaint.

4          In other words, if the complaint was made directly

5    to a cook, I would like some more curry in the food, that's

6    clearly not Signal management.

7          If it's something substantial like the

8    overcrowding, I think that that would be reflected on Signal

9    management.

10         But something that is -- I guess does not

11   necessarily rise to that level, and not discussed with Signal

12   management, I think it is unfair to tab management with

13   either that decision or indecision.

14         MS. GRAUNKE:  Your Honor, our view, there has been

15   testimony about complaints made to Mr. Sanders -- and e-mails

16   back this up -- and Mr. Snyder, both managing employees,

17   about the conditions in the man camp.

18         THE COURT:  What you can do to help me decide this

19   would be now -- between now and lunchtime do a list of

20   exactly what complaints you are talking about, because I

21   think Ms. Hangartner is right, there could be a whole host of

22   complaints from day-to-day that never went to management.

23         So if you can do that, then we'll talk about it at

24   lunch.  All right?

25         MS. HANGARTNER:  Your Honor, should I have Alan and

**OFFICIAL TRANSCRIPT**

1    Mitch here for lunch?

2          THE COURT:  We won't have very long.

3          DR. ROUX:  If Mr. Dewan is going on next, I would

4    like to speak to the Court about the cross-claims regarding

5    the maximum fees and additional information and treaties.

6          THE COURT:  Well, come up.

7          Is this something that's been brought to my

8    attention before?

9          DR. ROUX:  Well, this is in regards to your comment

10   this morning about the cross-claim and having questions about

11   Sections, I believe, 21 and 41, as well as the text in place

12   at the time of the recruitment with regard to Rule 25 that is

13   sub -- substantive to my cross-examination of Mr. Dewan.

14         So if I may briefly speak to the Court, I may be

15   able to clear some of these issues up.

16         THE COURT:  Okay.

17         DR. ROUX:  I would like to first --

18         THE COURT:  In other words, you want to

19   cross-examine him about whether he violated Indian law?

20         DR. ROUX:  That's correct, Your Honor, with regard

21   to our cross-claims.

22         Starting first with the Foreign Recruiting Act of

23   1874, I have located a text of that act from a book that was

24   part of the Google Books Project.

25         Let me see if I can switch this to a document.

**OFFICIAL TRANSCRIPT**

1          Let me put this here.

2          This text indicates that the purpose of this act is

3    regulating the recruitment of Indians by foreign states.

4          And that is consistent with the comments in the

5    Immigration Act of 1983 to Section 42 that deals with the

6    Foreign Recruiting Act which says:  The provisions of the act

7    shall not apply to the recruitment or immigration of any

8    person who is not a citizen of India, and the control over

9    recruiting in India for the service of foreign states to

10   which the Foreign Recruiting Act of 1874 applies.

11         So Signal would urge that the Foreign Recruiting

12   Act is specific to the recruitment by state actors and the

13   Indian government's interest in regulating that.

14         THE COURT:  Now, you have to slow down because I'm

15   looking for my copy.  I thought I had it with me.

16         DR. ROUX:  And also note that this was passed when

17   the British were still in control of India prior to its

18   independence.

19         THE COURT:  So this is Section 42, recruiting for

20   service of foreign states?

21         DR. ROUX:  That's correct, Your Honor.

22         THE COURT:  And what does it apply to?

23         DR. ROUX:  We would argue that, based on this text

24   of the original, as well as the comments to that section,

25   that this is applicable only to the recruitment by foreign

**OFFICIAL TRANSCRIPT**

1  states of Indian workers, and that it would not be applicable

2  here.

3           THE COURT:   Okay.

4           DR. ROUX:   Secondly, with regard to Your Honor's

5  comments, I believe about Section 21, the power to exempt --

6           THE COURT:   Section 41, I think.

7           DR. ROUX:   I believe you also referred to

8  Section 21 of the Indian Act, as well as the power to

9  exempt -- or perhaps 41 as well.

10           THE COURT:   It was 41 of the rules.

11           DR. ROUX:   Of the rules.  I don't believe they are

12  in --

13           THE COURT:   Section 41 of the rules has some --

14  central government can exempt certain classes of foreign

15  employers.

16           And I also mentioned Section 2(O) of the act, the

17  central government may exempt categories of workers.

18           DR. ROUX:   Right.  And, Your Honor, I believe that

19  the section -- 41 is actually a section in the

20  Immigration Act, not 41 of the rules.  There is no Rule 41.

21           With regard to 41, as well as to 21, this gives the

22  government the ability to exempt from any requirements of the

23  act.  And I would urge that there is no evidence of them

24  exempting with regard to recruitment fees.

25           There are exemptions that have been had for classes

10:18:19
10:18:36
10:18:55
10:19:10
10:19:30

**OFFICIAL TRANSCRIPT**

1  of workers with regard to the exit requirements by the

2  government.

3       And if I may approach the bench, Your Honor, I have

4  a copy of a learned treatise, a chapter of one, which I'll

5  also provide to other counsel.

6       If I could direct Your Honor to Page 260.

7       And just for background, this particular document

8  is the India Migration Report of 2010.  It's a publication

9  that is put forth by the Research Unit on International

10  Migration, which is directed by the ministry that oversees

11  Indian affairs, which is an org of the Indian government.

12       On Page 260, it discusses different exceptions that

13  the government has made to what they call immigration

14  clearance.

15       Specifically with regard to categories of workers

16  that have high levels of education, and with regard to

17  specific types of employers, certain countries are excepted.

18  And they've actually taken the position of requiring and

19  specifying the countries that it would apply to as opposed to

20  excepting others.

21       And that is primarily places like the UAE, KSA --

22  in footnote 12 -- Qatar, Oman, and so forth.

23       So with regard to those two particular, 41 --

24  Sections 41 and Section 21 of the act itself, the places

25  where the government has chosen to grant exceptions have to

OFFICIAL TRANSCRIPT

1    do with immigration clearance.

2            There is no information about that application to

3    recruiting fees.

4            I also have asked somebody from my office to bring

5    me a copy of a printout from the Ministry of Indian Affairs'

6    website that discusses recruitment fees -- and it does not

7    have any exceptions listed -- which I can provide as soon as

8    they come.

9            On the same section of this particular page -- or

10   the physical page, but the next one on 261, it also indicates

11   the fee arrangements, as in an effort to prevent exorbitant

12   charging by recruitment agents, the government --

13           THE COURT:  Where are you reading?

14           DR. ROUX:  Huh?

15           THE COURT:  Where are you reading?

16           DR. ROUX:  Page 261, about -- the second paragraph

17   about midway through.

18           It says (as read:)  In an effort to prevent

19   exorbitant charging by recruitment agents, the government of

20   India has fixed upper limits for service charges.

21           It should not exceed 2,000 rupees in the case of

22   unskilled workers; 3,000 rupees for semi-skilled workers;

23   5,000 rupees for skilled workers; and 10,000 rupees for

24   person of other categories.  The RAs are required to give

25   receipts to the immigrants for such payments.


                        **OFFICIAL TRANSCRIPT**

1       And in the footnote there, it says it is citing to

2   the Immigration Rules 1983, Section 25.

3       And then further, this particular source at the end

4   in its sources section -- which is on the very last page,

5   Your Honor -- on the fourth reference it indicates that the

6   version of the immigration rules and -- that the Immigration

7   Act and the immigration rules that it is relying upon are

8   those from 2007, which would have been the ones in effect at

9   the time periods here, which is consistent with the footnote

10  in the Immigration Act -- or immigration rules that indicates

11  that prior to the 2009 amendment, Rule 25 read as specified

12  there in the footnote.

13       So in conclusion, Your Honor, I think that with

14  respect to the points the Court indicated this morning, that

15  these particular documents and sections adequately address

16  Signal's -- the presence of these regulations in Signal's

17  cross-claims.

18       THE COURT:  What about the testimony that --

19  throughout the trial about the workers being instructed to

20  tell the consulate that they didn't pay more than 35,000

21  rupees?

22       DR. ROUX:  That was instructions of what to tell

23  the U.S. consulate, not to an Indian immigration official.

24       And if I could also draw your attention that in

25  this document, the learned treaties on Indian immigration, it

OFFICIAL TRANSCRIPT

1    talks extensively about how it is quite common in India that

2    recruiting agents do charge in excess of that allowed by law.

3    It's a chronic problem in India.

4              And so I would urge that, one, the U.S. consulate

10:24:08    5    may not be the one that would be red-flagging that amount, as

6    opposed -- as a specific amount.

7              And, two, that the level of corruption is so

8    rampant and the amount of fees are so rampant, that the 3500

9    may be low enough to fly under the consulate's radar.

10:24:28   10             THE COURT:  Was the testimony that they were

11   instructed to tell that to the U.S. consulate or the Indian

12   consulate?

13             DR. ROUX:  The U.S. consulate, because --

14             THE COURT:  And why?  What was the -- why were

10:24:44   15   they -- where was the rule that said that it wasn't supposed

16   to be over 35,000?

17             DR. ROUX:  We don't believe there is a rule.  We

18   believe that they are just using that lower number to avoid

19   raising a red flag as opposed to five lakh rupees.

10:24:58   20             The Indian workers here would not have had to see

21   an Indian consulate officer because the United States is not

22   one of the countries that requires immigration clearance.

