<pre>
 1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3    KURIAN DAVID, et al.,              CIVIL ACTION
                Plaintiffs
 4
      versus                            No. 08-1220
 5

 6    SIGNAL INTERNATIONAL, LLC., et al.,   Section "E"
                Defendants
 7

 8    Related Case:

 9    EQUAL EMPLOYMENT OPPORTUNITY        CIVIL ACTION
      COMMISSION,
10              Plaintiffs

11    versus                            No. 12-557

12
      SIGNAL INTERNATIONAL, LLC, et al.,   Section "E"
13              Defendants

14    Related Case:

15    LAKSHMANAN PONNAYAN ACHARI, et al.,   CIVIL ACTION
                Plaintiffs
16
      versus                            No. 13-6218
17                                      (c/w 13-6219,
                                         13-6220,13-6221
18                                        14-1818)
      SIGNAL INTERNATIONAL, LLC, et al.,
19              Defenants                Section "E"

20    Applies to:
      David 08-1220
21

22                          DAY 20
                       February 10, 2015
23                     MORNING SESSION

24         TRANSCRIPT OF THE TRIAL PROCEEDINGS
          BEFORE THE HONORABLE SUSIE MORGAN,
25           UNITED STATES DISTRICT JUDGE,
                    AND A JURY.


                       OFFICIAL TRANSCRIPT
</pre>

1    **APPEARANCES:**

2

3    For Plaintiffs:                    ALAN HOWARD, ESQ.
                                        HUGH D. SANDLER, ESQ.
4                                       CHIEMI D. SUZUKI, ESQ.
                                        Crowell & Moring, LLP
5                                       590 Madison Avenue
                                        New York, NY 10022
6                                       212.803.4021

7                                       DANIEL WERNER, ESQ.
                                        NAOMI TSU, ESQ.
8                                       MELIA AMAL BOUHABIB, ESQ.
                                        MEREDITH STEWART, ESQ.
9                                       Southern Poverty Law Center
                                        Immigrant Justice Project
10                                      233 Peachtree Street NE
                                        Atlanta, GA 30303
11                                      404.521.6700

12                                      CHANDRA S. BHATNAGAR, ESQ.
                                        American Civil Liberties Union
13                                      Foundation (New York/Broad)
                                        125 Broad Street, 18th Floor
14                                      New York, NY  10004

15

16   For Signal Entities:               ERIN CASEY HANGARTNER
                                        ELHAM RABBANI, ESQ,
17                                      HAL UNGAR, ESQ.
                                        BRIAN ROUX, Ph.D., ESQ.
18                                      LANCY RYDBERG, ESQ.
                                        Hangartner Rydberg & Terrell
19                                      One Shell Square
                                        701 Poydras Street
20                                      Suite 310
                                        New Orleans, LA 70139

21                                      PATRICIA BOLLMAN, ESQ.
                                        Patricia Bollman, APLC
22                                      P.O. Box 13707
                                        New Orleans, LA 70185.
23
                                        ALAN WEINBERGER, ESQ.
24                                      Weinberger Law Firm
                                        201 St. Charles Avenue
25                                      New Orleans, LA  70170


                    **OFFICIAL TRANSCRIPT**

```
1    For Sachin Dewan:              STEPHEN SHAPIRO, ESQ.
                                    Law Office of Stephen Shapiro
2                                   700 Camp Street
                                    New Orleans, LA 70130
3

4    For Malvern Burnett:          TIM CERNIGLIA, ESQ.
                                    Law Office of Tim Cerniglia
5                                   1521 St. Charles Avenue
                                    New Orleans, LA 70130
6

7

8

9
     REPORTED BY:
10
     MARY V. THOMPSON, RMR, FCRR
11   Official Court Reporter
     HB 273
12   500 Poydras Street
     New Orleans, Louisiana 70130
13   (504)589-7783
     mary_v_thompson@laed.uscourts.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

                              **OFFICIAL TRANSCRIPT**

1                              **INDEX**

2

3                                                      **PAGE NO.**

4

5

6

7    **SACHIN DEWAN**

8

9         Cross-Examination by Mr. Bhatnagar...........   4623

10         Cross-Examination by Dr. Roux...............   4708

11         Cross-Examination by Mr. Cerniglia..........   4732

12         Recross-Examination by Dr. Roux.............   4761

13

14

15

16   **MOTION PRACTICE**.................................   4769

17

18

19

20

21

22

23

24

25

                         **OFFICIAL TRANSCRIPT**

<pre>
 1                    P R O C E E D I N G S
 2                              (Call to order of the court.)
 3              THE COURT:  Bring in the jury.
 4              THE CASE MANAGER:  We're going to do exhibits.
 5              THE COURT:  Oh, we are going to do exhibits.  I
 6    believe you are prepared.
 7              These are exhibits for Burnett first.
 8              Have a seat while we do this.
 9              MR. CERNIGLIA:  Your Honor, these are the exhibits
10    that was used in Burnett's case.
11              THE COURT:  All right.
12              MR. BURNETT:  No. 527, Nos. 1143, 1985, 756, 1253,
13    1482, 2017, 740, 1234, 1235, 498, 200, 1481, 1, 90, 646, 190,
14    550, 1645, 1459, 1088.  No. 160, I believe that was already
15    introduced, 1085, 61, and 536.
16              THE COURT:  Anybody else have exhibits?
17              MR. HOWARD:  Plaintiffs used Exhibits 17, 1354,
18    786, 497, 784, 740, 1140, 564, 1893, 1894, 501, 940 and 640.
19              THE COURT:  Ms. Bollman?
20              MS. BOLLMAN:  Your Honor, Signal used
21    Exhibits 1374, 1300, 1571, 1268, 1895, 0574, 0689, and 1603.
22              THE COURT:  Mr. Shapiro, did you have any?
23              MR. SHAPIRO:  I did not have any more for
24    Mr. Burnett.
25              THE COURT:  All right.  Do we have any additional
</pre>

08:07:03 (line 5)
08:07:19 (line 10)
08:08:18 (line 15)
08:08:58 (line 20)
08:09:17 (line 25)

**OFFICIAL TRANSCRIPT**

1    ones?

2            THE CASE MANAGER:  That's it, Judge.

3            THE COURT:  All right.  Any objections to those

4    exhibits?

5            (No response.)

6            THE COURT:  Those are admitted.

7            All right.  Mr. Shapiro, have you decided to waive

8    the reading of the Mannish Dewan deposition?

9            MR. SHAPIRO:  Yes, we have, Your Honor.

10           THE COURT:  Okay.  All right.

11           So I think we're ready now to bring the jury in.

12                           (Jury in at 8:09 a.m.)

13                           (Call to order of the Court.)

14           THE COURT:  All right.  Be seated.

15           And good morning, ladies and gentlemen.

16           MR. BHATNAGAR:  Morning, Your Honor.

17           THE COURT:  Good morning.

18                        SACHIN DEWAN,

19   having been previously sworn, testified as follows, to wit:

20                      CROSS-EXAMINATION

21   BY MR. BHATNAGAR:

22       Q.   Good morning, Mr. Dewan.

23       A.   Good morning.

24       Q.   Mr. Dewan, as you may remember, my name is

25   Chandra Bhatnagar, and I represent the plaintiffs in this


                        OFFICIAL TRANSCRIPT

1    lawsuit.  We met back in 2009 in Mumbai at your deposition,
2    and then again last year at your deposition here in
3    New Orleans.
4              It's nice to see you, sir.
08:10:43    5    A.    Yes, I remember.
6         Q.    Mr. Dewan, you're the managing director of
7    Dewan Consultants, right?
8         A.    Yes.
9         Q.    And you're the head of the company?
08:10:49    10   A.    Yes.
11        Q.    You do not report to anybody; everyone reports to
12   you?
13        A.    No.  There are some decisions that my -- I take
14   with my brothers.
08:11:03    15   Q.    But you're the final arbiter?
16        A.    Yes, I am.
17        Q.    And Dewan Consultants is over 30 years old,
18   correct?
19        A.    Correct.
08:11:12    20   Q.    And it's -- remains in business, right?
21        A.    Sorry?
22        Q.    It remains in business, currently in business?
23        A.    Yeah.  It was out of business for a few years, and
24   it is back in business just this few months back.
08:11:27    25   Q.    Great.


                        OFFICIAL TRANSCRIPT

08:11:38

08:11:57

08:12:16

08:12:37

08:12:58

1          I want to begin by asking you about the work that

2     you did for Signal International.

3          You testified yesterday that in the spring of 2006,

4     Mr. Pol came to India to tell you about the Signal

5     opportunity, right?

6          A.   He informed me about the Signal opportunity when he

7     was in the U.S.; and followed with that, he came to India.

8          Q.   And from the very beginning of your involvement in

9     the Signal recruitment, your understanding was that whether

10    or not the Indian workers went on an H-2B visa, they would

11    still have the green card as part of the process and they

12    would transfer from the H-2B visa to the green card, right?

13         A.   Yes.  My understanding was that Signal will apply

14    for the green cards, as I mentioned before.  And I --

15    initially, I was not sure myself that the H-2B visas would be

16    approved and -- because of the reasons that I mentioned

17    yesterday, that the H-2B visas were not granted to the

18    shipyards in the Gulf Coast.

19         So my understanding was if that is denied, H-2B --

20    Signal will continue with the -- with the -- with the

21    permanent resident visa process.

22         Once the -- once the H-2Bs were approved, then my

23    understanding was once the -- once the job candidates arrive

24    at Signal, Signal would apply for the green cards.

25         Q.   So from the very beginning, you understood that

**OFFICIAL TRANSCRIPT**

1     Signal wanted you to recruit for permanent residency visas

2     and also for H-2B visas, right?

3          A.   Correct.

4          Q.   And with this understanding, you posted

08:13:11   5     advertisements, you had seminars, and you distributed

6     information to interested candidates, right?

7          A.   Correct.

8          Q.   Let's look at one of the documents that your lawyer

9     showed you yesterday.

08:13:21   10               MR. BHATNAGAR:  Trial Exhibit 790.

11               The second paragraph.

12               If we could blow up the...

13               It's the first paragraph, Bullet Point 1 on the

14    bottom.  Sorry.

08:13:55   15    **MR. BHATNAGAR: (CONTINUING)**

16         Q.   (As read:)  Offering employment-based green card

17    sponsorship and option of H-2B temporary work visas.  All

18    green card applicants will automatically be enrolled as H-2B

19    candidates.  However, it is not guaranteed that they be

08:14:09   20    approved with H-2B visas, which will bring them to the

21    United States within six months.  This will not affect the

22    employment-based green card process.

23               Did I read that correctly?

24         A.   Yes.

08:14:20   25         Q.   And that, in essence, describes the Signal process,

**OFFICIAL TRANSCRIPT**

1    correct?

2         A.   Correct.

3         Q.   So if I'm an applicant and I want clarity, you will

4    tell me that I -- if I go into the Signal process,

5    irrespective of whether or not I get the H-2B visa, I'm still

6    going to be part of the green card process, right?

7         A.   Yes.  Correct.

8         Q.   And you would tell me that, because it was your

9    understanding from Signal that Signal was intending to apply

10   for green cards on behalf of all the workers, right?

11        A.   Yes.  That was the understanding that Pol gave me

12   initially.  And I verified that with Mr. Bill Bingle when he

13   came to India.

14             And it also give me the same understanding once --

15   when I received the demand letter from Signal.  The wordings

16   on that gave me the same understanding, what Mr. Pol had told

17   me.

18        Q.   So you mentioned that the demand letter --

19             MR. BHATNAGAR:  Let's look at Exhibit 743.

20             And if we could pull out the first sentence.

21   MR. BHATNAGAR:  (CONTINUING)

22        Q.   (As read:)  And so be it known that we hereby

23   appoint Dewan Consultants as our representative in India to

24   facilitate the recruitment of skilled workers to the United

25   States of America for employment under the temporary and

OFFICIAL TRANSCRIPT

1     permanent resident program.

2              Did I read that correctly?

3        A.   Yes, sir.

4        Q.   And that led you to believe that you were

5     authorized to recruit Indian workers for the temporary and

6     permanent resident program, right?

7        A.   Yes.

8        Q.   Now, you received -- and this was signed on --

9              MR. BHATNAGAR:  Close that.

10   MR. BHATNAGAR:   (CONTINUING)

11       Q.   This was signed by Bill Bingle, correct?

12       A.   Yes.

13       Q.   And you received an identical letter, which is

14    1272, which was signed by -- I'm sorry, 1271, and this

15    identical letter was signed by Ron Schnoor, correct?

16       A.   Correct, sir.

17       Q.   And it is also notarized, correct?

18       A.   Correct, sir.

19       Q.   So these documents gave you the clear understanding

20    that you were authorized by Signal to recruit workers for the

21    temporary and permanent resident program, right?

22       A.   Right.

23       Q.   Now, in addition, your lawyer showed you yesterday

24    a power of attorney, which is 1272.

25              And this power of attorney appointed you as


                          OFFICIAL TRANSCRIPT

1    Signal's true and lawful agent, right?

2        A.    Yes.

3        Q.    And you were to process skilled foreign workers,

4    right?

08:16:45    5        A.    Right.

6        Q.    Now, this power of attorney doesn't have any

7    limiting information -- sorry -- limiting language, does it?

8        A.    No, sir.

9        Q.    So there were two groups of workers that you

08:16:59    10    recruited to come to Signal, right?

11            The first group pre-H-2B approval, and then the

12    second group after the H-2Bs were approved, right?

13        A.    Yes.

14        Q.    And the approval happened in July -- around

08:17:12    15    July 20th of 2006, right?

16        A.    I would not recall the date, but it must be July or

17    August, something like that.

18        Q.    Okay.  But regardless of whether the recruits were

19    from the first group or the second group, it was still your

08:17:25    20    understanding that Signal was going to apply for permanent

21    residency for all of the workers, correct?

22        A.    Yes, that was my understanding.

23        Q.    And you recruited the workers with that

24    understanding?

08:17:34    25        A.    Correct.


                    OFFICIAL TRANSCRIPT

 1    **Q.**   And you communicated to the workers that
 2    understanding?
 3        **A.**   Correct, sir.
 4        **Q.**   And the Indian workers relied on that understanding
 5    when they decided to enroll?
 6        **A.**   As far as my understanding goes, my
 7    understanding -- what my understanding was through Mr. Pol
 8    and through the documents and through the -- and through the
 9    communication that I had with Mr. Bingle when he was in
10    India, I didn't think I lied to the candidates about that.
11        **Q.**   So the candidates expected that Signal was going to
12    apply for permanent residency on their behalf across the
13    board?
14        **A.**   Yes.
15        **Q.**   Now, you would not have made these statements
16    regarding green card sponsorships if Signal hadn't offered
17    the option of permanent residency, right?
18        **A.**   Correct, sir.
19        **Q.**   And the demand letter that we looked at earlier
20    gave you the understanding that you were doing so with the
21    express authority of Signal International, right?
22        **A.**   Right.
23        **Q.**   And you were not alone in this understanding?
24    Mr. Pol and Mr. Burnett also understood that Signal was going
25    to apply for permanent residency for all of the workers,

                    **OFFICIAL TRANSCRIPT**

1    right?

2         A.    That is correct.

3         Q.    So Dewan Consultants, as I asked you earlier, it

4    has been in business for over 30 years, correct?

08:18:51    5         A.    Yes, sir.

6         Q.    And you've worked with many companies over that

7    time period?

8         A.    Yes.

9         Q.    And you testified yesterday that you have placed, I

08:18:58    10   think, thousands of Indian workers over that timeframe,

11   right?

12        A.    Yes.

13        Q.    So in order for you to build a healthy business,

14   you have to respond to the needs of the companies that you

08:19:08    15   are working for, right?

16        A.    Sorry.  Can you give me question again?

17        Q.    In order to build your business, build a healthy

18   business, you have to respond to the needs of the companies

19   that you're working for, correct?

08:19:18    20        A.    Correct, sir.

21        Q.    And part of doing so is by when you're retained by

22   a company, you particularly set out the terms that that

23   company is recruiting for and you recruit based on those

24   terms, right?

08:19:30    25        A.    Yes.

OFFICIAL TRANSCRIPT

1    **Q.**   And that is what you did in this case with

2    Signal International, right?

3    **A.**   Yes.

4    **Q.**   So your recruitment in this case was based

5    precisely on your understanding of what Signal was looking

6    for?

7    **A.**   Correct.

8    **Q.**   So the steps were Signal -- number one, Signal

9    wanted you to find workers to go work for Signal, right?

10   **A.**   Right.

11   **Q.**   And then, number two, you agreed to act for Signal

12   to find workers to go work for Signal, right?

13   **A.**   Right.

14   **Q.**   But in doing so, you could only offer the workers

15   what Signal had authorized you to offer?

16   **A.**   Correct.

17   **Q.**   And you didn't offer anything to the workers that

18   Signal did not authorize you to offer?

19   **A.**   Correct, sir.

20   **Q.**   So if Signal were to say that you acted outside of

21   the scope of the authority that Signal gave you, you would

22   disagree with that statement, right?

23   **A.**   I would definitely disagree with that.

24   **Q.**   Because you didn't act outside of the authority

25   that Signal gave you?

**OFFICIAL TRANSCRIPT**

