1           IN THE UNITED STATES DISTRICT COURT FOR.

2              THE EASTERN DISTRICT OF LOUISIANA

3                      AT NEW ORLEANS

4
KURIAN DAVID, ET AL,          *      Case No. 08-1220 Section E
5                             *
            Plaintiffs,       *
6                             *      DAY 20 - AFTERNOON SESSION
        v.                    *      February 10, 2015
7                             *
SIGNAL INTERNATIONAL,         *
8                             *
            Defendants.       *      Daily Copy Transcript
9    _____

     Related case:
10
EQUAL EMPLOYMENT OPPORTUNITY          CIVIL ACTION
11   COMMISSION,
                Plaintiff,            No. 12-557
12          v.
SIGNAL INTERNATIONAL, LLC, et al,     SECTION "E"
13          Defendants.
     _____
14
     Related case:
15
LAKSHMANAN PONNAYAN ACHARI, et al,    CIVIL ACTION
16
            Plaintiffs,               No. 13-6218 (c/w
17          v.                        13-6219, 13-6220,
SIGNAL INTERNATIONAL, LLC, et al,     13-6221, 14-732
                                      14-1818
18          Defendants.               SECTION "E"
     _____
19   *Applies to:  David v Signal (08-1220)*

20              TRANSCRIPT OF THE TRIAL PROCEEDINGS
                BEFORE THE HONORABLE SUSIE MORGAN,
21                UNITED STATES DISTRICT JUDGE,
                        AND A JURY
22
     **REPORTED BY:**
23   TERRI HOURIGAN, CRR
     Official Court Reporter
24   500 Poydras Street
     New Orleans, Louisiana 70130
25   (504)589-7775
     terri_hourigan@laed.uscourts.gov

                   OFFICIAL TRANSCRIPT

1    **APPEARANCES:**

2

3    For Plaintiffs:            ALAN HOWARD, ESQ.
                                HUGH D. SANDLER, ESQ.
                                MELIA AMAL BOUHABIB, ESQ.
4                               Crowell & Moring, LLP
                                590 Madison Avenue
5                               New York, NY 10022

6

7                               DANIEL WERNER, ESQ.
                                NAOMI TSU, ESQ.
8                               KRISTI L. GRAUNKE, ESQ.
                                Southern Poverty Law Center
9                               Immigrant Justice Project
                                233 Peachtree Street NE
10                              Atlanta, GA 30303

11                              CHANDRA S. BHATNAGAR, ESQ.
                                American Civil Liberties Union
12                              Foundation (New York/Broad)
                                125 Broad Street, 18th Floor
13                              New York, NY  10004

14   For Signal Entities:       ERIN CASEY HANGARTNER, ESQ.
                                ELHAM RABBANI, ESQ,
15                              HAL UNGAR, ESQ.
                                BRIAN ROUX, ESQ.
16                              ALAN DEAN WEINBERGER, ESQ.
                                LANCE R. RYDBERG, ESQ.
17                              Hangartner Rydberg & Terrell
                                One Shell Square
18                              701 Poydras Street
                                Suite 310
19                              New Orleans, LA 70139

20                              PATRICIA BOLLMAN, ESQ.
                                Patricia Bollman, APLC
21                              P.O. Box 13707
                                New Orleans, LA 70185

