<pre>
 1                IN THE UNITED STATES DISTRICT COURT FOR

 2                  THE EASTERN DISTRICT OF LOUISIANA

 3                          AT NEW ORLEANS

 4
     DAVID, ET AL,                *     Case No. 08-1220 Section E
 5                                *
              Plaintiffs,         *
 6                                *
         v.                       *     February 9, 2015
 7                                *
     SIGNAL INTERNATIONAL,        *     DAY 19 - CHARGE CONFERENCE
 8                                *
              Defendants.         *     Daily Copy Transcript
 9    _____
     Related Case:
10
     EQUAL EMPLOYMENT OPPORTUNITY      CIVIL ACTION
11   COMMISSION,
                   Plaintiff,          No. 12-557
12        v.
     SIGNAL INTERNATIONAL, LLC,        SECTION "E"
13   et al,
                   Defendants.
14    _____
     Related Case:
15
     LAKSHMANAN PONNAYAN ACHARI,       CIVIL ACTION
16   et al,
                   Plaintiff,          No. 13-6218 (c/w 13-6219
17        v.                           13-6220, 13-6221, 14-732,
     SIGNAL INTERNATIONAL, LLC,        14-1818)
18   et al,
                   Defendants.         SECTION "E"
19    _____
     Applies to:  David v Signal (08-1220)
20
                   TRANSCRIPT OF THE TRIAL PROCEEDINGS
21              BEFORE THE HONORABLE SUSIE MORGAN,
                   UNITED STATES DISTRICT JUDGE,
22                        AND A JURY
     REPORTED BY:
23   TERRI HOURIGAN, CRR
     Official Court Reporter
24   500 Poydras Street
     New Orleans, Louisiana 70130
25   (504)589-7775
     terri_hourigan@laed.uscourts.gov

                        OFFICIAL TRANSCRIPT
</pre>

1   **APPEARANCES:**

2

3      For Plaintiffs:              HUGH D. SANDLER, ESQ.
                                    MELIA AMAL BOUHABIB, ESQ.
4                                   Crowell & Moring, LLP
                                    590 Madison Avenue
5                                   New York, NY 10022

6
                                    DANIEL WERNER, ESQ.
7                                   NAOMI TSU, ESQ.
                                    KRISTI L. GRAUNKE, ESQ.
8                                   Southern Poverty Law Center
                                    Immigrant Justice Project
9                                   233 Peachtree Street NE
                                    Atlanta, GA 30303
10

11
       For Signal Entities:        ALAN DEAN WEINBERGER, ESQ.
12                                  MITCHEL HASENKAMPF, ESQ.
                                    Hangartner Rydberg & Terrell
13                                  One Shell Square
                                    701 Poydras Street
14                                  Suite 310
                                    New Orleans, LA 70139
15

16     For Sachin Dewan:           STEPHEN SHAPIRO, ESQ.
                                    Law Office of Stephen Shapiro
17                                  700 Camp Street
                                    New Orleans, LA 70130
18

19     For Malvern Burnett:        TIM CERNIGLIA, ESQ.
                                    Law office of Tim Cerniglia
20                                  1521 St. Charles Avenue
                                    New Orleans, LA 70130
21

22

23

24

25

CHARGE CONFERENCE PROCEEDINGS

(6:25 P.M.)

* * *


THE COURT:  Have a seat.

Steve is not here, but I assume he will be in a moment.

MR. WEINBERGER:  Mitchell is around, Your Honor.

THE COURT:  He might be looking at exhibits.

Let's see, maybe we can talk first about this *Bridge* defense issue.

MR. SANDLER:  Sure.

THE COURT:  Let me see if I can untangle my stuff.

All right.  I guess -- you know, is it the -- the defense that Signal is making to these claims is not that they didn't know about them, but you didn't do anything wrong.

MR. WEINBERGER:  Sorry?

THE COURT:  Isn't your defense, it doesn't really have to do with whether you knew about what was being done or not.

It's really there is nothing wrong with what was being done.  I mean, you knew -- is there any issue about whether people were doing things that Signal didn't know about?

MR. WEINBERGER:  I'm sorry.  Your Honor, we're talking about *Bridge* now?

THE COURT:  Yes.

MR. WEINBERGER:  So *Bridge* is by definition an argument

1    over the quality of proof that will allow these people to win

2    their RICO case.  If we're talking about *Bridge,* that is

3    what --

4              THE COURT:  But the context is that the discrimination

5    case can be --

6              MR. WEINBERGER:  *Bridge* has nothing now do with it.

7              MR. SANDLER:  Discrimination now.  It's just a RICO

8    *Bridge.*

9              THE COURT:  You know what, I'm thinking about the wrong

10   thing.  I think I'm using the wrong --

11             MR. SANDLER:  The wrong case.  *Faragher* case is that

12   the one you are thinking of?

13             THE COURT:  Now.  That's the one I was thinking about.

14   Sorry.  *Faragher* is the one I wanted to talk about first.

15             That's the one in the discrimination --

16             MR. WEINBERGER:  Yes, Your Honor.

17             THE COURT:  -- whether or not there are supervisors and

18   whether or not you knew about it and had an opportunity.

19             MR. WEINBERGER:  Right.  Right.  Right.  Right.

20             THE COURT:  So I'm thinking about this and I'm saying,

21   well, that is not really Signal's defense, that they didn't

22   know about it, and that no one complained.  It's that there is

23   nothing wrong with what you are doing.

24             So I'm wondering what this has to do with anything.  We

25   put -- I see where the plaintiffs have brought out that this

1    fifth requirement has to do with cases where, you know, you

2    have -- whether the issue of whether or not it's a supervisor

3    and whether or not Signal knew about what was happening.

4          So I'm wondering if that is really an issue in this

5    case.  You know, the people -- so that's when we talked about

6    it, well, who did what --

7          MS. GRAUNKE:  Right.

8          THE COURT:  -- well, there were clearly upper-level

9    management people involved in some of this.  And then there

10   were some who were not as high up.

11         But the things that you said they did, like making the

12   rules and establishing the penalties for the rules, didn't

13   Signal know about that?  It wasn't like, you know, some kinds

14   of sexual harassment where the company doesn't know what, you

15   know, lower-level employees are doing.

16         MR. WEINBERGER:  Right.  I will give you an answer,

17   Your Honor.  I don't know whether you will find it very

18   satisfying.  But it's the most intelligent one I know how to

19   give.

20         The issues -- so we're talking about now have a bearing

21   on how Signal closes this case.

22         If we're going to talk about the discrimination in

23   which Signal engaged, the point of cases like *Vance* and

24   *Faragher* and all of the other cases.  This point is made over

25   and over and over again in these cases, especially by *Kulstad*.

1          The point is that these cases are full of agency

2     principles.  There are important principles in these cases

3     about how these companies are supposed to have acted with

4     regard to the discrimination in which they allegedly engaged.

5          THE COURT:  Well, let's stick to the jury instructions

6     because I'm just trying to get past this.

7          MR. WEINBERGER:  No.  I understand, Your Honor.

8          THE COURT:  So tell me --

9          MR. WEINBERGER:  You are going to talk to the jury

10    about how they should think about the evidence that they

11    received and the way these lawyers are going to talk to them

12    about how to analyze this case.

13         In theory, those people over there are going to talk

14    about the people who are responsible for the decisions that

15    culminated in a hostile work environment.

16         When we close, in theory, we will say, "Fine, let's

17    talk about those people.  Let's talk about this person."

18         THE COURT:  Who would you be talking about?

19         MR. WEINBERGER:  It could be a range of people.  Kristi

20    talked to you about them this morning or this afternoon,

21    Darrell Snyder.

22         THE COURT:  Well, are you going to say that any of them

23    did things that Signal didn't know about?

24         MR. WEINBERGER:  No.  I think what we're going --

25         THE COURT:  So that's what I think this sounds like --

OFFICIAL TRANSCRIPT

1          MR. WEINBERGER:  Your Honor, what I'm not having a good

2    time understanding is how the jury is going to sort through the

3    examination or evaluation or analysis in which he's supposed to

4    engage.

5          If it doesn't get a program from the Court as to what

6    it's supposed to think about what they say and what we say

7    about how these individuals acted towards these people in

8    relation to federal antidiscrimination laws, they're going to

9    say this company is responsible for the horrible way in which

10   these people lived because of these decisions made by these

11   individuals.

12          And they are going to identify -- or they are not.  I

13   don't want to speak --

14          THE COURT:  My question is, if they do that are you --

15   when you get up and argue on defense -- going to say, "But

16   these weren't supervisory people.  These were -- these were

17   lower-level employees, and Signal had no idea what they were

18   doing."

19          Is that going to be a defense?

20          MR. WEINBERGER:  It depends.  It depends.

21          THE COURT:  Well, I haven't heard anything -- any

22   testimony like that.  So I don't want to instruct about that

23   single -- a lower-level people were doing things that Signal

24   didn't know about.

25          MR. WEINBERGER:  That's different, Your Honor.  I'm

1    sorry.  I'm hearing that for the first time.

2        That is different.

3        If you think there is just no basis for an argument in

4    this case about whether Signal is responsible with regard to

5    intentional discrimination --

6        THE COURT:  No.  I'm saying -- I haven't heard any

7    evidence of a defense that people who were not supervisors did

8    these things and Signal didn't know about it.  That doesn't

9    mean you are liable.

10       I'm just talking about whether that is one of your

11   defenses.  I thought your defense was there is nothing wrong

12   with what we did.  But that doesn't have anything to do with

13   whether you knew about what lower-level employees were doing.

14       MR. WEINBERGER:  That's a fair statement.  I don't

15   think it is something that we're saying, Your Honor.

16       THE COURT:  All right.  So I'm going to take that fifth

17   element out of the jury instructions because I think it's only

18   needed in cases where that is an issue.

19       MR. WEINBERGER:  Yes, Your Honor.  Can you refer me to

20   a page that you are going to be looking at right now?

21       THE COURT:  Well, it's on page 34 of my version.

22       MR. WEINBERGER:  Your version that you circulated last

23   night?

24       THE COURT:  Yes, harassing living conditions, what the

25   elements are.

1        MR. WEINBERGER:  And I think you are referring to the

2   idea that you'll remove 4.

3        THE COURT:  Yes.  Because I just don't think it's at

4   issue in this case.

5        MR. WEINBERGER:  All right, Your Honor.

6        THE COURT:  Okay.

7        MR. WEINBERGER:  With one question?

8        THE COURT:  Okay.

9        I'm listening.

10        MR. WEINBERGER:  What about the question of whether any

11   of these individuals complained that they considered that they

12   were living under --

13        THE COURT:  But isn't that only important if you are

14   going to say they didn't complain -- we didn't know about it,

15   they didn't complain, so I couldn't have found out about it?

16   That has to do with knowledge.

17        MR. WEINBERGER:  But, Your Honor, aren't those two

18   different questions?

19        THE COURT:  I don't think that means you can't say

20   there was nothing wrong, they never complained, they all liked

21   it.  That is a different issue.