23             So that would be an area that is excepted under the

24   act.  So they would never have had to seek immigration

10:25:14   25   clearance from an Indian protector of immigrants, and thus

OFFICIAL TRANSCRIPT

1    that 3500 rupees, which is illegal under Indian law, would
2    never have been brought to the government of India.
3            THE COURT:  Mr. Shapiro, do you have a response?
4            MR. SHAPIRO:  I do, Your Honor.  And the first
5    thing I will say is --
6            THE COURT:  Come here so I can hear you.
7            MR. SHAPIRO:  While all of this is very interesting
8    academically, the first problem is the -- you're talking
9    about the exhibit or just testifying about the -- is that --
10   it's interesting that Dr. Roux --
11           THE COURT:  We're talking about whether he can
12   examine him about this -- cross-examine him about this rule
13   that restricted the amount of fees.
14           MR. SHAPIRO:  Okay.  And I just listened to what
15   Dr. Roux has to say about all of this, and it might be very
16   interesting and...
17           But one of the big problems is that, number one,
18   Signal does not have an expert in Indian law -- not that I
19   know of anyway.
20           And the state of Indian law is -- as we've seen
21   from the jury instructions, in a lot of instances is
22   confusing.  And it gets even more confusing when you are
23   dealing with an administrative body like the Protector of
24   Immigrants.
25           And there are lots of changes in the law based on

OFFICIAL TRANSCRIPT

1    circulars that are transmitted to recruiters.  We have done

2    our own independent research trying to find the actual

3    circular that talks about the exemption of recruitment fees,

4    and we have not -- it's an old document from 1991.  And

10:27:03    5    apparently it's not online anywhere.  And we have looked for

6    this actually for a long time.

7              And I would say that while all of this discussion

8    is interesting academically, I don't see how anything

9    changes.

10:27:20    10              I don't see how the references that Dr. Roux has

11    made somehow automatically -- or even comes close to

12    satisfying the burden of proving that Mr. Dewan was exempt

13    from recruitment to the United States.

14              And I will say as a practical matter also, if you

10:27:42    15    look at 20,000 rupees as a recruitment fee, or about there,

16    we're talking about charging a worker about $300 for a

17    recruitment effort to come to the United States.

18              The ad alone, as you will see from Mr. Dewan's

19    testimony, is even more expensive to place than the

10:28:03    20    recruitment fee would be.

21              So I just -- I was trying to understand what

22    Dr. Roux was saying.  Frankly, a lot of it went over my head,

23    but I just don't see how what he was saying changes anything.

24              THE COURT:  Will Mr. Dewan have testimony about

10:28:20    25    this requirement and whether it applies to him?

OFFICIAL TRANSCRIPT

```
 1              MR. SHAPIRO:  I believe so, yeah.
 2              THE COURT:  Well, I think that maybe your reader
 3    just came in.  Is there a reader in the house?
 4              MR. SHAPIRO:  No.  It's George Cheney from the --
 5              THE COURT:  Okay.
 6              MR. SHAPIRO:  He is missing in action,
 7    unfortunately, and I'm --
 8              THE COURT:  All right.  So we're going to have to
 9    put Mr. Dewan on the stand.
10              MR. SHAPIRO:  Yes.  There other thing --
11              THE COURT:  But this is in cross-examination, so I
12    guess I can think about it and talk to you about it at lunch,
13    correct?
14              But then you would want to ask him on direct about
15    the fees.
16              MR. SHAPIRO:  Yeah.  And I -- what Dr. Roux --
17              DR. ROUX:  May I approach, Your Honor?
18              THE COURT:  I'm sorry?
19              DR. ROUX:  May I approach, Your Honor?
20              THE COURT:  Yes.
21              DR. ROUX:  This is a printout from the Indian
22    Government's website with a specific entry about service
23    charges to recruiting agents.  This is about the current law,
24    but as you can see, they don't list any exemptions.
25              And I would also point, Your Honor, to Section 43
```

10:28:36
10:28:44
10:28:57
10:29:10
10:29:29

**OFFICIAL TRANSCRIPT**

1    of the Indian Immigration Act, which specifies the manner in

2    which the central government may by notification make rules

3    to carry out provisions of the act.  And that is what, in

4    fact, is embodied in the Indian immigration rules document.

10:29:52    5    So I think if there was an exception, it would be present

6    there.

7         THE COURT:  Does somebody want to comment on behalf

8    of the plaintiffs?

9         MR. WERNER:  Your Honor, we just have a couple of

10:30:01   10    brief comments on this.

11         First of all, with respect to the Google Books

12    document, there is no way to update -- there's no Shepherds

13    on Google Books, and I think there is a real question as to

14    whether the document, which is an act from the 19th Century,

10:30:19   15    remains current.

16         But with respect to the learned treatise, you know,

17    we have questions just about its reliability.  It's not the

18    full document.  There is no indication in the document about

19    the qualifications of the authors.

10:30:35   20         And, you know, it was incumbent on Signal to -- if

21    they had questions of India law that they needed to present,

22    to do what plaintiffs have done and bring in an expert,

23    particularly on an issue that appears to be as complex as the

24    question that is before the Court right now.

10:30:59   25         THE COURT:  All right.


                    **OFFICIAL TRANSCRIPT**

1    DR. ROUX:  Let me briefly respond to that.

2    THE COURT:  All right.  Then we're going to move

3    on.

4    DR. ROUX:  With regard to his comments just about

5    the age of the treatise, I only mentioned the treatise in its

6    original text in order to point to the comments to Rule 41

7    being consistent with that original intent behind its

8    passage, that it applies to foreign states.

9    And that with regard to an Indian law expert, I

10   pulled these documents this morning, some of them from past

11   research, but I think that the documents speak for

12   themselves.

13   MR. SHAPIRO:  If I can respond briefly to that.

14   Your Honor, I hate to belabor this point, but I

15   really do need to make another point here.

16   And I do find it admirable that Dr. Roux has done

17   all the research.  But the state of law -- and again,

18   particularly on the administrative level in the immigrant

19   area where there are lot of immigrants that come over from

20   India to the United States to the Gulf region and Singapore

21   and all over the world -- is usually in a constant state of

22   flux.

23   And as I mentioned, there were -- there are a

24   number of changes that are made informally, and they are not

25   necessarily memorialized in the -- in an amendment to any of

OFFICIAL TRANSCRIPT

```
 1    the statutes.  Therein, we have the difficulty.  And again --
 2           THE COURT:  Okay.  We've got to go.  We have to put
 3    the witness on the stand.
 4           I assume Mr. Cheney is not here.  Do you need to --
 5    a brief restroom break?
 6           THE REPORTER:  I do.
 7           THE COURT:  Okay.  All right.  The court reporter
 8    does.  So we're going to take three minutes and we'll be --
 9    so we're going to take a three-minute break.  Everybody come
10    right back.
11                        (A recess was taken.)
12                        AFTER THE RECESS
13                        (Call to order of the court.)
14           THE COURT:  All right.  Bring the jury in.
15                        (Jury in at 10:38 a.m.)
16           THE COURT:  All right.  Be seated.
17           Mr. Shapiro is now going to present evidence on
18    behalf of the Dewan Defendants.
19           Mr. Shapiro, do you want to call your first
20    witness?
21           MR. SHAPIRO:  Yes, Your Honor.  I would like to
22    call my client, Mr. Sachin Dewan to the stand.
23                        (The oath was administered.)
24           THE CASE MANAGER:  Please be seated.
25           State and spell your name for the record.
```

10:32:26 (line 5)
10:32:51 (line 10)
10:38:00 (line 15)
10:38:46 (line 20)
10:39:01 (line 25)

**OFFICIAL TRANSCRIPT**

1          THE WITNESS:  Sachin Dewan, S-a-c-h-i-n  D-e-w-a-n.

2                  **SACHIN DEWAN,**

3    having been first duly sworn, testified as follows, to wit:

4                  **DIRECT EXAMINATION**

5    BY MR. SHAPIRO:

6      **Q.**   Good morning, Mr. Dewan.  How are you today?

7      **A.**   Good morning.  I'm okay.

8      **Q.**   Good.

9            Mr. Dewan, I want to ask you some -- a little bit

10   about yourself, some background information.

11     **A.**   Sure.

12     **Q.**   Tell me, are you married?

13     **A.**   Yes, I am.

14     **Q.**   Okay.  And do you have any children?

15     **A.**   Yes, I have two daughters.

16     **Q.**   Okay.  And do you have any siblings?

17     **A.**   Yes, I do.  I have two brothers and two sisters.

18     **Q.**   And are they married?

19     **A.**   Not all of them.  One sister is not married.  The

20   rest of them are married.

21     **Q.**   And do they have children as well?

22     **A.**   Yes.  My sister has two daughters.  And my -- one

23   of my brother, Ashish, has one daughter.  And Manish has one

24   son.

25     **Q.**   And are your parents still alive?

**OFFICIAL TRANSCRIPT**

1        A.    No, they are not.

2        Q.    When did they pass?

3        A.    My mother passed away in 2003, and my father passed

4    away in 2005.

10:40:32    5        Q.    Okay.  And in what city do you live?

6        A.    I live in Mumbai.

7        Q.    And where is Mumbai?

8        A.    Mumbai is like in the -- on the -- like the west

9    coast of, you know, India, in like -- not exactly center, but

10:41:01    10   it is on the coast.

11       Q.    Was Mumbai ever known by another name?

12       A.    Yes, it was.  It was known as Bombay.

13       Q.    And where approximately do you live in Mumbai?

14       A.    I live in the suburbs that is -- I'll spell it,

10:41:23    15   P-o-w-a-i, Powai.  That's the place.

16       Q.    And do you live in a home -- in a house or an

17   apartment?

18       A.    Yes.  It's called a row house.  And it is an

19   interesting concept in India.  It is called a row house.

10:41:45    20       Q.    What is a row house, so the jury understands what

21   that is?

22       A.    It's a -- it's like about houses that are connected

23   to each other and it's an independent house.

24       Q.    Okay.  And can you describe the home where you

10:42:05    25   reside?