```
 1        A.    Absolutely.  As far as my understanding goes, I did
 2   not act anything outside the scope of what the understanding
 3   Signal gave me.
 4        Q.    You didn't offer anything to the Indian H-2B
 5   workers that Signal hadn't expressly authorized you to offer
 6   them?
 7        A.    Correct, sir.
 8        Q.    And everything that you promised the workers was
 9   lawful, right?
10        A.    Absolutely, sir.
11        Q.    You never acted unlawfully when you did the things
12   that Signal authorized you to do?
13        A.    Yes, I did everything what Signal had authorized me
14   to do.
15        Q.    So I'd now like to ask you about the green card
16   promises that Signal made to you and that you relayed on to
17   the workers.
18              You testified yesterday and referenced earlier the
19   conversation that you had with Mr. Bingle in India.  Do you
20   remember that?
21        A.    I remember that very well.
22        Q.    And Mr. Bingle told you in the fall of 2006, right,
23   that you had this conversation, the fall of 2006?
24        A.    Yeah.  It was, I think, October of 2006.
25        Q.    And in October of 2006, you had that conversation
```

**OFFICIAL TRANSCRIPT**

1    with Mr. Bingle before a single Indian worker had arrived at
2    Signal, correct?
3        A.    Absolutely.  This was the time when Mr. Bingle had
4    come to India to meet with the consulate to express the need,
5    and to express that to -- you know, there were problems with
6    the dates, with the appointment dates at the consulate, there
7    was a backlog on that.  And also to, you know, tell the
8    consulate that Signal is a legitimate company.
9            So that was the time when I -- as far as I
10   remember, none of the candidates had even gone for the
11   consulate interviews.
12       Q.    So if at that time Mr. Bingle had told you that
13   Signal was not going to apply for green cards for all the
14   workers, you could have stopped the workers from getting on a
15   plane by telling them Signal is not going to sponsor you,
16   right?
17       A.    Absolutely.  I would have put a stop to that or I
18   would have made the correction.  The understanding that I had
19   given to the workers, to the job candidates, I would have --
20   I would have made the correction that this is not going to
21   happen.
22       Q.    But standing next to you in India, Mr. Bingle said,
23   no, no, no, Signal will sponsor the workers for green cards?
24       A.    Absolutely.  He told me that Signal will sponsor
25   everybody, all the candidates that join Signal, for the

OFFICIAL TRANSCRIPT

1    permanent resident visa process.

2        Q.    And that conversation with Mr. Bingle was not the

3    only assurance -- not the only oral assurance that Signal

4    provided to you regarding green cards, correct?

08:22:50    5        A.    I'm sorry, I didn't get the question.

6        Q.    Sure, sure.  I'll ask it a better way maybe.

7              In addition to Mr. Bingle, you had a conversation

8    with John Sanders about green card sponsorship, correct?

9        A.    Correct.

08:23:02    10       Q.    And like Mr. Bingle, Mr. Sanders was also in India

11   at the time that you spoke with him, correct?

12       A.    Correct, sir.

13       Q.    And Mr. Sanders also told you that Signal would

14   apply for green cards for the Indian workers, correct?

08:23:11    15       A.    Correct.

16       Q.    So from these conversations with Mr. Bingle and

17   Mr. Sanders, you knew that Signal was aware that the Indian

18   recruits were told that the opportunity at Signal included an

19   opportunity for permanent residency, right?

08:23:26    20       A.    Right.

21       Q.    Now, you testified yesterday about traveling to

22   Signal's Pascagoula facility in January of 2007.  Do you

23   remember that?

24       A.    I remember that.

08:23:36    25       Q.    And I believe you testified that you, together with

**OFFICIAL TRANSCRIPT**

Signal management, had a big meeting with the workers.  I

think it was in the mess hall or the cafeteria.  Right?

     **A.**   Correct, sir.

     **Q.**   And at that meeting, I believe you testified that

the workers were again told that Signal would apply for

green cards -- permanent residency -- for all the workers,

correct?

     **A.**   Yeah, at that -- because the -- one of the main

reasons, apart from the accommodation issue and the food

issue, was -- the main issue was -- one of the main issues

was the applying of the green card.

          As I testified yesterday, that candidates were --

they were more anxious to know and more curious to know about

when the green card would be applied than their extensions.

          So -- and at that point of time, I also got to know

about the -- that the green card -- that the permanent

resident visa cannot be applied until the second extension,

as I mentioned yesterday.

          So at that meeting, along with Signal, we expressed

to the candidates that -- that the permanent resident visa

process will be applied only after the second extension,

because that was the time I got to know and I thought it was

my duty to inform all the candidates there.

     **Q.**   So -- well, we'll get back to that later.

          But at that meeting, in your presence you heard

**OFFICIAL TRANSCRIPT**

1   Signal tell the workers that they would apply for permanent

2   residency for all the workers?

3       A.   Yes.

4       Q.   Now, I want to take you back to India.

5            When you and Mr. Bingle and Mr. Sanders were in

6   India, you observed Mr. Bingle and Mr. Sanders interacting

7   with your staff, correct?

8       A.   Yes.  They were interacting with my staff and also

9   they were interacting with the applicants as well.

10      Q.   With the applicants as well?

11      A.   Yes.

12      Q.   Now, during the time that Mr. Bingle and

13  Mr. Sanders were in India, you never made any attempt to keep

14  the offer of permanent residency to the workers a secret, did

15  you?

16      A.   No, never.

17      Q.   You didn't instruct your employees or your partners

18  to keep the offer of permanent residency a secret from

19  Mr. Bingle or Mr. Sanders, did you?

20      A.   Never.

21      Q.   So if Signal were to take the position that prior

22  to the workers' arrival at Signal, Signal had no knowledge

23  that the workers had been promised that Signal would apply

24  for green cards for them, you would say that's incorrect,

25  right?

**OFFICIAL TRANSCRIPT**

1      **A.**   Absolutely.  That would be wrong statement.

2      **Q.**   And you would -- you would not find Signal's

3   position to be credible, would you?

4      **A.**   Absolutely not.

08:26:10    5      **Q.**   And you would not find Signal's position to be

6   consistent with the facts?

7      **A.**   Absolutely correct.

8      **Q.**   And you would not find Signal's position to be

9   consistent with what Signal authorized you to promise and

08:26:24   10   what you actually promised to the workers, right?

11      **A.**   Sorry, give me question again.

12      **Q.**   Sure.  I'll break that up a little bit.

13          THE COURT:  Slow down a little bit.

14          MR. BHATNAGAR:  Thank you, Your Honor.

08:26:33   15   **MR. BHATNAGAR: (CONTINUING)**

16      **Q.**   You would not find Signal's position to be

17   consistent with what Signal authorized you to promise and

18   what you actually promised to the workers?

19      **A.**   Yes, I promised exactly what Signal had promised me

08:26:45   20   like -- had made to me.

21      **Q.**   So this jury heard testimony from Mr. Schnoor about

22   why Signal fired Mr. Pol.  You are aware of that, right?

23      **A.**   Yes.

24      **Q.**   And Mr. Schnoor testified that Signal fired Mr. Pol

08:27:00   25   because Mr. Pol had represented the amount of the high fees

**OFFICIAL TRANSCRIPT**

 1   that were charged to the workers.  You understand that,
 2   right?
 3        A.   I understand that.
 4        Q.   So I would like to ask you, Mr. Dewan, according to
 5   what we heard, Signal was told by Indian workers in the
 6   beginning of November 2006, the amount of fees that the
 7   workers had paid to you, to Mr. Pol, and Mr. Burnett.  Do you
 8   recall that testimony?
 9        A.   Sorry.  Give me that again.
10        Q.   Sure.
11             In the beginning of 2006, Signal learned the amount
12   of the fees that the workers had paid to you, Mr. Burnett,
13   and Mr. Pol, right?
14        A.   Yes.
15        Q.   And if Signal had a problem with your fees when
16   they terminated Mr. Pol in November of 2006, they could have
17   also terminated you, right?
18        A.   Yes, correct.
19        Q.   Similarly, if Signal had a problem with the
20   green card promises that you had made to recruits, Signal
21   could also have terminated you based on those promises in
22   November of 2006, right?
23        A.   Absolutely correct.
24             I think Signal -- Signal could have put a stop to
25   this -- put a stop to this right after the first wave of

                         OFFICIAL TRANSCRIPT

 1    candidates arrived in the U.S.  Signal had the right to do
 2    that.  They did not do that.
 3           Not only that, when Mr. Bingle and Mr. Sanders came
 4    to India, they were interacting with the workers there during
 5    the testing.  They were interacting with the workers during
 6    the preparation to take them to the consulate.
 7           They were interacting with them.  They could have
 8    asked the workers, how much is Mr. Dewan charging you, how
 9    much is Mr. Pol charging you?
10           They could have put a stop to all of this right
11    then before anybody arrived in the U.S.  They could have put
12    a stop to everything right there.
13      Q.   So let me take you now to February of 2007.
14           Mr. Schnoor, in January, sends you a letter asking
15    you and Mr. Burnett to return some of the fees.  Do you
16    remember that?
17      A.   Yes, I remember that.
18      Q.   And in February you send a response where you
19    decline the offer, right?
20      A.   Yes, correct.
21      Q.   Now, in February of 2007, Signal could also have
22    terminated you when you refused to refund the fees, couldn't
23    they?
24      A.   Correct.
25      Q.   But Signal didn't do anything like that, did they?


                           OFFICIAL TRANSCRIPT

1    **A.**   No, they did not do anything like that.  In fact,

2    there was one -- one more wave that came after that.

3          After my refusing to -- me and Mr. Burnett refusing

4    to sign that and to refund, to send that letter to them,

5    there was -- as far as I remember, there was one more wave

6    that came after that.

7    **Q.**   So if Signal didn't like or didn't approve of

8    anything that you did, they could have terminated you at any

9    time?

10   **A.**   They could have terminated me at any time.

11         They could have terminated me when the testing was

12   going on.  They -- the Signal representatives could have

13   asked the candidates and informed Signal management this is

14   what is being charged.  They could have put a stop to the

15   recruitment there.

16         They could have put a stop to the whole process

17   even before the first candidate went to the -- went to the

18   consulate to get the visa.

19         They could have terminated me at any of these

20   points.

21   **Q.**   And, in fact, Signal has never terminated you, have

22   they?

23   **A.**   They have still today never terminated me.

24   **Q.**   They've sued you, but they've never terminated you?

25   **A.**   Correct.


**OFFICIAL TRANSCRIPT**

1    Q.    So let's go back to October 2006.

2          If Signal had told you then that they were not

3    going to sponsor workers for green cards, it was your

4    testimony that you would have given refunds to the workers,

08:30:33    5    right?

6    A.    Sorry.  Give me the question again.

7    Q.    Sure.

8          October 2006, if Signal would have told you, we're

9    not going to sponsor the workers for green cards, you would

08:30:41    10    have given refunds to the workers, right?

11    A.    Yes, I would have -- I would have considered -- I

12    mean, changing the fees definitely.  I would have considered

13    changing the fee structure.

14          If Signal had told me that they are not going to

08:30:54    15    apply for the permanent resident visas, definitely I would

16    have -- I couldn't be charging the same fees.

17    Q.    And when they terminated Mr. Pol, and if they had

18    chosen to terminate you at the same time, they could have

19    done so before hundreds of more Indian workers came, right?

08:31:13    20    A.    Correct.

21    Q.    But Signal did the opposite, right?  They didn't

22    terminate you?

23    A.    Correct.

24    Q.    After they terminated Mr. Pol, they gave you a

08:31:24    25    brand-new contract to sign, right?


OFFICIAL TRANSCRIPT

1    **A.**    Correct.

2    **Q.**    And they did that because they wanted to keep doing

3    business with you, right?

4    **A.**    Yes.  In general, they were very happy with me.  I

08:31:36    5    mean, I never -- I never received a single e-mail from them

6    saying that they were unhappy, unhappy with my work that I --

7    the services that I performed and the services that I gave

8    for them.

9         I don't remember seeing a single e-mail that meant

08:31:52    10    they were unhappy with me.

11    **Q.**    Not only were they not unhappy with you, they

12    wanted to reaffirm and deepen their relationship with you and

13    they sent you a contract?

14    **A.**    Correct.

15    **Q.**    So let's look at the contract.  It is Trial Exhibit

08:32:00    16    No. 254.

17         Now, you've heard in this trial, Mr. Dewan, Signal

18    alleged that they had problems with the fees and the

19    green card promises that you made to the workers, right?

08:32:22    20    **A.**    Right, sir.

21    **Q.**    Does this document have any limiting language on

22    your fees?

23    **A.**    No.  I don't see it.

24    **Q.**    Does this document have any limitation on the

08:32:37    25    green card promises?

**OFFICIAL TRANSCRIPT**

1     **A.**   No, it doesn't.  In fact, it says there H-2B and/or
2     permanent resident process.
3     **Q.**   So this document doesn't address either the fees or
4     the green card issues, right?
08:32:50    5     **A.**   Right.
6     MR. BHATNAGAR:  So let's put this document and 289
7     side by side, if we could.
8     **MR. BHATNAGAR:  (CONTINUING)**
9     **Q.**   So Exhibit 254 is the contract that Signal sent you
08:33:13    10    to sign, right?
11    **A.**   Right, sir.
12    **Q.**   And Exhibit 289 is the contract that Signal signed
13    with Mr. Pol and Global Resources, right?
14    **A.**   Right.
08:33:22    15    **Q.**   So I first want to draw your attention to
16    Paragraph Number 2 of both documents which establishes the
17    framework for the agreement.
18    MR. BHATNAGAR:  Can we pull out Paragraph 2, Dan.
19    **MR. BHATNAGAR:  (CONTINUING)**
08:33:40    20    **Q.**   Now, the paragraph says -- I'll read it.  Let me
21    know if I've read it correctly.
22    (As read:)  The agreement establishes a business
23    relationship between Signal and Dewan to select, acquire, and
24    transport to and from the United States foreign skilled
08:33:54    25    workers, hereinafter foreign workers, under the H-2B


**OFFICIAL TRANSCRIPT**

1    temporary program and/or the permanent residence process to

2    be employed by Signal or its subsidiaries and acquired on

3    behalf of Signal by Dewan for that purpose.

4            Did I read that right?

08:34:10    5    A.    No, I -- I don't see that same thing there.  Behind

6    the -- the enlarged is not the same, I think.

7            MR. BHATNAGAR:  Can we close the -- we'll get it

8    straight.

9            MR. WERNER:  Sure.

08:34:46    10   MR. BHATNAGAR:  (CONTINUING)

11       Q.    Okay.  If we go to the top of the document on the

12   left, the -- okay.  The second paragraph on the document.

13   There we go.

14           I think that's what I was reading to you, right,

08:35:17    15   Mr. Dewan?

16       A.    Yes.

17       Q.    So did I read that correctly?

18       A.    Yeah.

19       Q.    Now, if we can go to the second paragraph on

08:35:29    20   Exhibit No. 289, which is the Global/Signal agreement.

21           (As read:)  This agreement establishes a framework

22   for a business relationship between the two parties to

23   select, acquire, and transport to and from the United States

24   foreign skilled workers, hereinafter foreign workers, under

08:35:52    25   the H-2B temporary program and/or the permanent resident

OFFICIAL TRANSCRIPT

1    process to be employed by Signal or its subsidiaries and

2    acquired on behalf of Signal by Global for that purpose.

3            Did I read that right?

4        A.   Yes.

5        Q.   So I think you would agree that those paragraphs

6    are identical, right?

7        A.   Exactly identical.

8        Q.   The only difference is Global and Dewan, right?

9        A.   Yes, right.

10       Q.   So I now want to direct your attention to

11   Paragraph 22 of the Global agreement, that's numbered 22.

12           (As read:)  Signal understands and agrees that it

13   is possible that temporary H-2B visas may not be issued in a

14   timely manner due to caps set by the U.S. government.  In any

15   case, the permanent resident I-140 process will continue as

16   agreed upon.

17           Did I read that correctly?

18       A.   Yes, sir.

19       Q.   That's the language from the agreement that Signal

20   signed with Global Resources, right?

21       A.   Absolutely correct.

22       Q.   Now, let's look at Paragraph 21 of the Dewan

23   agreement.

24           (As read:)  Signal understands and agrees that it

25   is possible that temporary H-2B visas may not be issued in a

**OFFICIAL TRANSCRIPT**

timely manner due to caps set by the U.S. government.  In any
case, the permanent resident process will continue as agreed
upon.

        Did I read that correctly?

**A.**    Yes, sir.

**Q.**    And those are also identical paragraphs, correct?

**A.**    Exactly identical.

**Q.**    Again, just replacing "Global" with "Dewan," right?

**A.**    That's correct.

**Q.**    So that paragraph means to you that, yet again,
Signal has promised to sponsor the workers that you will be
recruiting for H-2B visas and for green cards, correct?

**A.**    This clause is exactly what I have testified, to my
understanding, that H-2B is not a guarantee.  And if H-2B
doesn't fall through, Signal will continue with the
green card process.

**Q.**    And Signal has not changed what it is authorizing
you to do from the time that it signed the agreement with
Mr. Pol in the spring of 2006 to January of 2007 when they
send you this contract, right?

**A.**    Right.

**Q.**    Okay.  Let's move on.

        Yesterday you testified about the J & M process.
Do you remember that?

**A.**    Yes, I remember that.

**OFFICIAL TRANSCRIPT**

1          **Q.**   And you said that in 2004, Mr. Pol approached you

2     and that J & M wanted Indian workers for recruitment on a

3     permanent resident visa.  Do you remember that?

4          **A.**   I remember that.

08:38:51        5          **Q.**   The immigration plan for the J & M recruitment

6     was -- correct me if I'm wrong because I'm not an immigration

7     expert -- that the candidate would get a permanent labor

8     certification, correct?

9          **A.**   Yes.

08:39:03       10          **Q.**   Then they would get an I-140 filed on their behalf,

11    right?

12         **A.**   No, no, no.  They would get the labor certification

13    approval under the PERM, and then they will get the I-140

14    approval, and then the security clearance, and then the

08:39:20       15    consulate.

16         **Q.**   And so that's the three-step process?

17         **A.**   Correct.

18         **Q.**   Okay.  And following the three-step process, they

19    would get a permanent residency visa, right?

08:39:30       20         **A.**   Yes.

21         **Q.**   So the candidates who signed up for J & M paid for

22    these things, correct?

23         **A.**   Yes.  As per the stages.

24         **Q.**   And all of the three steps that you just explained

08:39:41       25    were supposed to be part of the permanent residency visa


**OFFICIAL TRANSCRIPT**

1    process of J & M?

2        A.   Yes, correct.

3        Q.   So the fees for J & M I, believe you testified,

4    were 500,000 rupees, right?

5        A.   Yes.  That was the total fees that was supposed to

6    be paid to Dewan and Mr. Pol and Mr. Burnett.

7        Q.   And that is roughly 10,000 American dollars, right?

8        A.   Roughly around, yes.

9        Q.   And I think you said that that was to be split

10   three ways, between you, Mr. Pol, and Mr. Burnett, correct?

11       A.   Correct.

12       Q.   And the timeframe for J & M was 24 months for the

13   candidate to acquire a permanent residency visa, right?

14       A.   Yeah.  That was the understanding given to me was

15   between 18 and 24 months.

16       Q.   So -- and because that was the understanding that

17   was given to you, the Indian recruits were told by you and

18   your staff that they would get a permanent residency visa

19   within two years?

20       A.   Correct.

21       Q.   Now, did Mr. Burnett ever tell you that permanent

22   residency could take 10 to 20 years?

23       A.   Not for the EB-3 category visa.

24       Q.   He didn't tell you that?

25       A.   Yeah.  He did tell me for the family and all that,

OFFICIAL TRANSCRIPT

1   that takes years and years together.  But when we initiated

2   the process, he never told me that it would take ten years.

3       Q.   Did you ever observe Mr. Burnett telling J & M

4   recruits that it could take ten years for them to get

5   permanent residency visas?

6       A.   I don't recall that.

7       Q.   So after the second meeting with the J & M

8   recruits, the workers were expected to make their first

9   payment to you, right?

10      A.   Right.

11      Q.   And you would collect that payment on behalf of

12  yourself, Mr. Burnett, and Mr. Pol, right?

13      A.   Yes.  At times when Mr. Burnett was there -- he

14  used to also be there during when the payments were paid, and

15  Mr. Burnett also used to sign receipts and take the payment.

16          And even when Mr. Pol used to be there -- he also

17  used to be there at times, and he also used to sign the

18  receipts and hand over to the applicants when they were

19  making the payments.

20      Q.   And on occasion, some of the cash payments were

21  made to Dewan Consultants through Mr. Saliman, right?

22      A.   Yes.

23      Q.   And in that instance, Mr. Saliman would carry the

24  cash to your office in Mumbai and give it to you there,

25  right?

**OFFICIAL TRANSCRIPT**

1      A.    Yes.

2      Q.    So for workers who made payments in the

3  United Arab Emirates, they would have their checks mailed by

4  Dewan Consultants from the UAE to either Mr. Burnett or

08:42:15    5  Mr. Pol, right?

6      A.    Yes.

7      Q.    And the cash that you collected in the UAE, you

8  kept in the UAE, right, you didn't send that to India?

9      A.    No, no, we didn't bring it to India.

08:42:25   10      Q.    So it stayed in the UAE?

11      A.    Yes, correct.

12      Q.    Okay.  As you testified yesterday, there were some

13  delays in the J & M process, right?

14      A.    Right.

08:42:33   15      Q.    And there was a backlog in the priority dates for

16  the third-preference skilled labor visa category, right?

17      A.    Right.

18      Q.    And that backlog took place in January of 2005,

19  right?

08:42:47   20      A.    Yeah.  That was my understanding, which I got to me

21  later.

22      Q.    Right, you got to learn that later.

23            And, in fact, you didn't learn that until December

24  or January -- December of 2005, at the earliest, right?

08:42:59   25      A.    I learned that the backlog of -- I was informed


OFFICIAL TRANSCRIPT

1    that the backlog took place in July 2005 by Mr. Burnett, but

2    I actually got to know during my deposition that it had

3    actually backlogged in January of 2005.

4          Q.   So until your deposition of last -- strike that.

5          Until the deposition that you gave last August, you

6    didn't realize that the backlog actually was from January of

7    2005; is that correct?

8          A.   Correct.

9          Q.   And because you didn't learn that until six months

10    ago, you didn't inform the workers that the delay began in

11    January of 2005, correct?

12          A.   No.  We did inform them about that the delay began

13    in July 2005 because -- but not about January of 2005 because

14    I didn't have the information.

15          Q.   Right, you didn't have that information.

16          So the workers made payments to you with the

17    expectation that they were still on target to get their

18    permanent residency visas within 24 months?

19          A.   Not when they made the second payments.  When the

20    second payments were made, they knew that there are delays

21    because of the -- because of the priority dates.

22          Q.   But at least for the first payments, the workers

23    had no idea that there were delays?

24          A.   Yeah, not at the first payment.

25          Q.   Okay.

08:43:20

08:43:35

08:43:49

08:44:03

08:44:15

**OFFICIAL TRANSCRIPT**

1      A.   The workers did knew that their labor certification

2  will be filed with the electronic way of filing, which is the

3  PERM.  They knew that.  And we had informed that it is soon

4  going to be implemented, it is not implemented yet.

5      Q.   Now, Ms. Lau testified on Friday that she was in

6  India collecting information from Indian workers for J & M.

7  Do you remember that testimony?

8      A.   Yes, I do.

9      Q.   And I believe she testified that she was in India

10  in April of 2004, around that time, right?

11      A.   Right.

12      Q.   She also testified that she didn't file I-140s for

13  J & M until August of 2006, and she filed some even in 2007.

14  Do you remember that testimony?

15      A.   I don't recall about 2007, but I definitely recall

16  about the -- some were filed in 2006.

17      Q.   I think she testified that Mr. Andrews' I-140 was

18  filed in 2007, actually.

19      A.   Okay.  I don't recall that.  I'm sorry.

20      Q.   Okay.  So from the time that they paid you in 2004

21  and 2005, over the next two years, J & M candidates --

22  some -- began asking you for refunds, right?

23      A.   Yes, right.

24      Q.   And they began asking you for refunds because of

25  the delays in Mr. Burnett's office in filing the I-140s,

OFFICIAL TRANSCRIPT

1    right?

2        A.   Yes, right.

3        Q.   And I believe you testified at your deposition that

4    your phone was constantly ringing off the hook with

5    candidates from J & M, along with some of the other

6    candidates, and you were getting calls 24 hours a day, seven

7    days a week; is that right?

8        A.   That's right.

9        Q.   So once you learned about all these delays, you

10   felt like you had been taken for a ride, right?

11       A.   Yes.  I mean, at that point of time, I didn't

12   exactly -- I was really upset about the delays.  I mean, I

13   was thinking to myself, I don't know why I got into this.

14       Q.   Well, you were upset and you felt taken advantage

15   of, correct?

16       A.   Yeah.  I was upset, yes.

17       Q.   And if you were taken advantage of, would it not be

18   fair to say that the workers were also taken advantage of?

19       A.   Yeah.  If it applies to me, it definitely applies

20   same way to the job -- to the job applicants as well.

21       Q.   So in December of 2006, you became concerned that

22   Mr. Burnett had not filed I-140s, correct?

23       A.   Sorry.  Give me the question again.

24       Q.   Sure, sure.

25            You began to be concerned in the end of 2006 that

OFFICIAL TRANSCRIPT

1    Mr. Burnett had not filed I-140s, right?

2       A.    I think he -- I think he had already begun filing

3    the I-140s.  He had already begun filing the I-140s for the

4    applicants who came to Signal and who did not come to Signal.

08:47:13    5    I think he had already started.

6       Q.    I'm going to show you an excerpt from your

7    deposition, Mr. Dewan.  Page 292, Lines 10 to 13.

8             And I'll just -- maybe I'll ask the question again

9    just in case it was unclear.

08:47:34    10            You were concerned at the end of 2006 that the

11   J & M applicants had not had their I-140s filed?

12      A.    I'm too confused with the dates and the years now,

13   but I -- as far as I'm recollecting, I think some were

14   definitely filed.

08:47:52    15      Q.    Okay.

16            And you asked Mr. Burnett about the delays, but you

17   testified that you never got a proper reply, correct?

18      A.    Yes.  I didn't get proper reply, that is correct.

19      Q.    And by your own view, Mr. Burnett did not file the

08:48:09    20   I-140s in a timely manner, right?

21      A.    That will be correct to say.

22      Q.    So a number of J & M candidates sought refunds for

23   J & M, right?

24      A.    Yes, right.

08:48:21    25      Q.    And you testified yesterday that Mr. Pol refused to

OFFICIAL TRANSCRIPT

 1   give refunds and Mr. Burnett also refused to give refunds,
 2   right?
 3        A.   Right.
 4        Q.   And you claim to be refunding the candidates
 5   because you were the collection agent for the money in all
 6   the recruiting schemes, right?
 7        A.   Absolutely.  Because I felt because we have had a
 8   reputation in India -- I mean, it's -- this company was
 9   started by my father.
10             I don't want anybody to point that Dewan has --
11   there may be delays refunding the payments, but I don't want
12   to point -- I don't want anybody to point finger at Dewan,
13   that they didn't refund or return the money back.
14        Q.   So because of these delays, you and your business
15   partners took the extra step of requiring the Indian workers
16   to sign annexures.  And I think your lawyer showed you one of
17   the annexures, right?
18        A.   No, that was an annexure with the candidates who
19   agreed to wait and to make sure that they understood that
20   there would be delays with the priority dates.
21        Q.   But the workers did not have the option of not
22   signing the annexures?
23        A.   No.  They always had --
24             THE COURT:  What is that word again?
25             MR. BHATNAGAR:  Annexure.

                    **OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  I'm sorry.  I may have spoken

2    over your answer.

3      A.    Sorry.  No, they always had an option not to sign

4    that.

08:49:42    5    MR. BHATNAGAR:  (CONTINUING)

6      Q.    It is your testimony today that the workers had an

7    option of not signing the annexure?

8      A.    Yeah.  Because that second page, when the I-140 --

9    there were a few candidates for whom the I-140 was approved,

08:49:53   10    and those candidates did not wish to continue further and

11    they were given the refunds.  And those were substituted with

12    the new candidates.

13      Q.    But if you wanted to continue with your J & M

14    application, you had to sign the annexure?

08:50:07   15      A.    Yeah.  If you had -- if you accepted to -- if the

16    job applicant, like he wished to continue that, then he would

17    have had to sign that.

18      Q.    You forced the applicants who wanted to continue

19    with their process to sign the annexure?

08:50:23   20      A.    No, I did not force anybody.

21      Q.    They were required to sign the annexure in order to

22    continue with their process?

23      A.    Yeah.  They were required to sign that, because it

24    was the understanding -- or what I was given, and Mr. Burnett

08:50:38   25    asked me to get this annexure.


                         OFFICIAL TRANSCRIPT

1        In fact, he drafted the annexure and e-mailed it to

2   me.  And he asked me that the candidates need to sign this

3   annexure to the agreement.  It was not my idea to make this

4   annexure.

08:50:51   5        Q.   But to move forward with the process, the candidate

6   did not have the option of not signing the annexure?

7             MR. SHAPIRO:  Objection.  Asked and answered.

8             THE COURT:  Overruled.  He is on cross.

9        A.   Sorry.

08:51:06   10   MR. BHATNAGAR:   (CONTINUING)

11        Q.   In order to continue with the process, the

12   candidate did not have the option of not signing the

13   annexure?

14        A.   No.  If -- as I said, that if they -- if they

08:51:16   15   agreed to continue further and they wanted us to -- they

16   wanted Mr. Burnett to proceed with the I-140, Mr. Burnett --

17   no, asked me to -- e-mailed me that annexure, drafted that

18   annexure, and he asked me that the candidates who wished to

19   proceed further, they need to sign that.

08:51:35   20        Q.   I think you are answering a different question.

21   Let me ask it a simpler way.

22             In order to continue with the process, the

23   candidates had to sign the annexure?

24        A.   Yeah, in order to proceed with the process, the

08:51:44   25   candidate had to sign the annexure.


                    **OFFICIAL TRANSCRIPT**

1    **Q.**   Let's look at Exhibit 498, if we could.  This is

2  one of the annexure agreements, right, Mr. Dewan?

3    **A.**   Yes, correct.

4    **Q.**   And if we could look at -- the language in this

08:52:03  5  document says (as read:)  However, due to the backlog of the

6  third-preference skilled labor visa category for nationals of

7  India which took place in July 2005, there may be additional

8  administrative delays to your obtaining the immigrant visa.

9         Did I read that right?

08:52:21  10   **A.**   Yeah.

11   **Q.**   And that is an inaccurate description of when the

12  backlog took place, correct?

13   **A.**   Correct.

14   **Q.**   The backlog, in fact, as you testified, took place

08:52:32  15  in January, right?

16   **A.**   Correct.

17   **Q.**   So the terms that were given to the candidates in

18  this agreement were inaccurate terms, right?

19   **A.**   Yes.  They were -- the dates were inaccurate.

08:52:48  20   **Q.**   Now, as you conceded in your deposition, there was

21  no added benefit to the candidate by signing this agreement,

22  right?

23   **A.**   No, there was no added benefit.

24   **Q.**   So when it came to J & M, Mr. Dewan, you testified

08:53:02  25  yesterday that you felt deceived by Mr. Burnett.  Do you


**OFFICIAL TRANSCRIPT**

1    remember saying that?

2        A.    Yes.

3        Q.    And if you were deceived by Mr. Burnett, wouldn't

4    it be fair to say that the Indian workers were also deceived

5    by Mr. Burnett?

6        A.    Yes, I believe so.

7        Q.    And when you were providing inaccurate information

8    to the Indian workers about the immigration process, the

9    Indian workers were also deceived by you, right?

10       A.    No, I don't think they're deceived by me because

11   that was the understanding I had because I'm not an

12   immigration expert.

13             So the understanding that I had, I didn't lie to

14   them.  I gave them -- I gave them the information that I had.

15       Q.    Well, if you gave them inaccurate information, even

16   if it was accidental, you still deceived them, right?

17       A.    Yeah, you could say that.  But because -- because I

18   was deceived, I did not get the correct information, the

19   information that I had, I -- I had no other option to give

20   them wrong information.  I couldn't give them wrong

21   information.  I had to give them information what I had.

22       Q.    Okay.  So let me ask you about your relationship

23   with Mr. Burnett and Mr. Pol.

24             Your lawyer showed you the multilateral business

25   agreement yesterday.  Do you remember that?


                        **OFFICIAL TRANSCRIPT**

1        **A.**    Yes, I remember that.

2        **Q.**    And the purpose of that agreement and your

3    relationship was that Mr. Pol was supposed to locate U.S.

4    companies, right?

08:54:24   5        **A.**    Right.

6        **Q.**    Mr. Burnett was to do the legal work, right?

7        **A.**    Right.

8        **Q.**    And you, Mr. Dewan, were to facilitate the Indian

9    recruiting process, right?

08:54:34   10        **A.**    Correct.

11        **Q.**    And that relationship stayed the same through 2007,

12    right?

13        **A.**    Correct.

14        **Q.**    Now, as you just testified, you're not an

08:54:44   15    immigration lawyer, right?

16        **A.**    Yes, correct.

17        **Q.**    Neither am I.

18            And anything that you knew about U.S. immigration

19    law came to you through Mr. Burnett, right?

08:54:51   20        **A.**    Yes, correct.

21        **Q.**    And any information that you gave to the Indian

22    workers also came to you through Mr. Burnett, right?

23        **A.**    Right.

24        **Q.**    So through the years, as you worked together, you

08:55:06   25    all had business needs which required you to collaborate,

**OFFICIAL TRANSCRIPT**

1   right, you and Mr. Pol and Mr. Burnett, correct?

2       A.   Not collaborate.  I wouldn't accept to that term.

3            But, yes, each of us had our individual roles to

4   play.  And as for my understanding with that bilateral

5   agreement, it was Mr. Burnett was to perform the immigration

6   services.

7       Q.   So maybe I can ask it in a better way.

8            There were times that you directed Mr. Burnett to

9   do things on your behalf, correct?

10      A.   Sorry?

11      Q.   There were times that you directed Mr. Burnett to

12  do things on your behalf, right?

13      A.   No.  He can't be -- he can't be like doing

14  recruitment, what -- you know, on my behalf.  He will not be

15  able to do recruitments.

16      Q.   Let me take it even -- a simpler course than that.

17           There were times when Mr. Burnett signed receipts

18  for Mr. Pol, correct?

19      A.   Yes.

20      Q.   There were times when you also signed receipts for

21  Mr. Burnett, right?

22      A.   Yes.  When he was not around.  Only when he was not

23  around.

24      Q.   That's all I'm asking.

25           When he was not available, you signed receipts for

OFFICIAL TRANSCRIPT

1  Mr. Burnett, correct?

2       A.   Yeah.  Because I could not give them unsigned

3  receipts.  So I had to sign them and give it on behalf of

4  Mr. Burnett.

08:56:25   5       Q.   And Mr. Pol also signed contracts for Mr. Burnett,

6  correct?

7       A.   I don't exactly remember that.  Must be.

8       Q.   Yes?

9       A.   He should have, yes.

08:56:38   10       Q.   And you also signed contracts for Mr. Burnett,

11  correct?

12       A.   Correct.

13       Q.   And you have also signed contracts for Mr. Pol,

14  right?

08:56:46   15       A.   Right.

16       Q.   In fact, Mr. Pol expressly authorized you to sign a

17  contract for him, right?

18       A.   I don't recall that, but -- whether he send me an

19  authorization.  But we spoke on the phone all that -- while

08:57:03   20  they were not there.

21       Q.   So he orally authorized you?

22       A.   Yeah, he orally authorized me.

23       Q.   Now, in the course of your business, from time to

24  time you would have to mail Mr. Pol and Mr. Burnett their

08:57:15   25  demand draft checks, right?


                         **OFFICIAL TRANSCRIPT**

1    **A.**   Yes.  They were sent by courier.

2    **Q.**   By courier.  Was that DHL?

3    **A.**   Yes.  Something like that.

4    **Q.**   Okay.  And you would also have to mail to Mr. Pol

08:57:27   5   and Mr. Burnett charts, right, with worker payments and other

6    documents relating to the candidates?

7    **A.**   Yeah.  There used to be a covering letter -- a

8    covering letter along with the drafts that were couriered to

9    them.

08:57:43   10   **Q.**   And Mr. Burnett would mail you information about

11   immigration documents and other information, right?

12   **A.**   Yes.  He used to send documents by courier.

13   **Q.**   And Mr. Pol would also send you documents

14   sometimes, right?

08:57:56   15   **A.**   I don't recall that.  But could be the demand

16   letter.  Could be the demand letter.

17   **Q.**   Now, in addition to -- we talked about receipts and

18   contracts.

19          Mr. Pol and Global Resources actually used

08:58:11   20   Dewan Consultants' address on its letterhead; isn't that

21   true?

22   **A.**   Yeah, that's true.

23   **Q.**   And when you came to know this, you didn't even

24   raise the issue with Mr. Pol, did you?

08:58:20   25   **A.**   Yeah, I don't recall raising the issue.


**OFFICIAL TRANSCRIPT**

1    Q.    But you had never told -- and you never told
2    Mr. Pol not to use your address on Global Resources'
3    letterhead, right?
4    A.    No, I don't recall that.
5    Q.    So would it be fair to say that -- there is an
6    e-mail which Mr. Sanders sent to some other managers at
7    Signal which quoted you as saying that you were the postman
8    and the bill collector for Michael Pol.
9         And this is in preparation for their meeting with
10   you in January of 2007.
11        Is that a fair characterization?
12   A.    No.
13   Q.    You wouldn't agree with that?
14   A.    No.  If Mr. Pol is not in India, it's obvious that
15   I have to collect the payment on his behalf and send it to
16   him.  That doesn't mean I become a postman for him.
17   Q.    Okay.  Let me ask you about -- you testified
18   yesterday about Mr. Saliman who was your representative,
19   right?
20   A.    Yes.
21   Q.    And we saw some of the documents that Mr. Saliman
22   signed at your direction, right?
23   A.    Yes.
24   Q.    And Mr. Saliman also acted for Dewan Consultants in
25   dealing with recruits going to Signal or J & M, right?

OFFICIAL TRANSCRIPT

1      A.   Yes, right.

2      Q.   And when he acted for Dewan Consultants, he was

3   acting subject to your instructions and your direction,

4   right?

08:59:43    5      A.   Correct.

6      Q.   And the candidates who interacted with Mr. Saliman,

7   they understood that when they spoke with him, that he was

8   speaking or acting on behalf of Dewan Consultants, right?

9      A.   Yes, that would be a right statement.

08:59:58   10      Q.   And sometimes he would have to direct -- or you

11   would actually direct workers to report directly to

12   Mr. Saliman, especially if they were in ^ * Karen, right?

13      A.   Yes, right.

14      Q.   And Mr. Saliman had a Dewan Consultants' e-mail

09:00:13   15   address too, right?

16      A.   Yes, right.

17      Q.   On occasion, Mr. Saliman would receive information

18   or send information to Mr. Burnett, but if he did that, you

19   wanted it to go through you, right?

09:00:27   20      A.   Yeah, I wanted it to go through me because I need

21   to know.

22      Q.   Because --

23      A.   I needed to know, yeah.

24      Q.   I'm sorry, I didn't mean to speak over you.

09:00:34   25      A.   Sorry.


                         OFFICIAL TRANSCRIPT

1      Q.   You didn't want him acting outside of your

2   direction, right?

3      A.   Yes.

4      Q.   So I now want to ask you a little bit about the

5   fees, Mr. Dewan.

6         I remember in your deposition you testifying that

7   some workers paid 500,000 rupees to go to Signal, right?

8      A.   Yes, right.

9      Q.   And some workers paid 600,000 rupees to go to

10  Signal?

11     A.   That's right.

12     Q.   And some workers paid 700,000 rupees to go to

13  Signal?

14     A.   I don't exactly remember, but there were very, very

15  few candidates who paid a little higher.

16     Q.   But there were some workers who went to Signal who

17  paid 700,000 rupees?

18     A.   Yes, correct.

19     Q.   And there were some workers who went to Signal who

20  paid 800,000 rupees, right?

21     A.   Maybe a few cases.  Very few cases.

22     Q.   Now, I took your deposition on October 10, 2009, in

23  India.  Do you remember that?

24     A.   Sorry?

25     Q.   In October of 2009, I took your deposition in


                    OFFICIAL TRANSCRIPT

1    India.  Do you remember that?

2         A.   Yes, I remember that.

3         Q.   As of that date, Signal had never asked you the

4    amount of the fees that you were charging the workers, right?

5         A.   I don't recall that, but they did -- they didn't

6    ask me because they already knew when the first wave -- they

7    already knew, when the candidates started coming, what they

8    had paid.

9         Q.   But they never asked you?

10        A.   No, they never asked me.

11        Q.   And they never tried to limit what you were

12   collecting?

13        A.   No.  They never tried to put a figure to what --

14   but I had offered them during -- when they send me a new

15   contract.

16             When they send me the new contract, me and

17   Mr. Burnett offered that for the new recruits -- because they

18   were intending to recruit more workers in 2007.  So at that

19   point of time, we had offered that we would reduce our fees

20   to 8,000.

21        Q.   Now, Signal also never paid you one penny to be

22   their recruiting agent, did they?

23        A.   No, never.

24        Q.   And at the same time, they were fully aware that

25   all of the fees that were being paid for your services -- all

OFFICIAL TRANSCRIPT

1    those fees were being borne by the Indian workers, right?

2         A.   Right.

3         Q.   So let's talk about what Signal knew about your

4    fees, Mr. Dewan.

09:02:48    5         You had discussions about your fees in India in

6    2006 in the presence of Signal employees, right?

7         A.   Yeah.   The candidates -- I don't recall that,

8    whether it was in the presence of Signal employees.   But at

9    that point of time, the tested workers already knew the fees.

09:03:09   10         Q.   But when Mr. Bingle and Mr. Sanders and the other

11   folks from Signal were in India, you made no attempt to hide

12   the fees that you were charging while they were there, right?

13        A.   Absolutely not.   Absolutely not.

14        Q.   And Signal never asked you about your fees while

09:03:23   15   they were in India, right?

16        A.   They never asked me about the fees.   They never

17   asked any applicant about the fees.

18        Q.   Now, speaking of fees, yesterday you testified

19   about the amount that you contend was paid by Mr. Hemant to

09:03:39   20   come to Signal.   Do you remember that?

21        A.   Yes, I remember that.

22        Q.   And you told this jury that Mr. Hemant paid -- how

23   much was it?

24        A.   I don't exactly remember, but I do remember I think

09:03:50   25   it was about 350,000.   And then I remember that he paid about

OFFICIAL TRANSCRIPT

1   100,000 -- his father paid about 100,000 to Mr. Shivram after

2   Mr. Hemant arrived here.

3        Q.   It is your testimony to this jury that Mr. Hemant

4   paid 450,000 rupees?

09:04:10  5        A.   I would not remember exactly, but I think it is

6   about 450,000.

7        Q.   And that's your testimony?

8        A.   Yes.

9        Q.   And the reason I asked you, Mr. Dewan, is because I

09:04:20  10  asked you the same question at your deposition six months

11  ago, and you gave me a different answer.

12            Do you remember that?

13       A.   No, I don't remember that.  I would not recall

14  exactly what the figure is, but it was about -- I think it

09:04:31  15  was 350,000 or 450,000, either of the two.

16       Q.   Let me help to refresh your recollection.

17            Sorry, Mr. Dewan.  I wanted to find it for you.

18            Okay.  The last question here (as read:)  I

19  appreciate your reasons for believing what you are testifying

09:06:02  20  that Mr. Dheer has told you.  My question is slightly

21  different.

22            You don't personally know how much Hemant Khuttan

23  paid?

24            Answer:  Since I have not collected myself, I would

09:06:11  25  definitely have to rely on Mr. Shivram Dheer, you know, what

OFFICIAL TRANSCRIPT

1    he has told me, the figures that he has told me.

2            Question:  So you personally would not know what

3    Hemant Khuttan paid, correct?

4            Answer:  Correct?

5        A.    That's what exactly I just said now, that I would

6    not exactly remember.

7            But what I recall was either it was 350- or

8    450,000.  It has been a while, I mean.  But this is what

9    Mr. Shivram had collected from him.

10       Q.    So, Mr. Dewan, can you show the jury a single

11   document that supports your contention that Mr. Hemant paid

12   350- or 450,000 rupees?

13       A.    No, I would not be able to show because he made

14   that payment to Mr. Shivram Dheer, not to me.

15       Q.    Well, I have a document to show you, Mr. Dewan.

16   Let's look at Trial Exhibit No. 827.

17           Do you know what this document is, Mr. Dewan?

18       A.    No.

19       Q.    This is the loan document that Mr. Hemant testified

20   he obtained when he and he family mortgaged their family home

21   in order to obtain the money to pay you your recruiting fees.

22           Do you see that?

23           MR. SHAPIRO:  Objection, Your Honor.  No knowledge

24   of this particular document.

25           THE COURT:  Well, it's sustained.


                         **OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | I think you can ask him what he knows, but he can't |
| 2 | identify this document, can he?  He has never seen it? |
| 3 | MR. BHATNAGAR:  This document has already been |
| 4 | admitted into evidence.  Mr. Hemant has already authenticated |
| 5 | it. |
| 6 | I'm simply wanting to ask Mr. Dewan about the |
| 7 | contents of the document as he understands it. |
| 8 | THE COURT:  All right.  So you can ask him about |
| 9 | the content. |
| 10 | MR. BHATNAGAR:  Can we publish it so he can see it. |
| 11 | **MR. BHATNAGAR:  (CONTINUING)** |
| 12 | **Q.**   Now, on the third page of the exhibit -- |
| 13 | **A.**   Can I know the date of this document? |
| 14 | **Q.**   Absolutely, sir.  Absolutely. |
| 15 | We'll -- at the bottom -- let's start with that. |
| 16 | At the bottom of the document, there is a date. |
| 17 | And it is, as you can see, Mr. Dewan, the 16th of October, |
| 18 | 2006. |
| 19 | Did I read that correctly? |
| 20 | **A.**   Yes. |
| 21 | **Q.**   And that's what Mr. Hemant also testified to. |
| 22 | MR. BHATNAGAR:  Now, if we can go up to the top of |
| 23 | that page and blow up the paragraph up there where the two |
| 24 | pink arrows are. |
| 25 | **MR. BHATNAGAR:  (CONTINUING)** |

09:07:52 (line 5)
09:08:00 (line 10)
09:08:18 (line 15)
09:08:42 (line 20)
09:08:59 (line 25)

**OFFICIAL TRANSCRIPT**

1      Q.    Now, do you see, Mr. Dewan, where it says that
2  Mr. Hemant borrowed 600,000 rupees?
3      A.    Yes, I see that.
4      Q.    And if you see below that, the interest rate is
5  there.  And I believe it's a 12.5 interest rate.  Can you see
6  that?
7      A.    No.
8      Q.    Paragraph Number 1.
9           MR. BHATNAGAR:  Can we blow that other paragraph up
10  there.  Thank you.
11  MR. BHATNAGAR:   (CONTINUING)
12      Q.    (As read:)  The first party has taken above said
13  loan from the second party for a limited period of ten years
14  with 12.5 percent interest.
15           Do you see that?
16      A.    I see that.
17      Q.    And we already saw the date on the document, which
18  is October 16, 2006, right?
19      A.    Yes.  I see the date, but --
20      Q.    Sir, there is actually no question pending so if
21  you'll just let me get to my question.
22      A.    Okay.
23      Q.    So 600,000 is an amount that is greater than 350-
24  or 450,000.  You would agree with that, right?
25      A.    Yes, I would agree with that.


OFFICIAL TRANSCRIPT

         1      **Q.**   So for the jury to believe your testimony over that

         2    of Mr. Hemant's, they would have to accept that Mr. Hemant

         3    and his family would be willing to take a 12.5 percent

         4    interest loan out on their family home that is at least

09:10:34 5    150,000 rupees greater than what he needs to pay you your

         6    fees?

         7      **A.**   That's correct.

         8            But I need to have a look at his visa, because I

         9    think his visa was -- his visa was granted by the consulate I

09:10:47 10   think after this date.

        11            And at that point of time when Hemant Khuttan

        12    applied, he applied along with his brother.  His brother was

        13    also supposed to come, but, unfortunately, his brother did

        14    not get the visa at the consulate.  The visa was rejected by

09:11:04 15   the consulate for his brother.

        16            So this could be a loan for both of them.

        17      **Q.**   Do you know that this is a loan for him and his

        18    brother, Mr. Dewan?

        19      **A.**   I don't know about that.  But I knew that his

09:11:14 20   brother also applied and his visa got denied by the

        21    consulate.

        22      **Q.**   So what you are saying now is just speculation,

        23    right?

        24            MR. SHAPIRO:  Objection, Your Honor.

09:11:22 25           THE COURT:  Overruled.


                            **OFFICIAL TRANSCRIPT**