22

23

24

25

```
 1   For Sachin Dewan:        STEPHEN SHAPIRO, ESQ.
                              Law Office of Stephen Shapiro
 2                            700 Camp Street
                              New Orleans, LA 70130
 3

 4   For Malvern Burnett:     TIM CERNIGLIA, ESQ.
                              Law office of Tim Cerniglia
 5                            1521 St. Charles Avenue
                              New Orleans, LA 70130
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

1                            **EXAMINATION INDEX**

2
                                                            **PAGE**
3

**CLOSING ARGUMENT**
4    **BY:   MR. HOWARD....................................4847**

5    **CLOSING ARGUMENT**
     **BY:   MS. HANGARTNER...............................4895**
6

     **CLOSING ARGUMENT**
7    **BY:   MR. CERNIGLIA...............................4934**

8    **CLOSING ARGUMENT**
     **BY:   MR. SHAPIRO..................................4955**
9

     **REBUTTAL CLOSING ARGUMENT**
10   **BY MR. HOWARD.....................................4985**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

A F T E R N O O N   P R O C E E D I N G S

* * *

3       MR. SANDLER:  Hugh Sandler on behalf of plaintiffs

4  respectfully submit the following objections to the presently

5  constituted jury instructions.  As to the claim under TVPRA,

6  the plaintiffs object.

7       THE COURT:  Tell me page numbers.

8       MR. SANDLER:  I will.

9       THE COURT:  Because I want to look at it while you --

10  what page number?

11       MR. SANDLER:  I direct the Court, first, to page 20.

12  Under the "TVPRA Claim," plaintiffs object to the first full

13  paragraph which reads, "Whether Signal paid plaintiffs a salary

14  or wage may be considered, but does not determine whether

15  plaintiffs were subjected to forced labor."

16       Plaintiffs object and maintain the language should

17  read, "Whether Signal paid plaintiffs a salary or a wage is not

18  determinative of whether plaintiffs were subjected to forced

19  labor."

20       Moving to page 55.  Plaintiffs object to the Court's

21  noninclusion of the factors upon which a jury may conclude that

22  a fiduciary relationship exists.  The conclusion of this

23  fiduciary duty practice is expressly supported by plaintiffs'

24  Indian law experts Ms. Sharma, whose expertise to opine on

25  Indian law is unchallenged by any party.

1    The support for these factors was submitted to the

2 Court and to all parties by a sworn declaration of Ms. Sharma

3 over a week ago.

4    The fiduciary relationship practice are relevant to the

5 ordinary diligence defense and, therefore, critical to the

6 instructions.

7    Moving to page 56.  Plaintiffs object to the Court's

8 decision that punitive damages are not available for fraud

9 under Indian law.  The Indian high court has that applied

10 punitive damages in the fraud context since the 40s, and that

11 is under the case of *Sheikh Jaru Bepari versus AG Peters* in the

12 high court of Calcutta.

13    Further, the India Supreme Court as recently as 2013

14 reaffirmed the availability of punitive damages under *Sterlight*

15 *Industries versus Union of India* and that's AIR 2013 SCW 3231.

16    Finally, the availability of punitive damages in fraud

17 under India law is expressly supported by plaintiffs India law

18 expert, Ms. Sharma, whose expertise to opine on India law is

19 unchallenged by any party.

20    The support for these facts were submitted to the Court

21 and all parties by a sworn declaration of plaintiffs --

22    THE COURT:  All that is not necessary for you to

23 preserve your objection.

24    MR. SANDLER:  Moving to page 58.

25    Plaintiffs object to the Court's noninclusion, again,

 1     of the fiduciary duty factors under the negligent

 2     misrepresentation claimed.  And that is for the same reasons as

 3     previously stated for its noninclusion under the fraud claim.

 4            Moving to page 61 under "Breach of Contract."

 5     Plaintiffs object to the present intent language on page 61.

 6            While present intent is relevant to promissory

 7     estoppel, it is not an element and, therefore, the two words

 8     must show -- words are objected to by plaintiffs.

 9            THE COURT:  Where are -- where are they?

10            MR. SANDLER:  Page 61.

11            THE COURT:  Okay.  At the last full paragraph on the

12     page.

13            MR. SANDLER:  Yes, Your Honor.  Plaintiffs maintain

14     that effectively establishes it as an element of promissory

15     estoppel.  That is all the objections that plaintiffs have to

16     the jury instructions.  Plaintiffs have no objections to the

17     jury verdict form.

18            THE COURT:  Thank you.

19            Okay.  Mr. Weinberger.

20            MR. WEINBERGER:  Thank you, Your Honor.  I was so

21     amazed by the statement when I heard it, that I wrote it down.

22            This is the first thing I want to talk to the Court

23     about is the RICO instruction and very specifically.

24            The language on page 36, essentially, the middle of the

25     page, "The alleged scheme need not actually succeed in

1    defrauding anyone."  That should be removed.

2            THE COURT:  Let me catch up with you.

3            MR. WEINBERGER:  Of course, Your Honor.

4            THE COURT:  Oh, on page 36.

5            MR. WEINBERGER:  Yes, Your Honor.

6            THE COURT:  Which paragraph?

7            MR. WEINBERGER:  The third one down.  It's one

8    sentence, "The alleged scheme did not."

9            THE COURT:  Okay.

10           MR. WEINBERGER:  Your Honor, that may be appropriate in

11   a criminal case, but it has no business in a civil one.

12           THE COURT:  All right.

13           MR. WEINBERGER:  The next paragraph, this is exactly

14   why I wrote the statement down.  After much, much argument

15   between opposing lawyers on *Bridge*, which you heard about

16   incessantly, the Court accepted a suggestion from plaintiff

17   counsel that you add to your previous instructions the

18   statement, "Also, plaintiff," excuse me, "does not have to show

19   he relied upon the fraud.  In other words, a plaintiff may be

20   injured by fraud directed at another person."

21           Your Honor, it is at 115.  At 1253, you heard

22   Mr. Werner say, "They paid as a result of the green card

23   promises," which is what Judge Zainey found three years ago,

24   and what I spoke about over and over and over again last night

25   when I urged the Court not to charge the jury that they may

1    decide this case on the basis of third-party reliance.

2           Your Honor, if that charge is given, the jury will not

3    be properly guided in its deliberations, and Mr. Werner just

4    proved that.

5           THE COURT:  Remember, we're just preserving your

6    objections.

7           MR. WEINBERGER:  And the grounds therefor.

8           THE COURT:  I want to make it clear for the record,

9    that when we're talking -- we'll -- we sent all of the parties

10   a version of the jury instructions and the jury verdict form

11   late last night.  We will put that in the record so that it's

12   clear when we're talking about page numbers, where you are.

13          MR. WEINBERGER:  And I would be remiss if I did not

14   thank the Court for having so many sessions with the lawyers,

15   such long hours.  Thank you, Your Honor.

16          THE COURT:  You are welcome.

17          MR. WEINBERGER:  At exactly this moment.  If, Your

18   Honor, please, moving on.

19          Your Honor, the next thing.  I provided the Court with

20   citations.  Judge Barbier's incredible decision in BP that

21   explains the difference between *Hemme* --

22          THE COURT:  Are we still on page 36?

23          MR. WEINBERGER:  I'm leaving it.

24          THE COURT:  Okay.

25          MR. WEINBERGER:  There is a wealth of material in this

1    record on that point.  Of course, Mr. Werner just sealed it
2    with his own statement.
3            If you would, Your Honor, please moving on to the TVPRA
4    issue.
5            THE COURT:  What page?
6            MR. WEINBERGER:  Well, if you will bear with me, Your
7    Honor, one moment.  The reason I'm not focused on a page so
8    much, but it is page 17 and thereafter.
9            Your Honor, our objection to this charge is to the
10   complete charge and for many reasons.  As you well know from
11   our many conversations, whether the charge -- Your Honor to
12   begin with -- whether the charge is literally and consciously a
13   result of the retroactive application of the 2000 amendments --
14   2008, excuse me, amendments to this statute, the effect is
15   exactly the same.
16           The definition of serious harm is identical to the
17   December 2008 version of 1589.  The definition of legal
18   coercion is identical.  As is the notion that the plaintiffs
19   should be studied in a particular way.  Your Honor, this is a
20   criminal statute which must be strictly construed.
21           THE COURT:  You need to give specific objections.
22           MR. WEINBERGER:  All right.  Your Honor.  Distinctly.
23           THE COURT:  Quickly.  The jury is waiting for us.  I
24   want to preserve your rights.
25           MR. WEINBERGER:  Your Honor, we object to the language

1   on page 18.  The first full paragraph should be removed.  The

2   second full paragraph should be removed.  The third full

3   paragraph should be removed.

4       The paragraph on page 19 that begins, "The fact that."

5   Given the strict construction of the statute that is required,

6   that is the opposite of that we argue, Your Honor.  That is a

7   liberal.

8       Your Honor, while the paragraph on page 20 that begins,

9   "Whether Signal paid," is, in a sense, favorable, to Signal,

10  once again it is a function of a construction of the statute

11  that isn't supported by the language of it.

12      THE COURT:  You asked for that language.

13      MR. WEINBERGER:  Your Honor, I asked for it to be

14  modified, so that it didn't solely refer to determinative.

15      The same thing with regard to the next paragraph and

16  the next paragraph.  None of that is supported by the language

17  of the statute in 2006, 2007.

18      Your Honor, not only strict construction, but the rule

19  of lenity applies.

20      Going on to forced labor and trafficking, yes, Your

21  Honor, as you know, we object to the language specifically, if

22  Your Honor, please, Paragraph 2, "The defendant acted with the

23  knowledge that the person."

24      That is nowhere in the statute.  It isn't supported by

25  the statutory language.  This charge should track the language

1    of the statute itself.

2           Your Honor, we object to the fact that the Court chose

3    not to charge on the basis of the *in pari delicto* defense with

4    regard to the RICO case.  The grounds, therefore, Your Honor,

5    there is evidence in this record that these people were

6    complicit.

7           The charge is warranted.  We cite the *Hills Farm* case,

8    which, essentially, said if there is knowledge, the charge is

9    warranted.

10          We asked the Court to adapt the *in pari delicto* defense

11   for use in the TVPRA case.  The Court chose not to do that.  We

12   object to that.

13          Your Honor, with regard to India fraud, turning to

14   page -- Your Honor, page 54.  The paragraph at the bottom of

15   the page, the next paragraph, the paragraph after that on

16   page 55, all of those paragraphs together reflect the decision

17   of the Court not to charge the jury, that the plaintiffs had a

18   responsibility and a burden to exercise ordinary diligence, not

19   only with regard to fraud that may result from silence, but

20   also fraud that may result from misrepresentation.

21          As you know, this is a raging dispute between the

22   parties.  Your Honor, the very specific reason for the Fifth

23   Circuit, that we argued to you that we should have won that

24   argument, is the word "misrepresentation" is explicitly used in

25   Section 19 of the Indian Contract Act.

 1          The clear and unambiguous language of the statute

 2   accordingly indicates that that should be part of the charge,

 3   diligence with regard to misrepresentation.

 4          Moving on, Your Honor.

 5          You will give me one second to look at my notes just to

 6   make sure I haven't forgotten something.

 7          Moving on, Your Honor, from that to the verdict forms.

 8   We have very few objections to lodge.

 9          THE COURT:  All right.

10          MR. WEINBERGER:  If Your Honor, please.  Some of these

11   issues are issues we discussed last night, Your Honor.

12          Turning to page 5 of the verdict form, Question No. 1.

13   Your Honor, the Fifth Circuit teaches that the standard for

14   motion with regard to a verdict form under Rule 49 there are

15   two overarching issues; the fairness of the question, and the

16   clarity of the question.

17          The first question on this page, as I indicated to the

18   Court last night, fails that test or those two tests because

19   the question ends with the words "labor or services."  It

20   should, at least, track the language of the statute in order to

21   acquire an answer that is responsive to the issue the Court has

22   decided -- the jury has decided, which is whether the

23   trafficking occurred for the purpose of -- for the purpose

24   of -- or for -- actually, the exact language of the statute,

25   the word "purpose" is not actually in 1590 during this period.

1     "For labor in violation of this part of the criminal code."

2     That question should say that.

3            Moving on, Your Honor.

4            Your Honor, page 41, regarding clarity and fairness.

5     Your Honor, Signal does object with regard to the first

6     question concerning fraud.  We object to the length of the

7     question.  We object to the fact that it repeats the

8     instruction, and we object to the compound nature of the

9     question.

10           And we object, most fundamentally of all, to the fact

11    that it doesn't actually ask the most salient question of all,

12    which is whether they found that there was fraud, which is the

13    ultimate issue under the federal rules of evidence and the real

14    question they are going through.

15           They don't need all of this.  You have instructed them

16    on all of that, and they listened to you carefully, and they

17    have understood everything that you have said.

18           They know how to find fraud as a matter of Indian law.

19    The only thing they should tell you is that they find it.

20    Moving on, Your Honor.

21           We make the same objection with regard to the

22    misrepresentation question.  Your Honor, those are very, very

23    long questions.  And again, with regard to misrepresentation,

24    the question should be whether they find that there is

25    negligence, which is nowhere in here.  That is the ultimate

1    issue.

2            We ask the Court not to repeat its instruction in these

3    questions.

4            Thank you, Your Honor.  We are finished.

5            THE COURT:  All right.  Mr. Cerniglia?

6            MR. CERNIGLIA:  Your Honor, I only have one objection

7    on the jury verdict form for the breach of contract, that there

8    is no corresponding --

9            THE COURT:  Tell me where you are.

10           MR. CERNIGLIA:  It's the page for Burnett on breach of

11   contract, that it actually be applied to all of them.  There is

12   nothing on there.  That is the objection.

13           THE COURT:  So there is a blank page.

14           MR. CERNIGLIA:  I would like to have included a

15   determination whether any of the plaintiffs breached the

16   contract.  And I'm not even sure what contract.

17           THE COURT:  Do you have a copy?  Somebody hand

18   Mr. Cerniglia a copy.  We need to be more specific.

19           MR. CERNIGLIA:  All right.

20           THE COURT:  What claim number is it?

21           MR. CERNIGLIA:  Actually, it's a breach of contract.

22           MR. SANDLER:  60 of the verdict form.

23           MR. CERNIGLIA:  It's breach of contract or promissory

24   estoppel.

25           THE COURT:  All right.  What is the objection?

1        MR. CERNIGLIA:  My objection is there's no place for

2   the jury to determine whether or not any of the plaintiffs

3   breached the contract.

4        THE COURT:  So what would you add?

5        MR. CERNIGLIA:  I would add under A3, before you get to

6   the number -- in replacement No. 3, making No. 3, No. 4, as:

7   "If you have answered yes, then the question would be:  Do you

8   find from a preponderance of the evidence that any of the

9   following plaintiffs breached the contract with Burnett?"

10       And that would be down -- you know, same thing -- we

11   had Sony Sulekha, yes no; Jacob Joseph Kadakkarappally, yes,

12   no.  That should be in there.

13       THE COURT:  Anything else?

14       MR. CERNIGLIA:  No, that's it.

15       THE COURT:  Mr. Shapiro?

16       MR. SHAPIRO:  None from Dewan.

17       THE COURT:  I think Mr. Weinberger has already had a

18   shot for Signal.

19       MR. HASENKAMPF:  We would like to lodge an objection to

20   the indemnity cross-claim instruction.  We urged an

21   agency-based instruction.  Instead, the Court adopted a

22   torte-based instruction, and that is the extent of the

23   objection.

24       THE COURT:  Okay.  A couple of things.  One, is the

25   plaintiffs want to use some of the parts of the jury verdict

1    form during closing argument, and what they have done is taken

2    the jury verdict form we sent out last night and removed any

3    questions about damages, I believe.

4            MR. HOWARD:  That's right, Your Honor.

5            THE COURT:  Made no other changes.  Does anyone want to

6    lodge an objection to that?

7            MR. WEINBERGER:  Your Honor, I rise simply to refer to

8    the typical line that all judges ask lawyers not to cross

9    excessively in closing argument between the province of the

10   Court with regard to legal instruction and the things that the

11   lawyers are doing.

12           Can we at least establish that Signal will have the

13   right to do the same thing?

14           THE COURT:  Well, yes.  What I'm not expecting any of

15   you -- you are going to tell the jury the Judge is going to

16   instruct you on the law.

17           But you -- often in closing argument, lawyers will put

18   the jury verdict form on the ELMO and -- or whatever, and talk

19   about how it's filled in.

20           I don't have any objection to anyone doing that.  You

21   know, as I have told you, I'm going to separate out the damages

22   from the version you have right now.  We're going to do this in

23   Stage 1 and Stage 2.  I just haven't done that yet.  So

24   Mr. Howard did it himself.

25           But just so the rest of the form is the same as what I

1    have provided to you, I don't have a problem with it.

2        MR. WEINBERGER:  Then I accomplished what I wanted.  We

3    know where the lines are.  Thank you, Your Honor.

4        MR. HOWARD:  Just to clarify as well, Your Honor, we do

5    have one slide which has some of the language from one of the

6    instructions on punitive damages, which was agreed to by

7    Signal.

8        They withdrew any objection they had to that.  There

9    are a couple of other instructions that I intend to allude to

10   with the jury in my closing, but make it clear you will be

11   instructing on the law.

12       THE COURT:  In other words, you are going to take the

13   damage where there is a line and a number for damages?

14       MR. HOWARD:  No.  I'm talking now purely about

15   instructions.  As far as using any verdict form on the ELMO,

16   that has no damage question in it whatsoever.

17       THE COURT:  Okay.

18       MR. HOWARD:  But in terms of some of the things that we

19   know you will be instructing on in terms of the law, I plan to

20   allude to them.  And in the case of punitive damages, at least

21   I have one slide where it reads exactly the same as what you

22   are going to be instructing.

23       THE COURT:  As to the instructions?

24       MS. HANGARTNER:  We had spoken about this yesterday.  I

25   just wanted to ensure that Mr. Howard, when he alludes to the

1    law, doesn't go too far afield and then begin to mix emotion

2    and facts into what this Court should actually be directing the

3    jury to do at the end of the day.

4           MR. HOWARD:  I won't be doing that, Your Honor.

5           THE COURT:  Okay.  There is one other thing I wanted to

6    mention to you.  We talked about this in chambers.  I think

7    it's on the record.

8           As I said, I'm dividing this into Stage 1 and Stage 2.

9    And the plaintiffs confirmed that their Claim 5 for fraud and

10   Claim 6 for negligent misrepresentation are alternative

11   remedies.

12          So what I proposed, and I think everyone agreed, is

13   that it would have been -- because of the time it took us to do

14   the jury instructions and doing this late at night last night,

15   it would have taken too much time to take -- to change the

16   instructions.

17          What I plan to do is if the jury finds for any

18   plaintiff on fraud and negligent misrepresentation as to any

19   defendant, in Stage 2 I'm just going to provide the jury with

20   the verdict form on fraud, damages, as to that plaintiff,

21   because if the plaintiff recovers on fraud, they shouldn't

22   recover on negligent misrepresentation.

23          So we will take care of this in Phase 2, because they

24   can't find damages on negligent misrepresentation because I'm

25   not going to give them a form to put it on.

 1          MR. WEINBERGER:  And I rise simply to state that there

 2     is no objection to what the Court has just described from

 3     Signal.

 4          Thank you, Your Honor.

 5          THE COURT:  All right.  Thank you.

 6          All right.  We're going to take a break.  We will --

 7     let's say 1:40, we will start closing argument.  And then, you

 8     know, before the day is over, we will have made any changes and

 9     split up the jury verdict form so that we will be ready

10     tomorrow.

11          MS. HANGARTNER:  May I ask just one question, Your

12     Honor, technical one?  Since we gave openings in the other

13     courtroom, are we going to be able to turn this podium around

14     like we did in Judge Lemmon's --

15          THE COURT:  Well, it will turn, so give it a whirl.

16          Okay.  Do you want to move that table now?

17          CASE MANAGER:  I was going to do all of that.

18          THE COURT:  We'll do that at the break.  Does anyone

19     need the easel?

20          Okay.  It sounds like we're almost ready.

21          THE COURT:  Okay.  We're going to go back on.

22          THE CLERK:  Everyone rise, please.

23          THE COURT:  Any other issues we need to talk about

24     before the jury comes in?

25               All right.  Let's bring them in.

OFFICIAL TRANSCRIPT

1              (JURY ENTERS THE COURTROOM.)

2          THE COURT:  Ladies and gentlemen of the jury, we're now

3      going to hear closing arguments from the parties.  We're going

4      to start with Mr. Howard for the plaintiffs.  And just so you

5      won't be worried, we will take some breaks during the

6      afternoon.

7          MR. HOWARD:  Thank you, Your Honor.

8                      CLOSING ARGUMENT

9          MR. HOWARD:  Ladies and gentlemen, first of all, on

10     behalf of myself, my team, and my clients represented here

11     today by Mr. Andrews, I want to thank you for your service.

12     It's been four-plus long weeks.  And I know you have all paid

13     incredibly careful attention to all of the evidence and all of

14     the testimony in this case, and I don't just give this lightly.

15         As a jury, you are the best part of our judicial system

16     -- the American judicial system and the jury system is unique

17     in the world.  This is one of the only places in the world

18     where a jury like yourselves in a civil case like this one can

19     correct injustices.  And you have also had an opportunity as a

20     jury to get what very few people get, and that is an inside

21     look at what happens inside companies in this country like

22     Signal, what they do behind closed doors that they never intend

23     to share with the public.  You have had that opportunity.

24         Now, my closing argument is my opportunity to stand

25     before you and summarize all of the evidence and all of the

1    testimony in the case.

2         I spent a lot of time and a lot of work pulling

3    together exhibits and testimony.  I had 152 slides ready to

4    walk through with you in the next hour or so.  And then I

5    realized you have been with me here all along.  You have seen a

6    lot of this evidence.  You have heard the testimony.  You know

7    what the evidence shows.  You know who has been telling the

8    truth and who has been less than truthful.

9         I am going to walk through some of the evidence that I

10   think underscores some key points, and show how that supports

11   the claims we are going to be asking you to render a verdict

12   on.  But I want to just talk to you a little bit.

13        I mentioned in the opening statement that this was a

14   really important case, one of the most important cases to be

15   heard in this courthouse in a long time.  And I think now you

16   know why.  What is decided in this case goes beyond just these

17   five plaintiffs.  It goes beyond even the 500 workers who were

18   brought to Signal.  You see, this case has implications for all

19   companies that hire foreign guest workers.  In fact, it has

20   implications for all companies that hire any workers.

21        The terms of the H-2B guest worker program, as you have

22   learned, means that the worker -- and this is a foreign worker

23   who is invited to our country; they call them "guest workers"

24   because they're our guests -- that can only work for the

25   company that sponsors them, that puts in the petition that gets

1    approved by the U.S. government.

2            The U.S. government puts its trust in companies to

3    treat these workers appropriately and fairly.  Signal breached

4    that trust.

5            The workers, the foreign workers, put their trust in

6    Signal to treat them appropriately and fairly.  Signal breached

7    that trust.  Signal did not treat them fairly, did not treat

8    them with respect, and even tried to take away their dignity.

9            And now you, the ten of you, together, have an

10   opportunity to do what no other ten people in this country can

11   do.  Myself and my team, as gifted and wonderful attorneys as

12   they are, can't do it.

13           Judge Morgan and every other judge in this courthouse

14   cannot do it.

15           President Obama and all of Congress in Washington can't

16   do what the ten of you can do.  And, that is to correct the

17   injustice that has been done in this case, to teach Signal and

18   send a message to any other company that is going to treat

19   workers this way that the trust placed in them by the

20   government, placed in them by the workers cannot be breached.

21   That fraud, discrimination, and exploitation have no place in

22   our country.

23           Now, as I mentioned before, you all have gotten an

24   inside view, an opportunity very few people get.  You have

25   gotten to see how a company like Signal made its decisions,

1    what the people who ran this company were thinking about when
2    they made the decisions they made.
3          And, the evidence is quite revealing in that regard.
4    What happened behind closed doors at Signal, you have now
5    gotten to see.  You have seen documents they never expected the
6    public to see.
7          I will show you an example of one.  Exhibit 940, this
8    was Mr. Schnoor's response when Signal received that letter
9    from the Southern Poverty Law Center on behalf of the Indian
10   workers.  What was the Southern Poverty Law Center asking?  An
11   opportunity to sit down and discuss the issue, talk about the
12   conditions at Signal, have a good faith dialog.
13         And this was Mr. Schnoor's response.  "We're going to
14   teach them a lesson.  Before the week is over, these Indians
15   will know, and so will their liberal lawyers, that we're not
16   afraid to fight."
17         Do you think Signal would have liked that published in
18   the Times Picayune?  No.  That was a private document.
19         We know what Signal wanted published in the Times
20   Picayune.  We had that, their press release.
21         This is what they told the public after the lawsuit was
22   filed.  "Signal stands behind its workers.  Signal won't back
23   down until its workers are made whole."
24         Well, because you have gotten this inside view, you
25   have the internal documents, you know the truth.  And the truth

1    was not what Signal is telling the public.  The truth is that

2    Signal knew that the workers had paid high fees, knew that the

3    workers had gone into debt, that they had been made promises of

4    green cards and that that was a false promise, and that these

5    men were trapped in Signal's man camp.

6         And the truth is, when the workers complained, when

7    they sought help from lawyers to get made whole, what did

8    Signal do?  "Taught them a lesson" by firing Mr. Jacob and

9    Mr. Sabulal, and firing them in a way to make an example to all

10   of the other workers, just as Mr. Schnoor said they would.

11        Here is another document that I'm sure Signal would

12   never have wanted to be made public.  I showed you this in the

13   opening.  The e-mail about Mr. Taft going to India would be

14   smelling better than most of the Indians.

15        What is really egregious about this, it was circulated

16   to most of the supervisors at Signal.  It was sent to

17   Mr. Bingle.  It was sent to Ms. Binion, the head of HR for

18   Signal.  This was business as usual at Signal.  Demeaning,

19   racial stereotypes.

20        If it were not for this lawsuit, if it were not for

21   this e-mail and many others like it becoming public, do you

22   think Signal would have done what they finally did in 2014 and

23   actually start following their own internal policies on

24   antiharassment and antidiscrimination?

25        Signal would still be doing what they were doing then,

1    today.

2           You heard Mr. Snyder's testimony, "This is a white

3    man's company."  And you can tell from all of the evidence you

4    have seen in this case and the testimony you have heard that

5    the men who ran Signal looked down on the Indians and saw them

6    as nothing more than a way to make money.

7           We know that from another private document.  This is

8    the memo that went out in June of 2007 to the owners of Signal,

9    ACON Offshore Limited Partners.  The Wall Street men who are

10   making money when Signal made money.

11          And, boy, were they happy in June of 2007, they got

12   their distribution Number 9 of $4.5 million.  And they got it

13   because of the Indian workers, because Signal did what their

14   competitors did not do; that is, used the H-2B system, used the

15   recruiters and an immigration lawyer, made false promises, put

16   workers in debt, brought them to Signal so they could work off

17   their backlog of contracts.  So they could go out and bid for

18   more contracts, get more business.  So they could raise their

19   profits by 100 -- I mean their revenues by 145 percent and

20   their profits by 50 percent in the first quarter of 2007 alone,

21   and distribute all of that money.

22          They could be darn sure that Mr. Marler did not want

23   the public to know that, not only did he share in these

24   profits, not only did he make his $300,000-plus, six-figure

25   bonus salary each year, he made another $4 million --

1    2.8 million after taxes -- because of the money that Signal

2    made from the Indian workers.

3          Now, Signal wants you to think they cared about the

4    workers.  They always did.  That they brought these workers in

5    despite knowing about the high fees and despite knowing about