22        MR. WEINBERGER:  Great.  I understand, Your Honor.

23        MS. GRAUNKE:  Right.  And there is still language in

24   there about whether they were subjected to unwelcome

25   harassment.  So people liked living there, that is something

1    that Signal could argue.

2            THE COURT:  Okay.  So that's one.

3            Now, let's see.  Now, on the RICO, remind me of what

4    the issue is.  The mail fraud?

5            MR. SANDLER:  The mail and wire fraud, we wanted to add

6    the instruction relating to the third-party reliance that is

7    endorsed by the Supreme Court.

8            THE COURT:  I started looking through it and trying to

9    find a requirement of reliance.  It sounds like you are saying

10   you don't have it.  I didn't find a requirement.

11           MR. SANDLER:  No, there absolutely isn't a reliance.

12           THE COURT:  There is not one in the jury instructions.

13           MR. SANDLER:  Because -- and this is what is discussed

14   in *Bridge* and a couple of other cases -- reliance is often used

15   to establish the proximate causation that is most definitely

16   required.

17           So what *Bridge* says is because there is no reliance

18   requirement and because you only need proximate cause,

19   third-party reliance, what existed in *Bridge* and what exists

20   here in *David* --

21           THE COURT:  But nobody is saying that it's not, that it

22   doesn't.

23           MR. SANDLER:  Right, but I think that because fraud --

24   common law fraud typically requires first-party reliance, and

25   typically requires that form of reliance, it's important for

1    the jury because there is a different fraud being --

2         THE COURT:  But the jury knows about common law fraud

3    and reliance?

4         MR. SANDLER:  Well, the jury will be analyzing fraud

5    under India law in this case, and they will be analyzing issues

6    of reliance in relation to other --

7         THE COURT:  Tell me where it is that you would want

8    that, what --

9         MR. WERNER:  Your Honor, in the red-line version I sent

10   late last night, and I don't know if that is -- if you were

11   able to e-mail that, but I should be able to --

12        MR. SANDLER:  It would be on the bottom of page 44.

13        THE COURT:  The one about -- have you got it, Philip?

14        MR. WEINBERGER:  Here it is.

15        MR. WERNER:  Is that what I circulated?

16        MR. SANDLER:  Yeah.  Yes.  It's right before the

17   paragraph that begins --

18        THE COURT:  Does anybody have any objections to the

19   blue language?

20        MR. WEINBERGER:  Yes.

21        THE COURT:  Okay.  What is the problem?

22        MR. WEINBERGER:  It's misleading.  There is an

23   extensive -- extensive discussion of this issue based on a

24   mountain of evidence in the class decision.

25        The problem in this case, Your Honor, as the Court

1    explained at length in the class decision, is that these people

2    are not only saying that the government relied on a fraud that

3    was practiced on the United States by Signal, they are

4    saying -- they have pled -- they have argued in the courtroom

5    repeatedly that they came to the United States because they

6    were told that if they came, they would receive in some way

7    that I don't understand exactly how it's been presented --

8            THE COURT:  But you say without this, there is no

9    causation.

10           MR. WEINBERGER:  Absolutely.  But, Your Honor, please

11   understand, it's not as if I'm inventing this.  I have made

12   this argument for years, and we prevailed.

13           And not only prevailed, but prevailed on the basis of a

14   very long, very extensive, very detailed evidence-based

15   analysis of this very --

16           THE COURT:  Just help me get through this.

17           MR. WEINBERGER:  Yes, Your Honor.

18           THE COURT:  What do you -- because you say there is

19   no -- the fraud that you say you are relying on that was

20   directed at another person is the plaintiffs relied -- the

21   fraud was to the U.S. government.

22           MR. SANDLER:  Yes.

23           THE COURT:  U.S. government issued visas.

24           MR. SANDLER:  H-2B visas.

25           THE COURT:  The plaintiffs relied on that.

1          MR. SANDLER:  No, that caused their injury.  The

2     government's reliance on Signal's fraudulent, false

3     attestations along with Malvern Burnett's false attestations

4     caused --

5          THE COURT:  Say that again.  Their reliance on the

6     false --

7          MR. SANDLER:  The U.S. government, the Department of

8     Labor and U.S. Customs and Immigration's reliance on Signal's

9     and Burnett's false attestations regarding the nature of their

10    labor needs caused the plaintiffs' injury.  And that injury is

11    a portion of the recruitment fees that were paid, as well as

12    subsequent injuries that happened thereafter.

13         THE COURT:  So it's that those are fraud on the U.S.

14    which was Signal's need, is that what you said, the fraud on --

15         MR. SANDLER:  Yes, their need for labor.  They made a

16    false attestation to the U.S. government regarding --

17         THE COURT:  That it was only temporary.

18         MR. SANDLER:  Yes.  At any rate, they are on the record

19    saying they had a two- to three-year need.  They told the

20    government they had a 10-month need.  That was communicated by

21    U.S. mails.

22         That's why it's under the mail fraud and it was also

23    done in furtherance of e-mails, and that's why it's wire fraud.

24         THE COURT:  Then the U.S. issued H-2B visas.

25         MR. SANDLER:  That's right.

1          THE COURT:  And then the plaintiffs -- the U.S.
2     government relied on the false attestations of Signal.
3          MR. SANDLER:  That's right.
4          THE COURT:  And that caused damages to the --
5          MR. SANDLER:  That caused injury to plaintiffs by
6     virtue of paying recruitment of fees by virtue of the --
7          THE COURT:  Why did it cause the plaintiffs' injury?
8          MR. SANDLER:  Because the issuance of those visas was a
9     triggering step, and I think Mr. Dewan testified to that today.
10    It was a triggering step to demand a third recruitment
11    installment, which was a very heavy recruitment installment.
12         And, further, that triggered the plaintiffs' travel to
13    the United States and employment at Signal.
14         So, now, Mr. Weinberger points out correctly that we
15    have articulated other forms of fraud.  However, this is pretty
16    much our whole mail fraud claim.
17         MR. WERNER:  Well, I would actually -- I wouldn't say
18    that.  I mean, I think part of what we have to show is a
19    pattern of racketeering activities, so we need to show multiple
20    acts, multiple predicate acts.
21         THE COURT:  The only things that were mailed were what,
22    the visa?  What was mailed?
23         MR. SANDLER:  The applications.  They were sent by
24    Federal Express, which is within the mail fraud statute, the
25    petitions and the supporting evidence for those petitions for

1    H-2B visas in 2006.  Again, the extensions were also done by

2    FedEx in 2007.

3         THE COURT:  All between somebody in the U.S.

4    government --

5         MR. SANDLER:  Burnett's office and the U.S. government.

6         There was further mails between Burnett and Signal

7    regarding these documents, and aspects of the specific false

8    attestations were communicated over e-mail, which contemplates

9    a wire fraud statute.

10        So once you break down the mail fraud statute and, you

11   know, if the jury were to conclude, well, they never received

12   any U.S. -- the plaintiffs never received any U.S. mail, so

13   that's not really going to be a claim that -- you know, then

14   how could they have caused that injury, and maybe aside from

15   Jacob, our other plaintiffs didn't e-mail or --

16        MR. WERNER:  I'm sorry.  I mean, what is required to

17   prevail on a mail/wire fraud claim is that the mail and wires

18   were used in furtherance of the fraud.  So we --

19        MR. SANDLER:  That's what I was going to say.

20        MR. WERNER:  So the fact that the mail and wires

21   communications were not directed at the plaintiffs does not

22   matter.  It just has to be essentially a significant component

23   of the fraudulent scheme.

24        THE COURT:  Alan, tell me about the -- specifically

25   what you object to in these two sentences that they want to

1    add.  First it's also plaintiff does not have to show he relied

2    upon the fraud.  And that is true, isn't it?  They just have to

3    have causation.

4         MR. WEINBERGER:  In the abstract.

5         THE COURT:  But they might have some other form of

6    cause --

7         MR. WEINBERGER:  Your Honor, it's true in the abstract.

8    It's not true in this case.

9         THE COURT:  And then, in other words, the plaintiff may

10   be injured by fraud directed at another person.

11        MR. WEINBERGER:  Which was what happened in *Bridge*

12   because of its unique facts, which would, in fact, resonate

13   with you because of how it played out.

14        But there are innumerable opinions from other district

15   judges around the country who have said, you know, 95 percent

16   of the time when I get a fraud case, it's a case that involves

17   a guy who has fraud practiced on him.

18        And when we litigated this to an extent that you can

19   barely imagine during the class period so that the Judge could

20   determine whether this case could be certified, he rejected --

21   not me, a Judge of this Court rejected --

22        MR. SANDLER:  I can specifically respond to that.

23        MR. WEINBERGER:  -- everything these people are saying.

24   He said, this isn't what happened.  These people came to the

25   United States for green cards.

1    THE COURT:  But you know what, I have now heard so much

2    more past that, I cannot -- Judge Zainey would not say, "Judge

3    Morgan, you should just assume you know what I know, and do

4    what I did."

5    I have to do with what I have right now.  So please

6    explain it to me.

7    You say there are other cases, and maybe you have given

8    them recently, but I don't have -- I don't know what they are

9    that say what?

10   MR. WEINBERGER:  When the case is characterized by

11   heavy individual reliance -- this is not a criminal case.

12   Mr. Werner says the issue is whether there was this

13   fraudulent scheme.

14   In a criminal case, that is the issue.  This is a civil

15   case.

16   THE COURT:  But if it's individual reliance, are there

17   cases that say, no, you can't rely on fraudulent --

18   MR. WEINBERGER:  What they say is that when the case

19   involves a scheme that depended on individual reliance, that in

20   order for the plaintiff to establish that he was injured by

21   reason of the enterprise, he has to prove that that individual

22   reliance occurred that he did, in fact, rely.

23   I will provide you -- I will provide you in the

24   morning -- I will provide you this evening --

25   THE COURT:  You have to do it tonight because I'm doing

1    this --

2         MR. WEINBERGER:  -- this evening with a series of cases

3    in which district judges have tried, carefully studied the

4    cases before them to see whether the cases aren't characterized

5    by arguments that what the case is really about is a fraud that

6    was directed at an individual, and that individual relied.

7         And, Your Honor, again, if you look at these

8    Complaints, the Complaints refer repeatedly to the green card

9    issue.  So, Your Honor, when I get back to the office, I will

10   send you a series of cites.

11        MR. CERNIGLIA:  I have a more basic question.  For it

12   to be fraud on the government, don't you have to show that the

13   government relied to its detriment?

14        MR. SANDLER:  No.

15        MR. CERNIGLIA:  What makes it fraud?  Because you want

16   to argue fraud?  That is what -- how --

17        MR. SANDLER:  We put a brief in two nights ago that

18   explains *Bridge* with great detail.

19        MR. CERNIGLIA:  I just want to understand how is it a

20   fraud.  I can understand if you say there is fraud on somebody

21   else, but how does this rise to a level of a fraud if somebody

22   doesn't rely on it?