OFFICIAL TRANSCRIPT

1      **A.** Yes. It's -- it's about -- it's called ground
2  floor, and on the ground floor there is only living room and
3  dining area. And on the first floor, there is one kitchen
4  and two bedrooms. And on the second floor, there are three
5  bedrooms.
6      **Q.** And who lives in the house there with you?
7      **A.** The entire Dewan family. That includes my two
8  brothers and their families; my sister who is unmarried, she
9  lives there; and also my sister who just got married last
10 year. She had lost her husband in a car accident. She also
11 used to live in the same house with her two daughters.
12     **Q.** Okay. And do you all -- you say there are two
13 floors. Is there a third floor as well?
14     **A.** No. That's not like a floor, but it's like a
15 terrace, they call it in India, where my -- the guy who works
16 for us, he stays there.
17     **Q.** Okay. And so how many people total live in the
18 Dewan house?
19     **A.** Well, as of now, it's my family and Manish's family
20 and Ashish's family and my sister. But until last year, we
21 were almost 13 of us living in that house. Right now, there
22 are about 10 of us living in the house.
23     **Q.** Okay.
24     **A.** Ten or eleven of us.
25     **Q.** Is your house any kind of a mansion or any kind of

**OFFICIAL TRANSCRIPT**

l0:42:28
l0:42:51
l0:43:15
l0:43:42
l0:43:56

1    an enormous house?

2        A.   No, it's not.  It's just a comfortable house as per

3    Indian standards, but it is not a mansion.

4        Q.   Is it unusual for Indian families to live together

5    like that?

6        A.   Yes, that's very common.

7        Q.   And is it common for middle class or perhaps a

8    little bit upper middle class people to have servants?

9        A.   Yes, it does -- yes, it is common.

10       Q.   Okay.  And what do the servants do for you?

11       A.   Sorry, I didn't get the question.

12       Q.   What do your servants do for you?

13       A.   Basically they do the domestic work.  Like

14   cleaning, cleaning the house.  And probably, you know, do

15   some ironing jobs and also cooking.  That's what they do.

16       Q.   Okay.  So they're sort of like housekeepers, then,

17   right?

18       A.   I don't know the terminology about housekeeper, but

19   it's like cook and domestic worker.

20       Q.   Okay.  And they live in the house there with you?

21       A.   Not all of them.  But two or three of them, they

22   live with us.

23       Q.   Okay.  And how do you treat them?

24       A.   Very well.  In fact, one of the guys, he has been

25   with us for almost 15 years, the guy who cooks for us.  He

OFFICIAL TRANSCRIPT

1    has been with us for the last 15 years.

2         Q.   Okay.  And do you pay them for their services?

3         A.   Yes, I do.

4         Q.   Okay.  And how is the pay?

5         A.   You mean how do I pay them?  Cash.  We pay them in

6    cash.

7         Q.   But are they satisfied with the pay that they

8    receive?

9         A.   Yeah, absolutely.  We pay them a little more than

10   what the market -- you know, in general in our area, what

11   they get.

12        Q.   Okay.  Now, I want to bring your attention to the

13   formation of Dewan Consultants.

14             What year was Dewan Consultants formed?

15        A.   Dewan Consultants was formed in 1982.  That is

16   close to when the Immigration Act came in place.

17             Before that, our company used to be known as Indian

18   Overseas Tech Services.

19             And in 1982, it was incorporated as a private

20   limited company with my father and my mother as shareholders

21   and directors.

22        Q.   And your father was really the president or the

23   managing director of Dewan Consultants?

24        A.   Yes, he was.  He was the managing director of our

25   company.


                        **OFFICIAL TRANSCRIPT**

```
1        Q.   Okay.  And what does the company do?
2        A.   The company has been into international recruitment
3   right from the beginning.
4        Q.   Okay.  And when you say international recruitment,
5   what kind of workers are recruited?  Where are they from?
6        A.   It all depends on the industry that we are
7   recruiting to, because they come from all parts of India.
8   But mostly -- mostly people who are interested to go to the
9   Middle East and to work abroad, they come from the South
10  India.
11       Q.   Okay.  And do you have job candidates that come
12  from North India as well?
13       A.   Yes.  The percentage is less, but, yes, they do
14  come.
15       Q.   But to put it in sort of a geographic perspective,
16  Mumbai is in the north of India, isn't it?
17       A.   It's not exactly in the north of India.  It's kind
18  of in the center, but on the west coast.
19       Q.   Okay.  But it is not in the southern portion?
20       A.   No, it's not.
21       Q.   So what was your father's name?
22       A.   Jagdish Dewan.
23       Q.   Okay.  And how long had he worked in the
24  recruitment business before forming Dewan Consultants?
25       A.   He started in 1978.
```

10:47:36
10:47:57
10:48:10
10:48:30
10:48:51

**OFFICIAL TRANSCRIPT**

4572

1      Q.    And what did he do in 1978?

2      A.    He did the same thing.  He did international

3  recruitments of mostly for Saudi Arabia.

4      Q.    And how long did he keep that -- what was the name

5  of the company?

6      A.    It was known as Indian Overseas Tech Services.

7      Q.    Who were the original members and directors of

8  Dewan Consultants?

9      A.    My father, Ashish Dewan, and my mother, Usha.

10      Q.    Okay.  And about how old were you when that company

11  was formed?

12      A.    I would have been about 14 years old.

13      Q.    Okay.  And are you the oldest of your family --

14  oldest child?

15      A.    Yes, I am.

16      Q.    And did you ever have occasion to begin working for

17  Dewan Consultants?

18      A.    You mean to ask me like when did I start working

19  for my father?

20      Q.    Yes.

21      A.    It would have been from probably in '87 or '88.

22  This was when I passed my 12th grade.  I joined my father

23  just part-time, to work with him part-time as a consulate

24  representative.  Because my college used to be in the

25  morning, so after I finished my college I used to go and work

10:49:17

10:49:42

10:49:59

10:50:20

10:50:46

**OFFICIAL TRANSCRIPT**

1   for my father.

2       Q.   Okay.  And where did you attend college at that

3   time?

4       A.   I attended college in Mumbai.

5       Q.   Okay.  And what university was it?

6       A.   This was Mumbai University.  The college name was

7   MVNLU, and this was located in Delhi.

8       Q.   Is that far from where you live?

9       A.   No, it wasn't far.

10      Q.   Okay.  And what did you study?

11      A.   Sorry?

12      Q.   What did you study in college?

13      A.   I did my bachelor of commerce.

14      Q.   Okay.  And so your role -- what was your initial

15  role in working for Dewan Consultants, if you could describe

16  that?

17      A.   Yes.  As I said earlier, I was a consulate

18  representative.

19      Q.   And what does that mean?  What do you do as a

20  consulate representative?

21      A.   As a consulate representative, my job was to take

22  the passports to the consulates, mostly to the Saudi

23  consulate for the visa stamping, the visa processing.  And

24  when it is completed, bring it back.

25      Q.   Okay.  So when you say take the passports, whose

OFFICIAL TRANSCRIPT

1    passports would you be taking to the consulate?

2        A.   I would be taking the passports of the workers or

3    the professionals who are the applicants going to the

4    Middle East or Saudi Arabia.

10:52:27

5        Q.   And that was something that was permissible for you

6    to do?

7        A.   Yes.  We were authorized -- authorized by the

8    consulates as we have the recruitment license.  So these

9    consulates could authorize you to -- the companies that have

10:52:49

10   the licenses, they authorize them to bring the passports to

11   them, and -- you know, for the visa process, and take them

12   back.  Because in most of these Middle East consulates, you

13   don't -- there is no requirement of the workers or the

14   professional to attend the consulate in person for the

10:53:09

15   interview.

16       Q.   Okay.  And after you brought the passports to the

17   consulate -- what would happen when you brought the passports

18   to the consulate?

19       A.   I just had to submit them on the counter.  And if

10:53:27

20   they had any objection, they used to check them and put their

21   remarks and objections on it.

22            And if they rejected them, I used to bring them

23   back.  And if I had an explanation to that, I would give them

24   that there at the counter.  And once the visa was processed

10:53:53

25   and stamped on the passport, I used to bring the passports

OFFICIAL TRANSCRIPT

1    back.

2        Q.    When you say the consulate, which consulate are you

3    talking about?

4        A.    It was mostly the Saudi consulate.

5        Q.    Okay.  Did that ever change?  Were there other

6    consulates that you used to go to?

7        A.    It was sometimes in Qatar, the Qatar consulate.

8        Q.    Okay.  So --

9        A.    But that was very less comparatively.

10        Q.    Okay.  And what was -- what kind of workers were --

11    was Dewan Consultants recruiting to go to Saudi Arabia?

12        A.    Mostly they were construction workers, people who

13    worked for the construction companies for constructing the

14    buildings.  Commercial buildings and residential complexes.

15            There were also companies we used to deal for IT.

16            We used to also deal with companies who were -- who

17    were electromechanical companies.

18            And there were a few more, like also some few FMCG

19    and some retail companies as well.

20        Q.    That last thing you mentioned before retail, what

21    is that?

22        A.    FMCG.

23        Q.    Yes?

24        A.    FMCG are companies who are like selling products

25    like, you know, Lipton and mostly products that go out in the

**OFFICIAL TRANSCRIPT**

1    market, the fast-moving products.

2        Q.   What kind of products are they?

3        A.   It was -- I don't recollect exactly in the initial

4    days.  I used to be -- in those days you are talking about,

5    it was only my job to take the passports to the consulate and

6    bring them back, most of it.  I was not much involved at that

7    point in time with the office activities in general and the

8    recruitment process.

9        Q.   Okay.  And who took that -- who took that lead for

10   Dewan Consultants at that time?

11       A.   My father.

12       Q.   Okay.  And what would he do to recruit workers?

13       A.   I guess the process used to be more or less the

14   same of when the companies gave the -- gave the order to us,

15   and we advertised.  And the candidates -- candidates were

16   called to the office or to the trade centers.  And after they

17   were selected by the client, they were -- they were sent for

18   medical checkup.

19            And once the medical was completed, the passports

20   were taken to the consulate for visa stamping.

21            And after that, there was an immigration clearance

22   required.  For most of these Gulf countries, the immigration

23   clearance is required.

24            So once the immigration clearance was done, then

25   they were sent abroad to their respective countries.