```
 1        A.   I mean, looking at this document, I cannot say that
 2   this loan was taken to pay Mr. Shivram or to pay us.
 3   MR. BHATNAGAR:   (CONTINUING)
 4        Q.   And you also can't say how much Mr. Hemant paid?
 5        A.   I cannot say.  I had to rely because, as per my
 6   understanding, his father and Mr. Shivram had a very good
 7   relationship.  They were just like brothers.  That's the
 8   understanding that I had, even through my father, that they
 9   both are very good friends.
10        Q.   But you don't know exactly what Mr. Hemant paid?
11        A.   No.
12        Q.   Okay.
13        A.   He didn't pay to me.
14        Q.   Let's move on.  He didn't pay to you.  Let's move
15   on.
16             At the beginning of the Signal recruitment, you
17   organized seminars in four cities in India, right, and one
18   city in the UAE?
19        A.   Correct.
20        Q.   And in those seminars, you didn't share with the
21   workers the amount of the room-and-board deductions, right,
22   because you didn't have that information yet?
23        A.   Sorry?
24        Q.   At those seminars, Signal seminars, you did not
25   give the information to the workers about the amount of the
```

09:11:36
09:11:52
09:11:59
09:12:09
09:12:21

OFFICIAL TRANSCRIPT

1　room-and-board deduction?

2　　　A.　No.  I did not have the amount of the deduction.  I

3　just -- I just knew that there would be a deduction.

4　　　Q.　But you didn't have an amount so you couldn't give

5　it to them?

6　　　A.　No, I did not have an amount.

7　　　Q.　You also, at those seminars, did not tell the

8　workers that even if they pass Signal's test in India, that,

9　when they arrive at Signal, they might get a demotion in

10　salary if they don't pass another test, right?

11　　　A.　No, I did not say that, because Signal did not

12　inform me -- Signal did not inform me that if they -- if they

13　fail the test after they arrive in the U.S. at Signal yard --

14　that if they fail the test there, that they would be demoted.

15　I was not informed about that.

16　　　Q.　You were not informed; and because you were not

17　informed, the workers were not informed?

18　　　A.　Correct.

19　　　Q.　Now, candidates at those seminars were also not

20　told that you cannot apply for an H-2B visa and a permanent

21　residency visa at the same time, right?

22　　　A.　Right.

23　　　Q.　And they were not told this because you, yourself,

24　Mr. Dewan, did not know that at this time, right?

25　　　A.　The understanding what I had was that -- the

1    understanding what I had -- what I had, I told exactly same

2    to the candidates.

3        Q.   Right.  And your understanding at that time was a

4    false understanding?

09:13:46   5    A.   Yes.

6        Q.   So the candidates received a false understanding?

7        A.   That would be correct to say.

8        Q.   And you learned in January of 2007 that the H-2B

9    and the green card were not processes that could run

09:14:01   10    concurrently, at the same time, right?

11        A.   Right.

12        Q.   And that was something that you believed

13    Mr. Burnett should have shared with you months earlier,

14    right?

09:14:10   15    A.   Right.

16        Q.   But he never did?

17        A.   Yes.

18        Q.   And thus, you didn't tell any of the candidates who

19    went to Signal about that before they went to Signal?

09:14:19   20    A.   Yes.  I only told them in January of 2007 when

21    the -- when I got to know.

22        Q.   So every single candidate who came to Signal came

23    to Signal with the same false understanding that you had?

24        A.   Yeah.  The understanding, false understanding that

09:14:37   25    I had, I had to pass on the same understanding.


                          OFFICIAL TRANSCRIPT

1    **Q.**   And none of the candidates who came to Signal were
2    told, prior to coming, that Signal could not file a
3    green card application until the H-2B visa was done, right?
4        **A.**   Right.
5        **Q.**   Another important thing that the candidates were
6    not told was that you cannot enter the United States on an
7    H-2B if you intend to stay in the U.S. permanently, right?
8        **A.**   Sorry.  Give me the question again.
9        **Q.**   Sure.
10        Another important piece of information that the
11   candidates were not told is that you cannot enter the
12   United States on an H-2B visa if you intend to stay in the
13   United States permanently, right?
14       **A.**   I don't recall that.
15       **Q.**   Okay.  And you told me at your deposition that you
16   didn't -- you also didn't tell the candidates that they might
17   have to go back to India before they got their permanent
18   resident visas because you didn't know that?
19       **A.**   That is -- that is true, that -- that I didn't knew
20   that the permanent resident visa could not be applied until
21   the second extension.
22        But as far as my recollection goes, that they --
23   they definitely were told that if the -- that the extensions
24   are only a possibility.  And if the extensions are not made,
25   they would have to go back and wait until the green card is

09:14:50

09:15:07

09:15:20

09:15:41

09:15:59

**OFFICIAL TRANSCRIPT**

1    done.

2         **Q.**   I'm going to ask you again, Mr. Dewan.

3              Did you tell them that they may have to go back to

4    India before they got their permanent resident visas?

09:16:11   5    **A.**   If -- regarding the permanent resident visa, no.

6         **Q.**   No.

7         **A.**   No.  Because my understanding was the permanent

8    resident visa could be applied -- could be applied, you know,

9    after they leave Signal.

09:16:30   10   **Q.**   So you didn't tell them that they might have to go

11   back to India before they got their permanent resident visas?

12        **A.**   Not in relation to the permanent resident visa.

13   But in relation to the extensions, definitely, yes.

14        **Q.**   You told me in your deposition, if you recall, that

09:16:50   15   you learned at the end of 2007 that at the conclusion of the

16   H-2B visas, the workers would have to go back to India?

17        **A.**   Yes, I did.

18        **Q.**   So if you learned that at the end of 2007, you

19   could not have shared that with the workers before they came

09:17:03   20   to Signal, right?

21        **A.**   Right.

22        **Q.**   Okay.  And Mr. Burnett never told you to tell the

23   Indian workers about the H-2B and the green card not being

24   concurrent, right?

09:17:13   25   **A.**   Right.


**OFFICIAL TRANSCRIPT**

1       **Q.**   So -- and you were passing along to the Indian
2  workers exactly what Mr. Burnett was telling you, right?
3       **A.**   Correct.
4       **Q.**   So every single Indian worker relied upon your
5  representation about the immigration process, right?
6       **A.**   Yeah.  They relied not only about me, but also with
7  the -- with Mr. Burnett, because they had the opportunity to
8  meet Mr. Burnett.  They had opportunity to meet Signal.  They
9  had opportunity to meet Mr. Pol.
10          It was not me alone, because at the seminars when
11  the things were discussed, Mr. Pol was there.  When they met
12  with the -- when they met with Mr. Burnett, they had
13  questions.  They verified whatever -- any clarity they wanted
14  on the process.  They spoke to Mr. Burnett as well.
15          So it was not me alone.
16       **Q.**   It was not you alone.  It was you, Mr. Pol, and
17  Mr. Burnett, right?
18       **A.**   Yes, correct.
19       **Q.**   All on behalf of Signal, right?
20       **A.**   Yes, correct.
21       **Q.**   So what you did tell the workers at the seminars is
22  that the opportunity for Signal was an opportunity which --
23  where Signal would sponsor all of them for permanent
24  residence, right?
25       **A.**   Yes.


**OFFICIAL TRANSCRIPT**

1     **Q.**   And the workers believed you, right?

2     **A.**   Yes.  That was my belief.  And the workers -- I

3     believe they believe what I'm telling them, what was my

4     understanding at that point of time.

5     **Q.**   Right.  And one of the documents that supports this

6     belief your lawyer showed you yesterday, Exhibit 606, is the

7     memorandum of understanding, right?

8     **A.**   Yes.

9          MR. BHATNAGAR:  And if we can pull out Paragraph 5.

10    **MR. BHATNAGAR:   (CONTINUING)**

11    **Q.**   The first sentence says (as read:)  The applicant

12    is fully aware that M/S Signal International has orally

13    promised the facilitators herein that the applicant reaching

14    the USA and resuming employment with them, after successfully

15    passing respective skills/trade test, they will be willing to

16    file and process their employment-based green card under EB-3

17    category.

18         I read that correctly?

19    **A.**   Yeah, correct.

20    **Q.**   Now, that promise that you refer to, that oral

21    promise, that is based upon a conversation that you testified

22    earlier about with Mr. Bingle, right?

23    **A.**   Exactly correct.

24    **Q.**   And you memorialized that conversation essentially

25    in this document, correct?

**OFFICIAL TRANSCRIPT**

1    A.   Exactly.

2         MR. BHATNAGAR:  You can take that down.

3 MR. BHATNAGAR:  (CONTINUING)

4    Q.   So you testified that up until January, you didn't

5 understand -- January of '07, you didn't understand how the

6 H-2B process worked, right?

7    A.   Yes.

8    Q.   And you said yesterday that you felt terrible when

9 you came to understand how it actually worked, right?

10   A.   Yes.

11   Q.   And when you came to realize that you had been

12 getting inaccurate information, you said you felt terrible

13 and that you should have told the candidates.  That's what

14 you said yesterday, right?

15   A.   Yes.  And I told the candidates when I was there at

16 Signal.

17   Q.   Well, while you were at Signal you may have told

18 the candidates, but you took no steps to notify the workers

19 that they might have to return to India who hadn't yet come

20 to Signal, did you?

21   A.   I don't recall that exactly.  But because I was --

22 I was here for quite some time in January when the waves

23 were -- when the waves were coming in.

24        When the waves were coming in, I was in the U.S.

25 that time for about almost I think 20 days or so.


OFFICIAL TRANSCRIPT

1          But I don't recall.  I may have called my office

2     and asked them to, you know, inform the workers who were

3     coming in the pending waves.

4          Q.   But you never e-mailed a single worker to tell them

09:20:48  5     what you had now just learned?

6          A.   No.  We didn't -- I didn't e-mail.  I didn't

7     e-mail.

8          Q.   You didn't e-mail.  You didn't have your staff

9     e-mail a single worker to tell them what you had just

09:20:57  10    learned?

11         A.   No.  We were not corresponding through e-mails at

12    that point of time.

13         Q.   You were receiving e-mails from workers, weren't

14    you?

09:21:05  15    A.   Very few of them.  Very few of them.

16              MR. SHAPIRO:  Objection.

17              Mr. Dewan has an opportunity to explain his

18    answers, and he is not being given that by Mr. Bhatnagar.

19              THE COURT:  I agree.

09:21:18  20             Please don't interrupt him when he's in the middle

21    of an answer.

22    MR. BHATNAGAR:  (CONTINUING)

23         Q.   I'm sorry, Mr. Dewan.  Please continue.

24         A.   Yeah.  So majority of the candidates were not

09:21:28  25    corresponding with us through the e-mails.

OFFICIAL TRANSCRIPT

1    **Q.**    Now, you testified yesterday about the consulate

2    meetings in India.  Do you remember that?

3    **A.**    Yes, I remember that.

4    **Q.**    And the preparation that you and Mr. Burnett gave

5    to the candidates before their meetings, right?

6    **A.**    Yes, right.

7    **Q.**    You instructed them what to say when they were

8    questioned, right?

9    **A.**    Yes, right.

10    **Q.**    You told them to tell the U.S. consulate that they

11    had paid 33,500 rupees, right?

12    **A.**    Yes.

13    **Q.**    And did you also instruct them to tell the

14    consulate when they would be returning to India?

15    **A.**    I don't recall that, but, yes.  As per the validity

16    of the visa, the validity was, I believe ten months at that

17    point in time.  So we informed them to say whatever the fact

18    was, the validity of the visa.

19    **Q.**    Now, on at least one occasion, Signal management,

20    and particularly Mr. Bingle, was in attendance for one of

21    these consulate meetings, right?

22    **A.**    Yes.  Not at the consulate, but during the

23    meetings, yes.

24    **Q.**    Mr. Bingle was in attendance at the preparation

25    meeting --

**OFFICIAL TRANSCRIPT**

1    A.   Yes.

2    Q.   -- with the candidates?

3    A.   Yes.

4    Q.   And that's the meeting where you advised the

5  candidates how to answer the questions?

6    A.   Yeah.  Mr. Burnett was there and I was there along

7  with Mr. Bingle.

8    Q.   Okay.  Great.

9         Now, I want to ask you, Mr. Dewan, about refunds.

10        You testified at length yesterday on this topic.

11  Just to be clear, none of the plaintiffs in this trial asked

12  you for a refund, right?

13   A.   No, none of the candidates -- none of these

14  plaintiffs.

15   Q.   And to the best of your knowledge, the plaintiffs

16  in this trial expected to go to Signal and be sponsored for a

17  green card, right?

18   A.   Yes, right.

19   Q.   So you testified yesterday that you gave out close

20  to $1 million in refunds.  Do you remember saying that?

21   A.   I remember that.  It is not like a correct

22  statement, but I said close to that, yes.

23   Q.   So you told this jury yesterday that you gave close

24  to $1 million in refunds, right?

25   A.   Right.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Now, I asked you the same question at your

2    deposition, Mr. Dewan, and you gave me a different answer.

3    Do you remember that?

4    **A.**   I don't recall the figure that I gave, but because

5    up to date I'm refunding the -- up to date I'm refunding the

6    candidates.

7    **Q.**   Well, let me ask you this:  You told me in 2009

8    that you had refunded $400,000.  Does that sound right?

9    **A.**   Yeah.  Maybe at that point in time it would have

10   been that amount.

11   **Q.**   So it is your testimony that you have refunded

12   $600,000 between 2009 and today?

13   **A.**   I would -- I would -- I cannot say 600,000.  I said

14   close to that.  I didn't say 600.  But -- I can't say 600

15   exactly, but it is a lot of money because I have been

16   refunding this over a period of time.  It is very difficult

17   for me to exactly know, even at times to put the summary

18   together.

19   **Q.**   Let me ask you this:  Was there an alleged occasion

20   where your business partner, Mr. Pol, did not believe that

21   you were giving out the refunds that you claim?

22   **A.**   It could be that would be his belief.

23   **Q.**   Well, this jury heard through Mr. Pol's deposition

24   designations that, in his view, there were few, if any --

25   few, if any, J & M refunds.


**OFFICIAL TRANSCRIPT**

1     **A.**    Absolutely not.  I have refunded almost 50 percent

2     of the J & M recruits that did not come to the U.S. on Signal

3     visa.

4            I've refunded them, as well as there were

5     applicants at the -- even at the first stage of -- you know,

6     with the labor of Pol, there were candidates who were

7     refunded at that point of time.

8     **Q.**    I'll read you a little portion -- question-and-

9     answer portion from Mr. Pol's sworn deposition testimony, and

10    then I would like you to tell me if this is accurate.  Okay?

11    **A.**    Sure.

12    **Q.**    This is Page 172, Line 7, to 172, Line 15.  And

13    it's already been read in as a designation.

14           Question:  Okay.  Other than that applicant, you

15    don't remember refunding any other applicants for J & M?

16           Answer:  I don't recall.

17           Question:  Do you recall refunding any applicants

18    other than that one applicant?

19           Answer:  I recall the one.

20           That's Mr. Pol's testimony, that he recalls that

21    one applicant that he refunded?

22    **A.**    That he refunded.  But I have refunded on Mr. Pol's

23    behalf.  I have refunded on behalf of Mr. Burnett.

24    **Q.**    But was there an occasion where Mr. Pol and

25    Mr. Burnett didn't believe that you were providing refunds?

**OFFICIAL TRANSCRIPT**

```
 1        A.    I don't -- I don't recall that.

 2        Q.    Okay.

 3        A.    I don't think they had any reason to believe that I

 4    would not refund the candidates, because they had seen with

 5    their own eyes what I was going through.  What I was going

 6    through.  How I was facing the candidates with the delays.

 7        Q.    Was there a time period when you were telling

 8    Mr. Pol and Mr. Burnett that you were providing refunds, and

 9    they suspected that you were lying to them?

10        A.    That could have.  I mean, I don't recall.  I don't

11    recall that right now.

12        Q.    Okay.  Let's look at Exhibit 1539.  And we'll start

13    at the bottom.

14              Mal and I -- let's start at the top so we can

15    authenticate it.

16              This is an e-mail from Global Resources to you,

17    Mr. Dewan, copying Mr. Burnett.  The subject line I will not

18    read, but it's essentially taking advantage of your friends.

19              Do you see that?

20        A.    Yeah.

21        Q.    Let's start at the bottom.

22              (As read:)  Mal and I listened to the recording

23    that the candidate made on his cell phone of you taking money

24    and making him agree to tell us that he was refunded.  What

25    you have done is unbelievable.  We thought you were our
```

OFFICIAL TRANSCRIPT

1   friend.  F you.  Hope you enjoy spending our money because we

2   are thinking every day about what we can do to F you back.

3   Signed Mal and Michael.

4           Did I read that right?

5       A.   Yeah, you read it right, but this was absolutely an

6   incorrect e-mail that they sent me.

7       Q.   Okay.  So let's go -- if we can scroll up.

8           You respond to them.

9       A.   Yeah.

10      Q.   And then on the top e-mail, if we can just go to

11  the top part, they write back to you (as read:)  Sachin,

12  Malvern and I want to believe you.  That is the problem.  One

13  of the candidates have you recorded telling them these

14  things.  Our hearts want to believe you, but our brains are

15  telling us something different.

16          Did I read that correctly?

17      A.   Yes.

18      Q.   So just to set the stage, Mr. Pol and Mr. Burnett

19  are two people that you have known through the mid-1990s,

20  right, since that time?

21      A.   That's right.

22      Q.   They have traveled with you?

23      A.   Sorry?

24      Q.   They have traveled with you?

25      A.   Yes, they have.


                        **OFFICIAL TRANSCRIPT**

1    **Q.**   They have worked closely with you?

2    **A.**   Yes, they have.

3    **Q.**   And they are not believing what you're asking this

4    jury to believe?

09:28:43   5    **A.**   This -- they are only referring to one single

6    candidate.  That's what I believe.  They are referring to one

7    single candidate, and I don't know -- I don't even know what

8    recording -- whether there was a recording or not a

9    recording.  I don't even know about that.  This is what they

09:28:59   10    are just writing in the e-mail.

11    **Q.**   But what they are writing in the e-mail --

12    **A.**   They are writing an e-mail, but I never -- I never

13    know how they even believed that I would not refund money to

14    the candidates.

09:29:12   15    **Q.**   But they are accusing you of instructing a

16    candidate to falsely attest to a refund.  Isn't that what

17    they are accusing you of?

18    **A.**   That's what they are accusing me of.

19    **Q.**   And they are accusing you of never actually

09:29:25   20    refunding the money, right?

21    **A.**   That absolutely would be a false statement.

22    **Q.**   But that's what they are accusing you of?

23    **A.**   That's what they are accusing me of.

24    **Q.**   And they are accusing you of taking money out of

09:29:35   25    their pockets by virtue of perpetrating this falsehood,

**OFFICIAL TRANSCRIPT**

1    right?

2        A.    That's what it says here.

3        Q.    Okay.  Let's look at another e-mail.  This is

4    Exhibit No. 1024.

09:30:07    5            So this is an e-mail on -- from Mr. John Sanders.

6    It is written to Mr. Schnoor, Mr. Bingle, and other members

7    of Signal senior management.

8            I'm not going to ask you to authenticate the

9    e-mail, Mr. Dewan.  I just want to ask you about the accuracy

09:30:23   10    of the statements that Mr. Sanders is making.

11            Is that all right?

12        A.    Yeah.  I'll have a read.

13        Q.    So Mr. Sanders writes (as read:)  Bing, this is an

14    example of the affidavit which the workers from Dubai must

09:30:39   15    sign for Dewan Consultants.  It says they paid no money which

16    is false.  They paid the same 14,000 or so as everyone else.

17    Their signatures were the price Sachin charged to give their

18    passports back.  Then they charged an additional 35,000

19    rupees for the ticket to send them over to the U.S.

09:30:55   20            MR. BHATNAGAR:  Take it down.

21    **MR. BHATNAGAR:  (CONTINUING)**

22        Q.    So my question to you, Mr. Dewan, is Mr. Sanders is

23    alleging that you've pressured a candidate to give a false

24    affidavit about a refund, right?

09:31:10   25        A.    No, I've never -- never pressurized any candidate

**OFFICIAL TRANSCRIPT**

1   to sign a false affidavit.

2       Q.   But that's what he is saying, right?

3       A.   No, I don't think this is what it means in the

4   e-mail.

09:31:20   5       Q.   Okay.

6       A.   He is referring -- I don't know exactly what he is

7   referring to.

8            MR. BHATNAGAR:  Can you put it back up.

9   **MR. BHATNAGAR:  (CONTINUING)**

09:31:34   10      Q.   So it's your testimony that you don't believe that

11  that is what Mr. Sanders is alleging?

12      A.   Can I see the e-mail again?

13      Q.   Of course.  We're going to pull it right back up.

14           We can blow it up a bit, too, if it is easier.

09:31:47   15           And it continues.  The second paragraph (as read:)

16  I would not know whom to believe, Sachin or the workers, were

17  it not for the despair in the two Indians' faces I mentioned

18  when they learned they had failed the Signal test in Texas

19  Friday.  That level of desperation cannot be faked.  My

09:32:07   20  recommendation is that we have nothing more to do with

21  Sachin.

22           Did I read that correctly?

23      A.   Yeah.  Can I just take a minute to read it?

24      Q.   Please.

09:32:17   25      A.   (Reviews document.)


                    **OFFICIAL TRANSCRIPT**

1      I don't recollect what effort he is referring to.
2  I mean, if somebody has come -- I have never in my -- any of
3  the depositions denied that I have not taken money, I have
4  not charged money.  I have never denied not taking money.  So
5  I don't understand.
6      And I have never denied that I have not charged for
7  the ticket.  I have never denied that.  So I don't exactly
8  understand --
9      Q.    I have a much simpler question, Mr. Dewan.
10      MR. BHATNAGAR:  We can take it down.
11  **MR. BHATNAGAR:   (CONTINUING)**
12      Q.    The question to you is:  Were you aware that your
13  business partners suspected that you were misrepresenting the
14  issue of refunds to them?
15      A.    That was in one particular case.
16      Q.    Were you also aware that the company that hired you
17  as its agent also suspected that you were misrepresenting the
18  issue of refunds to them?
19      A.    No, I don't -- I don't know about that e-mail, and
20  I don't know what he is referring to.
21      Q.    Okay.
22      A.    Because Signal knew that I was charging the e-mail
23  [sic].  And if they were writing in an e-mail that I am
24  making them to sign something and charging them for the
25  ticket, there was nothing new that -- or something that they

OFFICIAL TRANSCRIPT

1    not knew about.

2         Q.   Okay.  Let's move on.

3              I want to turn your attention now to the events of

4    March 9, 2007, Mr. Dewan.

5              You testified that you heard about Mr. Sabulal's

6    suicide attempt on that day, right?

7         A.   Yes.

8         Q.   And you actually came to the Signal facility on

9    March 9th, correct?

10        A.   Yes.  I came there in the evening.

11        Q.   So I want to ask you about how you came to be at

12   Signal on March 9th.

13             I think you testified in your deposition that

14   Mr. John Sanders spoke with you and told you some Indian

15   workers had been meeting in a local church?

16        A.   Yes.  I think he spoke to me and also sent me in an

17   e-mail, I think so.

18        Q.   And you understood that the purposes for the church

19   meetings were because the workers were feeling insecure about

20   their salaries and terminations?

21        A.   Yes.

22        Q.   And you understood that the meetings were

23   specifically to discuss the concerns of the workers; the

24   living conditions, the salaries and terminations, right?

25        A.   Yeah.  Those were -- those problems were already

OFFICIAL TRANSCRIPT

1   there.  Those problems were already there.  But I think the

2   main reason at that point of time was I think the

3   terminations and the salary reductions.

4        **Q.**   The workers were afraid about those issues, right?

5        **A.**   Yes.

6        **Q.**   And that's what they were meeting in the church to

7   talk about?

8        **A.**   Yes.

9        **Q.**   Now -- so Mr. Sanders tells you that these meetings

10   are happening, right?

11        **A.**   Yes.

12        **Q.**   And he also tells you that Mr. Sabulal was one of

13   the people who is participating in those meetings, right?

14        **A.**   Yes, he did.

15        **Q.**   And --

16        MR. BHATNAGAR:  Can we pull up the calendar of the

17   week of March 9th.

18   **MR. BHATNAGAR:  (CONTINUING)**

19        **Q.**   I think this will be helpful just to see the dates.

20        **A.**   Sure.

21        **Q.**   So you testified yesterday that following your

22   conversation with Mr. Sanders -- well, let me ask it another

23   way.

24        So you speak to Mr. Sanders and you come to

25   understand that Mr. Sabulal is participating in these

**OFFICIAL TRANSCRIPT**

1   meetings, right?

2       A.   Yeah, he was one of the guys who was participating

3   in the meetings.

4       Q.   And you testified yesterday that you decided to try

5   to contact Mr. Sabulal because you wanted to help him based

6   upon what you had learned, right?

7       A.   Yes.

8       Q.   And you wanted to help Mr. Sabulal to avoid being

9   terminated, correct?

10      A.   Yes.  Correct.

11      Q.   Because you had been told by Mr. Sanders that

12  Mr. Sabulal was going to be terminated for participating in

13  those meetings?

14      A.   Yes.  Correct.

15      Q.   So you asked Mr. Saliman to call Mr. Sabulal's wife

16  at their home in Kerala, correct?

17      A.   Yes, correct.  Because first I tried to call a few

18  of the workers and get Mr. Sabulal's number, but I was not

19  successful in getting his number.

20      Q.   And Mr. Sabulal's wife is obviously in India and

21  Mr. Sabulal is in the United States, right?

22      A.   Yes.

23      Q.   So Mr. Sabulal testified to this jury that he spoke

24  with his wife, and that she told him that Dewan Consultants

25  had called their home, right?


                    **OFFICIAL TRANSCRIPT**