6    the false promises because it would be good for the workers.

7    You know, they had no other way to make the money over there in

8    India, so let's do them a favor.  Even though we know we have

9    no intent to get them green cards, and even though we do

10   nothing, nothing, to tell them the truth, let's just keep

11   bringing them here because it will be good for them.

12         If -- that is their story now.  If that story were

13   true, it's reprehensible enough.  But the true story is they

14   didn't think about the workers at all.  All they thought about

15   was how to make money.  And we know this because I asked

16   Mr. Schnoor that question at his deposition.  At least one

17   honest answer he gave me.

18         "QUESTION:  Well, did you give any thought to what was

19   in the best interest of the Indian workers who were still in

20   India in making the decision to continue to bring them to

21   Signal?

22         "ANSWER:  Eventually.

23         "QUESTION:  Eventually, when?

24         "ANSWER:  Later in 2007."

25         In other words, he thought about the next crop of

1    Indians that he was going to bring in, and maybe I should think

2    about whether we should tell them the truth.  But for those

3    waves of Indians workers, including our plaintiffs, that Signal

4    made the decision to bring in, dispute the high fees, despite

5    the false promise, he didn't think about those workers at all.

6          Now, he did change his testimony in court.  He said,

7    Oh, I must have not understood the question.

8          You can read the question.  It's not that hard to

9    understand.  But he said now:

10         "ANSWER:  I didn't understand the question, perhaps.

11   But I was always concerned about the Indians."

12         That is Mr. Schnoor.  Always concerned about the

13   Indians.  The one who told them on March 8th, If any of you sue

14   Signal, you will all be going back to India.  The same

15   Mr. Schnoor who fired Mr. Jacob.  And we will talk about that.

16         I want to talk for a second, though, about this notion

17   of changing deposition testimony.  How many times during this

18   trial did my colleagues and I, when examining Signal witnesses,

19   have to remind them of what they had said in their deposition

20   and how it was different than what they were telling the Court?

21         And just as you will recall what a deposition is, a

22   deposition is something really, really important.  You gather

23   not in a court, but in a conference room, but the witness is

24   reminded that the testimony can be read just as if the witness

25   was sitting on the witness stand.  There is a court reporter

1    just like this young lady here taking down everything the

2    witness says.  The witness has to swear an oath, just as they

3    do here in court, that they're going to tell the truth.

4         Well, think about our five plaintiffs.  All of them

5    were deposed for days.  Days of deposition.  They are welders

6    and fitters from India.  They are not even used to the whole

7    nature of our judicial system, but they gave days of testimony.

8         English isn't even their first language, and their

9    testimony from the time of their deposition to the time they

10   took the witness stand didn't change a bit.  Because that's

11   what happens when you are telling the truth.  Facts are the

12   facts.  They don't change.

13        But in Signal's case, the story changed because when

14   it's just that, a story, it's hard to keep the story straight

15   sometimes.

16        Now, Judge Morgan, after we finish all of the closing,

17   before you do deliberations, is going to give you some

18   instructions, read you instructions on the law.  And one of the

19   things she is going to tell you is that you can ask yourself,

20   when weighing the credibility of a witness, whether there was

21   evidence of the witness saying something different at some

22   other time.  I submit to you that is what Signal did in almost

23   every case.

24        And in her instructions, Judge Morgan is also going to

25   tell you that, if the witness is found by you to be untruthful

1  or has been discredited, you have the right to reject all of

2  the testimony given by that witness in any and all particulars.

3       What that means is, if you decide someone has not been

4  telling the truth about something, say like the reasons

5  Mr. Jacob was fired, you can reject all their testimony and

6  find they weren't being truthful with you about anything.

7       How does that apply to Mr. Marler, the president and

8  CEO of Signal.  The buck stops with him.  I went back to the

9  transcripts.  You know how many times I had to show him his

10  deposition and show him that he changed his answer completely

11  from his deposition to his time in court?  17 times.  I think

12  it's a record.

13       The very last answer he gave in my examination of him,

14  the question I asked him at his deposition -- well, the

15  question I asked him in court:

16       "QUESTION:  Mr. Marler, I'm looking for a yes or no

17  answer to this question.  It's true, is it not, that you and

18  Signal made money as a result, at least in part, of some

19  workers coming to Signal and a recruiting process where they

20  were victimized by promises of green cards, and excessive fees?

21       "ANSWER:  No."

22       What was the answer to that very same question at his

23  deposition?  You can read the question, exactly the same

24  question.  I asked it exactly the same way.  The answer at

25  deposition:  "Yes."

1          So, you have seen internal documents and you have seen

2    some documents, too, for the other defendants.  I don't want to

3    forget about them.  You have seen some documents from

4    Mr. Burnett that I'm sure he didn't want the public to see.  In

5    fact, he testified those were not intended for the public,

6    where he refers to his own legal clients, the Indian workers,

7    as "idiots" and "dolts."

8          You saw an e-mail just today during my colleague's

9    cross-examination of Mr. Dewan -- Mr. Dewan, who said he would

10   never do anything to injure anything of his countrymen.  Well,

11   in the private e-mail that he sent to Signal, he said, Let me

12   recommend the workers I think you should deport first,

13   Mr. Jacob and Mr. Sabulal.

14         I'm sure he didn't intend for the public to see that

15   document.

16         I want to move now and talk about something that is

17   really crucial and the heart of this case.  I call it the big

18   scam, and that is the promise of green cards.  Now, like many

19   scams, there are a lot of moving pieces, and you have got to

20   really find all of the pieces and finally put the picture

21   together.  And I think you now get the picture.

22         Here, I think a slide will help.  The green card

23   promise, the big scam.  Signal authorized its agents to make

24   the green card promise.  But at the same time, Signal had no

25   intent to honor that promise.  Signal kept bringing in hundreds

1    of workers that they knew had been made this false promise, and

2    then they made the biggest scam of all; they come and tell you,

3    Oh, but if they had stuck around, we would have sponsored them

4    for green cards.

5         I want to walk through the testimony here and how these

6    pieces fit together a little bit.  So did Signal actually

7    authorize its agents to make the green card promise to every

8    Indian worker?  Mr. Bingle admitted that on that stand.

9         "QUESTION:  And so is it fair to say, based on your

10   conversations with him, Mr. Dewan, and your understanding of

11   what Mr. Dewan was doing for Signal, that he was authorized to

12   tell the workers that Signal was going to sponsor all of them

13   for green cards?

14        "ANSWER:  Yes."

15        Cut and dry.

16        Now, that green card promise which was put in an ad,

17   permanent employment visas, that is a hook that got the clients

18   in the door.  They would never have even called Mr. Dewan's

19   office, let alone have to go, you know, into debt and gather

20   the fees and end up in Signal's man camp, if it wasn't for that

21   hook.

22        You look at ads, and it says what you are going to get.

23   You think, "That is worth it.  I'm going to go in.  I'm going

24   to make the call."

25        If it had said just temporary, these guys were already

1   gone on temporary visas to Dubai and Singapore, they weren't

2   interested in that.  It was the permanent visa, the opportunity

3   to come permanently to America, which is what interested them

4   and drew them in.  And the other documents all said the same

5   thing.

6         "The company shall proceed with your employment-based

7   permanent residence visa for the United States."

8         Mr. Burnett testified that:  "This was consistent with

9   the promise you believed you were authorized to make by Signal,

10  correct?"

11        "ANSWER:  Yes, Signal represented that they would

12  petition for all of the H-2B workers that arrived to work for

13  them, correct."

14        Petition for green cards for all of them.  Mr. Burnett

15  thought he was authorized.  I don't have a slide because

16  Mr. Dewan just said it this morning.  I will read you what I

17  heard him say.  That is, not only did he understand that Signal

18  was authorizing him to make this promise, he had a conversation

19  with Mr. Bingle in October, exactly as Mr. Bingle says.  They

20  are online at that point.  Mr. Dewan said, Mr. Bingle told me

21  that Signal would sponsor each and every one of these workers

22  for a green card, which is why I indeed made that promise to

23  each and every worker.

24        Now, you are going to hear during the instructions and

25  you are going to see in the jury verdict form this thing about

 1     agency.  Now, there is no question here, and even Signal refers

 2     to Mr. Dewan and Mr. Burnett as their "agents."  They gave them

 3     agreements, they gave them powers of attorney.  But what Signal

 4     is going to tell you is, Well, these agents weren't authorized

 5     to make that promise of green cards, so we're not responsible

 6     for it.

 7             In other words, if I, Mr. Bingle, didn't make -- if I,

 8     Mr. Malvern, didn't make that promise directly to Mr. Andrews,

 9     then we're off the hook.

10             That's not the way agency works, and the judge will

11     instruct you on this.

12             The first way it works is if you expressly authorize

13     your agent to do something, you are responsible for it.  And

14     you just saw Mr. Bingle's testimony, he expressly authorized

15     the promise.

16             There is also something called "apparent authority."

17     And there, you have people from Signal standing side by side in

18     India during seminars and during the testing.  Documents were

19     even handed out with Signal letterhead.  Every one of these

20     workers thought Mr. Dewan and Mr. Burnett were working for

21     Signal.  And Signal never said anything differently.

22             And then there is a third reason.  I'm going to talk

23     about this in a little bit, but I will mention it.  It's called

24     "ratification."  Ratification is when you know something is

25     happening, and then you go along with it, and you go along with

1    it intentionally so you can benefit.

2           Signal ratified what was happening because when they

3    knew about the false promises, they didn't correct them.  They

4    kept bringing hundreds more workers to Signal with that false

5    promise.  That is ratification.

6           So at the end of the day, you might actually decide,

7    you know, with the authority that Mr. Burnett had and

8    Mr. Dewan -- and we will talk about them in a bit, they did

9    their own things -- but you might decide, you know what --

10   maybe they're not responsible for the promises.  But no matter

11   what, Signal is.  Signal authorized the promises, they

12   benefited from it, they knew what they were doing.

13          So all of them or just Signal, but Signal doesn't get

14   off the hook by saying, "Our agents did it."  Or as they said

15   in the press release, "These unscrupulous people, we had no

16   idea what they were doing."  Or as Mr. Marler said when he

17   wrote to Jennifer Ludden, who is with the press release:  "We

18   want a positive story.  Some U.S. middleman, some U.S. lawyer

19   did this.  We were not involved."

20          Not involved?  Signal was running this thing.

21          Now, as I said, with Mr. Burnett, he's an immigration

22   lawyer.  He should have known better.  He knew that the system

23   would not let these workers get a green card without coming

24   back to India and waiting a long time.

25          So he's responsible for misleading the workers as well.

1    And the workers put their trust in Mr. Burnett, an immigration

2    lawyer, and he breached that trust.

3            The workers also put their trust in Mr. Dewan, a

4    licensed recruiter in India.  And he testified, though, that he

5    was misled by both Signal and Mr. Burnett, so he's not

6    responsible.  But you also heard him say that he came to Signal

7    in January of 2007, sat in the meeting and learned the truth

8    that these guys would all have to go back to India and wait and

9    wait and wait before getting a green card, and he didn't bother

10   to tell any of them that.

11           Now, bottom line, though, this promise, the green card

12   promise at the time it was made was a false promise, because

13   Signal had no intent to sponsor any worker for the green cards.

14   To Signal, they were temporary labor.

15           How do we know that?  Mr. Marler, Exhibit 900.  This

16   was about that MDA grant.  You recall this.  What was this

17   about?  Signal was trying to get more money out of the State of

18   Mississippi, $200,000 to beautify their facility.  But they had

19   to tell the State of Mississippi how many workers they had

20   there.  The State of Mississippi wants to know how many workers

21   they had, and they put restrictions when they give out this

22   money.

23           So Signal is saying, should we count the Indians or not

24   count the Indians?  They decided, we don't have to count the

25   Indians.  Why don't we have to count them?  As Mr. Marler said,

"By the time we get this money, the Indians will be gone.  They are temporary workers."

Mr. Marler had no intent for a single one of these Indian workers to be there permanently, even though Mr. Bingle was over in India saying, "Yeah, yeah, tell them we'll sponsor them for green cards."

How about Mr. Schnoor's testimony?  Well, I asked Mr. Marler if that was his view.  I said:

"QUESTION:  That was your view in February of 2007, right, that by the time this gets to the approval cycle, they will be gone?"

And he agreed that it was.

And Mr. Schnoor testified about the same e-mail.

"QUESTION:  My question to you isn't about Mr. Marler, it's about Signal.  At the time of this e-mail, February 22nd, 2007, did Signal have the intent to seek permanent residency status for any Indian workers?  The answer is no, correct?

"ANSWER:  At that time, that's correct.  We didn't have it."

Just so there is no question at all.

"QUESTION:  Mr. Schnoor, I don't want to go over everything from yesterday, but I think we established that, as far as Signal was concerned, no guarantee could be given to any worker that Signal would even file for a green card for them. Isn't that right?

1        "ANSWER:  That's exactly what I said yesterday, that's

2    correct."

3        So the clear testimony from Signal is:  Even though

4    they had their agents over making promises to these workers, we

5    will sponsor them for green cards, they had no intent to do so.

6        That is a fraud, ladies and gentlemen.  You can't get

7    any more clear.  Just put Mr. Bingle's testimony side by side

8    with Mr. Schnoor's.

9        "QUESTION:  Did you authorize Mr. Dewan to promise a

10    green card for every worker?

11        "ANSWER:  Yes.

12        "QUESTION:  Did you have any intent to sponsor every

13    worker for a green card?

14        "ANSWER:  No."

15        Just to show it wasn't just Mr. Schnoor and Mr. Marler,

16    we have the testimony from the third head of Signal,

17    Mr. Cunningham.  Mr. Cunningham's testimony is these Indian

18    workers are going to be gone in ten months or a year.  His view

19    was, "We are going to build this man camp, we are going to

20    cycle through new crops of Indian workers, get them to pay for

21    the man camp.  This group will stay for a year, go back, and we

22    will get more."

23        And Signal kept bringing in the workers.  They kept

24    bringing in the workers because they needed them.  And this is

25    what I was telling you about ratification.  Then I asked

1   Mr. Schnoor:

2           "QUESTION:  What was your mindset in 2006 when you made

3   the decision to keep bringing in workers from India who you

4   knew had all been promised that Signal would get them green

5   cards, and I want to know whether your mindset at that time was

6   that's a false promise because I don't know which, if any, of

7   these people are going to be sponsored for green cards?"

8           He said:

9           "ANSWER:  At the time, that's correct."

10          How about this?

11          "QUESTION:  So for two more months, hundreds more

12  workers came that you knew had been made false promises, sold a

13  bill of goods, and that paid too much money, isn't that right?"

14          "ANSWER:  That's what I believe."

15          It's not only what Mr. Schnoor believed, it's what

16  happened.  And Signal had a choice.  Signal could have told the

17  workers the truth.  Signal could have said, you know, we don't

18  know if we're going to sponsor any of you guys for green cards.

19  The most we can say is you will be here for ten months, then we

20  will see what happens and, by the way, while you are here, you

21  have to live in our man camp.  And while you are living in our

22  man camp, you have to pay us not just the cost of running the

23  man camp, you have to pay us back for the money we spent to

24  build this man camp because we built it for you Indians.

25  That's the deal.  Do you like it?  Do you want to come?

1    Not one of the workers would have come under that deal.

2    Signal knew that.  That's why they didn't tell them the truth.

3    Signal let them believe that they were going to get green

4    cards.  They dangled that carrot, and that's what brought the

5    workers there.  And then they kept dangling that carrot while

6    the workers were there.

7    January, Mr. Sanders and Mr. Burnett get up in front of

8    the mess hall and said, Yeah, yeah, yeah, we're going to go

9    through and get your green card, don't worry about it.  You

10   just keep behaving.  Don't worry about it.  You will get your

11   green cards.

12   The next month, Mr. Marler is writing to the MDA grant,

13   They will all be gone.

14   That was the carrot.  We will talk about the stick when

15   we talk about March 9th.

16   And why did they do this?  Because they desperately

17   needed the workers.  Mr. Marler told me in his deposition -- of

18   course, he reversed himself on the stand in this court -- these

19   workers were critical to Signal.  And you know because you

20   heard the evidence from Dr. Mehta and others about all of the

21   ways these workers were so important to Signal.  They needed

22   them to do the backlog of work, the contracts; that if they

23   didn't get the work done with their shortage of labor, they

24   would have to pay millions of dollars in delay penalties.  They

25   also used them to get new work, more contracts.

1      They had a competitive advantage because Signal got

2   these workers when their competitors didn't.  That's okay to

3   compete in business.  You are in business.  But you got to

4   compete fairly.  You don't compete by defrauding people and

5   getting a 500-person labor force under terms of fraud.  That is

6   not the way American businesses are supposed to behave.  It's

7   certainly not what the U.S. government has in mind when it

8   gives an entitlement to companies like Signal, gives them a

9   privilege of bringing in guest workers to help them compete.

10      Again, that is a privilege that the government puts

11   their trust in Signal.  When they behave this way to get a

12   competitive advantage to make millions of dollars, that is a

13   breach of the trust.

14      And as I told you before, there is nobody else in the

15   world, other than you ten, who can set that right.

16      Now, the last part of the scam, the smoke screen.

17   Signal's story now, Oh, well, if they had just stayed at Signal

18   like 81 people did, we would have sponsored them for green

19   cards.  Well, first of all, you know that is a scam and a smoke

20   screen because of what I just showed you about their intent.

21   Their intent all along was not to do that.

22      So after they get sued, now they say, "Okay, we will

23   sponsor them for green cards.  We will live up to the promise

24   now."  But at that time, not only had they been sued, but they

25   also knew because their new immigration lawyer was telling

1    them, "What good is that going to do?  They're going to be

2    waiting in India for 20 or 30 years.  How does that fulfill the

3    promise?"  They knew that.

4            I asked Mr. Schnoor.  I said, you know, "Are you aware

5    it could be up to another 20 years" -- first of all, he said,

6    "We'll sponsor for a green card."

7            I said, "Has any one of them gotten a green card?"

8            No, they are sitting there still six, seven years

9    later, haven't got a green card.

10           "QUESTION:  And are you aware it could be up to another

11   20 years before any one of them gets a green card?

12           "ANSWER:  I wasn't given that, but I know it's a long

13   time.  We applied back in 2009, that is after the lawsuit, and

14   it's 2015 now, so that's six years.  That's a long time."

15           Cyrus Meta, our immigration expert -- you don't have to

16   read the whole thing, but at the end, he said basically --

17   Mr. Sandler asked:

18           "QUESTION:  Would it be more than ten years after the

19   initial filing that they have to wait?"

20           Mr. Meta said, Line 19:

21           "ANSWER:  At least, at the very minimum."

22           That is based on the current retrogression priority.  I

23   bet you all never knew you'd learn what that all meant.

24           "QUESTION:  At the very minimum.  Then what would you

25   say would be the maximum?

1        "ANSWER:  30 to 40 to 50 years."

2        Do you think Signal fulfilled the promise that they

3   knew had been made by their agents back in the fall of 2006 to

4   get these workers to come if it might be 2056 when they get

5   their green cards?  The story now is just a smoke screen, part

6   of the scam.

7        So, you are going to get questions about a bunch of

8   different claims.  And you are going to get a verdict form.

9   And I hope you are not as scared as I was when I saw the

10  verdict form.  It's pretty thick.  But there is a lot of text

11  on there, but ultimately there is just a handful of questions

12  with each of the claims and then they repeat themselves for

13  each of the defendants.  So it's a little easier than it looks

14  at first flush.

15       I will show you, for example, on the fraud claim, you

16  know, fraud -- so they ask for each of the defendants, the

17  first question:  Do you find from a preponderance of the

18  evidence -- you are going to hear about "preponderance of the

19  evidence."  That is the burden of proof to most of these

20  claims.  And it's very different than in a criminal court.  In

21  a criminal court, you got to find beyond a reasonable doubt.

22       Preponderance of the evidence, some people talk about a

23  scale that just tips a little bit in your favor, you establish

24  a burden of proof.  I'm a football fan, so I kind of think of

25  it as if I'm standing on my own goal line to prove my case, I

 1    just got to get over the 50-yard line.  I don't even have to

 2    put any other team in the zone, I don't have to kick a field

 3    goal, I just got to get it past the 50-yard line.

 4         In this case, though, on our claims, I think we put it

 5    in the end zone.  I think you will find we put it in the end

 6    zone.

 7         So here, for example, do you find by a preponderance of

 8    the evidence, you know, that as a party to a contract, Signal

 9    or Signal's agents committed any of the following acts?  For

10    example, C, a promise made without any intention of performing

11    it.

12         I just reviewed with you the promise of the green card

13    that was made when Signal had no intention of performing it.

14         "And do you find by the preponderance of the evidence

15    that it was made with the intent to deceive any plaintiff or

16    intent to convince any plaintiff to enter into a contract?"

17         Signal knew that they had promised a green card.  These

18    guys weren't going to be paying those exorbitant fees and come

19    to Signal.

20         Then the third question -- you know, we would ask you

21    to check question "yes" on all of these for all of the

22    plaintiffs.

23         And then the third question:  "Do you find from a

24    preponderance of the evidence that plaintiffs relied on the

25    fraudulent representations made by Signal?"

1          Well, you heard from all of our plaintiffs that, if

2     they had known the truth, if they had known there was no green

3     card at the end of the day, they would never have paid the

4     money they paid and come to work for Signal.  That is called

5     "reliance."

6          Finally:  "Do you find that they were deceived?"

7          Well, again, yes, the plaintiffs testified about how

8     they were deceived.

9          So -- so what was the end result of this big scam?  The

10    Indian workers, our five plaintiffs, all made the sacrifices

11    they had to make.  They sold or pledged any land that they had,

12    their family land, they sold personal property.  They pledged

13    family heirlooms, their wives' treasured wedding jewelry that

14    is passed down in the Indian culture generation to generation.

15    They took out loans at high interest rates.  They went deep

16    into debt.

17         And you heard Ms. Mowl talk about the risks of taking

18    out those kinds of debts in India.  It's not just the risks of

19    maybe I will not be able to pay it back; there is physical

20    intimidation involved when you take that risk and you are

21    unable to pay back the loans.

22         Then they left their families.  Mr. Sony left his wife

23    and two-month-old child.  Mr. Jacob left his wife and two young

24    children.  His daughters were three and four years old when he

25    came to Signal.  Mr. Palanyandi left his sister.  Mr. Andrews,

1    he left his wife and his sons, they were age 7 and 11.

2    Mr. Hemant left his family, including his father, who passed

3    away, and his fiancé.

4           They left their families to come to the United States

5    to pave the way for a better life for their families.  They

6    came halfway around the world, only to end up in Signal's man

7    camp.  They did all this because of the promise of the American

8    dream, that green card, the assurance they would get that green

9    card and be able to live with their families.  That's why they

10   went into debt, and Signal knew it.

11          Look at this, Exhibit -- here is Mr. Hemant.  This is

12   an example of what I was saying about reliance.

13          "QUESTION:  Mr. Hemant, if you had been told at the

14   meeting the second time you went to Mumbai by Dewan Consultants

15   that the opportunity to work at Signal was only on a temporary

16   guest worker visa, you had no guarantee of being sponsored by

17   Signal for a green card, and they could terminate you at any

18   time and send you back to India, would you have paid that first

19   installment?"

20          That first installment, which locks him in.

21          "ANSWER:  No, never."

22          And did Signal know this?  Of course they did.  Here in

23   the handwritten notes of Mr. John Sanders, the man who was

24   working in the camp talking with the workers, and he understood

25   exactly what went on, and he noted it in preparation for the

1    meeting with Mr. Schnoor and Mr. Pol, where they fired Mr. Pol.

2    He talks about how much money they had paid, $15,000 apiece.

3    And he says, "The assurance of a green card is why they came.

4    Workers took out loans from family members, pledged houses,

5    land, farms, et cetera, as collateral to pay money lenders at

6    high interest rates."

7        What did Signal do?  They fired Mr. Pol.  They kept

8    working with Mr. Dewan and Mr. Burnett to bring in hundreds

9    more workers under exactly these circumstances.  That was their

10   actions.

11       And, ladies and gentlemen, that is something I'm going

12   to ask you to think about.  Judge Signal by its actions, not by

13   the words you heard on the witness stand.

14       I was amused I had to put a slide together because

15   Mr. Schnoor testified that Signal's motto is "Actions speak

16   louder than words."  I couldn't agree with that more.  So what

17   were Signal's actions?  Well, first, as we have been

18   discussing, they brought in hundreds of workers on a basis of a

19   false promise.  And why?  As Mr. Schnoor told you, because we

20   needed the workers.

21       "QUESTION:  Signal needed the workers, right?

22       "ANSWER:  Right?"

23       Mr. Marler -- had to remind them again about his

24   deposition testimony, showed the pages a few times, but that

25   testimony was:

1    "QUESTION:  In any way, shape, or form, you needed

2 these H-2B Indians workers; is that fair to say?

3    "ANSWER:  I would say that's correct."

4    They were willing to do whatever it took to get these

5 workers it needed.  Didn't care about the falsities of the

6 promise made to the workers, and it also was willing to lie to

7 the United States government to get it.

8    Now, the plaintiffs were all asked by counsel for

9 Signal today:  "Did you lie to the U.S. consulate when you went

10 in for your consulate interview?"  And you know what, couple of

11 them said yes.  And I don't condone lying under any

12 circumstances, but put yourself in the place of these workers

13 who paid all of this money, taken out all of these debts, and

14 basically told by the lawyer and the recruiter that you trust,

15 if you don't say this to the consulate, they are not going to

16 give you your visa, you are going to lose all of your money,

17 you are not going to America.

18    They had no real choice.  Signal, on the other hand,

19 had a choice.  And Signal made untrue statements under oath in

20 its written visa applications to the government.  You saw that.

21 Mr. Bingle under oath:  "I certify under penalty of perjury

22 that the evidence submitted with this visa application is true

23 and correct."  Then I walked him through the letter that was

24 submitted.  What did he admit?

25    "QUESTION:  Did you say things that were not true to

1    the U.S. government in the written documents, didn't you?

2            "ANSWER:  That's correct.

3            "QUESTION:  So you knew that this was an inaccurate

4    statement to tell the government; is that right?

5            "ANSWER:  That's correct.

6            "QUESTION:  And that signature, you certified under

7    penalty of perjury under the laws of the United States of

8    America that this petition and the evidence submitted with it

9    is all true and correct.  You did that, right?

10           "ANSWER:  Yes."

11           Now, Signal says, "Well, they were relying on the

12   advice of their immigration lawyer."  They sued him.  Well,

13   plaintiffs were relying on the same immigration lawyer.  These

14   are just workers and fitters from India.  This is an American

15   company submitting documents with its name, under oath, to the

16   U.S. government.

17           And you know what is even more hypocritical about

18   Signal standing here and criticizing the plaintiffs for being