23        MR. SANDLER:  They did rely on it.

24        MR. CERNIGLIA:  To the detriment --

25        MR. SANDLER:  They relied and they issued H-2B visas

1    that they would not otherwise issue, because they issue H-2B

2    visas for a certain type of employer need.

3          Here, that employer did not have that need.  So they

4    issued a -- and this is exactly what *Bridge* is for.  Because

5    the U.S. government may not sue necessarily for this fraud.

6    And that's what *Bridge* contemplates, a situation where the

7    actual defrauded party may not sue.  And there are better

8    situated plaintiffs for the fraud.

9          THE COURT:  Okay.  We're at the point where things

10   aren't simple.  They are right over my head because there is

11   too much, and I don't do all the time the way you do.

12         If you want me -- if you want me to see a case that

13   says what you say, it needs to be simple and to the point.

14         MR. WERNER:  Can I just -- I will -- if I can just

15   clarify one really quick point.  There were -- and this is in

16   our Complaint.  This is what we have been saying from the

17   beginning of the case, this has been discussed.

18         There are essentially two types of fraud that we're

19   talking about.  One was the fraud that was directed at the U.S.

20   government, which was the fraud that the U.S. government relied

21   upon in issuing the H-2B visas.

22         The second fraud was the fraud directed at the

23   plaintiffs regarding the green cards.  Two separate frauds.

24         THE COURT:  Signal did the first, and then Signal,

25   Burnett and Dewan did the second; is that what you're saying?

1        MR. WERNER:  Signal and Burnett did the first, and then
2  Signal, Burnett, Dewan did the second.
3        MR. SANDLER:  So I misspoke.  What Dan is correcting is
4  that I misspoke earlier when I said the mail fraud was
5  exclusively the fraud on the U.S. government.
6        There is a separate independent fraud that used U.S.
7  mails in furtherance of this, which is all you need for the
8  mail fraud statute that was directed at plaintiffs directly.
9        THE COURT:  Let me move on.  Let's talk about
10  cross-claims.  The -- on the malpractice claims, when I read
11  Mississippi law, it looks to me like there is really -- there
12  is not a negligence claim and then a breach of fiduciary claim.
13  Did you look at those cases?
14        MR. HASENKAMPF:  Yes, I did.  In the *Chris* case on at
15  page 842, at the end it says, the law recognizes a clear
16  distinction between allegations of malpractice based on
17  negligence --
18        THE COURT:  But they are both just species of
19  malpractice, I guess.
20        MR. HASENKAMPF:  Correct.  If it's a matter of
21  semantics, I'm okay calling both malpractice.  What I want to
22  make plain is that we do have distinct theories, distinct
23  damages, and distinct conduct.
24        THE COURT:  Let me get to that.  How about the cases
25  that talk about -- for breach of -- that for the breach of the

1    standard of care, what you have been calling malpractice, that

2    it's -- that's the kind of case where you were sued and you

3    lost the case, and you have to do the case within the case.

4    This case that -- *Wilburn,* Supreme Court, 1997 -- well, that's

5    not the one I was thinking of -- it's 2014, it's -- let's see,

6    the *Estate of St. Martin versus Hixson* where they say the first

7    time malpractice is where you lost a suit, you have to show you

8    would have lost the suit but for the malpractice.

9          The second kind is the duty of loyalty violation and

10   breach of fiduciary duty.  And the proof of proximate cause in

11   those cases is tailored to the injury and the remedy, like it's

12   more flexible.

13         MR. HASENKAMPF:  Correct.

14         THE COURT:  Then I wondered about what the difference

15   is where your damages for the breach of fiduciary duty --

16   remind me of what those damages are and how they differ from

17   malpractice.

18         MR. HASENKAMPF:  Sure.  The breach of fiduciary is --

19   we claim the basis of the conduct for that is the dual

20   representation, we have them --

21         THE COURT:  So that's the -- that's the fees you pay to

22   Ms. Bollman.

23         MR. HASENKAMPF:  No, that is malpractice.  So these --

24   the -- the fiduciary duty damages are the -- it's the

25   differential between the J&M worker --

OFFICIAL TRANSCRIPT

1          THE COURT:  Because they left, the J&M issue.

2          MR. HASENKAMPF:  Correct.  We're attempting to identify

3     only those Signal employees who left for J&M.

4          THE COURT:  Do you have -- excuse me for interrupting

5     all of the time.  I'm in a big hurry.

6          Do you have cases that say, that malpractice -- you can

7     call it malpractice and breach of the standard of care, even

8     though it's not this kind of case where, you know, you lost the

9     suit and you are going to have to prove the suit within the

10    suit.

11         MR. HASENKAMPF:  In the transactional sense?

12         THE COURT:  Yeah.  That's the only one -- that's the

13    only kind of case I saw, where they called it malpractice,

14    breach of the standard of care.

15         MR. CERNIGLIA:  The problem as I see it, Your Honor, is

16    that it goes to what damages were caused for a case within a

17    case for them to have -- the standard of care has been violated

18    they have to show that that somehow would have had a different

19    result had he reached the standard of care.  So that's not --

20         THE COURT:  I mean, that's not the kind of claim

21    they're making.

22         MR. CERNIGLIA:  No.  That's not even for the damages

23    for, but they are trying to claim for -- and I don't think they

24    have established the damages, they are trying to say is because

25    he didn't complete the job, they had to do something else.  But

1    that is not --

2         THE COURT:  Maybe both of those are under breach of

3    fiduciary duty.

4         MR. CERNIGLIA:  He was terminated by Signal.

5         THE COURT:  You have got a case where there is not this

6    case within a case issue that they called it malpractice.

7         MR. HASENKAMPF:  I have seen one recently.  I was

8    hoping it was one right at my fingertips.

9         But, yes, there is a transactional malpractice --

10   transactional breach of the duty of care where you don't have a

11   case within a case.

12        You have the standard of care, which does have to be

13   established by expert testimony, which Mr. Gonzalez did do, and

14   he identified what would a reasonable immigration attorney do.

15   And that was -- I believe that was yesterday.  No.

16        THE COURT:  Well, I --

17        MR. CERNIGLIA:  But what damages flow from that?

18        THE COURT:  We're going to get into that in a minute.

19        But I may collapse that in to one because they are both

20   malpractice actions.

21        Or you could have two, but they are both malpractice

22   issues, just one is breach of the duty of the standard of care

23   and one is the breach of the duty of loyalty and that --

24        MR. HASENKAMPF:  I'm okay with that.  I just want to

25   make sure there are instructions that address both different

1   theories, and I do think that the conduct is different and the

2   damages are different.

3          THE COURT:  Well -- and you also on breach of fiduciary

4   duty had -- you had to prove it by clear and convincing

5   evidence.

6          MR. HASENKAMPF:  And that is that from Mississippi case

7   law.  I'd love to go to preponderance of evidence.

8          THE COURT:  Tell me what case says that.

9          MR. HASENKAMPF:  These were cases provided by

10  Mr. Burnett.

11         THE COURT:  Can you tell me that, Tim?  Can you

12  remember?

13         MR. CERNIGLIA:  Not offhand.  I sent them all of the

14  citations, but I don't have a copy with me.

15         THE COURT:  So I need that.

16         MR. CERNIGLIA:  See, if you read the *St. Martin*

17  case -- you know what St. Martin -- I didn't know that he died

18  when I referred to him as the late.

19         But, anyway, in that case, they talk about three

20  different duties of the attorney.  And one is the person who

21  cared consistent with the legal of expertise he holds and

22  possesses.  So that's one of them.

23         And I don't think they are claiming that, but if they

24  are, I don't know the damages flow from that.

25         The second one is --

1          THE COURT:  Wait.  I'm looking --

2          MR. CERNIGLIA:  -- *Joaquin Fidelity*.  This is the first

3     case.

4          THE COURT:  Yes.

5          MR. CERNIGLIA:  And the third is duties by his

6     contract.

7          And the damages they're trying to claim -- the

8     indemnity they are trying to claim for Patricia Bollman is

9     those referring from the contract.

10         I mean, the third duty is stated in this *Estate of*

11    *St. Martin versus Hixson*.

12         THE COURT:  Well, that sounds like a breach of

13    contract.  I don't know which one that fits under.

14         MR. HASENKAMPF:  Right.

15         MR. CERNIGLIA:  It's -- it's -- it's something --

16         THE COURT:  But it does say that.  I'm reading it.

17         MR. HASENKAMPF:  I agree that it says that.  I'm just

18    saying that is our theory.

19         We're saying but for Mr. Burnett's negligence.  And

20    this is his breach of duty of care which -- and the duty of

21    care was established by Mr. Gonzalez.

22         MR. CERNIGLIA:  Just go ahead and tell me what the duty

23    of care was because that will tell us what damages would flow

24    from that.

25         MR. HASENKAMPF:  To put in writing the expected

1    timeline of the visas and green card processing.  And it's

2    failure to do so, and it's failure to explain that to Signal.

3         MR. CERNIGLIA:  Don't you have a problem with that he's

4    not a client at the time because that was decided in February

5    when they had their own immigration attorney and their own

6    lawyer?

7         I don't see how you get to that point.

8         MR. HASENKAMPF:  So the issue is that he was obligated

9    as their attorney to file --

10        THE COURT:  When did that happen?  When did it

11   happen that he --

12        MR. HASENKAMPF:  He was terminated in December 2007.

13        MR. CERNIGLIA:  That's when he was terminated, but when

14   was this?

15        THE COURT:  When did this conduct take place?

16        MR. HASENKAMPF:  The conduct took place through the

17   summer and fall of 2006.  But Signal did not realize it until

18   2007.

19        So the issue was Signal discovered the dual

20   representation with J&M.

21        Ron Schnoor called up Mr. Burnett and said, "Why are

22   you representing J&M."  And he said, "I wasn't."  And he said,

23   "I'm looking at your signature" --

24        THE COURT:  But that is the other claim that is

25   fiduciary duty.  So when did this breach his duty of care, when

1    did that happen?

2        MR. HASENKAMPF:  In the summer and fall of 2006.

3        So they terminate Burnett.  Ms. Bollman comes in and

4    says, "Look -- I need to take over the immigration filings.

5    You have been getting bad information, the workers have been

6    getting bad information.  The green card processing cannot

7    start until after H-2B extensions are finished."

8        And these filings -- this new work, these new fees, we

9    believe, are attributable to the breaches of the duty of care,

10   the failure to explaining immigration process.

11       THE COURT:  Tim?

12       MR. CERNIGLIA:  Well, there is -- first off, there is

13   not one shred of testimony from any person that what

14   Mr. Burnett said or did not say.

15       The only testimony has been that there was -- it's from

16   Mr. Burnett and Mr. Pol -- that at meetings -- discussion

17   meetings in February before he was, quote, their attorney, he

18   told -- he explained to them the process.

19       In fact, we even -- Mr. Bingle says he remembers he

20   heard it, but the point is he wasn't -- directed to them.