**OFFICIAL TRANSCRIPT**

1    Q.    Okay.  And just moving on a little bit, was your

2  father a member of any recruitment organizations in India?

3    A.    Yes.  My father, at the time he passed away, he was

4  the vice-president of the ^ * I pep /SEUL, which is one of

10:57:46   5  the largest recruitment association.  He was the

6  vice-president for that.

7    Q.    Okay.  And what does it mean to be the

8  vice-president of that particular organization?

9    A.    It means a lot.  I mean, he was quite active --

10:58:07  10  active with helping with the problems of the recruitment

11  agencies and meeting -- meeting with the director of

12  immigrants, meeting with the ministries, taking up the

13  problems of the industry.

14    Q.    So would it be fair to say he was very

10:58:28  15  well-conversant and experienced in the field of recruitment?

16    A.    Yes, he was.  He was a very well-known figure in

17  the industry.

18    Q.    And what was his reputation like?

19    A.    He was very well-respected in the industry.

10:58:46  20    Q.    Now, you started working for Dewan Consultants.  As

21  you got a little older, did your role change in the company,

22  Dewan Consultants?

23    A.    Yes, it did.

24    Q.    Okay.  And what -- how did your role change?

10:59:07  25    A.    Once I finished my college, I think somewhere in

OFFICIAL TRANSCRIPT

1    '91, then I started coming to the office full-time and I
2    started getting involved in the recruitments and doing the --
3    doing the paperwork of -- for the consulates.  Typing the
4    forms.  Putting up the papers together, along with the
5    passports to be taken to the consulate.  And most of it was
6    connected to the recruitment and the consulate.

7        Q.   Okay.  And did Dewan Consultants continue to
8    recruit only for Saudi Arabia?

9        A.   Mostly it was for Saudi Arabia.  And a little bit
10   for UAE, United Arab Emirates.  And very little percentage
11   for Bahrain.  And maybe a little bit for Kuwait.

12       Q.   Okay.  Now, when your father passed, what happened
13   with the structure of Dewan Consultants?

14       A.   My father passed away in May 2005.  And after he
15   passed away, I became the managing director of the company.

16       Q.   Okay.  And you mentioned you had -- you have a
17   brother -- two brothers.  Did they start working for
18   Dewan Consultants as well?

19       A.   Sorry, I didn't get your question.

20       Q.   Sorry.  I need to get a little closer to the
21   microphone.

22            You mentioned you have brothers.  Do any of -- did
23   any of them start working for Dewan Consultants?

24       A.   Yes.  Only Manish -- Manish used to work for
25   Dewan Consultants.  And more or less, he started working

OFFICIAL TRANSCRIPT

```
 1    almost the same time I did.
 2           Once I was full-time, then he took over as the
 3    consulate representative.  I think that was somewhere again
 4    in '91.
 5           Q.    Okay.
 6           A.    Maybe a little earlier.
 7           Q.    All right.  And how about Ashish, has he ever
 8    worked for Dewan Consultants?
 9           A.    No, Ashish did not work for Dewan Consultants.
10           Q.    Now, does Dewan Consultants have a staff presently?
11           A.    Yes.
12           Q.    And when the recruitment efforts were going on that
13    form the basis of this case, did Dewan Consultants have a
14    staff?
15           A.    Yes.
16           Q.    And how many people worked as staff members for
17    Dewan Consultants?
18           A.    I don't remember exactly, but I think around five
19    to six people.
20           Q.    Okay.  And what kind of roles did they play -- what
21    kind of jobs did they have for Dewan Consultants?
22           A.    One was the consulate representative.  And one
23    was -- one was for the immigration and ticketing.  And I
24    think there were two of them for the sourcing of the
25    candidates.  And I think one was for the paperwork.
```

**OFFICIAL TRANSCRIPT**

1       **Q.**   Let me direct your attention to your experience

2   working for Dewan Consultants.

3          You mentioned that you -- initially you would

4   submit passports to the Saudi Arabian consulate.

5          Is there any -- for recruitment effort to

6   Saudi Arabia, is there any reason for holding on to a

7   passport before a worker is deployed for that country?

8       **A.**   Sorry, I didn't get the question.

9       **Q.**   Is there any reason why Dewan Consultants, or any

10  recruiter, would want to hold on to a passport before the

11  worker was deployed to the country where he was going to

12  work?

13      **A.**   Yeah.  That's a -- number one, that's a general

14  practice in India for all the recruitment agencies.  At the

15  time when they come to apply and they get selected by the

16  company, the passport is handed over to the recruitment

17  agencies.

18         For the reason is, one, that the agency has to --

19  the recruitment agency has to take that passport to the

20  consulate, complete their paperwork.

21         And also, once the visa is completed -- sorry, once

22  the visa is completed, and the candidate chooses not to go,

23  if he changes his mind, then I have to take the passport back

24  to the consulate to get the visa canceled because for

25  Saudi Arabia, the visas are issued unnamed, as it was in the

**OFFICIAL TRANSCRIPT**

L1:03:22

L1:03:36

L1:03:53

L1:04:13

L1:04:41

1    case of Signal.

2          So the visa is canceled and the visa is added back

3    to the block so that the company doesn't lose the visa.

4    **Q.**   Okay.  I appreciate that explanation.

5          So I may have asked this, but anything unlawful

6    about holding the passports, the workers' passports?

7    **A.**   No, it's not.

8    **Q.**   When a worker's assignment in a foreign country

9    recruited by Dewan Consultants is over, where does he go?

10   **A.**   (No response.)

11   **Q.**   Where is he required to go?

12   **A.**   Sorry, I didn't get your question.

13   **Q.**   When Dewan Consultants recruits a worker for work

14   in a foreign country and that assignment -- that job

15   assignment is finished, where is the worker required to go?

16   **A.**   He comes back to India.

17   **Q.**   Okay.  And why?

18   **A.**   Because if his contract finishes with the company,

19   he is required to return to his country.

20   **Q.**   Okay.

21   **A.**   At times his visa would be valid, but if his

22   contract is over, then he needs to return back to the

23   country.

24   **Q.**   Okay.  Now, at the time of the recruitment process

25   in this case -- and I'm talking going back to 2003 or 2004,

L1:05:04
L1:05:24
L1:05:38
L1:05:55
L1:06:10

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| L1:06:32 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| L1:06:53 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| L1:07:16 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| L1:07:45 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| L1:08:10 | 25 |

and the prior -- what kind of clients did Dewan Consultants
have?

    A.   Are you asking me about when we started the
recruitment for Signal?

    Q.   No, I'm not yet.  I will get to that.  But I wanted
to know who was considered the client of Dewan Consultants?

    A.   Okay.  The client is the companies who come to us
requesting for workers or for professionals.  They are called
clients.

    Q.   Okay.  So you sent -- you say for professionals.
What kind of professional workers would you send to foreign
countries?

    A.   When you say professionals, it can be engineer.  It
can be manager.  It can be an accountant.  It can be a
chartered accountant.  These are considered as professionals.

    Q.   Okay.  And at the time of -- around the time of the
recruitment efforts that have been described in this case,
where have your clients been located?

    A.   Most of our clients were located in Saudi Arabia.
And some of them in United Arab Emirates.  And a few in
Kuwait and Bahrain and Oman.

    Q.   Okay.  And in general, what are your clients
required to do to recruit workers?  Are there any specific
requirements that have to be met?

    A.   Once they send us a request that they need

OFFICIAL TRANSCRIPT

1   following positions, they ask -- they are required to send us
2   the demand letter and power of attorney to us.

3       Q.   Okay.  Now, would you describe for the jury what a
4   demand letter is, as you understand it.

5       A.   Demand letter is a requirement under the -- under
6   the -- you know, as per the Protector of Immigrants.  They
7   want to see the request that it is coming from the company
8   with the positions on it, the numbers on it, the salaries on
9   it, and the other terms and conditions like the
10  accommodations, food, and medical.  This is what needs to be
11  given.

12          And the power of attorney is basically -- is
13  basically authorizing the -- authorizing the recruiting
14  agency to act on their behalf to take necessary permissions
15  for the -- for advertising, to take necessary permission for
16  the recruitments that -- the recruitments that are done in
17  locations other than the registered office that is on the
18  license, because I could interview a candidate other than my
19  office.  Maybe other city also.

20          So we need to have -- we need to submit these
21  documents to the Protector of Immigrants and take necessary
22  permission.

23          Also the requirement for the demand letter and
24  power of attorney is for the -- for the immigration office
25  which is the Protector of Immigrants, to grant immigration

L1:08:35
L1:09:05
L1:09:31
L1:09:55
L1:10:15

OFFICIAL TRANSCRIPT

1    clearance to the workers.

2         Suppose the demand letter says 100 workers.  The

3    immigration office will only grant workers -- only grant

4    immigration clearance to 100 workers, as per the demand

5    letter.

6         Q.   Okay.  So to be clear, the demand letter -- is the

7    demand letter something -- it's not making a -- is it making

8    some kind of demand on the company or is it -- or is it

9    simply just a request?

10        A.   It's -- number one, it's the information that is

11   given by the company, which is passed on by the recruiting

12   agency to the immigration office to give the clearance -- to

13   give the clearance to the worker that is going to work for

14   the company.  Based on the information that is given on the

15   demand letter, the immigration office gives clearance to

16   the -- immigration clearance to the candidate.

17        Q.   So that's -- those two things, the demand letter

18   and the power of attorney, absolute requirements, right?

19        A.   Yeah, yeah.  Yeah, three requirements for that.

20        One is to take the permission for the

21   advertisement.

22        Second one is to -- second is to take permission to

23   conduct interviews other than in the registered office that

24   is on the license.

25        And third is the grant of immigration clearance to

OFFICIAL TRANSCRIPT

the candidate for the job candidate that is going to work for

that company.

Q.   Now, why do workers from India want to work abroad?

A.   The main reason is they go abroad because they get

more salary than they get in India.  And they want to get --

they want to earn more salary and give a better living --

give a better living to their families.