```
 1        A.    Yes.  Saliman.
 2        Q.    Yes.
 3              And he testified that he then called you.  Do you
 4    remember that conversation?
 5        A.    Sorry?
 6        Q.    Mr. Sabulal testified that following talking to his
 7    wife, he called you in your office?
 8        A.    I'm sorry, I was not there during his -- during his
 9    testimony, I was not here so I would not know.
10        Q.    My apologies.
11              You remember Mr. Sabulal calling you?
12        A.    No, I don't remember that.
13        Q.    Do you remember talking to him on the phone?
14        A.    No, I don't remember talking to him on the phone.
15        Q.    Okay.  Did someone from Signal ask you to call
16    Mr. Sabulal?
17        A.    I don't recall that.  I don't recall.  I don't
18    recall that.
19        Q.    You don't recall if anyone from Signal said to you,
20    please call Mr. Sabulal?
21        A.    No, I don't.  I don't recall that.
22        Q.    Okay.  So your reasons for wanting to talking to
23    Mr. Sabulal -- and you're saying now that you don't remember
24    talking to him, right?
25        A.    Sorry?
```

**OFFICIAL TRANSCRIPT**

1    Q.    You don't remember talking to Mr. Sabulal?

2    A.    No, I don't remember talking to him.

3    Q.    But your reasons for wanting to talk to him was

4    because you wanted to help your fellow Indians, right?

09:38:08    5    A.    Yes, correct.

6    Q.    So let's look at Exhibit 834, if we could.

7          This is an e-mail chain between you and

8    Mr. Darrell Snyder copying Mr. Bingle and Mr. Burnett.

9          Let's go to the e-mail that you send.

09:38:26    10          MR. BHATNAGAR:  And blow up the bottom paragraph,

11    if we could, all the way at the bottom.

12   **MR. BHATNAGAR:  (CONTINUING)**

13   Q.    You write (as read:)  I want to speak to you and

14   Mr. Bingle regarding the development taking place in

09:39:00    15   Mississippi with the South Indians.  I wonder if I could be

16   of some help to Signal by explaining the workers who are

17   trying to cause problems for everyone.  I feel the workers

18   who have initiated this problem should be deported first.

19         Did I read that correctly?

09:39:15    20   A.    Yes.

21   Q.    So you're telling Signal management on Wednesday,

22   March 7th, that, in your opinion, the workers who have

23   initiated these problems should be deported first?

24   A.    Yes, I am saying that, but at the same time I want

09:39:35    25   to see why -- at that point of time, the job candidates were

**OFFICIAL TRANSCRIPT**

1    already at Signal.

2         The problem that was there was between Signal and

3    the job applicants.  And I am -- because I heard from other

4    workers that there were problems going on.  That's why I

5    needed -- that's a reason to help my fellow Indians who are

6    there.  So that's the reason I felt that I should get

7    involved into this.

8    Q.   So you are going to help your fellow Indians by

9    suggesting that Mr. Sabulal be deported first?

10   A.   No, I didn't exactly mean that.

11   Q.   All right.  Well, let's see Mr. Snyder's response

12   to you.  This is Exhibit No. 834.

13        So Mr. Snyder writes back to you (as read:) Sachin,

14   thank you for the prompt reply.  Malvern will be here this

15   afternoon to meet with us concerning the very issue that you

16   mentioned below.  And your comments are so noted and will be

17   taken into consideration concerning the, quote, unhappy

18   workers.

19        Did I read that correctly?

20   A.   Yes, you read that correctly.

21   Q.   So your suggestion that the unhappy workers be

22   deported first is noted and taken into consideration by

23   Mr. Snyder, correct?

24   A.   Yes, that's what it says.

25   Q.   And then two days later, Mr. Sabulal and Mr. Jacob

**OFFICIAL TRANSCRIPT**

1    are terminated, right?

2        A.   Yeah.  But at the same time, I also -- also asked

3    Signal not to have meetings.  I wanted to be there in the

4    meeting, but they didn't wait.  They just went ahead and did

5    what they wanted to do.

6        Q.   So let's look at your response to Mr. Snyder.

7             MR. BHATNAGAR:  At the top paragraph, we can blow

8    that up.

9    MR. BHATNAGAR:  (CONTINUING)

10       Q.   (As read:)  I think it will be a good idea to meet

11   with the workers on Friday and Saturday, which is before

12   their planned meeting with the lawyers on Sunday.

13            Now, let me just ask you that:  How did you come to

14   know the workers were going to be meeting with lawyers on

15   Sunday?

16       A.   That is what I got to know from the other job

17   applicants who were at the man camp.

18       Q.   Ramesh Gunisetti?

19       A.   I don't recall that, but there were a few.  There

20   was not one specific guy.  There were a few of them that they

21   called me.

22       Q.   Was Mr. Ramesh one of the people that you talked

23   to?

24       A.   I would not recall.

25       Q.   You don't recall.  Okay.


OFFICIAL TRANSCRIPT

1          So let's now turn our attention to March 9, 2007.

2          You arrived at Signal in the evening, right?

3     A.   Yes, right.

4     Q.   And when you get there, I believe you testified

5   that you came to learn that the workers had been detained in

6   a room, right?

7     A.   Yes, that's right.  When I landed at Atlanta and I

8   called Anjay, that's what he informed me, that this is what

9   Signal did.

10         They locked the three people -- three of the job

11  applicants, in a room.  And then he told me what happened

12  about Sabulal.

13    Q.   I'm not going to ask you about Mr. Sabulal's

14  suicide attempt, because you were not there, but I would like

15  to ask you about whether you believe, from your conversation

16  with John Sanders, that Mr. Sabulal was terminated for taking

17  part in those meetings?

18    A.   No, I was not informed about that.

19    Q.   You were not informed?

20    A.   No.

21    Q.   Okay.

22    A.   If they were already terminated, then I had no

23  reason to travel all the way from India to the U.S.

24    Q.   I think maybe my question was not so clear.

25         Do you believe that the reason that Signal


                    **OFFICIAL TRANSCRIPT**

1    terminated Mr. Sabulal was because of his participation in

2    those meetings?

3            DR. ROUX:  Objection; speculation.

4            THE COURT:  Sustained.

5    **MR. BHATNAGAR:  (CONTINUING)**

6        Q.   Do you have an opinion as to the reason that

7    Mr. Sabulal was terminated?

8        A.   Yes, I think that was the reason, as far as I

9    remember.  Sabulal was a very good skilled worker, and I

10   personally knew him since 2003.  And we had many interactions

11   and meetings together.

12           So as far as his work, I know that Signal would

13   not -- would have not terminated him for his work or demotion

14   or -- but for just for the reason that he was involved in the

15   meetings.

16       Q.   Okay.  I'm on my last topic, Mr. Dewan.  We're

17   about to wrap up.

18           As you may know, shortly after this lawsuit was

19   filed, Signal put out some press releases telling the world

20   their version of this story.  Are you aware of that?

21       A.   Yes, sir.

22       Q.   We've seen some of the press releases in this

23   trial, but I want to show you one we haven't yet seen.

24           MR. BHATNAGAR:  Can we pull up Exhibit 956, please.

25   **MR. BHATNAGAR:  (CONTINUING)**

                          OFFICIAL TRANSCRIPT

1      **Q.**   Now, let me start by referring you to the title,

2      Mr. Dewan.  "Signal International Stands With Its Employees

3      In Taking Action Against --

4                    DR. ROUX:  Objection; foundation.

5                    THE COURT:  All right.  Sustained.

6                    This has not been discussed with anyone.  I don't

7      know that he has any knowledge of it.  It's a Signal press

8      release?

9                    MR. BHATNAGAR:  It was a release that was put out

10     into the world that refers to Mr. Dewan.

11                   THE COURT:  You can ask him about it, but don't

12     show the press release.

13                   MR. BHATNAGAR:  Sure.

14     **MR. BHATNAGAR:  (CONTINUING)**

15     **Q.**   So you understand, Mr. Dewan, that Signal put out a

16     press release which related to the actions of the Indian

17     recruiters, as well as Mr. Pol and Mr. Burnett, correct?

18     **A.**   Yes, correct.

19     **Q.**   And in that press release, you're aware that you

20     and the other -- and your partners are referred to as

21     unscrupulous.  Are you aware of that?

22     **A.**   Yes, I heard about that.

23     **Q.**   And your fees are described as highly excessive.

24     Were you aware of that?

25     **A.**   Yes, I'm aware of that.


                         **OFFICIAL TRANSCRIPT**

1    **Q.**   Now, these highly excessive fees that are made
2    referenced to in Signal's release, Signal was aware of those
3    fees when they gave you a brand-new contract in 2007, right?
4    **A.**   Yes, correct.
5    **Q.**   And we discussed that that contract had no cap on
6    fees in it, right?
7    **A.**   Yes.
8    **Q.**   And the press release, you're aware of, also makes
9    reference to false promises about green cards, right?
10   **A.**   Yes.
11   **Q.**   And these are the same promises that Signal was
12   aware of in 2006, right?
13   **A.**   That's correct.
14   **Q.**   And these are the same false promises that Signal
15   made to you when you spoke to Bill Bingle in October of 2006,
16   right?
17   **A.**   Correct.
18   **Q.**   So if Signal were to call you unscrupulous,
19   Mr. Dewan, would you find that -- strike that.
20        Signal has never formally terminated its
21   relationship with you, right?
22   **A.**   Correct.
23   **Q.**   If Signal were to say that it was outraged that the
24   workers were misled before joining the Signal family, you
25   would find that to be a false statement, right?

**OFFICIAL TRANSCRIPT**

1     A.   Absolutely false statement.

2     Q.   Prior to the filing of this lawsuit from -- did

3   anyone from Signal ever convey outrage to you about the fees

4   that you had charged?

5     A.   Except for asking me to reduce or refund the fees,

6   a part of it, they never expressed anything that it was

7   outrageous.

8     Q.   Prior to the filing of this lawsuit, did anyone

9   from Signal convey outrage to you for the green card promises

10   that you had made to the Indian workers?

11     A.   No.

12     Q.   Mr. Dewan, until the workers sued Signal in this

13   case, did you ever see any outrage from Signal on behalf of

14   the Indian workers?

15     A.   No.

16          MR. BHATNAGAR:  I have no further questions.

17          THE COURT:  All right.  We're going to take our

18   break before we proceed to the next cross-examiner.

19          So I want to remind you all --

20          You can have a seat until I finish, sir.

21          THE WITNESS:  Sorry.

22          THE COURT:  I want to remind you of the

23   instructions I've given you.

24          Until the trial is over, you're not to discuss the

25   case with anyone, including your fellow jurors, members of


OFFICIAL TRANSCRIPT

1   your family, people involved in the trial, or anyone else.

2          If anyone approaches you and tries to talk about

3   the case, do not tell your fellow jurors, but advise me about

4   it immediately.

5          You are not to reach any conclusions in the case

6   until all the evidence has been presented, the Court has

7   instructed you on the law, and it is given to you for

8   deliberations and decision.

9          And also remember not to communicate with anyone by

10  any means, such as a cell phone or an iPad or computer about

11  the case or to attempt to get any information about the case.

12         So let's -- we'll be back at 10:00.

13                           (Jury out at 9:48 a.m.)

14         THE COURT:  All right.  So is there anything we

15  need to talk about right now?  I've got a list of things for

16  us to talk about as soon as we finish the evidence.

17         Mr. Werner, do you want to put a statement on the

18  record about Global Resources?

19         MR. WERNER:  This is about the Gulf Coast

20  Immigration Law Center.

21         THE COURT:  We're still in session.

22         MR. WERNER:  Counsel for the Burnett defendants has

23  represented to the Court by e-mail that the Gulf Coast

24  Immigration Law Center has been completely dormant since

25  Hurricane Katrina, and no work dealing with any of the

**OFFICIAL TRANSCRIPT**

1    plaintiffs or Signal or any of its H-2B workers was performed

2    by the Gulf Coast Immigration Law Center or any employee of

3    that entity.

4            He also has represented to the Court that

09:50:18   5    Mr. Burnett is not claiming and will not claim Gulf Coast

6    Immigration Law Center is, was, or should be responsible for

7    his actions or any that may be attributed to any of those

8    working for him.

9            Mr. Burnett understands that any liability or

09:50:35  10    judgment for any conduct by him or those working for him is

11    his personal responsibility.

12            Based on the representation -- on these

13    representations, plaintiffs will dismiss their claims against

14    the Gulf Coast Immigration Law Center without prejudice to

09:50:53  15    pursue the Gulf Coast Immigration Law Center as part of a

16    judgment enforcement and/or collection proceeding against the

17    other two Burnett defendants.

18            THE COURT:  All right.

19            Is that correct?

09:51:06  20            MR. CERNIGLIA:  That would be correct, Your Honor.

21            THE COURT:  Thank you, Mr. Werner.

22            MR. WERNER:  Thank you.

23            THE COURT:  I'll see you all at 10:00.

24                    (A recess was taken.)

09:51:12  25            **AFTER THE RECESS**


**OFFICIAL TRANSCRIPT**