19   coached to lie to the U.S. consulate?  Signal knew they were

20   doing it.

21           Exhibit 1903.  This was an e-mail from August of 2006,

22   when Mr. Pol told Mr. Sanders of Signal:  "One of us needs to

23   be with each and every candidate going to the consulates before

24   the interview.  They sometimes say the dumbest things, and need

25   to be coached on the proper way to interview.  For example, if

1    one of these guys says he's going to the U.S. for immigration

2    and Signal is sponsoring for permanent residence, he's a

3    goner."

4         Signal knew they were being coached.  They were

5    participants in that.  And now they want to blame the workers?

6    Well, Mr. Sanders in his deposition said, you know, I don't

7    really remember receiving this e-mail.  I might have been too

8    busy that day to actually open my e-mails.  I don't remember

9    this one.

10        Mr. Pol, though, testified, and you heard in his

11   deposition that he not only sent this to Mr. Sanders, he called

12   him up afterwards and discussed it with him.

13        Signal put its own livelihood over the lives of the

14   workers and did whatever it needed to do to get the workers to

15   make money.

16        Now, Signal has pointed out throughout this trial that

17   the workers got paid.  We don't dispute that.  For the most

18   part, they made the same wages as Signal's other direct-hire

19   workers, although only the Indian workers had the wage

20   deduction for the man camp.  And you know, after the wage

21   deduction for the man camp, and after taxes and after other

22   deductions and paying their interest on the loans back home and

23   sending money to support their families home, it wasn't that

24   much money left.

25        You heard Mr. Marler keep saying that he does not care

1    about gross profits, only net profits.  Well, Signal still

2    earned a lot of net profits.  There wasn't much net for the

3    workers.  Let's see what Signal earned.

4          The cost savings from the Indian H-2B workers to

5    Signal, the pure cost savings, the difference of having the

6    Indian workers versus having the contract worker at $67 or more

7    was over $8 million right to Signal's bottom line.  If Signal

8    got to keep the program going and bring in new crops of workers

9    like they wanted to, it would have been over $22 million.  That

10   is why they kept doing everything they could to hold on to

11   these H-2B workers.  All of the money they could make.

12         And that is why they fired Mr. Burnett.  They didn't

13   fire Mr. Burnett when they found out about his fees.  They

14   didn't fire Mr. Burnett when they found out about him making

15   false promises to the workers.  When did they fire Mr. Burnett?

16   A year later.  Because they found out Mr. Burnett was doing

17   some immigration filings for some of their H-2B workers, and if

18   Mr. Burnett had been successful with those filings, those

19   workers would have been free to leave Signal and go work for

20   someone else.

21         You heard Mr. Schnoor characterize that "he was

22   stealing our workers."

23         "Our workers."  That's what Signal thought of these

24   guys, captive workers.  They are in their man camp.  The

25   moneymaking machine, and how dare he now try to give them their

1    freedom so they could go work for someone else.  They are ours.

2         That is why they fired Mr. Burnett.  If Mr. Burnett was

3    successful, they could leave the man camp, they could go work

4    for the competitor and, all of a sudden, the competitor would

5    legally and fairly have the competitive advantage now over

6    Signal.  Signal wasn't going to have that.

7         Let's compare the picture of what the workers earned.

8    This is a breakdown of one of Mr. Sony's weekly paychecks.  So

9    you get the man camp fee deduction, which is $245, you got $172

10   in other deductions, you get his U.S. taxes, he ends up with a

11   net pay per week of $473.  Once he has to make his loan

12   repayment and send some money home, under $100 just so his

13   family can live, his wife and two-month-old baby, he's left

14   with $206 in his pocket.

15        Now, even if he had no expenses of his own in

16   Mississippi and he could put that entire $200 in the bank, what

17   is that?  Do the math $800 in a month, $9,600 in a year.  Less

18   than the fees he spent to come to Signal.

19        The other plaintiffs didn't do much better.  Mr. Marler

20   ended up with a $4 million bonus on top of his pay -- well,

21   $2.8 million after taxes.  Mr. Soni, when he left Signal in

22   March because he was so scared of what happened on March 9th,

23   left with $78 in his bank account.

24        What else did Signal do?  Signal required its workers

25   to live in the man camp and pay Signal back for the cost of the

1    man camp.  You heard his testimony.  It's the size of a

2    baseball infield.  Mr. Marler, I think, alluded to one of my

3    favorite movies, A Field of Dreams, "If you build it, they will

4    come," during his testimony.  And in the case of Signal is, "If

5    you build it, they must come."

6         Signal put in the money to build this man camp for

7    Indian workers, and that meant it had to do everything it could

8    to fill that camp with Indian workers in order to pay

9    themselves back.

10        And this is what Signal got -- I mean, what the workers

11   got -- 24 men to a trailer.  These trailers didn't each comply

12   with federal laws, OSHA laws about the standards for workers'

13   health and safety.  The beds were too close together.  There

14   was not enough room for each worker.  Some of these beds were

15   so close together, it was like having a double bed.

16        Signal knew this.  At least Signal believed it at the

17   time.  Now Signal is telling you, "Well, we learned after the

18   lawsuit that OSHA didn't really apply to these man camps, so we

19   didn't have to comply with those conditions."

20        Not arguing whether they are right or wrong about that,

21   but at the time, they thought it applied.  They thought they

22   had to comply with OSHA, and they decided it's just too

23   difficult.  Besides, with these Indians, this is good enough.

24   That was their view for the Indians, this is good enough.

25        You know, ladies and gentlemen, I think -- have you

1    read in the Book of Hebrews -- the Book of Hebrews said:  "Show
2    hospitality to strangers."

3              "Show hospitality to strangers."

4              What did Signal show to these guest workers that came,
5    they wanted to make part of the Signal family?  They showed
6    them this and said, "This is where you are going to live and
7    this is where you have to live if you want to work here at
8    Signal."  And were they ultimately forced to live there?  Yeah,
9    because they couldn't afford to pay them $1,000 to live
10   somewhere else, and they couldn't afford to go back to India.

11             Signal called this a profit center.  They were making
12   money.  And they knew they could get away with this because
13   they knew that going back to India was a serious financial
14   hardship.

15             This is what Mr. Schnoor said.

16             "QUESTION:  You understood that going back to India
17   where they wouldn't be able to make money to repay the debts to
18   pay off the fees, that would be a serious financial hardship,
19   wouldn't it?

20             "ANSWER:  Absolutely."

21             And that is really important, ladies and gentlemen,
22   because one of our claims is forced labor.  And one of the ways
23   you can prove forced labor, and you are going to hear this in
24   the instructions, is if you get someone to do what you want, to
25   work for you, and the man camp is a condition of your

1   employment, through a threat of serious harm.

2        But she is also going to tell you what "serious harm"

3   means.  It doesn't have to be physical harm.  Serious harm can

4   mean serious financial harm.  And that's the exact threat that

5   Signal used to keep these workers doing what they wanted them

6   to do, the threat that, if you don't do that, you are back to

7   India where you will face serious financial hardship.

8        You know, I can show you the form, and you will see it

9   on there really quickly.

10        "Do you find by a preponderance of the evidence that

11   Signal knowingly obtained any plaintiffs' labor by threatening

12   serious harm to him or another person?"

13        Serious harm means serious financial harm, and the

14   answer to that is:  "Yes."

15        "Do you find from a preponderance of the evidence

16   Signal knowingly obtained plaintiffs' labor by means, scheme,

17   plan, or pattern to cause him to believe that, if he did not

18   perform the work at Signal, that he or another person would

19   suffer serious harm?"

20        Again, serious financial harm or psychological harm or

21   reputational harm, the answer is:  "Yes."

22        Now, the conditions in this man camp were not only an

23   element of forced labor, they were discriminatory.  They were

24   discrimination.  The judge will instruct you on the civil

25   rights laws of this country.  An employer cannot subject one

1   set of workers to different and worse conditions than another

2   set of workers because of their race, which for purposes of our

3   laws, Indian is -- constitutes a race, or because of their

4   immigration status.

5           The judge will tell you, for example, if Signal's

6   decision to make the Indians live in and pay for the man camp

7   was motivated at all by the fact that they were Indian or by

8   the fact that they were H-2B workers, then that's

9   discrimination.  Here, we have both.

10          The Indians were housed there, not American workers.

11  They are housed on what was called "the reservation."  Because

12  Signal thought, "They are just Indians.  We know how they live

13  over in India.  This will be better.  This will be good enough

14  for them.  It will be like the Taj Mahal.  It will be like the

15  Taj Mahal."

16          Mr. Schnoor:  "This is better than the current

17  conditions, they will be happy campers."

18          This, Mr. Schnoor, who thought these workers were

19  living over in India "pooping in ditches."  Those are his

20  words.

21          So they knew when they brought them over and put them

22  in these conditions they had to accept them because, otherwise,

23  they would have to go back to India, and that was not an

24  option.

25          And you heard from our workers that the conditions here

1    were not better than they were in India.  They were much worse.

2    It was a fenced-in, guarded facility with no privacy, no place

3    to be alone, no place to relax after a long day of work, with

4    rules that would not have applied if they had their own homes.

5        These men suffered stress and humiliation.  They felt

6    like cooped-up animals.  There was not even room for them to

7    change their clothes, let alone a place for them to keep their

8    clothes.  The bunks were separated by a little piece of

9    plywood.  And you learned how demeaning it was for these grown

10   men to have to live like this.

11       Signal wants to take credit for giving them laundry

12   service after six months, for giving them a bus to Wal-Mart,

13   for giving them a pool table and board games.  Signal even

14   bragged about and showed you a picture of Indian workers

15   getting to play cricket one day in 16 months.  Signal wants

16   credit for that?  It's like putting lipstick on a pig.

17       Signal says, "We did everything to make them happy."

18       If you really wanted to make them happy, let them

19   leave.  Let them go get their own home.  But Signal wasn't

20   going to do that because Signal was making money off this man

21   camp, getting paid back for the cost of building it.

22       Signal even gave the workers a mother hen, Rhonda

23   George.  These workers didn't need a mother hen.  They needed a

24   place of their own.  And Signal imposed this on them because

25   they knew they were H-2B workers and their only legal choice

1    was to go back to India, where they would have no way to repay

2    the debts.  That is Mr. Marler's testimony.

3        Signal says, "Well, that is the H-2B law.  The H-2B law

4    that binds the workers to Signal."  Well, that's right.  It was

5    Signal's law that made them live in the man camp.

6        Now, you also saw, I think, a lot of really horrific

7    e-mails about calling:  Indians F'ing Keralites, and whining,

8    back-stabbing, little female dogs; going on a rat hunt.  The

9    offensive joke about Hindu women which was sent to the head of

10   HR and she just responded, "Pig."  Mr. Shouse's testimony that

11   not only the Indian people smelled, the whole country smells.

12   You heard about Mr. Branson talk about the foreman talking on a

13   daily basis about the sexual preferences of the Indian workers.

14       Maybe it's joking.  It's demeaning, it's disparaging,

15   and it has no place in the workplace.  But this was the routine

16   course in Signal's workplace.

17       You know, again, you heard from Darrell Snyder, the man

18   who was put in charge of this case, of the kind of racism that

19   we all wish this country put behind us years ago.  It still

20   exists in a place like Signal.  Perhaps, that's why e-mails

21   like, "Proud to be white" were circulated at Signal.  And

22   Signal didn't even follow its own anti-harassment policy,

23   Section 177.  In fact, its head of HR wasn't even aware of that

24   policy until she was sitting on the stand and cross-examined by

25   my colleague.  She didn't even know you had to report bad

1    e-mails like that.

2         Mr. Marler, the man who admitted that, while the

3    Indians were there -- that is Ms. Binion.  She wasn't aware of

4    the policy.

5         Mr. Marler, "We were woefully inadequate in following

6    that."

7         You also heard from Ms. Spears.  Ms. Spears came and

8    testified after she settled the wage discrimination case

9    against Signal for $250,000.

10        What were the other actions of Signal?  The firing of

11   Mr. Jacob and Mr. Sabulal.  And it was done to make an example

12   to the other workers of what happens in the man camp.

13        March 9th, 2007, ladies and gentlemen, was a window on

14   the soul of Signal.  That revealed the true Signal.  They even

15   had one of their security guards falsify the witness statement

16   about what happened saying:  "The workers were not detained

17   that day."  But Mr. Snyder had to admit they were detained.

18   And we have a false imprisonment claim on behalf of Mr. Jacob.

19   We have a claim that he was detained and that was unreasonable.

20   He was left under guard in that TV trailer for hours and not

21   even let go to the bathroom.

22        Now, why were they fired?

23        Why were they fired?  Their story, now, is they were

24   fired for talking on the rig.  Talking on the rig.  There is

25   not a written warning -- a written safety warning given to

1    Mr. Jacob talking on the rig.  Mr. Shouse testified, if you do

2    that, you get talked to, then you get a written warning, then

3    you get a three-day suspension, and then you get terminated if

4    you ever do something like that.  Mr. Jacob was summarily

5    dismissed.  You know why he was dismissed?  He was dismissed

6    because he was organizing the meetings with the lawyer.  He was

7    dismissed just as Mr. Schnoor said he would do, "to send a

8    message."  Send a message to all of the other workers:  If you

9    pose a legal threat to Signal, this is what is going to happen

10   to you.  You are going to get fired.  You are going to get

11   publically humiliated in front of the whole camp.  You are

12   going to be put in a van, sent to the airport, and put on a

13   plane back to India.  Good luck with your debts.

14          CASE MANAGER:  You have used an hour.

15          MR. HOWARD:  Thank you.  You know, you've heard from

16   all the evidence from what happened that day, evidence of how

17   horrible it was that Mr. Sabulal actually attempted suicide.

18   That was not easy testimony for a man to give.  He was ashamed

19   to give that testimony, but Signal had so broken him, and he

20   was so fearful over the idea of going home in disgrace and

21   facing his family and facing his debts that he took the first

22   blade he could find and cut his wrists.

23          Then you heard Mr. Marler comment on behalf of Signal

24   and tell you that he thought that that act was nonsense, a

25   bunch of nonsense and theatrics.

1          You heard the testimony from Mr. Tanner, the first man

2     who saw Mr. Sabulal, the one who was sent to his room with him.

3     He said he'd never seen so much blood.  He still gets

4     nightmares from it.  The CEO of Signal, it's a bunch of

5     nonsense and theatrics.  That's what they think of these Indian

6     workers.

7          Mr. Dewan recommended that these workers be the first

8     ones to be deported.  His countrymen.

9          Mr. Burnett participated in the meetings before at the

10    firing with Signal people, and Mr. Burnett didn't even ask the

11    names.  These were his clients, ones he promised he would get

12    them green cards.  He had taken thousands of their dollars.

13    They are, now, about to be terminated by Signal and deported

14    back to India, and the names of those clients of his, to him,

15    were meaningless.

16         Mr. Dewan, Mr. Burnett together with the Signal CEO sat

17    in the room and decided the fate of Mr. Jacob.  You meet with

18    lawyers, you try to exercise legal rights to cure this

19    discrimination, and this is what is going to happen.  That is

20    retaliation, ladies and gentlemen.

21         I have got another verdict form, but in the interest of

22    time, we will see it, the questions there on retaliation.  That

23    he acted -- he spoke out against the discrimination.  They

24    fired him for it, and the reason they fired him for it was

25    because he spoke out.  They are going to say it was for talking

1    on a rig.  I think you all know better.

2        Now, we also have Mr. Schnoor's speech that he gave on

3    March 8th.  The one where he said -- I'm not going to play it

4    for you.  Again, I'm sure you have it in your mind -- that we

5    have lawyers.  We have very good lawyers.  If any one of you

6    brings a lawsuit against Signal, then your visas will expire

7    and you are all going home.

8        And see, there is another element of forced labor in

9    our claim.  I showed you the one which was threats of serious

10    harm, including financial harm.  But another way it could be is

11    by obtaining labor by means of the abuse or threatened abuse of

12    law or legal process.  And Judge Morgan will tell you:  What

13    that means is, among other things, exerting pressure on a

14    person to cause a person to do something or not do something,

15    like, file a lawsuit with threats like the threat of

16    deportation.  That is exactly what that March 8th speech did.

17        You can't get a better example of "abuse of legal

18    process" than that.

19        You know, ladies and gentlemen, you have seen

20    throughout this trial evidence of untruthfulness of Signal.

21    Signal was untruthful to the plaintiffs; false promises.

22    Signal was untruthful with Homeland Security; the letter that

23    Mr. Bingle sent.  Signal was untruthful with the Department of

24    Labor; the visa applications that were sent.

25        Signal was untruthful with the State of Mississippi.

1   It told them, "Oh, the man camp is only going to be there for

2   18 months."  The man camp is still there today, but, of course,

3   now, it's refurbished into two-man apartments.  They are

4   charging money to their customers for it.  Anyway to make

5   money.  Signal did not get the authority that it was supposed

6   to get for building a man camp because it's on an environmental

7   site.

8          Signal took that obligation really seriously.  You

9   know, they have environmental sites.  The Department of

10  Environmental Quality of Mississippi says, "We want to come out

11  there even before you start building."  Oops.  It's already

12  built.  Their explanation?  Somebody just dropped the ball.

13         They were untruthful with the press.  Do you remember

14  this?  This is Mr. Marler's e-mail to Jennifer Ludden.  We --

15  you know, when we learned that we were sold a bill of goods and

16  paid too much money, we immediately fired those responsible.

17  No, they didn't.  They kept working with Mr. Dewan and

18  Mr. Burnett to bring in hundreds more workers.  That is an

19  untruthful statement to the press.  They lied to the public.

20  They said, "We're going to not back down until our workers are

21  made whole."

22         I ask Mr. Marler, "Can you identify anything you have

23  done to make the workers whole?"  In his deposition, he said,

24  "No."  Then he thought about it some more.  He came up with,

25  "Well, we're only making whole those 81 who stuck around.  We

1    don't care about the rest of them."

2         My question is: Are they now lying to you?

3         Failures of Mr. Burnett. He didn't give his workers --

4    Indian workers accurate information. He didn't keep his Indian

5    worker clients informed. He did not protect his clients'

6    interest with Signal. He did not fulfill his promises. He,

7    like Signal, just treated these men as a source of money. I

8    don't have a slide for Mr. Burnett because we just heard from

9    Mr. Burnett, but he failed to inform the workers of the

10   accurate information when he learned it, and he recommended the

11   termination and deportation of Mr. Jacob and Mr. Sabulal among

12   other things. Ultimately, he made promises to the workers that

13   were not fulfilled.

14        So these are the claims we have, ladies and gentlemen.

15   We talked about forced labor and discrimination.

16        Now, racketeering, that is a big word. And I will tell

17   you, it's a long jury verdict form. I'm not going to walk you

18   through it, but really what it simply means is when people get

19   together and do a fraud. And Signal got together with

20   Mr. Dewan, and Mr. Burnett, and Mr. Pol. You are going to be

21   asked about different enterprises. And one, the Swetman

22   security guards who were used. They don't have to be knowing

23   participants of fraud. They have to be participants in the

24   enterprise, but what it ultimately means is that people do

25   things, and they do what is called a pattern of fraud. That

1   means two or more accounts of fraud.  It can be -- they have to

2   include mail.  That's why we kept asking, "Are these things

3   mailed?  Things Federal Expressed?"  The visa information for

4   the false information to government.  Defrauding the government

5   to issue the visa.  Those were Federal Express.  That is called

6   an act of mail fraud.  It was done more than once.  It's a

7   pattern.  But the bottom line, what it really is is a fancy

8   statute for fraud.  Then, we have other claims for Mr. Jacob.

9        So what we're going to be asking you, the jury, is for

10   a verdict.  A verdict that will correct the injustice that's

11   been done here.  The workers told you.  It's not just about the

12   money.  It's about correcting the injustice.  The one way we

13   have, correcting injustice, is an award of money.  So against

14   Signal for the discrimination, the stress, and humiliation each

15   worker faced, we ask you to return a verdict of $1 million.

16   And $2 million for Jacob, an extra million dollars on his

17   individual claims.

18        For the forced labor and exploitation for each

19   plaintiff, $1 million.  Fraud, racketeering, misrepresentation,

20   breach of contract, there, you can only get your actual

21   out-of-pocket damages.

22        The other two places, you get what are called emotional

23   distress damages.  That's why we're asking for the million

24   dollars.  Everything these workers had to go through and were

25   put through by the defendants.

1    In the case of actual out-of-pocket damages, what are

2    comprised there is just the recruiting fees, the interest

3    payments on loan, and the man camp fees.  That's all we can ask

4    for under those categories of claims.

5    Well, you will see also categories for punitive

6    damages.  Ladies and gentlemen, we are entitled to ask a jury,

7    if you find compensatory damages and you find that the conduct

8    was particularly egregious, you could award punitive damages.

9    And punitive damages are different from compensatory damages.

10   They're not to compensate the workers.  That is done with the

11   compensatory.  Punitive damages, ladies and gentlemen, serve to

12   punish the defendant, and by doing so, to deter others from

13   engaging in similar conduct in the future.

14   It means that any other company out there who is even

15   thinking about using the H-2B guest worker system to bring in

16   foreign guests workers that get bound to the company and are

17   even thinking of treating them the way Signal treated these

18   Indian workers, will think twice.  That is what the punitive

19   damages award is assigned to do.  And you can consider the

20   reprehensibility of the defendants conduct.  How bad it was.

21   Including, but not limited to, whether there was deceit, cover

22   up, insult, intended or reckless injury, and whether the

23   defendant's conduct was motivated by a desire to augment

24   profit.  We have all of those in this case for the defendants.

25   And so, under general standards, we ask as a ratio for

1    punitive damages in the amount of three times compensatory

2    damages.  So for each million-dollar verdict, the punitives

3    would be $3 million.  And that's under each of the

4    discrimination and the forced labor.

5         Against the defendants, Mr. Dewan and Mr. Burnett, we

6    are not asking for punitive damages.  There is a -- or not

7    recommending.  There is an opportunity for you, if you find

8    that they have committed the forced labor -- and there is not a

9    discrimination claim against them.  The forced labor, you are

10   entitled to award punitive damages if you think their conduct

11   rises to the same level of reprehensibility as does Signal's.

12        We submit to you Signal distanced itself from its

13   agents in terms of how bad its conduct was here.  Then the

14   actual damages are the same amounts of actual damages as in the

15   case with Signal.

16        Ladies and gentlemen, this is the verdict.  This is the

17   verdict that will reflect the importance of this case.  This is

18   the verdict that will send the message that we talked about at

19   the beginning of my closing, that this kind of conduct is not

20   acceptable in our country.

21        You know, Signal wanted to teach the Indian workers a

22   lesson:  Don't even think about suing Signal or we will deport

23   you.  Well, now, you have an opportunity to do what Signal

24   never expected would ever happen.  They did everything in their

25   power to keep this case from ever getting to Court, from ever

1   getting before a jury or you.  But these workers did not lose

2   their dignity.  They persevered.  They made it here, six long

3   years, and they have gotten to tell the facts to all of you.

4   Now, it's time to teach Signal a lesson.  Teach Signal a

5   lesson, and send a message to the other companies out there

6   that this is not what America is about.  This is not how

7   companies are allowed to behave in our country.  And you ten

8   people are the only ones who have the power to do that.

9        I really thank you for your time.

10        THE COURT:  All right.  We're going to take a

11   ten-minute break before we hear the next closing arguments, so

12   we will come back at 3:05.

13                  (JUST EXITS THE COURTROOM.)

14        THE COURT:  Have a seat.  I want to ask -- tell the

15   lawyers one thing about the verdict form.  I don't remember

16   whether we talked about this at one of our conferences or not,

17   but when we divide this up in to Stage 1 and Stage 2, the

18   concept is that I will only send back the form where the jury

19   could award damages if they have answered the questions in a

20   way that would make a damage award appropriate.  If you -- I

21   don't know if you have your form in front of you, but if you

22   look at page 5, for an example, with Claim 1.  It's the second

23   page.  And at the bottom of the page is Question C,

24   compensatory damages.

25        Have you all got that in front of you, anybody?  Does

1  anybody have it?  It's on page 5.  Okay.  Under C, the first

2  sentence, "Do you find from a preponderance of the evidence

3  that any plaintiff was damaged by Signal as a result of forced

4  labor or trafficking for forced labor?"  Well, when we were

5  doing it all together, I left -- I, then, had the next sentence

6  be, "If so, enter the amount of compensatory damages."  Well,

7  if I'm only going to give them the damage form if damages are

8  appropriate, then I think I need to split that up and put the

9  first sentence of C in the Stage 1 jury verdict form.  And so I

10  just wanted to -- so you won't be surprised.  That's what I'm

11  going to do.  So you will see that in the form that we give to

12  you.

13         Anything else we need to talk about?  Okay.

14         We will see you all in about five minutes.

15                    (Recess taken.)

16              (JURY ENTERS THE COURTROOM.)

17         THE COURT:  I apologize for the delay, Ms. Hangartner

18  we gave you a build-up.  That was just to make it more

19  dramatic.

20                    CLOSING ARGUMENT

21         MS. HANGARTNER:  I can honestly say that was not how I

22  intended to start.  That was not how I expected it to go.

23         I think, though, however by the end of this -- I have a

24  feeling that some of you already feel this way.  That this case

25  isn't exactly what you expected.  It's not everything that it

OFFICIAL TRANSCRIPT

1    was built to be.  Let's start with this.

2         This is the expert opinion of Enrique Gonzalez, leading

3    expert in the field of immigration.  What he specifically says

4    is in the field of immigration, yes, it's so complex, so

5    convoluted that many multi-national companies stand no better

6    educated or better suited to understand these concepts than an

7    individual who is less sophisticated and less educated.

8         But they want to put the burden on Signal.

9         Why do they want to put the burden on Signal?  Because

10   when it comes to things like human trafficking, and RICO, and

11   fraud, and violations of human rights, it really isn't sexy to

12   go after a small law firm, small recruiter out at Pascagoula,

13   Mississippi, and an individual from India.

14        You also don't have the deep pockets that you have with

15   Signal International.

16        What I was going to start with was there is none so

17   blind as those who will not see.  The most deluded people are

18   those who choose to ignore what they already know.

19        And I think the testimony and know the testimony you

20   have heard throughout the last four weeks, one day, and what is

21   it now, seven hours, hasn't exactly been built -- or hasn't

22   exactly risen to the level that we may have thought it would.

23        Let's start with the few things first.  Mr. Bingle.

24   Mr. Howard likes to label Mr. Bingle as a liar.

25        Here's their immigration expert.  Okay, this is the guy

1    that they called.

2         Mr. Bingle signed those documents on the advice of

3    Malvern Burnett and he said, yes, he did not think they were

4    true, because at the time he signed them, the immigration

5    attorney who was representing Signal International and had a

6    fiduciary duty to Signal International said, "This is the way

7    it works.  It's an H-2B, you start for ten months, the law --

8    the H-2B statutory scheme contemplates two extensions.

9         So think about it.  If the H-2B law contemplates two

10   extensions, it means that is available under law.

11        So Mr. Bingle signed those documents and his lawyer