21       THE COURT:  So some of this may be fact issue.

22       MR. CERNIGLIA:  Well, some of this is fact, but the

23   question is what damages flow from that, is what -- I don't

24   understand how you jump the hoop and are saying because you

25   terminated somebody so that he can't file the extensions, how

1   does something he may or may not have said get to that point?

2   I don't see how that flows.

3       THE COURT:  Let's talk about the damages on the

4   cross-claims.  I'm trying to think whether I have -- are there

5   other issues -- you all may have things you want to do or need

6   to do because I want to talk about the cross-claims now.

7       Are there other issues you all need to discuss?

8       We have got to go in and talk about the demonstratives,

9   too.

10       MR. CERNIGLIA:  On the agency charge, Your Honor --

11       THE COURT:  That effects everybody.

12       MR. CERNIGLIA:  -- the language that I wanted is in

13   there, but I think it's in the wrong position because otherwise

14   the jury will get totally confused.

15       MR. SANDLER:  What page are you on to?

16       MR. CERNIGLIA:  I will pull it up.

17       THE COURT:  Page 17?

18       MR. CERNIGLIA:  It is under "Agency" on page 17, right.

19   Right now it reads [As read]:

20       "If the agent was acting within the scope and course of

21   his authority when he harmed the injured plaintiffs, then

22   principal and the agent are both legally responsible for any of

23   the plaintiffs who you believed were injured by the conduct."

24       But later on you have this language which is much

25   later.

1          THE COURT:  Say it again, Counsel.

2          MR. CERNIGLIA:  Right now on page 17 the first -- the

3    paragraph I'm reading is the last paragraph before establishing

4    the agency relationship.

5          THE COURT:  Uh-huh.

6          MR. CERNIGLIA:  It reads that [As read]:

7          "If the agent was acting within the scope of his

8    authority when he harmed the injured plaintiffs, then the

9    principal and agent are both legally responsible to any of the

10   plaintiffs who you believe were injured by the conduct."

11         That actually only applies if the agents were doing

12   something wrong themselves.  And that sentence is provided for

13   but much later, and I think it ought to go right now.

14         That other sentence is [As read]:

15         "However, an agent for a disclosed principal is not

16   liable for the principal or the principal's breach of contract

17   to be liable to --

18         THE COURT:  Where are you reading now?

19         MR. CERNIGLIA:  Okay.  This is on --

20         MS. BOUHABIB:  That is on page 22.  It's the last part

21   right before it says, "Application of Plaintiffs' claim."

22         THE COURT:  Okay.

23         MR. CERNIGLIA:  It fits better up there so that the

24   jury understands the distinction that's trying to be made.

25         THE COURT:  But in one place on 17 we're talking about

1    what makes the principal liable and on 22 --

2         MR. CERNIGLIA:  No.  They are also talking about what

3    makes the agents liable.  It says, "Agents are also liable."

4    That's why I think the next thing the agent can't be liable

5    unless --

6         THE COURT:  So what you really --

7         MR. CERNIGLIA:  I just want to move that sentence up.

8    So underneath --

9         THE COURT:  You want to move what is on 24 --

10        MR. CERNIGLIA:  Whatever page.

11        THE COURT:  -- to page 17 -- I mean, 22?

12        MR. CERNIGLIA:  Right.

13        THE COURT:  Does anybody have a problem with that?

14        MS. GRAUNKE:  No, Your Honor.

15        MR. WEINBERGER:  Signal's problems are different with

16   regard to agency.

17        THE COURT:  Okay.  But not that particular --

18        MR. WEINBERGER:  Correct.

19        THE COURT:  Okay.  We can do that.

20        All right.  Do you want to talk about something on

21   agency?

22        MR. WEINBERGER:  I don't know whether you want to do

23   this right now, Judge.  You said --

24        THE COURT:  I want to do things that the plaintiffs

25   would want to hear because apparently they've worked out the

1    issues on the demonstratives, except one.  So they are -- we

2    don't have to go meet with them.  So you all may want to leave

3    if they're down to cross-claims issues.

4           So what are the issues about agency?

5           MR. WERNER:  If you are still talking agency, I have

6    another issue with the broader charges.

7           MR. WEINBERGER:  Your Honor, I don't have granular

8    problems with agency charge as such.  I have a problem with the

9    way it's presented or where it is.

10          My issue is this, Your Honor:  There is no agency cause

11   of action in this complaint.

12          THE COURT:  Right.

13          MR. WEINBERGER:  There is no claim of agency in this

14   case.  The only thing these principals are doing in this case

15   is effectuating a strategy these people have developed in

16   connection -- don't shake your head at me.  Please.

17          THE COURT:  Please don't annoy him.

18          MR. SANDLER:  I'm sorry.  I didn't --

19          THE COURT:  Don't shake your head at him.  Leave him

20   alone.

21          MR. SANDLER:  I'll leave him alone.

22          MR. WEINBERGER:  Yes.  Leave me alone.

23          THE COURT:  Leave him alone.

24          MR. SANDLER:  I'm sorry.  That was very immature of me.

25          MR. WEINBERGER:  Well, everybody tells lawyers not to

 1     shake their heads in Court.

 2             MR. CERNIGLIA:  I haven't heard that.

 3             THE COURT:  It's like a Hillary Clinton thing.  She's

 4     always nodding.

 5             MR. WEINBERGER:  All of this is -- respectfully, is a

 6     way of visiting the liability of Signal's alleged agents on

 7     Signal with regarding to the pendent state law claims.  That is

 8     all it is.

 9             THE COURT:  Right.

10             MR. WEINBERGER:  Well -- but, Your Honor, the point

11     that I'm making is that I think the place for that discussion

12     around these principals, using these principals, with these

13     principals is back with the material that concerns the pendent

14     state law claims.

15             And the reason I feel that way is I think it will help

16     the jury understand better --

17             THE COURT:  So you are just saying -- this is how you

18     say something clearly and succinctly.  "I would like to move it

19     closer to Claims 5, 6, and 7; is that what you are saying?

20             MR. WEINBERGER:  That's what I'm saying.

21             THE COURT:  That is a lesson for you.

22             MR. WEINBERGER:  Yes, Your Honor.

23             THE COURT:  Now, how do you all feel about that?

24             MS. BOUHABIB:  I don't see a problem.  I don't know

25     that that's what he was saying.  I don't see a problem with

1    that unless it's confusing --

2           THE COURT:  Do you see what happens if you say

3    something clearly?

4           MR. WEINBERGER:  I am well criticized, Your Honor.  You

5    are absolutely right.  I apologize for not being focused.  I

6    owe you an apology.

7           I teach everybody in the world not to do what I did.

8    Thank you, Your Honor.

9           THE COURT:  So we'll do that.

10          Dan?

11          MR. WERNER:  Sure.  Just in the red-line version we

12   circulated late last night -- I think this also reflected in

13   the e-mail -- there are just a few, I think, minor tidbits that

14   might be helpful to just breeze through right now, and then we

15   can --

16          THE COURT:  Right now the e-mail that you sent or

17   something different?

18          MR. WERNER:  Well, Ms. Graunke sent an e-mail, and then

19   I followed up with a red-line version.

20          THE COURT:  I haven't looked at the red-line.

21          MR. WERNER:  It was -- as is typical of my e-mails, it

22   was after midnight.

23          MR. WEINBERGER:  I have it.  If you can just go to

24   specific places.

25          MR. WERNER:  Sure.  Of course.

1          THE COURT:  He's trying to teach you to be succinct.

2          MR. SHAPIRO:  We, in the general instructions --

3          THE COURT:  I'm not changing everywhere "more likely

4     than not."  So don't bother with that.

5          MR. WERNER:  Okay.

6          THE COURT:  You are going to tell them that, and

7     somebody is going to tell them in closing.

8          MR. WERNER:  Of course.  The -- we thought it might be

9     helpful -- and I will say up front I don't think -- this isn't

10    critical -- to make it clearer in Paragraph 6 of the general

11    instructions that a corporation is considered --

12         THE COURT:  I made that change.

13         MR. WERNER:  Thank you, Judge.  That is great.

14         We thought more about the TVPRA, the change and the not

15    determinative instruction with TVPRA.

16         THE COURT:  I will leave it the way it is.

17         MR. WERNER:  We have addressed the forced in the 1981

18    charge.

19         THE COURT:  I made that change.

20         MR. WERNER:  That will be in the form as well.

21         Then the last thing -- and this is really -- I mean --

22         THE COURT:  Mr. Jacob --

23         MR. WERNER:  Mr. Jacob was changed, I think, if I

24    remember correctly.

25         The last thing is really minor tidbit, and this is in

1    the instructions -- in the closing instructions in

2    Paragraph 33, at one point the -- Signal is -- with respect to

3    cross-claims is called plaintiff in cross-claim, and another

4    place they are called --

5            THE COURT:  I made that change.

6            MR. WERNER:  Okay.

7            THE COURT:  So is this all this is --

8            MR. WERNER:  Yeah, we just tried to --

9            THE COURT:  You already dealt with all of that, except

10   the two issues we talked about -- well, we talked about *Bridge.*

11   We dealt with that.

12           MR. WERNER:  Uh-huh.

13           THE COURT:  I think that was it.

14           MR. WERNER:  I think that was all, yes.

15           MS. GRAUNKE:  I just noticed one thing in reviewing the

16   fraud charge where -- on page 55 it says [As read]:

17           "I have earlier instructed you on the law of agency.

18   If you decide that the plaintiffs were defrauded, that the

19   defendants who defrauded them were agents of Signal."

20           I think, "or Signal, Burnett, or Dewan."  I think it

21   would be better to put persons who defrauded them.

22           Because, for example, we heard testimony about a

23   Mr.  Salimon today, who is not a defendant, but is an agent of

24   Mr. Dewan.

25           THE COURT:  What would you change?

1              Not that the defendants, but that the persons --

2              MS. GRAUNKE:  The persons who defrauded them were

3    agents of Signal, Burnett and/or Dewan.

4              THE COURT:  All right.  Anything else?

5              Okay.  Philip, can you think of anything else we had?

6              THE LAW CLERK:  There is minor spelling and some kind

7    of things --

8              THE COURT:  We have to do that.

9              MR. WEINBERGER:  Your Honor, you are not thinking you

10   would want to handle every issue that we would raise concerning

11   anything right now or --

12             THE COURT:  No.  Not if we have already covered it.

13   You are just going to say it on the record --

14             MR. WEINBERGER:  Well, Your Honor --

15             THE COURT:  I mean, if you have specific issues,

16   nitpicky things or whatever --

17             MR. WEINBERGER:  I don't think them of as nitpicky --

18             THE COURT:  -- this is your time because we're doing

19   the final --

20             MR. WEINBERGER:  Oh, sure.  I'll be --

21             THE COURT:  But if it's things we talked about before,

22   just save them for in Court tomorrow.