Q.   Okay.  And is this -- and how common is this in

India?

A.   It used to be -- it used to be very common earlier,

but nowadays -- nowadays it is different than what it used to

be.

        People were -- earlier days, the people were

interested to go and work abroad and get more money, but now

the salaries in India are pretty much very good.  They can

compare them with the Gulf countries.  So the interest of

people to go abroad has come down.

Q.   Okay.  But about the time of the recruitment effort

in this case, prior to Signal and Signal, it was -- what was

the view -- what was -- was it common to work abroad -- for

men to work abroad?

A.   Yeah.  I wouldn't say it was common, but, yes,

people who definitely wanted to make more money would be

definitely interested to go and work abroad.

Q.   Okay.  And this would require the workers to stay

**OFFICIAL TRANSCRIPT**

1    away from their families for a long time?

2        A.    Yes.

3        Q.    Okay.  And they would have no problem with that?

4        A.    No.

5        Q.    Because the money was good -- I'm sorry.  Strike

6    that.

7              And what would the workers do with the money that

8    they earned in foreign countries?

9        A.    I guess the -- I think the priority for most of

10   them was to make a house for themselves and probably give a

11   better living for the family.

12       Q.    Okay.  And did you have occasion to recruit workers

13   abroad for work in shipyards?

14       A.    Yes.  The first unfortunately we got was to recruit

15   for Mr. Pol, for his company, IMI.

16       Q.    Before you go -- I'm going to get to that in a

17   minute.

18             But, typically, are the workers required to pay you

19   a fee for work in foreign countries?

20       A.    Yes.  Typically, yes.  But there are -- there are

21   occasions where the companies -- the companies ask or request

22   us not to charge the worker and they are willing to pay our

23   fees and all the charges.

24       Q.    Okay.  And I'm still talking generally prior to the

25   recruitment efforts at issue in this case.


                          OFFICIAL TRANSCRIPT

l1:13:49

l1:14:09

l1:14:44

l1:15:01

l1:15:27

1        What would Dewan Consultants do to initiate the

2  recruitment process and bring it -- and further it so that

3  they could start attracting workers?

4        A.   In particular, when we receive the requests, we

11:15:51   5  advertise in the newspapers and the worker comes to the

6  office.

7        And at times, the workers walk in -- walk in

8  interview -- we have walk-in interview where he comes on the

9  day where the client is already there.

11:16:12  10        Q.   Okay.  So are you saying that the client comes to

11  India to your office as well?

12        A.   Yes.

13        Q.   Okay.  And in what regions of India do you place

14  advertisements for jobs abroad?

11:16:31  15        A.   Well, as I said earlier, that it all depends on

16  the -- depends on the company and the industry that the

17  request has come from.

18        So if it is construction workers, it would be

19  north.  If it is -- if they need like welders and fitters,

11:16:52  20  these kind of professions, it's -- it would be south because

21  the shipyards -- shipyards and the refineries and all are

22  mostly located in the south.

23        So it all depends on the industry.  The particular

24  industry.  And at times -- most of the times the

11:17:15  25  advertisement were released in Mumbai itself.


                        OFFICIAL TRANSCRIPT

1    **Q.**   When you say released in Mumbai itself, what does
2    that mean?
3    **A.**   Like the newspapers that are -- that are from
4    Mumbai and the ads were placed in the Mumbai newspapers most
5    of the time.
6    **Q.**   Is that the starting point, is that what you are
7    saying?
8    **A.**   Yeah.
9    **Q.**   And does that effort ever expand into other regions
10   of India?
11   **A.**   Yeah.  As I said, only if the positions -- the
12   requests that we have received, if those workers would not be
13   available in Mumbai and also if the numbers are high.
14       If the numbers required are high, then we go around
15   different places, different cities to get workers.
16   **Q.**   When you say the numbers are high, where are
17   those -- how do you learn about those numbers?
18   **A.**   The numbers are on the demand letter.
19   **Q.**   And the numbers mean what?
20   **A.**   The requirements, the number of positions.
21   **Q.**   Okay.  Now, when you place ads in the newspaper, do
22   you tell everything that you possibly can about the job
23   opportunity?
24   **A.**   Sorry, I didn't get you.
25   **Q.**   I'm sorry.  I need to get a little closer here.

L1:17:39
L1:17:48
L1:18:09
L1:18:21
L1:18:41

**OFFICIAL TRANSCRIPT**

Sorry.

When you place -- when Dewan Consultants places an ad in the newspaper, does the ad have every little detail about the job opportunity?

A.    No.  We can't give all the details in the advertisement because there is limitation of the space.  The advertisement cost is very high in India.  So we have limitation to give all the information in the advertisement, so we give only limited information in the advertisements.

Q.    Okay.  So what would be the next step?  What would the advertisement say as far as the next step in the recruitment process?

A.    The advertisements usually talk about the positions, and it talks about -- it talks about the country. If -- and if it's a short term -- it will talk about short term or long term, the term of the duration.  And it would also -- at times we give salaries and at times we don't.

Q.    Okay.  But are workers invited to any sort of meetings?

A.    Typically the worker in those days used to come to the office.  And -- come to the office.  And then we tell them the company name and the -- where they are situated and give them all -- give them more details.

Q.    Okay.  And at such meetings, how many people are usually present?

**OFFICIAL TRANSCRIPT**

1    **A.**   Well, it all depends on the positions and it all
2    depends on the numbers.  It's very difficult to say.
3    **Q.**   Okay.  So you say it varies from time to time?
4    **A.**   Yeah.  Time to time, yeah.
5    **Q.**   And is it unusual for job recruits or job
6    candidates to travel long distances to come see you in
7    Mumbai?
8    **A.**   Yes.  When we release advertisements in Mumbai,
9    usually the newspaper that we use is *Times of India*.  And
10   *Times of India* does circulate at -- they have like all India
11   editions where we advertise in Mumbai, but the same
12   advertisement is carried by the newspaper to the other
13   cities.
14            So people read it from different parts of India and
15   they travel to Mumbai for the job.
16   **Q.**   Okay.  And what happens at the meetings that you
17   conduct?
18   **A.**   Typically in recruitment for the Middle East and
19   the Gulf, you don't have to really tell them much.  You just
20   have to tell them about -- give them details about the
21   company.
22            They -- you have to tell them about the salaries
23   that the company is going to offer, because typically in the
24   Middle East, the food and accommodation is -- at least the
25   accommodation and medical is provided by the company.


**OFFICIAL TRANSCRIPT**

1          So they don't have much questions about that.  So

2     most of the questions are related to the salaries and the

3     work, what kind of projects they are going to work on.  These

4     are the questions that they have.

L1:22:56    5          Q.   And do you answer those questions to their

6     satisfaction?

7          A.   Yes, we do.

8          Q.   Okay.  And why do you give them all of this

9     information?

L1:23:05   10          A.   Because it is important.  I feel it is important

11     for the candidate to know because -- before we process his

12     visa, it is important for him to know the details about the

13     company.

14          Because as I said, for the Middle East, when we

L1:23:27   15     recruit for the Middle East, they all know that the contracts

16     usually are for two years.

17          Q.   Okay.  And I meant to ask you something, Mr. Dewan.

18          When you place advertisements in the newspapers,

19     what language are the advertisements written in?

L1:23:45   20          A.   They are written in English mostly.

21          Q.   Okay.  Are they ever written in any other language?

22          A.   Maybe one in hundred ad.

23          Q.   Okay.  Where -- what region of the country might

24     you put an advertisement in a different language?

L1:24:07   25          A.   It is usually -- it's like very, very rare, as I

**OFFICIAL TRANSCRIPT**

1    said.  It is one in hundred.

2         If an ad is released in a regional newspaper, which

3    is not like a national newspaper, and the positions are like

4    very, very lower positions where they don't read English --

5    because if they are like unskilled workers, unskilled

6    workers, they don't read English.  Only in that case if the

7    advertisement is released in a regional newspaper, so you

8    have to release in that regional language.

9         Q.   Okay.  And are you saying that's a very rare

10   occurrence?

11        A.   Very rare occurrence.

12        Q.   I want to just briefly ask you a few questions.

13        You -- before recruiting for Signal, you had -- you

14   undertook a recruitment effort in 1996?

15        A.   Are you referring to Mr. Pol?

16        Q.   Yes, I am.

17        A.   Yes, I did.

18        Q.   Okay.  And please tell me, Mr. Pol -- what was

19   Mr. Pol's company, what was the name of it?

20        A.   His company name was International Marine and

21   Industrial Services, Inc.

22        Q.   And when did you first meet Mr. Pol?

23        A.   I met him in -- I don't remember the month.  But I

24   guess it would be somewhere September or maybe -- somewhere

25   middle of 1996.


                    OFFICIAL TRANSCRIPT

1    Q.    Okay.  And what is Mr. Pol's nationality?

2    A.    He was a U.S. citizen.

3    Q.    Okay.  And what did his company do?

4    A.    His company was a labor supplier.

11:26:00  5    Q.    And from where did his company, IMI, recruit

6    workers?

7    A.    At that point of time, they recruited workers from

8    India.

9    Q.    Okay.  And was your father familiar -- was Jagdish

11:26:21  10   familiar with Mr. Pol as well?

11   A.    Yes, I guess, because he was the first one to meet

12   him.

13   Q.    Now, how did you come to know Mr. Malvern Burnett?

14   A.    Through Mr. Pol.

11:26:38  15   Q.    Okay.  Was he involved in the recruitment effort

16   that IMI undertook?

17   A.    I don't think the recruitment effort, but I do

18   remember he filed for the immigration of the -- he did the

19   immigration work for Mr. Pol.

11:26:56  20   Q.    Okay.  So would it be fair to say that he was the

21   attorney who did the legal work?

22   A.    Yes.

23   Q.    And in that effort, were there workers recruited

24   from India?

11:27:14  25   A.    Yes.