```
 1                              (Call to order of the court.)
 2            THE COURT:  All right.  Let's bring in the jury.
 3            Who is going next?
 4            DR. ROUX:  Signal is, Your Honor.
 5            THE COURT:  All right.  Why don't you get ready.
 6                              (Jury in at 10:03 a.m.)
 7            THE COURT:  All right.  Have a seat.
 8                          CROSS-EXAMINATION
 9   BY DR. ROUX:
10       Q.   Good morning, Mr. Dewan.  My name is Brian Roux,
11   and I represent Signal International.
12            We did not meet during your deposition, but I met
13   you a few days ago.
14       A.   Correct.
15       Q.   I'm going to be brief, but there are a few areas
16   I'm going to cover to clarify some of your testimony for the
17   jury.
18            I want to start with what exactly a recruiting
19   agent is in India.
20            I understand that you are a licensed recruiting
21   agent; is that correct?
22       A.   That's correct.
23       Q.   And during 2006 and 2007 when you were involved in
24   the recruitment for Signal, you were also a licensed
25   recruitment agent in India at that time?
```

OFFICIAL TRANSCRIPT

1      A.    Correct.

2      Q.    Now, during the examination by your lawyer, you

3   discussed very briefly that Signal had to engage you for them

4   to recruit, correct?

5      A.    Correct.

6      Q.    And that's because as they exist prior to engaging

7   you, Signal could not directly recruit anyone from India,

8   correct?

9      A.    Correct.  But that would be Signal could have -- if

10   all they were going for only green cards, only permanent

11   resident visa, they could have -- they could have hired or

12   contracted with an agency who doesn't have a license.

13      Q.    Okay.  But they had to engage some sort of

14   recruiting agency or applied for a permit from the Indian

15   government if they wanted to recruit in India?  They could

16   not, as they were sitting without doing either of those

17   things, recruit?

18      A.    As I said, that if the intent was the temporary and

19   the permanent, then they would have had to hire a licensed

20   recruitment agency.

21         But if the intent was only permanent -- if H-2Bs

22   were denied, if there was only permanent resident, they could

23   have hired a non-licensed recruitment agency.

24      Q.    But they still would have had to hire a recruitment

25   agency?

OFFICIAL TRANSCRIPT

1     **A.**   I would not say exactly recruitment.  But because

2     there are companies who only do the immigration process for

3     countries like Canada, U.S., Australia, and to my belief,

4     they don't require the license from the Ministry of Indian

5     Immigration Affairs.

6          **Q.**   And recruitment in India is regulated by the

7     Immigration Act of 1983, correct?

8          **A.**   Yes, correct.

9          **Q.**   And that act requires that, for certain countries,

10    Indian workers go through a preclearance process, but that is

11    not necessary for the United States, correct?

12         **A.**   Yes, correct.

13         **Q.**   And you testified yesterday and today that during

14    the recruitment effort, before the workers left India, you

15    sat down with between five and seven of them in your office

16    in India and explained to them the documents that they were

17    asked to sign prior to leaving for America, correct?

18         **A.**   Yes.  That was prior to their departure.

19         **Q.**   And they understood the documents that they signed

20    at that time, correct?

21         **A.**   They understood the documents.

22         DR. ROUX:  Can I see Exhibit 27.

23    **DR. ROUX:  (CONTINUING)**

24         **Q.**   You were shown this memorandum of understanding

25    before, correct?


                         **OFFICIAL TRANSCRIPT**

1   **A.** Yes.

2     DR. ROUX:  Can we go to Paragraph 9 on the second

3 page.

4 **DR. ROUX:  (CONTINUING)**

10:07:38 5   **Q.** Earlier today you testified, in response to

6 Mr. Bhatnagar's questioning, that you didn't understand that

7 if the workers failed the skilled test that they may be

8 demoted.

9     And the reason you didn't understand that is

10:07:50 10 because the agreement that you presented to the workers, the

11 memorandum of understanding, said that they would be

12 terminated, correct, if they failed the skill test?

13   **A.** Yes.

14   **Q.** And so instead of being terminated, Signal chose to

10:08:02 15 demote them and see if they could work with them, correct?

16   **A.** Sorry.  Give me the question again.

17   **Q.** Signal chose not to terminate them, but instead

18 tried to work with them and find other lower-skilled

19 positions that they could occupy, correct?

10:08:15 20   **A.** Sorry.  I didn't get the question.  I'm sorry.

21   **Q.** Let me rephrase.

22     So the understanding, as you explained to the

23 workers when they signed this memorandum of understanding,

24 was that if they didn't pass the skills test when they came

10:08:30 25 to Signal, that they would be terminated, correct?

**OFFICIAL TRANSCRIPT**

1      A.   Yes.  Correct.

2      Q.   And Signal did not initially terminate them, but

3 instead tried to demote them to a position that they could

4 fulfill, correct?

10:08:39

5      A.   Yes, I understood that later on that they would be

6 demoted -- they did demote some of the workers, but I was not

7 given that understanding.

8      Q.   Because you thought they would be terminated if

9 they didn't pass the test?

10:08:54

10     A.   Yes.

11     Q.   And this lists other areas that they could be

12 terminated for, including that they didn't prove their skills

13 at work, misconduct or misbehavior at the worksite or the

14 company-provided accommodations, correct?

10:09:07

15     A.   Sorry?  I didn't get you.

16          DR. ROUX:  Can we highlight this here, please.

17 DR. ROUX:  (CONTINUING)

18     Q.   When you explained this to the workers, they also

19 were aware that they could be terminated for other reasons,

10:09:21

20 including failing to prove their skills at work, misconduct

21 or misbehavior at the worksite or company-provided

22 accommodations, correct?

23     A.   Yes, correct, because this is very common and very

24 general when a job candidate goes to any country.  That's --

10:09:41

25 this is like a general statement, and this is very common.


OFFICIAL TRANSCRIPT

1    **Q.**   Right.  Because if you're offered a job generally

2    in this sort of industry, you have to do the job or you'll be

3    terminated, correct?

4    **A.**   Yes, correct.  That would not only apply to Signal,

5    that would apply to any company.  Even if it goes to

6    Saudi Arabia or United Arab Emirates.

7    **Q.**   This is true for the thousands upon thousands of

8    workers that you recruited in your career, correct?

9    **A.**   Correct.

10   **Q.**   And these workers, many of whom have gone abroad

11   before, would have worked under similar conditions, correct?

12   **A.**   Yes.

13   **Q.**   And this would have been pretty standard, correct?

14   **A.**   Yes, this is pretty standard.

15   THE CASE MANAGER:  What is this exhibit number?

16   DR. ROUX:  This is Exhibit No. 27.

17   Can I see Exhibit 1272.

18   **DR. ROUX:  (CONTINUING)**

19   **Q.**   This is the power of attorney that you were asked

20   about before, correct?

21   **A.**   Yes, correct.

22   **Q.**   And this is how Signal engaged you as its

23   recruiting agent as provided under Indian law, correct?

24   **A.**   This I received after Mr. Pol engaged me.  This was

25   received I believe somewhere in August.  But Signal had

l0:09:56

l0:10:10

l0:10:22

l0:10:40

l0:10:53

**OFFICIAL TRANSCRIPT**

1    already engaged me much earlier with their demand letter and

2    the earlier power of attorney.

3         Q.   The earlier power of attorney -- a power of

4    attorney is required to engage you as a recruiting agent,

10:11:09    5    correct?

6         A.   Correct.

7         Q.   And the demand letter is required in order for you

8    to place the advertisements, correct?

9         A.   Correct.

10:11:17    10         DR. ROUX:  Can we go to the second page of this

11    document.

12   **DR. ROUX:  (CONTINUING)**

13        Q.   And this power of attorney expired in

14   November 2006, correct?

10:11:26    15        A.   Correct.  That's what it says.

16        Q.   And the reason you were never terminated by Signal

17   is because this power of attorney expired and they just

18   didn't use your services past that point -- or past the last

19   time they used you in 2007, correct?

10:11:41    20        A.   To my understanding, this is not a contract.  This

21   is not a contract.

22             To my understanding, power of attorney -- power of

23   attorney is given to -- this power of attorney was given to

24   me to sign if any documents were required to sign on behalf

10:12:02    25   of Signal.


**OFFICIAL TRANSCRIPT**

1    Because at that point of time, when this power of

2   attorney was given in August, Signal would have assumed that,

3   by November, all of the job candidates would be in the U.S.

4    So I believe that is the reason they have put the

5   date of November there.

6    But to me, this is not a contract.

7   **Q.**   I'm not suggesting that it is a contract.  I'm

8   referring to Mr. Bhatnagar's line of questioning.

9    Without a valid power of attorney in effect, you

10   were no longer Signal's recruiting agent, correct?

11   **A.**   Yeah.  But after -- because the -- Mr. Pol was

12   terminated somewhere I think in November.

13    And Signal -- Signal called me up.  Mr. Schnoor

14   called me up.  I think it was probably after 6 of November.

15   He called me up and he wanted to have a fresh -- you know,

16   contract with me, and he wanted to continue -- he wanted to

17   continue with the business relation with Dewan in the talk

18   that we had.

19    And even there was e-mails.  There were things that

20   itself explains that Signal wanted to continue their business

21   relationship with me and continue it further.

22    So even if this expires, Signal's intent is to do

23   further relation and wanted to enter into a new contract with

24   me.

25    THE COURT:  I want you to slow down a little so the

**OFFICIAL TRANSCRIPT**

1  court reporter can get your testimony.

2          THE WITNESS:  Okay.

3          DR. ROUX:  And I'm going to try to be slower, too,

4  for the court reporter.

10:13:36   5  **DR. ROUX:  (CONTINUING)**

6      Q.   But you are not currently Signal's recruiting

7  agent, because there is no power of attorney in effect with

8  you, correct?

9      A.   No, this does not say that.  Because the earlier

10:13:46  10  power of attorney, when -- along with the demand letter,

11  because along with this power of attorney, the demand letter

12  was not sent to me.

13          So I had earlier two demand letters and power of

14  attorneys, and that is valid until the last candidate is sent

10:14:05  15  to Signal.

16      Q.   But today, as you sit here, you are not Signal's

17  recruiting agent because those events have transpired?

18      A.   I cannot say that, that I was not Signal -- yeah, I

19  can say that I was not directly -- directly appointed by

10:14:22  20  them.

21          I was at that point of time -- when this power of

22  attorney and the previous power of attorneys were given to

23  me, I was appointed by Mr. Pol and by three demand letters

24  with Signal.

10:14:35  25          But I cannot say that by just this power of

**OFFICIAL TRANSCRIPT**

1   attorney expiring that -- that the -- I'm no more the

2   recruiting agent for Signal.

3       Q.   Let's talk about Mr. Pol.

4            DR. ROUX:  Can I see Exhibit 17.

10:14:52  5  **DR. ROUX:  (CONTINUING)**

6       Q.   Do you recognize this document?

7       A.   Yes, I do.

8       Q.   And this is the multilateral business agreement

9   that you, Mr. Pol, and Mr. Burnett entered into in 2004 when

10:15:03  10  you were doing the earlier recruitments, correct?

11      A.   Yes, correct.  This was -- this was -- this

12  multilateral business agreement was done for J & M.

13           DR. ROUX:  And could we go to Page 2.

14  **DR. ROUX:  (CONTINUING)**

10:15:25  15      Q.   And this sets out how you would split the fees from

16  that recruitment, correct?

17      A.   Yes, correct.

18      Q.   And that arrangement is similar to how you split

19  fees during the Signal recruitment, correct?

10:15:35  20      A.   Not exactly, but more or less -- more or less it

21  was same.  Not to all candidates.

22      Q.   But you split fees with Mr. Pol and Mr. Burnett?

23      A.   Yes, we did split fees, because the -- yes, we did

24  split.  Yes.

10:15:53  25      Q.   And part of the work that Mr. Burnett performed was

**OFFICIAL TRANSCRIPT**

1   legal in nature; is that correct?

2      A.   Yes.  Correct.

3      Q.   Did Mr. Pol -- did Mr. Burnett ever tell you that

4   under his professional obligations, he may not split legal

5   fees with a non-lawyer?

6      A.   I'm sorry.  I need to get the question again.

7      Q.   Okay.

8          Did Mr. Burnett ever tell you that under his

9   professional obligations as a lawyer, he may not split fees

10  with a non-lawyer for legal work?

11     A.   No.

12     Q.   Did he ever talk to you about conveying information

13  to the candidates about how he was dealing with the funds

14  they deposited with him?

15     A.   No.

16     Q.   Did he ever talk to you about his trust account?

17     A.   Yes.  Yes, I -- yes, I think I do remember that.

18  Something he mentioned to me about an escrow account or

19  something like that.

20     Q.   Did he ever provide information to the workers

21  through you on fees that he had actually earned as opposed to

22  holding in the trust account?

23     A.   No.

24     Q.   And you earlier testified that you felt deceived by

25  Mr. Burnett about the way the H-2B and green card process

OFFICIAL TRANSCRIPT

1    worked?

2         A.   Yes.

3         Q.   And did you feel deceived by Mr. Burnett when the

4    J & M recruitment was unsuccessful?

10:17:26   5         A.   Yes.

6         Q.   And when you learned of how the green card and H-2B

7    visa processes actually worked in 2007, you said that you

8    were -- what was the word that you used?  How did you feel

9    about that when you first came to learn of that?

10:17:46   10         A.   I said I was upset about it.

11         Q.   You were upset about it.

12              And you were upset because you had been deceived by

13    somebody that you worked with, correct?

14         A.   Yes, correct.

10:17:55   15         Q.   And you had worked with him for many years,

16    correct?

17         A.   Correct.

18         Q.   And you felt that he had deceived the workers, is

19    what you said, correct?

10:18:02   20         A.   Yeah.  If I was deceived, then obviously the

21    workers were also deceived.

22         Q.   And Signal was also deceived by Mr. Burnett,

23    correct?

24         A.   I mean, I cannot comment on that.  But if there is

10:18:16   25    something that Mr. Burnett must -- should have told -- should


                        OFFICIAL TRANSCRIPT

1    have told Signal about, which I would not know because I was

2    back in India.

3        Q.   So did you have any reason to believe that anyone

4    in this situation other than Mr. Burnett knew how this

5    process worked?

6        A.   At that point of time --

7             MR. BHATNAGAR:  Objection; speculation.

8             DR. ROUX:  I asked about his personal knowledge.

9             THE COURT:  Overruled.

10       A.   See, my personal knowledge was that Malvern was

11   appointed an immigration lawyer.  But at the same time,

12   Signal could have made their own choice.

13            They would have -- or they should have said that we

14   want to -- whatever, you know, they wanted to do, the process

15   that they wanted to do, they could have taken a second

16   opinion on that.

17   DR. ROUX:  (CONTINUING)

18       Q.   But you felt deceived by Malvern Burnett, correct?

19       A.   Yes, I did.

20       Q.   Do you have any reason to think that Signal was not

21   equally deceived by Mr. Burnett?

22       A.   I cannot comment about equally deceived or not.

23            But, yes, if he had not passed the information --

24   correct information that should have been passed, then

25   definitely I have other reasons to believe that.


                          OFFICIAL TRANSCRIPT

1    **Q.**   I'm going to talk some more about the J & M
2    candidates.
3         There was testimony earlier in this trial that the
4    workers that initially came to Signal were skilled, but the
5    later workers that came towards the tail-end of the
6    recruitment had a significant number that were both unskilled
7    and unfamiliar to the testers.  There is also testimony that
8    those later workers paid more fees.
9         Do you -- and you've testified you think that the
10   J & M candidates were sent later; is that correct?
11   **A.**   Yes.  But the J & M candidates were also tested by
12   Signal in -- specifically I remember that they all came down
13   to Chennai for testing.  And J & M candidates and Zito
14   candidates and IAS candidates were tested by Signal.
15   **Q.**   How do you explain Mr. Shouse's testimony that the
16   later waves were unfamiliar to him, that he hadn't seen any
17   of them?
18   **A.**   I would not know because I was not there during his
19   testimony.
20   **Q.**   At the time that you were sending J & M candidates
21   to Signal, it was your impression that the green card process
22   would be completed in 12 to 14 months?
23   **A.**   Yes.  Correct.
24   **Q.**   Or 18 to 24 months, excuse me.
25        But was that the same timeframe that you had

**OFFICIAL TRANSCRIPT**

10:20:01
10:20:20
10:20:45
10:20:59
10:21:18

1    anticipated with the J & M recruitment process initially?

2         A.   Yes.  Correct.

3         Q.   And that didn't come to pass, did it?

4         A.   Sorry?

5         Q.   That didn't come to pass?  Those workers didn't get

6    green cards through J & M in 18 to 24 --

7         A.   Yes, they didn't get.

8         Q.   I'm sorry?

9         A.   Yes, they did not.

10        Q.   And you had originally conducted the J & M

11   recruitment with Mr. Burnett's deception about how long that

12   process would take, correct?

13        A.   Yes.  Correct.

14        Q.   And so you were already on notice that that was an

15   unreasonable time estimate, weren't you?

16        A.   Yes.

17        Q.   And yet you sent these workers to Signal with the

18   same timeframe starting a new process, didn't you?

19        A.   Yes, I -- yes, I did send them with the -- with the

20   same understanding, because the understanding that was given

21   to me by Mr. Burnett, that the -- that the priority dates

22   that had backlogged would become current in 12 months.  This

23   was the understanding given to me.

24             So putting the labor certification PERM process and

25   the I-140 together, the processing time of six to eight

**OFFICIAL TRANSCRIPT**

1    months for each process, I -- it gave me all the reasons to
2    believe that within this time -- six to eight months, that is
3    about twelve to fourteen months, the labor certification and
4    the I-140 will be completed.  And by the time in 12 months,
5    the priority dates will become current.

6           So I had all the reason to believe that the process
7    would be completed in 24 months.

8    Q.    You just testified that when you started the J & M
9    process, they were promised in 18 to 24 months it would be
10   green cards.  They didn't get green cards.  You felt
11   Mr. Burnett had deceived you.

12          You sent workers on another process that had the
13   same timeframe, relying on the same person you felt deceived
14   you; and then when it turned out that it happened again, you
15   felt -- you still say you felt deceived.

16          Don't you think that's unreasonable?

17   A.    Yes.

18   Q.    And when you came to this understanding in 2007 at
19   Signal of how the process actually worked, you didn't
20   actually tell anyone at Signal what you discovered, did you?

21   A.    Sorry?

22   Q.    I said, when you came to this realization of how
23   this process actually worked, you didn't actually tell anyone
24   at Signal what you had discovered, did you?

25   A.    No, I didn't -- I don't recollect or I don't recall

**OFFICIAL TRANSCRIPT**

1    that.

2        **Q.**    And you didn't tell them that some of those

3    candidates that were unhappy were also unhappy because this

4    is the second time that this had occurred, did you?

5        **A.**    I don't recall that.

6            But the -- Signal's -- if -- even if I have not

7    told Signal, but Signal understood that, because Signal was

8    present during the meetings when I was -- when I was

9    explaining and telling the candidates -- when I was

10   explaining and telling the candidates, John Sanders was

11   present there.

12           When I was telling them -- when I was explaining

13   them that the green card or the permanent resident visa

14   cannot be applied, only after -- it can only be applied after

15   the second extension, Signal was present there.

16           So when they were hearing me talking to so many

17   people -- and I was repeating the same thing in English and

18   also in Hindi to the workers.  And we did this in groups.  We

19   did not do this one time.  We addressed the day workers and

20   we addressed the night-shift workers separately.

21           So it was not that Signal was not aware even if I

22   didn't mention to them, because he was present there when I

23   was mentioning or when I discovered this.

24       **Q.**    But not once during that time did you volunteer the

25   information that some of those candidates had come from the

**OFFICIAL TRANSCRIPT**

1    J & M recruitment, and that you shifted them to Signal like a

2    hot potato, did you?

3         A.   Sorry.  I need the question again.

4         Q.   I said, not once during that timeframe did you

10:25:27   5    reveal to Signal that some of those candidates came from

6    J & M, and that you had shifted them from one recruitment to

7    the other like a hot potato?

8         A.   Yes, because I had already -- I had only informed

9    Mr. Pol about it, and Pol told me that he has discussed this

10:25:46   10   with Signal.

11        Q.   That's your testimony, that Mr. Pol said that he

12   told Signal about J & M?

13        A.   Yes.

14        Q.   And the reason that you sent J & M candidates was

10:26:01   15   because you couldn't recruit all new candidates with them

16   making such a fuss in India, correct?

17        A.   Sorry?

18        Q.   The reason you sent J & M candidates in the first

19   place was because they were unhappy and they were spreading

10:26:12   20   rumors about what had occurred with their process, which was

21   inhibiting your ability to recruit all new workers for

22   Signal?

23        A.   Yes.  To some extent, that would be correct.

24             DR. ROUX:  Can we see Exhibit 1895.

10:26:26   25             Can you blow up Item 4.


                         OFFICIAL TRANSCRIPT

1    DR. ROUX:  (CONTINUING)

2        Q.   Can you read this, Mr. Dewan?

3        A.   Yeah.  (As read:)  You and Mal know the reason why

4    500 candidates passed the test during Signal interviews and

10:26:48    5    only 200 came forward with the advance.  The reason are the

6    old groups who are waiting for three years.

7             DR. ROUX:  Go back to the full documents.

8    DR. ROUX:  (CONTINUING)

9        Q.   Do you recognize this e-mail?

10:27:03    10        A.   Yes, I do recognize this e-mail.

11        Q.   It is from you to your business associates,

12    Michael Pol at Global Resources and Malvern Burnett, correct?

13        A.   Correct.

14        Q.   And you're discussing the J & M workers here,

10:27:13    15    aren't you, and the other workers from the prior

16    recruitments?

17        A.   Yes.  I think it is not only J & M.  It's referring

18    to IAS, it's referring to Zito, and J & M.

19        Q.   And these are all the recruitments prior that

10:27:32    20    expected green cards in 18 to 24 months and didn't get them,

21    correct?

22        A.   Yes.

23        Q.   And they are causing problems for you in India,

24    correct?

10:27:39    25        A.   Yes.  Correct.


                         OFFICIAL TRANSCRIPT

1    **Q.**   And so you shuffled them to Signal to get rid of

2    them, correct?

3    **A.**   No, I didn't -- it was not my -- like an idea or I

4    went out to them.  They started -- initially they started

10:27:51   5    coming to us and -- when they heard about the Signal visas

6    getting approved at the consulate.

7    **Q.**   But they were causing some of the workers that had

8    been recruited and tested by Signal to not come forward, and

9    you replaced those candidates with these candidates?

10:28:16   10    **A.**   Yes.  Because at that point of time, the H-2B was

11    not a clarity.  And the permanent resident visa process were

12    delayed for the previous candidates, and H-2B was only a

13    backup plan because nobody was sure if the H-2Bs would be

14    granted.

10:28:36   15         So at that point in time, H-2B -- sorry, the

16    permanent resident visa process was like the main thing.  So

17    that was the understanding, that they would be delayed.  So

18    there were probably -- you know, some of them would be

19    working with them in the same companies.

10:28:53   20    **Q.**   And you sent these unhappy workers to Signal.  And

21    when problems occurred at Signal, you went twice, in January

22    and March of 2007, to Signal, correct?

23    **A.**   The unhappy workers at Signal -- I mean, are you

24    relating that to J & M?

10:29:13   25    **Q.**   J & M, Zito, and Indo-AmeriSoft.  You shifted

**OFFICIAL TRANSCRIPT**

1    workers from those prior recruitments to Signal, and they
2    were unhappy when they got to Signal.

3           And in response to the problems that occurred, you
4    went in person to Signal in January and March of 2007, didn't
5    you?

6       A.    Not only the candidates who were J & M, Zito, and
7    IAS were unhappy, but even the direct recruits of Signal were
8    also unhappy.

9       Q.    But in January and March of 2007, you didn't tell a
10   single soul at Signal that some of these workers had been
11   waiting between three and four years for what was originally
12   supposed to be an 18-to-24-month visa process and had been
13   initiated before they ever heard the name Signal
14   International or Pascagoula, Mississippi; isn't that correct?

15      A.    I had no reason -- no reason to tell Signal,
16   because all these J & M, IAS, and Zito recruits had signed a
17   declaration, and they were informed that the old process
18   would be canceled.  And they would -- whether he was a J & M
19   or IAS and he has come to Signal, he is just like a direct
20   recruit.  He is just like a direct recruit.

21          So there was no necessary because -- because they
22   were -- they had already given up their previous green card
23   process.  So they were like a fresh candidate to Signal.

24      Q.    But that's not true, is it?  Because later you and
25   Mr. Burnett filed I-140s on behalf of those workers through

10:29:27
10:29:48
10:30:07
10:30:30
10:30:48

OFFICIAL TRANSCRIPT

1  J & M.

2      A.   Absolutely incorrect.  I was not involved in that.

3      Q.   But Mr. Burnett was?

4      A.   I cannot comment for him.  But I was 110 percent

10:31:05   5  not involved into that.

6      Q.   Ultimately, at the end of the recruitment -- at the

7  end of the H-2B visa program at Signal, Signal applied for

8  green cards for every single worker that stayed until the end

9  of the program; isn't that correct?

10:31:23   10      A.   Yes.  That's what I heard, yes.  And the happy --

11  the workers that were working at Signal, Signal applied for

12  the green cards for them.

13      Q.   They were happy.  They stayed until the end of the

14  program.  They went back to India, and Signal applied for

10:31:40   15  green cards on their behalf?

16      A.   Correct.

17      Q.   And if all the workers that had left Signal hadn't

18  left and had stayed until the end of the program, Signal

19  would have applied for green cards for them, too, but because

10:31:57   20  they left, Signal couldn't?

21           MR. BHATNAGAR:  Objection; speculation.

22           THE COURT:  Overruled.

23  DR. ROUX:  (CONTINUING)

24      Q.   You can answer.

10:32:07   25           THE COURT:  You can answer.


                         OFFICIAL TRANSCRIPT

1    A.   Yeah, I think if they had stayed, yeah, with

2  Signal.  But if they had stayed with Signal, Signal would

3  have -- would have applied or not applied.  I don't know.

4         But what -- but what I'm seeing now that Signal

5  is -- was blaming us that we made these false promises.  I

6  mean, this is absolutely incorrect.

7         So it's very difficult notion to answer whether it

8  is a yes or a no, because there is a lot of -- you know,

9  things that I have seen.  And I personally feel that Signal

10  filed this only because of the lawsuit.

11  DR. ROUX:   (CONTINUING)

12    Q.   You would agree that the reason Signal thought that

13  the false promises were being issued was because Mr. Burnett

14  had deceived everyone about how the process worked?

15    A.   Yes, I do believe that that is one of the reasons.

16         But as I said, that Signal should have taken --

17  because when the contract was made -- that is what I got to

18  know.  When the contract was made, it was made by Signal

19  lawyers, so Signal lawyers should have done research on it

20  before even Michael Pol appointed Burnett.

21    Q.   Which contract are you referring to?

22    A.   The Global and Signal contract.

23    Q.   The Global agreement was provided to Signal by

24  Global, wasn't it?

25    A.   What I know of that, it was drafted by Signal.

**OFFICIAL TRANSCRIPT**

1      Q.   And, in fact, the power of attorney that we just

2  looked at was drafted by Malvern Burnett, wasn't it?

3           MR. CERNIGLIA:  Objection, Your Honor.  There is no

4  testimony.  It is beyond the scope.

10:33:51    5           DR. ROUX:  It was testified to by Lisa Spears.

6           THE COURT:  It's on cross.  It's overruled.

7           THE WITNESS:  Sorry?

8           THE COURT:  You can answer.

9           THE WITNESS:  Give me the question again.

10:34:00   10  DR. ROUX:  (CONTINUING)

11      Q.   The power of attorney that I just showed you a few

12  minutes ago was drafted by Mr. Burnett, wasn't it?

13      A.   The power of attorney that was given to Dewan.

14      Q.   That I showed you a few minutes ago.

10:34:11   15      A.   I don't know about that.

16           To my belief, I think all of these -- the drafting

17  was done by Signal.

18           And I used to get e-mails from Lisa Spears, who was

19  the -- I believe the legal consultant.  I used to get e-mails

10:34:30   20  from her on all of these contracts and documents.

21      Q.   And you testified that you gave refunds to any

22  workers that didn't want to come or continue with the

23  programs, correct?

24      A.   Yes.

10:34:51   25      Q.   And you are still giving refunds?

OFFICIAL TRANSCRIPT

1      **A.**   Correct.

2      **Q.**   Did any of the plaintiffs in this lawsuit ask you

3   for a refund?

4      **A.**   I don't recall that.

10:34:59   5      **Q.**   But if they had asked you, you would have given

6   them one?

7      **A.**   Absolutely correct.

8           DR. ROUX:   I have no further questions, Your Honor.

9                         **CROSS-EXAMINATION**

10:35:17   10   **BY MR. CERNIGLIA:**

11     **Q.**   Good morning, Mr. Dewan.  My name is Tim Cerniglia.

12     **A.**   Good morning.

13     **Q.**   I represent Mr. Burnett.

14          I want to ask you about, to start off, the annexure

10:36:02   15   agreement that we have seen.  And I'm going to show you

16   Exhibit No. 498.

17          This is something you testified that Mr. Burnett

18   asked to notify all of the previous candidates, J & M

19   candidates?

10:36:45   20     **A.**   Correct.

21     **Q.**   IAS candidates?

22     **A.**   I think so.

23     **Q.**   Now, this was given -- you said you got this

24   sometime in late 2005 or early 2006?

10:37:10   25     **A.**   Correct.

**OFFICIAL TRANSCRIPT**

1    Q.    Okay.  So at the time that this was -- information

2 was imparted to you, it was that at that time, late December

3 '05 or early '06, the priority dates were backlogged.  That

4 was the information being conveyed, right?

5    A.    Correct, sir.

6    Q.    And that was true?

7    A.    Yeah.  It had backlogged, that is true.  But --

8 that's true.

9    Q.    Now, does --

10    A.    But -- just let me add.  But it -- which took place

11 in July 2005 was wrong.

12    Q.    That was wrong.

13         Now, do you understand that in one column on the

14 website for the State Department, that there is for worldwide

15 availability and the next column is India?  Have you ever

16 been explained that?

17    A.    Sorry, I don't...

18    Q.    Let me ask you this:  When Mr. Burnett was in India

19 after the Signal recruitment started, do you recall him

20 giving you the website gov.com?

21    A.    Yes, I do recall that.

22    Q.    And he gave you that so you could check up on

23 priority dates to keep track of the priority dates?

24    A.    Yes.

25    Q.    And I'm going to ask you if you recall that there

OFFICIAL TRANSCRIPT

1    are different columns for different countries and worldwide?

2         A.   Yes.

3         Q.   If he made a mistake when he was drafting this and

4    looked across and saw the July date for worldwide as opposed

5    to January, he is not trying to mislead you, is he?  He made

6    a mistake?

7         A.   I mean, he knew that I'm already facing so much of

8    trouble and problems with these candidates for the past two

9    years and he had seen this with his own eyes.  Don't you

10   think it was necessary for him to put the right information

11   on the draft?

12              And if he had put the wrong information in the

13   e-mail, to have it corrected?

14              Or, too, if he had not made the correction to that

15   e-mail, at least when he realized that he had made a mistake,

16   at least to inform me that this is wrong?

17        Q.   Let me ask you this:  If you give this to somebody

18   in, let's say, January of '06, and it's backlogged, and it

19   has been backlogged since, we know now, January of '05.  What

20   does it matter if it's backlogged from January '05 or July of

21   '05?

22              By the time they get this, it is still backlogged.

23   Do you agree with that?

24        A.   I agree with that.  But he should have given me the

25   right information when it is put in writing on an annexure,

OFFICIAL TRANSCRIPT

1    which is going to be a part of an agreement.

2            I believe he should have double-checked things and

3    put it to me on an e-mail.  And if it was wrong information

4    by mistake -- which mistake happens with everybody, I

5    understand that, but he should have corrected it somewhere.

6        Q.    What if he didn't catch the mistake until the same

7    time it was pointed out to you?

8        A.    Sorry?

9        Q.    If he didn't catch the mistake until it was pointed

10   out in his deposition the same way it was pointed out in your

11   deposition, that at the time he typed it up, he thought it

12   was right, the important thing he is trying to convey is that

13   right now, January '06 is backlogged and it has been

14   backlogged.  If the first time that he finds out, oh, I had

15   the wrong July date, is the same time that you learned it, at

16   his deposition after this lawsuit, how can he let you know?

17       A.    I agree, that he made a mistake.  But even when he

18   opened up the site again to show me when he was in India, he

19   should have -- he should have realized that, you know, if he

20   is opening it again to show me.

21           I mean, I'm not an immigration expert.  I don't

22   understand.  I, first of all, didn't even understand the

23   concept of the immigration and the concept of priority dates,

24   what exactly.  Because to me, it had to be explained in a

25   simple language for me to understand.


                        OFFICIAL TRANSCRIPT

1      **Q.**   But did you understand enough to be able to check

2  the website and see whether the date for India, third

3  preference, was current or not current?

4      **A.**   Yes.  He showed me how to check whether it is

5  current or not current.

6      **Q.**   Okay.

7      **A.**   But from which date it was backlogged, I don't know

8  how to see that.

9      **Q.**   When it first started, he didn't -- you didn't

10  figure that out?

11      **A.**   No.

12      **Q.**   Okay.  Now, I want to direct your attention to the

13  last sentence here speaking about the priority dates.

14          (As read:)  As this depends entirely on allocation

15  of visas by the U.S. Department of State, we can only give

16  you an estimate of how long it takes.

17          Have I read that right?

18      **A.**   Yes.

19      **Q.**   Now, an estimate is just that, an estimate, right,

20  a best guess?

21      **A.**   Yes.

22      **Q.**   And his best guess at this time, based on his

23  experience, was that -- the sentence ahead of that, that he

24  believes that within 12 months, the priority date will become

25  current.

**OFFICIAL TRANSCRIPT**

1      Once again, the word "belief," my best belief, my

2  best guess, that is still an estimate, right?

3      A.   I -- sitting here today, I definitely, definitely

4  don't understand.  If he made this -- if he made this a part

5  of the annexure, he -- being an expert in immigration and

6  practicing for so many years, he should have told me, Sachin,

7  this is going to take -- the estimation I'm giving of this

8  12 months can take up to ten years, can take up to five

9  years, can take up to seven years.

10      He should have at least mentioned this to me.

11      Q.   Is it just as bad to give up all hope and use a

12  number that is going to just make everybody not even try to

13  come to the United States as opposed to giving them your best

14  estimate?

15      If you are asked to give your best estimate, do you

16  automatically try and think of the very worst-case scenario

17  or do you think what you really believe is the best estimate?

18      What would you do?

19      A.   As far as I understand, I understand when you say

20  delays or when you say you cannot give an exact estimate.

21      If he has mentioned to me twelve months, I would

22  have -- and I feel he had mentioned eight months to me

23  earlier, eight to nine months.  Then we had few -- I think we

24  had a discussion, and we had changed it to 12 months.

25      Considering there could be some delays, which I

**OFFICIAL TRANSCRIPT**

1   thought probably would be -- instead of eight months it would

2   be ten months or it would be twelve months, so maybe a four-

3   to five- or six-month delay.  This is what was in my mind.

4          Had I known this is going to take another five to

5   seven years or ten years, I would have never accepted to go

6   ahead.

7      Q.   In fact, do you recall an e-mail from him in

8   mid-'06 where he was forwarding you copies of a Senate bill

9   that had passed, saying that if this goes through, the

10  priority dates can become current?

11     A.   Yes, I do remember that.

12     Q.   So all he can do is what any human being can do, he

13  can give you his best estimate, right?

14     A.   Yeah.  I mean, it's very easy to say.

15          But knowing that what I was facing with the

16  candidates, he should have told me that, Sachin, this could

17  take -- this could take even longer.  This could take five

18  years, this could take ten years.

19          To me, an estimate of a delay is not like five to

20  ten years when he already knew that the candidates had so

21  much anxiety, they were upset in just two years.

22     Q.   Well, I want to ask you about that right now, in

23  fact.

24          We were just looking at Exhibit 1895, and I'm going

25  to show it to you again.


**OFFICIAL TRANSCRIPT**

1        And this is the e-mail that counsel for Signal was

2    just showing you.

3        And he showed you Number 4, "you and Mal now know

4    the reason why 500 candidates passed."

5        And when you say "the reason are the old group has

6    been waiting three years," by that you meant that the H-2B

7    people were saying, well, if nobody is getting a visa, we're

8    not interested, right?

9        A.   Sorry.  I need to get the question again.

10        Q.   Okay.  The reason that only 200 came forward was

11    because the old group had not yet obtained visas?

12        A.   Correct.

13        Q.   And the old group, they wanted to go to the

14    United States to start earning higher wages?

15        A.   Yes.

16        Q.   And they were upset because the earlier -- I mean

17    the later groups, the ones that were doing Signal, were

18    getting to go and they weren't?

19        A.   Yes.  I would agree to that statement, that they

20    were upset that people -- all these J & M and IAS and Zito

21    were waiting for almost two to three years, and they were --

22    these candidates who applied in June of 2006 were getting

23    their visas and were getting to go to the States to work.

24        Q.   So you were asked about whether you were

25    transferring unhappy workers.


                    **OFFICIAL TRANSCRIPT**

1          Actually, the workers that got to go, including

2     from J & M and Zito, they were very happy because they were

3     able to now go to the United States and earn higher wages?

4          A.    Yeah, they were happy.  They were happy to go.

10:48:27    5     Otherwise, they would have not come forward to go on an H-2B

6     visa because they were given an option.

7               Not everybody from J & M -- J & M had over 200

8     candidates and only about 120 came forward to join Signal.

9     So they had a choice.

10:48:43   10          Q.    All right.  Now, let me get back to the first time

11     that you met Mr. Pol was with the Avondale recruitment?

12          A.    Yes, sir.

13          Q.    And Pol -- Michael Pol was the one that used

14     Malvern Burnett, and that's where you met him?

10:49:07   15          A.    Correct.

16          Q.    And Malvern Burnett was there to do the immigration

17     paperwork, consulate interviews?

18          A.    Correct.

19          Q.    That was strictly and solely only an H-2B concept,

10:49:26   20     right?

21          A.    Correct.

22          Q.    The workers were going to come back to India when

23     the visa was over?

24          A.    Correct.

10:49:33   25          Q.    And you knew that it wasn't going to automatically

**OFFICIAL TRANSCRIPT**

1    turn into a green card?

2        **A.**   Correct.

3        **Q.**   Because Michael Pol's company,

4    International Marine Industrial [sic], they didn't say they

10:49:55  5    were going to file a green card for these people after the

6    visa was over?

7        **A.**   Correct.

8        **Q.**   But you knew and they knew that just because you

9    got the H-2B doesn't mean you automatically get a green card?

10:50:08  10       **A.**   Correct.

11       **Q.**   To do that, you have to file a separate document?

12       **A.**   Correct.

13       **Q.**   Now, you first heard about Signal from Michael Pol

14   by telephone sometime in April, you said, of '06?

10:50:30  15       **A.**   Yeah.   April or May, something like that, yeah.

16       **Q.**   And then he came to India in April of '06?

17       **A.**   I don't exactly remember, but, yeah, it was either

18   April or May.   Something like that.

19       **Q.**   The information that you learned -- that Signal was

10:51:07  20   going to first try with an H-2B, and if that doesn't work, if

21   it gets denied, then they would sponsor immediately the

22   workers for a green card -- you learned that from Michael

23   Pol?

24       **A.**   Yes.

10:51:20  25       **Q.**   And the information was that if it was granted and

**OFFICIAL TRANSCRIPT**

1    the workers were then in the United States -- they would try

2    for an extension first, and if that didn't work, then Signal

3    would sponsor them for a green card?

4         A.   Correct -- no.  I need to hear that again, please.

5         Q.   Okay.

6              You knew that if the H-2B is granted --

7         A.   Yeah.

8         Q.   -- then the next -- when that visa ran out -- or

9    before it ran out, the first thing that was going to be tried

10   was an extension of the H-2B; and if that didn't work, Signal

11   was going to sponsor them for a green card?

12        A.   No, that was not my understanding.

13        Q.   Well, you understood, I believe you said, that if

14   the H-2B was not granted, you explained to the workers that

15   they were going to have to return to India?  You said that

16   several times.

17        A.   If H-2B were not granted?

18        Q.   If the H-2B extension was not granted --

19        A.   Okay.

20        Q.   -- the workers would have to return --

21        A.   Yes.

22        Q.   -- and they would have to return to wait for the

23   green card process to be finished?

24        A.   Yes.

25        Q.   Okay.  So you knew, then, that there would be an

**OFFICIAL TRANSCRIPT**

1    extension.  That is what Signal was going to try first.  They

2    were going to try an extension, and if it didn't work, they

3    would file for the green card but the workers were going to

4    have to come back to wait?

10:52:55    5    A.   See, that would have been only in the case if the

6    extensions were not granted.

7    Q.   Correct.  That's right.

8    A.   Only in that case --

9    Q.   Right.

10:53:04    10    A.   -- they would have to come back.

11    Because if the extensions were not granted in ten

12    months -- after ten months or within ten months, because the

13    understanding of the permanent resident visa process was 18

14    to 24 months.

10:53:18    15    So it was -- it was obvious that if the extension

16    was not granted, they would have to come back.

17    Q.   And also the plan was that if the first extension

18    was granted, then they would try a second extension.  And if

19    that was not granted, they would sponsor them for the

10:53:40    20    green card, but they would have to come back?

21    A.   Yes.

22    Q.   Now, do you recall that actually the first

23    recruiting trip by Signal was in May of 2006?

24    A.   I don't exactly remember.  It was May or June of

10:54:08    25    2006.

OFFICIAL TRANSCRIPT

1    **Q.**   Okay.  I'm going to show you a document.  It is not

2  one that you are on, but just like you were shown an earlier

3  Signal document, if it refreshes your memory.

4          This is from Bill Bingle.  Of course you know

10:54:27   5  Mr. Bingle.  And it is dated May 24th, '06.

6          And it says (as read:)  We are currently in India

7  recruiting, and to date we have made offers to about half of

8  what we need.

9          My question to you is does this refresh your memory

10:54:42   10  that Signal was actually in India recruiting in May as well

11  as in June?

12    **A.**   Could have been.

13    **Q.**   And Michael Pol was there, correct?

14    **A.**   Yes.

10:54:58   15    **Q.**   And testers from Signal were there?

16    **A.**   Yes.

17    **Q.**   And of course either you or somebody from your

18  office was there?

19    **A.**   Sorry?

10:55:08   20    **Q.**   Either you or someone from your office was there,

21  your company?

22    **A.**   Correct.

23    **Q.**   Mr. Burnett was not there?

24    **A.**   Correct.

10:55:17   25    **Q.**   And after the -- and at these seminars where you

**OFFICIAL TRANSCRIPT**

1    were present and Michael Pol was present and Signal was

2    present, what Signal was offering was explained to them?

3       A.   Yes, that was explained to them.

4       Q.   All right.  And that information would have come

5    from, once again, Michael Pol to you, and he got it from

6    Signal?

7       A.   No.  It was not -- I think the discussion -- I

8    would have had -- I had discussion with Mr. Burnett also on

9    this, because we used to have regular phone calls and --

10   between us.

11      Q.   Let me show you a document.  This is Exhibit 804.

12          Actually, before I show you that, I believe you did

13   testify, though, that all the information that you passed on

14   to the workers that Signal offered, you got that information

15   from Michael Pol?

16          That's what you testified to, to plaintiffs'

17   attorney, and I think that's what you testified to when

18   Signal was asking.  You learned that information --

19          MR. BHATNAGAR:  Objection; mischaracterizes

20   testimony.

21          THE COURT:  Overruled.

22   MR. CERNIGLIA:  (CONTINUING)

23      Q.   You learned that information from Michael Pol, you

24   learned it from Signal?

25      A.   Yes, I do.


OFFICIAL TRANSCRIPT

1      **Q.**    Now, this particular --

2      **A.**    But as I said earlier, we used to have discussion

3  with even Mr. Burnett.

4      **Q.**    Okay.

5          The first person you talked to about all of this,

6  including what Signal was offering, was from Mr. Pol?  He

7  contacted you and then he came to India?

8      **A.**    Correct.

9      **Q.**    Now, this letter -- the second sentence says

10  (as read:)  We are pleased to inform you that you have been

11  selected.

12          Well, the first it starts off (as read:)  With

13  reference to your application and subsequent test passed with

14  the clients.

15          So do I understand -- and this was for

16  Mr. Palanyandi Thangamani.  I'm assuming I'm saying that

17  correct.

18          They applied, prior to this letter, at one of those

19  meetings that Signal was testing?

20      **A.**    Yes, it is correct.  But I have already testified

21  yesterday that this -- the intent of this letter was only to

22  get the bank drafts from the bank.  The intent of this letter

23  was not to explain the worker about the process.

24      **Q.**    But you had to get information to put in this

25  letter from somebody?


**OFFICIAL TRANSCRIPT**

1          A.    Yes.

2          Q.    For example, you know that Mr. Palanyandi

3     Thangamani had applied for a job at Signal?

4          A.    Correct.

10:58:55    5          Q.    It is in reference to your application?

6          A.    Correct.

7          Q.    And somebody must have told you that he passed the

8     test for Signal.  That would be Signal?

9          A.    Yes.

10:59:04   10          Q.    And, for instance the information that we are

11     pleased to inform you that you have been selected -- that he

12     was selected, that had to have been told to you by Signal?

13          A.    Yes.

14          Q.    And so you were authorized with that -- either the

10:59:22   15     power of attorney or the demand letter, to tell this

16     candidate that, you know, congratulations, you have been

17     selected?

18          A.    Yes.

19          Q.    And then the rest of the purpose, your intent, was

10:59:36   20     so that he could go get the necessary bank drafts?

21          A.    Correct.

22          Q.    This is a letter, I take it, that you typically

23     use, the type of letter that you typically use?

24          A.    Yes, I typically use this letter.  But this is --

11:00:05   25     this understanding that I have is -- is from Mr. Burnett,


                          OFFICIAL TRANSCRIPT

1    because it was from 2003.  More or less the concept are

2    things -- the wordings and things that we used was more or

3    less the same.

4        Q.   You use more or less the same information that you

5    had in 2003?

6        A.   Yes.  Correct.

7        Q.   And of course at this time in June 23, 2006, you

8    already knew how to look up on the -- you already knew about

9    priority dates being backlogged?

10       A.   Yes.

11       Q.   Let me show you another document that has been

12   shown before.  And this is the H-2B and employment-based

13   green card.

14            I believe you indicated this was information that

15   was handed out to all the candidates?

16       A.   Yes.

17       Q.   Now, in particular, you got the information to put

18   Knight Marine & Industrial Services from Michael Pol?

19       A.   Yes, I did.

20       Q.   To your knowledge, in fact, Mr. Burnett had nothing

21   to do with Knight Marine?

22       A.   (No response.)

23       Q.   He wasn't involved in any aspect of Knight Marine,

24   that was Michael Pol?

25       A.   No, I remember he didn't do any -- I don't think he

OFFICIAL TRANSCRIPT

1    did any paperwork for any of the Knight Marine.

2        Q.    He was going to do it for Signal, if anybody

3    accepted?

4        A.    Yes.

5        Q.    And in this document, the candidate is also told

6    that there is a backlog, right?

7        A.    Correct.

8        Q.    It is the same thing.  It says that as it is

9    entirely on the allocation of visas, we can only give an

10   estimate.

11            Of course, one of the estimates that he gave was

12   12 months, but it was only an estimate.  These candidates all

13   knew that?

14       A.    Correct.

15       Q.    On the consular interviews -- or interviews for the

16   consulate, you would have actually assisted in the

17   preparation of the applications for the candidates' visas?

18       A.    Sorry.  Give me the question again.

19       Q.    Let me find it.

20            Yesterday you testified that you could not recall

21   the name -- the number of the document that the workers would

22   have to fill out in order to apply for a green card -- an

23   H-2B visa?

24       A.    Yes.  The application for the consulate, right?

25       Q.    Correct.


                    **OFFICIAL TRANSCRIPT**

1        A.    You're correct.

2        Q.    You helped in having that document actually filled

3  out with the worker's information and stuff on it?

4        A.    Yes.   Correct.

5        Q.    So you have seen that document before?

6        A.    Yeah, of course I've seen it.

7        Q.    I mean, you know what it looks like, not each

8  individual particular document.

9        A.    Yeah.   I remember what it looked like, but it has

10  changed now.

11        Q.    Let me show you.

12              This is a blank form.   Does that refresh your

13  memory of what it would look like, that (indicating) and that

14  (indicating), and have information?

15        A.    Yes.

16        Q.    Now, one of the questions that the -- well, before

17  I get to that, you indicated that Mr. Burnett would explain

18  to them what to expect, what type of questions to expect

19  dealing with experience -- what their experience levels are,

20  where they have worked in the past, how much they are going

21  to be making.   Do you recall that?

22        A.    Correct.

23        Q.    And also one of the things that will be asked is

24  what type of visa are you here on, right?

25        A.    Yes.


                      OFFICIAL TRANSCRIPT

**Q.**   And you know from your experience that there is not just H-2B, there is a bunch of other ones?

**A.**   Yes.  Correct.

**Q.**   So the workers had to know that the proper terminology is H-2B, right?

**A.**   Yes, correct, because at that point of time, they were going to the consulate not for the permanent resident visa, but they were going to the consulate for the H-2B visa.

**Q.**   And the most important thing was that the workers understand their experience and be able to demonstrate to the consulate that they have the requisite experience that they are being asked about or being hired for?

**A.**   Correct.

**Q.**   And the next most important thing was that they understood that at the end of the visa, if no extension is granted, that they would have to return back to the United States?

**A.**   Correct.

**Q.**   And that was told to all the applicants?

**A.**   Yes.  If the -- yes, it was told about the ten-month visa, yes.

**Q.**   And do you also recall that Mr. Burnett would also always tell them, "and no matter what, always tell the truth"?  "If you are asked a question, tell the truth."

**A.**   I remember that.

OFFICIAL TRANSCRIPT

1    Q.   The J & M candidates, as I understand the
2    testimony, the ones that have been waiting, no one can
3    guarantee what the federal government is going to do one way
4    or the other?
5         Would you agree with that?
6         Especially when it comes to immigration.
7    A.   Sorry.  I need to hear the question again, please.
8    Q.   Would you agree that no one can guarantee what the
9    United States government is going to -- how much time it is
10   going to take to do anything?
11   A.   Yes, I agree with that.
12   Q.   Just like you can't guarantee that the
13   U.S. government is going to approve or will grant any
14   application for a green card?
15   A.   Yes, I agree with that.
16   Q.   And you also -- for the H-2B, you couldn't
17   guarantee that either?
18   A.   Yes.
19   Q.   And all the workers understood that?
20   A.   Sorry.  Again?
21   Q.   All the workers understood that there are no
22   guarantees?
23   A.   Yes.
24   Q.   The J & M workers, though, when the delays -- the
25   backlog occurred and continued to happen, you gave them three

OFFICIAL TRANSCRIPT

1    choices, right?  They can back out, get a refund -- and you
2    did that, right?
3         A.    Yes.
4         Q.    You could continue to wait, and if it goes through,
5    then you can go on your permanent green card?
6         A.    Yes.
7         Q.    And of course the third option was to go to Signal
8    on an H-2B visa?
9         A.    Yes.
10        Q.    And get sponsored by them for a green card?
11        A.    By cancelling the previous -- the previous
12   application.
13        Q.    Oh, yeah.  The previous decision to try and go with
14   J & M?
15        A.    Yes.
16        Q.    You do know that a lot of candidates for J & M did
17   elect to wait for the I-140 to be filed?
18        A.    Yes.  Almost 50 percent.
19        Q.    And Mr. Burnett filed for just about all of those,
20   all of those that still wanted to go forward with the system,
21   right?
22        A.    Yes, more or less.  More or less.  Maybe a few may
23   have been missed out or -- I don't know, but a few -- most of
24   them got filed, yes.
25        Q.    And some were granted but later revoked, but the

OFFICIAL TRANSCRIPT

1    vast majority were just denied, right?

2         A.   Yes.  I got to know about it later, yeah.

3         Q.   And that's one of the things, there is no

4    guarantee, right?

11:10:30    5         A.   Yes.  Correct.

6         Q.   So those individuals that elected to wait, they did

7    not get the opportunity that these plaintiffs had to go to

8    the United States and to earn higher American wages?  They

9    did not get that opportunity because they decided to wait?

11:10:49   10         A.   See, to my understanding, the denials were majorly

11   not because of the -- not majorly because of the experience

12   of the worker.

13        Q.   No.  It was because J & M, they determined, didn't

14   have enough money to pay them?

11:11:07   15        A.   Exactly.  The same goes with the IAS.  And --

16        Q.   The IA --

17        A.   Mr. Pol and Mr. Burnett should have realized this

18   earlier, even before getting into this or offering me to get

19   into this.

11:11:21   20             They should have realized this, whether J & M was

21   able to -- you know, able to sponsor so many and pay so many

22   of the job applicants.

23        Q.   Now, you do admit that things can change?  For

24   example, Dr. Rao's company was totally wiped out by Katrina,

11:11:47   25   right?


                           OFFICIAL TRANSCRIPT

1    **A.**   That's true.  But that was not the main reason --

2    that was not the reason for the denials.  That was not the

3    reason he could not file.

4         He could not file because Dr. Rao did not have a

5    contract in place.

6    **Q.**   And he did not have a contract in place because his

7    office was wiped out by Katrina?

8    **A.**   That was of course -- that was a factor.  Katrina

9    was a fact.

10   **Q.**   My point only is those individuals who elected to

11   wait, they did not get the opportunity, like the plaintiffs

12   did, to come to America and earn higher wages?

13   **A.**   Sorry.  I need the question again.

14   **Q.**   The workers, the J & M workers that decided to go

15   to Signal, they did get to come to the United States and earn

16   higher wages?

17   **A.**   Yes.

18   **Q.**   The ones that were waiting on the hope that they

19   would get a green card, they didn't get to come to the

20   United States?

21   **A.**   No.

22   **Q.**   And you were asked, and it is understood, that if

23   the employer -- or if the individual that comes over --

24   better yet, let's just go to an exhibit.

25        This is one that you've seen before.


OFFICIAL TRANSCRIPT

1          This is the -- one of the memoranda of
2    understanding.  This one is with Mr. Jacob.
3          A.    Yes.
4          Q.    And you've been shown several paragraphs, but not
5    one of them that I want to now show you.  And that is
6    Paragraph -- first off, before I do that, let's go up a
7    little bit.
8                You were asked about fee splitting.
9                Do you have any idea what that means, if that is a
10   technical legal term, or does it mean something different to
11   you, that everybody has taken their particular fee?
12         A.    Sorry.  Can you show me where it is?
13         Q.    Let me back up.  You were asked the question about
14   fee splitting.
15         A.    Okay.
16         Q.    You had a fee for your services, right?
17         A.    Yes.
18         Q.    Mr. Burnett had a fee for his services, right?
19         A.    Right.
20         Q.    Did you share in any of Mr. Burnett's fees?
21         A.    No, I didn't.
22         Q.    And he didn't share in any of your fees?
23         A.    No.
24         Q.    And of course Mr. Pol had his fees?
25         A.    Yes.


                        **OFFICIAL TRANSCRIPT**

L1:13:32
L1:13:46
L1:13:59
L1:14:05
L1:14:14

1     **Q.**   And in your memoranda of understanding -- which was

2     given to and explained to all the candidates that came over

3     for Signal?

4     **A.**   Yes.

5     **Q.**   And you explained to them that the applicant

6     entered into separate agreements with the law firm and

7     Mr. Pol?

8     **A.**   Correct.

9     **Q.**   And they knew that, right?

10    **A.**   Correct.

11    **Q.**   And you had your select services that you provided,

12    right?

13    **A.**   Correct.

14    **Q.**   And Mr. Pol was the one that brought Signal over,

15    so that was his client, right?

16    **A.**   Correct.

17    **Q.**   And Mr. Burnett performed the immigration services?

18    **A.**   Correct.

19    **Q.**   I'll come back to that.

20          This paragraph that I want to show you is, first of

21    all, once again, everybody knew that they were coming over on

22    an H-2B visa for Signal, right?

23    **A.**   Yes.

24    **Q.**   And they also acknowledged that if they were -- any

25    of the applicants were in violation/breach of the

**OFFICIAL TRANSCRIPT**

1    contracts -- -first it says if he is in breach of any of the

2    contracts, if he engages in conduct which results in his

3    termination, or if the applicant voluntarly terminates his

4    employment with Signal for any reason, then the contracts

5    will be considered breached by the applicant, right?

6         A.   Correct.

7         Q.   And they were also told that if they do -- if they

8    are terminated, then Signal has to follow the law and notify

9    the Immigration Service so that the H-2B visa will be

10   revoked?

11        A.   Yes.

12        Q.   So all of the candidates also were aware that if

13   they voluntarily left Signal, they are on their own, Signal

14   is not going to sponsor them, right?

15        A.   Correct.

16        Q.   And if Signal is not going to sponsor them,

17   Mr. Burnett can't file the paperwork for them, right?

18        A.   Correct.

19        Q.   And of course if Signal fires Mr. Burnett, he can't

20   do that either, right?

21        A.   Correct.

22        Q.   Which brings me, then, to the agreement itself

23   between Global and Signal.  And you have been shown it.  I

24   will show it to you again.  But the agreement was between

25   Global and Signal, right?


                        OFFICIAL TRANSCRIPT

1       **A.**   Correct.

2       **Q.**   Now, in this agreement, much like the one they sent

3   you, almost identical as we saw, Global was to provide an

4   immigration attorney, an attorney to file the paperwork,

5   right?

6       **A.**   Right.

7       **Q.**   And this was signed April 18th, 2006.

8            And you testified that you dealt a lot with a

9   Lisa Spears who was in charge of contracts?

10      **A.**   Yes.

11      **Q.**   So they had their own in-house person they would go

12  to, right?

13      **A.**   Yes.  They have an in-house legal department, I

14  believe.

15      **Q.**   Now, if in February -- all right, February '07,

16  Signal management is saying, I think we need to talk and

17  consult with our own immigration lawyer to find out what we

18  have to do under this contract, what we are responsible for,

19  that is advice that Signal should have followed, right, their

20  own attorneys?

21      **A.**   Absolutely.

22      **Q.**   If Mr. Burnett didn't tell Signal anything except

23  in an informational meeting -- not as a client, not as an

24  attorney, just informational -- that these are options you

25  have available, but -- and Signal doesn't consult their own

OFFICIAL TRANSCRIPT