12   said:  "No, no, no, you don't understand.  That is just the way

13   this works.  It's immigration.  It's kind of funky.  It's kind

14   of weird."

15        Okay.  Well that makes sense.  Here is their

16   immigration lawyer.  Assume incorrectly you could get the two

17   extensions, which Signal did in this case, H-2B extensions,

18   year one and year two, and file labor certification in year

19   three, given the backlog and the employment-based third

20   preference, these individuals from India, everyone who came

21   over, there is no way that the person would be able to apply

22   for the green card in one year.  It would be impossible.

23        See, that is what Mr. Burnett failed to tell Signal.

24   How is Signal supposed to know to tell the people that they are

25   trusting over there, trusting to recruit, that it doesn't go

1    H-2B, extension, extension, green card.

2         When your lawyer is telling you, and in that contract,

3    the Global contract you all saw, it specifically states that

4    Malvern Burnett will be the lawyer assigned to Signal and have

5    that duty of loyalty to Signal, which Mr. Burnett broke.  Not

6    once, not twice, not three, but four or five, ten times.

7         You heard from Mr. Dewan today who said the same thing.

8    Mr. Burnett misled him.  You have heard from the plaintiffs.

9    Mr. Burnett misled them.

10        But again it all comes back to Signal, because Signal

11   is the big company.  The deep pocket.  The one that they can

12   get something from.

13        Mr. Howard also talked about lying to the Department of

14   Labor.  Signal lied.  Department of Labor, Mr. Schnoor

15   testified, sat here and explained to you all, Department of

16   Labor, just before March 9th, came out to Signal, open-book

17   policy Signal has, they came out, they inspected, they looked

18   at all of Signal's books to figure out how are you paying your

19   direct labor, how are you paying your contract labor, how are

20   you paying the H-2B workers?  We want to see the housing

21   facility -- the man camp.  Although, Mr. Howard likes to name

22   it the labor camp.

23        And guess what, DOL said:  "We thought we would be here

24   for two or three days, but you know what, we have seen enough.

25   You are good.  Everything is in order.  We talked to some of

1    the workers.  Everything seems fine."  So that's two things.

2         Let me go back a moment because I do want to thank each

3    and every one of you.

4         I want to thank you for your time, I know it has been

5    difficult.  I saw your face when the Judge asked you during

6    voir dire if you were available to serve on a jury that would

7    possibly last four to five weeks.

8         I do agree with Mr. Howard.  You are the key to our

9    justice system.  Indeed, you are the ones who make the ultimate

10   determination, and the Judge will instruct you.  Remember that

11   in a very real way you are the judges.  The judges of the

12   facts.  The facts.

13        Your only interest is to seek the truth from the

14   evidence in this case.

15        And I could tell you that our legal team, our motto has

16   been since day one.  Bring the truth.  Kind of like the Saints,

17   that phenomenal season that we had.  Bring the wood.  We have

18   got bats, and on there it says, bring the truth.  It is our

19   motto and we believe in it.

20        On behalf of everybody who has sat at this table, our

21   support staff, who we couldn't live without, our paralegals and

22   everybody else, we want to tell you that we are proud to

23   represent the men and the women of Signal International.

24        It has been a pleasure and it continues to be an honor.

25   They are not only friends to us, they have become family.

1          If we could put up Slides 1 through 10.

2          What is the truth?  What is forced labor?  How do you

3     force someone to work when their testimony said they didn't

4     have a problem with the job site.  They didn't have a problem

5     with their supervisors.  They didn't have a problem with W.A.

6     Shouse or David Cochran or Darrell Snyder or Terry Elly who is

7     in safety.

8          This is Mr. Hemant Khuttan.

9          "So Signal you are saying Signal trafficked you against

10    your will and forced you in to labor against your will.  That

11    is the company that gave you a six-week leave to India, right?

12    That is Signal, right?"

13         "Yes."

14         "And then you chose to get on a plane and come back to

15    Signal where you say you were forced to work against your

16    will."

17         "So the way that you were treated on the worksite is

18    exactly how the Americans were treated on the worksite."

19         Hemant Khuttan.

20         "Yes."

21         "All right.  Your foreman never told you you would get

22    sent back to India."

23         "No."

24         Andrews Padavettiyil.

25         "Do you think you felt obligated to work for Signal."

1           "Definitely, I'm obligated."

2           "You felt obligated the entire time you worked at

3    Signal?"

4           "I did not have any problems working there in Signal.

5    I was happy to work there.  I did not have any difficulties

6    working there.  I even had worked without eating and food from

7    morning until evening.  I still had done hard work there

8    because I did not have any problems working there at all.  I

9    did not want to leave their employment.  The only reason I have

10   to leave is because they did not fulfill their promise.  And

11   that is the only reason I have to leave.  Not -- I would be

12   happy working there."

13          We're going to get to the promise just a little bit

14   later.

15          Andrews Padavettiyil.

16          "You like your day to day work at Signal I think you

17   testified."

18          "Definitely, that's right."

19          "In fact you cannot remember a single time when you did

20   a job at Signal that you thought was unsafe."

21          "Never."

22          Palanyandi Thangamani.

23          "I am wondering if there were members of work crew that

24   were American while you were working at Signal."

25          "Yes."

1        "Wherever you would work at Signal those Americans
2   would work as well."
3        "Yes."
4        "You actually didn't think the working conditions at
5   Signal were improper, did you?"
6        "Yes."
7        Joseph Jacob.
8        "In your lawsuit you alleged that Signal caused you to
9   work against your will.  You understand that?"
10       "It's not that they injured, but that they had
11   compelled me to do a job or to work a job that I did not like."
12       "You didn't like the job at Signal?"
13       "I liked."
14       "Do you allege that Signal assigned you a job that was
15   unsafe?"
16       "No, no.  Nothing like that."
17       See, this is where we start to pull back the curtain.
18   This is where we start to see what the truth is.
19       "Nothing like that.  But my job as a pipe fitter.  But
20   one of my coworkers was working there without fire watch, so I
21   stood as a fire watch there.  For that reason as punishment
22   they asked me to clean the whole rig on the whole day.  And
23   then, um, then, um, Shouse," W.A. Shouse right over there, "and
24   then the foreman had come to me and told me you could roll up
25   for the day and then he gave me a brush, and then he asked me

1    to start cleaning from one end of the rig.  He said the rest of

2    the day your job would be to clean up and go and clean up the

3    entire thing."

4         Really?  Really?  And I'm not being sarcastic.  But

5    that's how distorted this case -- the actual facts of this case

6    have become.

7         "I had to clean up this entire rig because W.A. Shouse

8    gave me a brush and said do it."

9         And what they want you to take that next step because

10   I'm Indian.

11        How can you be forced when you have no problems on the

12   job site, you have no problems in the yard, you have no

13   problems with your supervisors.

14        You are making 19.50 an hour overtime, safety bonuses,

15   rig bonuses, health insurance, and a matching 401(K).  I'm not

16   sure about you all, but I don't have a matching 401(k).  Most

17   people in America, sadly, these days don't have a matching

18   401(K).

19        Let's assume for the sake of argument that these men

20   did not testify under oath that they actually liked the job at

21   Signal, that they liked their foreman, they liked the people

22   that they worked with.  They didn't get the dirtiest jobs.

23   They weren't put in the worse positions.

24        Now you have to go to your back-up argument.  Because

25   they were so far in debt they were forced to labor against

1    their will, which meant that they made the conscious decision

2    in India to take out this money, to pay the recruiters.

3            The recruiters, by the way, were still saying the same

4    thing to them as they were to Signal.

5            So you take that money out, and you make the grown-up

6    decision as a grown man -- remember we'll talk about it later

7    many of them worked abroad previously.  So you make the

8    decision you are going to borrow the money.  And now, even

9    though you liked your job, unfortunately, you have to get up

10   every morning and you have to go to work.

11           So, I think that I am a victim of forced labor because

12   all these years later, they still want my money.

13           If you got a Visa card because you charged on that

14   card, and you have got to get up every morning and go to work,

15   that's the same thing.

16           If you decide to take out a mortgage on your home or a

17   second mortgage, it's the same thing.

18           It's called responsibility, freedom of choice, free

19   will, and taking responsibility for your actions.

20           Again, where is the personal responsibility?  It's so

21   easy to point to Signal.  It's too easy to point to Signal.

22           False promises of a green card.  How many times did we

23   hear that during the trial?  At first it sounds really, really

24   really bad.

25           Signal promised green cards and a promise is a promise,

1    right?

2         Mr. Howard went on and on about the false promises of

3    green cards.  But you know the more he asked, the more we see

4    how convoluted the argument gets.

5         Here is a quote from Mr. Howard having an interaction

6    with Ron Schnoor:

7         "Mr. Howard in the fall of 2006, when the workers were

8    still in India getting ready to make their final payments and

9    get on the plane to fly in the U.S. and to Signal, any promises

10   made to any of those workers that the process would play out

11   for every worker."

12        Think about this.  Their position is every worker.

13   Every single worker who signed up at India had to be sponsored

14   for a green card by Signal.

15        That means you don't have to be skilled, you don't have

16   to show up to work, you can show up drunk on a rig.  You can do

17   whatever you want because Signal promised you a green card.

18   You could quit and leave, but somehow Signal still has to

19   promise you or maintain that promise to sponsor you for a green

20   card, even though you up and left of your own free will.

21        Mr. Howard continues:

22        "QUESTION:  So any promises made to any of those

23   workers that the process would play out for every worker so

24   that Signal would sponsor them for a green card was a false

25   promise.  Correct?

1   "MR. SCHNOOR:  I don't believe so at the time.  Given

2 what I have testified, it was our goal to bring in a direct

3 employee for Signal.  And it was our intent, given all of the

4 things that I have previously testified to, that if the workers

5 did their part, if they were still with us, they didn't quit,

6 they didn't leave, et cetera, et cetera, we would apply and

7 sponsor them for a green card.  And we did.  We ultimately did.

8 So it was not a false promise.  That was our goal and that was

9 always our goal, and we followed through with that goal."

10   Next.

11   "MR. HOWARD:  But, Mr. Schnoor, to the extent that each

12 and every worker in India had been promised that Signal would

13 sponsor them for a green card, that was a false promise, yes or

14 no?

15   "MR. SCHNOOR:  The potential was there for green cards,

16 Mr. Howard.  It's a potential, not a guarantee.  If they did

17 their parts, certainly.  And one would have to expect the

18 employee and the employer to be there, would they not?"

19   And again, one last time, because he keeps pounding

20 over and over and over again.

21   "QUESTION:  Okay.  And now you are telling the jury,

22 Okay, well, the potential was there, but the workers had to be

23 there at the end of the 30-month process, right?

24   "MR. SCHNOOR:  Yes."

25   Doesn't this make sense?  Both immigration -- I think

1    the only time we actually agreed during this entire four weeks,

2    one day and a few hours, we actually agreed were our experts,

3    our immigration experts.

4           A green card in this case is a green card that is an

5    employer-sponsored green card.  It's not any other kind.  So

6    Signal International would have to sponsor these individuals

7    for the green card.  Why are you going to sponsor someone for a

8    green card who is no longer working with you?  Where is the

9    allegiance?  Where is the honesty?  It works both ways.

10          If Mr. Marler is going to keep his end of the

11   commitment, so should a worker.  If Mr. Schnoor is going to

12   keep his end of the commitment, so should the worker.

13          Can we get 31, 32, and 33, please.

14          Sony Sulekha.

15          "QUESTION:  On the day you left Signal, prior to that

16   day, nobody from Signal ever told you that they would not apply

17   for a green card for you?

18          "ANSWER:  No.

19          "QUESTION:  You understood that in order for Signal to

20   apply for a green card for you, that you needed to remain

21   employed at Signal."

22          Response:

23          "Because I could not stay there at Signal and work

24   because of my mental stress, that's why I had to leave."

25          Going to be a little surprised later on during this

1    closing argument.

2          Palanyandi Thangamani.

3          "QUESTION:  Sure.  When you left Signal, nobody from

4    Signal had told you that they would not apply for a green card

5    for you?

6          "ANSWER:  Well, even before that, they were just merely

7    saying that they were going to do an extension.  They were

8    going to do an extension.  But they did not give any paper to

9    show that as a authority.  So how could I trust them?"

10         Now, remember during this time, Signal management is

11   telling these individuals, we are not in the process of

12   applying for the visa extensions for you, the H-2B extensions,

13   because the only thing that Signal knew at that time is they

14   had to exhaust the H-2B process and then they could begin the

15   application process for the green card.

16         "QUESTION:  Nobody from Signal ever told you,

17   Palanyandi, that they would not apply for a green card for you?

18         "ANSWER:  No one has ever said that."

19         And he left anyway.

20         Hemant Khuttan.

21         "QUESTION:  Within two days of you leaving Signal, you

22   sued Signal, right?

23         "ANSWER:  Yes.

24         "QUESTION:  All right.  Now, at the time you left

25   Signal, you had been told by Signal specifically that Signal

1    was going to apply for a green card for you?

2           "ANSWER:  Yes.

3           "QUESTION:  And you were told there was a chance that

4    the green card application would be denied.

5           "ANSWER:  Yes."

6           Signal is telling the truth here.

7           "QUESTION:  You were told that there is a chance that

8    the green card application would take a long time to come

9    through.

10          "ANSWER:  Yes."

11          Prior to Hemant Khuttan leaving Signal on his own free

12   will, somebody from Signal told him the absolute truth.  He

13   still decided to leave, but he still sat here in front of each

14   and every one of you and said that Signal didn't fulfill their

15   end of the promise.

16          But for the 81 men who stayed, Signal fulfilled their

17   promise.

18          We talked about personal responsibility.  This is the

19   testimony of Mr. Palanyandi again.  I'm sorry, I believe this

20   was -- this is actually Joseph Jacob.

21          "ANSWER:  The food was very bad.  It was not very

22   satisfactory at all.  The reason being is that when we go to

23   work in the morning, we have to pack our lunch to take it with

24   us.  They had given us a steel container that we have to take

25   the food in, and the food was usually prepared early morning.

1    When we take it, by the time lunchtime comes around noon, the

2    food gets spoiled.  Most of the time, I had to throw it away.

3    I was unable to eat that.

4              "QUESTION:  Did you ever complain?

5              "ANSWER:  Oh, yes, I have complained.

6              "QUESTION:  Who did you complain to?

7              "ANSWER:  The manager of the mess, then to John

8    Sanders, then to Darrell Snyder.  We had continuously been

9    complaining about this."

10             I have a question:  If the container that Signal gave

11   you for free when you came to Signal isn't keeping your food

12   warm, why don't you get on the bus that Signal provided, go to

13   Wal-Mart and buy an Igloo like everybody else?

14             Again, I'm not being snarky, but this is the real

15   world, and these are the complaints that they have surrounded

16   themselves with and hauled Signal into court for.

17             There were signs along the way, and they ignored them.

18             "QUESTION:  Mr. Sulekha, yesterday you described

19   attending a meeting that was interrupted by police in India,

20   correct?  Were there members of Sachin Dewan's office or staff

21   present at the meeting that was interrupted by the police?

22             "ANSWER:  If my memory serves me right, there was

23   Burnett, Sachin Dewan, and Salimon were present there.

24             "QUESTION:  You saw the police require someone at that

25   meeting to return fee payments, correct?

                    OFFICIAL TRANSCRIPT

1          "ANSWER:  Yes.

2          "QUESTION:  The person that police required to return

3     the fee payments --

4          "ANSWER:  Yes.

5          "QUESTION:  The police --

6          "ANSWER:  The police told the recruiters that they

7     should not be collecting money without the visa being issued.

8     So they asked them to pay back those two people they had

9     collected the money from and then to stop meeting there."

10         Despite this, he went back and continued to pay money.

11         Here is another good one.  And again, this is their

12    testimony.  This is what they are basing everything on.

13         Andrews Padavettiyil.  He is the individual who went to

14    Buffalo Wild Wings.

15         "ANSWER:  So I think it's toward the end of 2007, I

16    think, I believe I bought the car then.

17         "QUESTION:  Was it a new car?

18         "ANSWER:  No, it was a used car.

19         "QUESTION:  Did you go on vacation?"

20         I'm sorry.

21         "ANSWER:  But if there is any time, I could tell you

22    more about it, but that is the reason why I had some other

23    friends put in money and we bought the car.

24         "QUESTION:  Okay.  So just to clarify, you paid $3,000

25    down payment?

                         OFFICIAL TRANSCRIPT

1          "ANSWER:  Yes.

2          "QUESTION:  You borrowed the money from friends to help

3     pay that down payment?

4          "ANSWER:  Yes.

5          "QUESTION:  Okay.  Did you go anywhere with the car?

6          "ANSWER:  Yes.  Definitely, when I had the Christmas

7     vacation, I had taken some of my friends to Disney World in

8     Florida, and that was a very happy moment for me."

9          This same individual earlier in his testimony.

10          "QUESTION:  So total, you grossed about $80,000 while

11     you were working for Signal?

12          "ANSWER:  Well, yes, sir, in that 16 months that I

13     worked there, for every month, they deducted $1,050 from that.

14     So if you could use that small amount also from the money, I

15     guess if you could say that."

16          Now this is Palanyandi, answering.  He then says:

17          "ANSWER:  But for the two years that I was working

18     here, my family had to borrow money to feed themselves."

19          Mr. Palanyandi worked for Signal for two years.  He

20     purchased a car, he traveled to Disney World with his friends.

21     Yet somehow we're led to believe that, at home in India, there

22     is a family who is having to borrow money to feed themselves.

23          It's almost the tales grow taller on down the line.

24          Another one just -- again, a lot of this is just

25     clarifying things that have been alleged or talked about in the

OFFICIAL TRANSCRIPT

1    opening statement.  And then miraculously, the individuals

2    changed their mind or changed their testimony on the stand.

3    This is --

4            "QUESTION:  Before I get into the substance of this

5    e-mail, do you remember Ms. Hangartner stating in her opening

6    that Signal used badge numbers to refer to Indian workers whose

7    names were hard to pronounce?"

8            Joseph Jacob.

9            "ANSWER:  While I was in Signal, I had not heard

10   anybody being called by their badge numbers."

11           Let's go to the housing, because Signal is accused --

12   I'm sorry -- of discriminating against these individuals from

13   India on the basis of race because they were living in the

14   housing facility.

15           Can we go to 12, please.  Let's go back just a little

16   bit.  There has been a lot of testimony saying that Signal's

17   lawyers drafted that Global agreement.  Signal's lawyers did

18   not.  Signal's corporate lawyers looked over the Global

19   agreement from a contractual standpoint.  The contract itself

20   came from Michael Pol with Global Resources.

21           And Lisa Spears testified to that.  She was the risk

22   manager at the time.  There was red-line by their attorneys,

23   and then it was brought in for finalization, and Mr. Cunningham

24   signed off on it.

25           Next, please.

1          These are the responsibilities that Signal felt as

2    though it had towards these workers.  Provide housing, set up

3    bank accounts, offer direct deposit, Social Security numbers,

4    401(K), medical, H-2B visas, and eventually apply for the green

5    cards.

6          As Chris Cunningham testified to, this wasn't a small

7    expense for Signal.  Dick Marler had to go to the board of

8    directors and ask for special permission to make a capital

9    expenditure of $7 million waiting for these H-2B workers to

10   arrive.

11         And just like Santhosh Kumar testified to about the

12   living conditions when he worked ten years in Abu Dhabi and

13   said that his bunk space, his room was about the size of that

14   jury box.

15         When Mr. Marler and Mr. Cunningham and Mr. Schnoor went

16   over, Mr. Bingle went over to Knights Marine and they saw where

17   Michael Pol was going to house these individuals, they said,

18   "No way.  Nobody who is going to be a part of Signal is going

19   to live in that type of condition.  No bathrooms in there, no

20   place to cook, no place to eat, no TV, no nothing.  It was a

21   box."  Just like Santhosh had to deal with for ten years in Abu

22   Dhabi.

23         But Mr. Marler wasn't going to let that happen in

24   America.  Unfortunately, the place that these individuals were

25   coming to live was devastated by Hurricane Katrina.  And I want

1    to make something abundantly clear.  Hurricane Katrina is not

2    an excuse; Hurricane Katrina is the reality that we were all

3    living with.  We all know that everything was upside down,

4    nothing was the same.  We all waited for the Rite Aid to

5    reopen, or the K & B that's now closed and never reopened.  We

6    waited for little bits of progress along the way, our neighbor

7    coming back, something, because it meant that much.

8         And when you drove along the Gulf Coast and you saw the

9    devastation, Mr. Marler, Mr. Cunningham, there isn't anyone in

10   this audience who works with Signal right now who needed to

11   hire a realtor or an expert to realize that in Pascagoula,

12   Mississippi, which is already heavy industrial, there were not

13   enough housing units to house 290 men.

14        You know what, I will give you this.  50 guys come in,

15   there is a possibility that Signal could have found room,

16   somewhere in apartments, scattered around, to house 50 guys.

17   290 workers?  I'm sorry.  It wasn't an option.  That's just

18   reality.  It's the reality that we were all living with.

19        Factor this in as well:  These are men from India.

20   They had no established credit history.  Where are they going

21   to get an apartment?  First of all, it doesn't exist.  They

22   don't have a bank account yet.  They don't have an established

23   credit history.  Where are they going to go?

24        Imagine what would be said right now about Dick Marler

25   if he hadn't built the housing facility, if he had let these

1    guys get off the bus and just said, "Good luck, show up at work

2    tomorrow morning."

3          That makes absolutely no sense whatsoever.  These are

4    the things that they are alleging and that they are asking you

5    to find.  Did Signal house these workers in the man camp

6    motivated by the fact that they are Indian and/or H-2B workers?

7    "Motivated by the fact."  That means that, but for the fact

8    that they were Indian or H-2B, they would have lived somewhere

9    else.

10         Mr. Marler said it before, if we could have brought in

11   290 guys from Wyoming, it would have been great.  Direct hires.

12   Guess what?  290 guys from Wyoming would have been living in a

13   housing facility.  They wouldn't have had an Indian caterer or

14   an Indian cook.  Burgers and cheese fries, but it would have

15   been the same exact situation.  Because that, again, was the

16   reality.

17         Did Signal prove that it would have made this decision

18   for any large group of workers who came in from the area with

19   no housing?  I submit to you, yes, absolutely.  Real-world

20   common sense, that is all that is left.

21         Did plaintiffs prove that, because they're Indian

22   and/or H-2B, Signal subjected them to a harassing environment

23   at the man camp?

24         Was it crowded?  Yes.

25         Were the bunks too tight initially?  Yes.

1          There were problems.  Nobody is going to stand up

2    here -- and nobody took that stand, if you noticed, from Signal

3    and said, "We're perfect," not a one of them.  They made

4    mistakes, and there were growing pains.

5          But here is the thing.  Joseph Jacob, who was

6    terminated, he says, because he spoke out for other workers and

7    spoke on their behalf, if Signal is so cold and so corporate

8    and such a hideous corporate citizen, why did they set up

9    meetings twice weekly in the man camp with the man camp

10   managers; Darrell Snyder being one and John Sanders being

11   another?  Why did they set those up to hear the complaints if

12   they are not going to do anything about them and make them

13   better?  Does that ring true?  Does that make any sense?

14         They brought in additional trailers.  They put in TVs.

15   They put in sofas.  They put in additional couches.  They put

16   in more bunk space.  And guess what happened?  Ramesh Gunisetti

17   told you.  When the Ameri-Tech trailers came in, most guys

18   didn't leave their bunkhouses.  They didn't want to.  They were

19   perfectly content where they were.

20         We set up a prayer room.  We set up a quiet room.

21   There was WI-FI.  I know you all are sick of hearing of

22   everything that Signal did with the housing facility.  But to

23   say "subjected them to a harassing environment in the man

24   camp"?  Three meals a day?  Yes, there was security, to keep

25   people from coming in and taking their stuff.  All they had to

1    do was walk right out the front gate, which they did.  Each and

2    every one of these five plaintiffs got up, packed their bags

3    and left.

4            Can I get 27, 28, and 29, please.

5            These are the deductions, evidence that these

6    individuals, these five plaintiffs knew in India that they

7    would be paying $35 per day to live in Signal's housing

8    facility.  This did not come as a surprise.  It did not come as

9    a shock.

10           Again, this is Hemant Khuttan.

11           "QUESTION:  Okay.  Now, you were told specifically in

12   India that the boarding deduction would be $35 per day?

13           "ANSWER:  Yes."

14           Next.

15           It is Signal's position -- okay, let's do this.  You

16   heard the testimony that the job site, management, supervisors,

17   that wasn't a problem.  Safety wasn't a problem.  None of that.

18   So now, discrimination, forced labor, and human trafficking is

19   all rooted in the housing program.  Look at what they got for

20   what they are asking.  Millions of dollars because they were

21   asked to live in a man camp.  In a housing facility.  Where,

22   again, that is all there was.  And they signed a lease just

23   like you and I have signed leases in the past or a mortgage, a

24   house note.  And when you break your lease, there are

25   consequences.

1          Chris Cunningham testified to you about the great

2   expense that Signal had when it came to housing these workers.

3   It wasn't just the $7 million price tag for GE, and then

4   Ameri-Tech topped on that.  It was the food which was $14 a

5   day.  It was the people who ran the camp.  It was the cleaning

6   crew.  It was the laundry service.

7          So I will submit to you --

8          Can I get the next slide?

9          -- if these people really deserve money because, again,

10   the worksite, that is gone.  Their testimony knocked that out.

11   Very beginning.  They really deserve money.

12          Sony Sulekha, $2,900.  I'm sorry, $2,009.  That is his

13   cost for boarding minus food.

14          And all of these are minus any vacation that they took.

15   Because when they took vacation, a month back to India, a week

16   or so in Disney World, all of that was subtracted and they were

17   not responsible for that.

18          Palanyandi Thangamani, $8,603; Hemant Khuttan, $6,370;

19   Andrews Padavettiyil, $7,595; Joseph Jacob Kadakkarappally,

20   $1,911.  I submit to you that if you believe that some

21   restitution is fair, these are the dollar values.  Certainly

22   not in the millions of dollars.

23          Let's talk about March 9th.  Joseph Jacob.  There is no

24   doubt that Mr. Jacob was a skilled worker.  His personnel file

25   shows it.  He received a raise.  He was a skilled welder.  Have

1   you ever dealt with anyone, though, on the work place that just

2   couldn't stop stirring the pot for one reason or another?

3   Trouble is the middle name.  Riling up other workers.  And

4   here's the problem.  Here's where Mr. Jacob begins to not just

5   stir the pot, but then to take steps in furtherance of it.  No

6   green card, no peace.

7        Told Darrell Snyder, the guy who ran the camp, the guy

8   who sat there night after night after night.  There was his day

9   job at Signal.  He was a project manager.  He cared about these

10  guys.  Even Ramesh said he would sit in the guard shack.

11  They'd answer questions; checking accounts, driving license.

12  How do I get my driver's license?  Darrell went down to the DMV

13  and got all of the paperwork that everybody needed who wanted

14  to get a driver's license.  And would also get the driver's

15  license.

16       "You know, Darrell, I really wish my wife could come in

17  on the H-2B program."  There is the option.  Darrell took the

18  paperwork off the Internet.  Guess what Darrell did?  Four of

19  the guys -- three of the guys got their wives in because