23             MR. WEINBERGER:  Let me save things for Court tomorrow,

24   Judge.  You are having an official charge conference?

25             THE COURT:  No, it is going to be an opportunity for

1    you to put your objections on the record.

2              MR. WEINBERGER:  Okay.

3              THE COURT:  This is the time for you to --

4              MR. WEINBERGER:  Fix things.

5              THE COURT:  Okay.

6              MR. WEINBERGER:  Let me cover a couple of things very

7    quickly and we'll get you out of here, Judge.

8              I have already spoken about please, please, please with

9    regard to retaliation, make that key question a question about

10   whether --

11             THE COURT:  Tell me where you are, what page?

12             MS. GRAUNKE:  It's the verdict forms --

13             MR. WEINBERGER:  It is, Your Honor, if you can turn to

14   your verdict forms, page 25.

15             THE COURT:  Okay.

16             MR. WEINBERGER:  Question No. 3.

17             THE COURT:  Did you find -- tell me --

18             MR. WEINBERGER:  That should read:  Do you find from a

19   preponderance of the evidence that Signal would not have

20   terminated Mr. Jacob but for his engaging in protected

21   activity?

22             That's how that should read.  That is the critical

23   issue of fact that the jury is being called upon to decide.

24             THE COURT:  And --

25             MR. WEINBERGER:  Do you find from a preponderance of

1    the evidence that Signal would not have --

2           THE COURT:  Does anybody object to that?  Because isn't

3    it true that retaliation is but for?

4           MR. WEINBERGER:  Absolutely.  That is it to a tee.

5    That is why I asked.

6           THE COURT:  So that sounds right to me.  See, things

7    sometimes work out.  What else?

8           MR. WEINBERGER:  Let me back up, Judge.  This will be

9    fast.

10          Judge, page 5.  And other defendants might have the

11   same issue to raise, but, Your Honor --

12          MS. GRAUNKE:  We were just talking about the issue.  I

13   don't object to -- you said but-for language, but I think just

14   inserting instead of "because" will cause some awkwardness, so

15   I'm certain that the Court could finesse the instruction to

16   make it make grammatical sense.  But I just want to raise that

17   it's not a smooth, grammatical --

18          THE COURT:  We will think about it.

19          MR. WEINBERGER:  Page 5, Your Honor, Question No. 1.

20   Is it the Court's intention to end that sentence that way?  "By

21   any means, any person for labor or services."

22          Should that not read "for labor or services in

23   violation of the laws relating to forced labor"?

24          MR. WERNER:  I'm sorry.

25          MR. WEINBERGER:  Page 5, trafficking with --

1          THE COURT:  This could just make any obtaining labor --

2          MR. WERNER:  Bear with me.

3          THE COURT:  Forced labor?

4          MR. WEINBERGER:  Do you find from a preponderance of

5     the evidence that Signal recruited, transported, provided or

6     obtained by any means any person for labor or services?

7          THE COURT:  Well, but I guess if you match it -- if you

8     go to 2, then it has to be that they would be subject to forced

9     labor.  Yeah, because we're thinking one doesn't get you

10    anywhere.  You have got to have one and two.  And two is where

11    they did this knowing they would be subjected to forced labor.

12    You see, if you answer yes to one and -- yes to one and no to

13    two, you --

14         MR. WEINBERGER:  Let's just call that something I will

15    put on the record, Judge.  We will move on.

16         MR. SANDLER:  We had one question.  With respect -- I

17    think we tried to handle this last week with respect to Malvern

18    Burnett and those two entities.

19         We got an e-mail from Mr. Cerniglia, and then I think

20    he made some representations on the record but, I guess it was

21    Friday, and I don't know that we got a resolution on it, and it

22    would help us to know that.

23         MR. CERNIGLIA:  The only thing I can do is what --

24         THE COURT:  He's not agreeing.  We can't do it.

25         MR. SANDLER:  So then we need multiple jury verdict

1    forms for each Burnett entity.

2            THE COURT:  We did do that.

3            THE LAW CLERK:  We did do that.

4            MR. WERNER:  Let's talk, because I wonder if there is a

5    way that we can finesse this without just getting rid of this

6    because I think --

7            THE COURT:  It has many pages.

8            MR. CERNIGLIA:  There has not been any testimony about

9    Gulf Coast Immigration --

10           THE COURT:  That's what I was thinking about Gulf

11   Coast, maybe we could all agree just to dismiss that claim

12   because there is no evidence about that entity.  It didn't

13   practice law.

14           MR. CERNIGLIA:  I don't see any evidence about the PLC

15   either.

16           THE COURT:  But at least he practiced, you know, it was

17   about his practice, and he practiced at the law firm, but there

18   is no testimony -- he mentioned -- he said he set it up

19   thinking he would advertise --

20           MR. CERNIGLIA:  I don't even think that came out in

21   this trial testimony.

22           MR. SANDLER:  Who does Maria Lau work for, what entity?

23           MS. TSU:  She testified that she worked for the Law

24   Offices of MCB.

25           MR. WERNER:  Stop me if I'm speaking out of turn, but I

1    think that we could -- and if I understand from your e-mail,

2    and maybe put this on the record just to make sure this is

3    right, the Gulf Coast Immigration Law Center does not do

4    business, has not done business for years, since 2000 --

5         MR. CERNIGLIA:  The problems are --

6         MR. WERNER:  -- since 2005.  It was not involved in any

7    aspect of the recruitment -- or the processing of papers for

8    the plaintiffs in this case.

9         Mr. Burnett currently has no assets and --

10        THE COURT:  Not Mr. Burnett, but that entity.

11        MR. WERNER:  That entity.

12        MR. CERNIGLIA:  I can't talk about what other assets he

13   may or may not have.  I just know it's been dormant.

14        I know -- for example, I think Burnett personally owns

15   his law office building.

16        MR. SANDLER:  Here is our issue with not dismissing it.

17   It's to the effect that Mr. Burnett has multiple entities, and

18   if he has moved his assets and resources into one entity in

19   connection with this because of this risk of this litigation --

20        THE COURT:  Never mind.  I know, this is like -- you

21   all have overdone things to me, and I know you think you are

22   doing it for the right reasons and to protect yourself every

23   which way, but sometimes it goes overboard, and I think it is

24   self-destructive.

25        MR. WERNER:  Tim and I will talk after the charge

1  conference.  If anything, it will just mean pulling that one

2  charge.

3         THE COURT:  But it's over and over again, you know, in

4  here, and so we would need some time to -- we have got a lot to

5  do.  We won't be going home when you leave because we --

6  because you all couldn't do your own jury verdict form, we're

7  doing it, and we have spent 50 hours plus doing it.  And it's

8  not going to happen again in another case.  You can tell your

9  Mississippi friends.

10        All right.  Anything else, general?

11        MS. TSU:  Your Honor, before we go into cross-claims,

12 if we are, if plaintiffs, in fact, are going to be dismissed, I

13 think there is one tiny little thing that Steve -- Tim, I don't

14 know if you saw the thing that I just sent you.

15        MR. CERNIGLIA:  It's in my e-mail.

16        MS. TSU:  Yes.  There is, I think, one remaining bit

17 of -- on the demonstrative that maybe we can --

18        MR. CERNIGLIA:  If I was not allowed to use it, I'm not

19 going to use that line --

20        MS. TSU:  Okay.  Well, then there is no problem.

21        MR. CERNIGLIA:  If you show me -- if you just have a

22 copy of that portion of the transcript there.

23        THE COURT:  Anything else?

24        MR. WEINBERGER:  I wasn't quite finished.

25        THE COURT:  All right.

1           MR. WEINBERGER:  Page 30, we cover conspiracy claim.

2           THE COURT:  Uh-huh.

3           MR. WEINBERGER:  Your Honor, I contend that that

4    question -- or those questions should be linked more explicitly

5    to the three different enterprises that are involved in this

6    case.  The objectives, the unlawful objective --

7           THE COURT:  I'm listening.

8           MR. WEINBERGER:  The unlawful objectives to which the

9    conspirators are supposed to agree are set out in the Complaint

10   when the three different enterprises are described.

11          And what I'm thinking is that what this should say is

12   something like "agreed to try to accomplish an unlawful

13   plan" --

14          THE COURT:  You are at the top, the very top?

15          MR. WEINBERGER:  Yes, Question No. 1, Your Honor.

16   Agreed to try to accomplish an unlawful plan to engage in a

17   pattern of racketeering activity, associated with one of the

18   three enterprises or, you know, all three enterprises.  However

19   the Court thinks that should work.

20          But that is where those objectives actually come from.

21   Because each enterprise is described in the Complaint as having

22   a different purpose or objective.  One is to get the employees,

23   one is to keep them docile, one is to -- it just seems it makes

24   more sense for the jury.

25          And, more importantly, Your Honor, much more

1    importantly, since the Fifth Circuit tells me with regard to

2    Rule 49 that I need to make sure we're asking the right

3    questions, that is a better, more right question to me than the

4    question as it stands.

5         THE COURT:  So what is the response from plaintiff?

6         MR. SANDLER:  What is the exact language just to the

7    end after "racketeering activity"?

8         MR. WEINBERGER:  After the word "activity," "associated

9    with one or more of the three alleged enterprises."

10        THE COURT:  I guess the issues, are these -- you don't

11   have to have violated A to violate B, correct?

12        MR. WEINBERGER:  That's why I say one --

13        THE COURT:  But you still have to have an enterprise.

14        MR. WEINBERGER:  You have to at least agree and

15   actually violate one of the three for there to be liability.

16        MR. WERNER:  Am I right, only one of the defendants has

17   to -- so not all three defendants needs to have engaged in

18   the --

19        MR. WEINBERGER:  But they all need to agree.

20        MR. WERNER:  Right.

21        MR. WEINBERGER:  What I'm trying to get at --

22        THE COURT:  Where it says two or more persons, one of

23   whom was Signal, agreed?

24        MR. WEINBERGER:  To try to accomplish an unlawful plan

25   to engage in a pattern of racketeering activity associated with

1   one or more -- you know, one or two or three -- however it

2   said -- one of the enterprises.

3        Your Honor, the thing that I'm trying to get at is a

4   clearer -- what -- statement by the jury that they are

5   associating the objective with the three different enterprises.

6        THE COURT:  So if you look at page 27, this is where

7   these kind of general questions, do you find they existed.

8   Well, if they say no, you would skip this question.

9        So if you said yes, then you will get to your question

10  on page 30.

11       MR. WEINBERGER:  Right.  The reason it doesn't satisfy

12  me, Your Honor, is specifically because what I'm trying to get

13  explicated a little bit more fully is the way in which the

14  enterprises provide the objective to which we're all supposed

15  to conspiratorially agree.  That is what I'm getting at.

16       The objective that we're all supposed to agree to, Your

17  Honor, comes from those enterprises and the way they alleged

18  what they are, what their purpose or objective was.

19       Each one had a different purpose.  I'm trying to get to

20  that idea.

21       THE COURT:  Yeah, I see.  So does anybody have a

22  problem with that?