                        OFFICIAL TRANSCRIPT

1    Q.    Okay.  And how many workers were recruited?

2    A.    I don't remember the exact numbers, but I think

3    there were close to around 400.

4    Q.    And what kind of workers were they?

5    A.    They were all welders and fitters.

6    Q.    And what was their skill level?

7    A.    (No response.)

8    Q.    What was the requirement for their skill level?

9    A.    All I was told that they need flux core arc welders

10   who have to have good experience, good experience.  And

11   fitters, who basically did -- they want like -- needed

12   workers particularly who worked in the shipbuilding or the

13   oil industry.

14   Q.    And where did -- was Dewan Consultants -- were you

15   and Dewan Consultants involved in the recruitment effort?

16   A.    Yes, I was.

17   Q.    Okay.  And you were the -- were you the only

18   recruiter?

19   A.    No.  He was introduced to us through Mr. Navalkar,

20   who was my father's friend.  And he initially approached

21   Mr. Navalkar of -- his company name is Uni Exports.  And

22   initially he had approached him, but I -- I believe he was --

23   Mr. Navalkar failed to deliver him the workers or line up --

24   provide him with enough workers.

25   Q.    Okay.  So then he turned his attention to

OFFICIAL TRANSCRIPT

1  Dewan Consultants?

2      A.    As far as I recollect, Mr. Navalkar approached my

3  father to help him in the recruitment.  And my father refused

4  him in the first place, and he said we have never acted for

5  somebody as a subagent and we will not do this.

6          Then Mr. Navalkar agreed to hand over his client to

7  us, because I believe Mr. Pol was very upset with him.  So he

8  handed over his client to us.

9      Q.    Do you know why Mr. Pol was upset?

10     A.    Because I believe the Avondale -- the testers from

11  Avondale were already in Mumbai and Mr. Navalkar could not

12  line up enough candidates -- enough candidates.

13     Q.    So what did Dewan Consultants do?

14     A.    Dewan Consultants also knew that it's not easy to

15  get flux core arc welders, because at that point in time, the

16  flux core arc welding technology was not widely used in

17  India.  And only workers who had experience in the Middle

18  East or Far East would have -- would have had experience in

19  flux core arc welding.

20          So what Dewan Consultants did was we bought -- we

21  bought our own machines, MIG machines, and we got candidates

22  who were having good experience on stick welding, and we kind

23  of trained them and we gave them some practice.

24          And those guys were tested and they passed the

25  test.  And I believe the fitters were given practical tests.


**OFFICIAL TRANSCRIPT**

1    They were given practical tests by the Avondale testers.

2        Q.    Now, what exactly is a fitter from your

3    understanding?

4        A.    Fitter, from my understanding, is somebody who

5    prepares the -- the job that the welder is going to perform

6    his work on.

7              He basically does the bevelling.  He does gas

8    cutting.  And he cuts the pieces into the required sizes and

9    he tacks them.

10             Now, tacking is, again, like welding.  You're using

11   the stick welding.

12       Q.    Okay.  What is the purpose of tacking?

13       A.    Putting two pieces together.  Like we just tack

14   them, and then the welder will come and do the complete weld

15   on it.

16       Q.    So the fitter is putting two pieces of metal

17   together in a bevel and then tacking it to keep it together?

18       A.    It could be plate.  It could be angle.  It could be

19   anything.

20       Q.    And then later, what would a welder do to that?

21       A.    The welder will come and weld the whole thing.

22       Q.    Now, with respect to that recruitment, were there

23   any issues regarding what the temporary need was or the

24   permanent need for workers at Avondale?

25       A.    I was not told anything about permanent need.  I

OFFICIAL TRANSCRIPT

1  was just told that they are required on H-2B visas.  And the

2  understanding I was given was it would be a ten-month visa.

3      Q.  Okay.  And was a consulate interview necessary?

4      A.  Yes, it was.

5      Q.  Why was a consulate interview necessary for this

6  particular recruitment effort?

7      A.  I believe they had to -- they had to satisfy the --

8  satisfy the consulate that, after they finished the --

9  finished the ten-month visa period, that they will come back

10  to India.

11      Q.  Okay.  So there was the -- the workers came over on

12  an H-2B for ten months?

13      A.  Yes.

14      Q.  And were there any extensions?

15      A.  I don't recall that.  I don't think so there were

16  extensions.

17      Q.  Okay.  And was that recruitment effort successful?

18      A.  Yes, it was very successful.  Avondale was very,

19  very happy.  And Mr. Pol was also very, very happy.

20      Q.  Okay.  How about the workers?

21      A.  Workers were also very happy working for IMI.

22      Q.  Okay.  Now, do you know if all of the workers who

23  came to work for Avondale returned to India at the conclusion

24  of the job?

25      A.  As far as my recollection goes, I think a few came

 

**OFFICIAL TRANSCRIPT**

1    back and a few stayed back in the U.S.

2         Q.   Okay.  And do you know why some stayed back?

3              MR. BHATNAGAR:  Objection, speculation.

4              THE COURT:  Sustained.

5              MR. SHAPIRO:  Okay.

6              THE COURT:  If he knows about some specific ones,

7    you can ask him.

8    MR. SHAPIRO:  (CONTINUING)

9         Q.   Do you know of any specific workers that stayed

10   behind in the United States after working for Avondale?

11        A.   I don't recall specific one.  I would not recall

12   their names, but I do recall speaking to them after they

13   stayed back.

14        Q.   Okay.  And did any of these workers, while they

15   were working for Avondale, abscond?

16        A.   Yes.  There were few workers while working for IMI,

17   I did hear from Mr. Pol that they had --

18             MR. BHATNAGAR:  Objection, Your Honor.  Relevance.

19             THE COURT:  Sustained.

20   MR. SHAPIRO:  (CONTINUING)

21        Q.   Okay.  And do you know whether -- from your

22   personal knowledge, whether some workers stayed in the United

23   States legally?

24             MR. BHATNAGAR:  Objection.

25             THE COURT:  Scope?

                         OFFICIAL TRANSCRIPT

1    MR. SHAPIRO:  Does he have personal knowledge.

2    THE COURT:  Why don't you approach the bench.

3                **SIDEBAR ON THE RECORD**

4    THE COURT:  Is the concern he is going to get in T

5    or U visas?

6    MR. BHATNAGAR:  Our concern is that a separate

7    recruitment that involves a whole different group of workers

8    and their actions, whether they were lawful or unlawful, is

9    irrelevant and prejudicial from the motivation of our

10   clients, so -- and it is also speculation.

11   MR. SHAPIRO:  There is evidence in this case that

12   workers absconded from Signal, and that it is very important

13   that Mr. Dewan share his knowledge of what actually happens

14   in the recruitment effort sometimes -- and actually

15   frequently, and in this particular instance, because I was

16   involved in that.

17   THE COURT:  I think what you had moved on to was

18   whether they stayed in the United States.  I guess did you

19   mean did they abscond and stay in the United States?

20   MR. SHAPIRO:  It is a multipart question.  There is

21   a reason for that, and it has nothing to do with the T or U

22   visa.

23   THE COURT:  I was concerned about that.  But I'm

24   not -- I don't see the relevance of what happened in IMI.  It

25   is a different place, different employer, different people.

**OFFICIAL TRANSCRIPT**

1          It could be different rules and different backlog

2     and I don't see the relevance.

3          So I'm going to sustain the objection and you may

4     be able to ask him some things related to that another way,

1:37:54  5     but the '90s is irrelevant, I think.

6          MR. SHAPIRO:   Thank you.

7                    **AFTER THE SIDEBAR IN OPEN COURT**

8     **MR. SHAPIRO:   (CONTINUING)**

9          **Q.**   Mr. Dewan, I would like to direct your attention to

1:38:35  10    a recruitment effort in 2003 with Indo-AmeriSoft and Dr. Rao.

11    Who is -- what is Dr. Rao full name?

12         **A.**   Dr. Kurella Rao.

13         **Q.**   And what is he -- he is a doctor.  What kind of

14    doctor is he?

1:38:59  15         **A.**   All I know is that he was a physician.

16         **Q.**   Okay.  And he had other business interests?

17         **A.**   Yes.  He was introduced to us through Mr. Burnett,

18    and we were informed by Mr. Burnett that he has a labor

19    supply company.  And he does --  he brings IT professionals

1:39:29  20    from India and supplies them to the companies in the U.S.

21         **Q.**   Okay.  And what was the name of his company?

22         **A.**   Indo-AmeriSoft, LLC.

23         **Q.**   Okay.  And do you happen to know what the

24    relationship was between Dr. Rao and Mr. Burnett?

1:39:56  25         **A.**   I believe they would have a client/attorney

**OFFICIAL TRANSCRIPT**

1    relationship.

2        Q.    Okay.   And was Dewan Consultants approached by

3    Rao -- and I'm going to call the company IAS to keep it brief

4    instead of saying Indo-AmeriSoft every time.

5        Was your company or you personally approached by

6    IAS with any kind of a business proposal?

7        A.    Yes.   Initial discussion was between me and

8    Burnett.   He informed us that he had a client and -- who was

9    looking to get some workers from India for the shipbuilding

10   industry.

11       And he wants to -- and he is in the labor supply

12   business.   And he wants to place these workers for

13   Bollinger Shipyard.

14       Q.    Okay.   Where is Bollinger Shipyard?

15       A.    I knew that Bollinger Shipyard, it was in

16   New Orleans.

17       Q.    And do you happen to know why Bollinger was chosen

18   as the company?

19       A.    I have no idea on that.

20       Q.    Okay.   And what did IAS want to accomplish in this

21   recruitment effort?

22       A.    IAS wanted to use us as a recruitment company and

23   provide them with welders and fitters and some mechanics and

24   I think a few electricians.

25       I don't recall exactly all the positions, but

**OFFICIAL TRANSCRIPT**

1   mostly it was welders and fitters.