```
 1   immigration attorney, how can Signal be deceived by anything
 2   Mr. Burnett may have said in such a preliminary meeting?
 3                DR. ROUX:  Objection; speculation.
 4                THE COURT:  He is on cross.  Did you say leading?
 5                DR. ROUX:  I said speculation.
 6                THE COURT:  Overruled.
 7                MR. CERNIGLIA:  That's the exact same question he
 8   asked, but the other way.
 9   MR. CERNIGLIA:  (CONTINUING)
10        Q.   There is no way, if Mr. Burnett is just talking
11   generally when -- and not as their immigration attorney, and
12   they have their own attorney and their own immigration
13   attorney, there is no way that anything Mr. Burnett might
14   have said deceived Signal?
15        A.   Absolutely correct.  Signal, as far as I know, they
16   had their own legal department.  And before signing this
17   contract with Mr. Pol, they should have taken consultation
18   through their own immigration attorney before putting up the
19   terms and conditions on the contract with Global.
20                MR. CERNIGLIA:  Your Honor, that's all I have.
21                Thank you, Mr. Dewan.
22                THE COURT:  Mr. Shapiro?
23                MR. SHAPIRO:  I have no redirect, Your Honor.
24                THE COURT:  Mr. Dewan, thank you.  You're excused.
25                DR. ROUX:  Your Honor, one question on recross.
```

11:20:11 (line 5)
11:20:20 (line 10)
11:20:41 (line 15)
11:21:02 (line 20)
11:21:10 (line 25)

OFFICIAL TRANSCRIPT