20  Darrell helped them; but no green card, no peace.

21       And when was this?  He wasn't there that long.  He was

22  there three months.  Three months.  He shows up and immediately

23  it's no green card, no peace.  Signal, A, can't even apply for

24  the green card; B -- at this point.  B, only the United States

25  government can guarantee a green card.  How realistic is it for

1  a man to show up and say, "I want my green card.  I want my

2  lottery ticket."  And they pushed Darrell on it.

3          I want to be absolutely clear:  "Mr. Snyder:  Did

4  Mr. Jacob, the plaintiff in this case, in this trial, use the

5  words with you, 'no green card, no peace.'"

6          "Yes."

7          Next, please.

8          "Did you ever get in the lounge where the workers were,

9  I guess, waiting?"

10          "Eventually, yes, I came back."

11          "Okay.  But that was okay you came back.  My question

12  was -- I was trying to get at it.  Did you get inside that

13  lounge building before you came back?  In other words, in the

14  initial -- this is the first time you were at" --

15          "No, there was no way for me to get to it.  There was

16  50 or 60 people beating on the doors."

17          "Why were they not getting in the doors?"

18          "I came to find out that the two guys that were in

19  there were the security guys and they were hanging on the

20  handles keeping the door closed."

21          Next.

22          This is most telling:  "Did you tell Mr. Snyder that

23  the Indian workers were tearing the place apart?"

24          This is Mark Tanner, no longer employed with Signal.

25  "I told them that they was about to beat the trailer down.  Me

1    and Neil was in it when it all went down.  If they -- if they

2    would have had their way, they would have tore down the doors

3    or windows to get in."

4          This is what happened after Signal, once again, made

5    every effort to do the right thing.  They had received a letter

6    from Immigrant Justice Project.  Now, remember, just before

7    this letter came out from Immigrant Justice, they had been

8    visited by DOL and got a clean bill of health.  Everything is

9    fine.  We're not going to need to be here for two days.  It's

10   good.

11         February 26.  Immigrant Justice Project with the

12   Southern Poverty Law Center.  Makes no mention of Joseph Jacob

13   nor of Sabulal Vijayan at all.  This strictly deals with -- and

14   Mr. Howard inadvertently left out this paragraph.  "We ask that

15   you immediately take the following actions to comply with the

16   terms and conditions of the workers contract.

17         First, we request that you restore all workers' hourly

18   wages to the prevailing wage for the job for which the worker

19   was originally hired.

20         Second, we request that you restore all workers' weekly

21   schedules to the hours promised under the contract."

22         Here is the problem.  Under the H-2B scheme, if you are

23   not qualified to be a first-class welder, you can't drop back

24   to fire watch.  So these individuals, who they were getting

25   ready to terminate because they were not skilled, there was

1    nothing they could do with them.  They possessed the same

2    skills as a fitter or a welder that I currently have, which is

3    none.  So this isn't talking about anything other than what

4    Signal, under law, cannot do.

5           Again, having nothing whatsoever to do with Joseph

6    Jacob.  Joseph Jacob had the right to speak on behalf of others

7    and voiced the complaints.  Both Dick Marler and Chris

8    Cunningham and Ron Schnoor testified to that.

9           Can I get Exhibit 1015, please?

10          I want to go back real quick.  Mr. Schnoor testified

11   that, prior to making the decision to terminate these workers,

12   both the unskilled as well as Sabulal Vijayan and Joseph Jacob,

13   he did what he believed was best.  He called ICE, Immigration

14   Customs Enforcement.  Why does somebody rely on ICE?  Because

15   ICE is the people, the group, the entity, the governmental

16   agency who is supposed to be able to tell you what to do and

17   how to do it when you are dealing with the guest worker

18   program.  I mean, this isn't a guy from Moss Point, Pascagoula,

19   or Lucedale who gets in his truck and drives down the road.

20   Signal believed that they had a responsibility to the

21   government to figure out how best to handle that.  And as we

22   just read, it all blew up.  Unfortunate, incredibly

23   unfortunate.  No one wanted that to happen; not Signal

24   management, not Signal security, not Darrell Snyder, not anyone

25   on the ground.

1           And now, I'm going to talk about something that is
2      uncomfortable for everybody.
3           Sabulal Vijayan.  He testified to you.  Mr. Marler made
4      the comment that it was a suicide gesture.  His medical records
5      show that it was a suicide gesture.  I am not belittling this
6      at all.  Please understand me.  But there is a difference
7      between a suicidal gesture and someone who is upset, distraught
8      versus someone who truly, truly wants to end their life.  And I
9      say this because he walked in to his bunkhouse, still not real
10     sure what it was, cut his arm, but then immediately did this
11     (indicating) and walked into that picnic area where everybody
12     was standing.
13          Again, I'm not belittling it.  I understand he was
14     upset.  But as counsel for Signal, I have an obligation to
15     point out to you what actually happened that day.  And it's not
16     a man who was bleeding to death who was rushed to the hospital.
17          On March 9th, Joseph Jacob was terminated for having an
18     at-length conversation with multiple individuals, Indian
19     nationals who were working on the rig.  This poses a number of
20     problems.  No. 1, this is not watercooler talk at Xerox or IBM
21     or a law firm.  You are on a rig.  It's dangerous.  You are
22     responsible for your safety as well as the safety of everybody
23     else in your crew, and everybody else who was working around
24     you.  When you are talking at length -- and if you remembered,
25     that e-mail specifically said, "talking at length."  I will

1    show it to you later.  Talking at length trying to recruit

2    individuals to go meet with the lawyers.  Meeting with the

3    lawyers is fine.  Mr. Marler, Mr. Cunningham, Mr. Schnoor all

4    said, "We have them meeting with lawyers all of the time."

5         It's when he took it that extra step.  It's when he

6    crossed that line, and took it to a rig.  That's when it became

7    the problem.  And in order to talk to more than one worker, one

8    Indian worker, he had to leave his crew.  That is the ultimate

9    sin on a rig.  In rig work, you never leave your crew.  Your

10   super is there at all times, and you maintain the integrity of

11   that crew.  Because if anything goes bad, you need to be

12   accounted for and you need to be there to help your fellow crew

13   members.  And Joseph Jacob violated that very important role.

14        They are going to ask you -- or they have asked you for

15   punitive damages.  Punitive, obviously, means punished.  It

16   actually says that the damages of the actions of Signal were

17   done out of malice or reckless indifference towards Joseph

18   Jacob.  If so, you can find punitive damages.  Punitive means

19   to punish.  Ask yourselves:  What did Signal do intentionally

20   with malice or reckless disregard to Joseph Jacob?  He had

21   already threatened Signal.  He crossed the line, went to the

22   rig, went to the job site, and was distracting other people.

23   What has to happen on a rig before Signal made the decision to

24   terminate him?

25        They called ICE.  They tried to do it in the best way

OFFICIAL TRANSCRIPT

1     possible.  Unfortunately for everyone, it did not work out that

2     way.

3                 Can I get 19, 20, and 21, please?

4                 This is Joseph Jacob.  "You testified yesterday --

5     today about some complaints you had at Signal."

6                 "Yes."

7                 "You delivered a lot of those complaints at a meeting

8     with your coworkers and some Signal management."

9                 "Yes."

10                "The purpose of those meetings -- well, those meetings

11    happened.  They happened more than once."

12                "Yes."

13                "The purpose of those meetings was so Signal could hear

14    the complaints of you and your co-workers."  Again, this is

15    Joseph Jacob testifying that Signal had an open door:  Let us

16    know what is wrong and we will fix it.

17                Can I get the next one, please?

18                "You remember the food at Signal?"

19                "Yes."

20                "Food at Signal ever make you sick?"

21                "No."

22                "You never ate spoiled food at Signal?"

23                "I did not get any."

24                If he is speaking for the workers and he is complaining

25    and the quality of the food is coming up, isn't that a positive

1    thing for Signal?  But they don't want you to focus on that.

2    Don't get lost on anything positive that Signal did because

3    they promised every single worker a green card, and even though

4    they left, Signal is supposed to sponsor them for a green card.

5           Can we go to 39 and 40, please?

6           I know you probably got sick of hearing from safety

7    people with Signal.  You heard from Pat.  You heard from Terry.

8    You heard from Ramesh, but safety is very important at Signal.

9    Literally, their motto is "Safety first."

10          Here is the thing, though.  Signal's safety record

11   means something.  You add 290 individuals to a workforce, and

12   you maintain your safety rating.  During the time that the H-2B

13   workers were present, Signal had an OSHA accident rate of .6 in

14   '07, and .67 in 2008.  The industry average is 6.8.

15          CASE MANAGER:  There is 50 minutes.

16          MS. HANGARTNER:  That is one-tenth the rate of the

17   competition.  That is a spectacular rate of safety.  You don't

18   get that if your workers are starved, if they are tired, if

19   they are abused, if they're maligned.  You don't get that.  You

20   don't see the same type of safety when you have suffering,

21   stressed, humiliated, exploited workers.  Again, it's simply

22   not the facts of the case.

23          I want to talk briefly about Tracey Binion.  Tracey is

24   our HR director.  She sat up on the stand and got beat up for

25   hour, hour and 20 minutes over e-mails.

 1          What you need to understand, though, at the inception

 2    of this case, or at some point during this case, with the

 3    plaintiff's counsel search terms, okay, and the Court's

 4    blessing, Signal had someone come in to its mainframe

 5    computers, all of its servers, and they called out everything;

 6    every document, every e-mail.  2.3 million e-mails.

 7    2.3 million documents.  And at the end of the day, they berate

 8    Tracey Binion for over an hour because of a handful of e-mails.

 9    A handful of e-mails.  Poor judgment?  Probably.

10          How many of us can say that in -- oh, over a five-year

11    period of time -- that you didn't say something that you really

12    didn't mean?  "My mother is driving me nuts.  I would like to

13    strangle her."  I know that is in an e-mail somewhere.  My mom

14    can't say anything in ten words or less.  I certainly don't

15    mean I want to strangle her.  You are frustrated.  You are

16    tired.  You put something in an e-mail.  E-mail now is what

17    people used to do "back when" is talk to one another, person to

18    person.  But instead, they berate Tracey.

19          And Tracey never said that she wasn't aware of the EEO

20    policy.  That's misconstrued as well.  It's twisted and it's

21    turned around.  What she said is she didn't realize that there

22    was the intricate reporting requirement in there.  She's aware

23    of the EEO policy.  She's aware of the limitations.  She's

24    aware of the burdens and the duties of her job, and she does

25    them well.

1        I had e-mails that I really wanted to show you, but I'm

2   not.  I got everything great that Tracey did.  How excited she

3   was to have the H-2B workers come onboard to help them along

4   the way, to prepare the housing for them, to make the beds, to

5   buy them the toiletries.  That's not really important.  And to

6   buy them the goats that she had slaughtered for them for a

7   special holiday.  And not to make a play on words, but Tracey

8   was made a scapegoat.  I think she deserves an apology, if you

9   want to be honest.  It was a little too far.

10        RICO.  Malvern Burnett, Sachin Dewan owe indemnity to

11  Signal.  But for the fact that Mr. Burnett consistently

12  misrepresented the truth to Signal, Signal would not be here

13  today.  Signal was in the position -- and here's another

14  mistruth or untruth or twisted fact, if you will.  Mr. Howard

15  said that Signal was jealous because -- that's why they

16  actually fired Mr. Burnett.  Because they didn't want

17  individuals leaving and going to their competitor J&M.  That is

18  actually not true.  Mr. Schnoor fired Malvern Burnett for lying

19  to them.  Same reason Michael Pol was terminated.  We had about

20  30 or 40 people who left and went to J&M.  They were under

21  pressure.  Do you know what Signal said?  "Oh, if you want to

22  come back, you can."  And about 30, 35 guys, after they were

23  finished with their tour, their stint of 3 to 4 months with

24  J&M, came back to work at Signal.

25        What didn't they want you to see?  I found this

1    interesting as well.

2        Let's pop up the photos of the man camp that they show.

3    1190, 808, and 809.  Aerial view only, no interior.  Next one.

4    Next one.

5        SCOTT:  What was the number?

6        MS. HANGARTNER:  808, I'm sorry.  Here is one.

7        Before the Ameri-Tech came in, before the bunks were

8    spaced out, before anything could be done, is it cramped?  Yes.

9    No one from Signal is going to deny that.  But they made the

10   changes and they made the improvements.  But they didn't want

11   to show you those.

12       Can I see 809?

13       Another photograph that they showed you, only two,

14   despite the fact that their counsel went and took a video that

15   lasted over three hours.

16       Can we see 610?  And you could just pop these up.  I'm

17   sorry, 1610.

18       614 -- 1614, this is the cafeteria.  It's a grainy

19   picture, but as you could see, there are big milk things for

20   warm milk back there, there is a TV in there, full-service

21   line.

22       Can I get 1628?

23       This is where all of the EEO and all notices were

24   posted so they knew exactly what was coming up and what they

25   had to do if they had a problem with a supervisor or anyone at

1    the housing.  It was all posted right there for them to see,

2    including what Tracey Binion had translated into Hindu for

3    them.

4          This is Exhibit 1672 and 1604.  "Sexual harassment is

5    forbidden by law.  Report all complaints immediately to your

6    supervisor."  So they could understand the complaint process

7    that was in place at Signal that every other worker had access

8    to, as did they.

9          I'm going to close by saying --

10          Actually, could I get the Slide 50, please.

11          I urge you again that your only interest is to seek the

12   truth from the evidence in this case.  The best words came from

13   Ron Schnoor:

14          "We didn't force anybody to do anything, sir."

15          "Well, we will let the jury decide," said Mr. Howard.

16          Sure.  You have the words of the plaintiffs, there were

17   no problems in the yard.  They liked their foremen, it wasn't a

18   yard problem.  It's just that they had to live in the housing.

19          There is no evidence whatsoever that any of them have

20   shown to you that shows that their labor was forced, and the

21   burden is by a preponderance of the evidence.

22          I hope today -- 1013 -- I hope today that I have helped

23   to pull the curtain back just a little bit further so you could

24   understand the truth, the root of all of this.

25          This is an e-mail that has been shown numerous times to

1    Mr. Marler, to Mr. Schnoor, and I believe to Mr. Bingle.

2              THE CLERK:  You have two minutes.

3              MS. HANGARTNER:  If we could go to page 2, please, and

4    pop up that bullet point -- I mean 3.

5              Some things just don't make sense until you put it into

6    context.

7              E, please.

8              If the workers will file a formal complaint, they will

9    be issued a work permit by the government that will allow them

10   to work wherever they want in the United States for up to three

11   years, while this lawsuit makes its way through the courts.

12   Sometimes lawsuits take a little longer than three years.  But

13   they are still here.

14             THE COURT:  All right.  Mr. Cerniglia.

15             MR. HOWARD:  Your Honor, before Mr. Cerniglia goes,

16   could we have a bench conference?

17             THE COURT:  Yes, counsel come up.

18                        (At sidebar on the record.)

19             THE COURT:  Two things.  You brought up the medical

20   records that could not be used about the suicide, and then you

21   said they are still here.  And I'm considering sanctioning you,

22   Ms. Hangartner.

23             MS. HANGARTNER:  I didn't mention it.  I didn't know

24   where --

25             THE COURT:  You know that we have purposefully avoided

1    talking about where they lived at this time, so there is

2    nothing I can do about it now.  I don't want to talk about it.

3    I'm wanting you -- where is Mr. Cerniglia?

4         MR. SHAPIRO:  He's at the podium, ready to go.

5         THE COURT:  I want you two to know Ms. Hangartner did

6    two things.  One was talk about the medical records, and the

7    other was to say they are still here.  I want you to know about

8    this so that you don't do what she did.

9         MR. CERNIGLIA:  I have no intention of using either of

10   those subjects.

11        MR. HOWARD:  I want to place on the record my absolute

12   disgust with the last question and flagrant violation of the

13   Court's order.

14        MS. HANGARTNER:  It's an e-mail.

15        MR. HOWARD:  It puts a tenor over the entire closing,

16   the entire four-and-a-half-week trial.

17        I have said from the beginning that Signal has been

18   looking for any way to avoid your orders in this case, and

19   Ms. Hangartner waited to the 11th hour and 59th minute and did

20   it.

21        THE COURT:  I know.  There is nothing I can do about it

22   right now except tell these two not to do it.  We will deal

23   with it later.

24                  (End of discussion at sidebar.)

25   ///

1                         CLOSING ARGUMENT

2           MR. CERNIGLIA:  Good afternoon.  I'm going to try as

3    hard as I can not to be as long as either of those lasted.  I

4    can't promise anything, no guarantees.  But I'm going to try.

5           I do want to thank you all.  It's been long and hard.

6    And I hate to be the one to break it to you, but guess what,

7    the easy part for you is now over.  The hard part is getting

8    ready to start, as you probably have figured out by now.  And

9    don't be shocked when you see a small book come in giving you

10   instructions on what to do next.

11          You will be given pages and pages of claims and what

12   qualifies to this claim, what is human trafficking, what is

13   forced labor.  If you take all of that and reduce it to its

14   base element, the job is easy.

15          Who, if anybody, did something wrong?  And that

16   includes the plaintiffs, too.  Who did something wrong?  Did my

17   client do something wrong because these people harmed or cause

18   these people harm?  And luckily, each and every one of you come

19   armed with the necessary tools and internal compass that you

20   know right from wrong.  You know right from wrong, and that's

21   going to be your guiding light to these 72 or 80 pages or so

22   you are going to be getting.

23          You know, I told you in the beginning that this case,

24   what it -- what this case was always about.  And you have seen

25   one of them.  As to the letter from the Southern Poverty Law

1    Center regarding violating terms and conditions of employment,

2    and you have seen the e-mail.

3         "Before the week is over, the Indians will know we're

4    not afraid to fight, and so should their liberal lawyers."  And

5    you know what?  That is exactly what they did.  They decided,

6    they both dug in their heels and both decided we're going to

7    fight this to the death.  And they have assembled -- they call

8    them a team, I call them an army.  They got two armies and they

9    have loaded their big guns.  I don't have big guns.  I don't

10   have IT people.  I do the best I can.

11        Caught in the middle is Mr. Burnett and Mr. Dewan.  Why

12   is it always the way?  Why is it always the way?  It's the

13   little guy's fault.  You know, the small law firm.  They misled

14   me.

15        Well, let me show you something.  I'm trying to show

16   it, and you probably recall it, but just to make sure.

17   Remember the letter, the contract?  Michael Pol goes to Signal

18   and makes a pitch.  You need workers -- and there is no doubt,

19   everybody here knows what it was like after Katrina.  You

20   couldn't get contractors.  You couldn't get plumbers.  You

21   couldn't get -- if you wanted a contractor, you had to wait for

22   hours for them to drive in from someplace from Lafayette or

23   Baton Rouge.  So they needed workers.

24        They, Signal, was already looking at options for the

25   same type of workers -- but through contract labors, H-2B

1   workers.  In fact, you may remember the testimony of Billy

2   Wilks that was read to you.  He thought he had an agreement

3   that Signal is going to take his H-2B workers, he was going to

4   get them.  Filed for them, and they came in.  Sorry, don't need

5   you anymore.

6        This is in early February when Signal is approached by

7   Mr. Pol.  And did Mr. Pol give him the contract?  I don't know,

8   from both sides.  Pol said it was them.  They said it was Pol.

9   But we do know that Signal looked at it.  But not only do we

10  know that they looked at it -- this was from a guy whose name I

11  still can't pronounce.  With a name like Cerniglia, you would

12  think I would understand that.

13       February 8th, to Bill Bingle, Chris Cunningham, copy to

14  Ron Schnoor.  Re: Recruitment agreement.  He makes a lot of

15  recommendations.  We recommend input from Signal's immigration

16  attorneys to fully understand Signal's liability.

17       Mr. Bingle said, "Well, yeah, I guess we got one."

18  Now, they don't.  They don't have an inhouse one.  But just

19  like David Bland, who you saw a reference to, and just like

20  they were saying how they had a lawyer red-line it, they have

21  access to an immigration lawyer.  Did they talk to them or not?

22  I don't know.  I'm not Signal.  But I do know this, they

23  thought about it.  It was recommended.

24       And at this point in time, all Mr. Burnett has done is

25  explained his understanding of their options.  You can do H-2B,

1    but there are problems.  You can do green cards, but there are

2    problems.  The problem is:  It's going to take a long time.

3    H-2B, you might not get it.

4         Enrique Gonzalez, the expert for Signal, that is the

5    opening slot.  Enrique Gonzalez, what did he say besides that

6    U.S. companies have -- it's complex and should rely on their

7    attorney.  Well, guess what?  That is exactly what Signal

8    management represented they should do.  But, no, now it's

9    Mr. Burnett's fault.

10        And what is the party line -- there were party lines --

11   party lines on both sides.  Party line on the Signal side is:

12   We didn't know it was inconsistent.  Nobody told us it was

13   inconsistent.  Mr. Burnett lied to us.

14        But actually, nobody said Mr. Burnett lied to you,

15   because nobody -- in fact, you remember Ron Schnoor?  I don't

16   know that Mr. Burnett represented anything to anybody.  He said

17   a couple of times, I want to make sure he said it again -- I

18   hope you all took notes.  The point is:  At the time

19   Mr. Burnett was explaining something, he wasn't their lawyer.

20   They had access to a lawyer.  But they didn't -- they elected

21   not to use it.

22        The question comes in now:  What exactly was Signal

23   told?

24        Now, this is Mr. Pol, the highlighted part.  I have

25   copies of depositions that were read to you.  I don't have -- I

1    don't have a transcript, didn't have the resources to pay for a

2    copy every day the court reporter types up.  But I do have

3    this.  And I will use that and hopefully your memory.

4         "QUESTION:  Was that concept that the workers may have

5    to return to their home country the conclusion of the H-2B visa

6    before they obtained permanent resident status communicated to

7    Signal?"

8         Mr. Pol's answer:

9         "ANSWER:  Oh, yes.

10        "QUESTION:  To who?

11        "ANSWER:  Just in general discussions, I remember, you

12   know, Mr. Burnett said these guys come over for H-2B, but the

13   permanent residence may not kick in until later, and they may

14   end up, in fact, having to go home.  And I know a lot of

15   workers were told the same thing.  They understood that."

16        First we start at Signal.  Mr. Bingle testified he

17   knew, he remembered at the beginning that that -- that that was

18   mentioned.  There it is, Mr. Burnett testified.  Yeah, of

19   course he explained it to them, because that is one of the

20   problems.  If it doesn't get granted and you have an extension

21   and an extension gets denied, with the priority dates -- at

22   this point in time, the priority dates that you've heard so

23   much about are backlogged.

24        Now, Mr. Pol also testified that:

25        "QUESTION:  Were you present when a worker was told

1     that?

2          "ANSWER:  I was present, just don't recall where or

3     what point.  I just know the workers were cautioned, at least

4     in conversations that I heard, that there was a possibility

5     that they may have to come home prior to getting their

6     permanent residency."

7          You heard Mr. Dewan even said that, and he didn't have

8     a kind thing to say about Mr. Burnett.  One of the things that

9     I don't know had much to do about anything, compared to whether

10    or not these workers were told what they needed to be told.

11    But he remembered that.  He also remembered that, yeah, the

12    workers were told not only they might have to come back if the

13    extension was denied, but they were always told to tell the

14    truth.

15         The point is, with both Signal knowing about the H-2B

16    and the workers knowing that it was H-2B and that you could get

17    an extension, is just like Mr. Pol described in his deposition.

18    It was a win-win for Signal because they could get their

19    workers sooner, and they needed them desperately.  And it's a

20    win for the plaintiffs or for the Indian workers who are going

21    to come over.  They could make some money, and they would come

22    back when the permanent residence process was completed.

23         Now, let me show you something on that point.  This is

24    just an example.  This is Mr. Palanyandi Thangamani.  We call

25    him Mr. Palanyandi.  2007, so it's a full year of wages,

1    53,425.29.  Federal income tax withheld; Social Security

2    withheld; Medicare withheld.

3         Now, this is something you all can do in the back if

4    you find you really need to get into it, but take a look.

5         Check the numbers.  The 53,425; 8,327.32 in federal

6    income taxes, same thing.  Social Security, Medicare.  Now,

7    this housing deduction is reduced $35 a day times 365.  That is

8    not what they were apparently charged, but they got time off or

9    if they were away for a week.  This is just $35 a day, 365 days

10   a year.  Take out the recruiter fees and take out the

11   attorneys' fees.  The net earnings is 16,628.93.  That is what

12   is left over.

13        Now, remember, that is net.  You pay for your housing,

14   you pay for your food, you paid your taxes, you paid the

15   recruiters' fees.

16        Now, remember, the testimony of several of the

17   witnesses, some of the ones -- some of the plaintiffs that were

18   -- they were in Saudi Arabia.  They are earning $500 a month.

19   In fact, I believe, it was either Isaac Andrews or Jacob Joseph

20   that had borrowed, I think, it was the second -- two

21   instalments.  It would be more than $6,000.  He said he paid it

22   back in three years.  But at any rate, the $500 a month wages,

23   which would -- they would be earning in Saudi Arabia, that is

24   equivalent of 33 months gross salary.  If they are only there

25   for ten months, they still earn equivalent of over two years.

1    So they can go back.  They can get another job, be earning

2    money, and have already saved up two years' worth while they

3    are waiting for the green card to come current.

4         If they leave for the full 30 months, net earnings,

5    after taking out housing, paying back the attorney and

6    recruiter fees, paying taxes, they have equivalent of nine

7    years of salary.  And the point is only is that it is a win-win

8    situation for them.  They get to come over on H-2B, which they,

9    obviously, wanted to do.  You heard Mr. Dewan saying they

10   wanted to go.  Yet Signal is going to say they are unhappy.

11   And that's Mr. Burnett's fault.

12        Now, on the consulate interviews, you may recall when I

13   was even -- well, before I get to that, let me show you another

14   thing.  You can look at this when you get in the back.  Still

15   talking about Mr. Palanyandi.  We'll turn this around for you.

16   First page of this, that is his savings -- I mean, loan

17   account.  That is Exhibit No. 1192.  You can look at it in the

18   back and have access to it as well.

19        You can see he's starting to pay off chunks of it.

20   This last payment in '07 still, while he is still there, he

21   makes another payment of 180,000 rupees, and he's down to

22   45,637.  That is just still in '07, but he continues to work

23   all the way through when he decides to leave in '08.  The point

24   being only that they knew what they were getting into, and they

25   knew that they would have the opportunity to make much higher

1    wages than where they were.  And is it worth attorneys fees and

2    is it worth recruiter fees to come do that even if it's just

3    that ten months?  Yes.  They -- they make a nice little tidy

4    sum to go back and get another job in Saudi Arabia or wherever

5    else.  If they stay here for the full time, which they could

6    have, they could make a sizeable amount of money.

7            Now, there have been allegations and claims by the

8    plaintiffs that the immigration documents that Mr. Burnett used

9    to get them over here were false.  At his advice, they were

10   false.  Well, you saw the document that was submitted and that

11   was the letter.  As a result of Hurricane Katrina and

12   devastation, hundreds of rigs and platforms other facilities.

13   This is what is submitted along with the piped up information.

14   And yet, this visa, this peak-load, is the one that was used.

15   And it's for ten months, and it can be extended.  And

16   Mr. Bingle testified that all of that was true.  Did he think

17   that it's more than a 10-month period?  Yeah.  But this is all

18   true.

19           This was submitted to the government.  The government,

20   that's what they do.  They looked through this.  They know what

21   happened with Katrina.  They know what has gone on in the labor

22   market.  This is the labor department.  They approve it, but

23   what is more important -- more important is when they did an

24   extension letter ten months later or so.  Same thing, total.