23       MR. SANDLER:  Well, unless Signal is taking the

24  position that you could answer the question on page 30 without

25  believing that it was associated with one of the enterprises as

1    if there were another enterprise or another conspiracy afoot

2    that you are answering to on page 30, I think it just makes it

3    seem like --

4         THE COURT:  But they could.  It just said a pattern of

5    racketeering activity.  It doesn't tie it to an enterprise.

6         MR. SANDLER:  As you pointed out, they wouldn't be

7    there but for the recognition of the enterprises.

8         THE COURT:  Right.  But it doesn't tie those two

9    together, so I'm going to do what he wants to do.

10        All right.  Anything else?

11        MR. WEINBERGER:  Yes, Your Honor, one more thing.

12        Your Honor, I just wonder -- if you would turn please,

13   Your Honor, to page 48.  What I want the Court to do -- I will

14   try to be very focused.  Very rapidly, Your Honor, what I want

15   is for the Court to separate these issues so that they are

16   distinct and clear and being dealt with in a clear and distinct

17   way.

18        And the reason I want it is because of what Rule 49

19   says.

20        Ask the jury to answer questions about important facts.

21   Start with the contractual and estoppel questions.  Focus on

22   those questions and get clear answers about those issues.

23        Then ask questions about agency.  Separate those

24   issues, that's what I'm driving at.

25        The exact mechanics of doing it, Your Honor, I can

1    attempt, the Court can attempt, the plaintiff lawyers can

2    attempt.  But that's what I'm talking about, getting those

3    issues separate so that it's clear, for example, to a reviewing

4    Court exactly what it is these people concluded.

5         Who did these people contract with?  Who exactly do you

6    think there is a contract with?  Who is estopped?  Who created

7    the estoppel?  Then ask questions.  Is Signal responsible for

8    that paper.

9         THE COURT:  Because there was no Signal contract.  I

10   mean --

11        MR. WEINBERGER:  Correct.

12        THE COURT:  So it had to be through an agent.

13        MR. WEINBERGER:  They told you many times, they made no

14   direct contract against Signal.  This is exactly why I want

15   these questions separated.

16        I want the record to reflect clearly what the jury

17   thinks happened from a contractual and estoppel standpoint, and

18   then have the Court ask questions about whether Signal is

19   responsible as a principal.

20        THE COURT:  But do I ask whether the plaintiffs entered

21   a contract with Signal?

22        MR. WEINBERGER:  No, Your Honor, what you do is -- the

23   thing I'm trying to eliminate to be very, very focused, please

24   don't say with Signal through Signal's agents.

25        Say, did all of this happen with agents or alleged

1    agents of Signal.  Then ask a question about whether Signal's

2    principal liability for that attaches, you know, or arises.

3         I can fashion questions that might be satisfactory to

4    the Court tonight when I return to find the *Bridge* cases.  I

5    can do lots of different things to try to help the Court with

6    regard to this.  But I ask the Court --

7         THE COURT:  Is that it?  To change with Signal's --

8    with agents of Signal as opposed to Signal's agent?

9         MR. WEINBERGER:  To me, Your Honor -- I'm sorry.  I

10   don't mean to speak over the Court, and it's hard for the

11   reporter.  Excuse me, Reporter.

12        What I'm trying to avoid is what to me is actually a

13   compound question.  There are two different thoughts there.

14        One is the relationship with someone, and then there is

15   the idea that it's an agency for which Signal is responsible.

16   I'm trying to avoid a compound question.  It's difficult for

17   review --

18        THE COURT:  But I can't ask that they enter a contract

19   with Signal.  There is no allegation.

20        MR. WEINBERGER:  But, Your Honor, the concept here is

21   that they entered into, or didn't, depending on what the jury

22   finds, contractual relationships or estoppel-based

23   relationships with agents of Signal.

24        That is one discrete idea, one discrete fact for the

25   jury to find.

OFFICIAL TRANSCRIPT

1          A completely separate fact is that individual --

2          THE COURT:  Oh, whether that person was an agent?

3          MR. WEINBERGER:  Exactly.

4          THE COURT:  See, that is what I said, because of the

5     way -- the late time of us getting the agency documents, I

6     built in to there if you find somebody was an agent, you have

7     to find there is an agency relationship, they were in the scope

8     of their agency, et cetera.

9          And, you know, if this weren't so complicated, and you

10    all didn't get this to me all so late, it might be different,

11    but we just have to deal with where we are.

12         MR. WEINBERGER:  I will just say it for the record, and

13    that will be that.

14         THE COURT:  Anybody else?

15         Did we send you the jury verdict form for Indian fraud

16    and Indian negligent misrepresentation?

17         MS. GRAUNKE:  Not that I recall, Your Honor.  I don't

18    think I have seen it yet.

19         THE COURT:  We did it today.

20         MR. WEINBERGER:  We don't have that yet, Judge.

21         THE COURT:  Do you want to run some copies off and let

22    them look at it while they are here?

23         THE LAW CLERK:  I think we changed the instructions,

24    too.

25         THE COURT:  Yeah, I remember drafting those last night,

1    but we haven't given them the instructions or the verdict form.

2    Let's just do it and see what they have to say.

3           So while he is making copies of that, let's talk about

4    damages on the cross-claims.

5           Let's see, for first, I did not see any damages --

6    where are my notes --

7           MS. BOLLMAN:  On the breach of contract?

8           THE COURT:  Right.

9           MR. HASENKAMPF:  That one is gone.  Without the

10   evidence of India law on the Indian immigration act, that claim

11   disappears.

12          THE COURT:  All right.  So let me see if I can find my

13   draft.

14          All right.  So breach of contract and detrimental

15   reliance.  Before I forget, Mitch, you are going to send us

16   malpractice cases that are transactional, and also somebody is

17   going to send us the clear and convincing evidence on fiduciary

18   duty?

19          MR. HASENKAMPF:  Yes.

20          THE COURT:  All right.  So that leaves -- let's look at

21   fraud, what you put in your memo.

22          Let me first say that the way on the first -- bottom of

23   the first page when you said what the issue is on Rule 50, that

24   we have to establish a conflict in substantial evidence.

25          Well, what you've first got to do is have substantial

1    evidence before we get to a conflict.

2              MR. HASENKAMPF:  I understand that.

3              THE COURT:  So I'm still looking for that.

4              MR. HASENKAMPF:  Right.

5              THE COURT:  Okay.  So I have got fraud.

6              MR. HASENKAMPF:  I don't want to handicap our claims.

7    The way I set it up was fiduciary duty, malpractice, then

8    fraud.  Those are the remaining cross-claims.

9              Indemnity, I didn't think that was at issue because

10   it's simply --

11             THE COURT:  Well, I'm afraid of -- I'm worried about

12   that one, too, because I'm not sure you can just say whatever

13   judgement the plaintiffs get against -- get against us in this

14   action, is that proving -- I guess, usually what you do is you

15   get a judgment against you.  Then you go try to have a claim

16   for indemnity, and if you don't have a judgment against you,

17   then how -- I don't know that in the abstract you can just say,

18   "Well, just whatever it is a judgment against us."

19             So you are going to have to -- that's another thing you

20   have got to do tonight because I don't know that it's enough

21   just to say that.

22             MR. HASENKAMPF:  I thought the case Tim cited was going

23   to handle that.

24             THE COURT:  No.  That was probably a case where they

25   had a judgment against them.  That was the issue of can you

1  recover for, I think, Tim, it was -- they already had a

2  judgment against them.

3           MR. CERNIGLIA:  All of the cases that I had -- I came

4  across where there was a judgment -- I think I even saw that

5  language, you know, you got to have a judgment or liability

6  first.

7           THE COURT:  Yeah.  So -- so you have got to be ready to

8  talk about that tomorrow.

9           So let's go back to fraud that you put at the back.

10          Is this because this is your least favorite?

11          MR. HASENKAMPF:  Absolutely.  There is no hiding that.

12          Fraud is -- I think what we have boiled this down to is

13  both the misrepresentation and the omission of a material

14  representation with respect to having this backlog of recruits

15  to other companies who had been promised green cards and such.

16          THE COURT:  But I'm more interested in what your

17  damages are.

18          MR. HASENKAMPF:  Sure.  So the area of damages there is

19  what we tie to J&M saying, "Look, you had some frustrated J&M

20  workers come over who believed they were getting green cards

21  quickly.  They were told, perhaps, they would not be, that

22  there is no guarantee, and whatever the case, it would not be

23  quickly."

24          And so there was some frustration.  So many of those

25  workers left, and Signal had replaced them with contract

1    workers.

2          THE COURT:  So it's the same quantification of the

3    damage, but this is what Signal did as opposed to what Burnett

4    did?

5          MR. HASENKAMPF:  Essentially, yes.  I think you mixed

6    up Signal with Dewan and Burnett.

7          THE COURT:  Yeah.  Oh, yeah.  That's right.  So on

8    fraud is what Dewan did or Dewan and Burnett?

9          MR. HASENKAMPF:  Dewan and Burnett.

10         THE COURT:  Okay.  And then how -- the quantification

11   of damages is the same as your --

12         MR. HASENKAMPF:  Breach of fiduciary duty.

13         THE COURT:  -- breach of fiduciary duty against --

14         MR. HASENKAMPF:  And that is the differential between a

15   contract worker and a H-2B worker.

16         And that point the leg work is identifying each of the

17   four elements, the differential but between the hourly rate --

18         THE COURT:  Okay.  Let me go back now to -- I go to the

19   beginning, the first one now is breach of fiduciary duty at the

20   beginning of your -- it's Cross-Claim 2, and the

21   quantification.

22         You suffered losses by the defections, the hourly

23   savings.  You see, what is the number?

24         You know, this is after the fact -- this is all -- I

25   guess when I read this I thought this is speculative.

1    MR. HASENKAMPF:  This is why it's not because with the

2    defections we had testimony from Billy Wilks saying it was 60.

3    And then we have --

4    MR. CERNIGLIA:  You do not.  You do not.  I can pull it

5    up.

6    Besides what he says he really didn't know --

7    THE COURT:  We will look for it, Tim.

8    But your argument is Wilks says there is 60 --

9    MR. HASENKAMPF:  Yes.

10   THE COURT:  -- people who were at Signal who went to

11   J&M?

12   MR. HASENKAMPF:  Yes.

13   THE COURT:  Then you make a calculation based on we're

14   assuming 40 hours a week.

15   MR. HASENKAMPF:  That comes -- well, we could point to

16   exhibit 1155 which, has all the data.  And in Column G, it

17   identifies hourly -- the number of hours per week each person

18   worked.

19   THE COURT:  But you understand what I mean that this is

20   in the past.  And what he could have done is say, "We looked at

21   these people and we looked at the contracts and we had this

22   many hours, and we would have used these people, but instead we

23   had to hire contract workers at this" --

24   MR. HASENKAMPF:  You are saying who could have done

25   that?

1          THE COURT:  Your economist, I guess, if that is who was

2     going to do it.