2       Q.   Okay.  And what year was the recruitment effort?

3       A.   I believe it was in 2003.

4       Q.   And what was the ultimate goal of the recruitment

5   effort?

6       A.   The ultimate goal was to provide them with

7   permanent resident visas and they would come here to the U.S.

8   and work for IAS.  This was my understanding.

9       Q.   Okay.  And was Mr. Pol involved in this in any way,

10   in this recruitment effort?

11       A.   No.

12       Q.   I want to direct your attention to two other

13   recruitment efforts.  First, the one for J & M.

14       What is J & M?

15       A.   J & M is, again, what my -- the understanding given

16   to me was again a labor supply company.

17       Q.   And did anyone contact you to request that you

18   recruit workers from India to work for J & M?

19       A.   Mr. Pol contacted me.

20       Q.   Okay.  And when did he contact you about that?

21       A.   I believe it was soon after -- soon after we did

22   the recruitment -- recruitments for IAS, which is

23   Indo-AmeriSoft.

24       Q.   So it was around the same time, around 2003?

25       A.   No.  It was after we finished the recruitments --

11:42:09
11:42:37
11:42:53
11:43:16
11:43:38

**OFFICIAL TRANSCRIPT**

1   after we finished the recruitments, it was after that.

2        Q.   Okay.  And do you know where J & M is located?

3        A.   The understanding I was given was J & M was located

4   in Mississippi.

L1:43:58   5        Q.   What did J & M actually do?  What was their

6   function?

7        A.   I believe they were labor supplier.

8        Q.   So what does that mean, to be a labor supplier?

9        A.   People who -- people who contract workers to other

L1:44:18   10  companies on a contract basis.

11       Q.   Okay.  So other companies meaning what, other

12  shipyards?

13       A.   Other shipyards or it could be any company.

14       Q.   Where would these shipyards be?  Where would they

L1:44:35   15  be located?

16       A.   As far as the understanding with me about J & M, it

17  was somewhere in California.  I think it was NASSCO.

18       Q.   But it could be any shipyard across the country?

19       A.   Yeah.  What was told to me was that they were going

L1:44:57   20  to be working for a company in California.  But it was,

21  again, up to J & M.

22            After the workers would have come here, it's

23  possible that they would have changed their work from

24  California and put them in someplace else.

L1:45:13   25       Q.   Okay.  Was that unusual for the work, the actual

OFFICIAL TRANSCRIPT

1    employer, to change?

2        A.    That's very -- that's very usual.  Even in the

3    Middle East when they go for the supply companies, they

4    change jobs very frequently.  They put them in one company

5    for a month and then they will change them to another

6    company.  That's very common.

7        Q.    And do the workers who go to those companies -- the

8    workers from India that go to those companies ever have any

9    problems with that?

10           MR. BHATNAGAR:  Objection.

11           THE COURT:  On what basis?

12           MR. BHATNAGAR:  Speculation.

13           THE COURT:  Sustained.

14   MR. SHAPIRO:  (CONTINUING)

15       Q.    Have you -- do you have any personal knowledge of

16   anyone -- any worker from India that has had a problem with

17   having to change companies at the request of the labor

18   supplier?

19       A.    As far as the working conditions are good, I don't

20   think anybody would have any problems.

21       Q.    Okay.  Now, I want to direct your attention to

22   another recruitment effort.

23           Did anyone ever contact you to request that you

24   recruit Indian workers for a company known as

25   Intracoastal Marine Repair?

OFFICIAL TRANSCRIPT

1      **A.**    Mr. Burnett contacted me for that in or about the

2   same time after we started the recruitment for J & M.

3      **Q.**    Okay.  And when was that approximately in time?

4   What year was that, approximately?

5      **A.**    I think it was 2004, but I would not recall the

6   month.

7      **Q.**    Okay.  And was Dr. Rao involved in this effort?

8      **A.**    No.

9      **Q.**    Okay.  Was Mr. Pol involved in this effort?

10      **A.**    No.

11      **Q.**    Okay.  Now, what did -- was Intracoastal

12   Marine Repair known as anything else?

13      **A.**    I was told that they are known as Zito, Zito Group

14   of Companies, because when I asked about the information from

15   Mr. Burnett, he asked me to see their website.

16          He gave me their website address, and I saw that it

17   was Zito Group of Companies and they had various companies

18   under that.

19      **Q.**    Did you come to learn why it is called Zito,

20   though?

21      **A.**    I believe the owners -- the owner's name was Zito.

22   His family name was Zito.

23      **Q.**    Okay.  And do you know where Zito is located?

24      **A.**    I was told that they -- I was told that they are in

25   New Orleans, Louisiana.


**OFFICIAL TRANSCRIPT**

L1:47:04
L1:47:19
L1:47:43
L1:47:57
L1:48:19

1      Q.   Okay.  Now, I want to get into very briefly with

2  you the recruitment effort that you made for IAS, J & M, and

3  Zito.

4           And I'm going to ask you this with respect to one

5  company, but what was the ultimate goal of all three

6  recruitment efforts?

7      A.   The ultimate goal was the workers would -- the job

8  candidates would come to the U.S. on a permanent resident

9  visa and work for these companies.

10     Q.   Okay.  Now, when you say permanent resident visa,

11  is that known as anything else?

12     A.   In India, people refer to it as green card visa,

13  because ultimately it leads you to a green card.

14     Q.   And what does that mean for the worker to get a

15  green card?

16     A.   That means to the worker that he will be able to

17  stay in the U.S., bring his family to the U.S., and I guess

18  someday he will become a U.S. citizen.

19     Q.   Okay.  And based on your knowledge in the

20  recruitment business, was that something that was highly

21  sought after in India by workers?

22     A.   I don't know about that.  But this was something I

23  was doing for the first time.

24     Q.   Okay.  And how long was the process supposed to

25  take to get the permanent resident visa?


                        OFFICIAL TRANSCRIPT

L1:48:40
L1:49:00
L1:49:22
L1:49:47
L1:50:04

1       **A.**   I was told different time frames.  In the

2   beginning, I was told -- I was told it would be 12 to

3   18 months.  And then later on it was told to me it would take

4   about 18 to 24 months.

5       **Q.**   Okay.  And that would be for all three companies?

6       **A.**   That would be for all three companies.

7       **Q.**   Okay.  And who gave you this projection with

8   respect to all three companies?

9       **A.**   Mr. Burnett.

10       **Q.**   Okay.  And when you first learned about this, what

11   was your view about the projected dates, the projected time

12   frame when this permanent resident visa could be obtained?

13       **A.**   Frankly, I had no idea about -- I had no idea about

14   this permanent resident visa process at all.

15       All I had heard about people from India going on

16   family -- family-dependent visas.  And this is what I heard,

17   that it takes years to get them to the U.S.  That's the

18   understanding I had.

19       But the process was -- during the time of IAS was

20   explained by Mr. Burnett.

21       **Q.**   Okay.  And when that was explained to you by

22   Mr. Burnett, did you believe it?

23       **A.**   I believed it because, as far as my -- my -- I

24   understood that Mr. Burnett is a -- has a good practice and

25   is a good immigration lawyer, because the -- I had seen his

**OFFICIAL TRANSCRIPT**

11:50:35
11:50:56
11:51:27
11:51:54
11:52:21

1    work during the IMI time, and it was very, very successful.

2    Most of the people had got the visas at the consulate.

3            So I had seen that.  I understood he is -- what

4    he -- I mean, I had to believe him, that he is -- what he is

5    telling me is the truth.

6        Q.    Okay.  And at that time your father, Jagdish, he

7    was still alive?

8        A.    Yes, he was.

9        Q.    Was he involved in the discussions for any -- for

10   all three of these recruitment efforts?

11       A.    No.

12       Q.    Okay.  Which ones was your father involved in?

13       A.    My father was involved in the Indo-AmeriSoft, LLC.

14       Q.    Okay.  Now, were you advised what the stages were

15   for obtaining the permanent resident visa?

16       A.    Yes.  He had given me -- Mr. Burnett had given me a

17   brief understanding about the whole thing.

18           And when he came to India, after the recruitment,

19   to do the paperwork for them.  And that was the time I sat

20   down with him, and I wanted to understand each and every

21   process because this was something new to me.

22           So this was -- this was before the candidates made

23   their first payment.

24           Upon hearing what he said, I was reluctant to get

25   into this.


                    **OFFICIAL TRANSCRIPT**

1      **Q.**   Why were you reluctant?

2      **A.**   I was reluctant because when he told me that the

3  labor certification, which is going to be the first process

4  of filing, would be -- that the first process, which is the

5  labor certification, he told me that he is going to file

6  under the electronic way of filing, which is not yet

7  implemented and it is going to be implemented soon.

8      So I was reluctant.  I mean, I didn't know how long

9  it was going to take.

10     **Q.**   Okay.  Well, let's just backtrack a little bit

11  because I would like to have you explain your understanding

12  of what a labor certification is.

13      What is a labor certification?

14     **A.**   My understanding is for the labor department to

15  determine that the -- that particular position, suppose it is

16  a welder, it is not available in the U.S., so they certify

17  that the company can bring in foreign worker.

18     **Q.**   You say "they."  Who is it that that certifies?

19     **A.**   The labor department in the U.S.

20     **Q.**   And which labor department?

21     **A.**   I would not know about that.

22     **Q.**   Okay.  I mean, would it be a state labor department

23  or --

24     **A.**   Yeah, state labor department.

25     **Q.**   And then would it be the federal labor department

**OFFICIAL TRANSCRIPT**

1   as well?

2        A.   I would not know about that.

3        Q.   Okay.  But you knew that there had to be a labor

4   certification?

5        A.   Yes.

6        Q.   Okay.  And your understanding of a labor

7   certification is what the projected need was for workers?

8        A.   Yeah.  I was made to -- I was made to understand

9   that the companies in general -- the understanding I was

10  given is that the company has to advertise, and then the

11  response of the advertisement goes to the -- goes to the

12  labor department.  And based on that -- and when we see that

13  the workers are not available, they grant you the labor

14  certification.