```
 1          THE COURT:  All right.  One question.
 2                  RECROSS-EXAMINATION
 3    BY DR. ROUX:
 4       Q.    Mr. Dewan, did you contact or retain your own
 5    immigration attorney to advise you in this process that
 6    Mr. Burnett worked with you on?
 7       A.    No.
 8          DR. ROUX:  Thank you, Your Honor.
 9          THE COURT:  All right.  Now, Mr. Dewan, you are
10    excused.  Thank you.
11          All right.  Are there any rebuttal witnesses to be
12    offered by any of the parties?
13          MR. HOWARD:  Plaintiffs have no rebuttal witnesses,
14    Your Honor.
15          MS. HANGARTNER:  Signal has no rebuttal witnesses,
16    Your Honor.
17          MR. CERNIGLIA:  No rebuttal, Your Honor.
18          MR. SHAPIRO:  No rebuttal from Dewan.
19          THE COURT:  Do the plaintiffs rest?
20          MR. HOWARD:  Plaintiffs rest, Your Honor.
21          THE COURT:  And Signal?
22          MS. HANGARTNER:  Signal rests, Your Honor.
23          MR. CERNIGLIA:  Burnett rests.
24          MR. SHAPIRO:  Dewan rests.
25          THE COURT:  Thank you all very much.
```

11:21:27 (line 5)
11:21:40 (line 10)
11:21:54 (line 15)
11:22:02 (line 20)
11:22:08 (line 25)

OFFICIAL TRANSCRIPT

1         All right.  What we're going to do right now is

2    take our lunch break.  And it will be a little longer than

3    usual because when you come back, we're going to do closing

4    arguments.  And so we've got to do some things to get ready

5    for that to happen.

6         So I think I would like for you to come back at

7    1:15.  And between now and then, I want you to remember all

8    the instructions that I've given you during this trial.

9         Thank you.

10                   (Jury out at 11:22 a.m.)

11         THE COURT:  All right.  Mr. Dewan, you can leave

12   the witness stand and go sit with your counsel.  Thank you.

13         Y'all have a seat.

14         Let's see.  First let's do the Dewan exhibits.

15         MR. SHAPIRO:  Your Honor, I have Exhibits 818,

16   1300, 1272, 463, 790, 804, 763, 34, 499, 607, 746, 799, 603,

17   1189, and 1085 --

18         MR. BHATNAGAR:  We have 1045.

19         MR. SHAPIRO:  I'm sorry.  1045.  I misspoke.

20         THE COURT:  1045?

21         MR. SHAPIRO:  1045.

22         THE COURT:  All right.

23         Mr. Roux?

24         DR. ROUX:  Signal offers Exhibits 27, 1272, 17, and

25   1895.

OFFICIAL TRANSCRIPT

1        MR. BHATNAGAR:  Plaintiffs offer Exhibit Nos. 790,

2   743, 1271, 254, 289, 827, 1539, 1024, 834, and 956.

3        THE CASE MANAGER:  I have two discrepancies.

4   498 --

L1:25:25    5        MR. BHATNAGAR:  That is Mr. Cerniglia.  He

6   hasn't --

7        THE COURT:  Did you have 498?

8        MR. CERNIGLIA:  You used it too.

9        THE COURT:  Mr. Cerniglia, did you use?

L1:25:36   10        THE CASE MANAGER:  He used it.  Okay.

11        MR. CERNIGLIA:  Yeah.

12        THE COURT:  What was the other one?

13        THE CASE MANAGER:  956.  I had that you put it up

14   and didn't use it.  So 956 --

L1:25:52   15        MR. BHATNAGAR:  Is that the press release?

16        THE CASE MANAGER:  The press release.

17        THE COURT:  Well, I didn't let him use it, I think.

18   So that one is not admitted.

19        MR. CERNIGLIA:  I think mine were used by everybody

L1:26:02   20   else, but I have 498, 606, 200 I used again, and 1895.

21        THE CASE MANAGER:  That's correct.

22        THE COURT:  Those exhibits are admitted.

23        Now I think that -- any other exhibits?

24        (No response.)

L1:26:20   25        THE COURT:  I think some of you have spoken to the


**OFFICIAL TRANSCRIPT**

1  clerk about reviewing the exhibits, because you all recall

2  that you all have to do a certification before they go to the

3  jury, but you don't have time after I charge the jury and

4  before they go to the jury room to go through this many

5  exhibits.

6          So if you want to -- and the exhibits don't --

7  can't leave the courtroom and the deputy clerk needs to be

8  there when people are looking at them.

9          So whoever wants to look at them before they sign

10  that certification and then they go to the jury needs to do

11  it today after closing arguments.

12          Everybody -- if you don't come, you're not going to

13  get a chance tomorrow and delay the exhibits going to the

14  jury.

15          Okay?  So we're all straight on that.

16          Then the demonstrative exhibits used during

17  closing, I understand that you all have reached agreement

18  except with respect to a portion of the audiotape of

19  Mr. Schnoor's speech.

20          Is that correct?

21          MR. HOWARD:  That's correct.

22          MS. HANGARTNER:  Yes, Your Honor.  All other

23  outstanding issues were resolved yesterday.

24          THE COURT:  Okay.  Well, do you want to make any

25  argument, Ms. Hangartner?  I think we talked about it

OFFICIAL TRANSCRIPT

1   yesterday, and I think I understand the issue.

2          MS. HANGARTNER:  Yes, Your Honor.

3          Just to add, I do believe that we should be

4   afforded the opportunity to introduce a very limited portion

5   of that testimony to balance out what Alan Howard played with

6   Dick Marler.

7          I understand that Mr. Schnoor took the stand

8   earlier, but I would like -- my emphasis is more on the

9   portion that he played for Dick Marler and had Dick Marler

10  comment on.

11         And we just didn't feel the need to -- or we felt

12  like it would be more of a burden to call Mr. Schnoor back

13  and put him back on the stand and add additional time instead

14  of just requesting Your Honor's permission to again play that

15  limited portion.

16         I appreciate your consideration.

17         THE COURT:  Thanks.

18         MR. HOWARD:  The one thing I can add in response to

19  that argument is the portion that was played for Mr. Marler

20  was the identical portion that was played with Mr. Schnoor

21  himself when he was on the stand the very first time he

22  appeared in the trial as the first witness.  It was the same

23  portion I played in opening statement.

24         And Signal had ample time at the time of

25  Mr. Schnoor's first appearance, or when they brought him back

OFFICIAL TRANSCRIPT

1    in their own case, to play whatever parts they wanted to.

2              THE COURT:  All right.  I'm ready to rule.

3              Rule 106 says if a party introduces all or part of

4    a writing or recorded statement, an adverse party may require

5    the introduction at that time of any other part.

6              And Signal did not request or require that any

7    additional portions be played at the time.

8              DR. ROUX:  Your Honor, with all due respect, we did

9    move under 106 --

10              THE REPORTER:  I can't hear you.

11              MS. HANGARTNER:  I'm sorry, I can say it.

12              Your Honor, with all due respect, we actually did

13    move under Rule 106 simultaneous -- or just prior to or just

14    after Mr. Howard played that audio clip for Mr. Marler.

15              THE COURT:  And then what did I rule?

16              MS. HANGARTNER:  You -- I believe that you ruled

17    that you would -- we would discuss it later.

18              THE COURT:  Well, then did you bring it up with me

19    later?

20              MS. HANGARTNER:  Yes, Your Honor.

21              THE COURT:  And then what happened?

22              MS. HANGARTNER:  It's kind of come to this point

23    now.

24              THE COURT:  Oh, well, I didn't mean that much

25    later.  So, you know, what --


                        **OFFICIAL TRANSCRIPT**

1        MS. HANGARTNER:  Well, I --

2        THE COURT:  You'll have to get -- you know what, if

3   you get the transcript and show me what happened then, and if

4   you brought it up again, then we'll -- then I'll look at it

5   again.

6        But, otherwise, you should have requested that at

7   that time, or shortly thereafter, that the entire thing be

8   played.

9        At the very least, you could have played it on

10  your -- when you examined him.

11       So if you can find it and you want to show me

12  something, I'll reconsider it.

13       MS. HANGARTNER:  Again, for me, it was when

14  Mr. Marler testified.  He was our last witness.

15       THE COURT:  That is when you brought it up or

16  when --

17       MS. HANGARTNER:  That's when I brought it up,

18  during Mr. Marler.

19       THE COURT:  All right.  And what was --

20       MS. HANGARTNER:  If you remember, I was out for

21  Mr. Schnoor.

22       THE COURT:  Okay.

23       Have you got it, Mr. Howard?

24       MR. HOWARD:  I have it here, Your Honor.

25       THE COURT:  What page are we on?


**OFFICIAL TRANSCRIPT**

1       MR. HOWARD:  Mr. Marler.  I was about to play it.

2   We approached.

3       Ms. Hangartner said under rule 106 that the entire

4   audio should be played, not simply the portion.

L1:30:55

5       You said overruled.  We could play part -- you can

6   play part of it if you want to.  You can only play part of it

7   if you want to.

8       So I think you are telling Ms. Hangartner at the

9   time that if she wanted to go back on redirect with

L1:31:08

10  Mr. Marler at that time and play part of it, she had the

11  opportunity.

12      MS. HANGARTNER:  And that was the issue, because I

13  didn't believe, with all due respect, that it was proper to

14  play it for Mr. Marler.  Mr. Marler wasn't present at that

L1:31:20

15  time.

16      THE COURT:  Well, you know, that's what I said to

17  you, though.  I said you can play it if you want to.  And you

18  could have done it then.

19      Obviously -- if he played it during Mr. Marler's --

L1:31:30

20  I don't know if it was his direct or cross --

21      MS. HANGARTNER:  Cross, Your Honor.

22      THE COURT:  And then you wanted to do it, play some

23  additional parts on redirect, I would have let you.  And

24  that's what I was telling you in that bench conference.

L1:31:40

25      So I -- that demonstrative exhibit is not going to

**OFFICIAL TRANSCRIPT**

1    be allowed.  I guess it is not really demonstrative, it's --

2         MS. HANGARTNER:  It's in evidence.

3         THE COURT:  Right.  But I'm not going to let you

4    play a part for the jury that you didn't play or request be

11:31:58     5    played during the trial.

6         The plaintiffs have a claim for punitive damages

7    under Mississippi law.  It is their breach of contract

8    and/or, in the alternative, promissory estoppel.

9         And the Court has to make a determination of

11:32:23     10    whether that issue should go to the jury.

11         Does anyone want to speak on behalf of the

12    plaintiffs?

13         MS. STEWART:  Yes, Your Honor.

14         Under Mississippi law, we can receive punitive

11:32:39     15    damages for breach of contract if we prove with clear and

16    convincing evidence that the defendants acted in reckless

17    disregard of the safety of others or with malice.

18         We believe we're entitled to punitive damages for

19    the breach of contract claim, because the contract, which is

11:32:57     20    the oral promises that the plaintiffs received from the

21    defendants, were reduced to writing in the submigration

22    letter.  That letter promised the plaintiffs a green card

23    sponsored by Signal once they got here to the United States.

24         Signal was aware, and its agents were also aware,

11:33:19     25    at that time that a green card was not possible under the

OFFICIAL TRANSCRIPT

1    terms that the contract laid out.

2         It was not possible for workers to get a green card

3    from Signal, while they were in the United States after their

4    H-2B visas expired, without returning first to India.

5         Because the defendants had knowledge of that and

6    still made that promise, both orally and in writing, we

7    believe that their actions were grossly negligent and in

8    reckless disregard of the rights of the plaintiffs.

9         And that's why we believe we're entitled to

10   punitive damages.

11        THE COURT:  Does anyone want to respond?

12        MS. HANGARTNER:  Your Honor, I believe this was an

13   issue that Mitch Hasenkampf was going to address, and I

14   didn't pick up on that earlier.  He is on his way.  He and

15   Mr. Weinberger should be here at any moment.

16        MR. CERNIGLIA:  I can argue my portion of that,

17   Your Honor.

18        THE COURT:  Okay.  And then we'll let him speak

19   when he gets here.

20        MR. CERNIGLIA:  Your Honor, the testimony of all of

21   these five -- Mr. Khuttan never met Mr. Burnett.

22        Mr. Palanyandi and Sony Sulekha, they made their

23   determinations after the last testing in June and before they

24   got that letter that they were referring to, which

25   Mr. Burnett -- I mean which Mr. Dewan just now testified to

OFFICIAL TRANSCRIPT

1    is something he always uses.

2         Mr. Burnett testified and those witnesses -- the

3    only witnesses that had ever met Mr. Burnett said they just

4    filled out paperwork.

5         At the time the decision's already been made, there

6    is no detrimental reliance, there is no reason for him to say

7    anything.  That's when he is there to help them with their

8    H-2B visa applications.

9         Certainly no showing of any malice or reckless

10   disregard or even lack of knowledge.

11        THE COURT:  All right.  So then we'll finish --

12   Mr. Shapiro, any argument?

13        MR. SHAPIRO:  Yeah, Your Honor.  I believe that

14   Ms. Meredith is referring to the submigration letter that

15   is --

16        THE COURT:  She said it was the submigration

17   letter -- it was oral promises reduced to writing in the

18   submigration letter?

19        MR. SHAPIRO:  Right.

20        And it is our position -- and has been our position

21   all along, and you heard the testimony of Mr. Dewan -- that

22   this letter is not -- was not a contract at all.

23        It was simply a notification of acceptance --

24   selection and acceptance.  And it was designed specifically

25   for the job candidates to go to the bank to show proof of

OFFICIAL TRANSCRIPT

1    this selection so that final payment could be made.

2            So it's our position it is not even a contract.

3    It's almost saying, well, congratulations, you have been

4    accepted to college.  Again, this is the next thing that you

5    need to do.

6            So that's our position.

7            THE COURT:  All right.  Thank you.

8            So we'll finish this.  Y'all remind me to come back

9    to it.

10           The next thing I have on my list is motions for

11   judgment as a matter of law under Rule 50.

12           And y'all know the standard is if after being fully

13   heard on an issue, there is no legally-sufficient evidentiary

14   basis for a reasonable jury to find for that party on that

15   issue, the Court may determine the issue against that party

16   and grant judgment as a matter of law with respect to a claim

17   or defense that cannot under controlling law be maintained or

18   defeated without a favorable finding on that issue.

19           And I think the cases say the moving party has to

20   specify the judgment sought and the law and the facts on

21   which the movant is entitled to rely.

22           And the party seeking relief has to submit

23   substantial evidence in support of each element necessary to

24   prevail on the claim.

25           That evidence must be viewed in the light most

**OFFICIAL TRANSCRIPT**

1    favorable to the non-movant.

2         And the movant has to show that all reasonable

3    persons would draw the same conclusions from the evidence

4    presented.

5         The -- before -- there are a few things.  One of

6    which we -- is a little confusing to me.

7         There were some Signal -- the plaintiffs and Signal

8    made claims against Global and J & M and Billy Wilks.  And I

9    want to be sure we have -- that we've tied up those loose

10   ends.

11        I don't have the minute entry or order in front of

12   me.  I know I severed the claims, I believe, against Global

13   and J & M, because -- and those are the ones that some

14   parties had obtained clerk's defaults against, and we were

15   discussing whether you could confirm a default in the trial.

16   And I think I severed those.

17        So that -- those are taken care of.

18        I can't remember about Billy Wilks who was -- was

19   he named as a defendant or --

20        MS. HANGARTNER:  J & M was named as a defendant.  I

21   believe Billy Wilks was later added as a defendant.  And then

22   J & M Marine was also added as a third defendant.

23        THE COURT:  Well, I think the J & M entities I

24   severed with Global.  If anybody can find that, that would

25   be -- I think it was maybe either an order or a minute entry,

L1:37:46

L1:38:13

L1:38:33

L1:38:48

L1:39:08

OFFICIAL TRANSCRIPT

1    but I know we talked about it.

2            But Mr. Sandler, do you remember details about

3    that?

4            MR. SANDLER:  We can certainly look for your order

5    in relation to the J & M entities.

6            Mr. Wilks, I believe, failed to answer our last

7    complaint, and, therefore, we moved for a default against

8    him.

9            THE COURT:  Well -- but, you know, I -- I don't

10   think that we anticipated confirming any defaults -- I did

11   not in this trial.  And I don't think that there is a clerk's

12   default against Mr. Wilks at this point.

13           MR. SANDLER:  We may not have yet moved for a

14   clerk's default against Mr. Wilks.

15           THE COURT:  So if anybody can find the order where

16   I severed those, maybe that will help clear it up, but I'm

17   just trying to tie up all the loose ends that I can at this

18   point.

19           MR. WEINBERGER:  I can clear things up a bit, Your

20   Honor.

21           If Your Honor please, Alan Weinberger on behalf of

22   Signal.  Good morning.

23           Your Honor, relative to Signal and the J & M

24   defendants -- Billy Wilks was one of those -- Your Honor held

25   that our cross-claim as to those defendants did not comply

                    OFFICIAL TRANSCRIPT

1   with the Fifth Circuit case concerning, and that was that

2   from Signal's perspective.

3            Thank you, Your Honor.

4            THE COURT:  All right.  Thank you for reminding me.

5            All right.  Then there were -- Signal filed, you

6   know, eight or nine or ten cross-claims, and some of those

7   have not been pursued.  They've dropped off along the way,

8   and I don't want to neglect to deal with those because they

9   were in the -- Signal's answer and cross-claim in response to

10  the Sixth Amended Complaint.

11           So Count 4 and 5 -- and that was the document --

12  this is Document 1748.

13           Counts 4 and 5 were breach of contract based on

14  unlawful acts under Indian law.

15           And I ruled that Signal had not established

16  Indian -- under Indian law the -- that Signal had not

17  established Indian law which was necessary to prove that the

18  acts were unlawful.

19           So I'm granting a judgment as a matter of law as to

20  Claim 4, dismissing that claim.

21           Then Count 6 was an Unfair Trade Practices Act.

22           I don't recall that that was -- has been dealt with

23  on the record.  I knew you weren't -- but no evidence was

24  presented on that claim.

25           So I'm issuing a judgment as a matter of law

**OFFICIAL TRANSCRIPT**

1   dismissing that claim.

2          Count 7 was detrimental reliance.

3          No evidence was presented on this claim -- that

4   claim, so I'm dismissing that on the basis of -- and granting

11:42:26   5   judgment as a matter of law.

6          Count 8 was tortious interference with contractual

7   relations.

8          No evidence was presented on that claim, so I'm

9   granting judgment as a matter of law.

11:42:38   10          Okay.  Then we've got Signal's remaining

11   cross-claims.

12          Is Mr. Hasenkampf here?  I saw Mr. Weinberger.

13          MR. WEINBERGER:  He will arrive here momentarily,

14   Your Honor.  Thank you, Your Honor.

11:42:55   15          THE COURT:  Is he going to argue these -- if there

16   are Rule 50 motions with respect to the cross-claims, who is

17   arguing this?

18          MR. WEINBERGER:  Mitchell will argue them,

19   Your Honor.

11:43:07   20          THE COURT:  All right.  I would have thought that

21   he would be here, then.

22          MR. WEINBERGER:  He will be here momentarily,

23   Your Honor.

24          MS. HANGARTNER:  My understanding is that we are

11:43:19   25   having printer issues.


**OFFICIAL TRANSCRIPT**

1           THE COURT:  I'm sorry?

2           MS. HANGARTNER:  Printer issues at the office.

3           THE COURT:  What is he trying to print?

4           MS. HANGARTNER:  I'm not sure, but that was the

5      delay.

6           THE COURT:  I hope you told him he better get over

7      here.

8           MS. HANGARTNER:  Oh, I did.  Don't worry.  I used

9      other language, but, yes.

10          THE COURT:  All right.  Then the plaintiffs --

11     let's talk about the plaintiffs, then.

12          Are there any -- do the plaintiffs have any Rule 50

13     motions?

14          MR. HOWARD:  Yes, Your Honor.

15          First plaintiffs move for a Rule 50 motion judgment

16     against Signal under 18 USC, Section 1589 for forced labor.

17          The evidence in the record demonstrates the

18     defendant Signal obtained the labor of the five plaintiffs in

19     this case both by threats of serious harm as well as by abuse

20     and threats of abuse of legal process.

21          The evidence also shows that Signal participated in

22     a scheme and plan to obtain the five plaintiffs' labor by

23     making them believe that they would suffer serious harm.

24          With respect to the serious harm threats and

25     scheme, as the Court has ruled in connection with plaintiffs'

**OFFICIAL TRANSCRIPT**

 1   TVPA claims in this case, serious harm includes financial

 2   harm as well as psychological and reputational harm.

 3         The evidence in this case is not credibly in

 4   dispute that Signal understood that plaintiffs were required

 5   to pay exorbitant recruiting fees to Signal's agents and that

 6   they went into debt to do so.

 7         And I cite Exhibit 624, Mr. Sanders' notes from --

 8         THE COURT:  You know, we --

 9         MR. HOWARD:  -- November 17th.

10         THE COURT:  I have to tell you, we do not have time

11   for you to give a long argument on each claim in your

12   complaint against each defendant.

13         MR. HOWARD:  We're only moving in Signal on four

14   claims.

15         THE COURT:  Okay.  And we don't have a lot of time

16   because we have to do the jury instructions and the jury

17   verdict form.

18         MR. HOWARD:  I'll move on.

19         THE COURT:  So if you can be succinct.

20         MR. HOWARD:  Sure.

21         So it was with knowledge of the fees and false

22   promises made to the workers, that Signal would sponsor them

23   all for green card, that Signal, nonetheless, made the

24   decision to bring hundreds of workers to Signal, including

25   the five claimants.


**OFFICIAL TRANSCRIPT**

1       And as a condition of their employment, required
2   them to live in Signal's man camp and pay Signal for the cost
3   of building the man camp.
4       An important testimony in this case was from
5   Mr. Schnoor when he testified at Trial Transcript Page 215,
6   Lines 8 to 15, that he understood when he made the decision
7   to bring the workers here, that going back to India would
8   impose, quote, a serious financial hardship on them.  And,
9   therefore, understood that that hardship was what was
10  requiring them to work at Signal, and Signal took advantage
11  of it.
12      It also follows that when Signal made threats to
13  the workers that they would have to go back to India if they
14  did not comply with Signal rule's and conditions and do their
15  work at Signal, Signal understood that those were threats of
16  serious harm, as well as the psychological and reputational
17  harm as testified by plaintiffs' expert Amy Mowl and the
18  plaintiffs themselves.
19      And further evidence is that such threats were made
20  directly.  Threats on March 8, 2007, by Mr. Schnoor to the
21  entire Mississippi camp, including the plaintiffs, that
22  Signal would let their visas expire and require them to go
23  back to India if anyone filed a lawsuit against Signal.  That
24  was a threat and also abuse of process.
25      There was also the evidence of March 9th.  I won't

L1:45:40
L1:46:01
L1:46:12
L1:46:26
L1:46:49

**OFFICIAL TRANSCRIPT**

1    elaborate on the details, but that also extended the threat

2    by Signal, the message behave and work or you will be

3    deported.

4         Going quickly -- we have all the evidence.  We have

5    a lot of the testimony we've collected on the different

6    threats, as well as the factors and the conditions to require

7    the workers to be in the man camp, to pay for the man camp,

8    otherwise they would have no choice but to go back to India,

9    which was, again, understood by Signal to be a serious

10   economic hardship.

11        So it satisfies that serious harm prong.

12        And, you know, again with respect to March 9th, it

13   is clearly the intent of Signal to set an example for all the

14   other workers with the termination of Mr. Jacob and

15   Mr. Sabulal -- not just terminating them, but how they

16   terminated them, to make an example of them that the other

17   workers were not to cause trouble for Signal.  And that is

18   further in support of the forced labor claim.

19        As far as 18 USC, 1590, we're moving for a Rule 50

20   judgment on that as well, because in addition to the elements

21   of 1589 that have been proved, 1590 just adds the elements of

22   knowingly recruiting and transporting.  And here there is no

23   dispute that plaintiffs were recruited abroad and transported

24   to work for Signal.

25        The next claim on which we're moving, Your Honor,

**OFFICIAL TRANSCRIPT**

1    is against Signal under 42 USC, Section 1981 for

2    discrimination.

3            And here, under two theories of liability.

4            First, that Signal employed discriminatory terms

1:48:47    5    and conditions of employment.

6            Signal required the plaintiffs to live in and pay

7    for the man camp.  It's undisputed by Signal.  Mr. Bingle and

8    Mr. Snyder and Mr. Marler all testified that living in the

9    camp and/or paying for the man camp was a condition of

1:49:02    10   employment for the plaintiffs and no -- and the other Indian

11   workers and no other Signal workers.

12           The paying for the man camp and living there was

13   obviously adverse.  The undisputed record is plaintiffs and

14   the other Signal non-Indian workers, working side by side

1:49:21    15   doing the exact same job, were paid the same hourly wage, and

16   plaintiffs -- and the Indian workers were taking home less

17   money than the other workers because of having to reimburse

18   Signal for the cost of building the man camp.

19           The testimony -- and we have it gathered for you,

1:49:36    20   too -- on multiple occasions is that the Indian workers were

21   the only workers at Signal from whom wage deductions were

22   taken to repay capital costs of Signal.

23           Signal housed up to 24 men per trailer.  Unhealthy

24   and discriminatory conditions.

1:49:54    25           There is also the evidence in the form of testimony

**OFFICIAL TRANSCRIPT**

1    of Signal foreman Jeffery Branson about the daily

2    disparagement and demeaning comments about the Indian

3    workers.  Obviously there's all the e-mails we've admitted in

4    evidence.

L1:50:07

5           And also importantly there is the admission of

6    Signal's head of human resources that Signal did not adhere

7    to its own anti-harassment policy, Exhibit 177.

8           And Mr. Marler's, the CEO, contention that Signal's

9    anti-harassment policy and practices at Signal during the

L1:50:24

10   time plaintiffs were there was, quote, woefully inadequate,

11   closed quote.  That's at Transcript Page 4229, Lines 5 to 9.

12          We have established that the motivating factor for

13   the decision to make these workers live in the man camp was

14   both that they were Indian and that they were H-2B employees,

L1:50:45

15   and we only need to prove one of them.

16          The fact that it was Indians -- only Indians that

17   were required to live there.  But also Signal acknowledged

18   that for the Indians, this would be better conditions.  That

19   this would be conditions that they would be happy with, happy

L1:51:00

20   campers, because they are used to living in India where they

21   are pooping in ditches.

22          It's clearly Signal did not build the man camp with

23   the intent to house any workers, it was specifically for the

24   Indian workers.

L1:51:13

25          And they also understood that because of the

OFFICIAL TRANSCRIPT

1   restrictions of the H-2B visa, these workers had no choice

2   but to sign the housing agreement, sign the agreement

3   requiring them to pay the money.

4         And so that condition as an alternative is met as

5   well.

6         I won't go further into the second element of

7   discrimination because of harassing living conditions, as

8   much as I've described what the Indian workers had to endure.

9   The woefully inadequate adherence to Signal's anti-harassment

10   policy and the nature and conditions at the man camp.

11         These affected the term or privilege of these

12   workers' employment.  That is, a condition of their

13   employment was they had to live in that man camp, and that

14   man camp was discriminatory.

15         Signal knew or should have known of the harassment

16   in question.  They got complaints upon it on a daily basis.

17   They were having meetings, they say, twice a week in the

18   man camp.  They understood these workers did not want to be

19   there.

20         They -- Signal's position is by putting in a

21   pool table or adding laundry service, that eliminated the

22   discriminating condition.

23         Our position is the evidence is clear what would

24   have eliminated it was to let the workers leave and find

25   their own homes.  Signal never did that.

**OFFICIAL TRANSCRIPT**

1          Turning to the third claim that we are moving for a

2     Rule 50 motion judgment on, it's the retaliation claim

3     against Mr. Jacob.

4          And for the full record, Mr. Jacob

5     Joseph Kadakkarappally.

6          Mr. Jacob engaged in activity protected under

7     Section 1981.  He complained about the discriminatory

8     conditions imposed by Signal on himself and the other Indian

9     H-2B workers, and went so far as to reach out to lawyers and

10    organize other H-2B workers to meet with lawyers and assert

11    their legal rights.

12         He was terminated.  That's the second element.  And

13    that is an adverse employment action.

14         It is undisputed that Signal terminated Mr. Jacob.

15         And it is really beyond credible dispute that they

16    terminated him precisely for engaging in this protected

17    action.  That is, meeting with the lawyers.

18         Exhibit 940 is Mr. Schnoor's statement, we're going

19    to terminate -- we're going to send a message to the workers

20    before the week is out that complaining against Signal and

21    imposing a legal threat to Signal will not be tolerated.

22         And his own testimony was terminating Mr. Jacob was

23    that message.

24         The story now about -- that Signal gives as the

25    alternative reason for terminating Mr. Jacob, that he was

OFFICIAL TRANSCRIPT

1   talking with someone on the rig, is just not sufficiently

2   credible to survive a Rule 50.

3          There is no written document in the record.  There

4   is no written safety warning in terms of giving Mr. Jacob a

11:54:12   5   safety warning.

6          Mr. Shouse, the supervisor of all the rig, said

7   that if someone is talking on the rig and it's posing a

8   safety threat, the first step is you talk to him.  The second

9   step is you give a written warning.  The third step is that

11:54:26   10   you actually give a three-day suspension.  And only then

11   would the fourth step be termination.

12          Signal engaged in none of those steps.

13          And the testimony in this courtroom is clear that

14   Signal did not even follow its own written policy on how to

11:54:41   15   do terminations in connection with Mr. Jacob.  He was never

16   called in.  He was never given the evidence of what he had

17   done supposedly wrong to lead to a termination.

18          It is clear from the record and the overwhelming

19   evidence, and judgment is warranted, that his termination was

11:54:59   20   retaliatory.

21          Finally, we move for a Rule 50 motion on false

22   imprisonment on Mr. Kadakkarappally, our Claim.

23          The unrebutted testimony is that Signal and its

24   hired guards from Swetman Security detained Mr. Jacob.

11:55:22   25          Darrell Snyder, his own testimony was that the

OFFICIAL TRANSCRIPT

1    worker, Mr. Jacob, and the other workers were detained.

2           Mr. Jacob's unrebutted testimony is that he was

3    detained in the TV trailer for hours under guard, and that he

4    was not even permitted to go to the bathroom.

11:55:43

5           So he -- it was not only detained, but by any, you

6    know, objective standard, the detention was unreasonable.

7    And that is the standard; looking at all the circumstances,

8    was it unreasonable.

9           And being under guard for hours with very large

11:56:07

10   security guards in a man camp in a trailer, we respectfully

11   submit is unreasonable.

12          We would also cite the Court to *Wallace v.*

13   *Thornton*, a Mississippi case from 1996, 672 So.2d 724, where

14   there was a -- it was a decision that there should have been

11:56:29

15   finding of false imprisonment and a punitive damages

16   instruction for a much shorter detention of less than an hour

17   in someone's office.

18          So we think the circumstances here warrant a

19   Rule 50 on the false imprisonment claim.

11:56:42

20          THE COURT:  Thank you.

21          Who is going to argue for Signal?

22          MR. WEINBERGER:  Your Honor --

23          THE COURT:  As I told Mr. Howard, we have to be

24   brief because we have a lot of to do.

11:56:54

25          MR. WEINBERGER:  Yes, Your Honor.


                         **OFFICIAL TRANSCRIPT**

1        Your Honor, Erin will deal with the false

2   imprisonment motion, and I'll deal with the other three.

3        THE COURT:  Actually, there are five.

4        MR. WEINBERGER:  Excuse me, five.

5        MS. HANGARTNER:  Your Honor, as to the false

6   imprisonment charge, it's Signal's position that it would

7   absolutely, based on the testimony in the record, survive the

8   move for a directed verdict.

9        Factually, this case is very different.  This is a

10  very volatile situation.  I don't think -- or I do think that

11  the record has actually established that the individuals who

12  were involved that day on March 9th did not expect it to be

13  become so emotional and so volatile.

14       If you remember, Darrell Snyder testified they were

15  pulling on the doors trying to get the doors open.

16       And then there was testimony from Mark Tanner, that

17  was actually taken via deposition, where it says:  Did you

18  tell Mr. Snyder that the Indian workers were tearing the

19  place apart?

20       His response:  I told them they was about to beat

21  the trailer down.  Me and you was in when it all went down.

22  If they would have had their way, they would have torn the

23  doors down and windows to get in.

24       This is very different, Your Honor.  These

25  individuals initially were brought in to the TV room as

**OFFICIAL TRANSCRIPT**

L1:57:14

L1:57:29

L1:57:47

L1:57:58

L1:58:12

1  directed by ICE called by Ron Schnoor, and the plan was to

2  just explain to them why they were being terminated.  A

3  number of individuals were being terminated because they did

4  not have the proper skills.  Sabulal and Joseph Jacob being

5  terminated for reasons other than that, for violating company

6  policy.

7       Unfortunately, the best intentions of Signal were

8  thwarted through no fault of their own, and the doors were

9  never locked.  This was, if anything, to keep the individuals

10  in the room safe.

11       As such, we do not believe that it is ripe for a

12  directed verdict.

13       THE COURT:  Thank you.

14       MR. WEINBERGER:  If Your Honor, please.

15  Alan Weinberger on behalf of Signal.

16       Your Honor, the mover bears the burden of proof at

17  trial.  So the first thing to do is to remember

18  Justice Stevens' -- I believe -- opinion in *Anderson versus*

19  *Liberty Lobby*:  Summary judgment is directed verdict;

20  directed verdict is summary judgment.

21       There are countless federal cases that make the

22  point that, when the party moving for judgement as a matter

23  of law bears the burden of proof at trial, it faces a heavier

24  burden in moving for judgment as a matter of law.

25       First point.

OFFICIAL TRANSCRIPT

1        Regarding the first forced labor argument,

2   Your Honor, I cannot find the exchange.  I wrote it down,

3   because it was so extraordinary when I read it.

4        I'm hoping that you may recall an exchange that

5   occurred between Mr. Howard and Mr. Schnoor.

6        Mr. Howard had been questioning Mr. Schnoor at

7   length and pointedly, of course, about the forced nature of

8   this labor.

9        And Mr. Schnoor said, I deny that categorically.

10  This wasn't forced.  It wasn't like that.  You're wrong about

11  this.

12       And Mr. Howard said, we will let the jury decide.

13  Mr. Howard said that.

14       He is, therefore, not credible when he now turns

15  around and says that this is something that should be decided

16  on the basis of judgment as a matter of law.

17       There is more.

18  THE COURT:  You don't have a lot of time.

19  MR. WEINBERGER:  Your Honor, just one last point.

20       Your Honor, I am -- I have the impression from all

21  of our charge conferences that it is the Court's position

22  that the instruction on this count is not based on a

23  retroactive application of the amendment, the Wilbert

24  Amendment.

25       The instruction is a function of the way this stuff

**OFFICIAL TRANSCRIPT**

1    was applied or used before the amendment.

2         Your Honor, the legislative history of the forced

3    labor statute I could read and read.  It says over and over

4    again that the issue is the subjective state of mind of the

5    alleged victim.

6         It's all about that person and whether they labored

7    consensually or not.  There is a mountain of evidence to

8    suggest in this case that these people labored consensually.

9    They were paid.

10         I'll move on, Your Honor.

11         With regard to the next matter, trafficking.

12    Your Honor, we have talked about this incessantly in jury

13    charge conferences.

14         Our view is that there cannot be trafficking

15    without a violation of the forced labor statute.

16         Your Honor has held, as I understand the

17    instructions, that there cannot be trafficking if there is

18    not knowledge -- which I take to mean foreknowledge -- by the

19    perpetrator of an intention to subject the individual to

20    forced labor.

21         Since forced labor is an ingenuine issue, to borrow

22    the phraseology of summary judgment law, well, trafficking is

23    as well.

24         The next issue, 1981.

25         Your Honor, the issue in a 1981 case is purposeful

OFFICIAL TRANSCRIPT

1   discrimination.  It's about intent.  Intent is a classic

2   issue for the jury.

3         There has been a mountain of evidence from every

4   single witness who has appeared in this case on behalf of

12:02:35   5   Signal that there was no intent to discriminate.  It is for

6   the jury to decide whether that testimony is credible.  If

7   they find it credible, the 1981 claim will be rejected.

8         The next claim, retaliation.

9         And Erin, as you know, handled false imprisonment.

12:02:55   10         Your Honor, the *Nassar* case, the entire judicial

11   bench recognizes, created an entirely new world for this kind

12   of case in federal case.

13         The test is "but for," the hardest test possible

14   for Mr. Howard to face.

12:03:13   15         It is for the jury to decide based on the evidence

16   that -- Mr. Howard thinks it's not credible, that evidence,

17   because it's not supported by a writing or it's not supported

18   by material that in his opinion is adequate to sort of deal

19   with this.

12:03:26   20         Our position is that this is the classic

21   credibility dispute, and Rule 50 case after Rule 50 case

22   after Rule 50 case says credibility is for the finder of

23   fact.

24         Thank you, Your Honor.

12:03:45   25         THE COURT:  Well, as y'all know, I have listened to

**OFFICIAL TRANSCRIPT**

1    your argument and you've noticed that I've been here during

2    all the evidence that has been presented.

3           So I've listened to the evidence and I've also

4    looked at the exhibits as they were presented to the jury.

12:04:00    5           Under Rule 50, I have to view the evidence in the

6    light most favorable to the non-movement -- non-movant.

7           And I think that both the plaintiffs and the

8    defendant have presented substantial evidence on these claims

9    and defenses.  And it's not clear to me that all reasonable

12:04:17   10    persons would draw the same conclusion on any of them.

11           So I find that there is -- that these are issues

12    that should go to the jury, and that the motion for judgment

13    as a matter of law on all five of those claims is denied.

14           Now, Mr. Hasenkampf is here, so let's go back to

12:04:46   15    Mississippi before we move on.

16           The issue is the Court has to make a finding

17    that -- whether punitive damages under Mississippi law will

18    go to the jury or not.  And whether or not the plaintiffs

19    have presented sufficient evidence for the punitive damages

12:05:05   20    question to go to the jury on breach of contract under

21    Mississippi law.  And maybe --

22           MR. WEINBERGER:  Your Honor, may I ask whether we

23    are discussing the main demand or the cross-claims at this

24    point?

12:05:22   25           THE COURT:  The main demand.


**OFFICIAL TRANSCRIPT**

1    MR. WEINBERGER:  Sorry, Your Honor.

2    Do you want me to make my motions now, Your Honor?

3    THE COURT:  No.  I'm trying to get past the point

4    of whether the issue of punitive damages on the plaintiffs'

5    breach of contract or, in the alternative, promissory

6    estoppel, will go to the jury, and there is -- obviously

7    the Signal defendants are not prepared to argue on that.  I'm

8    ready to rule on that.

9    MR. WEINBERGER:  Okay, Your Honor.

10   THE COURT:  I think that they have presented --

11   that the plaintiffs have presented sufficient evidence for

12   the issue of punitive damages on that claim to go to the

13   jury.

14   All right.  Now, the next issue --

15   MS. TSU:  Your Honor, if I may, do you want to hear

16   argument on the other matters of Mississippi law on which we

17   have asked for punitive damages?

18   There is the false imprisonment and intentional

19   infliction of emotional distress.

20   THE COURT:  Well, I assume it's the same standard,

21   and on all those I have to decide whether it goes to the

22   jury, and I think there's sufficient evidence on all of them

23   for it to go to the jury.

24   But if you don't want to take yes for an answer,

25   you can keep talking.

**OFFICIAL TRANSCRIPT**

1          MS. TSU:  I'm happy for Your Honor to make that

2    determination.

3          THE COURT:  All right.  Now, the Signal

4    cross-claims.

12:06:51   5          There are four -- let me get organized.  Four

6    cross-claims that remain.

7          Claim 1 for fraud.

8          Claim 2, malpractice practice/breach of duty of

9    care.