25   As a result of Hurricane Katrina and Rita, the devastation of

1    the Gulf Coast, a lot of work needs to be done.  A lot of
2    repair needs to be done.

3          Now, what happened with that?  This is a very important
4    letter.  This is Department of Labor saying, "We don't know.
5    You are telling us the same thing you told us ten months ago,
6    and that is that there is a lot of damage from Hurricane
7    Katrina.  We got some complex situations."  And last year, or,
8    you know, ten months or nine months ago or earlier, the same
9    employers using the same standard of temporary need.  And what
10   is that standard?  One-time occurrence, seasonal, peak-load,
11   infinite need.  Mr. Gonzalez admitted, a lot of companies were
12   doing a lot of the same things and they were all going with a
13   little bit different strategies.  Some call it peak-load, some
14   one-time occurrence.  It's all for the same type of work that
15   is going to last a long time saying, "This is temporary."  Who
16   has got to make the decision on that?  First, the Department of
17   Labor.  They say, "We can't make a decision."  So they kick it
18   upstairs.

19         They kick it upstairs to the United States Citizenship
20   and Immigration Service.  Who, in turn, kicks it up to the
21   Administrative Appeals Office, but they recommended it be
22   approved.  They said, "It appears the petitioner," that is
23   Signal here, "appears to be supplementing full-time staff with
24   the requested workers, because of the combination of increased
25   need for labor in the aftermath of Hurricane Katrina and Rita."

1    Qualified workers, and down here, we recommend the instant

2    petition be approved; which it was.

3         So what does this tell you?  There is not one thing

4    fraudulent, false, or wrong about that document.  The

5    Department of Labor knew it, the immigration department knew

6    it, and the appeals administration office knew it.  And that's

7    why they were approved.  And they were approved again.

8         Now, Mr. Mehta, he is an imminent attorney from --

9    immigration attorney from Manhattan, but he doesn't have a lot

10   of experience with the problems with trying to get temporary

11   workers, especially after Hurricane Katrina, and then, prior to

12   that, whether that was a permanent need or a temporary need.

13   The Department of Labor, the immigration department, determined

14   it was a temporary need, even though Hurricane Katrina --

15   although there was a lot of damage.  But when that temporary

16   need is gone and it's over with, you are back to square one

17   with -- now, it's a chronic permanent need.  That is when you

18   would apply for a permanent resident worker.  That's what

19   Signal understood, and it was explained to him.  And it worked.

20        Plaintiffs have claims of trafficking and forced labor

21   by Mr. Burnett.  The Judge is going to give you the definition.

22   It's in the instructions, but you have to knowingly provide

23   someone's labor or services for the purposes of forced labor,

24   which is going to be by one of several means.

25        Mr. Burnett, first off, he did not provide anybody.  He

1     did not recruit anybody.  He did not select anybody.  But the

2     workers that did get approved and selected wanted to go, and

3     they wanted to go to work to earn the wages.  That is not

4     forced labor.  This is not a forced labor case.  This is not a

5     trafficking case.  This is not a racketeering case.  Plaintiffs

6     want to say, it's mail fraud because they put this fraudulent

7     application in the mail.  Yet it's not fraudulent.  They want

8     to say it's fraudulent.  Not even their expert, not one expert,

9     not Signal's, not the plaintiff's said, "If that document was

10    false, or fraudulent, or improper, or wrong," none of them said

11    that.  Do you know why they can't say that?  Because the

12    federal government said, "You are right.  It is a temporary

13    need."

14         They want to say that -- the plaintiffs want to claim

15    that they were lied on false promises by Mr. Burnett, No. 1.

16    You know, you heard the cross.  "Well, when you made the

17    promises, you were doing it for Signal."  If asked, yes, that

18    is what Mr. Burnett would relate what Signal had said they

19    would do.  They would H-2B, extension, extension, green card.

20         The workers, they knew that they would have to come

21    back or maybe have to come back at the end of the extension.

22    How do we know that?  Mr. Burnett went through the list, and

23    that was Exhibit 1 which includes bank accounts, proof of

24    ownership of houses, real estate, marriage certificate, birth

25    certificates.  And what is the reason for that?  Mr. Dewan

1    explained it.  So you can have roots.

2         And you may remember during Mr. Palanyandi's

3    cross-examination when he was -- after he had talked about --

4    well, he was being -- he was being accused almost by Signal's

5    attorney that they were being told to lie, and -- wrong

6    document.  He was asked in the deposition, which I reminded him

7    of, "Do you remember when Sachin Dewan told you to lie to the

8    United States consulate?"

9         "Nothing was said to say as a lie."

10        "Didn't Sachin Dewan tell to you lie to the United

11   States consulate?"

12        "What it is, is that if they asked, then you tell

13   them."

14        Do you remember when Mr. Burnett said, "I always told

15   them, above all else, tell the truth.  You tell it like it is.

16   If they ask, you tell them."  What did Mr. Dewan say if asked?

17   He said, "Yeah, I remember Mr. Burnett telling them to tell the

18   truth."  So there is no fraud.  There is no false statements.

19        And when asked about whether or not he understood he

20   had to come back.  Of course, trying to say that, well, I

21   didn't really understand it, or no, no.  I asked him again.

22   Remember, your deposition.  The question was, "Part of your

23   testimony you indicated you hoped to stay in the United States,

24   and then possibly come back to India, but then return to the

25   United States permanently; is that correct?"

1          And, of course, he says he didn't come as a tourist,

2     but after they said -- because they said that they were going

3     to give him permanent residency.  "That's why I came here to do

4     the job.  And I would go back and come back again."

5          And if you remember Mr. Pol's testimony that I showed

6     you.  It's amazing.  Look, same thing.  They would make some

7     money, and then they would come back when the present process

8     was complete.  Exactly what Mr. Palanyandi said in his

9     deposition.  Now, did he go and say, "I was talking about our

10    plane ride.  I was going to go for a vacation and come back."

11         Add up the pieces.  Remember, as jurors, you are not

12    required to check in your common sense like an umbrella or a

13    coat.  You get to keep that and you get to use that common

14    sense.  Add up all of the evidence.  Add up what Mr. Burnett

15    said, what Mr. Dewan said, what Palanyandi said in his

16    deposition.  Then, also, remember that none of the five

17    plaintiffs made their decision to go for Signal based on

18    anything Mr. Burnett said.

19         Mr.  Khuttan never met him in India.  He saw him one

20    time in the United States at Signal's camp.  Mr. Burnett did

21    tell the worker exactly what Signal had said.  We're going to

22    process your green card, and when the extensions are finished,

23    we will, then, file your application for permanent residency.

24    You saw the e-mail from Mr. Burnett to Signal, to John Sanders

25    saying, "I'm ready to stand by what we promised the workers."

1    But Mr. Khuttan Thanasekar didn't meet Mr. Burnett at all in

2    India.

3         Mr. Jacob Joseph, I believe, met him once in April with

4    Maria Lau where they were asking questions, the biographical

5    data to file for the J&M people.

6         Same way with Isaac Andrews.  He made a decision later

7    when he went to Dewan's office.  And Saket Soni also made his

8    decision, as well as Palanyandi, after the meeting in June or

9    after one of the testing sessions in June long before he even

10   met Mr. Burnett.  Yet, they want to say, "Mr. Burnett made

11   these promises to me."

12        It's not fraud what Mr. Burnett did.  And how you do

13   you know that?  Fraud, the judge will instruct you, is a

14   conscious intent to deceive or cheat.  Judge Mr. Burnett by his

15   actions.  They want to show you some e-mails where he calls

16   people "idiot" or "dolt," mild by some of the other language we

17   have heard, but still, judge him not by his words, but by his

18   actions.

19        What was he doing when he found out that Signal was

20   going to terminate these people or a bunch of them?  When can

21   you give me the names -- I might be able to find employers that

22   could help them stay here.  If they don't want to leave yet --

23   I know they don't want to leave yet.  He continued to ask, time

24   and time again, even said, I would like to compose a letter to

25   advise them of their rights and obligations.

1          In May, June, July -- June, Tracey Binion on July 29th,

2     I don't have the list yet, I hope it doesn't hurt, I hope it

3     doesn't interfere.  What happens four days before John Sanders

4     says, "Are you going to -- it's important to let these people

5     know their rights because they can stay here legally."

6          And what does Darrell Snyder do the day before?  Too

7     late.  So sorry.  Too late.

8          But judge Mr. Burnett by his actions.  When you get in

9     the back, if you care to, look for these exhibits, 1873, 1878,

10     1875, 526, 1877, 1876.  This is the work that Mr. Burnett and

11     his staff did to be able to get jobs, find jobs for the workers

12     who were being terminated.  And you saw how labor intensive it

13     is having to match things up, file them.  And he got them

14     approved.  He did that for 148 workers that Signal was

15     terminating.  And he didn't ask not one of them for another

16     penny.

17          Is that an intent to deceive or defraud?  Are you going

18     to do everything you can for them?  And he filed I-140s, 190

19     I-140s, most of them were in India.  He was doing the best he

20     could.  Is it late?  Maybe.

21          Now, you need to realize also he's not being sued by

22     the plaintiffs for malpractice.  I don't know if that is

23     malpractice.  A lot of stuff has gone on, you heard Maria Lau

24     explain it.  It is a long time, fine.  Is the federal

25     government suddenly going to -- we need immigration reform.

1    Yeah, we need immigration reform.  We need help in this

2    country.  We need help for skilled workers.  We don't grow them

3    anymore.

4         Mr. Burnett did the best he could for these people.  He

5    did the best he could for Signal to get the workers in because

6    they needed them desperately.  He did the best he could for the

7    Indians, the workers, because they wanted to come and make some

8    wages.  And then what's happened?  They both say, no, it's your

9    fault, Mr. Burnett, you are the wrong person.

10        That is not the case.  And, ladies and gentlemen of the

11   jury, all I'm asking you to do is use your internal compass and

12   decide, do you think Mr. Burnett did anything wrong, or was he

13   just doing the best he possibly could for a lot of workers and

14   for Signal?  And now he's caught by crossfire because these two

15   want to duke it out.

16        Ladies and gentlemen, thank you for your time.  And

17   remember, after this is all over, you will get to go home.

18   Everybody else, including myself, will get to go home.  But

19   Mr. Burnett, the rest of his career hangs in the balance.  Use

20   that internal compass to know what is right from wrong.  He did

21   not do anything wrong.  He was doing his level best to help

22   everybody.  And no good deed goes unpunished.  We all know

23   that.  Thank you.

24        THE COURT:  Would you all like a break before the final

25   closing argument?  All right.  So we will take a ten-minute

1    break.  Coming back at about 5:12.

2                (A recess was taken.)

3          MR. HOWARD:  Apropos the discussion we had during bench

4    conference.

5          THE COURT:  I don't really want to do that --

6          MR. HOWARD:  No, what I'm going to ask is a process

7    matter.

8          THE COURT:  We'll talk about it tomorrow.

9          MR. HOWARD:  I'm wondering for my rebuttal if --

10   perhaps if Mr. Shapiro is going for an hour, that we could

11   break for the evening.  It would give me the opportunity to

12   look at the transcript and do my rebuttal in the morning.

13         MR. CERNIGLIA:  I object to that.

14         THE COURT:  We're not going to do that.  Is there

15   something in particular that you would want to do?

16         MR. HOWARD:  I really need to see exactly what was

17   said.  The other --

18         THE COURT:  Don't you have realtime?

19         MR. HOWARD:  No.

20         THE COURT:  Well, we can get back to that.

21         We can show you that during the break.

22         MR. HOWARD:  I do have another question about my

23   rebuttal, and I don't know if we can do it as a side

24   conference.

25         THE COURT:  Why don't we go into my conference room

1   right now.  I'll see counsel in chambers.

2               (Conference in chambers.)

3        MR. HOWARD:  The other question I had, Your Honor, is I

4   thought it was kind of clear that when we had the conversation

5   concerning whether they were going to DOJ or any more into DOL

6   whether that would open the door for EEOC.  I think the door is

7   open.

8        MS. HANGARTNER:  No, you said we lied to DOL.

9        MR. HOWARD:  The visa petitions were made to DOL.

10       MS. HANGARTNER:  You said DOL.

11       MR. HOWARD:  Correct, the labor.  Those visa petitions

12   get mailed to the Department of Labor.

13       MS. HANGARTNER:  I thought you were talking about the

14   DOL investigation.

15       THE COURT:  That's the other thing I heard you say.  I

16   was surprised you said it.

17       MS. HANGARTNER:  I mean, when he said DOL, I thought he

18   meant when DOL came out.

19       THE COURT:  I would be more likely to accept that if

20   you hadn't done two other things you weren't supposed to do in

21   closing.

22       So, I guess the issue is you need to think about what

23   it is you want so I can decide whether you can do it.

24       MR. HOWARD:  As far as DOL, the thing I want to say,

25   DOL had no authority to investigate discrimination in the man

OFFICIAL TRANSCRIPT

1    camp.  That decision is EEOC's.

2         MS. HANGARTNER:  But he did talk about the details.  I

3    said they came out, they looked at Signal's books.

4         MR. HOWARD:  They gave them a clean bill of health.

5         MS. HANGARTNER:  To see they were paying.

6         THE COURT:  You implied they investigated all of the

7    activities at Signal.

8         MS. HANGARTNER:  I think I only said how were we paying

9    people, how were we paying contract labor.  They looked at the

10   camp, they talked to the people.  That was it.

11        THE COURT:  You made it sound like they came in and

12   inspected the camp and buildings, they gave them a clean bill

13   of health.

14        MR. HOWARD:  The EEOC is the government agency

15   responsible for investigating discrimination, and they sued

16   Signal.

17        THE COURT:  Okay.

18        I'm going let you say that.  I do think you opened the

19   door.

20        Now, the medical records, I don't think there is

21   anything --

22        MR. HOWARD:  No, I can handle that.

23        THE COURT:  And then they are still here.  You know,

24   that comment came out of nowhere.

25        MR. HOWARD:  You can't unring that bell.

1          THE COURT:  That's right.  That was a complete shock.

2     You know, I think you know that we had been avoiding any

3     discussion -- don't say anything.

4          MS. HANGARTNER:  I'm not.

5          THE COURT:  We have been avoiding a discussion

6     completely about where they lived.

7          MS. HANGARTNER:  Right.

8          THE COURT:  You know that, and you said they are still

9     here, like they live here.

10         So I'm very disappointed you did that, and I'm going to

11    think about what I'm going to do about it.  But that we

12    can't -- I assume there is nothing you want to say to that.

13         MR. HOWARD:  Maybe one thing I could say, and that is

14    tell them, first of all, the implication, you know, it ties to

15    one of the points that I want to make on rebuttal, which is

16    that Signal is saying now that they sponsored everybody for

17    green cards, but the fact of the matter is not one person

18    Signal has gone forward for a green card has actually got the

19    green card.  They waited for decades.  If we could add to the

20    extent that Signal's counsel, in her closing, suggested that

21    some people have gotten green cards or, for example, that our

22    plaintiffs are still here in this country on green cards, that

23    is untrue.

24         THE COURT:  Because they are not here on green cards?

25         MR. HOWARD:  Correct.

OFFICIAL TRANSCRIPT

 1          THE COURT:  I'm going to let you do that.  That's the

 2     only thing I know to do.  So you opened the door for both of

 3     those.  So does that answer all of your questions?

 4          MR. HOWARD:  That does, Your Honor.  I have about

 5     18 minutes left.  If I go a little bit over, will you give me a

 6     little bit of leeway?

 7          THE COURT:  You get 20.

 8                    (End of Chambers Conference.)

 9               (JURY ENTERS THE COURTROOM.)

10          THE COURT:  Be seated.  Mr. Shapiro will make closing

11     argument on behalf of Dewan defendants.

12                         CLOSING ARGUMENT

13          MR. SHAPIRO:  Good afternoon, ladies and gentlemen of

14     the jury.  It's kind of cold in here.  I can see that.  I'm

15     cold and I'm rarely cold.  I have got a lot of insulation.

16          You understand I represent Sachin Dewan and Dewan

17     Consultants in this case.  And let me tell you, I'm very, very

18     proud to represent Sachin Dewan and Dewan Consultants.  This

19     has been going on for a very, very long time.  And his wife --

20     Mr. Dewan's wife is here with us, Anita, his beautiful wife.

21     She is here to support him.  I'm here to support him.

22          And you know, it's interesting.  I have had a unique

23     opportunity in this case.  I got a chance to go to India, as

24     some of us did, and I got a chance to meet Mr. Dewan's family

25     and get to know them, break bread with them.  It's a wonderful

1    family, very close-knit family, and they are good people.

2    Mr. Dewan is a really good person.  Now, I say that because I

3    want to let you understand a little bit where we are coming

4    from.  And by the way, I will add, just as Ms. Hangartner

5    added, I have gotten to know the family so well I feel like

6    family with them as well.

7         So here I am last, but certainly not least.  This case

8    is a tragedy.  There is no doubt about it.  And you are hearing

9    that from me.

10        Now, you have heard closing arguments.  And now is my

11   chance to tell you what I need to say.  And remember, in the

12   beginning, when you heard from me, originally, I said it's like

13   a -- trial is sort of like -- or the opening statement is kind

14   of like a movie trailer.  You go to the movies, you are ready,

15   you got your popcorn, you are sitting down there.  All of a

16   sudden that trailer comes on, you hear bits and pieces.  Then

17   you go back to actually seeing the movie.  What happens?  Well,

18   it's not exactly what you expected it to be.  And I know that

19   the movie you have seen over the last four weeks -- and it's

20   been a long movie -- it's a lot different than what has been

21   portrayed right in the beginning.

22        Now, I am not nearly as articulate as these fine

23   lawyers in this room, and I will make no apologies for that.  I

24   am who I am.  And I'm not going to show you exhibits.  My

25   closing is no-frills.  I just want to talk with you.

 1          You have heard all of the evidence, and I'm relying on

 2     your memories of the evidence to come up with your decision in

 3     this case.

 4          Now, in a way, I got all of this.  I feel like just

 5     throwing this across the room, but I have to rely a little bit

 6     because my memory is not always that great, okay.  But I want

 7     to go over with you some of the things that have come out in

 8     this case that are terribly important.  And I want you to take

 9     heed to those things.  I want you to take heed of Mr. Dewan's

10     position and his company's position.

11          Now, you know that Signal needed workers.  They needed

12     workers desperately.  And they got involved with a fellow by

13     the name of Michael Pol, a labor recruiter in Mississippi.  In

14     fact, there was a contract, and Mr. Pol said, "Look, I know you

15     have got problems.  You need workers.  I can help you get those

16     workers.  I know how to do it."  And you know what?  He did

17     know how to do it because he had done it in the past pretty

18     successfully at Avondale.  You have heard that evidence.  So

19     Mr. Pol decides, okay.  Well, I know that I can get workers --

20     very good workers from India.  And what Mr. Pol does, he

21     enlists the help of a lawyer, Mr. Burnett, an immigration

22     attorney, and he enlists the help of my client, Mr. Sachin

23     Dewan, and his company, Dewan Consultants.

24          Now, why did he hire Mr. Dewan and Dewan Consultants?

25     Because Mr. Dewan and Dewan Consultants, they know how to

1    recruit.  They know how to recruit in India.  They have been

2    doing it for years and years.  They take great pride in what

3    they do and they do it well.  They always have.

4         Signal agreed.  They said, "Look, we agree with you,

5    Mr. Pol.  We want to get Mr. Dewan involved."  Okay.  And how

6    did it have to happen?  There had to be what you have heard to

7    be a demand letter with a requirement for the number of

8    workers, and you have also heard that there had to be a power

9    of attorney.  So these are some of the requirements that just

10   had to be satisfied and they were.  They were very typical.

11        So when Signal does that -- and one letter, in

12   particular, I think, you'll recall, is that -- the subject line

13   of it was "H-2B/Permanent Resident Visa."  Okay.  And this was

14   very absolutely consistent with the understanding between

15   Signal and Michael Pol.  The recruitment effort was designed to

16   be a green card application.  And hopefully, an H-2B, if it

17   happened, and if it did happen, then extensions of those H-2Bs

18   so that the workers could stay in the United States for

19   30 months while the green card application was being processed.

20        I know you have heard it mentioned as a green card and

21   permanent resident visa, and I'm going to go back to calling it

22   a permanent resident visa.

23        So what does Mr. Dewan do?  He gets to work.  He places

24   ads in the newspapers.  He brings in workers from mostly south

25   India, but not exclusively.  Some in the northern part of

1    India, and some workers actually came from Dubai in the United

2    Arab Emirates, where there were some very skilled workers

3    already working there.

4         So Mr. Dewan does what he knows best, and he gets these

5    people the word that he's interested in recruiting for Signal.

6    And seminars are held.  And the purpose of the seminar was to

7    learn about the job opportunity.  Well, everything that needed

8    to be explained was explained in the seminars.  And the workers

9    were told exactly what they were to expect.  Though, again,

10   Mr. Dewan and Dewan Consultants did their job.

11        Now, we had Mr. Pol at times.  We had Mr. Burnett at

12   times assisting.  We had Mr. Burnett assisting in every aspect

13   of the immigration process.

14        And the workers themselves, the job candidates, knew

15   that they would -- that Signal -- Signal would sponsor them for

16   the green card, the permanent resident visa, and the H-2B

17   visas.  Well, the fee structure was given to the job

18   candidates.  The understanding that housing would be provided

19   was also given.  There was an understanding that food would be

20   provided and that there would be a deduction from wages to pay

21   for the food and the housing.

22        Now, you have heard testimony in this case that there

23   was -- there were couple of -- two or three previous

24   recruitment efforts with companies called J&M and MIS and IRS

25   or Intercoastal, also known as Zito.  Well, the evidence also

1    came out that these folks had been waiting a very, very long

2    time and much longer than expected.  So Mr. Dewan at the

3    request of these workers -- let me backtrack just a second to

4    make sure that I'm telling you this correctly.

5           The workers that were in the prior recruitment effort

6    learned about the Signal recruitment.  They were excited about

7    it.  And they approached Mr. Dewan, and they said, "How can we

8    get involved?"

9           Well, Mr. Dewan says, "You can get involved, but here

10   are your options.  Your options are:  You can continue on with

11   the program you are in and just keep waiting, and maybe that

12   priority date will become current soon, or you can cancel that

13   particular application and go to Signal."

14          And later, you will come to learn in the evidence that

15   many refunds were given to the workers that just wanted to give

16   up the program completely.

17          Well, a lot of workers from the previous efforts took

18   up this opportunity.  What did Mr. Dewan do?  He -- first thing

19   that happened was that Signal came over to -- once some workers

20   were identified that they were interested, representatives from

21   Signal came over and did the testing.  And they did the testing

22   over a summer, three different occasions.  And it was, you

23   know, two specific individuals; Mr. Shouse and Mr. Taft and

24   later Mr. Pastrana.

25          Well, what is really important that happens next.  And

1    I should say that the testing was done at all times

2    appropriately and in accordance with the appropriate stance.

3    In fact, Mr. Dewan went out of his way to make sure that that

4    happened.

5            Now, here's the key thing that happened in this case.

6    You heard testimony that Mr. Bill Bingle came over, and he came

7    over when the H-2B -- which was still uncertain whether it was

8    going to be granted at that time -- he came over because it had

9    to be granted.  It had been granted, so he came over.  He was

10   excited about it.  He came over and he wanted to talk to the

11   consulates themselves, in the case of one, an embassy.  And he

12   made a pitch.  "We have a shortage of workers, you know.  We

13   need workers urgently.  And we need -- we want to do -- we need

14   to do what we have to do to get them."  And that is fine, but

15   the most important thing, from Mr. Dewan's perspective, is that

16   they had a conversation, and this came out loud and clear in

17   the testimony in this case.  They had a conversation about the

18   exact visa that the workers would be coming over on.  Even

19   though the H-2B had been granted at that time, Mr. Bingle

20   advised Mr. Dewan that the workers -- that Signal would be

21   absolutely sponsoring the workers for permanent resident visas

22   or green cards.

23           All right.  This was -- this was a good situation.

24   This was a good situation for the workers because, "Hey, it's

25   great.  I'm coming over on an H-2B, and when I get to the

1    United States, at a certain point in time, Signal is going to

2    apply for a permanent resident visa for me.  In the meantime, I

3    have got a chance to work for ten months and make an attractive

4    hourly wage and salary and overtime."

5         And there was one thing that has to be impressed upon

6    everyone is that there really was no guarantee that any

7    extensions would be granted.  Things happen at a job site where

8    somebody gets fired, somebody has misconduct, something like

9    that, H-2B cannot be renewed for some reason.  If that was the

10   case or if something else happened where the H-2B visa could

11   not be renewed, then they would have to go back to India.  But

12   that would have been fine because they would have gone back to

13   India -- unless it was misconduct, they would have gone back to

14   India.  They still would have had the green card application

15   process going.

16        All right.  I wanted to remind you of all of that

17   because it's very, very important, because Mr. Dewan -- it was

18   Mr. Dewan's job to recruit.  And he had to tell the workers

19   what they could expect.  And it was Signal that told him what

20   they expected and what to transmit or tell the workers about

21   the visa.  So it was always Mr. Dewan's understanding that the

22   workers were coming over on that initial H-2B process, like we

23   have learned about a lot over the past four weeks, and then

24   there would always be a green card process.

25        Well, all of this -- excuse me -- all of this -- the

1    concept of this recruitment effort was designed by Mr. Burnett.

2    Mr. Burnett was the key person on immigration law.  My client

3    is not a lawyer.  He doesn't -- particularly, has even less

4    knowledge of United States immigration law.  So he relied on

5    Mr. Burnett to be able to tell the workers what they should

6    expect.  And you know, things were going fine.  Everything was

7    going fine in the recruitment effort.  The testing was done.

8    Testing was done right, and if it wasn't done right, it was

9    because Signal didn't do it right.

10       So the workers went through this process where they had

11   to come to Mr. Dewan's office and make certain payments.  And

12   then, they would have to eventually go to his office and make

13   the final payment before deployment or departure to the United

14   States to work for Signal.

15       Now, going back just a little bit.  There has been much

16   discussion here about what was misleading about any of this.

17   And there were different things that plaintiffs have urged have

18   been misleading and how Mr. Dewan mislead them.  And Mr. Dewan

19   didn't mislead anyone, at all, at any time.  He was following

20   his direction from Signal.  He was Signal's agent.  He had a

21   power of attorney.  He could do what he knew how to do best,

22   but he also had to follow their specific instructions which he

23   did to a tee.  But those instructions were based on advice

24   given by Mr. Burnett.  So here, as I told you at the beginning

25   of the case, he was caught in the crossfire.  Caught in the

1   crossfire.  It will come out a little bit later in this closing

2   argument.

3         But there has been much discussion about what happened

4   at the United States consulate when the workers went there for

5   their interview for the H-2B visa.

6         Well, you know what, they had to go.  They had to go

7   for an interview.  They were not coached into what to say.

8   They were not coached by Mr. Burnett -- I mean, by Mr. Dewan or

9   Mr. Burnett to misrepresent anything to the consulate

10   officials.  Nothing.

11         They were to represent what visa they were coming over

12   on.  They were coming over on an H-2B.  They were to represent

13   how much money they paid.  Well, they paid a sum for the H-2B

14   visa.

15         So even though you have heard some of the people get up

16   here, plaintiffs and other witnesses, say they were told to lie

17   to the consulate, and they actually did, or the question wasn't

18   asked, but they were coached into lying, it didn't happen that

19   way.  And I think you understand that from the testimony that