3          MR. HASENKAMPF:  I understand that the economist

4     definitely could have to give greater weight to it.  I don't

5     think an economist is necessary to identify the fundamental of

6     the damages.

7          MR. CERNIGLIA:  It is not the abstract -- is not --

8     what you have in the abstract, but what happened in both the

9     two Signal employees on the subject testified they don't know

10    how many left because they didn't keep track of that, they

11    don't know how many came back.

12          There has been no testimony as to whichever ones they

13    were, what contacts they were on because Cunningham

14    specifically testified that they had their contracts, that they

15    would get a wage differential of $6 an hour.

16          There is also testimony that the difference in what you

17    pay for contract laborer and what you pay a direct-hire

18    includes what you are paying for benefits, such as you pay --

19          THE COURT:  I assume he factored that in to the $7.

20          MR. HASENKAMPF:  He did, yeah.

21          MR. CERNIGLIA:  No, it's not because --

22          MR. HASENKAMPF:  Yes, it is.

23          MR. CERNIGLIA:  That's what Cunningham said.  They got

24    the $6 an hour in addition -- for any contract they had to use

25    contract labor on, they got paid an additional premium of $6 an

1    hour per person.

2              So how do you figure if you don't know which contract

3    these people are on?

4              MR. HASENKAMPF:  We cite the $7 an hour number.  And we

5    also cite Michael Pol, who also knew it was 7 to $10 an hour.

6              THE COURT:  I think Tim is talking about something

7    different, that if you had to use contract workers you got paid

8    more under the contract.

9              MR. HASENKAMPF:  Yeah.  That is not established by the

10   record.

11             MR. CERNIGLIA:  It is.  That's exactly what he

12   testified to.

13             THE COURT:  Who did?

14             MR. CERNIGLIA:  Chris Cunningham.

15             THE COURT:  All right.

16             MR. CERNIGLIA:  I asked him that on redirect, and he

17   confirmed it.  And it applied to any time they had to use

18   contract labor regardless of the reason they left.

19             THE COURT:  You need to be able to -- you know what the

20   arguments is going to be tomorrow, Tim, and if you have got --

21             MR. CERNIGLIA:  I don't have daily copy.  But somebody

22   ought to have Cunningham saying that.  But they need to

23   establish that.

24             MR. HASENKAMPF:  Yes.  We could establish that there

25   was a value proposition to Signal of 7 to $10 an hour.

1          We were saying conservatively $7 an hour savings for a

2     contract worker.  I mean, not for a contract worked -- for a

3     direct hire H-2B worker after you figure all other costs.

4          THE COURT:  But how about revenue?  Well, I guess,

5     maybe that -- you know, if you got paid more --

6          MR. HASENKAMPF:  This is after benefits, this is after

7     you factor in different contracts.  This is --

8          THE COURT:  How did they do that when -- you know, you

9     don't know exactly which contract you are talking about?

10          Is every -- every contract not exactly the same, is it?

11     Every contract in terms of what you get paid by -- what Signal

12     gets paid by -- what Signal did pay to they contract to?

13          MR. HASENKAMPF:  Correct.  The way you -- your expenses

14     to your employees and contract employees are fairly consistent.

15          THE COURT:  "Fairly" is the problem.  I mean --

16          MS. BOLLMAN:  And those differences have been

17     identified by -- by an economist -- I mean, to the extent of --

18     I criticize that quite a bit, but he is an economist.  He did

19     determine there was a $7 per hour differential between

20     direct-hire H-2B worker and a Signal worker -- I mean, a direct

21     and a contract worker.

22          THE COURT:  Do the plaintiffs have the same issue about

23     what damages are?  I can't remember if that is any part.

24          Was your expert talking about what the difference was?

25          MR. SANDLER:  Yes.

1          THE COURT:  He was just talking about to show there was

2     a motivation.

3          MR. SANDLER:  Yes.

4          THE COURT:  But it's not an element of your damages?

5          MR. SANDLER:  No.  It's a motivation for the

6     ramification and other aspects of this.

7          MR. HASENKAMPF:  But it's analysis and we have

8     corroborating evidence from other witnesses that satisfy the

9     legal sufficient standard.

10         MR. SANDLER:  So for them it's an out of pocket and for

11    plaintiffs --

12         THE COURT:  So you have other witnesses to testify

13    that do tests to establish this amount of the loss?

14         MR. HASENKAMPF:  David Cochran said it was up to $12.

15    Michael Pol said he knew -- he didn't know exactly what time it

16    was at the time, but it was 7 to $10 -- a range.

17         THE COURT:  The way I'm looking -- but all of those

18    ranges aren't what -- you know, that is not sufficient evidence

19    of the specific amount.

20         MR. HASENKAMPF:  Well, we went with the most

21    conservative.  That's what we consistently did.  We went with

22    the most conservative range to establish that.  That there were

23    damages to Signal when you had --

24         THE COURT:  This is not your -- this is -- you are

25    stuck with the record is your problem and -- which you didn't

1    make in trying to put together sufficient proof of the damages.

2    But you are hearing what my concerns are.

3              MR. HASENKAMPF:  I understand that.  I think we have

4    evidentiary support for each element, whether that is $7

5    figure, whether that is at least 40 hours a week figure.

6              THE COURT:  What I'm asking for you to do tomorrow --

7    when you ask the jury for a number, then you have to have some

8    support that a reasonable juror could rely on in reaching the

9    number.  And that is what I'm struggling with.

10             You know, the ranges are not -- you know, if it's pain

11   and suffering, yes, a range is okay.  But if you are talking

12   about a particular amount of loss, then --

13             MR. HASENKAMPF:  I think it is something you could

14   calculate as far as what the difference to Signal was.

15             THE COURT:  I got your argument.  All right.

16             Malpractice.  Legal malpractice.

17             MR. HASENKAMPF:  Malpractice we're going with the

18   $280,000 figure.  That was the fees of Ms. Bollman for doing

19   all of the work that they had expected Mr. Burnett to do.

20             THE COURT:  All right.  You said Tracey Binion

21   testified those fees -- you know, I need -- if you are here

22   tomorrow, it would be good if you could bring copies of these

23   pages where you say people said specific things.  In fact, it

24   would be better if you give them to me ahead of time.

25             MR. CERNIGLIA:  Chris Cunningham says when he was the

1    CFO to testify to those exact numbers.  You all have the
2    numbers.
3            MR. HASENKAMPF:  We can e-mail that now.
4            THE COURT:  I want the pages.
5            MR. CERNIGLIA:  Chris Cunningham talked about the 11 --
6    Exhibit 1181 --
7            MR. SANDLER:  Oh, yes.  What about that?
8            MR. CERNIGLIA:  How he said all of the attorneys' fees
9    for --
10           MR. SANDLER:  He said it went to the *David* lawsuit.
11           MR. CERNIGLIA:  Went to -- on the *David* lawsuit was on
12   that number.
13           MR. SANDLER:  I don't know that he said all of it, Tim,
14   but he did admit that that was where the costs for the *David*
15   *versus Signal* lawsuit was being charged.
16           MR. HASENKAMPF:  Then Binion said that was a mistake.
17   I'm familiar with it.
18           MR. SANDLER:  Okay.  So what?
19           MR. CERNIGLIA:  She's not the CFO.
20           THE COURT:  Okay.  Can you give me all of that so I
21   can -- if it is the facts -- I don't know, but both of your
22   witnesses saying different things.
23           But -- I'm not trying to decide facts.  I'm trying to
24   make sure that they are there.  We are --
25           MR. HASENKAMPF:  Right.  I'm just want to make sure

1    they are being --

2            MR. CERNIGLIA:  There has got to be some evidence --

3            MR. SANDLER:  There's also -- let me help you, Tim,

4    through this -- there also a large spike in that charge when

5    the *David* lawsuit is filed, when you look at the numbers that

6    are in each one.

7            MR. CERNIGLIA:  And on top of that --

8            MR. SANDLER:  Spikes.

9            MR. CERNIGLIA:  -- from her filings no filings were

10   needed again until the second extension.  And the second

11   extension doesn't come up until June or July, rather, of 2008.

12   So you have got February, March, April, May charges.

13           MR. SANDLER:  You have got big mark -- you have a

14   spike -- February to March spikes up, and that's when *David* is

15   filed.  So that circumstantial.  It doesn't prove anything.

16   It's just another point.

17           MR. CERNIGLIA:  My point is you should have produced

18   the actual attorneys' fees invoices so we know exactly what was

19   being billed because there is also testimony in evidence that

20   she was referring herself, Patricia Bollman, dealing with OSHA.

21           MS. TSU:  You know, we don't have edits of the Indian

22   law.

23           MR. SANDLER:  We might.  We might.

24           MS. GRAUNKE:  Yeah.  We do.

25           THE COURT:  Did you make copies?

1        MS. GRAUNKE:  We have been looking at them, yes.

2        THE COURT:  All right.  So you got a list of things you

3   are going to send me.

4        MR. HASENKAMPF:  So with respect to with the 60 number,

5   that there are two places where we're going to corroborate

6   that.  One is Billy Wilks says [As read]:

7        "QUESTION:  So some of those Signal workers, did they

8   end up going to work for J&M on H-2B visa?"

9        MR. CERNIGLIA:  J&M Marine.  J&M Marine's testimony is

10  absolutely crystal clear that there were no I-140s.

11       Billy Wilks testified to that.  Malvern Burnett

12  testified to that.  J&M Marine were transfers.  I have the

13  evidence in the record.

14       THE COURT:  We're not deciding facts.  I just want to

15  know if there is substantial evidence the jury can look at.

16       MR. CERNIGLIA:  Well, no.  That's my point is if he is

17  relying on workers that went to J&M Marine, that was not by the

18  I-140s.  That had nothing to do -- those are the people that

19  they let go.

20       MR. HASENKAMPF:  He says, "About 60."  He scrolls down

21  a little bit further.  He says, "about 40 for I-140, 20 for

22  H-2B visa."

23       THE COURT:  That's a problem.  It's "about."

24       So how does the jury make a determination of, you know,

25  if it was 40 people and they worked 40 hours a week and it

1    costs $7?

2          MR. CERNIGLIA:  In fact, remember both Cunningham and

3    Binion testified a number of them came back, and they don't

4    know how many.

5          So what number do we use?  Pick one out of the air?

6          MR. HASENKAMPF:  Sorry.  I think the argument is saying

7    that zero is more accurate.  You can't find a more speculative

8    number than zero.

9          MR. CERNIGLIA:  You have to prove it.  You have to

10   prove it.

11         MR. HASENKAMPF:  I disagree.  I think we have evidence

12   of every element that goes into a reasonable calculation of

13   damages that satisfies a legally sufficient basis.

14         THE COURT:  Well, maybe you ought to argue why that is

15   legal and sufficient.

16         MR. HASENKAMPF:  Sure.

17         THE COURT:  All right.  So now we got the fraud.  Have

18   you all had a chance to look at that?