15       Q.   Okay.  Just to -- just to make sure that we all

16  understand, are you a lawyer?

17       A.   No, I'm not.

18       Q.   And you've worked in the recruitment business your

19  whole life?

20       A.   Yes, sir.

21       Q.   And so you indicated just before that you were a

22  bit reluctant because of the -- this electronic system had

23  not -- filing system had not been put in place.

24            What concerned you about that?

25       A.   It concerned me because -- because of something

                        OFFICIAL TRANSCRIPT

1  which has not been implemented.  If the delays -- if there

2  are -- if it's like indefinite, because if something --

3  something is with the government.  You never know because, I

4  mean, at least in India they used to -- the government --

5  things takes forever -- forever.

6         And back of my mind I was thinking -- you know, I

7  don't know how long this is -- how long this is going to

8  take.  And I would be responsible to answer these workers.

9     Q.   And why would you be responsible to answer for the

10 workers?

11    A.   I would be responsible because the workers have

12 come to my office.  I'm the recruiter.  And...

13    Q.   And the companies would have to do -- go through

14 the same process with the demand letter and the power of

15 attorney?

16    A.   Yes.

17    Q.   Okay.  And everyone else would be -- everyone else

18 in the process would be here in the United States?

19    A.   Sorry, I didn't --

20    Q.   All the other people involved in the recruitment

21 effort and the legal work would be located in the

22 United States?

23    A.   Yeah, of course.  The company was from the

24 United States.

25    Q.   Right.  And where was -- where did Mr. Burnett come

**OFFICIAL TRANSCRIPT**

1    from?

2        A.   He was based in New Orleans.

3        Q.   Okay.  And Dr. Rao?

4        A.   He was also in New Orleans.

5        Q.   So you were the only one in India, correct?

6        A.   Yeah, correct.  So I would have to face these guys

7    on daily basis.

8        Q.   Okay.  So did you inquire with Mr. Burnett as to

9    whether he could obtain any kind of certainty on the

10   electronic filing system?

11       A.   I don't recollect asking him this, but all I

12   remember was I told my father I don't want to get into this.

13       Q.   Okay.  And what was your father's response?

14       A.   I don't know.  He had a meeting with him

15   separately.  I was not in that meeting.  And he somehow -- he

16   somehow convinced him.  And my father instructed me that we

17   need to go with this.

18       Q.   Okay.  Now, was this -- this electronic filing

19   system, what is that known as?

20       A.   I was made to understand that it will be called

21   PERM, P-E-R-M.

22       Q.   Okay.  And this recruitment effort would be for all

23   three of the companies that you mentioned or just for one or

24   two?

25       A.   Yeah, for all the three companies he had mentioned

OFFICIAL TRANSCRIPT

1    that he would be using PERM.

2        Q.   Okay.  And who took the initial steps in filing

3    the -- for the labor certifications?

4        A.   Mr. Burnett.

5        Q.   Okay.  And do you recall how many -- well, first of

6    all, do you recall how long it took for the labor

7    certification to get approved?

8        A.   I think it took almost -- almost two years.

9        Q.   Did it take two years for IAS?

10       A.   Yes.

11       Q.   Did it take two years for Zito?

12       A.   Maybe a little less.

13       Q.   Okay.  And did it take two years for J & M?

14       A.   I think a little less than two years.

15       Q.   And the expectation -- what was the expectation for

16   the time frame to obtain the labor certification?

17       A.   The understanding I was given by Mr. Burnett is

18   that within nine months, the implementation of PERM and the

19   approval of the labor certifications under the PERM would be

20   completed.

21           THE COURT:  Mr. Shapiro, would this be a good time

22   to take a break?

23           MR. SHAPIRO:  Yes, it would.

24           THE COURT:  Let's do that.  We'll take a half an

25   hour break for lunch today.


                         OFFICIAL TRANSCRIPT

1    Please remember the instructions that I have given

2 you throughout the trial.

3                                    (Jury out at 12:01 p.m.)

4    THE COURT:  All right.  So Mr. Dewan, since you are

5 on the witness stand, you are not to discuss the case with

6 anyone during the break.

7    THE WITNESS:  Yes, Your Honor.

8    THE COURT:  You can leave the witness stand if you

9 would like to.  If you would, just be back on at 12:30.

10    I have a couple of questions I want to ask you

11 quickly, but I have a conference so I need to be really

12 quick.

13    First, on the issue of whether the -- Signal has

14 proved India law with respect to this unlawfulness, I

15 appreciate the additional information, but I don't -- it

16 doesn't -- I guess what you are doing is asking me for

17 reconsideration, and it does not change my opinion about

18 Signal not having met its burden of proof.

19    And I remember we specifically talked about Signal

20 saying we didn't get an expert on the plaintiffs' claims

21 because it was the plaintiffs' burden of proof, so they

22 needed to get an expert.

23    Well, these are your claims, your cross-claims, and

24 so you would have needed to get an expert to establish what

25 India law is.


OFFICIAL TRANSCRIPT

1        So I'm not changing that ruling.

2        Are there objections to -- maybe you're supposed to

3    exchange right now about the objections to demonstratives,

4    was it at noon?

12:04:00  5        MR. HOWARD:  We were supposed to exchange the

6    demonstratives.

7        THE COURT:  All right.  Okay.  So we don't know

8    whether there are objections, but I'm assuming you all will

9    meet that deadline.

12:04:08  10       If we finish putting on evidence today, then I'm

11   going to take up the Rule 50 motions with respect to the

12   cross-claims today.

13       There is a memo due from Signal at 5:00 about what

14   your evidence of damages is, so I need that by 5:00 because

12:04:29  15   I'm assuming we're going to finish the evidence today and I'm

16   going to take up the Signal Rule 50 motions.

17       So anybody that has one needs to be prepared to

18   discuss it.

19       And I want to do that so that you can know what the

12:04:43  20   status is so you can plan your closing argument.

21       MS. HANGARTNER:  Yes, Your Honor.  Thank you.

22       MR. HOWARD:  Your Honor, will our Rule 50 motions

23   be addressed in the morning?

24       THE COURT:  It depends on what time it is when we

12:05:01  25   finish with Signal.  And if it's late, then we'll wait and do

OFFICIAL TRANSCRIPT

1    them tomorrow morning.  And it probably will be at that

2    point.

3            The plaintiffs -- we were talking about your

4    discrimination claim, and I wanted you to tell me what the

12:05:21    5    specific decisions about the -- alleging the harassing

6    conditions, who made those decisions.

7            Are you ready to do that?

8            MR. SANDLER:  Who set up the conditions for the

9    harassing -- who is the personnel who set up the harassing

12:05:46    10   conditions at Signal?

11           THE COURT:  Yes.  This has to do with the jury

12   instructions and whether the instructions we inserted from

13   the Fifth Circuit needs to be there.

14           I need to know what decisions you are talking about

12:06:00    15   to know whether it was supervisory people who made the

16   decisions or not.  I think Ms. Graunke was here and so maybe

17   she is --

18           MS. TSU:  She needed to -- she has another case she

19   has to take care of.

12:06:15    20           THE COURT:  Well, somebody needs to tell me because

21   it affects the jury instructions.

22           So when we come back at 12:30 -- can you still get

23   in touch with her?  She was -- you were here, Ms. Tsu.  You

24   heard that conversation.

12:06:27    25           MS. TSU:  Yeah.


                        OFFICIAL TRANSCRIPT

 1          THE COURT:  So y'all need to talk and just let me
 2     know when we come back at 12:30.
 3          MS. TSU:  Okay.
 4          THE COURT:  Unless you are ready to do it now, but
12:06:36  5     we can do it at 12:30.
 6          You would rather wait.  Okay.
 7          Then I have another question, Mr. Howard and
 8     Mr. Werner or whoever.
 9          On the plaintiffs' fraud and negligent
12:06:48  10     misrepresentation claims under India law, if the plaintiffs
11     prevail under India fraud, does the negligent
12     misrepresentation still go to the jury or is that an
13     alternative?
14          MR. WERNER:  Negligent misrepresentation is an
12:07:05  15     alternative to the fraud claim.
16          THE COURT:  Okay.  So we need to address that in
17     the verdict form?
18          MR. WERNER:  Yes.
19          THE COURT:  So that is helpful.
12:07:13  20          Okay.  So I'll see y'all at 12:30.
21          MS. HANGARTNER:  Can I just ask one quick question?
22          THE COURT:  Yeah.
23          MS. HANGARTNER:  So all Rule 50 motions by Signal
24     will be presented and then completed this evening?
12:07:26  25          THE COURT:  Right.


                    **OFFICIAL TRANSCRIPT**

1     MS. HANGARTNER:  And plaintiffs will go in the

2   morning?

3         THE COURT:  Right.

4         So if you have any against the plaintiffs' claims

5   or somebody has any against your cross-claims, let's do it

6   all tonight so you can be prepared.

7         And if by some miracle we all still have a lot of

8   energy and want to keep going, we'll talk about the

9   plaintiffs, but it probably will be in the morning.

10        MR. SANDLER:  Will there be any other red-lines

11  that we'll be able to address the Court about?

12        THE COURT:  In the jury instructions?

13        MR. SANDLER:  Yeah.

14        THE COURT:  Maybe this afternoon on a break or at

15  the end of the day, but not right now.

16        MR. SANDLER:  Okay.

17                        (End of morning session.)

18

19                        * * * *
                          **CERTIFICATE**
20
        **I hereby certify this 9th day of February, 2015, that**
21  **the foregoing is, to the best of my ability and**
    **understanding, a true and correct transcript of the**
22  **proceedings in the above-entitled matter.**

23                        */s/ Mary V. Thompson*

24                        _____
                          **Official Court Reporter**

25


                        **OFFICIAL TRANSCRIPT**