12:07:08  10          Claim 3, malpractice/breach of fiduciary duty.

11          And Claim 4, indemnity.

12          Do any of the cross-claim -- you want to -- why

13    don't we take them one at a time.

14          Do -- well, do any of the cross-claim defendants --

12:07:28  15    does Signal have motions for judgment as a matter of law?

16          MR. HASENKAMPF:  Yes, on both fiduciary duty and

17    malpractice.

18          THE COURT:  All right.  Let's let him start and

19    then we'll go to the defendants.

12:07:41  20          So the two of you have -- say it again?

21          MR. HASENKAMPF:  Fiduciary duty and malpractice.

22          THE COURT:  All right.  In other words, breach of

23    fiduciary duty and breach of standard of care?

24          MR. HASENKAMPF:  Yes.  And we don't believe there

12:07:53  25    is any reasonable dispute that Mr. Burnett represented Signal

**OFFICIAL TRANSCRIPT**

1   as its immigration counsel throughout the summer of 2006 and

2   the fall of 2006 and through 2007.

3          He owed -- as an attorney, he owed fiduciary duties

4   of loyalty to Signal.

12:08:15   5          Mr. Gonzalez testified (as read:)  In your opinion,

6   does the filing of an I-140 for one company and an H-2B

7   extension for another company for the same worker create a

8   conflict of interest?

9          It most definitely creates a conflict of interest.

12:08:30   10          When we asked Mr. Burnett (as read:)  And when the

11   workers with certified PERMS to J & M came to work at Signal,

12   you never notified Signal in writing of any potential

13   conflict of interest with respect to your representation of

14   Signal and J & M, did you?

12:08:44   15          I did not.

16          This is the most black-and-white breach of

17   fiduciary duty/breach of loyalty claim there is.  He had a

18   duty -- he had a duty to be loyal to Signal, to represent

19   Signal's interest, to represent solely Signal's interest.

12:08:59   20          He -- instead, he took on a conflict of interest, a

21   very specific conflict of interest.

22          Ms. Binion testified (as read:)  With respect to

23   labor -- with respect to the labor market, we were a

24   competitor of J & M.  We competed for the same sources of

12:09:17   25   skilled labor.

1    There is no reasonable dispute with respect to

2    whether J & M, as a labor provider, was in an adverse

3    position to Signal's interest as a -- as an employer seeking

4    skilled labor.

12:09:35

5        Mr. Burnett represented both sides of the coin.  He

6    did not inform either person.  He did not inform either

7    client.  In fact, his testimony was (as read:)  I did not

8    perceive a conflict of interest.

9        Whether he perceived a conflict of interest or not

12:09:51

10   is not a question of fact for the jury, but a question of law

11   for the Court to decide.

12       THE COURT:  Okay.  Let's hear some response from

13   Mr. Burnett's lawyer.

14       This is just on the fiduciary duty.

12:10:03

15       MR. CERNIGLIA:  Just on fiduciary duty.

16       And I have a counter-motion on that one, which is

17   also part of the reason why theirs needs to fail.

18       First off, the issue of whether there is a conflict

19   of interest or not, with regard to J & M, Mr. Gonzalez

12:10:23

20   admitted that if at the time they were filed, which was to

21   protect priority dates, the workers would have to go back to

22   India, in which case the same thing happens, they still stay

23   at H-2B status at Signal [sic].

24       More importantly, even if granted, all that does is

12:10:50

25   allow them, the workers, to choose.  But the point is, is the

**OFFICIAL TRANSCRIPT**

1    reasonableness of any expectation that there would be a

2    conflict of interest.

3            One, he is representing workers, and all he's doing

4    is trying to protect their rights.

12:11:10    5            Two, it has no impact at that point in time because

6    they would have to go back to India at that point in time,

7    except for a fluke that happened two or three weeks later.

8            Three, Signal never provided Mr. Burnett the list

9    of all the people they had until near the end.

12:11:30    10           And this one was filed -- this I-140 here that is

11   involved was in June of '07, at a point in time when the

12   priority dates were not current.

13           For those reasons, I don't think there is a

14   conflict.  And if nothing else, it's for the jury to

12:11:47    15   determine if there is a conflict.

16           More importantly, there has been no establishment

17   of any damages if you assume that there was a conflict.

18           The only testimony in the record is that neither

19   Chris Cunningham nor Tracey Binion had any concept of how

12:12:18    20   many workers left to go to J & M.

21           They also could not answer why they left to go to

22   J & M.

23           Third, they could not testify as to how many came

24   back to work for them.

12:12:32    25           And then lastly Cunningham -- Mr. Cunningham

**OFFICIAL TRANSCRIPT**

1    testified that there was, in the later years -- and this

2    would be the later years, 2007 -- end of 2007 -- that the

3    contracts provided for a $6-per-contract-laborer per-hour

4    increase in their contracts.

12:12:51    5              There is no indication that any of the workers,

6    that they don't even know who they are, were working on this

7    particular job.

8              And if I may, in Mr. Wilks' testimony, who in

9    arguments at -- during the charge conference, they were

12:13:13   10    trying to rely on, was asked these series of questions.

11             (As read:)  How many workers, Signal H-2B workers,

12    came to work for J & M Marine on work permits?

13             Answer:  I could give you an estimate?

14             An estimate?

12:13:31   15             Maybe 40, 40 work permits and 20 processing.

16             So he is giving an estimate and maybe.  Estimates

17    and maybes are not enough.

18             If they have damages from the fact that Mr. Burnett

19    filed documents that, because of a fluke, they were allowed

12:13:51   20    to get work permits -- they haven't shown that they have been

21    physically damaged.

22             They have just said, well, we have some workers

23    that left and we don't know how many.  But some came back,

24    but we don't know how many.  And we don't know what the wage

12:14:05   25    differential is, but just award us damages up to 40 and award

OFFICIAL TRANSCRIPT

1    us damages for up to $7 a worker.

2         And that is just asking the jury to pull numbers

3    out of the air.  That's not sufficient proof on the record.

4         THE COURT:  Mr. Hasenkampf, do you want to respond?

12:14:25    5         MR. HASENKAMPF:  Absolutely.

6         So with respect to damages, Signal's position is

7    that there is certainly evidence that Signal was harmed by a

8    somewhat mass exodus of workers, of direct-hire Indian H-2B

9    workers, which they had to replace with more expensive

12:14:49   10    contract workers.  So Signal has established damages.

11         The issue now is how to quantify those damages --

12    how to reasonably quantify those damages and whether a jury

13    should be entitled to rely on sufficiently -- legally

14    sufficient evidence to determine the amount of those damages.

12:15:14   15         Signal points to four elements that the jury could

16    rely on to determine those damages.

17         The first, how many workers left Signal for J & M

18    due only to the breach of fiduciary duty?

19         Mr. Billy Wilks testified that about 60 workers

12:15:36   20    left.  About 40 of those left because they had pending

21    paperwork -- pending immigration paperwork that Mr. Burnett

22    had started.  Thus, 40 of those workers left because of this

23    dual representation of Mr. Burnett.

24         We believe that is attributable to his breach of

12:15:55   25    fiduciary duty.


                         **OFFICIAL TRANSCRIPT**

1    THE COURT:  Do you think his saying "about," just

2    off the top of his head, is sufficient evidence?

3    MR. HASENKAMPF:  I do.  And to corroborate that, we

4    have additional evidence from Mr. Burnett of I-140s filed

12:16:11    5    relating to some of these numbers.

6    So even if we adopt the most conservative number of

7    only looking at the actual I-140s of Signal employees, we

8    still have a number.  We still have damages.

9    THE COURT:  What's the testimony of Mr. Burnett

12:16:29   10    that tied down the exact number of people who left Signal to

11    go to J & M?  What testimony is that?

12    MR. HASENKAMPF:  This relates to the number of

13    I-140s that he filed of pending Signal employees.

14    THE COURT:  And what ties that to exactly -- what

12:16:49   15    testimony is it that -- where he says it is exactly this

16    number of I-140s?  And then what ties that to how many people

17    left Signal to go to J & M?

18    MR. HASENKAMPF:  Each of the I-140s -- each of the

19    persons -- of the J & M persons for whom he filed an I-140

12:17:08   20    left Signal for J & M.

21    And that is a -- that's enough -- we could count

22    those documents.  We could point to those documents, that

23    that is an easily quantifiable number.  And that is merely

24    quantifiable -- that is merely corroborating evidence.  We

12:17:27   25    have the "about 40" number --

OFFICIAL TRANSCRIPT

1          THE COURT:  Do you have the page number of the

2     transcript where he did that and he testified that each of

3     the I-140s left Signal and went to J & M?

4          MR. HASENKAMPF:  The Burnett testimony, I do not

5     have that citation.

6          THE COURT:  Because I don't remember that testimony

7     exactly that way.

8          So if somebody can find it, you can give it to me

9     in a minute.  I don't know if they are looking for it.

10          MR. HASENKAMPF:  Sure, I can find that.

11          The second element, how much did Signal actually

12     save from a direct-hire Indian H-2B worker as compared to a

13     replacement contract worker?

14          Plaintiffs' economist, Dr. Maness, testified that

15     it was $6.96.  This is consistent with Michael Pol's

16     testimony that the range was $7 to $10, which simply supports

17     our proximate cause and foreseeability element that the

18     persons working with Signal understood the value proposition

19     of a direct-hire H-2B worker.  That value proposition was

20     about $7 per hour.

21          This is, again -- that $7- to $10-per-hour estimate

22     of Michael Pol is merely corroborating Dr. Maness's

23     testimony.

24          THE COURT:  Do you think it is sufficient to be

25     about $7 based on the plaintiffs' economist?

**OFFICIAL TRANSCRIPT**

12:17:41
12:17:50
12:18:08
12:18:35
12:18:49

1    MR. HASENKAMPF:  Dr. Maness's testimony was $6.96.

2    THE COURT:  I think in the pages of the transcript

3 that you have pointed me to --

4    MR. HASENKAMPF:  The Dr. Maness cite is Trial

5 Record 3291 through 3293.  And I do not believe we have that

6 citation.

7    THE COURT:  Because what I have is on Page 1793 and

8 he says (as read:)  I'm not sure exactly the number at that

9 point in time, but there is a significant difference of at

10 least $7 to $10 an hour.

11    MR. HASENKAMPF:  Correct.  But that is from

12 Michael Pol.

13    What Dr. Maness says is (as read:)  So then the

14 $6.96 that you see there is the cost difference between a

15 contract worker and a Signal worker -- and an Indian worker,

16 I'm sorry, on an hourly basis.

17    THE COURT:  Does Dr. Maness differentiate between

18 welders and fitters or is he using kind of an average?

19    MR. HASENKAMPF:  He is using an average.

20    THE COURT:  That's what I -- my recollection is,

21 that he was making -- he made some assumptions, and he said

22 what those assumptions are.  But that -- so he wasn't dealing

23 with actual, you know, specific numbers.

24    He made some assumptions and explained them and he

25 did some averaging, and -- that's my recollection of his

**OFFICIAL TRANSCRIPT**

testimony, which is different -- and may be sufficient for an expert report, but it's different from proving the amount of damages on this kind of claim.

MR. HASENKAMPF:  We argue that is a legally sufficient data point from which to corroborate damages.

THE COURT:  You said there were four?

MR. HASENKAMPF:  Yes.

THE COURT:  We have to move along, so talk fast.

MR. HASENKAMPF:  The third element is simply the 40-hour workweek.  We have -- I think that's a common assumption, but to the extent it needs to be supported by data, we have all of the payroll data.

Exhibit 1155 is all of Signal's payroll data with respect to the H-2B workers.  Column G is the hourly -- the hours they worked each week.

That column could be examined by the jury, and from that it can be determined whether the 40-hour-per-week assumption is supported or not supported.

And for what it's worth, Dr. Maness said that is -- the assumption was 50 hours per week, so this is a conservative number.

The fourth element is simply what is the reasonable period of time that Signal should have expected the -- these J & M workers to stay at Signal compared to when they left?

We know that most of them left in the summer of

OFFICIAL TRANSCRIPT

1    2007 because that is when this magic window occurred.

2         Dick Marler testified that he thought the program

3    could last up to 30 months.

4         Is it reasonable to expect that every one of the

5    workers would stay for 30 months?  Probably not.  But is it

6    reasonable that they would stay for another month, another

7    week, another three months?  Absolutely.

8         And the reasonableness of that -- of that

9    difference is a question of fact for the jury to decide.

10        So if the only -- the only issue remaining is what

11   is an appropriate quantification of damages.

12        The fact of -- the fact that Signal was damaged by

13   40 workers leaving due to a blatant conflict of interest is

14   not reasonably in dispute.  An employer losing 40 employees

15   is hurt -- is damaged.  It incurs expenses.

16        Signal provided data from which a jury could

17   reasonably determine what that damage is, what that financial

18   loss is, and the extent of that financial loss.

19            THE COURT:  Okay.

20        Do you want to respond?

21            MR. CERNIGLIA:  Your Honor, even with all of that,

22   he's asking the jury to look at a list and they don't even

23   know if any of the people that left are on that list.  They

24   don't know if any of the people that came back are on that

25   list.  They don't know.

                    **OFFICIAL TRANSCRIPT**

1          There is also another very important element, and
2   that is it has to be the proximate cause.  That is, both a
3   "but for" and legal reasonable -- reason to foresee that
4   that's the reason that they would leave.

12:23:24
5          The testimony was that workers were leaving all the
6   time.  Even those that had H-2Bs extended, that did not have
7   a work authorization, they left.

8          So they don't have proximate causation.

9          And certainly, they are just asking to pull numbers
12:23:44
10  out of the air because there is -- even with that -- the
11  expert referred to, there is no -- they don't account for the
12  contract that Mr. Cunningham spoke of.

13         And if we don't know the numbers who left and we
14  don't know the numbers who came back, there is no way a jury
12:23:59
15  can pull out a number.

16         That was their responsibility in their case to say,
17  look, these are the ones that worked for us, these are the
18  ones that left to go to J & M, these are the ones that came
19  back.  Subtract it.  These are the contracts they were on.
12:24:13
20  This is how much we had to pay while we were without them.

21         They didn't do any of that.  They just want to
22  throw things in the air.

23         THE COURT:  All right.  So we had motions for
24  judgment as a matter of law on the legal malpractice/breach
12:24:27
25  of fiduciary duty by Signal and Burnett.


                          OFFICIAL TRANSCRIPT

1          I find that Signal has not presented substantial

2     evidence to support damages under this claim.  So even if

3     they had met all the elements of the claim, I don't think

4     that they have presented substantial evidence supporting

5     their position.

6          I don't think that there is legally sufficient

7     evidence that has been presented for a reasonable juror to

8     find in Signal's favor with respect to the damages.

9          So I'm granting judgment as a matter of law in

10     favor of Burnett, and dismissing the cross-claim for

11     malpractice/breach of fiduciary duty.

12          So the second motion that Signal had was with

13     respect to the breach of the standard of care.

14          Do you want to argue that?

15     MR. HASENKAMPF:  Again, there is no reasonable

16     dispute about an attorney/client relationship.  That has not

17     been contested.

18          The standard of care was provided by Mr. Gonzalez,

19     the only immigration law expert testifying to the standard of

20     care.

21          So the standard of care is not reasonably in

22     dispute.

23          He testified that (as read:)  I'm sure that

24     Mr. Burnett, as Signal's immigration counsel, had explained

25     to Signal that the 18-to-24-month timeframe was not a

OFFICIAL TRANSCRIPT

1   realistic timeframe?

2         Yes.  I refer back again to the ACL standard that

3   we've developed.  That is the standard for most of the

4   industry.  The analysis, the communication, and the

5   maintaining current on the law.

6         The communication standard, he says, should usually

7   be in writing -- at least an overview should be in writing.

8   The most important element from the client's perspective is

9   what is the timeline -- or what is the reasonable timeline.

10         All the clients want to know is what can I expect

11   as to when will I get the visa, when will I get the

12   green card, when will I get whatever it is that I'm seeking

13   from the government.

14         Mr. Burnett explains -- and admits, quite frankly,

15   that he never provided any of this in writing.  He -- there

16   is no argument that he did.  He said he did things orally,

17   but he can't point to them.

18         We have testimony from Mr. Schnoor and we have

19   testimony from Ms. Binion that indeed they never knew this

20   timeline.

21         In fact, Signal suffered quite a bit from the

22   timeline, as the plaintiffs say.  Signal believed that this

23   18-to-24-month timeframe may have been reasonable.

24         While we dispute that, what is undisputed is Signal

25   did not know whether -- that the timeframe may have been five

OFFICIAL TRANSCRIPT

1    years or that the workers had to go back to India prior to

2    beginning the process.

3         THE COURT:  I'm interested in the damages on this

4    one also.

5         MR. HASENKAMPF:  Sure.  Damages.

6         Again, Mr. Schnoor testified that he had to

7    terminate Mr. Burnett for not only the breach of fiduciary

8    duty, but for failing to properly inform Signal.

9         Ms. Bollman came in and indicated to Signal that

10   this -- that, in fact, there were serious problems with the

11   paperwork.  There were serious problems with Signal's

12   expectations with respect to the timelines of when the

13   workers could get -- could --

14        THE COURT:  Get to the damages.  The quantum.

15        MR. HASENKAMPF:  Sure.

16        Ms. Binion testified that this $280,219 number was

17   specific to her fees -- to Ms. Bollman's fees for doing work

18   that Mr. Burnett was supposed to have done.  That if

19   Mr. Burnett had not breached his duty of care, he would have

20   done and Signal would not have incurred those legal fees.

21        MR. CERNIGLIA:  Your Honor, we have a cross-motion

22   also on this one.  And two things.

23        He says it's not in reasonable dispute.  As to the

24   standard of care of whether there was an attorney/client

25   relationship, the testimony is crystal-clear that Mr. Burnett

**OFFICIAL TRANSCRIPT**

1   was not provided to do the immigration work until after

2   April 19th.

3           I have it right before me, Exhibit 340, and

4   Mr. Cunningham, and I believe Mr. Bingle, were both asked

5   about it, where it was recommended that there be input from

6   Signal's immigration attorney to fully understand Signal's

7   liability.

8           This is at a time after Mr. Burnett has met with

9   them informally to tell them of the different options

10  available.

11          They did consult with -- according to their

12  testimony, with their own lawyer.  No testimony as to whether

13  or not they did follow this advice to find input -- there is

14  no indication if they followed the advice of their managers

15  to have input from Signal's immigration lawyer.

16          But the point is they clearly did not rely on

17  Mr. Burnett to execute the contract that Global was -- that

18  Global entered.

19          THE COURT:  I'm going to tell you the same thing.

20  I'm not --

21          MR. CERNIGLIA:  On the damages aspect, if they

22  wanted to show that there was -- because of filings that had

23  to be done afterwards by Ms. Bollman, they should have just

24  put on her attorney's fees to show it.

25          We did establish that the chief financial officer

OFFICIAL TRANSCRIPT

1    said that the attorney's fees for the litigation, in

2    addition -- additionally, the attorney's fees for the

3    litigation were put on that spreadsheet.

4            Ms. Binion says that, well, she thinks he's wrong,

5    but she doesn't know how the accounting department accounts

6    for things.  She says she saw the -- she has seen invoices,

7    but she didn't bring them in.

8            We also showed her that there was stuff that was

9    submitted to Patricia Bollman on OSHA-related stuff.

10           We just -- the jury is going to be asked to assume

11   that somewhere out of that number that's on that

12   spreadsheet -- some of that had to do with filings and some

13   of it had to do with the lawsuit, defending the lawsuit and

14   the prosecution of their claims.  And that is insufficient

15   evidence.  It was their burden to establish the amount of

16   money that was actually spent because they fired

17   Mr. Burnett --

18           THE COURT:  All right.

19           MR. CERNIGLIA:  -- as to damages.

20           THE COURT:  Hold on.

21           When I looked at the testimony that was pointed to,

22   and of course I remember the testimony, and Ms. Binion

23   testified, I believe this is -- she is talking about

24   Exhibit 1181.  And she says (as read:)  I believe they --

25           She is talking about the Patricia Bollman invoices.

OFFICIAL TRANSCRIPT

1          -- just for immigration work in this time period

2     were charged to this number.  I believe they were.

3          She said she had very limited knowledge of the

4     accounting system.

5          I'm not the senior accountant.

6          She thought Mr. Cunningham was not correct, but he

7     did testify that the amounts shown on this spreadsheet also

8     included litigation expenses.

9          And then when I looked at -- when I looked at 1181,

10    the third page, which I believe is what Ms. Binion was

11    looking at and Mr. Cunningham, there is a line, legal and

12    professional services.

13         That line does show an increase around the time

14    this -- a substantial increase around the time this lawsuit

15    was filed, which might indicate that some of the expenses of

16    the lawsuit were included in that number.

17         And then if I look at the other pages of that

18    exhibit, they also have line items for immigration attorney's

19    fees/litigation, attorney's fees/PERM application.

20         So, you know, what -- what I would have thought the

21    evidence would be is these are the invoices -- this is how we

22    know that this is work related to the work that Ms. Bollman

23    had to do because Mr. Burnett didn't do it, so that there

24    would have been direct evidence about what the amount of the

25    damages is.

**OFFICIAL TRANSCRIPT**

1        And, in fact, when -- at one point, Ms. Binion was

2    asked (as read:)  So would these numbers under this category

3    correspond to expenses Signal incurred for Ms. Bollman's

4    services that they would not have had but for Mr. Burnett's

5    malpractice?

6        Well, we never got an answer to that question

7    directly.

8        And instead what she said is (as read:)  I have

9    just seen it during the litigation of the different cost

10   centers and how it's tracked.  I'm not the senior accountant.

11   They set up the different cost centers, but I'm familiar with

12   what that is.  Not necessarily what every expense is, but I'm

13   just letting you know that this should be -- is her fees for

14   the extensions and the PERM process.  We tracked those

15   separately than the other fees.

16       So there was -- there was testimony from Ms. Binion

17   and from Mr. Cunningham that was conflicting, and so I don't

18   think that Signal put on legally sufficient evidence to

19   establish its damages with respect to the malpractice breach

20   of the standard of care, which is Claim 2.

21       So, you know, I don't think there would be a

22   reasonable basis for a jury to find as to a specific amount

23   of damages in Signal's favor, and I think that is what is

24   required.

25       So I'm granting judgment as a matter of law

**OFFICIAL TRANSCRIPT**

1    dismissing Cross Claim 2.

2             All right.  And were there any other --

3             MR. CERNIGLIA:  There was also misrepresentation.

4    I filed a Rule 50 on the fraud claim.

12:35:33
5             THE COURT:  Well, you know, that is -- those

6    damages are the same as the ones for the malpractice breach

7    of fiduciary duty.

8             And since they did not -- Signal did not

9    establish -- present sufficient evidence on Claim 3, they

12:35:51
10   also did not present sufficient evidence on Claim 1 for

11   fraud.  So I'm also granting judgment as a matter of law with

12   respect to that claim.

13            All right.  So now I think we need to talk about

14   jury -- is there anything else?

12:36:10
15            MR. CERNIGLIA:  I had one motion.

16            THE COURT:  Okay.  Mr. Cerniglia.

17            MR. CERNIGLIA:  I have a Rule 50 motion on the

18   plaintiffs' forced labor and trafficking against Mr. Burnett.

19            The testimony from every witness, including the

12:36:24
20   plaintiffs, was Mr. Burnett did not recruit, he did not

21   select, he did not provide, he did not even offer any workers

22   to Signal for their selection.

23            He came into the process after these workers had

24   been selected to perform the immigration work.  And the fact

12:36:46
25   that he performs the immigration work does not mean that he

OFFICIAL TRANSCRIPT

1    is providing or recruiting or supplying or transporting,

2    especially for purposes of forced labor.

3              In other words, if he did not recruit at all, if he

4    did not provide at all, then clearly he did not provide,

12:37:04    5    recruit or supply somebody knowing that it was going to be

6    for some type of forced labor.

7              But the testimony is that he did none of those

8    things.

9              THE COURT:  All right.

12:37:15   10              MR. SHAPIRO:  I have several motions, Your Honor.

11              MR. WEINBERGER:  As does Signal, Your Honor.

12              MR. SHAPIRO:  I'll try to be as brief as I can,

13    Your Honor.

14              On behalf of Dewan, a Rule 50 motion on plaintiffs'

12:37:27   15    forced labor claim.

16              There is no evidence -- there has been no evidence

17    presented that Mr. Dewan or Dewan Consultants issued threats

18    of serious harm or physical restraint.

19              There is also no evidence of his involvement or

12:37:45   20    Dewan Consultants' involvement in the participation -- or

21    participation in a scheme or plan or pattern to -- such that

22    if a person did not perform labor, that he would suffer

23    serious harm or restraint at all.

24              And also there is no evidence of any abuse or

12:38:11   25    threatened abuse of legal process, as that has been defined

OFFICIAL TRANSCRIPT

1    for us so far.

2         With respect to the -- do you want me to go through

3    all of them at once?

4         THE COURT:  Yes.

12:38:25    5    MR. SHAPIRO:  Okay.

6         With respect to the trafficking for forced labor,

7    we can't get around the fact that Mr. Dewan is a recruiter

8    and he certainly did recruit workers for and provided workers

9    for Signal.

12:38:42   10    However, there has been -- Mr. Dewan has -- and I'm

11   using the standard that we've been given -- no knowledgeable

12   person would be -- he had no -- he didn't have the intent

13   that -- no knowledgeable person would be subjected to forced

14   labor as a result of his recruitment of workers.  He simply

12:39:13   15   recruited the workers for Signal, and that's all.

16        With respect to the RICO claim brought by

17   plaintiffs, I don't believe that Mr. Dewan was part of an

18   enterprise, particularly the one involving the

19   Swetman Security.

12:39:36   20   And even if there was some kind of -- and there is

21   no dispute that we're dealing with interstate commerce.  That

22   has been defined as international as well.

23        However, there -- it is our position the evidence

24   did not show a pattern of racketeering activity.  There was

12:40:03   25   no mail -- no evidence of mail fraud, no scheme to defraud,

**OFFICIAL TRANSCRIPT**

1    and no specific intent to defraud.  In addition to that,
2    there is no wire fraud.
3           Along the same lines, no forced labor, as I have
4    just mentioned.
5           And no claim under the trafficking statute.
6           So all the predicate acts, because they would fail,
7    there would be no RICO -- valid RICO claim against Mr. Dewan.
8           With respect to a conspiracy, again I go back to
9    the intent.  Mr. Dewan must have known that others were
10   conspiring to participate in a pattern of racketeering
11   activity.  And there is no evidence that he was aware of any
12   pattern, to the extent there even was one.
13          With respect to the cross-claims --
14          THE COURT:  Now, the only one that is left is
15   indemnity.
16          MR. SHAPIRO:  Thank you.  I was going to argue
17   something else.
18          I'm still confused about that.  Based on our
19   discussions last night, and the status -- or the state of the
20   law at this time, it is our position that a party can't
21   simply come into court, get hit with a judgment, and then
22   shift the entire blame on somebody else.
23          And so I would say that with respect to indemnity,
24   it is rather convenient for Signal to do that.  There is no
25   claim against Mr. Dewan for indemnity.


OFFICIAL TRANSCRIPT

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. WEINBERGER:  If Your Honor please,

4   Alan Weinberger on behalf of Signal.

12:42:13  5          I'll go through these quickly, Your Honor, but I

6   must do this to protect this record, as you know.

7          I want to begin by turning to something that's a

8   bit obscure -- certainly, the Supreme Court case is.

9          Your Honor, during the cross-examination of

12:42:30  10  Mr. Schnoor, there was an exchange between Mr. Howard and

11  Mr. Schnoor concerning the idea that there were a variety of

12  things about the housing facility at Signal that were

13  illegal.

14          During this exchange, Ms. Hangartner did interpose

12:42:50  15  an objection that this was getting into issues of law and

16  questions about law, and this was overruled.

17          I make that point just to sort of emphasize that

18  the record was protected.

19          Your Honor, the first motion that we make for

12:43:04  20  judgment as a matter of law is going to strike the Court as a

21  little unusual, but it is directly supported by a case

22  decided by the Supreme Court --

23          THE COURT:  You need to get to it because I keep

24  telling you I don't have a lot of time.

12:43:15  25          MR. WEINBERGER:  Sorry.


                        **OFFICIAL TRANSCRIPT**

1        Your Honor, we want all of that evidence -- all of

2    it -- excised from the record, and for you to then determine

3    as a matter of law that there is no basis in this case for

4    anyone to argue that Signal violated the Occupational, Safety

5    and Health Act.

6        Your Honor, you addressed this in the order by

7    which you dealt with Mr. Payne and Mr. Signorino.

8        THE COURT:  There is no claim about Signal

9    violating OSHA.

10       MR. WEINBERGER:  But the evidence was used to try

11   to drive home the point that the housing facility was

12   unlawful.

13       THE COURT:  What issue are you asking for a

14   judgment on?  That's what Rule 50 is, is --

15       MR. WEINBERGER:  I'm asking for a judgment as a

16   matter of law with regard to any claim for which Mr. Howard

17   elicited the testimony.

18       He may have done it for the purposes of the case on

19   discrimination.  They tend to argue that the housing facility

20   was an extension of Signal's nefarious psychological scheme

21   to force labor from these individuals.

22       I probably should move for judgment as a matter of

23   law with regard to every single claim in this case.

24       But this much --

25       THE COURT:  Well, on the basis that they -- this

**OFFICIAL TRANSCRIPT**

12:43:31
12:43:44
12:44:01
12:44:14
12:44:29

1    evidence was introduced and it was irrelevant, and so that

2    should mean that the entire claim should be dismissed as a

3    matter of law?

4                MR. WEINBERGER:  Insofar as the notion that the

5    housing facility was unlawful is used to support some theory

6    of the plaintiffs in this case --

7                THE COURT:  Well, that motion is denied.  That is

8    not the purpose of a judgment as a matter of law.

9                MR. WEINBERGER:  But the Supreme Court of the

10   United States has said that --

11               THE COURT:  All right.  I may be wrong, but that

12   motion is denied.

13               MR. WEINBERGER:  Let me just name the case for the

14   record, if I may, Your Honor.  For the record.

15               THE COURT:  Okay.

16               MR. WEINBERGER:  The case is *Weisgram v Marley*,

17   528 U.S. 440, in which the Supreme Court reminded everybody

18   that actually a motion for directed verdict is a motion for

19   summary judgment.

20               THE COURT:  Okay.

21               The next motion -- the next motion, Your Honor.

22               The next motion is a motion concerning the argument

23   that Signal conspired with others to violate RICO.

24               You certainly have not heard any direct evidence --

25   direct evidence -- on any agreement on the part of Signal

**OFFICIAL TRANSCRIPT**

1    with anyone else to pursue the unlawful objective of running

2    out some enterprise in order to get people at Signal to do

3    anything else.

4         If that claim is going to be determined in favor of

12:45:54    5    the plaintiffs in this case, it's going to have to be on the

6    basis of an inference drawn by this jury from circumstantial

7    evidence.

8         We argue that there is not sufficient evidence of

9    that.

12:46:08    10        And one of the reasons we do it -- and this tends

11   to get lost -- is these are criminal statutes with

12   corresponding *scienter* requirements.

13        There is no evidence in this case that these people

14   knowingly joined a conspiracy that they knew was unlawful.

12:46:26    15        Next, Your Honor -- Your Honor, it will make things

16   go much faster if I just say that I move and that you deny.

17        I move with regard to retaliation, forced labor,

18   trafficking.

19        Your Honor has said on this record that you feel

12:46:44    20   that that is an issue -- or those are issues for this jury.

21        I don't want to belabor something the Court has

22   decided.  All I want to do is protect this record.

23        I want the record to reflect that Signal argues

24   that the evidence is insufficient.  It does not bear the

12:46:59    25   burden of proof at trial.


**OFFICIAL TRANSCRIPT**

1          The evidence is insufficient on forced labor and

2     trafficking and RICO.  It is insufficient because those are

3     criminal offenses.  And this record does not contain evidence

4     of the requisite *mens rae*.

5          If you will give me one second, I believe I will

6     sit down if Your Honor, please.

7          Oh, lastly -- sorry.  The entire 1981 case, it is

8     the position --

9          THE COURT:  1981?

10          MR. WEINBERGER:  1981, Section 1981,

11     discrimination.

12          As the Court knows, that is a claim of purposeful

13     discrimination, intentional discrimination.  Discrimination

14     that is deliberate, conscious, knowing.

15          That evidence does not in this record exist.

16          Thank you, Your Honor.

17          MR. CERNIGLIA:  I just want to -- on the Rule 50

18     also on the RICO against Burnett, that there is no evidence

19     of immigration fraud, mail fraud, wire fraud.  And certainly

20     not an enterprise with the consulate.  There is not

21     sufficient time and there is not no -- no enterprise with the

22     security people.

23          THE COURT:  All right.

24          Do the plaintiffs want to respond?

25          I've heard, I think, argument on -- if not all

**OFFICIAL TRANSCRIPT**

1    these issues, on several of them.

2          Were there some of the issues that you didn't

3    respond on -- or didn't present some argument about what your

4    evidence is?

5          MR. HOWARD:  Your Honor, addressing just Signal's

6    motions, and then Mr. Werner will address the motions from

7    the Burnett and Dewan defendants.

8          I think with respect to retaliation, forced labor,

9    the trafficking and discrimination, we've already presented

10   evidence and there's ample evidence in the record of what was

11   done and why it was done to meet the intent requirement in

12   all those causes of actions.

13         With respect to RICO, we did not move on RICO, but

14   again the evidence of the fraud.

15         The evidence of the fraud on the plaintiffs, the

16   evidence of the fraud on the U.S. government in the form of

17   visa petitions in which Signal, with their immigration

18   attorney, Mr. Burnett, presented under oath to the

19   U.S. government.  That information that Signal's witness,

20   Mr. Bingle, who actually signed under oath those documents,

21   admitted was untruthful information, certainly is the

22   beginning of establishing -- in and of itself establishes the

23   basis for the RICO claim.

24         And I won't burden the record with all the other

25   evidence we have of the frauds, the predicate acts, the

**OFFICIAL TRANSCRIPT**

1    enterprise, et cetera.

2             THE COURT:  Mr. Werner.

3             MR. WERNER:  Sure, Your Honor.  I'll start with the

4    trafficking claims against Burnett and Dewan both.

5             With respect to Dewan, the -- there was the

6    threatened abuse of legal process claim, we just presented

7    evidence during Dewan's testimony of an e-mail where Dewan --

8    Mr. Dewan said that the troublemakers should be --

9    essentially, the troublemakers should be deported first.

10            He acknowledged that he sent that e-mail to Signal.

11   That certainly is sufficient to show that he was involved in

12   the -- in the threats of deportation to the workers that

13   compelled their continued labor at Signal.

14            With respect to Mr. Burnett, Mr. Burnett

15   certainly -- the definition of recruit in the jury

16   instructions that the Court has adopted, is to engage in

17   finding and attracting a person for employment.

18            The primary attraction for employment at Signal --

19            THE COURT:  Mr. Werner, can you give me just a

20   second?

21            MR. WERNER:  Sure.

22                            (A pause in the proceedings.)

23            THE COURT:  I apologize.

24            MR. WERNER:  No, that's fine.  I'll be very brief

25   because I know the jury needs to come back.


                      **OFFICIAL TRANSCRIPT**

1    As I was saying, the reason why the plaintiffs paid

2    the money they paid was because of the green card promises.

3    That has been clearly established in the record.

4    And Mr. Burnett was the source of those green card

12:52:41    5    promises -- or certainly one of the primarily sources of

6    those green card promises.

7    He certainly can't be excised from that and

8    relieved of the trafficking-for-forced-labor claim, and

9    certainly there are factual disputes that need to be

12:53:01    10    determined by the jury.

11    With respect to enterprise, we also contend that

12    the evidence has clearly established -- or at least there is

13    a dispute of fact that should be determined by the jury about

14    the existence of enterprises.

12:53:29    15    With respect to the concerns that Mr. Dewan and

16    Mr. Burnett have raised regarding the RICO Enterprise 3

17    involving Swetman Security, both of them went to Signal.

18    Both of them communicated with the workers.  Both of them had

19    involvement in orchestrating the March 9th incident in which

12:54:05    20    Swetman Security was involved.

21    The fact that the Dewan defendants -- or that

22    Mr. Dewan and Mr. Burnett may or may not have directly

23    communicated with Swetman Security has no bearing on whether

24    they are part of a RICO enterprise.

12:54:23    25    And then I'll just wrap up.


**OFFICIAL TRANSCRIPT**

1          Forgive me, Your Honor, because there is a lot that

2    went in there.  It is hard to sort of keep track and go piece

3    by piece.

4          With respect to Dewan's -- Mr. Dewan's contention

5    that he was not engaged in the mail and wire fraud, the

6    evidence has certainly shown, as we just heard, that Dewan

7    actively communicated the fraudulent statements to the

8    plaintiffs about the green cards.  He certainly took no steps

9    to correct those misrepresentations.

10         And the extent of -- and that is certainly a

11   factual question that the jury needs to resolve.

12         THE COURT:  All right, thank you.

13         MR. CERNIGLIA:  Just one quick reply, Your Honor.

14         As far as the definition of recruitment, that has

15   nothing to do with what Mr. Burnett did.

16         And if -- they can't take their claims of breach of

17   contract and negligent misrepresentation and turn that into

18   knowingly recruited.  That had nothing to do with the

19   selection of or rounding up or gathering of workers.

20         THE COURT:  All right.

21         So there are motions for judgment as a matter of

22   law filed by Burnett, Dewan, and Signal against the

23   plaintiffs and then some with respect to Signal on cross-

24   claims.

25         I find that there has been legally sufficient

**OFFICIAL TRANSCRIPT**

1  evidence presented with respect to all those claims such that

2  a reasonable juror could find for plaintiffs or for Signal on

3  those claims, so I'm denying the motions for judgment as a

4  matter of law.

5                              (A pause in the proceedings.)

6        THE COURT:  We are going to take a break and go off

7  the record.  And we're going to do some shifting around.

8                              (End of morning session.)

9

10                      *  *  *  *

11                      **CERTIFICATE**

12

13      **I hereby certify this 10th day of February, 2015, that**

14  **the foregoing is, to the best of my ability and**

15  **understanding, a true and correct transcript of the**

16  **proceedings in the above-entitled matter.**

17

18                              */s/ Mary V. Thompson*

19                              **Official Court Reporter**

20

21

22

23

24

25


                      **OFFICIAL TRANSCRIPT**