20   came out -- that came out to the contrary.

21         Now, I agree with Mr. Cerniglia that you have to look

22   at -- in all of the claims that have been made against

23   Mr. Dewan -- I'm saying for Mr. Dewan, you have to look at what

24   his intent was.  There is no getting around it.  There has been

25   very serious allegations of fraud.

1          What was Mr. Dewan's intent throughout this process?

2     His intent was always to do the right thing and not to mislead

3     anyone, not to commit a fraud.  He holds himself to a very high

4     standard.  Why would he do that?  Why would he jeopardize his

5     life and his career and his family to do that anyway?  Really.

6          So the problem is he was given instruction, the

7     marching orders from Signal as to what to do, and he was given

8     information by Mr. Burnett as to what visas to apply -- were

9     going to be applied for, and he communicated that information

10    to the job candidates because that's what he knew.  That -- he

11    didn't know anything different.

12         And there has been some conversation about other

13    fraudulent activities, such as the -- actually, the fraud based

14    on representations that were made to the workers in India and

15    also breach of contract.

16         What was the contract all about?  Well, I showed it to

17    you.  The contract was a letter saying, "Congratulations, you

18    passed the test, and you have been selected for employment at

19    Signal."  Okay.

20         And Mr. Dewan explained to you that the purpose of that

21    letter was not an offer at all, it was simply to take to the

22    bank because the bank needed verification of this so that these

23    men who were selected could make the final payment to Mr. Dewan

24    before they left.

25         You have also heard a lot about passports.  That's been

1    quite an issue in this case, hasn't it?  It's really a

2    nonissue, and I will tell you why.  And you've heard the

3    evidence.  It's a nonissue because, as Mr. Dewan explained in

4    his testimony, when you are a recruiter, it is common practice

5    and common standard to collect the passports of the workers

6    with the stamped visas.

7         And one of the main reasons for that is so that the

8    number of available jobs remains the same in case some

9    individuals decide to drop out.  It's important because the

10   client loses that -- those numbers.  But they can be replaced

11   if they want to drop out.

12        But there is absolutely nothing illegal, contrary to

13   what the plaintiffs have said for years now and in this

14   courtroom over the past four weeks, that Mr. Dewan somehow held

15   the passports of these workers hostage -- hostage to extract

16   the final payment from them.  That follows under the category

17   of "you can't be serious."

18        Another thing in that category is the plaintiffs'

19   contention that:  "Oh, my God, we came to Mr. Dewan's office

20   and he rushed us through, and he -- there were so many people

21   there and his office was so crowded, and he was giving us

22   documents to sign, contracts to sign.  He never explained them

23   to us.  We were just -- we had to sign them, we had to -- we

24   didn't have enough time to read them.  We had to sign them.

25   And we didn't have time because we had to catch a flight."

1          And Mr. Dewan explained that these workers had actually

2     come in in the morning into Mumbai for the meeting.  They had

3     plenty of time.  All they were really interested in doing is

4     getting some last-minute shopping, which I guess in a way, you

5     can't blame them.  But you can't blame Mr. Dewan for rushing

6     them through a process where they had plenty of time to do what

7     they needed to do, whether they spoke English or not, which

8     most of them did, most of them are from south India and they

9     know how to speak English -- know how to read English, at

10    least, very, very well.

11         So this whole business about, oh, my God, I had no

12    time.  And by the way, if I didn't sign them, if I didn't sign

13    them, I wouldn't go.  And by the way, if I didn't go -- if I

14    didn't sign them, I would never get my money back.  Never.

15         But not one of them had ever expressed that concern at

16    all.  Not until long after the fact.  And these men are not

17    children.  They are men.  They work overseas.  They work in the

18    Gulf countries.  They work in some rough countries, actually.

19    And, you know, I got to hand it to them, it's admirable.  It's

20    admirable.  Because they want to make money.  They want to go

21    to other countries, countries other than India because the

22    wages are better, and they leave their families behind to have

23    a better life for themselves, and I applaud that.  I think

24    that's terrific.

25         But it illustrates the point that these guys, when they

1   are told they are coming over on a certain visa, they

2   understand the visa process.  And significantly what they

3   understand is, other than the H-2B visa that was guaranteed,

4   why was it guaranteed?  Because it was granted.  Other than

5   that, there were no guarantees of anything.  There was a risk

6   associated with the entire process.

7          They knew that.  They don't want to admit it, but they

8   knew it.

9          And I think the thing that is so terribly important

10  that you need to consider when you go back into the jury room

11  and make your deliberations is that everything was going fine

12  in this recruitment effort.  Mr. Dewan was doing the job that

13  he normally does, and it's a good one.  But when they got to

14  Signal, everything changed.  Everything changed.

15         Mr. Dewan did not start hearing complaints until some

16  months later about what was going on.  You kind of wonder why,

17  if he was the recruiter who sent them over there, and they were

18  living in that bunkhouse you saw, and the food was rotten, and

19  there were other problems, did he get complaints right away?

20  Did anybody call him right away and say, "Hey, Mr. Dewan, what

21  have you put me into here?  You know, what have you got me

22  into?"  Did anyone say, "I want my money back?"  No, nothing.

23  Nothing.  Nothing.

24         But things did change at Signal, and you have heard a

25  lot of testimony about what happened at Signal.  And that's --

1    when I say that this case is a tragedy, that's what I'm talking

2    about.  I am talking about Signal.  I am talking about putting

3    these people in utter horrible conditions.

4         I know they tried their best, maybe they did -- you

5    know, maybe they didn't.  But they provided something.  It

6    wasn't good enough.  I know I would be unhappy if I went to

7    that situation.  I might not have complained that much about

8    the food, but if I was living in a bunkhouse like that, I think

9    I would complain.

10        So this just angered these workers, and then they

11   decided, "Oh, boy, now I'm going to start blaming everybody.

12   Now I'm going to start blaming everybody.  I'm going to blame

13   Signal, I'm going to blame Dewan, I'm going to blame Burnett.

14   It's everybody else's fault.  It's unfair."  It's beyond

15   unfair, it's ridiculous.

16        Now, I do think they had some very, very legitimate

17   gripes against Signal, particularly with a lot of the comments

18   that were made and a lot of the way the workers were treated

19   and really mistreated.  These folks are from -- virtually, I

20   think, most -- out in the country in India, in south India.

21   Most of them, this group of five.  And they struggle.  So they

22   look for things to do.  They get skills.  How about that?  They

23   became a welder.  You become a welder, you get a better way of

24   life than what you used to have.  That is terrific.

25        But I don't really believe the story entirely is what

1    I'm trying to tell you.  Because the story against Dewan really

2    begins when these guys arrive at Signal, and they start

3    complaining and they start having problems, and some of them

4    legitimate.  But all of a sudden, Mr. Dewan gets dragged into

5    this.  These are his countrymen.  These are his countrymen.

6          Mr. Howard pointed out, "Oh, well, if these were his

7    countrymen, then why did he send an e-mail to Signal saying

8    words to the effect that the troublemakers or the bad workers"

9    or whatever it was -- I think it was "the troublemakers," if

10   I'm not talking out of school -- they have got to be deported

11   first.

12         But yet within hours or a day, Mr. Dewan was on a

13   plane, didn't pass go, went straight on a plane.  Signal said,

14   "We need your help again.  We need your help.  We got problems

15   here.  You know, we need you to talk to -- these are your

16   countrymen, we need you to talk to them.  Please come."

17         So he comes.  And it was Mr. Dewan's intention at all

18   times to get to Signal and talk to the workers about the issues

19   with the green cards and the visas, and try to get it all

20   straightened out for all of them.  And you know what?  He was

21   not one bit contractually obligated to do this at all.

22         What he did -- what he did -- and we need to see it

23   more in this country, he fulfilled what was in his heart.  He

24   felt like he had a moral obligation, a moral obligation.  How

25   about that?  Because he wanted to help his countrymen.  And he

1    shouldn't be faulted when Signal reports to him, "Well, we have

2    got some people that are acting crazy here.  You know, what do

3    we do?"

4        Well, the remedy is, if they are acting crazy or if

5    they are involved in some kind of misconduct, then it's not

6    that Signal has the power to deport them, but if they are

7    terminated, that is the end of the visa.  I mean -- but they

8    have to have legitimate reasons for termination.

9        My understanding is that some of these workers were

10   stellar performers.  So I don't know what happened with all of

11   that.  But this was Mr. Dewan's -- I guess it was his gut

12   reaction.  But you know what?  He didn't have to do anything.

13       If he sent that e-mail saying, "These folks ought to go

14   first, these troublemakers ought to go first," he could have

15   just stayed back in Mumbai and enjoyed life and said and done

16   nothing.  Instead, he got on a plane.  You know why?  Because

17   he wanted to help.  Just like he helped in January when they

18   were having problems.  They were having problems.  Signal

19   didn't know what to do.  I'm shocked.  They had workers from

20   south India.  The cuisine is different, north India, south

21   India.  And it seemed like no big deal, but it was for them.

22       So Mr. Dewan came halfway around the world to tell

23   them, "Folks, you need to have a variety of food for the south

24   Indian workers and the north Indian workers."  Signal didn't

25   understand the concept of a day and a night shift, people

1   working in the same -- people living in the same bunkhouse.

2   It's not that complicated, folks.

3        Again, Mr. Dewan flies halfway around the world.  Why

4   does he do it?  Signal needed his help and he wanted to help

5   his countrymen.  And that's something that is absolutely

6   spectacular.

7        And he helps.  He helped the situation with Signal.  He

8   helped a lot.  He couldn't -- he couldn't -- he couldn't

9   address all of the things that were out of his control.  He

10  couldn't address the rogue workers at Signal who were making

11  just horrible discriminatory statements against Indians.  I'm

12  shocked listening to that when I listened to all of that.  It

13  made me nauseated.

14       So here we are:  We are almost at the conclusion of

15  this grand event.  Almost at the conclusion.  And for years

16  now, Mr. Dewan has been faced with allegations of human

17  trafficking -- human trafficking based on forced labor.

18       When the Judge instructs you, it will be as clear as a

19  bell.  I don't know where that expression comes from, but I

20  like it.  It will be clear as a bell that he's not responsible

21  for human trafficking because he would have to have been

22  involved somehow in forced labor, you know, making the workers

23  at Signal believe that they had no other choice but to stay

24  there and work.  He had no role in that whatsoever.

25       Now, yeah, you are going to hear a little instruction

1   about trafficking.  Well, trafficking, I mean, it's just

2   basically -- the first part of it is just transporting -- not

3   transporting, but recruiting workers.

4        Well, guess what?  That's what he does for a living.

5   He can't be faced with -- if he recruits every day of his life,

6   he can't be faced with a trafficking charge for just doing his

7   job.

8        The forced labor needs to be focused on Signal.  Then

9   you are going to hear about RICO.  What a thrill.  What a

10  thrill.  Good luck understanding the instructions.  I mean it.

11       Fraud.  Putting things in the mail that don't mean

12  anything.  Putting things in a courier.  It's a mess.  And the

13  key thing is it's a very, very serious accusation of fraud, of

14  some kind of fraud, of people getting together and committing a

15  fraud.

16       Let me tell you, you have heard the testimony, and, in

17  fact, the last day or so, just prior to the closing arguments,

18  you heard from my client.  And I was happy that you had a

19  chance to hear from him because, you know what, he told you the

20  story, and he told you like it was.  He didn't have to

21  embellish anything.  If he made a couple of mistakes here and

22  there, he admitted it, but they were not fatal to this program.

23  He did his job.  And importantly, he did his job because Signal

24  wanted him to do his job in a specific way.  And he did his job

25  based on representations -- well, based on law that was given

1    to him by Mr. Burnett, which were absolutely incorrect.

2    Imagine you are a recruiter and you are charged with all of

3    this responsibility, and nobody is giving you the right story.

4    And then, it all blows up.  Then what happens?  Then you are

5    here in federal court and you've got to fight a lawsuit for

6    six-and-a-half years.  Imagine that.  Imagine what a nightmare

7    that might be.  This has been a nightmare for this man.  And

8    his intentions at all times, at all times was to just do the

9    right thing.  And he did the right thing.

10        And I ask you, when you go into that jury room with all

11   of your common sense and everything you have heard, I want you

12   to think about what I have just told you today, right now.  And

13   I want you to remember Mr. Dewan's testimony.  He's my only

14   witness.  He has come all the way from India to defend himself.

15   He would never, ever, ever, ever hurt his own countrymen.  And

16   I'm going to ask that you, when you return the verdict, that

17   you find him -- that he's not responsible for any of this mess

18   that Signal created.  Thank you.

19        THE COURT:  Mr. Howard represents the plaintiff --

20   plaintiffs and they have a right to do the final closing

21   argument.

22                  (REBUTTAL CLOSING ARGUMENT.)

23        MR. HOWARD:  I actually get to be last and least.

24        You know, Mr. Shapiro, Mr. Cerniglia, I give them a lot

25   of credit for well representing their clients, and I respect

1    that they think their clients did nothing wrong and are

2    admirable, but let's not forget something:  Their clients were

3    in it for millions of dollars in fees.  That's why Mr. Dewan

4    got on a plane in March 2007 to help his client, Signal, quell

5    the rebellion, because Signal was going to be getting more

6    workers from India, and Mr. Dewan had an opportunity to get

7    lots more fees.  That's why Mr. Burnett sat in on the meeting

8    and didn't even ask the names of his clients who were going to

9    be terminated because he was part of the next wave of Indian

10    workers being recruited.  They hired him, again, in September

11    of 2007, to get more fees.  That's why they did it.

12         But I want to focus, now, on my rebuttal on some things

13    that came out during Signal's closing.  First of all, the

14    problem was not, as Ms. Hangartner suggested, just the man

15    camp.  The problem -- and I will use the words of Signal's own

16    Mr. Marler.

17         The problem was that they were charged too much money

18    and sold the bill of goods.  That was the Ludden e-mail.  You

19    remember it.  And that plus the man camp.  So it was the false

20    green card promise that was the bait.  It was the debts and

21    fees that were acquired, the too much money that set the trap.

22    The man camp was just the place where the trap was.  That's

23    where the workers were put.

24         Now Signal's attorney, Ms. Hangartner, said, "We

25    sponsored those who stayed.  That was always our intent."  I

1  mentioned that in my closing.  That's part of the scam.  It was

2  not always Signal's intent.  I'm not going to reread for you

3  all of the testimony I showed you in my closing you saw during

4  the trial, but Exhibit 900, Mr. Marler -- Mr. Marler --

5  Mr. Marler said, "They won't be here that long."

6       Mr. Schnoor -- what did he say at the time of that

7  e-mail, February 2007?  "It was not Signal's intent to sponsor

8  any worker for a green card."  That was their intent at the

9  time.  What happened was, after the lawsuit, they decided, Oh,

10 now the people that are still left, we better sponsor them for

11 a green card even though this would take 30 years.  And that

12 was Mr. Schnoor's testimony.  "That, I know it was a long time.

13 We applied back in 2009."  That's after the lawsuit.  Those

14 people are still waiting six years, and it could be 20 more.

15      But the other important thing from this testimony is,

16 "Mr. Schnoor, am I correct, that not a single one of them has

17 actually gotten employment based on green cards sponsored by

18 Signal?"

19      "I believe that's true.  Yes."

20      Now, you know, I don't know what Ms. Hangartner was

21 trying to suggest or imply at the end of her closing statement

22 when she talked about the plaintiffs.  But if she was trying to

23 imply that our clients got green cards, I am telling you that

24 is patently untrue.

25      And Ms. Hangartner also talked about the man camps.

1    She said discrimination, such as the requirement that they live

2    in man camps because they are Indian or because they are H-2B

3    workers is a "but for" requirement; meaning, it has to be the

4    only motivating factor for that.  She is just wrong on the law.

5    I will show you the chart that -- the questions you will get on

6    discrimination, the form.  The very first thing, "Have we

7    proven by a preponderance of the evidence that Signal required

8    them to live in the man camp and/or deducted fees from

9    plaintiff's wages."  I don't think even Signal would dispute

10   that.  They have admitted, every one of their witnesses, it was

11   a requirement of these plaintiffs, the Indian workers, to live

12   in the man camp and to pay for them.

13         So the crucial question, then, is:  Have plaintiffs

14   proven by a preponderance of the evidence -- meaning, did we

15   get it over the 50-yard line -- that their being Indian or H-2B

16   visa holders, one or the other, was a motivating factor in the

17   decision to require them to live in the man camp?  A motivating

18   factor.  In fact, Ms. Hangartner got it backwards.  It's

19   Signal's burden of proof.

20         And this was the next question you will get on the

21   verdict form.  "Has Signal proven by a preponderance of the

22   evidence that it would have made the same decision to require

23   the plaintiffs to live in the Signal man camp or deduct fees

24   for man camp accommodations even if it had not considered the

25   fact that they are Indian or H-2B visa?"

1    She has the visa holders.  Signal has to show that it

2  would have made the same decision for anybody else.  She said,

3  "Well, they would have made the same decision for a bunch of

4  welders from Wyoming."  The fact of the matter is, Signal

5  didn't advertise to look for welders from Wyoming, or

6  Wisconsin, or Michigan, or any state in this country, because

7  those workers would not have come and lived in this man camp.

8    This man camp, the reservation, was built for Indian

9  workers.  It was built with that standard in mind.  Well, these

10 are guys back in India who are used to living in slums.  We can

11 put them 24 guys to a trailer.  We can charge them all 1,000 a

12 month; $25,000 a month Signal collected from each and every one

13 of those trailers.  That was the rent they collected as

14 landlord.

15    Well -- and, you know, the American workers, guys from

16 Wyoming, wouldn't have been H-2B workers.  They wouldn't have

17 had to sign that or face the risk of going back to their home

18 country deep in debt.  So they wouldn't have had to sign that.

19 They wouldn't have had to stay in the man camp.  It was the

20 fact that these workers, the plaintiffs, were Indians, and they

21 were H-2B workers.  We only have to show either/or that makes

22 it discriminatory.

23    Now, speaking of leases, Ms. Hangartner said, "Well,

24 it's just like you signed your lease."  I don't think when you

25 sign your lease you are told, "If you don't sign it, you lose

1    your job, you get deported out of the country, and you face

2    financial ruin." That was the deal with the housing agreement

3    with the H-2B Indian workers.

4         Now, Ms. Hangartner also mentioned this Department of

5    Labor investigation. I told you during my closing that Signal

6    had, basically, effectively told them truths to the Department

7    of Labor. I was talking about the submission of the visa

8    petitions. The H-2B visa petitions, those mailings, Exhibit

9    559, goes to the U.S. Department of Labor. It includes within

10   it the letter that Mr. Bingle agreed contained misinformation,

11   the letter that is addressed to USCIS or Homeland Security.

12        But, then, Ms. Hangartner starts talking about this

13   Department of Labor investigation, that they came to Signal.

14   And you know, they gave Signal a clean bill of health. They

15   checked everything out. They checked the man camp. No

16   discrimination going on here. Well, the problem with that is

17   the Department of Labor has no authority to investigate

18   discrimination claims. They were looking at payroll records.

19   That's their authority. The branch of this U.S. government

20   that has the authority to investigate discrimination claims is

21   called the Equal Employment Opportunity Commission. And the

22   Equal Employment Opportunity Commission of the U.S. government

23   has brought charges of discrimination against Signal. She

24   didn't tell you that.

25        They talked about Mr. Jacob and the firing of Mr. Jacob

1    on the rig.  And Ms. Hangartner talked about how he talked to

2    many guys on the rig, and he was distracting and of safety

3    violations.  The problem with that is, none of that's in the

4    record.  None of that.  The only thing in the record, the only

5    writing we have was Mr. Snyder's e-mail.  If you recall this,

6    he says -- this is the next-to-last bullet point I'm looking at

7    right here, that "500296," that's the badge number of

8    Mr. Jacob, "talked to the employee," one employee, "at length

9    today on the rig trying to influence him into talking to a

10   lawyer."

11         I asked Mr. Snyder, "How long did they talk?  Was it

12   during lunch hour?  When was it?"  He didn't know.  He was

13   getting this information from some source, one of his moles in

14   the camp.  Did Signal bring to you and put them in the witness

15   stand?  They brought everybody else.  Did they bring to you the

16   foreman or the supervisor who actually witnessed Mr. Jacob

17   talking on the rig to tell you what a safety violation it was

18   -- who he was endangering?  What happened on the rig?  No.

19   Ms. Hangartner stood up here and gave you a story.  "He was

20   talking to several people.  It was a safety risk."  It was all

21   this, and all that.  There is nothing about that in the record.

22   This is all the writing in the record.  There is not a safety

23   violation in the employee records.  Nothing.

24         But as you know -- and I won't go through it again,

25   what else is in the record.  It was about the meeting of

1    lawyers, and that's why Mr. Jacob was terminated.  That's why

2    we have a retaliation claim.  And the way he was terminated,

3    rounded up, early in the morning in the man camp by very large

4    intimidating guards, put in a trailer for hours, not allowed to

5    go to the bathroom, that's why we have a false imprisonment

6    claim.  And all of that done in a public way to make an example

7    to all of the other workers so that he was humiliated and he

8    had to feel that shame.  That's why we have an intentional

9    infliction of emotional distress claim.

10          And Mr. Sabulal.  Mr. Sabulal attempted suicide.  He

11   was that stressed out about what happened that day.

12          Now, I understand when a lawyer wants to cover for a

13   client.  And I understand if a lawyer wants to cover when the

14   CEO of her client says something really awful, but that doesn't

15   mean you can just make things up.  And Ms. Hangartner got up

16   here and talked to you about what is in some medical records

17   that you have never seen that are not in evidence in this case.

18   And she talked about things that, "Oh, it's just a suicide

19   gesture."  There is not any evidence of that in this case.  And

20   she told you that Mr. Sabulal walked in to the picnic area

21   holding his arms up like this.  Not only isn't there evidence

22   of that in this case, that is contrary to the evidence in this

23   case.  Mr. Jacob talked about how he was there in the bunkhouse

24   and had to help Mr. Sabulal out where other people took him to

25   get rushed to the hospital.  Mr. Jacob couldn't go because the

OFFICIAL TRANSCRIPT

1     guards came for him.

2            Mr. Tanner, the man that Mr. Snyder sent to the

3     bunkhouse, to the trailer with Ms. Sabulal testified that he

4     saw blood coming down his arms, that he still gets nightmares

5     to this day from that scene, that he thought his life was in

6     danger.  That is the record in the case about what happened to

7     Mr. Sabulal, not what Ms. Hangartner was telling you.

8            You know, Signal wants to blame everybody else.  They

9     want to blame the unscrupulous lawyer and the unscrupulous

10    recruiter.  They want to blame ICE, the immigration office, for

11    what happened on March 9th.  They blame the plaintiffs.  Oh,

12    the plaintiffs knew what they were doing.  They took out the

13    debts of their own free will.  They are grown men.  They are

14    responsible for their own actions.

15           The only people that Signal does not blame are

16    themselves.  They take no accountability.  Ms. Hangartner

17    wanted us to apologize for criticizing their head of HR for

18    allowing what their own CEO called a woefully inadequate

19    anti-harassment culture.  She is asking for us to apologize for

20    that.  Did you hear any apologies from anyone at Signal about

21    the treatment of our clients?  Absolutely none.

22           That is why, ladies and gentlemen, that is why your

23    verdict, the message that we are asking you to send, is so

24    important.  They still don't get it.  They don't get it.  They

25    have not looked in the mirror.  So I'm asking you:  Hold up the

1   mirror and make them see what they have done -- who they are.

2   And send the message to any other company that would have its

3   head in the sand and think they can treat foreign workers --

4   foreign guest workers this way.  No.  An American jury is not

5   going to let that happen.  It may take a long time.  It may

6   take a lot of perseverance, but if people who are victimized

7   and exploited get their day in court, they will receive a

8   correction of the injustice that has been done to them.

9           That is what we're asking in our verdict.  A verdict

10  that will say that this kind of behavior by an American company

11  is unacceptable and will not go unpunished.  Ladies and

12  gentlemen, you have that power, and I mentioned that at the

13  beginning.  You ten people can do what nobody else can do.  And

14  you have the opportunity to really make history with the kind

15  of verdict you send here, because it will have an effect on the

16  way American companies do business.  And, you know, I know it's

17  going to take some hard work.  That form is a lot to get

18  through, but, at the end of the day, I do believe you will come

19  back with a verdict that will make the country proud, will make

20  yourselves proud.  Something you will be able to talk with your

21  family members and say, "This is what we accomplished."

22          I really thank you for your service and your time.

23          THE COURT:  I want to thank all counsel for their

24  argument.

25          We are going to recess for the night, and we will begin

1    again at 8:00 a.m. tomorrow morning.  I want to remind you of

2    the instructions that I have given you.  You are not to discuss

3    the case with anyone, including your fellow jurors, members of

4    your family, people involved in the trial or anyone else.

5         If anyone approaches you and tries to talk about the

6    case, do not tell your fellow jurors, but advise me about it

7    immediately.

8         You must not communicate with or provide any

9    information to anyone by any means about this case.  You may

10   not discuss this case, even among yourselves, until it's

11   concluded and you are instructed to begin your deliberations.

12        Also, you are not to reach any conclusions in the case

13   until all of the evidence has been presented, the Court has

14   instructed you on the law applicable to the case, and it's

15   given to you for deliberation and decision.

16        So in the morning when you come in at 8:00 a.m.,

17   that -- I will instruct you on the law and then you will begin

18   your deliberations.  So I hope you all have a good evening.

19   And see you in the morning at 8:00.

20                    (JURY EXITS THE COURTROOM.)

21        THE COURT:  All right.  Our goal this evening is to

22   prepare -- the jury instructions are ready.  We are now

23   preparing the jury verdict form for Stage 1.  That is what the

24   jury will get tomorrow.

25        I think you all know this, that we give -- I will have

                         OFFICIAL TRANSCRIPT

1    some copies of the jury instructions, the final version.  We

2    give copies to the jury so that they can follow along.  And

3    they then can take the jury instructions into the jury room

4    with them.

5             I think I also told you, usually, we just give one jury

6    verdict form, but this one is so long, we're going to give

7    everybody a copy.  When they leave at night, we will make sure

8    they leave them here and that we collect them all at the

9    conclusion of the case.

10            So any questions from anyone?

11            All right.  I will see you all in the morning.  Good

12   night.

13                          *    *    *

14                     REPORTER'S CERTIFICATE

15

16            I, Terri A. Hourigan, Certified Realtime Reporter,
     Official Court Reporter for the United States District Court,
17   Eastern District of Louisiana, do hereby certify that the
     foregoing is a true and correct transcript to the best of my
18   ability and understanding from the record of the proceedings in
     the above-entitled and numbered matter.

19

20                            *s/Terri A. Hourigan*
                              Terri A. Hourigan, CRR, RPR
21                            Certified Realtime Reporter
                              Registered Professional Reporter
22                            Official Court Reporter
                              United States District Court
23                            Terri_Hourigan@laed.uscourts.gov

24

25