19         MS. GRAUNKE:  Yes, Your Honor.  I think one thing that

20   we did do is suggested at the beginning both of fraud and

21   negligent misrepresentation where there is a paragraph about

22   what the meat of the allegations are, we had suggested adding

23   in Signal's -- one of the intentionally fraudulent statements

24   or one of the misrepresentations was Signal's intent to sponsor

25   plaintiffs for green cards.

1        So we had red-lined that last night.  I'm not sure if a

2   decision was not to include that, but we would ask that be

3   included.

4        THE COURT:  In the first paragraph.

5        MS. GRAUNKE:  Correct.  Where it lists, you know,

6   concealment of material facts or fraudulent statements made

7   regarding the following and a number of things in that Signal's

8   intent to sponsor plaintiffs for green cards should be added.

9        That would apply to this paragraph that precedes both

10  the fraud and the misrepresentation because it's the same

11  language.

12       MR. WEINBERGER:  How does the paragraph in question

13  begin?

14       MS. GRAUNKE:  It's the very first paragraph,

15  "Plaintiffs assert that."  In both of those.

16       MR. WEINBERGER:  Okay.

17       THE COURT:  Okay.

18       MS. GRAUNKE:  The only other change is in the jury

19  verdict form for negligent misrepresentation in the subsection

20  the Question 1, subsection A.  [As read]:

21       "So made an untrue assertion believing it to be true in

22  a manner not warranted by the information."

23       It says "information or the person making the

24  assertion."  It should be "of," I believe.

25       THE COURT:  Yes.

1       MS. GRAUNKE:  That's all I have.  Hugh, you looked at

2   it as well.

3       MR. SANDLER:  That's great.

4       THE COURT:  All right.

5       MR. WEINBERGER:  My turn?

6       THE COURT:  Yes.

7       MR. WEINBERGER:  Well, the first question concerning

8   negligent misrepresentation is that the only question you

9   thought you would ask?

10       THE COURT:  Yeah.

11       MR. WEINBERGER:  You are not going to ask --

12       THE COURT:  That's why it's on here.

13       MR. WEINBERGER:  Well, Your Honor, a couple of things.

14   Number one, contributory negligence.  I believe --

15       THE COURT:  Oh, yeah.  Damages.  Well, we split out

16   damages.  So I'm wondering if I put it there.

17       MR. WEINBERGER:  To me, that belongs in the liability

18   part of the case.  But that is just me.

19       THE COURT:  You know, I guess if they put -- if they

20   were 100 percent contributory negligence, there would be none

21   left for anybody else, so there would be a "no" here.

22       So I guess I thought that -- that when it was together,

23   we had it after the damages, so I thought it would stay there.

24       MS. GRAUNKE:  I think it makes sense in the damages as

25   well.  We will have the percentage in front of them if they

1  decide they need a portion, and that's where they will do it.

2        MR. WEINBERGER:  I think this is a place where I have

3  to draw a line in the sand.

4        Going back to the fraud verdict form, Your Honor.

5        THE COURT:  All right.

6        MR. WEINBERGER:  Question No. 3 on the fraud verdict

7  form, I would like to suggest, even though I'm virtually the

8  last person in the world to create a compound question, I

9  dislike them intensely, I wonder if it isn't necessary, and I

10  want to emphasize the word "necessary," to ask here:  Do you

11  find from a preponderance of the evidence that plaintiffs

12  relied on the false representation by Signal or its agents and

13  were deceived?

14        Isn't the critical question not just reliance, but

15  their conviction that they were deceived and therefore harmed

16  by Signal or its agents.

17        MS. GRAUNKE:  Can we change it to "fraudulent

18  representation" instead of "false," because I think that

19  encompasses the conception because of the definition of the

20  fraud there?

21        MR. WEINBERGER:  I do not have a problem with changing

22  the word "false" to "fraudulent."

23        My issues with the underlying instruction I will take

24  up tomorrow when we have a charge conference.  But this is

25  something I think that we can do jointly.

1           So I think, if I'm hearing Kristi correctly -- I can't

2      speak -- we have an agreement to add the words "and were

3      deceived" if on my side I agreed to replace the word "false"

4      with the word "fraudulent," which I certainly do agree to.

5           MS. GRAUNKE:  Well --

6           MR. WEINBERGER:  Excuse me.

7           MS. GRAUNKE:  No, no, no, rather than add the "and were

8      deceived" to incorporate "fraudulent" instead of "false"

9      because my understanding of the way the fraud is defined is

10     deceptive -- fundamentally deceptive conduct.  That is

11     encompassed -- I just don't want to give multiple terms to be

12     sort of running around.

13          MR. WEINBERGER:  In other words, what you want --

14          THE COURT:  Well, if they relied on something that is

15     fraudulent, isn't that --

16          MR. WEINBERGER:  Your Honor, and call me, you know,

17     just idiosyncratic about stuff like this, but what you are

18     saying is that it's your sense that causation is implicit.  And

19     the answer to the question without, you know, the additional

20     three words I want to add -- and, to me, things are never

21     implicit in a lawsuit.

22          They are either found factually by the jury, or they

23     don't exist.

24          THE COURT:  It's really more like they rely on were

25     they damaged.

1       MR. WEINBERGER:  Well, it gets to a point that is also

2  part of my issue with this verdict form.

3       Again, I'm trying to do what I believe Rule 49 requires

4  me to do.  Somewhere in here -- this is a civil case -- there

5  must be a question concerning causation.  Right now, there is

6  not.

7       THE COURT:  Well, you know what, if you want -- the way

8  for you to address your concerns is take a piece of paper and

9  write on it exactly what you want, where you want it.

10      I am tired of all of these vague, "Judge, you should

11  fix this."

12      It is not my responsibility.  If you want something in

13  particular, then you should have been writing me -- I don't

14  care if it's handwritten, but it's on a piece of paper where

15  you want, what you want, and then everybody can look at it.

16      Do the plaintiffs object to the "and were deceived"

17  language at the end of three?

18      I will write it down and I will think about it.

19      MS. GRAUNKE:  Yeah.  I feel like it's a little bit of

20  clutter because I think the concept of deception is encompassed

21  in the definition of fraud above.

22      THE COURT:  If you rely on something that is

23  fraudulent, you are deceived.  That's what I thought, too, but

24  I will think about it.

25      MS. GRAUNKE:  I would like to keep it simple, but --

1       THE COURT:  It doesn't matter that much.  This is so

2   long that, you know, all of the little stuff is just going to a

3   wash over them.

4       Okay.  I think that's all we can do tonight.

5       MS. GRAUNKE:  There is one other thing.

6       Oh, I see what you are saying.  Can you bring it up?

7       MR. SANDLER:  Sorry, if you want to --

8       THE COURT:  Go ahead.

9       MR. SANDLER:  This is very specific.

10       As for No. 2 on the Indian law fraud, we have the

11   wording "another party."

12       "Do you find from a preponderance of the evidence that

13   the acts identified above were committed with intent to deceive

14   another party or intent to convince another party to enter into

15   the contracts."

16       We would request it to be changed to "any plaintiff."

17   I don't know if the defendants have a position on that, but

18   it's just because it seems like some other --

19       THE COURT:  It comes from the instruction, but okay.

20   All right.

21       MR. WERNER:  Your Honor, I think that we can -- if we

22   can put something on the record about the Gulf Coast

23   Immigration Law Center, I think we can get rid of those

24   charges.

25       THE COURT:  Okay.

1          MR. WERNER:  And, Tim, you are going to want to listen

2     up.

3          The -- make sure I sort of phrase this correctly.

4     We -- based on the representations that Mr. Cerniglia has made

5     to the Court by e-mail, which is that the Gulf Coast

6     Immigration Law Center has been completely dormant since

7     Hurricane Katrina and no work dealing with any of the

8     plaintiffs or Signal or any of its H-2B workers was performed

9     by the Gulf Coast Immigration Law Center or any employee of

10    that entity, plaintiffs would be prepared to dismiss their

11    claims against the Gulf Coast Immigration Law Center without

12    prejudice to pursue the Gulf Coast Immigration Law Center as

13    part of a judgment enforcement and/or collection proceeding

14    against the other two Burnett defendants.

15         MR. CERNIGLIA:  I have no problem with that.

16         THE COURT:  Okay.  So tomorrow in Court, if you would

17    dismiss that without prejudice, we will take it out of the --

18         MR. HASENKAMPF:  Okay.  So we will -- I relied on this

19    e-mail that he understands that any liability or judgment for

20    any conduct by him or those working for him is his personal

21    responsibly.

22         And my understanding is that Lau testified that she was

23    working for the law office and that's important because she

24    said there was a conflict and I didn't notify anybody, and that

25    is something we care about.

1          And we pulled the verdict forms for the law office and

2     Gulf Coast relying on that.

3          We're happy with a judgment of personal liability, but

4     I'm concerned that the law -- that her employment with the law

5     office could affect -- I mean, I don't think it would be -- it

6     might not be material after I look at them.

7          MR. CERNIGLIA:  I'm sure that she didn't -- you know,

8     when she was using the term "law office," that is the way he

9     practices.

10         THE COURT:  Who knows who she works for?  He may have a

11    new entity.

12         MR. CERNIGLIA:  I don't think he does.

13         THE COURT:  It's the same entity that she works for?

14         MR. CERNIGLIA:  She works for him as --

15         THE COURT:  But her paycheck comes from the entity?

16         MR. CERNIGLIA:  I don't think it comes from the PLC

17    entity.  My understanding, it does not.

18         THE COURT:  Who does it come from?

19         MR. CERNIGLIA:  I think it comes from Malvern Burnett

20    Attorney at Law.  I can confirm that, but that's what he has

21    always explained to me.

22         MR. WERNER:  That's why we're, at this point only, you

23    know, we're dismissing the Gulf Coast Immigration Law Center,

24    not the law offices of, for that reason.

25         THE COURT:  You want us to add back the firm.  Is that

1    what you are saying?

2            MR. HASENKAMPF:  I think we have to.

3            THE COURT:  Okay.  You all leave.  I don't want to talk

4    to you anymore.  So you know how I feel about it.

5            Phil, I will come to your office.

6            (Whereupon, the proceedings were concluded at

7    8:03 p.m.)

8

9                              *   *   *

10

11                    REPORTER'S CERTIFICATE

12

13          I, Terri A. Hourigan, Certified Realtime Reporter,

14   Official Court Reporter for the United States District Court,

15   Eastern District of Louisiana, do hereby certify that the

16   foregoing is a true and correct transcript to the best of my

17   ability and understanding from the record of the proceedings in

18   the above-entitled and numbered matter.

19

20

21                         *s/Terri A. Hourigan*_____

22                         Terri A. Hourigan, CRR, RPR
                           Certified Realtime Reporter
23                         Registered Professional Reporter
                           Official Court Reporter
24                         United States District Court
                           Terri_Hourigan@laed.uscourts.gov
25

                         OFFICIAL TRANSCRIPT